**THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

**PLAINTIFFS' NOTICE OF SUBSEQUENT EVENTS BEARING ON DEFENDANT'S SUBJECT MATTER WAIVER OF THE ATTORNEY-CLIENT PRIVELEGE**

## INTRODUCTION

In each of the cases in this consolidated action, plaintiff's timber sale was suspended for a substantial period of time, in whole or in part, in order to allow the United States Forest Service ("Forest Service") time to conduct certain wildlife and plant surveys which were required by law to have been conducted prior to the award of these sales but which were not performed prior to award. A core issue in each plaintiff's breach of contract claim in this action is whether the Forest Service breached its duties to cooperate and not to hinder plaintiffs' performance of their timber sale contracts by arbitrarily and capriciously failing to conduct the required surveys prior to award. In Oregon Natural Resources Council Action, et al. v. United States Forest Service, 59 F. Supp.2d 1085 (W.D.Wa. 1999) ("ONRC Action"), the district court determined that the Forest Service acted arbitrarily, capriciously and contrary to law in failing to conduct these surveys. Nonetheless, the government has asserted that the Forest Service acted reasonably in deciding to award these timber sales without conducting the surveys. In this context, what the Forest Service knew or should have known regarding its legal obligation to perform the required surveys is relevant. Accordingly, the actions and statements of the Department of Justice and agency lawyers advising the Forest Service on whether it should or should not conduct the surveys prior to award and related matters is directly relevant to this case.

Several other cases pending before this Court also involve the suspension of timber sales by the Forest Service for this same reason and the same assertions of reasonableness by the government. See Zip-O-Log Mills, Inc. v. United States, COFC No. 04-1123C (J. Williams); Scott Timber Co. v. United States, COFC No. 05-708C (J. Lettow); Swanson Group, Inc. v. United States, COFC No. 05-179C (J. Wheeler). In the course of recent discovery in these cases

the government has voluntarily produced several documents involving attorney-client communications and/or attorney advice to the Forest Service involving matters directly related to the ONRC Action plaintiffs' challenge to timber sales based on the Forest Service's failure to conduct the required wildlife and plant surveys before award. Most of these documents were the subject of recent deposition testimony by Susan M. Zike, a Forest Service attorney for "FOIA & Litigation." See page 1 of Deposition Exhibit 35A attached hereto. Plaintiffs submit that these documents and Ms. Zike's deposition testimony constitute further evidence of the government's subject matter waiver of its attorney-client privilege claims in this action. Each of these documents is discussed briefly below and copies of these documents and Ms. Zike's deposition transcript are attached as the Appendix to this filing.

**PROCEDURAL HISTORY**

This discovery dispute formally began with plaintiffs' January 9, 2004 Motion to Compel and for Sanctions. Since that time, numerous orders of this Court have slowly reduced, but not eliminated, the issues in contention. The Court's first substantive order in the dispute came on June 18, 2004, in which the Court granted plaintiffs' motion to compel in part. That order required the government, inter alia, to finalize its claims of privilege on all documents and allowed plaintiffs to file a revised motion to compel.

Pursuant to the Court's Order, plaintiffs filed their Revised Motion to Compel on September 15, 2004. Plaintiffs asserted, inter alia, that the government's disclosure of ten documents constituted a subject matter waiver of its attorney-client privilege and that the government's "reasonableness" and "assumption of the risk" arguments constituted an at-issue

waiver of privilege. Plaintiffs also challenged the government's claims of "settlement privilege." During a status conference on December 3, 2004, the Court ruled in plaintiffs' favor regarding the at-issue waiver as to attorney-client privilege documents and ordered further briefing as to work product documents. The Court also ruled that government could not assert a "settlement privilege." The Court did not rule on the at-issue waiver as to deliberative process documents nor the issue of subject matter waiver. The government has subsequently produced documents it previously withheld solely on claims of a "settlement privilege."

On June 28, 2005, the Court ordered that the government's disclosure of the "Brouha Memorandum" constituted a subject matter waiver of the attorney-client privilege at least as to that document, and the "Brouha Memorandum" was produced by the government. The Court further ordered the parties to file supplemental briefs on the scope of the government's subject matter waiver beyond the "Brouha Memorandum." Prior to the Court's ruling on the scope issue, however, the government reversed its original position and argued that the "Brouha Memorandum" was not privileged. By Orders of September 1, 2005 and October 11, 2005, the Court required the government to submit affidavits and plaintiffs to submit further briefing on the issue of the scope of the government's subject matter waiver, respectively. Those briefs were subsequently filed with the Court.

Plaintiffs' Revised Motion to Compel has been pending before the Court since September 15, 2004. As the parties stated in their Joint Status Report of November 23, 2005, they agree that all matters necessary for the Court to issue its opinion and order on the unresolved privilege claims that are the subject of plaintiffs' motion have been completed. The parties have not been

able to finalize pre-trial discovery or make other progress in this case in the absence of the Court's final opinion and ruling on plaintiffs' revised motion to compel.

**DESCRIPTION OF DOCUMENTS FURTHER SUPPORTING THE DEFENDANT'S SUBJECT MATTER WAIVER OF THE ATTORNEY-CLIENT PRIVELEGE**

Each of the following documents was produced by the government in one or more of the Court of Federal Claims cases identified above. These documents were also marked as deposition exhibits and were the subject of testimony at the depositions of Ms. Zike and Cheryl McCaffrey (a Bureau of Land Management employee who worked on Survey and Manage issues with Forest Service personnel)[1] in early January 2007 in Scott Timber Co. v. United States, COFC No. 05-708C. A complete copy of Ms. Zike's deposition transcript is included in the Appendix to this filing. The government did not object to the use of these documents in this deposition nor to the questions asked of attorney Zike or Ms. McCaffery about these documents. (Government counsel, however, objected and instructed Ms. Zike not to answer plaintiffs' counsel's question as to whether the Department of Justice or the Forest Service made the ultimate decision to award Forest Service timber sales challenged by the ONRC Action plaintiffs, but this limited objection and instruction (and in plaintiffs' view, unjustified objection and instruction) (Zike Dep. 38) did not apply to any documents or other deposition testimony which are the subject of this Notice.)

---

[1]Only one document, Deposition Ex. 31 was a subject of Cheryl McCaffery's deposition. See discussion infra.

**ADDITIONAL SUBJECT MATTER WAIVER DOCUMENTS**

1. Deposition Exhibit 31. A fax cover sheet message and draft report for proposed changes to the Survey and Manage Standards and Guidelines, Component 2 implementation schedule under the Northwest Forest Plan from Cheryl McCaffery sent for review and approval to Ellen Athas, an attorney working for the President's Council on Environmental Quality, and "Ted Bowling" [sic] lead attorney for the Department of Justice in the ONRC Action litigation, among other recipients, dated May 18, 1998. This document was the subject of deposition testimony by Cheryl McCaffery on January 10, 2007.

2. Deposition Exhibit 35A. This exhibit includes a fax cover sheet from attorney Zike with a message reading in pertinent part:

> Attached is draft DOJ ltr to plaintiff's atty. Note last sentence of let ¶ on 2nd page. Are you willing to notify the bidders before you open bids? UMP [Umpqua National Forest] and WIL [Willamette National Forest] say yes. Need to hear from GIP [Jack Gipsman, Forest Service attorney]. There is no reason –YET – to plan on delaying award of the USFS sales. We'll know more after the 8/17 meeting between DOJ and ONRC Attys.

This exhibit also includes a draft letter from counsel of record Edward Boling in the ONRC Action litigation to ONRC Action counsel of record Michael Axline with a list of Forest Service sales apparently challenged by ONRC Action including the Jack Heli sale at issue in this action. Plaintiffs' Deposition Exhibit 35A also includes a legal memorandum from Robert M. Simmons, Regional attorney for the Forest Service in Region 5, to the Region 5 and Region 6 Regional Foresters advising them that if the Forest Service proceeds with the sale by auction of the sales that the ONRC Action plaintiffs identified to have violated the Northwest Forest Plan, the Forest Service should "notify all purchasers prior to the opening of the bids that the plaintiffs in this

lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale." (See page 6 of Deposition Exhibit 35A, page numbered SCOTT 1100030.)

3. Deposition Exhibit 35B. A DOJ fax cover sheet from Ted Boling (counsel of record for the United States in the ONRC Action litigation) to Susan Zike dated August 27, 1998, attaching a letter from ONRC Action lead counsel Michael Axline to Edward Boling further attaching a list of timber sales that the ONRC Action plaintiffs believed did not comply with the Northwest Forest Plan because the required wildlife and plant surveys had not been performed. The list includes a "Jack" timber sale on the Klamath National Forest, among many others. The Jack Heli timber sale is at issue in this case.

4. Deposition Exhibit 41A. Two emails from Susan Zike to various individuals in the Forest Service, including Owen Schmidt, an attorney representing the Forest Service, and Ted Boling, counsel of record in the ONRC Action case, regarding Forest Service actions taken with respect to the Happy Thin timber sale which is involved in the instant action, among other sales, and discussing advice and communications from the Department of Justice and Forest Service attorneys in the Office of General Counsel at the Department of Agriculture concerning how to handle timber sales challenged by the ONRC Action plaintiffs.

5. Deposition Exhibit 41D. A memorandum from Susan Zike to Brenda Woodard, Forest Service Contracting Officer, in which Ms. Zike conveys legal advice to Ms. Woodard which was given by Ted Boling, counsel of record representing the government in the ONRC

Action litigation. The advice concerns how the Forest Service should handle certain categories of timber sales with respect to "at risk" concerns.

Plaintiffs submit that the defendant has waived any attorney-client privilege claims with respect to the deposition exhibits described above and the deposition testimony of Ms. Zike (except at Zike Dep. 38) and Ms. McCaffery. By voluntarily producing these documents and allowing deposition testimony regarding those exhibits and related subjects with out objecting, defendant's actions further support a finding of subject matter waiver of any attorney-client privilege regarding the government's actions in response to the ONRC Action plaintiffs' challenges to Forest Service timber sales, including those at issue in this action.

Plaintiffs urge the Court to take this additional filing into consideration and respectfully request that the Court issue a final opinion and order on all outstanding issues relating to plaintiffs' Revised Motion to Compel as soon as possible so that this action may proceed through the completion of pre-trial discovery.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: February 7, 2007

# APPENDIX TO PLAINTIFFS' NOTICE OF SUBSEQUENT EVENTS BEARING ON DEFENDANT'S SUBJECT MATTER WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE, CONSOLIDATED – COFC NOS. 01-570C, 01-627C AND 04-501C

1. S. Zike Deposition Transcript
2. Plaintiffs' Deposition Exhibit 31
3. Plaintiffs' Deposition Exhibit 35A
4. Plaintiffs' Deposition Exhibit 35B
5. Plaintiffs' Deposition Exhibit 41A
6. Plaintiffs' Deposition Exhibit 41D

UNITED STATES COURT OF FEDERAL CLAIMS

SCOTT TIMBER CO., )
Plaintiff, )
) No. 05-708C
vs. )
THE UNITED STATES, )
Defendant. )

DEPOSITION OF
SUE ZIKE
Taken in behalf of Plaintiff
* * *
January 4, 2007
333 S.W. First Avenue
Portland, Oregon

Teresa L. Dunn, CSR, RPR
Court Reporter



APPEARANCES:

For the Plaintiff: MR. GARY G. STEVENS
Attorney at Law
Suite M-110
1801 K Street
Washington, DC 20006

For the Defendant: MS. JOAN M. STENTIFORD
Attorney at Law
Room 12038
1100 K Street
Washington, DC 90005

Also Present: (None)

INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Stevens | 4 - 58 |
| Ms. Stentiford | 59 - 63 |




EXHIBITS
(Exhibits marked prior to deposition.)

No. 35 E-Mail dated 9-4-98
No. 35A Fax dated 8-8-98
No. 35B Fax dated 8-27-98
No. 37C Letter dated 10-26-98
No. 38 Handwritten Note dated 11-30-98
No. 40 Memorandum dated 2-22-99
No. 41A E-Mail from Sue Zike
No. 41B Letter dated 4-12-99
No. 41D Letter dated 4-23-99
No. 43 Handwritten Note dated 7-2-99
No. 44 Letter dated 7-6-99
No. 45 Timber Sales List
No. 46 Handwritten Note dated 7-8-99
No. 51 Memorandum dated 10-5-99



PORTLAND, OREGON; THURSDAY, JANUARY 4, 2007
3:50 p.m.
* * *
SUE ZIKE
called as a witness in behalf of the Plaintiff,
having first been sworn by the Reporter,
testifies as follows:
EXAMINATION
BY MR. STEVENS:
Q. Ms. Zike, have you ever been deposed before?
**A. Yes.**
Q. Could you tell me when and where?
**A. I was deposed in Portland in 1990.**
Q. In connection with what?
**A. It was a private land developer issue.**
Q. Was there a court action? I assume there was?
**A. There was.**
Q. What was it?
**A. It was an issue about the division of subdivision lots between the land developer and the developer.**
Q. Did you win?
**A. Well, I wasn't on either side. I had just been an employee of one company and they went into a fight and they needed my testimony.**

Q. Sure. Do you remember the case name?

**A. It would have started with Morrisette because it was Don Morrisette, M-O-R-R-I-S-E-T-T-E. It was versus Hobbs.**

Q. It was state court?

**A. Yes.**

Q. Here in Oregon?

**A. Yes.**

Q. I'm sure you know this, but just let me mention three basic ground rules that I think will help this process go a little faster today.

One is when the question calls for a "yes" or "no," answer "yes" or "no" audibly rather than nodding your head or saying "uh-huh" or "huh-uh."

**A. Okay.**

Q. You never know how it is going to come out on the transcript. The second basic rule if you don't understand my question because it is late in the day, I haven't been able to formulate a question properly or use a term wrong, whatever the problem, ask me and I will try to restate it and make it clearer for you.

If you don't tell me you don't understand, I will presume you do.

**A. Okay.**

Q. And then finally you should answer all of my



questions fully and completely even if your counsel objects.

As you know, I think she will be objecting for the record and if she instructs you not to answer, then you have a right not to answer, but otherwise you should give me as full and complete an answer you can.

Is that okay?

**A. Okay.**

Q. Sketch for me briefly your education since high school.

**A. I have a Bachelor of Science degree in landscape architecture in 1974 and a Juris Doctorate from Northwestern School of Law in 1990.**

Q. So you celebrated graduation from law school by testifying in a deposition?

**A. Something like that.**

Q. No other formal education?

**A. No.**

Q. Okay. And let's go over your job history just a little bit beginning with your present position with the Forest Service.

What are you doing right now?

**A. I'm the regional litigation coordinator and Freedom of Information Act coordinator. I have held that position since 1991.**



Q. Okay. What were you doing before that?

**A. Prior to that I was forest planner and landscape architect with Custer National Forest in Billings, Montana, and Lewis and Clark National Forest out of Great Falls, and I did those jobs for nine years.**

Q. Okay. That's enough. Did you have any involvement in the Northwest Forest Plan?

**A. In what part of the Northwest Forest Plan?**

Q. Well, did you have any involvement in developing the EIS and the version of the plan that became -- was issued in 1994?

**A. I did not.**

Q. Did you ever participate in any entity called the Survey and Manage Work Group?

**A. I did not.**

Q. Or the Survey and Manage Core Group?

**A. I did not.**

Q. Or the Issue Resolution Team?

**A. I did not.**

Q. Did you have any dealings with any of those organizations?

**A. I did not.**

Q. And the Regional Interagency Executive Committee, did you have any dealings with that



organization?

**A. The RIEC?**

Q. Yes, ma'am, that's the acronym.

**A. They met probably monthly for a while and I would from time to time be invited to give litigation updates to that group.**

Q. And the Region Ecosystem Office, did you have any dealings with that?

**A. I did have some dealings with REO primarily when the ONRC Action was filed in 1998 we needed to assemble portions of the record and the folks in the REO group had access to those records so I guided them and helped them prepare records for that lawsuit.**

Q. Let's look at what was previously marked plaintiff's Exhibit 35. This is an electronic message. Some parts are inscrutable to me, but it appears to me there are two messages here.

Am I right about that?

**A. There are two messages.**

Q. What are the two messages so I can sort it out later? What's the first message?

**A. It appears to me in time the first message would be, Susan, We have Brian Stone back in the loop taking care of this information. I think that would be. Let me read this other one.**

Q. That's Mr. Jensen's electronic message to you?
**A. Yes. Let me see, well, I will change that then. It looks to me like my note would say, I need to remind you that the list of sales I sent out to you is privileged.**
**That would be from me and then Jerry responds to that -- responds to me and B. Stone who is Brian Stone in California that we have Brian back in the loop taking care of this, and I forwarded the note to him.**
Q. Okay. At the top left-hand corner on this message it says, Attached Date.
Do you know what that means, Attached Date? Does it mean date sent, for example?
**A. I think what it meant back with this e-mail system was that if you forwarded a message instead of reply, that what you forwarded got -- that the content of what you got forwarded was considered attached.**
Q. I see.
**A. So what would have been attached to this would be my note. I need to remind you that the list of sales, that would have been attached to Jerry's message starting with Susan.**
Q. I notice in the upper right-hand corner there's 9-4-98 written on this document and then on the right-hand side towards the bottom it looks like



9-4-98. I want to make sure I have this straight.
Mr. Jensen's electronic message to you was September 4, 1998, and your earlier message to him was what date, can you tell?
**A. I can't tell from this.**
Q. Prior to 9-4-98?
**A. Right, that would be my assumption.**
Q. And would I be correct it would be after the filing of the ONRC Action lawsuit in July of 1998?
**A. Correct.**
Q. There's a reference in your message to the list of sales I sent you. Do you see that?
**A. Yes.**
Q. Would that be the list of sales at risk being challenged in the ONRC Action lawsuit?
**A. The at-risk sales is what you are asking me?**
Q. Yes. What would be this list?
**A. Sometimes they were called problem sales. I don't think those were the at-risk.**
Q. Okay. What was this list of sales?
**A. What I would recall is that plaintiffs sent to us lists of sales that they wanted us to negotiate on. And when plaintiffs sent us those lists, they sent it under a settlement banner citing I think Federal Rules of Evidence 408.**



**So I would have needed to ask my forest people what are the status of those sales so I would have forwarded plaintiff's list out to them.**
Q. When you say plaintiffs, you are talking about the ONRC Action plaintiffs?
**A. That's correct.**
Q. And you said they were negotiating with you with this list of sales meaning that they were trying to negotiate a settlement to the lawsuit?
**A. Yes.**
Q. Was it your understanding these were sales they meant to challenge?
**A. Well, challenge in the context of the issues raised in this particular lawsuit?**
Q. Yes.
**A. Yes, they were sales that they wanted to negotiate with us whether or not they would be awarded and allowed to operate.**
Q. Were these a list of sales that were not awarded?
**A. I don't recall that because plaintiff's list, they didn't know. I mean, we could not rely on plaintiff's list of sales as being accurate as far as their status so that's why I had to go to my forest people.**



Q. You did that?
**A. I did.**
Q. You found out something about them?
**A. Well, we had these charts that we refer to here that had status on it and what issues had been raised.**
Q. That's the as-is chart?
**A. As is the chart, meaning privileged.**
Q. Okay. Let's look at plaintiff's Exhibit 35A. The first page is a fax cover sheet and it looks like would I be correct a fax you sent?
**A. It is.**
Q. That's your business card that you photocopied?
**A. It is.**
Q. And you sent it to Mike Hupp and Brenda Woodard on the Umpqua National Forest?
**A. Correct.**
Q. What were their positions at the time do you recall?
**A. Mike Hupp was the forest planner I believe and Brenda Woodard was the contracting officer. They were also sent to Herb Wick on the Willamette and Fred Dorn on the Gifford Pinchot and those are both contracting officers on those forests.**

Q. I took it Ms. Woodard was the contracting officer on some of the sales on plaintiff's list?
**A. I don't know. I don't know where the plaintiff's list -- Attached is a draft letter.**
Q. We will go through this and reconsider that question later.
**A. Okay.**
Q. That's your handwriting on the first page?
**A. It is.**
Q. And you ask, Are you willing to notify the bidders before you open bids?
**A. Correct.**
Q. Notify them of what?
**A. That there was a pending lawsuit.**
Q. What was the answer?
**A. I don't recall. I don't know what they decided to do about at bid opening. We felt it would be prudent to notify the bidders.**
Q. Who is "we"?
**A. It would be who I was conferring with was Jerry Hofer, regional contract officer, and Devlin, Bob Devlin.**
Q. What was Mr. Devlin's position at the time?
**A. He was director of timber.**
Q. For Region 6?



**A. Correct.**
Q. What was the other gentleman's name?
**A. Jerry Hofer.**
Q. H-O-L-F-E-R?
**A. H-O-F-E-R.**
Q. All right. So you, Devlin, and Hofer thought it would be prudent to advise them?
**A. Correct.**
Q. Okay. Further down in your handwritten statement staying there you say, There is no reason yet to plan on delaying award of the USFS sales.
Why not?
**A. Because we hadn't made any agreement with plaintiffs to delay award of sales.**
Q. Okay. The next two pages are the draft letter you refer to in your fax sheet?
**A. Uh-huh.**
Q. Did you draft the letter?
**A. No. Department of Justice doesn't let us have their letterhead.**
Q. On page two of the draft there's a statement in the letter that says, In the interest of facilitating settlement discussions the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales



have been identified in connection with this lawsuit.
Do you know what timber sales they were referring to?
**A. These three.**
Q. Sorry, which three?
**A. I don't know. It says -- that sentence you read refers to three timber sales.**
Q. Yes, it does.
**A. I would have to read the letter.**
Q. Okay.
**A. Three are scheduled for auction in late August and only Lois is scheduled --**
Q. Is it L. Horse Peak and Yaka Guard at the top of page two?
**A. Yes. Are you asking if that's what that means?**
Q. Those are the three sales?
**A. I don't know.**
Q. Okay. Do you know if notification was, in fact, given to the bidders on those three sales, the three referenced here, whichever it is?
**A. I don't know. Whatever they are. That's just a draft because it doesn't identify what three.**
Q. Okay. Turning over to the next document which is on page 00030, do you see that in the right-hand



corner, bottom right-hand corner that control number?
**A. Got it.**
Q. Okay. If you look -- hold your place there, but look back to the first page of 35A. Your PS notation says OGC memo is attached but DOJ?
**A. That.**
Q. Why don't you read it to me?
**A. PS, OGC memo is attached that DOJ based its sentence on. RO-NR meaning Regional Office Natural Resources, which is Bob Devlin, sent this out late last week.**
Q. And that's what we're looking at that started with 00030?
**A. Oh, I don't think so.**
Q. You don't?
**A. No, but let me look. This is from Simmons. Okay. Oh, it is, yep, yes.**
Q. And if you turn back to page 00030 and look in the bottom paragraph of this document -- by the way I read it as dated July 29, 1998.
Do you agree with that in the upper right-hand corner?
**A. You think it's what?**
Q. July 29, 1998, that's the date.
**A. It is probably right.**

Q. Okay. In that last paragraph the first part reads, Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs and that if this is not acceptable to the bidders they should withdraw their bid at that time.
Do you know if that warning was conveyed to the purchasers, rather the high bidders on all of the sales?
**A. Yeah, I would have no way of knowing that.**
Q. Do you know if that warning was supposed to be in writing or oral?
**A. What I recall is that we had, meaning Jerry Hofer and Bob Devlin and I and with probably general counsel's help had determined that if it had not been in the advertisement for the sale and, of course, it would not have, but for the sales that we had bid openings that we would make an oral announcement.**
**When we would have time to get the warning put**



**in the advertisement that this sale is the subject matter of litigation, then we would put it in the advertisement.**
Q. Was it put in the instructions to bidders?
**A. I have no idea.**
Q. That wasn't the direction?
**A. You know, all of the terms of contract administration isn't my deal, but --**
Q. Okay. On page two of this memo at the top the paragraph there begins, As indicated in the new case memo from Katherine Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6.
What were you doing with Owen and the sales in Region 6?
**A. We were determining the status of the sales that plaintiffs sent to us in these series of lists.**
Q. And the status as to what?
**A. Well, there was a number of pieces of information. One was whether or not the NEPA was done, what the date of the NEPA was, had it had been appealed, who had appealed, what were the issues raised in the appeal, and then if it had been awarded and when it had been awarded and to whom it had been awarded and if it was awarded, what was the status of the sale in**



**terms of operations, had it had been operating or not yet happening.**
Q. And what was done with this information?
**A. It provided information to our managers, both Bob Devlin and on up to the Regional Forester to help us determine our settlement position.**
Q. Okay. If you turn further to the page that starts with 00033 in the lower right-hand corner about three pages in it is on Western Environmental Law Center letterhead?
**A. Yes.**
Q. Now, Western Environmental Law Center, that was Mr. Axline and the attorneys representing the ONRC Action plaintiffs?
**A. Correct.**
Q. Now, what's your understanding of why the ONRC Action plaintiffs identified this list of sales in this letter as sales that have problems with the Northwest Forest Plan compliance?
**A. I can't tell you. This was -- this is dated July 28th, 1998, which means we hadn't even defended the case yet because it was filed July 7th or something, 1998.**
**So plaintiffs are just asserting that these timber sales are not in compliance with the plan.**



Q. Okay. On page 00036, a fax message from Ted Boling to Mike Gippert, do you see that?
**A. No, no, oh, six, I'm sorry, I'm looking at five.**
Q. 00036.
**A. From Ted to -- correct.**
Q. Mr. Boling was the attorney representing the government in the ONRC Action case, right?
**A. Yes.**
Q. And he is asking for certain information ASAP. Do you know why he needed it no later than close of business Thursday?
**A. No, I don't, but that's often the way the requests for information came. No, I don't.**
Q. Okay. Let's look at 35B. Do you see the handwriting at the bottom of this page?
**A. I do.**
Q. Is it yours?
**A. No.**
Q. Can you read it?
**A. No, I can't other than, Have you something anything on something, oh, Parkaboo, that was a timber sale, Parkaboo.**
Q. Parkaboo?
**A. Parkaboo. I think it is, Have you sent us**

**anything on Parkaboo. That would be my guess. That's Ted's writing so he would have scratched that on there before he faxed it.**

Q. Next page is another letter from the ONRC Action plaintiffs to the government's attorneys.

**A. Yes.**

Q. And two pages after that there's a list of timber sales entitled Category 1 Unsold Problem Sales With Calendar Year 1998 Auction Dates.

Is that something to your knowledge the Forest Service produced or is that something from the plaintiffs, the ONRC Action?

**A. I don't know. I don't recall. I don't think I have seen it. It certainly doesn't ring a bell and it doesn't look familiar.**

Q. Would you understand by the adjective "problem" as in problem sales that these were sales that the ONRC Action plaintiffs were also threatening to challenge?

**A. I would and I would also assume Category 1 is from page one of their memo.**

Q. Category 2, that would be the same and that would refer to the second category mentioned later on?

**A. Sales with proposed action dates, auction dates, yes, calendar year 1998, right.**



Q. And we can make the same inference with respect to Category 3?

**A. Yes. The "problem" word is plaintiff's characterization.**

Q. Yes, I understand.

**A. Okay.**

Q. What about the last page PT 0049, does that look familiar to you?

**A. It does not.**

Q. This says Category 4 up in the left-hand corner and it is kind of hard to read?

**A. It does.**

Q. Let's see --

**A. That aligns with Category 4 on page one, PT 0040, sales on Gifford Pinchot.**

Q. So it would be your testimony that you don't believe these are lists that were produced by the Forest Service?

**A. That would be my testimony.**

Q. Were these lists ever disclosed to the high bidders on these sales?

**A. I would have no knowledge of that.**

Q. You never disclosed it?

**A. To bidders?**

Q. This information.



**A. I would have no way to do that.**

Q. Was it your understanding that these lists were to be kept confidential and not disclosed --

**A. That was my understanding, yes.**

Q. -- and not disclosed to anyone outside of the agency?

**A. Other than to DOJ, correct.**

Q. As far as you know that's what happened?

**A. As far as I know that's correct.**

Q. Take a look at 37C, Exhibit 37C. If you look at the very top of this letter which has apparently been faxed there are some fax numbers in area code 503.

Are any of those Forest Service numbers?

**A. Well, the 808 number is for our building.**

Q. That's the Region 6 office?

**A. Correct. The 326 number is the Federal building which is Office of General Counsel.**

Q. OGC?

**A. Right.**

Q. Okay. Was a copy of this letter provided to you?

**A. I would have to assume that it was. It doesn't look familiar particularly.**

Q. If you turn to page five of this letter, the five is on the bottom, it says page nine in the upper



right-hand corner.

**A. I'm with you.**

Q. The letter reads, Also we are prepared to not award the Forest Service timber sales listed below until November 23, 1998. And there's a list that follows.

Did you help put that list together?

**A. Did I help put the list together, well, yes, I would have.**

Q. How did you go about doing that?

**A. As we looked in the earlier fax, I don't remember the exhibit number, but it was through those faxes out to my forests that plaintiff's list that we developed charts of the status of the sales that plaintiffs were interested in.**

**So that compendium of data then would tell us status of those sales and choices would then be made on whether to advertise an award or hold the award.**

Q. So you have three columns here, Forest Service, Sale, and that's the name of the sale?

**A. Correct.**

Q. The forest is the National Forest it is on and Status is either awarded or no award, although, all of these but it looks like two, all of them are no award.

What does it mean to say, Award by agreement

25

with purchaser in settlement of NFRC vs. Glickman?

**A. That was the National Forest Research Council's lawsuit against USDA on the Forest Service under the Recisions Act that we were not prosecuting our duties under the Recisions Act which was primarily to provide replacement volume for the sales that had nesting birds, you know, the Rescissions Act has lots of funky details like that.**

**So we did have a court overseeing mediation with Judge Hogan on NFRC vs. Glickman and as part of that we agreed and then the court ordered us to award certain sales.**

Q. Okay. Take a look at what's been previously marked plaintiff's Exhibit 38. Have you seen that before?

**A. No.**

Q. Do you know what Allen Apliss (phonetic) is?

**A. I do know who Ellen Apliss was, yes.**

Q. Is she no longer with us?

**A. She's not in Department of Justice anymore I don't believe.**

Q. Sorry. And have you not seen this cover sheet or the pages attached to it previously?

**A. No, I haven't.**

Q. Okay. Do you see on the first page of this

26

document where it says, As I promised here is the list of Forest Service and Bureau of Land Management timber sales rushed through to avoid the Survey and Manage requirements?

Do you see that?

**A. I do.**

Q. Do you have any knowledge of environmental groups providing such a list to the government other than in the ONRC Action litigation?

**A. I do not.**

Q. Did you hear from anyone in the course of your duties that an allegation had been made that the Forest Service and the Bureau of Land Management had rushed through the decision documents on sales in order to avoid Survey and Manage requirements?

**A. We had heard that from plaintiffs in the ONRC Action case as well as they did public press releases and those sorts of things.**

**It was fairly general knowledge to those of us who follow such things that plaintiffs believed we had rushed through to make decisions to avoid the oncoming Survey and Manage requirement.**

Q. Did the Forest Service do that?

**A. No.**

Q. What's your basis for that answer?

27

**A. My answer is as far as I know we observed every law that we needed to do in terms of NEPA and NFMA and Endangered Species Act for all of the sales that we did NEPA decisions for.**

**I don't think anything was rushed necessarily.**

Q. Did you ever hear there had been instructions or directions to forests to hurry up and finish Decision Notices in order to beat the October 1, 1996, deadline?

**A. Yes, I had heard that.**

Q. From whom?

**A. I'm aware there's an e-mail from Bob Devlin out to the forests where he urges them to appreciate that the October 1 deadline was coming.**

Q. And your understanding is that he urged them to finish up the Decision Notices rather than wait until after the deadline?

**A. Well, we knew as did -- Bob knew and our forests knew that as of October 1 the survey obligations were greatly increased.**

**So I think his e-mail stands for itself. I mean, he said what he said and if you need to interpret that as plaintiffs did that that was a rush, to rush, you know, the public is entitled to so many days of review on NEPA documents anyway and that was short-cut**

28

**so rush what, you know. I'm not sure.**

**Legally we couldn't rush anything. You had to meet your statutory time frame.**

Q. Did you discuss this e-mail you are talking about with Mr. Devlin?

**A. No.**

Q. Did you discuss the Devlin e-mail with anyone else?

**A. At the time?**

Q. At any time.

**A. Only through the discovery of Blue Lake case, your Blue Lake case. When we ran across it during that discovery I discussed it then.**

Q. With whom?

**A. I would have discussed it with, who was our counsel, Jack Groat I believe.**

Q. So you didn't talk to anyone else about it like Jerry Jensen, he was in Region 5, but anyone else from Region 6 did you talk to?

**A. I didn't know Devlin sent it out. I didn't know. I wouldn't have any reason to know that. It wasn't a litigation matter and Bob would do his director job, you know, with his timber people and I would have no reason to know what he was directing them to do or not do until it became a matter of litigation**

**and then when it did in your Blue Lake case is when I saw it.**

Q. When you saw this e-mail you were surprised?

**A. Was I surprised?**

Q. Yes.

**A. I don't know I would use the word surprised. I found it interesting he would send that out.**

Q. Why was it of interest?

**A. Well, because, and I'm thinking and trying to get the dates right, because I wouldn't have known about it until when was Blue Lake? What was the year of your Blue Lake case? It was certainly not '98 or '99. It had been in the 2000s.**

Q. I presume the e-mail you are referring to was written sometime prior to October 1, 1996, or '98, one of those two?

**A. It must have been, but I didn't see it and I wasn't aware of it until we did the discovery in Blue Lake.**

Q. After you became aware of it did you discuss it with anyone other than Mr. Groat?

**A. No.**

Q. No discussion at all?

**A. No, it is like water over the dam. No, I didn't discuss it with anybody and it wouldn't be my**



**position to do that anymore.**

Q. I meant informally as well as formally. You said it was of interest so I thought perhaps you talked to somebody else about it, one of your colleagues, for example?

**A. Not other than Jack, no.**

Q. Take a look at plaintiff's Exhibit 40. Can you identify the document?

**A. It is a letter from Diana Bus, who was the contracting officer on the Willamette National Forest, to me.**

Q. You say the contracting officer. There was just one for the whole forest?

**A. I believe that's right.**

Q. She writes to you and says, Here is some information on sales we would like to move forward with award on?

**A. Correct.**

Q. Do you know why they wanted to move forward on award?

**A. Well, because that's what the Forest Service does, when they get sales prepared they advertise them and try to sell them and then award them.**

**And we had been -- this was February of 1999 so we had been held up since the filing of the ONRC**



**lawsuit. That was July of '98 so we had been through all of the machinations of do we award, don't we award, do we delay, what's the deal.**

**So by February we solicited forests as she mentions here about my call -- about the call we had in the lawsuit that we believed there was an opening to award some sales. And if you check the docket for the ONRC Action case you will find that Judge Dwyer actually dismissed the case in the end of 1998.**

**And then the plaintiffs erroneously did a second amended complaint and then a third amended complaint and the case started all over. And I recall that was sometime in February or March. And they asked -- they asked leave to file their amended complaint, but I think we believe there was an opening of time for us to get sales awarded there in January and February.**

Q. Why do you characterize that as an opening of time?

**A. Because the lawsuit was temporarily gone.**

Q. So the lawsuit was not formally in existence, but they had been given leave to amend?

**A. They had not been given leave. They requested leave.**

Q. There had been no action taken on that. Judge



Dwyer didn't deny them leave?

**A. Ultimately, no.**

Q. Was there initial denial?

**A. I don't recall.**

Q. So who made the decision that this was an opening within which sales could be awarded?

**A. I don't know who made that decision.**

Q. Someone above your level?

**A. Yes. I make no decisions. I'm a staff person. I recommend, but I don't make decision.**

Q. Would such a decision have required Mr. Devlin's concurrence?

**A. It would have required Bob's concurrence and the Regional Forester. We didn't do much in this case without Bob Williams in the know.**

Q. Was there any discussion at the time of the risk that the government might be assuming in awarding these sales?

**A. I don't know if there was. Not with me.**

Q. No e-mails or other conversations with you about that?

**A. See, that wouldn't fall in my world. That would be a Jerry Hofer, contracting officer for the region, forest contracting officers and Bob's discussion of risk about that.**

Q. I think you said earlier we solicited forests so at someone's instruction did you send a letter or e-mail?

**A. It looks here like we did a phone call.**

Q. Phone call. And you were asking them what sales would they like to award within this window of opportunity?

**A. Yes.**

Q. And they gave you some information?

**A. Diana did.**

Q. But information was requested I take it by you?

**A. It makes sense to me at this point that we would have said we believe we have a window where we can get some of your sales awarded so if you have some you would like to move along, let us know, and so that's what Diana did here. Not all forests did, but Diana did.**

Q. You made the requests of all forests?

**A. Correct.**

Q. So you would have made the request to the Umpqua as well?

**A. Correct.**

Q. That would have gone to Brenda Woodard?

**A. It would have.**



Q. And so did you ask the forest to provide you with some information on the sales that they would like to move forward with award?

**A. Well --**

Q. For example, did you ask if they had been appealed by ONRC Action representatives?

**A. Right. My recollection is we already had that information. We had gathered all of the sale data back when they built the charts in 1998.**

Q. Okay. All right. And did -- were you asking the forest to give you the dates on which they were proposing to award the sales?

**A. I don't recall that, Gary.**

Q. Okay. Further down in this communication under eight, Trove Thin, Christy Basin EIS, first page of plaintiff's Exhibit 40 --

**A. All right.**

Q. -- there's a statement which reads, Are we going to move forward with advertising them, question mark, question mark, question mark. That's probably a Devlin question/answer.

Do you know what that is referring to? Is it referring to the sales that are on this ONRC list?

**A. Right.**

Q. But what does she mean about probably a Devlin



question?

**A. Meaning that it is a policy level call.**

Q. Whether to advertise them or not?

**A. Correct.**

Q. At the bottom of the page there's a reference to the ALA lawsuit. What's that?

**A. That's the American Lands Alliance lawsuit.**

Q. In brief what was that about?

**A. You know, there were two of them and I don't remember what the issues were in those cases, but I think we won them both, but I can't remember.**

Q. Let's move to another document. Take a look at plaintiff's Exhibit 41A. On the first page of 41A this looks like an electronic message. Am I right?

**A. It is.**

Q. Is this in the old DG system?

**A. You know, I actually had to mark down on my Rolodex because of your Blue Lake discovery when we moved from Applix to IBM and I don't recall the date, Gary, but if I look down here at my e-mail address it is the IBM system address.**

**So this would not have been -- this would not have been the Applix time.**

Q. Can you tell the approximate time period when this e-mail was sent?



**A. What I'm recalling is when I talk about March 26, that's shortly after their third amended complaint.**

Q. That's 1999?

**A. Yes, and this would make sense that we got a briefing schedule after that last amended complaint came in.**

Q. What is promise one and promise two about?

**A. That's for awarded sales. Promise one would be ten days of notice before we approved the plan of operations, that being the pre-work the purchasers do with us.**

Q. These are for the nine sales actually named in the complaint?

**A. Right, and apparently they were awarded sales.**

Q. And promise two?

**A. Those would be as to unawarded sales, certain unawarded sales --**

Q. All right.

**A. -- because we would be giving them notice of our decision to award.**

Q. You say further down in the e-mail, To help you with that I will be sending an issue chart tomorrow.

What was that?

37

**A. We developed charts that had in columns I believe the issues that were raised in the amended complaint and then we asked the forest to look at any appeals that came in on the named sales so we could conclude whether or not plaintiffs had raised or waived an issue because they can't take it to court -- they can't take the issue to court if they didn't raise it in their appeal.**

Q. And what would that mean in terms of what the Forest Service could do with that sale?

**A. Well, that would mean if they had not raised the issue, that we would ask the court to dismiss the claim as to those sales where plaintiffs did not raise that and then if we were successful, then that sale would not be part of the lawsuit.**

Q. But you need to raise that in a motion and the judge would have to decide?

**A. Correct, correct.**

Q. You say in here, We need to assure DOJ that we have a strong defense on the sales that we intend to award even though DOJ is not asking to be a part of the award decision. Good news you say?

**A. Good news, that's true.**

Q. Why is that good news?

**A. Well, because there's always tension between**

38

**the client and the attorney in our cases on who is making the policy calls when we get into litigation.**

Q. Who made the policy call here?

MS. STENTIFORD: Objection. Don't answer that.

THE WITNESS: What's the rule, Counsel?

MS. STENTIFORD: Privileged.

THE WITNESS: Okay. So don't answer?

MS. STENTIFORD: Don't answer.

MR. STEVENS: What was the question?

(Reporter read back last question.)

MR. STEVENS: You are instructing her not to answer that question?

MS. STENTIFORD: Yes, I'm instructing her not to answer that question.

MR. STEVENS: We will pursue that absolutely later on, but I don't think we are going to be able to get the judge on the phone at 8:00 at night back there.

Q. (By Mr. Stevens) Let me ask you this, was the policy call made by the Forest Service for the Forest Service?

**A. The Forest Service made the decision whether or not to award sales.**

Q. And the Forest Service had the final say as to whether a sale would be awarded?

39

**A. I don't know how to answer that.**

Q. Did the Forest Service have to concur with any other governmental agency?

**A. We certainly conferred with trial counsel and this sentence means we needed to assure our trial counsel that we had a strong defense generally meaning that the issues raised in the complaint were not raised in appeal.**

**And so if they were not raised in appeal, we felt -- the agency felt we had a pretty strong defense to try to get that sale out of the lawsuit.**

Q. Further on down in this e-mail you say, R5 is sending a ten-day notice letter to ONRC today for two sales, Upper South Fork and Happy Thin.

What's the ten-day notice letter?

**A. That was part of the stipulation on the briefing schedule promise, well, it would be promise one or two and I don't remember if it was whether or not they were going to award Happy Thin or whether or not they had approved their plan of operation.**

Q. So in either case it would be ten days' notice before any ground-disturbing activities could take place, at least that?

**A. At least that, correct.**

Q. Do you know if any purchasers were notified

40

that this ten-day notice letter had been sent out on Happy Thin?

**A. I don't know about Happy Thin. That's Region 5.**

Q. And you say at the very bottom, As before the sale list is not -- it is not be, but you meant to say is not to be distributed outside the agency?

**A. Where are you reading?**

Q. The very last sentence at the bottom of this paragraph that is in all caps.

**A. Correct. What's your question?**

Q. Well, so would I be correct that that list was not made available to anyone outside the agency so far as you know, the list being referred to?

**A. Correct.**

Q. And that's the list of sales that the Forest Service intended to award?

**A. You know, that's a good question because I don't know what sale list really I'm referring to. It would not be the named sales in the complaint because that would be public knowledge.**

Q. Right, that's fair enough.

**A. So here we say, Attached is an R6 chart of the sales that are subject to promise two, you need to check the appeal files to be sure plaintiffs appealed.**

**That might be what we're talking about.**
Q. Okay. Let's turn over to the next page that's attached. We're looking at 00104 and this is 00105 and they're stapled together and I assume that's the way we got them for some reason or another. I'm not representing they are otherwise related.
This is an electronic message that you sent?
**A. It is.**
Q. Is that your handwriting on the document?
**A. No.**
Q. Do you know whose handwriting it is?
**A. I don't recognize that, I don't.**
Q. Do you know why the sale names of Whitebird, Pigout, and Jigsaw are included on this document?
**A. I do not.**
Q. And the other information at the bottom, that's not your handwriting either?
**A. It is not my handwriting.**
Q. Okay. It looks like the categories of information you were just describing before, Plaintiff Appealed, yes or no, Auction Date, et cetera, et cetera, Award Date, Advertise Date?
**A. Correct.**
Q. That's the kind of information that you gathered?



**A. Yes, I agree we did gather that.**
Q. You sent this to Ted/Owen, right, Ted Boling and Owen Schmidt?
**A. They were -- I would assume that I sent this to my standard forest mailing list and that included Ted Boling and Owen Schmidt.**
Q. You say, Can you fill out chart and return to me by tomorrow. So you were asking the forest to fill out a chart and am I correct that it was a chart that would have columns on it very similar to the ones that are handwritten?
**A. Yes.**
Q. Okay. Do you know if the Forest Service was considering awarding Whitebird, Pigout, and Jigsaw among others and that's why?
**A. You know, I don't know who wrote this and so I don't know what the forest's intent was on that.**
Q. In your e-mail you say, The immediate job is to identify the sales that have been awarded or that you intend to award by mid-June.
Why was the date of mid-June significant?
**A. My guess is that's the briefing schedule because the sentence before says they would like to get the briefing done without the interruption of a TRO or PI.**



Q. Okay.
**A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.**
Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?
**A. I would characterize it differently.**
Q. How would you characterize it?
**A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.**
Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?
**A. The 808-2255 number is my fax which is here in**



**the Regional Office.**
Q. So in the ONRC Action the plaintiffs faxed this to you?
**A. I would not think so. I would have gotten it from Ted Boling.**
Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.
What's he talking about, the at-risk category?
**A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.**
Q. Yes, we are. Sorry.
**A. I'm sorry, it is from Axline.**
Q. It is not that I have it and you don't. It is not in my copy either.
**A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.**
Q. So it was not too veiled a threat, they might

sue and try to get a temporary restraining order?
**A. Correct. They had already sued. They would be asking for injunctive relief during the summary judgment briefing schedule.**
Q. Okay.
**A. See, the second paragraph says that, And some of the sales seem unlikely to be awarded and operated prior to completing summary judgment motions. Because we believe in Murphy's law, however, we think they might be awarded and might be operated during our summary judgment schedule.**
Q. Well, the control number on here, 338 followed by 339 indicates that this was the way we got it from the government. I agree with you it looks like at least the signature page is missing?
**A. Yes.**
Q. Sales at Risk Pre-June 11 and so the Forest Service sales on that list are sales at least as of the date of this letter, April 12, 1999, the ONRC Action plaintiffs were threatening to challenge with TROs if they were awarded?
**A. Correct.**
Q. We're going to look at 41D next. In this letter from you to Brenda Woodard you say, I forwarded your April 19, 1999, letter to the Department of



Justice in which you relay your intent to award, and various sales are listed there, on or before May 5.
Did you receive that letter, the April 19, 1999, letter? I assume you did.
**A. I would have seen it.**
Q. Do you know why Ms. Woodard was sending this letter to the Department of Justice?
**A. She didn't send it to the Department of Justice. I forwarded her letter to me to the Department of Justice, like we had looked at Diana Bus's letter earlier, this was Brenda's answer to that inquiry.**
Q. Okay. All right. Then you say to her you understood these sales were not at-risk sales that ONRC had identified, but the next paragraph you add a qualification based on your discussions with Mr. Boling.
In the last sentence of the paragraph you say, In other words, the at-risk list does not replace the April 5 sales identified by ONRC Action as sales they are to receive prior notice of award according to the Stipulation to Establish a Briefing Schedule filed in this case.
**A. That's a confusing sentence.**
Q. What were you trying to tell us?



**A. In other words, the at-risk list does not replace the April 5 sales identified as sales they were to receive the ten-day notice.**
**So in our Stipulation to Establish the Briefing Schedule we would have represented that these sales on the Umpqua were -- that we would give notice to plaintiffs of either awarding or approving the plan of operations with a ten-day notice.**
Q. So you are reminding her the ten-day notice applies to sales listed here?
**A. Yes, under the stipulation and whether or not ONRC considered them at risk or not did not matter because we had made this representation to the court about the sales we were going to give notice on.**
Q. In the last short paragraph you say, As you know we have a hearing on June 11. That's the summary judgment hearing?
**A. That would be the summary judgment hearing.**
Q. In the ONRC Action?
**A. Correct.**
Q. So when you sent this to Ms. Woodard what did she do with respect to these sales?
**A. I don't know what she did.**
Q. Did you ever find out?
**A. No.**



Q. Take a look at plaintiff's Exhibit 43, please. Can you identify that document for me?
**A. I don't know who authored this.**
Q. This is not in your handwriting?
**A. It is not.**
Q. The Jerry Hofer referred to there is the Jerry Hofer you were referring to before?
**A. It is.**
Q. And, of course, Bob Devlin is Bob Devlin?
**A. Correct.**
Q. Were you involved in a conversation with Bob Devlin and Jerry Hofer as referenced here in this document?
**A. Well, it appears that I was a part of a conversation and/or a phone call, but I can't -- I don't recall it.**
Q. Do you remember the discussion, if any, regarding Prairie Thin and Pigout?
**A. Not particularly.**
Q. Do you have any recollection of that at all?
**A. No.**
Q. Okay. We will talk with Axline on Tuesday. Do you know what that might be about?
**A. I would assume from the format of this note that this is what Ted is telling us, Ted Boling is**

49

**telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.**
Q. Okay.
**A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.**
Q. Okay.
**A. That would be my read of it, but I don't recognize the handwriting or the topic.**
Q. And you don't have independent recollection?
**A. I don't.**
Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?
**A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.**
Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?
**A. Correct.**
Q. So if anybody needed to know what was on that list or which list, you were the authoritative source

50

to call?
**A. I had files.**
Q. And you could read them what was on the document?
**A. I could.**
Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?
**A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.**
Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?
**A. I don't know.**
Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?
**A. I do.**
Q. Can you identify it then for the record?
**A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.**
Q. As of July 6th?
**A. As of that -- it was their July 6th letter which I believe we just looked at.**

51

Q. Okay. Did you prepare this chart?
**A. I think someone on my staff prepared it.**
Q. Okay. What was the purpose in preparing it?
**A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.**
Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?
**A. On July 7th, right, that appears to be when we printed this off.**
Q. And you can tell that from the date on the lower left?
**A. Yes.**
Q. Was this chart used in any decision-making process that you are aware of?
**A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.**
Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.
What hearing is that a reference to?
**A. Well, we would have to check the docket for**

52

**this case.**
Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?
**A. That would be my interpretation of it.**
Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?
**A. Not to my knowledge.**
Q. Was it made available to Mr. Axline?
**A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.**
Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?
**A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.**
Q. Who would be on that -- is that your distribution list you are talking about?
**A. Yes.**
Q. Who would be on that list?
**A. It would be my case coordinators on these west-side national forests.**

Q. There would be one designated for each forest?
**A. There is.**
Q. Usually the contracting officer for the forest?
**A. Not necessarily. Usually, no, it did not have to be the contracting officer. Whoever the forest supervisor told me was the contact.**
Q. Who else?
**A. Well, Owen Schmidt and Ted Boling would be on that distribution list as well.**
Q. Okay. Anyone else?
**A. Not that I recall.**
Q. Would Bob Devlin be on the list?
**A. No, I don't think so. He usually gave me the instructions to do things so I don't know if I would have sent it to him.**
Q. Would there be somewhere a printed-out document that lists the people on the distribution list or could we find such a document?
**A. Not anymore. Yeah, not anymore.**
Q. Am I right this e-mail refers to that chart we were just looking at?
**A. That would be my conclusion.**
Q. You refer to a briefing paper, but that's not attached, is it?



**A. It is not.**
Q. Do you know where that briefing paper is?
**A. I don't.**
Q. We haven't talked about it today, have we? It is not that other briefing paper we looked at earlier?
**A. It would be -- if it was one I did, it would be dated similarly. It would be a July 6th -- around July.**
MR. STEVENS: Ms. Stentiford, I don't believe we received a copy of that briefing paper and I'm sure it would be within the scope of our request so let me reiterate the request and I will check with my office and get back with you to be sure.
MS. STENTIFORD: Okay.
Q. (By Mr. Stevens) Further down in your e-mail you say R5/R6 are ready to award seven sales and approve plan of operations on one.
Do you know which sales we're talking about here?
**A. I do not.**
Q. There's a reference to the draft Bartuska letter. What was that?
**A. Bartuska was head of the timber department in the Washington office and she issued a letter and I don't know why it was a draft.**



**They must have sent out a warning flag or something, but I recall the Bartuska letter telling us we could not award any sales in litigation and if we wanted to do that, we had to go through the chief.**
Q. That was in effect at this time?
**A. Well, it says draft so my guess is it was not in effect, but ultimately it became in effect.**
Q. You saw it in final form?
**A. I did.**
MR. STEVENS: I will make a request also for the draft and the final form of the Bartuska letter. I don't think we have that.
THE WITNESS: June 25th, 1999, I believe is the date.
MS. STENTIFORD: If we have it. If we didn't give it to you, I will assume it's because we didn't have it.
MR. STEVENS: If you have it and we didn't get it, I assume it is just an oversight.
MS. STENTIFORD: Right, that's what I'm saying.
Q. (By Mr. Stevens) Was that letter superseded by another letter?
**A. It was.**
Q. Who wrote the second letter?



**A. Bartuska's letter was rescinded by --**
Q. Mr. Furnish?
**A. Yes, Jim Furnish.**
Q. You are so good on dates do you recall when that happened?
**A. No, I don't recall that. It was a year or two later if not more.**
Q. Okay.
MR. STEVENS: I will add a request for the Furnish letter in addition to the draft and final Bartuska letter.
Q. (By Mr. Stevens) You say here, We want to consider moving ahead with this, meaning these, sales and future sales notwithstanding the draft Bartuska letter.
Who is the "we" you are referring to?
**A. That would be Bob Devlin.**
Q. And you refer to something called trading stock?
**A. Uh-huh.**
Q. What's that?
**A. Well, plaintiffs appreciated that they had named very few sales in their third amended complaint which started our briefing schedule in 1999 yet they were asking us in these, quote, settlement letters to**

**not award hundreds of sales, you know, only a few of which had been actually named in their complaint, and we were negotiating with plaintiffs because we did not want to interrupt the briefing schedule because we thought we would win with TROs and PIs.**

**So all of these other delays in award in my vernacular were trading stock. It was a buy-off to keep plaintiffs from filing a TRO or PI.**

Q. Okay. Next page handwriting, is that yours?

**A. No.**

Q. It looks like the handwriting you couldn't identify before to me?

**A. It is.**

Q. Do you have any idea whose it is?

**A. The BW at the bottom leads me to believe it is Brenda Woodard.**

Q. Okay. Does looking at the substance of it, does this reflect a telephone call involving you, Brenda Woodard, and Ted Boling?

**A. It looks like it, but I don't recall this call.**

Q. Okay. Take a look at plaintiff's Exhibit 51, please.

**A. Oh, I'll be. Go ahead.**

Q. Is this the Furnish letter?



**A. It is.**

Q. It is the one you were referring to?

**A. It is.**

Q. You said it was a couple years later?

**A. I was mistaken. And the Bartuska letter rather than June 25th is June 8th.**

Q. How can you tell that?

**A. That's the first sentence of this letter, This letter supercedes the direction provided by the Washington office Director of Forest Management, who was Ann Bartuska.**

Q. Okay. So between June 8th, 1999, and October 5th, 1999, the Bartuska letter was the direction --

**A. Was the direction.**

Q. After October 5th, 1999, the correct direction was found in this Furnish letter?

**A. Correct.**

MR. STEVENS: Okay. I think that's all I have.

MS. STENTIFORD: I have a couple questions on cross.



EXAMINATION

BY MS. STENTIFORD:

Q. Is it your understanding that part of the mission of the Forest Service is to conduct timber sales?

**A. Well, conduct is a difficult verb.**

Q. Award?

**A. We prepare and offer for sale timber sales. That's very much our mission.**

Q. As much a part of the Forest Service mission is complying with environmental laws?

MR. STEVENS: Objection. That calls for speculation from the witness. There's also no foundation and you are asking a legal question.

MS. STENTIFORD: You can answer.

THE WITNESS: Do I answer?

MR. STEVENS: Yes.

THE WITNESS: Ask it again.

Q. (By Ms. Stentiford) Well, you testified that it is your understanding part of the mission of the Forest Service is to conduct timber sales?

**A. Correct.**

Q. You testified a great deal in your direct testimony as to this environmental litigation?

**A. Correct.**



Q. What is your understanding of the nature of that litigation?

**A. They were challenges to our compliance with the National Forest Management Act and the National Environmental Policy Act.**

Q. Are those -- what is the nature of those statutes?

**A. Those are --**

MR. STEVENS: I object again. That calls for a legal conclusion from the witness.

THE WITNESS: The National Environmental Policy Act is a disclosure statute that requires us to go through certain processes in order to disclose environmental consequences of our actions.

The National Forest Management Act primarily guides us to produce forest plans and develop standards and guides for how we are going to manage the land.

Q. (By Ms. Stentiford) When you say "manage the land," what do you mean?

**A. That would range anywhere from all of our multiple use duties from recreation to timber to wildlife to water, all of the land management activities that would be attendant to those obligations.**

Q. And the Forest Service is obligated to meet

61

those obligations?
**A. We are.**
Q. You testified in your direct testimony about several -- well, fairly early on in your direct testimony you testified you thought there was an opening for the Forest Service to award certain timber sales; is that correct?
**A. That's correct.**
Q. Now, the sales that you were referring to -- the sales that you asked the Regional Forests to identify as being ready for award, it is your understanding that the foresters would not identify these sales unless they were -- unless they had met all of the legal requirements for releasing the sale?
**A. That's correct. There are certain gates of accomplishment our timber sales have to go through before they're ready to be advertised and awarded and that was part of our inquiry as to whether or not they had passed through all of those gates and were ready to be advertised and awarded.**
Q. That includes compliance with the environmental statutes you referred to before?
**A. That's correct.**
Q. The contracting officers that you would have dealt with at the Regional Forests, they're familiar

62

also with the environmental legal requirements for awarding timber sales?
**A. They are.**
MR. STEVENS: Objection, speculation, lack of foundation.
Q. (By Ms. Stentiford) Do you have any basis for knowing whether timber companies monitored any of the -- well, specifically the ONRC litigation that you discussed in your direct testimony?
**A. We had a defendant intervener that represented the industry as I recall.**
Q. So there were timber companies that were parties to the ONRC litigation?
**A. I don't recall if there were any companies, but I believe there was -- NFRC, the National Forest Resource Counsel I believe was a defendant intervener in the ONRC Action case.**
Q. And do you have any basis for knowing whether that counsel informs timber companies as to the status of, well, specifically with the ONRC litigation informed timber companies as to what was going on in that litigation?
**A. I wouldn't have particular knowledge their counsel did that, but I do know in order to gain intervener status NFRC does have to explain to the**

63

**court that it represents companies that have interests in our timber sales.**
Q. And if nothing else the ONRC litigation was a matter of public record; is that correct?
**A. It is a matter of public record.**
Q. And it was not litigated under seal?
**A. It was not.**
MS. STENTIFORD: I don't have anything else. Thanks.
MR. STEVENS: We're all finished.
(The deposition concluded at 5:45 p.m.)
(Signature reserved.)

64

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss.
COUNTY OF CLARK )

I, Teresa L. Dunn, a Notary Public for Oregon, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, SUE ZIKE personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 1 to 64, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

Witness my hand and seal at Vancouver, Washington, this 18th day of January, 2007.

Teresa L. Dunn

TERESA L. DUNN
Notary Public for Oregon
Residing in Vancouver, Washington
My Commission Expires: 4/18/07

SUE ZIKE

I have read the transcript of the deposition taken on January 4, 2007 at Portland, Oregon, and make the following additions or corrections:

PAGE LINE CORRECTION AND REASON FOR CORRECTION

____________________________
SUE ZIKE

Subscribed and sworn to before me this ____ day of ________________________, 2007.

____________________________
Notary Public for the State of __________________
residing at ________________
My Commission Expires: ____

Re: Scott Timber vs. The United States,
United States Court No. 05-708C
TLD

# FAX

Number of Pages to Follow: 29

| | | | FAX Number: |
|---|---|---|---|
| To: | Ellen Athas | CEQ | (202) 456-0753 |
| | Nancy Hayes | FWS-WO | (202) 208-4684 |
| | Ted Bowling | DOJ | (202) 305-0506 |
| | Chris Jauhola | BLM-WO | (202) 452-7702 |
| | PLEASE DELIVER TO: | | |
| | Nancy Green Or Eric Johnston | FS-WO Fish, Wildlife and Rare Plants | (202) 205-1599 |
| email: | Arnie Holden | FS-R6 | |
| | Jay Watson | REO | |
| From: | Cheryl McCaffrey tel: (503) 952-6050 | BLM OR931 | (503) 952-6021 |

Date: May 18, 1998

Subject: DRAFT Report for proposed change to Survey and Manage Standard and Guideline Component 2 implementation schedule under the Northwest Forest Plan.

We are sending this Draft document pursuant to the request made by CEQ and DOJ on the 5/15/98 conference call. This is the latest DRAFT version of the report addressing the proposed change for component 2 species following the authority on page C-6 of the ROD/S&Gs. Appendix B has the common names of the species. Appendix C is a DRAFT summary of the increment of risk to the species. The species groupings in the report were based on a regional perspective.

We are polling field staff to verify this analysis, primarily, relative to the feasibility of survey issue. Comments on our assessment of increment of risk are also being made by the field as appropriate. It is possible that the information from the field will result in some species being considered more or less feasible or that the increment of risk could change. We have not yet added substantially to either the risk analysis section of the report or that the proposed change is based on increased field experience with the species. We are aware that these requests have been made of us. Therefore, this document is still very much a draft and is considered a predecisional, working document.

PLAINTIFF'S EXHIBIT 31 1-10-07 McCaffrey

*Pre-decisional deliberative document — not subject to FOIA*

DRAFT 5/15/98

# REPORT TO THE REGIONAL INTERAGENCY EXECUTIVE COMMITTEE ON THE IMPLEMENTATION SCHEDULE FOR SURVEY AND MANAGE AND PROTECTION BUFFER SPECIES

## ISSUE SUMMARY

The Northwest Forest Plan (NFP) requires surveys prior to FY 1999 ground-disturbing activities for most Survey and Manage Component 2 species and Protection Buffer species. The Forest Service and BLM may not be able to implement surveys according to this schedule for all of these species. Without a change in the schedule, the failure to complete surveys could seriously disrupt resource programs, including timber harvest, riparian restoration, prescribed fire, and recreation, and would do little to benefit the species because of our limited ability to locate these species in such surveys at this time. The Forest Service and BLM propose to change the survey schedule for some of these species, based on the technical infeasibility of surveys and the lack of any substantial increment of risk to the species from changing the schedule by one year. This report contains the Forest Service and BLM proposal, analysis of this proposal and options, and the Regional Ecosystem Office (REO) recommendation.

## BACKGROUND

The NFP is a strategy for managing habitat for late-successional forest related species on Forest Service and BLM-administered lands within the range of the northern spotted owl. The NFP balances two primary purposes: (1) providing sustainable timber harvests, and (2) maintaining and restoring healthy old-growth ecosystems and adequate populations of fish, wildlife, and plants (ROD, pp., 2, 25, 61). The NFP includes land allocations and standards and guidelines that collectively establish broad-scale conservation strategies for individual species, species groups and communities, and ecosystems. For example, the land allocations and the standards and guidelines in the NFP constitute the federal lands' contribution to the recovery of the northern spotted owl (ROD, Appendix A, p. 3). The NFP also provides specific protection for some late-successional forest related species not listed under the Endangered Species Act (ESA) including species covered under the Survey and Manage and Protection Buffer standards and guidelines.

The history of the Survey and Manage and Protection Buffer standards and guidelines is complicated and somewhat abstruse. Between 1991 and 1994, federal courts had enjoined the Forest Service and BLM from holding most timber sales with the range of the northern spotted owl. The courts had held that the agencies failed to meet the various requirements of the

National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), and ESA. In response to the courts' concerns about the viability of late-successional forest related species, the Forest Service formed a team of scientists, the Scientific Analysis Team (SAT). The SAT report, completed in March 1993, contained a viability evaluation process for a wide range of species associated with late-successional forests. Although the agencies took no actions in direct response to the SAT report, its findings and processes were used in the Forest Ecosystem Management Assessment Team (FEMAT) report, which played an important role in the development of the alternatives and the analysis in the Supplemental Environmental Impact Statement (SEIS) for the NFP (FEMAT, Chapter IV, p. 49; FSEIS, Chapters 3&4, p. 3).

The FEMAT report assessed the viability of a total of 1120 species (FEMAT, Chapter IV, pp. 77-185). After the Draft SEIS, 490 species or groups of species were identified for further analysis (FSEIS, Appendix J2, p. 4). As part of the Final SEIS, a Species Analysis Team composed of federal scientists provided additional explanation of species viability ratings from the FEMAT report and assessed mitigation measures that could be employed to improve the likelihood of species viability. The Species Analysis Team described a list of 23 possible mitigation measures, explained the benefits of each possible mitigation measure, and summarized all mitigation measures that had been proposed for each species (FSEIS, Appendix J2, p. 6). The Survey and Manage strategy was among the proposed mitigation measures that were incorporated into Alternative 9 of the FSEIS and were eventually adopted in the ROD (FSEIS, Chapter 2, p. 1; Appendix J2, p. 7; ROD, pp. 11, 29).

The Survey and Manage strategy consists of four components:

> *Survey and Manage: The standards and guidelines require land managers to take certain actions relative to rare species of plants and animals, particularly amphibians, bryophytes, lichens, mollusks, vascular plants, fungi, and arthropods. These include: (1) manage known sites of rare organisms; (2) survey for the presence of rare organisms prior to ground-disturbing activities; (3) conduct surveys to identify locations and habitats of rare species; and (4) conduct general regional surveys for rare species.* (ROD, p. 11).

Separate from the Survey and Manage strategy, the NFP gave special and specific protection to species identified in the SAT report as Protection Buffers. The recommendations of the SAT report were carried almost verbatim into the Late Successional Reserve, Managed Late Successional Area, and Matrix sections of the standards and guidelines (ROD, Appendix C, pp. 9, 19-21, 23, 26-28, 45-48). Application of the Protection Buffer provisions for some species result in the addition of unmapped Late-Successional Reserves and Managed Late-Successional Areas to be managed according to species-specific standards and guidelines (ROD, Appendix C, pp. 11, 26). Although the Protection Buffer provisions and the Survey and Manage strategy have different histories and implementation mechanisms, the division between these provisions is indistinct: 13 of the 17 Protection Buffer species are also included as Survey and Manage species (ROD, Appendix C, pp. 49-61). Also, the non-animal Protection Buffer species (i.e., mosses,

liverworts, and fungi) share a common implementation schedule with Survey and Manage species:

> *Protection Buffers are additional standards and guidelines from the Scientific Analysis Team Report of specific rare and locally endemic species, and other specific species in the upland forest matrix ... Protocols for surveys will be developed that ensure a high likelihood of locating these occupied sites, and such surveys will be conducted prior to ground-disturbing activities within the known or suspected ranges and within the habitat types or vegetation communities occupied by these species, according to the implementation schedule for Survey and Manage components 1 and 2 on pages C-4 and C-5 of these Standards and Guidelines.* (ROD, Appendix C, pp. 19-20).

Between the Final SEIS and the ROD, the implementation schedule was changed for some Survey and Manage species and Protection Buffer species:

> • *The requirement to develop and apply protocols for surveys for species for which protection buffers are required, from page B-64 of the Final SEIS, has been edited to provide timelines for implementation of protocols that are consistent with those described for the "survey and manage" standards and guidelines. It is included on pages C-19 and C-27 of Attachment A. This change gives the agencies time to develop protocols and information needed to implement these standards and guidelines.* (ROD, p. 34).
>
> • *The standards and guidelines for "survey and manage" (Final SEIS App. B-11) have been revised. See Attachment A, pp. C-4 through C-6. There are no changes to the requirement to manage known sites. In addition, there are no changes to the requirement that vertebrates listed on page C-59 will have surveys conducted prior to ground disturbing activities that will be implemented in FY 1997 or later. The survey strategy 3 and 4 surveys 2 will be initiated no later than FY 1996, and the category 4 surveys are to be completed within 10 years. For other species addressed by Species Analysis Team, the time lines for the implementation of survey requirements have been changed.*
>
> *Survey protocols will be developed and implemented for the 71 remaining species under survey strategy 2 listed on pp. C-49 through 61 as soon as possible. In all cases, these surveys must be completed prior to ground disturbing activities that will be authorized or implemented in FY 1999 or later. This will provide agencies a maximum of four full fiscal years (FYs 1995, 1996, 1997, and 1998) in which to develop and apply survey protocols for these species. Agencies are to begin implementation of this requirement with available resources in FY 1994. Work to establish habitat requirements and survey protocols may be prioritized relative to the estimated threats to the species.* (ROD, pp. 36-37).

As a result of these changes, surveys are required prior to ground-disturbing activities that will be implemented in Fiscal Year 1999 or later for 80 Survey and Manage Component 2 species and Protection Buffer species (hereafter referred to as "FY 1999 species").

## PURPOSE OF THE PROPOSAL

The Forest Service and BLM propose to change the implementation schedule for surveys of some Survey and Manage Component 2 and Protection Buffer species. The Forest Service and BLM may not be able to implement surveys according to the above schedule for all species for the following reasons:

- survey protocols or standard methods are not available;
- the need for further training of field personnel; and
- survey opportunities for many species are extremely limited.

Without a change in the schedule, the failure to complete surveys could seriously disrupt resource programs, including timber harvest, riparian restoration, prescribed fire, and recreation, and would do little to benefit the species because of our limited ability to locate these species in such surveys at this time

The purpose of this proposed change is to develop a schedule that will:

- allow the implementation of effective and technically credible surveys;
- prioritize implementation relative to the estimated risk to the species; and
- avoid substantial disruption of other resource programs.

It is not the purpose of this proposal to alter the requirement to manage known sites for species that are also listed as Survey and Manage Component 1 species.

This proposed change is in conformance with individual Forest Service and BLM land and resource management plans and the NFP, which anticipated such changes. This proposed change would be made throughout the range of the NFP, for which the Final SEIS describes the affected environment (FSEIS, Chapters 3&4).

## NEED FOR THE PROPOSAL

The Survey and Manage provisions in the NFP are inherently uncertain; many species were identified as Survey and Manage species because little was known about their abundance, range, habitat, and ecology (see generally, FSEIS, Appendix J-2). The ROD explicitly anticipated that the agencies would have to change Survey and Manage provisions in the course of implementing the NFP:

> *As experience is acquired with these requirements, agencies may propose changes to the REO for analysis.* ***These changes could include changing the schedule****, moving a species from one survey strategy to another, or dropping this mitigation requirement for*

*any species whose status is determined to be more secure than originally projected. The REO will forward such proposals, along with recommendations, to the RIEC for action. The RIEC may recommend such changes as appropriate in order to assure the continuing attainment of the purposes of the plan and the conservation requirements of all laws applicable to the affected species.* (ROD, p. 37, emphasis added).

The process by which species were identified as Survey and Manage or Protection Buffer species was very different than the listing process under ESA, which requires considerable scientific information about species, and a formal proposal and status review before a species is listed. None of the species considered in this proposal are listed or proposed for listing under ESA.

The decision in the ROD about the implementation schedule for these species was made based on admittedly incomplete information (ROD, p. 11; Appendix C, p. 5; and see generally, FSEIS, Appendix J2). In fact, it was necessary to change the implementation schedule between the FSEIS and the ROD:

*These changes reflect the magnitude of the task, coupled with the lack of species information and skilled personnel.* (ROD, pp. 36-37).

Despite considerable work since the ROD, the magnitude of the task, the lack of species information, and the need for further training for field personnel still limit the agencies' ability to implement surveys for these species.

More importantly, species were assigned in the ROD to Survey and Manage Component 2 based in part on the assumptions that survey protocols existed or could be developed reasonably soon, and that adequate searches could be conducted in a single year (Draft Meeting Notes on Intent of Survey and Manage Strategies in the ROD, 12/2/94). As the agencies have gained more information about these species and have attempted to develop survey protocols, these assumptions have been called into question for many of the Survey and Manage Component 2 and Protection Buffer species, as discussed below under "Feasibility of Surveys."

**Agency Accomplishments**

The agencies have made substantial progress since the ROD in developing survey protocols and management recommendations, as well as building the necessary organizational infrastructure and biological databases to implement the Survey and Manage and Protection Buffer provisions (see Appendix A). The RIEC has chartered an Interagency Survey and Manage workgroup to develop databases, survey protocols, and management recommendation. The agencies have sorted through historical records of Survey and Manage species; have constructed a database of Survey and Manage known sites; and are near completion of the Interagency Species Management System (ISMS), designed to store Survey and Manage data in a central database available to field staff. The agencies have hired interagency technical experts to lead extensive and general regional surveys, as well as to provide training, species identification, and technical

advice. The workgroup has succeeded in developing management recommendations for 163 species for field implementation and review; management recommendations for an additional 95 species are currently in review or revision status. Survey protocols have proven more problematic, although progress has been made on many survey protocols. The work since the ROD has made it possible to survey for many of the Survey and Manage Component 2 and Protection Buffer species at this time, but the taxonomy and life history of some of these species makes systematic surveys infeasible at this time.

**Feasibility of Surveys**

On April 20, 1998, 17 Survey and Manage taxa specialists and field biologists and botanists met in the REO offices in Portland. They came from the Forest Service (PNW, R-5, and R-6), BLM, and the U.S. Fish and Wildlife Service. They evaluated the 80 Component 2 and Protection Buffer species that have the requirement for survey prior to ground-disturbing activities implemented in FY 1999. They focused on the feasibility of surveying for the species in time for FY 1999 projects, and on the increment of risk of changing the survey schedule from FY 1999 to FY 2000. The interagency Survey and Manage Core Team reviewed and summarized their species-by-species reports (see Appendices B, C, and D).

This evaluation identified the following problems with surveys: unavailable survey protocols; the need for further training of field personnel; the inability to identify some species in the field; and the inability to identify some species in a single year of surveys.

- Survey protocols or standard methods are not available for all FY 1999 species to permit surveys of projects to be implemented in FY 1999. At this time, well over half of the protocols have been delivered to field units for review and use. However, development of survey protocols has taken longer than expected because of the lack of knowledge of some of these species, the scarcity of taxonomic experts, and the inherent difficulty of surveying for some of these species because of their taxonomy and life history, as discussed below. For most of these species, generally accepted field methods for survey do not exist.

- Some of the FY 1999 species can be authoritatively identified only by one or a very few experts. At this time, agency field personnel are not yet sufficiently trained and experienced to reliably identify 29 of the 80 FY 1999 species, including most of the freshwater snails. Further training of agency specialists in both species taxonomy and the specific requirements of the survey protocols is needed before surveys can be completed for all ground-disturbing activities.

- For many of the FY 1999 species, the necessary characteristics to identify the species cannot be distinguished in the field. Species that could not be generally identified in the field and required more than simple laboratory confirmation for identification were considered infeasible to identify in the field. At this time, there is not a taxonomic

description available for field identification of 20 of the 80 FY 1999 species, including most of the freshwater snails, two liverworts, and two fungi. Therefore, surveys could at least require collection in the field with a complete record of collection locations; extensive laboratory work for identification; and a return to the field to mark known sites based on laboratory identification. Implementing such a survey for all ground-disturbing activities would present an overwhelming workload.

- Finally, adequate searches for many FY 1999 species cannot be conducted in a single year because there is only a short time period when the critical identifying characteristics are visible, or the species does not produce the identifying structures annually or predictably. For 10 of the 80 FY 1999 species, the species' life history is such that surveys require several or many years to complete. Most of these species are fungi that do not annually or reliably produce fruiting bodies. Attempting to survey for such species in a single year is not likely to find known sites or to yield technically credible results.

As a result of the above difficulties, surveys are not technically feasible at this time for 40 of the 80 species evaluated.[1]

**Risk to Species**
In addition to evaluating the technical feasibility of surveys, Survey and Manage taxa specialists and field biologists and botanists also evaluated the whether changing the survey schedule from FY 1999 to FY 2000 would substantially increase the risk to the long-term viability of each FY 1999 species (see FEMAT, Chapter IV, pp. 39-44; FSEIS, Appendix J2, pp. 2-3 for discussions of species viability). The specialists determined that for 68 of the 80 species, changing the survey schedule from FY 1999 to FY 2000 would not substantially increase the risk to species

---

[1] Note that this definition focuses on technical feasibility of surveying for the species based on what is known at a regional level. It does not address the operational feasibility for field units to conduct surveys or the workload of any particular field office. It does not address the rarity or the abundance of the species. It is probable that some species which have poor descriptions of their range and habitat or which appear irregularly (and are thus are "not technically feasible" to survey) are being found while surveying for other species.

viability.[2] However, the specialists did determine that changing the survey schedule would substantially increase the risk to the remaining 12 species[3] (see Appendices B and C).

**Feasibility of Surveys and Increment of Risk of Changing the Survey Schedule for 80 Survey and Manage Component 2 and Protection Buffer Species**

| Increment of Risk to Species | Survey Feasibility: *technically feasible* | Survey Feasibility: *not technically feasible* |
|---|---|---|
| *substantially increased* | 10 | 2 |
| *not substantially increased* | 30 | 38 |

[2] Note that this evaluation of risk does not represent a revised or formal viability analysis. However, it does represent a judgement by taxa specialists of the increment of risk to the long-term viability of the species from an additional year of projects prior to surveys. The specialists determined the increment of risk using professional expertise and experience, considering factors such as the species distribution, number and location of known sites, habitat requirements, other protections for the species, and planned activities in the species' habitat (see Appendix C).

[3] For 2 of these species for which a change in the survey schedule would substantially increase risk, surveys do not appear to be technically feasible at this time. Taxa specialists are currently working to develop feasible surveys that can be implemented for FY 1999 projects. If feasible surveys for these two species cannot be developed in time, project implementation may need to be delayed in the species' known or suspected habitat within the species' known or suspected range, or changes may need to be made in the Survey and Manage provisions for these species.

## THE FOREST SERVICE AND BLM PROPOSAL AND OPTIONS

If **no change** is made in the Survey and Manage provisions, surveys for all FY 1999 species must be completed prior to all ground-disturbing activities that will be implemented in FY 1999. This report considers the Agency Proposal and additional options for changing the implementation schedule.

**Option 1— The Forest Service and BLM Proposal** (the Agency Proposal) — is to change the survey schedule for some of the FY 1999 species, based on the technical feasibility of surveys and the increment of risk to the species. Specifically, the survey schedule would be changed from FY 1999 to FY 2000 for 38 species for which surveys are not technically feasible and for which there is not a substantially increased risk to the species from changing the survey schedule. For the remaining 42 species, surveys would be required prior to FY 1999 ground-disturbing activities.

**Option 2** is to change the survey schedule for some of the FY 1999 species, based only on the increment of risk to the species. Specifically, the survey schedule would be changed from FY 1999 to FY 2000 for 68 species for which there is not a substantially increased risk to the species from changing the survey schedule.

**Option 3** is to change the survey schedule from FY 1999 to FY 2000 for all 80 FY 1999 species. This option would keep together the species for which the ROD established a common survey schedule.

## ANALYSIS OF THE OPTIONS

If **no change** is made in the Survey and Manage provisions, surveys for the FY 1999 species must be completed prior to all ground-disturbing activities that will be implemented in FY 1999. However, given that surveys are not technically feasible for many species, surveys would not be completed before all ground-disturbing activities in FY 1999, and some planned projects would not be implemented.

Attempting to survey for many of these species despite the difficulties discussed above would consume a great deal of the time and energy of field personnel and the few taxonomic experts, and would do little to benefit the species because of our limited ability to locate these species in such surveys at this time. This expenditure of effort would detract from gaining habitat and life history information on these and other Survey and Manage species, and distract taxonomic experts from efforts to design management to maintain the viability of some of these species.

Without any change in the Survey and Manage provisions, some planned FY 1999 projects would not be able to proceed because of incomplete surveys. Based on initial estimates by field managers in the Forest Service and BLM, the inability to complete surveys would prevent the implementation of 40-50% of planned timber harvests, most prescribed burning, and some construction and repair of recreation sites in FY 1999.

**Option 1 (the Agency Proposal) — change the schedule for 38 species for which surveys are technically infeasible and there is not a substantially increased risk**

Changing the survey schedule to FY 2000 for 38 species would remove the requirement to survey for these species prior to FY 1999 ground-disturbing activities, which would reduce disruptions to planned FY 1999 activities. Under this option, the schedule for surveys would be changed only for species for which surveys are not technically feasible at this time and for which there is not a substantially increased risk to species' viability. However, surveys for the remaining 42 species would still constitute a considerable workload for the agencies. The agencies are currently asking field offices if this option would adequately reduce the survey workload in FY 1999 to avoid serious disruptions of resource programs.

Changing the survey schedule for 38 species could allow some loss of populations that would otherwise be protected. If the survey schedule is not changed, these populations would be protected simply because the inability to complete surveys would halt implementation of projects, not because pre-project surveys would likely have found these populations. However, based on the evaluation by the taxa specialists and field biologist and botanists, the change in schedule would not substantially increase the risk to these species beyond what had been anticipated in the SEIS for the NFP, and is highly unlikely to result in a loss of populations that would foreclose future management opportunities, such as moving the species to another Survey and Manage component.

**Option 2 — change the schedule for 68 species for which there is not a substantially increased risk**

Changing the survey schedule to FY 2000 for 68 species for which there is not a substantially increased risk would have somewhat similar effects to Option 1. Surveys would still be required for the 12 species for which a schedule change would substantially increase the risk to the species. However, surveys would not be required in FY 1999 for 68 species for which there would not be a substantially increased risk to the species from a schedule change (including 30 species for which surveys are technically feasible at this time).

Therefore, Option 2 would more effectively reduce disruptions to planned FY 1999 activities and more effectively reduce survey workload than would Option 1.

Changing the survey schedule for 38 species for which surveys are not technically feasible at this time and for which there is not a substantially increased risk would have effects similar to Option

1. In addition, changing the survey schedule for 30 species for which surveys are technically feasible at this time and for which there is not a substantially increased risk could potentially allow some loss of populations that would otherwise be protected. If the survey schedule is not changed, populations of these 30 species could be effectively found by pre-project surveys. However, based on the evaluation of the taxa specialists and field biologist and botanists, the change in schedule would not substantially increase the risk to these species beyond what had been anticipated in the SEIS for the NFP, and is highly unlikely to result in a loss of populations that would foreclose future management opportunities, such as moving the species to another Survey and Manage component.

Under Option 2, like Option 1, the agencies would also need to consider other changes to the Survey and Manage and Protection Buffer provisions.

**Option 3 — change the schedule for all 80 FY 1999 species**

Changing the survey schedule to FY 2000 for all FY 1999 species would remove the requirement to survey prior to FY 1999 ground-disturbing activities, which would eliminate disruptions to planned FY 1999 activities due to surveys. As discussed above under Option 1, surveys are not technically feasible at this time for 40 species. However, surveys are technically feasible for 40 other species. Under Option 3, surveys would not be required for any of these 80 species for FY 1999 projects.

Changing the survey schedule for 68 species for which there is not a substantially increased risk would have effects similar to Option 2. In addition, for 12 other species, changing the survey schedule could substantially increase the risk to the species. Failure to protect populations of these species which might have been found by surveying prior to ground-disturbing activities in FY 1999 projects could reduce future management opportunities for these species. Although extremely unlikely, such activities could inadvertently foreclose a future opportunity to protect sufficient populations of the species to have justified moving these species to other Survey and Manage components.

Under Option 3, like Option 1, the agencies would also need to consider other changes to the Survey and Manage and Protection Buffer provisions.

## RECOMMENDATION

The REO recommends adoption of **Option 1 (the Agency Proposal)**, which would change the survey schedule from FY 1999 to FY 2000 for 38 species for which surveys are not technically feasible at this time and for which there is not a substantially increased risk to species' viability from changing the survey schedule. This proposal best reflects the balance between resource production and healthy ecosystems that is the laid out in the NFP. This proposal prioritizes implementation of surveys relative to the estimated risk to species and will avoid serious

disruption of resource programs in FY 1999. However, without additional measures to address survey difficulties, disruption of projects beyond FY 1999 is likely. This change in schedule will allow the agencies more time to develop effective and technically credible surveys for FY 2000 projects and to consider changes in status for Survey and Manage and Protection Buffer species.

If **no change** is made in the survey schedule, agencies would not be able to conduct effective and technically credible surveys for some species in FY 1999 and, as a result, would experience serious disruption of resource programs with little benefit to the species.

**Option 2** prioritizes implementation relative to the estimated risk to the species and would avoid substantial disruption of resource programs. However, Option 2 does not require the most expeditious implementation of effective and technically credible surveys.

**Option 3** fails to prioritize implementation relative to the estimated risk to the species; it would forego surveys that are technically feasible at this time and would substantially increase the risk to 12 species.

**Long-term strategy**
Changing the survey schedule from FY 1999 to FY 2000 will not remove all of the difficulties in surveying for the 38 species for which surveys are not technically feasible at this time and for which there is not a substantially increased risk. In the next year, the agencies will make substantial progress in finalizing survey protocols and training personnel in taxonomy and survey protocols. However, the survey difficulties related to the species' taxonomy and life history are relatively intractable. In addition, for many species there is very little known about the species' range, distribution, habitat, and abundance. Therefore, in addition to changing the survey schedule from FY 1999 to FY 2000, the agencies will need to consider other changes to the Survey and Manage and Protection Buffer provisions. These changes might include moving Survey and Manage Component 2 species to other components; removing some species from the Survey and Manage list; or adjusting of the structure of the Survey and Manage strategy. For example, it is possible that some of the FY 1999 species, especially the Protection Buffer fungi, will be moved to Component 3 in the future: Component 3 was designed primarily for species whose characteristics make site and time-specific surveys difficult (ROD, Appendix C, pp. 5-6; Draft Meeting Notes on Intent of Survey and Manage Strategies in the ROD, 12/2/94), which appears to be the case for most of the Protection Buffer fungi.

The ROD explicitly anticipated that the agencies would have to change Survey and Manage provisions in the course of implementing the NFP, including changing the schedule, moving a species from one survey strategy to another, or dropping this mitigation requirement for any species whose status is determined to be more secure than originally projected. (ROD, p. 37). Such anticipated changes in the Survey and Manage provisions do not require NEPA analysis or plan amendment processes. However, other changes not anticipated in the ROD that would change the scope of resource uses or change the terms, conditions, and decisions in the Forest

Service and BLM land and resource management plans would be made only after appropriate NEPA analysis and plan amendment processes.

**CONTACTS**

Jay Watson, Regional Ecosystem Office, (503) 808-2178
Judy Nelson, BLM, (503) 952-6066
Arnie Holden, Forest Service, (503) 808-2272

This report was developed from evaluation provided by the taxa specialists, field biologists and botanists, and Core Group and REO members listed in Appendix E.

**REFERENCES**

Draft Meeting Notes on Intent of Survey and Manage Strategies in the ROD, December 2, 1994. [copy on file in the BLM Oregon/Washington State Office].

USDA Forest Service. March 1993. Viability Assessment and Management Considerations for Species Associated with Late-Successional and Old-Growth Forests of the Pacific Northwest: the Report of the Scientific Analysis Team [SAT Report].

USDA Forest Service, et al. July 1993. Forest Ecosystem Management: an ecological, economic, and social assessment [FEMAT]. Washington, D.C.: U.S. Government Printing Office.

USDA Forest Service and USDI Bureau of Land Management. February 1994. Final Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl.

USDA Forest Service and USDI Bureau of Land Management. April 1994. Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl.

## APPENDIX A — Survey and Manage Accomplishments

In November 1994 the RIEC chartered an Interagency Survey and Manage workgroup which still operates under the purview of the REO. An Intermediate Management Group with BLM, FS, FWS, and PNW regional level management representatives guides the workgroup. The main purpose of this workgroup is to develop the database on species locations, and to prepare management recommendations for component 1 and 2 species, survey protocols for component 2 species, and procedures for addressing components 3 and 4. The Protection Buffer species were added to the purview of this workgroup as the information needs were similar. The workgroup consists of approximately 50 agency experts and program managers in the various taxonomic groups. Three subgroups are addressing components 3 and 4 with more of a research approach to these more long-term and broad scale surveys.

Data on locations of all component 1 S&M species was collected widely during 1994-1995. Data from BLM, USFS and NPS agency files was collected and several experts were contracted to collect information from herbaria, museums, and private collections across the country which were thought to have the major holdings of northwest species. Nearly 8000 records of variable quality and precision were collected. Approximately 2000 records contained accurate location information and were therefore locatable sufficiently for project planning. A database containing this information was developed and sent to BLM and USFS field units for use in project planning and in management of these known sites if located in proposed project areas.

The data received varied considerably in quality from vague descriptions specific to mountains, trails, rivers, or even just name of the state; to legal descriptions broken into smaller units, though not usually finer than the 1/4 1/4 section (1/4 mile); to accurately located sites indicated by crossings or maps. As a main purpose of component 1 is to use the "known site" information to design or modify activities, the locational information needed to be known precisely enough to do this. The ROD (at page C-4) also suggested using a Geographic Information System (GIS) in this compilation effort. In order to spatially depict the site, points or boundaries of the site are needed. These were not generally available, especially from herbarium and museum records. The data was reviewed and located as finely as possible, including review of aerial photos and topographic maps to follow features identified on data sheets or collection labels. The categories in the "precision" field of the database were the same as used by the state heritage programs, with the two finest being to the second (approximately 150 ft.) and minute (approximately 1.5 miles) of latitude-longitude. It was determined that 1.5 miles was too indefinite an area to use to plan projects, thus the sites known to approximately 150 ft. were identified as "known sites". For species where fewer than ten sites were known, all sites were considered "exception" sites and were identified as "known sites" for protection. It was considered that losing these sites, even though broadly identified, could be harmful to species persistence. The Known Site Database v. 1.0 was transmitted to the field July 5, 1995 and consisted only of the sites considered as "known sites" by the above criteria in such a way that points could be put onto local GIS themes for project planning.

All data collected of any precision was compiled and included in the Known Sites Database v. 2.0 which was transmitted to the field on May 28, 1997.

Difficulties in keeping the database up-to-date for all field units as well as the inability to sort some kinds of data in the "Known Sites Database" stimulated development of a more widely useful database. This project is called the Interagency Species Management System (ISMS) and is designed to store all species-specific data at a central point accessible in real-time by both BLM and USFS field staff. Development is nearly completed on this system and a calendar year 1998 release to the field is expected. Data very similar to that collected for the Known Sites Database will be managed in ISMS on all Survey and Manage component 1 and 2 species. Although the database will be stored centrally, GIS coverages will be maintained locally due to the technical complexity of central storage of GIS coverages. It will be uploaded periodically at a regional level.

To facilitate information exchange and dissemination within the BLM, an IntRAnet site has been established including many aspects of the Northwest Forest Plan. The various planning documents (FEMAT, ROD & S&Gs) are basic to the site. It also contains all BLM memoranda pertaining to survey and manage, as well as copies of all Management Recommendations (MRs) and Survey Protocol documents soon after they are officially transmitted to the field. An information exchange section includes an opportunity for field offices to post information which will facilitate field implementation of S&M requirements.

The workgroup gathered the known information on each of the approximately 400 species and prepared drafts of management recommendations. These documents are probably the most complete single source of information on most of these species. Completed management recommendation documents on 163 bryophytes, fungi species and red tree vole have been sent to the field for implementation and review. Management recommendations for approximately 95 species of vascular plants, lichens, mollusks, and amphibians are in review or revision status at this time and will be released to the field soon.

Survey protocols for Component 2 species have been developed by the same team members developing the management recommendations. Survey protocols for the great gray owl, five amphibians, and red tree vole were prepared and distributed to the field in time to initiate surveys in 1995 (for great gray owl) and prior to 1997 ground-disturbing activities as identified in the ROD. Fourteen protocols for bryophytes and lichens have been transmitted to the field. Forty-four protocols for mollusks have been prepared and drafts were distributed in training sessions, but questions on the feasibility of implementing the protocols has delayed transmittal of them to the field. The protocol for one component 2 fungus has been prepared and is awaiting transmittal to the field. The 15 vascular plant protocols are in preparation and will follow the existing methods now commonly used by agency botanists in surveys for agency sensitive species.

In the process of researching the S&M species, justifications to move species among components, and to correct errors in the S&Gs were also prepared. These followed the process identified on page C-6 for modification, or agency regulations for correcting minor errors. These included *Arceuthobium tsugense* ("hemlock dwarf mistletoe"), lynx, *Buxbaumia piperi*, and the "understory and forest gap herbivores" guild of arthropods.

Three vascular plants and some fungi have been determined to not be in need of this mitigation. Justifications to remove these species from the S&M mitigation are in preparation. One component 2 fungus species has been determined to be inappropriately placed in Component 2 and justification for moving this species to component 3 is in progress.

Subgroups focusing on component 3 and 4 species of bryophytes, lichens, and fungi have prepared a plan of work and are surveying for these species starting with those for which there appears to be the greatest risk. Researchers at PNW and PSW have developed and initiated general regional surveys for two of the arthropod guilds.

In addition to the above efforts, an Interagency Bryologist-Lichenologist and an Interagency Regional Mycologist were hired to direct the component 3 and 4 survey efforts for those taxa, to provide technical advice to the agencies, and training to field staff. The Bryologist, Mycologist, and mollusk and amphibian subgroups have conducted training throughout the region and provide identifications and technical advice to field personnel in addition to their document preparation efforts.

Through the work of both the Survey and Manage regional level workgroup and the surveys of field staff, many new sites of species in all components have been found since 1995.

## APPENDIX B — Summary of Species Evaluation by Taxa Specialists and Field Biologists and Botanists

| Scientific Name | Common Name | Taxonomic Group |
|---|---|---|
| **Technically Feasible/Substantially Increased Risk** | | |
| *Bridgeoporus nobilissimus* | Noble polypore | FUNGI |
| *Hypogymnia duplicata* | rare leafy lichen | LICHEN |
| *Lobaria linita* | rare nitrogen-fixing lichen | LICHEN |
| *Pseudocyphellaria rainierensis* | rare nitrogen-fixing lichen | LICHEN |
| *Ptilidium californicum* | liverwort | BRYOPHYTE |
| *Oreohelix* n.sp. | Chelan mountain snail | MOLLUSK |
| *Hemphillia pantherina* | Panther jumping-slug | MOLLUSK |
| *Coptis trifolia* | Threeleaf goldthread | VASCULAR PLANT |
| *Cypripedium montanum* (west Cascades) | Mountain lady's slipper | VASCULAR PLANT |
| *Habenaria orbiculata* | Round-leaved orchid | VASCULAR PLANT |
| **Not Technically Feasible/Substantially Increased Risk** | | |
| *Tritomaria exectiformis* | liverwort | BRYOPHYTE |
| *Pristiloma arcticum crateris* | Crater Lake tightcoil | MOLLUSK |
| ***Technically Feasible/Not Substantially Increased Risk*** | | |
| *Ulota meglospora* | moss | BRYOPHYTE |
| *Cryptomastix devia* | Puget oregonian | MOLLUSK |
| *Cryptomastix hendersoni* | Columbia oregonian | MOLLUSK |
| *Helminthoglypta hertleini* | Oregon shoulderband | MOLLUSK |
| *Helminthoglypta talmadgei* | Klamath shoulderband | MOLLUSK |
| *Megomphix hemphilli* | Oregon Megomphix | MOLLUSK |
| *Monadenia chaceana* | Siskiyou sideband | MOLLUSK |
| *Monadenia churchi* | Church's sideband | MOLLUSK |
| *Monadenia fidelis minor* | Dallas sideband | MOLLUSK |
| *Monadenia troglodytes* | Shasta sideband | MOLLUSK |
| *Monadenia troglodytes wintu* | Wintu sideband | MOLLUSK |
| *Trilobopsis roperi* | Shasta chaparral | MOLLUSK |
| *Trilobopsis tehamana* | Tehama chaparral | MOLLUSK |
| *Vertigo* n.sp. | Hoko vertigo | MOLLUSK |
| *Hemphillia malonei* | Malone jumping-slug | MOLLUSK |
| *Fluminicola seminalis* | Nugget pebblesnail | MOLLUSK |

| | | |
|---|---|---|
| *Lyogyrus* n.sp. 2 | Masked duskysnail | MOLLUSK |
| *Vorticifex klamathensis sinitsini* | Sinitsin rams-horn | MOLLUSK |
| *Allotropa virgata* | Sugar stick | VASCULAR PLANT |
| *Aster vialis* | Wayside aster | VASCULAR PLANT |
| *Bensoniella oregana* | Bensoniella | VASCULAR PLANT |
| *Botrychium minganense* | Mingan moonwort | VASCULAR PLANT |
| *Botrychium montanum* | Mountain grape-fern | VASCULAR PLANT |
| *Clintonia andrewsiana* | Redwood beadlily | VASCULAR PLANT |
| *Coptis asplenifolia* | Spleenwort-leaved goldthread | VASCULAR PLANT |
| *Corydalis aquae-gelidae* | Cold-water corydalis | VASCULAR PLANT |
| *Cypripedium fasciculatum* (Klamath) | Clustered lady's slipper | VASCULAR PLANT |
| *Galium kamtschaticum* | Boreal bedstraw | VASCULAR PLANT |
| *Pedicularis howellii* | Howell's lousewort | VASCULAR PLANT |
| *Scoliopus biglovei* | Bigelow's adder's tongue | VASCULAR PLANT |

## Not Technically Feasible/Not Substantially Increased Risk

| | | |
|---|---|---|
| *Bondarzewia montana* | Bondarzew's polypore | FUNGI |
| *Aleuria rhenana* | Stalked orange peel fungus | FUNGI |
| *Otidea leporina* | Rabbit ears | FUNGI |
| *Otidea onotica* | Rabbit ears | FUNGI |
| *Otidea smithii* | Rabbit ears | FUNGI |
| *Polyozellus multiplex* | Blue/black chanterelle | FUNGI |
| *Sarcosoma mexicana* | Giant gel cup | FUNGI |
| *Diplophyllum plicatum* | liverwort | BRYOPHYTE |
| *Kurzia makinoana* | liverwort | BRYOPHYTE |
| *Marsupella emarginata* var. *aquatica* | liverwort | BRYOPHYTE |
| *Brotherella roellii* | moss | BRYOPHYTE |
| *Buxbaumia viridis* | moss | BRYOPHYTE |
| *Rhizomnium nudum* | moss | BRYOPHYTE |
| *Schistostega pennata* | moss | BRYOPHYTE |
| *Tetraphis geniculata* | moss | BRYOPHYTE |
| *Vespericola pressleyi* | Pressley heperian | MOLLUSK |
| *Vespericola shasta* | Shasta hespian | MOLLUSK |
| *Deroceras hesperium* | Evening fieldslug | MOLLUSK |
| *Hemphillia barringtoni* | Keeled jumping-slug | MOLLUSK |
| *Hemphillia glandulosa* | Warty jumping-slug | MOLLUSK |
| *Prophysaon coeuleum* | Blue-gray tail-dropper | MOLLUSK |
| *Prophysaon dubium* | Papillose tail-dropper | MOLLUSK |
| *Fluminicola* n.sp. 1 | Klamath pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 2 | Tall pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 3 | Klamath Rim pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 11 | Fredenburg pebblesnail | MOLLUSK |

| | | |
|---|---|---|
| *Fluminicola* n.sp. 14 | Potem pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 15 | Flat-top pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 16 | Shasta pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 17 | Disjunct pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 18 | Globular pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 19 | Umbilicate pebblesnail | MOLLUSK |
| *Fluminicola* n.sp. 20 | Lost Creek pebblesnail | MOLLUSK |
| *Juga (Oreobasis)* n. sp. 2 | Basalt juga | MOLLUSK |
| *Juga (Oreobasis)* n. sp. 3 | Cinnamon juga | MOLLUSK |
| *Lyogyrus* n.sp. 1 | Columbia duskysnail | MOLLUSK |
| *Lyogyrus* n.sp. 3 | Canary duskysnail | MOLLUSK |
| *Vorticifex* n.sp. 1 | Knobby rams-horn | MOLLUSK |

## APPENDIX C — DRAFT Summary of Increment of Risk to Species

*Initial Findings Pending Further Input and Review*

| scientific name | Substantially Increased Risk? yes | no | Comments |
|---|---|---|---|
| **TECHNICALLY FEASIBLE/ SUBSTANTIALLY INCREASED RISK** | | | |
| Bridgeoporus nobilissimus | X | | Known from only seven sites |
| Hypogymnia duplicata | X | | Appears to be rare; most sites in northwestern WA. Only 4 of the 18 known sites are in OR. Very infrequently found despite many surveys (7/1375 plots, though plots not necessarily in appropriate habitat for this species). |
| Lobaria linita | X | | Limited distribution, restricted habitat particularly from the Gifford Pinchot NF and south into northern CA. Of 40 known sites, most are in northwestern WA. Despite surveys for the species, new sites have been found (0/1375 plots, though plots not necessarily in appropriate habitat for this species). |
| Pseudocyphellaria rainierensis | X | | Restricted, patchy distribution. It is now considered rare, but has recently had a southern range extension. With little known sexually reproductive populations, there is concern about the possibility of losing additional sexually reproductive populations. It has a strong affiliation with old growth. |
| Ptilidium californicum | X | | Only one known site |
| Oreohelix n.sp. | X | | Most known sites were destroyed by Tyee fire |
| Hemphillia pantherina | X | | Only one known site, other populations would be necessary to ensure viability |
| Coptis trifolia | X | | Rare, narrow, hydrologically-dependent habitat zone |
| Cypripedium montanum (west Cascades) | X | | Only four known sites, consisting of less than ten plants<br>Is not on the FS's sensitive species list although does receive some inventory as a BLM special status species |
| Habenaria orbiculata | X | | Occurs in many areas slated for salvage sale and commercial thinning |

| | | | |
|---|---|---|---|
| NOT TECHNICALLY FEASIBLE/SUBSTANTIALLY INCREASED RISK | | | |
| Tritomaria exectiformis | X | | Based on expected timber harvest on Deschutes National Forest, fuel and forest health treatments |
| Pristiloma arcticum crateris | X | | Only two known sites |
| TECHNICALLY FEASIBLE/ NOT SUBSTANTIALLY INCREASED RISK | | | |
| Ulota meglospora | | X | Broad distribution, no problem delaying for one year |
| Cryptomastix devia | | X | populations found in both 50-60 year old and old-growth stands |
| Cryptomastix hendersoni | | X | It's not an old-growth forest related species, grazing has more potential impact than logging, road construction has potential for adverse impacts |
| Helminthoglypta hertleini | | X | Not unless there is road construction through habitat or rock removed from quarry areas |
| Helminthoglypta talmadgei | | X | Riparian reserves offer some protection |
| Megomphix hemphilli | | X | Much habitat in riparian reserves |
| Monadenia chaceana | | X | Habitat generalist |
| Monadenia churchi | | X | Not unless there will be disturbance of rock or road construction |
| Monadenia fidelis minor | | X | Not unless there will be road construction or grazing |
| Monadenia troglodytes | | X | Not unless there will be disturbance of rock or road construction |
| Monadenia troglodytes wintu | | X | Not unless there will be disturbance of rock or road construction |
| Trilobopsis roperi | | X | Not unless there will be disturbance of rock or road construction<br>Large scale prescribed burning could have adverse impact |
| Trilobopsis tehamana | | X | Not unless there will be disturbance of rock or road construction<br>Large scale prescribed burning could have adverse impact |
| Vertigo n.sp. | | X | |
| Hemphillia malonei | | X | Well distributed, few activities in known range |
| Fluminicola seminalis | | X | Riparian reserves and ACS should reduce risks |
| Lyogyrus n.sp. 2 | | X | Riparian reserves and ACS should reduce risks |

| | | | |
|---|---|---|---|
| Vorticifex klamathensis sinitsini | | X | Riparian Reserves and ACS would reduce risks to acceptable levels. Habitat in large streams and rivers. |
| Allotropa virgata | | X | Sensitive species surveys will pick up known sites on most administrative units<br>Currently not on state sensitive species list, hence no state concerns<br>Non-regeneration harvest may not impact populations |
| Aster vialis | | X | Many FY99 sales have already been surveyed<br>Species is currently surveyed for under BLM's special status plant program<br>Umpqua National Forest may have some habitat, may need to be added to Regional Forester's (sensitive species?) list |
| Bensoniella oregana | | X | Would receive some protection from ACS and presence in riparian reserves<br>Species would receive surveys due to presence on sensitive species list for R-5, R-6 and BLM special status species list for OR |
| Botrychium minganense | | X | Abundant in WA<br>In OR and south, most known sites are in LSRs or congressionally withdrawn areas<br>Occurs in riparian reserves and wet meadows which receive protection<br>Receives some inventory from being on the FS's sensitive plant list and BLM's special status plant list |
| Botrychium montanum | | X | Many sites may be protected under other land use allocations such as riparian reserves<br>In OR it is listed on the BLM and R-6 sensitive species lists<br>No protection in WA under special status or sensitive plant program |
| Clintonia andrewsiana | | X | Found in a land base with very little management of an intensive nature |
| Coptis asplenifolia | | X | Present on FS R-6 list as sensitive, not suspected on BLM lands |
| Corydalis aquae-gelidae | | X | Usually protected by riparian reserves, will be surveyed for as a sensitive species in both OR and WA |
| Cypripedium fasciculatum (Klamath) | | X | One year delay will not jeopardize viability<br>BLM and OR/WA FS survey for this species with their sensitive plant surveys.<br>CA plans to add it to their list next year. |

| | | | |
|---|---|---|---|
| Galium kamtschaticum | | X | Receives some inventory from being on the FS's sensitive species and BLM's special status species lists, viability is not a concern on Mt. Baker-Snoqualmie National Forest (MBSNF)<br>May be at risk from riparian enhancement projects outside of the MBSNF, however, few projects are expected to occur in its habitat |
| Pedicularis howellii | | X | Most occurrences are within relatively restrictive land allocations (LSR, wilderness), ACS affords some protection |
| Scoliopus biglovei | | X | Found in a land base with very little management of an intensive nature |
| **NOT TECHNICALLY FEASIBLE/NOT SUBSTANTIALLY INCREASED RISK** | | | |
| Bondarzewia montana | | X | Little increase in risk from one year delay<br>Depends on how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |
| Aleuria rhenana | | X | Little increase in risk with a single year delay<br>Depends on whether species is dependent on late-seral habitat, how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |
| Otidea leporina | | X | Little impact from a one year delay<br>Depends on whether or not the species is dependent on late-seral habitat, how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |
| Otidea onotica | | X | Little risk from one year delay<br>Depends on whether or not the species is dependent on late-seral habitat, how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |

| | | | |
|---|---|---|---|
| Otidea smithii | | X | May increase risk because there are few known sites, BUT may be appropriate to drop survey requirement due to annual variability necessitating multi-year surveys Depends on whether or not the species is dependent on late-seral habitat, how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |
| Polyozellus multiplex | | X | Species is widespread and risk is unlikely to increase Depends on whether or not the species is dependent on late-seral habitat, how much of timber harvest occurs in old growth fragments in LSR and matrix, and on how the current level of habitat fragmentation will affect the species demographics |
| Sarcosoma mexicana | | X | Species is well-distributed, delay won't increase risk to species |
| Diplophyllum plicatum | | X | overlap with marbled murrelet range will provide protection during one year delay |
| Kurzia makinoana | | X | range overlaps with marbled murrelets which will provide some protection during a one year delay |
| Marsupella emarginata var. aquatica | | X | Riparian reserves and ACS afford protection, species always found in water, existing known site is protected |
| Brotherella roellii | | X | Due to many new locations including a broadening of habitat to large alder trees, it is expected to be more common than originally thought thus not adversely impacted by an additional year of activities without survey. |
| Buxbaumia viridis | | X | It is likely that the coarse woody debris left in LSRs will contribute to protection of this species, thus, one more year without survey is not expected to substantially increase the risk to the species. |
| Rhizomnium nudum | | X | Well distributed in northern portion of range (30 sites in northwestern WA, 2 in OR and 1 in CA In OR and CA it is in coastal locations where it should be protected by LSRs and protections for marbled murrelet. |
| Schistostega pennata | | X | risk is acceptable/minimal due to existing LSRs, low number of actions in old-growth, and receives some protection through National Cave Protection Act |
| Tetraphis geniculata | | X | Some loss of populations, but should be O.K. within existing LSRs due to association with large coarse woody debris |

| | | | |
|---|---|---|---|
| Vespericola pressleyi | | X | Strong riparian association, large scale prescribed burning could have some impact |
| Vespericola shasta | | X | Strong riparian association, large scale prescribed burning could have some effect |
| Deroceras hesperium | | X | |
| Hemphillia barringtoni | | X | Much of range already modified, some sites in LSRs and national park |
| Hemphillia glandulosa | | X | Some sites in national park |
| Prophysaon coeruleum | | X | |
| Prophysaon dubium | | X | Wide distribution, though rare, single year shouldn't affect a significant number of sites given their wide distribution and the number of new sites found since the ROD--probably more than doubled the known sites |
| Fluminicola n.sp. 1 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 2 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 3 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 11 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 14 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 15 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 16 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 17 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 18 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 19 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Fluminicola n.sp. 20 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |
| Juga (Oreobasis) n. sp. 2 | | X | Riparian reserves and ACS likely to reduce risks |
| Juga (Oreobasis) n. sp. 3 | | X | Riparian reserves and ACS likely to reduce risks |
| Lyogyrus n.sp. 1 | | X | Riparian reserves and ACS likely to reduce risks |
| Lyogyrus n.sp. 3 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |

| | | | |
|---|---|---|---|
| Vorticifex n.sp. 1 | | X | Riparian reserves and ACS likely to reduce risks to an acceptable level |

## APPENDIX D — Questionnaire to Taxa Specialists and Field Biologists and Botanists

Date: ______________ Species Name: ______________________

Taxonomic Group: ______________________

Participants: ________________________________________

________________________________________

### ANALYSIS OF SPECIES FOR PROPOSED CHANGE IN SURVEY SCHEDULE

The object of this analysis is to identify which of the Component 2 Survey and Manage species (C-4, Table C-3) and the Protection Buffer species (C-19 - C-20 and C-26 -C-28) may be appropriate to propose for a schedule change. Some of the questions will also seek to identify species which should receive further analysis for a possible move to a different survey strategy or to drop from the list.

For each species, please provide answers to the following questions, providing additional information or rationale if the "yes" or "no" answer is not as complete as you believe necessary. Use the additional information sheets provided.

1. A.) Is there an officially transmitted* protocol available to use to survey for this species in preparation for ground disturbing activities implemented in FY 1999? ____Yes ____No

   * An "officially transmitted" protocol is one sent by the REO under a transmittal letter signed by FS and BLM executives. Officially transmitted protocols are intended for field use under Survey Strategy 2 (Component 2) for projects, and for field testing and comment to provide basis for protocol review and possible revision. The transmittal letters instructed that deviation from the protocol is allowed if the rationale is documented.

   B.) Is there a commonly used, professionally accepted, method available to use to survey for this species for FY 99 projects? ____Yes ____No

   C.) Is there a protocol which has not been officially transmitted but is available to use to survey for this species for FY 99 projects, (for example, a draft protocol distributed at training session)? ____Yes ____No

2. A.) Is there a taxonomic description available for identification of this species <u>in the field</u>? ____Yes ____No

B.) Do the agencies have sufficient personnel (employees or contractors) who can reliably identify this species in the field in time to prepare for FY 99 projects? ____Yes ____No

3. A.) Is this species' habitat known well enough to target surveys so that there is a high likelihood of finding the species? ____Yes ____No

B.) Is this species' range known well enough to target surveys so that there is a high likelihood of finding the species? ____Yes ____No

C.) Is the species' life history such that finding the species' location may take several or many years, thus not be feasible to do for FY99 projects? ____Yes ____No

Does a "No" answer to 3 A, B, or C suggest that it may be appropriate to further analyze the species, perhaps to move the species' Survey Strategy from Component 2 to Component 3 or 4 in order to acquire information through extensive or general regional surveys to better specify the species' habitat and/or range? ____Yes ____No

4. Given what we know and don't know about this species and its habitat, consider the risk to this species of an additional year of management projects like those conducted in FY 1997 or 1998. Do you believe that there would be a substantially increased risk to the species if the schedule requiring surveys before ground-disturbing projects were changed from FY 1999 projects to FY 2000 projects?

If you perceive a substantial risk, please describe the nature and extent of the risk to the species and the factors that you considered. If you do not foresee a substantial risk, please indicate what factors support your judgement.

5. A. Does known information and survey results so far indicate that the species is likely to be much more common or more secure than previously thought? ____Yes ____No

B. If "Yes", do you believe it would be appropriate to explore:
____moving the species to a different survey strategy;
____changing the management recommendations;
____preparing a conservation strategy in lieu of management recommendations; and/or
____dropping the survey and manage mitigation requirement for this species?

Thank you.

## APPENDIX E — Taxa Specialists and Field Biologists and Botanists

**Mollusks**

| | |
|---|---|
| Joseph Furnish | Wildlife Biologist, USFS Region 5 |
| Roger Monthey | Wildlife Biologist, BLM Salem District |
| Paul Jeske | Natural Resource Specialist, BLM Salem District |
| Tom Burke | Wildlife Biologist, USFS, Wenatchee NF |
| Dave Kennedy | Wildlife Biologist, USFS, Mt. Hood NF |

**Bryophytes**

| | |
|---|---|
| Nancy Fredricks | Botanist, Gifford Pinchot NF |
| Robin Lesher | Ecologist, Mt. Baker-Snoqualmie NF |
| Judy Harpel | Regional Bryologist-Lichenologist, Gifford Pinchot NF |
| John Davis | Fish and Wildlife Biologist, US FWS, Oregon State Office |

**Lichens**

| | |
|---|---|
| Linda Geiser | Botanist, Siuslaw NF |
| Chiska Derr | Botanist, USFS Mt. St. Helens National Monument |

**Fungi**

| | |
|---|---|
| Thomas O'Dell | Regional Mycologist, USFS Pacific Northwest Research Station, Corvallis |

**Vascular Plants**

| | |
|---|---|
| Nancy Wogen | Ecologist, BLM Eugene District |
| Joan Seevers | Botanist, BLM Medford District |
| Lisa Hoover | Botanist, Six Rivers NF |
| Laura Potash | Botanist,Mt. Baker-Snoqualmie NF |
| Sally Claggett | Botanist, Gifford Pinchot NF |

**Core Group Members conducting Supplemental Analysis**

| | |
|---|---|
| Robin Bown | Wildlife Biologist, USFWS, Oregon State Office |
| Sarah Madsen | Wildlife Biologist, USFS Region 6 |
| Cheryl McCaffrey | Botanist, BLM Oregon State Office |
| Jay Watson | Environmental Specialist, Regional Ecosystem Office (USFWS) |

United States Department of Agriculture

Forest Service

## FAX TRANSMITTAL COVER SHEET

DATE: 8/18/98

TIME: 2:10 pm

TO: Mike Tripp/Brenda Woodard - UMP

FAX NO.: Herb Wick - WIL

TELEPHONE NO.: Fred Dom - GIP

TOTAL NO. PAGES: 14
(Including Transmittal Sheet)

FROM: ONRC Action v. USFS

U.S. FOREST SERVICE
PACIFIC NORTHWEST REGION
PLANNING & ENVIRONMENTAL AFFAIRS

SUSAN M. ZIKE
ATTORNEY
FOIA & LITIGATION

ROBERT DUNCAN PLAZA
333 SW FIRST AVENUE
PORTLAND, OR 97208-3623

P.O. BOX 3623
TEL: (503) 808-2257
FAX: (503) 808-2255

TELEPHONE NO.:

MESSAGE:

Attached is draft DOJ ltr to plaintiff's atty. Note last sentence of 1st ¶ on 2nd page. Are you willing to ~~[illegible]~~ notify the bidders before you open bids? [redacted] WIL [redacted]. Need to hear from GIP. There is no reason -YET- to plan on delaying award of the USFS sales. We'll know more after the 8/17 meeting between DOJ & ONRC attys.

If you do not receive all pages, please call back as soon as possible

Let me know - FRED! 503-808-2257

Sue

PS. OGC memo is attached that DOJ based its sentence on. RO-NR sent this out late last week.

PLAINTIFF'S EXHIBIT
35A
1-4-07 Zike

SCOTTII00025

U.S. Department of Justice

Environment and Natural Resources Division

EAB
90-1-4-09179
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663

Telephone (202) 305-0504
Facsimile (202) 305-0506

Draft

July 31, 1998

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Via Fax: 541-485-2457

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Michael:

This is in response to your letters of July 27 and 28, 1998, which identified 32 timber sales that your clients believe do not comply with the Northwest Forest Plan and are scheduled for auction before a settlement meeting can be arranged. There appears to be a significant discrepancy between the timber sale information that you provided and the agency information. In the interest of settlement, and subject to Rule 408 of the Federal Rules of Evidence, we are providing the following information. Further, we propose a meeting during the week of August 17, 1998 to discuss your complaint, your concerns regarding these timber sales and your clients' settlement proposal.

Of the seven BLM timber sales identified, it appears that three BLM timber sales have been auctioned but not yet awarded. (See timber sale list attached) Two of these sales, North Murphy and West Botkin, have been appealed and the award withheld pending resolution of the appeal. There was no appeal of Slippery Moose and the award is pending. The four remaining timber sales will not reach an auction date until after the week of August 17, allowing time to reconsider that auction in light of a meeting. We have no information indicating that your clients have appealed any of these BLM timber sales. Nevertheless, in the interest of facilitating settlement discussions, the BLM is prepared to postpone the award of the identified timber sales through the week of August 17, 1998. Further, BLM will notify bidders on the three timber sales scheduled for auction in August that these timber sales have been identified in connection with this lawsuit.

Of the 25 Forest Service timber sales identified, three are scheduled for auction in late August and only Lois is scheduled for auction during the week of August 17. However, timber sales

that you refer to as "L. Horse Peak" and "Yaka Guard" may refer to sales that have been auctioned or awarded. The remaining sales should not interfere with a meeting during the week of August 17 either because no final decision has been made, any advertisement or auction would occur later, or the Forest Service has no plans to offer the timber for sale. In the interest of facilitating settlement discussions, the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales have been identified in connection with this lawsuit.

Please confirm that we have identified the relevant timber sales and an appropriate week for settlement discussions. In order for us to have a productive meeting, we request that you provide us with a settlement offer by August 10, 1998. This will allow the Forest Service and BLM sufficient time to provide a carefully considered response.

Sincerely,

Edward A. Boling
John Watts
Trial Attorneys

cc: Owen Schmidt
Roger Nesbit

pre-rod sales

__Bureau of Land Management__

| Sale | District | Status |
|---|---|---|
| Deer Mom | Medford | In 15 day protest period beginning with advertisement on 7/29/98. If no protest, auction on 8/27/98. |
| Bummer Swamp 1 | Salem | In 15 day protest period beginning with advertisement on 7/31/98. If no protest, auction on 8/26/98. |
| Jones 25 | Coos Bay | Advertisement on 8/6/98 will begin 15 day protest period. If no protest, auction on 8/28/98. |
| Remote Control | Coos Bay | Advertisement on 8/6/98 will begin 15 day protest period. If no protest, auction on 8/28/98. |
| North Murphy | Medford | Sold, award withheld pending resolution of IBLA appeal. |
| Slippery Moose | Salem | Sold 7/29/98, award pending. |
| West Botkin | Salem | Sold 7/29/98, award withheld pending resolution of IBLA appeal. |

__Forest Service__

| Sale | Forest | Status |
|---|---|---|
| Lois Timber Sale | Willamette | Auction scheduled for 8/19/98, award 30 to 60 days after auction. |
| Lost Creek Thin | Umpqua | Auction scheduled for 8/26/98, award 5 days after auction. |
| Heli-Tower | G.Pinchot | Advertised 7/31/98 for auction 8/31/98. |
| Little River Demo | Umpqua | In NMFS consultation, ~~no decision~~ or advertisement date. |
| Jefferson Heli | Klamath | In NEPA review, no decision has been made. |
| Upper South Fork Salmon | Klamath | Advertisement 9/7/98 for auction 10/7/98 and award up to 30 days after auction. |
| Collins Hazard | Klamath | Decision due on 9/10/98, advertise on 9/14/98 for auction 9/29/98 and award up to 30 days after auction. |
| Jolt Heli Salvage | Klamath | Decision due on 9/10/98, advertise on 9/14/98 for auction 9/29/98 and award up to 30 days after auction. |
| Jack Heli | Klamath | In appeal period. If no appeal by ?/?/98, advertise on 8/25/98 for auction on 9/22/98 and award up to |

| | | |
|---|---|---|
| | | 30 days after auction. |
| Little Horse Research | Klamath | Awarded 6/15/98. |
| Blue Canyon YG Thin | Klamath | Advertisement planned for 2/99, auction 3/99, award 4/99. |
| Bars ~~Jefferson~~ | Mt. Hood | 3/13/98 decision, appeal denied 3/7/98? No advertisement date. |
| Batwing | Mt. Hood | 3/13/98 decision, appeal denied ?/?/98? No advertisement date. |
| Bear Cub | Mt. Hood | 3/16/98 decision, appeal denied ?/?/98? No advertisement date. |
| Burnt Granite | Mt. Hood | 7/29/93 decision, no plans to advertise. |
| Misc. Salvage | Mt. Hood | No such sale. This has been removed from 6 month list. |
| Bonanza II | Mt. Hood | 5/24/93 decision, no plans to advertise. |
| Break | Mt. Hood | 12/23/93 decision, no plans to advertise. |
| Mt. Defiance | Mt. Hood | 7/20/98 decision, still in appeal period. No advertisement date. |
| Ringo | Mt. Hood | 6/27/96 decision. No advertisement date. |
| Solo | Mt. Hood | In NEPA comment period, no decision has been made. |
| Tarzan | Mt. Hood | In NEPA comment period, no decision has been made. |
| Abbott Salmon | Mt. Hood | No such timber sale. Plaintiffs may mean Abbott Road or Salmon Curves: |
| Abbott Road | Mt. Hood | Advertised 7/27/98 for auction 9/11/98. |
| Salmon Curves | Mt. Hood | No advertisement date. |
| Yaka Guard | Mt. Hood | No such timber sale. Plaintiffs may mean Yaka or Yaka 22/23: |
| Yaka | Mt. Hood | Awarded 5/15/98. |
| Yaka 22/23 | Mt. Hood | Auctioned 7/17/98, award pending. |
| Cowpoke | Mt. Hood | No advertisement date. |

USDA

United States Department of Agriculture
Office of the General Counsel
Pacific Region
San Francisco Office

33 New Montgomery, 17th Floor
San Francisco, CA 94105-4511
415-744-3162; FAX 415-744-3170
Internet: robert.simmons@usda.gov

July 29, 1998

SENT VIA FAX ONLY

TO: G. Lynn Sprague (415) 705-1109
Regional Forester
Pacific Southwest Region

Robert W. Williams (503) 808-2210
Regional Forester
Pacific Northwest Region

FROM: Robert M. Simmons
Regional Attorney

SUBJECT: *Oregon Natural Resources Coalition v. Forest Service*
Civil No. C98-942WD

Attached is a copy of two notices we have received from the Western Environmental Law Center. The notices identify sales on the Klamath and Mt. Hood NFs that are sales of concern to the plaintiffs in terms of their belief that the forests have not complied with the Northwest Forest Plan in preparing those sales. As I understand it, plaintiffs contend that the Forest Service has not complied with the survey and manage requirement of the Northwest Forest Plan.

The Department of Justice has asked several questions regarding these sales. The questions are: (1) what is the decision status of the sales; (2) what surveys and NEPA work has been done on the sales: (3) what is the agency response with regard to these sales, and are there any special factors (salvage) that need to be considered in regard to these sales; and (4) did any of the 13 plaintiffs in the lawsuit participate in the NEPA process for these sales or in an administrative appeal of these sales. For the initial list of five sales, DOJ asked for the information by Thursday, July 30. We have a conference call with DOJ scheduled for tomorrow, and hope to get a revised date for all of these sales at that time. However, you should start to prepare the answers, as I am sure DOJ will want the information by early next week at the latest.

Should you proceed with the auction of these sales, you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs, and that, if this is not acceptable to the bidders, they should withdraw their bid at that time. All bidders should be given the opportunity to withdraw their bid simply because of the litigation. Finally, you should take action to make sure that the appropriate language is in the contract.

As indicated in the new case memo from Kathryn Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6. To facilitate communication with OGC and with DOJ, and help assure a consistent approach to the litigation, it would be helpful if there were a single point of contact for the Forest Service for activities in both regions. Please let me know if this approach is acceptable. If it isn't, please designate a contact for Region 5.

cc: Mike Lee, Klamath National Forest (530) 842-6327
Roberta Moltzen, Mt. Hood National Forest (503) 668-1423
Owen Schmidt (503) 326-3807
Kathryn Toffenetti (202) 690-2730
Sue Zike (503) 808-2255

*UNITED STATES DEPARTMENT OF JUSTICE*
*ENVIRONMENT and NATURAL RESOURCES DIVISION*
*GENERAL LITIGATION SECTION*

U.S POSTAL MAILING ADDRESS
P. O. Box 663
Washington, D.C. 20044-0663

FED EX/HAND DELIVERIES
601 Pennsylvania Ave., N. W.
Suite 854
Washington, D.C. 20004

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If you have received this transmission in error, please notify us by telephone.

FAX NO. (202) 305-0506 OR (202) 305-0267
VOICE NO. (202) 305-0504

DATE: 7/31, 1998

| TO: | FAX NO. |
|---|---|
| Mike Gippert | 690-2730 |
| Sue Zike | 503-808-2255 |
| Owen Schmidt | 503-326-3807 |
| Karen Mouritsen | 219-1792 |

FROM: Paul Bly

NUMBER OF PAGES SENT (INCLUDING COVER PAGE): 3

SPECIAL INSTRUCTIONS: More timber sales – same info needs

JUL-29-1998 06:52

SCOTTII00032

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (Fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*
Cittie Stiewell*
Charles Tebbutt†
* admitted in Oregon
† admitted in New York
~ admitted in Colorado

Scientist
Michael Wach*

Development Director
Deborah Mailander, J.D.

Office Manager
Kathy Carson

Development Assistant
Kari Kyndo

Legal Assistant
Rachel Thielmanger

Administrative Assistant
Marilyn Kamp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (Fax)
[illegible]@laplaza.org

Director SW Office
Grove Burnett

Attorneys
David Gomez
Nicole L. Mimer
[illegible] admitted in New Mexico
[illegible] admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

July 28, 1998

Ted Boling
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
Washington, D.C. 20044-0663

Via FAX (202) 305-9609

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Ted:

Plaintiffs have continued working to determine the auction dates of sales that have problems with Northwest Forest Plan compliance.

In addition to the list I sent you yesterday, we now know that the following problem sales are scheduled to be auctioned before a settlement meeting can be arranged:

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Jones 25 | Coos Bay BLM | 7/31/98 |
| Remote Control | Coos Bay BLM | 8/28/98 |
| North Murphy | Medford BLM | any day |
| Little River Demo | Umpqua NF | any day |
| Slippery Moose | Salem BLM | 7/29/98 |
| West Boftin | Salem BLM | 7/29/98 |
| Jefferson TS | Klamath NF | 8/01/98 |
| Upper South Fork | Klamath NF | 8/01/98 |
| Collins Hazard | Klamath NF | 8/01/98 |
| Jolt Heli | Klamath NF | 8/01/98 |
| Jack TS | Klamath NF | 8/30/98 |
| L. Horse Peak | Klamath NF | pending |
| Blue Canyon | Klamath NF | pending |
| Barn | Mt. Hood NF | August 98 |
| Banking | Mt. Hood NF | August 98 |
| Bear Cub | Mt. Hood NF | August 98 |
| Burnt Granite | Mt. Hood NF | August 98 |

[illegible] unbleached · 100% postconsumer waste · soy ink

07/28/98 TUE 15:28 FAX

Ted Bolling
July 28, 1998
Page 2

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Misc. Salvage | Mt. Hood NF | August 98 |
| Bonanza II | Mt. Hood NF | August 98 |
| Break | Mt. Hood NF | August 98 |
| Mt. Defiance | Mt. Hood NF | September 98 |
| Ringo | Mt. Hood NF | 8/04/98 |
| Solo | Mt. Hood NF | August 98 |
| Tarzan | Mt. Hood NF | August 98 |
| Abbott Salmon | Mt. Hood NF | 9/1/98 |
| Yaka Guard | Mt. Hood NF | August 98 |
| Cowpoke | Mt. Hood NF | August 98 |

As with the previous list I sent you, this information is being provided subject to the provisions of Federal Rule of Evidence 408. Although there may be a few additional sales, I believe the list is now relatively complete.

Sincerely,

Michael Axline
Counsel for Plaintiffs

TOTAL P.04

26

U.S. DEPARTMENT OF AGRICULTURE
OFFICE OF THE GENERAL COUNSEL
NATURAL RESOURCES DIVISION

*Providing and coordinating legal services to the Department of Agriculture, Forest Service, and Natural Resources Conservation Service*

1400 Independence Avenue, SW - Room 4625
Washington, D.C. 20250-1412

July 28, 1998

KATHRYN TOFFENETTI

(202) 720-2651
FAX: (202) 690-2730

Subject: ONRC Action

To

Owen Schmidt

Bob Simmons

Al Ferlo

Susan Yonts-Shepard

cc: Gippert, Mulach

MESSAGE:

Attached is the expected letter from Michael Axline to Ted Boling. Note that there are only 5 sales listed - so far.

There is no explanation stating the connection of the sales to the lawsuit (i.e., no statement of what allegations in the suit apply to any of the sales).

Please note the information that Ted Boling wants by COB Thursday at the latest. In addition to the information Ted asks for, we should find out whether any of the plaintiffs administratively appealed any of these sales.

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Department of Justice
Environment and Natural Resources Division
General Litigation
601 Pa. Ave., NW
Washington, DC 20004

Fax No.
Voice No.

**SENT BY:** Ted Boling

**TO:** USDA- Mike Gippert

DOI - Karen Mouritsen

**FAX No.** 690-2730, 213-1792

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 3

**SPECIAL INSTRUCTIONS:** Adline's timber sales (5) - Please let us know ASAP (no later than COB Thursday) at least: 1) decision status of the sales (offered, bids opened, etc.), 2) what surveys and NEPA documentation has been done for the sale decision, and 3) agency response.

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*
Carrie Sikorski*
Charles Tebbutt*†
* admitted in Oregon
† admitted in New York
• admitted in Colorado

Scientist
Michael Wack*

Development Director
Deborah Pfadenhauer, J.D.

Office Manager
Kathy Carreras

Development Assistant
Kari Kytola

Legal Assistant
Rachel Thimmesch

Administrative Assistant
Marilyn Kamp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (fax)
taoslaw@laplaza.org

Director SW Office
Grove Burnett

Attorneys
David Gomez
Vidal L. Alvarez
admitted in New Mexico
admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

7/27/98

Ted Hadling
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
Washington, D.C. 20044-0663

Via FAX (202) 305-9609

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Ted:

At your request and pursuant to the July 16, 1998, order of the Court, I am sending the following list of sales scheduled to be auctioned before the end of August that plaintiffs believe were not prepared in compliance with the terms of the Northwest Forest Plan. This information is being provided subject to the provisions of Federal Rule of Evidence 408.

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Lewis Timber Sale | Willamette N. F. | August 19, 1998 |
| Lost Creek Thin | Umpqua N. F. | August 26, 1998 |
| Dear Mom | Medford District | August 27, 1998 |
| Bummer Swamp 1 | Salem BLM | August 26, 1998 |
| Hall-Tower | Gifford Pinchot N.F. | Late August |

Please note that this is merely a preliminary list of sales scheduled for auction before a meeting can be arranged to discuss settlement.

Postponement of these sales, at least until a settlement meeting can be scheduled, would be necessary to avoid a request by plaintiffs for injunctive relief. Additionally, we do not have complete information about auction dates, and may have to add to this list if we discover that other sales of concern are to be auctioned before we can meet to discuss settlement.

07/27/98 MON 20:16 [TX/RX NO 7056]

JUL-28-1998 07:25

SCOTTII00037

Please call as soon as you have reviewed this list, so that we can determine whether agreement on an interim arrangement is possible.

Sincerely,

Michael Axline
Counsel for Plaintiffs

**IMPORTANT:** This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** 202-305-0506

**SENT BY:** Ted Boling (202-305-9609)

**TO:** Sue Zike

**FAX No.** 503-808-2255

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):**

**SPECIAL INSTRUCTIONS:**

Michael Axline's complete letter. Please let me know if you can join us 8/28 at 1:00 p.m to discuss the letter in light of the upcoming due dates for our report on settlement potential to Judge Dwyer (9/8) and answer (9/14).

Also, the letter that you requested.

— Have you heard [illegible] anything on [illegible]?

PLAINTIFF'S EXHIBIT
35B
1-4-07 Zike

tabbies

PT0039

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*-
Carrie Stilwell*
Charles Tebbutt*†
* admitted in Oregon
† admitted in New York
- admitted in Colorado

Scientist
Michael Wach*

Development Director
Deborah Mailander, J.D.

Office Manager
Kathy Cannon

Development Assistant
Kari Kytola

Legal Assistant
Rachel Thiesmeyer

Administrative Assistant
Marilyn Kemp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (fax)
taoslaw@laplaza.org

Director SW Office
Grove Burnett‡

Attorneys
David Gomez‡
Vickie L. Minor‡**
‡ admitted in New Mexico
** admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

August 26, 1998

Privileged and Confidential

Edward A. Boling
John Watts
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663
AND VIA FAX to (202) 305-0506

Dear Ted and John:

This letter is in response to your letter of August 21 and our subsequent conversations regarding the list of sales and identification of our concerns regarding compliance with the ROD. As with my previous letters to you, this letter is subject to the provisions of Federal Rule of Evidence 408.

We attach a list of sales that we believe fail to comply with the Northwest Forest Plan, and which would need to be withheld from award pending our negotiations. The list is broken into four categories:

1) Sales which were not sold when we filed our complaint, with auction dates during calendar year 1998 (this does not include any sales which the plaintiffs did not appeal). This is a total of 96 sales.

2) Sales with proposed auction dates during calendar year 1998, but which we are not <u>certain</u> have or have not yet been sold. This is a total of 12 sales.

3) Sales with unknown auction dates. If these turn out to have auction dates in calendar year 1999, no immediate agreement would be necessary, since we should know before then whether a more permanent agreement is possible, and they would be subject to that agreement. This is a total of 177 sales.

4) Sales on the Gifford Pinchot National Forest for

which post-sale salamander surveys were promised, but not performed or not performed to protocols. This is a total of 36 sales.

Several caveats apply to these lists of sales:

1) As more information comes to light regarding specific sales, the lists may change over the next month or so. For example, if the government proposes new (non-complying) sales with a short time-frame, or dusts off old sales that we thought were defunct, we may need to add them to the list.

2) The names of sales may be changed. For example, some of the listed sales have not yet been split into individual auctions. These sales may be given "as-auctioned" names that are different from the NEPA document name. Conversely, there may be some redundancy due to listing of both NEPA names and auction names.

3) For sales that are not yet in the administrative appeal period, we do not expect that you will require our clients to administratively appeal every sale in order to address them in our settlement discussions.

4) Except for sales on the Gifford Pinchot National Forest that failed to follow required post-sale protocols for salamanders, it is our intent to limit our request to sales that have not been awarded. This list may inadvertently include some sold sales, because it is difficult for the public to acquire timely and accurate information on the timber sale auction and award process.

5) Given the limits of public access to information and timing constraints, we were unable to segregate unobjectionable harvest units within sales we have listed. In general we do not object to precommercial thinning, and if given more information and/or time, we may be able to identify unobjectionable units.

Please contact me after you have had a chance to review this letter with your clients, so that we can discuss how (and whether) to proceed from here.

Sincerely,

Michael Axline
Counsel for Plaintiffs

cc: California Wilderness Coalition
Citizens for Better Forestry
Oregon Natural Resource Council
Pilchuck Audubon Society
Klamath Forest Alliance
Klamath Siskiyou Wildlands Center
American Lands Alliance
Umpqua Watersheds
Northcoast Environmental Center
Portland Audubon Society
Gifford Pinchot Task Force
Northwest Ecosystem Alliance
Headwaters

Category 1: Unsold Problem Sales With Calendar Year 1998 Auction Dates

| timber sale name | NF/BLM District | RD/ BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| Jones 25 | Coos Bay | Myrtlewood | | 8/28/98 | 0.8 |
| Remote Control | Coos Bay | Myrtlewood | | 8/28/98 | 7.5 |
| Slide Show | Coos Bay | Myrtlewood | | 8/25/98 | |
| Alma Over | Eugene | | | 9/24/98 | |
| Go Cart | Eugene | | | 9/24/98 | |
| Gold Wind | Eugene | McKenzie | | 8/27/98 | 8.5 |
| Link'n'Log | Eugene | | | 8/27/98 | |
| Second Wind | Eugene | | | 9/24/98 | |
| Torched Mill | Eugene | South Valley | | 8/27/98 | 3.3 |
| Heli-Tower | GP | Cowlitz | | 8/31/98 | |
| Jack Hell | Klamath | | | 9/22/98 | |
| Upper South Fork | Klamath | Salmon River | 5/13/98 | 10/7/98 | 8.5 |
| B Lost | Medford | | | 9/24/98 | |
| Bonnie & Slyde | Medford | Glendale | 7/1/98 | 9/24/98 | 2.7 |
| Cenoak | Medford | Grants Pass | 7/1/98 | 9/24/98 | 3.0 |
| Deer Mom | Medford | Grants Pass | 5/15/98 | 8/27/98 | 2.8 |
| Jumpin Jack | Medford | | | 9/24/98 | |
| Key Elk | Medford | Glendale | | 9/24/98 | |
| Musty Donut | Medford | Butte Falls | 6/1/97 | 9/24/98 | 4.0 |
| North Murphy | Medford | Grants Pass | | 4/30/98 | 3.6 |
| POC Sanitation | Medford | Grants Pass | 8/15/98 | 9/24/98 | 1.0 |
| Poor Bishop | Medford | Ashland | | 9/24/98 | |
| Round Fork | Medford | | | 9/24/98 | |
| Serpent's Grave | Medford | Glendale | 7/1/98 | 9/24/98 | |
| Stratton Hog | Medford | Grants Pass | 6/1/98 | 10/29/98 | 1.8 |
| Titanic | Medford | Grants Pass | 3/1/98 | 9/24/98 | 9.0 |
| Wild Wonder | Medford | Grants Pass | 6/1/98 | 9/24/98 | 0.7 |
| Wildcat Thin | Medford | Glendale | 7/27/97 | 2/26/98 | 1.9 |
| Abbott Road | Mt Hood | Zigzag | 8/11/97 | 9/11/98 | |
| Bars | Mt Hood | Clackamas | 3/16/98 | 8/1/98 | |
| Evans | Mt Hood | Hood River | | 9/21/98 | |
| Partner II | Mt Hood | Clackamas | | 7/8/98 | |
| Ringo | Mt Hood | Clackamas | 6/27/96 | advert. 8/24/98 | |
| Salmon Curves | Mt Hood | Zigzag | 8/11/97 | advert. 8/24/98 | |
| Tila | Mt Hood | Hood River | 5/1/98 | 9/21/98 | |
| Wagner Gap | Rogue River | Ashland | | 9/20/98 | 3.0 |
| Bell Mountain Regen | Roseburg | Swiftwater | | 9/22/98 | 5.0 |
| Buck Fever | Roseburg | South River | 8/1/97 | 9/22/98 | 9.5 |
| Christopher Folley | Roseburg | Swiftwater | | 9/22/98 | 10.7 |
| Class of '98 Regen | Roseburg | South River | 2/1/98 | 3/98? | 7.0 |
| Dream Weaver | Roseburg | South River | | 9/22/98 | 4.4 |
| Final Curtin Regen | Roseburg | South River | 8/1/97 | 9/22/98 | 9.7 |
| Happy Summit DM | Roseburg | Swiftwater | | 9/22/98 | 7.0 |
| Johnson Creek | Roseburg | Swiftwater | | 9/22/98 | 2.2 |
| Bummer Swamp I | Salem | Mary's Peak | | 9/30/98 | 6.3 |
| Delph Creek | Salem | | | 9/30/98 | |
| Pig's Puzzle | Salem | Tillamook | 2/25/98 | 9/29/98 | 10.0 |
| Slippery Moose | Salem | Cascades | | 7/28/98 | 1.9 |
| West Botkin | Salem | Mary's Peak | | 7/29/98 | 1.9 |
| Too Wild | Siskiyou | Gold Beach | | 9/17/98 | 11.9 |
| Deadwood Thin | Siuslaw | Mapleton | 5/2/98 | 8/26/98 | 17,895 CC |

Category 1: Unsold Problem Sales With Calendar Year 1998 Auction Dates

| timber sale name | NF/BLM District | RD/ BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| Coon Salvage | Six Rivers | Smith River | | ad 9/30/1998 | 0.1 |
| Henhawk | Six Rivers | Lower Trinity | | ad 9/30/1998 | 1.0 |
| Jones | Six Rivers | Mad River | | ad 9/20/1998 | 2.5 |
| Lenny | Six Rivers | Mad River | | ad 9/20/1998 | 0.6 |
| Panther Salvage | Six Rivers | Smith River | | ad 8/15/1998 | 0.1 |
| Siskiyou Timber Sale | Six Rivers | Smith River | | ad 8/15/1998 | 2.4 |
| Slide Salvage II | Six Rivers | Smith River | | ad 8/7/1998 | 0.0 |
| Spigot | Six Rivers | Mad River | | ad 9/20/1998 | 2.8 |
| Weaver | Six Rivers | Orleans | | ad 9/30/1998 | 2.5 |
| Borderline Thin | Willamette | Middle Fork | | 5/30/98 | 3.1 |
| Bould Puppy | Willamette | Detroit | | 7/1/98 | 2.7 |
| Canyon ATV | Willamette | Detroit | | 9/15/98 | 1.0 |
| Cascade Cat | Willamette | Blue River | 5/28/98 | 8/15/98 | 6.5 |
| Cat | Willamette | Blue River | 5/29/98 | 9/1/98 | 4.5 |
| Coffin Thin | Willamette | Detroit | | 9/1/98 | 1.5 |
| Dusty ATV | Willamette | Detroit | | 6/15/98 | 5.0 |
| East Devil | Willamette | Middle Fork | | 9/15/98 | 4.7 |
| Foley Ridge | Willamette | McKenzie | 5/5/98 | 9/1/98 | 9.4 |
| French Marten | Willamette | Detroit | | 7/31/98 | 1.0 |
| Friscoe Salvage | Willamette | McKenzie | 5/19/97 | 5/1/98 | 0.2 |
| Happy Bird | Willamette | Middle Fork | 4/29/98 | 9/15/98 | 5.3 |
| Halldun ATV | Willamette | Middle Fork | | 9/15/98 | 12.0 |
| High and Dry | Willamette | Detroit | | 5/15/98 | 2.0 |
| Humstinger | Willamette | Detroit | | 4/15/98 | 0.9 |
| Kinkoe | Willamette | McKenzie | 5/19/97 | 6/1/98 | 5.5 |
| Lois | Willamette | Middle Fork | 10/3/97 | 8/19/98 | |
| Monument Peak | Willamette | Detroit | | 9/1/98 | 1.2 |
| Moose | Willamette | Sweet Home | 7/29/98 | 8/15/98 | 22.5 |
| Navergales | Willamette | Middle Fork | 5/4/98 | 10/15/98 | 13.5 |
| North Winberry ATV | Willamette | Middle Fork | 2/1/98 | 8/30/98 | 15.0 |
| Parkaboo | Willamette | Detroit | | 8/24/98 | |
| Prairie Fence | Willamette | Sweet Home | 8/18/97 | 7/30/98 | 1.4 |
| Pryor | Willamette | Middle Fork | 5/1/98 | 8/1/98 | 11.2 |
| Rhody | Willamette | Middle Fork | 8/24/97 | 8/1/98 | 10.0 |
| Ridge | Willamette | Blue River | 6/8/98 | 9/1/98 | 5.2 |
| Roaring ATV | Willamette | Blue River | 6/8/98 | 8/15/98 | 5.5 |
| Ross Salvage | Willamette | McKenzie | 5/19/97 | 5/1/98 | 0.4 |
| Shelter 1 ATV | Willamette | Detroit | 1/22/98 | 5/15/98 | 2.8 |
| Shelter 2 ATV | Willamette | Detroit | 1/22/98 | 5/15/98 | 0.9 |
| Simco | Willamette | Middle Fork | 3/4/98 | 9/30/98 | 10.0 |
| Slap ATV | Willamette | Middle Fork | | 10/15/98 | 15.0 |
| Stan | Willamette | McKenzie | 5/19/97 | 7/1/98 | 6.0 |
| Straw Devil | Willamette | Middle Fork | 6/16/98 | 9/1/98 | 14.0 |
| Windy Canyon | Willamette | Detroit | | 8/1/98 | 6.0 |
| Young 'n | Willamette | Middle Fork | | 12/1/98 | 20.1 |

Category 2: Problem Sales With Calendar Year 1998 Auction Dates That May Have Been Sold

| timber sale name | NF/BLM District | RD/ BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| 70 SSF | Mt Hood | Clackamas | | 3/11/98 | |
| Lightening Flats | Mt Hood | Clackamas | 5/27/98 | | |
| Lunch | Mt Hood | Clackamas | | 4/15/98 | |
| Burma CT | Roseburg | South River | | | |
| Broken Buck Regen | Roseburg | Swiftwater | 9/1/96 | trade | 4.9 |
| Red Top I | Roseburg | South River | 7/21/97 | 8/97? | 10.7 |
| Signal Tree | Roseburg | South River | 10/22/97 | 11/97? | |
| Yoncalla | Roseburg | Swiftwater | 8/31/93 | 10/97? | |
| Chapter 4 salvag | Umpqua | Diamond Lake | | | |
| Pigout | Umpqua | Diamond Lake | 2/1/98 | | 3.0 |
| T-Line salvage | Umpqua | Diamond Lake | | | |
| Prairie Gate ATV | Willamette | Sweet Home | 8/18/97 | 10/23/97 | 4.0 |

Category 3: Problem Sales Without Auction Dates

| timber sale name | NF/BLM District | RD/ BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| Sagaberd Complex | Coos Bay | Umpqua | 1/26/98 | | 14.3 |
| Baja 58 | Deschutes | | | | |
| Cultus Demonstration | Deschutes | | | | |
| Katalo West | Deschutes | | | | |
| Santiam LSR Restoration | Deschutes | | | | |
| Hult View | Eugene | | | | |
| Log Creek | Eugene | McKenzie | | | |
| Alpha | GP | Mt St Helens | | | |
| Baby Bare Fiber salvage | GP | Mt Adams | 5/4/85 | | |
| Beta | GP | Mt St Helens | | | |
| Bug | GP | Mt Adams | | | |
| Cispus Flats | GP | Cowlitz | | | |
| Dark Canyon | GP | Cowlitz | | | |
| Dry Jackpot | GP | Cowlitz | | | |
| East | GP | Mt Adams | 5/1/97 | | |
| EC Ridge (NSH) | GP | Cowlitz | | | |
| Gage | GP | Mt St Helens | | | |
| Goose Egg | GP | Mt Adams | | | |
| Iron Horse | GP | Cowlitz | | | |
| Johnson | GP | Cowlitz | | | |
| Kirk | GP | Cowlitz | | | |
| La Roux | GP | Mt Adams | | | |
| Limbo | GP | Mt Adams | | | |
| Lock | GP | Mt Adams | | | |
| Lower Iron | GP | Cowlitz | | | |
| Mine Fiber salvage | GP | Mt Adams | | | |
| Olallie | GP | Cowlitz | | | |
| Omega | GP | Mt St Helens | | | |
| Siler Owens | GP | Cowlitz | | | |
| Silver Watch | GP | Cowlitz | | | |
| Skeeter | GP | Mt St Helens | | | |
| Swell | GP | Mt Adams | | | |
| Tower | GP | Cowlitz | | | |
| Tuff F.P. | GP | Cowlitz | | | |
| Two Peaks | GP | Mt St Helens | | | |
| Upper Iron Creek | GP | Cowlitz | | | |
| Willame | GP | Cowlitz | | | |
| Cherry Creek Road Reconstruction Project | Klamath | Salmon River | | | |
| Glassups | Klamath | Salmon River | | | 7.0 |
| Jack | Klamath | Scott River | | | 14.0 |
| Jefferson | Klamath | Happy Camp | none yet | | 11.0 |
| Military Pass | Klamath | Goosenest | | | |
| New Year '97 Road Reconstruction | Klamath | all | | | |
| Road Access | MBS | North Bend | | | |
| Skull | MBS | Darrington | | | |
| Sky Forks Thin | MBS | Skykomish | | | 12.0 |
| Berlin Mummer | Medford | Grants Pass | 7/1/98 | | 1.5 |
| Lost Creek | Medford | | 5/1/98 | | 30.0 |
| Scattered Apples | Medford | Grants Pass | 9/1/98 | | |

Category 3: Problem Sales Without Auction Dates

| timber sale name | NF/BLM District | RD/ BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| Stratton | Medford | Grants Pass | | | 1.2 |
| Blands | Mendocino | Covelo | | | 4.8 |
| Divide-Auger | Mendocino | Stonyford | | | In scoping |
| Gulch | Mendocino | | | | In scoping |
| Fourmile Hill Geothermal | Modoc | | | | |
| Telephone Flat Geothermal | Modoc | | FEIS pending | | |
| Batwing | Mt Hood | Clackamas | 3/16/98 | | |
| Bear Cub | Mt Hood | Clackamas | 3/16/98 | | |
| Blaze | Mt Hood | | | | |
| Bonanza II | Mt Hood | Clackamas | 5/24/93 | | |
| Borg | Mt Hood | Clackamas River | | | |
| Break | Mt Hood | Clackamas | 12/23/93 | | |
| Bronze | Mt Hood | Hood River | 7/17/98 | | 1.9 |
| Burnt Granite | Mt Hood | Clackamas | 7/19/93 | | |
| Cowpoke | Mt Hood | Clackamas | | | |
| Five Mile | Mt Hood | Barlow | 4/28/97 | | |
| Guard | Mt Hood | Clackamas | 4/13/98 | | |
| HiLynx | Mt Hood | Barlow | | | |
| Lemiti Auction | Mt Hood | Clackamas | | | |
| Mt. Defiance | Mt Hood | Hood River | 7/20/98 | | |
| Orchard | Mt Hood | Clackamas | | | |
| Osprey | Mt Hood | Hood River | | | 1.3+OG |
| Pohlallie/Cooper | Mt Hood | Hood River | | | |
| Ramsey/15 Mile Creek | Mt Hood | Barlow | 8/17/98 | | |
| Salmonberry | Mt Hood | ZigZag | 7/7/98 | | |
| Solo | Mt Hood | Clackamas | none yet | | |
| Surveyor's Ridge | Mt Hood | Hood River | | | |
| Talc | Mt Hood | Hood River | 7/27/98 | | |
| Tarzan | Mt Hood | Clackamas | none yet | | |
| Upper Mt Hood | Mt Hood | Clackamas | | | |
| Wildfire | Mt Hood | | | | |
| Yaka 22/23 | Mt Hood | | | | |
| Crater Creek | Mt Hood | ZigZag | | | |
| North Clackamas | Mt Hood | ZigZag | | | |
| Easter | Olympic | Quilcene | | | |
| Mouse Inn | Olympic | Quinalt | | | |
| Slider | Olympic | Quinalt | | | |
| Two-Y | Olympic | Soleduck | | | |
| Bibbits | Rogue River | Butte Falls | | | 4.0 |
| Brush | Rogue River | Prospect | | | |
| Buck Point | Rogue River | Butte Falls | | | 4.0 |
| Cougar | Rogue River | Applegate | | | 3.0 |
| Flat | Rogue River | Prospect | | | 2.0 |
| HazRed | Rogue River | Ashland | 4/18/98 | | 3.5 |
| Lodge | Rogue River | Prospect | | | 3.0 |
| Mt Ashland Ski Exp | Rogue River | Ashland | | | |
| North Fish | Rogue River | Prospect | | | 3.5 |
| Peak | Rogue River | Prospect | | | 4.0 |
| Salix | Rogue River | Prospect | | | 6.0 |
| Sturgis | Rogue River | Applegate | | | 6.0 |
| Beaver Newt | Rogue River | Applegate | | | 3.7 |

Category 3: Problem Sales Without Auction Dates

| timber sale name | NF/BLM District | RD/BLM RA | date of NEPA decision | planned auction date | total harvest volume (mmbf) |
|---|---|---|---|---|---|
| Silver Fork | Rogue River | Applegate | 4/15/98 | | 5.0 |
| Buck Creek CT | Roseburg | Swiftwater | 8/1/97 | | 3.8 |
| Cobble Creek Regen | Roseburg | Swiftwater | | | 5.0 |
| Cow Catcher TS | Roseburg | South River | | | |
| Diamondback Regen | Roseburg | Swiftwater | 8/1/97 | | 6.0 |
| Dickerson Heights TS | Roseburg | South River | | | |
| Emile | Roseburg | Swiftwater | 8/1/97 | | 5.2 |
| Foghorn Cleghorn | Roseburg | Swiftwater | 11/1/98 | | 4.3 |
| Leonard TS | Roseburg | Swiftwater | | | |
| Loose Laces Regen | Roseburg | South River | | | 7300 CCF |
| North Bank Habitat Mgt Plan | Roseburg | Swiftwater | | | |
| North Myrtle TS | Roseburg | South River | | | |
| Pipeline TS | Roseburg | Swiftwater | | | |
| Ragu TS | Roseburg | South River | | | |
| Red Top II | Roseburg | South River | 11/17/97 | | 1.7 |
| Sugar Pine DM | Roseburg | South River | | | |
| What a Gas | Roseburg | Swiftwater | | | |
| Harry Thomas | Salem | Cascades | | | |
| Upper Nestucca Motorcycle Trail System | Salem | Tillamook | 3/13/98 | | |
| Barker Road Hazards | Shasta-Trinity | | | | |
| Beegum Corral | Shasta-Trinity | Yolla Bolla | 7/1/97 | | |
| Beegum Regan | Shasta-Trinity | Yolla Bolla | 7/1/97 | | |
| Beegum Rock | Shasta-Trinity | Yolla Bolla | 8/1/98 | | |
| Big Creek Road Salvage | Shasta-Trinity | | | | |
| Butter Grassy Hyampom | Shasta-Trinity | Hayfork | 7/1/98 | | |
| Cow Buck Salvage | Shasta-Trinity | | | | |
| Deadwood | Shasta-Trinity | | | | |
| Digger Salvage | Shasta-Trinity | | | | |
| Dubablue Salvage | Shasta-Trinity | | | | |
| East Fork/Potato SS | Shasta-Trinity | | | | |
| Fitch Road Hazard | Shasta-Trinity | | | | |
| Harrison Knob SS | Shasta-Trinity | | | | |
| Henhawk Thinning | Shasta-Trinity | | | | |
| Lost Vegetative Mgt Project | Shasta-Trinity | | | | |
| Lower Hayfork Creek | Shasta-Trinity | Hayfork | 10/1/98 | | |
| LSR RC-305 Fuel Reduction Project of 1997 | Shasta-Trinity | | | | |
| Miller Road Hazard Tree Removal | Shasta-Trinity | | | | |
| Packer Road Salvage | Shasta-Trinity | | | | |
| Peanut Powerline Trees | Shasta-Trinity | | | | |
| Redway Road Hazard Tree Removal | Shasta-Trinity | | | | |
| Salvage sales (1998) | Shasta-Trinity | | | | |
| Siskiyou Habitat Improvement Project | Shasta-Trinity | | | | |
| Stafford Johnson SS | Shasta-Trinity | | | | |
| Station Thin and Fuels Reduction | Shasta-Trinity | Weaverville | 8/1/98 | | |

Category 4

## Gifford Pinchot National Forest

Timber sales requiring salamander surveys - sales awarded since 9/30/97

### Awarded Sales Lacking Survey to Protocol for Salamanders

| District | Name | Sale | Dec. Date | Award Date | Purchaser | Comments |
|---|---|---|---|---|---|---|
| Mt. Adams | East | timber/C-thin | 3/1/97 | 11/24/97 | High Cascade, Inc. | unlogged |
| Mt. Adams | Bug | timber/C-thin | 5/12/97 | 10/2/97 | High Cascade Inc. | unlogged |
| Mt. Adams | Whip | timber/C-thin | 5/27/97 | 11/24/97 | High Cascade Inc. | unlogged |
| Mt. Adams | Misc Fiber salvage | salvage | ? | 12/16/96 | Mike Flood | need DM |
| Mt. Adams | Baby Bare Fiber salvage | salvage | 5/4/95 | 6/17/97 | Milo Flood | need DM |
| Mt. St. Helens | Cage | timber/C-thin | 5/13/97 | 11/10/97 | High Cascade, Inc. | unlogged |
| Mt. St. Helens | Skeeter | timber | 3/10/97 | 11/10/97 | High Cascade, Inc. | unlogged |
| Mt. St. Helens | Tile | timber | 7/18/97 | 5/6/98 | High Cascade, Inc. | need award date; unlogged |
| Mt. St. Helens | Two Peaks | timber | 3/10/97 | 10/2/97 | High Cascade, Inc. | unlogged |
| Cowlitz | BC Ridge (NSH) | C-thin | 7/14/95 | 10/31/96 | Superior Lumber | DN prior to FY97; unlogged |
| Cowlitz | Fourmile salvage | salvage | 7/7/97 | 7/28/97 | Kimberly Nichols | need DM; logged |
| Cowlitz | Siller Owens | timber | 1/24/97 | 11/24/97 | High Cascade, Inc. | unlogged |
| Cowlitz | Sister salvage | salvage | 8/26/97 | 4/3/98 | R and D Cascade | need award date |
| Cowlitz | Tower | C-thin | 5/21/97 | 10/29/97 | Frisco Timber, Co. | unlogged |
| Cowlitz | Tri salvage | salvage | 8/26/97 | 4/14/98 | Noblitt and Sons | need award date |
| Cowlitz | Tuff F.P. | salvage | ? | 8/8/97 | Noblitt and Sons | need DM |

### Unawarded sales lacking Surveys to Protocol for Salamanders — NEPA complete (through appeals)

| District | Name | Sale | Dec. Date | Award Date | Purchaser | Comments |
|---|---|---|---|---|---|---|
| Cowlitz | Copper Flats | C-thin | 11/5/97 | unsold | NA | re-advertise 10/98 |
| Cowlitz | Dark Canyon | C-thin | 7/17/97 | unsold | NA | in consultation |
| Cowlitz | Heli-Tower | C-thin | 5/31/97 | unsold | NA | re-advertise 8/98 |
| Cowlitz | Lower Iron | timber/C-thin | 5/31/97 | unsold | NA | in consultation |
| Cowlitz | Iron Horse | timber/C-thin | 5/31/97 | unsold | NA | in consultation |

### awarded Sales lacking Surveys to Protocol for Salamanders — NEPA pending

| District | Name | Sale | Dec. Date | Award Date | Purchaser | Comments |
|---|---|---|---|---|---|---|
| Mt. Adams | Ocean Egg | timber | pending | NA | NA | awaiting DN |
| Mt. Adams | La Roux | timber | 6/1/98 | pending | NA | in appeal period |
| Mt. Adams | Limbo | timber | pending | NA | NA | awaiting DN |
| Mt. Adams | Look | timber | pending | NA | NA | awaiting DN |
| Mt. Adams | Swell | timber | 7/13/98 | pending | NA | in appeal period |
| Mt. St. Helens | Alpha | timber | 6/30/98 | pending | NA | in appeal period |
| Mt. St. Helens | Beta | timber | 6/16/98 | pending | NA | in appeal period |
| Mt. St. Helens | Omega | timber | 6/16/98 | pending | NA | in appeal period |
| Cowlitz | Dry Jackpot | C-thin | 2/23/98 | pending | NA | in consultation |
| Cowlitz | Johnson | timber/C-thin | pending | NA | NA | awaiting DM |
| Cowlitz | Kirk | C-thin | pending | NA | NA | awaiting DM |
| Cowlitz | Olallie | timber | 6/15/98 | pending | NA | in appeal period |
| Cowlitz | Silver Watch | timber | pending | NA | NA | awaiting DM |
| Cowlitz | Upper Iron Creek | C-thin | 6/29/98 | pending | NA | in appeal period |
| Cowlitz | Willame | timber/C-thin | pending | NA | NA | in consultation |

On Mar 26, all of the parties stipulated to a briefing schedule for this case that should bring it should a hearing in mid June (good news). (The court has not yet signed the stipulation.) In order to reach that agreement, we had to give a little (bad news) on the current need to award sales associated with this lawsuit. With Devlin's, R5's and BLM's concurrence, the govt made 2 promises in the stipulation (I'll fax it to the forests and R5).

Promise 1: As to the nine named sales in the Amended Complaint, we would give ONRC 10 bus. days notice before we approved the General Plan of Operations (applies to Bear TS (MTH) and any Christy Basin sales(WIL).

Promise 2: As to the sales appealed by the plaintiffs AND identified by plaintiff s "based on claims presented in the Complaint (not amended complaint)", we would give ONRC 10 bus. days notice of our decision to award.

So attached is R6 chart of the sales (R5 will come separately ) that are subject to Promise 2 (you need to check the appeal files to be sure plaintiffs appealed). Before you decide to award a sale, the RO and OGC ask that you compare and discuss with us the issues in the appeal of the sale to the issues in the Amended Complaint (there are some differences). To help you with that, I'll be sending an issue chart tomorrow. We need to assure DOJ that we have a strong defense on the sales that we intend to award even tho' DOJ is not asking to be a part of the award decision (good news).

Bottom line: the process to award these sales associated with the lawsuit is no different than the last 3 months, other than now we need to give ONRC 10 day notice before we send the award letter.

R5 is sending a 10 day notice letter to ONRC today for 2 sales (Upper S.Fork and Happy Thin - KLA). So the process works! I think we'll have WIL sales ready in a few days too. If ONRC finds it necessary to file for an injunction on these sales, then we will look to the awarding forest for their Admin. Rec. and sale info ASAP. You guys always come through, so I'm not worried about this.... only the stress that it brings to all of us.

AS BEFORE, THE SALE LIST IS NOT BE DISTRIBUTED OUTSIDE THE AGENCY.

*****

Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us
**********

PLAINTIFF'S EXHIBIT 41A
1-4-07 Zike

4/5/99

ONRC Action has taken issue with the operation of Roundup TS on the MTH, claiming it falls under the the ONRC Action lawsuit. DOJ has called and asked that we assess the status of the sales in the chart I sent out to you all late last week entitled "Region 6 Timber Sales, ONRC Action d. USFS, BLM, CV98-942WD, western District of Washington, Plaintiffs' Sale List Submitted Feb. 26, 1999". Same title for R5. They are attached again here.

The immediate job is to identify the sales that have been awarded or that you intend to award by mid-June. DOJ would like to get the briefing done on this case without the interruptions of TRO or PI, so please fill out the chart for the sales you have awarded or intend to award by mid-June. Can you fill out chart and return to me by tomorrow, Tuesday, April 6?? Once we have that set of sales in mind, don't be surprised if we ask you to delay the award or the start of operations.

TED/OWEN: the charts are in RTF so you ought to be able to read them.

*****

Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us

**********

Whitebird
Pigout
~~Peach~~
~~T-Line SV~~
~~Salty~~
~~Ch. 4 SV~~
Jigsaw

| Plt Apl? Y/N | Ad Date | Auc Date | Award Date | Status | Notice to Ps? |
| --- | --- | --- | --- | --- | --- |

Wyatt

United States Department of Agriculture | Forest Service | Pacific Northwest Region | P. O. Box 3623 Portland, OR 97208-3623 333 S.W. First Avenue Portland, OR 97204

File Code: *
Route To: 1570 Litigation

Date: April 23, 1999

Subject: Intent to Award Timber Sales in ONRC Action

To: Brenda Woodard, Umpqua NF

I forwarded your April 19, 1999, letter to the Department of Justice in which you relay your intent to award Chapter 4 Salvage, T-Line Salvage, Salty, Jigsaw, Whitebird, and Pigout Timber Sales on or before May 5. You explained that you understood that these sales were not "at risk" sales that ONRC Action had identified on April 12.

While you are correct that the sales are not considered "at risk" by ONRC Action, Ted Boling, Department of Justice, advised me that unless something had changed as to these sales since our earlier representation to not award them until mid-June, we needed to abide by that representation. In other words, the "at risk" list does not replace the April 5 sales identified by ONRC Action as sales they are to receive prior notice of award according to the Stipulation to Establish a Briefing Schedule, filed in this case.

As you know, we have a hearing on June 11 and will hopefully get a ruling shortly thereafter. It will be at that time we can re-assess our position on these sales. Thanks for your patience.

/s/ Susan M. Zike
SUSAN M. ZIKE
Regional Litigation Coordinator

PLAINTIFF'S EXHIBIT
tabbies
41D
1-4-07 Zike