UNITED STATES COURT OF FEDERAL CLAIMS

SCOTT TIMBER CO., )
Plaintiff, )
vs. ) No. 05-708C
THE UNITED STATES, )
Defendant. )

DEPOSITION OF
SUE ZIKE
Taken in behalf of Plaintiff
* * *
January 4, 2007
333 S.W. First Avenue
Portland, Oregon

Teresa L. Dunn, CSR, RPR
Court Reporter



APPEARANCES:

For the Plaintiff: MR. GARY G. STEVENS
Attorney at Law
Suite M-110
1801 K Street
Washington, DC 20006

For the Defendant: MS. JOAN M. STENTIFORD
Attorney at Law
Room 12038
1100 K Street
Washington, DC 90005

Also Present: (None)

INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Stevens | 4 - 58 |
| Ms. Stentiford | 59 - 63 |




EXHIBITS
(Exhibits marked prior to deposition.)

No. 35 E-Mail dated 9-4-98
No. 35A Fax dated 8-8-98
No. 35B Fax dated 8-27-98
No. 37C Letter dated 10-26-98
No. 38 Handwritten Note dated 11-30-98
No. 40 Memorandum dated 2-22-99
No. 41A E-Mail from Sue Zike
No. 41B Letter dated 4-12-99
No. 41D Letter dated 4-23-99
No. 43 Handwritten Note dated 7-2-99
No. 44 Letter dated 7-6-99
No. 45 Timber Sales List
No. 46 Handwritten Note dated 7-8-99
No. 51 Memorandum dated 10-5-99



PORTLAND, OREGON; THURSDAY, JANUARY 4, 2007
3:50 p.m.
* * *
SUE ZIKE
called as a witness in behalf of the Plaintiff,
having first been sworn by the Reporter,
testifies as follows:
EXAMINATION

BY MR. STEVENS:
Q. Ms. Zike, have you ever been deposed before?
**A. Yes.**
Q. Could you tell me when and where?
**A. I was deposed in Portland in 1990.**
Q. In connection with what?
**A. It was a private land developer issue.**
Q. Was there a court action? I assume there was?
**A. There was.**
Q. What was it?
**A. It was an issue about the division of subdivision lots between the land developer and the developer.**
Q. Did you win?
**A. Well, I wasn't on either side. I had just been an employee of one company and they went into a fight and they needed my testimony.**

Q. Sure. Do you remember the case name?
**A. It would have started with Morrisette because it was Don Morrisette, M-O-R-R-I-S-E-T-T-E. It was versus Hobbs.**
Q. It was state court?
**A. Yes.**
Q. Here in Oregon?
**A. Yes.**
Q. I'm sure you know this, but just let me mention three basic ground rules that I think will help this process go a little faster today.
One is when the question calls for a "yes" or "no," answer "yes" or "no" audibly rather than nodding your head or saying "uh-huh" or "huh-uh."
**A. Okay.**
Q. You never know how it is going to come out on the transcript. The second basic rule if you don't understand my question because it is late in the day, I haven't been able to formulate a question properly or use a term wrong, whatever the problem, ask me and I will try to restate it and make it clearer for you.
If you don't tell me you don't understand, I will presume you do.
**A. Okay.**
Q. And then finally you should answer all of my



questions fully and completely even if your counsel objects.
As you know, I think she will be objecting for the record and if she instructs you not to answer, then you have a right not to answer, but otherwise you should give me as full and complete an answer you can.
Is that okay?
**A. Okay.**
Q. Sketch for me briefly your education since high school.
**A. I have a Bachelor of Science degree in landscape architecture in 1974 and a Juris Doctorate from Northwestern School of Law in 1990.**
Q. So you celebrated graduation from law school by testifying in a deposition?
**A. Something like that.**
Q. No other formal education?
**A. No.**
Q. Okay. And let's go over your job history just a little bit beginning with your present position with the Forest Service.
What are you doing right now?
**A. I'm the regional litigation coordinator and Freedom of Information Act coordinator. I have held that position since 1991.**



Q. Okay. What were you doing before that?
**A. Prior to that I was forest planner and landscape architect with Custer National Forest in Billings, Montana, and Lewis and Clark National Forest out of Great Falls, and I did those jobs for nine years.**
Q. Okay. That's enough. Did you have any involvement in the Northwest Forest Plan?
**A. In what part of the Northwest Forest Plan?**
Q. Well, did you have any involvement in developing the EIS and the version of the plan that became -- was issued in 1994?
**A. I did not.**
Q. Did you ever participate in any entity called the Survey and Manage Work Group?
**A. I did not.**
Q. Or the Survey and Manage Core Group?
**A. I did not.**
Q. Or the Issue Resolution Team?
**A. I did not.**
Q. Did you have any dealings with any of those organizations?
**A. I did not.**
Q. And the Regional Interagency Executive Committee, did you have any dealings with that



organization?
**A. The RIEC?**
Q. Yes, ma'am, that's the acronym.
**A. They met probably monthly for a while and I would from time to time be invited to give litigation updates to that group.**
Q. And the Region Ecosystem Office, did you have any dealings with that?
**A. I did have some dealings with REO primarily when the ONRC Action was filed in 1998 we needed to assemble portions of the record and the folks in the REO group had access to those records so I guided them and helped them prepare records for that lawsuit.**
Q. Let's look at what was previously marked plaintiff's Exhibit 35. This is an electronic message. Some parts are inscrutable to me, but it appears to me there are two messages here.
Am I right about that?
**A. There are two messages.**
Q. What are the two messages so I can sort it out later? What's the first message?
**A. It appears to me in time the first message would be, Susan, We have Brian Stone back in the loop taking care of this information. I think that would be. Let me read this other one.**

Q. That's Mr. Jensen's electronic message to you?
**A. Yes. Let me see, well, I will change that then. It looks to me like my note would say, I need to remind you that the list of sales I sent out to you is privileged.**
**That would be from me and then Jerry responds to that -- responds to me and B. Stone who is Brian Stone in California that we have Brian back in the loop taking care of this, and I forwarded the note to him.**
Q. Okay. At the top left-hand corner on this message it says, Attached Date.
Do you know what that means, Attached Date? Does it mean date sent, for example?
**A. I think what it meant back with this e-mail system was that if you forwarded a message instead of reply, that what you forwarded got -- that the content of what you got forwarded was considered attached.**
Q. I see.
**A. So what would have been attached to this would be my note. I need to remind you that the list of sales, that would have been attached to Jerry's message starting with Susan.**
Q. I notice in the upper right-hand corner there's 9-4-98 written on this document and then on the right-hand side towards the bottom it looks like



9-4-98. I want to make sure I have this straight.
Mr. Jensen's electronic message to you was September 4, 1998, and your earlier message to him was what date, can you tell?
**A. I can't tell from this.**
Q. Prior to 9-4-98?
**A. Right, that would be my assumption.**
Q. And would I be correct it would be after the filing of the ONRC Action lawsuit in July of 1998?
**A. Correct.**
Q. There's a reference in your message to the list of sales I sent you. Do you see that?
**A. Yes.**
Q. Would that be the list of sales at risk being challenged in the ONRC Action lawsuit?
**A. The at-risk sales is what you are asking me?**
Q. Yes. What would be this list?
**A. Sometimes they were called problem sales. I don't think those were the at-risk.**
Q. Okay. What was this list of sales?
**A. What I would recall is that plaintiffs sent to us lists of sales that they wanted us to negotiate on. And when plaintiffs sent us those lists, they sent it under a settlement banner citing I think Federal Rules of Evidence 408.**



**So I would have needed to ask my forest people what are the status of those sales so I would have forwarded plaintiff's list out to them.**
Q. When you say plaintiffs, you are talking about the ONRC Action plaintiffs?
**A. That's correct.**
Q. And you said they were negotiating with you with this list of sales meaning that they were trying to negotiate a settlement to the lawsuit?
**A. Yes.**
Q. Was it your understanding these were sales they meant to challenge?
**A. Well, challenge in the context of the issues raised in this particular lawsuit?**
Q. Yes.
**A. Yes, they were sales that they wanted to negotiate with us whether or not they would be awarded and allowed to operate.**
Q. Were these a list of sales that were not awarded?
**A. I don't recall that because plaintiff's list, they didn't know. I mean, we could not rely on plaintiff's list of sales as being accurate as far as their status so that's why I had to go to my forest people.**



Q. You did that?
**A. I did.**
Q. You found out something about them?
**A. Well, we had these charts that we refer to here that had status on it and what issues had been raised.**
Q. That's the as-is chart?
**A. As is the chart, meaning privileged.**
Q. Okay. Let's look at plaintiff's Exhibit 35A. The first page is a fax cover sheet and it looks like would I be correct a fax you sent?
**A. It is.**
Q. That's your business card that you photocopied?
**A. It is.**
Q. And you sent it to Mike Hupp and Brenda Woodard on the Umpqua National Forest?
**A. Correct.**
Q. What were their positions at the time do you recall?
**A. Mike Hupp was the forest planner I believe and Brenda Woodard was the contracting officer. They were also sent to Herb Wick on the Willamette and Fred Dorn on the Gifford Pinchot and those are both contracting officers on those forests.**

Q. I took it Ms. Woodard was the contracting officer on some of the sales on plaintiff's list?

**A. I don't know. I don't know where the plaintiff's list -- Attached is a draft letter.**

Q. We will go through this and reconsider that question later.

**A. Okay.**

Q. That's your handwriting on the first page?

**A. It is.**

Q. And you ask, Are you willing to notify the bidders before you open bids?

**A. Correct.**

Q. Notify them of what?

**A. That there was a pending lawsuit.**

Q. What was the answer?

**A. I don't recall. I don't know what they decided to do about at bid opening. We felt it would be prudent to notify the bidders.**

Q. Who is "we"?

**A. It would be who I was conferring with was Jerry Hofer, regional contract officer, and Devlin, Bob Devlin.**

Q. What was Mr. Devlin's position at the time?

**A. He was director of timber.**

Q. For Region 6?



**A. Correct.**

Q. What was the other gentleman's name?

**A. Jerry Hofer.**

Q. H-O-L-F-E-R?

**A. H-O-F-E-R.**

Q. All right. So you, Devlin, and Hofer thought it would be prudent to advise them?

**A. Correct.**

Q. Okay. Further down in your handwritten statement staying there you say, There is no reason yet to plan on delaying award of the USFS sales.

Why not?

**A. Because we hadn't made any agreement with plaintiffs to delay award of sales.**

Q. Okay. The next two pages are the draft letter you refer to in your fax sheet?

**A. Uh-huh.**

Q. Did you draft the letter?

**A. No. Department of Justice doesn't let us have their letterhead.**

Q. On page two of the draft there's a statement in the letter that says, In the interest of facilitating settlement discussions the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales



have been identified in connection with this lawsuit.

Do you know what timber sales they were referring to?

**A. These three.**

Q. Sorry, which three?

**A. I don't know. It says -- that sentence you read refers to three timber sales.**

Q. Yes, it does.

**A. I would have to read the letter.**

Q. Okay.

**A. Three are scheduled for auction in late August and only Lois is scheduled --**

Q. Is it L. Horse Peak and Yaka Guard at the top of page two?

**A. Yes. Are you asking if that's what that means?**

Q. Those are the three sales?

**A. I don't know.**

Q. Okay. Do you know if notification was, in fact, given to the bidders on those three sales, the three referenced here, whichever it is?

**A. I don't know. Whatever they are. That's just a draft because it doesn't identify what three.**

Q. Okay. Turning over to the next document which is on page 00030, do you see that in the right-hand



corner, bottom right-hand corner that control number?

**A. Got it.**

Q. Okay. If you look -- hold your place there, but look back to the first page of 35A. Your PS notation says OGC memo is attached but DOJ?

**A. That.**

Q. Why don't you read it to me?

**A. PS, OGC memo is attached that DOJ based its sentence on. RO-NR meaning Regional Office Natural Resources, which is Bob Devlin, sent this out late last week.**

Q. And that's what we're looking at that started with 00030?

**A. Oh, I don't think so.**

Q. You don't?

**A. No, but let me look. This is from Simmons. Okay. Oh, it is, yep, yes.**

Q. And if you turn back to page 00030 and look in the bottom paragraph of this document -- by the way I read it as dated July 29, 1998.

Do you agree with that in the upper right-hand corner?

**A. You think it's what?**

Q. July 29, 1998, that's the date.

**A. It is probably right.**

Q. Okay. In that last paragraph the first part reads, Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs and that if this is not acceptable to the bidders they should withdraw their bid at that time.

Do you know if that warning was conveyed to the purchasers, rather the high bidders on all of the sales?

**A. Yeah, I would have no way of knowing that.**

Q. Do you know if that warning was supposed to be in writing or oral?

**A. What I recall is that we had, meaning Jerry Hofer and Bob Devlin and I and with probably general counsel's help had determined that if it had not been in the advertisement for the sale and, of course, it would not have, but for the sales that we had bid openings that we would make an oral announcement.**

**When we would have time to get the warning put**



**in the advertisement that this sale is the subject matter of litigation, then we would put it in the advertisement.**

Q. Was it put in the instructions to bidders?

**A. I have no idea.**

Q. That wasn't the direction?

**A. You know, all of the terms of contract administration isn't my deal, but --**

Q. Okay. On page two of this memo at the top the paragraph there begins, As indicated in the new case memo from Katherine Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6.

What were you doing with Owen and the sales in Region 6?

**A. We were determining the status of the sales that plaintiffs sent to us in these series of lists.**

Q. And the status as to what?

**A. Well, there was a number of pieces of information. One was whether or not the NEPA was done, what the date of the NEPA was, had it had been appealed, who had appealed, what were the issues raised in the appeal, and then if it had been awarded and when it had been awarded and to whom it had been awarded and if it was awarded, what was the status of the sale in**



**terms of operations, had it had been operating or not yet happening.**

Q. And what was done with this information?

**A. It provided information to our managers, both Bob Devlin and on up to the Regional Forester to help us determine our settlement position.**

Q. Okay. If you turn further to the page that starts with 00033 in the lower right-hand corner about three pages in it is on Western Environmental Law Center letterhead?

**A. Yes.**

Q. Now, Western Environmental Law Center, that was Mr. Axline and the attorneys representing the ONRC Action plaintiffs?

**A. Correct.**

Q. Now, what's your understanding of why the ONRC Action plaintiffs identified this list of sales in this letter as sales that have problems with the Northwest Forest Plan compliance?

**A. I can't tell you. This was -- this is dated July 28th, 1998, which means we hadn't even defended the case yet because it was filed July 7th or something, 1998.**

**So plaintiffs are just asserting that these timber sales are not in compliance with the plan.**



Q. Okay. On page 00036, a fax message from Ted Boling to Mike Gippert, do you see that?

**A. No, no, oh, six, I'm sorry, I'm looking at five.**

Q. 00036.

**A. From Ted to -- correct.**

Q. Mr. Boling was the attorney representing the government in the ONRC Action case, right?

**A. Yes.**

Q. And he is asking for certain information ASAP. Do you know why he needed it no later than close of business Thursday?

**A. No, I don't, but that's often the way the requests for information came. No, I don't.**

Q. Okay. Let's look at 35B. Do you see the handwriting at the bottom of this page?

**A. I do.**

Q. Is it yours?

**A. No.**

Q. Can you read it?

**A. No, I can't other than, Have you something anything on something, oh, Parkaboo, that was a timber sale, Parkaboo.**

Q. Parkaboo?

**A. Parkaboo. I think it is, Have you sent us**

**anything on Parkaboo. That would be my guess. That's Ted's writing so he would have scratched that on there before he faxed it.**
Q. Next page is another letter from the ONRC Action plaintiffs to the government's attorneys.
**A. Yes.**
Q. And two pages after that there's a list of timber sales entitled Category 1 Unsold Problem Sales With Calendar Year 1998 Auction Dates.
Is that something to your knowledge the Forest Service produced or is that something from the plaintiffs, the ONRC Action?
**A. I don't know. I don't recall. I don't think I have seen it. It certainly doesn't ring a bell and it doesn't look familiar.**
Q. Would you understand by the adjective "problem" as in problem sales that these were sales that the ONRC Action plaintiffs were also threatening to challenge?
**A. I would and I would also assume Category 1 is from page one of their memo.**
Q. Category 2, that would be the same and that would refer to the second category mentioned later on?
**A. Sales with proposed action dates, auction dates, yes, calendar year 1998, right.**



Q. And we can make the same inference with respect to Category 3?
**A. Yes. The "problem" word is plaintiff's characterization.**
Q. Yes, I understand.
**A. Okay.**
Q. What about the last page PT 0049, does that look familiar to you?
**A. It does not.**
Q. This says Category 4 up in the left-hand corner and it is kind of hard to read?
**A. It does.**
Q. Let's see --
**A. That aligns with Category 4 on page one, PT 0040, sales on Gifford Pinchot.**
Q. So it would be your testimony that you don't believe these are lists that were produced by the Forest Service?
**A. That would be my testimony.**
Q. Were these lists ever disclosed to the high bidders on these sales?
**A. I would have no knowledge of that.**
Q. You never disclosed it?
**A. To bidders?**
Q. This information.



**A. I would have no way to do that.**
Q. Was it your understanding that these lists were to be kept confidential and not disclosed --
**A. That was my understanding, yes.**
Q. -- and not disclosed to anyone outside of the agency?
**A. Other than to DOJ, correct.**
Q. As far as you know that's what happened?
**A. As far as I know that's correct.**
Q. Take a look at 37C, Exhibit 37C. If you look at the very top of this letter which has apparently been faxed there are some fax numbers in area code 503.
Are any of those Forest Service numbers?
**A. Well, the 808 number is for our building.**
Q. That's the Region 6 office?
**A. Correct. The 326 number is the Federal building which is Office of General Counsel.**
Q. OGC?
**A. Right.**
Q. Okay. Was a copy of this letter provided to you?
**A. I would have to assume that it was. It doesn't look familiar particularly.**
Q. If you turn to page five of this letter, the five is on the bottom, it says page nine in the upper



right-hand corner.
**A. I'm with you.**
Q. The letter reads, Also we are prepared to not award the Forest Service timber sales listed below until November 23, 1998. And there's a list that follows.
Did you help put that list together?
**A. Did I help put the list together, well, yes, I would have.**
Q. How did you go about doing that?
**A. As we looked in the earlier fax, I don't remember the exhibit number, but it was through those faxes out to my forests that plaintiff's list that we developed charts of the status of the sales that plaintiffs were interested in.**
**So that compendium of data then would tell us status of those sales and choices would then be made on whether to advertise an award or hold the award.**
Q. So you have three columns here, Forest Service, Sale, and that's the name of the sale?
**A. Correct.**
Q. The forest is the National Forest it is on and Status is either awarded or no award, although, all of these but it looks like two, all of them are no award.
What does it mean to say, Award by agreement

with purchaser in settlement of NFRC vs. Glickman?

**A. That was the National Forest Research Council's lawsuit against USDA on the Forest Service under the Recisions Act that we were not prosecuting our duties under the Recisions Act which was primarily to provide replacement volume for the sales that had nesting birds, you know, the Resscissions Act has lots of funky details like that.**

**So we did have a court overseeing mediation with Judge Hogan on NFRC vs. Glickman and as part of that we agreed and then the court ordered us to award certain sales.**

Q. Okay. Take a look at what's been previously marked plaintiff's Exhibit 38. Have you seen that before?

**A. No.**

Q. Do you know what Allen Apliss (phonetic) is?

**A. I do know who Ellen Apliss was, yes.**

Q. Is she no longer with us?

**A. She's not in Department of Justice anymore I don't believe.**

Q. Sorry. And have you not seen this cover sheet or the pages attached to it previously?

**A. No, I haven't.**

Q. Okay. Do you see on the first page of this



document where it says, As I promised here is the list of Forest Service and Bureau of Land Management timber sales rushed through to avoid the Survey and Manage requirements?

Do you see that?

**A. I do.**

Q. Do you have any knowledge of environmental groups providing such a list to the government other than in the ONRC Action litigation?

**A. I do not.**

Q. Did you hear from anyone in the course of your duties that an allegation had been made that the Forest Service and the Bureau of Land Management had rushed through the decision documents on sales in order to avoid Survey and Manage requirements?

**A. We had heard that from plaintiffs in the ONRC Action case as well as they did public press releases and those sorts of things.**

**It was fairly general knowledge to those of us who follow such things that plaintiffs believed we had rushed through to make decisions to avoid the oncoming Survey and Manage requirement.**

Q. Did the Forest Service do that?

**A. No.**

Q. What's your basis for that answer?



**A. My answer is as far as I know we observed every law that we needed to do in terms of NEPA and NFMA and Endangered Species Act for all of the sales that we did NEPA decisions for.**

**I don't think anything was rushed necessarily.**

Q. Did you ever hear there had been instructions or directions to forests to hurry up and finish Decision Notices in order to beat the October 1, 1996, deadline?

**A. Yes, I had heard that.**

Q. From whom?

**A. I'm aware there's an e-mail from Bob Devlin out to the forests where he urges them to appreciate that the October 1 deadline was coming.**

Q. And your understanding is that he urged them to finish up the Decision Notices rather than wait until after the deadline?

**A. Well, we knew as did -- Bob knew and our forests knew that as of October 1 the survey obligations were greatly increased.**

**So I think his e-mail stands for itself. I mean, he said what he said and if you need to interpret that as plaintiffs did that that was a rush, to rush, you know, the public is entitled to so many days of review on NEPA documents anyway and that was short-cut**



**so rush what, you know. I'm not sure.**

**Legally we couldn't rush anything. You had to meet your statutory time frame.**

Q. Did you discuss this e-mail you are talking about with Mr. Devlin?

**A. No.**

Q. Did you discuss the Devlin e-mail with anyone else?

**A. At the time?**

Q. At any time.

**A. Only through the discovery of Blue Lake case, your Blue Lake case. When we ran across it during that discovery I discussed it then.**

Q. With whom?

**A. I would have discussed it with, who was our counsel, Jack Groat I believe.**

Q. So you didn't talk to anyone else about it like Jerry Jensen, he was in Region 5, but anyone else from Region 6 did you talk to?

**A. I didn't know Devlin sent it out. I didn't know. I wouldn't have any reason to know that. It wasn't a litigation matter and Bob would do his director job, you know, with his timber people and I would have no reason to know what he was directing them to do or not do until it became a matter of litigation**

and then when it did in your Blue Lake case is when I saw it.

Q. When you saw this e-mail you were surprised?

A. Was I surprised?

Q. Yes.

A. I don't know I would use the word surprised. I found it interesting he would send that out.

Q. Why was it of interest?

A. Well, because, and I'm thinking and trying to get the dates right, because I wouldn't have known about it until when was Blue Lake? What was the year of your Blue Lake case? It was certainly not '98 or '99. It had been in the 2000s.

Q. I presume the e-mail you are referring to was written sometime prior to October 1, 1996, or '98, one of those two?

A. It must have been, but I didn't see it and I wasn't aware of it until we did the discovery in Blue Lake.

Q. After you became aware of it did you discuss it with anyone other than Mr. Groat?

A. No.

Q. No discussion at all?

A. No, it is like water over the dam. No, I didn't discuss it with anybody and it wouldn't be my



position to do that anymore.

Q. I meant informally as well as formally. You said it was of interest so I thought perhaps you talked to somebody else about it, one of your colleagues, for example?

A. Not other than Jack, no.

Q. Take a look at plaintiff's Exhibit 40. Can you identify the document?

A. It is a letter from Diana Bus, who was the contracting officer on the Willamette National Forest, to me.

Q. You say the contracting officer. There was just one for the whole forest?

A. I believe that's right.

Q. She writes to you and says, Here is some information on sales we would like to move forward with award on?

A. Correct.

Q. Do you know why they wanted to move forward on award?

A. Well, because that's what the Forest Service does, when they get sales prepared they advertise them and try to sell them and then award them.

And we had been -- this was February of 1999 so we had been held up since the filing of the ONRC



lawsuit. That was July of '98 so we had been through all of the machinations of do we award, don't we award, do we delay, what's the deal.

So by February we solicited forests as she mentions here about my call -- about the call we had in the lawsuit that we believed there was an opening to award some sales. And if you check the docket for the ONRC Action case you will find that Judge Dwyer actually dismissed the case in the end of 1998.

And then the plaintiffs erroneously did a second amended complaint and then a third amended complaint and the case started all over. And I recall that was sometime in February or March. And they asked -- they asked leave to file their amended complaint, but I think we believe there was an opening of time for us to get sales awarded there in January and February.

Q. Why do you characterize that as an opening of time?

A. Because the lawsuit was temporarily gone.

Q. So the lawsuit was not formally in existence, but they had been given leave to amend?

A. They had not been given leave. They requested leave.

Q. There had been no action taken on that. Judge



Dwyer didn't deny them leave?

A. Ultimately, no.

Q. Was there initial denial?

A. I don't recall.

Q. So who made the decision that this was an opening within which sales could be awarded?

A. I don't know who made that decision.

Q. Someone above your level?

A. Yes. I make no decisions. I'm a staff person. I recommend, but I don't make decision.

Q. Would such a decision have required Mr. Devlin's concurrence?

A. It would have required Bob's concurrence and the Regional Forester. We didn't do much in this case without Bob Williams in the know.

Q. Was there any discussion at the time of the risk that the government might be assuming in awarding these sales?

A. I don't know if there was. Not with me.

Q. No e-mails or other conversations with you about that?

A. See, that wouldn't fall in my world. That would be a Jerry Hofer, contracting officer for the region, forest contracting officers and Bob's discussion of risk about that.

Q. I think you said earlier we solicited forests so at someone's instruction did you send a letter or e-mail?
**A. It looks here like we did a phone call.**
Q. Phone call. And you were asking them what sales would they like to award within this window of opportunity?
**A. Yes.**
Q. And they gave you some information?
**A. Diana did.**
Q. But information was requested I take it by you?
**A. It makes sense to me at this point that we would have said we believe we have a window where we can get some of your sales awarded so if you have some you would like to move along, let us know, and so that's what Diana did here. Not all forests did, but Diana did.**
Q. You made the requests of all forests?
**A. Correct.**
Q. So you would have made the request to the Umpqua as well?
**A. Correct.**
Q. That would have gone to Brenda Woodard?
**A. It would have.**



Q. And so did you ask the forest to provide you with some information on the sales that they would like to move forward with award?
**A. Well --**
Q. For example, did you ask if they had been appealed by ONRC Action representatives?
**A. Right. My recollection is we already had that information. We had gathered all of the sale data back when they built the charts in 1998.**
Q. Okay. All right. And did -- were you asking the forest to give you the dates on which they were proposing to award the sales?
**A. I don't recall that, Gary.**
Q. Okay. Further down in this communication under eight, Trove Thin, Christy Basin EIS, first page of plaintiff's Exhibit 40 --
**A. All right.**
Q. -- there's a statement which reads, Are we going to move forward with advertising them, question mark, question mark, question mark. That's probably a Devlin question/answer.
Do you know what that is referring to? Is it referring to the sales that are on this ONRC list?
**A. Right.**
Q. But what does she mean about probably a Devlin



question?
**A. Meaning that it is a policy level call.**
Q. Whether to advertise them or not?
**A. Correct.**
Q. At the bottom of the page there's a reference to the ALA lawsuit. What's that?
**A. That's the American Lands Alliance lawsuit.**
Q. In brief what was that about?
**A. You know, there were two of them and I don't remember what the issues were in those cases, but I think we won them both, but I can't remember.**
Q. Let's move to another document. Take a look at plaintiff's Exhibit 41A. On the first page of 41A this looks like an electronic message. Am I right?
**A. It is.**
Q. Is this in the old DG system?
**A. You know, I actually had to mark down on my Rolodex because of your Blue Lake discovery when we moved from Applix to IBM and I don't recall the date, Gary, but if I look down here at my e-mail address it is the IBM system address.**
**So this would not have been -- this would not have been the Applix time.**
Q. Can you tell the approximate time period when this e-mail was sent?



**A. What I'm recalling is when I talk about March 26, that's shortly after their third amended complaint.**
Q. That's 1999?
**A. Yes, and this would make sense that we got a briefing schedule after that last amended complaint came in.**
Q. What is promise one and promise two about?
**A. That's for awarded sales. Promise one would be ten days of notice before we approved the plan of operations, that being the pre-work the purchasers do with us.**
Q. These are for the nine sales actually named in the complaint?
**A. Right, and apparently they were awarded sales.**
Q. And promise two?
**A. Those would be as to unawarded sales, certain unawarded sales --**
Q. All right.
**A. -- because we would be giving them notice of our decision to award.**
Q. You say further down in the e-mail, To help you with that I will be sending an issue chart tomorrow.
What was that?