**A. We developed charts that had in columns I believe the issues that were raised in the amended complaint and then we asked the forest to look at any appeals that came in on the named sales so we could conclude whether or not plaintiffs had raised or waived an issue because they can't take it to court -- they can't take the issue to court if they didn't raise it in their appeal.**
Q. And what would that mean in terms of what the Forest Service could do with that sale?
**A. Well, that would mean if they had not raised the issue, that we would ask the court to dismiss the claim as to those sales where plaintiffs did not raise that and then if we were successful, then that sale would not be part of the lawsuit.**
Q. But you need to raise that in a motion and the judge would have to decide?
**A. Correct, correct.**
Q. You say in here, We need to assure DOJ that we have a strong defense on the sales that we intend to award even though DOJ is not asking to be a part of the award decision. Good news you say?
**A. Good news, that's true.**
Q. Why is that good news?
**A. Well, because there's always tension between**



**the client and the attorney in our cases on who is making the policy calls when we get into litigation.**
Q. Who made the policy call here?
MS. STENTIFORD: Objection. Don't answer that.
THE WITNESS: What's the rule, Counsel?
MS. STENTIFORD: Privileged.
THE WITNESS: Okay. So don't answer?
MS. STENTIFORD: Don't answer.
MR. STEVENS: What was the question?
(Reporter read back last question.)
MR. STEVENS: You are instructing her not to answer that question?
MS. STENTIFORD: Yes, I'm instructing her not to answer that question.
MR. STEVENS: We will pursue that absolutely later on, but I don't think we are going to be able to get the judge on the phone at 8:00 at night back there.
Q. (By Mr. Stevens) Let me ask you this, was the policy call made by the Forest Service for the Forest Service?
**A. The Forest Service made the decision whether or not to award sales.**
Q. And the Forest Service had the final say as to whether a sale would be awarded?



**A. I don't know how to answer that.**
Q. Did the Forest Service have to concur with any other governmental agency?
**A. We certainly conferred with trial counsel and this sentence means we needed to assure our trial counsel that we had a strong defense generally meaning that the issues raised in the complaint were not raised in appeal.**
**And so if they were not raised in appeal, we felt -- the agency felt we had a pretty strong defense to try to get that sale out of the lawsuit.**
Q. Further on down in this e-mail you say, R5 is sending a ten-day notice letter to ONRC today for two sales, Upper South Fork and Happy Thin.
What's the ten-day notice letter?
**A. That was part of the stipulation on the briefing schedule promise, well, it would be promise one or two and I don't remember if it was whether or not they were going to award Happy Thin or whether or not they had approved their plan of operation.**
Q. So in either case it would be ten days' notice before any ground-disturbing activities could take place, at least that?
**A. At least that, correct.**
Q. Do you know if any purchasers were notified



that this ten-day notice letter had been sent out on Happy Thin?
**A. I don't know about Happy Thin. That's Region 5.**
Q. And you say at the very bottom, As before the sale list is not -- it is not be, but you meant to say is not to be distributed outside the agency?
**A. Where are you reading?**
Q. The very last sentence at the bottom of this paragraph that is in all caps.
**A. Correct. What's your question?**
Q. Well, so would I be correct that that list was not made available to anyone outside the agency so far as you know, the list being referred to?
**A. Correct.**
Q. And that's the list of sales that the Forest Service intended to award?
**A. You know, that's a good question because I don't know what sale list really I'm referring to. It would not be the named sales in the complaint because that would be public knowledge.**
Q. Right, that's fair enough.
**A. So here we say, Attached is an R6 chart of the sales that are subject to promise two, you need to check the appeal files to be sure plaintiffs appealed.**

**That might be what we're talking about.**
Q. Okay. Let's turn over to the next page that's attached. We're looking at 00104 and this is 00105 and they're stapled together and I assume that's the way we got them for some reason or another. I'm not representing they are otherwise related.
This is an electronic message that you sent?
**A. It is.**
Q. Is that your handwriting on the document?
**A. No.**
Q. Do you know whose handwriting it is?
**A. I don't recognize that, I don't.**
Q. Do you know why the sale names of Whitebird, Pigout, and Jigsaw are included on this document?
**A. I do not.**
Q. And the other information at the bottom, that's not your handwriting either?
**A. It is not my handwriting.**
Q. Okay. It looks like the categories of information you were just describing before, Plaintiff Appealed, yes or no, Auction Date, et cetera, et cetera, Award Date, Advertise Date?
**A. Correct.**
Q. That's the kind of information that you gathered?



**A. Yes, I agree we did gather that.**
Q. You sent this to Ted/Owen, right, Ted Boling and Owen Schmidt?
**A. They were -- I would assume that I sent this to my standard forest mailing list and that included Ted Boling and Owen Schmidt.**
Q. You say, Can you fill out chart and return to me by tomorrow. So you were asking the forest to fill out a chart and am I correct that it was a chart that would have columns on it very similar to the ones that are handwritten?
**A. Yes.**
Q. Okay. Do you know if the Forest Service was considering awarding Whitebird, Pigout, and Jigsaw among others and that's why?
**A. You know, I don't know who wrote this and so I don't know what the forest's intent was on that.**
Q. In your e-mail you say, The immediate job is to identify the sales that have been awarded or that you intend to award by mid-June.
Why was the date of mid-June significant?
**A. My guess is that's the briefing schedule because the sentence before says they would like to get the briefing done without the interruption of a TRO or PI.**



Q. Okay.
**A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.**
Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?
**A. I would characterize it differently.**
Q. How would you characterize it?
**A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.**
Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?
**A. The 808-2255 number is my fax which is here in**



**the Regional Office.**
Q. So in the ONRC Action the plaintiffs faxed this to you?
**A. I would not think so. I would have gotten it from Ted Boling.**
Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.
What's he talking about, the at-risk category?
**A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.**
Q. Yes, we are. Sorry.
**A. I'm sorry, it is from Axline.**
Q. It is not that I have it and you don't. It is not in my copy either.
**A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.**
Q. So it was not too veiled a threat, they might

sue and try to get a temporary restraining order?
**A. Correct. They had already sued. They would be asking for injunctive relief during the summary judgment briefing schedule.**
Q. Okay.
**A. See, the second paragraph says that, And some of the sales seem unlikely to be awarded and operated prior to completing summary judgment motions. Because we believe in Murphy's law, however, we think they might be awarded and might be operated during our summary judgment schedule.**
Q. Well, the control number on here, 338 followed by 339 indicates that this was the way we got it from the government. I agree with you it looks like at least the signature page is missing?
**A. Yes.**
Q. Sales at Risk Pre-June 11 and so the Forest Service sales on that list are sales at least as of the date of this letter, April 12, 1999, the ONRC Action plaintiffs were threatening to challenge with TROs if they were awarded?
**A. Correct.**
Q. We're going to look at 41D next. In this letter from you to Brenda Woodard you say, I forwarded your April 19, 1999, letter to the Department of



Justice in which you relay your intent to award, and various sales are listed there, on or before May 5.
Did you receive that letter, the April 19, 1999, letter? I assume you did.
**A. I would have seen it.**
Q. Do you know why Ms. Woodard was sending this letter to the Department of Justice?
**A. She didn't send it to the Department of Justice. I forwarded her letter to me to the Department of Justice, like we had looked at Diana Bus's letter earlier, this was Brenda's answer to that inquiry.**
Q. Okay. All right. Then you say to her you understood these sales were not at-risk sales that ONRC had identified, but the next paragraph you add a qualification based on your discussions with Mr. Boling.
In the last sentence of the paragraph you say, In other words, the at-risk list does not replace the April 5 sales identified by ONRC Action as sales they are to receive prior notice of award according to the Stipulation to Establish a Briefing Schedule filed in this case.
**A. That's a confusing sentence.**
Q. What were you trying to tell us?



**A. In other words, the at-risk list does not replace the April 5 sales identified as sales they were to receive the ten-day notice.**
**So in our Stipulation to Establish the Briefing Schedule we would have represented that these sales on the Umpqua were -- that we would give notice to plaintiffs of either awarding or approving the plan of operations with a ten-day notice.**
Q. So you are reminding her the ten-day notice applies to sales listed here?
**A. Yes, under the stipulation and whether or not ONRC considered them at risk or not did not matter because we had made this representation to the court about the sales we were going to give notice on.**
Q. In the last short paragraph you say, As you know we have a hearing on June 11. That's the summary judgment hearing?
**A. That would be the summary judgment hearing.**
Q. In the ONRC Action?
**A. Correct.**
Q. So when you sent this to Ms. Woodard what did she do with respect to these sales?
**A. I don't know what she did.**
Q. Did you ever find out?
**A. No.**



Q. Take a look at plaintiff's Exhibit 43, please. Can you identify that document for me?
**A. I don't know who authored this.**
Q. This is not in your handwriting?
**A. It is not.**
Q. The Jerry Hofer referred to there is the Jerry Hofer you were referring to before?
**A. It is.**
Q. And, of course, Bob Devlin is Bob Devlin?
**A. Correct.**
Q. Were you involved in a conversation with Bob Devlin and Jerry Hofer as referenced here in this document?
**A. Well, it appears that I was a part of a conversation and/or a phone call, but I can't -- I don't recall it.**
Q. Do you remember the discussion, if any, regarding Prairie Thin and Pigout?
**A. Not particularly.**
Q. Do you have any recollection of that at all?
**A. No.**
Q. Okay. We will talk with Axline on Tuesday. Do you know what that might be about?
**A. I would assume from the format of this note that this is what Ted is telling us, Ted Boling is**

**telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.**
Q. Okay.
**A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.**
Q. Okay.
**A. That would be my read of it, but I don't recognize the handwriting or the topic.**
Q. And you don't have independent recollection?
**A. I don't.**
Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?
**A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.**
Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?
**A. Correct.**
Q. So if anybody needed to know what was on that list or which list, you were the authoritative source



to call?
**A. I had files.**
Q. And you could read them what was on the document?
**A. I could.**
Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?
**A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.**
Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?
**A. I don't know.**
Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?
**A. I do.**
Q. Can you identify it then for the record?
**A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.**
Q. As of July 6th?
**A. As of that -- it was their July 6th letter which I believe we just looked at.**



Q. Okay. Did you prepare this chart?
**A. I think someone on my staff prepared it.**
Q. Okay. What was the purpose in preparing it?
**A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.**
Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?
**A. On July 7th, right, that appears to be when we printed this off.**
Q. And you can tell that from the date on the lower left?
**A. Yes.**
Q. Was this chart used in any decision-making process that you are aware of?
**A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.**
Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.
What hearing is that a reference to?
**A. Well, we would have to check the docket for**



**this case.**
Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?
**A. That would be my interpretation of it.**
Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?
**A. Not to my knowledge.**
Q. Was it made available to Mr. Axline?
**A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.**
Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?
**A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.**
Q. Who would be on that -- is that your distribution list you are talking about?
**A. Yes.**
Q. Who would be on that list?
**A. It would be my case coordinators on these west-side national forests.**

Q. There would be one designated for each forest?
**A. There is.**
Q. Usually the contracting officer for the forest?
**A. Not necessarily. Usually, no, it did not have to be the contracting officer. Whoever the forest supervisor told me was the contact.**
Q. Who else?
**A. Well, Owen Schmidt and Ted Boling would be on that distribution list as well.**
Q. Okay. Anyone else?
**A. Not that I recall.**
Q. Would Bob Devlin be on the list?
**A. No, I don't think so. He usually gave me the instructions to do things so I don't know if I would have sent it to him.**
Q. Would there be somewhere a printed-out document that lists the people on the distribution list or could we find such a document?
**A. Not anymore. Yeah, not anymore.**
Q. Am I right this e-mail refers to that chart we were just looking at?
**A. That would be my conclusion.**
Q. You refer to a briefing paper, but that's not attached, is it?



**A. It is not.**
Q. Do you know where that briefing paper is?
**A. I don't.**
Q. We haven't talked about it today, have we? It is not that other briefing paper we looked at earlier?
**A. It would be -- if it was one I did, it would be dated similarly. It would be a July 6th -- around July.**
MR. STEVENS: Ms. Stentiford, I don't believe we received a copy of that briefing paper and I'm sure it would be within the scope of our request so let me reiterate the request and I will check with my office and get back with you to be sure.
MS. STENTIFORD: Okay.
Q. (By Mr. Stevens) Further down in your e-mail you say R5/R6 are ready to award seven sales and approve plan of operations on one.
Do you know which sales we're talking about here?
**A. I do not.**
Q. There's a reference to the draft Bartuska letter. What was that?
**A. Bartuska was head of the timber department in the Washington office and she issued a letter and I don't know why it was a draft.**



**They must have sent out a warning flag or something, but I recall the Bartuska letter telling us we could not award any sales in litigation and if we wanted to do that, we had to go through the chief.**
Q. That was in effect at this time?
**A. Well, it says draft so my guess is it was not in effect, but ultimately it became in effect.**
Q. You saw it in final form?
**A. I did.**
MR. STEVENS: I will make a request also for the draft and the final form of the Bartuska letter. I don't think we have that.
THE WITNESS: June 25th, 1999, I believe is the date.
MS. STENTIFORD: If we have it. If we didn't give it to you, I will assume it's because we didn't have it.
MR. STEVENS: If you have it and we didn't get it, I assume it is just an oversight.
MS. STENTIFORD: Right, that's what I'm saying.
Q. (By Mr. Stevens) Was that letter superseded by another letter?
**A. It was.**
Q. Who wrote the second letter?



**A. Bartuska's letter was rescinded by --**
Q. Mr. Furnish?
**A. Yes, Jim Furnish.**
Q. You are so good on dates do you recall when that happened?
**A. No, I don't recall that. It was a year or two later if not more.**
Q. Okay.
MR. STEVENS: I will add a request for the Furnish letter in addition to the draft and final Bartuska letter.
Q. (By Mr. Stevens) You say here, We want to consider moving ahead with this, meaning these, sales and future sales notwithstanding the draft Bartuska letter.
Who is the "we" you are referring to?
**A. That would be Bob Devlin.**
Q. And you refer to something called trading stock?
**A. Uh-huh.**
Q. What's that?
**A. Well, plaintiffs appreciated that they had named very few sales in their third amended complaint which started our briefing schedule in 1999 yet they were asking us in these, quote, settlement letters to**

**not award hundreds of sales, you know, only a few of which had been actually named in their complaint, and we were negotiating with plaintiffs because we did not want to interrupt the briefing schedule because we thought we would win with TROs and PIs.**
**So all of these other delays in award in my vernacular were trading stock. It was a buy-off to keep plaintiffs from filing a TRO or PI.**
Q. Okay. Next page handwriting, is that yours?
**A. No.**
Q. It looks like the handwriting you couldn't identify before to me?
**A. It is.**
Q. Do you have any idea whose it is?
**A. The BW at the bottom leads me to believe it is Brenda Woodard.**
Q. Okay. Does looking at the substance of it, does this reflect a telephone call involving you, Brenda Woodard, and Ted Boling?
**A. It looks like it, but I don't recall this call.**
Q. Okay. Take a look at plaintiff's Exhibit 51, please.
**A. Oh, I'll be. Go ahead.**
Q. Is this the Furnish letter?



**A. It is.**
Q. It is the one you were referring to?
**A. It is.**
Q. You said it was a couple years later?
**A. I was mistaken. And the Bartuska letter rather than June 25th is June 8th.**
Q. How can you tell that?
**A. That's the first sentence of this letter, This letter supercedes the direction provided by the Washington office Director of Forest Management, who was Ann Bartuska.**
Q. Okay. So between June 8th, 1999, and October 5th, 1999, the Bartuska letter was the direction --
**A. Was the direction.**
Q. After October 5th, 1999, the correct direction was found in this Furnish letter?
**A. Correct.**
MR. STEVENS: Okay. I think that's all I have.
MS. STENTIFORD: I have a couple questions on cross.



EXAMINATION
BY MS. STENTIFORD:
Q. Is it your understanding that part of the mission of the Forest Service is to conduct timber sales?
**A. Well, conduct is a difficult verb.**
Q. Award?
**A. We prepare and offer for sale timber sales. That's very much our mission.**
Q. As much a part of the Forest Service mission is complying with environmental laws?
MR. STEVENS: Objection. That calls for speculation from the witness. There's also no foundation and you are asking a legal question.
MS. STENTIFORD: You can answer.
THE WITNESS: Do I answer?
MR. STEVENS: Yes.
THE WITNESS: Ask it again.
Q. (By Ms. Stentiford) Well, you testified that it is your understanding part of the mission of the Forest Service is to conduct timber sales?
**A. Correct.**
Q. You testified a great deal in your direct testimony as to this environmental litigation?
**A. Correct.**



Q. What is your understanding of the nature of that litigation?
**A. They were challenges to our compliance with the National Forest Management Act and the National Environmental Policy Act.**
Q. Are those -- what is the nature of those statutes?
**A. Those are --**
MR. STEVENS: I object again. That calls for a legal conclusion from the witness.
THE WITNESS: The National Environmental Policy Act is a disclosure statute that requires us to go through certain processes in order to disclose environmental consequences of our actions.
The National Forest Management Act primarily guides us to produce forest plans and develop standards and guides for how we are going to manage the land.
Q. (By Ms. Stentiford) When you say "manage the land," what do you mean?
**A. That would range anywhere from all of our multiple use duties from recreation to timber to wildlife to water, all of the land management activities that would be attendant to those obligations.**
Q. And the Forest Service is obligated to meet

those obligations?

**A. We are.**

Q. You testified in your direct testimony about several -- well, fairly early on in your direct testimony you testified you thought there was an opening for the Forest Service to award certain timber sales; is that correct?

**A. That's correct.**

Q. Now, the sales that you were referring to -- the sales that you asked the Regional Forests to identify as being ready for award, it is your understanding that the foresters would not identify these sales unless they were -- unless they had met all of the legal requirements for releasing the sale?

**A. That's correct. There are certain gates of accomplishment our timber sales have to go through before they're ready to be advertised and awarded and that was part of our inquiry as to whether or not they had passed through all of those gates and were ready to be advertised and awarded.**

Q. That includes compliance with the environmental statutes you referred to before?

**A. That's correct.**

Q. The contracting officers that you would have dealt with at the Regional Forests, they're familiar



also with the environmental legal requirements for awarding timber sales?

**A. They are.**

MR. STEVENS: Objection, speculation, lack of foundation.

Q. (By Ms. Stentiford) Do you have any basis for knowing whether timber companies monitored any of the -- well, specifically the ONRC litigation that you discussed in your direct testimony?

**A. We had a defendant intervener that represented the industry as I recall.**

Q. So there were timber companies that were parties to the ONRC litigation?

**A. I don't recall if there were any companies, but I believe there was -- NFRC, the National Forest Resource Counsel I believe was a defendant intervener in the ONRC Action case.**

Q. And do you have any basis for knowing whether that counsel informs timber companies as to the status of, well, specifically with the ONRC litigation informed timber companies as to what was going on in that litigation?

**A. I wouldn't have particular knowledge their counsel did that, but I do know in order to gain intervener status NFRC does have to explain to the**



**court that it represents companies that have interests in our timber sales.**

Q. And if nothing else the ONRC litigation was a matter of public record; is that correct?

**A. It is a matter of public record.**

Q. And it was not litigated under seal?

**A. It was not.**

MS. STENTIFORD: I don't have anything else. Thanks.

MR. STEVENS: We're all finished.

(The deposition concluded at 5:45 p.m.)

(Signature reserved.)



CERTIFICATE

STATE OF WASHINGTON )
) ss.
COUNTY OF CLARK )

I, Teresa L. Dunn, a Notary Public for Oregon, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, SUE ZIKE personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 1 to 64, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

Witness my hand and seal at Vancouver, Washington, this 18th day of January, 2007.

Teresa L. Dunn

TERESA L. DUNN
Notary Public for Oregon
Residing in Vancouver, Washington
My Commission Expires: 4/18/07

SUE ZIKE

I have read the transcript of the deposition taken on January 4, 2007 at Portland, Oregon, and make the following additions or corrections:

PAGE LINE CORRECTION AND REASON FOR CORRECTION

__________________________
SUE ZIKE

Subscribed and sworn to before me this ____ day of ________________________, 2007.

____________________________
Notary Public for the State of __________________________
residing at ________________
My Commission Expires: ____

Re: Scott Timber vs. The United States,
United States Court No. 05-708C
TLD