# In the United States Court of Federal Claims

### Nos. 01-570C, 01-627C, 04-501C
### (Filed: March 29, 2007)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
BLUE LAKE FOREST PRODUCTS, INC.,     *
                 Plaintiff,           *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                 Defendant.           *
* * * * * * * * * * * * * * * * * * * * * ** * * * * *
TIMBER PRODUCTS COMPANY,              *
                 Plaintiff,           *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                 Defendant.           *
* * * * * * * * * * * * * * * * * * * * * ** * * * * *
CLR TIMBER HOLDINGS, INC.,            *
                 Plaintiff,           *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                 Defendant.           *
* * * * * * * * * * * * * * * * * * * * * ** * * * *
```

Discovery; Attorney-Client
Privilege; "At-Issue"
Waiver; Subject-Matter
Waiver; Scope of Waiver;
Work-Product Doctrine;
Inadvertent Production of
Privileged Material.

Gary G.  Stevens, Saltman & Stevens, P.C., Washington, D.C., for Plaintiffs.

Richard P.  Schroeder, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

_____

### OPINION AND ORDER GRANTING PLAINTIFFS'
### REVISED MOTION TO COMPEL IN PART

_____

**WILLIAMS, Judge**

This matter comes before the Court on Plaintiffs' revised motion to compel.  In the motion, Plaintiffs contend that Defendant waived the attorney-client privilege and work-product immunity

by placing privileged material at issue in this suit, by voluntarily filing privileged documents in other lawsuits, and by inadvertently disclosing privileged documents during discovery in this litigation.

The Court agrees that these privileges have been waived, finding an "at-issue" waiver and a subject-matter waiver based upon Defendant's voluntary disclosure of privileged documents.[1]

### Background

In these consolidated cases, Plaintiffs seek damages for breach of contract stemming from the United States Forest Service's suspension of their timber operations in national forests in the wake of the District Court's ruling in Oregon Natural Resources Council Action v. United States Forest Serv., 59 F. Supp. 2d 1085 (W.D. Wash. 1999) (ONRC Action). In ONRC Action, the District Court held that the Forest Service arbitrarily and capriciously failed to comply with its obligation to perform surveys for certain rare plant and animal species before awarding timber sale contracts. ONRC Action, 59 F. Supp. 2d at 1093.

These obligations derive from the Northwest Forest Plan (the Plan) which contains Survey and Manage (S&M) Guidelines which were adopted in a Record of Decision (ROD) by the Forest Service and the Bureau of Land Management (BLM). Under the Plan, surveys of species to be protected were required to be done before ground-disturbing activities were undertaken to ensure that the viability of certain rare species would not be affected by logging. The Forest Service and the Department of the Interior issued memoranda saying that timber sales were exempt from the survey requirements if environmental impact statements (EIS) had been completed for the areas, even if the ground-disturbing activities had not begun. Thus, according to the memoranda, timber sales could be awarded without the surveys as long as an EIS had been done. The plaintiffs in ONRC Action argued that the memoranda unlawfully exempted many timber sales from the Plan's survey requirements in violation of statutes. The ONRC Action Court agreed. In its August 2, 1999 decision, the Court explained:

> Although the plan states that the category two surveys must be done
> if "ground-disturbing activities . . . will be implemented" after certain
> dates, the federal defendants issued interpretive memoranda equating
> issuance of an environmental impact statement with the
> "implementation" of ground-disturbing activities. The result is to
> exempt numerous proposed sales from the survey requirements. A
> November 1, 1997, memorandum issued jointly by the Forest Service
> and BLM stated that "[t]he interagency interpretation is that the

---

[1] This decision confirms and explains an oral ruling upholding the at-issue waiver and addresses additional discovery disputes on which the parties filed supplemental briefing. Tr. at 150-52. Unless otherwise stated, references to the transcript are to the December 3, 2004 argument. The Court also reviewed three binders of documents in camera, and the rulings on the privileged status of those documents are contained in a companion decision issued this date.

"NEPA decision equals implement[ation]". . . . Thus, for the first six category two species, for "[p]rojects with NEPA decisions signed prior to October 1, 1996, and contracts offered before January 1, 1997– no survey is required."  A September 1, 1998, memorandum extended this interpretation to the survey requirements for the remaining 71 category two species, concluding that surveys need not be done for any timber sale for which an environmental impact statement was completed before October 1, 1998.  The record shows that Forest Service and BLM managers uniformly relied on these memoranda in deciding not to require category two surveys before approving the nine timber sales challenged here, even though ground-disturbing activities have yet to begin on any of those sales.

These actions by the federal defendants are arbitrary and contrary to the plain language of the ROD. . . . Environmental impact statements often precede ground-breaking activities by a number of years.  To equate the NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements. . . . Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends.

59 F. Supp. 2d at 1092-93.

Plaintiffs contend that the Government breached both the express provisions of their timber contracts as well as the implied duties to cooperate and not to hinder, which Plaintiffs characterize as subparts of the implied duty of fair dealing.  They argue that Defendant's interpretation of the Plan as exonerating the agencies from the obligation to conduct surveys was arbitrary, capricious, and unreasonable.  Plaintiffs further argue that the suspensions were unreasonable because of this interpretation and because the Government possessed information which it did not provide Plaintiffs before they bought the sales.  Pls.' Motion to Compel Discovery Responses and For Sanctions (Motion to Compel) at 3-4; Tr. at 37-41.

Plaintiffs recognize that some of their timber contracts contain a clause which purports to limit the Government's liability to out-of-pocket expenses in the event of a suspension.  However, Plaintiffs contend that the Government is liable for breach of contract damages, not limited by the clause, because the Government also breached the implied duties to cooperate and not to hinder.  Tr. at 37-41.[2]

---

[2] Plaintiffs rely on <u>Precision Pine & Timber, Inc. v. United States</u>, 50 Fed. Cl. 35 (2001).  <u>See</u> <u>Precision Pine</u>, 50 Fed. Cl. at 59 ("the efficacy of a limitation on liability clause does not extend

(continued...)

3

Plaintiffs also assert that Defendant's assumption of risk defense -- which posits that Plaintiffs had special knowledge equal to the Government's when they bid on and accepted the timber awards -- places what Government personnel knew and when they knew it at issue.  Tr. at 38-39.  Because the Government is the only repository of information reflecting its own knowledge, Plaintiffs claim a vital need for this discovery.  Tr. at 38-39.

In a similar vein, Plaintiffs contend that Defendant broadly waived its attorney-client privilege by intentionally disclosing in other litigation, privileged information regarding its interpretation of the Plan and its knowledge about potential suspension of the timber sales.  Defendant contends that the waiver should be limited to those documents actually disclosed.

I.      **Do Defendant's Defenses of Reasonableness and Assumption of Risk Implicate An At-Issue Waiver of Defendant's Privilege Claims?**

Plaintiffs contend that attorney-client privilege and work product immunity have been waived in this lawsuit with respect to the following issues:

1)      Defendant's interpretation of the Northwest Plan, that NEPA equals implementation[3] and

---

[2](...continued)
to those situations where the breach, whether total or partial, arises out of events within the Government's control") (quoting C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992)).  The Precision Pine Court found a breach of the implied duties to cooperate and not to hinder performance and ruled that damages in excess of those permitted under the clause could be awarded.  Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, passim (2001) (citing C.J. Betters Corp. v. United States, 25 Ct. Cl. 674 (1992)).  During oral argument the Court ruled that in light of Precision Pine, discovery regarding the reasonableness of Defendant's conduct could lead to relevant information.  Tr. at 37-39.

[3]  Plaintiffs' counsel clarified this element of the at-issue waiver during oral argument as follows:

> Well, the first category has to do with the adoption of the interpretation that the NEPA decision equals implementation, the grandfathering-in provision, the concept that instead of taking ground-disturbing activities as the cutoff point, the government adopted an interpretation that allowed it to take the completion of an environmental analysis, even if it was done years prior to the Northwest client survey requirements, and use that as the cutoff point, meaning that they could sell the sale as if it had already had the plants and wildlife surveyed.

Tr. at 62.

> 2) Defendant's decision to award the timber sales despite developments in the <u>ONRC Action</u> litigation.[4]

Tr. at 26, 60-61. Plaintiffs assert that the agencies were confronted with questions as to whether they should follow the Northwest Plan by halting the sales and doing the surveys or grandfathering in the environmental impact statements which had already been performed and construing this to be sufficient compliance with the Plan without doing any surveys. Plaintiffs contend that the advice of DOJ attorneys involved with the <u>ONRC Action</u> litigation was implicated in awarding the sales which underlie these actions -- the "Happy Thin," "Jack Heli" and "Too Wild" sales.[5]

The Federal Circuit has recognized the implicit waiver of the attorney-client privilege when privileged information is "at issue." This concept was first articulated in <u>Hearn v. Rhay</u>, 68 F.R.D. 574, 581 (E. D. Wash. 1975) and adopted by the Federal Circuit in <u>Zenith Radio Corp. v. United States</u>, 764 F.2d 1577, 1579 (Fed. Cir. 1985). <u>Afro-Lecon, Inc. v. United States</u>, 820 F.2d 1198, 1204-05 (Fed. Cir. 1987); <u>accord United States v. Doe (In re Grand Jury Proceedings)</u>, 219 F.3d 175, 182-83 (2d Cir. 2000); <u>Granite Partners, L.P. v. Bears, Stearns & Co.</u>, 184 F.R.D. 49, 54 (S.D.N.Y.

---

[4] Plaintiffs' counsel clarified this element of the at-issue waiver as follows:

> What I'm saying with respect to the sales, the issue is what did the government know about the timber sales before they were awarded to Plaintiffs, and the question is -- that would be both specifically and generally. For example, the government might have known that the jack timber sale was an express target, if you want, of the environmental activists, and they never told Timber Products. That would be one kind of document. I'm just drawing up a hypothetical.

> Another kind of document that would fall within this category would be an internal government document that says we know that we have a substantial number of timber sales that are, in fact, the subject of this litigation, and, yeah, we're going to go ahead and award them anyway because we think it's more important for our policy reasons to proceed with the timber sale program than to not award, and we've made a tactical decision not to disclose this information to anyone else, and that may not happen.

Tr. at 71.

[5] Plaintiffs do not argue that the at-issue waiver covers attorney-client privileged communications among various Government counsel in <u>this</u> action. Tr. at 20-21. Rather, Plaintiffs claim the at-issue waiver for documents which, for the most part, predate December 2000, and relate privileged information concerning the Government's challenged interpretation of the Plan and its decision to award the timber sales despite developments in <u>ONRC Action</u>. <u>Id.</u> at 20-21, 68.

1999).[6]  Under <u>Hearn</u>, an implied waiver of the attorney-client privilege occurs when:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

<u>Hearn</u> at 581.  The at-issue implied waiver applies where the privilege holder makes assertions, the truth of which can only be assessed by examination of privileged communications.  <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1292 (2d Cir. 1991), <u>cert. denied</u>, 502 U.S. 813 (1991).  <u>See generally Developments in the Law-Privileged Communications</u>, 98 Harv. L. Rev. 1629, 1637 (1985) ("It has become a well accepted component of waiver doctrine that a party waives his privilege if he affirmatively pleads a claim or defense that places at issue the subject matter of privileged material over which he has control.").  The <u>Hearn</u> rationale for excepting communications from the attorney-client privilege has been applied to work product.  <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.</u>, 210 F.R.D. 506, 509-11 (S.D.N.Y. 2002);  <u>Mitzner v. Sobol</u>, 136 F.R.D. 359, 362 (S.D.N.Y. 1991); <u>see also</u> <u>Holgren v. State Farm Mut. Auto Ins. Co.</u>, 976 F.2d 573, 577 (9th Cir. 1992) ("We agree with the several courts and commentators that have concluded that opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling."); <u>FDIC v. Wise</u>, 139 F.R.D. 168, 172 n.4 (D. Colo. 1991).[7]

---

[6]  However, the Second Circuit recently ruled in <u>John Doe Co. v. United States</u>, 350 F.3d 299, 302 (2d Cir. 2003) that the designation of this waiver as an "at-issue waiver" is "not especially appropriate . . . [in] circumstances in which the party possessing the privilege makes no representation, express or implied, that it intends to surrender its privilege," which is normally the case when the advice of counsel defense is asserted.  "In such circumstances, the rule is perhaps more aptly described as one of forfeiture, rather than waiver."  <u>Id.</u>

[7]  The parties concur that "in appropriate circumstances courts in this jurisdiction may recognize 'at-issue waiver' of attorney work product protection."  Def.'s Supp. Submission Regarding Alleged "At Issue" Waiver at 4; Pls.' Supp. Submission Regarding the Applicability of an "At Issue" Waiver to Attorney Work Product.  The Federal Circuit's recent decision in <u>In re Echostar Commc'ns Corp.</u>, 448 F.3d 1294, 1302 (Fed. Cir. 2006), <u>reh'g denied</u>, 2006 U.S. App. LEXIS 17511 (Fed. Cir. Jul. 5, 2006), does not alter this conclusion.  There, the Federal Circuit reversed the district court's conclusion that the scope of a waiver of the work-product protection should include work product that was not disclosed to the client.  The Federal Circuit explained that "work-product waiver only extends to 'factual' or 'non-opinion' work product concerning the same subject matter as the disclosed work product," and does not cover "counsel's legal opinions and mental impressions that were not communicated" to the client.  <u>Id.</u> at 1303-04.  Here, by virtue of Plaintiffs' definition of the at-issue waiver, the work product subject to the waiver is only that which

(continued...)

Plaintiffs argue that the Government acted arbitrarily and capriciously both by interpreting the Plan to permit the Government to forego surveys where an EIS had been completed and by awarding timber sales despite developments in ONRC Action. As such, the allegations in this action center on information transmitted from Government counsel in the ONRC Action litigation and the use of that information in the Government's concurrent decisionmaking. Many of the documents in dispute are components of massive transmittals of information back and forth from counsel to agency personnel through two litigation coordinators, concerning strategy and actions dependent upon developments in ONRC Action, including timber sales. Here, as in Hearn "due to the nature of this suit, which puts the legal advice defendants received directly in issue, the policy behind the privilege is outweighed by the necessity of disclosure, and the privilege is inapplicable." 68 F.R.D. at 583; see also Estate of Cornwell v. American Federation of Labor, 197 F.R.D. 3, 4 (D.D.C. 2000) (finding an at-issue waiver of privileged information necessary to determine the asserted reasonableness of trustees' denial of benefits); accord United States v. Exxon Corp., 94 F.R.D. 246, 249 (D.D.C. 1981) (finding that the only way to assess the validity of defendant's defense of good-faith compliance with regulations was to probe attorney-client communications).

Under the unusual circumstances here, the reasonableness of Defendant's interpretation of the Northwest Plan survey requirements and its award of the timber sales, despite developments in ONRC Action implicate privileged communications.[8] The documents and testimony produced by Defendant in discovery in this action as well as privileged documents voluntarily produced by Defendant in other cases being litigated in this Court directly link advice of counsel with the agencies' decisions for implementing the Plan, as well as their assessment of the ONRC Action litigation and its impact on the decision to award sales. See Deposition Exhibits 31, 35A, 35B, 41A and 41D, Pls.' Notice (Feb. 7, 2007) Attachments. These documents and deposition testimony reflect that the approval of counsel was a factor in the agencies' interpretation of the Northwest Plan

---

[7](...continued)
was communicated to the client agencies in connection with the decisionmaking being challenged.

The Court notes that the Federal Circuit has granted a petition for en banc consideration in In re Seagate Technology, LLC, No. 830, 2007 U.S. App. LEXIS 2457 (Fed. Cir. Jan. 26, 2007), and invited the parties to address inter alia, the following related questions:

> (1) Should a party's assertion of the advice of counsel defense to willful infringement extend waiver of the attorney-client privilege to communications with that party's trial counsel? See In re Echostar Commc'ns Corp., 448 F.3d 1294 (Fed. Cir. 2006).
>
> (2) What is the effect of any such waiver on work-product immunity?

In re Seagate Tech., LLC, No. 830, 2007 U.S. App. LEXIS 2457, at *1-2 (Fed. Cir. Jan. 26, 2007).

[8] Of course, this ruling should not be construed to mean that every time the reasonableness of agency action is challenged, the agency's privileged information becomes at issue.

and in going forward with the sales.  For example, the Forest Service advertised and offered the Jack Heli timber sale to the public because information from DOJ led the contracting officer to conclude that the Jack Heli sale had been dropped from the ONRC Action litigation.  Pls.' Revised Mot. to Compel (Pls.' Rev. Mot.), Ex. B, Def.'s Resp. to Interrog. No. 19.[9]

In addition, during his deposition, the contracting officer was shown a handwritten note on the bid for the Jack Heli timber sale which stated, "With respect to Bill Turner [the chief forester for Timber Products Co.], advise him we cannot award until Justice Department says we can." Matthews Dep. at 46.  The contracting officer was then asked: "[T]ell me what role the Justice Department advice played in the decision not to award the Jack Heli timber sale at the time of the bid opening or shortly thereafter," but  Defendant's counsel instructed him not to answer this question.  Id. at 45-46.  However, the contracting officer did address the involvement of counsel as follows:

> MR. STEVENS:  Going back to . . . your letter to Mr. Bill Turner of the Timber Products Company, when you said, "I do not know when award of the sale will be approved," what did you mean?
>
> A.  Basically, because of the litigation, we were looking for approval from the Department of Justice attorneys to proceed.
>
> Q.  Did you, at some point, receive approval?
>
> A.  Yes.

Id. at 51-52.

Moreover, the contracting officer stated during his deposition that lists of timber sales from the ONRC Action plaintiffs were used to decide whether the sales should or should not be offered to the public.  Matthews Dep. at 38-39.  However, some of these lists of sales were designated as

---

[9]  This Interrogatory Response stated:

> The sale was advertised on September 25, 1998, and bids were opened on November 3, 1998.  ONRC sent a letter to the Department of Justice on November 11, 1998, indicating it had inadvertently dropped the Jack Heli sale [from the ONRC complaint] and requested that the sale not be awarded.  The Department of Justice then requested that the forest not award the sale.  The Department of Justice informed the plaintiffs on March 1, 1999, that the sale would be awarded.  The sale was awarded on March 2, 1997.

Def.'s Resp. to Interrog. No. 19.

privileged and not produced, while some were apparently produced voluntarily by Defendant as "settlement documents from <u>ONRC Action</u>."  Tr. at 10; Tr. (Mar. 23, 2005) at 34; Tr. (Apr. 26, 2005) at 7; Tr. (Oct. 7, 2005) at 65, 77, 120.[10]  In addition, Deposition Exhibits 35A, 35B, 41A, 41B and 41D, which Defendant voluntarily disclosed in other COFC litigation, expressly disclose attorney-client privileged communications and advice regarding potential timber sales in light of developments in <u>ONRC Action</u>.  <u>See also</u> Def.'s Aug. 18, 2005, Amended DE Priv. Log, Doc. DE 654, Tab 7 at 1.  While these documents form the basis for a wholly separate subject-matter waiver of the attorney-client privilege as discussed <u>infra</u>, they also indicate that legal advice played a role in the Government's decisions on the timber sales, giving rise to an independent at-issue waiver.

Further, Defendant has raised an "assumption of the risk" defense, arguing that Plaintiffs assumed the risk by bidding on their timber contracts, knowing as much as the Defendant did about whether those contracts were likely to be suspended.  Tr. at 24.  Plaintiffs contend that knowledge that the sales were likely to be suspended was kept from them, and that it is essential to their case to know what the Government agencies knew and when they knew it.  <u>Id.</u> at 24-25.

In the instant case, absent the implied waiver, Plaintiffs will be unable to ascertain why the government agencies interpreted the Northwest Plan in the manner they did and what the Government itself knew about the likelihood of suspending these awards at various points in time. These are crucial elements in assessing both the reasonableness of the Government's actions and whether Plaintiffs assumed the risk in accepting the awards.  In a similar breach of contract action, the Court analyzed the reasonableness of the defendant's underlying actions in suspending the contract.  <u>See</u> <u>Precision Pine</u>, 50 Fed. Cl. at 64 (stating that the clause cannot be interpreted "to permit the suspension of contracts when the Government unjustifiably and unreasonably failed to comply with its pre-existing duties that relate directly to the performance of the contracts at issue."); <u>see also</u> <u>C. Sanchez and Son, Inc. v. United States</u>, 6 F.3d 1539, 1542 (Fed. Cir. 1993) (in

_____

[10]  As reflected in Defendant's settlement privilege log, some of these documents appear to be subject to the attorney-client privilege as well:

<u>ONRC Settlement Document 12, dated November 6, 2000</u>, letter from John Watts (DOJ Trial Attorney) to C. Stilwell, Owen Schmidt (Attorney, OGC).

<u>ONRC Settlement Document 10, dated December 18, 2000</u>, letter from C. Stilwell to John Watts (DOJ Trial Attorney).

<u>ONRC Settlement Document 27, dated August 28, 2000</u>, letter and attached response of BLM to issues raised by plaintiffs regarding supplemental information report regarding certain timber sales, from John Watts (DOJ Trial Attorney) to C. Stilwell, Roger Nesbit (Attorney, OGC), Mark Rutzik.

<u>ONRC Settlement Document 29, dated August 26, 2000</u>, facsimile encouraging BLM not to lift suspension on certain timber sales, from C. Stilwell to John Watts (DOJ Trial Attorney).  ONRC Settlement Documents Privilege Log (June 2, 2004).

performing contracts, "the government must avoid actions that unreasonably delay or hinder contract performance.").

Because privileged information is clearly at issue in this action and because withholding that information under privilege would deny Plaintiffs access to information vital to their claim, the Court concludes that there has been an at-issue waiver of the attorney-client privilege and work product protection with respect to documents relating to Defendant's interpretation of the Northwest Plan (NEPA equals implementation) and its decisions to award the timber sales despite developments in ONRC Action.

## II.    Subject-Matter Waiver of the Attorney-Client Privilege

Defendants have disclosed six documents voluntarily in other litigation and another seven privileged documents inadvertently in the instant litigation.[11]  Plaintiffs ask the Court to conclude that Defendant's voluntary disclosures resulted in a subject-matter waiver of the attorney-client privilege on three subjects: 1) assumption-of-risk, 2) interpretation and implementation of the Northwest Forest Plan, and 3) the contracting implications of awarding the timber sales to Plaintiffs without surveys and then having to suspend the sales to conduct surveys.  Pls.' Br. on Scope of Subject Matter Waiver at 1-2 (Pls.' Br.); Pls.' Notice of Subsequent Events at 1-2, 8.[12]

## The Document Voluntarily Disclosed in District Court: The Brouha Memorandum

Initially, the Government claimed that the Brouha Memorandum was subject to the attorney-client privilege.  However, once Plaintiffs suggested that the voluntary disclosure of this privileged document resulted in a waiver of all attorney-client privileged information on the same subject matter, Defendant reversed its position and claimed the Brouha Memorandum was never privileged

---

[11] One document, the Brouha memorandum, was filed as part of the Administrative Record in a district court action, and five documents were voluntarily disclosed in other actions in this Court -- Zip-O-Log Mills, Inc. v. United States, No. 04-1123C; Scott Timber Co. v. United States, No. 05-708C; Swanson Group, Inc. v. United States, No. 05-179C.  See Pls.' Notice of Subsequent Events (Feb. 7, 2007).

[12] Plaintiffs subsequently argued that the subject-matter waiver covers: "any attorney-client privilege regarding the government's actions in response to the ONRC Action plaintiffs' challenges to Forest Service timber sales, including those at issue in this action."  Pls.' Notice (Feb. 7, 2007) at 8.

in the first place.[13]  As such, the Court must determine whether the Brouha Memorandum is in fact privileged and if so, what the scope of the subject-matter waiver is.

The Brouha Memorandum was prepared during the <u>ONRC Action</u> litigation and consists of a one-page cover memorandum dated January 22, 1999, and an attached briefing entitled "Lawsuit on Northwest Forest Plan and Implementation of Survey and Manage," dated January 8, 1999.[14] Def.'s Supp. Submission Regarding "Brouha Memorandum" (Def.'s Supp.) App. at 1-2.  The cover memo was signed by Paul Brouha, the Associate Deputy Chief of the National Forest Service (NFS), and was addressed to:

- Anne Kennedy, Deputy Under Secretary, Natural Resources and Environment, United States Department of Agriculture (USDA).

- Barbara Weber, Associate Deputy Chief for Research and Development, Forest Service, Washington, D.C.

---

[13]  The Government initially claimed the attorney-client privilege for the Brouha Memorandum in a "Wildlife Privilege Log" attached to a letter dated September 25, 2003. Pls.' Mot., App.  (Pls.' App. I), Ex. 6 (Att. A) at 118, item 26.  In Defendant's partial response to Plaintiffs' motion to compel, Defendant stated that "regarding [the] privilege logs contained in Exhibit 6 to motion to compel, all of the privilege logs are final."  Def.'s Partial Resp. to Pls.' Mot. to Compel (Def.'s Part. Resp.) at 3.  Defendant specified that the "Wildlife" privilege log contained a privilege assertion for the Brouha Memorandum. <u>Id.</u> at 5.  The Government again claimed the attorney-client privilege for the Brouha Memorandum in its Revised Wildlife Privilege Log, created August 10, 2004. Pls.' Rev. Mot., Ex. A, Tab 10, item 26.  Then, in its later response to Plaintiffs' revised motion to compel, Defendant stated that it had "recently produced . . . the 'Brouha Memorandum'" to Plaintiffs because "although initially described as privileged, [it] was incorporated into an administrative record in previous litigation and, therefore, [the Government] determined [it] should no longer be withheld."  Def.'s Resp. at 11.  On September 15, 2004, Plaintiffs argued that the Brouha Memorandum established a subject-matter waiver in their Revised Motion to Compel. Ex. C at 7.  On July 29, 2005, in supplemental briefing on Plaintiffs' Revised Motion to Compel, the Government claimed that the "attorney-client privilege had been erroneously asserted" for the Brouha Memorandum and that the privilege was carried over to the revised log from an earlier version of the log.  Def.'s Supp. at 2, n.2.  This put the Court in the anomalous position of having to decide whether a document was attorney-client privileged when the party carrying that burden of proof as to privilege abandoned that claim.

The Government also dropped its attorney-client privilege claim for several other documents, changing its privilege claim to work product.  <u>Compare</u> Privilege Logs dated Aug. 18, 2005, <u>with</u> Privilege Logs dated July 29, 2005 and April 27, 2005.

[14]  The date on the briefing was January, 1998, but this was a typographical error which should have read 1999.  Tr. (Aug. 30, 2005), at 4.  The <u>ONRC Action</u> lawsuit was filed in July, 1998.

> • Al Ferlo, Counselor to the Chief, Forest Service, Washington, D.C.[15]

Def.'s Supp. App. at 1; Decl. of Paul Brouha (Sept. 29, 2005) ¶ 12 (Brouha Decl.). The cover memo indicates that four non-attorneys from FS and BLM were copied, Nancy Green, Margaret (Peggy) Kain, Arnie Holden, and Chris Jauhola. Def.'s Supp. App. at 1; Brouha Decl. ¶ 13.

The cover memo states:

> **Subject: Working Document concerning "Survey and Manage" Lawsuit for CEQ.**
>
> The enclosed brief, requested by [the Council on Environmental Quality] CEQ during our December 2, 1998, meeting was hand delivered to CEQ Acting Chair, George Frampton on January 19, 1999. Prepared by Forest Service employees in Regions 5 & 6 and by Oregon BLM's Judy Nelson, it offers a good overview of the current situation surrounding the lawsuit.
>
> I   In addition to providing this brief, I have discussed with several people the need for a status review of the "Survey and Manage" program as it has evolved since its inception as a result of the Northwest Forest Plan. There is concurrence on the need to rapidly convene a small group of knowledgeable Forest Service, BLM, and disinterested subject matter scientists to assess whether the implementation is in fact yielding the result originally envisioned.
>
> Specifically, are we progressing rationally toward describing, defining the distribution of, and assessing population status and vulnerability of species to Forest Service and BLM activities. Does the program make the most effective use of limited available funds to ensure the future viability of all species in the Northwest Forest Plan area? I have asked Nancy Green to set up this status review as expeditiously as possible and to work with the group to ensure that the planned EIS will yield the desired results.

Def.'s Supp. App. at 1.

The attached briefing contains five pages of discussion and two appendices, I. "Programmatic Overview" and II. "Summary of 12 Species; Species by Species Survey Requirements." Id. at 6.

---

[15]   Mr. Ferlo is an attorney licensed to practice in the District of Columbia and New York. Decl. of Albert M. Ferlo (Sept. 29, 2005) ¶¶ 1, 4 (Ferlo Decl.).

The top of each page of the discussion is marked: "Working document, litigation sensitive, not subject to FOIA" in italics.  Id. at 2-6.  The briefing stated its purpose as follows:

> The Oregon/Washington Office of BLM and Region 5 and 6 of the Forest Service have been asked by the Council on Environmental Quality (CEQ) to provide information to evaluate a strategy to reduce litigation risks from an ongoing lawsuit on the Northwest Forest Plan. The strategy offers to survey some portion of the timber sales "implemented" in FY 1998 for twelve species which are identified as "high risk" species.  These species were identified as "high risk" should the required survey date be moved from FY 1999 to FY 2000 in the "Environmental Assessment to Change the Implementation Schedule for Survey and Manage and Protection Buffer Species," October 7, 1988.  Surveying for the 12 species could have substantial impacts to the FY 1999 program of work.

As background, the briefing provided an overview of the ONRC Action lawsuit and described a strategy to update the survey and manage guidelines, which was already being implemented, developed by the Regional Interagency Executive Committee (RIEC), Interagency Steering Committee (ISC), and CEQ. [16]  Id. at 2.  This strategy included:

- an Environmental Assessment (EA) to change the survey implementation schedule for 32 species where surveys were evaluated to be not-technically-feasible and where this one year delay in survey did not substantially increase risk to the species.

- an Environmental Impact Statement (EIS) to strengthen the adaptive management provisions of the ROD by providing a process and clearer criteria for making changes to species' status in response to new information, and re-categorize some survey and manage species through use of this process;

- the completion of the survey protocols and management recommendations for field use by January [1999]; and

- a full-time oversight team of managers assigned with expediting the strategy tasks.

---

[16] "Survey and manage standards and guidelines are mitigation measures, developed as part of the Record of Decision (ROD) on the Northwest Forest Plan, for approximately 400 old-growth related species where there was concern for the continued persistence of these species across the landscape, but where little knowledge existed on the species themselves."  Def.'s Supp. App. at 2.

Id. at 2-3.

The briefing next addressed six issues:

1. Should the agency survey FY 1998 projects for the 12 "high risk" species?

2. What would be the cost of surveying FY 1998 timber sales for the 12 species?

3. What are the contracting implications of surveying awarded sales?

4. What impacts would a significant decrease in the planned federal timber sale offering for the region have?

5. What progress is being made to complete the survey requirements for these species?

6. What other steps is the region taking to correct any problems with implementing these "Standards and Guidelines?"

Id. at 3-6.

With regard to question one -- whether the agencies should survey timber sales implemented in FY 1998 for the twelve high-risk species -- the briefing stated:

> The Environmental Assessment proposes to change [(delay until FY 2000)] the survey implementation schedule for 32 species where surveys were evaluated to be not-technically-feasible and where this one year delay in survey did not substantially increase risk to the species. The analysis also identified 12 species which were estimated to be at a "substantially increased risk" if surveys were delayed from FY 1999 to FY 2000. Under the NFP ROD, the requirement to survey for the 12 species is to begin in FY 1999. The NFP developers did not believe that ground disturbing activities prior to FY 1999 posed an imminent threat to those species. We have no new information to indicate that this belief was in error. Surveys for these 12 species will be conducted prior to the implementation of any ground disturbing activity in FY 1999.

Id. at 3.

Second, the briefing provided a preliminary cost estimate for surveying FY 1998 timber sales for the 12 high-risk species as $863,000, based on the costs of surveying the approximately 100 timber sales identified by the <u>ONRC Action</u> plaintiffs in the settlement talks, and explained that the survey costs would be greater if all timber sales implemented in the last quarter of FY 1998 had been included. <u>Id.</u> at 4.

Third, the briefing addressed the contracting implications of surveying awarded sales as follows:

> The agencies would argue vigorously against surveying sales that have been awarded. The Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species. The "Protection of Habitat of Endangered, Threatened, and Sensitive Species" clause (C6.25#) only includes those species listed as Threatened, Endangered, or Sensitive (Regional Forester's list). None of the survey and manage species are on the Threatened & Endangered list and many are not on the Sensitive List. A contract modification under this subsection would require reimbursement to the purchaser.

> BLM timber sales contain contract language that permits the suspension of sale operations when species have been discovered that were "identified for protection through Survey and Manage and/or Protection Buffer standards and guidelines." However, in the event a change to the sale area is deemed appropriate, it must be effected through negotiation and a bilateral contract modification with the purchaser. The purchaser is unlikely to agree to bilateral contract modifications. The nature of survey protocols and the BLM interpretation of when a project is implemented relies on the logic and efficiency of completing the survey prior to award, or the point at which the Government loses the discretion to make unilateral changes.

<u>Id.</u>

Fourth, the briefing concluded that delaying federal timber sale offerings would cause a regional impact because there appears to be "a steady demand for federal timber across the region." <u>Id.</u> at 5.

Fifth, the briefing discussed the progress made in completing the survey requirements and recounted what had been done over the past three years.

15

Finally, the briefing discussed the steps taken by the agencies to correct any problems with implementing the Standards and Guidelines of the Northwest Forest Plan, concluding that "[i]n order to increase the efficiency and consistency of the survey and manage and protection buffer provisions in the [Record of Decision] the [Forest Service and BLM] are preparing an [Environmental Impact Statement]." Id. at 6.

## Creation of the Brouha Memorandum

Mr. Brouha was the "primary Forest Service employee responsible for coordinating with other agencies upon a strategy for complying with the survey and manage requirements of the NWFP and applicable laws, and for addressing any programmatic issues arising from the [ONRC Action] lawsuit." Brouha Decl. ¶¶ 1, 4. Mr. Brouha is not an attorney. Tr. at 83. On December 2, 1998, Mr. Brouha attended a meeting at the CEQ "to discuss the survey and manage requirements and the ONRC Action lawsuit." Brouha Decl. ¶ 5. CEQ is an agency of the Executive Office of the President that was established "to develop and recommend to the President national policies to improve environmental quality, and to oversee programs and activities of the Federal Government in its implementation of the National Environmental Policy Act (NEPA)." Pls.' Supp. App. at 1-2.[17] George Frampton, Acting Chair, CEQ, Al Ferlo, Counselor to the Chief of the Forest Service, Anne Kennedy, Deputy Under Secretary for Natural Resources and Environment, USDA, and representatives from DOI also attended the December 2, 1998 meeting. Brouha Decl. ¶ 5. Messrs. Frampton and Ferlo are attorneys. George T. Frampton, Jr., was acting Chair of CEQ and Albert M. Ferlo, Counselor to the Chief of the Forest Service was "a policy advisor to the Chief upon issues concerning how Forest Service policies could interact with and respond to requirements and federal environmental laws, including NEPA, the National Forest Management Act, and the Endangered Species Act."[18]

Mr. Brouha explained that the purpose of the meeting was:

> to educate the CEQ and others within the agencies . . . about the survey and manage requirements of the NWFP -- in the context of ensuring that the Government complied with the survey and manage requirements of the NWFP and applicable environmental and

---

[17] CEQ promulgates regulations governing the requirements for the preparation of Environmental Impact Statements (EIS) and other NEPA documentation required of agencies. 40 C.F.R. § 1500 et seq. (2006); Exec. Order No. 11,991. Further, CEQ reviews federal agency programs and activities to ensure that these programs and activities comply with NEPA and makes recommendations to the President for such programs or activities not in compliance with NEPA. 42 U.S.C. § 4344 (2000).

[18] Mr. Ferlo testified that his role as Counselor "was not to provide legal advice to the Chief." Ferlo Decl. ¶ 4. However, he assisted the Chief "in the development of Forest Service policy as it relates to compliance with environmental and procedural laws." Id.

procedural laws -- and to provide background to policy makers about the <u>ONRC Action</u> lawsuit.

<u>Id.</u> at ¶¶ 6-9.  The possibility of settlement of the <u>ONRC Action</u> also was discussed.  <u>Id.</u>

During the meeting, Mr. Frampton requested a briefing, and the next day, Mr. Brouha asked Forest Service personnel to prepare the briefing which ultimately became the Brouha memorandum. <u>Id.</u> at ¶ 7.  Mr. Brouha explained:

> The purpose of the briefing paper was to lay the factual foundation for survey and manage issues and provide agency policy makers with the information needed for the continuing discussions regarding compliance with survey and manage requirements, and regarding the possible resolution of the <u>ONRC Action</u>.  I contemplated that the report would be distributed to CEQ, policy makers within USDA and the Forest Service, as well as the Department of Interior and the BLM.

<u>Id.</u> at ¶ 8.  None of the individuals who participated in the creation of the Brouha Memorandum are attorneys.

## Disclosure of the Brouha Memorandum in HCPC, et al. v. Veneman

The Brouha Memorandum and its attachments were disclosed in <u>HCPC, et al. v. Veneman</u>, No. 02-983-AA (D. Or.) (formerly No. 02-389-R (W.D. Wa.), as part of the "Survey and Manage Administrative Record" (Survey & Manage AR) for that lawsuit.  Pls.' Rev. Mot., Ex. C.[19]

---

[19]   Although the index to the Survey & Manage AR refers to this case as <u>HCPC, et al. v. Veneman, et al.</u>, the docket indicates that the caption for case number 02-983-AA (formerly 02-389-R) is <u>Oregon Natural Resources Council Fund, et al. v. Veneman, et al.</u>  According to the public docket, of which the Court takes judicial notice, the <u>HCPC</u> plaintiffs filed a Complaint in the District Court for the Western District of Washington on February 15, 2002, challenging a Record of Decision adopted in January 2001, that amended the Survey and Manage standard of the Northwest Forest Plan.  Previously, on December 26, 2001, a related case, which challenged the same 2001 Record of Decision, <u>Douglas Timber Operators v. Secretary of Agriculture</u>, No. 01-6378-AA (D. Or.), had been filed in the District of Oregon.  The <u>HCPC</u> plaintiffs intervened in <u>Douglas Timber</u> on March 5, 2002.  <u>Douglas Timber</u> was stayed while the Government prepared a supplemental environmental impact statement (SEIS) and issued a new Record of Decision.  On December 10, 2003, the Government filed an amended settlement agreement in <u>Douglas Timber</u>.  On December 15, 2003, the Court granted plaintiffs' unopposed motion to dismiss the <u>HCPC</u> case without prejudice.

The plaintiffs in the <u>HCPC</u> litigation sought declaratory and injunctive relief under the Administrative Procedure Act (APA) arising from the defendants' alleged violations of the National Forest Management Act (NFMA), Federal Lands Policy and Management Act (FLPMA), National Environmental Policy Act (NEPA) (collectively the Acts), and the implementing regulations. HCPC Compl. ¶ 1.  Specifically, the plaintiffs challenged the defendants' failure to comply with the Acts when adopting and implementing the Record of Decision (ROD), which adopted and implemented the Final Supplemental Environmental Impact Statement (FSEIS) for "Amendment to the Survey & Manage, Protection Buffer, and other Mitigation Measures Standards and Guidelines."  The FSEIS was issued in November 2000, and the ROD was issued on January 17, 2001.  HCPC Compl. ¶ 2.  The ROD amended the original 1994 "Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl," commonly known as the "Northwest Forest Plan" (NWFP). HCPC Compl. ¶ 2.  The Brouha Memorandum was part of the public administrative record in the <u>HCPC</u> action, and the Government did not attempt to retract it.  Tr. at 94-97.[20]

**<u>Scope of the Waiver of Attorney-Client and Work-Product Privileges By Disclosure of the Brouha Memorandum</u>**[21]

Plaintiffs initially asserted that the voluntary disclosure of the Brouha Memorandum warrants a conclusion that the privilege has been waived with respect to three subjects: 1) assumption-of-risk; 2) the reasonableness of the Forest Service's interpretation of the NWFP, and 3) the contracting implications of awarding timber sale contracts to Plaintiffs without surveys and then having to suspend the sales to conduct surveys.  More recently, pointing to five additional documents the Government subsequently disclosed in discovery in other litigation in this Court, Plaintiffs asked the Court to find a waiver of "any attorney-client privilege regarding the

---

[20]  During oral argument, Defendant's counsel stated that he did not know who authorized release of the Brouha memorandum, but conceded that the Brouha Memorandum had been voluntarily produced and that any privilege with respect to the Brouha Memorandum itself had been waived.  Tr. at 94-95, 98.

[21]  The Government has not invoked the deliberative process privilege for the Brouha Memorandum, but it has invoked this privilege for 155 CEQ documents.  The Court has reviewed those documents <u>in camera</u> and issued an order this date.  The Court declined to find a subject-matter waiver of the deliberative process privilege.  Rather, "the concept of subject-matter waiver is almost uniquely a function of the attorney-client relationship.  There is no authority for applying the waiver rule to the deliberative process privilege."  <u>Gen. Elec. Co. v. Johnson</u>, No. 00-5855, 2006 U.S. Dist. LEXIS 64907, at * 55-56 (D.D.C. Sep. 12, 2006); <u>see also</u> <u>In re Sealed Case</u>, 121 F.3d 729, 741 (D.C. Cir. 1997) (release of a document only waives the privilege for the document or information specifically released, and not for related materials); <u>Marisol v. Giuliani</u>, No. 95 Civ. 10533, 1998 U.S. Dist. LEXIS 3719, *23 (S.D.N.Y Mar. 23, 1998)("release of the document only waives [the deliberative process] privilege for the documents specifically released and not for related materials.").

Government's actions in response to the <u>ONRC Action</u> Plaintiffs' challenges to Forest Service timber sales, including those at issue in this action." Pls.' Notice at 8.

Defendant argues that waiver should be restricted to the Brouha Memorandum itself because the Memorandum, while work product, is not protected by the attorney-client privilege and therefore its disclosure does not constitute a subject-matter waiver with respect to any documents beyond the Brouha Memorandum itself. Def.'s Supp. at 3-4.

## Was the Brouha Memorandum Protected by the Attorney-Client Privilege?

The attorney-client privilege protects confidential communications between an attorney and client made for the purpose of obtaining legal advice. <u>Echostar</u>, 448 F.3d at 1300; <u>American Standard Inc. v. Pfizer Inc.</u>, 828 F.2d 734, 745 (Fed. Cir. 1987); <u>see also</u> <u>Genentech, Inc. v. U.S. Int'l Trade Com'n</u>, 122 F.3d 1409, 1415 (Fed. Cir. 1997); <u>see generally</u> <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981). The attorney-client privilege is properly invoked where:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made (a) is a member of the bar of a court [and] . . . (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding [and] . . . (4) the privilege has been (a) claimed and (b) not waived by the client.

<u>Energy Capital Corp. v. United States</u>, 45 Fed. Cl. 481, 484-85 (2000) (citation omitted).

For purposes of applying the attorney-client privilege, a federal agency qualifies as a "client," and federal agency counsel function as attorneys. <u>See</u> <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854, 862-63 (D.C. Cir. 1980). In addition, whenever the United States, its agencies, or officers are involved in litigation, an attorney-client relationship exists between DOJ attorneys and an affected federal agency and its officers. 5 U.S.C. § 3106 (2000); 28 U.S.C. § 516 (2000); 28 C.F.R. § 50.15; <u>see also</u> <u>Cities Service Helex, Inc. v. United States</u>, 216 Ct. Cl. 470 (Ct. Cl. 1978) (en banc).

Two recipients of the Brouha Memorandum were attorneys -- George Frampton and Al Ferlo. Mr. Frampton, the acting Chair of CEQ requested the Brouha Memorandum. The CEQ is generally responsible for assuring and assessing agencies' compliance with NEPA. 42 C.F.R. § 4344; <u>see also</u> Pls.' Supp. App. at 1. Mr. Ferlo was the Counselor to the Chief of the Forest Service who assisted the Chief in the development of Forest Service policy relating to compliance with environmental and procedural laws. Ferlo Decl. § 4. Mr. Ferlo claimed not to provide legal advice, but nonetheless "served as a policy advisor to the Chief upon issues concerning how Forest Service

policies could interact with and respond to requirements of federal environmental laws, including [NEPA, NFMA] and the Endangered Species Act." Id. Both Messrs. Frampton and Ferlo were responsible for ensuring compliance with environmental laws at the time they received the Brouha Memorandum.

As the Federal Circuit has recognized, information presented to an attorney for purposes of assessing compliance with law and regulation is a communication covered by the attorney-client privilege. In re The Regents of the Univ. Of California, 101 F.3d 1386, 1390-91 (Fed. Cir. 1996), cert. denied, 520 U.S. 1193 (1997) (citing Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). The Court explained:

> It is well established that the attorney-client privilege is not limited to actions taken and advice obtained in the shadow of litigation. Persons seek legal advice and assistance in order to meet legal requirements and to plan their conduct; such steps serve the public interest in achieving compliance with law and facilitating the administration of justice and indeed may avert litigation.

Id.; see also Olen Properties Corp. v. Sheldahl, Inc., No. CV 91-6446-WDK, 1994 WL 212135 (C.D. Cal. Apr. 12, 1994) (finding environmental audit that was prepared to gather information for corporation's attorneys to assist in evaluating compliance with relevant laws and regulations was protected by attorney-client privilege).

Defendant argues that the Brouha Memorandum was not created "for the purposes of obtaining legal advice" and therefore does not qualify for the privilege. Tr. (Oct. 7, 2005) at 20-21. However, the Memorandum itself indicated that it provided information concerning compliance with, and potential implementation of, the survey and manage requirements of the NWFP. The briefing was titled "Lawsuit on Northwest Forest Plan and Implementation of Survey and Manage," and its stated purpose was "to evaluate a strategy to reduce litigation risks from an ongoing lawsuit on the Northwest Forest Plan." Mr. Brouha was "responsible for coordinating with other agencies upon a strategy for complying with the survey and manage requirements of the NWFP and applicable laws," and for addressing any programmatic issues arising from the ONRC Action litigation. Id. ¶¶ 1, 4. The purpose of the meeting which spawned the Brouha Memorandum was to educate the various agencies about the survey and manage requirements of the NWFP "in the context of ensuring that the Government complied with the survey and manage requirements of the NWFP and applicable environmental and procedural laws." Id. ¶ 6. In sum, according to Mr. Brouha's testimony and the briefing itself, the briefing provided information to Messrs. Frampton and Ferlo for their determination regarding compliance with the survey and manage requirements

of the NWLP and federal statutes.[22]  As such, the Brouha Memorandum is subject to the attorney-client privilege.

The Court recognizes that, in general, in order for a document to be covered by the attorney-client privilege, the privilege must be claimed by the client.  Here, Defendant is no longer asserting the attorney-client privilege for the Brouha Memorandum and is making no effort to carry what would normally be its burden of proving the privileged status of this document.  Nonetheless, under the circumstances here, Defendant's change of heart in claiming the attorney-client privilege for the Brouha Memorandum does not defeat the privilege and enable Defendant to avoid the subject-matter waiver.[23]  Rather, the Court assesses the privileged status of the document by examining the communication, its authors and recipients, and the circumstances and purpose of its preparation.  Here, these factors confirm that the Brouha Memorandum is subject to the attorney-client privilege.

**Scope of Attorney-Client Privilege Waiver**

By voluntarily filing the Brouha Memorandum in the Administrative Record of another lawsuit, the Government waived its attorney-client privilege for this document and all communications on the same subject matter.  It is settled in this Circuit that a voluntary, intentional waiver of the attorney-client privilege applies to all other communications relating to the same subject matter.  Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349 (Fed. Cir. 2005); see also Genentech, Inc., 122 F.3d at 1416; GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1275 (Fed. Cir. 2001). As the Federal Circuit has explained:

> Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums. Professor Rice explains the scope of a waiver of the attorney-client privilege as follows: When the attorney-client privilege has been waived, whatever the subject matter of the waiver, the privilege is gone.

---

[22]  There is no suggestion that the information contained in Brouha Memorandum was disseminated to anyone outside the Government.  Each page was marked "Working document, litigation sensitive, not subject to FOIA."

[23]  In three separate instances in this litigation Defendant claimed the attorney-client privilege for the Brouha Memorandum.  Further, Defendant did not explain its original "erroneous" assertion of the attorney-client privilege or why it took almost two years to discover this error.  Defendant merely asserted that the "privilege was carried over to the [revised log] from an earlier version of the log," Def.'s Supp. at 2 n.2.  However, its revised log was purportedly final.

Genentech, 122 F.3d at 1416.[24]   However, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." Fort James, 412 F.3d at 1349-50 (citing In re Keeper of the Records XYZ Corp., 348 F.3d 16, 23 (1st Cir. 2003)).

## Circumstances of the Disclosure

In the present case, the Government made a strategic decision to disclose the Brouha Memorandum as part of the Administrative Record of the HCPC litigation.   That litigation challenged an ROD adopting an EIS amending certain Survey and Manage Standards and Guidelines.   An agency's inclusion of a document in the Administrative Record is not to be taken lightly.   Rather, the Administrative Record filed by the agency is the basis for judicial review and suggests that the agency considered the document to be necessary for the Court's resolution of the action, presumably because the document informed the agency's own decisionmaking.   Because by statute the reviewing court is directed to review "the whole record or those parts of it cited by a party," the inclusion of a document in the Administrative Record is not only a voluntary disclosure, but also an intentional invitation to the reviewing court to consider the document.   See 5 U.S.C. § 706.

In First Heights Bank, FSB v. United States, 46 Fed. Cl. 312, 317 (2000), the Court held that voluntary disclosure of privileged documents in one litigation resulted in a broad subject-matter waiver in a subsequent proceeding.   The Court determined that the circumstances surrounding the disclosure counseled "against a restrictive interpretation of the scope of the waiver" because the disclosure was "intentional rather than inadvertent" and because the Government sought to introduce the privileged communications as evidence for its own benefit.   Id.   In a similar vein, the Government's intentional inclusion of the Brouha Memorandum in an Administrative Record militates against a narrow interpretation of the scope of the waiver.

## Nature of the Legal Advice Sought

The Brouha Memorandum endeavored to provide cognizant Government officials with the information necessary for complying with the Northwest Plan and federal environmental statutes in the face of an ongoing litigation in which the Government's interpretation of the Northwest Forest Plan regarding surveys was being challenged.   That memorandum also provided information for the possible resolution of the ONRC Action lawsuit.   Finally, the memorandum contained the

---

[24] See also In re Grand Jury Proceedings Oct. 12, 1995, 78 F.3d 251, 255 (6th Cir. 1996) (noting that the case law informs that waiver applies to the rest of the "'communication on the same subject matter.'" (citation omitted)); In re Sealed Case, 676 F.2d 793, 823-24 (D.C. Cir. 1982); United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982); Weil v. Investment/Indicators, Research & Mgmt., Inc., 647 F.2d 18, 24 (9th Cir. 1981); see generally, 6 James Wm. Moore et al., Moore's Federal Practice P 26.60[2], at 26-204.

Government's perspective on the contracting implications of surveying timber sales and the impact of delaying timber sales -- matters which bear on a central issue in this action -- the reasonableness of the Government's surveying and timber sale decisions.

## Prejudice to the Parties of Permitting or Prohibiting Further Disclosure

The Government has not demonstrated that it would be prejudiced by applying its voluntary privilege waiver to all other communications involving the same subject matter. The privileged information implicated here is not counsel's advice on handling the instant litigation. Rather, the privileged information concerns the reasonableness of the underlying conduct challenged here, the Government's actions in interpreting the Northwest Plan and in awarding timber sales. The privileged information was not only intentionally disclosed in another litigation, it is at issue here in that discovery has raised substantial questions as to whether the contracting officer's actions in proceeding with the timber sales were based on advice of counsel. Fairness demands that Plaintiffs be provided the opportunity to probe the entire record and assess what the Government selectively chose to reveal. As the Federal Circuit recognized in Echostar:

> [S]elective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice. In such a case, the party uses the attorney-client privilege as both a sword and a shield. To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.

448 F.3d at 1301 (citations omitted); see also Sparton Corp. v. United States, 44 Fed. Cl. 557, 567 (1999) ("[T]his principle is intended to prevent parties from disclosing some attorney client communications while retaining other, potentially harmful communications under the guise of the attorney-client privilege."); In re Sealed Case, 676 F.2d at 818 ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter.").

By inserting the Brouha Memorandum into the Administrative Record in the HCPC litigation, Defendant waived the attorney-client privilege for all documents concerning the same subject matter. The Court defines that subject matter to be: 1) the Government's interpretation and implementation of survey and manage requirements under the Northwest Forest Plan, and 2) the Government's actions in response to the ONRC Action lawsuit regarding timber sales.

## The Five Documents Voluntarily Disclosed in Other COFC Actions

Plaintiffs argue that the Government's voluntary disclosure of five additional documents, as well as Susan Zike's deposition testimony regarding those documents in recent discovery in other

COFC actions -- <u>Zip-O-Log Mills v. United States</u>, No. 04-1123C, <u>Scott Timber Co. v. United States</u>, No. 05-708C and <u>Swanson Group Inc. v. United States</u>, No. 05-179C -- "constitute further evidence of the Government's subject-matter waiver of its attorney-client privilege claims in this action."  Notice at 3.  Specifically, Plaintiffs contend that this discovery supports a waiver of "any attorney-client privilege regarding the Government's actions in response to the <u>ONRC Action</u> plaintiffs' challenges to Forest Service timber sales, including those at issue in this action."  Defendant contends that none of these documents are subject to the attorney-client privilege.  Def. Resp. to Pls.' "Notice of Subsequent Events" at 3.

1.    <u>Exhibit 31</u>[25]    (Marked "Pre-decisional deliberative document - not subject to FOIA")

Exhibit 31 is a fax from Cheryl McCaffrey, dated May 18, 1998, enclosing a draft "Report to the Regional Interagency Executive Committee on the Implementation Schedule for Survey and Manage and Protection Buffer Species," dated May 15, 1998, to Ellen Athas, an attorney working for CEQ, and Edward Boling, lead attorney for DOJ in the <u>ONRC Action</u> litigation, among other recipients.[26]  This document was the subject of deposition testimony by Cheryl McCaffery on January 10, 2007 in <u>Scott Timber Co. v. United States</u>, COFC No. 05-708C.[27]

According to the fax, the draft report was requested by CEQ and DOJ during a May 15, 1998 conference call and addressed the proposed change for Component 2 species and summarized the increment of risk to the species.[28]  The fax indicated that the field staff was being polled to verify the analysis "primarily relative to the feasibility of survey issue."  The fax noted that the report was "still very much a draft and is considered a predecisional working document."

Because this fax and draft report was provided in response to a request by counsel at CEQ and DOJ and the communication explains the requested information to counsel, the exhibit is subject to the attorney-client privilege.

---

[25]  The documents are referenced according to their exhibit numbers in the Zike deposition.

[26]  Edward A. (Ted) Boling, was counsel of record for DOJ in the <u>ONRC Action</u> case and later served as the Deputy General Counsel of CEQ.  Pls.' Br. at 13, n.10; Decl. of Edward A. Boling (Sept. 29, 2005) ¶ 1 (Boling Decl.).

[27]  Cheryl McCaffrey is a Bureau of Land Management employee who worked on Survey and Manage issues with Forest Service personnel.  Pls.' Notice at 5.

[28]  According to counsel for Plaintiffs, this document "dealt with the management and the implementation and the risks associated with . . . the wildlife species that were at issue, the surveys that are at issue, in this lawsuit and the <u>ONRC Action</u> litigation."  Tr. at 110.

2.   Exhibit 35A

The first page of the exhibit is a fax cover sheet dated Aug. 8, 1998, with a handwritten message from Susan M. Zike, who is identified as "attorney, FOIA & Litigation," to Mike Hupp and Brenda Woodard,[29] stating:

> Attached is draft DOJ ltr to plaintiff's atty. Note last sentence of let ¶ on 2nd page.  Are you willing to notify the bidders before you open bids? UMP [Umpqua National Forest] and WIL [Willamette National Forest] say yes. Need to hear from GIP [Jack Gipsman, Forest Service attorney]. There is no reason – YET – to plan on delaying award of the USFS sales.  We'll know more after the 8/17 meeting between DOJ and ONRC Attys.
>
> PS OGC memo is attached that DOJ based its sentence on. [Regional Office-Natural Resources] sent this out late last week.

Exhibit 35A at 1.  The referenced sentence which Ms. Zike "notes" in the attached draft letter from Edward Boling, DOJ trial counsel in the ONRC Action litigation, to Michael Axline, plaintiff's counsel states: "In the interest of facilitating settlement discussions, the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales have been identified in connection with this lawsuit."  Ex. 35A at 3.

Susan M. Zike has been employed as the Regional Litigation Coordinator for the Pacific Northwest Region (Region 6) of the Forest Service, in Portland, Oregon, since 1991.[30]  Decl. of Susan M. Zike (Oct. 14, 2005) ¶ 1 (Zike Decl.).  As a Litigation Coordinator, Ms. Zike acted as a liaison between DOJ and the U.S. Attorneys' Offices for Oregon and Washington, the USDA General Counsel Offices in Portland, San Francisco, and Washington, D.C., and multiple Forest Service offices, in connection with lawsuits filed against the Forest Service in Region 6.  Zike Decl.

---

[29]  The record does not identify Mr. Hupp's position.  Ms. Woodard is a Forest Service contracting officer.

[30]  Ms. Zike earned her JD from Northwestern School of Law in 1990.  Zike Dep. (Jan. 4, 2007) at 6.  The position description for Ms. Zike's position is titled "Paralegal Specialist," and the description explains that an individual in this position "serves as the Regional Litigation and FOIA Coordinator responsible for preparing Regional evaluations to legal challenges resulting from lawsuits against the Agency . . . ." Attachment to Zike Decl. (Zike Att.).  Ms. Zike began working on the ONRC Action lawsuit shortly after it was filed and was designated by the Regional Foresters for Regions 5 and 6 as the "primary Forest Service contact in the field for the Department of Justice" in mid-July 1998.  Id. ¶ 5.

¶ 3. Ms. Zike explained that she: "regularly confer[ed] with agency and trial counsel upon litigation matters and then disseminate[d] their advice and recommendations to Forest Service personnel." Id. ¶ 4. She also responded to requests for information from Forest Service counsel and on some occasions transmitted such information to counsel under a cover document containing her explanation of the information and/or recommendations. Id.

The draft letter in Exhibit 35A also listed Forest Service sales challenged by ONRC Action, including the Jack Heli sale at issue here, and the status of those sales. The exhibit includes a legal memorandum dated July 29, 1998, from Robert M. Simmons, counsel for the Forest Service, to the Regional Foresters of Regions 5 and 6, regarding the ONRC Action litigation, which Ms. Zike describes as the memo "that DOJ based its sentence on." Ex. 35A at 1. The memorandum identified sales of concern to the ONRC Action plaintiffs and related four questions from DOJ regarding those sales, asking the Foresters to begin preparing answers to DOJ's questions. The memorandum advised: "Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of bids that the plaintiffs in this lawsuit . . . have contended that the Forest Service has violated the [NFP] in preparing the sale." Id. at SCOTT 1100030. The memorandum also advised the Foresters to give bidders the opportunity to withdraw their bids "simply because of the litigation." Id.

Page ten of Exhibit 35A, is a fax from Ms. Tottenetti of the USDA Office of General Counsel to counsel regarding ONRC Action, attaching an "expected letter" from Michael Axline to Ted Boling, listing five sales. The cover sheet notes "information that Ted Boling wants . . . In addition, we should find out whether any of the plaintiffs administratively appealed those sales." Id. Attached was a fax cover sheet from Ted Boling to Mike Gyplit, USDA, and Karen Mouritsen, DOI, referencing "Axline's Timber sales and requesting decision status of the sales and what surveys and NEPA documentation had been done for the sale decision and agency response." Id. at SCOTT 1100036. The referenced letter, dated July 27, 1998, is attached.

This exhibit contains information being transmitted to and from counsel through the litigation coordinator incident to providing legal advice regarding timber sales. As such, this exhibit is subject to the attorney-client privilege. See Genentech, 122 F. 3d at 1415; Energy Capital Corp., 45 Fed. Cl. at 484-85.

3.    Exhibit 35B (Marked "Privileged and Confidential")

This exhibit contains a DOJ fax cover sheet from Edward Boling to Susan Zike dated August 27, 1998, attaching, pursuant to her request, a letter from ONRC Action plaintiffs' counsel Axline to Boling, regarding a list of timber sales that the ONRC Action plaintiffs believed did not comply with the Northwest Forest Plan because the required wildlife and plant surveys had not been performed. This communication from DOJ trial counsel transmitting information requested by the litigation coordinator is work product and attorney-client privileged. See Genentech, 122 F. 3d at 1415.

4.     Exhibit 41A

Exhibit 41A contains two emails from Susan Zike to various individuals in the Forest Service, including Owen Schmidt, an attorney representing the Forest Service, and Edward Boling, DOJ trial counsel.  The emails discuss advice and communications from the Department of Justice and attorneys at the Forest Service and the Department of Agriculture concerning how to handle timber sales challenged by the ONRC Action plaintiffs.  In the first e-mail Ms. Zike states:

> Before you decide to award a sale, the RO and OGC ask that you compare and discuss with us the issues in the appeal of the sale to the issues in the Amended Complaint (there are some differences).  To help you with that, I'll be sending an issue chart tomorrow.  We need to assure DOJ that we have a strong defense on the sales that we intend to award even tho' [sic] DOJ is not asking to be a part of the award decision (good news).

Ex. 41A at 1.  The second e-mail, apparently dated April 5, 1999, requests that the recipients identify the sales that would be awarded by mid-June because "we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule. . . ."  Zike Dep. at 43.  Because these e-mails contain attorney-client communications and advice on how to handle the timber sales during the ONRC Action litigation, they are privileged.

5.     Exhibit 41D

The final exhibit is a one-page memorandum dated April 23, 1999, from Susan Zike to Brenda Woodard, Forest Service Contracting Officer, in which Ms. Zike conveys legal advice from Edward Boling regarding the timing of awarding certain timber sales.  This memorandum is also privileged.

**Further Support for Subject-Matter Waiver**

The five deposition exhibits which the Court found to be privileged -- Exhibits 31, 35A, 35B, 41A and 41D -- reflect the Government's interpretation of the Northwest Plan and/or its deliberations and legal considerations concerning awarding timber sales while the litigation in ONRC Action was ongoing.  As such, Defendant's voluntary disclosure of these exhibits support defining the scope of Defendant's subject-matter waiver of the attorney-client privilege as covering the Government's interpretation of the survey and manage requirements under NWFP and the Government's actions in response to the ONRC Action lawsuit regarding timber sales.

**The Seven Documents Inadvertently Disclosed in This Litigation**

Seven privileged documents were inadvertently produced by Defendant in this action, and Plaintiffs seek a waiver of the attorney-client privilege as to the subject matter of those documents

27

as well.  The Court does not extend the subject-mater waiver this far.  The seven privileged documents Defendant inadvertently disclosed in this litigation are:

1) A memorandum dated March 9, 1995, from Jeffrey Handy, an attorney, OGC, USDA, advising Randy Hickenbottom, a TES Program Assistant, regarding certain requirements pertaining to the Plan's standards and guidelines for survey and management.

2) A fax dated October 18, 1996, from Tim Obst, an attorney, OGC, USDA, to Dinah Bear, general counsel of CEQ, attaching a draft memorandum regarding "Analyses of New Information for the Northwest Forest Plan" which outlines a review process for dealing with new information which may affect the required environmental analysis for the Plan, including the survey requirements of the Plan.

3) A memorandum dated February 22, 1999, from Diana Bus, to Sue Zike providing information regarding the status of several timber sales to facilitate a decision about whether to proceed with the award of these sales while the ONRC Action litigation was pending.

4) A memorandum dated August 31, 1999, summarizing and responding to discussions involving DOJ, CEQ, USDA's OGC and the Solicitor's Office, DOI concerning various options available to the Government in the wake of Judge Dwyer's decision finding that the government's interpretation of the "implement before ground disturbing activity requirement" was invalid.  The memorandum included a list of the pros and cons for each option, as well as a recommendation.

5) Document entitled "Linda Hale, District S&M Coordinator Notes from 5/26/98 conference call." This document reflects a statement of DOI that "if surveys were done before the protocol was done, and official protocol was different from what was done, then these surveys would NOT be valid and the surveys would have to be repeated." (emphasis in original).

6) Memo from Linda Hale to Interested Parties re: "Notes from 4/13/98 S&M Conference Call." This discussed a proposal to delay implementation of the FY 99 S&M category 2, stating a DOI attorney's legal opinion.

7) S&M Conference Call Notes for 4/27/98, concerning "what to do about the S&M Component 2 Implementation as to the 'drop dead'

date in the matter of 'Survey Prior to Ground Disturbing Activities' Standard and Guidelines." Page 2 contains legal advice.

"There is no per se rule that a waiver must be found in all situations where there is a mistaken or inadvertent production of a privileged document." <u>Telephonics Corp. v. United States</u>, 32 Fed Cl. 360, 361 (1994). Under the two-part test set forth in <u>National Helium</u>, an inadvertent disclosure does not waive the document's privileged nature if the party: (1) "wish[ed] to keep back the privileged materials" and (2) took "adequate steps in the circumstances to prevent disclosure of such documents." <u>Nat'l Helium Corp. v. United States</u>, 219 Ct. Cl. 612, 615-16 (1979); <u>see also</u> <u>Alaska Pulp Corp., Inc. v. United States</u>, 44 Fed. Cl. 734, 735-36 (1999); <u>Int'l Business Machines Corp. v. United States</u>, 37 Fed. Cl. 599, 602 (1997).

Here, the Government did not intend to disclose these seven privileged documents. In the course of producing thousands of documents and some fourteen separate privilege logs for various categories of documents in response to Plaintiffs' discovery requests, Defendant inadvertently produced these documents. Although Defendant did not explain what steps it took to prevent the disclosure of privileged documents, Defendant has not benefitted from those disclosures, and the purposes of the subject-matter waiver doctrine would not be served by requiring Defendant to further disclose additional confidential communications. <u>See</u> <u>Parkway Gallery Furniture, Inc. v. Kitinger/Pennsylvania House Group, Inc.</u>, 116 F.R.D. 46, 52 (M.D.N.C. 1987) ("the general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications is not appropriate in the case of inadvertent disclosure, unless it is obvious a party is attempting to gain an advantage or make offensive or unfair use of the disclosure."); <u>see also</u> <u>In re Hechinger Inv. Co.</u>, 303 B.R. 18, 26 (D. Del. 2003); <u>Koch Materials Co. v. Shore Slurry Seal, Inc.</u>, 208 F.R.D. 109, 120 (D.N.J. 2002).

## Conclusion

1.  Plaintiffs' revised motion to compel is **GRANTED IN PART**.

2.  Defendant has waived the attorney-client privilege and work-product protection as follows:

    1)  There has been an at-issue wavier of the attorney-client privilege and work product immunity with respect to 1) documents relating to Defendant's interpretation of the Northwest Plan (NEPA equals implementation) and 2) Defendant's decision to award the timber sales despite developments in <u>ONRC Action</u>.

    2)  Defendant has waived the attorney-client privilege for the Brouha Memorandum, Deposition Exhibits 31, 35A, 35B, 41A and 41D and all documents on the same subject matter. The Court defines that subject matter to be: 1) the Government's interpretation and implementation of survey and manage requirements under the

Northwest Forest Plan, and 2) the Government's actions in response to the <u>ONRC Action</u> lawsuit regarding timber sales.

3. The Government's inadvertent disclosure of seven privileged documents did not result in a subject-matter waiver of the attorney-client privilege.

4. Defendant shall produce all documents for which a privilege has been waived forthwith. Defendant shall make any witnesses possessing information relating to these documents available at its expense for deposition.  Defendant shall pay any court reporter and witness fees associated with such depositions.

5. The court will convene a telephonic status conference in this action on **April 5, 2007, at 11:00 A.M.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

30