**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 01-570C<br>(Judge Williams) |

| | | |
|---|---|---|
| TIMBER PRODUCTS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 01-627C<br>(Judge Williams) |

| | | |
|---|---|---|
| CLR TIMBER HOLDINGS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-501C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT[*]**

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:
Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 7, 2008

[*] On September 28, 2007, the Court and the parties held a telephonic status conference establishing the briefing schedule for the cross-motions for summary judgment. At that conference plaintiffs' counsel requested permission for the parties to file briefs in excess of the page limits contained in RCFC 5.2(b). In response the Court stated that it would not impose a page limit on any of the briefs and that it wanted detailed briefing in this case. Accordingly, plaintiffs submit this brief without regard to the page limits contained in RCFC 5.2(b).

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........ iv

Table of Contents of Appendix ........ x

Table of Acronyms ........ xviii

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 1

STATEMENT OF THE CASE ........ 2

The Northwest Forest Plan And Survey Program ........ 2

The Administrative Structure Of The Northwest Forest Plan ........ 5

The Creation Of The Issue Resolution Team And Development Of The Category 2 Survey Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ........ 6

Events Subsequent To The Issuance Of The Joint Forest Service/BLM Memoranda Adopting The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ........ 8

ARGUMENT ........ 12

I. Standard of Review ........ 12

II. The Forest Service, As The Sole Drafter Of The Contracts, Assumed The Risk Of Liability To Plaintiffs When It Awarded The Timber Sale Contracts Without The Required Category 2 Surveys And Then Had To Suspend Plaintiffs' Timber Sale Operations In Order To Perform Those Surveys And Failed To Include Any Exculpatory Provisions Or Disclaimers In The Contracts Or Require Plaintiffs To Execute Any Waivers Of Liability ........ 12

III. The Forest Service Breached Its Implied Warranty Of Specifications ........ 24

A. The Law Of Implied Warranty Of Specifications ........ 25

B. Plaintiffs' Timber Sale Contracts Are Contracts Of Adhesion That Contain Detailed Timber Harvesting Specifications Which They Must Follow ....................26

C. The Forest Service's Obligation To Design Timber Sale Contracts In Conformity With Federal Environmental Law ....................27

D. Where Delay Is Caused By Defective Specifications, That Delay Is Presumed To Be Unreasonable ....................31

IV. The Forest Service Breached The Contracts Because It Intentionally Failed To Disclose To Plaintiffs That Their Timber Sales Were On ONRC Action's "At-Risk" Lists And That The Forest Service Had Secret Agreements With ONRC Action Regarding The Award Of The Contracts And Because The Forest Service Falsely Represented To Plaintiffs That The Sales Were Not Threatened By The ONRC Action Litigation ....................32

V. The Forest Service Breached Its Implied Duties To Cooperate And Not To Hinder ....................42

A. The District Court Holding In ONRC Action That The Forest Service's Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Arbitrary, Capricious And Contrary To Law Establishes That The Forest Service Unreasonably Caused The Suspensions Of Plaintiffs' Sales ....................43

B. The Forest Service Was Unreasonable In Causing The Suspension Of Plaintiffs' Sales Because It Awarded The Contracts Without Conducting Category 2 Surveys Despite Having Been Put On Notice Repeatedly Prior To Award That Its Legal Rationale For Not Conducting The Surveys Was Deficient ....................51

1. The Issue Resolution Team's Concerns And The Development Of "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ....................53

2. Warnings To The Forest Service In Public Comments, ONRC Action's Administrative Appeals And In The ONRC Action Lawsuit ....................60

3. Warnings To The Forest Service From The Department Of Justice And The Forest Service Regional Attorney After ONRC Action Was Filed....................................................63

4. The Forest Service Awarded Plaintiffs' Contracts Despite Its Secret Knowledge That If Plaintiffs' Sales Were Operated They Would Trigger Motions For Injunctive Relief.........................................................................................67

VI. This Case Is Ripe For Summary Judgment On Liability......................................68

A. The Legal Standard For Breach Of The Implied Duties To Cooperate And Not To Hinder ...........................................................69

B. Scott Timber Establishes That The Forest Service Can Breach Timber Sale Contracts Containing Clause C(T)6.01 If It Suspends Those Contracts Unreasonably, But Does Not Hold That The Question Of The Reasonableness Of The Suspension Precludes Summary Judgment On Liability...........................71

C. Even Assuming The Cases Subsequent to Precision Pine Have Correctly Interpreted Scott Timber To Mean That Summary Judgment Is Rarely Appropriate In Cases Alleging Breach Of The Duties To Cooperate And Not To Hinder, The Instant Case, Like Precision Pine, Is A Case In Which Summary Judgment Is Appropriate .........................................................77

VII. Under Contract Clause C6.01, Even If The Forest Service Did Not Breach The Jack Heli Timber Sale Contract, Timber Products Is Entitled To Compensation For Its Increased Sale Operating Costs Incurred As A Direct Result Of The Forest Service's Suspension........................77

CONCLUSION...........................................................................................................82

## TABLE OF AUTHORITIES

**CASES** **PAGE**

Al Johnson Constr. Co. v. United States,
854 F.2d 467 (Fed. Cir. 1988)....................25

Anderson v. Liberty Lobby, Inc.,
477 U.S. 422 (1988)....................12

Beauchamp Constr. Co., Inc. v. United States,
14 Cl. Ct. 430 (1988)....................31

Bighorn Lumber Co. v. United States,
49 Fed. Cl. 768 (2001)....................78

Brooks v. United States,
65 Fed. Cl. 135 (2005)....................12

Castle Constr. Co.,
ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984)....................25

Cedar Lumber, Inc. v. United States,
5 Cl. Ct. 539 (1984)....................13, 70, 71

Chaney and James Constr. Co. v. United States,
421 F.2d 728 (Ct. Cl. 1970)....................31

C.J. Betters Corp. v. United States,
25 Cl. Ct. 674 (1992)....................21, 22

Dep't of Natural Res. and Conservation of Montana v. United States,
1 Cl. Ct. 727 (1983)....................13, 22

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct. Cl. 1981)....................22, 30, 31

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992)....................33

George A. Fuller Co. v. United States,
69 F. Supp. 409 (Ct. Cl. 1947)....................22

Hall v. Aqua Queen Mfg., Inc.,
93 F.3d 1548 (Fed. Cir. 1996)....................12

Helene Curtis Industries, Inc. v. United States,
312 F.2d 774 (Ct. Cl. 1963)....................33, 40

Hercules, Inc. v. United States,
516 U.S. 417 (1996)....................25

H.N. Wood Products, Inc. v. United States,
59 Fed. Cl. 479 (2003).................... *passim*

Huber, Hunt & Nichols, Inc.,
GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975)....................25

In re Gartside,
203 F.3d 1305 (Fed. Cir. 2000)....................50

J.A. Jones Constr. Co. v. United States,
390 F.2d 886 (Ct. Cl. 1968)....................33

J.L. Simmons Co. v. United States,
412 F.2d 1360 (Ct. Cl. 1969)....................25

John E. Gallno,
AGBCA No. 97-146-1, 98-1 BCA ¶ 29,616 (1998)....................27

John Woods Trucking,
AGBCA No. 97-1-158, 98-1 BCA ¶ 29,644 (1998)....................26

Laburnum Constr. Co. v. United States,
325 F.2d 451 (Ct. Cl. 1963)....................26, 31

Louisiana Pacific Corp. v. United States,
656 F.2d 650 (Ct. Cl. 1981)....................26

Luria Bros. & Co., Inc. v. United States,
369 F.2d 701 (Ct. Cl. 1966)....................26, 31

Maintenance Eng'rs v. United States,
50 Fed. Cl. 399 (2001)....................12

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986)....................12

Miller Elevator Co. v. United States,
30 Fed. Cl. 662 (1994) ....................................................................................41

Munn v. Secretary of Dept. of Health and Human Services,
970 F.2d 863 (Fed. Cir. 1992)..........................................................................50

Nicholson v. United States,
29 Fed. Cl. 180 (1993) ....................................................................................12

Northcoast Environmental Center v. Glickman,
136 F.3d 660 (9th Cir. 1998) ..........................................................................50

Oregon Natural Resources Council Action v. United States Forest Service,
59 F. Supp. 2d 1085 (W.D. Wash. 1999).................................................... *passim*

Ozark Dam Constructors v. United States,
130 Ct. Cl. 354 (1955) ....................................................................................21

Ozark Dam Constructors v. United States,
127 F. Supp. 187 (Ct. Cl. 1955).......................................................................23

Pacific Rivers Council v. Thomas,
30 F.3d 1050 (9th Cir. 1994) ......................................................................48, 49

Petrochem Services, Inc. v. United States,
837 F.2d 1076 (Fed. Cir. 1998)........................................................................33

Phyllis Wolf,
AGBCA No. 96-102-1, 96-2 BCA ¶ 28,504 (1996)........................................27

Poston Logging,
AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (1998), recons. denied,
AGBCA No. 99-143-R, 00-1 BCA ¶ 30,829 (2000) .......................................27

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) ................................................................................ *passim*

Precision Pine & Timber, Inc.,
AGBCA No. 99-160-1, 00-2 BCA ¶ 30,942 (2000)........................................27

Prineville Sawmill Co. v. United States,
14 Ct. Cl. 186, rev'd on other grounds, 859 F.2d 905 (Fed. Cir. 1988) ...........................30

Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy,
898 F.2d 1410 (9th Cir. 1990) ....................50

Reidhead Bros. Lumber Mill,
AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (2001),
aff'd Reidhead Bros. Lumber Mill v. Veneman, 36 Fed. Appx. 426
(Fed. Cir. 2002)....................77, 78, 79

Scott Timber Co. v. United States,
44 Fed. Cl. 170 (1990), aff'd 333 F.3d 1358 (Fed. Cir. 2003) ....................72

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003)....................69, 71, 72, 73, 76

Seaboard Lumber Co. v. United States,
41 Fed. Cl. 401 (1998) .................... 22-23

Sergent Mechanical Systems, Inc. v. United States,
34 Fed. Cl. 505 (1995) ....................31

Shawn Montee, Inc. dba Shawn Montee Timber Company,
AGBCA Nos. 2003-132-1 through 2003-136-1,
04-1 BCA ¶ 32,564 (2004) ....................21, 49, 69, 74, 75

Shawn Montee, Inc.,
AGBCA No. 1004-153-R, 04-2 BCA ¶ 32,755 (2004) ....................76

Silver v. Babbitt,
924 F. Supp. 976 (D.Ariz. 1995) ....................48, 70

Southern California Edison v. United States,
58 Fed. Cl. 313 (2003)....................33

Spearin v. United States,
248 U.S. 132 (1918)....................24, 25, 31, 32

Superior Timber Co., Inc.,
IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996) ....................29, 48, 68, 69

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987)....................12

Tamarack Mills, LLC,
AGBCA Nos. 2003-115-1 and 2003-116-1, 04-1 BCA ¶ 32,591 (2004)........21, 49, 69, 75

Trinity River Lumber Co. v. United States,
66 Fed. Cl. 98 (2005) .......... *passim*

United States v. Seckinger,
397 U.S. 203 (1970) .......... 12, 22

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A) .......... 44

16 U.S.C. § 472a .......... 31

16 U.S.C. § 472a(a) .......... 27

16 U.S.C. § 472a(e)(2) .......... 16

16 U.S.C. § 475 .......... 27

16 U.S.C. § 528 .......... 27

16 U.S.C. § 1600 et seq. .......... *passim*

42 U.S.C. § 4321 et seq. .......... *passim*

Section 318 of the Department of the Interior Appropriations Act of 1990,
Pub. L. No. 101-121, 103 Stat. 701 (1989) .......... 72

36 C.F.R. Part 223 .......... 31

36 C.F.R. § 223.1 .......... 27

36 C.F.R. § 223.88 .......... 16

36 C.F.R. § 223.100 .......... 16

**MISCELLANEOUS**

2 Childress and Davis, STANDARDS OF REVIEW (1986) .......... 50

11 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW
OF CONTRACTS (4th ed. 1999) .......... 78

BLACK'S LAW DICTIONARY (8th ed. 1999) ........................................ 78

J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS
(4th ed. 1995) ........................................ 25-26

M. Davis, A BASIC GUIDE TO STANDARDS OF JUDICIAL REVIEW,
33 S.D.L.Rev. 469 (1988) ........................................ 50

Forest Service Manual ........................................
§ 2403.5 (eff. 8/8/96, amend 96-4) ........................................ 27
§ 2432.04b (eff. 4/28/95, amend 95-3) ........................................ 29
§ 2432.1 (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.11 (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.13 (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.14 (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.2 (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.22g (eff. 4/28/95, amend 95-3) ........................................ 28
§ 2432.23 (eff. 5/7/02, amend 2002-3) ........................................ 28

RCFC 56(a) ........................................ 12

# TABLE OF CONTENTS OF APPENDIX


| TAB | DATE | SENDER | RECIPIENT | DOCUMENT DESCRIPTION |
|---|---|---|---|---|
| | | | | |
| 1 | 4/1/1994 | N/A | N/A | Plaintiff's Deposition Exhibit 133: Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl |
| 2 | 5/26/1994 | N/A | N/A | Plaintiff's Deposition Exhibit 1A: Survey and Manage (Component 1) Meeting Notes |
| 3 | 7/8/1994 | Cheryl McCaffrey | Jay Watson, Mike Crouse, Bernie Rios, John Tappenier, Steve Macdonald, Randy Hickenbottom, Jim Alegria and Dan McKenzie | Plaintiff's Deposition Exhibit 1B: Email re: Survey and Manage Strategies 2-4 |
| 4 | 7/14/1994 | N/A | N/A | Plaintiff's Deposition Exhibit 1C: Survey and Manage Briefing for Regional Executives |
| 5 | 11/1/1994 | Cheryl McCaffrey | Participants in Survey and Manage Working Group | Plaintiff's Deposition Exhibit 1D: Email re: Update and Review Opportunity for Survey and Manage Working Group |
| 6 | 12/2/1994 | N/A | N/A | Plaintiff's Deposition Exhibit 1E: Development of the Survey and Manage Measure handout |
| 7 | 12/2/1994 | N/A | N/A | Plaintiff's Deposition Exhibit 3: Meetings Notes on Intent of Survey and Manage Strategies in ROD |
| 8 | 4/28/1995 | N/A | N/A | FSM 2400 - Timber Management WO Amendment 2400-95-3 |
| 9 | 9/5/1995 | Acting DARD-NPCE, Region 1 | State Supervisor, Western Washington State Office, State Supervisor, Oregon State Office and Deputy ARD-Klamath and California Ecoregion | Plaintiff's Deposition Exhibit 137: Memorandum re: draft notes from the December 2, 1994, Survey and Monitoring Committee Meeting which discuss the Intent of Survey and Manage Strategies in the ROD |
| 10 | 9/5/1995 | Acting DARD-NPCE, Region 1 | State Supervisor, Western Washington State Office, State Supervisor, Oregon State Office and Deputy ARD-Klamath and California Ecoregion | Plaintiff's Deposition Exhibit 1: Memorandum re: draft notes from the December 2, 1994, Survey and Monitoring Committee Meeting which discuss the Intent of Survey and Manage Strategies in the ROD |
| 11 | 9/7/1995 | N/A | N/A | Plaintiff's Deposition Exhibit 7: Survey and Manage Briefing Agenda |
| 12 | 1/17/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 2A: Survey and Manage Standards and Guidelines Project Implementation - When? |
| 13 | 3/2/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 3A: Relevant Survey and Manage Meeting Notes from 8/23/95 |
| 14 | 319/1996 | William Bradley | District Managers | Memorandum re: Protocols for Survey and Manage Amphibians |
| 15 | 6/12/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 5A: Agenda: Intermediate Managers Group For Survey And Manage |
| 16 | 7/17/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 73: Email re: Here are the notes I took |
| 17 | 7/19/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 8: Survey And Manage Work Group Proposed FY 1996 Organization And Work Plan |
| 18 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 11: Draft - Implementation Of Survey And Manage (Component 2) Requirements |
| 19 | 8/8/1996 | N/A | N/A | FSM § 2403.5 (eff. 8/8/96, amend. 96-4) |

| | | | | |
|---|---|---|---|---|
| 20 | 8/14/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 12: Survey and Manage Update (#1) |
| 21 | 8/16/1996 | Thomas Hussey | J. Casey and R. Hickenbottom | Plaintiff's Deposition Exhibit 13: Email re: S&M staff paper |
| 22 | 8/28/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 14: Survey and Manage Current Implementation Issues |
| 23 | 8/28/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 72: Survey and Manage Current Implementation Issues |
| 24 | 9/1/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 14A: Survey And Manage Current Implementation Issues |
| 25 | 9/1/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 64: Survey And Manage Current Implementation Issues |
| 26 | 9/18/1996 | Survey and Manage Core Group | Intermediate Management Group: Bradley, Geyer, Nygren and Wesley | Plaintiff's Deposition Exhibit 15: Issue handout re: When should field units survey for protection buffer species and what level(s) of survey are to be done? The ROD langage is unclear and subject to interpretation but timing could be as soon as October 1, 1996 |
| 27 | 9/18/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 16: Handwritten agenda |
| 28 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 17: Draft - Implementation of Survey and Manage (Component 2) Requirements |
| 29 | 9/30/1996 | Elaine Zielinski and Robert Williams | N/A | Plaintiff's Deposition Exhibit 67: Fax re: Survey and Manage Implementation Draft |
| 30 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 68: Draft - Implementation of Survey and Manage (Component 2) Requirements |
| 31 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 71: Draft - Definitions of Survey and Manage Terms |
| 32 | 10/4/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 18: Survey and Manage Update (#2) |
| 33 | 10/22/1996 | N/A | N/A | Plaintiff's Deposition Exhibit 19: Survey and Manage Component 2 Implementation Issues |
| 34 | 11/1/1996 | Ed Hastey and G. Lynn Sprague | USDI BLM District Managers and Area Managers; USDA FS Forest Supervisors within the NWFP | Plaintiff's Deposition Exhibit 20: Memorandum re: Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline |
| 35 | 11/1/1996 | Ed Hastey and G. Lynn Sprague | USDI BLM District Managers and Area Managers; USDA FS Forest Supervisors within the NWFP | Plaintiff's Deposition Exhibit 132: Memorandum re: Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline |
| 36 | 11/4/1996 | Elaine Zielinski and Robert Williams | USDI BLM District Managers and USDA FS Forest Supervisors within the Range of the Northern Spotted Owl in Oregon | Plaintiff's Deposition Exhibit 125: Memorandum re: Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole |
| 37 | 11/25/1996 | Ed Hastey and G. Lynn Sprague | Kate Benkert, Jodi Bush, Bruce Halstead, Ron Iverson, Jim Smith and Steve Lewis | Memorandum re: Survey and Manage Workgroup Products |
| 38 | 1/22/1997 | N/A | N/A | Notes on S&M Concerns Meeting |
| 39 | 6/17/1997 | Randy Hickenbottom | N/A | Plaintiff's Deposition Exhibit 25A: Email re: I agree with most of your interpretation |
| 40 | 1/1/1998 | N/A | N/A | Decision Notice And Finding Of No Significant Impact: Too Wild Timber Sale Environmental Assessment |

| | | | | |
|---|---|---|---|---|
| 41 | 7/8/1998 | Michael Axline | Robert Williams, Elaine Zielinski, G. Lynn Sprague and Ed Hastey | Plaintiff's Deposition Exhibit 124: Letter re: suit filed in federal court seeking to enforce the provisions of the Record of Decision on Management of Habitat for Late-Successional and Old-Growth Forest Related Species with the Range of the Northern Spotted Owl |
| 42 | 7/14/1998 | N/A | N/A | Plaintiff's Deposition Exhibit 68: Comparison of Lawsuit Issues and Administrative Appeal Issues |
| 43 | 7/27/1998 | Kathryn Toffentti | Ted Boling and Al Ferlo | Plaintiff's Deposition Exhibit 21: Fax re: meeting to gather facts |
| 44 | 7/29/1998 | Edward Boling | Michael Gippert and Renee Stone | Plaintiff's Deposition Exhibit 24A: Letter re: request for expedited information regarding allegations in ONRC Action |
| 45 | 8/8/1998 | Susan Zike | Brenda Woodard | Plaintiff's Deposition Exhibit 35a: Fax re: attached is a draft DOJ letter to plaintiff's attorney |
| 46 | 8/27/1998 | Ted Boling | Sue Zike | Plaintiff's Deposition Exhibit 35B: Fax re: attached is Michael Axline's complete letter |
| 47 | 9/1/1998 | Susan Zike | ONRC Action Coordinators | Plaintiff's Deposition Exhibit 24b: Email re: need to gather pertinent information on 200 USFS and BLM sales listed by Michael Axline |
| 48 | 9/4/1998 | Jerry Jensen | Susan Zike and Brian Stone | Plaintiff's Deposition Exhibit 26: email re: I need to remind you that the list of sales I sent out is privileged information and not available to the public |
| 49 | 9/11/1998 | Chuck Wassinger, Robert Devlin, Ed Hastey and G. Lynn Sprague | USDA Forest Service Supervisors Within the Area of the Northwest Forest Plan; USDI BLM District Managers and Area Managers | Plaintiff's Deposition Exhibit 36: Memorandum re: Implementation of Survey and Manage Component 2 and Protection Buffer Standards and Guidelines Regarding "Survey Prior to Ground-Disturbing Activities" |
| 50 | N/A | Bob Devlin | N/A | Plaintiff's Deposition Exhibit 39A: Email re: We have a process in place to agree at level one teams that documentation of consistency with NW Plan is adequate |
| 51 | 9/25/1998 | Ted Boling | Lois Schiffer and Peter Coppelman | Plaintiff's Deposition Exhibit 30: Fax re: Michael Axline's response to my letter asking him to follow through on his commitment to identify timber sales that do not comply with the Northwest Forest Plan ROD and the ways in which they do not comply |
| 52 | 9/25/1998 | Elaine Zielinski, Robert Williams, Ed Hastey and G. Lynn Sprague | USDI BLM District Managers and Area Managers; USDA FS Forest Supervisors within the Range of the Northern Spotted Owl | Memorandum re: Extension of Draft Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole |
| 53 | 10/1/1998 | N/A | N/A | Plaintiff's Deposition Exhibit 1(tab 10f): Timber Sale Prospectus for Jack Heli |
| 54 | 10/16/1998 | Bob Devlin | Distribution List | Plaintiff's Deposition Exhibit 31: Email re: still working with DOJ and OGC lawyers on settlement discussions with the plaintiffs on the NW Plan lawsuit |
| 55 | 10/24/1998 | Robert Devlin | Susan Zike | Plaintiff's Deposition Exhibit 33: Email re: delay requested by DOJ on Too Wild timber sale |
| 56 | 10/26/1998 | Edward Boling | Michael Axline and Marianne Dugan | Plaintiff's Deposition Exhibit 37c: Letter re: details of the counter-proposals of the Forest Service and BLM in response to September 25, 1998 settlement proposal |
| 57 | 10/28/1998 | Sue Zike | ONRC Action Coordinators | Plaintiff's Deposition Exhibit 39: Memorandum re: ONRC Action: government counter-offer |
| 58 | 10/28/1998 | Sue Zike | ONRC Action Coordinators | Plaintiff's Deposition Exhibit 35: Memorandum re: ONRC Action: government counter-offer |
| 59 | 10/28/1998 | Sue Zike | Regional Forester; Bob Devlin; Peggy Kain; Lisa Freedman; Arnie Holden | Plaintiff's Deposition Exhibit 37: Memorandum re: ONRC Action counter-offer letter from DOJ to ONRC Action (Axline) |

| | | | | |
|---|---|---|---|---|
| 60 | 10/29/1998 | Susan Zike | Paula Fong, Mike Redmond and Tom Ortiman | Plaintiff's Deposition Exhibit 40: Email re: attached is the edited version of the MTH sales from the 9/17 list from ONRC Action |
| 61 | 11/20/1998 | Owen Schmidt | Edward Boling | Plaintiff's Deposition Exhibit 48: Letter re: attached is the writeup you requested this morning |
| 62 | 11/23/1998 | Susan Zike | Susan Carter, Jan Flatten, Jamia HansenMurray, Ward Hoffman and Fred Dorn | Plaintiff's Deposition Exhibit 49: Email re: attached is the briefing paper I prepared for the RF/DRF and the BLM State Director |
| 63 | 11/23/1998 | N/A | N/A | Plaintiff's Deposition Exhibit 50: USFS Assessment for Regional Foresters and State Directors Briefing |
| 64 | 11/25/1998 | Susan Zike | N/A | Plaintiff's Deposition Exhibit 30a: Email re: Ted Boling's answers to questions about what were Schiffer's and Coppelman's concerns about this case |
| 65 | 11/25/1998 | Ted Boling | Dinah Bear | Plaintiff's Deposition Exhibit 126: Fax re: heavy-hitter issues looming on the Northwest's horizon |
| 66 | 11/25/1998 | N/A | N/A | Plaintiff's Deposition Exhibit 52: Handwritten notes |
| 67 | 11/25/1998 | Nancy Graybeal | Robert Devlin, Lisa Friedman, Susan Zike, Robert Williams and Richard Ferraro | Plaintiff's Deposition Exhibit 54: Email re: non-decision from Lois Schiffer |
| 68 | 11/30/1998 | Erin Espenhardt | Ellen | Plaintiff's Deposition Exhibit 38: Letter re: list of Forest Service and BLM timber sales rushed through to avoid the survey and manage requirements |
| 69 | 12/3/1998 | Susan Zike | Susan Carter, Jan Flatten, Jamia HansenMurray, Ward Hoffman and Fred Dorn | Plaintiff's Deposition Exhibit 56: Email re: ONRC Action end of delay period Dec. 3 - DOJ request |
| 70 | 12/4/1998 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 59: Email re: ONRC Action: process to award sales named by plaintiffs |
| 71 | 12/7/1998 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 62: Email re: ONRC Action: info needed to determine award of pending sales |
| 72 | 12/8/1998 | Susan Zike | Nancy Graybeal, Robert Devlin, Robert Williams, Margaret Kain and Brian Stone | Plaintiff's Deposition Exhibit 63: Email re: ONRC Action: WO briefing and sales award |
| 73 | 12/9/1998 | Susan Zike | Robert Williams and Elaine Zielinski | Memorandum re: ONRC Action v. USFS, BLM: risks and benefits of award sales |
| 74 | 12/11/1998 | Susan Zike | ONRC Action Coordinators | Plaintiff's Deposition Exhibit 65: Memorandum re: Assessing ONRC Action names sales for award |
| 75 | 12/11/1998 | Peggy Kain, Susan Zike and Judy Nelson | Paul Brouha and Chris Jauhola | Plaintiff's Deposition Exhibit 66: Memorandum re: Timber Program Overview FYs 1995-1999 and effects of surveying certain FY 1998 timber sales in Forest Service Regions 5 and 6 and Western Oregon BLM (revised) |
| 76 | 12/11/1998 | N/A | N/A | Paragraph re: agencies would argue vigorously against surveying sales that have been awarded |
| 77 | 1/10/1999 | Bill Turner | Ed Matthews | Plaintiff's Deposition Exhibit 69: Letter re: Jack Heli Timber Sale |
| 78 | 1/10/1999 | Bill Turner | Ed Matthews | Defendant's Deposition Exhibit 8: Letter re: Jack Heli Timber Sale |
| 79 | 1/10/1999 | Bill Turner | Ed Matthews | Plaintiff's Deposition Exhibit 1(tab 6f): Letter re: Jack Heli Timber Sale |
| 80 | 1/21/1999 | Edward Matthews | Bill Turner | Defendant's Deposition Exhibit 9: Letter re: forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of Jack Heli sale |
| 81 | 1/21/1999 | Ed Matthews | Bill Turner | Plaintiff's Deposition Exhibit 1 (tab 8): Letter re: forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of Jack Heli sale |

| | | | | |
|---|---|---|---|---|
| 82 | 1/22/1999 | Paul Brouha | Anne Kennedy, Barbara Weber and Al Ferlo | Plaintiff's Deposition Exhibit 69a: Memorandum re: Working Document concerning "Survey and Manage" Lawsuit for CEQ |
| 83 | 1/22/1999 | Brian Stone | Distribution List | Plaintiff's Deposition Exhibit 70: Email re: ONRC Action lawsuit: process to determine which sales to award |
| 84 | 1/29/1999 | Bev Cox | Bill Turner | Plaintiff's Deposition Exhibit 1 (tab 9): Fax re: expiration and extension of bid on Jack Heli |
| 85 | 2/1/1999 | Bill Turner | Ed Matthews | Defendant's Deposition Exhibit 10: Letter re: Timber Products would like to extend the time of consideration of their bid on Jack Heli |
| 86 | 2/1/1999 | Bill Turner | Ed Matthews | Plaintiff's Deposition Exhibit 1 (tab 10): Letter re: Timber Products would like to extend the time of consideration of their bid on Jack Heli |
| 87 | 2/6/1999 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 74: Email re: ONRC Action v. USFS, BLM proposed awards chart |
| 88 | 2/22/1999 | Susan Zike | E. Matthews | Plaintiff's Deposition Exhibit 75: Email re: attached is a draft letter to DOJ re: the USFS sales to be awarded after 3/1/99 |
| 89 | 3/1/1999 | Edward Boling | Michael Axline | Plaintiff's Deposition Exhibit 1 (tab 10a): Letter re: additional information regarding BLM and Forest Service plans to award certain timber sales |
| 90 | 3/2/1999 | Edward Matthews | Bill Turner | Defendant's Deposition Exhibit 11: Letter re: written notification to furnish within 30 days of the award date a down payment |
| 91 | 3/2/1999 | Edward Matthews | Bill Turner | Plaintiff's Deposition Exhibit 1 (tab 10b): Letter re: written notification to furnish within 30 days of the award date a down payment |
| 92 | 3/2/1999 | N/A | N/A | Defendant's Document #2379: Report of Timber Sale Convertible and Noncovertible Products |
| 93 | 3/2/1999 | N/A | N/A | Jack Heli Timber Sale Contract, A, B, and C sections as awarded 3/2/99 |
| 94 | 3/9/1999 | Edward Matthews | B. Stone and E. Matthews | Plaintiff's Deposition Exhibit 76: Email re: complete documentaion package for the Happy Thin timber sale |
| 95 | 3/19/1999 | Robert Devlin | Susan Zike | Plaintiff's Deposition Exhibit 117: Email re: ONRC Action: sale review process |
| 96 | 3/31/1999 | N/A | N/A | Plaintiff's Deposition Exhibit 1 (tab 10e): Correction To Timber Sale Prospectus for Happy Thin Heli Timber Sale |
| 97 | 3/31/1999 | Ed Matthews | Michael Axline | Plaintiff's Deposition Exhibit 1 (tab 11b): Fax re: 10 day notice prior to award of Upper South Fork Heli Timber Sale and Happy Thin Heli Timber Sale |
| 98 | 3/31/1999 | Ed Matthews | Michael Axline | Plaintiff's Deposition Exhibit 77: Fax re: 10 day notice prior to award of Upper South Fork Heli Timber Sale and Happy Thin Heli Timber Sale |
| 99 | 4/1/1999 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 79: Email re: attached is the issues chart for the amended complaint |
| 100 | 4/5/1999 | Susan Zike | N/A | Plaintiff's Deposition Exhibit 41a: Email re: government made two promises in the stipulation |
| 101 | 4/6/1999 | Edward Boling | Bob Williams, Lynn Sprague, Elaine Zielinski and Ed Hastey | Letter re: reiterate commintments to inform plaintiffs and Judge Dwyer regarding Forest Service and BLM decisions with regard to timber sales that are at issue in ONRC Action |
| 102 | 4/12/1999 | N/A | Ted Boling and John Watts | Plaintiff's Deposition Exhibit 41B: Letter re: 45 sales are at risk of being awarded and operated prior to June 1, 1999. These 45 at risk sales are identified on the attached list |
| 103 | 4/23/1999 | Susan Zike | Brenda Woodard | Plaintiff's Deposition Exhibit 41D: Letter re: Intent to Award Timber Sales in ONRC Action |
| 104 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 58: Survey & Manage Component 2 Implementation Scenarios chart |
| 105 | N/A | N/A | N/A | Plaintiff's Deposition Exhibit 59: portion of document re: "gray zone" |
| 106 | N/A | Elaine Zielinski and Robert Williams | N/A | Plaintiff's Deposition Exhibit 60: Memorandum re: Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline |
| 107 | N/A | Elaine Zielinski and Robert Williams | N/A | Plaintiff's Deposition Exhibit 61: Memorandum re: Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline |
| 108 | 4/28/1999 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 82: Email re: ONRC Action: April 5 sale list categorized |
| 109 | 5/1/1999 | N/A | N/A | Too Wild Timber Sale Prospectus |

| | | | | |
|---|---|---|---|---|
| 110 | 5/14/1999 | Thomas Link | CLR Timber Holdings | Letter re: sale of Too Wild Timber Sale awarded to CLR |
| 111 | 5/14/1999 | N/A | N/A | Too Wild Timber Sale Contract A, B, and C sections as awarded 5/14/99 |
| 112 | 5/19/1999 | Susan Zike | Distribution List | Plaintiff's Deposition Exhibit 82a: Email re: ONRC Action: update |
| 113 | 6/7/1999 | Susan Zike | Robert Devlin, Margaret Kain, Bill Funk, Val Black, Owen Schmidt, Steve Paulson, Brian Stone and Roberta Moltzen | Plaintiff's Deposition Exhibit 83: Email re: ONRC Action/ALA I/ ALA II: probable sales to try to award |
| 114 | 6/8/1999 | Ann Bartuska | Regional Foresters | Plaintiff's Deposition Exhibit 1 (tab 11a): Letter re: Implementation of Timber Sale Decisions and Presale Activities |
| 115 | 6/14/1999 | Susan Zike | Brian Stone, Steve Paulson and Ed Matthews | Plaintiff's Deposition Exhibit 84: Email re: ONRC Action: draft letter to DOJ re: awarding sales after 6/15 |
| 116 | 6/15/1999 | N/A | N/A | Plaintiff's Deposition Exhibit 82b: Email re: urge the quiet award of the following sales after June 15 |
| 117 | 6/19/1999 | Susan Zike | John Watts | Plaintiff's Deposition Exhibit 87: Fax re: Implementation of Timber Sale Decisions and Presale Activities |
| 118 | 6/23/1999 | Robert Devlin and Steve Paulson | Edward Boling | Plaintiff's Deposition Exhibit 88: Letter re: we have determined that these sales are defendable against this issues in this lawsuit and we intend to award the following sales in the normal course of business after July 1 |
| 119 | 6/23/1999 | Robert Devlin and Steve Paulson | Edward Boling | Plaintiff's Deposition Exhibit 89: Letter re: we have determined that these sales are defendable against this issues in this lawsuit and we intend to award the following sales in the normal course of business after July 1 |
| 120 | 7/5/1999 | Beverly Cox | N/A | Plaintiff's Deposition Exhibit 1 (tab 11c): The Happy Thin Timber Sale is listed in litigation but is not currently involved in the litigation. The sale will not be awarded until after July 5, 1999 |
| 121 | 7/6/1999 | Michael Axline | Ted Boling and John Watts | Plaintiff's Deposition Exhibit 44: Letter re: revision of April 12, 1999 list of sales that are "at risk" |
| 122 | 7/6/1999 | Edward Matthews | Ron Johnston | Plaintiff's Deposition Exhibit 1 (tab 12): Letter re: written notification to furnish within 30 days of the award date a down payment |
| 123 | 7/6/1999 | Susan Zike | R. Fitzgerald, Marcia MacNaughton, G. Stern and Own Schmidt | Plaintiff's Deposition Exhibit 90: Email re: ONRC Action: WO briefing paper |
| 124 | 7/6/1999 | N/A | N/A | Happy Thin Heli Timber Sale Contract A, B, and C sections as awarded 7/6/99 |
| 125 | 7/7/1999 | Susan Zike | Robert Devlin and Kathryn Toffenetti | Memorandum re: ONRC Action: Status and pending litigation question: can we join in BLM position on awarding sales? |
| 126 | 7/7/1999 | N/A | N/A | Plaintiff's Deposition Exhibit 45: Chart for Timber Sale Identified In Axline July 6 Letter As "At-Risk" |
| 127 | 7/9/1999 | Susan Zike | Susan Carter, Jan Flatten, Jamia HansenMurray, Ward Hoffman and Fred Dorn | Plaintiff's Deposition Exhibit 91: Email re:ONRC Action: DOJ reply to ONRC's 7/6/99 At-Risk list and 10 day notice |
| 128 | 8/26/1999 | N/A | N/A | Plaintiff's Deposition Exhibit 1 (tab 15): Order On Additional Motions Re Preliminary Injunction |
| 129 | 8/27/1999 | Edward Matthews | Bill Turner | Defendant's Deposition Exhibit 12: Letter re: suspension of all operations on Jack Heli Timber Sale in accordance with the Court Order |
| 130 | 9/1/1999 | Thomas Link | CLR Timber Holdings | Defendant's Deposition Exhibit 7: Letter re: Too Wild Timber Sale Contract and Dwyer Injunction |
| 131 | 9/20/1999 | Mike Gippert | Ted Boling | Plaintiff's Deposition Exhibit 99: Fax re: review in Washington of the "implementation" interpretation |
| 132 | 9/25/1999 | N/A | N/A | Plaintiff's Deposition Exhibit 1 (tab 6): Bid for Advertised Timber for Jack Heli Timber Sale with handwritten note re: message left for Bill Turner |
| 133 | 10/5/1999 | James Furnish | Regional Foresters | Plaintiff's Deposition Exhibit 101: Letter re: Implementation of Timber Sale Decisions and Pre-award Activities |

| | | | | |
|---|---|---|---|---|
| 134 | 10/5/1999 | Susan Zike | Nancy Graybeal | Plaintiff's Deposition Exhibit 102: Memorandum re: ONRC Action: Survey/Manage needs on enjoined awarded sales in R5/R6 |
| 135 | 10/15/1999 | Owen Schmidt | Kathryn Toffenetti and Ronald Mulach | Plaintiff's Deposition Exhibit 105a: Letter re: ONRC Action (Northwest Forest Plan); Update on where we stand |
| 136 | 11/18/1999 | Lois Schiffer | N/A | Plaintiff's Deposition Exhibit 110: Memorandum re: Settlement of ONRC Action |
| 137 | 6/13/2000 | Bruce Taylor | Edward Matthews | Defendant's Document #1443-1461: Letter re: Contract Disputes Act Claim for Breach Arising Out of the Happy Thin Heli Timber Sale |
| 138 | 6/22/2000 | N/A | N/A | Supplemental Information Report For the Happy Thin Heli Timber Sale |
| 139 | 7/14/2000 | Bill Turner | Edward Matthews | Letter re: Contract Disputes Act Claim for Jack Heli Timber Sale |
| 140 | 7/24/2000 | N/A | N/A | Supplemental Information Report For the Jack Heli Timber Sale: Unit 5, 9, 11, 12, 14, 56 and 105 |
| 141 | 8/17/2000 | Edward Matthews | Bruce Taylor | Defendant's Deposition Exhibit 14: Letter re: Klamath Forest Alliance has withdrawn its objections to survey and manage on the Happy Thin Timber Sale |
| 142 | 10/6/2000 | Edward Matthews | Bruce Taylor | Happy Thin Decision Notice |
| 143 | 11/9/2000 | Edward Matthews | Bill Turner | Defendant's Document #2620-2625: Jack Heli Decision Notice |
| 144 | 11/17/2000 | Jerry Broom | Edward Matthews | Letter re: submitting the following Supplemental Contract Dispute Claim arising out of the suspension of the Happy Thin Timber Sale |
| 145 | 11/17/2000 | N/A | N/A | Defedant's Document #1688-1696: Supplement Information Report For the Too Wild Timber Sale |
| 146 | 12/5/2000 | Michael Axline | John Watts | Defendant's Document #100,746: Letter re: confirm our acceptance of your offer to settle the attorney fees |
| 147 | N/A | N/A | N/A | Defendant's Document #1551: Comment and Response page |
| 148 | 5/22/2002 | N/A | N/A | FSM § 2432.23 (eff. 5/22/02, amend. 2002-3) |
| 149 | 5/14/2003 | N/A | N/A | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 150 | 7/2/2003 | Edward Matthews | Bill Turner | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 151 | 7/28/2003 | Bill Turner | Edward Matthews | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 152 | 8/1/2003 | Edward Matthews | Bill Turner | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 153 | 9/10/2003 | Ronald Fallert | Robert Thomas | Claim letter for Too Wild Timber Sale Contract |
| 154 | 9/10/2003 | Bill Turner | Contracting Officer:Klamath National Forest | Letter re: Contract Disputes Act Claim for Breach Arising Out of the Jack Heli Timber Sale |
| 155 | 10/27/2003 | Robert Thomas | Ronald T. Fallert | Contracting Officer's Findings and Decision re: Too Wild Timber Sale |
| 156 | 10/29/2003 | Jan Burns | Bill Turner | Final Decision of Contracting Office for Jack Heli timber sale |
| 157 | 10/29/2003 | Jan Burns | Bruce Taylor | Final Decision of the Contracting Officer for Happy Thin Heli Timber Sale |
| 158 | 11/25/2003 | Robert W. Thomas | Ronald T. Fallert | Contracting Officer's Findings and Decision re: Too Wild Timber Sale |
| 159 | 3/23/2005 | Bill Turner | Jan Burns | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 160 | 4/13/2005 | Jan Burns | Bill Turner | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 161 | 4/20/2005 | N/A | N/A | Timber Products' Answer to Defendant's Interrogatory No. 24 |
| 162 | 4/21/2005 | Bill Turner | Jan Burns | Letter re: Timber Products' Offer of No-Cost Cancellation |
| 163 | 6/28/2005 | Mark Bosetti | Joseph Franco | Letter re: Guard MP Timber Sale and Deanes MP Timber Sale with attached Pre-Award Waiver, Release, and Limitation of Liability Agreement |
| 164 | 8/24/2005 | Bill Turner | Jan Burns | Supplemental Contract Disputes Act Claim of Breach Arising Out of the Jack Heli Timber Sale |
| 165 | 6/13/2007 | Bill Turner | Contracting Officer:Klamath National Forest | Supplemental Contract Disputes Act Claim of Breach Arising Out of the Jack Heli Timber Sale |
| 166 | 5/12/2004 | N/A | N/A | Deposition of Ed Matthews |
| 167 | 5/12/2004 | N/A | N/A | Deposition of Bev Cox |
| 168 | 1/3/2007 | N/A | N/A | Deposition of John R. Hickenbottom |
| 169 | 1/4/2007 | N/A | N/A | Deposition of Sue Zike |
| 170 | 1/4/2007 | N/A | N/A | Deposition of Tom Hussey |

| | | | | |
|---|---|---|---|---|
| 171 | 1/5/2007 | N/A | N/A | Deposition of Larry Larsen |
| 172 | 1/8/2007 | N/A | N/A | Deposition of Bob Devlin |
| 173 | 8/20/2007 | N/A | N/A | Deposition of Susan Zike |
| 174 | 8/20/2007 | N/A | N/A | Deposition of Owen Schmidt |
| 175 | 8/21/2007 | N/A | N/A | Deposition of Susan Zike |
| 176 | 8/21/2007 | N/A | N/A | Deposition of Robert Devlin |
| 177 | 8/22/2007 | N/A | N/A | Deposition of Edward Matthews |
| 178 | 8/24/2007 | N/A | N/A | Deposition of Edward Boling |
| 179 | 9/11/2007 | N/A | N/A | Deposition of Michael Gippert |
| 180 | 9/11/2007 | N/A | N/A | Deposition of Darrel Bonde |
| 181 | 9/12/2007 | N/A | N/A | Deposition of Bill Turner |
| 182 | 9/13/2007 | N/A | N/A | Deposition of Ronald Lee Johnston |
| 183 | 9/13/2007 | N/A | N/A | Deposition of Jerry Broom |
| 184 | 9/14/2007 | N/A | N/A | Deposition of Bruce Taylor |
| 185 | 9/30/2007 | N/A | N/A | Deposition of Richard Holthausen |
| 186 | 3/5/2008 | N/A | N/A | Declaration of Darrel Bonde |
| 187 | 3/5/2008 | N/A | N/A | Declaration of Bruce M. Taylor |
| 188 | 3/5/2008 | N/A | N/A | Declaration of Bill Turner |
| 189 | 3/20/1996 | Robin Brown | Donald Knowles | Plaintiff's Deposition Exhibit 4: Memorandum re: Draft Survey and Manage Work Group Report Including Budget and Time Line |
| 190 | 7/29/1998 | Robert Simmons | G. Lynn Sprague and Robert Williams | Letter re: attached is a copy of two notices we have received from the Western Environmental Law Center |
| 191 | 12/8/1998 | Peggy Kain and Sue Zike | Rod Salle | Plaintiff's Deposition Exhibit 64: Fax re: requested information from 12/4/98 conference call |
| 192 | 2/1/1999 | Edward Matthews | R. Haupt and M. Chaney | Plaintiff's Deposition Exhibit 72: Email re: Jack Heli timber sale award |
| 193 | 5/1/2000 | Edward Boling | Michael Axline and Carrie Stilwell | Defendant's Document #102,139-102,143: Letter re: attorneys fees request |
| 194 | 10/9/2001 | N/A | N/A | Order issued by the United States Court of Federal Claims in Wetsel-Oviatt Lumber Company, Inc. v. United States, No. 94-389C |
| 195 | N/A | N/A | N/A | Decision Notice and Finding of No Significant Impact: Happy Thinning Environmental Assessment |
| 196 | 8/20/1998 | N/A | Lynn Sprague | Letter re: Klamath Siskiyou Wildlands Center appeals the decision to implement the Jack Timber Sale |
| 197 | 10/15/1998 | John De La Torre | Marty Bergoffen | Letter re: decision regarding appeal by Klamath Siskiyou Wildlands Center |
| 198 | 10/30/1998 | N/A | N/A | Appellant's Notice of Appeal, Statement of Reasons, And Request for Relief in Klamath Forest Alliance v. Michael P. Lee, Acting Forest Supervisor |
| 199 | 12/17/1998 | Roberta Moltzen | Kyle Haines | Letter re: appeal review of Klamath Forest Alliance's appeal of the Happy Thinning Sale Project Decision Notice |
| 200 | 11/23/1999 | N/A | N/A | ONRC Action: Stipulation for Order Dismissing Action; Order Thereon |

# TABLE OF ACRONYMS

| | |
|---|---|
| AGBCA | Department of Agriculture Board of Contract Appeals |
| APA | Administrative Procedures Act |
| BLM | Bureau of Land Management |
| CDA | Contract Disputes Act |
| CO | Contracting Officer |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FS | Forest Service |
| FWS or F&WS | Fish & Wildlife Service |
| FY | Fiscal Year |
| IBCA | Department of the Interior Board of Contract Appeals |
| IMG | Intermediate Management Group |
| IRT | Issue Resolution Team |
| LRMP | Land Resource Management Plan |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFP | Northwest Forest Plan |
| NOS | Normal Operating Season |
| PPF | Plaintiffs' Proposed Findings of Uncontroverted Fact |
| REO | Regional Ecosystem Office |
| RIEC | Regional Interagency Executive Committee |
| ROD | Record of Decision |
| RTV Directive | Red Tree Vole Directive |
| S&M | Survey and Manage |
| SIR | Supplemental Information Report |

**INTRODUCTION**

In this case plaintiffs allege that the Forest Service ("FS") breached each of their timber sale contracts. Sections II-IV of this memorandum are premised on legal theories that require proof of the FS's erroneous acts or omissions but do not require inquiry by this Court into whether these acts or omissions were unreasonable. In Section V plaintiffs contend that the FS breached the contracts by violating its implied duties to cooperate and not to hinder. This legal theory, as articulated in Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001), and the cases which have followed, involves a determination that the FS failed to act reasonably.

Each of the arguments in Sections II-V constitutes an independent ground for granting summary judgment on liability to plaintiffs. In addition, all four arguments may be considered together as another basis for granting summary judgment on liability to plaintiffs. In Section VI plaintiffs demonstrate that this case is ripe for summary judgment on liability to plaintiffs. Section VII addresses the issue of whether Timber Products may recover its additional operational costs resulting from the suspension of its Jack Heli timber sale pursuant to contract clause C6.01 which requires that the FS reimburse a purchaser for its out-of-pocket costs that directly result from a suspension of more than 30 days within the Normal Operating Season of the contract.

**QUESTIONS PRESENTED**

1. Is the FS liable because as the sole drafter of the contracts it assumed the risk of liability to plaintiffs when it awarded the timber sale contracts without Category 2 surveys and then had to suspend plaintiffs' timber sales to perform those surveys but failed to include any

valid exculpatory provisions or disclaimers in the contracts or require plaintiffs to execute any waivers of liability excusing FS fault?

2. Is the FS liable to plaintiffs because it breached its implied warranty of specifications when it had to suspend plaintiffs' operations in order to reevaluate whether the original specifications governing timber harvesting, road building and other ground-disturbing activities were adequate to protect Category 2 species?

3. Is the FS liable because it breached its obligation to plaintiffs to disclose its superior knowledge that (a) the timber sales were on ONRC Action's "at-risk" lists and (b) the FS had secret agreements with ONRC Action regarding the award of plaintiffs' contracts, and because the FS falsely represented to plaintiffs that the sales were not threatened by the ONRC Action litigation?

4. Is the FS liable to plaintiffs because it breached its duties to cooperate and not to hinder by suspending plaintiffs' sales because it failed to conduct Category 2 surveys on those sales prior to contract award?

5. Is Timber Products entitled to be compensated by the FS under contract clause C6.01 for the additional timber sale operational costs it incurred as a direct result of the FS's suspension of Jack Heli for more than 30 days during the Normal Operating Season?

## STATEMENT OF THE CASE

### The Northwest Forest Plan And Survey Program

In April 1994, the Secretary of the United States Department of Agriculture on behalf of the FS and the Secretary of the United States Department of the Interior on behalf of the Bureau of Land Management ("BLM") issued a Record of Decision ("ROD") for "amendments to Forest

Service and [BLM] planning documents within the range of the Northern Spotted Owl." Plaintiffs' Proposed Findings of Uncontroverted Fact ("PPF") ¶ 13. This document amended the Land and Resource Management Plans ("LRMPs") governing the operation of the National Forest and BLM lands in Washington, Oregon and northern California where it was believed that populations of Northern spotted owls existed. This amendment became known as the Northwest Forest Plan ("NFP"). Id. The Klamath National Forest in California on which plaintiff Blue Lake's Happy Thin sale and plaintiff Timber Products' Jack Heli sale were located was included within the area governed by the NFP. Id. The NFP also governed the Siskiyou National Forest in Oregon where plaintiff CLR's Too Wild sale was located. Id.

The fundamental purpose of the NFP was to permit a predictable and sustainable level of timber sales and use of non-timber resources that would not degrade or destroy the environment or endanger the viability of a variety of species of plants and animals present on NFP federal forests. Id. As part of the NFP ROD, Survey and Manage ("S&M") Standards and Guidelines were developed as mitigation measures for over 400 old growth-related species where there was a concern for the continued persistence of these species across the landscape but where little knowledge existed of the species themselves. PPF ¶ 14.

The NFP identified four survey strategies for the S&M species: (1) manage known sites; (2) survey prior to ground-disturbing activities; (3) conduct extensive surveys to find high priority sites for management; and (4) conduct general regional surveys to acquire additional information to determine necessary levels of protection. PPF ¶ 15. S&M species fall into one or more of these categories, also sometimes called "components" or "strategies." Id.

The Oregon red tree vole, five species of salamanders, and the Canada lynx were initially designated as Category 2 species. PPF ¶ 16. Prior to the award of the Happy Thin, Jack Heli, and Too Wild timber sale contracts to plaintiffs, the Canada lynx was removed from the Category 2 species by the Regional Interagency Executive Committee ("RIEC") under a provision of the NFP which allowed for such a modification. Id. Surveys for the red tree vole and the five salamanders in Category 2 were required for certain timber sales as of October 1, 1996. Id. Approximately 71 invertebrate species, including certain bryophytes, lichens, fungi, mollusks, and vascular plants, were also designated as Category 2 species. Surveys for those species were required for certain timber sales as of October 1, 1998. Id.

The Category 2 surveys required by the NFP were important to the environmental evaluation of the sales. It was important to have survey information before the issuance of a decision document approving the sales as being in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and to comply with the substantive requirements of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. PPF ¶ 17. Category 2 surveys were "designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon." PPF ¶ 18. "High-risk" species refers to the risk of extirpation as does the phrase "persistence concerns." For Category 2 species, it was necessary that surveys be conducted prior to ground-disturbing activities which could result in the destruction or impairment of habitat necessary for those species' survival. The Category 2 surveys were the most restrictive of the NFP S&M surveys in terms of the potential impact on federal lands, including from FS timber sales. Id.

As more time passed after the NFP was adopted in April 1994 and more activities such as timber sales were undertaken prior to the implementation of the Category 2 surveys, the risk of extirpation to Category 2 species in all or part of the NFP area increased. PPF ¶ 19. A critical purpose of the Category 2 surveys was to help insure the viability of the species that were being surveyed by acquiring a sufficient knowledge base in order to have a better idea of the degree of risk of extirpation to species prior to the initiation of ground-disturbing activities on projects like timber sales. PPF ¶¶ 20-21. For this reason one of the important objectives of the NFP was to develop as soon as possible the protocols necessary for the Category 2 "prior to ground-disturbing activities" surveys which the NFP directed were to be implemented for six vertebrate species as of October 1, 1996 and for 71 invertebrate species as of October 1, 1998. PPF ¶ 22.

**The Administrative Structure Of The Northwest Forest Plan**

Under the NFP there were several government groups with various levels of authority for recommending and determining the intent and meaning of the NFP S&M requirements. PPF ¶ 24. At least as early as the spring-summer of 1994, there existed a "Survey and Manage Working Group" composed of representatives from the FS, the BLM and other agencies. Id. Among other things, the purpose of the Survey and Manage Working Group was to develop working definitions and directions for the implementation of NFP wildlife and plant surveys and to recommend the adoption of certain definitions and interpretations to higher levels of authority within the management structure of the NFP. Id. At various times from at least December 1994 through 1998, the team leaders of this Group included Cheryl McCaffrey of the BLM and Randy Hickenbottom of the FS. Id.

There was an Intermediate Management Group ("IMG") immediately above the Survey and Manage Working Group in the NFP administrative hierarchy. PPF ¶ 25. This Group included representatives of the FS and the BLM at what was determined to be the intermediate management level. Id. One purpose of the IMG was to act on and approve the recommendations from the Survey and Manage Working Group with regard to definitions, directions and interpretations of the survey requirements under the NFP when, in the view of the IMG members, such decisions could be made without referring the matter to the next higher level of authority, the Regional Interagency Executive Committee ("RIEC"). Id.

The RIEC represented the highest level of agency authority at the regional level within the NFP administrative hierarchy. PPF ¶ 26. The RIEC included the Regional Foresters of Regions 5 (California) and 6 (Oregon and Washington) of the FS and the Director of the Oregon State Office of the BLM or their designated representatives. Id.

As part of the administrative structure for the NFP, there existed a Regional Ecosystem Office ("REO") under the direction of Donald Knowles, Executive Director, which functioned as the staff of the RIEC coordinating certain agency actions and reporting thereon to the RIEC. PPF ¶ 27. Mr. Knowles and other members of the REO from time to time worked with other administrative levels under the NFP including the Survey and Manage Working Group and the IMG. Id.

**The Creation Of The Issue Resolution Team And Development Of The Category 2 Survey Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive**

By at least January 1996, a group called the Issue Resolution Team ("IRT") was added to the NFP administrative structure. PPF ¶ 31. This Team was charged with, among other things,

developing and recommending interpretations of the NFP Category 2 survey requirements, including the interpretation of when Category 2 surveys were required to be performed. Id. The IRT members principally involved in developing that interpretation and memoranda recommending that interpretation for adoption by the RIEC were Tom Hussey (FS) and Larry Larsen (BLM). Randy Hickenbottom (FS) also played a major role in this effort with Messrs. Hussey and Larsen. Id.

Beginning at least in the summer of 1996 and continuing as late as October 1996, Messrs. Larsen, Hussey and Hickenbottom collaborated in an effort which ultimately led to a recommendation to the RIEC that it officially adopt the interpretation of the requirement for Category 2 surveys, "NEPA decision equals implementation." PPF ¶¶ 38. By this it was meant that the NFP ROD was interpreted to mean that Category 2 surveys would not be required for FS timber sales where NEPA decision documents signifying approval of the environmental analyses preparatory to offering the sales to the public were signed by either October 1, 1996 or October 1, 1998.[1] PPF ¶ 44. The former date, the first day of fiscal year ("FY") 1997, was the trigger date for requiring Category 2 surveys for five salamanders and the red tree vole; the October 1, 1998 date, the first day of FY 1999, was the trigger date for requiring Category 2 surveys for 71 invertebrate species. PPF ¶ 16. The interpretation "NEPA decision equals implementation" and

[1]NEPA requires the FS to prepare a decision document approving the environmental analyses before offering timber for sale to the public. A decision document can be either a Decision Notice ("DN") or a ROD. A DN is the decision document issued as part of the NEPA process where only an Environmental Assessment ("EA") is required. (An EA is the form of environmental analysis prepared for most FS timber sales.) A ROD is the decision document issued as part of the NEPA process where an Environmental Impact Statement ("EIS") is required. (An EIS is a more extensive undertaking than an EA.) Oregon Natural Resources Council Action v. United States Forest Service ("ONRC Action"), 59 F. Supp. 2d 1085, 1092 n.4 (W.D. Wash. 1999). In this case, the FS's decision documents which authorized the sale of Happy Thin, Jack Heli and Too Wild were DNs. App. Tabs 40, 140, 195.

the RTV Directive were adopted by the RIEC effective October 1, 1996 and then readopted on September 11, 1998 to apply to October 1, 1998. PPF ¶¶ 73, 75. The adoption of the "NEPA decision equals implementation" interpretation meant that if NEPA decision documents for planned timber sales were signed prior to the trigger dates Category 2 surveys would not have to be performed. PPF ¶¶ 48, 76, 80. This would be true regardless of whether those timber sales were offered to the public and awarded months or even years later. PPF ¶¶ 48, 76, 80, 85. The effect of this interpretation was to exempt numerous FS and BLM timber sales from Category 2 surveys. ONRC Action, 59 F. Supp. 2d at 1093.

Randy Hickenbottom of the FS and others were involved in developing the November 4, 1996 Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole (the "RTV Directive"). App. Tab 36. The RTV Directive was an interpretation of the Category 2 survey requirements that employed various parameters which resulted in exempting approximately 90% of the red tree vole habitat and all of the red tree vole habitat in California from the survey requirements. The rationale for this interpretation was the Forest Service's belief that red tree vole surveys were not necessary where red tree vole habitat was abundant. Id. at 1094. The RTV Directive was in direct conflict with the specific direction in the NFP ROD that red tree vole surveys must be conducted "within the species' 'known or suspected ranges and within the habitat types or vegetation communities associated with it." Id. at 1095.

**Events Subsequent To The Issuance Of The Joint Forest Service/BLM Memoranda Adopting The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive**

Various environmental groups and members of the public began filing administrative appeals of the FS and the BLM decision documents which did not include Category 2 surveys

based upon the interpretation "NEPA decision equals implementation" and the RTV Directive. See, e.g., App. Tabs 88, 94. Such administrative appeals were filed for each of plaintiffs' sales, Happy Thin, Jack Heli and Too Wild. PPF ¶¶ 151, 173; see App. Tab 128 at A-1101, A-1107. The ONRC Action lawsuit was filed on July 8, 1998, challenging, among other things, the FS's adoption of the interpretation "NEPA decision equals implementation" and the RTV Directive. PPF ¶ 81. The allegations of the complaint directed to both of these points were spelled out in further detail in a September 25, 1998 letter from ONRC Action to the Department of Justice. PPF ¶ 83.

Edward (Ted) Boling, the chief trial lawyer for the government in ONRC Action, was initially "leery" of the FS's rationale for these two Category 2 survey interpretations. PPF ¶ 93. On or about November 25, 1998, Mr. Boling briefed his superior, Assistant Attorney General for the Environment and Natural Resources Lois Schiffer, and her immediate deputy Peter Coppleman, on the ONRC Action allegations regarding "NEPA decision equals implementation." PPF ¶ 84. Ms. Schiffer told Mr. Boling that "NEPA decision equals implementation was nonsense." PPF ¶¶ 84, 91. Ms. Schiffer indicated that she was concerned the FS would rush to sign decision documents in order to have timber sales offered to the public without Category 2 surveys. PPF ¶ 85. Mr. Coppleman agreed with Ms. Schiffer. PPF ¶¶ 84-85, 91. The views of Ms. Schiffer and Mr. Coppleman were communicated to agency attorneys for the FS and upper level management personnel for the FS in November and December of 1998. PPF ¶¶ 84, 87, 89-91.

In April 1998, the FS and the BLM approached the RIEC with a request to consider a one-year delay of survey implementation for several Category 2 species from FY 1999 (October

1, 1998) to FY 2000 (October 1, 1999). A procedure for such changes was authorized in the NFP ROD, but a change of this type required compilation of an EA or EIS before the ROD could be amended. Preparing such EAs or EISs typically require several months of effort. The FS and the BLM could have used, but chose not to use, this procedure to delay any or all of the 71 invertebrate Category 2 surveys rather than adopt the interpretation "NEPA decision equals implementation" without environmental analysis. PPF ¶¶ 69-71.

After the filing of ONRC Action, the Department of Justice and the ONRC Action plaintiffs entered into settlement negotiations and several lists of "at-risk" or "problem sales" were provided by the ONRC Action plaintiffs to the FS through the Department of Justice. PPF ¶ 109. The purpose of these lists of sales (which were not mentioned in the ONRC Action complaint (PPF ¶ 108)) was to put the FS on notice initially that if it awarded any of the listed sales, the ONRC Action plaintiffs would immediately seek a temporary restraining order or a preliminary injunction. Id.; PPF ¶¶ 104-05. Later, the FS secretly agreed with the ONRC Action plaintiffs that certain of the at-risk or problem sales could be awarded but that ONRC Action reserved the right to file a motion for a temporary restraining order or preliminary injunction if any ground-disturbing operations occurred on those sales. PPF ¶¶ 139-41, 143, 189-90. These secret lists, agreements and negotiations were not revealed to the public and in particular not to plaintiffs Blue Lake, Timber Products or CLR. PPF ¶¶ 106-08, 138-39, 189, 202. Representations were made by FS personnel to plaintiffs both explicitly and by implication that Happy Thin, Jack Heli and Too Wild were not under threat of injunction in the ONRC Action litigation when in fact they were under explicit threat of injunction if any ground-disturbing operations took place after contract award. PPF ¶¶ 137, 157-58, 161, 163, 182, 184, 189, 191-

92, 203. The FS awarded Jack Heli on March 2, 1999, Too Wild on May 14, 1999 and Happy Thin on July 6, 1999. PPF ¶¶ 165, 188, 204.

The district court's decision granting summary judgment to the ONRC Action plaintiffs and enjoining the FS from allowing operations on nine specified timber sales was issued on August 2, 1999. By order dated August 26, 1999, the district court expanded the injunction to preclude the FS from allowing operations on other timber sales, including Happy Thin, Jack Heli and Too Wild. PPF ¶ 96. The FS suspended sale operations on Happy Thin, Jack Heli and Too Wild on or about August 27, 1999. PPF ¶¶ 166, 193, 207.

Edward Boling recommended that the government not appeal the ONRC Action decision because the agencies' rationale for the interpretation "NEPA decision equals implementation" was weak and the RTV Directive was in obvious tension with the explicit direction in the ROD. PPF ¶ 146. In December 1999 the FS and the BLM through the Department of Justice settled the ONRC Action lawsuit. Pursuant to this settlement agreement, the complaint was dismissed and the injunction dissolved; however, the FS agreed to continue its suspensions of all affected timber sales, including Happy Thin, Jack Heli and Too Wild, until applicable Category 2 surveys had been completed and the ONRC Action plaintiffs had been given an opportunity to review and object to Supplemental Information Reports ("SIRs") on those surveys. PPF ¶¶ 147, 166, 169, 193-94, 207-08. The government also agreed as part of that settlement to pay ONRC Action's attorneys' fees pursuant to the Equal Access to Justice Act. Id.

Plaintiffs Blue Lake, Timber Products and CLR filed timely claims under the Contract Disputes Act for the damages they incurred as a result of the FS's suspensions of their timber sales. PPF ¶¶ 167, 195, 209.

## ARGUMENT

### I. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 422 (1986). "An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, while the materiality of the fact is determined by reference to applicable legal standards." Nicholson v. United States, 29 Fed. Cl. 180, 186 (1993) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562, 1567 (Fed. Cir. 1987)). An outcome-determinative fact is a material fact. Brooks v. United States, 65 Fed. Cl. 135, 140 (2005) (citing Liberty Lobby, 477 U.S. at 248). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996); Maintenance Eng'rs v. United States, 50 Fed. Cl. 399, 408 (2001) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### II. The Forest Service, As The Sole Drafter Of The Contracts, Assumed The Risk Of Liability To Plaintiffs When It Awarded The Timber Sale Contracts Without The Required Category 2 Surveys And Then Had To Suspend Plaintiffs' Timber Sale Operations In Order To Perform Those Surveys And Failed To Include Any Exculpatory Provisions Or Disclaimers In The Contracts Or Require Plaintiffs To Execute Any Waivers Of Liability

When the government is the sole drafter of a contract the courts will strictly construe that contract against the government and in favor of the contractor. See United States v. Seckinger, 397 U.S. 203, 210 (1970) (stating that contracts are "construed most strongly against the drafter"). This is particularly appropriate where the contractor has been damaged by delay or

cost increases resulting from events within the government's control, and the government, as the sole drafter of the contract, has failed to protect itself with a valid exculpatory provision or effective disclaimer language in the contract. Dep't of Natural Res. and Conservation of Montana v. United States, 1 Cl. Ct. 727, 734 (1983); see Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984). That is precisely the situation in the instant case involving each of the plaintiffs' timber sale contracts.

The FS had a fundamental obligation under each of plaintiffs' contracts to make the timber available to plaintiffs to harvest during the Normal Operating Season ("NOS") within the terms of each contract as awarded. App. Tabs 93 at A-611, 111 at A-791, 124 at A-997 ("Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber"). The FS breached each of plaintiffs' contracts because it failed to fulfill this basic obligation and was not excused from doing so by any valid exculpatory clause or disclaimer or by any other provision in plaintiffs' contracts, including standard FS contract clause C(T)6.01.

Beginning as early as 1996, the FS was fully aware there were serious legal risks involved in awarding timber sale contracts without Category 2 surveys based upon the interpretation "NEPA decisions equals implementation." In 1996, the members of the IRT considered this legal risk for several months while they developed the interpretation "NEPA decision equals implementation." Larry Larsen, a BLM employee who worked with Tom Hussey and Randy Hickenbottom of the FS as the primary developers of the interpretation "NEPA decision equals implementation," observed to his colleagues in drafts he produced that there were legal risks to the FS and the BLM in not performing Category 2 surveys on timber

sales for which NEPA decision documents were signed prior to October 1, 1996 but for which contracts were not to be awarded until after that date. PPF ¶ 54.

Tom Hussey has acknowledged that the IRT was always aware that there was a risk of lawsuits by environmental activists challenging any interpretation that favored the FS's timber sale program goals over its species protection goals. PPF ¶ 60. Such lawsuits could lead to injunctions and suspensions of the timber sale contracts, and therefore contract claims by purchasers. Similarly, Randy Hickenbottom has acknowledged that the IRT members and other government personnel working on the development of the interpretation "NEPA decision equals implementation" understood there was a risk of legal challenge to that interpretation. PPF ¶ 45. Field personnel of the FS and BLM also expressed concern that adopting the interpretation "NEPA decision equals implementation" could result in a substantial number of timber sale contracts being awarded without Category 2 surveys and therefore increased the risk of legal challenge and biological risk to the species. PPF ¶¶ 45, 50-51, 53.

There was so much concern within the REO about the possible adverse consequences of exempting many timber sales from Category 2 surveys that Don Knowles, director of that Office, approached Richard Holthausen, the leader of the Species Analysis Team, to inquire if it was possible to do an assessment of the potential impact of the different implementation dates for surveys required under the NFP. PPF ¶ 49. Mr. Holthausen told Mr. Knowles "that in general, one could reasonably assume that delay of implementation of surveys would result in some negative effect for some species, but it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects." Id. In short, there was no way of knowing whether delaying the Category 2 surveys would or would not cause the extirpation of

a species. PPF ¶ 49. Virtually all of those involved in developing the interpretation "NEPA decision equals implementation" understood that there were serious risks of legal challenges and potential liability to purchasers of timber sales that were not surveyed if the FS and BLM adopted that interpretation. PPF ¶¶ 45, 54, 58, 60.

On July 8, 1998, the ONRC Action lawsuit was filed, and the likelihood of a legal challenge to timber sales dependent on the interpretation "NEPA decision equals implementation" and the RTV Directive became a reality. When he first reviewed ONRC Action's allegations regarding the interpretation "NEPA decision equals implementation," Edward Boling, lead counsel for the government in the ONRC Action lawsuit, became concerned about the litigation risk associated with this interpretation. PPF ¶ 82. Mr. Boling told Owen Schmidt, the principal FS lawyer for the ONRC Action litigation, that he was "leery" of the FS's legal rationale for the interpretation "NEPA decision equals interpretation." PPF ¶ 83.[2]

[2]Edward Boling reiterated his view that the FS's rationale for its interpretation "NEPA decision equals implementation" was very weak and stated that the RTV Directive seemed clearly inconsistent with the NFP ROD in his memorandum to Lois Schiffer, Assistant United States Attorney for the Environment and National Resources, recommending settlement of the ONRC Action litigation, dated November 18, 1999. App. Tab 136. In that memorandum Mr. Boling recommended against appeal of the district court's decision in ONRC Action because the likelihood of "success on appeal is not great because the agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" Id. at A-1141 to A-1142. Further, Mr. Boling noted that when the interpretation "NEPA decision equals implementation" was adopted "many units [FS and BLM personnel] had interpreted other ROD text ('surveys conducted prior to ground-disturbing activities') as allowing the authorization of projects [timber sales] without surveys and signed NEPA decisions with the intention to survey prior to the contract offering." Id. at A-1138. As to the RTV Directive, Mr. Boling stated that it "effectively excluded much of the red tree vole's habitat from survey, which is inconsistent with the ROD requirements to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.' ROD C-5." Id. at A-1139.

Soon after ONRC Action was filed, in a memorandum dated July 29, 1998, Robert Simmons, the Regional Attorney for Region 5 of the FS (California), advised the Regional Forester for Region 5 (which includes the Klamath National Forest and the Happy Thin and Jack Heli timber sales) and the Regional Forester for Region 6 (which includes the Siskiyou National Forest and the Too Wild timber sale) that if certain timber sales threatened by the ONRC Action lawsuit were to be offered to the public, the FS should take specific precautions:

> Should you proceed with the auction of these sales [some of the "sales of concern" identified by the ONRC Action plaintiffs], you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit [ONRC Action] have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale.[[3]] You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs, and that, if this is not acceptable to the bidders, they should withdraw their bids at that time. All bidders should be given the opportunity to withdraw their bids simply because of the litigation. Finally, you should take action to make sure the appropriate language is in the contract.

PPF ¶ 99 (emphasis added). For the contracts at issue in this action no direction was given regarding FS liability for suspensions. Nothing at all was said in the prospectuses or instructions to bidders for each contract about possible suspensions or about any language being included in the contracts to limit the FS's liability in the event of suspension. PPF ¶¶ 155, 175, 203. No "appropriate language" was included in these contracts.

On or about November 25, 1998, Edward Boling briefed his superior, Assistant Attorney General for the Environment and Natural Resources Lois Schiffer, and her immediate subordinate Peter Coppelman on the ONRC Action litigation and ONRC Action's challenge to

---

[3] Award of FS timber sale contracts follows the opening of sealed bids and often an oral auction conducted by the FS to determine the high bidder. See 16 U.S.C. § 472a(e)(2); 36 C.F.R. §§ 223.88; 223.100.

the interpretation "NEPA decision equals implementation." At this meeting Ms. Schiffer told Mr. Boling that "NEPA decision equals implementation was nonsense." Ms. Schiffer was concerned that the "NEPA decision equals implementation" interpretation would allow the FS and the BLM to authorize timber sales without having first conducted Category 2 surveys even though the sale contracts might not be offered or awarded until months or even years later. This was exactly the allegation raised by the ONRC Action plaintiffs. Mr. Coppelman shared Ms. Schiffer's concerns. PPF ¶¶ 84-85, 91. Ms. Schiffer indicated that she would need to have further discussions with high level officials within the Department of Agriculture and the Department of the Interior before deciding whether the Department of Justice would defend the "NEPA decision equals implementation" interpretation in court. PPF ¶¶ 84, 87. The substance of this meeting and Ms. Schiffer's statements were communicated by Edward Boling to Sue Zike, the FS litigation coordinator for the ONRC Action litigation, and Ms. Zike in turn communicated the substance of this meeting to Robert Devlin, the Director of Natural Resources within the FS for Region 6. PPF ¶¶ 84-87, 89-91.

Also on or about November 25, 1998, FS attorney Owen Schmidt called Nancy Graybeal, Deputy Regional Forester for Region 6, to communicate the substance of Ms. Schiffer's evaluation. Ms. Graybeal reported, "Owen Schmidt, OGC [Office of General Counsel], called this morning to say that Ted Boling reported a non-decision from Lois Schiffer. Lois wants to talk to an Asst Sec (I don't know which one) before deciding course of action. I agreed we'd delay award of any sales until December 3. Bob [Devlin] - please let Forest [contracting officers] know." PPF ¶ 87. Thus, months before the award of plaintiffs' timber sale contracts the FS was aware that lead trial counsel for the Department of Justice in ONRC Action and the

Assistant Attorney General for the Environment and Natural Resources and her deputy had, at a minimum, very serious doubts about whether the interpretation "NEPA decision equals implementation" was even defensible.

Following the filing of the ONRC Action litigation and prior to the award of Happy Thin, Jack Heli and Too Wild, plaintiffs' timber sales were named on lists of "at-risk" sales provided by the ONRC Action plaintiffs to the government. The FS kept the identity of the sales on these lists, including plaintiffs' sales, secret from the public, including plaintiffs. PPF ¶¶ 106-08, 138, 189, 202. By providing these lists of "at-risk" sales to the government, the ONRC Action plaintiffs were putting the FS on notice that if it allowed harvesting or any other kind of ground-disturbing activities to proceed on these sales the ONRC Action plaintiffs would immediately seek injunctive relief. PPF ¶¶ 139-40, 189-90. The FS contracting officer ("CO") for Blue Lake's Happy Thin sale and Timber Products' Jack Heli sale specifically understood when those contracts were awarded that harvesting or ground-disturbing operations would likely prompt a motion for a temporary restraining order or a preliminary injunction. PPF ¶¶ 111-12, 131, 134, 153, 191. Despite this knowledge the FS did not include clear and direct disclaimer or exculpatory language in the contracts to protect itself from liability in the event that plaintiffs' timber sales were suspended because of the FS's failure to perform Category 2 surveys.

In addition, the FS knew that it faced serious liability to purchasers if it awarded timber sales that later had to be suspended for the completion of Category 2 surveys. Sue Zike, for example, warned that awarding such sales "May create $$ liability to govt if lose case." PPF ¶ 129. When it was considering the prospect of having to survey sales that had been awarded, the FS would "vigorously argue against such surveys" because "The Forest Service has no

provision in its timber sale contracts that allow for suspension for survey and/or discovery of survey and manage species." PPF ¶¶ 130, 132-33; App. Tab 82 (Memorandum from Paul Brouha, Associate Deputy Chief of the FS, to the Deputy Under Secretary for Natural Resources and the Environment for the Department of Agriculture and others (the "Brouha Memorandum")).

The Jack Heli timber sale contract was awarded on March 2, 1999. PPF ¶ 188. The Too Wild timber sale contract was awarded on May 14, 1999. PPF ¶ 204. The Happy Thin timber sale contract was awarded on July 6, 1999. PPF ¶ 165. All of these awards occurred months after the filing of ONRC Action and after the FS knew of the Department of Justice's serious doubts about the legal defensibility of the FS's Category 2 survey interpretations. Nevertheless, none of these contracts contain any language referencing the ONRC Action litigation and no language clearly and directly disclaiming FS liability for suspensions resulting from the FS's failure to conduct Category 2 surveys. Each of these contracts were contracts of adhesion, all the terms and conditions of which were drafted unilaterally by the FS except for the price term which was a result of the purchaser being selected as the high bidder at a FS bid opening. PPF ¶ 7. The award letters for these contracts also contained no reference to the ONRC Action lawsuit, and the FS did not impose as a condition of plaintiffs' receipt of award any requirement that the purchasers waive any rights to damages in the event that their timber sales were suspended due to the FS's failure to conduct Category 2 surveys.

In the absence of any clear and direct exculpatory language in the contract itself or at a minimum, clear and direct language requiring the purchaser to waive any potential damages claim as a condition of its receipt of contract award, the FS must be deemed to have assumed the

risk of liability if the plaintiffs' timber sales were suspended because the FS elected not to perform Category 2 surveys before making contract award. It appears that defendant will attempt to argue that standard timber sale contract clause C(T)6.01 permitted the FS to suspend sale operations with limited liability to the purchasers, even where, as here, FS fault caused the suspension.[4] Precision Pine and all the cases subsequently dealing with allegations that the FS breached its implied duties to cooperate and not to hinder by suspending timber sales under

---

[4]The Jack Heli contract contains clause C6.01. Both the Happy Thin and Too Wild contracts contain clause CT6.01. Clauses C6.01 and CT6.01 are substantively the same. The slight differences in the clauses are immaterial to the issues in this case. See, e.g., Precision Pine, 50 Fed. Cl. at 40, 67 n.37.

> Clause C6.01 provides:
>
> C6.01 – Interruption or Delay of Operations. (10/96) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;
>
> (b) To comply with a court order, issued by a court of competent jurisdiction; or
>
> (c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).
>
> Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to B8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

App. Tab 93 at A-657 (Jack Heli contract); see App. Tab 111 at A-870 to A-871 (clause CT6.01 in Too Wild); App. Tab 124 at A-1037 (CT6.01 in Happy Thin contract).

clause C(T)6.01 to satisfy pre-award environmental obligations have held that this clause is not a valid exculpatory clause.[5] Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005); H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 487 (2003); Precision Pine, 50 Fed. Cl. at 59, 64; Tamarack Mills, LLC, AGBCA Nos. 2003-115-1 and 2003-116-1, 04-1 BCA ¶ 32,591 (2004), at 161,228; Shawn Montee, Inc. dba Shawn Montee Timber Company, AGBCA Nos. 2003-132-1 through 2003-136-1, 04-1 BCA ¶ 32,564 (2004), at 161,073-74.

Because the rule in the Federal Circuit "is that the efficacy of a limitation of liability clause does not extend to those situations where the breach arises out of events within the Government's control," (C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992) (citing Ozark Dam Constructors v. United States, 130 Ct. Cl. 354 (1955)), it may very well be that the government cannot exculpate itself from liability for actions within its control that cause harm to a contractor. As articulated by the court in Precision Pine:

> If the Forest Service sought to exculpate itself from delays . . . caused by conduct within the Government's own control, there would need to be a clear expression of that intent in [clause C6.01]. "It is not only reasonable, but it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in direct and express language." Dept. of Natural Resources and Conservation of Mont. v. U.S, 1 Cl. Ct. 727, 734 (1983); see also Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984) ("when

[5] The limited liability provisions of clause C(T)6.01 may very well apply to situations in which the FS has not caused a suspension to take place. For example, the discovery after award of an unknown threatened or endangered species on the sale area which the FS could not reasonably have known about prior to award could result in a suspension under clause C(T)6.01 with limited liability to the FS. Also, the limited liability provisions of clause C(T)6.01 may apply in situations where environmental plaintiffs seek and obtain a court order that is entered to maintain the status quo until the court can resolve the merits of a case, and the FS then goes on to prevail by demonstrating that it has met its environmental obligations. See, e.g., Precision Pine, 50 Fed. Cl. at 61. Of course, in the latter instance, the length of any such suspension and whether the FS was responsible for unduly prolonging its duration of the suspension would separately raise questions as to the applicability of the liability limitation provisions of clause C(T)6.01.

> the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent"). However, nowhere in [clause C(T)6.01] is such language to be found.

Precision Pine, 50 Fed. Cl. at 58.

Even assuming that the government could draft a valid clause that would exculpate itself from the adverse impacts of its wrongful actions, such a clause would fundamentally alter the relationship between the parties, and therefore the government could only do so clearly, expressly and directly. Seckinger, 397 U.S. at 212 ("[I]f the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intentions of the parties to this effect should appear with clarity from the face of the contract"); see George A. Fuller Co. v. United States, 69 F. Supp. 409, 412 (Ct. Cl. 1947) ("Indeed, so far as we have been able to find, it has never been doubted that the government is liable for delays caused by it, in the absence of a clause in the contract explicitly exempting it from liability therefor") (citations omitted) (emphasis added); C.J. Betters Corp. v. United States, 25 Cl. Ct. at 677 ("cases of inadequate or incomplete performance fall outside of the exculpatory reach of a limitation of liability provision"); Dep't of Natural Res. and Conservation of Montana, 1 Cl. Ct. at 734 ("it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in clear, direct and express language"). There is no such clear and direct exculpatory language in plaintiffs' contracts, and the FS, therefore, may not use clause C(T)6.01 to limit its liability for the damages plaintiffs suffered as a direct result of the suspensions of Happy Thin, Jack Heli and Too Wild.

Timber sale contracts are contracts of adhesion. E.g., Everett Plywood Corp. v. United States, 651 F.2d 723, 720 (Ct. Cl. 1981); Precision Pine, 50 Fed. Cl. at 66; Seaboard Lumber Co.

v. United States, 41 Fed. Cl. 401, 408 (1998). The FS as the sole drafter of the Happy Thin, Jack Heli and Too Wild timber sale contracts could have required that Blue Lake, Timber Products or CLR, respectively, execute a clear release and waiver of all claims as a condition of receiving contract award.[6] When the FS as the sole drafter of a contract of adhesion fails to include language necessary to insulate itself from liability for an event which it clearly foresaw and which it actually caused (i.e., the pre-award failure to survey), the FS is liable to the purchaser under the governing law of the Federal Circuit. See Ozark Dam Constructors v. United States, 127 F. Supp. 187 (Ct. Cl. 1955).

Years before awarding plaintiffs' timber sale contracts, the FS was on notice that awarding timber sale contracts without Category 2 surveys entailed a significant risk of FS liability to the purchasers of those contracts. After the filing of the ONRC Action lawsuit, this risk of liability became very specific. In light of the concerns expressed by the government's chief trial counsel in ONRC Action and the Assistant Attorney General for the Environment and Natural Resources, among others, it should have been apparent to the FS at least by December 1998 that if it awarded timber sale contracts without Category 2 surveys the FS must include explicit exculpatory language to protect itself against liability in the event of suspensions. It did not do so, and it elected to award plaintiffs' contracts months later without Category 2 surveys. For these reasons the FS must be held to have assumed the risk of liability to plaintiffs. Whether the FS was reasonable or not in failing to conduct Category 2 surveys prior to the award of the

[6]Although under the law of the Federal Circuit such releases or waivers of liability for FS fault may not be effective, the FS could have at least attempted to require releases or waivers from plaintiffs. The fact that it had this option is illustrated by the fact that recently in Region 5 the FS has required purchasers to execute a "pre-award waiver, release and limitation of liability agreement," when a timber sale contract has been threatened with a possible injunction and suspension after award. PPF ¶ 11.

contracts is not relevant to the risk of liability analysis. By failing to conduct the surveys before award, the FS assumed the risk that it would have to suspend sale operations after award to perform the surveys.

## III. The Forest Service Breached Its Implied Warranty Of Specifications

When the government specifies the manner in which a contract must be performed, the government impliedly warrants to the contractor that it will be able to complete the contract satisfactorily by following those specifications. Spearin v. United States, 248 U.S. 132 (1918). In this case, the Happy Thin, Jack Heli and Too Wild timber sale contracts contained many detailed specifications governing the manner in which the timber must be harvested and roads built and maintained in order to protect natural resources, including wildlife and plant species. After award, the FS was forced to re-examine the detailed specifications it drafted in order to determine whether they provided adequate protection for Category 2 wildlife and plant species that had not been surveyed prior to award. The FS suspended sale operations for substantial periods of time while these surveys were performed and the contract specifications were re-examined and in some cases modified.[7] Such suspensions fall directly within the ambit of the Spearin doctrine, and the FS is liable to plaintiffs for damages incurred as a result of its defective or inadequate specifications.

[7]After conducting the required Category 2 surveys, the FS issued SIRs for the Happy Thin, Jack Heli, and Too Wild sales. The SIRs for Happy Thin and Too Wild required that harvesting on these sales be modified to provide necessary protection for Category 2 species that were found in the sale areas. PPF ¶¶ 169, 208. The initial SIR for Jack Heli determined that no harvest changes were necessary for the sale units surveyed. The majority of the sale units, however, were to be surveyed in a second SIR. The record is unclear as to whether there ever was a second SIR or if harvest changes were made based on these other units. PPF ¶ 194.

### A. The Law Of Implied Warranty Of Specifications

"When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications." Hercules, Inc. v. United States, 516 U.S. 417, 425 (1996). This black letter rule of law has its origin in the Spearin case and has become known as the "Spearin rule" or "Spearin doctrine." Over the ensuing decades the Spearin doctrine has been regularly applied and expanded in the Federal Circuit. Al Johnson Constr. Co. v. United States, 854 F.2d 467, 468 (Fed. Cir. 1988) ("The Spearin doctrine is much alive today, and we have recently had occasion to extend and apply it in a case other than a construction contract dispute").

The "Spearin rule is not dependent on a finding of independent fault or negligence. The Spearin rule originates and is inherent in the Government's undertaking to prepare adequate plans and specifications." J.L. Simmons Co. v. United States, 412 F.2d 1360, 1383 (Ct. Cl. 1969) (internal quotations omitted). The government's inclusion of a contract specification that runs afoul of laws and regulations is a breach of the implied warranty of specifications. Huber, Hunt & Nichols, Inc., GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975), at 54,572 (contractor awarded damages incurred as a result of complying with more costly municipal Department of Water and Power requirements which conflicted with contract specifications prepared by the government); Castle Constr. Co., ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984), at 84,859 (government's preparation of specifications that did not comply with national plumbing standards breached the implied warranty of specifications and entitled contractor to damages); accord J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS

at 279-80, 282 (4th ed. 1995) ("The government also assumes the risk if its detailed specifications require performance contradictory to local codes or ordinances . . . . Design specifications depicting a method of performance or the particular process a contractor is to follow are also warranted").

The case law also establishes that where the government's defective specifications cause a delay in a contractor's performance, the contractor is entitled to recover the costs it has incurred as a result of that delay. Laburnum Constr. Co. v. United States, 325 F.2d 451, 457 (Ct. Cl. 1963) ("If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. . . " (citations omitted)); Luria Bros. & Co., Inc. v. United States, 369 F.2d 701, 707-08 (Ct. Cl. 1966) ("When, as here, defective specifications delay completion of the contract, the contractor is entitled to recover damages for defendant's breach of this implied warranty. . . " (citations omitted)).

### B. Plaintiffs' Timber Sale Contracts Are Contracts Of Adhesion That Contain Detailed Timber Harvesting Specifications Which They Must Follow

As noted, FS timber sale contracts are offered on a "take it or leave it basis," all provisions of which are drafted by the FS, with only the price term being open to the bidder to specify. E.g., Precision Pine, 50 Fed Cl. at 66. Tribunals have consistently recognized that FS timber sale specifications cover all aspects of the contractor's operations under the contract. Louisiana Pacific Corp. v. United States, 656 F.2d 650, 654 (Ct. Cl. 1981). See John Woods Trucking, AGBCA No. 97-1-158, 98-1 BCA ¶ 29,644 (1998), at 146,887, where the Board referred to all three divisions of the standard FS timber sale contract (Division A – Specific Conditions, Division B – Standard Provisions and Division C – Special Provisions) as

"specifications." Accord Precision Pine & Timber Inc., AGBCA No. 99-160-1, 00-2 BCA ¶ 30,942 (2000), at 152,726 (contract "specifies" normal operating season and termination date); Phyllis Wolf, AGBCA No. 96-102-1, 96-2 BCA ¶ 28,504 (1996), at 142,335 (contract "specified" total number of acres to be inventoried on sale area); Poston Logging, AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (1998), at 149,374, recons. denied, AGBCA No. 99-143-R, 00-1 ¶ BCA 30,829 (2000) ("[i]ncluded timber was defined in the [contract] specifications"); John E. Gallno, AGBCA No. 97-146-1, 98-1 BCA ¶ 29,616 (1998), at 146,762 (contract specified the number of trees per acre to be left and the spacing between those trees). The three timber sale contracts at issue in this action are of this same type and contain similarly detailed specifications. App. Tabs 93, 111, 124.

### C. The Forest Service's Obligation To Design Timber Sale Contracts In Conformity With Federal Environmental Law

Like many government contracts, FS timber sale contracts are designed to achieve management goals in keeping with the agency's statutory mission. Much as the specifications for the construction of a nuclear submarine are designed to advance the Navy's role in meeting the needs of national defense, a FS timber sale contract is part of a statutorily mandated program developed over more than a century to improve timber stand productivity across the National Forest System, manage fire, conserve fish and wildlife habitat, develop a road system (with its attendant increase in access to the forest for recreational purposes), regulate water flows and improve many other resources. See Organic Administration Act, 16 U.S.C. § 475; Multiple-Use Sustained-Yield Act, 16 U.S.C. § 528; NFMA, 16 U.S.C. § 472a(a); 36 C.F.R. § 223.1; App. Tab 19 (FS Manual ("FSM") § 2403.5 (eff. 8/8/96, amend 96-4)).

The process by which a timber sale comes into being starts with planning and the preparation of a preliminary document, i.e., a timber sale project plan, in which the feasibility of proceeding with the project which may contain one or more sales is verified. PPF ¶ 1; App. Tab 8 (FSM §§ 2432.1, 2432.11 (eff. 4/28/95, amend 95-3)). The plan must present appropriate data needed by the responsible FS official to determine whether or not to proceed with the environmental analysis and project design. Id. (FSM § 2432.13 (eff. 4/28/95, amend 95-3)). Such data is to include current surveys, current aerial photos, and inventories plus on the ground reviews of the project areas to verify existing data. Id. (FSM § 2432.14 (eff. 4/28/95, amend 95-3)).

The next step in the process is for the FS to conduct "an intensive field investigation within and adjacent to the proposed project area," the purpose of which is "to develop an environmentally sound and cost-efficient project under NEPA . . . and to develop a design for field lay out of the project." Id. (FSM § 2432.2 (eff. 4/28/95, amend 95-3)). As part of this step, the FS is to perform its statutory obligations under NEPA – complete the appropriate environmental analysis (typically either an EIS or an EA); prepare alternatives, including a no-action alternative; decide which alternative to select; and document the decision in a decision document, either a DN and finding of no significant impact ("FONSI") or a ROD.[8] Id. (FSM § 2432.22g (eff. 4/28/95, amend 95-3)). At the conclusion of this phase of the process, a responsible FS line officer must execute a certification as to what has been done. App. Tab 148 (FSM § 2432.23 (eff. 5/7/02, amend 2002-3)). The FS Manual makes clear that it is the duty of the Forest Supervisor to ensure that sale planners consider the environmental effects both in the

[8] See supra note 1.

environmental and sale preparation processes. App. Tab 8 (FSM § 2432.04b (eff. 4/28/95, amend 95-3).

The FS's process of planning and preparing timber sales should have resulted in harvest specifications prepared in accordance with the procedural requirements of NEPA and the substantive requirements of NFMA, and which will permit operations under the resulting contract both to proceed and to be accomplished in full compliance with all environmental laws to which the FS is subject. The FS, like any other contracting agency, is required to design the specifications for its projects based on all available information and in accordance with applicable environmental laws so that they can be performed as designed. Contract specifications of this type include: prescribing helicopter logging rather than tractor logging for certain parts of a sale area, App. Tabs 93 at A-662, 111 at A-880, 124 at A-1042; the specification of limited operating periods to protect certain species, App. Tab 111 at A-875; and specifying which trees to cut or not to cut in the sale area. App. Tabs 93 at A-642-643, 111 at A-842, 124 at A-1028. See generally App. Tabs 93, 111, 124.

With regard to the sales here in issue, the district court found that the FS had not conducted certain pre-award Category 2 species surveys which were designed to ensure the viability of the species. 59 F. Supp. 2d at 1092. Without these surveys, the FS could not know if its specifications were adequate. Therefore, it was ultimately the FS's contract specifications prepared without the guidance provided by Category 2 surveys which was the primary cause of the suspensions of performance, not any court order. See Superior Timber Co., Inc., IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996), at 143,436 ("We also do not agree with BLM that the [temporary restraining order] and injunctions absolved it from contract breach liability because it

was required to comply with them. They were the practical, but only the secondary, causes of BLM's suspension of Superior's contract").

In Everett Plywood, the FS terminated a timber sale contract when it was discovered after award that "road construction and logging planned for units 3 and 4 would result in massive mantle failures with resulting soil and watershed damage, thereby making difficult the re-establishment of the timber stand." 651 F.2d at 726. The FS and the purchaser in that case were unable to agree upon a modification of the contract specifications. There was no termination for convenience clause in that case (and none in the instant case),[9] and therefore the FS, believing that the adverse environmental consequences of road construction under the specifications as awarded would be in conflict with the FS's statutory environmental obligations, unilaterally cancelled the contract.

The trial judge initially ruled in favor of the government in Everett Plywood, finding that because the FS had certain environmental objectives in connection with the timber sale contract but not stated in the contract, the FS could cancel the contract with no liability to the purchaser based upon the common law doctrine of frustration of purpose. Id. at 727. On appeal, the Court of Claims rejected this theory, holding that the government had assumed the risk that its specifications might be defective or inadequate to accomplish their environmental purposes because the FS as "owner of the tracts to be harvested would be presumed to be the party informed as to soil conditions, and geologic structure that might indicate that logging would endanger the environment." Id. at 730-31.

[9]Because timber sale contracts are not subject to the Federal Acquisition Regulations, e.g., Prineville Sawmill Co. v. United States, 14 Ct. Cl. 186, 192, rev'd on other grounds, 859 F.2d 905 (Fed. Cir. 1988), a termination for convenience clause is not required.

The Court of Claims found it unnecessary to decide whether the Spearin doctrine should be applied directly in Everett Plywood but ruled that "the fact that the government did design the specified roads is relevant for purposes of allocating the risk of environmental damages caused by the construction of these roads." Id. at 731. The Court of Claims concluded that "the contract allocated the risk to the government." Id. This same reasoning applies with respect to the FS's defective plans and specifications in the Happy Thin, Jack Heli and Too Wild timber sale contracts.

**D. Where Delay Is Caused By Defective Specifications, That Delay Is Presumed To Be Unreasonable**

Where a delay is caused by deficient specifications that delay is per se unreasonable for purposes of the standard suspension of work clause.[10] Sergent Mechanical Systems, Inc. v. United States, 34 Fed. Cl. 505, 526 (1995) ("The case law has held that any delay is per se unreasonable for the purpose of applying the standard suspension clause if the delay is caused by a deficient specification in the contract" (citing Chaney and James Constr. Co. v. United States, 421 F.2d 728, 731 (Ct. Cl. 1970)); Luria Bros., 369 F.2d at 707-08; Laburnum Constr., 325 F.2d at 453-54; see Beauchamp Constr. Co., Inc. v. United States, 14 Cl. Ct. 430, 438 (1988). Here, the FS prepared specifications that could not be performed. This situation, where a court concluded that the FS could not continue performance of the contract because the specifications it had prepared could detrimentally affect Category 2 species habitat and therefore were deficient, is not substantively different from the more common situation where the specifications

[10]General principles of federal government contract law are routinely applied to timber sale contract disputes even though the FS enters into timber sale contracts pursuant to NFMA, 16 U.S.C. § 472a, and its implementing regulations, 36 C.F.R. Part 223, rather than pursuant to the federal procurement statutes and regulations.

which the government has provided a contractor are functionally defective and unperformable. In both instances, governmental failure to do that which was needed before putting the contract out for bid resulted in defective specifications and a contract that could not be performed.

The Spearin doctrine as construed consistently by the Federal Circuit and its predecessor the Court of Claims applies directly in this case. The harvesting and road building (i.e., ground-disturbing) specifications contained in the Happy Thin, Jack Heli and Too Wild contracts were not adequate to allow plaintiffs to perform satisfactorily until they could be assessed after Category 2 surveys had been performed. Because the FS's implied warranty of its specifications under the Spearin doctrine does not require any proof that the FS was unreasonable or negligent, the FS must be held liable for the consequences of its defective specifications.

## IV. The Forest Service Breached The Contracts Because It Intentionally Failed To Disclose To Plaintiffs That Their Timber Sales Were On ONRC Action's "At-Risk" Lists And That The Forest Service Had Secret Agreements With ONRC Action Regarding The Award Of The Contracts And Because The Forest Service Falsely Represented To Plaintiffs That The Sales Were Not Threatened By The ONRC Action Litigation

The FS awarded the subject timber sale contracts to plaintiffs without informing them that the FS knew that these sales were named targets of ONRC Action and that the commencement of operations was virtually certain to provoke applications for temporary restraining orders or other injunctive relief by ONRC Action. See, e.g., PPF ¶¶ 98, 106-08, 123, 135, 137-44, 163-65, 189-92, 202-04. The FS also failed to inform plaintiffs that before deciding to make contract award it had weighed the risk of likely injunctive action against these sales by ONRC Action and evaluated the strength of the government's case on the merits as to each. PPF ¶¶ 114, 119-20, 125-29, 131, 134. The FS actively misled Blue Lake and Timber Products by stating or strongly indicating before award of the Happy Thin and Jack Heli timber

sale contracts that these sales were not at risk in the ONRC Action lawsuit. PPF ¶¶ 157-59, 161, 182, 184-85, 188.

The purchasers only learned about the FS's secret agreements and misrepresentations long after the fact as a result of the discovery they conducted in this case, discovery which defendant resisted at every turn.[11] PPF ¶ 143. By failing to disclose to plaintiffs the vital knowledge it possessed that the sales were explicit targets of the pending ONRC Action litigation and intentionally misleading plaintiffs to the contrary, the FS breached its implied affirmative duty "to disclose superior knowledge that is required for the performance of a contract to which it is a party." Southern California Edison v. United States, 58 Fed. Cl. 313, 325 (2003).

The four-part test for determining whether the government has a duty to disclose superior knowledge and whether it has breached that duty is well-established:

> To show a breach under the superior knowledge doctrine, a contractor claiming a breach by non-disclosure must produce specific evidence that it (1) undert[ook] to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992) (internal citations omitted); see, e.g., Petrochem Services, Inc. v. United States, 837 F.2d 1076, 1078-79 (Fed. Cir. 1988); J.A. Jones Constr. Co. v. United States, 390 F.2d 886 (Ct. Cl. 1968); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774 (Ct. Cl. 1963).

[11] As the Court knows, defendant made many of the underlying documents available to plaintiffs only after plaintiffs were forced to file a motion to compel and for sanctions. Even then, it took defendant months to produce all of the documents for which it had unsuccessfully made a number of ever-changing assertions of privilege.

In this case, the standard is easily met. The uncontroverted facts demonstrate that (1) when they accepted award of the subject timber sale contracts the plaintiffs did not have the vital knowledge that the sales were explicit targets in the ONRC Action litigation, (2) the FS knew that the purchasers had no knowledge that the sales were explicit targets of ONRC Action or on "at-risk" lists and no reason to seek that information because the FS actively pursued a strategy of keeping the information secret from the purchasers and representing to the purchasers that these sales were not at risk, (3) by entering into the standard timber sale contracts it had drafted without informing the purchasers of the virtual certainty that the sales would be challenged after award, the FS supplied the purchasers with contract specifications that misled them or did not put them on notice to inquire about whether the sales would likely be challenged, and (4) the FS failed to provide the secret information it possessed and actively hid that information from the purchasers for its own purposes so that the purchasers would be placed "squarely at the table" to the purchasers' detriment and the government's assumed benefit. PPF ¶ 129; see, e.g., PPF ¶¶ 106-08, 139-43, 155-59, 161-65, 181-82, 184-85, 188-92, 202-06.

On May 4, 1999, at the bid opening for Happy Thin the FS announced to all the bidders, including Blue Lake, that Happy Thin had been a part of some lawsuit but that Happy Thin was no longer included in the lawsuit. PPF ¶¶ 157, 161. The FS also announced that the sale would not be awarded until after July 5, 1999. PPF ¶ 161. Despite this announcement, at the time Happy Thin was still under threat of an injunction in the ONRC Action litigation but this fact was not divulged by the FS to Blue Lake and Blue Lake was declared the apparent high bidder at the conclusion of the oral auction which followed big opening. PPF ¶¶ 137-39, 161. Also not disclosed to Blue Lake were the FS's secret internal communications, assessments of the risk of

going forward with contract award, and communications with counsel for ONRC Action about the Happy Thin sale both before and after the bid opening and oral auction. PPF ¶¶ 105-06, 125-31, 137-38, 140-44, 160, 162-64.

For example, in a memorandum dated December 9, 1998 from Sue Zike, Regional Litigation Coordinator, to Bob Williams, Regional Forester for Region 6 of the FS, and BLM State Director Elaine Zielinski, Ms. Zike analyzed the pros and cons of awarding sales the plaintiffs in the ONRC Action litigation named as examples of sales violating the NFP survey requirements. One of the "pro" considerations she identified in favor of awarding such sales was that doing so "puts purchasers squarely at the table." PPF ¶ 129. Ms. Zike later explained this advantage to the government as follows: "That means, in my view, that we have much better litigation arguments. We have better defense arguments when we let the purchasers be the ones who talk about harm and what happens to their company and their employees if in fact an injunction were to lie." Id. One of the "cons" identified by Ms. Zike in her memorandum was, "May create $$ liability to govt if lose case." Id. Ms. Zike explained this reference as follows: "If . . . we were to lose the PI which we thought was likely, then we would have, most likely, contractual damages to the purchasers that we awarded them to." These "pros" and "cons" were never communicated to Blue Lake. Id.

Further, by letter dated July 6, 1999, counsel for ONRC Action notified the Department of Justice, and through the Department of Justice the FS, that Happy Thin remained "at-risk." PPF ¶ 141. Despite this information, the FS awarded the Happy Thin contract to Blue Lake on July 6, 1999. PPF ¶ 165. The award letter made no mention of the status of the timber sale in relation to ONRC Action or the virtual certainty that the ONRC Action plaintiffs would seek a

temporary restraining order or a preliminary injunction against any harvesting on the sale and the FS did not otherwise inform Blue Lake of this development. Id.

At the bid opening for Jack Heli on November 3, 1998, the FS made no announcement similar to the announcement at the Happy Thin bid opening although it had included language in the prospectus for Jack Heli which stated that the sale had been identified in a lawsuit in which plaintiffs contend that the FS has violated the NFP in preparing the sale. PPF ¶ 175. At the conclusion of the oral auction which followed the bid opening for Jack Heli, Timber Products was declared the apparent high bidder. PPF ¶ 176. On November 24, 1998, Bev Cox of the FS informed Bill Turner of Timber Products that the FS could not award Jack Heli to Timber Products "until the Justice Department says we can." PPF ¶ 177. When the sale still had not been awarded over two months after the bid opening and oral auction, Bill Turner contacted CO Ed Matthews requesting "some formal communication as to what the FS expectations are for award." PPF ¶ 182. It was Bill Turner's understanding from his conversation with Ed Matthews that the FS would not award Jack Heli if it was still under threat of injunction in ongoing litigation. Timber Products relied upon the FS's representations. Id.

In a letter dated January 21, 1999, Ed Matthews told Timber Products that, "The Forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that government attorneys have filed for dismissal of the case. . . . I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February." PPF ¶ 184. Bill Turner understood from this letter that Jack Heli would only be awarded if it was no longer threatened by the lawsuit referenced by Mr. Matthews. Id. Despite the FS's representations to

Timber Products, Jack Heli was still under threat of an injunction in the ONRC Action litigation but this fact was not divulged by the FS to Timber Products. PPF ¶ 188.

Also not disclosed to Timber Products were the FS's secret internal communications, assessments of the risk of going forward with contract award, and communications with counsel for ONRC Action about the Jack Heli sale. PPF ¶¶ 105-06, 117, 125-31, 137-43, 186-89. For example, during the first six months of 1999 the Department of Justice and the ONRC Action plaintiffs reached an agreement that the FS could award certain timber sales on the secret ONRC Action "problem list" without immediately triggering a motion for a preliminary injunction or for a temporary restraining order. PPF ¶ 189. Jack Heli was one of the sales awarded as a result of this agreement. Id. This agreement, however, did not preclude ONRC Action from challenging the actual operations on Jack Heli after it was awarded. The Department of Justice, the ONRC Action plaintiffs and the FS did not disclose the existence of this agreement to Timber Products and Timber Products was not aware of this agreement until after the filing of the above-captioned action. Id.; PPF ¶ 139.

As described above with respect to Happy Thin, the FS also considered the "pros" and "cons" of awarding the sales on the secret at-risk lists including Jack Heli. The government never communicated these "pros" and "cons" to Timber Products. PPF ¶ 129.

The FS awarded the Jack Heli contract to Timber Products on March 2, 1999. The award letter made no mention of the status of the timber sale in relation to ONRC Action or the virtual certainty that the ONRC Action plaintiffs would seek a temporary restraining order or a preliminary injunction against any harvesting on the sale. PPF ¶ 188. The award letter also did not inform Timber Products that the lawsuit had not been dismissed with respect to Jack Heli as

Ed Matthews had led Bill Turner to believe would have to occur before the FS made contract award of Jack Heli to Timber Products. Id.

The record is unclear as to whether the FS made mention of ongoing litigation that might impact the Too Wild sale at the bid opening conducted on September 17, 1998. For purposes of this motion, plaintiffs assume that the FS made its "standard announcement" at the Too Wild bid opening that "the sale is currently under litigation and award may be delayed." PPF ¶ 97. The record is clear, however, that prior to submitting its bid on Too Wild, CLR was not informed that the ONRC Action plaintiffs had identified Too Wild to the FS as a sale on a list of "problem" or "at-risk" sales that the ONRC Action plaintiffs would seek to enjoin if awarded, and nothing in the Too Wild prospectus issued to CLR prior to the submission of bids informed CLR that Too Wild was threatened by the ONRC Action lawsuit. PPF ¶¶ 202-03.

CLR was declared the apparent high bidder at the bid opening on September 17, 1998. PPF ¶ 202. CLR was thereafter assured by Tom Link, the CO for Too Wild, that, although the contract would not be immediately awarded, Too Wild was going to be awarded soon and that the government had only a few more things to do before being able to approve the award. PPF ¶ 205. The FS awarded Too Wild to CLR on May 14, 1999. Nothing in the award letter disclosed that Too Wild was threatened by the ONRC Action lawsuit. PPF ¶ 204. Also not disclosed to CLR were the FS's secret internal communications, assessments of the risk of going forward with contract award and communications with counsel for ONRC Action about the Too Wild sale. PPF ¶¶ 105-06, 108, 110, 118, 122-23, 127-28, 137, 139-43. For example, by letter dated October 26, 1998 to ONRC Action counsel, signed by Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, the government agreed not to award

certain FS timber sales which were being challenged by the ONRC Action plaintiffs until after November 23, 1998. This list of sales included Too Wild. PPF ¶ 123. CLR was not aware of this agreement until after the filing of the above-captioned action. PPF ¶ 143. CLR also was not aware when the FS awarded Too Wild to it that the sale was targeted as a "problem" sale in the ONRC Action litigation. PPF ¶ 139.

As described above with respect to Happy Thin, the FS also considered the "pros" and "cons" of awarding the sales on the secret at-risk lists including Too Wild. The government never communicated these "pros" and "cons" to CLR. PPF ¶ 129. CLR did not believe that the FS would award Too Wild to CLR if the FS believed that it was likely that there would be a meritorious motion for a preliminary injunction or a temporary restraining order against the sale after award. PPF ¶ 206.

As detailed above, when the FS actually made contract award to the plaintiffs it explicitly or impliedly misrepresented that the risk of delay due to ONRC Action had passed because it had either advised or implied to the plaintiffs that award would not be made while the risk was still viable. Of course, as the FS knew and plaintiffs did not, the sales were indeed at risk and the risk became a virtual certainty once the FS decided to make contract award and authorize sale operations to commence.

In contrast, other sales in the NFP planning area that were not on the secret "at-risk" lists were awarded at about the same time as the subject sales and performance took place after contract award without suspension or delay. PPF ¶ 103. For example, during the period July 8, 1998 (the filing of the ONRC Action complaint) through August 2, 1999 (Judge Dwyer's decision finding the "NEPA decision equals implementation" interpretation and the November 4,

1996 RTV Directive arbitrary, capricious and contrary to law), the FS awarded a number of timber sale contracts within NFP National Forests which were not challenged in ONRC Action, such as Jack Trac on the Klamath National Forest and Spenser on the Winema National Forest. The BLM similarly awarded contracts within the NFP area during the same time frame that were not challenged in ONRC Action, such as Burma Shave. PPF ¶ 103.

The FS conducted the bid opening and oral auction for Jack Trac on the same day as the bid opening and oral auction for Jack Heli. Both sales were located within the same ranger district on the Klamath National Forest and were analyzed under the same EA, and the decision documents for each of these sales were pursuant to that EA. Both Jack Trac and Jack Heli were timber sales within the NFP area and subject to all of the requirements of the NFP including any required wildlife and plant surveys. Timber Products was declared the high bidder on Jack Trac and within a few days of the oral auction was awarded that contract by the FS. Although it was within the NFP area and subject to all of the applicable provisions of the NFP, Jack Trac was not one of the sales enjoined in the ONRC Action litigation and it was not suspended. PPF ¶ 179.

Plaintiffs could not have known that the subject sales were on the secret "at-risk" lists by the FS's pre-bid opening statement that award (as opposed to performance after award) of the contracts might be delayed. Plaintiffs relied on the FS's conduct in making contract award to them and authorizing sale operations to commence without giving them any indication that the sales were still at risk of being delayed as a result of ONRC Action, and by its silence on the subject effectively representing to plaintiffs that the sales were not at risk. It is well-established that a government agency cannot remain silent where, as here, it has a duty to share information. See Helene Curtis, 312 F.2d at 778.

Plaintiffs relied on the FS's silence and suffered injury as a result of the FS's failure to disclose. As for reliance, plaintiffs accepted contract award at the prices they bid with the expectation that their operations would not be suspended based on the ONRC Action lawsuit. PPF ¶¶ 165A, 166A, 188B, 193A. As for injury, because the suspension based on the ONRC Action lawsuit resulted in significant increased costs, lost profits and the need for plaintiffs to acquire, if commercially available, replacement timber for the suspended volume in these sales and these damages were incurred without precedent knowledge of the cause thereof, the nondisclosure by the FS resulted in direct injury to the plaintiffs. App. Tabs 137, 139, 144, 153, 156, 164-65 (plaintiffs' claim letters and supplemental claim letters); see Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 674-75 (1994).

Had the FS disclosed the information to plaintiffs, as it had a duty to do, plaintiffs could have acted to prevent their damages by deciding, for example, that they did not want to accept contract award in the circumstances and/or by offering a significantly lesser amount to the FS for the sales to account for the likely damages they would incur as a result of an expected lengthy delay in contract performance as a result of ONRC Action. PPF ¶¶ 166B, 193B. Because the FS knew that the sales were implicated in the ONRC Action litigation and knew that the plaintiffs did not know this, the FS's failure to disclose its superior knowledge to the plaintiffs breached the contracts and caused plaintiffs' damages. By failing to share its superior knowledge with plaintiffs before making contract award and by effectively misrepresenting to plaintiffs that the sales were not subject to being challenged in the ONRC Action litigation, the FS assumed the risk of having to suspend plaintiffs' contracts as a result of the litigation and must be held accountable for the damages plaintiffs suffered as a direct result of the suspensions.

## V. The Forest Service Breached Its Implied Duties To Cooperate And Not To Hinder

In the preceding sections of this memorandum plaintiffs have argued that the FS is liable to them for the damages they suffered as a result of the suspensions caused by the FS because (1) the FS was the sole drafter of the contracts and it failed to include clear and direct language exculpating itself from damages resulting from suspensions which it caused, (2) the FS breached its implied warranty of specifications, and (3) the FS failed to disclose its superior knowledge to plaintiffs regarding the specific threat of injunction to the sales, the secret agreements which the FS had with the ONRC Action plaintiffs, and the FS misrepresented to plaintiffs that the sales were not threatened by the ONRC Action litigation. None of these independent grounds for holding the FS liable to plaintiffs in this case requires an inquiry into whether the FS's acts and omissions were unreasonable. In the alternative, in this section of our memorandum, plaintiffs argue that under the legal standard articulated in Precision Pine and the board of contract appeals and federal court cases which have followed Precision Pine, the FS breached its implied duties to cooperate and not to hinder plaintiffs' performance of their timber sale contracts based upon the uncontroverted facts in this case.

In Trinity River, the court succinctly summarized the key holdings of the cases following Precision Pine:

> These cases demonstrate that a breach of the implied duties to cooperate and not to hinder may be found where the government causes delay by unreasonably prolonging timber contract suspensions or by unreasonably provoking the suspension of a contract. If such a breach causes harm to purchasers, the government may be found liable for damages.

66 Fed. Cl. at 111. For Trinity River and other cases following Precision Pine, the key question in determining whether the FS acted unreasonably was "whether the Forest Service knew or

should have known that [the environmental analyses supporting the sale were] inadequate when it awarded the Contract." H.N. Wood Products, 59 Fed. Cl. at 491; Trinity River, 66 Fed. Cl. at 112. In the context of the instant case, the question is "whether the Forest Service knew or should have known that its environmental analyses were inadequate at the time of contract award because of its decision not to perform Category 2 surveys on plaintiffs' sales."

As demonstrated herein, from the very beginning of the development of the interpretation "NEPA decision equals implementation" and the RTV Directive through the award of plaintiffs' contracts and the ONRC Action decision, the FS was repeatedly placed on notice that awarding contracts without Category 2 surveys would likely be challenged successfully after award by environmentalists, resulting in suspensions causing damages to the purchasers. As Sue Zike candidly admitted, as early as December 9, 1998, individuals within the FS, including Ms. Zike, thought it was "likely" that the ONRC Action plaintiffs would prevail if they filed a motion for a preliminary injunction to force the suspension of the "at-risk" FS timber sales. The "at-risk" sales included plaintiffs' sales. PPF ¶¶ 129, 191.

### A. The District Court Holding In ONRC Action That The Forest Service's Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Arbitrary, Capricious and Contrary To Law Establishes That The Forest Service Unreasonably Caused The Suspensions Of Plaintiffs' Sales

In ONRC Action the district court carefully considered the government's and the ONRC Action plaintiffs' arguments in the context of the plain language of the NFP Category 2 survey requirements and the undisputed basic purpose of those surveys and firmly concluded that the FS and BLM interpretation "NEPA decision equals implemented [or implementation]" and the RTV Directive were "arbitrary and contrary to the plain language of the ROD." 59 F. Supp. 2d at

1093. The court found the interpretation "NEPA decision equals implementation" and the RTV Directive arbitrary, capricious and contrary to law under the Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706(2)(A). Id. at 1093-95. This holding and the supporting findings by District Court Judge Dwyer, who had previously adjudicated challenges to FS actions under the NFP and was familiar with the basic intent and purpose of the NFP, prove that the FS acted unreasonably in awarding plaintiffs' contracts without Category 2 surveys.

The FS and the BLM developed the interpretation "NEPA decision equals implementation" purportedly because of a conflict in the NFP language. The explanatory memorandum accompanying the FS's and the BLM's joint memorandum dated November 1, 1996 purports to answer the question, "At what point in the process of developing, setting in motion, and executing a project is it 'implemented' in the context of the Component 2 Survey and Manage S&G requirements?" According to this memorandum, the agencies perceived a conflict between language on page C-5 of the NFP Standards & Guidelines which states that "Surveys [for Component 2 species] must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later" and language in the NFP ROD itself at page 36 which states "surveys [must be] conducted prior to ground-disturbing activities." App. Tab 34. The FS and the BLM chose to adopt what they allegedly saw as the meaning of the language on page C-5 of the Standards & Guidelines, i.e., that the FS and the BLM were authorized to treat the signing of NEPA decision documents for planned timber sales as the commencement of ground-disturbing activities. In adopting this highly strained interpretation, the FS and the BLM

"exempt[ed] numerous proposed sales from the survey requirements." ONRC Action, 59 F. Supp. 2d at 1092.

In ONRC Action the court found the "NEPA decision equals implementation" interpretation arbitrary and irrational because it was obvious that in both the ROD and the Standards & Guidelines "'implemented' refers to ground-disturbing activities."[12] Id. at 1093. The court observed that even "the title of the category two survey requirements is 'Survey prior to ground-disturbing activities.'" Id. at 1093 (emphasis in original). In addition, "there is no mention of NEPA decisions" in either the Standards & Guidelines or in the ROD itself of the survey requirements. Id. Further, as the FS well knew, EISs, EAs and NEPA decision documents "often precede ground-breaking activities by a number of years. To equate a NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements" and "create an incentive to rush NEPA decisions to avoid conducting surveys." Id.

The clear intent of the Category 2 surveys was to gather vital information on species for which there was little information and a serious concern about their persistence before timber harvesting and other ground-disturbing activities took place. From this basic intent, it follows that the NFP did not contemplate exempting numerous timber sales, including plaintiffs' sales,

[12]In a footnote reciting the nine federal timber sales authorized under the "NEPA decision equals implementation" interpretation which were specifically challenged in ONRC Action (none of plaintiffs' sales at issue in the instant action were ever named in ONRC Action complaints), the court noted that the BLM's North Murphy timber sale had been upheld in an administrative agency appeal before the Department of the Interior Board of Land Appeals. 59 F. Supp. 2d at 1092 n.5. Had the North Murphy administrative decision been appealed, the challenge would have been prosecuted before the same court that decided ONRC Action. The summary judgment decision in ONRC Action struck down the FS's and the BLM's use of the interpretation "NEPA decision equals implementation" and in effect disposed of the North Murphy administrative determination by the Board of Land Appeals.

from Category 2 survey requirements merely because NEPA decision documents had been rushed to completion in order to beat the October 1, 1996 or, in the case of plaintiffs' sales, the October 1, 1998 trigger dates.

The key emphasis in both the ROD at page 36 and the Standards & Guidelines at page C-5 is on the implementation date of ground-disturbing activities. The district court recognized this when ruling that "in both instances, 'implemented' refers to ground-disturbing activities." Id. In other words, the main focus was on whether the FS intended ground-disturbing activities on planned timber sales to take place after October 1, 1996 or after October 1, 1998. For any planned timber sales in this category, surveys were clearly required as part of the environmental analyses necessary for a NEPA decision document to issue. The correct approach, which the FS intentionally did not follow, would have been to treat ongoing environmental analyses for such timber sales as incomplete until Category 2 surveys had been performed. Only then would it have been appropriate to issue NEPA decision documents and thereafter to offer the sales and award the contracts.

The Happy Thin NEPA decision document was a DN that was signed without Category 2 surveys on September 15, 1998, PPF ¶ 148; the NEPA decision document for Jack Heli was a DN that was signed without Category 2 surveys on July 14, 1998, PPF ¶ 171; and the NEPA decision document for Too Wild was a DN that was signed without Category 2 surveys on June 15, 1998, PPF ¶ 196.[13] Category 2 surveys should have been performed for each of these timber

[13]Red tree vole surveys were not performed for Happy Thin and Too Wild until after award pursuant to the ONRC Action settlement agreement. PPF ¶¶ 147, 168, 169, 208. Red tree vole surveys were not performed for Jack Heli because it was determined that there was no red tree vole habitat on that sale area. PPF ¶194.

sales prior to the issuance of the NEPA decision documents because ground-disturbing activities were planned by the FS to take place on these sales after October 1, 1998.

"The [NFP] ROD's Category Two survey requirements are clear, plain and unmistakable." 59 F. Supp. 2d at 1094. Because it was arbitrary, capricious, contrary to law, contrary to the plain language of the ROD and therefore irrational action, the district court struck down the FS's interpretation "NEPA decision equals implementation." The FS's adoption of the "NEPA decision equals implementation" interpretation was unreasonable and the suspensions of plaintiffs' timber sales that resulted from that interpretation were likewise unreasonable.

The holding in ONRC Action that the RTV Directive was arbitrary, capricious and contrary to law is equally well-supported. The November 4, 1996 RTV Directive unreasonably and without the necessary further NEPA analysis reversed the explicit NFP ROD direction for Category 2 surveys for the red tree vole. App. Tab 36 (RTV Directive); ONRC Action, 59 F. Supp. 2d at 1094-95. Under the RTV Directive, no red tree vole surveys were required where it was believed that there was a substantial amount of red tree vole habitat. This interpretation was ostensibly based upon the agencies' belief that "field surveys are not needed" in these areas.

As the district court observed, the clear direction in the NFP ROD is that surveys must be conducted "within the species' 'known or suspected ranges and within the habitat types or vegetation communities associated with' it." Id. at 1095 (emphasis in original). The court reasoned, "The plan's requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that 'field surveys were not needed.'" Id. Any such change in the ROD requirements for red tree vole surveys would have required an amendment to the NFP and associated NEPA analysis. See id. at 1088, 1094. The FS did not follow this NEPA

process even though the RTV Directive exempted "about ninety percent of the red tree voles' habitat, including all of its California habitat, from the survey requirements." Id. at 1094. The district court held that the RTV Directive was arbitrary, capricious and contrary to law. Id. at 1096-97. The implementation of this arbitrary and capricious Directive resulting in the suspensions of Happy Thin and Too Wild was unreasonable.[14]

In Precision Pine, this court granted plaintiff summary judgment on liability where the FS unreasonably failed to submit LRMPs for formal consultation to the Fish & Wildlife Service ("FWS") in the face of the Ninth Circuit's "clear ruling" in Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1051-52 (9th Cir. 1994), that the FS was required to do so under the Endangered Species Act ("ESA"). 50 Fed. Cl. at 68-69.[15] The FS had tried to avoid these consultation requirements by issuing numerous amendments to its LRMPs and submitting the amendments, but not the underlying LRMPs for consultation. An environmental organization sued to enforce the ESA's consultation requirements and, citing Pacific Rivers, the district court found that the FS's actions were "contrary to the ESA and clear Ninth Circuit law." Silver v. Babbitt, 924 F. Supp. 976, 985 (D.Ariz. 1995).

The Arizona district court issued an injunction which caused the FS to suspend Precision Pine's timber sales until the required consultations were completed. 50 Fed. Cl. at 38. Precision Pine then filed suit in this court alleging that the FS's suspensions breached the government's

[14]See supra note 2.

[15]In Superior Timber, the Interior Board of Contract Appeals ("IBCA") likewise found that the government had breached its implied duties to cooperate and not to hinder by suspending BLM timber sales in order to perform environmental analyses after award that should have been conducted by the government prior to award. The Precision Pine court found Superior Timber "remarkably similar" to the case before it. 50 Fed. Cl. at 65.

implied duties to cooperate and not to hinder. The court in Precision Pine found that for some of the suspensions prior to Pacific Rivers, there was a reasonable legal argument for not submitting LRMPs for consultation because there was "an open . . . legal question" on the matter up to that point, but afterwards the FS was unreasonable for trying "to avoid the clear mandate of Pacific Rivers." Id. at 68, 70.

In the instant case, there was no need for a Pacific Rivers-type court decision because the intent and direction of the NFP Category 2 surveys was "clear, plain and unmistakable." ONRC Action, 59 F. Supp. 2d at 1094. There was never any genuine "open legal question" before the FS regarding the unreasonableness of the "NEPA decision equals implementation" interpretation or the RTV Directive. Moreover, in this case, as in Precision Pine, there is uncontroverted evidence that the Department of Justice expressed deep concerns to the FS about the legal defensibility of its proposed actions. See Precision Pine, 50 Fed Cl. at 45, 68-69; PPF ¶ 84 ("NEPA decision equals implementation was nonsense").

In Precision Pine, this court granted summary judgment on liability to plaintiff on the facts in that case under the legal theory that the FS breached its duty to cooperate and not to hinder plaintiff's performance. 50 Fed. Cl. at 70, 72. Since the Precision Pine decision, other tribunals considering different factual circumstances have reached the conclusion that, although the FS's failure to comply with critical underlying environmental requirements may very well constitute a breach of the government's duty to cooperate and not to hinder, on the facts of those cases the need for factual inquiry precluded summary judgment. E.g., Trinity River, 66 Fed. Cl. at 112; H.N. Wood Products, 59 Fed. Cl. at 490-91; Tamarack Mills, 04-1 BCA at 161,228; Shawn Montee, 04-1 BCA at 161,077. The unrebutted facts in this case are stronger and more

comprehensive than those in Precision Pine or in those timber sale suspension cases before this court and the Department of Agriculture Board of Contract Appeals ("AGBCA") which followed Precision Pine.

The arbitrary and capricious "test is a standard well understood to be the most deferential possible." Munn v. Secretary of Dept. of Health and Human Services, 970 F.2d 863 (Fed. Cir. 1992) (citing M. Davis, A BASIC GUIDE TO STANDARDS OF JUDICIAL REVIEW, 33 S.D.L.Rev. 469, 476 (1988); 2 Childress and Davis, STANDARDS OF REVIEW § 15.7 (1986)); accord In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000). An agency decision can be overturned under the APA standard of review only if that decision is not just unreasonable but irrational. E.g., In re Gartside, 203 F.3d at 1312 ("the reviewing court analyzes only whether a rational connection exists between the agency's fact findings and its ultimate action").

This rule is the same in the Ninth Circuit, under whose law ONRC Action was decided. E.g., Northcoast Environmental Center v. Glickman, 136 F.3d 660, 666 (9th Cir. 1998) ("Under the arbitrary and capricious standard, . . . the question is whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made'"); Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy, 898 F.2d 1410, 1414 (9th Cir. 1990). Moreover, the Ninth Circuit expressly recognizes that when a court reviews an agency action for reasonableness, the court is less deferential than when it applies the arbitrary and capricious test. Northcoast Environmental Center, 136 F.3d at 666-67. When the district court found that the FS was arbitrary and capricious for adopting the "NEPA decision equals implementation" interpretation and the RTV Directive in ONRC Action, the court ipso jure concluded that the FS had no rational basis for its actions. Had the court analyzed the "NEPA

decision equals implementation" interpretation and the RTV Directive under a reasonableness standard, it would have been even more likely to find that the FS had unreasonably failed to comply with the requirements of the NFP.

The holding of ONRC Action establishes that upon reviewing the NFP, any rational person or agency, including the FS, could not reasonably have concluded that the "NEPA decision equals implementation" interpretation and RTV Directive were lawful.[16] By ignoring the NFP's clear requirements and instead trying to avoid them by promulgating the "NEPA decision equals implementation" interpretation and the RTV Directive, the FS acted irrationally and unreasonably and is therefore liable to plaintiffs for damages caused by the suspensions of plaintiffs' sale operations. See Precision Pine, 50 Fed. Cl. at 68-69, 70.

### B. The Forest Service Was Unreasonable In Causing The Suspension Of Plaintiffs' Sales Because It Awarded The Contracts Without Conducting Category 2 Surveys Despite Having Been Put On Notice Repeatedly Prior To Award That Its Legal Rationale For Not Conducting The Surveys Was Deficient

The basic purpose of the NFP Category 2 surveys and the plain language of the NFP plus ONRC Action's allegations were enough in themselves to put the FS on notice that awarding

---

[16] The government has recognized the soundness of the ONRC Action court's opinion. Rather than taking an appeal, the government decided to settle the matter. In recommending settlement to his superiors, Edward Boling, lead trial counsel for the government in ONRC Action, stated that "success on appeal is not great because the agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" PPF ¶ 146; App. Tab 136. Even more pointedly, Mr. Boling told his superiors that the RTV Directive was "not clearly allowed" by and "inconsistent with the ROD requirement to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.' ROD C-5." Id. Ultimately, as part of a joint stipulation dismissing the case, the government agreed to conduct the required Category 2 species surveys on specified timber sales and to pay the ONRC Action plaintiffs their attorneys' fees under the Equal Access to Justice Act. PPF ¶ 147.

Happy Thin, Jack Heli and Too Wild to plaintiffs without first performing Category 2 surveys was unreasonable. Additionally, for years before award of the contracts, the FS was repeatedly put on notice that its interpretation "NEPA decision equals implementation" and the RTV Directive were without any reasonable legal basis. Warnings piled upon warnings from FS and other agency personnel and government attorneys and high level personnel within the Department of Justice were repeatedly ignored by FS management which proceeded to award Happy Thin, Jack Heli and Too Wild without Category 2 surveys. In the words of the Assistant Attorney General for the Environment and Natural Resources when she was briefed by Justice Department trial counsel on the allegations in the ONRC Action complaint, "NEPA decision equals implementation was nonsense." PPF ¶ 84. All of the uncontroverted evidence demonstrates that the FS knew or should have known that it was not reasonable to award Happy Thin, Jack Heli and Too Wild to plaintiffs without Category 2 surveys.

For example, beginning as early as May 26, 1994, FS biologist Richard Holthausen, the team leader of the Species Analysis Team responsible for developing recommendations regarding the species surveys which ultimately became the S&M program under the NFP, provided oral and written presentations explaining the background, rationale for and intent of the wildlife and plant surveys required under the NFP, including Category 2 surveys. PPF ¶ 28. Mr. Holthausen described the Category 2 surveys as "survey prior to ground-disturbing activities in managed sites that are discovered (Strategy II)." PPF ¶ 29 (emphasis added). He stated that "the survey and manage strategy in the ROD was intended to provide additional protection for species whose outcomes were judged to be low under draft Alternative 9 [the alternative analysis under NEPA which became the NFP]." Id.

At an early meeting of the Survey and Manage Working Group on September 2, 1994, which included FS personnel, the stated purpose of requiring wildlife and plant surveys under the NFP ROD was "to maintain the viability of the species addressed" and it was acknowledged that surveys were "designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon and for which adequate searches can be conducted in a single year." PPF ¶ 30. In short, at the outset the government employees who were charged with guiding the implementation of the Category 2 surveys were aware of and understood the important objective of conducting surveys on projects before ground-disturbing activities. This fundamental concept was well-understood by the FS three years or more prior to the award of the Happy Thin, Jack Heli and Too Wild timber contracts in the spring and summer of 1999. Exempting timber sales from Category 2 surveys clearly would be contrary to that objective.

**1. The Issue Resolution Team's Concerns And The Development Of "NEPA Decision Equals Implementation" And The Red Tree Vole Directive**

By at least January 1996, a group called the Issue Resolution Team ("IRT") was added to the NFP administrative structure. This team was charged with, among other things, developing and recommending interpretations of the NFP Category 2 survey requirements. Typically, recommendations from this Team would be provided to the IMG and/or to the RIEC for adoption as official direction to field personnel for both the FS and BLM employees. Tom Hussey (FS) and Larry Larsen (BLM) were members of the IRT and Randy Hickenbottom (FS) worked with the IRT on developing interpretations of the NFP requirements for Category 2 surveys. PPF ¶ 31.

At a January 17, 1996 Forest Plan Implementation Workshop designed to provide guidance to FS field personnel on the meaning and intent of the NFP, the question was asked, "When is a project implemented [for purposes of requiring Category 2 surveys]?" At that Workshop, Tom Hussey, a member of the IRT, answered, "Project implementation is when the FS has committed to a project to the point where it would be unreasonable (cost or resource impacts) to delay or cancel the project. When the FS has entered into a legal contractual agreement, the project is considered implemented." PPF ¶ 37. The logic of this candid response by Mr. Hussey to the question raised at the Workshop is obvious.[17]

At the point in time when FS timber sale contracts are awarded, both the purchaser and the FS have fixed legal obligations to one another, including the purchaser's contractual right to proceed with performance and harvesting of the timber and the FS's obligation to allow these activities to go forward in accordance with the contract. E.g., App. Tabs 93 at A-611, 111 at A-791, 124 at A-997. If Mr. Hussey's January 17, 1996 definition had been adopted by the FS, all applicable Category 2 surveys would have been performed on Happy Thin, Jack Heli and Too Wild, and there would have been no basis for the ONRC Action plaintiffs' contention that the FS sought to rush NEPA decision documents to execution before the implementation dates in order to exempt timber sales from the Category 2 surveys. Had this definition been implemented by the FS there also would have been no need for suspensions of plaintiffs' sales, and the instant lawsuit would not have occurred. As early as January 17, 1996, more than three years before the award of the Happy Thin, Jack Heli and Too Wild timber sale contracts, the FS was aware of a reasonable and logically defensible definition of implementation which would have effectively

[17]Mr. Hussey has testified that in his view at that time "implementation" referred to physical actions not the "signing of a decision document." PPF ¶ 64.

obviated the challenges by ONRC Action to "NEPA decision equals implementation" and avoided the unilateral suspensions of plaintiffs' timber sales. Unfortunately, the FS did not adopt Mr. Hussey's definition.

In the summer of 1996, Larry Larsen of the BLM and Tom Hussey and Randy Hickenbottom of the FS collaborated to produce a proposed official "answer/ resolution" to the question of when ground-disturbing activities implemented on a project or timber sale for purposes of determining when Category 2 surveys are required. Multiple draft memoranda were prepared throughout the summer and into the fall of 1996 in an attempt to provide this proposed "answer/resolution." PPF ¶ 38.

Ultimately, the IRT plus Randy Hickenbottom recommended the interpretation "NEPA decision equals implementation," which was then adopted by the FS and the BLM in a joint agency memorandum of November 1, 1996. PPF ¶ 56. This interpretation was subsequently extended and applied not only in 1996 but also to timber sales with NEPA decision documents signed prior to October 1, 1998 which contemplated ground-disturbing activities on that date or later. PPF ¶ 73. This latter group included plaintiffs' Happy Thin, Jack Heli and Too Wild timber sales.

From the very beginning of their efforts, Messrs. Larsen, Hussey and Hickenbottom recognized that adoption of the interpretation "NEPA decision equals implementation" would mean offering for sale and approving timber sales which contemplated ground-disturbing activities on or after October 1, 1996 or October 1, 1998 without Category 2 surveys. In what appears to be the first draft memorandum produced for the purposes of refining the joint agency rationale for adopting the interpretation "NEPA decision equals implementation," Mr. Larsen

observed that adopting this interpretation had the advantage of allowing the FS and the BLM "to move ahead with projects [timber sales] for which a decision has already been made, but will not begin operations until 1997." PPF ¶ 41; App. Tab 18 at A-194. In addition, although he characterized it as a "last resort" Mr. Larsen also acknowledged "In cases where [timber sales] need to have a [NEPA] decision made prior to the time that the survey can be conducted, then the decision document can be signed but the project cannot commence operations until the survey is conducted and a project design adjusted to include S&M species considerations as appropriate." PPF ¶ 43; App. Tab 18 at A-195. Here, Mr. Larsen was responding to the concern that timber sales should not be automatically exempted from Category 2 surveys when there was time to perform the surveys prior to award just because a NEPA decision document had been executed.

In an August 28, 1996 draft IRT memorandum, concerns were expressed regarding adopting the interpretation "NEPA decision equals implementation" under which timber sales with a NEPA decision document signed on or before September 30, 1996 could months or years later be awarded without Category 2 surveys:

> This could result in projects [including timber sales] being operated on in fiscal years 1997, 1998, and possibly even 1999 without surveys having been done. We have been unable to determine how many projects [including timber sales] this might include, nor have we been able to get an estimate of the possible resource damage that could occur.

PPF ¶ 48. This August 1996 IRT draft acknowledged the core issue raised by ONRC Action in its lawsuit nearly two years later in July 1998. Perhaps even more importantly, this draft also admits that there was "strong concern on the part of many FS, BLM and F&WS personnel that allowing major activities such as timber sale or road building operations to proceed after 9/30/96

without surveys is unacceptable because it does not meet a commonly accepted understanding of when implementation occurs." Id. (emphasis added). One of the specific concerns of the IRT was "how much risk do we want to take in going ahead with activities without surveys." PPF ¶ 58. Had the FS heeded the concerns voiced by its own field personnel and those concerns raised in August 1996 by the IRT draft and not awarded plaintiffs' sales without surveys,[18] the ONRC Action lawsuit and the instant action for damages directly related to it would not have occurred.

Sometime prior to January of 1997, Richard Holthausen, team leader for the NFP Wildlife Species Team, was asked by Don Knowles, Director of the REO, if it was possible to do an assessment of the potential impact of different implementation dates for the surveys required under the NFP. PPF ¶ 49. Mr. Holthausen told Mr. Knowles at that time, "That in general, one could reasonably assume that delay of implementation strategies would result in some negative effect for some species, but that it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects." Id. In short, there was no way of knowing whether the negative effect on the species would be relatively small or whether it would cause extirpation of a species. Id. This exchange appears to be the basis for the statement in the above-referenced IRT draft memorandum: "We have been unable to determine how many projects [including timber sales] this might include, nor have we been able to get an estimate of the possible resource damage that could occur." PPF ¶ 48. Again, it is significant that the key concern about the harmful effect of awarding timber sale contracts after the trigger dates without

[18]In fact, FS line officers were not compelled by the interpretation "NEPA decision equals implementation" or the RTV Directive to sign decision documents prior to the trigger dates without completing Category 2 surveys. PPF ¶ 57. They could have waited until the surveys were done before signing, if they had so chosen.

Category 2 surveys was raised for FS consideration years before plaintiffs' contracts were awarded.

As the IRT was coming to the end of its task of finalizing a recommendation to the RIEC, the issue of whether a large number of timber sales with completed NEPA decisions but without Category 2 surveys would now be sold, was again a subject of concern. In a draft IRT memorandum written sometime prior to October 4, 1996 but late in the process of the IRT finalizing its recommendation, the following concern was raised:

> Question 2: Does The Above Definition Of The Point Of Implementation [NEPA Decision Equals Implementation] Allow Us To Make A Large Number Of NEPA Decisions Prior To September 30, 1996 For Outyear Projects In Order To Avoid The Need For Category 2 S&M Surveys?
>
> Response: The ROD clearly intended that we perform surveys for Category 2 species prior to the design and implementation of projects; and it also clearly intended that we have until FY 97 to phase in this requirement. But the "banking" of NEPA decisions prior to FY 97 for projects that will not begin for several years is inappropriate. If we do not plan to make an irreversible commitment to proceed with the project prior to mid-year 1997, then we should conduct the survey for the Category 2 S&M species prior to making a NEPA decision on the project. If for some reason it is necessary to make a NEPA decision prior to Sept. 30 for an outyear project, then it might also be appropriate to do so but plan to conduct the S&M survey prior to making an irreversible commitment to proceed with the project. This should be a reluctant "last-resort" approach, as it creates the risk that the project will need to be re-designed based on the results of the S&M survey and the NEPA process recycled. The definition of the term "irreversible commitment to proceed" will vary according to the type of project and the policies and procedures of the managing agency, but it usually should be the point at which it is relatively difficult and expensive to redesign or cancel a project. Examples of that point might be the award of a timber sale, the signing of a service contract, or the actual operational start of a force account project.

PPF ¶ 50. This concern about the "banking" and later awarding of timber sale contracts without Category 2 surveys was not only a concern voiced within the IRT, it was also a concern voiced

by field personnel of both the FS and the BLM, and these concerns were conveyed to IRT members. PPF ¶ 53.

The IRT understood that there were potential biological and legal risks to the FS and the BLM arising from one or more of the definitions of implementation under consideration. One form of legal risk considered by the IRT was the potential contractual liability of the FS and the BLM to purchasers of timber sale contracts for which Category 2 surveys had not been performed and which might be challenged by environmental activists on grounds that these timber sales did not comply with the NFP Category 2 survey requirements. PPF ¶¶ 45, 52, 60.

As the October 1, 1996 trigger date for the required commencement of Category 2 surveys for the five salamanders and the red tree vole began to grow near, the red tree vole survey protocols were not yet ready and so surveys for red tree voles could not have occurred prior to September 1, 1996. Survey protocols for the salamanders, however, had been available since March of 1996 and were available to survey timber sales for which NEPA decision documents had not yet issued. Not performing Category 2 surveys for timber sales in this situation and proceeding with the award of those contracts was of significant concern for Larry Larsen of the IRT. PPF ¶ 54.

It was not until on or about October 4, 1996 that Messrs. Larsen, Hussey and Hickenbottom reached an agreement on a final interpretative memorandum they would submit to the RIEC through the IMG for adoption by the FS and the BLM as support for an official interpretation of when Category 2 surveys would be required. PPF ¶ 55. The IRT's final recommendation is embodied in a document entitled "Survey and Manage (Component 2) implementation issues" dated October 22, 1996. PPF ¶ 56. Based on this recommendation, the

RIEC adopted the interpretation "NEPA decision equals implementation." But nowhere in that document is there any discussion for RIEC consideration of the potential problem of grandfathering in a substantial number of timber sales without Category 2 surveys if the interpretation "NEPA decision equals implementation" were approved by the RIEC.[19]

Similarly, this document recommending adoption of the interpretation "NEPA decision equals implementation" does not discuss or even mention the option of either selecting the award date of a timber sale contract as the "implementation" date or delaying the signing of NEPA decision documents then under consideration until Category 2 surveys had been performed for timber sales planned to be operated after October 1, 1996 or October 1, 1998. In short, the RIEC which made the final decision to adopt the interpretation "NEPA decision equals implementation" was never fully informed of alternative and less controversial interpretations considered by the IRT; nor was it informed about the IRT and agency field personnel concerns about "banking" timber sales without surveys. PPF ¶ 63.

### 2. Warnings To The Forest Service In Public Comments, ONRC Action's Administrative Appeals And In The ONRC Action Lawsuit

The ONRC Action lawsuit was filed July 6, 1998. PPF ¶ 81. This lawsuit directly challenged the FS's interpretation "NEPA decision equals implementation" on the same grounds that the IRT and other government personnel had raised years earlier. 59 F. Supp. 2d at 1092-93. This lawsuit also raised the argument that the RTV Directive was erroneous and contrary to the

[19]The FS did not consult with the Department of Justice regarding the legal viability of the interpretation "NEPA decision equals implementation" before the FS adopted that interpretation. PPF ¶ 77.

NFP survey requirements because it exempted 90% of the red tree vole habitat in the NFP forests from surveys without any basis for such an exclusion in the NFP. Id. at 1094-95.

Although the FS did not consult with the Department of Justice regarding the legal viability of the interpretation "NEPA decision equals implementation" before adopting that interpretation (PPF ¶ 77), this interpretation was discussed with the Department of Justice and representatives of the President's Council on Environmental Quality in the Washington Office of the FS before the filing of the ONRC Action lawsuit. At that time Michael Gippert, lead Washington Office attorney for the FS on NEPA and NFMA issues, advised the FS that in light of existing caselaw, the NFP needed to be formally amended (including appropriate NEPA analysis) if the definition of "NEPA decision equals implementation" was to be extended to FY 1999. PPF ¶ 78. The FS declined to follow Mr. Gippert's advice and extended the interpretation to FY 1999 without formal amendment or NEPA analysis.

Moreover, two and a half months after the filing of the ONRC Action complaint, at the express request of Department of Justice counsel, the ONRC Action plaintiffs provided the government with a detailed written description, including examples, of how the ONRC Action plaintiffs believed the NFP was being improperly implemented with respect to Category 2 surveys. This letter spelled out in detail ONRC Action's allegation that the interpretation "NEPA decision equals implementation" was a violation of the NFP ROD and would allow "the FS and BLM to quickly 'implement' projects [including timber sales] before survey requirements kick in by simply signing the NEPA documents." PPF ¶ 83. The letter also raised the argument that the RTV Directive wrongly exempted most of the habitat of the red tree vole and drew an arbitrary line excluding all red tree vole habitat in the California national forests

from such surveys. Id. Months before plaintiffs' contracts were awarded, the FS was put directly on detailed notice of the serious deficiencies of these two Category 2 survey interpretations. Nevertheless, the FS pushed forward, processing plaintiffs' sales to be offered to the public without Category 2 surveys.

On October 30, 1998, the Klamath Forest Alliance, an ONRC Action plaintiff, filed an administrative appeal of the EA and NEPA decision documents for the Happy Thin timber sale challenging directly the failure of the FS to perform Category 2 surveys for the same reasons raised in the ONRC Action complaint and the subsequent letter. PPF ¶ 151. On August 21, 1998, Klamath Siskiyou Wildlands Center, an ONRC Action plaintiff, filed an administrative appeal of the FS's approval of the EA with respect to the Jack Heli timber sale. PPF ¶ 173. This appeal likewise raised the same legal challenges to the FS's decision not to conduct Category 2 surveys on Jack Heli because of its interpretation "NEPA decision equals implementation" as those raised in the ONRC Action complaint and the subsequent letter. Id. During the public comment period on the Too Wild timber sale EA (December 31, 1997 through February 2, 1998), the FS received comments from the public objecting to the failure to perform Category 2 surveys for Too Wild based upon the FS's interpretation "NEPA decision equals implementation" and its RTV Directive. PPF ¶¶ 199-200. These same issues were later raised in the administrative appeals of the Too Wild EA and NEPA decision documents by ONRC Action plaintiffs. See App. Tab 128 at A-1101, A-1107.

Both before and after the ONRC Action litigation the FS was repeatedly put on notice that its interpretation "NEPA decision equals implementation" and its RTV Directive were

fatally defective. Still, the FS pressed ahead with its decision to award Happy Thin, Jack Heli and Too Wild.

### 3. Warnings To The Forest Service From the Department Of Justice And The Forest Service Regional Attorney After ONRC Action Was Filed

After the ONRC Action lawsuit was filed on July 8, 1998, the FS was repeatedly warned by the chief trial counsel for the government in ONRC Action, the FS's own Regional Attorney and the Assistant Attorney General for the Environment and Natural Resources that its rationale for the interpretation "NEPA decision equals implementation" was of dubious validity and that the FS should take special measures to protect itself if it insisted on awarding timber sale contracts without Category 2 surveys based upon that interpretation.

When he first reviewed ONRC Action's allegations regarding the interpretation "NEPA decision equals implementation," Edward Boling, lead counsel for the government in the ONRC Action lawsuit, had concerns about the legal viability of this interpretation and that the agencies might rush to sign decision documents prior to the trigger dates. PPF ¶ 79. At this time Mr. Boling was also concerned that a sizeable number of timber sales had been approved and awarded by the FS without surveys based on the interpretation "NEPA decision equals implementation." PPF ¶ 82. Mr. Boling told Owen Schmidt, the principal FS lawyer for the ONRC Action litigation, that he was "leery" of the FS's legal rationale for the interpretation "NEPA decision equals implementation" (PPF ¶ 93), and he told Dinah Bear, General Counsel for the President's Council on Environmental Quality, that "the agencies' interpretation of the ROD is difficult to square with the common meaning of the term 'implemented.'" PPF ¶ 86.

Later, when recommending to his superior Lois Schiffer, the Assistant Attorney General for the Environment and Natural Resources, against attempting to appeal the ONRC Action decision, Mr. Boling reiterated his view that the FS's rationale for its interpretation "NEPA decision equals implementation" was very weak and stated that the RTV Directive was inconsistent with the NFP ROD. PPF ¶ 146. Mr. Boling was candid in advising Ms. Schiffer that the FS's interpretation was "clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" Id. Mr. Boling was even more direct as to the RTV Directive, stating that it "effectively excluded much of the red tree vole's habitat from survey, which is inconsistent with the ROD direction to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.'" Id.

Robert Simmons, the Regional Attorney for Region 5 of the FS, advised both the Region 5 and Region 6 Regional Foresters that if timber sales threatened by the ONRC Action lawsuit were to be offered to the public, the FS should, among other things, "take action to make sure the appropriate language is in the contract" to protect the FS from liability to the purchasers. Mr. Simmons gave this advice to the FS several months prior to the award of Happy Thin, Jack Heli and Too Wild. PPF ¶ 99. Notwithstanding this explicit advice, no valid exculpatory or disclaimer provisions were included in the Happy Thin, Jack Heli or Too Wild contracts; there were no references in the FS's prospectuses or instructions to bidders for any of these contracts about a threat of suspensions due to ONRC Action or language being included in the contracts to limit the FS's liability in the event of such suspensions. In short, no "appropriate language" was included in the contracts.

The strongest warning received by the FS regarding the deficiency of its rationale for the interpretation "NEPA decision equals implementation" came from the Assistant Attorney General for the Environment and Natural Resources when she was briefed by Edward Boling on the allegations of the ONRC Action plaintiffs on or about November 25, 1998. At that briefing Ms. Schiffer told Mr. Boling that "NEPA decision equals implementation was nonsense." PPF ¶ 84. She told him that she was concerned that the "NEPA decision equals implementation" interpretation would allow the FS and the BLM to authorize timber sales without first conducting Category 2 surveys even though the sales might be offered or awarded months or even years later, as was the case for Happy Thin, Jack Heli and Too Wild. PPF ¶ 85. Peter Coppelman, Ms. Schiffer's immediate subordinate, shared her concerns. Id. Ms. Schiffer also indicated that she would need to have further discussions with high level officials within the Department of Agriculture and the Department of the Interior before deciding whether the Department of Justice would even defend the FS and the BLM NFP interpretations in the ONRC Action litigation. Nancy Graybeal, the Deputy Regional Forester for Region 6, and FS Attorney Owen Schmidt were informed of Ms. Schiffer's position. PPF ¶ 87. Ms. Schiffer's blunt assessment was communicated by Edward Boling to Sue Zike, the FS litigation coordinator for the ONRC Action litigation, and Ms. Zike in turn communicated the substance of this meeting to Robert Devlin, the Director of Natural Resources within the FS for Region 6. PPF ¶¶ 84, 91. After Mr. Devlin heard about Ms. Schiffer's assessment, he wrote to his FS colleagues, "[The Justice Department's] Not being able to defend us is one thing but not agreeing with what we are doing is another." PPF ¶ 89. It was Mr. Devlin's understanding in November 1998 that the Department of Justice did not agree "with our definition of implement." PPF ¶ 90.

During the period leading up to October 1, 1998, the trigger date for requiring Category 2 surveys for the 71 invertebrate Category 2 species, and in the midst of ONRC Action's allegations that the FS was rushing through the signing of NEPA decision documents in order to avoid performing Category 2 surveys, Robert Devlin, the Director of Natural Resources for Region 6, specifically advised Forest Supervisors in the NFP planning area that they should push through the signing of NEPA decision documents for timber sales prior to October 1, 1998, even if certain items were missing because by doing so these timber sales could be exempted from Category 2 surveys. PPF ¶ 80. Mr. Devlin wrote:

> There is always a risk that something may come up that causes you to redo a decision notice but I believe that it is a safe risk to take. By signing DN's before 9/30/98, we avoid having to put these projects [timber sales] under the S&M timeline that kicks in on 10/1/98. If all you have waiting on the projects is the final BO [biological opinion] I would recommend that you sign DN's after level 1 team agreement. . . . I know this will make some folks in [the FS's Office of] Strategic Planning nervous but it is a reasonable risk. We have the documentation of agreement at level 1 teams to fall back on. I guess if we find out that this strategy will not work we will have to rethink what we are up to.

App. Tab 50; App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 86:16-90:10).

Mr. Devlin's direction to Forest Supervisors to expedite the signing of NEPA decision documents in the form of DNs for timber sales prior to the October 1, 1998 trigger date in order to avoid the requirement to perform Category 2 surveys is exactly what the ONRC Action plaintiffs feared the FS would do.[20] Mr. Devlin's above-referenced direction to the Forest Supervisors became known to the ONRC Action plaintiffs and they notified the government at least as early as February 17, 1999 of their knowledge of the Devlin direction. App. Tab 50. The knowledge that Mr. Devlin's message had fallen into the hands of environmental activities

[20] Job performance evaluations for all FS line officers took into consideration whether they met their timber selling targets, among other factors. PPF ¶ 10.

should have been another serious warning to the FS not to proceed with the awards of Happy Thin, Jack Heli and Too Wild without Category 2 surveys or, at a minimum, without waiting until it had obtained a dispositive decision in ONRC Action.

Despite all of these warning signs, the FS remained steadfastly on its path to award Happy Thin, Jack Heli and Too Wild without Category 2 surveys and to do so prior to the resolution of the pending ONRC Action litigation. This course of action was unreasonable and the suspensions of plaintiffs' sales were unreasonably caused by the FS.

**4. The Forest Service Awarded Plaintiffs' Contracts Despite Its Secret Knowledge That If Plaintiffs' Sales Were Operated They Would Trigger Motions For Injunctive Relief**

As blunt warnings continued to flow from FS attorneys and the Department of Justice during the pendency of the ONRC Action litigation, the FS through the Department of Justice engaged in secret negotiations with the ONRC Action plaintiffs to at first delay award and then to allow the award of certain timber sale contracts on ONRC Action's "at-risk" or "problem" sale lists. These lists included Happy Thin, Jack Heli and Too Wild. ONRC Action provided these lists to the government to put the FS and the BLM on notice that it would likely file for a temporary restraining order or a preliminary injunction if these sales were operated. The FS kept the identity of the sales on these lists a secret and did not disclose this information to plaintiffs. PPF ¶¶ 106-08, 138-39, 189, 202. Plaintiffs were also not notified when secret agreements were reached between the government and the ONRC Action plaintiffs to allow plaintiffs' contracts to be awarded with the understanding that ONRC Action would likely seek a temporary restraining order or a preliminary injunction if these sales were actually operated. PPF ¶¶ 139-41, 143, 189-90. Despite the FS's secret knowledge that Happy Thin, Jack Heli and Too Wild were explicit

targets of ONRC Action, the FS awarded the contracts and deliberately did not inform the purchasers of their precarious status. PPF ¶¶ 137, 157-58, 161, 163, 182, 184, 189, 191-92, 203.

The awards of Jack Heli on March 2, 1999 (PPF ¶ 188), Too Wild on May 14, 1999 (PPF ¶ 204) and Happy Thin on July 6, 1999 (PPF ¶ 168) all occurred during the briefing of cross-motions for summary judgment in the ONRC Action lawsuit. The district court issued its summary judgment decision on August 2, 1999. ONRC Action, 59 F. Supp. 2d at 1096-97. Under these circumstances the FS's decision to award Happy Thin, Jack Heli and Too Wild without Category 2 surveys before the court's summary judgment decision in the ONRC Action lawsuit was unreasonable.

## VI. This Case Is Ripe For Summary Judgment On Liability

In Precision Pine and Superior Timber, this court and the IBCA, respectively, found on the facts of those cases that the FS and the BLM were liable to federal timber sale purchasers for suspensions where the FS and the BLM were at fault in failing to comply with certain pre-award environmental obligations and the sales had to be suspended in order for the government to fulfill those obligations. Both of these cases were decided on the legal theory that the government had breached its implied duties to cooperate and not to hinder. Precision Pine, 50 Fed. Cl. at 72; Superior Timber, 97-1 BCA ¶ at 143,444.

Subsequent cases before the Court of Federal Claims and the AGBCA have agreed with the holding in Precision Pine (and Superior Timber) that the FS may be liable for breach of the implied duties to cooperate and not to hinder for unilateral suspensions of timber sale contracts, but found on the facts of those cases that there were disputed issues of material fact that precluded summary judgment for the purchasers. Trinity River, 66 Fed. Cl. at 112; H.N. Wood

Products, 59 Fed. Cl. at 490-91; Shawn Montee, 04-1 BCA at 161,077; Tamarack Mills, 04-1 BCA at 161,228. These subsequent cases rely heavily upon the decision of the Federal Circuit in Scott Timber Co. v. United States, 333 F.3d 1358, 1369 (Fed. Cir. 2003), for the proposition that an intensely factual reasonableness inquiry will nearly always be required in order to adjudicate a claim of breach of the implied duties to cooperate and not to hinder. Although these cases acknowledge the appropriateness of summary judgment on liability in Precision Pine and Superior Timber based on the facts of those two cases, they interpreted the decision of the Federal Circuit in Scott Timber as endorsing the view that summary judgment was rarely appropriate in such cases. Trinity River, 66 Fed. Cl. at 109-10; see Shawn Montee, 04-1 BCA at 161,074; Tamarack Mills, 04-1 BCA at 161,228.

Plaintiffs respectfully submit that the Court of Federal Claims' decisions in Trinity River and H.N. Wood Products and the decisions of the AGBCA in Shawn Montee and Tamarack Mills have incorrectly characterized the legal standard for reasonableness articulated in Precision Pine and Superior Timber and have misinterpreted the Federal Circuit's decision in Scott Timber. However, even applying the legal standard as articulated by these latter decisions and adopting their reading of the Federal Circuit's decision in Scott Timber, the uncontroverted facts in the instant case still lead to the inescapable conclusion that the FS breached its duties to cooperate and not to hinder the performance of plaintiffs' contracts.

### A. The Legal Standard For Breach Of The Implied Duties To Cooperate And Not To Hinder

In Precision Pine, the FS suspended the purchaser's timber sale contracts in order to comply with a district court injunction which required the FS to submit its LRMPs for formal consultation with the FWS pursuant to the ESA. 50 Fed. Cl. at 38 (citing Silver v. Babbitt, 924

F. Supp. 976 (D.Ariz. 1995)). All but one of the contracts at issue in Precision Pine contained clause C(T)6.01.[21] 50 Fed. Cl. at 40. The court held that although clause C(T)6.01 gave the FS a right to suspend timber sale contracts to comply with a court order, that right is qualified by the implied duties to cooperate and not to hinder contract performance which are a vital part of every contract. The court further held that clause C(T)6.01 was not a valid exculpatory clause and that in the absence of such a clause the law of the Federal Circuit was that the FS was liable to the plaintiff for breach of its implied duties to cooperate and not to hinder. Id. at 58-59.

The FS's breaches of its duties to cooperate and not to hinder in Precision Pine arose out of the FS's breach of an express warranty under clause C(T)6.25 that it had included in the contract all protective measures necessary for certain wildlife species. Id. at 66. However, citing the standard enunciated long ago in Cedar Lumber, 5 Cl. Ct. at 549-50, the court in Precision Pine also recognized that "even if there is no specific warranty, an unreasonable delay that is caused in some way by the Government can breach the implied duty not to hinder," and that a delay in contract performance caused by the government may give rise to a breach of the implied duty to cooperate if the contractor establishes that (1) "the cause of the delay was the fault of the Government" and (2) the delay is of "sufficient magnitude" and "a sufficient hindrance to the operations of the contractor to constitute a breach." 50 Fed. Cl. at 59.[22]

[21] See supra note 4.

[22] The Precision Pine court addressed two separate implied contractual duties: the implied duty to cooperate and the implied duty not to hinder performance. A FS breach of the implied duty not to hinder may be established by the purchaser showing that there is "an unreasonable delay that is caused in some way by the Government." 50 Fed. Cl. at 59.

Nowhere in Precision Pine or in Cedar Lumber is there any indication that in order to prevail a plaintiff must establish some particular degree of "unreasonableness," much less prove that the FS was highly unreasonable or particularly unreasonable as measured by some unspecified enhanced standard. In the absence of any such language, the "reasonableness" standard applies; that is, in this case based on what the FS knew and when it knew it, the question is whether the FS acted as any reasonable person would have under the circumstances. In short, was the FS acting prudently when it awarded plaintiffs' timber sale contracts without having performed Category 2 surveys.[23] There is more than enough uncontroverted evidence in this case to demonstrate that the FS failed to meet the Precision Pine/Cedar Lumber reasonableness standard.

### B. Scott Timber Establishes That The Forest Service Can Breach Timber Sale Contracts Containing Clause C(T)6.01 If It Suspends Those Contracts Unreasonably, But Does Not Hold That The Question Of The Reasonableness Of the Suspension Precludes Summary Judgment On Liability

In Scott Timber, the issue before the court was whether the Court of Federal Claims had properly granted summary judgment to defendant on contracts that contained clause C(T)6.01 on the grounds that the FS's suspensions were reasonable.[24] 333 F.3d at 1364. The Court of

[23]In Trinity River and H.N. Wood Products the court recognized that the central question for determining the reasonableness of the FS's actions was based upon what the FS knew and when it knew it. 66 Fed. Cl. at 112; 59 Fed. Cl. at 491. In Trinity River the court also characterized plaintiffs' burden as having to prove not only that the FS's actions were unreasonable but that the FS "was so derelict . . . that it provoked a challenge which otherwise would not have arisen, or that it was unnecessarily sustained." 66 Fed. Cl. at 112. There is no basis for requiring any such enhanced level of unreasonableness.

[24]For contracts at issue in Scott Timber that did not contain clause C(T)6.01, the issue before the court was whether those contracts provided the FS with suspension authority. The court ruled that they did not. 333 F.3d at 1366-68.

Federal Claims had concluded that the suspensions were reasonable as a matter of law because Section 318 of the Department of the Interior Appropriations Act of 1990, Pub. L. No. 101-121, 103 Stat. 701 (1989), had relieved the FS of the normal statutory requirements of complying with NFMA and NEPA before entering into the timber sale contracts at issue in that case. See 333 F.3d at 1369.[25] In this context, the Federal Circuit reversed the grant of summary judgment to the government and noted that whether the suspension in a case where NFMA and NEPA did not apply was reasonable was "intensely factual." Id.

In Scott Timber, the court found the evidence presented by the parties regarding the reasonableness of the length of the suspension conflicting and determined that when drawing all inferences in favor of the non-moving party, neither party had demonstrated entitlement to summary judgment and the matter was remanded to the trial court for further proceedings. 333 F.3d at 1368-70. Significantly, in Scott Timber, the Federal Circuit did not state that all questions of FS fault or alleged unreasonableness were necessarily "intensely factual" as was the question of the reasonableness of the duration of the suspension before it in that case. Also, unlike in Precision Pine or the instant case, there was no allegation in Scott Timber that the cause

[25] Generally, the FS must comply with NFMA and NEPA before approving any timber harvest such as that which it approves when it awards a timber sale contract. Section 318 relieved the FS of the obligation to comply with NFMA and NEPA with regard to a certain class of timber sale contracts awarded during 1990. Scott Timber Co. v. United States, 44 Fed. Cl. 170, 175-76 (1990); aff'd 333 F.3d 1358 (Fed. Cir. 2003). The FS was not relieved of its obligation to comply with NFMA and NEPA before entering into the Happy Thin, Jack Heli and Too Wild contracts in 1999 at issue in this case.

of the suspension was itself a consequence of FS fault; but rather, the focus of analysis was on the prolonged length of the suspension.[26]

H.N. Wood Products, like the instant case, involved an allegation that the FS violated its contractual duty to cooperate and not to hinder, notwithstanding the presence of clause CT6.01 in the contract, by suspending a timber sale contract in order to perform environmental analyses which the FS should have performed earlier. Following contract award, the FS suspended the sale after it received two district court decisions stating that the sale could not proceed until the government performed certain cumulative effects analyses required by NEPA. 59 Fed. Cl. at 481-82. In denying H.N. Wood's motion for summary judgment because there were insufficient undisputed facts, the court adopted the legal standard articulated in Precision Pine and concluded that the FS could be liable for breach of its implied duty to cooperate and not to hinder, notwithstanding clause CT6.01. 59 Fed. Cl. at 486-89.[27] Specifically, the court in H.N. Wood Products held:

> The Forest Service was not authorized to suspend H.N. Wood's Contract indefinitely in order to comply with a court order of its own unreasonable or

[26]The parties in Scott Timber agreed that clause C6.01 supplied express authority for the FS to suspend Scott's operations when the marbled murrelet was listed as a threatened species under the ESA after contract award. However, as the Federal Circuit noted, "the Court of Federal Claims correctly found that 'clause C6.01 does not authorize the FS to indefinitely or permanently suspend the contracts.'" 333 F.3d at 1368. The Federal Circuit cited Precision Pine with approval in holding that clause C(T)6.01 does not limit the FS's liability to a timber sale purchaser if the FS's suspension is unreasonable in length. Id. at 1368-70.

[27]The court also relied on the unpublished decision in Wetsel-Oviatt Lumber Co. v. United States, CoFC No. 94-389C (Oct. 9, 2001), which had similarly adopted the Precision Pine standard. H.N. Wood Products, 59 Fed. Cl. at 487. App. Tab 194. Wetsel-Oviatt involved allegations of FS fault, but unlike the instant case, Precision Pine, H.N. Wood Products and the AGBCA cases discussed in the text, there was no district court finding of FS fault. Wetsel-Oviatt settled before trial.

> wrongful actions caused the court order to be imposed in the first place, or if it unreasonably delayed in remedying the offending circumstances.

59 Fed. Cl. at 487 (emphasis added) (citations omitted). H.N. Wood Products settled before trial.

Shawn Montee involved five timber sale contracts awarded by the FS as part of a project to salvage trees and stem an outbreak of bark beetles by removing already infested portions of the sale areas. 04-1 BCA at 161,065. A few months after contract award in a series of federal trial and appellate court cases, it was determined that the FS had violated federal law by failing to complete required environmental analyses before awarding the contracts. Id. at 161,070. The FS subsequently suspended the sales in order to perform these analyses. The purchaser claimed that the suspensions were caused by FS fault and that notwithstanding the presence of clause CT6.01 in the contracts, by suspending sales in order to perform environmental analyses that should have been performed earlier, the FS violated its duty to cooperate and not to hinder. Id.

The parties filed cross-motions for summary judgment. Citing the decision of the Federal Circuit in Scott Timber, the AGBCA stated:

> In Scott Timber, the court found that a suspension due to the Government's failure to comply with a statute, could constitute [ ] a breach [of the implied duty to cooperate and not to hinder], notwithstanding the authority to suspend set out in clause CT6.01 of the contract.

Id. at 161,073. The AGBCA also cited H.N. Wood Products in support of the same legal standard. Id. at 161,075. However, the AGBCA found that some of the court decisions before the suspension favored the FS and that there were other factual issues which precluded summary judgment in favor of Shawn Montee. 04-1 BCA at 161,079. The AGBCA found that a trial would be necessary to determine whether "the FS acted reasonably in issuing the suspension in February 2001 and acted reasonably in continuing the suspensions for the time in issue." Id.

Following its decision on the cross-motions for summary judgment, the AGBCA issued a second decision in response to Shawn Montee's motion for partial reconsideration. Shawn Montee, Inc., AGBCA No. 1004-153-R, 04-2 BCA ¶ 32,755 (2004). Shawn Montee argued that the AGBCA had applied an incorrect legal standard and that the correct standard was not whether the FS acted reasonably as set out in the initial ruling in the case but "whether the suspension was caused by a FS pre-award error and FS violation of environmental law." Id. at 161,998. Shawn Montee argued that the failure to satisfy environmental obligations constituted in itself sufficient evidence of FS fault in order for the suspensions to constitute a breach of the duty to cooperate and not to hinder and that there was no need for a trial on the degree of unreasonableness or level of culpability attributable to the FS. Id. at 161,988-99. The AGBCA disagreed, denied the motion for reconsideration, and reiterated its ruling based upon its interpretation of Scott Timber and H.N. Wood Products that the purchaser must prove at trial that an "actionable unreasonable action" occurred either "on the date of the initial suspension or some later time." Id. at 161,900.

Tamarack Mills involved suspension of timber sales after federal courts had determined that the FS failed to comply with the procedural and substantive requirements of NEPA and NFMA in approving those sales prior to award. 04-1 BCA at 161,220-227. On the question of what constitutes the appropriate legal standard for determining whether the FS breached its duty to cooperate and not to hinder by suspending the timber sales in these circumstances, the AGBCA's reasoning in Tamarack Mills is the same as its reasoning in Shawn Montee. Citing Scott Timber, H.N. Wood Products and Shawn Montee, the AGBCA in Tamarack Mills saw the

issue before it as a question of whether the FS was reasonable or unreasonable "either as to the suspension itself or as to the length of the suspension." Id. at 161,228.

In Trinity River, purchasers were unable to perform modifications to their contracts that added substantial volumes of timber resulting from a forest fire because the FS-drafted EIS which supported these modifications was invalidated by a federal district court. 66 Fed. Cl. at 101. The court ruled in Trinity River that the purchasers could not rely solely on the district court's decision on the EIS to establish breach. Although acknowledging that the district court's decision would "'serve as a factor in the reasonableness analysis,'" 66 Fed. Cl. at 112 (quoting Scott Timber, 333 F.3d at 369) (citing Precision Pine, 50 Fed. Cl. at 63)), there remained genuine issues of material fact in that case which precluded summary judgment. 66 Fed. Cl. at 111-12. Nevertheless, in Trinity River the court did acknowledge, "If the FS had knowledge that its EIS was inadequate before it was issued, it would be unreasonable to award a timber sale contract in light of the risk that environmental groups would challenge the plan." Id. at 112. "There [was] a gap in the evidence, however, with respect to what the FS knew before it issued the EIS." Id. Trinity River settled before trial.

There is no basis in Scott Timber for concluding that the reasonableness inquiry for purposes of deciding whether the FS breached its implied duties to cooperate and not to hinder is always so intensely factual that summary judgment on liability is virtually impossible. In addition, there is no basis in Scott Timber or Precision Pine, or elsewhere in the law, for concluding that plaintiffs cannot prevail unless they establish that the FS was in some sense highly or particularly unreasonable. Unreasonableness based on proof of a lack of prudence given the FS's knowledge at the time is sufficient.

### C. Even Assuming The Cases Subsequent To Precision Pine Have Correctly Interpreted Scott Timber to Mean That Summary Judgment Is Rarely Appropriate In Cases Alleging Breach Of The Duties To Cooperate And Not To Hinder, The Instant Case, Like Precision Pine, Is A Case In Which Summary Judgment Is Appropriate

Section V of this memorandum discusses in detail the repeated warnings and admonitions the FS received not only from environmental activists but also from the government's chief trial counsel in ONRC Action and the Assistant Attorney General for the Environment and Natural Resources that its interpretation "NEPA decision equals implementation" and its RTV Directive were legally deficient. In addition, as discussed in Section IV of this memorandum, the FS intentionally withheld from plaintiffs the fact that their specific timber sales were identified targets of the ONRC Action litigation and that ONRC Action had indicated to the government that if those sales were operated after award ONRC Action would seek injunctive relief. Despite these warnings and being put on notice multiple times prior to award that injunctions and subsequent suspensions were likely, the FS pressed ahead with the award of plaintiffs' contracts. In sum, there is a virtual mountain of uncontroverted evidence in this case which establishes that the FS acted unreasonably. Summary judgment on liability in favor of plaintiffs is appropriate.

## VII. Under Contract Clause C6.01, Even If The Forest Service Did Not Breach The Jack Heli Timber Sale Contract, Timber Products Is Entitled To Compensation For Its Increased Sale Operating Costs Incurred As A Direct Result Of The Forest Service's Suspension

Separate from any claim for breach damages, Timber Products is entitled to compensation for its increased sale operating costs under standard clause C6.01 of the Jack Heli contract. See Reidhead Bros. Lumber Mill, AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (2001), at 155,441 (FS liable to timber purchaser under clause CT6.01 for contract suspension;

compensation awarded), aff'd Reidhead Bros. Lumber Mill v. Veneman, 36 Fed. Appx. 426 (Fed. Cir. 2002).[28] When an interruption or delay of a timber purchaser's operations exceeds 30 days during the Normal Operating Season ("NOS"), clause C6.01 entitles the purchaser to out-of-pocket expenses incurred as a direct result of the interruption or delay. See id. (clause CT6.01 "expressly provides for the recovery of out-of-pocket expenses incurred as a direct result of a suspension").

Although the Jack Heli contract does not define "out-of-pocket expenses," both this court and the AGBCA have construed clause C6.01 as applying to additional costs incurred in order to harvest timber under the contract. Bighorn Lumber Co. v. United States, 49 Fed. Cl. 768, 771-72 (2001); see Reidhead Bros., 01-2 BCA at 155,441 (timber purchaser entitled to increased log hauling costs under clause CT6.01). This construction adopted by the Court of Federal Claims and the AGBCA is consistent with the plain and ordinary meaning of "out-of-pocket expenses" and C6.01's role as a remedial clause. See BLACK'S LAW DICTIONARY 618 (8th ed. 1999) (defining "out-of-pocket expense" as an "expense paid from one's own funds"); 11 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 30:9 (4th ed. 1999).

Timber Products is entitled to reimbursement of its out-of-pocket expenses because the FS suspended Jack Heli well beyond the 30-day threshold required by clause C6.01. The NOS for Jack Heli was May 15 to October 15. App. Tab 93 at A-619 (Jack Heli contract). The FS suspended the contract from August 27, 1999 to August 17, 2000 alone just in order to conduct surveys on part of the sale area. PPF ¶¶ 193-94. Because the FS suspension of Jack Heli

[28] C6.01 and C(T)6.01 are substantively identical. See supra note 4.

exceeded 30 days of the NOS, Timber Products may recover all of its out-of-pocket expenses incurred as a direct result of the suspension.

Increased sale operating costs, including logging and hauling costs, are out-of-pocket expenses recoverable under clause C6.01. In Reidhead Bros., the AGBCA awarded the appellant the difference between the $90/MBF it actually paid its logging and hauling subcontractor in 1998 and the $85/MBF the appellant would have paid in 1995 had the FS not suspended the contract. 01-2 BCA at 155,441. Here, Timber Products intended to begin operations on Jack Heli in 1999. However, because the FS suspended the contract, Timber Products could not begin operations until later, when costs had increased. App. Tabs 149, 159, 164-65. The increased operating costs Timber Products incurred were a direct result of the suspension preventing Timber Products from operating the sale at the lower 1999 costs.

Timber Products made a valid and timely Contract Disputes Act ("CDA") claim for compensation under clause C6.01 for these out-of-pocket expenses. Once the FS lifted the suspension of Jack Heli and sale operations commenced, Timber Products began to incur operating costs at a much higher rate than if it had been allowed to operate the sale in 1999 as it had originally intended. On August 24, 2005, Timber Products submitted to the CO a supplemental CDA claim for the $242,087.05 in increased sale operating costs it had incurred up to that point. App. Tab 164. As required by the contract, Timber Products continued to operate Jack Heli. During the period between October 2005 and February 2006, Timber Products incurred an additional $239,875.80 in increased operating costs. In the final season of operations, from August through October 2006, Timber Products incurred another $300,531.17 in increased operating costs. Timber Products submitted supplemental CDA claims for these

additional operating costs. App. Tab 165. Despite the clear language of clause C6.01, the CO failed to grant any of Timber Products' supplemental claims.

In an attempt to mitigate its damages and avoid entirely these substantially increased costs of operations, Timber Products made repeated requests to the FS for a no-cost cancellation of the Jack Heli contract or other measures which might eliminate or mitigate Timber Products' expenses. In May 2003, while Jack Heli was still suspended, Timber Products wrote the CO a five-page letter detailing the higher costs that Timber Products would incur if the FS lifted the suspension and Timber Products was required to perform the contract. App. Tab 149 (Letter from B. Turner to E. Matthews (May 14, 2003)). Specifically, Timber Products pointed out that since the sale had been suspended, "both the logging and hauling of logs [had] gotten substantially more expensive." Timber Products explained that, during the time of the suspension, fuel costs and workers compensation rates had climbed considerably and that logging costs had doubled. In order to avoid incurring these additional costs, which Timber Products told the CO would be passed on to the government through a supplemental CDA claim, Timber Products proposed that it and the FS agree to a no-cost cancellation of the Jack Heli contract or modify the contract in ways that might mitigate Timber Products' damages. Id.

The CO rejected Timber Products' proposals. App. Tab 150 (Letter from E. Matthew to B. Turner (July 2, 2003)). Timber Products made another attempt to have the Jack Heli contract canceled on July 28, 2003. App. Tab 151 (Letter from B. Turner to E. Matthews (July 28, 2003)). In its letter requesting that the CO reconsider his earlier decision, Timber Products pointed out that the FS had recently agreed to a mutual cancellation of a timber sale contract with another affected purchaser. Again, the CO rejected Timber Products' proposal. The CO stated

that the FS would entertain cancellation only if Timber Products would withdraw all of its CDA claims and release the FS from liability associated with the suspension. App. Tab 152 (Letter from E. Matthews to B. Turner (Aug. 1, 2003)). Refusing to give up its rights under the contract and the CDA, Timber Products did not accept the CO's preconditions to cancellation.

Again, in March 2005, after the FS had lifted the suspension and with operations scheduled to begin in a few months, Timber Products renewed the request it first made in May 2003. App. Tab 159 (Letter from E. Matthews to J. Burns (Mar. 23, 2005)). Timber Products explained that the sale could "now only be completed at a very substantial loss" because of the high costs. Timber Products stated that it did not want to proceed with the contract but that it would do so "in an effort to mitigate the damages due from the FS." Id. In reply to Timber Products' entreaty, the CO mailed Timber Products a letter that was a copy-and-pasted version of the CO's July 2, 2003 rejection letter. App. Tab 160 (Letter from J. Burns to E. Matthews (Apr. 13, 2005)).

Because Timber Products incurred increased operating costs on Jack Heli as a direct result of the FS's suspension of that sale for more than 30 days during the NOS, Timber Products is entitled to recover those costs under clause C6.01 even if the FS did not breach the contract. The FS's liability to Timber Products for the increased costs it incurred is further reinforced by the fact that Timber Products repeatedly attempted to mitigate or eliminate these increased costs by requesting that the FS agree to a no-cost cancellation of the Jack Heli contract. The Court should rule that the FS is liable to Timber Products for its increased operating costs.[29]

[29]Timber Products is not seeking summary judgment as to the amount of the increased operating costs it incurred but only as to the FS's liability for those increased costs due to the suspension.

**CONCLUSION**

For the foregoing reasons, both individually and collectively, plaintiffs respectfully request that the Court grant their motion for partial summary judgment.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 7, 2008