# APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page Number**

Excerpts from Oregon Natural Resources Council Action v. United States Forest Service and Bureau of Land Management, 59 F.Supp.2d 1085 (W.D. Wash. 1999)....................1

Excerpts from ONRC Action Order On Additional Motions Re Preliminary Injunction....................7

July 6, 1999 Letter from Ed Matthews Awarding Happy Thin Timber Sale....................11

Excerpts from Happy Thin Timber Sale Contract....................13

August 27, 1999 Letter from Ed Matthews Suspending Operations Pursuant to a Court Order....................18

Blue Lake's Certified Claim....................19

Excerpts from Contracting Officer's Decision on Blue Lake's Claim....................27

Blue Lake's Supplemental Claim....................30

Contracting Officer's Decision on Blue Lake's Supplemental Claim....................31

Blue Lake's October 8, 1999 Request for a Contract Term Adjustment....................33

November 1, 1999 Letter from Ed Matthews Approving CTA Request....................34

Excerpt from August 29, 2000 Contract Modification Extending Contract Term....................35

March 2, 1999 Letter from Ed Matthews Awarding Jack Heli Timber Sale....................36

Excerpts from Jack Heli Timber Sale Contract....................38

August 27, 1999 Letter from Ed Matthews Suspending Operations Pursuant to a Court Order....................43

Timber Products' Certified Claim....................44

Excerpts from Contracting Officer's Decision on Timber Products' Claim....................53

Timber Products' Supplemental Claim....................56

Timber Products' December 7, 1999 Request for a Contract Term Adjustment ..........................62

Excerpts from January 3, 2000 Contract Modification Extending ContractTerm.........................63

Timber Products' March 20, 2000 Request for a Contract Term Adjustment...............................64

Excerpt from December 7, 2000 Contract Modification Extending Contract Term.....................65

May 14, 1999 Letter from Thomas Link Awarding Too Wild Timber Sale................................66

Excerpts from Too Wild Timber Sale Contract.............................................................................70

September 1, 1999 Letter from Thomas Link Suspending Operations
Pursuant to a Court Order ..........................................................................................76

October 5, 1999 Down Payment Reduction On The Too Wild Timber Sale................................77

CLR's Certified Claim..................................................................................................................78

Contracting Officer's Decision on CLR's Claim...........................................................................92

**H**
Oregon Natural Resources Council Action v. U.S. Forest Service
W.D.Wash.,1999.

United States District Court, W.D. Washington, at Seattle.
OREGON NATURAL RESOURCES COUNCIL ACTION, et al., Plaintiffs,
v.
UNITED STATES FOREST SERVICE and Bureau of Land Management, Defendants,
andLone Rock Timber Co., Seneca Sawmill Company, Freres Lumber Co., Inc., and Hampton Tree Farms, Inc., Defendant-Intervenors.
**No. C98-942WD.**

Aug. 2, 1999.

Environmental groups challenged timber sales by United States Forest Service. On cross-motions for summary judgment, the District Court, Dwyer, J., held that: (1) defendant's exemption of several timber sales from forest management plan requirement that wildlife surveys be conducted for activities implemented after certain date was contrary to plain language of record of decision under which plan was issued; (2) defendant was not required to conduct supplemental environmental impact statement (SEIS).

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⚷103.2**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing
170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A ⚷103.3**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing
170Ak103.3 k. Causation; Redressability. Most Cited Cases
To establish constitutional standing, plaintiffs must show: (1) invasion of legally-protected interest; (2) causal connection between injury and defendant's conduct; and (3) likelihood that court can redress injury by favorable decision. U.S.C.A. Const. Art. 3, § 2.

**[2] Environmental Law 149E ⚷652**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases
(Formerly 411k8)
Environmental groups, whose members frequented areas of forest subject to timber sales, had standing to challenge federal government's compliance with forest management plan when approving sales; members' enjoyment of biological diversity of forest was legally protectable interest, there was reasonable probability that failure to comply with plan threatened viability of forest animal species, and injury was redressable by court. U.S.C.A. Const. Art. 3, § 2.

**[3] Administrative Law and Procedure 15A ⚷666**

15A Administrative Law and Procedure
15AV Judicial Review of Administrative Decisions
15AV(A) In General
15Ak665 Right of Review
15Ak666 k. Interest in General. Most Cited Cases
To establish prudential standing under Administrat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV. CLAIMS REGARDING THE SURVEY REQUIREMENTS

The Secretaries of Agriculture and Interior, in promulgating the ROD, said that it would "provide the highest sustainable timber levels from Forest Service and BLM lands of all action alternatives that are likely to satisfy the requirements of existing statutes and policies." ROD at 61. This meant, as noted in the decision upholding the ROD's legality, that "any more logging sales than the plan contemplates would probably violate the laws." *Lyons,* 871 F.Supp. at 1300. The plan and voluminous studies and reports that led to it recognized the marginal state of certain wildlife species in the federal forests, and made clear that careful monitoring would be vital. The FSEIS stated:

Monitoring is an essential component of natural resource management because it provides information on the relative success of management strategies.

FSEIS at 2-10.

The decision in *Lyons* emphasized the importance of this:

[T]here is no doubt that excessive logging and development have brought the spotted owl, and other species sharing its habitat, to a perilous point.

* * * * * *

Careful monitoring will be needed to assure that the plan, as implemented, maintains owl viability. New information may require that timber sales be ended or curtailed.

* * * * * *

Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered.

871 F.Supp. at 1321, 1324.

### A. The Category Two Survey Requirements

The ROD identifies more than 400 "at risk" species. ROD at C-49-61 (Table C-3). It sets out four levels of survey and management requirements.[FN2] Known sites of rare species are to be protected by barring logging on a certain number of surrounding acres. ROD at C-4. For 77 species markedly at risk from the continued harvest of old growth and late-successional forests, the plan requires that surveys be conducted before ground-disturbing activities are carried out.[FN3] Plaintiffs challenge the manner in which the ***1092** federal defendants have implemented these "category two" survey and manage requirements.

FN2. The "survey and management" requirements are listed in descending order of priority. Under category one, known locations of certain species must be managed. Under category two, surveys must be conducted for rare species at risk from continued logging activities before ground-disturbing activities are implemented; any sites found must be appropriately managed. Category three surveys are required for species "whose characteristics make site and time-specific surveys difficult;" these surveys do not have to be completed before ground-disturbing activities are started. Category four surveys are general regional surveys intended to identify and obtain more information about various species to determine necessary levels of protection. ROD at C-4-5.

FN3. Six of these species are vertebrates: five salamanders and the red tree vole. The other seventy-one include rare polypores, leafy and nitrogen-fixing lichens, certain bryophytes, and numerous species of mollusks and vascular plants. The lynx originally was included as a category two species but later was reclassified into category three and thus is no longer subject to the category two survey requirements.

The plan states that "[e]fforts to design protocols and implement [category two] surveys should

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be started immediately. Where surveys are completed, the information gathered from them should be used to establish managed sites for species ... [and] management standards will be developed to manage habitat for the species on sites where they are located." The category two survey requirement is implemented in two stages. First, within the known or suspected ranges of five salamander species and the red tree vole, "surveys ... must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." For the other 71 category two species, "development of survey protocols ... must begin in 1994 and proceed as soon as possible. These surveys must be completed prior to ground-disturbing activities that will be implemented in F.Y.1999 or later."

Although the plan states that the category two surveys must be done if "ground-disturbing activities ... will be implemented" after certain dates, the federal defendants issued interpretive memoranda equating issuance of an environmental impact statement with the "implementation" of ground-disturbing activities. The result is to exempt numerous proposed sales from the survey requirements. A November 1, 1997, memorandum issued jointly by the Forest Service and BLM stated that "[t]he interagency interpretation is that the 'NEPA decision equals implemented'." FN4 Thus, for the first six category two species, for "[p]rojects with NEPA decisions signed prior to October 1, 1996, and contracts offered before January 1, 1997-no survey is required." A September 1, 1998, memorandum extended this interpretation to the survey requirements for the remaining 71 category two species, concluding that surveys need not be done for any timber sale for which an environmental impact statement was completed before October 1, 1998. The record shows that Forest Service and BLM managers uniformly relied on these memoranda in deciding not to require category two surveys before approving the nine timber sales challenged here, even though ground-disturbing activities have yet to begin on any of those sales.FN5

FN4. In this context, "NEPA decision" refers to the environmental impact statement or finding of no significant impact ("FONSI") that must be produced before a timber sale is authorized.

FN5. In approving the Christy Basin timber sale, the Forest Service stated that the category two survey requirements were inapplicable because "[t]he interagency letter of November 1, 1996, states that 'the specific direction in S & G on page C-5 [of the ROD] will be used.... The interagency interpretation that NEPA decision equals implemented' is in context to Component 2 species survey requirements. The Christy Basin Record of Decision was signed on September 3, 1998, thus the project was implemented before FY 1999." Christy Basin AR at 61.

When the Beegum Corral Regan timber sale was approved, the Forest Service simply stated that surveys were not required because this is an activity implementing a Regional Guide decision previously made. Beegum Corral Regan AR at 8.

For the Skull Thin timber sale it was explained that "[because] the Decision Notice ... for Skull Thin was signed on September 28, 1998, implementation in regards to this standard and guideline, occurred in fiscal year 1998, not fiscal year 1999. The survey requirement found on ROD C-5 ... did not apply to Skull Thin for those 71 species cited." Skull Thin AR at 10.

The documents approving the Gold Wind Timber sale concluded that no surveys are necessary for red tree voles based on BLM Instruction Memorandum OR-97-009, and that "no surveys for Component 2 species are required" under the general interpretive memoranda because "[t]he Notice of Sale, which is the official decision document implementing these sales, was ...[completed] on May 27, 1998." Gold Wind AR at 15.

The North Murphy timber sale was upheld on appeal because the Board of Land Appeals decided to defer to the interpretation of "implemented" pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mulgated by Instruction Memorandum No. OR-97-007. North Murphy AR at 4. No surveys were required for the red tree vole based on "Instruction Memorandum OR-97-009," *id.* at 6, and no category two surveys were required because "[t]he first Notice of Sale, which is the official decision document implementing this sale, was published on April 2, 1998." *Id.* at 9.

The Bear timber sale also was found to comply with the survey requirements for the red tree vole: "The 1997 red tree vole (RTV) analysis done on the Mt. Hood National Forest followed the direction in the November 4, 1996 FS-Memorandum and the BLM-Instruction Memorandum No. OR-97.... [S]ince the fifth-field watersheds these sales fall within contain adequate RTV habitat, no actual on-ground surveys were conducted on these timber sales for the RTV." Bear AR at 10.

The Class of '98 timber sale was found to be exempt from category two survey requirements because the sale decision was signed on September 21, 1998, and "[i]n matter of the interpretation of the ROD, regarding implementation, the IBLA has ruled on this question as recently as November 20, 1998, interpreting the intent of 'implemented', as found in the NFP (ROD, p. 37), to mean 'designed' or 'authorized.' " Class of '98 AR at 8 (citing *In re North Murphy Timber Sale,* 146 IBLA 305 (1998)).

Finally, in regard to the Sweet Pea timber sale, no category two surveys were required because the "decision to award this sale was signed on September 21, 1998," and therefore under the interpretive memoranda no surveys were required. Sweet Pea AR at 4.

***1093** [9] These actions by the federal defendants are arbitrary and contrary to the plain language of the ROD. The plan requires that surveys for five salamander species and the red tree vole "precede the design of all ground-disturbing activities that will be implemented" on October 1, 1996, or later. Surveys for other category two species "must be completed prior to ground-disturbing activities that will be implemented" on October 1, 1998, or later. In both instances, "implemented" refers to ground-disturbing activities. Indeed, the title of the category two survey requirements is "*Survey prior to ground-disturbing activities.*" There is no mention of NEPA decisions. Environmental impact statements often precede ground-breaking activities by a number of years. To equate the NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements. It would also create an incentive to rush NEPA decisions to avoid conducting surveys; of the nine timber sales being challenged here, four received a final NEPA decision in September 1998, the last month before the survey requirements were to apply under the defendants' memoranda.[FN6]

> FN6. The Christy Basin Record of Decision was signed on September 3, 1998. Christy Basin AR at 61. The Sugar Pine and Sweet Pea offers of sale were signed on September 21, 1998. Sugar Pine AR at 7; Sweet Pea AR at 4. The Skull Thin decision was signed on September 28, 1998, only two days before the survey requirements were to apply. Skull Thin AR at 10.

Defendants argue that their interpretation is reasonable and entitled to deference because the plan gives them "a maximum of four full fiscal years (FYs 1995, 1996, 1997, and 1998) in which to develop and apply survey protocols for these species." But that "maximum" is a ceiling, not a floor, and is consistent with the specific, phased-in requirements stating that surveys must be conducted prior to ground-disturbing activities being implemented after fiscal years 1996 and 1998.

Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends. The surveys are designed to identify and locate species; if they are not done before logging starts, plants and animals listed in the ROD will face a potentially fatal loss of protection. The plan itself recognized the importance of site-specific analysis:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This record of decision does not provide final authorization for any timber sale, nor does it compel that any timber sale be awarded. Rather, the decision amends various Forest Service and BLM planning documents; timber sales offered subsequent to the effective date of this Record of Decision must be consistent with these planning documents. In addition, timber sales must undergo appropriate site-specific analysis, and must comply with applicable regulatory ***1094** requirements for public participation and administrative appeal.

ROD at 13.

The ROD's category two survey requirements are clear, plain, and unmistakable. For the salamanders and red tree voles, surveys must be completed prior to the design of ground-breaking activities to be implemented on or after October 1, 1996. For other category two species, surveys must precede ground-disturbing activities implemented on or after October 1, 1998. For any timber sales in which ground-disturbing activities did not commence by those dates, the surveys must be done. Agency actions exempting timber sales from the plan's category two survey requirements by equating "implemented" with "NEPA decision" are unlawful and must be set aside under the APA, 5 U.S.C. § 706(2)(A).[FN7]

FN7. The Eleventh Circuit recently reached a similar conclusion with respect to survey requirements in the forest plan for the Chattahoochee National Forest in Georgia:

Since the agency's position is contrary to the clear language of the Plan and the statute, it is not entitled to deference. We consequently hold that the Forest Service's failure to gather population inventory data on the PETS species occurring or with a high potential to occur within the project areas is contrary to the Forest Plan and, therefore, that the decision to approve the timber sales without considering this information is arbitrary and capricious.

*Sierra Club v. Martin,* 168 F.3d 1, 5 (11th Cir.1999).

**B. The Survey Protocol for the Red Tree Vole**

[10] In addition to the general memoranda discussed above, the federal defendants issued specific guidance with regard to the red tree vole. A November 4, 1996, memorandum issued jointly by the Forest Service and BLM, entitled "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," eliminates the requirement that surveys be conducted in a number of areas. First, "[i]n those watersheds where less than 10 percent of the land is under management and there is no direct dispersal connection to BLM or Forest Service lands in other watersheds, neither site-specific surveys nor management of red tree voles is required." In other areas, whether surveys are required is determined by habitat conditions. In watersheds with large amounts of suitable red tree vole habitat, no surveys are to be done. If "a minimum of 40 percent of the federal land in the fifth-field watershed is forested and (a) has approximately 60 percent crown closure or greater, and (b) has an average conifer tree diameter at breast height of approximately 10 inches or greater, and (c) this closure and diameter can be maintained through the end of the decade," there are to be no red tree vole surveys. Only in watersheds that do not meet the threshold habitat criteria are surveys required. This guidance was initially intended to "apply for a short term, estimated to be one-to-two years" because the team that drafted the protocol "recognized that there were additional risks associated with not requiring site-specific surveys in all areas." But a September 25, 1998, memorandum extended its applicability through September 30, 1999. The net result is to exempt about ninety percent of the red tree voles' habitat, including all of its California habitat, from the survey requirements.

Defendants argue that the protocol is reasonable because where habitat is abundant management of particular red tree vole sites is not necessary, and where populations already are isolated, with no potential for the creation of connective corridors, trying to protect the voles would be futile.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A claim under § 706(1) of the APA is "in essence" one for mandamus under 28 U.S.C. § 1361. *Independence Mining Co., Inc. v. Babbitt,* 105 F.3d 502 (9th Cir.1997). Plaintiffs must show that defendants' duty to act "is ministerial and so plainly prescribed as to be free from doubt ...."*Oregon Natural Resources Council v. Harrell,* 52 F.3d 1499, 1508 (9th Cir.1995) (internal quotations and citation omitted). On the present record, plaintiffs have not carried their burden to compel the preparation of a new region-wide SEIS.

## VI. CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment is granted as to the claims regarding defendants' failure to implement the ROD's survey requirements, ***1097** and defendants' and defendant-intervenors' motions as to those claims are denied. The defendants' administrative actions to authorize timber sales on the basis of memoranda that would vitiate the survey requirements are declared to be unlawful. As to the NEPA claim, plaintiffs' motion for summary judgment is denied, and defendants' and defendant-intervenors' motions for summary judgment are granted.

Defendants' request for a separate hearing regarding injunctive relief is granted. Defendants' and defendant-intervenors' briefs on that subject will be due on August 10, 1999; plaintiffs' responding brief on August 17, and any replies by August 24, 1999. Defendants and defendant-intervenors will each have twelve pages (including opening briefs and replies); plaintiffs will have twelve pages. Decision is reserved as to whether the hearing will be evidentiary or will be limited to oral argument.

Pending further order of the court, the preliminary injunction issued on July 26, 1999, as to the North Murphy and Bear sales, will continue in effect. The preliminary injunction is hereby expanded to include the other seven sales identified in the amended complaint-i.e., the Christy Basin, Beegum Corral Regan, Skull Thin, Gold Wind, North Murphy, Bear, Class of '98, Sugar Pine, and Sweet Pea sales-and to require that the defendants provide to the court and all counsel at least ten days' advance written notice of any decision to award timber sales that have been administratively appealed by one or more plaintiffs and have been identified by plaintiffs based on claims presented in the amended complaint.

The clerk is directed to send copies of this order to all counsel of record.

W.D.Wash.,1999.
Oregon Natural Resources Council Action v. U.S. Forest Service
59 F.Supp.2d 1085, 30 Envtl. L. Rep. 20,021

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OREGON NATURAL RESOURCES COUNCIL ACTION, et al.,

Plaintiffs,

503-223-9009

v.

UNITED STATES FOREST SERVICE and BUREAU OF LAND MANAGEMENT,

Defendants,

and

LONE ROCK TIMBER CO., SENECA SAWMILL COMPANY, FRERES LUMBER CO., INC., and HAMPTON TREE FARMS, INC.,

Defendant-Intervenors.

NO. C98-942WD

ORDER ON ADDITIONAL MOTIONS RE PRELIMINARY INJUNCTION

On July 6, 1999, pending a hearing on the summary judgment motions, the court preliminarily enjoined the federal defendants from proceeding with the award or operation of two timber sales. Dkt. # 154. On August 2, 1999, following a hearing, the summary judgment motions were decided in a nineteen-page order. Dkt. # 165. That order granted plaintiffs' motion for summary judgment as to the claims that defendants had failed to comply with the Northwest Forest Plan's survey requirements for seventy-seven "category two" wildlife species, one of which is the red tree vole, a prime food source for the northern spotted owl. The order granted defendants' and defendant-intervenors'

motion for summary judgment on plaintiffs' NEPA claim. It also granted defendants' request for a separate hearing regarding permanent injunctive relief and adopted a schedule which, as later amended at defendants' request (see Dkt. # 172), calls for a series of briefs culminating on October 22, 1999. The Forest Service and the Bureau of Land Management have stated that they intend to develop a plan for complying with the summary judgment order and the Northwest Forest Plan. That effort, if successful, could moot the permanent injunction issue and end the litigation. The August 2 order expanded the preliminary injunction to include seven other timber sales identified in the amended complaint. The nine sales thus preliminarily enjoined, pending further rulings, were the Christy Basin, Beegum Corral Regan, Skull Thin, Gold Wind, North Murphy, Bear, Class of '98, Sugar Pine, and Sweet Pea timber sales. Plaintiffs now move to add certain sales to the preliminary injunction. The federal defendants neither support nor oppose the motion. The defendant-intervenors oppose it and seek to release certain sales from the preliminary injunction already in effect. All materials filed, and the arguments of counsel presented in open court on August 25, 1999, have been considered.

The motion is directed only to a narrow category of timber sales. It does not seek relief as to sales awarded before the present lawsuit was filed on July 8, 1998, even though the agencies failed to comply with the wildlife survey requirements, and even though plaintiffs contend that as a result substantial damage has been done. It seeks no relief as to planned but unawarded sales (the agencies have announced a voluntary temporary suspension of those sales pending compliance with the summary judgment order). The motion concerns only those sales that (1) were awarded after the case was filed, by which time it was clear that they might be stopped or delayed by an injunction; (2) were administratively appealed by one or more plaintiffs because of noncompliance with the category two survey requirements; and (3) were approved by the agencies, notwithstanding the appeals, in violation of the plan. The motion asks that these sales, claimed to be twenty-six in number, be held up until the issue of injunctive relief is decided several weeks from now. The federal defendants respond, as to

must explain "how the appellant believes the decision violates the law, regulation, or policy." 36 C.F.R. § 215.14(b)(5). "It is axiomatic that [a court] cannot review issues that have not been passed on by the agency . . . whose action is being reviewed." Kleissler v. United States Forest Service, – F.3d –, 1999 WL 437282, at *4 (3d Cir. June 30, 1999) (citing New Jersey v. Hufstedler, 724 F.2d 34, 36 n. 1 (3d Cir. 1983), rev'd on other grounds, 470 U.S. 632 (1985)) (internal quotation marks omitted). Here, the plaintiffs' administrative challenge to the Upper South Fork timber sale was too vaguely worded to meet this requirement. The administrative officer did not have a chance to decide the contention, now made, that the category two survey requirements had been unlawfully abandoned as to the Upper South Fork sale. Accordingly, defendant-intervenors' argument is correct and the contentions as to that sale are beyond the scope of what this court can review and what the plaintiffs define in their preliminary injunction motion.

The defendant-intervenors, in moving to release five sales from the preliminary injunction already in effect, contend that there should be no preliminary injunction as to any sale that was awarded before the August 2, 1999, order was entered, the timber companies having relied on being able to log the sales. On this basis they ask that the Gold Wind, North Murphy, Bear, Sugar Pine and Sweet Pea sales be released from the preliminary injunction already in effect. Operations have not begun at any of these sales, but two of them (North Murphy and Bear) have operations scheduled for this year. For the reasons given above, this motion must be denied.

It appears that over the past several years the Forest Service and BLM have approved timber sales without complying with the Northwest Forest Plan's category two wildlife survey requirements. To a considerable extent the effects of this cannot be undone. But the present record does not justify an order that would allow twenty-five more sales to go forward without compliance with law.

For the reasons stated, the federal defendants are preliminarily enjoined, pending a decision on the issues on which briefing is to be completed by October 22, 1999, or any earlier order of the court vacating or modifying this order, from approving a plan of operations for or proceeding with

operation of the following additional timber sales: Serpents Grave, "B" Lost, Flying Lost, Round Forks, Titanic, Poor Bishop, Isabelle, Deer Mom (except Unit 7-2A thereof, see Dkt. # 157), Torched Mill, Bald Elk YG, Happy Thin, Jack Heli, Beegum Rock, Yaka 22/23, Roundup, Carberry Creek, Too Wild, Chapter 4 Salvage, Pigout TS, T-Line Salvage, Prairie Thin, Jigsaw, Whitebird, Prairie Fence, and Rhody. The plaintiffs' motion as to the Upper South Fork sale is denied. The defendant-intervenors' motion to release five sales from the preliminary injunction is denied.

The clerk is directed to send copies of this order to all counsel of record.

Dated: August 26, 1999.

William L. Dwyer
William L. Dwyer
United States District Judge

United States Department of Agriculture | Forest Service | Klamath National Forest | 1312 Fairlane Road
Yreka, CA 96097-9549
(530) 842-6131
TTY (530) 842-5725

File Code: 2450

Date: July 6, 1999

BLUE LAKE FOREST PRODUCTS
ATTN: Mr. Ron Johnston
P O Box 1176
Arcata, CA 95518

CERTIFIED RRR # 112 134 784

Dear Mr. Johnston:

On June 22, 1999, the sale officer declared you the apparent high bidder on the Happy Thin Heli Timber Sale. This award is made in accordance with FSM 2430 and the Contracting Officer has made an affirmative determination of your ability to complete this timber sale contract as required by Title 36 CFR 223.101. This sale is awarded to you as of July 6, 1999 under Klamath Contract No. 060772.

This letter will serve as your written notification to furnish within 30 days of the award date a downpayment of $5,500. The downpayment may be in the form of cash, bank draft, certified check, cashier's check, or bank or postal money order. Only effective purchaser credit may be used in lieu of cash. Failure to submit the required downpayment on time will be treated as a repudiation of contract, resulting in loss of the bid guarantee.

Enclosed are copies of the timber sale contract and performance bond for your execution.

Your attention is called to the requirement on your bid that the contract be executed and performance bond furnished within 30 days of the award date. Failure to execute the contract and furnish a satisfactory performance bond on time will be treated as a breach of contract, resulting in loss of the bid guarantee. Cash or payment bond is required prior to felling any trees in a payment unit.

Your bid bond for $3,600 will be returned after Forest Service receipt of downpayment and executed contract with required performance bond.

Please furnish the Happy Camp Ranger District with your general plan of operation within 60 days of the first normal operating season as required under CT6.3#. For this purpose, an operating plan form is enclosed.

This sale was a set-aside sale. Per CT6.9, please complete the enclosed Small Business Certification and return with your executed contracts within 30 days.

The total net bid value of this contract is in excess of $10,000.00. Therefore, the BT8.63 is in effect. Enclosed is a copy of the required Poster and instructions on how to post it.





Printed on Recycled Paper

A copy of the Report of Timber Sale is enclosed for your information.

Please follow the instructions for executing the contract (Page 2) carefully and return two copies of the contract and performance bond for approval to the above address, Attention: Timber Business. We will return a contract executed by the Forest Service for your files.

Sincerely,

Edward L. Matthews

EDWARD L. MATTHEWS
Contracting Officer

Enclosures

cc: S. O.

Z 112 134 784

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| | |
|---|---|
| Sent to BLUE LAKE FOREST PROD. | |
| Street & Number PO BOX 1176 | |
| Post Office, State, & ZIP Code ARCATA, CA 95518 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date JUL 6 - 1999 | |

PS Form 3800, April 1995

SENDER:
- Complete items 1 and...
- Complete items 3, 4a,...
- Print your name and a... card to you.
- Attach this form to the... permit.
- Write "Return Receipt R...
- The Return Receipt will... delivered.

3. Article Addressed... BLUE LAKE... ATTN: RO... PO BOX... ARCATA, ...

5. Received By: (Pri...

6. Signature: (Addressee or Agent) X Mary A. Bruner

PS Form 3811, December 1994 102595-97-B-0179 Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract

Purchaser Blue Lake Forest Products

Sale Name Happy Thin Heli

Award Date 07/06/99

Contract No. 060772

Region Five

National Forest Klamath

Ranger District Happy Camp

★U.S.GPO:1989-0-624-786

FS-2400-13(7/70)