No. 01-570C, No. 01-627C, No. 04-501C (Judge Williams)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC.,Plaintiff,
v.
THE UNITED STATES,
Defendant.

TIMBER PRODUCTS COMPANY,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

CLR TIMBER HOLDINGS, INC.,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRYANT G. SNEE
Deputy Director
ELLEN M. LYNCH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7994
Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
James L. Rosen
Marcus R. Wah
Ben Hartman
Office of the General Counsel
United States Department of Agriculture

May 2, 2008

# TABLE OF CONTENTS


STATEMENT OF FACTS. . . . . 2

I. The "NEPA Decision Equals Implementation" Memorandum. . . . . 2

II. The Red Tree Vole Memorandum. . . . . 4

III. The Forest Service's Mission And The Timber Industry's Role In Developing The Standard Timber Sale Contract . . . . . 8

ARGUMENT. . . . . 12

I. Assuming Plaintiffs' Are Correct And The Forest Service Awarded These Contracts In Violation Of Law, The Contracts Are Void Ab Initio . . . . . 12

II. The Forest Service Cannot Be Liable To Plaintiffs For Actions Taken Prior To Contract Award. . . . . 14

III. Summary Judgment Regarding Whether The Forest Service Acted Reasonably When It Entered Into These Timber Sale Contracts Is Inappropriate. . . . . 18

A. Plaintiffs' Reliance Upon Precision Pine and Superior Timber Is Misplaced.. . . . . 19

B. The Directions Given In The Forest Service's Policy Memoranda Were Reasonable . . . . . 21

1. The "NEPA Decision Equals Implementation" Memorandum. . . 22

2. The Red Tree Vole Memorandum. . . . . 25

C. Plaintiffs' Evidence Regarding Whether The Forest Service Knew Or Should Have Known There Was A "Serious Legal Risk" In Proceeding With Award Is Disputed . . . . . 29

IV. Plaintiffs' Assertion that Timber Sale Contracts Are Contracts Of Adhesion Is Immaterial To The Interpretation Of C6.01 - An Unambiguous Contract Provision . . . . . 32

A. Contra Proferentum Only Applies In Cases Where The Contract Is Ambiguous, And C6.01 Unambiguously Provides For Suspension In Response To A Court Order . . . . . 32

B. The Timber Industry Assisted In Drafting These Timber Sale Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V. These Contracts Do Not Contain An Implied Warranty Of Specifications. . . . . . 38

A. The *Spearin* Doctrine Does Not Apply To Timber Sale Contracts. . . . . . 39

B. Timber Sale Contracts Do Not Contain Design Specifications. . . . . . . . . 41

C. Contract Specifications Did Not Proximately Cause Plaintiffs' Alleged Harms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VI. Plaintiffs' Cannot Maintain a "Superior Knowledge" Claim. . . . . . . . . . . . . . . . 44

A. Plaintiffs Cannot Demonstrate That The Forest Service Violated The First Two Prongs Of The Superior Knowledge Test . . . . . . . . . . . . . 45

B. Plaintiffs' Reliance Upon The Forest Service Is Unfounded.. . . . . . . . . . . 47

C. Plaintiffs' Factual Assertions Are Erroneous And Contested. . . . . . . . . . 48

VII. Timber Products' Claim For Out Of Pocket Expenses Is Not Properly Before The Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## TABLE OF AUTHORITIES

### CASES

Al Johnson Constr. Co. v. United States,
854 F.2d 467 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Appeal of Superior Timber Co., Inc., IBCA No. 3459,
97-1 BCA ¶ 28 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 43

Baker v. United States,
50 Fed. Cl. 483 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Boyer v. United States,
__ Fed. Cl. __,
2008 WL 857452 (March 27, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Bradley v. Chiron Corp.,
136 F.3d 1317 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.J. Betters Corp. v. United States,
25 Cl. Ct. 674 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C. Sanches and Son, Inc. v. United States,
6 F.3d 1539 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Cast Constr. Co., ASBCA No. 28509,
84-1 BCA ¶ 17,045 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

David Nassif Assocs. v. United States,
664 F.2d 4 (Ct. Cl. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Essex Electro Engineers, Inc. v. Danzig,

224 F.3d 1283 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct. Cl. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Federal Crop Ins. Corp. v. Merrill et al.,
332 U.S. 380 (1947).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991), cert. denied,
502 U.S. 1071 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Gardner, Kamya & Assoc. v. United States,
467 F.3d 1348 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 32, 33

H.N. Wood Products, Inc. v. United States,
59 Fed. Cl. 479 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Helene Curtis Industries, Inc. v. United States,
160 Ct. Cl. 437,
312 F.2d 774 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Hercules Inc. v. United States,
24 F.3d 188 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hercules, Inc. v. United States,
516 U.S. 417 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Huber, Hunt & Nichols, Inc., GSBCA No. GS-09B-C-7004-SF,
75-2 BCA ¶11,457 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re North Murphy Timber Sale,
146 IBLA 305,
1998 WL 951006 (Nov. 20, 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Interior Board of Land Appeals ("IBLA") in In re North Murphy Timber Sale,
146 IBLA 305,
1998 WL 951006 (Nov. 20, 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

J.L. Simmons Co. v. United States,
412 F.2d 1360 (Ct. Cl. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kalvar Corp. v. United States,
211 Ct. Cl. 192,
543 F.2d 1298 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Laburnum Constr. Co. v. United States,
325 F.2d 451 (Ct. Cl. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Luria Bros. & Co. v. United States,
369 F.2d 701 (Ct. Cl. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

M.A. Mortenson Co. v. Brownlee,
363 F.3d 1203 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re North Murphy,
IBCA No. 3459,
97-1 BCA ¶ 28,736 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re North Murphy Timber Sale,
146 IBLA 305,
1998 WL 951006 (Nov. 20, 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 29

ONRC Action v. United States Forest Service,
59 F.Supp. 2d 1085 (W.D. Wash. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ordnance Research, Inc. v. United States,
609 F.2d 462 (Ct. Cl. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Pacific Rivers Council v. Robertson,
30 F.3d 1050 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Precision Pine & Timber, Inc. v. United States,
__ Fed. Cl. __,
2007 WL 5030766 (Sept. 14, 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35, 49

R.E.D.M. Corp. v. United States,
428 F.2d 1304 (Ct. Cl. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Record Club of Am. v. United Artists Records,
890 F.2d 1264 (2d Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Residential Mktg. Group v. Granite Inv. Group,
933 F.2d 546 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rick's Mushroom Service, Ins. v. United States,
2008 WL 861975 (Fed. Cir. Apr. 2, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Spearin v. United States,
248 U.S. 132 (1918).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Star Fruits S.N.C. v. United States,
393 F.3d 1277 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Total Medical Management, Inc. v. United States,
104 F.3d 1314 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Trinity River Lumber Co. v. United States,
66 Fed. Cl. 98 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 34

United States v. Amdahl Corp.,
786 F.2d 387 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Wetsel-Oviatt Lumber Co., Inc. v. United States,
38 Fed. Cl. 563 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**STATUTES**

Fed. R. Civ. P. 65.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

60 Fed. Reg. 25367 (May 6, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

68 Fed. Reg. 70758 (Dec. 19, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-570C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| TIMBER PRODUCTS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-627C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| CLR TIMBER HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-501C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7 of the rules of this Court ("RCFC") and the Court's September 28, 2007 and April 14, 2008 orders, we respectfully submit this opposition to plaintiffs' cross-motion for summary judgment. Notwithstanding the considerable length of their cross-motion, plaintiffs fail to raise any genuine issues of material fact to counter our position that the Forest Service had the authority to suspend, and properly suspended, the timber sale contracts at issue pursuant to C6.01. Because the proper interpretation of a contract provision entitles defendant to judgment

as a matter of law, we respectfully request the Court grant defendant's cross-motion for partial summary judgment and, deny plaintiffs' cross-motion. In the alternative, to the extent that plaintiffs' argument is based upon the premise that the Forest Service awarded these timber sale contracts when it should have known that its legal reasoning for not conducting Category 2 surveys was deficient, we are entitled to summary judgment because, if we accept plaintiffs' argument as true, the Forest Service did not have the authority to award a contract contrary to law. The remaining allegations in plaintiffs' cross-motion for summary judgment are erroneous as a matter of law, and include numerous disputed factual issues that are material as to whether the timber sale contracts at issue are contracts of adhesion, whether the Forest Service breached an implied warranty of specifications, and, finally, whether the Forest Service failed to disclose its superior knowledge.[1] Plaintiffs cannot prevail upon summary judgment because their remaining arguments fail as a matter of law or are based upon disputed factual allegations. As outlined in defendant's cross-motion for partial summary judgment, proper interpretation of the applicable contract provisions entitles defendant to judgment as a matter of law, we respectfully request the Court to grant defendant's cross-motion for partial summary judgment and to deny plaintiffs' cross-motion.

## STATEMENT OF FACTS

### I. The "NEPA Decision Equals Implementation" Memorandum

The Northwest Forest Plan ("NFP") Record of Decision ("ROD") instructed that Category 2 surveys should "precede the design of all ground-disturbing activities . . .

---

[1] See Defendant's Responses to Plaintiffs' Proposed Findings of Uncontroverted Facts, dated March 7, 2008.

implemented in [Fiscal Year] 1999 or later. Defendant's Proposed Findings of Uncontroverted Fact (DPFUF) ¶ 21. The Forest Service and Bureau of Land Management ("BLM") were faced with questions regarding implementation of the NFP, and established the NFP Issue Resolution Team ("IRT") to ensure consistent responses between agencies and between functional disciplines within each agency. DPFUF ¶ 22. The IRT was asked to interpret the transition period established by the NFP for phased-in survey requirements; specifically, they were asked to review a portion of the ROD's Standards and Guidelines, "Survey prior to ground-disturbing activities." DPFUF ¶ 23.

To respond to these inquiries, Tom Hussey (Forest Service lead on the IRT) and Larry Larson (BLM lead on the IRT) sought assistance from Randy Hickenbottom, Chair of the Survey and Manage Workgroup, Cheryl McAfree, a botanist, Lyndon Werner, a BLM timber sale specialist, and Nancy Anderson, another BLM employee. DPFUF ¶ 22, 23. This group determined that there were three different ways to define "implement" within the context of the NFP ROD. Implementation could mean: (1) when there is physical activity on the ground; (2) when an agency signs a contract; or (3) when the National Environmental Policy Act ("NEPA") decision is signed. DPFUF ¶ 23.

The IRT adopted the third definition, that a project is implemented when the NEPA decision is signed, because they determined it made sense for the responsible official to have the survey information before he or she signed off on a project's NEPA decision. DPFUF ¶ 24. The other definitions of "implement" would create a situation where surveys could require changes to the NEPA decision documents after those documents were signed, or after contract award. Id. Either case would lead to additional costs and possible contract modification or termination. Id.

Furthermore, any other definition of "implement" would effectively read out the NFP's phased-in survey requirements, which were intended to provide time to develop and apply the survey protocols. DPFUF ¶ 25.

The Regional Foresters for Regions 5 and 6, and the BLM State Directors for Oregon and California adopted the IRT's recommendation regarding the definition of "implement" within the context of the NFP ROD. DPFUF ¶ 26. They issued a memorandum on November 1, 1996, commonly referred to as the "NEPA Decision Equals Implementation" memorandum, which states that a project is implemented for purposes of the NFP when the NEPA decision is signed. DPFUF ¶ 26.

When questioned during a deposition, Ms. Lois Schiffer, Assistant Attorney General for the Department of Justice's Environment and Natural Resources Division ("ENRD") at the time of the ONRC Action litigation, did not have any recollection regarding the statement attributed to her that "NEPA decision equals implementation is nonsense." DPFUF ¶ 35. Mr. Edward Boling, the lead trial counsel for the ONRC Action litigation, similarly did not recall any conversation in which Ms. Schiffer allegedly stated that "NEPA decision equals implementation is nonsense." DPFUF ¶ 36. Mr. Coppelman, the Deputy Assistant Attorney General for ENRD at the time of the ONRC Action litigation, also did not recall that conversation. Id.

## II. The Red Tree Vole Memorandum

The Forest Ecosystem Management Assessment Team ("FEMAT") assembled after the 1993 "Forest Conference" in Portland, Oregon. DPFUF ¶ 27. The FEMAT was a group comprised of scientists and technical experts from the Forest Service, BLM, Environmental Protection Agency, Fish & Wildlife Service, National Marine Fisheries Services, and several

universities. Id. The FEMAT was charged with preparing an assessment based upon an ecosystem approach to forest management. Id. The FEMAT analyzed ten options that encompassed a mixture of Late-Successional Reserves ("LSRs"), Riparian Reserves ("RRs"), and prescriptions for forest management both inside and outside of the reserves. DPFUF ¶ 28. Most of the management activities would occur in matrix lands, which is land outside the LSRs and RRs. Id. For each option, the FEMAT "evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls." Id. The FEMAT also assessed over 1,000 plant and animal species that were "thought to be closely associated with late-successional forests." Id. For these species, the FEMAT suggested that if the species had an 80 percent or greater likelihood of stabilizing, well-distributed, across federal lands, then the species' viability could be assured. Id. Significantly, the FEMAT noted that "species with scores lower than 80 percent should not automatically be regarded as unviable." Id.

A team from the Forest Service and BLM used the FEMAT Report to prepare a draft Supplemental Environmental Impact Statement ("SEIS"), which identified FEMAT's ten alternatives as options. DPFUF ¶ 29. The team decided upon alternative 9, and prepared a draft SEIS, which they sent out for public comment. Id. After receiving public comment, additional analysis was conducted on many of the species; this additional analysis was included as an appendix to the final SEIS, and is commonly referred to as "Appendix J2" or "Additional Species Analysis." Id. The Additional Species Analysis "identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well-distributed, across federal lands. Id.

The Additional Species Analysis identified the red tree vole. DPFUF ¶ 30. However, research in the FEMAT Report and in the Additional Species Analysis demonstrated that the tree vole was "thought to be in less dire circumstances." Id. The FEMAT Report determined that Alternative 9 resulted in a 73 percent likelihood of achieving habitat sufficient to allow the red tree vole to stabilize across federal lands; had the red tree vole received a 7 percent higher rating, it would not have been included in the Additional Species Analysis. Id.

The final SEIS Species Analysis Team's Mammal Subgroup determined that it was unnecessary to protect every red tree vole site; therefore, the red tree vole was not included in the Category 1 Survey and Manage species. DPFUF ¶ 31. The subgroup further decided that the red tree vole sites should be assessed in relation to their value in adding to the connectivity between LSRs and RRs, many of which were not ecologically functional because of past management practices. Id. The group wanted to prevent isolation of major portions of the red tree vole population, and, therefore, determined that the red tree vole should be included in the Category 2 Survey and Manage Species. Id.

As a result of this determination, the Survey and Manage Workgroup developed interim guidance for the Forest Service and BLM to implement the Category 2 Survey and Manage requirements for the red tree vole. DPFUF ¶ 32. The group determined that, because of concerns related to ensuring connectivity between LSRs, "those requirements should be designed to maximize the efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population." Id. The group solicited input from FEMAT scientists, the Additional Species Analysis Team, and the final SEIS team, and, based upon that input, the group developed the recommendations that were ultimately adopted in the November 4, 1996,

memorandum entitled: "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," which is informally known as the Red Tree Vole Memorandum. Id.

Because the threat to the red tree vole's continued viability was minimal (as stated above, the red tree vole had a 73 percent chance of achieving habitat sufficient to allow it to stabilize across federal lands), the concern regarding the red tree vole related to past forest management practices that fragmented LSRs and resulted in the creation of young, even-aged forests. DPFUF ¶ 33. Therefore, the focus of the red tree vole mitigation measure was to improve LSR connectivity, rather than managing known sites that may be isolated due to a lack of LSR connectivity. Id. The group determined that if a stand of trees containing red tree voles was surrounded principally by older forests, that stand of trees would do little to add to the connectivity already provided by the older forests. Id. On the other hand, a stand containing red tree voles in an area with almost no older forest or suitable habitat would have a much higher value in maintaining connectivity between LSRs. Id. Finally, if a stand of trees containing a red tree vole population was located in an area isolated from federally managed lands, and, therefore, LSRs, that stand could not contribute to improving the species' viability. Id.

The Red Tree Vole memorandum required that, before conducting surveys, geographic information system ("GIS") information was to be used to analyze federal lands to screen based upon their value in increasing LSR connectivity. DPFUF ¶ 34. The first screen would determine how much land was federally managed, and, if the area contained less than 10 percent federal land, surveys were not required for those areas. Id. The second screen would determine whether "at least 40 percent of the federal lands in the watershed area was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and

whether that closure and diameter could be maintained throughout the year 2000." Id. If federal lands met the requirements outlined in the second screen, there was no need to survey for the red tree vole because the habitat already provided sufficient LSR connectivity. Id.

On July 18, 1998, ONRC Action filed a complaint challenging, among other things, the Forest Service's November 1, 1996 memo that defined the term "implement" as the time when the NEPA decision document is signed, and the November 4, 1996 memo that "excludes approximately 5.5 million acres . . . nearly 90% of the red tree vole habitat . . . from the survey requirement." DPFUF ¶ 58.

## III. The Forest Service's Mission And The Timber Industry's Role In Developing The Standard Timber Sale Contract

The Forest Service must consider the competing interests of the environment and the timber industry, a fact that President Clinton recognized during the Forest Conference on April 2, 1993: "How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in the region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?" DPFUF ¶ 37. Further, the Forest Service must meet congressionally-mandated timber-harvest levels. DPFUF ¶ 38.

The timber industry played a role in developing the Forest Service's standard timber sale contract. The National Forest Products Association ("NFPA") acknowledged that the 2400-6 standard timber sale contract was developed in 1970 with "extended discussions between NFPA's Federal Timber Purchaser's Committee and the Forest Service." DPFUF ¶ 39. The Forest Service, NFPA, other timber industry groups, and individuals in the timber industry,

communicated throughout 1971 and 1972 regarding possible revisions to the standard timber sale contract. DPFUF ¶ 40. After these communications, the contracts were revised in September 1973. Id. These timber sale contracts included terms that were favorable to the timber industry, including allowing purchasers to operate their sale with little Forest Service oversight, and the contract did not contain a clause that would allow the Forest Service to terminate the contract for its own convenience, or a liquidated damages provision. Id. These terms remained the same for about two decades. Id.

Over the past thirty years, the Forest Service has continued to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. DPFUF ¶ 42. In the late 1980s and early 1990s, the Forest Service decided to revise the standard timber sale contract to reflect changes in environmental laws, court decisions interpreting those environmental laws, and to protect the Forest Service's financial interests. DPFUF ¶ 43. The Forest Service sought, and received, input from the timber industry. Id. In particular, NFPA provided numerous comments on C/CT6.01. Id.

The Forest Service has an on-going relationship with the timber industry. For example, the Forest Service met with members of the NFPA Federal Timber Purchaser's Committee ("FPTC") and its counsel, Alan Saltman, to consider revisions to the latest version of the timber sale contracts. DPFUF ¶ 47. Over the past thirty years, and within the bounds of laws governing the formation of regulation and policy, the Forest Service has engaged in discussions with members of the timber industry about the standard timber sale contracts and issues affecting the timber industry. DPFUF ¶ 48.

IV. The Timber Sale Contracts

All three of plaintiffs' timber sale contracts include a clause that requires purchasers to submit a plan of operations prior to commencing work each season. DPFUF ¶ 49. Other clauses in the contracts contain "objectives" or "methods" for harvesting timber. DPFUF ¶ 50. The Too Wild contract includes clause C6.41# - Special Felling Objectives, which states: "felling objectives shall be accompanied by the type of felling methods or equipment listed herein. Methods or equipment other than those specified may be approved." Id. The Too Wild contract also includes clause C6.42# - Special Yarding/Skidding Methods, which allows for the use of "[m]ethods or equipment other than those specified . . . ." Id. The Jack Heli contract similarly provides for the purchaser's discretion, and includes clause C6.411# - Directional Felling, which provides that: "[D]irectional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing." Id. The Jack Heli contract also includes clause C5.411 - Dust Abatement for Temporary Roads, which states: "Purchaser may choose the material used in dust abatement." Id. The Happy Thin contract includes the Directional Felling clause, and clause CT5.414 - Snow Removal, which states: "[i]f Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources. Id.

Prior to awarding these timber sale contracts, the plaintiffs all had knowledge of the ONRC Action lawsuit. The Northwest Forestry Association, a timber industry group, issued a newsletter, Forestry Forum, that tracked the ONRC Action litigation in detail - including making mention of "secret agreements" between the ONRC Action plaintiffs and the Government - and discussed the litigation's possible impact on timber sales in the region. DPFUF ¶ 51. The prospectus for the Jack Heli timber sale included the language: "This sale has been identified in a

lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost." DPFUF ¶ 52. The award of all three sales was delayed; for the Jack Heli timber sale, the Forest Service requested and received permission to extend the purchaser's bid. DPFUF ¶ 53.

The Contracting Officer for the Happy Thin and Jack Heli timber sales, Ed Matthews, communicated regularly with representatives from the timber industry, including Blue Lake Forest Products, Inc. and Timber Products, Co., and discussed the ONRC Action litigation and its potential impact on the Klamath's timber sale program. DPFUF ¶ 54. Tom Link, the Contracting Officer for the Too Wild timber sale, also provided information to CLR Holdings, Inc., regarding the ONRC Action litigation including general information about the case, how it affected the delay in award, and information regarding ongoing settlement negotiations. DPFUF ¶ 55.

The plaintiffs in all three sales did not accept the Forest Service's estimate of timber available for harvest on a particular sale; therefore, the plaintiffs all cruised the sales themselves to obtain more accurate estimates of the amount of timber available for harvest. DPFUF ¶ 56.

Finally, the Forest Service provided notice to the ONRC Action plaintiffs of its intent to award the three timber sales at issue, and the ONRC Action plaintiffs did not take action prior to award. DPFUF ¶ 57.

## ARGUMENT

I. Assuming Plaintiffs' Are Correct And The Forest Service Awarded These Contracts In Violation Of Law, The Contracts Are Void Ab Initio

Throughout their brief, plaintiffs go to great lengths to demonstrate that the Forest Service caused the suspensions by unreasonably awarding the contracts without conducting Category 2 surveys when it knew, or should have known, that its legal reasoning for awarding the contracts without conducting those surveys was deficient. Essentially, plaintiffs' argument rests upon the notion that the Forest Service awarded these contracts based upon an unlawful interpretation of the applicable regulations (in this case, the Northwest Forest Plan ("NFP") and the accompanying Record of Decision ("ROD")).[2] If true, these contracts are not valid because no government official can enter into a contract that conflicts with statute or regulation. See United States v. Amdahl Corp., 786 F.2d 387, 392 (Fed. Cir. 1986). Such contracts are void ab initio. Id. Plaintiffs themselves have put at issue the question of whether these contracts are valid contracts.

To establish a valid contract with the United States, plaintiffs must prove that the individual who entered into the contract on behalf of the government had the authority to bind the government in contract. Total Medical Management, Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997). Furthermore, government contracts must comply with applicable statutes and regulations. Id. citing United States v. Amdahl Corp., 786 F.2d at 392 (finding that a contract awarded in violation of statute and regulation was void ab initio). A contract that is "plainly illegal" is one that is made contrary to statute or regulation and the contractor has

[2] For purposes of this section, we have assumed that plaintiffs' allegations regarding the illegality of the Forest Service's decisions are correct. We believe that these contracts are valid.

constructive or actual notice that the regulatory scheme would be used to enter into the contract. Id. at 1319, 1321. In a case involving a contract for crop insurance under the Federal Crop Insurance Act, the Supreme Court of the United States found that applicable regulations are "binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance." Federal Crop Ins. Corp. v. Merrill et al., 332 U.S. 380, 385 (1947) (holding plaintiffs bound to a regulation that prohibited federal crop insurance for reseeded wheat despite the government's acceptance of their application for insurance).

Here, plaintiffs call into question the Forest Service's authority to enter into these contracts by claiming that the Forest Service awarded the timber sale contracts without conducting Category 2 surveys, "despite having been put on notice repeatedly prior to contract award that its legal rationale for not conducting the surveys was deficient." Pls.' Cross-Motion at 51. As support for their arguments, plaintiffs cite extensively from the district court decision in ONRC Action, where the court noted that there was no "open legal question" related to when the Category 2 surveys must be conducted. Id. at 49. According to plaintiffs' own allegations, these contracts were awarded contrary to law.

Furthermore, these contracts were also "plainly illegal," because, as plaintiffs themselves contend, "[t]he holding of ONRC Action establishes that upon reviewing the NFP, any rational person or agency, including the [Forest Service], could not have concluded that the 'NEPA decision equals implementation' interpretation and RTV Directive were lawful." Id. at 51. Plaintiffs cannot even claim "innocent ignorance" of the applicable regulations. See Federal Crop Ins. Corp. v. Merrill, et al., 332 U.S. at 385. Plaintiffs in this case knew that the NFP

supplied the regulatory scheme for awarding these timber sale contracts, and, prior to contract award, plaintiffs communicated with the contracting officers about the ONRC Action litigation.[3] DPFUF ¶¶ 54, 55. Therefore, as rational people, plaintiffs must also be charged with responsibility for reviewing the NFP and concluding that the Forest Service's directives were unlawful.

If plaintiffs are correct that these contracts were awarded contrary to law and the illegalities should have been apparent to any rational person reviewing the NFP (including plaintiffs), these contracts are void ab initio and plaintiffs cannot maintain a cause of action for breach. To be clear, the Government believes these contracts are valid, but were plaintiffs to establish that these contracts were entered into in violation of law, the necessary result of plaintiffs' effort would be to render the contracts void ab initio.

## II. The Forest Service Cannot Be Liable To Plaintiffs For Actions Taken Prior To Contract Award

As explained in our opening brief, the Forest Service has the authority to suspend timber sale contracts to comply with court orders pursuant to C6.01. This authority, however, remains subject to the implied covenant of good faith and fair dealing. "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2007). It imposes obligations upon both contracting parties that include the duty not to interfere with the other party's

---

[3] The ONRC Action complaint challenged, among other things, the Forest Service's November 1, 1996 memo that defined the term "implement" as the time when the NEPA decision documents are signed, and the November 4, 1996 memo that "excludes approximately 5.5 million acres . . . nearly 90% of the red tree vole habitat . . . from the survey requirement." ONRC Action Compl., ¶¶ 31-34.

performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. Id. However, the covenant is limited to assuring compliance with the express terms of the contract and thus does not create obligations not contemplated in the contract itself. Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1998). Consequently, "the assertion of a legitimate contract right cannot be considered violative of a duty of good faith and fair dealing." David Nassif Assocs. v. United States, 664 F.2d 4, 12 (Ct. Cl. 1981).

Here, plaintiffs' contention that the Forest Service breached the implied covenant of good faith and fair dealing is based upon conduct occurring before contracts were awarded. The covenant of good faith and fair dealing is an implied contract term. Because no duty of good faith and fair dealing exists in the absence of a contract, it necessarily follows that pre-contract conduct cannot constitute a breach.[4] Simply put, when no duty exists, there can be no breach of duty.[5]

In addition, because the timber sale contracts give the Forest Service the right to suspend performance to comply with the order of a court of competent jurisdiction, the suspension of plaintiffs' contracts cannot constitute a breach of the implied covenant of good faith and fair dealing. David Nassif Assocs. v. United States, 664 F.2d at 12. It is undisputed that a Federal

[4] Another judge of this Court has found that an agency did not owe plaintiffs a fiduciary duty in accordance with the duty of good faith and fair dealing when "any conduct in violation of statutes and rules . . . occurred prior to the formation of a contract . . . ." Baker v. United States, 50 Fed. Cl. 483, 499 (2001).

[5] Where a contract contains an express warranty, actions taken before the execution of the contract might conceivably breach the warranty. For instance, a seller who warrants clear title breaches the warranty if a pre-sale loan has not been paid off. Here, however, plaintiffs allege no breach of warranty.

district court entered an injunction in ONRC Action. App. __. The Forest Service was, therefore, entitled to suspend plaintiffs' contracts pursuant to C6.01.

Plaintiffs respond that the Forest Service cannot invoke C6.01 because the ONRC Action injunction was caused by the Forest Service's allegedly unreasonable or illegal pre-award interpretation of its environmental responsibilities under the NFP. Such a limitation on the ability to suspend would render clause C6.01 nugatory and, thus, violate a basic canon of statutory construction. See Gardner, Kamya & Assoc. v. United States, 467 F.3d 1348, 1352 (Fed. Cir. 2006) ("We must interpret a contract as a whole and in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.") (brackets and internal quotes omitted).

C6.01 authorizes a suspension in order to comply with an order from a court of competent jurisdiction. However, a district court will enter a preliminary injunction that prevents timber harvesting only if an environmental plaintiff has shown a "likelihood of success on the merits." Fed. R. Civ. P. 65. Consequently, the most probable situation in which the Forest Service would seek to invoke C6.01 is after a court has concluded that the Forest Service may have erred in some material respect. It would therefore effectively void C6.01 to hold that the clause cannot be invoked where some Forest Service action "caused" the court order upon which the suspension is based.

Throughout their brief, plaintiffs rely upon the Court of Federal Claims' decision in Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001). Precision Pine, which was decided before the United States Court of Appeals for the Federal Circuit issued Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003), addressed the Forest Service's suspensions

of 14 timber sale contracts pursuant to contract clause C[]6.01. The court found two distinct breaches: (1) the breach of a purported express warranty in clause C[]6.25; and (2) a breach occurring when otherwise valid contract suspensions continued for too long.[6] Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. at 58. The claim that C[]6.25 contains an express warranty was rejected by Scott Timber, and, therefore, this aspect of the Precision Pine decision is no longer viable. Scott Timber v. United States, 333 F.3d at 1371. Moreover, the Precision Pine court - like the Federal Circuit in Scott Timber - found that C[]6.01 expressly authorizes the Forest Service to suspend contracts to comply with a district court injunction:

> C[]6.01 gives the Forest Service the contractual right to suspend the contracts. It is only after the statutory time frame [for consultation with the Fish and Wildlife Service] expires that the Forest Service can be found to have breached the implied duty not to hinder, and even then only after additional findings with respect to unreasonableness are made. Thus, defendant was not in breach of the implied duty not to hinder until, at the earliest, the time at which the 135-day statutory consultation period had elapsed.

Precision Pine & Timber, Inc. v. United States, __ Fed. Cl. __, 2007 WL 5030766 at *30 (Sept. 14, 2007) (emphasis added). Thus, Precision Pine stands only for the unremarkable proposition that the duty of good faith and fair dealing might place an outer limit on the length of the suspension authorized by C6.01. See id.

Furthermore, in Scott Timber, the Federal Circuit recognized that any reasonableness inquiry is only appropriate as it relates to the duration of the suspensions, not the mere fact that the contracts were suspended. Scott Timber Co. v. United States, 333 F.3d at 1368 (noting that

---

[6] The Court sometimes described the breach of warranty as a breach of the "implied duty to cooperate" and discussed the other breach as the breach of the "implied duty not to hinder." These implied duties are characterized as subspecies of the well-known duty of good faith and fair dealing. See Precision Pine, 50 Fed. Cl. at 58-59.

C6.01 does not authorize the indefinite or permanent suspension of the contracts, and that the court looks to the reasonableness of the suspension only to determine whether a prolonged suspension constitutes a breach). Therefore, for contracts that include clause C6.01, Scott Timber establishes that the only possible breach plaintiffs could prove is a breach that resulted from the duration of the suspension.

Binding precedent establishes that the duty of good faith and fair dealing - and its subspecies, the duties to cooperate and not to hinder - does not apply to the Forest Service's pre-contract actions. Because plaintiffs focus solely on the Forest Service's pre-contract actions, and do not challenge the duration of the suspensions, this Court cannot find that the Forest Service breached these timber sale contracts.

III. Summary Judgment Regarding Whether The Forest Service Acted Reasonably When It Entered Into These Timber Sale Contracts Is Inappropriate

If this Court determines that it is necessary to review the Forest Service's pre-contract actions outside the context of the duration of a suspension, which plaintiffs do not challenge here, plaintiffs have failed to establish that there are no disputes over material facts that might affect the outcome of the case, and, therefore, summary judgment is inappropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-78 (1986). Plaintiffs go to great lengths to argue that summary judgment in their favor is appropriate on the issue of whether the Forest Service acted reasonably when it entered into the timber sale contracts with plaintiffs. Pls.' Cross-Motion at 68-77. Plaintiffs assert the appropriateness of their position based upon a decision of this court, Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001), and a decision of the Interior Board of Contract Appeals ("IBCA"), Appeal of Superior Timber Co., Inc., IBCA No.

3459, 97-1 BCA ¶ 28,736 (1996), and argue that the uncontroverted evidence establishes that the Forest Service breached the implied duties to cooperate and not to hinder plaintiffs contracts. Contrary to plaintiffs' assertions, there are genuine issues of material facts in dispute, which preclude the entry of summary judgment in plaintiffs' favor.

A. Plaintiffs' Reliance Upon Precision Pine and Superior Timber Is Misplaced

The weight of authority dictates that any consideration of reasonableness, an issue that is "intensely factual," is not properly determined upon summary judgment. Scott Timber Co. v. United States, 333 F.3d at 1369, see also Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 109-10 (2005) (noting that "[w]hile the facts in Precision Pine warranted summary judgment, the Federal Circuit, in Scott Timber, has indicated that summary judgment in such cases is rarely appropriate."); H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 491 (2003) (finding that genuine issues of fact precluded summary judgment on the issue of whether the Forest Service knew or should have known that its environmental documents were inadequate when it awarded the contracts). Plaintiffs seek to distinguish this Court's more recent decisions denying summary judgment upon the issue of reasonableness and argue that the summary judgment is appropriate based upon Precision Pine and Superior Timber, by erroneously arguing that the Trinity River and H.N. Wood Products decisions adopted the incorrect legal standard for reasonableness and have incorrectly interpreted the Federal Circuit's Scott Timber decision. Plaintiffs' position is incorrect. Instead, we fairly read Precision Pine and Superior Timber cases - both of which were decided before the Federal Circuit's decision in Scott Timber - are clearly distinguishable and are contrary to the recent trend of decisions in this Court.

The plaintiffs in Precision Pine and Superior Timber prevailed upon summary judgment because the Forest Service awarded the timber sale contracts in those cases despite being told that they had a legal obligation to do certain environmental assessments prior to award. In Precision Pine, a judge of this Court determined that the Forest Service breached the plaintiff's timber sale contracts when it ignored a decision from the United States Court of Appeals for the Ninth Circuit, Pacific Rivers Council v. Robertson, 30 F.3d 1050 (9th Cir. 1994), that found that the agency's land resource management plans ("LRMPs") must be submitted for consultation with the Fish and Wildlife Service ("FWS"). Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. at 68. However, the Precision Pine court noted that, prior to the Pacific Rivers Council decision, "the Forest Service had a genuine legal argument that it did not have to submit these [LRMPs] for consultation." Id. Similarly, in Superior Timber, the IBCA found that the Bureau of Land Management ("BLM") had been put on sufficient notice during litigation prior to the award of the contract that its environmental assessments were inadequate, such that it was unreasonable to award the contract without addressing the deficiencies. Appeal of Superior Timber Co., Inc., 97-1 BCA ¶ 28,736 at ¶ 143,442-43. As another judge of this Court noted in H.N. Wood Products, "the timing of the prior decision in Superior Timber was key to the board's conclusion that the BLM breached the implied duty to cooperate and not to hinder in that case." H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. at 491.

In the cases currently before the Court, the Forest Service did not ignore a prior decision that established a need to conduct Category 2 surveys prior to awarding these timber sale contracts. It is incontrovertible that the ONRC Action decision was issued after the award of the timber sale contracts at issue here. See ONRC Action v. United States Forest Service, 59

F.Supp. 2d 1085 (W.D. Wash. 1999) (summary judgment decision issued on August 2, 1999). In fact, to borrow language from the Precision Pine decision, the Forest Service had a "genuine legal argument" that it did not have to conduct Category 2 surveys prior to award. Precision Pine & Timber Co., Inc. v. United States, 50 Fed. Cl. at 68. The existence of the Forest Service's "genuine legal argument" for not performing Category 2 surveys prior to awarding these timber sale contracts forms the basis for the material disputes before this Court.

Plaintiffs argue that the Forest Service should not have awarded these timber sale contracts prior to conducting the "important" Category 2 surveys, and acknowledge that they must establish "[u]nreasonableness based on proof of a lack of prudence given the FS's knowledge at the time is sufficient" to establish breach. Pls.' Cross-Motion at 76. However, based upon the Forest Service's interpretation of the NFP Record of Decision ("ROD") and the associated Standards and Guidelines ("S&G"), an interpretation that was upheld by the Interior Board of Land Appeals ("IBLA") in In re North Murphy Timber Sale, 146 IBLA 305, 1998 WL 951006 (Nov. 20, 1998), at a minimum, it is a question of material fact as to whether the Forest Service acted reasonably when it awarded these timber sale contracts without conducting Category 2 surveys. Accordingly, summary judgment on plaintiffs' cross-motion is inappropriate.

B. The Directions Given In The Forest Service's Policy Memoranda Were Reasonable

For Category 2 survey species, the NFP ROD instructed that the surveys should "precede the design of all ground-disturbing activities . . . implemented in [Fiscal Year] 1997 or later." DPFUF ¶ 21. The Forest Service issued a memorandum, commonly referred to as the "NEPA

Decision Equals Implementation" memorandum, that interpreted this instruction. DPFUF ¶ 26. Plaintiffs' brief, in its exhaustive recitation of the conflicting viewpoints on the Issue Resolution Team ("IRT"), and in comments submitted to the Forest Service in public comments and lawsuits, merely demonstrates that the Forest Service (and BLM) were faced with a difficult decision. While it is easy to second-guess agency actions through the benefit of hindsight, Government officials are presumed to act in good faith. Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1301-02 (1976) (finding that Government officials are presumed to act in good faith, and "it requires 'well-nigh irrefragable proof' to induce a court to abandon the presumption of good faith."); see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (noting that a "high burden must be carried to overcome this presumption . . . .").

1. The "NEPA Decision Equals Implementation" Memorandum

As plaintiffs recognize, questions arose within the Forest Service with regard to how to the individual Forests could achieve the NFP survey and manage requirements. DPFUF ¶ 22. These questions were directed to a group established to ensure consistent responses, the NFP IRT. Id. One of the questions the IRT faced was defining when a project should be considered "implemented" for purposes of the survey and manage requirements. DPFUF ¶ 23. This question arose in part because of ambiguities within the NFP ROD and the NFP Standards and Guidelines ("S&G"). In re North Murphy Timber Sale, 146 IBLA 305, 1998 WL 951006 (Nov. 20, 1998). The ROD states that "surveys [must be] conducted prior to ground-disturbing activities." Id. The S&G states that "surveys [for component 2 species] must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later." Id. The IRT

noted that there are three possible interpretations for when a project is implemented: (1) when there is physical activity on the ground; (2) when an agency signs a contract; or (3) when the responsible official signs the NEPA decision. DPFUF ¶ 23.

The IRT settled on the third definition, that a project is implemented when the NEPA decision is signed, so that the surveys would be complete before the official could determine a project's design. DPFUF ¶ 24. The group determined that it made sense to have the survey information available for the responsible official to consider before he or she signed the NEPA decision. Id. To find otherwise would mean that the surveys could change the project's design after the NEPA decision was signed, or after contract award, which would lead to additional costs and possible contract modification or termination. Id. Furthermore, any other definition would effectively read out the NFP's phased-in survey requirements, which the NFP intended to provide time to develop and apply the survey protocols. DPFUF ¶ 25.

The IRT's determination led to the issuance of a memorandum by the Forest Service Regional Foresters for Regions 5 and 6, and the BLM State Directors for Oregon and California, on November 1, 1996. DPFUF ¶ 26. This memorandum, the "NEPA Decision Equals Implementation" memorandum, states that a project is implemented for purposes of the NFP ROD when the NEPA decision is signed. Id.

Furthermore, the Forest Service had received assurances from an administrative court that its "NEPA decision equals implementation" guidance was valid. The United States Department of the Interior, Interior Board of Land Appeals ("IBLA"), heard a challenge by environmental groups with respect to the North Murphy timber sale. In re North Murphy Timber Sale, 146 IBLA 305, 1998 WL 951006 (Nov. 20, 1998). In this case, environmental groups challenged the

"NEPA Decision Equals Implementation" memorandum. While noting that "[a]s a general matter, we would be inclined to agree with appellants that ground-disturbing activities are 'implemented' when they, in fact, occur . . . ," the IBLA recognized that there is an ambiguity in the NFP. Id. at 332. In its decision, the IBLA referenced the ambiguity – the fact that the term "implementation" is used differently in the Category 2 Survey & Manage Guidelines. Id. The NFP first directs that surveys "must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." Id. As the IBLA noted, this reference "clearly differentiates between planning (design) and implementation." Id. The second reference, however, does not make that same distinction: "surveys must be completed prior to ground-disturbing activities that will be implemented in F.Y. 1999 or later." Id. The NFP ROD adds to the confusion, by first stating that "surveys must be completed prior to ground-disturbing activities that will be authorized or implemented in FY 1999," and then later stating that "[t]his will provide agencies a maximum of four full fiscal years (FYs 1995, 1996, 1997, and 1998) in which to develop and apply survey protocols for these species." Id. The IBLA recognized that "the only way that four full fiscal years would be available for development of protocols would be if 'implemented' were interpreted to mean 'designed' or 'authorized.'" Id. Because of this ambiguity, the IBLA deferred to the agencies' interpretation[7] – the IBLA upheld the "NEPA Decision Equals Implementation" memorandum. Id. While plaintiffs here naturally afford little weight to the In re North Murphy decision, it is clear that the Forest Service, prior to awarding these timber sale contracts, received independent validation for its interpretation of the NFP.

---

[7] The IBLA's finding is consistent with the rule that an "agency's interpretation of its own regulations will be accepted unless it is plainly erroneous or inconsistent with the regulation." Star Fruits S.N.C. v. United States, 393 F.3d 1277, 1282 (Fed. Cir. 2005).

Prior to the ONRC Action decision issued in August of 1999, the Forest Service had a "genuine legal argument" for awarding these timber sales without conducting Category 2 surveys. The existence of this "genuine legal argument" is a material fact in dispute that precludes summary judgment.

2. The Red Tree Vole Memorandum

Plaintiffs charge that the red tree vole decision was contrary to law, and the Forest Service unreasonably implemented the red tree vole directive. Pls.' Cross-Motion at 48. Whether the evidence shows that the Forest Service approached the red tree vole issue reasonably and in good faith, based upon scientific information, is a disputed question of fact that is not properly determined upon summary judgment.

The Forest Ecosystem Management Assessment Team ("FEMAT") assembled after President Clinton's April 1993 "Forest Conference" in Portland, Oregon. DPFUF ¶ 27. The FEMAT, a group made up of scientists and technical experts from the Forest Service, BLM, Environmental Protection Agency, Fish & Wildlife Service, National Marine Fisheries Services, and several universities, was charged with preparing an assessment based upon an ecosystem approach to forest management. Id. The team analyzed ten different options that encompassed mixtures of Late-Successional Reserves ("LSRs"), Riparian Reserves ("RRs"), and prescriptions for forest management both inside and outside of the reserves. DPFUF ¶ 28. The vast majority of management activities would occur in Matrix lands, those lands outside of the LSRs and RRs. Id. For each of the ten options, the FEMAT "evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls." Id. Furthermore, assessments were done for over 1,000 plant and animal species

that were "thought to be closely associated with late-successional forests." Id. For these 1,000 species, the FEMAT suggested that if the species had an 80 percent or greater likelihood of stabilizing, well-distributed across federal lands, that was the point at which a species' viability could be assured. Id. Significantly, the FEMAT noted that "species with scores lower than 80 percent should not automatically be regarded as unviable." Id. The FEMAT put together a report commonly known as the FEMAT Report. Id.

A team from the Forest Service and BLM used the FEMAT Report to prepare a draft Supplemental Environmental Impact Assessment ("SEIS"), identifying FEMAT's ten different alternatives as options. DPFUF ¶ 29. The team decided upon Alternative 9, and prepared the draft SEIS, which was sent out for public comment. Id. After receiving public comment, additional analysis was conducted on many of the species; this additional analysis was included as an appendix to the final SEIS, and is commonly referred to as "Appendix J2" or "Additional Species Analysis." Id. The Additional Species Analysis "identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well distributed across federal lands." Id.

The red tree vole was identified in the Additional Species Analysis. DPFUF ¶ 30. However, research in the FEMAT Report and the Additional Species Analysis demonstrates that the red tree vole was "thought to be in less dire circumstances." Id. The FEMAT Report determined that Alternative 9 resulted in a 73 percent likelihood of achieving habitat sufficient to allow the red tree vole to stabilize across federal lands; had the red tree vole received a 7 percent higher likelihood rating in the FEMAT Report, it would not have been included in the Additional Species Analysis. Id.

The final SEIS Species Analysis Team's Mammal Subgroup determined that it was unnecessary to protect every red tree vole site; therefore, the red tree vole was not included in the Category 1 Survey and Manage species. DPFUF ¶ 31. The subgroup further decided that the red tree vole sites should be assessed in relation to their value in adding to connectivity between LSRs and RRs, many of which were not ecologically functional because of past management practices. Id. The group decided that it was important to prevent isolation of major portions of the red tree vole population. Id. Therefore, they determined that the red tree vole should be included in the Component 2 Survey and Manage species by managing the red tree vole population in the lands between LSRs. Id.

The Survey and Manage Workgroup developed interim guidance for the Forest Service and BLM to implement the Component 2 Survey and Manage requirement for the red tree vole. DPFUF ¶ 32. The group determined that, because of concerns related to ensuring connectivity between LSRs, "those requirements should be designed to maximize the efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population." Id. The group solicited input from the FEMAT scientists, the Additional Species Analysis Team, and the final SEIS team, and, based upon that input, the group developed the recommendations that were ultimately adopted in the November 4, 1996 memorandum entitled "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," informally known as the Red Tree Vole Memorandum. Id.

The threat to the red tree vole's continued viability was minimal. DPFUF ¶ 33. Rather, the concern with the red tree vole related to past forest management practices that fragmented the LSRs and resulted in the creation of young, even-aged forests. Id. Therefore, the focus of the red

tree vole mitigation measure was to improve LSR connectivity, rather than manage known sites that may be isolated due to a lack of LSR connectivity. Id. For example, the group decided that if a stand of trees containing red tree voles was surrounded by principally older forests, that stand of trees would add little to the connectivity already provided by the older forests. Id. On the other hand, a stand of trees containing a red tree vole population in an area with almost no older forest or suitable habitat would have a much higher value in maintaining connectivity between LSRs. Id. Finally, if a stand of trees containing red tree voles was located in an area isolated from federally managed lands, and, therefore, LSRs, that stand could not contribute to improving the species' viability. Id. Therefore, it was reasonable to do site-specific surveys only in areas that were valuable to maintaining LSR connectivity, which, in turn, improved the red tree vole population's viability.

According to the Red Tree Vole Memorandum, before conducting surveys, geographic information system ("GIS") information was to be used to analyze federal lands to screen the lands based upon their value in increasing LSR connectivity. DPFUF ¶ 34. The first screen would determine how much land was federally managed, and, if the watershed contained less than 10 percent federal lands, survey and manage was not required for those areas. Id. The group decided not to survey in areas with less than 10 percent federal lands because, due to the small portion of federal lands, those areas could not contribute to the goal of LSR connectivity (and, therefore, the continued viability of the red tree vole population). Id. The second screen would determine whether "at least 40 percent of the federal lands in the watershed was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and whether that closure and diameter could be maintained through the year 2000."

Id. If federal lands met the requirements outlined in the second screen, then there was no need to survey and manage for the red tree vole because the habitat already provided adequate LSR connectivity. Id.

The guidance provided in the Red Tree Vole Memo was reasonable, and was directed at meeting the concerns regarding LSR connectivity raised by the FEMAT and in the Additional Species Analysis. Whether the Forest Service acted reasonably when it adopted the policy regarding red tree voles outlined in the RTV Memorandum is a disputed question of material fact that precludes summary judgment.

C. Plaintiffs' Evidence Regarding Whether The Forest Service Knew Or Should Have Known There Was A "Serious Legal Risk" In Proceeding With Award Is Disputed

Plaintiffs claim that there is "a virtual mountain of uncontroverted evidence in this case which establishes that the Forest Service acted unreasonably." Pls' Cross-Motion at 77. They point to warnings from environmental activists and from various attorneys that the Forest Service knew or should have known that the timber sale contracts here would be suspended because of the environmental litigation. However, there are material facts at issue that prevent plaintiffs from prevailing on summary judgment.

Plaintiffs use the mere fact that the ONRC Action litigation was filed, and that the timber sales at issue were administratively challenged, to support their contention that the Forest Service knew or should have known that its environmental documents were inadequate. Pls.' Cross-Motion at 62 and 80-81. However, plaintiffs ignore the fact, as discussed above, that the Forest Service's "NEPA Decision Equals Implementation" memorandum had already survived the only legal challenge brought against it prior to the ONRC Action litigation, the In re North

Murphy administrative action. See In re North Murphy, IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996). Plaintiffs cannot allege as an uncontroverted fact that the Forest Service, therefore, knew or should have known that its interpretation was inadequate simply because environmental activists challenged the interpretation.

Plaintiffs also use the alleged words of Lois Schiffer, Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") at the Department of Justice, as another material fact supporting their contention that the Forest Service knew or should have known that its legal reasoning for awarding these timber sale contracts was insufficient. Plaintiffs repeatedly allege that Ms. Schiffer told Mr. Boling, the lead trial counsel for the ONRC Action, and Mr. Coppelman, the Deputy Assistant Attorney General at ENRD, that "NEPA decision equals implementation is nonsense." Pls.' Cross-Motion at 9, 17, 49, 52, 65. Plaintiffs also characterize this statement as "[t]he strongest warning received by the FS regarding the deficiency of its rationale for the interpretation . . . ." Id. at 65. However, Ms. Schiffer herself does not recall expressing that opinion, and, therefore, provides no support for plaintiffs' position. DPFUF ¶ 35. Moreover, neither Mr. Boling nor Mr. Coppelman recall that Ms. Schiffer ever made that statement. DPFUF ¶ 36. Furthermore, plaintiffs' evidence is contested by the material fact that the Department of Justice defended the Forest Service's position in the ONRC Action litigation.[8]

---

[8] Plaintiffs cite to portions of an unsigned settlement memorandum from Mr. Boling to Ms. Schiffer, dated November 17, 1999, to further support their position that the Forest Service acted unreasonably. Pls.' However, this fact is not material to a discussion of the reasonableness of the Forest Service's actions prior to the ONRC Action litigation, because the settlement memorandum was drafted well after the ONRC Action court issued its summary judgment decision on August 2, 1999. ONRC Action v. Forest Service, 59 F.Supp. 2d 1085 (W.D. Wash. 1999).

Plaintiffs also cite to the suggestion by a Forest Service attorney, Robert Simmons, that the Forest Service should "take action to make sure that the appropriate language is in the contract" as further evidence of the Forest Service's unreasonableness because "no appropriate language was included in the contracts." Pls.' Cross-Motion at 64. Plaintiffs, however, disingenuously ignore the material fact that all of the timber sale contracts at issue included clause C6.01, a clause that the United States Court of Appeals for the Federal Circuit has recognized explicitly authorizes the Forest Service to suspend timber sale contracts to comply with a court order.[9] See Scott Timber Co. v. United States, 333 F.3d at 1397.

Furthermore, plaintiffs' arguments focus solely on the environmental aspect of the Forest Service's mission. However, it is not possible to consider the Forest Service's environmental responsibilities without similarly considering the Forest Service's responsibilities to the timber sale program. The NFP ROD noted that President Clinton recognized the need for balance between the competing interests of the environment and the timber industry: "How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests . . . ?" DPFUF ¶ 37. Additionally, Congress establishes and approves timber-harvest levels that the Forest Service is expected to meet. DPFUF ¶ 38. The Forest Service's obligations to the timber program are material facts that should be considered in this case (facts which, ordinarily, are of great interest to plaintiffs), and the plaintiffs disingenuously ignore the Forest Service's obligations to meet the congressionally mandated timber-harvest levels when they

[9] The importance of this clause was fully briefed in our opening brief in this case, filed on March 7, 2008. A discussion of this clause, and, specifically, its use as a limited liability provision, can be found in Section IV, infra.

assert that the Forest Service should not have awarded these contracts without conducting Category 2 surveys.

Plaintiffs' contention that summary judgment is appropriate here must fail because there are material issues of fact in dispute upon which this cross-motion rests.

## IV. Plaintiffs' Assertion that Timber Sale Contracts Are Contracts Of Adhesion Is Immaterial To The Interpretation Of C6.01 - An Unambiguous Contract Provision

Plaintiffs' argue that timber sale contracts are "adhesion contracts" and must therefore be construed against the Government. Pls.' Cross-Motion at 12-13. Plaintiffs' argument is both legally and factually flawed.

### A. Contra Proferentum Only Applies In Cases Where The Contract Is Ambiguous, And C6.01 Unambiguously Provides For Suspension In Response To A Court Order

Plaintiffs would have the Court assume that these contracts are ambiguous, and move straight into an analysis of parol evidence. Pls.' Cross-Motion at 12. However, as we explain in our motion for summary judgment, clause C6.01 is unambiguous and expressly authorizes the Forest Service to suspend timber sale contracts to comply with a court order. Parol evidence, much less the doctrine of contra proferentum, plays no role in construing an unambiguous contract term.

The starting point for construing a contract is its plain language. Gardiner, Kamya & Assoc., P.C. v. Jackson, 467 F.3d at 1353; M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004). By contrast, the doctrine of contra proferentum is a "'rule of last resort' that 'is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract,

the ambiguity remains unresolved.'" Gardiner, Kamya & Assoc., P.C. v. Jackson, 467 F.3d at 1352 (citations omitted); see also Residential Mktg. Group v. Granite Inv. Group, 933 F.2d 546, 549 (7th Cir. 1991); Record Club of Am. v. United Artists Records, 890 F.2d 1264, 1271 (2d Cir. 1989); see also 5 Margaret N. Kniffin, Corbin on Contracts § 24.27 at 297 (contra proferentum is "a tie-breaker when there is no other sound basis for choosing one contract interpretation over another") (internal quotations omitted); 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.11 at 304 (contra proferentum "is often denigrated as a rule of last resort") (internal quotations omitted).

Here, there is no need to employ this rule of last resort because the contracts at issue include a clause - C6.01 - that gives the Forest Service authority to suspend the timber sale contracts to comply with a court order. C6.01 states:

> INTERRUPTION OR DELAY OF OPERATIONS. (10/96) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of the Contracting Officer: . . . (b) To comply with a court order, issued by a court of competent jurisdiction.

App. 16, 41, 74. Plaintiffs do not argue, much less establish, that C6.01's authority to suspend is ambiguous. See, e.g., Gardener, Kamya & Assoc., P.C. v. Jackson, 467 F.3d at 1352 (citing C. Sanches and Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.")).

In addition, C6.01 specifically establishes the remedy available to purchasers in the event of a court-ordered suspension - an adjustment of the contract term and out-of-pocket expenses. App. 16, 41, 74. Plaintiffs assert that the contracts lack "explicit exculpatory language to protect [the Forest Service] against liability in the event of suspensions." Pls.' Cross-Motion at 23.

Plaintiffs are plainly wrong; it is difficult to imagine a clearer statement limiting liability than C6.01. And while plaintiffs point to other cases from this Court and the Agriculture Board of Contract Appeals ("AGBCA")[10] for the proposition that the language of C6.01 does not limit liability, they ignore the United States Court of Appeals for the Federal Circuit's pronouncement that the "Forest Service had the authority to unilaterally suspend operations under any contracts with the C6.01 clause." Scott Timber Co. v. United States, 333 F.3d 1358, 1366 (Fed. Cir. 2003).

In an attempt to establish that C6.01 is invalid, plaintiffs argue that C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992), demonstrates that C6.01 is an invalid exculpatory provision. However, C.J. Betters Corp. v. United States dealt with a contract of sale that included an explicit warranty. Id. Plaintiffs do not allege, nor is there, an explicit warranty in these timber sale contracts. C6.01 does not seek to exculpate the Forest Service from liability for the breach of an express warranty in the contract, it merely serves to define the rights and responsibilities of the parties after, for example, a court of competent jurisdiction enjoins work on the sales. Therefore, the holding of C.J. Betters Corp. v. United States is inapposite here.

Furthermore, Precision Pine did not, as plaintiffs intimate, establish that C6.01 is invalid as a limited liability clause. In that case, another judge of this Court reviewed C6.01 in terms of

---

[10] Plaintiffs cite to other Court of Federal Claims decisions and two AGBCA cases, which are not binding upon this Court. See Boyer v. United States, __ Fed. Cl. __, 2008 WL 857452 at *21, n.3 (March 27, 2008) (noting that another Court of Federal Claims decision is not binding precedent in this Court); Wetsel-Oviatt Lumber Co., Inc. v. United States, 38 Fed. Cl. 563, 569 (1997) (noting that AGBCA cases are not binding upon this Court). Plaintiffs cite Trinity River and H.N. Wood Products as evidence that C6.01 is not a valid exculpatory provision; however, these cases do not analyze C6.01 in those terms, and, therefore do not support plaintiffs position. Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005); H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 487 (2003).

whether C6.01 was an exculpatory provision. Precision Pine & Timber Co. v. United States, 50 Fed. Cl. at 58. Precision Pine clearly did not invalidate C6.01 as a limited liability provision, however, because the Court determined that C6.01 provided the only damages available to plaintiffs for the timber sales where the Forest Service acted reasonably. Precision Pine & Timber Co. v. United States, __ Fed. Cl. __, 2007 WL 5030766 at *53 (Sept. 14, 2007).

The clear language in C6.01 provides the Forest Service clear authority suspend, and establishes the extent of Forest Service liability in the event of a suspension. Therefore, there is no need to consider whether these contracts are contracts of adhesion, entertain extrinsic evidence, or apply the rule of contra proferentum. The plaintiffs' companion argument that the Forest Service assumed the risk of liability when it did not include any language limiting liability is belied by the express terms of plaintiffs' contracts.

B. The Timber Industry Assisted In Drafting These Timber Sale Contracts

Alternatively, should this Court find that there exists an ambiguity in these timber sale contracts, the Court will necessarily reach the issue of whether these contracts are contracts of adhesion, and whether, as plaintiffs allege, they should be construed against the Forest Service as the sole drafter. Plaintiffs simply assert, without support, that timber sale contracts are contracts of adhesion. Pls.' Cross-Motion at 22. Contracts offered on a take-it-or-leave-it basis are not automatically adhesion contracts. See Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1565-66 (Fed. Cir. 1990) (noting that private parties are not compelled to enter into contracts with the Government). Here, plaintiffs also fail to take into account the integral role played by the timber industry in drafting these timber sale contracts, including C6.01.

The National Forest Products Association ("NFPA") noted that the 2400-6 contract (the standard timber sale contract) developed in 1970 was "a result of extended discussions between NFPA's Federal Timber Purchasers Committee [NFPA] and the Forest Service . . . ." DPFUF ¶ 39. Throughout 1971 and 1972, the Forest Service, NFPA, other timber industry groups, and individual members of the timber industry, communicated regarding possible revisions to the 2400-6/6T contract. DPFUF ¶ 40. After these discussions, the standard timber sale contracts were revised in September 1973. Id.

Those standard contracts contained terms favorable to the timber industry; for example, the contracts allowed timber purchasers to operate their timber sales with little oversight from the Forest Service, and the contract did not contain a clause to permit the Forest Service to terminate the contract for its own convenience or a liquidated damages provision. DPFUF ¶ 41. These terms remained unchanged for approximately two decades. Id.

During the past thirty years, the Forest Service has continued to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. DPFUF ¶ 42. In the late 1980s and early 1990s, the Forest Service decided to revise the 2600-6/6T contract to reflect changes in environmental laws, court decisions interpreting those environmental laws, and to protect the Forest Service's financial interests. DPFUF ¶ 43. The Forest Service sought and received input from the timber industry regarding these revisions, including industry comments on C/CT6.01.

The language in C/CT6.01 in plaintiffs' timber contracts is similar to the language proposed in 1990. DPFUF ¶ 44. In 1990, C/CT6.01 permitted the interruption or delay of operations upon the written request of the Contracting Officer "[t]o comply with a court order,

regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale . . . ." Id. In the timber sale contracts at issue here, C/CT6.01 provides for the interruption or delay of operations upon the written request of the Contracting Officer "to comply with a court order, issued by a court of competent jurisdiction." Id.

The NFPA commented specifically on C/CT6.01 by letter dated December 4, 1989. DPFUF ¶ 45. In that letter, the NFPA stated its belief that the Forest Service already had "sufficient authority to interrupt operations under B9.3 – BREACH when used in conjunction with other existing environmental protection provisions" and stated that section (a) of C/CT6.01 "should be dropped." Id. In a letter from NFPA in May 1990, NFPA acknowledged that the Forest Service made efforts to modify C/CT6.01 in response to NFPA's earlier concerns. DPFUF ¶ 46. Furthermore, the NFPA acknowledged that the Forest Service provided it an opportunity to comment on and negotiate the terms of the contracts. NPFA wrote:

> We also appreciate the opportunity we had to discuss the proposed liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did.

DPFUF ¶ 45. In another letter dated May 1, 1990, the NFPA expressed appreciation for the opportunity to discuss proposed contract provision C/CT6.01, and other provisions that addressed modification, termination, and compensation under the 2400-6/6T contracts. DPFUF ¶ 46.

The Forest Service's communication with the timber industry regarding the terms of the 2400-6/6T contracts continues to the present day. For example, the Forest Service met with

members of the NFPA Federal Timber Purchaser's Committee ("FTPC") and its counsel, Alan Saltman, to consider revisions to the latest version of the standard timber sale contracts. DPFUF ¶ 47. The Forest Service made the proposed revisions available for public comment, and made appropriate changes based upon those comments. See 68 Fed. Reg. 70758 (Dec. 19, 2003); 60 Fed. Reg. 25367 (May 6, 2004).

For the past thirty years, and within the bounds of laws governing the formulation of regulation and policy, the Forest Service has engaged in discussions with members of the timber industry about the standard timber sale contracts and issues affecting the timber industry. DPFUF ¶ 48. The standard timber sale contracts, including the contracts at issue in this litigation, were not drafted entirely by the Forest Service, and provided ample opportunity for negotiating the terms of the contracts. These indisputable facts demonstrate plaintiffs are not entitled to summary judgment; plaintiffs cannot establish that these timber sale contracts are contracts of adhesion because they cannot establish that the Forest Service was the sole drafter. If plaintiffs dispute these facts, this issue would require a trial to establish whether these timber sale contracts are contracts of adhesion, solely drafted by the Forest Service.

V. These Contracts Do Not Contain An Implied Warranty Of Specifications

Plaintiffs' next argument is that the Forest Service breached an implied warranty of specifications because the timber sale contracts "contained many detailed specifications governing the manner in which the timber must be harvested and roads built and maintained . . . ." Plaintiffs' Cross-Motion at 24. Therefore, following the doctrine established by the Supreme Court of the United States in Spearin v. United States,[11] 248 U.S. 132 (1918)

[11] In Spearin, the Supreme Court of the United States found the government responsible for delay caused by defective design specifications in a construction contract. Spearin v. United

plaintiffs argue that the Forest Service is liable for damages incurred as a result of the Forest Service's allegedly defective specifications. Plaintiffs' argument is inapposite because the United States Court of Appeals for the Federal Circuit has construed the Spearin doctrine narrowly, the timber sale contracts at issue do not contain design specifications, and the specifications were not the proximate cause of plaintiffs' alleged harms.

A. The *Spearin* Doctrine Does Not Apply To Timber Sale Contracts

Plaintiffs' attempt to extend the Spearin doctrine to timber sale contracts must fail. While plaintiffs' contend that the United States Court of Appeals for the Federal Circuit has expanded the Spearin doctrine, a recent decision by that Court demonstrates that the doctrine applies only to cases involving construction contracts or contracts for the procurement, by the government, of goods and services. Rick's Mushroom Service, Ins. v. United States, 2008 WL 861975, *5 (Fed. Cir. Apr. 2, 2008) (declining to find that the Spearin doctrine applies outside of the procurement contract context). By definition, timber sale contracts are not contracts for the procurement, by the government, of goods and services. See Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 639 (2004) (noting that the Federal Acquisition Regulation ("FAR") does not apply to timber sale contracts). These contracts are timber sale contracts, whereby "[i]n consideration of the premises and promises hereinafter contained, unless provided otherwise herein, the Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber." App. 14, 39, 71. The Spearin doctrine cannot be extended to timber sale contracts.

---

States, 248 U.S. at 137.

Plaintiffs cite numerous cases that ostensibly demonstrate that the Spearin doctrine is expansive, and should, therefore, be applied to these timber sale contracts. A review of the cited cases shows otherwise. In Hercules, Inc. v. United States, the Supreme Court of the United States declined to apply the Spearin doctrine against the government to allow Agent Orange manufacturers to claim indemnification from the United States for costs incurred settling tort claims. Hercules, Inc. v. United States, 516 U.S. 417, 425 (1996). Other cases cited by plaintiffs have one commonality - they all relate to construction contracts. Al Johnson Constr. Co. v. United States, 854 F.2d 467, 468 (Fed. Cir. 1988) (constructing a spillway for the government); J.L. Simmons Co. v. United States, 412 F.2d 1360, 1383 (Ct. Cl. 1969) (building a hospital for the government); Huber, Hunt & Nichols, Inc., GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975), at 54572 (constructing a federal office building and post office); Cast Constr. Co., ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984), at 84,859 (constructing barracks at a military base); Laburnum Constr. Co. v. United States, 325 F.2d 451, 452 (Ct. Cl. 1963) (installing a high pressure steam line at a naval base); Luria Bros. & Co. v. United States, 369 F.2d 701, 703 (Ct. Cl. 1966) (constructing aircraft facilities). In the one timber case that references the Spearin doctrine, Everett Plywood Corp. v. United States, 651 F.2d 723 (Ct. Cl. 1981), the Court of Claims declined to decide whether the Spearin doctrine applied, and allocated the risk of environmental damages caused by the construction of government-designed roads to the government. Id. at 731. Here, plaintiffs here cannot point to a single specification that they attempted to follow and suffered damages as a result.[12]

[12] Aside from construction cases, the application of the Spearin doctrine has been limited to procurement contracts. See Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1286 (Fed. Cir. 2000) (applying the Spearin doctrine to a case involving a contract to "manufacture, test, and

Plaintiffs' own brief demonstrates that courts have not extensively applied the Spearin doctrine outside the context of construction contracts, and the doctrine certainly should not be expanded to apply to timber sale contracts.

B. Timber Sale Contracts Do Not Contain Design Specifications

While plaintiffs refer to the many "specifications" outlined in the timber sale contracts, mere use of the word "specification" does not trigger the Spearin doctrine, which, aside from its limited application in the context of construction and procurement contracts, applies only to design specifications, not performance specifications. "Design specifications explicitly state how the contract is to be performed and permit no deviation . . . . Design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (emphasis added). These timber sale contracts expressly permit deviation by requiring purchasers to submit their own plan of operations prior to commencing work each season. DPFUF ¶ 49. Therefore, while certain aspects of contract performance are outlined by the Forest Service (clauses in the contracts define, as plaintiffs' appropriately point out, the normal operating season and contract termination date), each purchaser may harvest the timber located on its timber sale area in accordance with its own plan of operations.

Furthermore, the contracts also contain "objectives" and "methods" for harvesting timber. For example, the Too Wild timber sale contract includes clause C6.41# (a clause titled "Special

---

deliver a number of skid-mounted floodlights"); Ordnance Research, Inc. v. United States, 609 F.2d 462, 481 (Ct. Cl. 1979) (involving a procurement for the production of igniters used in fire bombs); R.E.D.M. Corp. v. United States, 428 F.2d 1304, 1308-10 (Ct. Cl. 1970) (involving a contract for the manufacture of artillery fuzes).

Felling Objectives"), which states: "felling objectives shall be accomplished by the type of felling methods and equipment listed herein. Methods or equipment other than those specified may be approved." DPFUF ¶ 50 (emphasis added). Another clause in the Too Wild timber sale contract, C6.42# - Special Yarding/Skidding Methods, also allows for the use of "[m]ethods or equipment other than those specified . . . ." Id. The Jack Heli timber sale contract includes a clause, C6.411# (Directional Felling), which states that: "[D]irectional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing." Id. Another clause in the Jack Heli timber sale contract, C5.411 (Dust Abatement for Temporary Roads), lets the purchaser choose the material used for dust abatement. Id. Finally, the Happy Thin contract includes the Directional Felling clause, and clause CT5.414 - Snow Removal, which states: "[i]f Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources. Id.

The specifications in these timber sale contracts are not sufficiently specific nor detailed, and they provide sufficient discretion to the purchasers, such that these specifications cannot reasonably be considered "design" specifications. Also, plaintiffs never identify which particular "specifications" of the timber sale contract were defective or how such defects materially impeded contract performance. The closest plaintiffs come to doing so is providing examples of timber harvest "specifications," such as "prescribing helicopter logging rather than tractor logging," "the specification of limited operating periods," and "specifying which trees to cut or not to cut in the sale area." Pls.' Cross-Motion at 29. However, plaintiffs do not prove, as they must to prevail on their defective specification argument, that any of these alleged specifications were defective in any way. They have not proven, or even alleged, that the helicopter logging

provisions were flawed, the limited operating periods were incorrect, or the tree specification provisions turned out to be erroneous. Indeed, none of these provisions were materially altered as a result of the ONRC Action litigation and resultant suspension. Therefore, Plaintiffs' argument fails, and they cannot establish a necessary element of the Spearin doctrine.

C. Contract Specifications Did Not Proximately Cause Plaintiffs' Alleged Harms

Finally, plaintiffs argue that the Forest Service's failure to conduct surveys "was the primary cause of the suspensions of performance." Plaintiffs' Cross-Motion at 29. If the Spearin doctrine could be extended to timber sale contracts, and if the contract specifications could reasonably be read as "design" specification, the plaintiffs would still have to establish that the Forest Service's allegedly faulty design specifications must necessarily be the proximate cause of the delay resulting from the suspension. Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000) (permitting recovery for costs proximately flowing from a breach). This plaintiffs cannot do; indeed, plaintiffs have not identified a single contractual specification with which they could not comply that resulted in harm. Plaintiffs fail to recognize that, but for the court order suspending work on the timber sales, contract performance would have proceeded in accordance with the specifications outlined in their contracts and in plaintiffs' own plans of operation. Therefore, the proximate cause of the suspensions and any resulting delay was the court order, not the specifications outlined in the contracts.

Furthermore, plaintiffs' reasoning requires this Court to establish a per se link between the ONRC Action court order and a finding that the Forest Service breached an implied warranty of specifications. In H.N. Wood Products, Inc. v. United States, this Court declined to establish a link between a post-award court order and the Forest Service's implied duties because "it is

unclear whether the Forest Service knew or should have known that its environmental assessment was inadequate when it awarded the Contract . . . ." H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 491 (2003). The Court's decision denying plaintiff's motion for summary judgment noted that "[u]nlike the contracts at issue in Precision Pine and Superior Timber, the Forest Service awarded H.N. Wood's contract before it received a decision from the district court . . . ." Id. Similarly, in these cases, the Forest Service had no reason to believe that the specifications outlined in the timber sale contracts were inadequate until the ONRC Action court invalidated the Forest Service's policies. The Forest Service followed Forest Service policy when it drafted and awarded these timber sale contracts, and plaintiffs' attempt to establish a per se link between the district court's post-contract award order and a breach of an implied warranty must fail.

## VI. Plaintiffs' Cannot Maintain a "Superior Knowledge" Claim

As a threshold issue, superior knowledge is a performance doctrine, where the "withholding of superior knowledge that makes it more difficult to perform under the terms of the contract at issue." Hercules Inc. v. United States, 24 F.3d 188, 197 (Fed. Cir. 1994) (emphasis added). Plaintiffs allege that, if the Forest Service had disclosed information regarding ONRC Action, plaintiffs could have decided "that they did not want to accept contract award in the circumstances and/or by offering a significantly lesser amount to the [Forest Service] for the sales . . . ." Pls.' Cross-Motion at 41. Plaintiffs ask the Court to transform the doctrine of superior knowledge from a doctrine that relates to contract performance into a doctrine that applies to the contractor's decision whether, and upon what terms, to enter into a contract with the government.

To prove a breach of the duty under the superior knowledge doctrine, a contractor must produce specific evidence that: (1) it began performance without knowledge of a fact that affects performance; (2) the government was aware the contractor had no knowledge and no reason to obtain that knowledge; (3) contract specifications misled the contractor; and (4) the government failed to provide relevant information. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992) (internal citations omitted). Moreover, the missing information must be absolutely critical information, without which the contractor was doomed to failure. See Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F.2d 774, 778 (1963). Plaintiffs, here, cannot prove that the Forest Service breached any duty relating to the superior knowledge doctrine.

Plaintiffs' argument fails, first, with regard to both the two initial prongs of the test, i.e., whether the contractor began performance without knowledge of the ONRC Action case, and whether the government was aware that the contractor had no knowledge and, importantly, no reason to obtain that knowledge. GAF Corp. v. United States, 932 F.2d at 949. Finally, plaintiffs erroneously assert that "commencement of operations was virtually certain" to trigger a response from ONRC Action, and that the Forest Service "intentionally misle[d] plaintiffs to the contrary." Plaintiffs' Cross-Motion at 32-33. Plaintiffs' superior knowledge argument is unsupported by the uncontested facts and, therefore, must fail.

## A. Plaintiffs Cannot Demonstrate That The Forest Service Violated The First Two Prongs Of The Superior Knowledge Test

Plaintiffs cannot establish either that they began performance without vital information, or that the Forest Service knew they lacked this allegedly vital information. GAF Corp. v.

United States, 932 F.2d at 949. Plaintiffs' arguments with regard to both of these prongs are insupportable.

These timber purchasers had notice, both formal and informal, that the three sales at issue here were involved in litigation. These timber sales were awarded in the Pacific Northwest at a time when environmental litigation was a fact of life. The Northwest Forestry Association, a timber industry group, issued a newsletter that, among other things, tracked environmental litigation in the area. DPFUF ¶ 51. Specifically, the newsletter, Forestry Forum, followed the ONRC Action litigation in detail – including the alleged "secret agreements" between the ONRC Action plaintiffs and the Government – and discussed its potential impact on timber sales in the region. Id.

The Forest Service specifically mentioned the litigation in the prospectus for the Jack Heli timber sale, and at bid opening for the Too Wild timber sale.[13] DPFUF ¶ 52. The prospectus announcement for the Jack Heli timber sale stated: "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost."[14] Id.

After bid opening, the Forest Service delayed awarding all three of these sales. As a consequence of the delay, Timber Products was asked to extend the validity of its bid; Timber

[13] Plaintiffs' concede that the Forest Service made its "standard announcement" at the Too Wild bid opening, that "the sale is currently under litigation and award may be delayed." Plaintiffs' Cross-Motion at 38. "Standard" or not, the announcement was in fact notice to the plaintiff.

[14] As plaintiffs' brief clearly states, Timber Products knew that the Jack Heli sale was involved in litigation. Pls.' Cross-Motion at 36. Timber Products' alleged decision to rely upon the Forest Service's judgment regarding the risk posed by litigation, rather than its own analysis and judgment, does not insulate Timber Products from bearing the responsibility for its actions nor establish that the Forest Service breached a duty to disclose.

Products agreed. DPFUF ¶ 53. Additionally, prior to contract award, the contracting officers for all three timber sales communicated with plaintiffs regarding the ONRC Action litigation. Ed Matthews, Contracting Officer for the Happy Thin and Jack Heli timber sales, routinely communicated with plaintiffs Blue Lake Forest Products and Timber Products, Inc. DPFUF ¶ 54. During meetings or telephone conversations, Mr. Matthews discussed the ONRC Action litigation and the potential for the litigation to affect timber sales. Id. Similarly, Tom Link, Contracting Officer for the Too Wild timber sale, also provided information to CLR Timber Holdings, Inc. regarding ONRC Action prior to contract award. DPFUF ¶ 55. That information included discussing the general issues in the case, how ONRC Action affected the delay in award, and information regarding settlement negotiations. Id.

These facts demonstrate that, at a minimum, all three plaintiffs did not begin contract performance without vital information, and that the Government did not have any reason to know that they lacked this allegedly "vital" information. Therefore, the uncontested evidence does not support plaintiffs' superior knowledge argument, and, in fact, supports a finding that plaintiffs themselves should have sought additional information regarding the environmental litigation and its potential impact upon their timber sale contracts.

B. Plaintiffs' Reliance Upon The Forest Service Is Unfounded

Plaintiffs' claim that they "relied upon the [Forest Service's] silence and suffered injury as a result of the [Forest Service's] failure to disclose." Pls.' Cross-Motion at 41. Plaintiffs' attempt to portray themselves as naive victims, rather than savvy businesses, is unavailing, if not disingenuous. Their supposed surprise, if true, that the contracts could be suspended is neither

supported nor relevant. Furthermore, this argument simply restates plaintiffs' argument that we should not have awarded the contracts.

Plaintiffs' knew about the ONRC Action lawsuit. See Section IV(A), supra. Plaintiffs' contracts all contained C6.01, the provision that expressly allows the Forest Service to suspend contracts to comply with a court order. App. 16, 41, 74. The Forest Service had no duty to inform plaintiffs about internal assessments or negotiations related to the ONRC Action litigation.

Plaintiffs' reliance upon the Forest Service to inform them of any possible litigative risk associated with their timber sale contracts is particularly suspect in light of the plaintiffs' decisions not to rely upon the Forest Service in other aspects of the timber sale program. For example, although the Forest Service estimates the amount of timber available for harvest in a particular timber sale area, a practice called "cruising," and includes that information in the timber sale prospectus, plaintiffs customarily cruise the sales themselves to obtain more accurate estimates of the amount of timber available for harvest. DPFUF ¶ 56.

The contrast between the plaintiffs' practiced skepticism of Forest Service information regarding the amount of timber available for harvest stands in stark contrast to the plaintiffs' purported complete trust in the Forest Service relating to environmental litigation. Furthermore, plaintiffs' actions with respect to cruising the sales demonstrates that the Forest Service had reason to believe that the plaintiffs in these cases would take similar steps to verify information relating to the risk of environmental litigation.

C. Plaintiffs' Factual Assertions Are Erroneous And Contested

Plaintiffs rely upon contested facts and inflammatory language in an attempt to demonstrate that the Forest Service purposely kept information regarding the ONRC Action lawsuit from the plaintiffs. Contrary to plaintiffs' assertions, the Forest Service did not make "secret agreements" with the ONRC Action plaintiffs.

The Forest Service, through the Department of Justice, engaged in entirely proper settlement negotiations with the ONRC Action plaintiffs, and it would have been improper for the government attorneys to release confidential settlement information to third parties. Furthermore, the Forest Service agreed to provide notice to the ONRC Action plaintiffs prior to awarding timber sale contracts; despite providing such notice for the three timber sales at issue prior to contract award, the ONRC Action plaintiffs did not any take action within with regard to these sales prior to contract award. DPFUF ¶ 57. Therefore, the Forest Service reasonably believed that the ONRC Action plaintiffs were not interested in stopping work on these timber sales.

VII. Timber Products' Claim For Out Of Pocket Expenses Is Not Properly Before The Court

As a threshold matter, plaintiff Timber Products' claim for out of pocket expenses is not properly before the Court because this case has been bifurcated, and a discussion of damages is not properly before the Court at this time. However, the Forest Service does not dispute that Timber Products may be entitled to out-of-pocket expenses pursuant to C6.01, so long as those expenses are properly documented. Timber Products' supplemental claims for out-of-pocket expenses pursuant to C6.01 are currently pending before the contracting officer.

Furthermore, Timber Products' claim for out-of-pocket expenses is the exclusive monetary remedy available under the contract. C6.01 specifically indicates that lost profits, attorney's fees, replacement cost of timber, and other anticipatory losses are not available. App. 16, 41, 74. In Precision Pine, the Court found that the plaintiff timber company could not recover for both out-of-pocket expenses pursuant to C6.01 and under a breach of contract claim. Precision Pine & Timber, Inc. v. United States, __ Fed. Cl. __, 2007 WL 5030776 at *53 (Sept. 14, 2007) (finding that "to the extent plaintiff seeks to exercise its rights under the terms of the contract, it must also subject itself to the limitations of that contractual right . . . ."). Therefore, a claim for out-of-pocket expenses provided by C6.01 precludes further recovery.

## CONCLUSION

The Forest Service, pursuant to C6.01, had express authority to suspend the timber sale contracts to comply with a court order issued by a court of competent jurisdiction. Because the duty of good faith and fair dealing - and its subspecies, the duties to cooperate and not to hinder - apply only to the terms of a contract, plaintiffs' attempt to focus the Court on the Forest Service's pre-contract actions is improper. Because there is no genuine issue of fact related to the United State's authority to suspend these contracts, the United States is entitled to judgment as a matter of law, and, therefore, we respectfully request the Court to enter summary judgment in favor of the United States. In the alternative, because there are genuine disputes of material fact to the grounds upon which plaintiffs seek summary judgment, plaintiffs' cross-motion for summary judgment must be denied.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

s/Ellen M. Lynch
ELLEN M. LYNCH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7994
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
Lori Polin Jones
James L. Rosen
Marcus R. Wah
Ben Hartman
Office of the General Counsel
United States Department of Agriculture

May 2, 2008

Certificate of Filing

I hereby certify that on this 2nd day of May, 2008, a copy of "Defendant's Response to Plaintiffs' Cross-Motion For Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Ellen M. Lynch
Ellen M. Lynch