**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

DEFENDANT'S RESPONSE AND OBJECTIONS TO
PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT

1. *The process by which a timber sale comes into being starts with initial planning and the preparation of a preliminary document, the timber sale project plan, in which the feasibility of proceeding with the project, which may contain more than one sales, is verified. App. Tab 8 (United States Forest Service ("Forest Service") Manual ("FSM") § 2432.1, 2432.11 (amend. 95-3, eff. Apr. 28, 1995)).*

<u>Defendant's Response:</u> Defendant objects characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

2. *The timber sale project plan must present appropriate data needed by the responsible Forest Service official to determine whether to proceed with the environmental analysis and project design. App. Tab 8 (FSM § 2432.13 (amend. no. 95-3, eff. Apr. 28, 1995)).*

<u>Defendant's Response</u> Defendant objects to plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

3. *After completion of the timber sale project plan, the Forest Service conducts "an intensive field investigation within and adjacent to the proposed project area." App. Tab 8 (FSM § 2432.2 (amend. 95-3, eff. Apr. 28, 1995)). As part of this step,*

*the Forest Service si to perform its statutory obligations under the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"), and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"): comlete the appropriate environmental analysis (typically either an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA")), prepare alternative actions (including a no-action alternative), decide which alternative to select and document the decision in a Decision Notice with a Finding of No Significant Impace or a Record of Decision. App. Tab 8 (FSM § 2432.22g (amend. 95-3, eff. Apr. 28, 1995)).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

4. *The FSM makes it clear that it is the Forest Supervisor's duty to ensure that sale planners consider the environmental effects both in the environmental and sale preparation process. App. Tab 8 (FSM § 2432.04b (amend. 95-3, eff. Apr. 28, 1995)).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, not a statement of fact. Additionally, plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and

responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

5. *Throughout the 1990s, including all time periods pertinent to the* <u>*ONRC Action*</u> *lawsuit filed in July 1998, the Forest Service had a regular practice of completing the environmental analysis and issuing the final NEPA decision document required for a timber sale months or even years before that timber sale would be offered to the public and involve any ground-disturbing activities. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 34:23-35:8; 58:14-61:3; 121:11-122:14).*

<u>Defendant's Response:</u> Defendant objects to this contention because it is not supported by the testimony cited. Mr. Devlin testified that completing the environmental analysis for a timber sale in advance of that sale's being offered to the public was "not a common practice as much as it is a given just because of the time of preparing projects." R. Devlin Dep. Tr. 35:7-8. Additionally, this contention contains plaintiff's legal conclusion concerning what constitutes "ground-disturbing" activities, which is not a contention of fact, and was not the subject of Mr. Devlin's testimony. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

6. *The NEPA decision for the Happy Thin timber sale was issued on September 15, 1998. App. Tab 142. The Happy Thin timber sale contract no. 060772 ("Happy Thin") was awarded to Blue Lake Forest Products, Inc. ("Blue Lake") on July 6, 1999. App. Tabs 122, 124. The NEPA decision notice for the Jack Heli timber sale contract no. 060715 ("Jack Heli") was awarded to plaintiff Timber Products*

*Company ("Timber Products") on March 2, 1999. App. Tabs 91, 93. The NEPA decision notice for the Too Wild timber sale was issued on June 15, 1998. App. Tab 40. The Too Wild timber sale contract no. 075862 ("Too Wild") was awarded to plaintiff CLR Timber Holdings, Inc. ("CLR") on May 14, 1999. App. Tabs 110-111.*

Defendant's Response: Defendant does not dispute these facts.

7. *The advertisements, prospectuses, instructions to bidders and all contract terms and conditions for each of the timber sale contracts involved in this consolidated action (Happy Thin, Jack Heli and Too Wild) were drafted entirely by the Forest Service. All three contracts are contracts of adhesion, the terms and conditions of which are not negotiable. App. Tabs 93, 111, 124.*

Defendant's Response: Defendant admits that the Forest Service drafted the advertisements, prospectuses, and instructions to bidders for each of the timber sale contracts involved in this action. Defendant objects to plaintiff's characterization of the contracts as "contracts of adhesion" because it is plaintiffs' legal conclusion, not a factual contention that the terms of the contract were not negotiable. Additionally, defendant states that the Forest Service has continually consulted with the timber industry in drafting the standard timber sale contract (designated 2400-6), and the timber industry has participated in the drafting of timber sale contracts, including the contracts at issue here. App. __ (R. Fitzgerald Declaration).

8. *Happy Thin and Jack Heli were located on the Klamath National Forest in northern California within Region 5 of the National Forest System. Too Wild was located on the Siskiyou National Forest within Region 6 of the National Forest*

*System. At all times the National Forest land on which all three sales were located was the area governed by the Northwest Forest Plan ("NFP") and under the complete administration and control of the Forest Service. App. Tabs 93, 111, 124; App. Tab 1 (Record of Decision of Amendments to Forest Service and Bureau Land Management Planning Documents Within the Range of the Northern Spotted Owl – Standards and Guidelines for Management of Habitat for Late-Successional and Old Growth Forest Related Species Within the Range of the Northern Spotted Owl.).*

Defendant's Response: Defendant agrees that Happy Thin and Jack Heli are located in the Klamath National Forest, which falls within Region 5 of the National Forest System. Defendant also agrees that Too Wild is located in the Siskiyou National Forest, which falls within Region 6 of the National Forest System. Defendant objects to plaintiffs' characterization of the forests as being under the "complete administration and control of the Forest Service" as that is plaintiffs' opinion and not a contention of fact. Additionally, plaintiffs' opinion is not supported by the documents cited. The Forest Service is charged with managing National Forests within the United States and administering timber contracts, but it does not have "complete" control over the forests which are subject to weather conditions, fires, and unpredictable natural disasters, as well as encompassing areas of private rights such as easements and contract rights.

9. *By awarding Happy Thin, Jack Heli and Too Wild, the Forest Service represented that it complied with all pre-award requirements under NMFA and NEPA. App. Tabs 93, 111, 124; ¶¶ 1-8 above.*

<u>Defendants' Response:</u> Defendant objects to this contention because it is plaintiff's legal conclusion and not a contention of fact. Defendant specifically denies that the Happy Thin, Jack Heli, and Too Wild timber sale contracts contained any express or implied warranty of compliance with any particular legal requirement. App. Tabs 93, 111, 124.

*10. During the 1990s and at least through the pendency of the <u>ONRC Action</u> lawsuit, all Forest Service line officers on National Forests, including District Rangers and Forest Supervisors, were regularly assigned certain target volumes of timber which each National Forest was expected to sell to the public, including the forests within the NFP, such as the Umpqua National Forest and the Klamath National Forest. Regional Foresters and the Chief of the Forest Service had similar target volumes for timber sales on the regional and national levels. One element of each of these line officers' job performance evaluations included whether or not they met these targets or had very good reasons for not meeting these targets. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 119:17-12-:6).*

<u>Defendant's Response:</u> Defendant objects to plaintiffs' characterization of Mr. Devlin's testimony because it is not supported by the testimony cited. Mr. Devlin testified "It is just I think as an agency I have always assumed that if we're given a task to do and financing to do it, we have an obligation to the public to meet that." App. Tab 172 (R. Devlin Dep. Tr. 119:23-120:1). Thus, Mr. Devlin testified that meeting the timber sale volume targets was important because it was a responsibility of the agency to the public. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is neither material nor relevant to plaintiffs' claims for breach of

contract.

11. *As a prerequisite to receiving the award of Happy Thin, Jack Heli, and Too Wild, the Forest Service could have required that Blue Lake, Timber Products, or CLR, respectively, execute a release and waiver of all claims for replacement timber costs or lost profits arising out of any suspension of operations specifically resulting from the ONRC Action lawsuit regardless of whether Forest Service fault or failure to comply with the law was the ultimate cause of the suspension. The Forest Service did not request any such releases or waivers even though it has done so with other timber sale purchasers as a prerequisite before awarding other timber sales threatened with litigation in Region 5. See App. Tab 163 (Letter From Mark Bosetti, Sierra Pacific, Inc., to Joseph Franco, Forest Service (June 28, 2005) with attached "Pre-award Waiver, Release and Limitation of Liability Agreement 04/09/2007").*

Defendant's Response: Defendant objects to this contention because it is plaintiff's legal conclusion, and constitutes parol evidence, and not a contention of fact. Additionally, it is irrelevant what the Forest Service may have done with another timber contract signed six years after the contracts at issue in this lawsuit, and the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure.

12. *As early as November 20, 1998, the Forest Service was considering a new timber sale contract clause that would explicitly allow the Forest Service to unilaterally modify the contract for the protection of survey and manage species. App. Tab 61. The Forest Service elected not to include this clause in the Happy Thin, Jack*

*Heli, or Too Wild contracts.* <u>See</u> *App. Tabs 93, 111, 124.*

<u>Defendant's Response:</u> Defendant objects to this contention because it is plaintiff's legal conclusion, and constitutes parol evidence, and is not a contention of fact.

*13. In April 1994, Secretaries of the United States Department of Agriculture on behalf of the Forest Service and the United States Department of the Interior on behalf of BLM issued a Record of Decision ("ROD") for "Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl." This document amended the plan and resource management plans governing the operation of the National Forest and BLM forestlands in the states of Washington, Oregon and Northern California where it was believed that populations of northern spotted owls existed. The Klamath National Forest in Northern California and the Umpqua National Forest in Oregon were among those forests governed by the NFP. The provisions in the NFP were drawn from Alternative 9 of the Final Environmental Impact Statement prepared as part of the planning effort leading up to the adoption of the plan. The fundamental purpose of the Plan was to permit a predictable and sustainable level of timber sales and use of non-timber resources that would not degrade or destroy the environment or endanger the viability of a variety of species of plants and animals present on NFP federal forests. App. Tab 1.*

<u>Defendant's Response:</u> Defendant agrees with the contentions in the first four sentences, but objects to the contention in the last sentence, because it constitutes plaintiff's opinion, and not a contention of fact.

*14. As part of the NFP ROD, survey and manage standards and guidelines were developed as mitigation measures for over 400 old-growth related species where*

*there was a concern for the continued persistence of these species across the landscape, but where little knowledge existed of the species themselves. App. Tab 185 (R. Holthausen Dep. Tr. 7:23-15:4); App. Tab 1 at A-3 to A-5; App. Tab 6.*

Defendant's Response: Defendant objects to this contention because it is plaintiff's opinion of the survey and manage guidelines, and not a contention of fact. Additionally, the Mr. Holthausen's memo refers to "300+" species that were covered by the original Survey and Manage mitigation measure, but states that "only 70 require specific survey requirements prior to ground-disturbing activity." (Tab 6, A-43). Similarly, the ROD(App. Tab 1) refers to 71 species covered by the survey and manage requirements, not 400 species. (Tab 1 at A-4). Moreover, pages 7-14 of Mr. Holthausen's deposition are not provided at Tab 185. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*15. The NFP identified four survey strategies for the Survey and Manage ("S & M") species: (1) manage known sites; (2) survey prior to ground-disturbing activities; (3) conduct extensive surveys to find high priority sites for management; and (4) conduct general regional surveys to acquire additional information to determine necessary levels of protection. App. Tab 1 at A-10 to A-12; App. Tab 11. Survey and manage species fall into one or more of these catetgories, also sometimes called "components" or "strategies."* Id.

Defendant's Response: Defendant objects to plaintiffs' characterization of the documents; the documents are the best evidence of their contents. Furthermore, the documents

cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*16. The Oregon red tree vole, five species of salamanders, and the Canada lynx were initially designated as the Category 2 species (also sometimes referred to as "Component 2" or "Strategy 2" species). App. Tab 11. Prior to the award of Happy Thin, Jack Heli, and Too Wild, the Canada lynx was removed from the Category 2 species by the Regional Interagency Executive Committee ("RIEC") under a provision of the NFP which allowed such modifications. App. Tab 1 at A-12. Surveys for these species were required for certain timber sales as of October 1, 1996. App. Tabs 1, 11. Approximately seventy-one other invertebrate species, including certain bryophytes, lichens, fungi, mollusks, and vascular plants, were also designated as Category 2 species, and surveys for those species were required for certain timber sales as of October 1, 1998. App. Tab 11.*

Defendant's Response: Defendant objects to the final sentence because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*17. The Category 2 surveys required under the NFP were important to an environmental evaluation of the sales before the sales were authorized, and it was important to have this information before the issuance of a decision notice approving the sales as in compliance with NEPA and NFMA. App. Tab 178 (E. Boling Dep. Tr. 38:9-42:5).*

<u>Defendant's Response:</u> Defendant objects to plaintiffs' characterization that it was "important" to have the Category 2 surveys "before the issuance of a decision notice" because it constitutes plaintiffs' opinion, not a contention of fact. Additionally, the Category 2 survey requirements are governed by the ROD, not by Mr. Boling's testimony. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*18. Category 2 surveys were "designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon, and for which adequate searches could be conducted in a single year." "High-risk" species refers to the risk of extirpation as does the phrase "persistence concerns." App. Tab 185 (R. Holthausen Dep. Tr. 15:10-16:3; 19:24-20:21). For Category 2 species, it was necessary that surveys be conducted prior to ground-disturbing activities which could result in the destruction or impairment of habitat necessary for those species' survival. App. Tabs 9, 35, 49; App. Tab 185 (R. Holthausen Dep. Tr. 15:8-23:18). The Category 2 surveys were the most restrictive in terms of the potential impact on federal lands, including Forest Service timber sales, of the NFP wildlife and plant surveys. App. Tab 185 (R. Holthausen Dep. Tr. 23:3-18).*

<u>Defendant's Response:</u> Defendant agrees with the first sentence of this contention. Defendant objects to the contention in the second sentence because it is not supported by the documents or testimony cited. The September 11, 1998 memorandum states only that Category

2 surveys were required to be done prior to ground-disturbing activity, it did not define "ground-disturbing activity." (App. Tab 49). The October 26, 1996 document titled "Survey and Manage Component 2 Implementation Issues," and the December 2, 1994 "Meeting Notes on Intent of Survey and Manage Strategies in ROD" define "ground-disturbing activity" as "Activities with disturbances having a likely "significant" negative impact on the species' habitat. . ." (App. Tab 9 at A-62 and Tab 35 at A-278). Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*19. As more time passed and more activities such as timber sales were undertaken prior to the implementation of the Category 2 surveys, the risk of extirpation to Category 2 species in all or part of the NFP area increased. App. Tab 185 (R. Holthausen Dep. Tr. 28:19-29:24).*

<u>Defendant's Response:</u> Defendant objects to plaintiffs' characterization of the Mr. Holthausen's testimony. Mr. Holthausen testified that "I think the general concept is correct, that the more time passed and the more activities that were undertaken prior to effective implementation of these strategies, would increase risk to species, but that's a very general statement." (App. Tab 185, Holthausen Dep. 30:15-19). Mr. Holthausen also testified that "Although our knowledge of these species was so poor that it would be impossible to quantify that increase in risk." (App. Tab 185, Holhausen Dep. 31:13-15). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*20. One of the fundamental purposes of the Category 2 surveys was for the government to acquire a sufficient knowledge base to have a better idea of the degree of risk of extirpation to species prior to the initiation of ground-disturbing projects like timber sales. App. Tab 185 (R. Holthausen Dep. Tr. 31:1-21).*

Defendant's Response: Defendant objects to plaintiffs' characterization of Mr. Holthausen's testimony. Mr. Holthausen stated that "Although our knowledge of these species was so poor that it would be impossible to quantify that increase in risk." (App. Tab 185, Holhausen Dep. 31:13-15). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*21. A critical purpose of the Category 2 surveys was to help insure the viability of the species that were being surveyed. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 30:17-32:3).*

Defendant's Response: The testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*22. One of the important objectives of the NFP was to develop as soon as possible the protocols necessary for the Category 2 "prior to ground-disturbing activities" surveys which the NFP directed were to be implemented for certain vertebrate species as of October 1, 1996 and for the remainder of the Category 2 species as of October 1, 1998. App. Tab 1 at A-4.)*

Defendant's Response: Defendant objects to plaintiffs' characterization of the document as it is plaintiff's opinion, not a factual contention concerning the document. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*23. Survey protocols for the five Category 2 salamanders were approved for use by the Forest Service and available at least as early as March 16, 1996. App. Tab 14 (Memo from W. Bradley, BLM, to BLM district managers (Mar. 19, 1996)).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the Category 2 salamander survey protocols as "approved for use" because it is not supported by the document cited. The document states that the attached amphibian protocols are "drafts" and also refers to instructional memoranda attached that are not provided in plaintiff's appendix. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*24. Under the NFP there were several government groups with various levels of authority for recommending and determining the intent and meaning of the NFP survey and manage requirements. At least as early as the spring-summer of 1994, there existed a Survey and Manage Working Group (which included a smaller entity referred to as the "Survey and Manage Core Group") composed of representatives from the Forest Service, the BLM and other agencies. Among other things, the purpose of the Survey and Manage Working Group was to*

*develop working definitions and directions for the implementation of NFP wildlife and plant surveys and to recommend the adoption of certain definitions and interpretations to higher levels of authority within the management structure of the NFP. At various times from at least December 1994 through 1998, the team leaders of this group included Cheryl McCaffrey of the BLM and Randy Hickenbottom of the Forest Service. App. Tabs 2-6, 189.*

Defendant's Response: Defendant objects to this contention because the documents cited do not support plaintiffs' contentions in the final sentence. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*25. There was an Intermediate Management Group ("IMG") immediately above the Survey and Manage Working Group in the NFP administrative hierarchy. This group included representatives of the Forest Service and the BLM at what was determined to be the intermediate management level. One purpose of the IMG was to act on and approve the recommendations from the Survey and Manage Working Group with regard to definitions, directions and interpretations of the survey requirements under the NFP when, in the view of the IMG members, such decisions could be made without referring the matter to the next higher level of authority, the RIEC. From at least December 1994 through 1998 at various times, Tom Nygren of the Forest Service and Bill Bradley of BLM were members of the IMG. App. Tab 189.*

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited. The document cited does not mention the Internediate Management Group; they discuss the Survey and Manage Work Group. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

26. *The RIEC represented the highest level of agency authority at the regional level within the NFP administrative hierarchy. The RIEC included the Regional Foresters of Regions 5 and 6 of the Forest Service and the Director of the Oregon State Office of the BLM or their designated representatives. App. Tabs 12, 189.*

Defendant's Response: Defendant objects because document cited does not support plaintiffs' contentions. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

27. *As part of the administrative structure for the NFP there existed a Regional Ecosystem Office ("REO") under the direction of Donald Knowles, Executive Director, which functioned as the staff of the RIEC coordinating certain agency actions and reporting thereon to the RIEC. Mr. Knowles and other members of the REO from time to time worked with other administrative levels under the NFP including the Survey and Manage Working Group and the IMG. App. Tabs 12, 189.*

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*28. Beginning as early as May 26, 1994, Richard Holthausen, the Team Leader of the Species Analysis Team responsible for developing recommendations regarding the species surveys which ultimately became the survey and manage program under the NFP, provided oral and written presentations explaining the background, rationale for and intent of the wildlife and plant surveys required under the NFP, including the Category 2 surveys. See App. Tabs 2, 6, 10; App. Tab 185 (R. Holthausen Dep. Tr. 32:21-33:8).*

Defendant's Response: Defendant objects to this contention because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*29. In his paper on the background and intent of the NFP survey requirements entitled "Development of the Survey and Manage Measure," Mr. Holthausen discussed the Category 2 surveys which he described as "survey prior to ground-disturbing activities and manage sites that are discovered (Strategy II)." He further stated, "Ground-disturbing activities also were not described, but a common sense definition would include any disturbances of a type and intensity that would have a significant, negative effect on species on the list and/or the habitat that supports them." Mr. Holthausen concluded in his paper that "the*

*survey and manage strategy in the ROD was intended to provide additional protection for species whose outcomes were judged to be low under draft Alternative 9 [the alternative analysis under NEPA which became the NFP],” and Mr. Holthausen offered the observation that “if survey and manage is marked by delays, inconsistencies, and clearly inadequate processes, flexibility will likely be lost and implementation of survey and manage will be likely become more difficult.” App. Tab 6.*

Defendant’s Response: Defendant objects to this contention because the document cited concerns the Forest Service’s actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs’ claims for breach of contract.

*30. At a meeting on December 2, 1994 involving Cheryl McCaffrey of the BLM, identified as the “lead” for the Survey and Manage Working Group, Randy Hickenbottom, Richard Holthausen and others, Mr. Holthausen addressed the intent and meaning of the survey and manage provisions in the ROD of the NFP. The basic purpose of this meeting was to clarify both the intent and development of the survey and manage standards and guidelines and to address the meaning behind some specific terms or phrases. At this meeting it was agreed that the intent of the NFP ROD in requiring wildlife and plant surveys was “to maintain the viability of the species addressed.” Also at this meeting it was generally recognized that Category 2 surveys were “designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon and for which adequate searches can be conducted in*

*a single year." App. Tab 10.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*31. By at least January 1996 a group called the Issue Resolution Team ("IRT") was added to the NFP administrative structure. This team was charged with, among other things, developing and recommending interpretations of the NFP Category 2 survey requirements. Typically, recommendations from this team would be provided to the IMG and/or to the RIEC for official adoption as direction to field personnel for both the Forest Service and BLM employees. Tom Hussey (Forest Service) and Larry Larsen (BLM) were members of the IRT and John R. "Randy" Hickenbottom (Forest Service) worked with the IRT on developing interpretations of the NFP requirements for Category 2 surveys. App. Tabs 12, 20.*

Defendant's Response: Defendant objects to this contention because it the documents cited do not support it. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*32. A joint Forest Service and BLM memorandum dated March 18, 1996 issued to all Forest Supervisors within the area of the NFP, including Forest Supervisors for the Klamath National Forest in California and the Siskiyou National Forest in Oregon, addressed draft standard protocols for the five salamanders to be surveyed before the implementation of ground-disturbing activities in FY 1997.*

*Although these protocols were designated at that time as "draft standard protocols," the memorandum directed that "projects surveyed according to the draft protocols (including modifications by agency biologists) will be considered as meeting the requirements of Component 2 for FY 1996." App. Tab 7.*

Defendant's Response: Defendant objects to this contention because the document cited is notes from a meeting dated December 2, 1996, and does not support plaintiffs' contentions. Additionally, both the contention and the document cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*33. [Intentionally left blank]*

*34. The Survey and Manage Working Group meeting minutes from the August 23, 1995 meeting were reproduced in part and distributed to Survey and Manage Working Group members in connection with a Survey and Manage Working Group meeting on March 22, 1996. Those 1995 minutes stated that Component 2 (Category 2) "Surveyed Prior to Ground-Disturbing Activities ("GDA")" required that surveys for 71 species be completed before ground-disturbing activities were implemented in FY 1999 (relying on ROD C-5) and that surveys for five salamanders and the red tree vole had to be completed before ground-disturbing activities were implemented before 1997 (citing ROD C-5). These minutes further stated that efforts to develop these protocols were to be started immediately. App. Tab 13.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*35. [Intentionally left blank]*

*36. In the Survey and Manage Working Group's proposed FY 1996 organization and work plan dated July 19, 1996, the following recommendation was made: Component 2: Complete survey protocols for all species. Surveys for amphibians and red tree voles are required for FY 1997 projects. For other species, surveys required for FY 1999 projects. All protocols should be complete in FY 1996 or 1997. App. Tab 17 at A-152.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*37. At a January 17, 1996 Forest Plan Implementation workshop designed to provide guidance to Forest Service field personnel on the meaning and intent of the NFP, the question was asked "When is a project implemented?" At the workshop, Tom Hussey, a member of the IRT, answered that question as follows: "Project implementation is when the Forest Service has committed to a project to the point where it would be unreasonable (cost or resource impacts) to delay or cancel the project. When the Forest Service has entered into legal contractual agreement, the project is considered implemented (IRT Response)." App. Tab 12 at A-90.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*38. In the summer of 1996 two members of the IRT, Larry Larsen of the BLM and Tom Hussey of the Forest Service, and Randy Hickenbottom, who was the team leader of the Survey and Manage Working Group at the time, collaborated to write a proposed answer/resolution to the question: when are ground-disturbing activities implemented on a project or timber sale for purposes of directing when Category 2 surveys are required. Multiple drafts were prepared throughout the summer and into the fall of 1996 in an attempt to provide a proposed answer/resolution. App. Tabs 16, 18, 20-24, 26-34, 39, 43, 71-72, 74-75, 77, 83, 87-88, 104-07; App. Tab 171 (L. Larsen Dep. Tr. 6:17-22); App. Tab 38 ("Notes on S&M Concerns Meeting" (Jan. 22, 1997)); App. Tab 37 ("Memo from Robin Bown, S&M Workgroup Representative, to Various Offices" (Nov. 25, 1996)).*

Defendant's Response: Defendant objects to this contention because several of the documents cited do not support plaintiffs' statements. The documents at Tab 87 and 88, 104, 105, do not concern the definition of "ground-disturbing." The document at Tab 37 does not relate to the summer or fall of 1996. Furthermore, the documents and testmony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*39. [Intentionally left blank]*

*40. [Intentionally left blank]*

*41. In the summer of 1996, in a draft paper addressing, among other points, the definition of implementation of ground-disturbing activities for purposes of the ROD direction requiring Category 2 surveys, Larry Larsen, a member of the IRT, wrote: Rationale: By requiring the S&M survey prior to the project decision, we can assure that the responsible official, other agencies, and the public have the benefit of the survey information prior to making an informed decision. This is consistent with the stated objective for doing the surveys: ". . . information gathered from them should be used to establish managed sites for the species." This definition of implementation would also allow us to move ahead with projects for which a decision has already been made, but will not begin operations until 1997. App. Tab 18 at A-194.*

<u>Defendant's Response:</u> Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*42. In Mr. Larsen's paper referred to in paragraph 41 above, he also stated that an alternative definition of implementation could be the date at which project operations actually began. As to this definition Mr. Larsen stated: The chief problem is that it would be inconsistent with the stated objective for doing the surveys as mentioned above. The information from the surveys would not be available in a timely manner for the project designed to include the managed sites*

*as needed for these species. A second problem with using the initiation of project [including timber sale] operations would be that there are a number of projects [timber sales] that need to begin operations in early 1997 and they would be delayed pending the completion of surveys. App. Tab 18 at A-194.*

Defendant's Response: Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*43. In Mr. Larsen's draft referenced in paragraph 41 above, he also made the following observation:*

*QUESTION 3: HOW SHOULD WE HANDLE SITUATIONS WHERE THE DRAFT S&M PROTOCOLS ISSUED IN THE NEXT FEW MONTHS REQUIRE SURVEYS THAT CANNOT BE PERFORMED UNTIL NEXT SPRING, YET WE NEED TO PLAN THE PROJECT AND MAKE A DECISION THIS FALL OR WINTER?*

*Response: There may be projects [including timber sales] where the draft protocol is available but for biological reasons the survey cannot be conducted until the spring or summer of 1997. In cases where these projects [timber sales] need to have a decision made prior to the time that the survey can be conducted, then the decision document can be signed but the project [timber sale] cannot commence operations until the survey is conducted and the project design adjusted to include the S&M species considerations as appropriate. Clearly, this*

*should be a reluctant "last resort" option because of the possible difficulties of adjusting a project to include the S&M information obtained after project design and decision. As discussed in Question 1, wherever possible we should schedule project decisions [timber sale Decision Notices] to include the results of S&M surveys. App. Tab 18 at A-194 to A-195.*

Defendant's Response: Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*44. One of the possible interpretations of how "implementation" should be defined for purposes of ascertaining the implementation of ground-disturbing activities which was considered by the IRT was the concept that ground-disturbing activities would be considered implemented on the date that an appropriate decision document, such as a Decision Notice, was signed signifying completion of the environmental analysis required under NEPA and NFMA before a timber sale could be offered to the public. This interpretation came to be known as "NEPA decision equals implementation" or "NEPA decision equals implemented." This interpretation was ultimately adopted by both the Forest Service and the BLM, and it was subsequently determined to be arbitrary and capricious and contrary to law in the ONRC Action litigation. App. Tabs 18, 34, 49; Oregon Natural Resources Council Action v. United States Forest Service, 59 F. Supp. 2d 1085, 1091-94 (W.D. Wash. 1999).*

Defendant's Response: Defendant agrees that the Forest Service concluded after considerable analysis, that for purposes of complying with the ROD, a timber sale would be considered implemented as of the time the environmental review was completed, and the NEPA documents were signed. (App. Tab 34). Defendant objects to the final sentence of this contention because it is plaintiff's legal conclusion, and not a contention of fact. Furthermore, the documents cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

45. *The IRT members and other government personnel working with them on the development of the interpretation "NEPA decision equals implementation" took both legal risk and biological risk into consideration as they analyzed alternative interpretations of the NFP Category 2 survey requirements. "Legal risk" in this context meant, for example, the government's risk of losing a lawsuit brought by environmental activists who might dispute the official interpretation. "Biological risk" referred to the risk to the viability of the species if the Category 2 surveys were not required for a significant number of timber sales. App. Tab 168 (R. Hickenbottom Dep. Tr. 105:15-107:1). Randy Hickenbottom, a working member of the IRT and for a period of time team leader of the Survey and Manage Working Group, thinks it is really important to know how many timber sales were going to be grandfathered in without surveys if the interpretation "NEPA decision equals implementation" was selected.* Id. *(R. Hickenbottom Dep. Tr. 108:3-15).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects that the testimony cited is hearsay, it does not support plaintiffs' contention, and plaintiffs mischaracterize the testimony. Mr. Hickenbottom testified that he did not recall any discussions about the threat of environmental litigation as a "legal risk" potentially affecting an awarded timber sale. (App. Tab 168, Hickenbottom Dep. 106:7-21). Mr. Hickenbottom also testified that the practice of "grandfathering" timber sales was not something he "would have delved into." (Hickenbottom Dep. 107:18-19). Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*46. During the IRT deliberations which ultimately resulted in the IRT recommending the adoption of the interpretation "NEPA decision equals implementation," Randy Hickenbottom preferred an interpretation which would define implementation as some point after the signing of a NEPA decision notice but before the Forest Service or the BLM made a relatively irreversible commitment to the project. Mr. Hickenbottom advocated this interpretation because it would require more projects to be surveyed, and therefore more projects would have the benefit of the knowledge of the presence or absence of the S&M species before timber harvest or other operations might adversely alter the available habitat of these species. App. Tab 168 (R. Hickenbottom Dep. Tr. 108:23-109:20); App. Tab 21.*

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further objects because the testimony does not support plaintiffs' contention and mischaracterizes the testimony. See Pls.' App. Tab 168 (R. Hickenbottom Dep. Tr. 109:18-109:23) (Mr. Hickenbottom did not recall drafting the document, and did not know who drafted the document). Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

47. When Randy Hickenbottom was a working member of the IRT and team leader of the Survey and Manage Working Group, he believed that whenever possible atimber sale's NEPA Decision Notice should include consideration of the results of the S&M surveys. It was optimal from a management standpoint to have as much information as possible in order to make a well-informed NEPA decision. App. Tab 168 (R. Hickenbottom Dep. Tr. 109:24-110:16); App. Tab 21.

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*48. As of August 28, 1996, the IRT was still analyzing different interpretations of the required start date for Category 2 species surveys under the NFP. With regard to the interpretation "NEPA decision equals implementation" under which no*

> *Category 2 surveys would be required prior to actual timber sale operations for timber sales with decision notices signed on or before September 30, 1996 regardless of whether those sales might not be offered to the public, awarded and operated for months or even years later, the following concerns were expressed: This could result in projects being operated on in fiscal years 1997, 1998, and possibly even 1999 without surveys having been done. We have been unable to determine how many projects this might include, nor have we been able to get an estimate of the possible resource damage that could occur. There is strong concern on the part of many FS, BLM, and F&WS personnel that allowing major activities such as timber sale or road building operations to proceed after 9/30/96 without surveys is unacceptable because it does not meet a commonly accepted understanding of when implementation occurs. App. Tab 22; App. Tab 168 (R. Hickenbottom Dep. Tr. 113:5-19).*

48.Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Additionally, plaintiffs mischaracterize Mr. Hickenbottom's testimony. Mr. Hickenbottom testified that he did not share the "strong concern" about operating sales without Category 2 surveys being done. In a portion of Mr. Hickenbottom's testimony not provided by plaintiff, Mr. Hickenbottom testified that he did not share this concern because "Quite frankly I felt that the distribution of activity relative to the known range of those species and the overall amount of activity that could be proposed and on the shelf for those was unlikely to result in serious extirpation viability issues for those species." (Hickenbottom Dep. Tr. 113:23-25-114:4.) Furthermore, the document and testimony cited

concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and therefore, are not relevant to plaintiffs' claims for breach of contract.

*49. Prior to January of 1997, Richard Holthausen, Team Leader for the NFP wildlife Species Team, was asked by Don Knowles, Director of the Regional Ecosystems Office, if it was possible to do an assessment of the potential impact of different implementation dates for the surveys required under the NFP. Mr. Holthausen told Mr. Knowles at that time, "That in general, one could reasonably assume that delay of implementation strategies would result in some negative effect for some species, but that it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects." In short, there was no way of knowing whether the negative effect on the species would be relatively small or whether it would cause extirpation of a species. App. Tab 185 (R. Holthausen Dep. Tr. (9/30/07) 48:4-51:23).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Additionally, pages 49-51 are not found at Tab 184 of the Appendix. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*50. In a draft memorandum produced by members of the IRT prior to October 4, 1996 but late in the process of the IRT finalizing its recommendation regarding the interpretation of the Category 2 survey implementation date requirements, the potential impact of adopting the interpretation "NEPA decision equals*

*implementation" was discussed as follows:* *Question 2: Does The Above Definition Of The Point Of Implementation [NEPA Decision Equals Implementation] Allow Us To Make A Large Number Of NEPA Decisions Prior To September 30, 1996 For Outyear Projects In Order To Avoid The Need For Category 2 S&M Surveys?*

*Response: The ROD clearly intended that we perform surveys for Category 2 species prior to the design and implementation of projects; and it also clearly intended that we have until FY 97 to phase in this requirement. But the "banking" of NEPA decisions prior to FY 97 for projects that will not begin for several years is inappropriate. If we do not plan to make an irreversible commitment to proceed with the project prior to mid-year 1997, then we should conduct the survey for the Category 2 S&M species prior to making a NEPA decision on the project. If for some reason it is necessary to make a NEPA decision prior to Sept. 30 for an outyear project, then it might also be appropriate to do so but plan to conduct the S&M survey prior to making an irreversible commitment to proceed with the project. This should be a reluctant "last-resort" approach, as it creates the risk that the project will need to be re-designed based on the results of the S&M survey and the NEPA process recycled. The definition of the term "irreversible commitment to proceed" will vary according to the type of project and the policies and procedures of the managing agency, but it usually should be the point at which it is relatively difficult and expensive to redesign or cancel a project. Examples of that point might be the award of a timber sale, the signing of*

*a service contract, or the actual operational start of a force account project. App. Tab 28.*

Defendant's Response: Defendant objects to plaintiffs' characterization of the document; the document is the best evidence of its contents. Defendant further objects because the date and authorship of the document are not clear from the face of the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*51. As the IRT was considering how to interpret the NFP direction for the implementation of Category 2 surveys, including the interpretation of the point at which ground-disturbing activities were implemented for purposes of timber sales, members of the IRT were aware of concerns raised by agency personnel regarding the possibility that the Forest Service and the BLM could rush the environmental analysis process forward in order to get decision documents signed prior to October 1, 1996. Individuals voicing such concerns included Cheryl McCaffrey of the BLM and Robin Bown of the Fish & Wildlife Service. Both Tom Hussey, a member of the IRT, and Randy Hickenbottom, who worked with the IRT on this interpretation question, were aware of these concerns. App. Tab 171 (L. Larsen Dep. Tr. 30:6-32:11).*

Defendant's Response: Defendant objects to this contention because it plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects on the basis that the proffered testimony constitutes inadmissible hearsay.

Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*52. In determining which interpretation to recommend regarding the date on which ground-disturbing activities would be considered implemented for purposes of Category 2 surveys, the IRT considered the potential contractual liability of the Forest Service and the BLM to purchasers of timber sales. App. Tab 171 (L. Larsen Dep. Tr. 37:18-39:7).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects because plaintiffs mischaracterize the testimony. See Pls.' App. Tab 171 (L. Larsen Dep. Tr. 38:25-39:2) (Mr. Larsen stated "amongst ourselves we probably discussed it . . . ."). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*53. At least as early as August 1996 while the IRT was trying to reach a consensus on its interpretation of what was meant by implementation of ground-disturbing activities for purposes of the requirement to perform Category 2 surveys on timber sales, members of the IRT were made aware of concerns expressed by field personnel at both the BLM and the Forest Service that adopting an interpretation such as "NEPA decision equals implementation" could lead to the exemption of a significant number of timber sales from the Category 2 survey requirements. At*

*this time there was concern among IRT members that it would be important to know how many timber sales might be exempted by such an interpretation and what the possible resource damage would be if that interpretation were adopted. It was generally understood by IRT members that the Forest Service had significantly more timber sales in this potential position than the BLM. App. Tab 171 (L. Larsen Dep. Tr. 47:15-51:3); App. Tab 22.*

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Defendant further objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further objects because the contention is not supported by the testimony cited. Mr. Larsen testified that the Survey and Manage group raised concerns to the "decision makers," but he did not testify as to any knowledge about any concerns the IRT members may have had, nor what was "generally understood" by the (unspecified) IRT members. (App. Tab 171, Larsen Dep. 49:14-50:16). This contention is therefore unsupported and amounts to nothing more than plaintiffs' opinion. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*54. In the draft "Survey and Manage Current Implementation Issues" paper dated September 1, 1996, prepared by Larry Larsen for IRT consideration, situations involving timber sales with NEPA documents signed prior to October 1, 1996 but awarded on or after October 1, 1996 was considered. As to these situations, Mr. Larsen noted that survey protocols for Category 2 salamanders had been*

> *available since March of 1996, that the red tree vole did not currently have approved survey protocols, and that the presence or absence of survey and manage species was a significant piece of information that should be analyzed prior to the execution of a NEPA decision document. App. Tab 24. Mr. Larsen also observed that there was legal risk to the agencies and potential biological risk to the species in not performing Category 2 surveys on timber sales for which NEPA decision documents were signed prior to October 1, 1996 but which were not awarded until after that date. Mr. Larsen concluded that in such situations there was a substantial risk to both species and the agencies because the Category 2 surveys were key information which should be available to decision makers at the time the NEPA decision was signed. Thus, not performing Category 2 surveys for timber sales in this situation raised a significant concern. Id.; App. Tab 171 (L. Larsen Dep. Tr. 61:25-62:16).*

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further objects to this contention because it is not supported by the document or testimony cited. The September 1, 1996 states only that it is based on the "assumptions" that the Salamander surveys were available, that the red tree vole did not have protocols, and that the intention was to perform surveys prior to the design phase and signing of NEPA documents. App. Tab 24. Additionally, Mr. Larsen did not testify that there was a "substantial risk" he said, in response to a question about what kind of "risk" would be involved by saying, "To the species, to the agency, whatever, yes." Furthermore, the document and testimony cited concern

the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*55. As of October 4, 1996, Larry Larsen, Tom Hussey and Randy Hickenbottom had reached agreement on the interpretation they would recommend for determining when ground-disturbing activities had been implemented for purposes of Category 2 surveys. App. Tab 171 (L. Larsen Dep. Tr. 65:12-24); App. Tab 32.*

Defendant's Response: Defendant objects to this contention because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*56. The document entitled "Survey and Manage (Component 2) Implementation Issues" dated October 22, 1996 reflects the interpretation of the implementation of ground-disturbing activities for purposes of performing Category 2 surveys under the NFP as recommended by the IRT and as adopted by the RIEC. App. Tab 171 (L. Larsen Dep. Tr. 66:4-67:21); App. Tab 43.*

Defendant's Response: Defendant objects to this contention because the document[1] and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*57. Nothing in the November 1, 1996 or September 11, 1998 joint agency memoranda adopting the interpretation "NEPA decision equals implementation," or elsewhere in the NFP precluded a Forest Service deciding officer (typically a*

[1] The document is dated November 1, 1996; not October 22, 1996. Pls.' App. Tab 43.

*Forest Supervisor) from opting not to sign a Decision Notice for a proposed timber sale before that sale had been surveyed for Category 2 species. In other words, the interpretation "NEPA decision equals implementation" did not preclude the Forest Service from delaying the execution of a Decision Notice on a timber sale until all Category 2 surveys required for FY 97 and/or FY 99 had been completed for that sale and fully considered before approval of that sale for public offering. App. Tabs 34, 49.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*58. As of August 28, 1996, one of the concerns of the IRT in deciding the meaning of "implementation of ground-disturbing activities" for purposes of Category 2 surveys was "how much risk do we want to take in going ahead with activities without surveys." App. Tab 74.*

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited. The memorandum cited was not written by the IRT, it was from the Forest Service's litigation coordinator, and it is dated December 11, 1998, not August 28, 1996. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*59. The document entitled "IMPLEMENTATION OF SURVEY AND MANAGE (COMPONENT 2) REQUIREMENTS" was an early staff paper prepared by Tom Hussey for IRT consideration by Larry Larsen of the BLM, Cheryl McCaffrey of the BLM, Randy Hickenbottom of the Forest Service and Lyndon Werner of the BLM. App. Tab 170 (T. Hussey Dep. Tr. 40:6-41:22); App. Tab 18.*

<u>Defendant's Response:</u> Defendant objects to this contention because the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*60. As the IRT was considering alternative interpretations of the concept of implementation of ground-disturbing activities for purposes of performing the Category 2 surveys, it was aware that some interpretations such as "NEPA decision equals implementation" would permit more timber to be sold on a faster timetable and would therefore assist the Forest Service in meeting its timber sale targets under the NFP. Thus, the IRT members were aware that, depending upon the interpretation ultimately adopted, the Forest Service could come up short on its timber sale program goals under the NFP and it could risk coming up short on its species protection goals under the NFP. The IRT was also always aware that there was a risk of lawsuits by environmental activists challenging an interpretation that favored the Forest Service's timber sale program goals over its species protection goals. App. Tab 170 (T. Hussey Dep. Tr. 45:21-47:14).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Hussey testified that the balancing of meeting environmental concerns and continuing to operate the timber program was not his primary focus, but rather "something that occurred at higher levels than our team." Mr. Hussey further testified that "Our team was far more worried about the Northwest Forest Plan direction than specific projects or targets or anything like that." App. Tab 170 (Hussey Dep. 45:25-46:7). Additionally, Mr. Hussey stated that balancing timber sales with environmental concerns affected him but "it wasn't weighted anywhere near as heavily as trying to figure out what the plan said and come up with direction that would meet it." Id. 46:12-16. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*61. The document entitled "IMPLEMENTATION OF SURVEY AND MANAGE (COMPONENT 2) REQUIREMENTS" was a draft provided for review to the IMG, including Tom Nygren of the Forest Service and Bill Bradley of the BLM. App. Tab 21; App. Tab 170 (T. Hussey Dep. Tr. 51:24-53:12).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Hussey testified that a version of this document would eventually have been provided to Mr. Nygren and Mr. Bradley, not that this particular document was. App. 170 (Hussey Dep. 51:21-23). Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of

contract.

62. *There was general agreement among the IRT members that whenever possible the Forest Service should schedule timber sale project decisions to include the results of S&M surveys before the Decision Notices were executed. App. Tab 170 (T. Hussey Dep. Tr. 58:25-59:10).*

Defendant's Response: Defendant objects to the use of the term "general agreement" because it is vague and ambigous, Additionally, we object to this contention because it is not supported by the testimony cited. Mr. Hussey testified only that he personally agreed with the statement referred to. App. 170 (Hussey Dep. 59:1-10). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

63. *Despite the fact that the IRT members all agreed that the NEPA analysis leading up to the execution of a Decision Notice for a timber sale should whenever possible include the results of S&M surveys for Category 2 species, no recommendation was ever made by the IRT to the IMG or the RIEC that Forest Service deciding officers should hold off on executing Decision Notices until the S&M surveys had been completed. App. Tab 170 (T. Hussey Dep. Tr.58:21-60:9); App. Tab 171 (L. Larsen Dep. Tr. 36:8-17).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited, and is therefore merely plaintiffs' opinion. Neither Mr.

Hussey nor Mr. Larsen testified that "the IRT members all agreed" about plaintiffs' counsel's statement. App. Tab 170 (T. Hussey Dep. Tr.58:21-60:9); App. Tab 171 (L. Larsen Dep. Tr. 36:8-17). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*64. According to Tom Hussey, a member of the IRT during the time that the interpretation "NEPA decision equals implementation" was being developed, the commonly accepted understanding of when implementation of ground-disturbing activities occur was as follows: My recollection at least was what was in my mind when we were discussing this is to most people implementation is an action, big yellow machines driving off low boys, chain saws roaring, dirt being moved and stuff like that rather than signing of a decision document. App. Tab 170 (T. Hussey Dep. Tr. 63:18-64:1).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Hussey testified only as to what was in his mind, regarding the definition of "ground-disturbing." Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*65. The document entitled "Survey and Manage Current Implementation Issues," dated September 1, 1996, was very near the final IRT agreed position on how to interpret the NFP Category 2 survey requirements and their implementation dates. App. Tab 170 (T. Hussey Dep. Tr. 66:9-20); App. Tab 24.*

Defendant's Response: Defendant objects to this contention because page 66 of Mr. Hussey's deposition is not attached at Tab 170. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*66. Tom Hussey and Larry Larsen were the primary drafters of the document entitled "Survey and Manage Current Implementation Issues" dated September 1, 1996. App. Tab 170 (T. Hussey Dep. Tr. 68:5-22); App. Tab 24.*

Defendant's Response: Defendant objects to this contention because document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*67. The Forest Service issued interim guidance for the surveys of the Oregon red tree vole ("RTV") on November 4, 1996. By its own terms this guideline was to expire on September 30, 1998. App Tab 36 (RTV Directive). Although there was evidence at that time that the Oregon RTV may also be found in northern California, the interim guidance did not require surveys to be conducted in California. Id. The interim guidance also did not require surveys to be conducted in National Forest areas where at least 40% of the land contained habitat suitable for the Oregon RTV. Id. This November 4, 1996 interim guidance was extended by the Forest Service on September 25, 1998. App. Tab 52 (Memo extending RTV Directive).*

Defendant's Response: Defendant objects to this contention because it is not

supported by the document cited. The RTV Memorandum does not state that there was "evidence" that the Oregon RTV was found in Northern California, nor that surveys were not required where at least 40% of the land contained habitat suitable for the Oregon RTV. App. Tab 36. The RTV Memorandum states that surveys are required in areas where an area is at least 40% forested, and "has at least a 60% crown closure or greater." Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*68. From approximately April 13, 1994, when the NFP ROD was issued, through October 1, 1998, the Forest Service knew that it was going to be very difficult to develop the necessary protocols for performing all of the Category 2 surveys in time to survey sales on which ground-disturbing activities would first take place on or after October 1, 1998. Thus, substantially before October 1, 1998, the Forest Service was well aware that many of the Category 2 surveys required by the NFP would probably have to be postponed. App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 166:6-171:2).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion based on speculation by Ms. Zike; it is not a contention of fact. Defendant further objects because Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

69. *In April 1998, the Forest Service and the BLM approached the RIEC with a request to consider a one-year delay of survey implementation for several Category 2 surveys, based on the language on the ROD, page C-6 and the problems associated with some Category 2 species surveys. As a result, the RIEC directed the Survey and Manage workgroup to try to devise a way that the socio-economic goals of the NFP (i.e., the Forest Service and BLM timber sale programs) could be upheld without increasing the risk of extirpation to the species. The group came up with a classification that considered the risk posed by a one-year delay of surveys from FY 1999 to FY 2000 and the technical feasibility of accomplishing the surveys. Accordingly, the RIEC authorized the development of an EA to change the implementation schedule for 32 species where surveys were believed to be not-technically-feasible and where this one-year delay in surveying did not appear to substantially increase risk to the species. The analysis used in this EA also identified 12 species which were estimated to be at "substantially increased risk" if surveys were delayed from FY 1999 to FY 2000 and planned Forest Service and BLM timber sales continued to be sold and harvested. The possibility of these types of changes was expressly contemplated in the NFP and was within the authority of the RIEC, provided that the necessary NEPA and NFMA analysis was performed first. App. Tab 75 at A-538.*

Defendant's Response: Defendant objects to this contention because the concluding sentence is not supported by the document cited, it is merely plaintiffs' opinion. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior

to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*70. [Intentionally left blank]*

*71. On or about December 11, 1998, Sue Zike and Peggy Kain of the Forest Service and Judy Nelson of the BLM submitted briefing information to Paul Brouha of the Washington Office of the Forest Service and Chris Jauhola, an official in the Washington Office of the BLM. This briefing paper discussed several items including Category 2 species surveys referred to as "survey before ground-disturbing activities." Addressing these Category 2 or "Strategy 2" surveys the paper states: Strategy 2 surveys have multiple implementation dates with surveys for red tree voles and amphibians beginning in FY 1996; and surveys for the remaining 71 species beginning in FY 1999. The ROD recognized that little was known about the species and that difficulties would be encountered in meeting the survey and manage requirements. Flexibility was built into the plan: as experience is acquired, the Regional Interagency Executive Committee (RIEC) can change the schedule, move a species from one survey strategy to another, or drop the mitigation strategy for species whose status is found to be more secure than originally projected (ROD, p. C-6). App. Tab 75 at A-537 to A-538.*

<u>Defendant's Response:</u> Defendant objects to this contention because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber

sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*72. As of approximately October 5, 1999, with respect to Happy Thin, Jack Heli and Too Wild, the following required wildlife and plant surveys had not been performed. In many cases, indicated below, protocols for these surveys were not yet available. In some cases these surveys were not scheduled to be completed until the year 2000.*

| **Species** | **Happy Thin, KLA** | **Jack Heli, KLA** | **Too Wild, SIS** |
|---|---|---|---|
| BrIdgeoporus nobilissimus (fungi) | To be completed Fall 2000 | To be completed Fall 2000 | To be completed Fall 2000 |
| Aleuria rhenana (fungi) | No protocol available | No protocol available | No protocol available |
| Bondarzewia Montana (fungi) | No protocol available | No protocol available | No protocol available |
| OtIdea leporina (fungi) | No protocol available | No protocol available | No protocol available |
| OtIdea onotica (fungi) | No protocol available | No protocol available | No protocol available |
| OtIdea smithii (fungi) | No protocol available | No protocol available | No protocol available |
| Polyozellus multiplex (fungi) | No protocol available | No protocol available | No protocol available |
| Sarcosoma Mexicana (fungi) | No protocol available | No protocol available | No protocol available |

| | | | |
|---|---|---|---|
| PtilIdium californicum (bryophytes) | | To be completed Fall 2000 | |
| Ulota meglospora (bryophytes) | No protocol available | | No protocol available |
| Buxbaumia vIdiris (bryophytes) | | | No protocol available |
| Kurzia makinoana (bryophytes) | | | No protocol available |
| Rhizomnium nudum (bryophytes) | | | No protocol available |
| Tetraphis geniculata (bryophytes) | | | No protocol available |
| Helminthoglypta hertleini (Oregon Shoulderband) (mollusks) | To be completed June 2000 | To be completed Summer 2000 | |
| Helminthoglypta talmadgei (Klamath Shoulderband) (mollusks) | | To be completed Summer 2000 | |

| | | | |
|---|---|---|---|
| Megomphix hemphilli (Oregon Megomphix) (mollusks) | | | To be completed November 1999 |
| Monadenia churchi (Church's SIdeband) (mollusks) | | To be completed Summer 2000 | |
| Monadenia churchi (Church's SIdeband) (mollusks) | | To be completed Summer 2000 | |
| Monadenia troglodytes (Shasta SIdeband) (mollusks) | | To be completed Summer 2000 | |
| Monadenia troglodytes wintu (Wintu SIdeband) (mollusks) | | To be completed Summer 2000 | |
| Prophysaon coeuleum (Bluegrey Tail-dropper) (mollusks) | To be completed June 2000 | | To be completed November 1999 |

| | | | |
|---|---|---|---|
| Prophysaon dubium (Papillose Taildropper) (mollusks) | To be completed June 2000 | To be completed Summer 2000 | To be completed November 1999 |
| Trilobopsis roperi (Shasta Chaparral) (mollusks) | | To be completed Summer 2000 | |
| Trilobopsis tehamana (Tehana Chaparral) (mollusks) | To be completed June 2000 | | |
| Allotropa virgata (Sugar Stick) (vascular plants) | To be completed June 2000 | | |
| Cypripedium fasciculatum (Klamath) (Clustered Lady's Slipper) (vascular plants) | To be completed Summer 2000 | | |

| | | | |
|---|---|---|---|
| Cypripedium montanum (west Cascades) (Mountain Lady's Slipper) (vascular plants) | To be completed Summer 2000 | | |

Defendant's Response: Defendant objects to this contention of fact because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*73. On November 1, 1996, the Forest Service and BLM issued a joint guidance memorandum adopting the interpretation "NEPA decision equals implementation" for the purpose of determining when ground-disturbing activities are implemented in the context of Category 2 species survey requirements. Although issued on November 1, 1996 the "NEPA decision equals implementation" interpretation was deemed effective direction to Forest Service line officers as of October 1, 1996. The joint memorandum adopting this interpretation by its own terms was to expire as of September 30, 1998. App. Tab 34.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*74. Prior to the Forest Service's adoption of the interpretation "NEPA decision equals implementation" in the joint agency memorandum dated November 1, 1996, the Forest Service had information available which would have allowed anyone who was interested in the Forest Service to ascertain how many and which timber sales were likely to have sufficient environmental analysis completed to allow the execution of Decision Notices prior to October 1, 1996, assuming Category 2 surveys did not have to be performed prior to the execution of those Decision Notices. Thus, it was possible to determine before this joint memorandum was issued, how many (and specifically which) Forest Service and BLM timber sales were in the planning pipeline and would likely be offered to the public after October 1, 1996 without Category 2 surveys. Nevertheless, the Forest Service did not ascertain how many such timber sales were in the planning pipeline. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 36:21-39:17).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited, and is merely plaintiffs' opinion. Defendant further objects because the plaintiffs have taken Mr. Devlin's testimony out of context and Mr. Devlin's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*75. The interpretation "NEPA decision equals implementation" in the November 1,1996 joint memorandum was re-adopted on September 11, 1998 for the second*

*group of Category 2 surveys (the invertebrates) which were required as of October 1, 1998 for certain timber sales. App. Tab 49.*

Defendant's Response: Defendant objects to this contention because document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*76. Just as was the case with the joint memorandum dated November 1, 1996, re-adoption of the interpretation "NEPA decision equals implementation" with respect to the October 1, 1998 Category 2 surveys meant that the Forest Service was not required to perform Category 2 surveys if Decision Notices were signed for timber sales in the planning pipeline prior to October 1, 1998, even if the Category 2 invertebrate surveys had not been performed and these timber sales were not offered to the public months or even years later. Prior to October 1,1998, the Forest Service had information available that would have allowed anyone in he Forest Service who was interested to ascertain how many (and specifically which) Forest Service and BLM timber sales were in the planning pipeline and could have Decision Notices executed prior to October 1, 1998, assuming no Category 2 surveys had to be performed on these sales prior to October 1, 1998. Nevertheless, prior to the re-adoption of the interpretation "NEPA decision equals implementation" in this September 1998 joint memorandum, the Forest Service did not ascertain how many such timber sales were in the planning pipeline. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 36:21-39:17).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Defendant further objects because the plaintiffs have taken Mr. Devlin's testimony out of context and Mr. Devlin's personal opinion cannot bind the Forest Service. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

77. The Forest Service did not consult with the Department of Justice regarding the legal viability of the interpretation "NEPA decision equals implementation" before the Forest Service adopted that interpretation. App. Tab 131; App. Tab 179 (M. Gippert Dep. Tr. 44:25-48:16; 50:12-53:22).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*78. However, the "NEPA decision equals implementation" interpretation was discussed with the Department of Justice and representatives of the President's Council on Environmental Quality in the Washington Office of the Forest Service before the filing of the ONRC Action lawsuit. At that time Michael Gippert, lead Washington Office attorney for the Forest Service on NEPA and NFMA issues, advised the Forest Service that in light of existing case law the NFP needed to be formally amended if the definition of "NEPA decision equals implementation" was to be extended to FY99 and beyond. App. Tab 131; App. Tab 179.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a statement of fact. Defendant further objects because Mr. Gippert's personal opinion cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*79. One implication of the joint agency interpretation "NEPA decision equals implementation" was that for those actions authorized prior to the deadline, there would be an incentive for the agency to hurry up and sign decision notices before the deadline occurred. This allegation was raised by the ONRC Action plaintiffs in their lawsuit filed July 8, 1998, and it was a concern to Edward (Ted) Boling, lead attorney for the government in the ONRC Action litigation. App. Tab 178 (E. Boling Dep. Tr. 58:12-61:3).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a statement of fact. Defendant further objects because Mr. Boling's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*80. Prior to September 30, 1998, Robert Devlin, Director of Natural Resources for Region 6, sent an email to all national forests in Region 6 urging them to sign Decision Notices prior to October 1, 1998 in order to avoid the obligation to conduct Category 2 species in instances in which apart from these surveys and formal biological opinions all the work necessary for the Decision Notices had*

*been completed. App. Tab 50; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 27:6-28:3).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Devlin's message to the forests stated his belief that his instructions met the requirements of the Northwest Forest Plan, and therefore it was acceptable to sign Decision Notices. Defendant further objects because Ms. Zike's deposition testimony constitutes inadmissible hearsay, and her personal opinion cannot bind the Forest Service. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

81. *Oregon Natural Resources Council Action et al. v. U.S. Forest Service and Bureau of Land Management, CV 98-942 WD ("ONRC Action"), was filed on July 8, 1998 in the U.S. District Court for the Western District of Washington. The plaintiffs in the ONRC Action litigation claimed that both the Forest Service's "NEPA decision equals implementation" interpretation and the Oregon red tree vole interim survey guIdelines violated the NFP ROD, NEPA and NFMA. ONRC Action, 59 F. Supp. 2d 1085, 1088 (W.D. Wash. 1999).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

82. *At the time of the ONRC Action lawsuit, lead Department of Justice counsel for the government in the ONRC Action litigation Edward Boling was aware of the*

*fact that a sizable number of timber sales had been approved and awarded by the Forest Service without surveys based upon the "NEPA decision equals implementation" interpretation. This practice was of concern to Mr. Boling as part of the litigation risk analysis conducted by the government with respect to the ONRC Action litigation. App. Tab 178 (E. Boling Dep. Tr. 33:2-34:22, 35:1836:3).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*83. By letter dated September 25, 1998, the ONRC Action plaintiffs, at the express request of Department of Justice counsel for the government in the ONRC Action lawsuit, provided a detailed description, including examples, of how the ONRC Action plaintiffs believed the NFP was being improperly implemented with respect to Category 2 or Strategy 2 surveys. This letter specifically discussed ONRC Action's argument that the interpretation "NEPA decision equals implementation" is a violation of the NFP ROD and would allow "the Forest Service and BLM to quickly 'implement' projects [including timber sales] before survey requirements kick in, by simply signing NEPA documents." This letter also argued that the NFP ROD's red tree vole survey requirement had been misinterpreted by the November 4, 1996 red tree vole directive because that directive stated that site-specific surveys need not be conducted in most of the*

*habited types or vegetation communities associated with the red tree vole and an arbitrary line had been drawn at the California border excluding all activities in California National Forests, such as the Klamath National Forest, for the red tree vole survey requirements, even though the red tree vole is found in California. The letter also noted that the adoption of the interpretation "NEPA decision equals implementation" and the red tree vole directive was not accompanied by any NEPA document and was not circulated for public review or comment. App. Tab 51.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second hand legal conclusions, and not a contention of fact. Furthermore, the document cited concerns the Forest Service's responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*84. On or about November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, briefed the Assistant Attorney General for Natural Resources and the Environment, Lois Schiffer, and her immediate subordinate, Peter Coppleman, on the issues involved in the ONRC Action litigation and proposals to settle that lawsuit. Among the subjects discussed was the Forest Service/BLM interpretation of the Category 2 survey requirements known as "NEPA decision equals implementation." Ms. Schiffer told Mr. Boling at this meeting that the interpretation "NEPA decision equals implementation was nonsense." Mr. Coppleman agreed. Then, Ms. Schiffer indicated that she would need to have further discussions with high level officials in the Department*

*of Agriculture and the Department of the Interior before deciding whether the Department of Justice would defend that interpretation in court. The substance of this meeting was communicated by Mr. Boling to Sue Zike, litigation coordinator within the Forest Service for the ONRC Action litigation, and Ms. Zike in turn communicated the substance of this meeting to Robert Devlin, the Director of Natural Resources within the Forest Service for Region 6, and others. App. Tabs 64, 66-67.*

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal conclusion and not a contention of fact, and is not supported by the documents cited. Defendant further objects because the documents cited are inadmissible hearsay. Additionally, Ms. Schiffer, Mr. Boling, and Mr. Coppelman did not recall the conversation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*85. At the November 25, 1998 meeting, Ms. Schiffer expressed concerns that the "NEPA decision equals implementation" interpretation would allow the Forest Service and the BLM to authorize timber sales without having first conducted Category 2 surveys even though the sales might not be offered or awarded months or even years later. This was an allegation raised by the ONRC Action plaintiffs. Ms. Schiffer's subordinate, Mr. Coppleman, shared Ms. Schiffer's concerns. App. Tabs 64, 66; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 10:6-12:9, 96:8-97:17); App. Tab 178 (E. Boling Dep. Tr. 88:10-89:16).*

Defendant's Response: Defendant objects to this contention because it is a legal conclusion, and not a contention of fact. Defendant further objects on the ground that these contentions are hearsay, that Ms. Zike's personal opinion does not bind the Forest Service, and that the documents and testimony cited do not support the contention. Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*86. By facsimile dated November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, sent an email to Dinah Bear, general counsel for the President's Council on Environmental Quality, the lead NEPA lawyer for the federal government, with an attached memorandum drafted by Mr. Boling and his co-counsel for the government, John Watts, in which Mr. Boling and Mr. Watts concluded "the agencies' interpretation of the ROD is difficult to square with the common meaning of the term 'implemented.'" App. Tab 65 at A501; App. Tab 178 (E. Boling Dep. Tr. 98:16-101:1).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*87. On November 25, 1998, the day Edward Boling briefed Schiffer and Coppleman, Forest Service attorney Owen Schmidt called Nancy Graybeal, Deputy Regional Forester for Region 6, to report that Lois Schiffer would not agree to defend the*

*"NEPA decision equals implementation" interpretation until she had talked to higher officials. Ms. Graybeal wrote to others in the Forest Service about the conversation saying, "Owen Schmidt, OGC, called this morning to say Ted Boling reported a non-decision from Lois Schiffer. Lois wants to talk to an Asst Sec. (I don't know which one) before dec<u>Id</u>ing course of action. I agreed we'd delay award of any sales until December 3. Bob [Devlin] – please let Forest CO's know." App. Tab 67.*

<u>Defendant's Response:</u> Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*88. Nancy Graybeal, who worked with Mr. Devlin, concluded that the Department of Justice would not accept the Forest Service's recommendation not to settle the <u>ONRC Action</u> case, which would require additional surveys of Category 2 species, if the only Forest Service arguments were based on the additional cost and the delay in proceeding with timber sales. Ms. Graybeal concluded that the Department of Justice, which as a matter of law had final authority to settle litigation on behalf of the United States, would have to be convinced that there were good resource reasons supporting the continued litigation of the <u>ONRC Action</u> case as opposed to agreeing to settle that lawsuit based upon the Forest Service's commitment to complete Category 2 surveys for all timber sales implicated in the lawsuit, including plaintiffs' timber sales in this action, even if*

*such sales had to be suspended for two seasons or more in order to perform those surveys. App. Tab 63 at A-496 to A-497; App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 11:5-13:23).*

<u>Defendant's Response:</u> Defendant objects this contention because it concerns discussions regarding settlement of a lawsuit, which is inadmissible pursuant to Federal Rule of Evidence 408. We further object because the contention relies on inadmissible hearsay. Additionally, the document and testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*89. After hearing of Ms. Schiffer's reaction to the joint agency interpretation "NEPA decision equals implementation" and her decision to seek guidance from higher officials within the Department of Agriculture and/or the Department of the Interior, Robert Devlin, the Director of Timber Management for Region 6 within the Forest Service, began to strategize with his colleagues in Region 6 of the Forest Service regarding the preparation of a briefing paper for submission to the Department of Agriculture, the Department of the Interior, and the Washington, D.C. Offices of both the Forest Service and the BLM. According to Mr. Devlin, "the trick is going to be to get both WO's [Washington Offices of the Forest Service and Bureau of Land Management] and Secretary's offices [the Secretaries of the Department of Agriculture and the Department of the Interior] to support where we are and not let DOJ decide for us. Not being able to defend us is one thing but not agreeing with what we are doing is another." App. Tab 63*

*at A-496; App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 11:5-26:9).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and is not supported by the testimony cited. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*90. In an email from Robert Devlin to Sue Zike and Peggy Kain of Region 6 of the Forest Service, sent on November 28, 1998, just after Edward Boling's briefing of Lois Schiffer and Peter Coppleman, Mr. Devlin stated that it was his understanding that the Department of Justice did not agree "with our definition of implement." App. Tab 63 at A-496.*

Defendant's Response: Defendant objects to this contention because it concerns discussions regarding the settlement of a lawsuit which are inadmissible pursuant to Federal Rule of Evidence 408. We further object because the document does not support the contention. The document states: "if they don't agree with our definition . . . ." See Pls.' App. Tab 63 at A-496 (emphasis added). Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*91. On or about November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, called Sue Zike to report that Lois Schiffer, Assistant Attorney General for Natural Resources and the Environment at the Department of Justice, and Peter Coppleman, Ms. Schiffer's subordinate, believed that the NFP Category 2 survey interpretation adopted by the Forest*

*Service known as "NEPA decision equals implementation" was nonsensical and that they had concerns "with trying to defend this case because they read our [the Forest Service's] implement memo to be nonsensical." App. Tab 64; App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 10:6-14:15). This information was communicated via email by Ms. Zike to Nancy Graybeal,Robert Devlin, and Peggy Kain. App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 22:10-23:4).*

Defendant's Response: Defendant objects to this contention because it is not supported by the documents or testimony cited. Pages 10-14 of Ms. Zike's testimony are not attached at App. Tab 173. Defendant further objects because it is based on additional hearsay. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*92. [Intentionally left blank]*

*93. Edward Boling, chief counsel for the government in the litigation, indicated to Owen Schmidt, the principal lawyer for the Forest Service Regions 5 and 6 for the ONRC Action litigation, that Mr. Boling was "leery" of the government's legal theory regarding the rationale for the Forest Service's interpretation "NEPA decision equals implementation." Accordingly, Mr. Schmidt believed that there were concerns within the Department of Justice as to whether it would defend this definition in federal court. Part of the Department of Justice's concern about rationale for the definition "NEPA decision equals implementation" was that an attempt had been made to find some support in the*

*administrative record for adopting this interpretation, but no support was found. App. Tab 174 (O. Schmidt Dep. Tr. 17:24-19:7, 28:12-29:10).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Defendant further objects because the contention is based on inadmissible hearsay, and Mr. Schmidt's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*94. [Intentionally left blank]*

*95. A June 8, 1999 memorandum by Ann Bartuska, Washington Office Director of Forest Management for the Forest Service, entitled "Implementation of Timber Sale Decisions and Presale Activities," stated that, "It is the position of the Forest Service that implementation of a timber sale decision for purposes of 36 C.F.R. § 215.10 occurs when a timber sale contract is awarded by the agency. This date is the date of the Contracting Officer's letter of award." App. Tab 114. Two days later, on June 10, 1999, Ann Bartuska issued a memorandum withdrawing her June 8, 1999 implementation memorandum, citing the need for further direction "regarding timber sales in litigation." App. Tab 117. That "further direction" came on October 5, 1999 in a memorandum written by James Furnish, Deputy Chief of the National Forest System. The October 5, 1999 memorandum re-adopted, using the same language, the interpretation expressed in the June 8, 1999 memorandum. App. Tab 133.*

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal conclusion not a contention of fact. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*96. On August 26, 1999, Judge Dwyer issued an injunction prohibiting the Forest Service and the BLM from approving any plan of operations for or proceeding with the operation of 25 timber sales, including Happy Thin, Jack Heli and Too Wild. App. Tab 128.*

Defendant's Response: Defendant does not dispute this fact.

*97. When ONRC Action was pending, it was Forest Service policy and practice to make a standard oral announcement at the oral auction of timber sales which were involved in litigation. That announcement told prospective bidders that "the sale is currently under litigation and award may be delayed." This standard announcement did not include any warning to bidders that the sale might be suspended after award. There was no other announcement specifically crafted for the ONRC Action lawsuit. This standard announcement was required to be made at the oral auction for Too Wild on the Umpqua National Forest in Region 6 and for Jack Heli and Happy Thin on the Klamath National Forest in Region 5. App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 3:12-8:9).*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Devlin stated that if there had been an announcement specifically crafted for the ONRC action, he would not have known about it. App. Tab 176

(Devlin Dep. 5:25-6:4) Defendant further objects to this contention because it is plaintiffs' legal conclusion not a statement of fact. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

98. The same day that ONRC Action filed its lawsuit, Michael Axline, lead attorney for ONRC Action, wrote the Regional Foresters for the two Forest Service regions containing Happy Thin, Jack Heli and Too Wild asking them to warn potential purchasers of the existence of the lawsuit and the potential for an injunction. App. Tab 41. Specifically, Michael Axline requested that the Forest Service "inform potential purchasers of sales offered subsequent to the filing of the complaint, within the area covered by the ROD, that such sales may be the subject of a request for injunctive relief for noncompliance with the ROD. This is particularly true for sales within the range and habitat type of 'Strategy 2' species for which the survey and management requirements of the ROD have not been performed. Such a notice to potential purchasers will provide protection for the federal government should these sales be enjoined, and insure that purchasers are fully informed of the pending lawsuit and its potential effect on noncomplying sales." Id.

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. We further object because this contention is plaintiffs' second-hand legal conclusion and not a statement of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and,

therefore, is not relevant to plaintiffs' claims for breach of contract.

99. *In a memorandum dated July 29, 1998, Robert M. Simmons, regional attorney for Region 5 of the Forest Service, advised Regional Foresters for Region 5 and Region 6 of the Forest Service that certain Forest Service timber sales were being challenged in ONRC Action. Accordingly, Mr. Simmons advised: Should you proceed with the auction of these sales ["sales of concern" identified by the ONRC Action plaintiffs on the Klamath and Mt. Hood National Forests], you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit [the ONRC Action lawsuit] have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs, and that, if this is not acceptable to the bidders, they should withdraw their bids at that time. All bidders should be given the opportunity to withdraw their bids simply because of the litigation. Finally, you should take action to make sure that the appropriate language is in the contract. App. Tab 190; App. Tab 35 at A-341; App. Tab 169 S. Zike Dep. Tr. (1/4/07) 12:9-18:8).*

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Defendant further objects on the ground that this contention is parol evidence, and that the foundation established for the documents indicates that the notice was sent to individuals on the Umpqua National Forest, which is not relevant to this litigation. See Pls.'

App. Tab 169 S. Zike Dep. Tr. (1/4/07) (12:16-12:18). Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*100. As early as August 8, 1998, Susan Zike, the litigation coordinator for Forest Service Region 6 and the primary litigation coordinator for ONRC Action for both Region 5 and Region 6, Jerry Hofer, Regional Contracting Officer for Region 6, and Robert Devlin, Director of Timber Management for Region 6, all believed that "it would be prudent to advise" the Forest Service timber sale bIdders at bId openings for timber sales threatened by the ONRC Action litigation that there was a pending lawsuit which threatened their sales. A draft letter prepared at or about the same time for signature by Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, stated, "the Forest Service is prepared to notify bidders on the three timber sales scheduled in auction for August that these timber sales have been identified in connection with this lawsuit [the ONRC Action lawsuit]." App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 12:9-14:8); App. Tab 45.*

Defendant's Response: Defendant objects to this contention because it is based on plaintiffs' inadmissible hearsay, and because Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*101. In the fall of 1998 the Department of Justice requested that the Forest Service direct contracting officers for involved timber sales to notify all bidders prior to the opening of the bids on timber sales threatened by the ONRC Action litigation that the plaintiffs in ONRC Action had identified the sale as one which they claimed was prepared in violation of the NFP, that language in the sale's contract has been included to limit the government's liability in case of cancellation to holding costs, and that bidders should be allowed to withdraw their bids simply because of the lawsuit. App. Tabs 54, 190. After the Department of Justice provided this advice, the Forest Service merely instructed the contracting officers for timber sales involved in the litigation to "make your standard announcement before bid opening that tells the prospective bidders that the sale is currently under litigation and award may be delayed." Id.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' secondhand legal conclusion and not a statement of fact. Defendant further objects because the documents cited do not support the contention regarding the Forest Service's actions. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*102. [Intentionally left blank]*

*103. During the period July 8, 1998 (the filing of the ONRC Action complaint) through Judge Dwyer's decision finding the "NEPA decision equals implementation" interpretation and the November 4, 1996 red tree vole directive arbitrary,*

*capricious and contrary to law, the Forest Service awarded a number of timber sales within NFP National Forests which were not challenged in ONRC Action. For example, Jack Trac (Klamath National Forest) and Spenser (Winema National Forest) were awarded. Likewise, the Bureau of Land Management awarded sales within the NFP area during the same time frame that were not challenged by ONRC Action; for example, Burma Shave. App. Tab 181 (B. Turner Dep. Tr. 60:3-14); App. Tab 88 at A-586; App. Tabs 85, 89.*

Defendant's Response: Defendant objects to this contention because it is not supported by the documents and testimony cited. Mr. Turner's testimony was only his opinion that some unidentified contract should have been awarded on November 4. P. App. Tab 181 (Turner Dep. 60-3-4). We further object because the document at Tab 89 of the plaintiffs' appendix concerns the settlement of a lawsuit and is inadmissible under Federal Rule of Evidence 408. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*104. From time to time after the ONRC Action lawsuit was filed in July of 1998, the ONRC Action plaintiffs provided the Department of Justice and the Forest Service with lists of "problem sales" or "at-risk sales" that they indicated they would challenge in court if awarded. The sales on these lists were in many cases not specifically named in the ONRC Action lawsuit. App. Tab 176 (R. Devlin Dep. Tr. (1/8/07) 109:19-110:14).*

Defendant's Response: Defendant objects to this contention because the testimony

cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*105. The ONRC Action plaintiffs indicated to the Department of Justice and the Forest Service that if the Forest Service proceeded to award the sales identified as "problem sales" or "at-risk sales" in the course of the ONRC Action litigation, the ONRC Action plaintiffs would immediately move for a temporary restraining order or a preliminary injunction with respect to each such sale. App. Tab 178 (E. Boling Dep. Tr. 67:7-68:4; 70:14-18).*

Defendant's Response: Defendant objects because the testimony does not support plaintiffs' contention that the ONRC Action plaintiffs would "immediately move for a temporary restraining order or a preliminary injunction," and the contention represents plaintiffs' legal conclusion. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*106. It was the uniform policy of the Forest Service throughout the ONRC Action litigation, at what Forest Service personnel believed was the request of Mr. Boling of the Department of Justice, not to disclose lists of "at-risk sales" or "problem sales" to anyone outside of the Federal Government and, in particular, not to potential bidders on such sales as Blue Lake Forest Products, Timber*

*Products Co. or CLR Timber Holdings, the plaintiffs in this action. App. Tab 100; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 35:12-40:15); App. Tab 48; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 32:7-33:10).*

Defendant's Response: Defendant objects because plaintiffs' contention is based upon inadmissable hearsay, and Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*107. Edward Boling, lead trial attorney for the government in the ONRC Action litigation, assumed that the Forest Service would treat these lists as privileged and confIdential. App. Tab 178 (E. Boling Dep. Tr. 74:20-75:8).*

Defendant's Response: Defendant objects because the testimony cited does not support plaintiffs' contention. Mr. Boling stated: "Certainly I would not expect the Forest Service to take this privileged and confidential information and put it on the fax machine hither and yon to all potential purchasers of a timber sale, but I don't know what they did with the fact of that information." App. Tab 178 (E. Boling Dep. Tr. 75:3-75:8). Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*108. The Forest Service intentionally withheld from plaintiffs and other potential timber purchasers the names of timber sales that were considered "at-risk" or "problem" sales by the ONRC Action plaintiffs. App. Tabs 48, 108. Additionally, neither the ONRC Action court nor the private industry intervenors in that case*

*were apprised of the existence of the lists of "at-risk" or "problem" sales or the names of the sales, including Happy Thin, Jack Heli and Too Wild, on those lists. App. Tab 123.*

Defendant's Response: Defendant objects because the documents cited do not support plaintiffs' contention, and plaintiffs' contention represents a legal conclusion. The document cited in Tab 48 notes: "If you have a request for [the list of sales], send the request to the RO and we'll process." Tab 48. Furthermore, plaintiffs' contention is that industry was unaware of the existence of these lists is unfounded. DPFUF ¶ 51. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*109. Shortly after the filing of the complaint in the ONRC Action litigation in July 1998, attorneys representing ONRC Action and the Department of Justice attorneys representing the United States, including the Forest Service, began to exchange communications concerning possible settlement of the litigation. Settlement discussions continued at least until some time in December of 1998. Throughout this time period, the Forest Service dId not award any timber sales which were Identified as "at-risk sales" or "problem sales" on lists provIded by the ONRC Action plaintiffs to the Department of Justice without Department of Justice concurrence. The reason for this was that both the Forest Service and the Department of Justice did not want to trigger a motion for a preliminary injunction or a temporary restraining order based only on the award of certain sales. If the litigation was not to be settled, the Department of Justice and the*

*Forest Service strongly preferred that any decision on the merits of the case be decided by cross-motions for summary judgment on the merits rather than in the context of a temporary restraining order or a preliminary injunction aimed only at one or a few timber sales. App. Tab 100.*

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion and based upon speculation. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*110. While the government was trying to settle the ONRC Action litigation, the Department of Justice had final authority over whether a sale which the ONRC Action plaintiffs had identified as an "at-risk sale" or "problem sale" could be sold by the Forest Service. Accordingly, from time to time the Department of Justice rejected the Forest Service's request to award a timber sale. This is precisely what happened regarding a Forest Service proposal to award Too Wild in October of 1998. App. Tab 55; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 45:14-50:9).*

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Furthermore, defendant objects because the document cited does not support the plaintiffs' contention that the Department of Justice had "final authority" over when a sale could be sold; the document cited states: "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we

delay the award until 11/23. I ran the idea past Devlin who agreed that one month . . . was ok." Tab 55. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*111. In Ms. Zike's capacity as the principal litigation coordinator for ONRC Action for both Region 5 and Region 6, it was her job to coordinate the preparation of the Forest Service's defense in the litigation between counsel from the Department of Justice and the Forest Service. Ms. Zike was an attorney licensed to practice in the State of Oregon. In particular, Ms. Zike regularly disseminated information, including lists of "at-risk sales" and "problem sales," together with other ONRC Action-related information to Forest Service personnel within both Region 5 and Region 6, including the contracting officers and forest supervisors for Happy Thin (Klamath National Forest, California), Jack Heli (Klamath National Forest, California) and Too Wild (Siskiyou National Forest, Oregon). App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 5:24-6:7); App. Tabs 44, 83, 108.*

Defendant's Response: Defendant objects because the documents and testimony do not support plaintiffs' conclusion. Defendant further objects because Ms. Zike was not acting as an attorney in her position as the principal litigation coordinator. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*112. In her capacity as Regions 5 and 6 litigation coordinator, Ms. Zike frequently*

*sent out group emails to groups designated as "Distribution List" or "ONRC Action coordinators." In both cases she frequently communicated in this manner with Ed Matthews, who was the contracting officer on Happy Thin and Jack Heli, and Tom Link, who was the contracting officer on Too Wild, among other Forest Service personnel. App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 23:12-25:11, 61:1-12).*

Defendant's response: Defendant objects because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

113. *During the pendency of the ONRC Action litigation, Sue Zike requested information from the NFP National Forests about timber sales that the Forests wanted to award. Ms. Zike also asked the Forests to provide her with their rationale for the need to award such sales. Such rationales had to include resource reasons in order to convince the Department of Justice to approve the award. App. Tab 40; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 62:3-63:1).*

Defendant's Response: Defendant objects because the contention is plaintiffs' legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Defendant further objects because plaintiffs' contention wrongfully imply that the Department of Justice had "final approval" over the timber sale decisions. See Tab 55, "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we delay the award until 11/23. I ran the

idea past Devlin who agreed that one month . . . was ok." Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*114. At least as early as December 7, 1998, Sue Zike, the principal litigation coordinator for the Forest Service for the ONRC Action case, was preparing forms for the Forest Service to use in assessing the risks and liabilities of awarding any of the timber sales on the ONRC Action's "problem" or "at-risk" lists. The principal objective of this assessment was to determine which timber sales put the government in the strongest litigation position if they were awarded. App. Tabs 71, 75.*

Defendant's Response: Defendant objects because this contention is plaintiffs' legal conclusion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*115. Robert Devlin, Director of Natural Resources for Region 6, worked very closely with Sue Zike, the Region 6 litigation coordinator on the ONRC Action lawsuit. Mr. Devlin characterized their relationship as "anything I dId with lawsuits, Sue Zike was right joined at my hip on so it wouldn't be just my answer, it would be our answer." App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 95:7-13). Mr. Devlin stated that he "would have no reason to dispute anything about what Sue says." App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 28:19-29:20).*

Defendant's Response: Defendant objects because the testimony cited concerns the

Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*116. At all times pertinent to the issues in this case, Owen Schmidt was an attorney employed by the Office of General Counsel of the Department of Agriculture and he was the lead Forest Service attorney within the Office of General Counsel for Forest Service Region 5 and 6 for the ONRC Action litigation. Mr. Schmidt also served as Forest Service counsel for the development and implementation of the NFP. App. Tab 174 (O. Schmidt Dep. Tr. 5:22-7:11, 8:20-10:5); App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 5:19-23).*

Defendant's Response: Defendant objects to this contention as plaintiffs' legal conclusion Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*117. During the period of March through June 1999, the Department of Justice and the ONRC Action plaintiffs negotiated the award of certain "problem list" sales, including Jack Heli. App. Tab 99.*

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention, this contention is plaintiffs' legal conclusion. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*118. During the pendency of the ONRC Action litigation when the various Forest Service contracting officers, in consultation with others on their National Forests, determined that the Forest wanted to award a sale that was on a list of "at-risk sales" or "problem sales" that had been provIded by the ONRC Action plaintiffs, the next step was to contact Sue Zike who would take up the matter with Peggy Kain or Robert Devlin and then, if they were in agreement, the matter would be presented to Edward Boling for his concurrence. That is the general process which occurred regarding the Forest Service's decisions to award Happy Thin, Jack Heli and Too Wild during the pendency of the ONRC Action litigation. App. Tab 54; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 36:22-41:12, 44:22-45:12).*

Defendant's Response: Defendant objects to the contention because it is plaintiffs' legal

conclusion, not a statement of fact, and because Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*119. In deciding what sales from the ONRC Action plaintiffs' lists of "problem sales" or "at risk sales" the Forest Service would award prior to the conclusion of the ONRC Action litigation, the Department of Justice trial attorneys in the ONRC Action litigation consulted with Owen Schmidt of the Forest Service's Office of General Counsel and Roger Nesbit, an attorney representing the BLM. The purpose of these consultations was to assess the litigation risk of proceeding with award of such sales. App. Tab 178 (E. Boling Dep. Tr. 82:6-84:21).*

Defendant's Response: Defendant objects because plaintiffs' contention suggests that the Department of Justice had final authority over the award of timber sales. "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we delay the award until 11/23. I ran the idea past Devlin who agreed that one month . . . was ok." Tab 55. Also, "DOJ is not asking to be a part of the award decision." Tab 100. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*120. During the pendency of the ONRC Action lawsuit, the Forest Service dId not award any timber sales which had been designated as "at-risk sales" or "problem sales" by the ONRC Action plaintiffs without first consulting the*

*Department of Justice attorneys representing the government in the* *ONRC Action* *lawsuit. In cases where the Forest Service desired to award a sale, it needed "to assure DOJ that we [the Forest Service] have a strong defense on the sales and that we [the Forest Service] intend to award even though DOJ is not asking to be a part of the award decision." App. Tab 100; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 35:12-39:11). However, if Edward Boling, lead counsel for the government in the* *ONRC Action* *lawsuit, had any concerns regarding the award of a particular sale, the Forest Service would not have awarded that sale. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 97:22-101:17).*

Defendant's Response: Defendant objects because neither Ms. Zike's nor Mr. Devlin's personal opinion can bind the Forest Service, and the first sentence of this contention represents plaintiffs' legal conclusion, not a statement of fact. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*121. On or about June 17 and 18, 1999, officials in the Washington Office of the Forest Service, Region 5 Office of the Forest Service, and Sue Zike, principal litigation coordinator for Regions 5 and 6, including Richard Fitzgerald, Assistant Director for Forest Products in the Washington Office, conferred regarding the possibility that* *ONRC Action* *would seek a preliminary injunction or temporary restraining order to stop operations on the Upper South Fork timber sale on the Klamath National Forest. Upper South Fork, like Happy Thin, Jack Heli and Too Wild, was not named in the* *ONRC Action* *lawsuit, but like*

*Happy Thin, Jack Heli and Too Wild it was a sale on the list of "problem" or "at-risk" sales shared between ONRC Action and the Forest Service acting through the Department of Justice. The Washington Office of the Forest Service concluded that the Forest Service could not stop harvesting operations on the Upper South Fork sale without incurring liability if it did so without a court order imposing a temporary restraining order or preliminary injunction with regard to the sale's operations. App. Tab 115.*

Defendant's Response: Defendant objects because the documents cited do not support plaintiffs' contention, the contention represents plaintiffs' legal conclusion, not a statement of fact, and the Upper South Fork timber sale is irrelevant to this litigation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*122. By letter dated August 26, 1998, attorneys representing ONRC Action notified the Justice Department which in turn notified the Forest Service that the proposed Jack Heli sale on the Klamath National Forest and the proposed Too Wild sale on the Siskiyou National Forest were "problem sales," meaning that these were sales that the ONRC Action plaintiffs were threatening to challenge in court. App. Tab 46; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 20:15-23:9).*

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention, the contention is plaintiffs' second-hand legal conclusion, not a statement of fact, and Ms. Zike's personal opinion cannot bind the Forest Service. Furthermore, the

document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*123. By letter dated October 26, 1998 to ONRC Action counsel, signed by Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, the government agreed not to award certain BLM and Forest Service timber sales which were being challenged by the ONRC Action plaintiffs until November 23, 1998. This list of sales included Too Wild on the Siskiyou National Forest. App. Tab 56. This letter was provided to Sue Zike of the Forest Service. App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 23:10-26:22).*

Defendant's Response: Defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*124. In a memorandum dated October 28, 1998, Sue Zike informed Robert Devlin, Peggy Kain, Lisa Friedman and Ernie Holden of the Forest Service's Office of Strategic Planning of the Department of Justice's proposals for settling the ONRC Action litigation. Ms. Zike noted in her memorandum that at that time there were "around 20 or so" timber sales which "Forests would be wanting to move ahead and the DOJ will be wanted [sic] to delay!" Mr. Boling of the Department of Justice was concerned that an award of these sales would prompt motions for preliminary injunctions from the ONRC Action plaintiffs and thus would interfere with the government's strategy of withholding award of such*

*sales to ensure that in the event that settlement talks broke down a decision on the merits would be decIded in cross-motions for summary judgment regarding the whole case and not just one of a few select sales. App Tabs 58-59; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 50:10-54:9, 54:24-59:15).*

Defendant's Response: Defendant objects because the cited testimony is hearsay, and Ms. Zike's personal opinion cannot bind the Forest Service. Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*125. In an email to her Distribution List, which included Forest Service contracting officers Ed Matthews (Happy Thin and Jack Heli) and Tom Link (Too Wild), on or about November 8, 1998, Ms. Zike reminded these indivIduals and the other contracting officers on her Distribution List that: "Please keep in mind (as CO's always do) the liability that may come to the USFS if the sale is awarded and then enjoined. Is there a need for a regional conf call re: the award question? I'm thinking we need to at least air the needs and risks of going forward. Please let me know. As usual we want Ted [Boling] up to speed on our plans and you all have been so helpful keeping us posted." App. Tab 69; App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 67:3-69:14).*

Defendant's Response: Defendant objects because document and testimony cited do not support the first sentence. Defendant further objects because the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale

contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*126. From at least January 1999 until the end of July 1999, the Department of Justice expected Forest Service agency counsel Owen Schmidt and other Forest Service personnel to assess whether the award of a timber sale that was on one of ONRC Action's lists of "problem" or "at risk" sales was worth the risk that the sale would be used by the ONRC Action plaintiffs as an example in an emergency motion to enjoin all sales in the area of the NFP. App. Tab 101 (Letter from E. Boling, DOJ, to Forest Service and BLM (Apr. 6, 1999)).*

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' legal conclusion regarding the ONRC Action "problem" or "at risk" sales. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*127. By letter dated December 4, 1998 from Edward Boling to Sue Zike and Alan Wood of the BLM, the Department of Justice notified the Forest Service and the BLM that they were free to award any of the "at-risk sales" or "problem sales" which had been the subject of settlement discussions in the ONRC Action litigation. However, the Forest Service and the BLM were asked to communicate their respective judgment if the award of the sale was worth the risk that it would trigger an emergency motion from the ONRC Action plaintiffs to enjoin all sales in the area of the NFP. The agency lawyers at the Office of General Counsel representing the Forest Service were to communicate to the Department of*

*Justice attorneys representing the government in the ONRC Action litigation their assessment of the risk that awarding any such sale would trigger a temporary restraining order or a preliminary injunction. Thus, the Forest Service with the aId of agency counsel did a risk assessment for each proposed award before actually making the award, including award of Happy Thin, Jack Heli and Too Wild. App. Tab 70; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 115:13-121:13).*

Defendant's Response: Defendant objects because the testimony is inadmissible hearsay, and Ms. Zike's personal opinion does not bind the Forest Service. Defendant further objects because the document cited does not support plaintiffs' legal conclusion regarding "at risk sales" or "problem sales." Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*128. By email dated December 7, 1998 to her Distribution List, Sue Zike stated that she was drafting a form for Forest Service use in Region 5 and Region 6 for evaluating "the risks and liabilities of awarding any of the timber sales ONRC has named as violations of the NWFP ROD." Ms. Zike's form was based on the five points Edward Boling referenced in his December 4, 1998 letter to Ms. Zike. Ms. Zike told her Distribution List recipients that "I think it is prudent that we determine which sales put us in the strongest litigation position in this case." App. Tab 71; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 124:4-127:22). Accordingly, using Ms. Zike's form and with the assistance of agency counsel, the Forest Service evaluated the litigation risk associated with each proposed award*

*of a timber sale, including the awards of Happy Thin, Jack Heli and Too Wild.*

Defendant's Response: Defendant objects because the contention is plaintiffs' legal conclusion, not a statement of fact. Defendant further objects because the contention is not supported by the document and testimony cited, and Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*129. In a memorandum dated December 9, 1998 from Sue Zike, regional litigation coordinator, to Bob Williams, Regional Forester, and BLM State Director Elaine Zielinski, Ms. Zike analyzed the pros and cons of awarding sales the plaintiffs in the ONRC Action litigation named as examples of sales violating the NFP survey requirements. One of the "pro" considerations she identified in favor of awarding such sales was that doing so "puts purchasers squarely at the table." Ms. Zike later explained this advantage to the government as follows: "That means, in my view, that we have much better litigation arguments. We have better defense arguments when we let the purchasers be the ones who talk about harm and what happens to their company and their employees if in fact an injunction were to lie." One of the "cons" identified by Ms. Zike in her memorandum was, "May create $$ liability to govt if lose case." Ms. Zike explained this reference as follows: "If . . . we were to lose the PI which we thought was likely, then we would have, most likely, contractual damages to the purchasers that we awarded them to." These "pros" and "cons" were never communicated to any of the*

*plaintiffs in this action. App. Tab 191 at A-1754; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 146:21-150:7).*

Defendant's Response: Defendant objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*130. In their memorandum to Paul Brouha and Chris Jauhola dated December 11, 1998, Peggy Kain and Sue Zike advised these Washington Office Forest Service and BLM officials about "the contracting implications of surveying awarded sales." In that regard they stated, "The agencies [Forest Service and BLM] would argue vigorously against surveying sales that have been awarded." The reason why the Forest Service would vigorously argue against such surveys was that: "The Forest Service has no provisions in its timber sale contracts that allow for suspension for survey and/or discovery of survey and manage species." App. Tab 75 at A-541.*

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention; specifically, it is not clear who drafted this document. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*131. By memorandum dated December 11, 1998, Sue Zike informed all ONRC Action coordinators at the Forest level and other Forest Service personnel on her*

*Distribution List of the process that would be followed by the Forest Service in deciding whether or not to award a timber sale which had been identified by the* ONRC Action *plaintiffs as an "at-risk sale" or "problem sale." First, representatives of the National Forest, normally the contracting officer, would complete a chart prepared by Ms. Zike to be used in the evaluation of the litigation risk for each such sale. The information and the chart was then sent to Ms. Zike and Peggy Kain in the Region 6 office in Portland, Oregon. This procedure applied not only to the Region 6 Oregon National Forest timber sales such as Too Wild on the Siskiyou National Forest but also to the Region 5 California National Forest timber sales that were included within the NFP also, such as Happy Thin and Jack Heli on the Klamath National Forest. Utilizing the information contained in the Zike charts, Forest Service personnel, normally including Sue Zike, Robert Devlin, Peggy Kain and Owen Schmidt of the Office of General Counsel, reviewed the facts and circumstances surrounding the proposed award of each sale and made a determination as to whether "the award is worth the risk of* ONRC Action *using it as a basis of a TRO or Preliminary Injunction." The Forest Service and the Justice Department expected any such sales would be challenged by the* ONRC Action *plaintiffs with a motion for a temporary restraining order or a preliminary injunction. If the Forest Service determined that awarding a timber sale was worth the risk of triggering a temporary restraining order or a preliminary injunction, then the Forest Service would communicate its rationale for the sale award to Edward Boling, lead counsel for*

*the government in the ONRC Action litigation. As of Mr. Boling's December 4, 1998 letter, the Department of Justice did not indicate that it would veto any such requests and the Department of Justice left the final decision of whether or not to award the sale to the Forest Service. Mr. Boling, however, requested that he receive advanced notice of any such award and that the Forest Service "compile the essential elements of the administrative record that we will need to defend against such a motion [for a temporary restraining order or a preliminary injunction]." All of this documentation and other information requested by the Department of Justice based on Mr. Boling's December 4, 1998 letter to the Forest Service and the BLM were required to be in his hands five days before award. App. Tab 70 at A-519; App. Tab 74; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 115:13-121:13, 152:3-158:19).*

Defendant's Response: Defendant objects because the documents cited do not support plaintiffs' contention that the Forest Service and Department of Justice expected sales would be challenged by the ONRC Action plaintiffs, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Defendant further objects because the statement attributed to Mr. Schmidt is inadmissible hearsay. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*132. In preparing portions of a draft briefing paper to be sent to Paul Brouha, Al Ferlo and Nancy Green in the Washington Office of the Forest Service, Sue Zike concluded, based upon conferring with Jerry Hofer, the Region 6 Forest Service*

*contracting officer, that the standard Forest Service timber sale contract did not contain provisions which allowed the government to make unilateral changes imposing a suspension on awarded contracts in order to perform surveys required under the NFP. App. Tab 191 at A-1749; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 141:22-23).*

Defendant's Response: Defendant objects because this contention is purely plaintiffs' legal conclusion. Defendant also objects because this contention is parol evidence, it is taken out of context, and the cited testimony does not support plaintiff's contention. Furthermore, defendant objects because Ms. Zike's personal opinions cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

133. *Under cover memorandum dated January 22, 1999, Paul Brouha, Associate Deputy Chief of the Forest Service, sent a memorandum including background and analysis of the ONRC Action litigation to Anne Kennedy, Deputy Under Secretary for Natural Resources and Environment for the Department of Agriculture; Barbara Webber, Forest Service Washington Office; and Al Ferlo, counselor to the Chief of the Forest Service. Mr. Brouha's cover memorandum indicates that the brief was also hand-delivered to the acting chair of the PresIdent's Council on Environmental Quality, George Frampton, on January 19, 1999 and that Forest Service employees in Regions 5 and 6 were involved in the preparation of the memorandum. In his cover memorandum Mr. Brouha*

*observed "it [the attached memorandum] offers a good overview of the current situation surrounding the lawsuit." At page 3 of 5 of the memorandum, under the heading "What are the contracting implications of surveying awarded sales?," the memorandum states:*

> *The agencies would argue vigorously against surveying sales that have been awarded. The Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species. The "Protection of Habitat of Endangered, Threatened, and Sensitive Species" clause (C6.25#) only includes those species listed as Threatened, Endangered or Sensitive (Regional Forester's list). None of the survey and manage species are on the Threatened & Endangered List and many are not on the Sensitive List. A contract modification under this subsection would require reimbursement to the purchaser.*

*App. Tab 82; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 180:3-181:9).*

<u>Defendant's Response</u>: Defendant objects because this contention is parol evidence. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*134. In an email exchange between Sue Zike and Brian Stone, at that time a Region 5 litigation coordinator for the <u>ONRC Action</u> lawsuit, dated January 22, 1999, Mr. Stone informed the Forest Service contracting officers and others on his Distribution List, including Ed Matthews, contracting officer for Happy Thin and Jack Heli, that "the question needs to be answered for each sale that would go forward: why do we need to go forward with this particular sale NOW, instead of waiting for the conclusion of the ONRC litigation??" In response to Mr. Stone, Ms. Zike stated "We'll need to consider our determination in light of the Motion*

*to Dismiss Schedule which the court 'noted' for 'consideration' on 1/29/99." By this Ms. Zike meant that the Forest Service "should not be awarding timber sales that could promote a motion for a preliminary injunction while the court was considering" the government's motion to dismiss. App. Tab 83; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 178:13-180:2).*

Defendant's Response: Defendant objects because the document and testimony do not support the plaintiffs' contention as to who received the document, and Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*135. Prior to the award of Jack Heli, Contracting Officer Ed Matthews was made aware that in a recent administrative proceeding the Interior Board of Land Appeals had issued a stay preventing the BLM from awarding or operating any BLM timber sales that involved the Oregon red tree vole. According to Mr. Matthews, "The Board does not feel the interim survey direction is consistent with the NWFP." Mr. Matthews also noted in an internal email dated February 1,1999 that, "There was a lot of discussion about the red tree vole including the fact that there are scientists that feel that we should be surveying for California red tree voles." App. Tab 192.*

Defendant's Response: Defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*136. In an email exchange dated March 19, 1999 from Sue Zike to Robert Devlin, Ms. Zike agreed with Mr. Devlin that the Department of Justice no longer required "concurrence" on any decision to award "at-risk sales" or "problem sales;" however, she understood that the Department of Justice wanted to be assured that the Forest Service would not award timber sales that would be likely to prompt the ONRC Action plaintiffs to file a motion for temporary restraining order or a preliminary injunction prior to the resolution of the case by cross-motions on summary judgment. In Ms. Zike's words,*

> *DOJ wants out of the "concurrence" but wants to be assured that "no dogs are let out on the street" while he [Edward Boling] is preparing our motion for Summary Judgment to the amended complaint and while the judge is considering the case, estimated to be May 15. So Owen [Schmidt] and I thought we might do the following to keep the bad dogs in the yard: For the sales they expect to award by June 1, ask the Forest to compare the issues (I'll do the chart for them) in the amended complaint to the issues raised in the P's appeal and assess the litigation risks. We know the RTV and "implement" are already in court, so they are not a worry.*

*App. Tab 96; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 185:2-188:10).*

Defendant's Response: Defendant objects because plaintiffs' contention is inadmissible hearsay. Defendant also objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*137. By letter dated April 12, 1999, the ONRC Action plaintiffs notified the Department of Justice through Edward Boling and John Watts that Happy Thin, Jack Heli and Too Wild, among others, were "at-risk sales" which might be*

*awarded and operated prior to June 1, 1999 and which, if awarded, would likely be challenged by the* <u>*ONRC Action*</u> *plaintiffs. App. Tab 102; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 43:21-45:22). The* <u>*ONRC Action*</u> *plaintiffs sought an agreement from the government not to award these sales and other sales on the list prior to June 11, 1999 and, absent such an agreement, the* <u>*ONRC Action*</u> *plaintiffs were putting the Justice Department and the Forest Service on notice that they would seek a temporary restraining order against any such sales being awarded or operated. The Justice Department sent this letter and the attached lists to Sue Zike of the Forest Service.* <u>*Id.*</u>

<u>Defendant's Response</u>: Defendant objects because the contention is plaintiffs' legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service, the Department of Justice, or the <u>ONRC Action</u> plaintiffs. Defendant further objects to plaintiffs' characterization of the sales as "at-risk sales," when the document cited clearly states: "Not all of these sales are equally at risk . . . ." Tab 102. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*138. In an email dated April 28, 1999, Sue Zike advised Forest Service personnel that they were not to share with others outside of the agency the list of "at-risk sales" or "problem sales" or the charts that were prepared by Ms. Zike to assist in the Forest Service's assessment of litigation risk in awarding those sales. App. Tab 108; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 188:11-192:3).*

<u>Defendant's Response</u>: Defendant objects because plaintiffs' contention is a legal

conclusion, not a statement of fact. Defendant further objects because this contention is directly challenged by he document cited in Tab 48, which notes: "If you have a request for [the list of sales], send the request to the RO and we'll process." Tab 48. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*139. In an email to her Distribution List dated May 19, 1999, Sue Zike stated that "during the last few months our DOJ Atty's have been talking with ONRC about moving ahead with some of the projects ONRC listed in their Feb. 26 and April 5 letters re: 'problem' timber sales." Among the sales which had been awarded pursuant to the agreement between the Department of Justice attorneys and the ONRC Action attorneys were Jack Heli awarded March 2, 1999 to Timber Products and Too Wild awarded May 14, 1999 to CLR. However, neither Timber Products nor CLR were informed at or before the award of their sales that their sales were targeted as "problem" sales in the ONRC Action litigation or that these sales would have been immediately challenged with a motion for a temporary restraining order or a preliminary injunction but for a secret agreement between the ONRC Action lawyers and the Department of Justice attorneys in the ONRC Action litigation. App. Tab 112; App. Tab 123 at A-986.*

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion and is not supported by the cited documents. Specifically, there is no evidence in the documents cited that there was an agreement between the Department of Justice attorneys and

the ONRC Action plaintiffs, and there is no evidence that the sales would be "immediately" challenged absent such agreement. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*140. By letter dated July 6, 1999 to Department of Justice attorneys Edward Boling and John Watts, the ONRC Action plaintiffs provIded the Department of Justice, and through them the Forest Service, with an updated list of sales the ONRC Action plaintiffs regarded as "at-risk sales" or "problems sales" which would be targets of a motion for a preliminary injunction or a temporary restraining order if awarded. Pursuant to an agreement between the government and the ONRC Action plaintiffs, the plaintiffs agreed to hold off seeking preliminary injunctive relief with respect to these sales until at least July 31, 1999 if the Forest Service and the BLM agreed to provide plaintiffs with at least ten days' advanced notice prior to approving any plan of operations for the sales. This list included Happy Thin and Jack Heli, among others. Blue Lake and Timber Products were not told of these developments either prior to submitting a bid or prior to award of these sales. App. Tab 121; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 49:14-50:15).*

Defendant's Response: Defendant objects because plaintiffs' contentions are not supported by the document and testimony, the contentions are plaintiffs' legal conclusions, and Ms. Zike's personal opinion does not bind the Forest Service. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of

contract.

*141. By letter dated July 6, 1999, the ONRC Action plaintiffs' counsel notified the Department of Justice, and through the Department of Justice the Forest Service, that Happy Thin, Jack Heli and Too Wild, among others, remained on ONRC Action plaintiffs' "at-risk" list. App. Tab 123 at A-986 to A-995. Despite this information the Forest Service went ahead with the award of Happy Thin on July 6th. Blue Lake was not informed of this development. App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 224:17-230:5).*

Defendant's Response: Defendant objects because plaintiffs' contentions are not supported by the documents and testimony. Tab 123 at A-986 to A-995 is not the July 6, 1999 letter, and the cited testimony contains no information about Blue Lake or the award of Happy Thin. Defendant further objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*142. On July 7, 1999, Sue Zike prepared a current list of "at-risk sales" or "problem sales" which Identified the actual or proposed award date of those sales. This list was provided to Edward Boling, lead trial counsel for the government in the ONRC Action litigation, and Robert Devlin, Director of Natural Resources in Region 6 of the Forest Service, in order for the Forest Service and the Department of Justice to "get an idea of the threat from ONRC Action for an injunction." Happy Thin, Jack Heli and Too Wild are shown on that list. The list*

*indicates the award of Jack Heli was March 2, 1999, the award date for Too Wild was May 14, 1999 and the award for Happy Thin which had been projected for May 5, 1999 was now delayed until after the summary judgment hearing before Judge Dwyer in the ONRC Action litigation which was schedule for July 1, 1999. Blue Lake, Timber Products and CLR were not told about this development. App. Tab 126; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 50:16-52:14).*

Defendant's Response: Defendant objects because the contentions are plaintiffs' legal conclusions, the document does not support plaintiffs' contentions, and Ms. Zike's personal opinion cannot bind the Forest Service. Specifically, the list does not include any information regarding the Too Wild timber sales, and there is no support for plaintiffs' contention that the plaintiffs were never informed. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*143. The Forest Service engaged in written and oral communications with the ONRC Action plaintiffs from shortly after the filing of the ONRC Action complaint in July 1998 through at least July 6, 1999. These written and oral communications included commitments by the Forest Service to delay auction, award or approval of any ground-disturbing operations on numerous sales, including Happy Thin, Jack Heli and Too Wild until the Forest Service had given notice to the ONRC Action plaintiffs that it was going to take such action. In return, the ONRC Action plaintiffs agreed not to immediately seek a preliminary injunction or temporary restraining order against the Forest Service if it offered or awarded these sales*

*but informed the Forest Service that the* ONRC Action *plaintiffs may seek such injunctive relief if the Forest Service allowed any harvesting operations to proceed. App Tabs 102-03, 112, 121, 125-26. Neither Blue Lake, Timber Products nor CLR were informed of these commitments until discovery in the above-captioned action. App. Tab 187 (B. Taylor Decl. ¶ 4); App. Tab 188 (B. Turner Decl. ¶ 2); App. Tab 186 (D. Bonde Decl. ¶ 3).*

Defendant's Response: Defendant objects because plaintiffs' contentions are hearsay, and defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*144. The Forest Service awarded Happy Thin despite the risk of the sale being enjoined by Judge Dwyer in part because the Forest Service feared that it would be liable for breach of contract if it withheld award of the timber sale. App. Tab 115.*

Defendant's Response: Defendant objects because the plaintiffs' contention is not supported by the documents, which refer to the Upper South Fork Timber Sale, not any of the timber sales at issue in this litigation, and the plaintiffs' contention is a legal conclusion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*145. In a memorandum to officials in the General Counsel's Office in Washington,*

*D.C., Owen Schmidt, the principal Forest Service lawyer for the ONRC Action litigation, advised that the Forest Service's liability for damages under the timber sale contracts to purchasers would be less if the sale in question was suspended pursuant to court order as opposed to unilaterally suspended by the Forest Service. App. Tab 135.*

Defendant's Response: Defendant objects because the plaintiffs' contention is parol evidence, and, furthermore, the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure (dated October 15, 1999). Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*146. On November 18, 1999, Edward Boling, lead trial counsel for the government in ONRC Action, wrote a memorandum for Lois Schiffer, then Assistant Attorney General of the Environment and Natural Resources Division of the Department of Justice, recommending settlement of the ONRC Action litigation. As part of providing the factual background, the memo discusses the Forest Service's red tree vole interim survey protocol, stating that the protocol did not comply with the ROD: "The protocol effectively excluded much of the red tree vole's habitat from survey, which is inconsistent with the ROD requirement to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.' ROD C-5." In evaluating the validity of the red tree vole interim survey protocol, the memo concludes, "[S]elective surveys for red tree voles are not clearly allowed by the*

*language of the ROD." As for the validity of the "NEPA equals implemented" interpretation, the memo concludes, "[T]he agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" App. Tab 136.*

Defendant's Response: Defendant objects because this document was drafted after the ONRC Action summary judgment decision issued, and, therefore, has no relevance to the reasonableness of the Forest Service's actions prior to contract award. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*147. The terms and conditions for the settlement of the ONRC Action lawsuit agreed to by the government and the ONRC Action plaintiffs were included in a "Stipulation For Order Dismissing Action; Order Thereon" dated and filed December 17, 1999. In accordance with paragraph 6 of this stipulated order, the government agreed to pay the ONRC Action plaintiffs' attorneys fees as of December 17, 1999 under the Equal Access to Justice Act. In addition, among other requirements, the stipulated order required the Forest Service to perform certain Category 2 surveys on a specified list of Forest Service sales, including Happy Thin, Jack Heli and Too Wild. This stipulation was regarded as a "settlement agreement" between the ONRC Action plaintiffs and the government, and it governed the obligations of the Forest Service regarding Category 2 surveys on Happy Thin, Jack Heli and Too Wild after the lawsuit was dismissed*

*on December 17, 1999. The government ultimately paid the ONRC Action plaintiffs $221,300 in attorneys' fees under the Equal Access to Justice Act. App. Tab 200 (ONRC Action, Stipulation For Order Dismissing Action; Order Thereon (Dec. 17, 1999)); App. Tab 193 (Letter from E. Boling, Department of Justice, to M. Axline and C. Stilwell, counsel for ONRC Action plaintiffs (May 1, 2000)); App. Tab 146 (Letter from M. Axline, counsel for ONRC Action plaintiffs, to J. Watts, Department of Justice (December 5, 2000)).*

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions, which are inadmissible under FRE 408.

*148. The Forest Service did not perform certain Category 2 surveys on Happy Thin prior to the award of that sale to Blue Lake on July 6, 1999 because the NEPA Decision Notice for that sale was signed on September 15, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tabs 134, 195.*

Defendant's Response: Defendant objects to plaintiffs' contention as inadmissible legal conclusions, not statements of fact. Defendant further objects because the documents do not support the contention that "timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future." Additionally,

this contention concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

*149. Category 2 surveys for the red tree vole were not performed by the Forest Service on the Happy Thin sale prior to award for the additional reason that the interim survey protocol for the red tree vole, in effect at the time of award, limited the survey area to north of the Oregon/California border and excluded California from the survey even if there was known red tree vole habitat in NFP forests south of the Oregon/California border. App. Tabs 36, 134.*

Defendant's Response: Defendant objects to plaintiffs' contention as inadmissible legal conclusions, not statements of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*150. The eighteen Category 2 surveys that were not performed by the Forest Service on the Happy Thin sale prior to award were the red tree vole (mammal), Aleuria rhenana (a.k.a. Sowerbyella rhenana) (fungi), Bondarzewia Montana (a.k.a. Bondarzewia mesenterica) (fungi), Otidea leporina (fungi), Otidea onotica (fungi), Otidea smithii (fungi), Polyozellus mutiplex (fungi), Sarcosoma Mexicana (fungi), Buxbaumia vidiris (bryophytes), Ptilidium californicum (bryophytes), Ulota meglospora (bryophytes), Helminthoglypta hertleini (Oregon Shoulderband) (mollusks), Prophysaon coeuleum (Blue-grey Tail-dropper) (mollusks), Prophysaon dubium (Papillose Tail-dropper) (mollusks), Trilobopsis*

*tehamana (Tehana Chaparral) (mollusks), Allotropa virgata (Sugar Stick) (vascular plants), Cypripedium fasciculatum (Clustered Lady's Slipper) (vascular plants), and Cypripedium montanum (Mountain Lady's Slipper) (vascular plants). App. Tab 138.*

Defendant's Response: Defendant objects because the contention is plaintiffs' inadmissible legal conclusion, not a statement of fact. Defendant further objects because document cited is dated June 22, 2000, and, therefore, is not relevant to the Forest Service's pre-contract actions.

*151. The Klamath Forest Alliance timely filed an administrative appeal of the Forest Service's approval of the Happy Thin Environmental Assessment on October 30, 1998. The appeal challenged, inter alia, the Forest Service's failure to conduct the required survey and manage surveys prior to FY 1999:*

*In addition to surveys for the Del Norte Salamander (PLEL), the ROD requires surveys to be completed for the other 71 species listed in Table C-3 [of the ROD] prior to ground-disturbing activities that will be implemented in FY 1999 or later. The Happy Thin project will be implemented in FY 199 or later, and thus surveys for these species are required. The EA fails to address these species, and until such an assessment is completed no project should be implemented. App. Tab 198 (Letter from K. Haines and F. Pace, Klamath Forest Alliance to M. Lee, Forest Service Acting Forest Supervisor (Oct. 30, 1998)). The Klamath Forest Alliance also challenged the interim survey protocol for the red tree vole. Id. On December 17, 1998, the Forest Service deciding officer upheld the Forest*

*Service's decision to implement the Happy Thin EA. The deciding officer concurred with the Appeal Reviewing Officer's finding that Klamath Forest Alliance objection regarding the Forest Service's definition of "implement" concerned a decision beyond the scope of the Jack EA and could not be challenged: "The Decision Notice for the Happy Thinning was signed on September 15, 1998, and is in compliance with an Interagency Memorandum dated September 11, 1998. This Interagency Memorandum defines the point at which "implementation" takes place. It is my opinion that this issue is outside the scope of the Decision." App. Tab 199 (Letter from R. Moltzen, Forest Service Deciding Officer, to K. Haines, Klamath Forest Alliance (Dec. 17, 1998)).*

<u>Defendant's Response</u>: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*152. The chart prepared by Sue Zike which included information from others within the Forest Service used for the evaluation of litigation risk with respect to proposed award of the Happy Thin timber sale recognized that at least one of the <u>ONRC Action</u> plaintiffs had challenged the Forest Service's interpretation "NEPA decision equals implementation" in the administrative appeal of Happy Thin prior to it being offered to the public. Ms. Zike's chart also indicates that the Forest Service's decision not to survey for red tree voles in the sale area was also challenged in the administrative appeal. Finally, as of the date of preparation of this chart on or about March 9, 1999, the chart indicates that no red tree vole*

*surveys were required on Happy Thin because at that time such surveys were limited by the Forest Service to Oregon and did not include California National Forest timber sales such as Happy Thin. App. Tab 94.*

Defendant's Response: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*153. On March 9, 1999, prior to the award of Happy Thin, Ed Matthews, contracting officer for that sale, recommended awarding the sale in part because he believed it was important for the Forest Service to know if it was going to be challenged on the red tree vole directive not to survey south of the Oregon state line. Mr. Matthews' concern was that this issue needed to be tested soon because there were other sales in the National Forests in northern California that were scheduled to proceed under this same red tree vole directive and it was important to find out if they were in jeopardy too. App. Tab 94; App. Tab 177 (E. Matthews Dep. Tr. (8/22/07) 30:25-38:5).*

Defendant's Response: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*154. On March 31, 1999, the Forest Service published the advertisement for Happy Thin. App. Tab 96.*

Defendant's Response: Defendant does not dispute these facts. However, this document is irrelevant to plaintiffs' breach of contract claims because it relates to the Forest Service's

actions and responsibilities prior to award.

155. *In March 1999, the Forest Service issued the Happy Thin prospectus. The prospectus did not specifically mention the ONRC Action litigation or that Happy Thin would likely be the subject of a motion for a temporary restraining order or a preliminary injunction, if awarded. Happy Thin timber sale prospectus. App. Tab 96.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, not a statement of fact. Furthermore, defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to contract award, and, therefore, is not relevant to this case.

156. *When Blue Lake submitted its bid on Happy Thin, it did not know that Happy Thin was threatened by the ONRC Action lawsuit or by any other lawsuit. App. Tab 187 (B. Taylor Decl. ¶ 5).*

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, the declaration concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

157. *At the bid opening for Happy Thin but prior to the opening of bids, Ed Matthews, the Forest Service Contracting Officer for Happy Thin, announced to all the bidders, including Blue Lake, that Happy Thin had been a part of some lawsuit but that Happy Thin was no longer included in the lawsuit. App Tab 177 (E.*

*Matthews Dep. Tr. 82:10-84:22); App. Tab 167 (B. Cox Dep. Tr. 24:10-26:5); App. Tab 182 (R. Johnston Dep. Tr. 31:8-34:18); App. Tab 120.*

Defendant's Response: Defendant objects because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*158. Before Blue Lake bid on Happy Thin, it learned that the sale had been administratively appealed prior to being offered to the public. At that time Blue Lake representative Jerry Broom asked the Forest Service Contracting Officer for Happy Thin, Ed Matthews, what the Forest Service was planning to do to remedy the appeal. Mr. Matthews told Mr. Broom that the Forest Service was working on it. Prior to bidding Mr. Broom also asked a Forest Service representative, probably Ed Matthews, "Is this sale clean? Is it ready to go?" The response from the Forest Service was "Yes." App. Tab 183 (J. Broom Dep. Tr. 32:16-33:10, 63:16-64:11).*

Defendant's Response: Defendant objects because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*159. In bidding on Happy Thin and accepting the award of that sale, Blue Lake relied upon its understanding from the Forest Service that Happy Thin was not threatened by the ONRC Action litigation or any other litigation or administrative appeals. App. Tab 187 (B. Taylor Decl. ¶ 6). Blue Lake began operating Happy Thin shortly after it was awarded, and Blue Lake was surprised when it was*

*suspended by the Forest Service due to the ONRC Action litigation and the Forest Service's failure to perform required surveys. App. Tab 187 (B. Taylor Dep. Tr. 43:22-44:14, 52:1-10).*

Defendant's Response: Defendant objects to this contention because it is a legal conclusion, not a statement of fact. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Defendant further objects because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*160. By letter dated March 25, 1999, Edward Matthews notified Michael Axline, lead counsel for the ONRC Action plaintiffs, that the Forest Service intended to award Happy Thin no sooner than May 5, 1999. Blue Lake was not informed of this letter. App. Tabs 97-98; App. Tab 187 (B. Taylor Decl. ¶ 7).*

Defendant's Response: Defendant does not dispute that Mr. Matthews informed Mr. Axline of the Forest Service's intent to award Happy Thin; however, because this relates to the Forest Service's pre-award conduct or responsibilities, this contention has little relevance. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight.

*161. On May 4, 1999, the oral auction for Happy Thin was held. App. Tab 96. Prior to the start of the auction, the Forest Service announced, "The Happy Thin Heli Timber Sale was listed in litigation but is not currently involved in the litigation. The sale will not be awarded until after July 5, 1999." App. Tab 120. At the time of the oral auction Happy Thin was still under threat of an injunction in the ONRC Action litigation but this fact was not divulged by the Forest Service to Blue Lake. App. Tab 187 (B. Taylor Decl. ¶¶ 5-7). Blue Lake was declared the apparent high bidder at the conclusion of the auction. App. Tab 122.*

Defendant's Response: Defendant does not dispute that Blue Lake was declared the apparent high bidder. Defendant objects to the extent this contention is plaintiffs' legal conclusion, not a statement of fact. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, defendant objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*162. In an internal email on or about June 7, 1999, Sue Zike suggested "the quiet award" of Happy Thin. In this email Ms. Zike noted that "DOJ is likely to request that we wait until we have our ONRC Action hearing with J. Dwyer, but there is no date set yet." Ms. Zike then suggested that the Forest Service propose the award of "the lesser of the two evils between Happy Thin and Lower Hayfork." App. Tabs 113, 115; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 192:9-195:5, 200:4-203:5). Blue Lake was not informed of Ms. Zike's suggestions or any other*

*Forest Service or DOJ strategies involving the ONRC Action lawsuit and the proposed award of Happy Thin. App. Tab 187 (B. Taylor Decl. ¶ 3).*

Defendant's Response: Defendant objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*163. By letter dated June 23, 1999 signed by Robert Devlin for Nancy Graybeal, Acting Regional Forester for Region 6 of the Forest Service, Edward Boling was given notice that the Forest Service had assessed the litigation risk in connection with awarding Happy Thin, including a review by Owen SchmIdt, of the Office of General Counsel of the Department of Agriculture, and that the Forest Service intended to award Happy Thin in the normal course of business after July 1, 1999. The letter further noted that Happy Thin was on a list of sales "identified by Plaintiffs [in the ONRC Action litigation] on April 5 as sales they had concerns with." Neither this letter nor the contents of this letter were disclosed to representatives of Blue Lake Forest Products. App. Tab 187 (B. Taylor Decl. ¶ 9); App. Tab 118; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 212:14-214:9).*

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Defendant further objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*164. When she learned of it, Sue Zike was surprised and unhappy that Edward Boling intended to inform ONRC Action counsel of the Forest Service's plans to award Happy Thin and other timber sales after July 1, 1999. App. Tab 119; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 214:10-217:3).*

Defendant's Response: Defendant objects because Ms. Zike's personal opinion cannot bind the Forest Service. Defendant further objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*165. The Forest Service did not award Happy Thin to Blue Lake until July 6, 1999. App. Tab 122. The letter awarding Blue Lake Happy Thin (Contract No. 060715) made no mention of the status of the timber sale in relation to ONRC Action or the likelihood that the ONRC Action plaintiffs would seek a temporary restraining order or a preliminary injunction against any harvesting on the sale. Id.*

Defendant's Response: Defendant does not dispute this fact.

*165A. When Blue Lake accepted contract award at the price it bid, Blue Lake expected that its operations would not be suspended based on the ONRC Action litigation. App. Tab 187 (B. Taylor Decl. ¶¶ 5, 8).*

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Furthermore, Mr. Taylor's expectations were contradicted by an unambiguous contract clause, C6.01, which explicitly permits suspension of operations.

*166. In response to the preliminary injunction issued in* *<u>ONRC Action</u>* *on August 26, 1999, the Forest Service wrote Blue Lake on August 27, 1999 and directed that Blue Lake immediately suspend all operations on Happy Thin. App. Tab 129.*

<u>Defendant's Response</u>: Defendant does not dispute this fact.

*166A. Blue Lake was "absolutely devastated" and "shocked" when the Forest Service suspended its operations on the Happy Thin sale as a result of the* *<u>ONRC Action</u>* *lawsuit. App. Tab 184 (B. Taylor Dep. Tr. 51:15-18). Blue Lake was surprised when the Forest Service suspended its ongoing operations because Blue Lake had no reason to believe that anything was going to happen to Happy Thin as a result of the* *<u>ONRC Action</u>* *lawsuit.* *<u>Id.</u>* *(B. Taylor Dep. Tr. 52: 5-8).*

<u>Defendant's Response</u>: Defendant objects to this contention because it is not a statement of fact, it is a self-serving opinion that should be afforded little evidentiary weight.

*166B. If Blue Lake had known about the Forest Service's secret agreements with the ONRC Action plaintiffs when it bid on the sale, Blue Lake could have taken steps to prevent the damages it incurred. App. Tab 187 (B. Taylor Decl. ¶ 12).*

<u>Defendant's Response</u>: Defendant objects to this contention because it is not a statement of fact, it is a self-serving opinion that should be afforded little evidentiary weight.

*167. Blue Lake timely submitted a Contract Disputes Act claim for breach of contract rising out of Happy Thin to Ed Matthews on June 13, 2000. App. Tab 137 (Letter from B. Taylor, Blue Lake Forest Products, to E. Matthews, Forest Service (June 13, 2000)). The contracting officer issued a final decision on Blue Lake's claim on October 6, 2000. App. Tab 143 (Letter from E. Matthews, Forest Service, to B.*

*Taylor, Blue Lake Forest Products (October 6, 2000)).*

Defendant's Response: Defendant does not dispute this fact.

*168. On February 18, 2000, the Forest Service revised its red tree vole survey directive to require surveys south of the Oregon/California border where there was known red tree vole habitat, as there was in the Happy Thin sale area. App. Tab 138.*

Defendant's Response: Defendant objects because this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims. Defendant further objects because the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure.

*169. Pursuant to a settlement agreement entered into between the Department of Justice, representing the Forest Service, and the ONRC Action plaintiffs which was the basis for the dismissal of the ONRC Action lawsuit, the Forest Service prepared a Supplemental Information Report ("SIR") for Happy Thin. That report, dated June 22, 2000, indicated that as part of the settlement of the lawsuit, during the suspension of Happy Thin, the Forest Service had surveyed the sale for various Category 2 species including the Oregon red tree vole, several species of fungi, bryophytes, mollusks and vascular plants. These surveys were completed during the period August 28, 1999 through June 22, 2000 when Happy Thin was suspended. A SIR, signed by Margaret J. Boland, Forest Supervisor for the Klamath National Forest, concluded that the original Decision Notice for Happy Thin remained valid because "the new information on these species does not*

*present a different picture of the environmental consequences already considered in the Happy Thinning EA," and that "A finding of no significant impact can still be concluded." Based on the SIR some modifications were made for harvesting requirements on Happy Thin. App. Tab 138.*

Defendant's Response: Defendant objects because this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims.

*170. The Forest Service lifted the suspension on Happy Thin by letter dated August 17, 2000. App. Tab 141.*

Defendant's Response: Defendant does not dispute this fact; however, this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims.

*171. The Forest Service did not perform certain Category 2 surveys on Jack prior to the award of that sale to Timber Products on March 2, 1999 because the NEPA Decision Notice for that sale was signed on July 14, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tab 134.*

Defendants' Response: Defendant objects to the last sentence of this contention because it is not supported by the document cited, and is merely plaintiffs' opinion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims

for breach of contract.

172. The twenty-one Category 2 surveys that were not performed by the Forest Service on the Jack sale prior to award were *Aleuria rhenana* (a.k.a. *Sowerbyella rhenana*) (fungi), *Bondarzewia Montana* (a.k.a. *Bondarzewia mesenterica*) (fungi), *Otidea leporine* (fungi), *Otidea onotica* (fungi), Otidea smithii (fungi), *Polyozellus mutiplex* (fungi), *Sarcosoma Mexicana* (fungi), *Buxbaumia vidiris* (bryophytes), *Ptilidium californicum* (bryophytes), *Helminthoglypta hertleini* (Oregon Shoulderband) (mollusks), *Helminthoglypta talmadgei* (Klamath Shoulderband) (mollusks), *Monadenia churchi* (Church's Sideband) (mollusks), *Monadenia chaceana* (Siskiyou Sideband) (mollusks), *Monadenia troglodytes* (Shasta Sideband) (mollusks), *Monadenia troglodytes wintu* (Wintu Sideband) (mollusks), *Prophysaon dubium* (Papillose Taildropper) (mollusks), *Trilobopsis roperi* (Shasta Chaparral) (mollusks), *Trilobopsis tehamana* (Tehana Chaparral) (mollusks), *Allotropa virgata* (Sugar Stick) (vascular plants), *Cypripedium fasciculatum* (Clustered Lady's Slipper) (vascular plants), and *Cypripediummontanum* (Mountain Lady's Slipper) (vascular plants). App. Tab 140.

<u>Defendant's Response:</u> Defendant does not object to this contention.

*173. The Klamath Siskiyou Wildlands Center timely filed an administrative appeal of the Forest Service's approval of the Jack Environmental Assessment on August 21, 1998. The appeal challenged, <u>inter</u> <u>alia</u>, the Forest Service's definition of implement: Surveys for all species in Table C-3 [of the ROD] must be completed,*

*since portions of this timber sale will be implemented in 1999. Despite Forest Service claims, implementing a timber sale includes on-the-ground disturbance. Since this timber sale will be implemented over the next 5 years, Survey and Manage requirements for all species, including mollusks, fungi, lichens, bryophytes, vertebrates, and plants, must be completed prior to any timber falling or roadbuilding. App. Tab 196 (Letter from Klamath Siskiyou Wildlands Center to L. Sprague, Forest Service Regional Forester (Aug. 20, 1998)). The Forest Service deciding officer upheld the Forest Service's decision to implement the Jack EA on October 15, 1998. The deciding officer found that the Klamath Siskiyou Wildlands Center objection regarding the Forest Service's definition of "implement" concerned a decision made in the Land Resource Management Plan (LRMP) and therefore was beyond the scope of the Jack EA and could be no longer challenged: "I have determined that objection[] number 3 . . . [is] not within the scope of the decision. Objection 3 refers to the timing of surveys under 'survey and manage' standards and guidelines which was decided in the LRMP (LRMP 4-26 and 4-33)." App. Tab 197 (Letter from J. Cruz, Forest Service Deciding Officer, to M. Bergoffen, Klamath Siskiyou Wildlands Center (Oct. 15,1998)).*

<u>Defendant's Response:</u> Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*174. On September 25, 1998, the Forest Service published the advertisement for Jack Heli. App. Tab 132.*

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

*175. In October 1998, the Forest Service issued the timber sale prospectus for Jack Heli. The prospectus stated, inter alia, "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale; language in this sale's contract has been included to limit the government's liability in case of cancellation as to holding costs." App. Tab 53.*

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

*176. The oral auction for Jack Heli was held on November 3, 1998. App. Tabs 79, 91. Timber Products was declared the apparent high bidder at the conclusion of the auction; however, the Forest Service did not immediately award the timber sale contract to Timber Products. Id.*

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber

sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

*177. On November 24, 1998, Bev Cox of the Forest Service informed Bill Turner that the Forest Service could not award Jack Heli to Timber Products "until the Justice Department says we can." This was done on the advice of Brian Stone, a litigation coordinator for Region 5 of the Forest Service. App. Tab 167 (B. Cox Dep. Tr. 13:8-14:16); App. Tab 132.*

<u>Defendant's Response:</u> Defendant objects to this contention because it is not supported by the testimony cited. Ms. Cox testified that she did not remember discussing award of the Jack Heli timber sale with either Mr. Turner or Mr. Stone. P. App. Tab 167 (Cox 14:25). Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*178. At the time of the Jack Heli oral auction, it was customary for timber sales on the Klamath National Forest to be awarded the day following the designation of a high bidder at the oral auction. App. Tab 167 (B. Cox Dep. Tr. 17:18-20); App. Tab 181 (B. Turner Dep. Tr. 60:314).*

<u>Defendant's Response:</u> Defendant objects to plaintiffs' use of the term "customary" which is plaintiffs' opinion and is not supported by the testimony cited.

Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*179. On the same day of the oral auction for Jack Heli, there was also an auction of the Jack Trac timber sale within the same ranger district on the Klamath National Forest. Both Jack Heli and Jack Trac were analyzed under the same Environmental Assessment and the Decision Notices for each of these sales were pursuant to that assessment. Both Jack Trac and Jack Heli were timber sales within the NFP area and subject to all of the requirements of the NFP including any required wildlife and plant surveys. Timber Products was declared the high bidder on Jack Trac and within a few days of the oral auction was awarded that sale by the Forest Service. Although it was within the NFP area and subject to all of the applicable provisions of the NFP, Jack Trac was not one of the sales enjoined in the ONRC Action litigation and it was never suspended. App. Tab 181 (B. Turner Dep. Tr. 60:3-14); App. Tab 85.*

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Turner testified only as to his understanding of the timber sale award process. Defendant further objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*180. On December 2, 1998, Contracting Officer Ed Matthews notified Brian Stone in*

*the Region 5 Forest Service office via email that Mr. Matthews was planning on awarding Jack Heli on December 18, 1998. App. Tab 70; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 170).*

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*181. By letter dated January 10, 1999, Bill Turner, timber procurement manager for Timber Products, asked Ed Matthews, the contracting officer for Jack Heli, what were the Forest Service's expectations for award of that timber sale and whether it was possible that the Forest Service would allow harvesting of that timber sale in the 1999 logging season. App. Tab 77.*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*182. When Jack Heli had not been awarded over two months after the oral auction, on January 10, 1999, Bill Turner of Timber Products wrote Edward Matthews requesting "some formal communication as to what the Forest Service expectations are for award." It was Bill Turner's understanding from his conversation with Edward Matthews that the Forest Service would not award Jack Heli if it was still under threat of injunction in ongoing litigation. Timber Products relied upon the Forest Service's representations. App. Tab 77; App.*

*Tabs 78, 80; App. Tab 181 (B. Turner Dep. Tr. 26:12-30:8, 50:8-51:8, 51:21-52:19, 54:10-14, 55:3-56:18, 63:10-65:19); App. Tab 161 (Timber Products' Answer to Defendant's Interrogatory No. 24); App. Tab 188 (B. Turner Decl. ¶ 5).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, rather than a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*183. The charts prepared by Sue Zike which included information from others within the Forest Service used for the evaluation of litigation risk with respect to proposed award of the Jack Heli timber sale recognizes that at least one of the ONRC Action plaintiffs had challenged the Forest Service's interpretation "NEPA decision equals implementation" in the administrative appeal of Jack Heli prior to it being offered to the public. Ms. Zike's chart also indicates that as of the date of preparation of this chart on or about January 20, 1999 no red tree vole surveys were required on Jack Heli because at that time such surveys were limited by the Forest Service to Oregon and did not include California National Forest timber sales such as Jack Heli. App. Tab 42.*

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal opinion and is not a contention of fact. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims

for breach of contract.

*184. In a letter dated January 21, 1999 in response to Bill Turner's January 10, 1999 letter, Edward Matthews told Timber Products that, "The Forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that government attorneys have filed for dismissal of the case. . . . I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February." App. Tabs 80-81. Bill Turner understood from this letter that the Jack Heli sale would only be awarded if it was no longer threatened by the lawsuit referenced by Mr. Matthews. See citations to ¶ 182 above.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' self-serving opinion that is not supported by the documents cited. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*185. Bev Cox, the Forest Service contracting officer, sent a fax to Bill Turner on January 29, 1999 informing him that Timber Products' bid on Jack Heli was scheduled to expire on February 1, 1999. App. Tab 84. A bid on a Forest Service timber sale expires in 90 days if the sale is not awarded if the bidder does not extend its bid. In a letter dated February 1, 1999, Timber Products extended its bid. App. Tabs 85-86. Timber Products extended its bid with the understanding,*

*based on Bill Turner's communication with the Forest Service, that Jack Heli would only be awarded to Timber Products after the sale was no longer threatened by the lawsuit. App. Tab 188 (B. Turner Decl. ¶ 5).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and plaintiffs self-serving opinion not supported by the documents or testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*186. By memorandum dated February 2, 1999, Sue Zike informed Edward Boling of the Forest Service's intent to award the Jack Heli timber sale. App. Tab 87; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 181:15-185:1).*

Defendant's Response: Defendant objects to this contention because it is not supported by the document or testimony cited. The document does not mention the Jack Heli sale, or any other sale, and Ms. Zike did not testify that she informed Mr. Boling of any intent to award the Jack Heli contract. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*187. On March 1, 1999, Edward Boling wrote Michael Axline, lead counsel for ONRC Action, to provide him with additional information regarding "certain timber sales that may be of concern to your client." App. Tab 89. Specifically, the letter stated that the Forest Service and BLM planned to award five timber sales after*

*March 1, 1999. Jack Heli was one of the timber sales listed. Timber Products was not informed of Mr. Boling's notice to Mr. Axline. id.; App. Tab 188 (B. Turner Decl. ¶ 6).*

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*188. The next day, the Forest Service awarded Jack Heli to Timber Products by letter dated March 2, 1999. App. Tab 90. The letter made no mention of the status of this timber sale in relation to ONRC Action or to Edward Boling's March 1, 1999 letter to Michael Axline. The letter did not inform Timber Products that the lawsuit had not been dismissed with respect to Jack Heli. Id.*

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*188A. The Forest Service's Report about the Jack Heli timber sale award, Form FS-2400-17, noted that contract award was "made upon approval of [the] Department of Justice." App. Tab 92.*

Defendant's Response: Defendant objects to this contention because the documents

cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*188B. When Timber Products accepted contract award at the price it bid, Timber Products expected that its operations would not be suspended based on the* <u>*ONRC Action*</u> *lawsuit. App. Tab 188 (B. Turner Decl. ¶¶ 5-7); App. Tab 181 (B. Turner Dep. Tr. 28:13-31:2, 51:21-22, 54:12-56:18, 63:21-65:19).*

<u>Defendant's Response:</u> Defendant objects to this contention because it is plaintiffs' unsupported self-serving opinion. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*189. During the first six months of 1999 the Department of Justice and the* <u>*ONRC Action*</u> *plaintiffs reached an agreement that the Forest Service could award certain timber sales on* <u>*ONRC Action*</u>*'s "problem list" without immediately triggering a motion for summary judgment or for a temporary restraining order. Jack Heli was one of the sales awarded as a result of this agreement. This agreement, however, did not preclude* <u>*ONRC Action*</u> *from challenging the actual operations on Jack Heli after it was awarded. The Department of Justice, the ONRC Action plaintiffs and the Forest Service did not disclose the existence of this agreement to Timber Products and Timber Products was not aware of this agreement until after the filing of the above-captioned action. App. Tabs 99, 112; App. Tab 188 (B. Turner Decl. ¶ 2).*

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*190. The Department of Justice and ONRC Action reached a secret agreement during March-June 1999 that the Forest Service could award Jack Heli and that ONRC Action would not seek a temporary restraining order or a preliminary injunction on the basis of that award so long as ONRC Action was given advance notice of any actual operations on Jack Heli. ONRC Action reserved the right to seek a temporary restraining order or a preliminary injunction with respect to any actual operations on that sale. Timber Products was not informed of this agreement. App. Tab 123.*

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*191. In an email on or about July 9, 1999, Sue Zike informed her Distribution List (which included Ed Matthews) that if operations were to be approved on Jack Heli, which had been awarded in March of 1999, the Department of Justice and the Department of Agriculture's Office of General Counsel needed to be notified*

*as soon as possible because such operations were highly likely to trigger a motion for a temporary restraining order or a preliminary injunction from the* *ONRC Action* *plaintiffs. Timber Products was not informed of this development. App. Tab 127; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 230:6-234:9); App. Tab 188 (B. Turner Decl. ¶ 7).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and not a contention of fact, and is not supported by the documents or testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*192. As early as July 9, 1999, the Department of Justice lawyers representing the government in* *ONRC Action* *believed that it was likely that if operations commenced on Jack Heli ONRC Action would file a motion for a temporary restraining order or a preliminary injunction with respect to that sale. This information was not provided to Timber Products. App. Tab 127.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact, and is not supported by the testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*193. In response to the preliminary injunction issued in* *ONRC Action* *on August 26, 1999, the Forest Service wrote Timber Products on August 27, 1999 and directed*

*that Timber Products immediately suspend all operations on Jack Heli. App. Tab 129.*

Defendant's Response: Defendant does not object to this contention.

*193A. Timber Products was surprised when the Forest Service suspended its ongoing operations because Timber Products had no reason to believe that anything was going to happen to Jack Heli as a result of the ONRC Action lawsuit. App. Tab 188 (B. Turner Decl. ¶ 9).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, and not a contention of fact.

*193B. If Timber Products had known about the Forest Service's secret agreements with the ONRC Action plaintiffs when it bid on the sale, Timber Products could have taken steps to prevent the damages it incurred. App. Tab 188 (B. Turner Decl. ¶ 12).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, and not a contention of fact.

*194. On July 24, 2000, the Forest Service completed a SIR for Jack Heli. This SIR reported the results of additional environmental analyses and surveys performed by the Forest Service as part of a settlement agreement between the government and the ONRC Action plaintiffs which included the dismissal of the ONRC Action lawsuit. According to the SIR, during the suspension of Jack Heli from August 27, 1999 through July 24, 2000 surveys were conducted on that sale only for units 5, 9, 11, 12, 14, 56 and 106 because the majority of units on Jack Heli (15, 18, 19,*

*27, 31, 40, 44, 49, 53, 57, 98, 100, 102, 103, 104, 350, 390 and 512) were covered with snow and could not be surveyed. Thus, suspension of this sale was continued after July 24, 2000. The SIR, signed by District Ranger Ray A. Haupt, concluded that Jack Heli included the potential habitat for fungi, bryophytes, mollusks and vascular plants but that no survey and manage or protection buffer species were found to exist in the units surveyed. Accordingly, Ranger Haupt determined that no additional environmental disclosures or changes in the original DN were necessary and that the original finding of no significant impact in connection with the original Decision Notice issued July 14, 1998 was still valid. App. Tab 140.*

Defendant's Response: Defendant does not object to this contention.

*195. Timber Products timely submitted a Contract Disputes Act claim for breach arising out of Jack Heli to Edward Matthews on July 14, 2000. App. Tab 139 (Letter from B. Turner, Timber Products, to E. Matthews, Forest Service (July 14, 2000)). The contracting officer issued his final decision on Timber Products' claim on November 9, 2000. App. Tab 143 (Letter from E. Matthews, Forest Service, to B. Turner, Timber Products (November 9, 2000)).*

Defendant's Response: Defendant does not object to this contention.

*196. The Forest Service did not perform certain Category 2 surveys on Too Wild prior to the award of that sale to CLR on May 14, 1999 because the NEPA Decision Notice for that sale was signed on June 15, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered*

*implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tabs 40, 134.*

Defendants' Response: Defendant objects to the last sentence of this contention because it is not supported by the document cited, and is merely plaintiffs' opinion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

197. Category 2 surveys for the red tree vole were not performed by the Forest Service on the Too Wild sale prior to award for the additional reason that the red tree vole directive in effect at the time did not require surveys for the red tree vole on that sale even though there was abundant red tree vole habitat on the Too Wild sale area. App. Tabs 34, 134.

Defendant's Response: Defendant objects to this contention because it is not supported by the documents cited. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

198. The twenty-seven Category 2 surveys that were not performed by the Forest Service on the Too Wild sale prior to award were red tree vole (mammal), *Aleuria rhenana* (a.k.a. *Sowerbyella rhenana*) (fungi), *Bridgeoporus nobilissimus* (fungi), *Bondarzewia Montana* (a.k.a. *Bondarzewia mesenterica*) (fungi), *Otidea leporine* (fungi), *Otidea onotica* (fungi), *Otidea smithii* (fungi), *Polyozellus mutiplex*

(fungi), *Sarcosoma Mexicana* (fungi), *Buxbaumia vidiris* (bryophytes), *Kurzia makinoana* (bryophytes), *Ptilidium californicum* (bryophytes), *Rhizomnium nudum* (bryophytes), *Tetraphis geniculata* (bryophytes), *Ulota meglospora* (bryophytes), *Megomphix hemphilli* (Oregon Megomphix) (mollusks), *Prophysaon coeuleum* (Blue-grey Tail-dropper) (mollusks), *Prophysaon dubium* (Papillose Tail-dropper) (mollusks), *Allotropa virgata* (Sugar Stick) (vascular plants), *Aster vialis* (vascular plants), *Botrychium montanum* (vascular plants), *Clintonia andrewsiana* (vascular plants), *Cypripedium fasciculatum* (Clustered Lady's Slipper) (vascular plants), and *Cypripedium montanum* (Mountain Lady's Slipper) (vascular plants), *Hypogymnia duplicata* (lichens), *Lobaria linita* (lichens), *Psuedocyohellaria reinierensis* (lichens). App. Tab 145 (Too Wild SIR).

<u>Defendant's Response:</u> Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*199. During the public comment period for the Too Wild Timber Sale EA (December 31, 1997 through February 2, 1998), the government received comments objecting to the interim survey protocol for the Oregon red tree vole and the Forest Service's failure to survey Too Wild for the vole. App. Tab 147. The government paraphrased the substance of the comments as stating: The proposed timber sale does not meet the "Survey and Manage" requirements of the Northwest Forest Plan Record of Decision (page C-5). The ROD requires that*

*'Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for red tree voles, must proceed [sic] the design of all ground-disturbing activities that will be implemented in 1997 or later.'" "The timber sale includes suitable habitat for red tree voles yet the sale area has not been surveyed as required by the PNW ROD. The Regional Ecosystem Office (REO) memo amending the ROD is objected to. Id. The EA provided the following response to the comments: There was an interagency memorandum concerning Red Tree Voles was [sic] issued on November 4, 1996. It stated that if there was more than 40 percent suitable habitat in the fifth order watershed that the project occurred, surveys were not required. The suitable habitat in the Lawson watershed is 76 percent, so surveys were not required. Authority to amend or modify the ROD is found on page 58 section H of the ROD and pages 3 and 4 of Appendix E of the Final SEIS of the Northwest Forest Plan. The comment refers to management direction that is outside the scope of the Too Wild Timber Sale project. The Forest personnel and idT members used the latest policy and direction in the analysis of the proposal. Id.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second-hand legal conclusion and not a contention of fact. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*200. The government also received comments on the Too Wild EA objecting to the*

*"NEPA decision equals implementation" interpretation. App. Tab 147. The government paraphrased the substance of the comments as stating, "The Forest Service is delaying implementation of the strategy 2 survey and manage requirements beyond the phase-in period allowed by the ROD. Disagrees with the definition the agency uses for implementation." Id. The EA provided the following response to the comments, "The comment refers to management direction that is outside the scope of the Too Wild Timber Sale project. The Forest personnel and idT members used the latest policy and direction in the analysis of the proposal." Id.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second-hand legal conclusion and not a contention of fact. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*200A. The Too Wild DN and EA were administratively appealed by the ONRC Action plaintiffs regarding the interpretation "NEPA decision equals implementation and the RTV Directive. App. Tab 131.*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, it is not supported by the document cited. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*201. The Decision Notice for Too Wild was signed on June 15, 1998. App. Tab 40; App. Tab 145 (Supplemental Information Report for the Too Wild Timber Sale ("Too Wild SIR")).*

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*202. The oral auction for Too Wild was held on September 17, 1998. CLR was declared the high bidder at the conclusion of the auction; however, the Forest Service did not immediately award the timber sale contract to CLR. App. Tab 145 (Too Wild SIR). Prior to submitting its bid on Too Wild, CLR was not informed that the ONRC Action plaintiffs had identified Too Wild to the Forest Service as a sale on a list of "problem" or "at-risk" sales that the ONRC Action plaintiffs would seek to enjoin if awarded. App. Tab 180 (D. Bonde Dep. Tr. 31:1832:13); App. Tab 187 (D. Bonde Decl. ¶ 2).*

Defendant's Response: Defendant objects to this contention because it is not supported by the documents or testimony cited. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*203. Nothing in the Too Wild prospectus issued to CLR prior to the submission of bids informed CLR that Too Wild was threatened by the ONRC Action lawsuit. App. Tab 109 (Too Wild Timber Sale Prospectus).*

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*204. By letter dated May 14, 1999, Thomas Link, contracting officer for the Forest Service, awarded Too Wild to CLR. App. Tab 110 (Too Wild SIR). Nothing in the Forest Service's award letter disclosed that Too Wild was still threatened by the ONRC Action lawsuit. Id.*

Defendant's Response: Defendant objects to the second sentence of this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

*205. After the oral auction CLR was assured by Tom Link, the contracting officer for Too Wild, that, although the sale would not be immediately awarded, Too Wild was going to be awarded soon and that the government had only a few more things to do before being able to approve the award. App. Tab 180 (D. Bonde Dep. Tr. 33:13-35:3, 34:12-35:3, 58:4-16).*

Defendant's Response: Defendant objects to this contention because it relies on inadmissible hearsay and plaintiffs' legal conclusion. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

206. *CLR did not believe that the Forest Service would award Too Wild to CLR if the Forest Service believed that it was likely that there would be a meritorious motion for a preliminary injunction or a temporary restraining order against the sale after award. App. Tab 180 (D. Bonde Dep. Tr. 48:4-48:19).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and not a contention of fact. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

207. *In response to the preliminary injunction issued in ONRC Action on August 26, 1999, the Forest Service telephoned CLR on August 27, 1999 and directed that CLR immediately suspend all operations on Too Wild. App. Tab 130. Thomas Link, the Forest Service contracting officer, reiterated the order in a letter to CLR dated September 1, 1999. Id.*

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited.

208. *On November 17, 2000, the Forest Service issued a SIR for Too Wild pursuant to the Forest Service's obligations under the settlement agreement entered into by the government and the ONRC Action plaintiffs resulting in the dismissal of the ONRC Action lawsuit. The SIR indicated that during the suspension of Too Wild between August 25, 1999 and November 17, 2000 various surveys for animal and plant life were performed including surveys for various vascular plants, bryophytes, lichens, fungi, mollusks and the red tree vole. As a result of these*

*surveys, various survey and manage species were found on Too Wild's units and harvest requirements for these units were altered by greater protection. Nevertheless, Too Wild's SIR was executed by Forest Supervisor Jack E. Williams who determined in the SIR that the existing environmental disclosure in the Too Wild EA was adequate and that neither a revised EA nor a new Decision Notice for the Too Wild EA was required. App. Tab 145 (Too Wild SIR).*

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact.

*209. By letter dated September 10, 2003, CLR submitted a timely Contract Disputes Act claim in accordance with the requirements of the Contract Disputes Act. App. Tab 154. By letter dated November 25, 2003, the Forest Service contracting officer for Too Wild issued a final decision finding that CLR was entitled to payment in the amount of $38,588 for out-of-pocket expenses associated with the delay of operations on Too Wild and otherwise denying the remainder of CLR's Contract Disputes Act claim. App. Tab 158 (Letter from R. Thomas, Forest Service, to R. Fallert, CLR (November 25, 2003)).*

Defendant's Response: Defendant does not object to this contention.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

Of Counsel:
Lori Polin Jones
James L. Rosen
Marcus R. Wah
Ben Hartman
Office of the General Counsel
United States Department of Agriculture

s/Ellen M. Lynch
ELLEN M. LYNCH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7994
Fax: (202) 514-8624

May 2, 2008

Attorneys for Defendant

Certificate of Filing

I hereby certify that on this 2nd day of May, 2008, a copy of "Defendant's Responses to Plaintiffs' Proposed Findings of Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Ellen M. Lynch
Ellen M. Lynch