**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 04-501C (Judge Williams) |

ADDENDUM TO DEFENDANT'S
PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Pursuant to Rule 56(h)(1) of the Rules of this Court, the following are the additional material facts that the United States contends are not in dispute.

Defendant's Proposed Finding of Uncontroverted Fact No. 21

The Northwest Forest Plan ("NFP") Record of Decision ("ROD") instructed that Category 2 surveys should "precede the design of all ground-disturbing activities . . . implemented in [Fiscal Year] 1999 or later. App. 98, NFP ROD Standards and Guidelines at C-

5.

Defendant's Proposed Finding of Uncontroverted Fact No. 22

Questions arose within the Forest Service and the Bureau of Land Management regarding the implementation of the NFP, and, to ensure consistent responses between agencies and between functional disciplines within the same agency, the agencies established the NFP Issue Resolution Team ("IRT"). App. 101, T. Hussey Decl. ¶¶ 7-8. Tom Hussey and Joyce Casey were the lead Forest Service staff on the NFP IRT. Larry Larson was the BLM lead on the NFP IRT. App. 101, T. Hussey Decl. ¶ 8.

Defendant's Proposed Finding of Uncontroverted Fact No. 23

One of the issues the IRT dealt with was interpreting the transition period established by the NFP for phasing in the survey requirements, "Survey prior to ground-disturbing activities." Specifically, the IRT was asked to define the term "implemented" within the context of the NFP ROD and the accompanying Standards and Guidelines. App. 98, NFP ROD, Standards and Guidelines at C-5; App. 103, T. Hussey Decl. ¶ 13. Tom Hussey and Larry Larson decided that they needed assistance to resolve this issue, and, therefore, met with Randy Hickenbottom, Chair of the Survey and Manage Workgroup, Cheryl McAfree, a botanist, Lyndon Werner, a BLM timber sale specialist, and Nancy Anderson, another BLM employee, several times. App. 104, T. Hussey Decl. ¶ 14. This group looked at three possible ways to define "implementation" in the context fo the NFP ROD. Implementation could mean: (1) when there is physical activity on the ground; (2) when an agency signs a contract; or (3) when the NEPA decision is signed. App. 104, T. Hussey Decl. ¶

Defendant's Proposed Finding of Uncontroverted Fact No. 24

The IRT decided that a project is implemented when the NEPA decision is signed. The group adopted this definition because it made more sense for the responsible official to have the survey information before he or she signed off on a project's NEPA decision. Any other definition of "implement" would create a situation where surveys could require changes in the NEPA decision documents after those documents were signed or after contract award, which would lead to additional costs and possible contract modification or termination. App. 105, T. Hussey Decl. ¶ 20.

Defendant's Proposed Finding of Uncontroverted Fact No. 25

Another definition of "implement" would effectively read out the NFP's phased-in survey requirements, which the NFP intended to provide time to develop and apply the survey protocols. App. 114, R. Devlin Decl. ¶ 16.

Defendant's Proposed Finding of Uncontroverted Fact No. 26

The IRT forwarded this recommendation to the Regional Foresters for Regions 5 and 6, and to the BLM State Directors for Oregon and California, who jointly issued a memorandum on November 1, 1996. This memorandum, commonly referred to as the "NEPA Decision Equals Implementation" memorandum, states that a project is implemented for purposes of the NFP when the NEPA decision is signed. App. 116-121.

Defendant's Proposed Finding of Uncontroverted Fact No. 27

The Forest Ecosystem Management Assessment Team ("FEMAT") assembled after President Clinton's April 1993 "Forest Conference" in Portland, Oregon. The FEMAT, a group made up of scientists and technical experts from the Forest Service, BLM, Environmental

Protection Agency, Fish & Wildlife Service, National Marine Fisheries Services, and several universities, was charged with preparing an assessment based upon an ecosystem approach to forest management. App. 122, J. Hickenbottom Decl. ¶ 2.

Defendant's Proposed Finding of Uncontroverted Fact No. 28

The FEMAT analyzed ten different options that encompassed mixtures of Late-Successional Reserves ("LSRs"), Riparian Reserves ("RRs"), and prescriptions for forest management both inside and outside of the reserves. The vast majority of management activities would occur in Matrix lands, those lands outside of the LSRs and RRs. For each of the ten options, the FEMAT "evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls." Furthermore, assessments were done for over 1,000 plant and animal species that were "thought to be closely associated with late-successional forests." For these 1,000 species, the FEMAT suggested that if the species had an 80 percent or greater likelihood of stabilizing, well-distributed across federal lands, that was the point at which a species' viability could be assured. Significantly, the FEMAT noted that "species with scores lower than 80 percent should not automatically be regarded as unviable." The FEMAT put together a report commonly known as the FEMAT Report. App. 123-124, J. Hickenbottom Decl. ¶ 3.

Defendant's Proposed Finding of Uncontroverted Fact No. 29

A team from the Forest Service and BLM used the FEMAT Report to prepare a draft Supplemental Environmental Impact Assessment ("SEIS"), identifying FEMAT's ten different alternatives as options. The team decided upon Alternative 9, and prepared the draft SEIS, which was sent out for public comment. After receiving public comment, additional analysis was

conducted on many of the 1,000 species; this additional analysis was included as an appendix to the final SEIS, and is commonly referred to as "Appendix J2" or "Additional Species Analysis." The Additional Species Analysis "identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well distributed across federal lands." App. 124, J. Hickenbottom Decl. ¶ 4.

Defendant's Proposed Finding of Uncontroverted Fact No. 30

The red tree vole was identified in the Additional Species Analysis. App. 126, J. Hickenbottom Decl. ¶ 12. However, research in the FEMAT Report and the Additional Species Analysis demonstrates that the red tree vole was "thought to be in less dire circumstances." The FEMAT Report determined that Alternative 9 resulted in a 73 percent likelihood of achieving habitat sufficient to allow the red tree vole to stabilize across federal lands; had the red tree vole received a 7 percent higher likelihood rating in the FEMAT Report, it would not have been included in the Additional Species Analysis. App. 127, J. Hickenbottom Decl. ¶ 13.

Defendant's Proposed Finding of Uncontroverted Fact No. 31

The final SEIS Species Analysis Team's Mammal Subgroup determined that it was unnecessary to protect every red tree vole site; therefore, the red tree vole was not included in the Category 1 Survey and Manage species. The subgroup further decided that the red tree vole sites should be assessed in relation to their value in adding to connectivity between LSRs and RRs, many of which were not ecologically functional because of past management practices. The group decided that it was important to prevent isolation of major portions of the red tree vole population. Therefore, they determined that the red tree vole should be included in the Component 2 Survey and Manage species by managing the red tree vole population in the lands

between LSRs. App. 127-128, J. Hickenbottom Decl. ¶ 14.

Defendant's Proposed Finding of Uncontroverted Fact No. 32

The Survey and Manage Workgroup developed interim guidance for the Forest Service and BLM to implement the Component 2 Survey and Manage requirement for the red tree vole. Id. The group determined that, because of concerns related to ensuring connectivity between LSRs, "those requirements should be designed to maximize the efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population." The group solicited input from the FEMAT scientists, the Additional Species Analysis Team, and the final SEIS team, and, based upon that input, the group developed the recommendations that were ultimately adopted in the November 4, 1996 memorandum entitled "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," informally known as the Red Tree Vole Memorandum. App. 128, J. Hickenbottom Decl. ¶ 15.

Defendant's Proposed Finding of Uncontroverted Fact No. 33

The threat to the red tree vole's continued viability was minimal. App. 130, J. Hickenbottom Decl. ¶ 18, App. 132. Rather, the concern with the red tree vole related to past forest management practices that fragmented the LSRs and resulted in the creation of young, even-aged forests. Therefore, the focus of the red tree vole mitigation measure was to improve LSR connectivity, rather than managing known sites that may be isolated due to a lack of LSR connectivity. App. 129, J. Hickenbottom Decl. ¶ 17. For example, the group decided that if a stand of trees containing a red tree vole population was surrounded principally by older forests, that stand of trees would add little to the connectivity already provided by the older forests. On the other hand, a stand containing red tree voles in an area with almost no older forest or suitable

habitat would have a much higher value in maintaining connectivity between LSRs. Finally, if a stand of trees containing red tree voles was located in an area isolated from federally managed lands, and, therefore, LSRs, that stand could not contribute to improving the species' viability. App. 130, J. Hickenbottom Decl. ¶ 18.

Defendant's Proposed Finding of Uncontroverted Fact No. 34

According to the Red Tree Vole Memorandum, before conducting surveys, geographic information system ("GIS") information was to be used to analyze federal lands to screen the lands based upon their value in increasing LSR connectivity. The first screen would determine how much land was federally managed, and, if the watershed contained less than 10 percent federal lands, survey and manage was not required for those areas. The group decided not to survey in areas with less than 10 percent federal lands because, due to the small portion of federal lands, those areas could not contribute to the goal of LSR connectivity. The second screen would determine whether "at least 40 percent of the federal lands in the watershed was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and whether that closure and diameter could be maintained through the year 2000." If federal lands met the requirements outlined in the second screen, then there was no need to survey and manage for the red tree vole because the habitat already provided adequate LSR connectivity. App. 128-129, J. Hickenbottom Decl. ¶ 16.

Defendant's Proposed Finding of Uncontroverted Fact No. 35

Ms. Lois Schiffer, Assistant Attorney General for the Department of Justice's Environment and Natural Resources Division ("ENRD") at the time of the ONRC Action litigation, did not have any recollection regarding the statement "NEPA decision equals

implementation is nonsense." App. 137-139, L. Schiffer Depo. Tr. at 7:14-7:18, 52:3-52:15.

Defendant's Proposed Finding of Uncontroverted Fact No. 36

Mr. Edward Boling, lead counsel for the ONRC Action litigation, and Mr. Peter Coppelman, the Deputy Assistant Attorney General at ENRD, do not recall any conversation where Ms. Schiffer allegedly said "NEPA decision equals implementation is nonsense." App. 140-145, E. Boling Depo. Tr. at 8:7-8:10, 91:15-92:11; App. 146.

Defendant's Proposed Finding of Uncontroverted Fact No. 37

The Forest Service must consider the competing interests of the environment and the timber industry, a fact that President Clinton recognized during the Forest Conference on April 2, 1993: "How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?" App. 150.

Defendant's Proposed Finding of Uncontroverted Fact No. 38

The Forest Service must meet congressionally-mandated timber-harvest levels. App. 109, R. Devlin Decl. ¶ 4.

Defendant's Proposed Finding of Uncontroverted Fact No. 39

The National Forest Products Association ("NFPA") acknowledged that the 2400-6 standard timber sale contract was developed in 1970 with "extended discussions between NFPA's Federal Timber Purchaser's Committee and the Forest Service." App. 162-163, R. Fitzgerald Decl. ¶ 3, Ex. 18 (App. 255-257).

Defendant's Proposed Finding of Uncontroverted Fact No. 40

The Forest Service, NFPA, other timber industry groups, and individual members of the timber industry, communicated throughout 1971 and 1972 regarding possible revisions to the standard timber sale contract. App. 162-163, R. Fitzgerald Decl. ¶ 3, Exs. 1-5 (App. 169-183). After these communications, the standard timber sale contracts were revised in September 1973. App. 163, R. Fitzgerald Decl. ¶ 4, Ex. 18 (App. 255-257).

Defendant's Proposed Finding of Uncontroverted Fact No. 41

The standard timber sale contracts contained terms that were favorable to the timber industry, including allowing the purchasers to operate their sales with little Forest Service oversight, and the contract did not contain a clause that would allow the Forest Service to terminate the contract for its own convenience, or a liquidated damages provision. App. 163, R. Fitzgerald Decl. ¶ 5. These terms remained unchanged for about two decades. App. 164, R. Fitzgerald Decl. ¶ 6.

Defendant's Proposed Finding of Uncontroverted Fact No. 42

The Forest Service has continued, over the past thirty years, to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. App. 164, R. Fitzgerald Decl. ¶ 7, Exs. 6-17 (App. 184-254).

Defendant's Proposed Finding of Uncontroverted Fact No. 43

When the Forest Service, in the late 1980s and early 1990s, decided to revise the standard timber sale contract to reflect changes in environmental laws, court decisions interpreting environmental laws, and to protect the Forest Service's financial interests, the Forest Service sought input from the timber industry. In particular, NFPA provided numerous comments on

C/CT6.01. App. 164, R. Fitzgerald Decl. ¶ 8, Ex. 14 (App. 211-236).

Defendant's Proposed Finding of Uncontroverted Fact No. 44

The C/CT6.01 language from the June 1990 timber sale contracts, which the NFPA commented on, is similar to the C/CT6.01 language in the plaintiffs' timber sale contracts. The 1990 version of C.CT6.01 permitted interruption or delay of operations upon the written request of the Contracting Officer "[t]o comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale . . . ." App. 165, R. Fitzgerald Decl. ¶ 11, Exs. 13-14 (App. 206-236). The plaintiffs' timber sale contracts provide for the interruption or delay of operations upon the written request of the Contracting Officer "to comply with a court order, issued by a court of competent jurisdiction." App. 165, R. Fitzgerald Decl. ¶ 10.

Defendant's Proposed Finding of Uncontroverted Fact No. 45

The NFPA commented specifically on C/CT6.01 in a letter dated December 4, 1989, in which NFPA stated its belief that the Forest Service had "sufficient authority to interrupt operations under B9.3 - BREACH when used in conjunction with other existing environmental protection provisions" and stated that section (a) of C/CT6.01 "should be dropped." App. 164-165, R. Fitzgerald Decl. ¶ 9, Ex. 14 (App. 211-236). In another letter, NFPA wrote:

> We also appreciate the opportunity we had to discuss the proposed liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did.

App. 166, R. Fitzgerald Decl. ¶ 13, Ex. 14 (App. 211-236).

Defendant's Proposed Finding of Uncontroverted Fact No. 46

Another letter from NFPA, dated May 1990, NFPA acknowledged that the Forest Service made efforts to modify C/CT6.01 in response to NFPA's concerns, and acknowledged that the Forest Service provided it an opportunity to comment on and negotiate the terms of the contracts. App. 164-165, R. Fitzgerald Decl. ¶ 9, Ex. 14 (App. 211-236). The NFPA further expressed its appreciation for the opportunity to discuss proposed contract provision C/CT6.01, and other provisions addressing modification, termination, and compensation in the timber sale contracts. App. 166, R. Fitzgerald Decl. ¶ 13, Ex. 14 (App. 211-236).

Defendant's Proposed Finding of Uncontroverted Fact No. 47

The Forest Service still communicates with the timber industry regarding these standard timber sale contracts. The Forest Service met with members of the NFPA Federal Timber Purchaser's Committee ("FPTC") and its counsel, Alan Saltman, to consider revisions to the latest version of the standard timber sale contracts. App. 166-167, R. Fitzgerald Decl. ¶ 14.

Defendant's Proposed Finding of Uncontroverted Fact No. 48

Over the past thirty years, and within the bounds of laws governing the formulation of regulation and policy, the Forest Service has engaged in discussions with members of the timber industry about the standard timber sale contracts and issues affecting the timber industry. App. 167-168, R. Fitzgerald Decl. ¶ 17.

Defendant's Proposed Finding of Uncontroverted Fact No. 49

These timber sale contracts include a clause that permits deviation by requiring purchasers to submit their own plans of operation prior to commencing work each season. App. 268, 273.

Defendant's Proposed Finding of Uncontroverted Fact No. 50

Other clauses in the timber sale contracts contain "objectives" and "methods" for harvesting timber. For example, the Too Wild contract contains C6.41# - Special Felling Objectives, which states: "felling objectives shall be accomplished by the type of felling methods or equipment listed herein. Methods or equipment other than those specified may be approved." App. 274. The Too Wild contract also contains C6.42# - Special Yarding/Skidding Methods, allows for the use of "[m]ethods or equipment other than those specified . . . ." App. 275. The Jack Heli contract, in clause C6.411# - Directional Felling, provides that: "[D]irectional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing." App. 269. The Jack Heli contract also includes clause C5.411 - Dust Abatement for Temporary Roads, which states: "Purchaser may choose the material used in dust abatement." App. 270. The Happy Thin contract includes the Directional Felling clause, and clause CT5.414 - Snow Removal, which states: "[i]f Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources. App. 350-351.

Defendant's Proposed Finding of Uncontroverted Fact No. 51

The Northwest Forestry Association, a timber industry group, issued a newsletter, Forestry Forum, that, among other things, tracked the ONRC Action litigation – including making reference to the alleged "secret agreements" between the ONRC Action plaintiffs and the Government. App. 277-295. The newsletter also discussed the lawsuit's potential impact on timber sales in the region. Id.

Defendant's Proposed Finding of Uncontroverted Fact No. 52

The prospectus for the Jack Heli timber sale included the language: "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost." App. 304; App. 309-310, E. Matthews Decl. ¶ 11.

Defendant's Proposed Finding of Uncontroverted Fact No. 53

The Forest Service delayed awarding these sales. For the Jack Heli timber sale, the Forest Service requested and received permission to extend the purchaser's bid. App. 311-312.

Defendant's Proposed Finding of Uncontroverted Fact No. 54

In late 1998 and early 1999, Ed Matthews, Contracting Officer for the Happy Thin and Jack Heli timber sales, routinely communicated with representatives from the timber industry, including Blue Lake Forest Products, Inc. and Timber Products Co., and discussed the ONRC Action litigation and its potential impact on the Klamath's timber sale program. App. 309, E. Matthews Decl. ¶ 8.

Defendant's Proposed Finding of Uncontroverted Fact No. 55

Prior to awarding the Too Wild timber sale contract, Tom Link, Contracting Officer for the Too Wild timber sale, provided information to CLR Timber Holdings, Inc., regarding ONRC Action, including general information about the case, how it affected the delay in award, and information regarding ongoing settlement negotiations. App. 316, T. Link Decl. ¶ 8.

Defendant's Proposed Finding of Uncontroverted Fact No. 56

Plaintiffs did not accept the Forest Service's estimates regarding the amount of timber available for harvest on a particular sale; instead, the plaintiffs all cruised the sales themselves to obtain more accurate estimates of the amount of timber available for harvest. App. 325, D. Bonde Depo. Tr. at 48:10-49:3; App. 323, B. Turner Depo. Tr. at 45:16-45:19; App.321, J. Broom Depo. Tr. at 10:16-10:20.

Defendant's Proposed Finding of Uncontroverted Fact No. 57

The Forest Service provided notice to the ONRC Action plaintiffs of its intent to award the three timber sales at issue, and the ONRC Action plaintiffs did not take action prior to award. App. 328-330, App. 317-318 (T. Link Decl. ¶ 14).

Defendant's Proposed Finding of Uncontroverted Fact No. 58

ONRC Action filed a complaint challenging, among other things, the Forest Service's November 1, 1996 memo that defined the term "implement" as the time when the NEPA decision documents are signed, and the November 4, 1996 memo that "excludes approximately 5.5 million acres . . . nearly 90% of the red tree vole habitat . . . from the survey requirement." ONRC Action Compl., ¶¶ 31-34. App. 341-342.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

Of Counsel:
Lori Polin Jones
James L. Rosen
Marcus R. Wah
Ben Hartman
Office of the General Counsel
United States Department of Agriculture

s/Ellen M. Lynch
ELLEN M. LYNCH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 353-7994
Fax: (202) 514-8624

May 2, 2008

Attorneys for Defendant

Certificate of Filing

I hereby certify that on this 2nd day of May, 2008, a copy of "Addendum To Defendant's Proposed Findings Of Uncontroverted Facts" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Ellen M. Lynch
Ellen M. Lynch

# APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page Number**

Excerpts from the Standards and Guidelines, Att. A to the Record of Decision..........................97

Declaration of Tom Hussey..........................................................................................99

Declaration of Robert J. Devlin...................................................................................108

November 1, 1996 Memorandum "Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline.......................116

Declaration of John R. Hickenbottom.........................................................................122

November 4, 1996 Memorandum "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole..............................................................132

Excerpts from L. Schiffer Depo., August 27, 2007....................................................137

Excerpts from E. Boling Depo., August 24, 2007......................................................140

Letter from E. Lynch to G. Stevens re P. Coppelman................................................146

Excerpts from the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl.........................................................147

Declaration of Robert J. Devlin...................................................................................153

Declaration of Richard O. Fitzgerald, with Exhibits..................................................161

Excerpts from Jack Heli Timber Sale Contract ..........................................................266

Excerpts from Too Wild Timber Sale Contract...........................................................271

Forestry Forum Newsletters........................................................................................277

Jack Heli Timber Sale Prospectus...............................................................................296

Declaration of E. Matthews.........................................................................................306

January 29, 1999 Fax to B. Turner re bid extension...................................................311

February 1, 1999 Letter to E. Matthews from B. Turner............................................312

Declaration of T. Link ....................................................................................................313

Deposition of J. Broom....................................................................................................320

Deposition of B. Turner....................................................................................................322

Deposition of D. Bonde....................................................................................................324

March 31, 1999 Letter from E. Matthews to M. Axline....................................................328

March 1, 1999 Letter from E. Boling to M. Axline..........................................................329

# Standards and Guidelines

for
Management of Habitat for Late-Successional
and Old-Growth Forest Related Species
Within the Range of the Northern Spotted Owl

## Attachment A

to the Record of Decision for Amendments to Forest Service
and Bureau of Land Management Planning Documents
Within the Range of the Northern Spotted Owl

appropriate action will be protection of relatively small sites, on the order of tens of acres. For some species, including some vascular plants, the appropriate action will include the use of specific management treatments such as prescribed fire. For rare and endemic fungus species, areas of 160 acres should be temporarily withdrawn from ground-disturbing activities around known sites until those sites can be thoroughly surveyed and site-specific measures prescribed. For one fungus species, *Oxyporous nobilissimus*, there are only six known sites and two of these do not currently have a protected status. Management areas of all useable habitat up to 600 acres are to be established around these two sites for the protection of those populations until the sites can be thoroughly surveyed and site-specific measures prescribed. The actions to protect *Oxyporous* must be undertaken immediately.

2. *Survey prior to ground-disturbing activities*. Measures to survey for species and manage newly discovered sites are to be phased-in over a somewhat longer timeframe than the measures specified for currently known sites (see above). For some species, these efforts have been ongoing through rare and sensitive species programs. Where such efforts have been ongoing, they should continue. However, protocols have not been developed for surveys for all of these species, and the expertise needed to conduct them is not readily available in some cases. Efforts to design protocols and implement surveys should be started immediately. Where surveys are completed, the information gathered from them should be used to establish managed sites for species. Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles (and lynx, see page C-47), must precede the design of all ground-disturbing activities that will be implemented in 1997 or later. Development of survey protocols for the other 71 species listed in Table C-3 must begin in 1994 and proceed as soon as possible. These surveys must be completed prior to ground disturbing activities that will be implemented in F.Y. 1999 or later. Work to establish habitat requirements and survey protocols may be prioritized relative to the estimated threats to the species as reflected in the SEIS. Management standards will be developed to manage habitat for the species on sites where they are located. These surveys may be conducted at a scale most appropriate to the species. For most species, this survey would start at the watershed analysis level with identification of likely species locations based on habitat. Those likely locations would then be thoroughly searched prior to implementation of activities. For other species, the identification of likely sites may be most appropriately done at the scale of individual projects. Surveys should be designed for maximum efficiency, focusing on the likely range and habitats of the target species. Multispecies surveys should be used wherever they would be most efficient. To the degree possible, surveys should be designed to minimize the number of site visits needed to acquire credible information. Survey protocols and proposed site management should be incorporated into interagency conservation strategies developed as part of ongoing planning efforts coordinated by the Regional Ecosystem Office.

3. *Extensive surveys*. Conduct extensive surveys for the species to find high-priority sites for species management. Specific surveys prior to ground-disturbing activities are not a requirement. Rather, the surveys will be done according to a schedule that is most efficient, and sites will be identified for protection at that time. This strategy entails some risk because some species sites may be disturbed prior to completion of surveys. It is recommended primarily for species whose characteristics make site and time-specific surveys difficult. For example, some fungi only produce fruiting bodies under specific

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

DECLARATION OF TOM HUSSEY

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I obtained my B.S. in Forestry from the University of Maine in 1972, and my M.S. in Forestry from Yale University in 1974.

2. My career with the USDA - Forest Service (Forest Service) spans 31 years from 1976 to the present day. Since 1994, I have worked as the Policy Planner on the Resource Planning and Monitoring staff for the Pacific Northwest Region (R6). In that capacity, my major

duties have included, *inter alia*, implementation issues surrounding the Northwest Forest Plan (NFP).

3. The NFP Record of Decision was signed in April 1994. It was developed by direction of President Clinton in response to controversy, litigation, and court injunctions over management of federal forest lands in Washington, Oregon, and northern California. The plan was based on a scientific analysis of the status of habitat for late successional and old-growth forest-related species. The NFP amended the existing land management plans for national forests and Bureau of Land Management (BLM) districts within the range of the northern spotted owl. That range covered 24 million acres of federal lands.

4. One of the key components of the NFP was its allocation of lands into different categories. Of the 24 million acres the plan covered, only 22 percent were made available for programmed timber harvest. The plan designated the remaining 78 percent as some type of reserve or land otherwise not available for programmed timber harvest.

5. In addition to setting aside large reserves of land, the NFP's standards and guidelines required that land managers "survey and manage" for certain rare species of plants and animals. "Survey and manage" (S&M) was a mitigation measure intended to benefit species closely associated with late successional or old-growth forests whose long term persistence was not assured by the land allocations and other standards and guidelines. The measures included management of known sites, surveys for species prior to ground-disturbing activities, and extensive regional surveys for species.

6. Because of the high level of coordination and cooperation among agencies during the plan's implementation, the NFP established a formal interagency structure to communicate

directions, coordinate activities, and resolve issues. Some of the key components of that structure included: (a) the Regional Interagency Executive Committee (RIEC), which comprised the regional heads of those federal agencies that were involved with the plan; and (b) the Regional Ecosystem Office (REO), which was an interagency staff group that provided technical support and analysis to RIEC.

7. During the spring and summer of 1994, in the first few months following the adoption of the NFP, it became apparent that there were many questions and issues concerning the plan's implementation. Field unit personnel were forwarding questions directly to REO staff or to Regional Office (or BLM State Office) functional staff specialists in their program areas. This was chaotic. Responses were sometimes inconsistent between agencies or between function disciplines within the same agency. REO staff were swamped with questions that could have been resolved by agency staff.

8. In order to respond to this situation, in the summer of 1994, a NFP Issue Resolution Team (IRT) was established. The two lead staff were Joyce Casey, who at the time went by Joyce Ulrich, and myself. For both of us, this was our major duty requiring almost three-quarters of our time for three to four years. There were several other Regional Office (RO) staff involved, but to a much lesser degree. The BLM had a similar set up, with Larry Larson as their key staff. Joyce and I coordinated closely with Larry on most of the issues and questions.

9. The protocol was for questions from Forest Service field units or documents requiring REO/RIEC review to first be sent to the Director of Strategic Planning, Tom Nygren, and Tom would refer the matter to Joyce and me for resolution. Our process began with a review of the question or issue and then agreement on which one of us would assume the IRT

lead for it, based on how well the issue matched our different backgrounds and expertise or on our current workload. The IRT lead would then initiate discussions with staff specialists who had knowledge and expertise pertinent to the issue, interface with BLM staff, discuss the issue with REO staff, facilitate agreement on the appropriate answer or response, and begin the process for transmittal of the response to the field.

10. In most cases, issues were resolved by the two land management agencies (Forest Service and BLM). The interagency REO staff was not required to concur or approve our positions. We did, however, consult regularly with REO staff on an informal basis during the issue resolution process. It was very common to meet with REO staff to sound out tentative positions, discuss, debate, and test our logic. Sometimes an issue or question was complex or controversial enough that, instead of a Forest Service/BLM issue resolution, we would formally request an interagency issue resolution by REO staff. Any of the RIEC federal executives could request interagency REO staff work on NFP issues.

11. Before the staff's agreed issue resolution could be officially transmitted to the field, it would be reviewed by higher level agency managers. Our draft issue resolution was always reviewed by RO Directors: 1) the Director of Strategic Planning, and 2) the Director of whatever functional areas (sometimes several) were most affected by the issue. Once approved by the Directors, the issue resolution was issued by official correspondence; sometimes signed by the Director, sometimes by the Regional Forester. In many cases, the issue resolution applied to both BLM and Forest Service. In those cases; the staff analysis and the review, approval, and official transmittal were interagency.

12. From its establishment in 1994 to 1996, the IRT addressed well over 100 questions. Those questions fell along a continuum from easy to difficult. On the easy end of the spectrum, the IRT was able answer some questions in minutes, if there was a clear "right answer." Those we often disposed of informally by phone call or email. On the other end of the spectrum, some questions presented issues that took us several days, weeks, or months, and were processed through higher level managers, as described above.

13. I recall that one of the more difficult issues to resolve concerned the transition period, which the NFP provided for phasing in the survey requirement for Category 2 species that ultimately would be required prior to any ground-disturbing activities. That transition period was set forth on page C-5 of the 1994 NFP ROD, Standards and Guidelines, under the heading "Survey prior to ground-disturbing activities." Three questions arose concerning how to interpret that standard and guideline. Those three questions are identified in the November 1, 1996, memo, which many now commonly refer to as the "NEPA Equals Implementation" letter. In brief, those questions were:

a. The "Survey prior to ground-disturbing activities" Standard and Guideline on page C-5 requires survey prior to design of ground disturbing activities to be implemented in 1997 or later. The ROD on page 36 uses FY1997 for the same requirement. Which is correct?

b. What is the definition of the term "ground disturbing activity" in the context of this standard?

c. What is the definition of "implemented" in the context of this standard?

14. I was the Forest Service member of the IRT who worked on those issues, which I collectively referred to as "the survey prior to ground-disturbing activities issues." I worked with Larry Larson, my BLM counterpart within the IRT. Larry and I concluded that, in order to resolve those issues, we needed Randy Hickenbottom, who was the Chair of the S&M Workgroup, and a wildlife ecologist; Cheryl McAfree, who was a botanist specializing in plant surveys; Lyndon Werner, who was a BLM Timber Sale Specialist; and Nancy Anderson, who also worked for the BLM. These four had expertise to assist our team.

15. The six of us met several times (four to eight times) to address the three questions noted in the November 1, 1996, NEPA Implementation letter.

16. Questions one and two were quickly resolved. However, the third question, "At what point in the process, setting in motion, and executing a project, is it 'implemented' in context with Component 2 Survey and Manage S&G requirement" was discussed over a period of months.

17. In search of an answer to this third question, we looked at three possible interpretations. Namely, that "implementation" could mean:

a. when there is physical activity on the ground;

b. when agency signs a contract; or

c. when the responsible official signs the NEPA decision.

18. The first possible interpretation had the advantage of simplicity and intuitive common understanding by almost anyone. It would tie "implementation" to an action you can go out and see in the forest.

19. The second possible interpretation tied "implementation" to the signing of a contract (almost in all cases, a timber sale contract) because this is when the government makes a relatively final commitment to act.

20. The third possible interpretation, which is the one we eventually adopted, was to define "implementation" as being the point at which the responsible official signs a NEPA decision document. I recall long arduous discussions over this point. What tipped the scale of the debate was the context for why the NFP adopted this requirement. The survey and manage standards were adopted to provide protective measures for a suite of species, which were relatively rare or had relatively little known about their life requirement, but which were believed to be associated with late-successional habitat. In addition to a standard to protect known sites occupied by these species, the NFP adopted a standard that required a survey for the presence of these species prior to ground disturbing activities. Our group arrived at the conclusion that it made more sense to interpret this language so that the surveys would be done and the information available to the responsible official before he or she made a project NEPA decision. To do otherwise would be to expose the government to a situation where our surveys might occur and the resulting information made available to the responsible official after a NEPA decision was made, or worse yet, after a contract was signed. This could cause us to expend time and money re-working decisions or project design and field layout or contract modification or termination.

21. This issue discussion was complicated by the fact that some NEPA decisions had already been signed or contracts signed without having done the surveys based on one of the alternative interpretations of this language. We were very concerned about adopting an issue

resolution that would require all of these projects to be surveyed for S&M species, and possibly be reworked based on the outcomes of the surveys. We dealt with this concern by recommending a transition phase in the period for adopting the interpretation of when the surveys are required as outlined in the November 1, 1996, letter.

22. I recall some discussion about the possibility of deferring projects, which had passed the NEPA decision point without yet having surveys, but which had not yet been offered for contract. The thought here was that perhaps other projects could be brought forward for contract to replace the ones awaiting S&M surveys. However, by this period (mid-90's), our timber sale program was pretty much "hand-to-mouth." The listing of the marbled murrelet and the northern spotted owl under the Endangered Species Act had deleted the most of the shelf stock of approved NEPA decisions in the region of the NFP. We had no timber projects near completion to bring forward to make up for any projects deferred for S&M surveys. Therefore, any project sent back for survey completion would represent a program fall-down.

23. A further complicating factor was the fact the not all the survey protocols were completely developed, reviewed, and approved for use. We dealt with this concern by recommending that the draft version of the species survey protocol be used until the approved version is issued.

24. Once the group of us agreed on the recommended interpretation of the NFP language concerning the "survey prior to ground-disturbing activities" standard and guideline, we drafted a letter for signature by the Forest Service Regional Foresters and BLM State Directors. Our letter was reviewed and edited by higher level managers in both agencies prior to being signed and issued on November 1, 1996.

25. In retrospect, I still believe that interpreting the "survey prior to ground-disturbing activities" standard and guideline to require surveys prior to the NEPA decisions was the appropriate outcome. If we accept the scientists' analysis of the situation for these species and the NFP decision that the agencies should survey for their presence prior to conducting an activity that might affect them, then it only makes sense to have that information before we make a decision about project design. My previous experience as a District Ranger for nine years influences my thinking. I recall that modifying contracts or changing the layout and marking of timber sales was so time consuming and expensive that we should make every effort to collect needed information prior to the NEPA decision rather than collect it later and accept the risk that the late arriving information could cause us to change a project layout or modify a contract.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3 day of January, 2008.

Tom Hussey

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBE RPRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF ROBERT J. DEVLIN**

I, Robert J. Devlin, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. Over the course of my 42-year career with the USDA-Forest Service (Forest Service), I worked in a variety of positions before retiring in June of 2000. In 1994, I became the Director of Natural Resources for the Pacific Northwest Region of the USDA-Forest Service (Region 6, or R6). In that capacity, I represented the Regional Forester and the Deputy Regional Forester in oversight of the staff from various programs. My responsibilities also included

oversight on matters associated with the Northwest Forest Plan and its implementation within Region 6.

2. Timber management was one of the programs that I oversaw. It was my responsibility to track the program's financing and output for the Regional Forester and Deputy Regional Forester.

3. Annually, the R6 Regional Forester compiled data projecting the amount of timber that the region and its national forests could offer for sale. This information would be combined with data from the other eight regions of the Forest Service and used to develop the entire agency's out-year budget proposal to the President. After several reviews and modifications, the President would submit the agency's proposal to Congress for approval. Congress would further review and modify the President's proposal and would eventually approve and budget, for the entire Forest Service, a very specific volume of timber to be offered for sale and later harvested. The Forest Service Chief distributed Congress's established volume among the nine regions of the Forest Service. The Regional Foresters, in turn, distributed that volume among the respective regions' national forests.

4. The timber-harvest levels established and approved by Congress were expected to be met. In other words, it was not discretionary by the Forest Service to vary the quantity established by Congress. Most line officers, from the District Rangers up to the Forest Supervisors in Region 6, had performance requirements to meet their allocated sale offerings. In my role as Region 6's Director of Natural Resources, I worked with the national forest supervisors and supported their efforts to prepare timber sale offerings to ensure that the timber management program met the region's allocated harvest levels.

5. It was a challenge to meet timber harvest levels because a significant amount of time was required to prepare sales before they were auctioned and awarded. Under the National Environmental Policy Act (NEPA), the forests had to analyze the environmental impact of a timber sale before deciding whether to offer that timber for harvest. That analysis typically took up to a full year from the date a line officer initiated a timber sale project to the date that officer signed the NEPA document and the Decision Notice (DN). After signing the DN, but before auctioning the timber sale, the field foresters would use the NEPA document to prepare the timber sale. This preparation would include marking the timber designated for harvest, laying out roads, cruising (measuring) the timber volume, and appraising the value of the sale. This sale preparation commonly required another one to two years to complete. In total, a forest needed up to three years to prepare a timber sale for auction. Thus, in order for Region 6 to meet its harvest levels, the line officers had to plan timber sales many years in advance of the planned award date.

6. Attaining the region's harvest levels was further complicated by the fact that during the intervening years unforeseen events frequently changed the specified harvest levels or the forests' ability to meet those levels. For example, from time to time Congress would increase the Forest Service's annual harvest levels or the Chief of the Forest Service would redistribute harvest volumes from one region to another or one forest to another. Additionally, unforeseeable natural events such as forest fires occasionally delayed or burned out certain sales requiring the modification or, if too severe, the cancellation of the timber sale.

7. Consequently, if a national forest had not completed in advance NEPA documents and DN to provide for an adequate number of timber-sale contracts in advance for offer and award, it would have been unable to accommodate unexpected increases set by Congress or to

compensate for shortfalls due to natural causes. Again, annual harvest offerings set by Congress were expected to be achieved. Thus, it was a good management practice for line officers to keep a "shelf" of signed NEPA documents and DNs, which could be used in response to unexpected increases or shortfalls.

8. When I took over my duties as Director of Natural Resources, there was very little timber volume on the "shelf." The listing of the marbled murrelet and the northern spotted owl, under the Endangered Species Act, caused sales that had already been awarded to be delayed or canceled. Additionally, those listings deleted the majority of timber sale projects with signed NEPA decisions on the "shelf", which line officers, otherwise, could have used to compensate for volume shortfalls.

9. The listing of the murrelet and owl was the context for the adoption of the 1994 Northwest Forest Plan (NFP). The listings reduced R6's timber sale offerings to the point of severely impacting the local communities dependent upon the timber harvest for their livelihood and Congress's budgeted and expected harvest volumes. The NFP, largely supported by President Clinton, was a major undertaking in which the Forest Service and the Bureau of Land Management (BLM) adopted a coordinated management direction for the lands those agencies administered within the range of the spotted owl. The NFP set aside millions of acres of late-successional and old-growth forest for species, such as the northern spotted owl, which depended upon that type of habitat. Additionally, the NFP and its "survey and management mitigation measures" (later to be known as Survey and Manage Standards and Guidelines) required that the agencies survey and manage habitat for a large number of species, known or unknown, which the agencies had no experience dealing with or locating.

10. While the specific requirements of the Survey and Manage Standards and Guidelines were new and somewhat nebulous, Congress's timber-harvest requirements were unambiguous. When the NFP was adopted, Congress had set the combined harvest level for the Forest Service and BLM at 1.1 billion board-feet. Because of the shortage of signed NEPA documents on the "shelf" in R6 affected by the NFP, forests had to begin timber projects from scratch, which necessarily impeded their ability to attain immediate harvest-volume expectations. The Chief persuaded the administration that the forests covered under the NFP could not meet their portion of the 1.1 billion board-feet for the first two years of the plan. We, in R6, determined that we needed three years to prepare a sufficient number of sales to meet our portion of the 1.1 billion board-feet volume.

11. Over that same timeframe, R6 and R5 (California) of the Forest Service and both Oregon and Washington districts of BLM were tasked with determining and implementing the new requirements of the NFP. Survey and Manage Standards and Guidelines was one of those new requirements. The plan provided a timeline for developing procedures for surveying and managing for certain species. A Survey and Manage Workgroup worked on developing survey protocols. Once the members of the Survey and Manage Workgroup reached consensus on the protocols to be used by the Federal agencies, they reported them to the Regional Ecosystem Office (REO). After the REO reviewed a protocol, it would circulate the protocol to the R5, R6, and Oregon and Washington BLM executives for them to sign and send out as policy. I was not involved with the Survey and Manage Workgroup or the development of survey protocols.

12. However, I was a member of the Intermediate Management Group (IMG) and, both in that capacity and in my capacity as R6 Director of Natural Resources, did work on questions concerning how to interpret the NFP. The IMG comprised representatives from all the

agencies that were called for in the NFP, including the Forest Service, BLM, Fish and Wildlife Service, the National Marine Fisheries Service, the Environmental Protection Agency, and the Parks Service. I became a member of the IMG after Tom Nygren retired. Nancy Diaz (previously Nancy Molina) and I were the Forest Service representatives on the IMG. Bill Bradley was the BLM representative.

13. The IMG worked with the Issue Resolution Team (IRT) to help interpret the NFP. Tom Hussey was the Forest Service representative on the IRT, with whom I worked. Whenever the IRT was faced with an issue that impacted one of the forest management program areas, the team would seek advice from the IMG on how to interpret the NFP. The IRT would develop alternatives and submit those alternatives to the IMG for comment.

14. One question that the IRT addressed was how to interpret the language on page C-5 of the Standards and Guidelines, which provided a transition period for phasing in the surveys for Category 2 species that ultimately would be required prior to any ground-disturbing activities. The survey requirements were phased in for different species based upon the date a project was "implemented." However, it was unclear from the NFP whether timber projects should be deemed implemented at 1) the date the NEPA document and DN were signed by the line officer (*i.e.*, when projects were added to the "shelf" of NEPA documents and DN); 2) the date the sale was offered or awarded; or 3) the date the timber companies broke ground on the project (*i.e.*, ground disturbing activities). There was also a question as to what constituted ground disturbing activities for the latter.

15. The question of when a project should be deemed implemented was especially significant because of the amount of time the Forest Service needed to prepare its timber sales for award, which included the NEPA documents and DN. It was apparent that for the surveys to

be useful, they were to be incorporated into the NEPA process. However, the NFP provided that survey protocols were to be developed over the first several years of the plan. Therefore, the forests were unable to incorporate the surveys into the NEPA process for timber sales during those first several years because the protocols did not yet exist. However, as I explained above, a timber sale typically required up to one year from project initiation to the signed NEPA document and DN and up to another two years of sale preparation before the award. Therefore, it was necessary for the forests to have the survey protocols years before a timber sale's anticipated award date in order to incorporate the surveys into the NEPA process.

16. Under those circumstances, if the Forest Service deemed a project "implemented" upon groundbreaking, the forests would have been unable to complete and award timber sales for years while the Forest Service developed survey protocols. That delay effectively would have removed the transition period, which the NFP clearly intended to provide, for developing and applying the survey protocols. Finally, it would have made it impossible for the region to attain its required timber-harvest volume for several years.

17. During this NFP transition period and development of the survey and manage protocols, the interpretation that the Forest Service and BLM ultimately adopted was that a project was deemed "implemented" on the date the NEPA document was signed. This commonly has been referred to as "NEPA Equals Implementation." This resolved the tension between the various requirements of the NFP. We saw that this balanced the requirements that the agencies could achieve their Congressionally-set timber-harvest volumes along with the requirements of the survey and manage program when those protocols were developed. It also ensured that the data collected from surveys would be obtained prior to, and therefore incorporated into, the NEPA document. Finally, it gave effect to the transition period that the

NFP provided for phasing in the requirement to perform surveys prior to ground-disturbing activities.

18. Given the NFP's requirements of meeting both timber harvest goals and survey and management requirements, the transition period set forth in page C-5 of the Standards and Guidelines, and the undefined term "implemented," I agreed that the most reasonable interpretation to be applied during this transition period was that a project should be deemed implemented at the time the NEPA document and DN were signed. With that interpretation, the Forest Service and BLM issued a policy-directional letter on November 1, 1996, instructing their field units that existing timber sales having completed their NEPA documents and DN could proceed to sale preparation and offering while protocols were being developed. It is this letter that has become known as the "NEPA Equals Implementation" letter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 18th day of DECEMBER, 2007.

[signature]
Robert J. Devlin

| United States Department of Agriculture | Forest Service | R-5 R-6 | OR/WA CA | Bureau of Land Management | United States Department of Interior |
|---|---|---|---|---|---|

**Reply to:** 1734-PFP(BLM-OR931) / 1920(FS)P **Date:** November 1, 1996

EMS TRANSMISSION 11/1/96

**FS-Memorandum** **BLM-Instruction Memorandum No. OR-97-** 007
**Expires 09/30/98**

**To:** USDI Bureau of Land Management District Managers (Coos Bay, Eugene, Lakeview, Medford, Roseburg, Salem) and Area Managers (Arcata, Redding); USDA Forest Service Forest Supervisors within the Area of the Northwest Forest Plan

**Subject:** Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline

This memorandum/bulletin pertains to the Survey and Manage Component 2 Standard and Guideline (S&G) found on page C-5 of the Northwest Forest Plan. The S&G states: "Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles . . . [Component 2 species], must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." This S&G is referred to as "Survey and Manage Component 2 Implementation."

This memorandum/bulletin addresses the following topics of clarification using a question-and-discussion format:

- Is calendar or fiscal year to be used to determine when surveys are required?
- What constitutes a "ground-disturbing" activity?
- When is a project considered "implemented?"
- What should be done about surveying for the red tree vole?

The information contained in this memorandum/bulletin gives guidance to help you determine when activities will potentially affect Component 2 species. During discussions on this topic, questions arose regarding the Bureau of Land Management (BLM) and Forest Service interpretation of this S&G. We have drafted this document to reflect a blending of approaches.

If you have additional questions, please contact Larry Larsen (503-952-6080) or Nancy Anderson (503-952-6072) at BLM; or Tom Hussey (503-326-3589) or Randy Hickenbottom (503-326-3626) at the Forest Service.

Ed Hastey
Ed Hastey
State Director, CA
USDI Bureau of Land Management

for G. Lynn Sprague
G. Lynn Sprague
Regional Forester, Region 5
USDA Forest Service

DEFENDANT'S EXHIBIT B

Elaine Y. Zielinski
State Director, OR/WA
USDI Bureau of Land Management

Robert W. Williams
Regional Forester, Region 6
USDA Forest Service

1 Attachment
1 - Questions & Discussion re
S&M Component 2 Implementation (4 pp)

BLM Distribution
WO-330 (Room 204 LS) - 1
CA-340 - 1
OR-930 - 1
REO (Knowles, Pietrzak) - 2
Tom Hussey, Forest Service R-6

# Survey and Manage Component 2 Implementation Issues

rev. 10/22/96

This paper discusses questions regarding implementation of the Survey and Manage standard and guideline (S&G) entitled "Survey prior to ground-disturbing activities" located on page C-5 of the Northwest Forest Plan (NFP). The S&G states:

- "Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles . . . [Component 2 species], must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." (emphasis added)
- "protocols have not been developed for surveys for all of these [Survey and Manage] species . . . Efforts to design protocols and implement surveys should be started immediately."

**Question 1:** The S&G on page C-5, cited above, states "implemented in 1997 or later." The Record of Decision (ROD), page 36, states "will have surveys conducted prior to ground disturbing activities that will be implemented in FY 1997 or later." Should the fiscal year or calendar year be used as the threshold when surveys are required to proceed project implementation?

DISCUSSION: When the NFP says fiscal year, use the fiscal year; when it gives year, use calendar year (commencing January 1). In this case where there is a conflict between the specified fiscal year (ROD-36) and the calendar year (S&G C-5), use the more specific fiscal year ROD date for implementation over the non-specific S&G language. Using fiscal year is the more conservative approach and corresponds to the fiscal year cycle used in project planning and, also, to the subsequent reference to surveys to be implemented prior to FY 1999.

**Question 2:** The S&G requires "surveys . . . precede . . . all ground-disturbing activities." Should "ground-disturbing" be defined as specifically meaning "soil-disturbing" activities or as a more generic "habitat-disturbing" activities criteria?

DISCUSSION: Survey protocols and management recommendations for Component 2 species include guidance on the type of activities likely to negatively affect a given species, and they also define likely "ground-disturbing activities." Activities with disturbances having a likely "significant" negative impact on the species' habitat, its life cycle, microclimate, or life support requirements should be surveyed and assessed per protocol and are included within the definition of "ground-disturbing activity."



ATTACHMENT I-1

ONRC-G-05-0207-0064

Limiting the definition of ground-disturbing activities to "soil-disturbing" activities does not adequately take into consideration the scope and intensity of impact of the activity. Activities, technically not disturbing the ground, might clearly affect microclimate or life cycle habitat factors enough to require a survey (e.g., harvesting over a snowpack or the use of helicopters). At the same time, all activities clearly having soil-disturbing effect might not have a large enough scope to trigger a need to survey. Such a case would be the installation of a signpost within a campground. The "significance" of potential negative impacts on the species and its habitat should be evaluated. Evaluation of the scope and intensity of the project's anticipated negative impact on habitat or life requirements should include an assessment of the type, timing, and intensity of the disturbing activity.

The responsible official should seek the recommendation of specialists to help judge the need for a survey based on site-by-site information. The need for a survey should be determined by the line officer's consideration of both the probability of the species being present on the project site and the probability that the project would cause a significant negative affect on its habitat.

**Question 3:** At what point in the process of developing, setting in motion, and executing a project is it "implemented" in context with the Component 2 Survey and Manage S&G requirement?

<u>DISCUSSION</u>: S&G C-5 states "surveys [for Component 2 species] must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later." ROD•36 states "surveys [must be] conducted prior to ground disturbing activities." The specific direction in S&G C-5 will be used. The intention is to accomplish surveys prior to the design phase since the presence or absence of Survey and Manage species is a significant piece of information and should be available prior to the signing of the National Environmental Policy Act (NEPA) document. The interagency interpretation is that the "NEPA decision equals implemented" in context to Component 2 species survey requirements.

Many organizational units have not used this definition of "implemented" for projects potentially affecting Component 2 species. Many NEPA decisions have been signed with the intention to survey prior to the contract offering. "Draft" survey protocols for Component 2 salamanders have been available since March 1996; see Question 4 for the red tree vole situation.

A "transition period" (October 1, 1996, to May 31, 1997) will be allowed to adjust our planning process to the interagency interpretation "NEPA decision equals implemented." Requiring surveys and shifting surveys from prior to contract offering to prior to the NEPA decision will take a period of adjustment. The following transition categories based on NEPA decision and contract offering are expected (see Table 1 for a timeline of likely scenario groups):



ATTACHMENT 1-2

| |
|---|
| Summary of survey requirements:<br>• Contracts offered before January 1, 1997. No survey is required.<br>• Contracts offered before June 1, 1997. One season survey required.<br>• Contracts offered on or after June 1, 1997. Standard "draft" protocols required. |

a. Pre-Transition:
*Projects with NEPA decisions signed prior to October 1, 1996, AND contracts offered before October 1, 1996* - No survey was required. (Group 0)

b. Transition:
*Projects with NEPA decisions signed prior to October 1, 1996, AND contracts offered before January 1, 1997* - No survey is required. (Group 1)

*Projects with NEPA decisions signed on or after October 1, 1996, and/or contracts offered on or after January 1, 1997, and before June 1, 1997* - One season of survey is required prior to contract offering. (Groups 2 and 3)

*Projects with contracts offered on or after June 1, 1997* - Standard "draft" protocol surveys are required prior to contract offering. (Group 4)

c. Post-Transition
*Projects with NEPA decisions to be signed on or after June 1, 1997* - Standard "draft" protocol surveys are required prior to the signing of the NEPA decision. (Group 5)

* NOTE: The standard "draft" salamander protocols refer to two survey seasons when there is a negative finding; that is, the species is not detected during the first survey and a second season survey is recommended. For this policy, the survey requirement is at least one survey season prior to the contract offering during the transition period. After the transition period has expired, standard "draft" protocol surveys (i.e., two survey seasons when there is a negative finding) are required prior to the signing of the NEPA document.

**Question 4:** The red tree vole, a Component 2 Survey and Manage species, does not currently have a draft survey protocol. What should we do about surveying for red tree voles, and are surveys required in FY 1997?

DISCUSSION: Follow implementation guidance given in Question 3. "Draft" protocols are being issued in October 1996.



ATTACHMENT 1-3

ONRC-G-05-0207-0066

# SURVEY & MANAGE COMPONENT 2 IMPLEMENTATION SCENARIOS

NEPA Decision = Implementation

Transition Period = surveys prior to contract offered to prior to the NEPA decision

| Survey Required? | Group | | Survey Season: Spring '96 | Sept 30 1996 | Oct 1 1996 (<-- TRANSITION PERIOD -->) | Jan 1 Survey Season: Fall '96 | Spring '97 | May 31 1997 | June 1 1997 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Transition** | | | | | | | | | | |
| No | 0 | NEPA Decision | no survey required | Contract Offered | | | | | | |
| **Transition** | | | | | | | | | | |
| No | 1 | NEPA Decision | no survey required | | Contract Offered | | | | | |
| No | 1 | | no survey required | NEPA Decision | Contract Offered | | | | | |
| Yes | 2 | one survey required | NEPA Decision | | | survey 1 | Contract Offered | | | |
| Yes | 2 | one survey required | | NEPA Decision | | | survey 1 | Contract Offered | | |
| Yes | 3 | one survey required | | | NEPA Decision | survey 1 | Contract Offered | | | |
| Yes | 3 | one survey required | | | | survey 1 | NEPA Decision | Contract Offered | | |
| Yes | 4 | standard surveys required | | NEPA Decision | | survey 1 | survey 2* | | Contract Offered | |
| Yes | 4 | standard surveys required | survey 1 | | NEPA Decision | | survey 2* | | | Contract Offered |
| **Post-Transition** | | | | | | | | | | |
| Yes | 5 | standard surveys required | | | | survey 1 | survey 2* | | NEPA Decision | Contract Offered |

*Salamander survey protocols require 2nd survey if first survey does not detect the species presence.

ATTACHMENT 1-4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF JOHN R. HICKENBOTTOM**

I, John R. Hickenbottom, declare and state as follows:

1. I have a B.S. in wildlife ecology from the University of Arizona. Currently, I am the District Ranger on the South Platte Ranger District, Pike and San Isabel National Forest, Comanche Cimarron National Grasslands, in the Rocky Mountain Region (Region 2 or R2) of the USDA-Forest Service (Forest Service). I assumed that position in 1999. Prior to that, from approximately 1997, I served as the Threatened, Endangered (T & E), and Sensitive Species Program manager for the Intermountain Region of the FS (Region 4 or R4). In that position, I

advised the R4 wildlife director and R4 leadership team on issues related to T & E and Sensitive Species. I also helped the Forest Service coordinate with U.S. Fish and Wildlife Service (FWS) on issues related to such species. From 1991 through 1997, I served in the Regional Office for the Pacific Northwest Region of the Forest Service (Region 6 or R6) as the region's T & E Assistant Program Manager.

2. On April 2, 1993, President Clinton convened a "Forest Conference" in Portland, Oregon, to produce a comprehensive plan for managing federal forests in the Pacific Northwest that balanced the importance of the forests and timber to the local economy and jobs with the need to preserve the old-growth forests and the species associated with those forests.

3. After the conference, the Forest Ecosystem Management Assessment Team (FEMAT) was assembled to prepare an assessment that took an ecosystem approach to forest management. FEMAT was composed of scientists and technical experts of a various disciplines from the Forest Service, Bureau of Land Management (BLM), Environmental Protection Agency (EPA), FWS, National Park Service, National Marine Fisheries Service (NMFS), and several universities. The team developed and analyzed 10 options encompassing various mixtures of Late-Successional Reserves (LSRs), Riparian Reserves (RRs), and prescriptions for the management of the forest both inside and outside of reserves, with the vast majority of management activities occurring in those lands called the Matrix, which were outside the LSRs and RRs. For each of the 10 options, FEMAT evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls. In addition, for seven of the options, similar assessments were done for over 1,000 plant and animal species thought to be closely associated with late-successional forests. FEMAT assessed the likelihood that the species' populations would stabilize, well distributed across

federal lands under each of the seven options. An 80 percent or greater likelihood of achieving that outcome was set as the benchmark for assuring a species' viability. FEMAT was careful to note, however, that species with scores lower than 80 percent should not automatically be regarded as unviable. The team assembled its assessment of the various options into a comprehensive report commonly referred to as the "FEMAT Report."

4. Using the FEMAT Report, an Interdisciplinary Team, composed of members from the Forest Service and BLM, prepared a draft Supplementary Environmental Impact Statement (SEIS) with FEMAT's 10 options identified as alternatives. Alternative 9 was the preferred alternative identified in the SEIS. After receiving public comment upon the draft, additional analysis was conducted on many of the late-successional and old-growth related species. This additional analysis was included as an appendix to the Final SEIS, which later was referred to as "Appendix J2" or "Additional Species Analysis." The Additional Species Analysis identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well distributed across federal lands. The prescribed management became known as "survey and manage mitigation measures" and, in short, was designed to further assure the viability of the species identified in the Additional Species Analysis.

5. In April 1994, the Record of Decision (ROD) selecting preferred Alternative 9 of the Final SEIS was signed. That ROD became commonly known as the Northwest Forest Plan (NFP). The NFP incorporated into its standards and guidelines the "survey and manage mitigation measures," which later became known as the "Survey and Manage Mitigation Measure Standards and Guidelines" of the NFP.

6. During my time in Region 6, I was heavily involved in the preparation of the Draft and Final SEIS, the Additional Species Analysis, and the 1994 ROD. Additionally, after the NFP was adopted, I worked to help the federal agencies determine and implement the requirements for the survey and manage mitigation measures.

7. The implementation of the NFP called for a high level of coordination and cooperation among Federal agencies. The principal decision-making authority rested with the Regional Interagency Executive Committee (RIEC). The RIEC consisted of the Pacific Northwest federal agency heads of the Forest Service, BLM, FWS, NMFS, EPA, and the Bureau of Indian Affairs (BIA). The Regional Ecosystem Office (REO) provided staff work and support to facilitate the RIEC decision-making and direction for the implementation of the NFP standards and guidelines. Among its various tasks, the REO was responsible for developing, evaluating and resolving inconsistencies on issues involving the implementation of the NFP. However, resolutions developed by the REO were only recommendations to the RIEC.

8. When the NFP was first adopted, there was much uncertainty regarding how to interpret and implement the survey and manage mitigation measures. The REO was overwhelmed with questions from the field. Similarly, staff working to develop issue resolutions was unable to obtain input in a timely manner from the executive members of the RIEC. To screen issues and facilitate timelier responses, additional interagency groups were created. The Intermediate Management Group (IMG) was set up to provide management input for staff working to develop issue resolutions. As the name suggests, the IMG's members were intermediate-level managers and were more accessible than the executive-level members of the RIEC. Therefore, issues that required management input before proceeding could be raised to the IMG, which could respond in a timelier manner than the RIEC. Although the IMG did not

substitute itself for the RIEC, it did provide management resolutions to the field staff on less controversial matters.

9. At the same time, a Survey and Manage Workgroup was created to address questions concerning the implementation of the survey and manage mitigation measures set forth in the Additional Species Analysis and incorporated into the NFP. The Survey and Manage Workgroup, which consisted of a select core of people from the agencies involved in the NFP, provided recommendations to the REO concerning the biological aspects of those mitigation measures.

10. In late 1994 or early 1995, I was assigned as the lead Forest Service representative on the Survey and Manage Workgroup. In that capacity, I spent a high percentage of my time working to develop survey and manage guidance, protocols, survey standards, *et cetera*. Cheryl McCaffrey was the lead representative from the BLM. Together, we addressed the issues of developing survey protocols and management recommendations from a biological perspective.

11. On survey and manage issues, I reported directly to Robert Devlin, who was a member of the IMG and the R6 Director of Natural Resources. Mr. Devlin provided input regarding how issues impacted the forest management program areas.

12. The Oregon red tree vole, *Arborimus longicaudus* (red tree vole), and the California red tree vole, *Arborimus pomo* (*A. pomo*), were both identified in the Additional Species Analysis. I am familiar with the species from my involvement with the Additional Species Analysis, the Draft and Final SEIS, the ROD, and the Survey and Manage Workgroup.

13. Although the red tree vole was included in the NFP's survey and manage standards and guidelines, its population was thought to be in less dire circumstances, according to the research set forth in the FEMAT Report and the Additional Species Analysis, than other species included in the survey and manage categories. The FEMAT report concluded that under Alternative 9, which the NFP selected, the red tree vole had a 73 percent likelihood of achieving habitat of sufficient quality, distribution, and abundance to allow the species population to stabilize, well distributed, across federal lands. If the red tree vole had received a 7 percent higher likelihood rating in the FEMAT report, it would not have been included among the species in the Additional Species Analysis or those in the NFP's survey and manage standards and guidelines.

14. The Additional Species Analysis set forth certain mitigation measures that, it was believed, would increase to at least 80 percent the likelihood of providing for a well-distributed red tree vole population. The Final SEIS Species Analysis Team's Mammal Subgroup felt there was no need to immediately protect every known red tree vole site, and, therefore, it was not included among the Component 1 Survey and Manage species in the NFP Standards and Guidelines. Rather, individual red tree vole sites needed to be assessed as to their value in adding to connectivity between LSRs. Both LSRs and RRs played a large role in the continued persistence of the species, the latter providing corridors between LSRs. However, at the time the NFP was adopted, some LSRs and many riparian zones were not ecologically functional due to past management activities. Under the NFP, that functionality would be restored over approximately 75 years. In the interim, the concern was to prevent the isolation of major portions of the red tree vole regional meta-population by additionally managing vole populations within Matrix lands between LSRs, which was the approach selected in the NFP to prevent

possible isolation. Because of that isolation concern, the red tree vole was included among the Component 2 Survey and Manage species in the NFP Standards and Guidelines.

15. In my capacity as a core member of the Survey and Manage Workgroup, I worked to develop the interim guidance for agencies to implement the Component 2 Survey and Manage Standard and Guideline requirement for the red tree vole. The workgroup determined those requirements should be designed to maximize efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population. Where possible, we solicited input from the FEMAT scientists, Additional Species Analysis team, and Final SEIS team who had worked on the question of the red tree vole population's viability in the range of the northern spotted owl. Based upon that input, the Survey and Manage Workgroup developed recommendations, which ultimately were adopted in the November 4, 1996 memorandum described as "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole" (Red Tree Vole Memo).

16. The Red Tree Vole Memo instructed that, as a precursor to on-the-ground surveys, existing geographic information system (GIS) information was to be used to analyze federal lands at the fifth-field watershed level and to screen those lands based upon their value in increasing LSR connectivity. The first screen was to determine how much land in the watershed was under federal management (Screen 1). If the watershed contained less than 10 percent federal lands, neither site-specific surveys nor management for red tree voles was necessary because those areas, due to the small percentage of federal lands in the watershed, could not contribute to LSR connectivity and, therefore, were unlikely to contribute to the viability of red tree voles. Under the second screen, the threshold for the survey and manage requirement was

whether at least 40 percent of the federal lands in the watershed was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and whether that closure and diameter could be maintained through the year 2000 (Screen 2). If federal lands in a watershed met that habitat threshold in Screen 2, no site-specific surveys for red tree voles were necessary because those areas already contributed adequately to LSR connectivity. The Red Tree Vole Memo also directed that neither site-specific surveys nor management for red tree voles was necessary in California because the evidence available then was insufficient to establish that the population extended into California.

17. As a practicing biologist, I believed at the time that the GIS approach using Screens 1 and 2 was biologically appropriate. The inclusion of the red tree vole among the Component 2 Survey and Manage species was an effort to utilize a mitigation measure, which was already being developed for a great many other Survey and Manage species, but which did not cleanly fit with the kind of action needed for red tree voles. For almost all other Survey and Manage species, the needs were to identify known sites, survey for additional sites, protect and manage those new and old sites for the retention of those narrowly endemic and poorly known species. In the case of the red tree vole, however, there was no need to protect individual sites because the threat to the species' viability was minimal. Instead, the concerns were about the past management practices that resulted in fragmentation and conversion of LSRs to young, even-aged forests. Therefore, the needs for the species were to improve LSR connectivity, better enable population dispersal, and, thereby, provide the opportunity to repopulate areas if, when, and where small populations might otherwise have become isolated or been eliminated. Those needs were best met by analyzing watersheds, rather than surveying every square inch and then protecting known sites. Therefore, the methods specified in the Red Tree Vole Memo, a

watershed-scale GIS analysis followed up by site- and situation-specific surveys, were appropriate.

18. Although Judge Dwyer held that the instructions of the Red Tree Vole Memo were unlawful, as a practicing biologist and more specifically as one of the biologists that worked on the Additional Species Analysis, the Draft and Final SEIS, and the ROD, it remains my opinion that those instructions were entirely reasonable and directed at meeting the concerns raised by FEMAT and the Additional Species Analysis. As I stated, although the red tree vole was included in the Survey and Manage Standards and Guidelines, the threat to its viability was minimal and the focus of the species' mitigation measures was to increase connectivity of the LSR populations through those in Matrix lands. With that purpose, the value of a Matrix stand would depend upon how much it contributed to LSR connectivity. If a stand containing red tree voles was in the middle of a large Matrix block comprised principally of older forests, then the stand would add little to the connectivity already provided by the older forests. By contrast, a stand containing red tree voles with almost no older forest or suitable habitat around it might have a much higher value in maintaining connectivity between LSRs. Further, if a stand containing red tree voles was isolated from federally managed lands, and so necessarily from LSRs, it had next to no value in increasing connectivity between red tree vole populations in LSRs and, therefore, could not measurably contribute to improving the population's viability. Given those factors, it was appropriate to reserve site-specific surveys for the forests that, according to GIS information, were valuable in terms of LSR connectivity and that, therefore, improved the red tree vole population's viability.

19. For similar reasons, requiring site-specific surveys and management for red tree voles in California would have had little value in improving the species' viability. At the time, the general understanding was that the species was restricted to mesic forest communities west of the crest of the Cascade Mountains in Oregon. Whether the red tree vole's range extended into California was in question. Whether the red tree vole was genetically distinct from its sibling species in California, *A. pomo*, was also in question. However, it was known that the vast majority, if not all, of red tree voles existed in Oregon. Therefore, managing the population in that region would necessarily have the greatest likelihood of mitigating the minimal threat to the species' viability, which was identified in the FEMAT Report and Additional Species Analysis.

20. As a biologist and as a member of the teams that worked on Additional Species Analysis, the Draft and Final SEIS, and the ROD, I continue to believe that the Red Tree Vole Memo properly interpreted the Component 2 Survey and Manage Standard and Guideline requirement for the red tree vole to most efficiently and effectively use federal resources to increase the species' viability. On the other hand, I continue to believe that the viability of the red tree vole population would not have improved measurably by performing on-the-ground surveys in every instance, as Judge Dwyer interpreted the NFP's standards and guidelines to require.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 1st day of February, 2008.

John R. Hickenbottom

United States Department of Agriculture | Forest Service | R-6 | OR/WA | Bureau of Land Management | United States Department of Interior

Reply to: 1736-PFP(BLM-OR931) / 1950(FS) Date: November 4, 1996
EMS TRANSMISSION 11/4/96

FS-Memorandum
BLM-Instruction Memorandum No. OR-97- 009
Expires 09/30/98

To: USDI Bureau of Land Management District Managers (Coos Bay, Eugene, Lakeview, Medford, Roseburg, Salem); USDA Forest Service Forest Supervisors within the Range of the Northern Spotted Owl in Oregon

Subject: Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole

*INTRODUCTION:*

This memorandum provides interim guidance to Oregon field units of the Forest Service and Bureau of Land Management to meet requirements in the Record of Decision (ROD) for the Northwest Forest Plan (NFP) relative to Component 2 surveys for the red tree vole [*Arborimus longicaudus* (*Phenacomys longicaudus* in the ROD)]. This guidance is to apply for a short term, estimated to be one-to-two years. The concept of this guidance was developed by an interagency team of field and research staff and approved by the Intermediate Management Group consisting of regional management representatives from the USDI Fish and Wildlife Service, USDA Forest Service, USDA Pacific Northwest Research Station, and USDI Bureau of Land Management (BLM). A copy of this guidance is being sent to the Regional Ecosystem Office (REO) for distribution to other agencies for informational purposes.

Viability ratings for this species were only slightly below acceptable when analyzed for the Final Supplemental Environmental Impact Statement (FSEIS) for the NFP, indicating that the risk to the species' viability is not great (see criteria in Appendix J-2 to the FSEIS). Early survey results suggest broader habitat usage than previously documented, and that site-specific surveys are not adding sufficiently to the scientific knowledge necessary to determine appropriate management for the species. Addition of this species to Component 4 (general regional surveys), while maintaining it as Component 2, will be recommended to the REO to augment species information on red tree vole habitat characteristics and populations. Because of the relatively low risk to species viability in the short term and the expected increase in data from regional surveys, it has been determined that field surveys are not needed for all project areas for the next couple of years and that the following, interim approach to survey and management of this species will be followed for the next one-to-two years.

Under this interim guidance, the landscape will be analyzed to determine red tree vole habitat availability through the year 2000, and to determine opportunities to maintain populations of red tree voles which can utilize that habitat to interbreed and disperse to Late-Successional Reserves or other suitable habitats. This will be facilitated by the use of existing geographic information system (GIS) themes containing particular forest characteristics to assess current and potential habitat. The results of this analysis will

guide the need for surveys and for management. The need for survey is restricted to marginal habitat where potential source populations would be maintained. Management options provide flexibility for managers to maintain populations and to accomplish projects.

Attachment 1 provides background on the intent of the ROD and rationale for this guidance. Attachment 2 provides background on documented red tree vole biology and a survey protocol to be used in implementing the interim guidance contained in this memorandum. Attachment 3 presents answers to some of the anticipated questions about this guidance.

*INTERIM GUIDANCE:*
The following interim guidance will apply to land areas below 4,300 ft. (1,300 m.) on BLM Salem, Eugene, Roseburg, Coos Bay, and Medford Districts; below 4,300 ft. elevation on the Siuslaw, Siskiyou, Willamette, Umpqua, and Rogue River National Forests; and on the Mt. Hood National Forest, west of the Cascade Crest and below 3,300 ft. (1,000 m.). Although there is some indication that the Oregon red tree vole (*Arborimus longicaudus*) may also be found in northern California, this preliminary information needs further analysis before applying Component 2 Standards and Guidelines for this species to California. This interim guidance will apply in Oregon until further notice (approximately one-to-two years):

*Screen 1 - Amount of Federal Land:*
For the purpose of this memorandum, federal land is defined as lands administered by BLM and/or the Forest Service. Throughout the range of the Oregon red tree vole, identify the fifth-field watersheds in which projects are planned. In those watersheds where less than 10 percent of the land is under federal management and there is no direct dispersal connection to BLM or Forest Service lands in other watersheds, neither site-specific surveys nor management of red tree voles is required. If the watershed has greater than 10 percent federal lands, follow Screen 2.

*Screen 2 - Habitat Condition Threshold:*
This screen is to evaluate habitat conditions in those fifth-field watersheds with more than 10 percent federal lands. Fifth-field watersheds which have a sufficient threshold level of potential red tree vole habitat on federal lands are treated differently from those which do not have sufficient potential habitat on federal lands.

The threshold determining survey and management requirements for the red tree vole is:
a minimum of 40 percent of the federal land in the fifth-field watershed is forested and (a) has approximately 60 percent crown closure or greater, and (b) has an average conifer tree diameter at breast height (DBH) of approximately 10 inches or greater, and (c) this closure and diameter can be maintained through the end of the decade (year 2000).

This initial threshold analysis can be done by local offices in a relatively short period of time through the use of GIS. Agencies or offices may differ in the data recorded for parameters such as canopy closure (e.g., data may be captured as 50-70 percent closure) and diameter. For GIS analysis, use existing agency data which is as close to the screen parameters (60 percent closure; 10 inch DBH) as is possible. These parameters may be convertible to more readily usable measurements (such as stand age) for the analysis. When GIS data is not considered adequate to determine these features, consult other

informational sources such as recent aerial photos. Factor projects proposed for the short and long term into GIS analysis to aid in projecting future red tree vole dispersal opportunities.

*Surveys Where Lands Pass Screen 1:*

Where conditions meet threshold: Where conditions meet the habitat threshold (potential habitat is sufficient for dispersal), no site-specific surveys are required.

Where conditions do not meet threshold: Where fifth-field watersheds do NOT meet the habitat threshold (i.e., potential habitat may not be sufficient for dispersal), surveys are required before ground-disturbing activities. Follow the survey method in Attachment 2. If populations are found in the project area, managers have the option of conducting additional surveys outside of the perimeter of the project area to find nearby (within approximately 1/4 mile) populations for supplemental protection. In such a situation, the entire 1/4 mile band around the project perimeter need not be surveyed if the additional populations found will likely provide reproduction and dispersal capability when habitat conditions become appropriate. The definition of a red tree vole population is "two or more active nest trees spaced no more than 100 m. (330 ft.) apart."

*Management of Known or Found Populations:* Since the red tree vole is not a Component 1 species, all known sites are not required to be protected. As described below, management varies depending on whether the habitat threshold is or is not met.

Where the habitat threshold is met or exceeded: Where fifth-field watersheds meet the habitat screen criteria (i.e., potential habitat is sufficient), no surveys are needed before ground-disturbing activities. However, within the project area, prior surveys may have located one or more known red tree vole populations. These populations should be evaluated to determine the appropriate management. The focus of this standard and guideline is to maintain dispersal capability and gene flow (Appendix J-2, pp. 473-475). Management of each known site is not critical in these potential habitats as there should be suitable opportunity for reproduction, dispersal, and genetic exchange. In conjunction with discussions with biologists, managers have the flexibility to make a determination regarding whether or not (and by which method) populations will be maintained to contribute to the viability of the species. They also have flexibility in determining how many, if any, populations need to be maintained considering population size, condition, dispersal opportunities, overall quality of dispersal habitat in the watershed, proximity of other populations, and other factors. Appendix J-2 (pp. 474-475) and this memorandum's Attachments 2 and 3 contain information about the species which can be factored into management considerations and decisions. When one or more populations are found within a project area and a determination has been made to maintain some or all of the populations in the area, it is recommended that managers consider options a. through c. below. They should also consider the retention of clusters of large green trees around the populations or the monitoring of red tree vole populations before and after actions are completed to assist in refining management direction.

a. Protect populations within the project area with an approximate 10-acre buffer; or

b. Where adjacent Riparian Reserves have a high proportion of Douglas-fir and other habitat characteristics meeting the threshold, adjust the boundaries to incorporate the population area; or

c. Conduct additional surveys outside of the perimeter of the project area to find nearby (i.e., within approximately 1/4 mile) populations (as defined above) for protection by an approximate 10-acre buffer. The approximate 1/4 mile band for supplemental survey would allow identification and protection of populations in the project vicinity to ensure existence of local, source populations for interbreeding and dispersal, thus addressing concerns about the red tree vole. This distance is based on the greatest distance documented for red tree vole movement from its natal tree, which is 1115 ft. or, roughly, 1/4 mile. Protection of these nearby populations, instead of those in a project area, would allow management flexibility in implementing actions while at the same time providing protection for populations in that vicinity.

Where the habitat threshold is not met: The purpose of managing for red tree vole populations in this "marginal habitat" is so that populations are not lost which could be the source for dispersal at a later time, when the habitat is appropriate and when the landscape loses its fragmented characteristics. If populations are found within the project area, then either the populations within the project area or those populations found near the project area (approximate 1/4 mile perimeter) must be protected. Protect such populations using management options a. through c. listed above.

*PROTOCOL MODIFICATIONS:*

The protocol was designed to ensure a high probability of finding populations of this species across its range. Follow the standard protocol as closely as possible. In some situations, there may be specific conditions at a provincial or local level which may warrant modification of the protocol. Permanent staff biologists should make the decision on any needed modifications to protocol implementation based on their professional judgment. Where there is any deviation from the protocol, biologists are requested to document the specific changes made and the rationale for those changes. In addition, the data sets collected using the modified protocol should be clearly identified. This information will assist in future protocol revisions and in interpreting survey results.

*COMPONENT 4:*

As part of this interim strategy, we will submit to the REO the documentation for adding the red tree vole to Component 4 under the guidance for changing species status found on p. C-6 of the ROD. The goal of this change is to allow the collection of key habitat and population information which will clarify assumptions regarding the current abundance, distribution, and habitat relationships of red tree voles within the various physiographic provinces, and to refine our description of what stand conditions are desirable in maintaining some resident vole populations within the Matrix lands.

This direction is applicable immediately. Please address any questions to Cheryl McCaffrey (BLM), telephone number: 503-952-6050, email: cmccaffr; or Randy Hickenbottom (Forest Service), telephone number: 503-326-3626, DG: R.Hickenbottom:R06C.

Elaine Y. Zielinski
State Director, OR/WA
USDI Bureau of Land Management

Robert W. Williams
Regional Forester, Region 6
USDA Forest Service

3 Attachments:
1 - Jeske/Biswell Issue Paper dtd 09/05/96 (3 pp)
2 - Biology & Interim Survey Protocol (17 pp) - 4 pages sent under separate cover
3 - Answers to Expected Questions (2 pp)

BLM Distribution:
WO-230 (Room 204 LS) - 1
CA-056 (P. Roush) - 1
OR-930 - 1
REO (Knowles, McNair, Pietrzak, Watson) - 4

UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - -x
BLUE LAKE FOREST PRODUCTS, INC.,   :
         Plaintiff,                :
     vs.                           : No. 01-570C
THE UNITED STATES,                 : (Judge Williams)
         Defendant.                :
- - - - - - - - - - - - - - - - - -x
TIMBER PRODUCTS COMPANY,           :
         Plaintiff,                :
     vs.                           : No. 01-627C
THE UNITED STATES,                 : (Judge Williams)
         Defendant.                :
- - - - - - - - - - - - - - - - - -x
CLR TIMBER HOLDINGS, INC.,         :
         Plaintiff,                :
     vs.                           : No. 04-501C
THE UNITED STATES,                 : (Judge Williams)
         Defendant.                :
- - - - - - - - - - - - - - - - - -x
```

DEPOSITION OF LOIS SCHIFFER

Washington, DC

Monday, August 27, 2007

REPORTED BY: CARMEN SMITH

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700 800-336-6646

A I was a professor of environmental law at Georgetown University Law Center.
Q When did you first assume that position?
A I have been an adjunct professor at Georgetown Law School since 1985. I became a full-time visiting professor or lecturer from late January 2001 through approximately May 2001.
Q So what were you doing prior to January 2001 when you --
A I was Assistant Attorney General for the Environment and Natural Resources Division at the U.S. Department of Justice.
Q When did you first assume that position?
A I was acting Assistant Attorney General from September 1993 through October 7, 1994. On October 7, 1994, I was confirmed and became the Assistant Attorney General and was in that job continuously to January 20, 2001.
Q Are you aware of lawsuits brought by various environmental groups, beginning in the early 1990s, challenging various aspects of the Northwest Forest Plan?

for litigation today?

A I don't think so.

Q I'll represent to you that these are handwritten notes of Suzanne Zike, telephone conference with Mr. Boling after he reported having met with you and Mr. Coppelman.

You see under "Schiffer" on the left-hand side, item number one, she writes "interpretation of implement equals DN is nonsense," double underscored. Does that refresh your recollection?

A It does not.

Q Could it be that Mr. Coppelman said that and not you?

A Since I don't have any knowledge of this, I don't have a way to answer that question.

Q All right. Well, it's very important. And I apologize for being repetitive here, but I appreciate your patience.

And at the top under item number 3 on the left, below that, first subitem, again it says "'implement' defin," meaning definition, "is nonsense."

24557
JB



UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 04-501C (Judge Williams) |

DEPOSITION OF EDWARD BOLING

Washington, DC

Friday, August 24, 2007

REPORTED BY: JULIE BAKER

Q Were there any materials that were prepared for you by anyone else in order to assist you in preparing for the deposition today?
A Aside from just the document?
Q Aside from the documents.
A No.
Q You were the lead government counsel in the ONRC action case before Judge Dwyer; is that right?
A That's correct.
Q You also had a colleague working with you on that case, Mr. John Watts?
A Yes, that's correct.
Q Do you recall that one of the key issues in that case involved a definition known by the shorthand NEPA decision equals implementation?
A Yes. That was one of the issues in the case.
Q So you're generally familiar with it?
A Generally familiar with that.
Q A second major issue involved the survey restrictions on the red tree vole. Do you recall

allegation in his September 25, 1998 letter, so that certainly would be part of our discussion. I think the prospect of going before Judge Dwyer to explain that this is a logical and reasonable explanation -- reasonable interpretation of the requirement to get these surveys up and running was somewhat -- it was not as clean and simple in retrospect as one would like.

It had the problem of this allegation that the agencies were rushing to get timber sales out the door to avoid the requirement. That's fairly obvious, and I expect that she -- I believe she had some concerns about that. That's sort of the nature of litigation risk.

Q Did Mr. Coppelman have the same concerns?

A I believe he shared them.

Q Did Ms. Schiffer at this meeting indicate to you that she thought that definition was so weak, that she wasn't prepared to make a decision to defend it in court until she had a chance to talk with the assistant secretary of agriculture, Mr. Lyons?

A He's the undersecretary.

Q Excuse me.

A Well, your Exhibit 53 says that "Shiffer and Coppelman want to confer with Ag and Interior Depts," and I assume that meant, amongst other people, Mr. Lyons "re: The key issues and cost assessment of reaching settlement." In other words, they wanted to make sure that the client at a fairly high level of leadership was aware that this was the choice being made.

There was an offer on the table that the agencies had assessed it as being too high a cost, and she wanted to confer, or they wanted to confer, with Ag and Interior departments to ensure that the leadership at those departments was aware that that judgment had been made before proceeding with litigation.

MR. STEVENS: Could you read my question back.

(The reporter read the record as requested.)

BY MR. STEVENS:

Q Can you answer that yes or no?

A No, I don't have a specific recollection. My answer was based on a -- based on my general recollection of these negotiations and discussions within the Department of Justice and your -- Plaintiff's Exhibit 53, which references this. So I'm filling in there. I don't have a specific recollection of what Lois Schiffer said to me at that briefing.

Q Do you recall reporting to Sue Zike what Ms. Schiffer said to you?

A I don't recall it in preparation for this deposition. I did see an e-mail that Sue Zike -- a text, recounting the discussion.

Q And?

A Turning you to your Exhibit 30A, your Plaintiff's Exhibit 30A, I don't know who this is to, but it's a fragment of an e-mail. It appears to be the text of a fragment of an e-mail, "Nancy and others: Ted Boling just called to answer my Qs about what were Shiffer's," again, misspelled, "and Coppelman's concerns about this case. He answered agency definition of implement 'was nonsense.'" And

it goes on. I assume that's what you're getting at.

Q That's part of what I'm getting at. You don't have a recollection?

A I don't recall that conversation. I don't recall if that's an accurate characterization of what I had told her.

Q Would you have any reason to doubt Ms. Zike if she said that is what you told her?

A Only in that I would be surprised that Sue Zike had a clearer recollection than I do of that conversation.

Q Did you take any notes of that conversation?

A I don't know. This is her characterization of what I said.

Q Do you have Plaintiff's Exhibit 52 in the book in front of you?

A Yes.

Q Ms. Zike testified in her deposition last week that these were her notes during a telephone conversation with you when you told her what happened at that meeting.

**U.S. Department of Justice**

Civil Division

D.J. Nos. 154-01-570, 154-01-627,
154-04-501
JED:KAB:EMLynch

Telephone: (202) 353-7994
Facsimile: (202) 514-8624

*Washington, D.C. 20530*

September 26, 2007

VIA MAIL AND FAX

Gary G. Stevens
Saltman & Stevens, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006

Re: Blue Lake Forest Products, Inc. v. United States, Fed. Cl. No. 01-570C; Timber Products Company v. United States, Fed. Cl. No. 01-627C; and CLR Timber Holdings, Inc. v. United States, Fed. Cl. No. 01-501C

Dear Gary:

As we discussed last week, I spoke with Peter Coppelman, former Deputy Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the Department of Justice ("DOJ") on September 19, 2007. I contacted Mr. Coppelman at your request, to find out whether he recalled a meeting with Lois Schiffer, former Assistant Attorney General for ENRD, and Ted Boling, an ENRD senior trial attorney, regarding ONRC Action v. U.S. Forest Service and Bureau of Land Management, No. C98-942WD, where Ms. Schiffer allegedly said that the Forest Service's "NEPA equals implementation" definition was "nonsense." Mr. Coppelman has no recollection of such a meeting.

If you have any questions or concerns, please feel free to contact me at (202) 353-7994.

Sincerely,

Ellen M. Lynch
Trial Attorney
Commercial Litigation Branch

# RECORD OF DECISION

## for

## Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl

### Table of Contents

I. Summary . . . . . 1

II. Introduction . . . . . 2

III. Decision . . . . . 4
A. Statutory Basis for Ecosystem Management . . . . . 5
B. Land Allocations . . . . . 6
C. Standards and Guidelines . . . . . 7
D. Application of Decision . . . . . 11
1. Application to Land and Resource Management Plans . . . . . 11
a. Bureau of Land Management
b. Forest Service
2. Relationship of Standards and Guidelines to Existing Plans . . . . . 12
3 Application to Timber Sales . . . . . 13
4. Application to other Contracts, Permits, and Special Use Authorizations . . . . . 15
5. Application to Research Activities . . . . . 15
6. Relationship to Other Plans and Proposals . . . . . 15
7. Relationship to Other Lands . . . . . 16

IV. The Alternatives . . . . . 17
A. Alternatives Considered . . . . . 17
B. The Action Alternatives . . . . . 19
C. No-Action Alternative . . . . . 24
D. The Environmentally Preferable Alternative . . . . . 25

V. The Selected Alternative . . . . . 25

VI. Mitigation . . . . . 29
A. Mitigation Measures Adopted . . . . . 29
B. Mitigation Measures Not Adopted . . . . . 29
1. Vertebrates
2. Invertebrates and Plants

VII. Changes in Standards and Guidelines Between Final SEIS and Record of Decision . . . . . 34

VIII. Findings . . . . . 38
A. Court Injunctions . . . . . 38
B. Legal and Regulatory Compliance . . . . . 39
1. National Environmental Policy Act (NEPA) . . . . . 40
2. National Forest Management Act . . . . . 42
3. Federal Land Policy and Management Act . . . . . 48
4. Oregon and California Lands Act . . . . . 49
5. Endangered Species Act . . . . . 50
6. Coastal Zone Management Act . . . . . 51
7. Executive Order 11990 - Protection of Wetlands . . . . . 51
8. Clean Air Act . . . . . 51
9. Clean Water Act . . . . . 52
10. Federal Advisory Committee Act . . . . . 52

IX. Implementation . . . . . 53
A. Interagency Coordination . . . . . 53
B. Planning and Analysis . . . . . 54
C. Consultation and Coordination . . . . . 54
D. Protection of Tribal Treaty Rights and Trust Resources . . . . . 54
E. Initial Implementation of this Decision . . . . . 55
F. Fiscal Year 1994 Watershed Restoration Program . . . . . 57
G. Monitoring . . . . . 57
H. Authority to Amend or Modify this Decision . . . . . 58

X. Public Involvement . . . . . 58
A. Public Comments on the Draft SEIS . . . . . 59
B. Summary of the Comments Received . . . . . 60
C. Response to Comments on the Draft SEIS . . . . . 61
D. Response to Comments on the Final SEIS . . . . . 65

XI. Review and Approval . . . . . 73
A. Administrative Review . . . . . 73
B. Effective Date . . . . . 74
C. Administrative Record . . . . . 74
D. Signatures . . . . . 74

I. Summary

This Record of Decision is the culmination of an unprecedented effort in public land management. On April 2, 1993, President Clinton convened the Forest Conference in Portland, Oregon to address the human and environmental needs served by the federal forests of the Pacific northwest and northern California. The President, Vice-President and much of the Cabinet spent an entire day listening to all points of view and collecting information. The President then directed his Cabinet to craft a balanced, comprehensive and long-term policy for the management of over 24 million acres of public land. An interagency, interdisciplinary team of expert scientists, economists, sociologists and others was assembled -- the Forest Ecosystem Management Assessment Team led by Dr. Jack Ward Thomas. After three months of intensive work, which included the review of all fully-developed proposals for management of federal forests within the range of the northern spotted owl, the team produced a report assessing in detail ten options.

President Clinton announced his proposed "Forest Plan for a Sustainable Economy and a Sustainable Environment" on July 1, consisting of strategies for forest management, economic development, and agency coordination. The forest management and implementation portion of the strategy, which is the subject of this Record of Decision, was analyzed in a Draft Supplemental Environmental Impact Statement (Draft SEIS) issued in July that received over 100,000 public comments during a three month public comment period. A Final Supplemental Environmental Impact Statement (Final SEIS) was made available to the public in February 1994.

In this Record of Decision, we, the Secretary of Agriculture and the Secretary of the Interior, jointly amend the planning documents of nineteen National Forests and seven Bureau of Land Management Districts. This represents the first time that two of the largest federal land management agencies, the Bureau of Land Management and the Forest Service, have developed and adopted a common management approach to the lands they administer throughout an entire ecological region.

The management direction consists of extensive standards and guidelines, including land allocations, that comprise a comprehensive ecosystem management strategy. The strategy is based on Alternative 9 of the Final SEIS, except for minor modifications noted in this document or made in the attached standards and guidelines. The conservation measures included in this strategy are based upon the best available science and attempt to anticipate and forestall future

environmental problems, avoiding the severe economic dislocation and legal gridlock that occur when environmental problems are ignored.

There are more than 24 million acres of federal land in the planning area for our decision (defined as the range of the northern spotted owl). Approximately 30% of these acres have been set aside by Act of Congress. The remaining 70% is allocated by this management direction as: late-successional reserves (30%); adaptive management areas (6%); managed late-successional areas (1%); administratively withdrawn areas (6%); riparian reserves (11%); and matrix (16%). Standards and guidelines for each land allocation provide a coordinated ecosystem management approach to the planning area. Although certain thinning and salvage activities would be allowed in the reserves, programmed timber harvest would only occur in the 22% of the land designated as matrix or adaptive management areas, and only in compliance with standards and guidelines designed to achieve conservation objectives.

## II. Introduction

The controversy over the northern spotted owl and old-growth federal forests of the Pacific northwest has continued since the 1970s. At present there have been or are pending over a dozen lawsuits involving the northern spotted owl, marbled murrelet, and possible future timber harvesting in old growth. There are currently three separate court injunctions that have severely restricted new timber sale programs on federal forests in northern spotted owl habitat for the past three years.

The federal agencies most directly involved in the issues concerning the management of late-successional and old-growth forest within the range of the northern spotted owl are the U.S. Forest Service, Bureau of Land Management, National Park Service, Bureau of Indian Affairs, U.S. Fish and Wildlife Service, National Biological Survey, National Marine Fisheries Service and the Environmental Protection Agency. The five major federal laws that apply to federal land management in the planning area are the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), National Forest Management Act (NFMA), Federal Land Policy and Management Act (FLPMA), and Oregon and California Lands Act (O&C Act).

President Clinton asked at the April 2, 1993, Forest Conference:

> How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?

The President set forth five principles to guide the federal interagency effort to develop a management strategy to protect the old-growth related species and produce a sustainable level of timber:

> First, we must never forget the human and the economic dimensions of these problems. Where sound management policies can preserve the health of forest lands, sales should go forward. Where this requirement cannot be met, we need to do our best to offer new economic opportunities for year-round, high-wage, high-skill jobs.
>
> Second, as we craft a plan, we need to protect the long-term health of our forests, our wildlife, and our waterways. They are a ... gift from God, and we hold them in trust for future generations.
>
> Third, our efforts must be, insofar as we are wise enough to know it, scientifically sound, ecologically credible, and legally responsible.
>
> Fourth, the plan should produce a predictable and sustainable level of timber sales and nontimber resources that will not degrade or destroy the environment.
>
> Fifth, to achieve these goals, we will do our best, as I said, to make the federal government work together and work for you. We may make mistakes but we will try to end the gridlock within the federal government and we will insist on collaboration not confrontation.

President Clinton summed up the Forest Conference:

> We're here to begin a process that will ensure that you will be able to work together in your communities for the good of your businesses, your jobs, and your natural environment. The process we [have begun] will not be easy. Its outcome cannot possibly make everyone happy. Perhaps it won't make anyone completely happy. But the worst thing we can do is nothing.

The land allocations and standards and guidelines that are adopted here satisfy all of the objectives set forth by the President. They comply with the requirements of federal law, including the five statutes listed above. They are based on the best available science and are ecologically sound. They will protect the long-term health of the federal forests. They will provide for a steady supply of timber sales and nontimber resources that can be sustained over the long term without

degrading the health of the forest or other environmental resources. Moreover, they involve a commitment by the federal agencies to work together.

This decision marks the turning point from formulation to implementation. Initial standards and guidelines have been developed, subjected to public comment, modified slightly, and adopted by this decision. The next step is to apply the standards and guidelines and adapt management of federal forests to sustain both the old-growth ecosystem and a supply of timber. In order to coordinate the activities of the various federal agencies that are involved, we have established an interagency structure that includes the Regional Interagency Executive Committee (RIEC), the Regional Ecosystem Office (REO), and provincial teams. These groups will oversee the necessary monitoring and research to continuously seek new information and understanding of the complexities involved in managing the old-growth and late-successional forest ecosystem in the Pacific northwest.

We view the action of adopting these standards and guidelines as a beginning and not an end of the process of resolving the issues that have developed during the controversy over federal forest management. We expect and welcome the continuing involvement of the public in the management of these valuable resources.

## III. Decision

In this Record of Decision, we jointly adopt Alternative 9 of the Final SEIS, as modified by this decision, and as amplified in the attachment to this Record of Decision entitled "Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl" (Attachment A). This decision, as spelled out in Attachment A (sometimes referred to herein as "the Standards and Guidelines"), is to be applied to lands administered by the USDA Forest Service and the USDI Bureau of Land Management within the range of the northern spotted owl, as provided in this Record of Decision. The following discussion explains the decision but is not intended to cover every aspect of the Standards and Guidelines, which set forth the management direction adopted by this decision in a single document and are intended to facilitate the agencies' implementation of our decision.

The Standards and Guidelines apply to the land allocations that are identified on the official maps of the Final SEIS, as corrected for minor mapping errors. These maps are stored electronically in the spatially unified database (SPUD) maintained by the interagency geographic information system (GIS) staff in the Regional Ecosystem Office at 333 S.W. First Avenue, Portland, Oregon 97204. Maps at 1/2-inch to the mile scale showing the land allocations are available for each Forest Service and BLM administrative unit at the respective unit offices.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBE RPRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF ROBERT J. DEVLIN**

I, Robert J. Devlin, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. Over the course of my 42-year career with the USDA-Forest Service (Forest Service), I worked in a variety of positions before retiring in June of 2000. In 1994, I became the Director of Natural Resources for the Pacific Northwest Region of the USDA-Forest Service (Region 6, or R6). In that capacity, I represented the Regional Forester and the Deputy Regional Forester in oversight of the staff from various programs. My responsibilities also included

oversight on matters associated with the Northwest Forest Plan and its implementation within Region 6.

2. Timber management was one of the programs that I oversaw. It was my responsibility to track the program's financing and output for the Regional Forester and Deputy Regional Forester.

3. Annually, the R6 Regional Forester compiled data projecting the amount of timber that the region and its national forests could offer for sale. This information would be combined with data from the other eight regions of the Forest Service and used to develop the entire agency's out-year budget proposal to the President. After several reviews and modifications, the President would submit the agency's proposal to Congress for approval. Congress would further review and modify the President's proposal and would eventually approve and budget, for the entire Forest Service, a very specific volume of timber to be offered for sale and later harvested. The Forest Service Chief distributed Congress's established volume among the nine regions of the Forest Service. The Regional Foresters, in turn, distributed that volume among the respective regions' national forests.

4. The timber-harvest levels established and approved by Congress were expected to be met. In other words, it was not discretionary by the Forest Service to vary the quantity established by Congress. Most line officers, from the District Rangers up to the Forest Supervisors in Region 6, had performance requirements to meet their allocated sale offerings. In my role as Region 6's Director of Natural Resources, I worked with the national forest supervisors and supported their efforts to prepare timber sale offerings to ensure that the timber management program met the region's allocated harvest levels.

5. It was a challenge to meet timber harvest levels because a significant amount of time was required to prepare sales before they were auctioned and awarded. Under the National Environmental Policy Act (NEPA), the forests had to analyze the environmental impact of a timber sale before deciding whether to offer that timber for harvest. That analysis typically took up to a full year from the date a line officer initiated a timber sale project to the date that officer signed the NEPA document and the Decision Notice (DN). After signing the DN, but before auctioning the timber sale, the field foresters would use the NEPA document to prepare the timber sale. This preparation would include marking the timber designated for harvest, laying out roads, cruising (measuring) the timber volume, and appraising the value of the sale. This sale preparation commonly required another one to two years to complete. In total, a forest needed up to three years to prepare a timber sale for auction. Thus, in order for Region 6 to meet its harvest levels, the line officers had to plan timber sales many years in advance of the planned award date.

6. Attaining the region's harvest levels was further complicated by the fact that during the intervening years unforeseen events frequently changed the specified harvest levels or the forests' ability to meet those levels. For example, from time to time Congress would increase the Forest Service's annual harvest levels or the Chief of the Forest Service would redistribute harvest volumes from one region to another or one forest to another. Additionally, unforeseeable natural events such as forest fires occasionally delayed or burned out certain sales requiring the modification or, if too severe, the cancellation of the timber sale.

7. Consequently, if a national forest had not completed in advance NEPA documents and DN to provide for an adequate number of timber-sale contracts in advance for offer and award, it would have been unable to accommodate unexpected increases set by Congress or to

compensate for shortfalls due to natural causes. Again, annual harvest offerings set by Congress were expected to be achieved. Thus, it was a good management practice for line officers to keep a "shelf" of signed NEPA documents and DNs, which could be used in response to unexpected increases or shortfalls.

8. When I took over my duties as Director of Natural Resources, there was very little timber volume on the "shelf." The listing of the marbled murrelet and the northern spotted owl, under the Endangered Species Act, caused sales that had already been awarded to be delayed or canceled. Additionally, those listings deleted the majority of timber sale projects with signed NEPA decisions on the "shelf", which line officers, otherwise, could have used to compensate for volume shortfalls.

9. The listing of the murrelet and owl was the context for the adoption of the 1994 Northwest Forest Plan (NFP). The listings reduced R6's timber sale offerings to the point of severely impacting the local communities dependent upon the timber harvest for their livelihood and Congress's budgeted and expected harvest volumes. The NFP, largely supported by President Clinton, was a major undertaking in which the Forest Service and the Bureau of Land Management (BLM) adopted a coordinated management direction for the lands those agencies administered within the range of the spotted owl. The NFP set aside millions of acres of late-successional and old-growth forest for species, such as the northern spotted owl, which depended upon that type of habitat. Additionally, the NFP and its "survey and management mitigation measures" (later to be known as Survey and Manage Standards and Guidelines) required that the agencies survey and manage habitat for a large number of species, known or unknown, which the agencies had no experience dealing with or locating.

10. While the specific requirements of the Survey and Manage Standards and Guidelines were new and somewhat nebulous, Congress's timber-harvest requirements were unambiguous. When the NFP was adopted, Congress had set the combined harvest level for the Forest Service and BLM at 1.1 billion board-feet. Because of the shortage of signed NEPA documents on the "shelf" in R6 affected by the NFP, forests had to begin timber projects from scratch, which necessarily impeded their ability to attain immediate harvest-volume expectations. The Chief persuaded the administration that the forests covered under the NFP could not meet their portion of the 1.1 billion board-feet for the first two years of the plan. We, in R6, determined that we needed three years to prepare a sufficient number of sales to meet our portion of the 1.1 billion board-feet volume.

11. Over that same timeframe, R6 and R5 (California) of the Forest Service and both Oregon and Washington districts of BLM were tasked with determining and implementing the new requirements of the NFP. Survey and Manage Standards and Guidelines was one of those new requirements. The plan provided a timeline for developing procedures for surveying and managing for certain species. A Survey and Manage Workgroup worked on developing survey protocols. Once the members of the Survey and Manage Workgroup reached consensus on the protocols to be used by the Federal agencies, they reported them to the Regional Ecosystem Office (REO). After the REO reviewed a protocol, it would circulate the protocol to the R5, R6, and Oregon and Washington BLM executives for them to sign and send out as policy. I was not involved with the Survey and Manage Workgroup or the development of survey protocols.

12. However, I was a member of the Intermediate Management Group (IMG) and, both in that capacity and in my capacity as R6 Director of Natural Resources, did work on questions concerning how to interpret the NFP. The IMG comprised representatives from all the

agencies that were called for in the NFP, including the Forest Service, BLM, Fish and Wildlife Service, the National Marine Fisheries Service, the Environmental Protection Agency, and the Parks Service. I became a member of the IMG after Tom Nygren retired. Nancy Diaz (previously Nancy Molina) and I were the Forest Service representatives on the IMG. Bill Bradley was the BLM representative.

13. The IMG worked with the Issue Resolution Team (IRT) to help interpret the NFP. Tom Hussey was the Forest Service representative on the IRT, with whom I worked. Whenever the IRT was faced with an issue that impacted one of the forest management program areas, the team would seek advice from the IMG on how to interpret the NFP. The IRT would develop alternatives and submit those alternatives to the IMG for comment.

14. One question that the IRT addressed was how to interpret the language on page C-5 of the Standards and Guidelines, which provided a transition period for phasing in the surveys for Category 2 species that ultimately would be required prior to any ground-disturbing activities. The survey requirements were phased in for different species based upon the date a project was "implemented." However, it was unclear from the NFP whether timber projects should be deemed implemented at 1) the date the NEPA document and DN were signed by the line officer (*i.e.*, when projects were added to the "shelf" of NEPA documents and DN); 2) the date the sale was offered or awarded; or 3) the date the timber companies broke ground on the project (*i.e.*, ground disturbing activities). There was also a question as to what constituted ground disturbing activities for the latter.

15. The question of when a project should be deemed implemented was especially significant because of the amount of time the Forest Service needed to prepare its timber sales for award, which included the NEPA documents and DN. It was apparent that for the surveys to

be useful, they were to be incorporated into the NEPA process. However, the NFP provided that survey protocols were to be developed over the first several years of the plan. Therefore, the forests were unable to incorporate the surveys into the NEPA process for timber sales during those first several years because the protocols did not yet exist. However, as I explained above, a timber sale typically required up to one year from project initiation to the signed NEPA document and DN and up to another two years of sale preparation before the award. Therefore, it was necessary for the forests to have the survey protocols years before a timber sale's anticipated award date in order to incorporate the surveys into the NEPA process.

16. Under those circumstances, if the Forest Service deemed a project "implemented" upon groundbreaking, the forests would have been unable to complete and award timber sales for years while the Forest Service developed survey protocols. That delay effectively would have removed the transition period, which the NFP clearly intended to provide, for developing and applying the survey protocols. Finally, it would have made it impossible for the region to attain its required timber-harvest volume for several years.

17. During this NFP transition period and development of the survey and manage protocols, the interpretation that the Forest Service and BLM ultimately adopted was that a project was deemed "implemented" on the date the NEPA document was signed. This commonly has been referred to as "NEPA Equals Implementation." This resolved the tension between the various requirements of the NFP. We saw that this balanced the requirements that the agencies could achieve their Congressionally-set timber-harvest volumes along with the requirements of the survey and manage program when those protocols were developed. It also ensured that the data collected from surveys would be obtained prior to, and therefore incorporated into, the NEPA document. Finally, it gave effect to the transition period that the

NFP provided for phasing in the requirement to perform surveys prior to ground-disturbing activities.

18. Given the NFP's requirements of meeting both timber harvest goals and survey and management requirements, the transition period set forth in page C-5 of the Standards and Guidelines, and the undefined term "implemented," I agreed that the most reasonable interpretation to be applied during this transition period was that a project should be deemed implemented at the time the NEPA document and DN were signed. With that interpretation, the Forest Service and BLM issued a policy-directional letter on November 1, 1996, instructing their field units that existing timber sales having completed their NEPA documents and DN could proceed to sale preparation and offering while protocols were being developed. It is this letter that has become known as the "NEPA Equals Implementation" letter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 18th day of DECEMBER, 2007.

[signature]
Robert J. Devlin

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC.<br><br>Plaintiff,<br><br>v<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 01-570C<br>(Judge Williams) |
| TIMBER PRODUCTS COMPANY<br><br>Plaintiff,<br><br>v<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 01-627C<br>(Judge Williams) |
| CLR TIMBER HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-501C<br>(Judge Williams) |

Declaration of Richard O. Fitzgerald

I, Richard Fitzgerald, declare as follows:

1. I am the Assistant Director of Forest Management in the Washington, D.C. office of the United States Department of Agriculture, Forest Service ("Forest Service"). I have held this position since1992. As the Assistant Director of Forest Management, I am responsible for timber sale and stewardship contract

preparation and administration. I also am responsible for work involving special forest products and small business timber sale set-aside issues. I have worked with the Forest Service in various capacities throughout the country for more than fifty years.

2. I am familiar with the lawsuits filed by the above-referenced plaintiffs, and understand plaintiffs have asserted that the contract terms and conditions for each of the timber sale contracts involved in the lawsuits (Happy Thin – contract no. 060772; Jack Heli – contract no. 060715; and Too Wild – contract no. 075862) were drafted entirely by the Forest Service, and that the contracts are contracts of adhesion, the terms and conditions of which are not negotiable. Plaintiffs' assertions incorrectly characterize the standard Forest Service timber sale contract used in each of the contracts at issue in these lawsuits and the input members of the timber industry have had in the timber sale contract's development.[1]

3. As the National Forest Products Association (NFPA), a timber industry member organization, recognized in its Buyer's Guide to Forest Service Timber Sale Contracts, Second Edition (1974), the 2400-6 contract was developed in July 1970 as "a result of extended discussions between NFPA's Federal Timber Purchasers Committee [NFPA] and the Forest Service, . . . ."[2]

---

[1] There are two standard timber sale contracts used to sell large, complex, timber sales from National Forest System lands pursuant to the National Forest Management Act, 16 U.S.C. § 472a ("NFMA"). Form FS-2400-6 is used when timber is harvested, then measured to determine the amount to be paid based a contractor's bid rate (commonly referred to as a scaled sale). Form FS-2400-6T is used when the timber to be sold is measured prior to harvesting (commonly referred to as a tree measurement sale). The terms and conditions of the contracts are virtually identical. For ease of reference, the contracts will be referred to as the 2400-6/6T.

[2] Exhibit 18, Buyers Guide, at 1.

The 2400-6T contract was issued for use in 1972. Buyers Guide at 1. Beginning early in 1971, the Forest Service, NFPA and other timber industry organizations, as well as individuals in the timber industry began meeting and discussing revisions to the 2400-6 contract for use nationally. Exhibits 1-5.[3] These discussions and meetings continued through 1971 and 1972.

4. In September 1973, after the extended discussions, and based on experience gained since the 2400-6 and 2400-6T's inception, both forms of the standard contract were revised. *See* Buyer's Guide at 1. It is this 1973 version of the contract, likely with some changes in special "C" provisions of the contract unrelated to the issues in these lawsuits that was executed with the plaintiffs.

5. From its inception, the standard timber sale contract permitted timber sale contractors to operate under extremely generous and favorable terms to the industry. For example, timber sale purchasers could conduct their contract operations with little oversight by the Forest Service. The contract contained no express provisions detailing the rights of the parties in the event a contract needed to be suspended, modified, or terminated to ensure compliance with environmental laws. The contract contained no termination for the convenience of the government or liquidated damages provisions.

---

3 In many instances, the Exhibits to my declaration contain letters between the Forest Service and either timber industry organizations or individual members of the timber industry. The attachments to those letters, draft contract provisions, may not be included in the exhibits to this declaration as some of the documents are quite lengthy. However, where the attachments to the letters contain industry comments or contract provisions at issue in the above-referenced lawsuits, the attachments have been included in the exhibit.

6. The standard timber sale contract essentially remained unchanged for about the first two decades, with timber sale contractors continuing to operate under generous and favorable terms.

7. The relationship forged between the Forest Service and members of the timber industry in the initial development of the 2400-6/6T continued throughout the more than thirty years since its inception. Specifically, over the past thirty years, the Forest Service continued to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. Exhibits 6-17.

8. In the late 1980s and early 1990s, when the Forest Service sought to revise the 2400-6/6T contract to reflect changes in environmental laws, court decisions interpreting those laws, and to protect the government's financial interests, the Forest Service sought input from the timber industry. In particular, the NFPA provided numerous comments on C/C(T)6.01, the contract provision authorizing suspension of plaintiffs' contracts at issue in these lawsuits. Exhibit 14.

9. In its comments on proposed C/CT6.01 dated December 4, 1989, Exhibit 14 (Letter from Frank Gladics to David Hessel), the NFPA stated, among other items, its belief that section (a) of the proposed C/CT6.01 was not necessary as "Contracting Officer's [sic] already have sufficient authority to interrupt operations under B9.3 – <u>BREACH</u> when used in conjunction with other existing environmental protection provisions" and stated that section (a) of C/CT6.01 "should be dropped." Later in May 1990, the NFPA

"acknowledged the [Forest Service's] efforts to modify [C/CT6.01] in response to [NFPA's] earlier concerns." Exhibit 14, May 1, 1990 letter from Frank Gladics, Manager, NFPA to Dave Hessel, Director, Timber Management.

10. The plaintiffs' contracts contain the October 1996 version of C/CT6.01. This version of the provision reads, in relevant part, as follows:

> C6.01 – INTERRUPTION OR DELAY OF OPERATIONS. (10/96) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3, or termination pursuant to C8.2;
>
> (b) To comply with a court order, issued by a court of competent jurisdiction; or
>
> (c) Upon determination of the appropriate Regional Forester that conditions existing on this timber sale are the same as or nearly the same as, conditions existing on timber sale(s) named in such an order, as described in paragraph (b).
>
> . . . .

11. The language in C/CT6.01 (10/96) included in plaintiffs' contracts is similar to the language in C/CT6.01 proposed in June 1990, and upon which members of the timber industry commented. Exhibits 13 and 14. The proposed June 1990 version reads in relevant part as follows:

> C(T)6.01 – INTERRUPTION OR DELAY OF OPRATIONS. (Proposed) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent environmental damage; or
>
> (b) To comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale.
>
> . . . .

12. Members of the timber industry clearly had ample opportunity to, and in fact did, provide input into the provision authorizing suspension of plaintiffs' contracts.

13. While the NFPA may not have fully agreed with all aspects of C/CT6.01 and other provisions proposed for inclusion in the 2400-6/6T contract concerning suspension, modification, termination, and compensation, it is clear the timber industry had ample opportunity to comment on and negotiate the terms of the provisions. NFPA specifically acknowledged the Forest Service's attempts to make changes to C/CT6.01 in response to NFPA's comments. *See* Exhibit 14, December 4, 1989 letter from Frank Gladics to David Hessel ("We appreciate the opportunity we had to discuss the proposed liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did."); *See also*, Exhibit 14, May 1, 1990 letter from Frank Gladics to Dave Hessel (Expressing appreciation for the opportunity to discuss proposed contract provisions C/CT6.01 and others addressing modification, termination, and compensation under the 2400-6/6T contract, and acknowledging that the proposed contract provisions are an improvement over previous proposed versions).

14. Again, prior to revisions to the 2400-6/6T in 2004 to, among other items, further refine the rights of the parties in the event suspension, termination or modification of the contract became necessary for environmental reasons, the Forest Service sought input from members of the industry. The Forest Service

met with members of the NFPA FTPC, and its counsel, Alan Saltman, to receive their comments about the proposed provisions and to consider the appropriateness of making any revisions. When the proposed revisions were made available for public comment, the Forest Service again accepted comments from members of the industry and made appropriate changes based on those comments.[4]

15. After the 2004 revisions to the 2400-6/6T contract were made available for use nationally, the NFPA and other members of the industry sought further revisions. The NFPA also asked that a third party neutral review the contract and render an opinion on whether the contract fairly balanced the risks of contracting between the parties. The Forest Service agreed to hire a third party reviewer and after receiving the reviewer's opinions, issued additional revisions to the contract in 2006.[5]

16. In addition to seeking written comments on the 2400-6/6T from members of the timber industry, the Forest Service has met, over the past thirty years, and continues to meet on at least a bi-annual basis with the NFPA Federal Timber Purchasers Committee and its counsel, Alan Saltman, to discuss the timber sale contract, revisions to it, and other issues effecting timber purchasers' operations on the ground. Exhibit 19.

17. While engaging in dialogue with members of the timber industry about the timber sale contract and issues effecting the timber industry, the Forest Service is careful to ensure its compliance with laws governing the

4 68 Fed. Reg. 70758 (Dec. 19, 2003); 69 Fed. Reg. 25367 (May 6, 2004).

5 71 Fed. Reg. 43096 (July 31, 2006).

formulation of regulation and policy, including the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, and the Federal Advisory Committee Act, 5 U.S.C. App. 2.

18. Based on the long history of collaboration between the Forest Service and members of the timber industry, I respectfully disagree with the plaintiffs' contention that the standard Forest Service timber sale contract and other associated documents were drafted entirely by the Forest Service and that the terms of such documents are not negotiable. The history of the development of the standard timber sale contract is well-documented and demonstrates that members of the timber industry have had ample opportunity to provide and have given significant input into the terms included therein.

19. I declare under penalty of perjury that the foregoing is true to the best of knowledge and belief.

Dated this 23 day of April, 2008.

Richard O. Fitzgerald

Industry - Forest Service Timber Sale Contract Meeting
(2400-6T), Milwaukee, Wisc. Aug. 4-5, 1971

| | | |
|---|---|---|
| Doug Smith | WWPA | Boise, Idaho |
| Bill MacConnachie | NW Paper Co. | Cloquet, Minnesota |
| Ted Meredith | SFPA | New Orleans |
| Henry Haalck | National Forest Products Association | Washington D.C. |
| R. Kirk Ewart | Boise Cascade | Boise, Idaho |
| Jim A. Coon | North West Tbr. Assn. | Eugene, Oregon |
| Richard A. Yankee | Packaging Corp of America | Filer City, Michigan |
| Peter J. Wagner | USFS R-9 | Milwaukee, Wisc. |
| Bernie A. Swift | USFS R-1 | Missoula, Montana |
| Norman O. Nelson | USFS R-9 | Milwaukee, Wisc. |
| William J. Bryan | USFS R-8 | Atlanta, Georgia |
| DeWilton C.Smith | USFS WO | Washington, D.C. |
| John E. Todd | USFS WO | Washington, D.C. |
| Louis M. Gabel | USFS R-6 | Portland, Oregon |
| Robert G. Rue | O.G.C., USDA | Washington, D.C. |
| Lynn Sandberg | Mead Corp. | Escanaba, Michigan |

Exhibit 1

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE

WO

REPLY TO: 2450 Commercial Timber Sale Contracts

MAR 19 1971

SUBJECT: Proposed National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due April 19, 1971

Enclosed are three copies of proposed National C Provisions for use with the 2400-6 contract. We need the benefit of your careful review and comment before we meet with the Federal Timber Purchasers Committee to discuss these draft provisions. The same draft provisions will be sent in a few days to industry's National committee so they also may have adequate time to study them before we meet.

There are three categories of provisions included on the enclosed list:

1. Provisions used previously in 2400-5 contracts, but edited to fit the 2400-6 contract.

2. Provisions in developmental stage for either the 2400-5 or 2400-6 contracts and which have had some previous review in the Regions.

3. New proposals not previously reviewed in the Regions.

Please review all of the provisions, even though little time need be spent on those in category 1. For our mutual convenience, any suggested changes should be handwritten directly on the draft provisions, unless impractical for a complex change. Please return two photo copies of those provisions on which you have indicated revisions.

Although we ask for reply by April 19, 1971, earlier replies will give us more time to assemble your comments and will be much appreciated.

HOMER J. HIXON
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

Exhibit 2

List of National C Provisions Proposed for 2400-6 Contracts

Category

(1) C2.11 - Timber Subject to Agreement (2/71)

(2) C2.3 - Reserve Trees (2/71)

(1) C4.22 - SBA Road Loan Repayment (2/71)

(2) C4.221 - Advance Deposits (2/71)

(2) C4.23 - Refund of Excess Cash (2/71)

(2) C4.25 - Extension Deposits (2/71)

(1) C5.201# - Cooperative Construction (2/71)

(2) C5.202 - Surface Treatment (2/71)

(1) C5.24 - Estimated Cost (2/71)

(3) C5.251 - Difference in Rock Riprap Costs (2/71)

(1) C5.41# - Road Deposits (2/71)

(3) C6.32# - Protection of Reserve Trees (2/71)

(2) C6.71 - Clearcutting Units (2/71)

(2) C6.72 - Group Regeneration Areas (2/71)

(1) C6.82 - Presentation for Scaling (2/71)

(1) C8.64 - Domestic Processing (2/71) (Alternatives A thru E)

(2) C8.71 - Tripartite Land Exchange (2/71)

(2) C8.72 - Bipartite Land Exchange (2/71)

National C Provisions for Use Only in 2400-5 Contracts

C6.86 - Scaling Services (2/71)

National Forest Products Association
1619 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-332-1050

October 12, 1971

Mr. Paul E. Neff
Director
Division of Timber Management
Forest Service, U.S.D.A.
3207 South Agriculture Building
Washington, D.C. 20250

Dear Paul:

At the Denver industry meeting in August, Federal Timber Purchasers Committee discussed the proposed national division C provisions which you sent last July for industry review. Enclosed is a copy of these provisions with industry suggested changes marked in ink.

Copies of national division C5.4 - Road Maintenance proposal, which you sent last June, were forwarded to the appropriate industry committees for their comments and suggestions. This proposal was not reviewed at the Denver meeting, since some regional contract committees were redrafting this C provision for regional use. We would appreciate, however, receiving a copy of your latest revision of this national division C provision on road maintenance, so that industry may have an opportunity to review it.

Please send us a national division C provision card for C4.224 (9/71) and C6.81 (8/71). Also, I asked Bill Settle to see whether it was possible for the Federal Timber Purchasers Committee to receive a complete set of each Forest Service Region's regional division C provision cards. Region 1 is the only one that has sent us their C provisions for form 2400-6 timber sale contracts.

Sincerely,

Henry G. Haalck
Forester

Exhibit 3

Enclosure

Alaska Loggers Association • American Institute of Timber Construction • American Plywood Association • American Walnut Manufacturers Association • American Wood Preservers Institute • Appalachian Hardwood Manufacturers, Inc. • California Redwood Association • Canadian Wood Council • Fine Hardwoods Association • Hardwood Dimension Manufacturers Association • Hardwood Plywood Manufacturers Association • Maple Flooring Manufacturers Association • National Oak Flooring Manufacturers Association • National Particleboard Association • National Woodwork Manufacturers Association • Northeastern Lumber Manufacturers Association, Inc. • Northern Hardwood and Pine Manufacturers Association, Inc. • Red Cedar Shingle & Handsplit Shake Bureau • Southern Cypress Manufacturers Association • Southern Forest Products Association • Southern Hardwood Lumber Manufacturers Association • Western Wood Products Association

WO-C5.111
(7/71)

C5.111# - Right-of-Way Reversion (7/71). Rights-of-way for the following listed roads will revert to the Grantor unless the roads are constructed prior to the dates shown:

| Road No. | Grantor | Reversion Date |
|---|---|---|

Purchaser shall ~~Substantially Complete~~ have initiated construction of Specified Roads needed by Purchaser on the above rights-of-way before the reversion dates. If rights-of-way revert because of Purchaser's failure to ~~Substantially Complete~~ Initiate construction of roads prior to the reversion date, Forest Service shall obtain new rights-of-way. Unless Purchaser's failure was caused by circumstances which would qualify for a Contract Term Adjustment, Purchaser shall reimburse Forest Service for costs incurred, and delays or interruptions caused by reversion of the right-of-way shall not qualify Purchaser for a Contract Term Adjustment.

---

Instructions: Include in new contracts if any right-of-way has a reversion date prior to Termination Date. Include by modification when Contract Term Extension or Contract Term Adjustment establishes a new Termination Date later than any right-of-way reversion date and the involved roads have not been ~~Substantially Completed.~~ Adequate time, a minimum of one year, shall be available for construction prior to reversion dates.

WO-C5.12
(7/71)

C5.12 Use of Roads by Purchaser (7/71). Unless agreed otherwise, Existing ~~temporary or permanent~~ roads where Purchaser's use is prohibited or subject to restrictive limitations are identified on Sale Area Map by the following codes:

| Code | Use Limitations |
| --- | --- |
| X | Hauling prohibited |
| R | Hauling restricted |
| U | Unsuitable for hauling prior to reconstruction |

Unsuitable roads (code U) shall not be used for hauling until completion of agreed reconstruction work.

Purchaser's use of restricted roads (code R) shall be limited by restrictions and for the reason stated in the attached Restricted Road List.

---

Instructions: Include in contract when limitation of road use is necessary for the reasons described in B5.12. Note reference to Sale Area Map. The Restricted Road List, to be inserted in the contract ahead of Road Specifications, will be prepared in the following format:

Restricted Road List (C5.12)

| Road | | | Description of Restrictions | Reason |
| --- | --- | --- | --- | --- |
| No. | Name | Termini | | |
| | | | | |

WO-C5.121#
(7/71)

C5.121# - Road Reconstruction Deposits (7/71). Unless agreed otherwise, roads listed below shall not be used for log hauling prior to completion of reconstruction by Forest Service. Purchaser shall be authorized to use such roads by making deposits under Public Law 88-657 for reconstruction on the following schedule:

| Road No. | Termini from - to | Schedule of Amounts to be Deposited | Date Reconstruction will be completed ~~Approx. Period of Time Needed to Reconstruct (days)~~ |
|---|---|---|---|
| (3N24) | (0+00-25+00) | ($5,000 by Sept.10, 1971) | (25 days; expected completion date - Oct. 5, 1971) |

Any deposits unexpended for such reconstruction shall be retained by Forest Service.

Instructions: Use this provision when Forest Service (either by force account or by contract) will perform needed reconstruction, such as replacement of surface rock on an existing road. Not to be used to replace surfacing on roads where replacement deposits ~~(maint.)~~ have been collected for the same purpose.

C5.3 - Purchaser Credit Computation (7/71). When Purchaser performs Surface Treatment if provided elsewhere herein or makes deposits for road reconstruction under C5.121, Forest Service shall credit Timber Sale Account each month as such work proceeds or as such deposits are made. Crediting of Timber Sale Account for deposits for road reconstruction or for share-cost roads shall be in the full amount of such deposits, notwithstanding B5.3.

---

Instructions: Required when other provisions of the contract provide for Surface Treatment or deposits for share-cost roads or road reconstruction.

C6.71 - Assistance in Slash Burning (7/71). If Forest Service requests, Purchaser shall furnish equipment and equipment operators to assist in preparation for slash burning at agreed times prior to the normal slash burning season in the area.

Purchaser shall furnish equipment and equipment operators for burning and mop-up when requested. The amount and kind of equipment requested shall be that normally used in slash [~~disposal work~~] burning and reasonably available under the existing equipment organization of Purchaser. Forest Service shall reimburse Purchaser for such work at rates [~~for~~ ~~firefighting~~] common in the area. or at previously agreed rates.

---

Instructions: For optional use when it is anticipated that Purchaser's assistance in preparation or burning will be needed. Purchaser's assistance should not be requested if Forest Service can reasonably accomplish the job by either force account or contracting.

C6.84 - Accountability (7/71). Purchaser shall not place products in storage for deferred Scaling, except when agreed under C6.82, until an accountability system has been agreed in writing for a stated period.

---

Instructions: To be included in all contracts where there is a possibility of deferred scaling. This provision supplements but does not replace B6.84. Pending development of a new log accountability system, the agreement should specify use of the system provided in B6.84. The agreement should last no longer than one logging season so that a new accountability system may be implemented promptly after development.

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE

WO

REPLY TO 2450 Sale Contracts and Permits NOV 2 1971

SUBJECT: National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due November 22, 1971

This is to bring you up to date on the status of several National C provisions and to invite your comments on other provisions still in the proposal stage.

For proposed National C provisions, our normal procedure is to obtain Regional review and then establish a Servicewide position before proposals are sent for industry's review. When timing is critical, we may depart from that procedure, as we did when we issued C4.224 and C6.81 following resolution of the deferred scaling-payment bond controversy.

Three groups of provisions are enclosed as follows:

1. Previously reviewed provisions which we are approving for use now. Cards will be sent as soon as printed.

C4.228 - Performance Bond as Security for Felled Timber (10/71). This is similar to the sample Regional provision C4.221 shown in FSM 2432.42a. The number was changed because it conflicted with C4.221 (2/71) and defined terms were capitalized.

C5.12 - Use of Roads by Purchaser (10/71). The draft dated 7/71 was edited for clarity, but no change in intent. Regions 1 and 5 suggestions are more proper as Manual instructions, which we will do.

C5.3 - Purchaser Credit Computation (10/71). Phrase added in first sentence to include deposits for share-cost roads. No other change from the 7/71 draft.

2. Revised proposals which need further review by you and industry before issuance:

Exhibit 4

C5.111# - Right-of-Way Reversion (11/71). This is changed considerably from the 7/71 draft as a result of advice from the Division of Lands and the Office of the General Counsel. The provision now serves primarily to put the purchaser on notice, but gives incentive for construction because of the limitation on contract term adjustment. The Manual will contain further guidelines on the use of this provision and will state that right-of-way extension will be at Forest Service expense unless the purchaser desires to speed the process through his payment of the costs.

C5.121# - Road Reconstruction Deposits (11/71). Edited to consider Regional and industry comments. Last sentence of instructions to be incorporated in the Manual. Although the intent is not really changed, we believe you should see this provision again before it is approved.

C6.71 - Assistance in Slash Burning (11/71). Next to last sentence changed. In last sentence, industry suggested that rates not be tied to firefighting rates. Since this provision, in effect, provides for an unadvertised service contract, rates must be established in advance by terms of the timber sale contract. However, the Manual will explain that rates used in the appraisal will reflect actual rates paid by industry for such work.

C6.81 - Scaling Services (11/71). This is a revision of the 8/71 provision, based on suggestions by Region 5. Broadened to provide for discontinuance of scaling at any site when standards are not met.

3. New proposals. Not sent to industry, as we need your comments first.

C7.4 - Negligence in Prevention or Suppression (11/71). Sent to you on October 19, but included here to completed this package.

C3.12 - Rates After Scheduled or Emergency Rate Redetermination (11/71) and C3.15 - Rates When Contract Term Extended (11/71). These two proposals relate to 2400-5 contracts modified to reduce resource or environmental damage, but would be used only when such modifications cause reduction in stumpage rates. One intent (C3.12) is to protect the price differential (determined by the "before and after" modification appraisals) in event scheduled or emergency rate redetermination indicates rates below base rates. In sales with little or no bid premium, such protection may not be possible because rates

may never go below base rates. The other intent (C3.15) is to restore bid premium rates, up to original levels, to the extent rates may be increased by extension appraisal. For contracts having scheduled rate redeterminations, both provisions would be used. Other sales would use only provision C3.15.

We will appreciate your comments by November 22, or earlier if possible. We want to summarize your replies before our San Francisco meeting, December 7-9.

for PAUL E. NEFF
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE
WO

REPLY TO: 2450 Sale Contracts and Permits DEC 28 1971

SUBJECT: National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due January 21, 1972

In consideration of our discussions in San Francisco, December 7-9, the following National C provisions are enclosed and approved for use at this time. Cards will be sent later.

C4.228 - Performance Bond as Security for Felled Timber (12/71). This supersedes provision dated 10/71.

C5.3 - Purchaser Credit Computation (12/71). Supersedes provision dated 10/71.

C5.111# - Right-of-Way Reversion (12/71). New provision.

C5.121# - Road Reconstruction Deposits (12/71). New provision.

Because the following provision is considered to be an unnecessary amplification of B6.81, it is canceled and should be removed from your card sets:

C6.81 - Scaling Services (8/71).

The enclosed C5.12 - Use of Roads by Purchaser (12/71) is a revision in accordance with our discussions. We agreed to provide you more time for study and comments. Please let us have your suggestions by January 21, 1972. At the same time please send any further comments you may have on the following proposals which were sent to you with our November 2 letter:

C7.4 - Negligence in Prevention or Suppression (11/71).

C3.12 and C3.15. Two proposals for 2400-5 contracts which are modified for environmental reasons.

Exhibit 5

As agreed, C6.71 - Assistance in Slash Burning (11/71) will not be issued as a National provision. Regions will issue a similar provision to meet Regional needs.

PAUL E. NEFF
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

**SUMMARY NOTES - STAFF MEETING**

9:00 a.m., November 23, 1987

Director's Office

Norm Sears attending for Strickland

**General Discussion:**

Wilcox: The Regional Engineers Meeting was excellent. The formal presentations the first day set the stage. The next two days were devoted to open discussions which resulted in an identified list of follow-up actions which we will share with the Regions in a few days. The Technology and Development people from both Centers did an excellent job.

On November 18, the Forest Service Seminar entitled "Alternative Road Building Strategies" was presented by Joel Holtrop, Chuck Blomdahl, and Gary Marple, was well received. It was standing room only in the South Building.

Buster LaMoure, Director of M&GM, advised us that he was working with MTDC to develop and construct a Lime Injector machine for use in strip mine reclamation.

Peg let us know that she made it to the South Building without any hitches.

Today is Vivian's first day as Peg's replacement. Glad to have her in the job. We have asked her to cover two jobs (her new one and her previous one in Reed's shop) until we find her replacement.

Schwarzhoff: A meeting between the Forest Service and the Federal Timber Purchaser Committee was held on November 9 regarding the timber sale contract revision process. A new time table has been established. A copy is enclosed. [redacted]

The National Transportation Development and Geotech Workshops are now going to be held in Eugene, OR, February 29-March 3. This is a change in place, from what we told the Regional Directors at San Dimas (they were going to be held in Washington, DC).

George Lippert had an excellent Functional Performance Evaluation trip to the Southern Station last week. The timing of the trip was important as the SO/SE Station Engineer is retiring January 2. Trip travelers included: SO Assistant Director, Wayne Hunt; R-8 Assistant Director of Engineering, Jim Milner; and SO/SE Station Engineer, Glen Brittian.

On Tuesday, November 24, George Lippert and Suzanne Buntrock will attend the USDA Radiological Safety Committee Meeting. The purpose of this meeting is to discuss Agency activities regarding radon and whether or not a USDA-wide monitoring program is warranted.

Exhibit 6

University of Wisconsin short course - "Inspection, Evaluation, Maintenance and Repair of Wood Structures. Tentative plans have been completed for a joint training session with U.S. Army Facility Engineering Support Agency (Ft. Belvoir) at Madison, WI, March 22-23. This session will be video taped for later distribution within our Facility Training Library. Twenty pre-paid trainee slots will be available to FS field personnel for "live" audience. More information to come later.

Sears: During the week of December 7, a follow-up meeting is scheduled with Research, Lee Northcutt, and Dick Silberberger on action items from a joint Research/Technology and Development meeting held last summer in Missoula.

Reed: House and Senate are on Thanksgiving recess this week. They will be back on Monday, November30 and we are expecting conference action on our appropriation either Tuesday or Wednesday.

We have received most the Regional ROADS spreadsheets and States reports and have been evaluating and validating the data for use in the FY 1987 Report of the Forest Service. So far, the spreadsheet program is working smoothly at our level.

On Wednesday and Friday, both Mike and I will be on annual leave. Be back in the office on Monday, November 30.

OMB Marks for FY 1989 will be in after the first week of December.

STERLING

November 23, 1987

FOREST SERVICE POSITION PAPER
ON
TIMBER SALE CONTRACT REVISION
POLICY ISSUES

This is the Forest Service response to Industry's position paper submitted at the FTPC meeting in San Francisco on November 9, 1987.

1. Treatment of Purchaser Credit:

Forest Service Position - Maintain the current concept of purchaser credit with regard to availability for use in payment for stumpage above base rates and transfer-in limits. Changes proposed by FTPC would require legislative action to amend the Forest Roads and Trails Act of 1964.

FTPC Position - Modify existing purchaser credit definition to make all earned effective purchaser credit equivalent to cash. Remove the transfer-in limit of earned purchaser credit and permit withdrawal of purchaser credit at anytime during the contract period. Provide for refund of unused purchaser credit if there are no sales to transfer it to.

FTPC further contends that 16 USC 535, which amends the FR&T Act, does not prohibit the changes proposed in their wording.

Forest Service Reasoning - Purchaser credit or road amortization has always been limited toward application to stumpage payments in excess of base rates. ...63 the Worrel Commission recommended and the Forest Service agreed to e...inate the "accelerated amortization" concept and use the "gross stumpage" (ie: stumpage plus roads) in advertizements and bids. Sales prior to this period under the 2400-2 timber sale contract provided for stumpage payments to be be adjusted by a formula consisting of road amortization rate deficit, base rates, and tentative rates. Depending upon the particular sale, it was common for the purchasers rates not to increase during the contract period due to the road amortization rate deficit and therefore not recover the full cost of road construction.

This concept was evidenced in the legislative history of the drafting of the Forest Roads and Trails Act of 1964. In 1965 the Forest Service issued the 2400-5 timber sale contract with purchaser credit being available only for stumpage in excess of base rates. This contract form did not define "effective purchaser credit". Subsequently, the 7/70 and 9/73 versions of the 2400-6 contract were published and Effective Purchaser Credit became a defined term in B4.21. Although not specifically defined in the law, the amendment to the FR&T Act in 1975 provided for purchasers to transfer-in "unused effective purchaser credit" up to a specified limit. This limit was specifically set to protect the base rate value and subsequently included salvage sale funds. Effective purchaser credit in the law was recognized as that definition included in the existing Forest Service contracts.

The Forest Service does not agree with the proposals provided by the FTPC subcommittee due to the required legislation necessary to implement them. This concept is outside the scope of the revision process.

Exhibit 7

2. Down Payment:

Forest Service Position - The Forest Service has included the existing Division C Provision C4.220# in response to the requirements of the Federal Timber Contract Payment Modification Act (16 USC 618(d)).

FTPC Position - The subcommittee has recommended language which would permit use of government securities to be used in lieu of cash to satisfy the down payment requirement.

Forest Service Reasoning - The FTPC wording is currently prohibited by statute and therefore is outside of the scope of the contract revision process.

3. Debt Collection Act:

Forest Service Position - Language implementing the requirements of the Debt Collection Act of 1982 has been included. Offset procedures are included in the draft language.

FTPC Position - Remove language pertaining to the Debt Collection Act and let each contract stand on it's own.

Forest Service Reasoning - The Forest Service is bound to implement the r---irements of the Debt Collection Act of 1982. The United States Claims , has ruled that the DCA does not cover intra-contractual disputes (AVCO C. ,ortation vs United States, No. 14-85C, dated August 19, 1986). The Administrative offset provisions do apply to claims that arise: a) Under a contact that is separate from the contract in which offset is taken; b) From a noncontractual source outside of the contract in which offset is taken.

The offset procedures are therefore required. Debts due the United States may generally be offset against any amounts held by the Forest Service pending payment or refund to the debtor. The following items, however, are usually not available for administrative offset: a) Cash, negotiable securities, letters of credit, or assigned savings accounts furnished to secure bid, payment or performance bonds; b) Advance payments under timber sale contracts that are not available for refund as excess cash as defined in the contract; c) Effective or ineffective purchaser credit; d) Any other payment by the debtor for a specific purpose or account.

FTPC's contention that use of offset procedures could possibly cause a purchaser to default on the sale being offset against is unfounded due to the restrictions indicated above.

4. Safety:

Forest Service Position - Safety is a responsibility of both parties to the contract. Forest Service should not place purchaser in a position which would create an unsafe situation.

Position - Include language which would identify Forest Service ı .onsibility for safe operations.

.st Service Reasoning - Language needs to be drafted which would provide for prompt resolution of purchaser safety concerns. Forest Service should not be so inflexible as to jeopardize a safe working environment for the purchaser. Compensation for such additional work will be handled through the existing contract provisions.

5. Eco-terrorism:

Forest Service Position - Forest Service has included vandalism to included timber and has assumed liability for loss in value.

FTPC Position - Include language which covers acts of terrorism which causes damage to timber, equipment, of threatens human life.

Forest Service Reasoning - Forest Service recognizes this as a problem in isolated situations. Due to the unforseen nature of this activity it does not appear that the entire risk should be assumed by the Forest Service. The parties must work together to resolve these occurances and likewise share in the cost of investigation. Compensation to the purchaser seems reasonable for time lost in investigation. In areas of known or potential terrorism this appears to be a legitimate appraisal item for security patrols or other measures and not necessarily a contractual problem. It is doubtful that it is common practice for industry to be afforded this type of protection and warrantee when operating on private lands.

:quitable Compensation Provisions:

Forest Service Position - Language has been proposed which would provide for cash credits, increased purchaser credit limits, and contract term adjustment due to changes in anticipated road construction needs. Certain compensation is afforded the purchaser when changes are made by the Forest Service. Flexibility is provided through contract modification in addressing changes which were not recognized by either party at the time of contract award.

FTPC Position - Provide language which would provide for compensation of time and money when Forest Service requires changes in contract requirements that were not contemplated by either party at the time of bid formation. Eliminate the use of net ineffective purchaser credit.

Forest Service Reasoning - The Forest Service appraises each timber sale on the premise that the work can be reasonably performed by an operator of average efficiency. There are no warrantees as to the volumes and values expected to be experienced by the successful bidder. FTPC's contention that conditions which were not contemplated by either party, and requiring modification, nullify the original bid formation is incorrect. No matter how carefully the sale is planned, the need for adjustments or modifications usually arise. The bidding reflects the anticipated values of the offering in the market place. Errors discovered after award of the contract and unknown to either party are acknowledged as mistakes. Such mistakes are not a basis for contract reformation as the agreement entered into originally continues to exist. Modifications work both ways and are entered into mutually and if appropriate, compensating adjustments.

Forest Service proposed language provides for compensation in numerous provisions for changes brought about through the normal operations of the contract. The Forest Service proposes to make a cash credit to the purchaser's account for changes brought about during the construction of Specified Roads which would not be compensated for due to an increase in net ineffective purchaser credit. Contract Term Adjustment would be granted in accordance with B8.21. Further, there are other provisions which provide for compensation to purchaser for actions taken by the Forest Service for environmental protection.

7. Extension Policy:

Forest Service Position - Forest Service intends to utilize the existing Chief's extension policy with minor modification for volume removal requirements.

FTPC Position - Change proposed language to accomodate revised volume estimates as a basis for determining diligent performance, eliminate requirement for meeting the road completion date, and to provide for actual cost payments for remarking and boundary establishment.

Forest Service Reasoning - Forest Service proposes to include a measure of area cut over in addition to volume removed as a measure of diligent performance.

Road completion dates are required by section 14i(2) of the National Forest Management Act of 1976. Road completion is a measure of diligent performance ould conceivably not be met at time of request of extension. Road completion dates may be adjusted to meet the approved plan of operations.

Purchasers will enter into a collection agreement to cover the cost of remarking and boundary reestablishment. The initial payment required before extension shall be for the estimated cost of such work and may be adjusted up or down based on actual costs.

8. Extended Contract Term AdjustmentsL

Forest Service Position - The Forest Service believes there is merit in providing relief to purchasers when extended interuption occurs and will pursue appropriate language. Federal Register notice published 11/6/87 addresses handling of down payment when interruptions occur.

9. Extraordinary Adjustment:

Forest Service Position - Provision language addresses delays experienced by the purchaser due to loss of primary processing facilities. CTA's will be granted for interruptions in planned operations.

FTPC Position - Proposes to provide for CTA for all timber sales within the tributary area regardless of the Normal Operating Season. Delays on private timber contracts would result in subsequent CTA for Forest Service sales.

Forest Service Reasoning - The draft language does not provide for CTA outside the Normal Operating Season. Contract Term Adjustment is provided for interruptions in planned operations and not on a blanket basis for all sales. It is recognized that there is a "pipeline" effect on timber removal from other

...er sales when manufacturing processes are interrupted. FTPC language provides for granting CTA when interruptions occur on sales on non-Forest Service lands and is not appropriate.

10. Threatened, Endangered, and Sensitive Species:

Forest Service Position - Forest Service language includes Sensitive species as possible indicators for the need to environmentally modify the contract.

FTPC Position - Require only federally listed Threatened and Endangered species to be protected under the timber sale contract.

Forest Service Reasoning - Forest Service is bound by the National Forest Management Act to provide protection for these species.

11. Contract Termination and Compensation:

Forest Service Position - Language is provided which permits modification to delete certain requirements of the contract, including portions of the sale area. Forest Service may terminate the entire contract under certain circumstances due to purchaser's actions. Termination may also occur by mutual agreement or by the purchaser when certain gates are met. Provisions are made to compensate the purchaser for certain items as a result of the terminination or modification action.

... Position - FTPC proposes language to address termination in whole or in p... Purchasers should be afforded the option of termination when the modification substantially affects the original offering. Compensation is expanded to include all costs incurred for abandonded work and severance fees for subcontacts.

Forest Service Reasoning - Partial termination as proposed by FTPC is currently handled as a modification, which requires mutual assent. Compensating adjustments to stumpage rates will be made through a rate redetermination and the estimated cost of waived work will be credited to the Timber Sale Account. In the event of environmental modification, the purchaser should be given an opportunity to elect to terminate the contract if certain gates are met. The FS revision committee is preparing language which would be similar to that established for catastrophic damage.

12. Operating Plans and Schedules:

Forest Service Position - Existing Division C language has been incorporated in the proposed draft. These requirements are established by NFMA.

FTPC Position - FTPC proposes to eliminate the requirement that the FS approve the plan of operations and that the operating schedule be in substantial compliance with the plan of operations.

Forest Service Reasoning - The requirement for operating plans is established b... the NFMA of 1976. Diligent performance for the purpose of extension or term ...tment is predicated on the plans and schedules.

Results of the Executive Meeting with George Leonard, Lamar Beasley, Dave Hessel, and selected FTPC representatives on December 4, 1987. Actions decided shown in bold type below.

PURCHASER CREDIT

FTPC DOES NOT DISAGREE WITH THE CONCEPT OF INEFFECTIVE PURCHASER CREDIT, HOWEVER, THEY WANT TO BE COMPENSATED FOR THE INVESTMENT BEING CONSTRUCTED.

REMOVE TRANSFER IN LIMITS:

**We will review the need for the limits. The reasons that the limit was established was to protect the returns to the counties. The basis may now have changed.**

LET SSF SALES TRANSFER PC:

**We will prepare FSH/FSM language to not collect all SSF $ and thereby make some PC available for transfer.**

REFUND UNUSED EFFECTIVE PC:

**PC is a creature of the TSC. Although we have stated that PC is equivilant to cash for purposes of stumpage payments, in actuality it is not cash. We will not consider this in the revision.**

DOWN PAYMENT

WANTS TO USE GOVERNMENT SECURITIES FOR DOWN PAYMENT.

USE OF GOVERNMENT SECURITIES:

**We are bound by the law in this case. Use of Government securities is not acceptable.**

USE OF PC FOR DOWN PAYMENT:

**We streached the interpretation to include PC as an acceptable form of down payment. We will keep this option available to purchasers.**

DEBT COLLECTION/OFFSET PROCEDURES

WHAT ARE THE FUNDS THAT CAN BE OFFSET AGAINST? DO WE NEED TO SPELL OUT IN THE CONTRACT?

POLICY ON USE OF FUNDS:

**Our objective is to prevent FS refund of surplus monies when the purchaser owes monies elsewhere. We will work with OGC to clarify language in the contract.**

SAFETY

IS FS RESPONSIBILITY TO PROVIDE FOR A SAFE WORKING ENVIRONMENT.

LANGUAGE TO EXPIDITE RESOLUTION:

**We will pursue language to expidite resolution with OGC.**

COMPENSATION TO PURCHASER:

**We will not provide compensation outside of existing provisions.**

ECO-TAGE

FTPC NEEDS AN ENCENTIVE TO HARVEST DAMAGED TIMBER.

DEVELOPE PLAN BETWEEN PURCHASER AND FS:

**We will develope language which will provide for a plan to be developed if eco-tage occurs. There will be no specified liability beyond title to damaged timber. As appropriate, we will provide appraisal estimates.**

COMPENSATION TO PURCHASER:

**Not thru the TSC but thru the plan/agreement indicated above.!**

EQUITABLE COMPENSATION

:DE REASSURANCE THAT ORDERED DESIGN CHANGE IS USED SPARINGLY. NEED TO h...EW WORDING ON CASH CREDIT FOR INCREASED IPC TO PROVIDE FOR ANY INCREASE.

REWORD COMPENSATION FOR IPC:

**We have addressed the concerns in the draft TSC. Need to review one more time.**

EXTENSION POLICY

FTPC WANTS CHANGE IN DILIGENT PERFORMANCE FOR ROAD COMPLETION DATE DUE TO IRREPARIABLE BREACH.

FAILURE TO MEET ROAD COMPLETION DATE IS TERMINATION OF TSC:

**Failure to meet road completion date is irremedial breach of the contract, unless adjusted by modification. This date is important, similar to periodic payment dates. We will provide direction to RF's on enforcement.**

ROADS MUST BE COMPLETED AS A CONDITION OF RIGHT TO EXTENSION:

**This will be dropped from our language and FSM policy.**

EXTENSION POLICY (CONT)

OF EXTENSION:

**We will address this in FSM language as to the sideboards to be used in establishing the costs.**

EXTENDED CTA

COMPENSATION FOR EXTENDED CTA DUE TO FS APPEAL, T&E, etc., IN DOWN PAYMENT, INTEREST, ESCALATION, AND LOST MARKETS.

DOWN PAYMENT:

**Regulations will be modified to provide use of guarantees.**

LOST MARKETS, ESCALATION AND OTHER COMPENSATION:

**We will consider a process for reimbursing the purchaser for out-of-pocket expenses as a result of FS request to delay. (ie: move-in/move-out costs)**

EXTRAORDINARY ADJUSTMENT

TAKE INTO ACCOUNT THE PIPELINE EFFECT ON OTHER SALES.

EARLY EXTENSION:

**T--- is under our current direction.**

P... LINE EFFECT:

**We will review. We may want to establish a gate "a percentage" of a purchaser's portfolio which has been affected and thereby qualify for CTA.**

T&E AND SENSITIVE SPECIES

HANDLING OF SENSITIVE SPECIES AS A CAUSE FOR ENVIRONMENTAL MODIFICATION.

DISCOVERY OF NEW SENSITIVE SPECIES:

**We must specify the measures to be taken in the planning stages of the TSC. Adjustments should be handled thru environmental modification. We do not need to define sensitive species in the TSC.**

CONTRACT TERMINATION AND COMPENSATION

PROVIDE FOR COMPENSATION TO PURCHASER FOR PARTIAL TERMINATION IN ADDITION TO RATE REDETERMINATION AND COST OF WORK ABANDONED.

COMPENSATION FOR TIMBER DELETED:

**Cost of replacement timber is reflected in hte Rate Redetermination. Reimbursment for work accomplished is appropriate. No compensation for lost p---its.**

CONTRACT TERM. AND COMP. (CONT)

:PT OF ORIGINAL SALE PREMISE:

:annot make the process too simple because the pressure to change will become too great. We will pursue a gate similar to catastrophic damage, whereby the purchaser may opt to terminate the contract. Try to make it simple and not another process. Need to look at the before and after appraisal to see if this is a true indicator of the value loss as a result of modification.

OPERATING PLANS AND SCHEDULE OF OPERATIONS

DO NOT TIE SCHEDULE TO PLAN OF OPERATIONS. SUBSTANTIAL COMPLIANCE IS ASSURED BY PERIODIC PAYMENTS, DOWN PAYMENTS, etc..

ELIMINATE SUBSTANTIAL COMPLIANCE:

We will eliminate the third paragraph of B6.311.

# TIMBER SALE CONTRACT REVISION

The Federal Timber Purchasers Committee and Forest Service agreed to the following plan of action to complete the timber sale contract revision process.

1. NFPA Contract Revision Subcommittee will complete it's white paper on the thirteen policy issues which outlines specific reasoning for the proposed changes included in the industry 7/87 contract draft. The Forest Service will receive the industry white paper by November 20.

2. The Forest Service will provide a written response to industry's white paper prior to a meeting between industry representatives and the Forest Service Chief and staff. The Agency white paper will describe it's reaction to industry's position on the thirteen policy issues.

3. Industry representatives and the Forest Service Chief and staff will meet in early December to resolve the thirteen policy issues. The meeting will focus on the policy level issues, not specific contract provision wording.

4. The Forest Service contract drafters will begin to incorporate the concepts agreed upon with industry the 2nd week of December. Copies of the completed draft will be made available to all Forest Service offices for in-service review during mid-December thru January.

5. Industry will provide the Forest Service with written proposals to modify the Agency's draft 2400-6T timber sale contract by December 31.

6. During the Agency drafting process, industry representatives will be given the opportunity to review provision working to ensure the Agency's contract draft clearly reflects the agreed upon concepts. A meeting of industry, Forest Service, and OGC representatives will occur in late January to resolve and draft provision language where conceptual agreement can be reached.

7. With the conclusion of the process outlined above the remaining issues will be available to be addressed through the publication of a notice in the Federal Register that the Agency updated draft timber sale contracts are available for public comment. It is anticipated that the notice will be published during March 1988.

Exhibit 8

PROVISIONS REMAINING TO BE RESOLVED 12/87

THE FOLLOWING IS A LISTING OF THE REMAINING PROVISIONS WHICH STILL NEED TO BE RESOLVED. THIS WILL BE THE FOCUS OF OUR DECEMBER 8-10 REWRITE HERE IN WASHINGTON, DC.

| Reference Number | Title |
|---|---|
| B2.6 | Volume Estimate<br>REVIEW: Need firm OGC decision as to how to best handle the implied warrantee disclaimer. |
| B3.1 | Current Contract Rates<br>REVIEW: We have incorporated a listing of all Other Contract Charges in Division A. Need to look again at the logistics of what we have done to Div. A. |
| B3.31 | Rate Redetermination for Environmental Modification<br><br>REVIEW: Need to look at compensation for increased ineffective purchaser credit as a result of modification or for work abandoned. |
| B3.41 | Material Not in A2<br>REVIEW: Is the flexibility and intented to permit removal of material not subject to the terms of the contract clear? |
| B4.223 | Purchaser Credit as Deposits<br>REVIEW: Should we pursue wording which provides for cash payment for unused purchaser credit which cannot be transfered to other sales. Does this require legislation? |
| B4.25 | Periodic Payments<br>REVIEW: Is the wording coordinated with the current Federal Register proposal? Do we need to revise the wording or the mechanics of periodic payments? Can we leave essentially as is and plan to issue a C provision when the dust settles? |
| B5.2 | Purchaser Road Maintenance<br>REWRITE: Include definition of pre-haul maintenance in glossary and wordsmith provision. |
| B5.52 | Construction Staking<br>REVIEW: Need to look at how purchaser is to be compensated if purchaser assumes staking responsibility. This looks more like a coop-agreement rather than an ordered design change. |

B5.54 thru B5.545 — Construction Cost Adjustments

Pricing and Payment for Physical and Design Change
REVIEW: Look at wording of these provisions and clean-up. Is FS proposal inadequate to address industry concerns about compensation for increased time or funding?

B5.62 — Road Completion Dates When Purchaser Elects Forest Service Construction
REVIEW: FS failure to provide access in a timely manner could provide relief for delay including cost of holding down payment, performance guarantees, etc.. Follows after concept of extended CTA at FS request (B8.21).

B6.33 — Safety
REVIEW: Need to pursue language for expidited resolution of purchaser saftey concerns.

B6.421 — Temporary Roads, Landings, and Skid Trails
REVIEW: Temporary road needs to be resolved.

B8.12 — Liability for Loss
REVIEW: I think this is resolved, but let's go over it one more time.

B8.21 — Contract Term Adjustment
REVIEW: Need to look into the extended CTA concept. FS has recently published some relief due to delays prior to meeting the down payment volume requirements in the Federal Register. Do we need to follow up on bonding requirements, changing market conditions, etc.?

**B8.211 — Extraordinary Adjustment.**
REVIEW: This whole concept needs to be reviewed. FTPC has argued that the "pipeline" effect on other sales is significant. Further, how are we to treat purchasers who are non-manufacturers? Do we want to pursue?

**B8.212 — Market Related Term Adjustment**
WRITE: Forest Service published a proposed rule in the Federal Register on November 6, 1987. Need to draft proposed language.

B8.221 — Conditions for Contract Term Extension
REVIEW: Is proposed wording clear as revised?

B8.3 thru B8.33 — Contract Modification

Modification or Termination for Catastrophe
REVIEW: Look at need to revise language to provide for safety of purchaser; provide for purchaser termination for environmental modification; and moving termination into B9.5.

B9.11 thru B9.121 Performance Guarantee

Blanket Payment Guarantee
REVIEW: Need to check with Financial Security work group.

B9.41 Failure to Cut
REVIEW: Need to review simplification of damage determination. Average bids received or determination by appraisal rather than resale needs to be finalized.

B9.5 thru B9.53 Contract Termination

Other Contract Termination
REVIEW: Need to look at concept of termination by purchaser for environmental modification, etc..

//////////////////////////////////////////////////////////////////////

ADDITIONAL AREAS TO BE REVIEWED

1. Glossary terms need to be finalized.

2. Divisions A and AT need to be reviewed.

3. Division C and CT provisions need to be finalized.

4. Training packages for new and experienced sale administrators and engineers.

Steve: I have gone through the draft, one more time. Following are a few of the notes I took. We may want to discuss some of these items next week in addition to the list you sent out.

B3.44 - The reference to B2.132 should be changed to B2.42.

B3.46 - This provision refers to timber that is "damaged or lost" because of Abnormal Delay. I believe this should be changed to "damaged, lost or stolen". I believe that it is our intent to hold the purchaser liable for all loses that result from Abnormal Delay, including theft by firewood cutters. It would be easier to add the word theft at this time, rather than to try to argue later on that lost means or includes theft.

B4.4 - Are the 1st and 3rd sentences in conflict? The 1st sentence states that interest shall be assessed on any payment not received within 15 days. The 3rd sentence states that if payment is not made in 30 days interest shall accrue from date of issuance. I had understood that a bill would be due 15 days after issuance and it would be a breach not to pay it then, but interest would not be charged if it was paid within 30 days. If this is the case, is it correct to say that interest shall be assessed on a payment not received in 15 days?

B5.4, B5.541, B5.546, and B5.8 - We have retained similar language to that used in B5.21 of the 9/73 version when we refer to "estimating procedures used in preparation of Schedule of Items" and "estimating procedures in effect at the time of the adjustment". I think we should add after procedures "and unit prices" or "unit costs", since what we are really trying to say is that we are going to use prices or costs that were effective at a given time and not necessarily just follow a procedure.

B5.546 - This provision deals with pricing and payment for physical changes, design changes and differing site conditions. In the last paragraph it states that we will pay cash for ineffective PC caused by physical change or ordered design change. Was it the intent that we are not going to pay cash for ineffective PC resulting from differing site condition?

B5.62 - The reference to C2.322 should be C2.32.

B6.22 - The reference to C6.221 should be C6.22.

B6.221 - The 2nd and 3rd paragraphs appear to be in conflict. One states that the Forest Service shall make arrangements and the other states that the purchaser shall make arrangements. I think our intent was that we would make the arrangements with the utility companies and the purchaser would notify them before they began work. The provision may need a little rewording.

B6.24 & B6.25 - Both of these provisions state that the Chief may terminate pursuant to B9.53. The reference should probably be to B9.51, under which the CO terminates on behalf of the Chief. I think B9.51 would be better if it said subject to approval of the Chief rather than on behalf of. In any event B9.53 is not correct.

Exhibit 9

B6.24 - The reference in the last paragraph to "tractor roads or skid roads" should be changed to "tractor roads or skid trails" to be consistent with B6.421 and B6.65. Since these terms appear in at least three places and there seems to be some confusion with them, it may be appropriate to define them in the glossary?

B6.411 - There are two problems with this provision on stump heights. The provision, as written, permits occasional high stumps when necessary for safe and efficient conduct of logging and permits them to be left high. This Region would prefer that the purchaser be required to recut these high stumps along with the ones that were not permitted. This could be accomplished by deleting the words "Except for acceptable high stumps stated above," in the 2nd paragraph. It is a common practice in this region to cut high stumps immediately below the road to deck against and we would like the provision to require that these be recut.

The second problem concerns the disposition of the severed portion. In accordance with a previous message I sent out, I don't believe the present language permits our requiring the purchaser to present this material for scaling and I definitely think that it should.

B8.21 - I am concerned about a portion of the language in this provision for contract term adjustment that is the same as in the present 9/73 version. In the 3rd paragraph is a reference to the purchaser experiencing delay in starting scheduled operations or interruption in active operations, either of which stops removal of included timber. There is a broad array of interpretations that have been applied to this language, some of which are difficult to relate back to the words in the contract. There is no mention of prorated term adjustment when one side is shut down and the other is operating. Prorated term adjustment is being granted. Doesn't stop mean stop? We have had situations where hauling was substantially reduced in freezing and thawing weather when hauling was restricted to a few loads early in the morning on some days. We have not granted term adjustment in such situations unless hauling was totally stopped for 10 consecutive days. Do we need to provide for adjustment when operations are substantially reduced, but not stopped?

There is no mention of how or when delays in road construction do or do not stop removal of timber scheduled for removal in future years, yet we have expanded the provision to cover delays from every type of change or adjustment in road construction. In some areas any delay in road construction qualifies for term adjustment. In other places it must be shown that the delay postponed the completion of the road into the period of planned haul. Whether or not such a delay will eventually result in stopping or delaying removal of timber may be impossible to determine at the time the request must be made by the purchaser and the determination made by the CO.

With the opportunity to delay scheduled payments, term adjustment is the greatest plum in the contract for the purchaser to go after. Tying term adjustment for road construction delays to planned logging operations only encourages a purchaser to submit a plan of operations that provides for logging immediately after road construction to assure his term adjustment options are all open. With the emphasis on and the importance of term adjustment I feel strongly that the contract language needs to come a little closer to what we

intend than it does now. I would not be opposed to deleting the tie to scheduled operations, at least for delays during road construction, if it would help clarify when term adjustment is or is not granted.

B8.22 - There are excessive words in the 1st sentence of the 2nd paragraph. It would say the same thing without the words "which amount shall be".

B8.221 - This provision was changed to permit an extension when the purchaser harvested 75% of the area as an option to removing 75% of the estimated volume. This was done to permit extension when the purchaser had logged over 75% of the area but due to an underrun had not reached the volume requirement. The provision, however, went in the opposite direction with the wording "which ever is greater". If the entire sale contained only 75% of the estimated volume that would be greater than 75% of the area and he would have to log the entire sale to qualify, as he does with our present contract. Shouldn't the provision have said which ever is less?

Also the reference to A9 in item (b) should be changed to A10.

B9.121 - The 3rd sentence should be changed as follows: When there is no cutting planned for 30 calendar days or more, **there is no timber cut but not removed**, and payment of current charges has been made...... As presently written the purchaser would not need to have any payment guarantee allocated to the sale when he shut down if he had paid his current charges, even if he left the sale with timber that had been cut but not removed.

B9.2 - The reference in paragraph (a) to PL 95-563 is not consistent with other references to laws in the contract. B1.1, B4.4 and B9.41 refer to the USC number. B3.31 refers the Statute. B4.226 states that it is based upon legal authorization with no cite to the law. We need OGC to get us straightened out on this one.

B9.3 - We could eliminate the confusion about weekends created by the term "30 practical operating days" if we added "including Saturdays, Sundays and holidays", provided that is what we mean.

B9.41 - In paragraph (4) is it necessary to base interest for defaults on a different rate than that used for late payments in B4.4 and extensions in B8.22? B9.41 refers to the Treasury Current Value of Funds Interest Rate, prescribed by the United States Department of the Treasury under Section 11 of the Debt Collection Act of 1982, as ammended (31 U.S.C. 3717). B4.4 and B8.22 refer to the rate prescribed by the United States Department of the Treasury under section 12 of the Contract Disputes Act of 1978, as ammended (41 U.S.C. 601 et seq).

Dave Faulkner

COMMENTS ON NFPA SUMMARY OF 12/4/87 MEETING WITH CHIEF

R. .ew of the documentation of our meeting on December 4, 1987, indicates general agreement of the discussion with the exception of the following:

Contract Termination and Compensation: Initially, the concept of compensating the purchaser for replacement timber, when portions of the sale were deleted for environmental reason, was rejected. However, as the conversation continued it was unclear as to what was agreed to. The revision team discussed this concept and decided to provide both a rate redetermination and an allowance for replacement timber. This was thought to be equitible as the FS was directing the purchaser and the purchaser was not afforded the opportunity to operate the deleted timber.

Extended CTA: George stated that we should cover certain out-of-pocket expenses for move-in/out, if the interuption occurred while operations were in progress. This is in addition to relief on down payments.

Eco-terrorism: We agreed that certain costs would be compensated for as a result of the action. Extra handling was discussed and I believe that we agreed that we would absorb it.

Transfer-in Limits: George said it would be worthwhile for us to look at the limit and see if it's original intent was valid. Our review showed that PC cannot be used for base rate charges and SSF is considered as a part of stumpage. We will continue with our language as proposed.

Exhibit 10

TO TM/DIRECTORS CC D.SPORES
CC S.PAULSON

From: David L. Hessel
Postmark: Dec 07,87 4:55 PM
Status: Previously read
Subject: CONTRACT REVISION-MTG WITH EXEC. GRP OF IND & LEONARD

---

Message:

WE MET FRIDAY WITH INDUSTRY ON 12 AREAS WHERE THE FS AND IND HAVE NOT REACHED RESOLUTION. I THINK WE CAME AWAY WITH A BETTER UNDERSTANDING ON THESE PROBLEM AREAS. STEVE HAS FS COMMITTEE IN WO THIS WEEK TO TRY AND COMPLETE. COMMITTEE MEMBERS WILL BRING HOME DRAFT REVISION FOR YOUR REVIEW OR WE WILL GET COPY TO YOU PRIOR TO FINALIZING TO GO TO FED REG. FOR COMMENT. YOU SHOULD DECIDE ON WHAT KIND OF REVIEW TO CONDUCT AS YOUR TIME FRAME WILL BE ABOUT 30 DAYS. WE NEED THE REGIONS CONSOLIDATED RESPONSE AT THIS POINT.IF WE GET ALOT OF COMMENTS FOR MANY CHANGES I'M NOT SURE HOW WE'LL HANDLE AT THIS POINT BUT WE'L TRY!

Exhibit 11

IDAHO FOREST INDUSTRIES, INC.

December 29, 1987

Mr. David Hessel
Director, Timber Management
USDA - Forest Service
P. O. Box 96090
Washington, DC 20013-6090

Re: Timber Contract Revision

Dear Dave:

This letter is to follow-up our conversation last week concerning the development of the revised Forest Service timber sale contract. I appreciated our candid discussion and apologize for not bringing my concerns to you sooner.

The relationship with the Federal Timber Purchasers Committee and the Washington office staff has been excellent. However, we should continue to strive to improve communication at the working subcommittee level. To assist in strengthening our communications throughout the remainder of the contract revision process, I seek your agreement on the following five points.

1. Provide an opportunity for a few members of my committee to work with Steve in preparing the January contract draft. I understand that Steve is willing to accommodate this request.

2. As soon as possible, provide industry with draft copies of the "C" clauses for its review. We can follow up with our assistance in drafting revisions if necessary.

3. Provide industry adequate time to review the January draft and "C" clauses.

4. Provide industry an opportunity to meet with Steve and a representative of the Chief in an attempt to resolve any remaining issues.

5. If there are some major philosophical differences remaining, we would request a meeting with the Chief's office, to which they have already agreed. By having a representative of the Chief at

P. O. BOX 1030 COEUR D'ALENE IDAHO 83814 A.C. 208-765-1414

received 1/5/88 TM

Exhibit 12

the meeting with Steve, I would hope that this step would be unnecessary.

Through the approach outlined above, I believe that we can reach our goal of a complete, equitable, and fair revised timber sale contract. Please give me a call if you would like to further discuss any of the items I have addressed.

Sincerely,

IDAHO FOREST INDUSTRIES, INC.

Michael C. Welling
Resource Manager

MCW/pab

cc: David Ford

United States Department of Agriculture
Forest Service
Washington Office
12th & Independence SW
P.O. Box 96090
Washington, D.C. 20090-6090

Reply To: 2450

Date: November 1, 1989

Mr. Frank Gladics
National Forest Products Association
1250 Connecticut Ave., Suite 200
Washington, DC 20036

Dear Mr Gladics:

We request that the Federal Timber Purchaser's Committee review the enclosed proposed contract provisions, and return their comments to me by November 17, 1989.

These proposed provisions are:

C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS,
C(T)8.2 - TERMINIATION
C(T)8.3 - CONTRACT MODIFICATION
C(T)9.5 - SETTLEMENT

Proposed provision C(T)6.01 is new, the other three provisions are revisions and will replace existing provisions C(T)8.2 (5/84), C(T)8.211 (8/88), C(T)8.3 (1/86), C(T)9.5 (10/77), and C(T)9.51 (8/88). Proposed revisions of C(T)8.211 and C(T)9.51 previously submitted to the committee are being dropped.

These provisions are intended for immediate use in the sales released from the injunction in Region 6. We expect these sales to begin being advertised on or about the 15th of November, therefore, your quick review is critical.

Sincerely;

/s/ Dave Hessel, for

F. Dale Robertson,
Chief.

Enclosures

Exhibit 13

C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS. (Proposed) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent unless environmental damage; or

(b) To comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale.

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be a Contract Term Adjustment pursuant to B(T)8.21. It is further agreed that the United States specifically intends to limit its waiver of sovereign immunity to the remedy for an interruption or delay of operations provided herein.

WO-2451-C(T)6.01
(proposed)

INSTRUCTIONS: Include in all new contracts and in existing contracts when extended.

Contracting Officer ... consult ... before

C(T)8.2 - TERMINATION. (PROPOSED) The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (1) to comply with a court order, regardless of whether this sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this sale; or (2) upon a determination that Purchaser's Operations would:

(a) cause ~~unacceptable~~ environmental damage;

(b) be inconsistant with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(c) cause unacceptable damage to cultural resources pursuant to C(T)6.24#;

(d) cause damage to habitat of sensitive, threatened, and endangered species pursuant to C(T)6.25#.

Damages due Purchaser for termination under this provision shall be determined pursuant to C(T)9.5.

WO-2451-C(T)8.2
(Proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of contract extension or upon mutual agreement. Include C(T)9.5 as a companion provision. Do not list B(T)8.2 as inapplicable.

C(T)8.3 - CONTRACT MODIFICATION. (proposed) This contract shall be modified, in whole or in part, in writing by the Contracting Officer:

(a) When necessary to comply with a court order, regardless of whether this contract is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale;

(b) upon determination of the Contracting Officer, in his/her sole discretion, that Purchaser's Operations would:

(1) cause ~~unacceptable~~ serious environmental damage;

(2) be inconsistant with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended.

(3) cause unacceptable damage to cultural resources pursuant to C(T)6.24#;

(4) cause damage to habitat of sensitive, threatened and endangered species pursuant to C(T)6.25#;

(c) upon Purchaser's agreement, to revise A(T)9 and A(T)10 to add roads not listed in A(T)9 as necessary to facilitate reconstruction of existing Forest Service roads or accepted Specified Roads including appurtenances thereto. Roads or road segments to be added must meet the follwing conditions: a) the required work must be on an actual hauling route used by, or scheduled for use by Purchaser, b) the required work must be the result of an unforeseen cause, such as slides, slumps, washouts, subgrade conditions or similar causes, and c) the work must be necessary for economic, safe and practical use of the road. Additions will not be made when reconstruction is made necessary by Purchaser's actions.

Modifications pursuant to this provision shall be limited to requirements with which the Contracting Officer, in his/her sole discretion, determines that Purchaser can reasonable comply.

Modifications under (a) and (b) shall receive compensating adjustments where appropriate pursuant to C(T)9.5.

Modification under (c) shall be made in accordance with B(T)5.2. Increases in Purchaser Credit Limit shall be limited to $20,000 or less. Cost adjustment for increase in Purchaser Credit Limit for added roads shall be calculated in accordance with C(T)5.221#, C(T)5.251#, C(T)5.253 and C(T)5.254.

WO-2451-C(T)8.3
(proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of extension, or upon mutual agreement. Include C(T)9.5 as a companion provision. Do not list B(T)8.3 as inapplicable.

C(T)9.5 - SETTLEMENT. (Proposed) If this contract is terminated pursuant to C(T)8.2, Purchaser agrees that its sole and exclusive remedy shall be the sum of (1) the value of unused Effective Purchaser Credit earned on this sale; (2) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area; (3) the out-of-pocket expenses involved in acquiring and holding this contract; and (4) one half the difference between (a) Current Contract Rates for remaining uncut volume, and (b) rates paid for comparable timber, if higher, on the same National Forest during the preceding 6-month period multiplied times the remaining uncut volume, which Purchaser had to replace. Comparable timber is timber of similar size and quality ~~with~~ on similar topography and access. Cost estimates for items listed in (2) shall be based upon Forest Service appraisal methods in use on the date contract is terminated. Out-of-pocket expenses in (3) do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify actual expenditures. No out-of-pocket costs shall be allowed for expenditures which cannot be verified to the satisfaction of the Contracting Officer.

Purchaser agrees that if modification of this contract pursuant to C(T)8.3 results in the elimination of 10 percent of the estimated volume of Included Timber stated in A2, or more than one million board feet or equivalent, Purchaser may request a rate redetermination under C(T)3.312 for remaining volume. Rates so redetermined shall apply to timber removed from Sale Area after the effective date of the modification. Purchaser's sole and exclusive remedy in event of a modification under this provision shall be the aforementioned rate redetermination.

In the event of termination or modification of this contract by Forest Service, Purchaser agrees that the liability of the United States shall be limited to the express remedies contained within this provision. It is further agreed that the United States specifically intends to limit its waiver of sovereign immunity to the express provisions contained herein.

WO-2451-C(T)9.5
(Proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of contract extension or upon mutual agreement. Include C(T)8.2 and C(T)8.3 as companion provisions. Do not list B(T)9.5 as inapplicable.

NFPA

July 23, 1990

Mr. Alan C. Raul
General Council
Department of Agriculture
14th and Independence Ave, SW
Room 234-W
Washington, DC 20250

R.E. U.S. Forest Service Timber Sale Contract Provision
C(T)9.3 - Breach (6/90)

Dear Mr. Raul:

I am writing on behalf of the National Forest Products Association's Federal Timber Purchasers Committee concerning a timber sale contract provision recently implemented by the United States Forest Service. We have requested the Chief of the Forest Service withdraw C-provisions C(T)9.3 - Breach because it does not comply with existing regulation. We would like you to review this situation and advise the Chief of the Forest Service to comply with existing regulation, as well as the Administrative Procedures Act.

National Forest Products Association represents a large number of companies who are partially or wholly dependant on national forests for their supply of timber. The Federal Timber Purchasers Committee is a committee of timber purchasers, consisting of both NFPA members and non-NFPA members, which meet with the Forest Service on a regular basis to discuss issues related to the harvest of timber from National Forest Lands. The Federal Timber Purchasers Committee is the nationally recognized group with whom the Forest Service works to develop timber sale contract specifications.

On June 21, 1990 the Forest Service implemented C(T)9.3 Breach. As the attached letter of protest to Chief F. Dale Robertson explains, we believe that the Agency violated the Administrative Procedure Act by implementing a timber sale contract provision which violates existing regulation.

Exhibit 14

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

The issue, and our concern, revolves around the wording in 36 CFR 223.116 (b) and the first sentence of the revised C-Provision C(T)9.3 -Breach (6.90).

36 CFR 223.116 (b) specifically directs:

> "Cancellation will be by the Chief, Forest Service. Authority to cancel contracts under paragraph (a)(1) through (4) of this section may be delegated to Regional Foresters for sales within their authorization. All contract cancellations under paragraph (a)(5) of this section shall be by the Chief, Forest Service....".

The new provision delegates the authority to cancel timber sale contracts to the Contracting Officers, with the concurrence of the Regional Forester. NFPA does not believe that requiring the Regional Forester to "concur" with a Contracting Officers opinion fulfills the requirements of 36 CFR 223.116 (b). Furthermore, we object to the Agency adopting this provision over our continued protest.

The Forest Service Timber Sale contract is supposed to be a bi-lateral contract which is agreed upon by the Forest Service and the timber industry. NFPA's Federal Timber Purchasers Committee noted our concerns with C(T)9.3 on a number of occasions. We philosophically disagree with delegating authority to terminate a timber sale contract to the Contracting Officer level and we have continually expressed that opinion. Further, we even suggested that the Forest Service should amend 36 CFR 223.116 (a) & (b) to reflect their wants and needs before implementing C(T)9.3-Breach (6/90).

We hope that you will review this situation and advise the Forest Service to follow standard governmental procedures when they wish to modify regulation. NFPA and the timber purchasers whom we represent see an emerging pattern of flagrant disregard for the willing buyer/willing seller concept so important to the bi-lateral nature of the Forest Service Timber Sale Contract. The Forest Service has, on an increasing basis, disregarded the timber industry's wants and needs when developing new or revised timber sale contract provisions. This results in a timber sale contract that is "dictated" to the purchasers rather than one which is "mutually agreed upon". Perhaps we can not expect the Forest Service to take the time to craft mutually agreeable C-provisions on all issues, but we do have the right to expect the Agency to follow prescribed procedures.

Thank you for your interest on this issue and we are looking forward to your comments on our concerns. If you have any questions please contact me at 202/463-2752.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

Attachments
FG/jw

NFPA

July 23, 1990

Mr. F. Dale Robertson
Chief
Forest Service - USDA
201 14th Street at Independence Ave., SW
Washington, DC 20250

Dear Chief Robertson:

As Chairman of the Federal Timber Purchasers Committee, I am writing to acknowledge the implementation of several new C-provisions and to remind you of our previous concerns related to C(T)4.220#, C(T)6.0, C(T)6.01, and C(T)9.3.

The Federal Timber Purchasers Committee also requests that you withdraw C(T)9.3 Breach (6/90) from use until the Agency meets the requirements of the Administrative Procedures Act. We do not believe that this provision conforms to current regulations and believe that implementation of this provision has the effect of changing regulation without public comment. By implementing C(T)9.3 Breach (6/90) without developing new regulations, the Forest Service has violated requirements of the Administrative Procedures Act.

## I. C(T)9.3 Breach (6/90) Comments

The provision authorizes the Contracting Officer to terminate a contract, with the concurrence of the Regional Forester. We do not believe that current regulations allow the Agency to delegate the authority to terminate the contract to the Contracting Officer. 36 CFR 223.116 (b) specifically limits authority to terminate a contract to the Chief and to the Regional Forester (see attached copy of regulation). Further, we question whether the Chief could delegate this authority to the Regional Foresters for contracts that do not fall within the Regional Foresters authority to sell the contract.

We have pointed out this concern to your staff on a number of occasions (see attached letters) and are extremely upset that the Agency has chosen to implement this provision over our protests. Due to this, we have forwarded a copy of this letter with attachments to General Council Alan C. Raul.

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

II. C(T)6.01 - Interruption or Delay of Operations (6/90) Comments

We acknowledge implementation of this provision, although we do not fully support its use due to inadequacies in the settlement portions of the provision.

This provision limits compensation for delays to Contract Term Adjustment (CTA) pursuant to B(T)8.21 if delay is less than 30 days and to CTA plus out of pocket expenses if the number of days of delay exceeds more than 30 days. There are a number of concerns that should be addressed, as follows:

1. In the event of delay of less than 30 days CTA is not sufficient compensation. In all likelihood an operator would have to move his equipment off site to another sale in order to continue operating. The purchaser would also have the expense of moving equipment back onto the sale when operations are allowed again. Limiting settlement in this situation to only CTA is inequitable.

2. Delays outside the Normal Operating Season are not covered in the settlement portion of this provision and that is unfair. Most timber sales currently under contract have short contract lengths and purchasers are forced to operate the timber sale outside of the normal operating season to survive economically. Compensation should be awarded to any purchaser who must cease actual woods operations no mater what time of year the purchaser's operations are delayed.

3. In the event this provision is invoked in a large scale fashion, (most timber sales on a forest) we do not believe the Agency should be allowed to walk away from its commitments. Clearly, a wide spread shutdown should require the Agency to compensate the purchaser for the cost of the replacement volume so that logging crews have some volume to sustain their operations until Forest Service sales become operable.

III. C(T)6.0 Operations (6/90) Comments

We acknowledge implementation of this provision.

IV. C(T)4.220# (Optional)

We acknowledge implementation of this provision. We still have the concerns articulated in our Dec. 6, 1989 letter to Mr. Dave Hessel. Additionally, we would like to know what mechanism has been set-up with the BLM to obtain information about defaulted BLM timber sale contracts.

## V. Conclusion

We repeatedly opposed your staff's proposal to delegate authority to terminate timber sale contacts to the Contracting Officer on a philosophical basis. With the Agency's June 21st decision to implement C(T)9.3, NFPA is now forced to also opposed the provision on a procedural basis.

We expect the Forest Service will withdraw C(T)9.3 and begin work to develop a proposal that will modify the current regulations to reflect the Agencies desires. We request that you respond to this protest by letting us know, as soon as possible, what course of action the Agency expects to take on this matter.

Sincerely,
Mike Welling
Mike Wellling
Chairman
Federal Timber Purchasers Committee

List of Attachments:

1. 6/21/90 letter to Regional Foresters - Additional Downpayments
2. Undated letter to Regional Foresters - C(T)6.0, 6.01, 9.3
3. 36 CRF 223.116 Cancellation
4. 12/4/89 NFPA letter to Hessel - Limited liability Comments
5. 1/5/90 NFPA letter to Hessel - Purchaser Integrity Comments
6. 5/1/90 NFPA letter to Hessel - Limited Liability and Purchasers Integrity Comments

MW/jw
cc: General Council Alan C. Raul

United States Department of Agriculture
Forest Service
Washington Office
14th & Independence SW
P.O. Box 96090
Washington, DC 20090-6090

Reply to: 2430-2

Date: June 21, 1990

Subject: Additional Downpayment Requirement

To: Regional Foresters

Federal Regulations at 36 CFR 223.49 Downpayment have been amended to include requirements for additional downpayment when purchasers or their affiliates default timber sale contract(s). Title 36 CFR 223.49(e) and (g) specify conditions for the additional downpayment. The so called "double" downpayment provisions requires a minimum downpayment of 20 percent of the total advertised value of the sale plus 40 percent of the total bid premium. A purchaser subject to the additional downpayment requirements cannot apply the amount deposited as downpayment to other uses until: on scaled sales, the estimated value of the unscaled timber is equal to or less than the amount of the downpayment; or, on tree measurement sales, the estimated value remaining to be cut and removed as shown on the statement of account is equal to or less than the amount of the downpayment.

Purchasers who meet the following circumstances are required to provide the additional downpayment:

(1) Purchasers or its affiliate after September 29, 1988, has failed to perform in accordance with the terms of a Forest Service or Bureau of Land Management timber sale contract which results in notification by the Contracting Officer that a contract has expired uncompleted or is terminated for cause; and

(2) The estimated value of unscaled timber on scaled sales or the estimated value of timber outstanding on tree measurement sales included in those terminated or expired contracts exceeds $100,000, and

(3) Unpaid damages claimed by the Government remain outstanding prior to award of a new sale at issue and corrective action has not been taken to avoid future deficit performance.

This amount of the additional downpayment in the current bidding situation and the additional length of retention should deter most purchasers from defaulting sales. Close coordination between Forests and Regions will need to be maintained to insure that sales defaulted after September 29, 1988, are properly and timely identified.

The following modification of the text for the timber sale prospectus, item 15 Award, notifying purchasers of the additional downpayment requirement is provided for immediate use:

C4.228# (Option 1)- DOWNPAYMENT. (6/98) Notwithstanding B4.22, Purchaser agrees to make a downpayment in the amount of $<>. Only cash or Effective Purchaser Credit earned on this sale or transferred to this contract pursuant to <> may be used to meet this requirement. No other forms of payment are acceptable in meeting this requirement. This payment must be made at the time the contract is executed and returned by Purchaser, and may not be applied towards payments under B4.8, transferred to other sales or refunded, until the estimated value of the unscaled timber is equal to or less than the amount of the downpayment.

Purchaser's failure to make the downpayment at the time the contract is executed and returned by Purchaser in accordance with C9.41 constitutes breach of this contract. As Purchaser's only remedy, Purchaser shall have 3-calendar days for Forest Service to receive the downpayment at the Forest Service designated office. B9.3 does not apply to C4.228# (Option 1). Purchaser shall pay interest on the unpaid downpayment for the period within the 3-calendar days in which the downpayment is late. The rate of interest shall be <> percent per annum. Failure to make the downpayment within 3-calendar days of the time the executed contract is returned by Purchaser, shall constitute repudiation of this contract. In such event, Purchaser and Forest Service agree that Purchaser's bid guarantee shall be retained by Forest Service as liquidated damages.

If a subsequent final determination is made that this contract should not have been included under the increased downpayment classification, the downpayment shall be revised and applied in accordance with 36 CFR 223.49(f).

INSTRUCTIONS: Substitute for C4.228# prior to award of new contracts where it has been determined to award the contract contingent upon the double downpayment requirements in 36 CFR 223.49 (e) through (h).

Enter the appropriate amount of double downpayment as determined under the rules in the above referenced CFR.

In the second blank, enter the number of the provision dealing with transfer of Purchaser Credit (C4.211# or C4.211# (Option 1).

In the third blank, enter the rate of interest as prescribed by the U.S. Department of Treasury and Rate Renegotiation Board/Prompt Payment (CDA) published in the Federal Register that is effective on the bid date.

If section 223.49(f) should apply, TSA shall be corrected to delete the requirements of the double downpayment and return to the normal downpayment in effect at bid date. The release gate shall also be changed to 25 percent of volume scaled and paid for.

Reply To: 2450

Date:

al Foresters, ALL

llowing special "C(T)" timber sale contract provisions are approved for ate use.

0 - Operations. (6/90) This revises and replaces the present provision (3/74).

01 - Interruption or Delay of Operations. (6/90) This new provision is included in all new contracts. Contracting Officers are reminded to the costs and benefits and seek appropriate counsel before using this ion. Resulting costs incurred by the Purchaser must be paid from riated project funds, there are no special or reserved accounts set up is purpose.

3 - Breach. (6/90) This provision revises and expands the present C9.3 provision and is new to the 2400-6T contract.

le Robertson

sures:

PA and other Industry Associations

to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C(T)8.3 or termination pursuant to C(T)8.2.;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to B(T)8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B(T)8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

WO-C(T)6.01
(6/90)

INSTRUCTIONS: Include in all new contracts and in existing contracts when extended. Contracting Officer shall seek the advice and council of the Regional Attorney and the Regional Forester before interrupting or delaying operations under this provision. (Ref. FSM 2453.24 and FSH 2409.15, Ch. 33.2)

...29, Dec. 17, 1979. Redesignated at .. Jan. 23, 1984]

**Proof of bidder's financial abili-**

...necessary in the judgment of ...oving officer, any applicant or ...nay be required to submit, ...pense is incurred in acting on ...lication or before award is ...response to a bid a satisfac- ...wing of financial ability and ...er may be required to show ...has or can obtain equipment ...plies suitable for logging the ...and for meeting the resource ...on provisions of the contract.

...1301, Pub. L. 95-465)

...029, Dec. 17, 1979. Redesignated at ...1, Jan. 23, 1984]

...ONTRACT ADMINISTRATION

**Delegation to regional forester.**

...hief, Forest Service, after ap- ...of conditions of sale, may au- ...Regional Foresters formally to ...timber sale contracts and re- ...apers in sales exceeding the ...which the Regional Forester ...n authorized to sell.

**Administration of contracts in ...gnated disaster areas.**

...section is to implement the pro- ...of section 242 (a), (b), and (c) ...Disaster Relief Act of 1970 (84 ...956) which relate to contracts ...sale of National Forest timber ...nection with areas damaged by ...disaster as designated by the ...nt pursuant to the Act.

...Where an existing contract for ...le of National Forest timber ...not provide relief from major ...al change not due to purchaser's ...nce prior to approval of con- ...on of any section of specified ...r other specified development ...and, as a result of a major dis- ...in a designated area a major ...al change results in additional ...uction work by the purchaser in ...ction with such a road or facili- ...United States shall bear such ...sed construction cost if, as deter- ...by the Chief, Forest Service, ...stimated cost is (1) more than $1,000 for sales under 1 million board feet, or (2) more than $1 per thousand board feet for sales of 1 to 3 million board feet, or (3) more than $3,000 for sales over 3 million board feet.

(b) Where the Chief, Forest Service, determines that damages are so great that restoration, reconstruction, or construction is not practical under the cost-sharing arrangement in paragraph (a) of this section, he may allow cancellation of the contract notwithstanding provisions therein or in § 223.116.

(c) The Chief, Forest Service, is authorized to reduce to 7 days the minimum time to advertise the sale of National Forest timber whenever he determines that (1) the sale of such timber will assist in the construction of any area of a State damaged by a major disaster, (2) the sale of such timber will assist in sustaining the economy of such area, or (3) the sale of such timber is necessary to salvage the value of timber damaged in such major disaster or to protect undamaged timber.

(d) Any request for relief under paragraph (a) or (b) of this section shall be made in writing to the Forest Supervisor having administrative responsibility for the land involved.

(Sec. 242 (a), (b), and (c), 84 Stat. 1756, 42 U.S.C. 4461)

### § 223.112 Modification of contracts.

Timber sale contracts may be modified only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States. Modifications may be made by the officer approving the sale, by his successor, or by his superior, except as provided in § 223.110.

### § 223.113 Modification to prevent environmental damage or to conform to forest plans.

Timber sale contracts may be modified to prevent environmental damage or to make them consistent with guidelines and standards developed to implement section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended, and with land management plans adopted thereunder. Modifications shall be subject to the purchaser's valid existing rights. Rates of payment for timber shall be adjusted to reflect changes, if any, in the value of the timber, subject to existing contract limitations on rates.

### § 223.114 Acquisition by third party.

No agreement permitting a third party to acquire the rights of a purchaser under a timber sale contract may be recognized and approved by the Forest Service except in writing, signed by the officer approving the sale, his successor, or superior officer. Such approval shall not relieve the purchaser of his responsibilities or liabilities under the timber sale contract and may be given only if (a) the third party is acceptable to the Forest Service as a purchaser of timber under the conditions and requirements then in effect for similar timber sales and assumes in writing all of the obligations to the Forest Service under the terms of the timber sale contract as to the uncompleted portion thereof, or (b) the rights are acquired in trust as security and subject to such conditions as may be necessary for the protection of the public interests.

### § 223.115 Contract extensions.

The term of any contract or permit shall not be extended unless the approving officer finds:

(a) That the purchaser has diligently performed in accordance with contract provisions and an approved plan of operation; or

(b) That the substantial overriding public interest justifies the extension.

### § 223.116 Cancellation.

(a) Timber sale contracts and permits may be canceled:

(1) For serious or continued violation of their terms.

(2) Upon application, or with the consent of the purchaser, when such action is of advantage to the United States or not prejudicial to its interests.

(3) Upon application of the purchaser if the value of the timber remaining to be cut is diminished materially because of catastrophic damage caused by forces beyond the control of the purchaser resulting in (i) physical

change in the sale area or access to it, or (ii) damage to timber remaining to be cut.

(4) For conviction of violation of criminal statutes or, following final agency or judicial determination, of violation of civil standards, orders, permits, or others regulations for the protection of environmental quality issued by a Federal agency, State agency, or political subdivision thereof, in the conduct of operations thereunder, on National Forest System land, unless compliance with such laws or regulations would preclude performance of other contractual requirements.

(5) Upon determination by the Chief, Forest Service, that operations thereunder would result in serious environmental degradation or resource damage and with reasonable compensation to the purchaser for unrecovered costs incurred under the contract and the difference between the current contract value and the average value of comparable National Forest timber sold during the preceding 6-month period.

(b) Cancellation will be by the Chief, Forest Service. Authority to cancel contracts under paragraph (a) (1) through (4) of this section may be delegated to Regional Foresters for sales within their authorization. All contract cancellations under paragraph (a)(5) of this section shall be by the Chief, Forest Service, whose decision shall be the final agency decision.

[42 FR 28252, June 2, 1977, as amended at 48 FR 23819, May 27, 1983. Redesignated at 49 FR 2761, Jan. 23, 1984]

**§ 223.117 Administration of cooperative or Federal sustained yield units.**

With respect to sustained yield units established pursuant to the provisions of the Act of March 29, 1944 (58 Stat. 132; 16 U.S.C. 583-583i), the Chief, Forest Service, with authority to delegate to other officers and employees of the Forest Service:

(a) Shall provide that National Forest timber in any sustained yield unit shall be available in sufficient amounts to meet the needs of bona fide farmers, settlers, miners, residents and prospectors for minerals for personal and domestic use as provided by law and by regulation.

(b) May offer for sale to cooperators, without competition but at not less than appraised value, timber on National Forest lands within an approved cooperative sustained yield unit; or, if the approved sustained yield unit consists entirely of federally owned or administered forest land and if necessary for the maintenance of a stable community or communities, may offer National Forest timber for sale to responsible operators within such community or communities, at not less than appraised value but without competition or with competition restricted to responsible operators who will manufacture the timber to at least a stated degree within the community or communities to be maintained. Each such sale which involves more than $500 in stumpage value may be made only after notice has been given in advance by such means as may be deemed effective in informing the public of the proposed action, including in any event, publication, once weekly for four consecutive weeks and with additional insertions if needed, in one or more newspapers of general circulation in the vicinity of the place where the timber is located, of a notice of the proposed sale stating at least:

(1) The location, estimated quantity and appraised value of the timber to be cut;

(2) The name and address of the proposed purchaser or those of the operators among whom bidding is to be restricted;

(3) The time and place of a public advisory hearing on the proposed sale, to be held not earlier than 30 days after the first publication of said notice, if requested by the State or county where the timber is located or by any other person deemed to have a reasonable interest in the proposed sale or in its terms; and

(4) The title and address of the officer of the Forest Service to whom any request for such hearing should be made.

Such requests need be considered only if received at the place designated in the notice not later than 15 days after the first publication of such notice. If





a public advisory hearing is to be he notice of it shall be published in t same newspaper or newspapers as t original notice, stating the place whe it will be held and the time, whi shall not be earlier than 10 days aft the first publication of the said not of hearing, and shall appear once ea week, but not for more than four su cessive weeks in any event, until t date set for the hearing. Any su hearing shall be conducted by t Chief or by any officer designated him as his representative, except th if the amount of the proposed sale not in excess of that which the R gional Forester has been authorized sell without prior approval of t Chief the hearing may be held by t Regional Forester concerned or by representative and decision may be the Regional Forester. At any su hearing, opportunity shall be given those having a reasonable interest make oral statements or to file writ statements discussing the advanta and disadvantages of the propo sale; and the officer holding the he ing may, in his discretion, permit t filing of such statements within a r sonable period after the close of hearing to become part of the rec for consideration before a decision made.

(c) Shall keep available for public spection, (1) During the life of sustained yield unit, the minutes other record of the hearing held the establishment thereof, and the termination of action taken follow the hearing including any modif tion of the proposals as submitted the hearing; and (2) during the lif any cooperative agreement for coo nated management the similar rec of the hearings and actions de mined upon; and (3) during the lif any sustained yield unit the sim record of any public hearing wh may be held on a sale made with competition or with restricted con tition and the action determined u Such records of any case may be k in any office of the Forest Service ignated by the Chief as being suit and convenient of access for prob interested persons.

(d) Shall make provision, in any tract for the purchase of timber w

NFPA

December 4, 1989

Mr. David Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, DC 20090-6090

RE: Comments on proposed limited liability provisions C(T)6.01, C(T)8.2, C(T)8.3, and C(T)9.5

Dear Dave:

We appreciate the opportunity we had to discuss the proposed limited liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did. However, we continue to be extremely displeased with the limited liability provisions.

The November 22nd proposal fails to respond to our key concerns. Thus, we cannot support implementation of the limited liability provisions at this time. We do however believe equitable limited liability provisions can be developed. The following comments are submitted in hopes of reaching such a solution.

I. PRINCIPAL OBJECTIONS

A. Shifting 50% of Government's Liability for Replacement Costs of Settlement to the Purchaser is Not Appropriate.

It is extremely frustrating to our members, given the time and energy they have invested on this issue, that the Forest Service persists in its belief that the purchaser should shoulder partial liability for agency actions. The agency seems to be concerned that it will be forced to terminate some timber sale contracts due to court orders. Realistically, the courts will only rule against the agency in those cases where it has failed to meet current NEPA requirements. The Forest Service must accept responsibility for its actions. The shift of liability, to the purchaser, brings a number of contract law principals into questions.

Your arguments that other government contracts provide only for out-of-pocket expenses, ignores the concept of just compensation. Other government contracts include a wide range of

compensation for government actions, or inactions. Many contractors, involved in agency service contracts, report that the Forest Service pays on almost all contractor claims. The agency's reliance on one small piece of a much larger compensation package is misguided. The exculpatory nature of the November 22nd proposal, if implemented, will imperil the contractual agreements timber purchasers and the Forest Service have developed over the years. A purchaser's responsibility under the contract is to complete the contract in a timely manner, within the contract guidelines (provisions). The purchaser's responsibility should not include insuring the agency has done an adequate job on NEPA documentation.

B. <u>It is an Inappropriate Policy for the Forest Service to Develop Contract Provisions that Obviate the Agency's Responsibility to Produce Strong Environmental Documents.</u>

As proposed, these provision afford the agency guaranteed protection from liability for its work. Knowing that the government is protected from a timber purchaser's claim does little to encourage the attention to detail that NEPA documentation deserves. Insulating the agency from liability sends the message, that NEPA is <u>not</u> important. These provisions will discourage the attention to detail, and thoughtful preparation, required to meet NEPA standards.

C. <u>Expanding the Contracting Officer's Authority to Unilaterally Modify the Timber Sale Contract Violates Regulation and Imperils the Willing Buyer/Willing Seller Relationship.</u>

In practice a unilateral modification is nothing less than a partial termination of the contract. 36 CFR §223.166 clearly delegates authority to terminate contracts for environmental reasons, to the Chief; or to Regional Foresters for: (1) serious or continued violation of a contract terms; (2) application by, or with consent, of the purchaser; (3) in the event of catastrophic damage; or (4) for conviction of violation of criminal statutes or, following final agency or judicial determination of violation of civil standards, orders, permits, or other regulations for the protection of environmental quality. As proposed, these provisions unacceptably re-delegate this authority.

The addition of caveats and reminders does not alter the implications of C(T)8.3. As written, it delegates authority to unilaterally modify a timber sale contract to the Contracting Officer (CO). The inclusion of these provisions so changes the buyer/seller relationship, that purchasers will no longer be able to consider themselves "willing buyers".

D. The Forest Service Should Not Expand a Court's Decision Beyond The Sale(s) Named in Such a Decision.

Decisions concerning the scope of an individual court order rests solely in the judicial branch of government, not the executive branch. Stay orders are serious and the courts need to understand the impacts of their decisions. Many times the scope of a stay depends on its expected impact. Contract language that allows the Forest Service to expand the impact of court orders, after the court has ruled: (1) usurps the court's authority; (2) places the agency in the position of having to make arbitrary and capricious decisions; and (3) interjects an opened end, and unacceptable, risk to the timber purchaser.

In the past the Forest Service and timber purchasers have dealt with court decisions by developing individual C-provisions that address the specific issue(s) involved. All court actions deserve this carefully reasoned approach. Since the timber sale contract is mutually developed by the buyer and the seller, we expect that industry will continue to be afforded the opportunity to addresses new issues on an individual basis.

II. SPECIFIC TECHNICAL CONCERNS

These are additional concerns related to the specific provisions that require attention. Many of our above mentioned principal objections stem from more than one provision and are not readdressed in this portion of our response.

A. C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS

1. Section (a) of this provision is addressed in other parts of the contract. Contracting Officer's already have sufficient authority to interrupt operations under B9.3 - BREACH when used in conjunction with other existing environmental protection provisions. This section of the provision is redundant and should be dropped.

2. The financial impacts of a delay are triggered as soon as that interruption or delay occurs. The magnitude of the impact grows in relation to the length of the delay. Purchasers should not have to suffer a 30 day waiting period before the delay is of sufficient magnitude to warrant a damage claim. We recommend removal of the 30 day trigger.

Further, as we have commented in the past, the addition of yet another trigger: (1) clouds the meaning of other provisions, such as the 10 day time limit for CTA; (2) adds

to the administrative work load of the Contracting Officer; and (3) lessens the seriousness of agency caused delays.

B. C(T)8.2 - TERMINATION

1. Although we did not comment on this point in our previous discussions, we believe some clarification on "consistency with the land management plans" might be helpful. We would suggest, in sections (b) of C(T)8.2 and section (d)(2) of C(T)8.3, that the word "inconsistent" be preceded by the word "materially".

2. We feel Forest Service Manual language should not be referenced in the contract. Manuals (FSM) are protected from public input, formal review, and are now completely protection under the current appeals process. In short, changes to Forest Service manuals and handbooks are to easily made and purchasers no longer have the ability to effect meaningful comments on proposed changes. The agency should reference; (1) other contract provisions; (2) federal law or regulation; or (3) other states laws or regulation. We believed that your staff agreed to make reference to State Designated Sensitive Species in C8.2 and 8.3 and do not understand why this can't be included in the proposal. We still believe sensitive species designation by individual states to be the best reference to use. References to C6.24# and C6.25# are more preferable than the latest proposal.

C. C(T)8.3 - CONTRACT MODIFICATION

We continue to be confused with the sections of this provision that deal with changes to A(T)9 and A(T)10. Can the parties to the contract agree to add new specified roads to the contract to facilitate a modification? Portions of the proposed provision seem to key on changes only needed to "necessary to facilitate reconstruction".

During previous discussions our members questioned the $20,000 limit for increases in purchaser credit. We suggested that the original Available Purchaser Credit Limit be used as an upper limit. While increasing the limit to $50,000 is a positive step, we continue to believe the provision should allow for the maximum amount of flexibility possible.

Finally, the existing contract also allows for modifications to other portions of the timber sale contract. Is it the intent of the agency to limit modifications to only the B(T)5.0 Transportation Facilities section of the

contract? Existing language, in the last section of C(T)8.3, also addressed changes in B2.0 <u>Timber Specifications</u> and B6.0 <u>Operations</u>. We trust this oversight will be corrected.

D. C(T)9.5 - <u>SETTLEMENT</u>

We have concerns with several different sections of this provisions, as follows:

1. Lead Paragraph - Rather than referencing C(T)8.2 in the opening sentence, the provision should say: "if terminated in whole, or in part". This adds clarity and leaves no doubt in the readers mind concerning partial terminations.

2. Section (4) (b) - Portions of this section need some clarification. History shows that "the preceding 6-month period" sometimes leads to confusion. Is it 6 months from the point of termination, or 6 months from when the operations where first delayed? If no timber is sold in the preceding 6 months on the effected Forest, do we relay on a neighboring forest? This section needs additional clarification.

3. New Section - The section on determination of uncut volume is confusing. If one subtracts A(T)2 volume from the Volume Cut and Removed on an uncompleted timber sale, theoretically one would end up with a negative number. We suggest the following wording:

> "In determining remaining uncut volume, the parties to the contract must first mutual agree on the remaining A(T)2 volume".

We believe, particularly in cases where the original AT2 volume has shown to be over estimated, that the purchaser and the Forest Service must begin this computation with a common agreement on remaining A(T)2 volume.

4. Section (4)(b) new wording - While wording on logging cost characteristics represents some improvement, many of our members would prefer to see timber value more clearly articulated in the provision. Although logging characteristics are included in the RV appraisal system, they may not be in many of the TEA appraisal systems. We suggest the following wording:

> "Comparable timber is timber with generally similar species composition, size, quality, value, and logging cost characteristics,"

## III. CONCLUSION

We hope you understand our frustration in dealing with these issues and look forward to working with your staff to ensure these proposed provisions are mutually acceptable to the different parties to the contract. Just as purchaser's don't expect the agency to log their timber sales, we hope you will not expect purchasers to accept the government's liability to complete NEPA documents. If you have any questions, I would be happy to meet with you at your earliest convenience.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

NFPA

January 5, 1990

Dave Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, D.C. 20090-6090

RE: Proposed Purchaser Integrity Provision C(T)6.0 and C(T)9.3

Dear Dave:

In response to your November 1 proposed purchaser integrity provisions, the Federal Timber Purchasers Committee submits the following comments. Our members appreciated the opportunity to discuss these provisions with you and your staff in Scottsdale. As we told you at that meeting, while the concept of these provisions is acceptable, there are a number of concerns that need to be addressed.

I. POLICY ISSUES

A. The Time to Deal With Unscrupulous Operators is Before the Contract is Awarded.

The time to weed out bad operators is prior to the bid opening. Once a sale is let, the purchaser's performance should be judged on a sale by sale basis. The Agency has worked very hard through the financial security initiative to encourage the timely harvest of timber sales. This proposal could result in unnecessary terminations that would heavily impact the Agency, as well as the purchaser.

B. The Policy Needs to Differentiate Between: (1) a Purchaser's Actions and Those of His/Her Employees; and (2) Whether Those Actions are Directly Related to Timber Sale Operations.

We understand and support the Agency's desire to deal with the unscrupulous operators. Conviction of some offenses must be considered as being directly related each and every business transaction a person may make.

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

Provided due process is followed, we support the Agency in its efforts to avoid doing business with dishonest operators. However, termination of an entire portfolio seems excessive in relationship to some of the offenses listed in C(T)9.3. For instance, is it reasonable to terminate an entire portfolio if a purchaser has been found to have rutted a road during his/her timber sale operations? We believe overzealous enforcement of these provisions could result in such an action. Implementation of these provisions by Contracting Officers will be closely monitored by our members. We trust we will continue to be able to work with your staff to ensure these provisions are implemented in a reasonable fashion.

Additionally, there is a need for a strong linkage between an operator's behavior and his/her timber sale operations. As written, a Contracting Officer could terminate all contracts in a purchasers portfolio if a subcontractor's employee is convicted of DWI or even hunting without a licence. Some of the activities sanctioned in the proposed provisions (subsections (b) of C(T)9.3 and (c) of C(T)6.0) are very broad when viewed in the context of a subcontractor's employees or affiliates.

Our members expect to be held responsible for their own actions, as well as those of subcontractors, affiliates, and employees <u>related</u> to timber sale operations, but are not comfortable with being responsible for their subcontractors, or employees actions, unrelated to timber sale operations.

C. <u>The Delegation of Authority to Terminate a Timber Sale Contract for Breach Should Not Rest With the CO.</u>

Authority to terminate a contract as a result of environmental conflict rests with the Chief. Delegation of authority to terminate for environmental conflict, as well as for non-compliance of terms of the contract, to the CO is improper. If implemented and utilized, these provisions could result in defacto debarments. In the past, debarment has been viewed as so serious that only the Chief has authority to take such an action. Current regulation preclude the delegation of authority to terminate a timber sale contract below the regional forester level. Thus, as proposed, these provision appear to violate existing regulation.

II. <u>SPECIFIC COMMENTS AND SUGGESTIONS</u>

A. C(T)9.3 - <u>BREACH</u> (Proposed)

1. In order to more clearly tie the provisions to existing

regulation, we recommend the following substitute preamble.

> "Breach of this contract may result in termination by the Chief pursuant to 36 CFR §223.116(a)(5), or by the Regional Forester pursuant to 36 CFR §223.116 (a)(1) - (4).
>
> The Contracting Officer may recommend termination of this contract for breach in the event:"

2. We believe subsections (d), (e), and (f) are adequately addressed in the existing contact. Existing provisions covering these situation have realistic liquidated damages, and we do not support modification of the current norm. We request that these subsections be dropped from the proposed provision.

3. We support the inclusion of subsections (a), (b), (c), and (h) with the following wording changes to clarify the proposal.

a. Subsection (a) - We support proposed language as is.

b. Subsection (b) - We suggest the following modification:

> "is convicted for a violation of criminal statutes or civil standards, orders, permits, or other regulations for the protection of environmental quality issued by a Federal agency, State agency, or political subdivision thereof in the conduct of his/her operations directly related to this timber sale contract pursuant to C(T)6.0;"

c. Subsection (c) - We support wording in this subsection.

d. Subsection (h) - We support wording in this subsection.

4. Subsection (g) is vague and unclear. We are unsure of what activities remain that are not covered by subsections (a), (b), (c), and (h). Thus, we request this subsection be dropped from the provision.

B. C(T)6.0 - <u>OPERATIONS</u> (Proposed)

1. The sanctioned activities must be directly related to the purchaser's operation of the timber sale contract. Thus, we suggest the following modification to the preamble:

"Purchaser agrees to conduct sale operations under this contract and other directly related business activities in compliance with Federal, State, and local statutes, standards, orders, permits, or other regulations so as not to damage the environment or be injurious to the interests of the United States."

2. The public interest and the interests of the United States are the same, and we suggest that one or the other be dropped from the preamble.

3. We cannot support the open ended language in paragraph three. We will support use of this paragraph if it is modified to read:

"A conviction of, or a civil judgement for, any of the following offenses will be considered a breach of this provision and may result in termination of this contract pursuant to C(T)9.3:"

4. We support inclusion of subsection (a),(b), and (c) as written.

III. <u>CONCLUSION</u>

We believe these provisions should reflect: (1) a direct tie between a purchasers activities and the individual sale; and (2) assignment of the authority to terminate a timber sale in accordance with 36 CFR §233.116.

We appreciate the opportunity to provide these comments and will be happy to meet with you to discuss or explain our views on this issue. If you have any questions, please contact me at 202/463-2752.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sales Programs

NFPA

May 1, 1990

Mr. Dave Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, DC 20090-6090

RE: Comments on Proposed Limited Liability and Purchaser Integrity Provisions C(T) 6.0, C(T)6.01, C(T)8.3, C(T)9.3, C(T)9.5, and C(T) 9.5 (option 1).

Dear Dave:

We appreciate the time you took to discuss these proposals with our members at the recent Federal Timber Purchasers Committee meeting in Dallas. As those discussions indicate, our members continue to be concerned with portions of the proposal. Rather than restate all of our concerns, I would ask that your staff review our July 24, 1989, December 4, 1989, and January 5, 1990 comments on past proposals addressing these issues.

Although the agency's latest proposals are an improvement, our members continue to express two basic concerns.

I. Basic Concerns

A. The agency has proposed or implemented a number of provisions that deal with contract settlements resulting from environmental modification or termination. All prescribe a different settlement solution. We would prefer to have one or two settlement provisions rather than four or five.

B. Our members believe authority to terminate a timber sale contract should rest with someone other than the Contracting Officer (CO). Allowing the CO to be chief negotiator, judge, and jury jeopardizes the willing buyer/willing seller relationship.

We feel termination of a timber sale contract is of such a consequence, that authority to terminate should rest with the Regional Forester for most terminations and with the Chief for those terminations mandated by environmental modifications.

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

This chain of command offers two distinct advantages over the C(T)9.3 proposal. First, it allows for agency review of CO decisions to ensure uniformity. Second, it provides for an unbiased internal review of CO decisions prior to a dispute evolving into a formal claim. Our members prefer to work disputes out as low in the contract chain of command as possible. Requiring the CO to terminate timber sale contracts would negatively affect the CO's ability to negotiate future disputes.

II. Specific Comments

A. C(T)6.0 - Operations

We agree with the provision as proposed.

B. C(T)6.01 - Interruption or Delay of Operations

We acknowledge the agency's efforts to modify this proposal in response to our earlier concerns. Making the Regional Foresters responsible for deciding whether contracts not named in civil actions should be delayed is much preferable to having individual contracting officers attempting to make such judgements. We trust the Washington Office will help guide Regional Foresters in their efforts to make these difficult decisions.

As stated in our July 25, 1989 comments on C(T)8.211 (proposed), we believe court-imposed delays are beyond the control of the timber purchaser. Thus, such delays should be treated in a similar fashion to delays addressed in B(T) 8.21.

We request the proposed 30-day time limit be reduced to 10 days in order to make C(T)6.01 (proposed) conform with existing B(T)8.21.

C. C(T) 8.3 - Contract Modification

We agree with the provision as written, provided the following questions can be satisfactorily addressed.

1. Will the agency continue to allow contract modification involving B2.0, B5.0 and B6.0? We would like to see this articulated in the final provision language.

2. We believe rate redetermination is a viable tool in developing mutually agreed upon contract modifications. Why has this option been dropped from the current proposal? We request the following C(T)8.3 language be carried forward in the final language.

> "Such modifications shall be limited to requirements with which Purchaser can reasonably comply. Resulting changes in the value of remaining Timber shall be reflected in a rate redetermination conducted in accordance with C3.312. Rates so redetermined shall apply to timber removed from Sale Area after the effective date of the modification".

D. C(T)9.3 - Breach

Our members continue to believe authority to terminate a contract should rest with the Regional Forester or the Chief (see above comments). On one hand, the agency seems to agree that Regional Forests should make the decision as to when an individual sale might be impacted by civil law suits (see C(T)6.01 proposed), while in this instance it seems to insist that Regional Foresters cannot be in the contract chain of command.

Given your staff's insistence that the CO must be unencumbered to make contract decisions, we are hard-pressed to propose a new solution.
We request our January 5, 1990 proposal, to have the Contracting Officer recommend termination, be reconsidered and incorporated in the final contract language.

Short of that, we expect the agency will amend 36 CFR 223.116(a) (1-5), through the federal register process, before implementing this proposed c-provision.

E. C(T) 9.5 - Settlement

We agree with this provision as written.

F. C(T)9.5 (option 1) - Settlement

Our members see this proposal as an unwarranted expansion of C(T) 9.52 - Settlement For T&E Species and are troubled by it. We feel a bit betrayed by the agency, given the hard fought agreements hammered out in previous discussions. However, given our conversation in Dallas, we request the following modification to paragraph two of the provision.

> "The Chief has determined that this contract qualifies for limited settlement compensation due to the high probability that ________________ may force cancellation of this contract prior to termination date in A(T)16. In such event, compensation will be limited to the expenses contained in (1), (2), and (3) only."

We request the following paragraph be added in the provision as new paragraph three.

"Settlement compensation will only be limited for those events listed in the preceding paragraph. All other contract termination settlement negotiations will be addressed under C9.5 - Settlement".

Instructions for this provision should include the following statements.

"Contract preparer will fill in the blank with the **specific** event that is expected to imperil the contract. Timber Sale prospectus will include a discussion of the event that may trigger use of C(T)9.5 Option 1 and the likelihood that it will occur".

" Acceptable events, beyond the control of the agency, are limited to: civil law suits, salvage sales delayed by civil actions, and strong potential of listing of species, known to exist on the sale area, being listed as Threatened or Endangered by U.S. Fish & Wildlife Service. All other situations require Chief's approval before they may be listed in paragraph two".

Finally, we request use of C(T) 9.51 Settlement and C(T) 9.52 Settlement for T&E Species be discontinued. Situations covered by these two provisions should logically fall under C(T)9.5 Option 1, as amended by our previous comments. Limiting the variety of different settlement provisions will help avoid confusion and frustration in future settlement negotiations.

## III. Conclusions

We trust you will incorporate our proposed changes in the final C-provision language. In the event the agency finds it cannot incorporate our proposed changes, we request a meeting be scheduled during May 6, 7 or 9th between yourself and Mike Welling, Chairman of the Federal Timber Purchasers Council, to iron out our differences. Hopefully, this meeting will not be necessary and we can move beyond our protracted discussions on limited liability.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

FG/lh

United States Department of Agriculture | Forest Service | Washington Office | 14th & Independence SW
P. O. Box 96090
Washington, DC 20090-6090

File Code: 2450
Date: October 31, 2000

Ms. Mary Coulombe
American Forest & Paper Association
1111Nineteenth Street, NW. Suite 800
Washington, DC 20036

Dear Ms. Coulombe:

Enclosed for your review are proposed revisions to the B/BT Divisions for the FS-2400-6 and 2400-6T contracts. Also enclosed are proposed revisions to the A/AT pages and proposed revisions to the C/CT provisions. We hope that we will have an opportunity to discuss this proposal with the Federal Timber Purchaser's Committee at the Flagstaff meeting in November.

This proposal to revise the contracts is due to changes in computer and word processing technology. If adopted, in the future, changes in contract provisions that are applicable to all contracts would result in a revised B/BT Division and changes in contract provisions that are applicable in only specific situations would result in new or revised C/CT provisions. The B/BT Divisions would not be commercially printed, but would be available in electronic format.

There are no policy changes being made with this proposed contract revision, although some minor editorial changes have been made, such as the elimination of gender specific nouns and pronouns, use of a more active voice, formatting for consistency within the contract, minor changes to increase consistency in wording between the two contracts, and conversion from board feet to cubic feet. The intent is to consolidate the B/BT and C/CT Divisions and make the contracts easier to use for both timber sale purchasers and Forest Service personnel.

The font size would be increased from 8 to 10 in the B/BT Division to assist reading.

We believe that this proposal would:

1. Reduce the complexity of the contract for Forest Service timber sale preparation people and sale administrators, who are less experienced and knowledgeable than in the past, and industry representatives. The chance of error in contract preparation and administration is reduced, thus reducing the likelihood of contract disputes and claims.

a. The number of C provisions is reduced from 106 to 32.

b. The number of CT provisions is reduced from 100 to 31.

Exhibit 15

c. The "typical" contract is changed as follows:

i. The number of pages would be reduced from 116 to 53 pages (10 of the 53 pages are additional pages due to increased font size).

ii. The number of Special Provisions would be reduced from 78 to 6.

iii. The number of inapplicable Standard Provisions would be reduced from 37 to 0.

d. Inaccurate cross-references would be fixed, e.g., references to inapplicable B/BT provisions.

e. Provisions would seldom be supplemented, i.e., there would usually be no B/BT and C/CT provisions with the same number.

f. The A/AT Division would include most of the data that varies by contract, making it easier to find.

g. Proposed minor editorial changes would simplify reading and assist interpretation.

2. Be much easier for the Forest Service to maintain within the Timber Information Manager (TIM), within the Forest Products Staff, and at the Regional, Forest, and District levels.

The specific changes proposed to the A/AT Division pages include:

1. 2400-6 (page 102) is revised to remove the issue date of the Division B Standard Provisions and to substitute a fill-in blank. This is the date that should be referenced when referring to the contract and referencing a date.

2. 2400-6 (page 104) is revised to add contract scaling as a required deposit and to update contract provision references.

3. 2400-6 (page 106) is revised to convert it to a landscape format.

4. 2400-6 (page 107) is revised to add A13 – Forest Service Engineering Completion Schedule, change the number of current A13 to A14, and to update contract provision references.

5. 2400-6 (page 108) is revised to change the number of current A14 through A21 to A15 through A22, respectively, and to add A23 – Downpayment and A24 – Periodic Payment Amounts.

6. 2400-6 (page 109) is revised to change the number of current A22 through A23 to A27 through A28, respectively, and to add A25 – Purchaser Credit Transfer-in Limit Amount and A26 – Market-Related Contract Term Addition Producer Price Index.

7. 2400-6T (page 102) is revised to remove the issue date of the Division BT Standard Provisions and to substitute a fill-in blank. This is the date that should be referenced hen referring to the contract and referencing a date.

8. 2400-6T (page 105) is revised to update contract provision references.

9. 2400-6T (page 107) is revised to convert it to a landscape format.

10. 2400-6T (page 108) is revised to add AT13 – Forest Service Engineering Completion Schedule, to change the number of current AT13 through AT18 to AT14 through AT19, respectively, and to update contract provision references.

11. 2400-6T (page 109) is revised to add AT20 – Downpayment, AT21 – Periodic Payment Amounts, AT22 – Purchaser Credit Transfer-in Limit Amount, and AT23 – Market-Related Contract Term Addition Producer Price Index; and to change the number of current AT19 through AT20 to AT24 through AT25, respectively.

The changes proposed to the B/BT Division and the current C/CT provisions include:

1. B/BT1.1 – Sale Area Map is revised to eliminate the reference to the identification of historic sites, since these are no longer shown on the sale area map. References to wildlife and plant habitat, cave resources, traffic control devices, weed-free areas, wetlands, and temporary roads to be kept open are added since the B/BT Division requires that these be shown on the sale area map.

2. B/BT2.133 – Damaged by Catastrophe is revised to change the volume gate from one million board feet to two hundred thousand cubic feet. In addition, B2.133 was revised, so that the criterion for catastrophic damage is based on value, rather than volume and value, making the provision consistent with BT2.133. Use of volume as a criterion is redundant with the remainder of the provision and is not necessary.

3. B2.36 – Incompletely Marked Timber is revised to make it consistent with the 2400-6T contract by requiring the location of representative sample areas of incompletely marked timber to be shown on the sale area map.

4. C2.41 – Adjustment for Volume Deficit is no longer approved as a C provision. Its text has been incorporated into the B Division, replacing B2.41.

5. CT2.41 – Adjustment for Quantity Deficit is no longer approved as a CT provision. Its text has been incorporated into the BT Division, replacing BT2.41.

6. B/BT3.2 – Current Contract Rates has a reference added to B/BT8.212, thus stating that current contract rates will continue during a contract term addition.

7. C/CT3.2 – Escalation Procedure is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.2.

8. C/CT3.21 – Unavailable Index is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.21.

9. C/CT3.3# – Rate Redetermination After Environmental Modification is renumbered as 3:321#.

10. C/CT3.31 – Scheduled Rate Redetermination is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.31. B/BT3.311 – Emergency Rate Redetermination is currently listed as inapplicable in all contracts and is not included in the revised contract.

11. C/CT3.312 – Rate Redetermination for Environmental Modification is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT3.32.

12. C/CT3.32 – Rate Redetermination After Catastrophic Damage is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT3.33.

13. B/BT3.41 – Material Not in A2 has the term Forest Service Officer changed to Contracting Officer.

14. C/CT4.11# – Amount Payable for Timber is renumbered as C/CT4.12# and updated to reflect revised provision references.

15. CT4.12 – Adjustment of Quantity is no longer approved as a CT provision. Its text has been incorporated into the BT Division, as BT4.11.

16. C/CT4.2 – Timber Sale Account is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.2.

17. C/CT4.211# – Transfer of Purchaser Credit is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.21, replacing B/BT4.21 – Purchaser Credit. The transfer-in limit is now stated in A25 or AT22.

18. C/CT4.220# – Downpayment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.221, replacing B/BT4.221 – Advance Deposits. The downpayment amount and interest rate are now stated in A23 or AT20.

19. C/CT4.221 – Advance Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.222, replacing B/BT4.222 – Purchaser Credit as Deposits.

20. C/CT4.222 – Transferred-in Purchaser Credit as Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as a final paragraph in B/BT4.21.

21. B/BT4.223 – Deposits for Charges Subject to Escalation is renumbered as B/BT4.224, replacing B/BT4.225 – Deposits When Payment Guaranteed.

22. C/CT4.224 – Deposits When Payment Guaranteed is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.225, replacing B/BT4.225 – Cooperative Deposits.

23. B/BT4.225 – Cooperative Deposits is renumbered as B/BT4.228.

24. B/BT4.227 – Blanket Cash Deposits is renumbered as B/BT4.226, replacing B/BT4.226 – Use of Deposits.

25. C/CT4.228 – Performance Bond as Security for Felled Timber is updated to reflect revised provision references and has been renumbered as C/CT4.33.

26. C/CT4.229 – Temporary Reduction of Downpayment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.23, replacing B/BT4.23 – Refund of Excess Cash.

27. C/CT4.23 – Refund of Excess Cash is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.24, replacing B/BT4.24 – Refund After Scaling Completed.

28. B/BT4.24 – Refund After Scaling Completed is renumbered as B/BT4.25.

29. C/CT4.254 – Extension Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.227, replacing B/BT4.227 – Blanket Cash Deposits.

30. C/CT4.264# – Periodic Payment Schedule is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.223, replacing B/BT4.223 – Deposits for Charges Subject to Escalation. The periodic payment schedule is now stated in A24 or AT21.

31. C/CT4.3 – Letters of Credit for Payment Bond is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.32.

32. C/CT4.31 – Blanket Bond is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.31.

33. C/CT4.4 – Payments Not Received for Timber Cut and Other Charges is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.4 – Payments Not Received.

34. C/CT4.41 – Other Payments Not Received is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.41. A cross reference to restoration of downpayment is added.

35. C/CT5.101# – Road Completion Date is renumbered as C/CT5.13# and is updated to reflect revised provision references.

36. B5.12 – Use of Roads by Purchaser is modified so that it uses the same language as the BT contract, specifically, it now refers to permanent or temporary roads, rather than just roads.

37. C/CT5.121# – Deposit for Reconstruction Engineering Services is updated to reflect revised provision references.

38. C/CT5.122# – Deposit for Actual Reconstruction is updated to reflect revised provision references.

39. C/CT5.2 – Specified Roads is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.2.

40. C/CT5.21# – Engineering is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.21. The engineering work schedule is now stated in A/AT13.

41. C/CT5.211 – Contract Drawings is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.211.

42. C/CT5.212 – Construction Staking is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.212.

43. B5.22 – Material Delivery is modified so that it uses the same language as the BT contract, specifically, a sentence was added to specify where unused materials should be returned.

44. C/CT5.221# – Material Sources is updated to reflect revised provision references.

45. B/BT5.24 – Estimated Cost has the term Forest Service Officer changed to Contracting Officer.

46. C/CT5.24 – Estimated Costs for Cooperative Roads is renumbered as C/CT5.241 and updated to reflect revised provision references.

47. C/CT5.25 – Construction Cost Adjustment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.25.

48. C/CT5.251# – Variation in Quantities is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.251 – Difference in Rock Cost. The following sentence is substituted for the insert: "Only changes in quantities where other than design and lump sum measurement is specified in the Schedule of Items are subject to this Item."

49. C/CT5.253 – Physical Change is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.252, replacing B/BT5.252 – Difference in Culvert Installation.

50. C/CT5.254 – Design Change is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.253, replacing B/BT5.253 – Cost Adjustment for Physical Change.

51. C/CT5.26 – Alternate Facilities is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.26.

52. C/CT5.4 – Road Maintenance is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.3, replacing B/BT5.3 – Purchaser Credit Computation. In addition, one sentence, which states that road maintenance does not include reconstruction or repairs of an extraordinary manner, has been added from B/BT5.4.

53. C/CT5.31# – Road Maintenance Requirements is a new provision to provide the Contract Road Maintenance Requirements Summary that was formerly in C/CT5.4#.

54. B/BT5.41 – Road Maintenance Deposits is removed from the B/BT Division and is replaced by C/CT5.32# – Road Maintenance Deposit Schedule.

55. C/CT5.41# – Road Maintenance Deposit Schedule is renumbered C/CT5.32#.

56. B/BT5.5 – Use by Others has been renumbered as B/BT5.4.

57. C/CT6.0 – Operations is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.01 – Statutory Compliance.

58. C/CT6.01 – Interruption or Delay of Operations is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.02.

59. C/CT6.1 – Representatives is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT6.1.

60. C/CT6.2 – Improvements is no longer approved as a C/CT provision. Its text has been combined with B/BT6.2 and incorporated into the B/BT Division as B/BT6.2.

61. C/CT6.22 – Protection of Improvements Not Owned by Forest Service is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.221.

62. C/CT6.221 – Protection of Property is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.222.

63. C/CT6.24# – Protection of Cultural Resources is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division replacing B/BT6.24 – Protection of Historic Sites. A new C/CT provision, C/CT6.24# – Site Specific Protection Measures for Cultural Resources, had been added.

64. C/CT6.25# – Protection of Habitat of Endangered Species is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division and it has been renamed to be B/BT6.25 – Protection of Threatened, Endangered, and Sensitive Species. A new C/CT provision, C/CT6.25# – Site Specific Protection Measures for Threatened, Endangered, and Sensitive Species, has been added.

65. C/CT6.26# – Protection of Cave Resources is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.26 – Protection of Cave Resources. A new C/CT provision, C/CT6.26# – Site Specific Protection Measures for Cave Resources, has been added.

66. C/CT6.3 – Plan of Operations is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.311. A phrase from the instructions was added to state that this Item only applies to sales of 2 or more years between award and termination date.

67. C/CT6.311 – Plan of Operations for Road Construction is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.312.

68. C/CT6.33 – Safety is no longer approved as a C/CT provision. Its text has been combined with B/BT6.33 and incorporated into the B/BT Division as B/BT6.33 – Safety.

69. C/CT6.341 – Prevention of Oil Spills is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.341.

70. B/BT6.35 – Acceptance of Work has one sentence moved to new B provision B/BT6.361 – Acceptance of Specified Roads. It has also been renumbered as B/BT6.36.

71. C/CT6.351 – Acceptance of Specified Roads and C/CT6.35 – Final Acceptance of Specified Roads are no longer approved as C/CT provisions. Their text has been combined and incorporated into the B/BT Division as B/BT6.361. In addition, one sentence from B/BT6.35 – Acceptance of Work has been added.

72. C/CT6.36 – Equipment Cleaning is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.35.

73. C6.4 – Conduct of Logging has a cross reference added, making it consistent with CT6.4.

74. C/CT6.41 – Felling and Bucking is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT6.41.

75. C/CT6.61# – Wetlands Protection is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.62 – Wetlands Protection. A new C/CT provision, C/CT6.62# – Site Specific Wetland Protection Measures, has been added. Subsequent subsections (B/BT6.62 through B/BT6.66) have been renumbered to allow for the insertion of this subsection.

76. C/CT6.621 – Temporary Roads to Remain Open is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.631.

77. C6.81 – Scaling Services is no longer approved as a C provision. Its text has been incorporated into the B Division, replacing B6.81.

78. C6.812 – Weighing Services is no longer approved as a C provision. Its text has been incorporated into the B Division as B6.811.

79. C6.813 – Third Party Scaling Services is updated to reflect revised provision references and renumbered as C6.812.

80. C6.82 – Product Identification Options 1 and 2 are no longer approved as C provisions. Their text has been combined and incorporated into the B/BT Division as B6.842. The phrase "West of the 100th meridian," has been added at the beginning of paragraph (b).

81. CT6.82 – Product Identification is no longer approved as a CT provision. Its text has been incorporated into the BT Division as BT6.81. The phrase "For timber sales west of the 100th meridian," has been added at the beginning.

82. C6.841 – Route of Haul is no longer approved as a C provision. Its text has been incorporated into the B Division as B6.841.

83. C6.85 – Scaling Lost Products is no longer approved as a C provision. Its text has been incorporated into the B Division, replacing B6.85.

84. C6.851 – Scaling Lost Sample Loads is no longer approved as a C provision. Its text has been incorporated into the B Division as B6.851.

85. C/CT6.9 – Requirement for Small Business Processing is updated to reflect revised provision references and is renumbered C/CT6.91.

86. C/CT6.91 – SSTS Processing Requirements and Records is updated to reflect revised provision references and is renumbered C/CT6.92.

87. C/CT8.11 – Title Passage is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT8.11.

88. B/BT8.2 – Period of Contract has a reference to B/BT8.212 added as one of the authorities for adjusting the termination date.

89. C/CT8.2 – Termination is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT8.24.

90. C/CT8.21 – Delay in Reconstruction of Processing Facilities is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT8.211.

91. C/CT8.211 – Delay of Award is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT8.213.

92. C/CTC8.212# – Market-Related Contract Term Addition is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT8.212. The index is now stated in A26 or AT23.

93. C/CT8.221 – Termination by Purchaser is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT8.221. Paragraph (b) of the C/CT provision is eliminated since it is always met if paragraph (a) is met.

94. C/CT8.23 – Contract Term Extension is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT8.23.

95. C/CT8.23-1 – Contract Term Extension (Option 1) is renamed and renumbered C/CT8.232 – Contract Term Extension with Environmental Modification.

96. C/CT8.231 – Conditions for Contract Term Extension is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT8.231.

97. C/CT8.3 – Contract Modification is no longer approved as a C/CT provision. Its text has been combined with B/BT8.3 and incorporated into the B/BT Division as B/BT8.3. The term Forest Service Officer was changed to Contracting Officer. The phrase "except as provided in B/BT8.24" was also added to reflect that only the Chief has authority to terminate a contract under this provision.

98. C/CT8.32 – Changed Conditions is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT8.32.

99. B/BT8.4 – Performance by Other Than Purchaser has the term Forest Service Officer changed to Contracting Officer.

100. C/CT8.6 – Debarment and Suspension Certification, Lower Tiered Covered Transactions is no longer approved as a C/CT provision. Its title has been shortened and its text has been incorporated into the B/BT Division as B/BT8.64 – Debarment and Suspension Certification.

101. B/BT8.63 – Nondiscrimination in Employment has a reference to Executive Order No. 12086 of October 5, 1978 added to update it to reflect current Executive Orders.

102. C/CT8.63 – Nondiscrimination in Employment is no longer approved as a C/CT provision. Its text has been combined with B/BT8.63 and incorporated into the B/BT Division as B/BT8.63.

103. C/CT8.641# – Use of Timber is renumbered as C/CT6.85#.

104. C/CT9.1 – Letters of Credit is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.12.

105. C/CT9.11 – Bond Reduction is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT9.11.

106. C/CT9.2 – Disputes is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT9.2.

107. C/CT9.21 – Submission of Claim is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.21.

108. C/CT9.22 – Contract Documents is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.22.

109. B/BT9.3 – Breach has the term Forest Service Officer changed to Contracting Officer. The last two sentences of BT9.3 have been incorporated into B/BT9.31.

110. C/CT9.3 – Breach is no longer approved as a C/CT provision. Its text has been renamed and incorporated into the B/BT Division as B/BT9.31 – Termination for Breach.

111. C/CT9.4 – Failure to Cut is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT9.4.

112. C/CT9.41 – Failure to Execute Contract is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.41.

113. C/CT9.5 – Settlement is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.52 – Settlement for Other Environmental

Termination. The relevant paragraphs of B/BT8.24 are referenced, as well as clarifying that it is the Chief, rather than the Forest Service, that has this authority.

114. C/CT9.51 – Settlement for Administrative Appeal or Litigation is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.53. A reference to provision B/BT8.24 has been added since damages are calculated under this provision.

115. C/CT9.52 – Settlement for Environmental Cancellation is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT9.51 – Settlement for Threatened, Endangered, or Sensitive Species Termination.

116. B/BT9.6 – Contract Closure has the term Forest Service Officer changed to Contracting Officer.

These revised B/BT Divisions would supersede the B and BT Divisions dated 9/73 and 10/73, respectively. The revised A/AT Division Special Condition pages and C/CT Division Special Provisions would also supersede previous versions.

Enclosed are complete sets of the proposed A/AT Special Conditions, B/BT Standard Provisions, and C/CT Special Provisions. We would like to discuss these proposals with you in Flagstaff, but if you have questions before then, please contact Rex Baumback at (202) 205-0855.

/s/ William E. Timko
for
ANN M. BARTUSKA
Director, Forest and Rangeland Staff

Enclosures
FS-2400-6/6T B/BT Division Standard Provisions (1/01)
Updated A/AT Division Special Conditions (all)
Updated C/CT Division Special Provisions (all)

cc (w/ enclosures):
Chris West, Northwest Forestry Assoc., 1500 S.W. First Ave., Suite 330, Portland, OR 97201
Frank Gladics, Independent Forest Products Assoc., 14780 S.W. Osprey Dr., Suite 270, Beaverton, OR 97007
Tom Troxel, Intermountain Forest Industry Assoc., 2040 W. Main St., Suite 315, Rapid City, SD 57702

*Baumback:202-205-0855:October 19, 2000*
*I Concur:RBaumback:Thursday,October 19, 2000*
*I Concur: RFitzgerald:October 30, 2000*

AMERICAN FOREST
RESOURCE COUNCIL

Ann Bartuska
Director of Forest Management
USDA Forest Service
P.O. Box 96090
Washington, D.C. 20090-6090

March 22, 2001

Dear Ann,

At the November meeting of the Federal Timber Purchasers Committee meeting, Rex Baumback presented the group with proposed new 2400-6 and –6T contracts. He explained to us that this new contract did not contain anything "new" but was rather a cleaning up of the existing contract. This cleaning up would consist of incorporating the long standing required "C" provisions into the "B" provisions and deleting the currently inapplicable "B" provisions. This sounded like a reasonable evolution of the contract so we made a commitment to provide you with our comments by April 1st.

On December 5th, Rex sent me the proposed contract as well as all of the current (7/00) "C" provisions. I proceeded to construct a side-by-side analysis to verify that the new contract was "as advertised." The result of that analysis found that the new contract was as it had been described except for some minor differences I feel we could have worked out.

On February 12th, I received an email from Rex informing me that the Forest Service had approved a revised (12/00) list of "C" provisions for the 2400-6 and –6T contracts. At that time, he sent an updated proposed new contract and list of "C" provisions. He also provided me with an updated side-by-side. These documents were distributed to the FTPC without my review as time was running short.

**Ross Mickey**
*Western Oregon Manager*
2300 Oakmont Way Suite 205 • Eugene, OR 97401
Tel. (541) 342-1892 • Fax (541) 342-5492
Email: rmickey@afrc.ws

Exhibit 16

I have received numerous comments back from the Committee and have come to the conclusion that we will require an extension in the comment period to August 1st. This is approximately one month after our next to-be-scheduled FTPC meeting. The reasons for this need for an extension are as follows:

1. Many changes and additions were made to the "C" provisions between the 7/00 and 12/00 versions. FTPC was neither asked for or gave any comments on these changes, many of which are unacceptable to the industry.
2. Many of the changed and added "C" clauses issued in December were incorporated as "B" provisions in the proposed new contract. This violates the spirit and intent of creating a "new" neutral contract.
3. The side-by-side that was done by Rex did not clearly reflect the changes being proposed between the status quo (what existed as of 7/00) and the proposed new contract. The side-by-side merely showed the changes between the Decembers modified "C" clauses and proposed contract language. The members of the FTPC, therefore, have not received a true picture of the magnitude of the changes being proposed in the new contract.

I now must prepare a new side-by-side to send out to the FTPC and solicit comments. The timing of this process will coincide with the next meeting of the FTPC in June or July. I would then like another month to compose our detailed comments.

Please call me if you have any questions. I hope to here from you soon regarding our request.

Sincerely,

Ross Mickey
Chair, Contract Sub-committee
FTPC

Cc: Rex Baumback

**Ross Mickey**
*Western Oregon Manager*
2300 Oakmont Way Suite 205 • Eugene, OR 97401
Tel. (541) 342-1892 • Fax (541) 342-5492
Email: rmickey@afrc.ws

March 29, 2001

Ross:

I have included the following documents:

2400-6 Contract incorporating C provisions as of July 2000 (modified from what you were sent before to remove C provisions not current in July 2000.

2400-6T Contract incorporating C provisions as of July 2000 (modified from what you were sent before to remove C provisions not current in July 2000.

A(AT) and C(CT) Provisions that would be necessary to implement the July 2000 Contract.

A Crosswalk from the propose B Section (first document above) to C provisions in effect in July 2000 (I used your crosswalk as a starting point and made changes to reflect only incorporating the C provisions in effect in July 2000. In other words, I did not check your document for accuracy. In addition, I did not compare today's C provisions with those in existence in July 2000, Since today's C provisions have already been implemented.)

Our October 31, 2000 letter to AFPA.

One of the principal objectives the Forest Service had in proposing a revision of the contract was to reduce the number of C provisions and the number of provisions that are made inapplicable. It was hoped that this objective would make the contract easier to understand and use. Now, based on your demand, that either we not include the December 2000 C provisions in the contract revision, or industry would not support the revisions and would do everything possible to stop the revision, I have added 25 C provisions to the list of C provisions that must be used with the July 2000 contract. There will also be about 25 inapplicable B provisions with the July 2000 contract. I guess that's better than the approximately 100 that we currently have, but it still does not make sense to only update the contract to a point approximately 1 year prior. Those December C provisions will be just as valid contractually (In fact C provisions take precedence over B provisions if there is a conflict.) as they would be if they were B provisions. They are not "temporary" as you suggested.

The revised contract has undergone extensive review within the Forest Service. I had planned on incorporating these review suggestions (All of which would be beneficial to industry or neutral.) into the revised contract, but will defer this, since none of the revisions are critical and the revised contract would end up with even more C provisions and deleted B provisions. They can all wait until there is a subsequent revision of the B Section. Many of the revisions in December and all of the C provisions that I was preparing for release were attempts to "perfect" the C provisions prior to incorporating them into the revised contract. Specifically, I had been planning to propose the following changes for approval:

C/CT3.3# – Scheduled Rate Redetermination After Environmental or Catastrophic Damage Modification. The procedure for determining redetermined rates after

Exhibit 17

catastrophic damage would be corrected to assure that stumpage is reduced to reflect the reduced value due to catastrophic damage when a sale is extended.

C/CT4.221 – Advance Deposits. The requirement to suspend operations when the credit balance in Timber Sale Account is less than the amount due for timber estimated to be cut in 10 days would be moved from C/CT4.4 to this provision.

C/CT4.229 – Temporary Reduction of Downpayment. This provision would be modified to provide that the downpayment be restored within 15 days after the bill for collection is issued to make it consistent with C/CT4.4 and other payment procedures. The restriction that out of pocket expenses must have been incurred during the normal operating season would be removed. Purchasers currently are not reimbursed for out of pocket expenses incurred outside of the normal operating season.

C/CT4.254 – Extension Deposits. The time for making the initial extension deposit would be clarified to make it clear that it is due prior to the Forest Service executing the contract modification, rather than prior to the effective date of the contract term extension, which is often much earlier.

C/CT4.4 – Payments Not Received. The requirement to suspend operations when the credit balance in Timber Sale Account is less than the amount due for timber estimated to be cut in 10 days would be moved from this provision to C/CT4.221.

C/CT5.4# – Road Maintenance. A sentence from B/BT5.4 (which is always inapplicable) would be added to make it clear that maintenance does not include road reconstruction and repairs of an extraordinary nature.

C/CT6.02 – Interruption or Delay of Operations. This provision would be modified to remove the restriction that out of pocket expenses must have been incurred during the normal operating season and to allow unused temporary roads as an out of pocket expense. Purchasers currently are not reimbursed for out of pocket expenses incurred outside of the normal operating season.

C/CT6.36 – Equipment Cleaning. This provision would be modified to clarify that it is administered on a species by species basis. It would also be modified so that the sale area map identifies cutting units infested with weeds, rather than cutting units that are free of infestation. It would be modified to remove the purchaser responsibility to report new infestations of noxious weeds on the haul route. Finally, it would be modified to provide for reimbursing the purchaser if the contract is modified to provide additional protection.

C/CT6.61 – Meadow Protection. This provision would be modified to add a requirement to show protected meadows on the sale area map.

C6.813 – Interrupted or Delayed Scaling Services. The restriction that out of pocket expenses must have been incurred during the normal operating season would be removed. Purchasers currently are not reimbursed for out of pocket expenses incurred outside of

the normal operating season. The provision would also be modified so that if scaling services are interrupted, the purchaser must discontinue hauling, rather than suspend operations. Finally, rather than discontinuing hauling outside of the scaling services schedule, the provision would state that logs will not be presented for scaling outside of this schedule.

C/CT9.31 – Termination for Breach. The paragraph authorizing the Contracting Officer to immediately terminate the contract if the purchaser designates or Marks timber would be removed.

You stated adamantly that we had not informed industry that it was our intent to keep the B section updated with new provisions that are applicable to all contracts. This is a quote of the 2nd paragraph from our October 31, 2000 letter to AFPA. I also gave you a copy of this letter on December 5, 2000:

> "This proposal to revise the contracts is due to changes in computer and word processing technology. **If adopted, in the future, changes in contract provisions that are applicable to all contracts would result in a revised B/BT Division and changes in contract provisions that are applicable in only specific situations would result in new or revised C/CT provisions.** The B/BT Divisions would not be commercially printed, but would be available in electronic format." (emphasis added)

I hope that you are willing to reconsider your position concerning updating the July 2000 contract with C provisions. Perhaps a compromise would be to update the contract with all existing C provisions, then in the future just update the B section for changes in C provisions on an annual basis.

Rex

# BUYER'S GUIDE

## to

## Forest Service Timber Sale Contracts

SECOND EDITION

National Forest Products Association

Exhibit 18

# BUYER'S GUIDE
(Second Edition)
To
FOREST SERVICE TIMBER
SALE CONTRACTS

Form 2400-6 (1970 edition)
Form 2400-6 (1973 edition)
Form 2400-6T (1972 edition)
Form 2400-6T (1973 edition)

**The information appearing herein has been obtained from reliable sources but we do not under any condition guarantee its accuracy. A timber sale contract is a legal document. Persons should refer legal questions to their own attorney.**

Published By

National Forest Products Association
1619 Massachusetts Avenue, N.W.
Washington, D.C. 20036
1974

# CHAPTER I
# INTRODUCTION TO THE SECOND EDITION

The second edition of the *Buyer's Guide* to Forest Service Timber Sale Contracts is designed to inform and help *Purchasers* of National Forest timber understand the intent and the requirements contained in the contracts written on contract forms 2400-6 (1970 edition), 2400-6 (1973 edition), 2400-6T (1972 edition), and 2400-6T (1973 edition). This guide is keyed to the timber sale contract form 2400-6 (1970 ed.), (Applicable to Sales to be Scaled After Felling). Differences between contract form 2400-6 (1970 ed.) and the three other types of contract forms are explained in separate chapters of the guide.

Contract form 2400-6 (1970 ed.) is a result of extended discussions between NFPA's Federal Timber Purchasers Committee and the Forest Service, and represents a complete revision of timber sale contract form 2400-5, issued July, 1965. Contract form 2400-6 (1970 ed.), issued July, 1970 and initially used for contracts advertised after June 30, 1971, is an improved version of its predecessor, and not a departure of the principles established in the old contract form 2400-5.

After only two years of use, contract form 2400-6 (1970 ed.) was revised in 1973 to include required removal of all material meeting *Utilization Standards* from *Sale Area* and to incorporate some of the existing National Division C Provisions in the revised contract's Division B section. The contract was reissued as contract form 2400-6, issue date of September, 1973, and has been in use for most scaled timber sale contracts advertised and awarded since July, 1974.

The old tree measurement contract, form 2400-5T, issued September, 1965, was also subject to extensive revisions at two separate occasions during the past three years. It was revised in 1971 and issued January, 1972 as contract form 2400-6T (1972 ed.), (Applicable to Sales to be Measured Before Felling). In 1973, this contract form, together with contract form 2400-6 (1970 ed.), was modified to incorporate changes of the contract's utilization provisions. The contract was reissued as contract form 2400-6T, issue date of October, 1973, and is now used for most tree measurement contracts awarded since July, 1974.

The first edition of the *Buyer's Guide* is still the appropriate reference for contracts written on contract forms 2400-5 and 2400-5T, which will remain in effect for several years until completed. However, the first edition may confuse rather than help *Purchasers*, if they try to use the

# FEDERAL TIMBER PURCHASERS COMMITTEE

## MONDAY, TUESDAY, & WEDNESDAY
## September 21 - 23, 1998

## Sheraton Four Points Hotel
## North Conway, New Hampshire

Exhibit 19

# *AGENDA*

Monday, September 21 (10:00 am) - FTPC (Industry Only)

TAB

1. Federal Timber Purchasers Committee Membership Roster............................ 1
2. Welcome & Introductions (Crouch)
3. Antitrust Statement (Bierer)
4. Approval of May 1, 1998 Reno FTPC Meeting Minutes (Crouch).................... 2
5. C Clause Provisions Eliminating Purchaser Credit (Bierer)
6 Road Moratorium Update (Bierer)
7. Committee of Scientists Report &New Forest Service Planning Regulations Update (Bierer)................................................................................ 3
8 Public Land and Timber Issues Updates (Bierer)
9. Results of AF&PA's VISTA Research (Watson & Dewitt)
10. New Hampshire Timberland Owners Association Issues (Kingsley)
11. Other Business:
    -Tree measurement vs. scale sales (Simon)
    -Special project funding (Crouch)

HOSTED RECEPTION at 6:30 pm & BANQUET at 7:00 pm

Tuesday, September 22 (9:00 am) - FTPC Joint Meeting With Agencies

1. Welcome & Introductions (Crouch)
2. Antitrust Statement (Bierer)
3. Summary of 1999 Forest Service & BLM Timber Sale Plans (Agencies)
4. Elimination of Purchaser Credit in FY 1999 (Forest Service)
5. FY 1999 Appropriations Items
    -Restrictions on overhead charges to off-budget accounts
    -All resources cost reporting to replace TSPIRS
    -Allocation of timber sale funds to regions with highest likelihood of attaining forest plan goals, objectives, and merchantable volume
    -More use of scale sales
6. Stewardship Contracts (Forest Service)
7. Small Diameter Log Utilization (Forest Service)
8. Other Business:
    -Timber Information Manager system briefing (Forest Service)............. 4
    -Updates on new regulations (Forest Service)

Wednesday, September 23 (8:00 am) - FIELD TOUR

1. Leave North Conway, NH
2. Travel to White Mtn. National Forest - Langdon Horn Timber Sale
3. Examine and Discuss Sale and Heavy Ice Damage
4. Travel to Bethel, MN
5. Visit Bethel Furniture Stock Facility
6. Return to North Conway, NH

# FEDERAL TIMBER PURCHASERS COMMITTEE
AND
# NATIONAL FOREST PLANNING COMMITTEE

**THURSDAY, FRIDAY, & SATURDAY**
**APRIL 30 - MAY 2, 1997**

**Peppermill Hotel & Casino**
**Reno, Nevada**

*AGENDA*
*Peppermill Hotel - Reno, Nevada*

Thurs. April 30 (10:00 am) - NATIONAL FOREST PLANNING COMMITTEE MEETING

| | | TAB |
|---|---|---|
| 1. | National Forest Planning Committee Membership Roster | 1 |
| 2. | Antitrust Statement | 2 |
| 3. | Approval of April 9, 1997 San Antonio NFPC Meeting Minutes | 3 |
| 4. | Overview of Committee of Scientists (Roger Sedjo) | |
| 5 | New Planning Regulations (Chris Risbrudt) | |
| 6. | Corporate Resource Information Project (Chris Risbrudt) | 4 |
| 7 | Ecoregion Assessment/EIS Updates (Chris Risbrudt) | 5 |
| 8. | Interior Columbia Basin Ecosystem Management Project Overview (Andy Brunelle) | |
| 9. | Update on the California Owl EIS (John Hofmann) | |
| 10. | Overview of the Quincy Library Group (Susan Barrymore) | |
| 11. | Other Business | |

Friday, May 1 (1:00 pm) - FEDERAL TIMBER PURCHASERS COMMITTEE MEETING (WITH AGENCIES)

| | | |
|---|---|---|
| 1. | Federal Timber Purchasers Committee Roster | 6 |
| 1. | Antitrust Statement | |
| 3. | Approval of October 14, 1997 Cedar City FTPC Meeting Minutes | 7 |
| 2. | Phase-out of Purchaser Credits (Bob Lynn) | |
| 3. | Proposal to Delink County Payments from Timber Sale Receipts (Bob Lynn) | 8 |
| 4. | Effects of the Roads Moratorium (Bob Lynn) | |
| 5. | FY 1998 Mid-Year Timber Sale Accomplishments (Bob Lynn & Bill Torgersen) | |
| 6. | Updates: | |
| | -Pilot vegetation management projects (Bob Lynn) | 9 |
| | -Status of regulation revisions (Bob Lynn) | |
| | -New Forest Service timber sale contract (Bob Lynn) | |
| | -Results of Rynearson study on cruising (Dick Fitzgerald) | |
| | -Chief's watershed/forest health initiative (Bob Lynn) | |
| 7. | Other Business | |

Saturday, May 2 (7:30 am) - Field Tour

1. Collins Pine Mill at Chester, California
2. Quincy Library Group Projects (Lassen National Forest)

# Federal Timber Purchasers Committee

MONDAY, TUESDAY & WEDNESDAY
October 13 - 15, 1997

Holiday Inn Hotel
Cedar City, Utah

# AGENDA

## FEDERAL TIMBER PURCHASERS COMMITTEE MEETING
TUESDAY, OCTOBER 14, 1997
8:30 am to 5:00 pm
(INDUSTRY MEETING with FOREST SERVICE & BLM)

I. Opening Remarks And Introductions

II. Antitrust Statement

III. Comments By Bob Joslin

IV. FY 1997 Timber Sale Accomplishments & FY 1998 Timber Sale Targets

V. Overview Of Old-Growth Ponderosa Pine Restoration Research By Dr. Wally Covington

VI. Status Of Rulemaking:

-Stumpage Rate Adjustments (SRA)
-Market Related Contract Term Adjustments (MRCTA)
-Contract Cancellation

VII. New Forest Service Timber Sale Contract

VIII. Recommended Forest Service Liability Clause When Purchasers Are Denied Sale Area Access By Third Parties

IX. Other Business:

-Status Of Pilot Project Proposals
-Status Of Non-Harvest Petition
-Summary Of Rynearson Study Re: Scale Sales vs. Tree Measurement Sales
-Cubic Cull Log Rule
-Purchaser Road Credits

X. Adjourn

# Federal Timber Purchasers Committee
## and
# National Forest Planning Committee

MONDAY, TUESDAY, & WEDNESDAY
APRIL 7 - 9, 1997

Homewood Suites River Walk
San Antonio, Texas

American Forest & Paper Association

# MEETING AGENDA

TAB

## Tuesday (9:00AM-4:00PM): FTPC - Agencies Joint Meeting

| | | |
|---|---|---|
| I. | Opening Remarks and Introductions | |
| II. | Antitrust Statement | 1 |
| III. | FTPC Membership List | 2 |
| IV. | Approval of October 22, 1996 FTPC Meeting Minutes | 3 |
| V. | Forest Service Efforts To Eliminate Or Minimize Government Financial Liability When Canceling Or Modifying Contracts<br><br>-Changes in Timber Sale Contract "C" Provisions Without Providing Comment Period<br>-Final Rule Combining Two Existing Regulations Covering Contract Modifications to Prevent Environmental Damage or to Conform to Forest Plans<br>-Proposed Rule Limiting Purchasers to Out-of-Pocket Expenses When Canceling or Modifying a Contract | 4 |
| VI. | Proposed SRA and MRCTA Rule Changes | 5 |
| VII. | 1998 Appropriations Issues<br><br>-Heissenbuttel's Testimony<br>-Roads<br>-Forestland Management<br>-Forest Ecosystem Restoration & Maintenance Fund | 6 |
| VIII. | Modification of the Cubic Rule | 7 |
| IX. | Metric Conversion Implementation Plan | 8 |

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract

Purchaser Timber Products Co.

Sale Name JACK HELI

Award Date 3/2/99

Contract No. 060715

Region FIVE

National Forest KLAMATH

Ranger District SCOTT RIVER

A-610

FS-2400-13(7/70)

FS-2400-6, Page 101 (9/73)

| USDA - FOREST SERVICE<br><br>**TIMBER SALE CONTRACT**<br>(Applicable to Sales to be Scaled After Felling) | | NAME OF PURCHASER TIMBER PRODUCTS COMPANY<br>P. O. Box 766<br>Yreka, CA 96097 | | |
|---|---|---|---|---|
| NATIONAL FOREST<br>Klamath | RANGER DISTRICT<br>Scott River | REGION<br>Five (PSW) | CONTRACT NO.<br>060715 | |
| SALE NAME<br>Jack Heli Timber Sale | | SUBREGION<br>Coast Range | AWARD DATE<br>3/2/99 | TERMINATION DATE<br>03/31/01 |

The parties to this contract are The United States of America, acting through the Forest Service, United States Department of Agriculture, hereinafter called Forest Service, and Timber Products Company, a partnership consisting of W. A. Atwood, A. J. Austin, and J. H. Gonyea

1 ______________________________

a ______________________________

hereinafter called Purchaser.

2 Forest Service having advertised a sale at which either (1) Purchaser, whose required bid deposit is now held by Forest Service as an initial deposit, was the successful bidder, or (2) no bids were received and Purchaser having subsequently offered at least the minimum advertised price and made an initial deposit in the same amount as the bid deposit specified in the sale advertisement; and the parties hereto desiring torecord their agreement; now therefore,

In consideration of the premises and the promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber.

This contract consists of three Divisions: A - Specific Conditions, B - Standard Provisions, and C - Special Provisions, together with Sale Area Map, Drawings and specifications for developments (if any) and such attachments as may be provided for in Division C. Specific Conditions are numbered and apply to the Part, Section, Subsection, or Item of the Standard Provisions, as indicated hereunder. Other conditions of this contract are stated in Division C - Special Provisions.

I **WITNESS WHEREOF**, the parties hereto have executed this contract as of the award date.

UNITED STATES OF AMERICA

BY Edward L. Matthews

Edward L. Matthews, Contracting Officer 3/15/99
(Title)

Two Witnesses:[3]

Amy Wagner
(Name)

P.O. BOX 766 YREKA CA 96097
(Address)

[signature]
(Name)

SAME
(Address)

TIMBER PRODUCTS COMPANY
(Purchaser)[4]

BY Bill T[illegible]

TIMBER PROCUREMENT MANAGER
(Title)

P. O. Box 766, Yreka, CA 96097
(Business Address)

I,[5] ______________________, certify that I am the ______________________

Secretary of the corporation named as Purchaser herein; that ______________________

who signed this contract on behalf of Purchaser, was then ______________________ of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

______________________ CORPORATE SEAL[6]

A-611

C6.3# - Plan of Operation. ( 5) Within 60 days of first normal op- ing season, Purchaser shall furnish Forest Service a written general plan of operation which shall be in addition to the annual operating schedule required under B6.31. The plan shall set forth planned periods for and methods of road construction, timber harvesting, and completion of slash disposal, erosion control measures and other contractual requirements. Forest Service written approval of the plan of operation is prerequisite to commencement of Purchaser's Operations. Purchaser may revise this plan of operations when necessitated by weather, markets or other circumstances, subject to the written approval of Forest Service. In the event of delays beyond the control of Purchaser which qualify for Contract Term Adjustment, the plan of operations shall be mutually adjusted as necessary to accommodate the adjusted contract period.

C6.311 - Plan of Operation for Road Construction. (6/80) Annually, prior to start of construction, Purchaser shall submit a supplement to plan of operation which shall include a schedule of proposed progress, and a description of planned measures to be taken to provide erosion control for work in progress, including special measures to be taken on any segments of construction not Substantially Completed prior to periods of seasonal precipitation or runoff. When Purchaser proposes a significant deviation from the progress schedule, Purchaser shall submit a revised schedule.

Prior to beginning construction on any portion of Specified Roads identified as sensitive on Drawings, Purchaser and Forest Service shall agree on proposed method of construction.

C6.313# - Limited Operating Period. (1/84) Except when agreed otherwise, Purchaser's Operations shall be limited as follows: No Purchaser's Operations in Unit 31 from March 1 through August 31. No Purchaser's Operations in Unit 57 from February 1 through July 31. No hauling of more than 5 loads per day on Road 41N16 between Jackson Creek and Little Jackson Creek from February 1 through August 31. No hauling of more than 5 loads per day on Road 41N14 in T40N, R9W, Section 20; M.D.M., from February 1 through August 31. No Purchaser's Operations in Units 98, 100, 102, and 104 from May 23 through September 7, or during first 7 days of deer season. Purchaser is required to give Forest Service 30 day's notice before beginning operations in these units.

C6.316 - Helicopter Transport of Forest Service Personnel. (10/30/97) Unless otherwise agreed, Purchaser shall provide helicopter transportation for Forest Service personnel as needed for the purpose of timber designation and contract administration at no charge to Forest Service.

Such helicopters and operators shall be approved for transporting Forest Service personnel under the rules prescribed by Forest Service in Region 5. A copy of these rules are available in the Forest Supervisor's Office, Yreka, CA.

Forest Service and Purchaser shall agree on a transportation schedule which facilitates timely timber designation and contract administration.

The rules shall include Title 5700 of the Forest Service Manual and Forest Service Handbook 5709.12 (Helicopter Operations Handbook).

C6.33 - Safety. (6/78) Unless otherwise agreed in writing, when Purchaser's Operations are in progress adjacent to or on Forest Service controlled roads and trails open to public travel, Purchaser shall furnish, install and maintain all temporary traffic controls which provide the user with adequate warning of hazardous or potentially hazardous conditions associated with Purchaser's Operations. A specific traffic control plan for each individual project shall be agreed to by Purchaser and Forest Service prior to commencing operations. Devices shall be appropriate to current conditions and shall be covered or removed when not needed. Except as otherwise agreed, flagperson and devices shall be as specified in the "Manual on Uniform Traffic Control Devices for Streets and Highways" (MUTCD), and as shown on Drawings, Sale Area Map or in specifications attached hereto.

C6.331 - Log Trucking. (11/76) To promote safe operations on National Forest roads and on Specified Roads, loads shall be safely secured before trucks move from the landing or loading location.

C6.332 - Restricted Flight Pattern. (10/30/97) Designated on the Sale Area Map are areas where flight pattern is restricted.

Logs shall not be yarded over these areas unless otherwise agreed in writing.

Helicopters involved in logging shall not fly over these areas unless otherwise agreed in writing.

C6.341 - Prevention of Oil Spills. (6/81) If Purchaser maintains storage facilities for oil or oil products on Sale Area, Purchaser shall take appropriate preventive measures to insure that any spill of such oil or oil products does not enter any stream or other waters of the United States or any of the individual States.

If the total oil or oil products storage exceeds 1320 gallons or if any single container exceeds a capacity of 660 gallons, Purchaser shall prepare a Spill Prevention Control and Countermeasures (SPCC) Plan. Such plan shall meet applicable EPA requirements (40 CFR 112) including certification by a registered professional engineer.

C6.35 - Final Acceptance of Specified Roads. (1/80) Prior to request for final inspection, roadways, borrow pits, and quarries occupied and no longer needed by Purchaser in connection with Purchaser's Operations shall be cleared of all rubbish, excess materials, and temporary structures.

C6.36 - Substitute Methods. (6/82) Notwithstanding other provisions herein, for minor changes such as changes in logging systems for areas smaller than 5 acres, Purchaser and Forest Service may agree in writing that use of substitute methods or equipment will achieve Forest Service objectives under this contract and may be used in lieu of those specified for Purchaser's Operations.

C6.41 - Felling and Bucking. (4/74) When agreed, dead timber not meeting Utilization Standards in open stands, may be pushed or pulled down with equipment. Other Included Timber shall not be felled in this manner except hardwoods as provided in C6.7.

In order to minimize damage to the residual stand, Purchaser shall coordinate his felling with tributary skid road and landing locations so as to avoid turning logs in partial cut areas. To the extent possible and consistent with minimizing breakage of Included Timber, and minimizing damage to the residual stand, trees shall be felled with lead toward the tributary landing or skid road.

Notwithstanding other provisions herein, Purchaser need not buck pieces to lengths that are multiples of less than 2 feet and resulting residues need not be removed or paid for.

C6.411# - Directional Felling. (6/79) Unless otherwise agreed in writing, trees which cannot normally be felled away from other ownership, wilderness boundary, controlled area, survey monument, ditch, trail, Pacific Crest Trail, pipeline, and streamcourse shown on Sale Area Map shall be directionally felled away from said areas with the aid of specialized equipment. Such directional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing.

C6.414# - Limbing. (7/86) Outside of construction clearings, Clearcutting Units and regeneration units, unless otherwise provided by B6.414, Purchaser shall, prior to skidding operations, cut exposed limbs from products which are to be yarded. Such limbing of stems shall be done to a top diameter of approximately 3 inches, at which point the top shall be cut from the remainder of the stem.

Notwithstanding other provis... herein, inside unit 100 for trees unde... ?" DBH, products shall be skidded to agreed landing locations prior to limbing and lopping.

Within units on subdivisions designated NO LOP on Sale Area Map, limbing and cutting unutilized tops shall not be required.

C6.429 - Helicopter Yarding. (3/74) Unless agreed otherwise in writing, within subdivisions so designated on Sale Area Map, yarding shall be by a helicopter capable of lifting and transporting products to landings without unnecessary damage to residual trees.

C5.411 - Dust Abatement for Temporary Roads. (5/79) Purchaser shall abate dust to promote safe use of road and to prevent excessive loss of road material. Purchaser may choose the material used in dust abatement. When anything other than water is to be used, such material must be approved in writing by Forest Service.

If water is used, complete abatement once for each hauling day shall satisfy this requirement, except that when production exceeds 50 M board feet per operating day, water shall be applied to dusting roads through the day while hauling.

C6.5# - Streamcourse Protection. (8/31/98) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 300 feet slope distance of the apparent high water mark on Scott River in Units 11 and 12, within 300 feet slope distance of the apparent high water mark in Boulder Creek and East Boulder Creek Creek in Units 15, 18, and 19, within 300 feet slope distance of the apparent high water mark in Jackson Creek in Units 49 and 53, and within 150 feet of streamcourses shown on Sale Area Map, except as necessary for fire suppression activities. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.

Culverts, bridges or other suitable structures shall be required on tractor roads and skid trails only at points where it is necessary to protect Streamcourses. The type of crossing structure, method of installation and removal shall be determined by agreement. Such structures and associated fills shall be removed by Purchaser in accordance with C6.6.

Damage to Streamcourse or Buffer Strips caused by unauthorized Purchaser's Operations shall be repaired by Purchaser in a timely and agreed manner to the extent practicable as determined by Forest Service to restore and prevent further damage to Streamcourses.

C6.6 - Erosion Prevention and Control. (9/72) Erosion prevention and control work, including Streamcourse protection, required by C6.5 and B6.6 shall be completed within 15 calendar days after skidding operations related to each landing are substantially completed or after Forest Service designation on the ground of work where such designation is required hereunder. Said time limit shall be exclusive of full days lost in Purchaser's Operations due to causes beyond Purchaser's control. Such on the ground designation shall be done as promptly as feasible unless it is agreed that the location of such work can be established without marking on the ground. After September 15 and as long thereafter as operations continue the work shall be done as promptly as practicable. Damage resulting from Purchaser's Operations due to failure to perform required work shall be repaired by Purchaser.

C6.7# - Slash Treatment. (3/83) All vegetative debris associated with construction of Specified Roads such as unutilized timber, brush and grubbed stumps is Construction Slash. Measures to be taken by Purchaser for treatment of Construction Slash are set forth in the attached road construction specifications and in item (1) below.

Copy for Purchaser

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract



Purchaser CLR TIMBER HOLDINGS, INC.

Sale Name TOO WILD

Award Date 5/14/1999

Contract No. 075862

Region SIX

National Forest SISKIYOU

Ranger District GOLD BEACH

A-790

Copy for Purchaser

| U.S. DEPARTMENT OF AGRICULTURE - FOREST SERVICE<br>TIMBER SALE CONTRACT<br>(Applicable to Sales to be Measured Before Felling) | | NAME OF PURCHASER<br>CLR TIMBER HOLDINGS, INC. | |
|---|---|---|---|
| NATIONAL FOREST<br>Siskiyou | RANGER DISTRICT<br>Gold Beach | REGION<br>Six | CONTRACT NO.<br>075862 |
| SALE NAME<br>Too Wild | | SUBREGION<br>Douglas-fir | AWARD DATE: 5/14/99 \| TERMINATION DATE: ~~12/31/00~~ ~~11/31/00~~ 8/31/03 8/31/05 6/2 3/1/0 |

The parties to this contract are The United States of America, acting through the Forest Service, United States Department of Agriculture, hereinafter called Forest Service, and
1/ CLR Timber Holdings, Inc.

a Corporation, organized and existing under laws of the State of Oregon
hereinafter called Purchaser.

2/ Forest Service having advertised a sale at which either (1) Purchaser, whose required bid deposit is now held by Forest Service as an initial deposit, was the successful bidder, or (2) no bids were received and Purchaser having subsequently offered at least the minimum advertised price and made an initial deposit in the same amount as the bid deposit specified in the sale advertisement; and the parties hereto desiring to record their agreement; now therefore,

In consideration of the premises and the promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber.

This contract consists of three Divisions: AT - Specific Conditions, BT - Standard Provisions, and CT - Special Provisions, together with Sale Area Map, Drawings and specifications for developments (if any) and such attachments as may be provided for in Division CT. Specific Conditions are numbered and apply to the Part, Section, Subsection, or Item of the Standard Provisions, as indicated hereunder. Other conditions of this contract are stated in Division CT-Special Provisions.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the award date.

UNITED STATES OF AMERICA

BY [signature]

Contracting Officer
(Title)

Two Witnesses: 3/

(Name)

(Address)

(Name)

(Address)

CLR Timber Holdings, Inc.
(Purchaser) 4/

BY [signature]

President
(Title)

P.O. Box 670
(Business Address)
Brookings, OR 97415

I, 5/ Lilace Keech, certify that I am the Assistant Secretary of the corporation named as Purchaser herein; that Ron Fallert who signed this contract on behalf of Purchaser, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

[signature]

CORPORATE SEAL 6/

A-791

(OVER)

FS 2400-6T, Page 101 (10/73)

**CT6.25# - PROTECTION OF HABITAT OF ENDANGERED, THREATENED, AND SENSITIVE SPECIES.** (1/93) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973, as amended, or as sensitive by the Regional Forester under authority of FSM 2670, are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

> In area shown as "ATP" on Sale Area Map in Harvest Units 6A, 9A and 12, all operational activities will be kept away from those areas. These areas are layed out so that the Area to Protect are "outside" the Harvest Unit boundaries.

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed, Forest Service may either cancel under CT8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known. Discovery of such areas by either party shall be promptly reported to the other party.

In the event of contract modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by Forest Service. Amount of reimbursement shall be determined by Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing. However, in no event may Current Contract Rates be reduced below Base Rates.

**CT6.3 - PLAN OF OPERATION.** (10/77) Within 60 days of final award of contract, Purchaser shall furnish Forest Service a written general plan of operation which shall be in addition to the annual operating schedule required under BT6.31. The plan shall set forth planned periods for and methods of road construction, timber harvesting, and completion of slash disposal, erosion control measures and other contractual requirements. Forest Service written approval of the plan of operation is prerequisite to commencement of Purchaser's Operations. Purchaser may revise this plan of operation when necessitated by weather, markets or other unpredictable circumstances, subject to the written approval of Forest Service. In the event of delays beyond the control of Purchaser which qualify for Contract Term Adjustment, the plan of operation shall be mutually adjusted as necessary to accommodate the adjusted contract period.

**CT6.343 (OPTION 2) - CLEANING OF EQUIPMENT.** (12/97) Unless otherwise agreed, to prevent the introduction of the seeds of noxious weeds onto National Forest land, Purchaser shall ensure all equipment moved onto National Forest land is free of soil, seeds, vegetative matter, or other debris that could contain or hold seeds. Purchaser shall employ whatever cleaning methods necessary to ensure compliance with the terms of this provision, and shall notify Forest Service prior to moving each piece of equipment onto National Forest land, unless otherwise agreed. Notification will include identifying the location of the equipment's most recent operations. Upon request of Forest Service, arrangements will be made for Forest Service to inspect each piece of equipment prior to it being moved onto National Forest Land.

Purchaser shall certify in writing, compliance with the terms of this provision prior to each start-up of sale operations. For the purposes of this provision, "equipment" includes all logging machinery except for log trucks, chip vans, pickup trucks, cars, or other vehicles used to daily transport personnel.

**CT6.351 - ACCEPTANCE OF SPECIFIED ROAD.** (9/93) Specified Road work may be accepted subject to completion of planting and seeding for soil stabilization when completion is delayed for reasons beyond control of Purchaser, such as seasonal limitations. Purchaser shall complete planting or seeding on such road during the next suitable planting season.

Specified Road work may be conditionally accepted prior to the application of dust palliatives when application is not necessary to prevent dusting of the road surface due to Purchaser's operating schedule or climatic conditions. Purchaser shall apply dust palliative on such roads prior to use during periods when dusting may occur.

**CT6.41# - SPECIAL FELLING OBJECTIVES.** (1/93) Notwithstanding BT6.41, BT6.411, BT6.5, and BT6.61, felling objectives shall be accomplished by the type of felling methods and equipment listed herein. Methods or equipment other than those specified may be approved. For Payment Units shown below, Purchaser shall submit a cutting plan for Forest Service acceptance, prior to the start of felling operations.

| FELLING METHODS | HARVEST UNITS |
|---|---|
| All designated trees shall be felled away from existing plantation. | ALL |
| All designated trees shall be felled away from 7A, designated streamcourses. | 2, 4, 5, 6A, 6B, 6C, 6D, 7, 9, 9A, 10, 12, 16 & 17 |
| Conifers shall be directionally felled to minimize breakage and damage to residual stand. | ALL |
| All designated trees shall be felled away from areas shown as "ATP" on Sale Area Map. | 1, 6A, 9A & 12 |
| All designated trees shall be felled away from meadow. | 2 & 4 |

**CT6.42# - SPECIAL YARDING/SKIDDING METHODS.** (1/93) Methods other than those specified may be approved. When appropriate, such approval shall include changes in Current Contract Rates and Sale Area Map shall be revised.

| YARDING/SKIDDING METHODS | HARVEST UNITS |
|---|---|
| A skyline yarder with at least a 47 foot tower capable of transporting logs at least 1500' horizontally uphill. | 1, 2, 4, 5, 6A, 6B, 6C 7, 7A, 9, 9A, 10, 12, and 16. |
| The yarder will be capable of providing one-end suspension by means of multi-span rigging in those areas designated MTSPAN of the Sale Area Map. | 5, 9A & 10 |
| Tail Trees will be selected prior to felling units<br>Average spacing between TT's will be 150 feet. | all cable yarded |
| Yarding will be directed away from: | |
| Designated streamcourses | 2, 4, 5, 6A, 6B, 6C, 6D 7, 7A, 9, 9A, 10, 12, 16, 17 |
| Existing plantations | 1, 3, 4 |
| Area Shown As "ATP" on Sale Area Map which is outside Harvest Unit boundary. | 6A, 9A & 12 |
| Area shown as "ATP" on Sale Area Map | 1 |
| The yarding system must provide one-end-suspension (except during lateral skidding) in areas designated on Sale Area Map. | All cable yarded units |
| A carriage capable of providing a means of pulling slack and maintaining a fixed position on the skyline during lateral in-haul will be required to minimize damage to reserve trees. | All cable yarded units |
| Skyline corridors shall normally not exceed 10 feet in width. Damaged trees designated with ORANGE leave paint and outside the 10 foot corridor will not be cut or removed. | 1, 2, 4, 5, 7, 7A, 9, 9A, 10 & 12 |
| Helicopter yarding specified. | 17 |
| A tractor equipped with an integral arch and winch system capable of elevating the leading ends of the logs during skidding. | 3, 4A, 13, 6D, 8, 13&18 Portions of the following 2, 4, 5, 7, 9, 9A, 10, 12 & 6B. |
| Tractor width should not exceed 107 inches | Tractor skidded units |
| Average spacing between tractor skid trails should be a minimum of 100 feet. | Tractor skidded units |
| No tractor landings shall be constructed on the 3318 Rd. | Tractor skidded units |

| | |
|---|---|
| Designated tractor skid trail locations shall be agreed to by the Forest Service and flagged on the ground prior to felling. Tractors will not be allowed off the skid trails. Skidding will be limited to those times when soil moisture will not lead to compaction (approximately June 1 to Sept. 30) or otherwise approved by Forest Service during dry periods. | Tractor skidded units |
| Tractors shall be required to operate without a blade to reduce damage to residual trees. | Tractor skidded units |
| Purchaser shall clean all yarding and associated equipment (yarder, loader, landing cat, etc.) Cleaning shall consist of the removal of soil by steam cleaning or washing with a high pressure hose. Equipment shall be cleaned prior to entering National Forest System lands. Non-diseased water sources on Roads 3318130 and 3680350 or from town will be used. | All |
| Maximum product length that can be removed will be 44 feet plus trim allowance. | All |

<u>**CT6.422 - CONSTRUCTED LANDINGS.**</u> (1/93) In an effort to avoid irrepairable soil and watershed damage, in areas on Sale Area Map designated "Landing Construction Critical," Purchaser shall construct landings in accordance with plans and specifications attached hereto.

<u>LANDING CONSTRUCTION SPECIFICATIONS</u> CT6.422 Schedule

1. The limits of all proposed landing areas shall be flagged for Forest Service approval prior to start of landing construction. The limits shall include the total area of excavation and fill.

2. A plan for disposal of clearing debris shall be prepared by the operator for Forest Service approval. All vegetative material shall be removed from fill area. Material less than 3" in diameter and 3' in length may be scattered within the clearing limits.

3. Compaction shall be required to maintain fill stability. Prior to placement of fill materials, the following requirements shall be met:

    a. A 10' wide bench shall be constructed at the toe of fill area.

    b. Additional key benches may be needed for fill stabilization.

    c. Fill materials will be placed in layers not exceeding 12 inches and compacted by at least 3 passes by a crawler tractor prior to placement of the next layer.

4. Landings on slopes over 55%, or in critical soil areas as shown on the Sale Area Map, shall have excavated material placed in designated waste areas as close as practicable to the landings.

# FORESTRY FORUM

COMPLIMENTARY

Vol. XII, No. 16 September 11, 1998


## Challenge to BLM R/Ws

On August 27, a 60-day notice of intent to sue was sent by the Klamath Siskiyou Wildlands Center to the BLM and National Marine Fisheries Service claiming that the BLM was violating the Endangered Species Act because it had failed to consult on the Reciprocal Right-of-Way Agreements. Specifically, the environmental group is claiming that the two agencies failed to enter into formal consultation on the effects logging and road building activities, facilitated by reciprocal right-of-way agreements, would have on listed threatened and endangered species. They also claim that the BLM's right-of way agreements are resulting in illegal takes of both coho salmon and Bull Trout.

In the notice they state that they intend to file a citizen suit as provided for under the ESA. Interestingly, the notice does not include the US Fish & Wildlife Service, which retains jurisdiction over the Bull Trout since it is a resident fish species. NFA staff and the NFRC Legal Committee will evaluate this potential litigation and consider industry involvement. /*Chris West*

## NMFS Violates ESA

A river user group has asserted that the National Marine Fisheries Service (NMFS) acted unlawfully by allowing tribal commercial gill net harvest of endangered fall chinook and steelhead on the Columbia River above Bonneville Dam. The Columbia River Alliance (CRA), a coalition representing river users and dependent communities, requested United States Commerce Secretary William Daley investigate the federal action allowing harvest and sale of an endangered species.

"Judge Malcolm Marsh clearly told the fisheries service on September 3 the proposed harvest action was illegal, however, on September 4 the fisheries service announced their decision to continue the harvest through September 12" said Bruce Lovelin, CRA Executive Director. In rejecting the harvest deal on September 3, Judge Marsh noted "the federal government appears to be more concerned with what the Tribes are willing to accept in reductions to their fall commercial harvest than they are with the needs of the listed species." He continued "once the government determined that the proposed action will likely jeopardize the listed steelhead, it was beyond prudence to then claim that the Act no longer applies."

**What's Hot**


Option 9 sales at risk....................page 2
Ag Committee comes to Portland....................page 3
Public safety & landslides....................page 3
Fifth Amendment....................page 3


Printed on recycled paper



DEx 3

Following Marsh's decision, NMFS Regional Director, Will Stelle, issued a press release on September 4 authorizing the continued commercial salmon harvest claiming "it is consistent with the provisions of the Endangered Species Act."

Judge Marsh's ruling was requested by the states of Oregon, Washington, and Idaho after the tribes and the federal government developed an agreement that would allow the tribes to conduct their gillnet fishery. The states asked Marsh to reject the agreement and based their case on the argument that NMFS is legally bound to conduct a scientific assessment of the effect of fishing endangered steelhead before permitting any fishing. The states maintained that NMFS was reluctant to conduct the assessment because it would find the stocks in such poor shape that fishing would be prohibited. */Chuck Burley*

## Forest Practices Case on Deck

NFA claims the Washington Forest Practices Board has abused the emergency rule-making process and has asked Thurston County Judge Hicks to void the rule. The Board claims an emergency really does exist with relationship to listed salmon therefore, justifying the emergency rule-making process. Besides the present disputed fish rule, the judge will hear how the Board passed several significant emergency rules (owls, murrelets and stream typing) since 1993.

Attorneys speculate Judge Hicks may render an opinion from the bench on September 11 at a hearing at the Thurston County Courthouse beginning at 1:30 p.m.

It may not be the stuff to make it on Court TV, but it is vitally important to forest landowners and operators, not to mention citizens who want full access to the rule making system. It is ironic that the same board that has limited public involvement in the rule making process is proposing a new set of rules vastly increasing the amount of bureaucratic hurdles and public input steps for most forest practices applications. */Bob Dick*

## Secret Negotiations?

On July 13, the Oregon Natural Resources Council and a dozen other environmental groups filed a case challenging the implementation of the President's Northwest Forest Plan. The case has been assigned to Judge Dwyer who heard the original challenge of the plan. The plaintiffs are represented by Mike Axline of the Western Environmental Law Center in Eugene, Oregon. The primary focus of the case is a claim that the agencies are not complying with the various requirements specified in the Record of Decision for the plan. The plaintiffs have not sought to enjoin the plan, but should they prevail in this litigation, it could result in halting most timber sales while surveying for sensitive species is conducted.

NFA has heard that the plaintiffs and Justice Department have entered into secret settlement negotiations. Our understanding is that ONRC has given Justice a list of 160 timber sales and is demanding they are terminated, suspended or revised as part of the settlement. Other sources have told NFA that the list has been narrowed down to about 30 timber sales. We are attempting to secure a copy of this alleged list. */Chris West*

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwtrees.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1998 Northwest Forestry Association

## Hearing on Region 6 Management

Congressman Bob Smith (R-OR), chairman of the House Committee of Agriculture, held a field hearing in Portland on September 3 to receive testimony on the barriers to implementing forest health restoration and salvage projects in Region 6. Witnesses included Chuck Burley, NFA's Eastern Oregon Manager, who testified on the problems encountered during the planning and implementation of the Summit Fire Recovery Project on the Malheur National Forest. In addition to his testimony, he presented visuals including some finished product and pieces of trees harvested from the Summit Fire. These displayed very clearly the deterioration due to delay in implementing salvage projects.

Also testifying were Judge Dennis Reynolds, Grant County Commissioner, and Bob Batty, director for the Grant County Education Service District. Both testified on the economic impacts of not managing the national forest on the local communities.

Tim Lillebo, Oregon Natural Resources Council, testified on behalf of the environmental community. His testimony was, in essence, that the burned area is already impacted and any further activities would simply exacerbate the problem. /*Chuck Burley*

## A New Property Takings Case??

SDS Lumber Company of Bingen, Washington has fee timber it wants to harvest. A spotted owl pair lives in the vicinity and hence SDS has a problem. After one trip to court, preparation of an Environmental Impact Statement and an appearance before the Forest Practices Appeals Board, SDS now has a conditional forest practices permit. The conditions specified in the forest practices permit for SDS's 210 acres prohibits harvesting 40 percent of the area and SDS can only cut three trees per acre on the remainder. Now SDS may want to claim a constitutional "taking."

The fifth amendment was one of the first ten United States Constitutional amendments known as the Bill of Rights proposed in September, 1789 and ratified in December, 1791. Amendment V is one paragraph and deals with double jeopardy, self incrimination, due process and just compensation for property. Specifically, Amendment V states, in part, "*...private property* (shall not) *be taken for public use, without just compensation.*" /*Bob Dick*

## Oregon's Salmon Plan

The latest development surrounding the future of Oregon's salmon plan came with the recent release by Governor Kitzhaber of a draft executive order. The draft order commits every state agency in Oregon to a vigorous effort to restore all species of salmon across the state. It replaces an earlier memorandum of agreement between NMFS and the state that was a required condition of a decision not to list the coho salmon. The draft order expands recovery efforts to include all salmon and steelhead across the state and not just coastal coho. Furthermore, it reduces the role that NMFS would play in revising state rules for habitat management on state and private lands. Comments are being accepted on the draft executive order until September 16. /*Chuck Burley*

## Landslides Task Force Issues Report

The Joint Interim Task Force on Landslides and Public Safety that was established by the Oregon Senate in 1997, has released a draft report that makes several recommendations to the legislature. The task force, chaired by Gail Achterman, an attorney with Stoel Rives, was asked to focus on four broad areas: Hazard Identification, Land Use Conflicts, Public Education and Hazard Mitigation. They took four field trips including the Portland Metro Area, the Tillamook/Wilson River Highway and two to Douglas County. The task force received public testimony and numerous written comments and publications.

The draft findings recommend that the Forest Practices Act be amended to give the State Forester the ability to react to public safety. They also recommend that the Beach Law and Removal-Fill Law be amended to consolidate overlapping authorities. The task force feels that the Zoning Laws need amending to place limits on restoration or replacement of structures that were adversely affected by natural hazards. They also would like to require geotechnical reviews for newly created plans and require disclosure of known natural hazards affecting property. The task force plans to have a final report and proposed legislation completed by November. */Chris West*

## Protection for Little Sandy

Senator Ron Wyden (D-OR) and Congressman Earl Blumenauer (D-OR) have introduced legislation to expand the Bull Run Watershed to include the Little Sandy drainage on the Mt. Hood National Forest. In 1996, now retired Oregon Senator Mark Hatfield passed the Oregon Resource Conservation Act which legislated no timber harvesting in the Bull Run Watershed that provides drinking water for the City of Portland. The Act also directed the Forest Service to conduct a study on the Little Sandy drainage that was recently released and called for no special protection beyond the Northwest Forest Plan.

The Wyden and Blumenauer legislative proposal would expand the no cut protection to the 14,000 acre Little Sandy Drainage, half of which is in matrix under the Northwest Forest Plan. Ironically, the City of Portland has no concrete proposal or need to develop the Little Sandy as a source of domestic water. Furthermore, the City does not have the water rights which are held by Portland General Electric/Enron.

Given the listing of the Lower Columbia Steelhead it is questionable if the Little Sandy could ever be developed as a domestic water source. Finally, as part of the legislation the City hopes to obtain title to the land under its dams and facilities in the Bull Run Watershed. This is an attempt to cut the Forest Service out of hydro-dam relicensing and ESA issues. Given the Congressional schedule in this election year, this legislation is not likely to go anywhere until next year. */Chris West*

## Suit on Delayed RPA

On September 9, the Southwest Center for Biological Diversity and 20 other groups filed suit in San Francisco against the Forest Service alleging that the agency is overdue in releasing the five-year national plan and accompanying environmental impact statement, also known as the Resource Planning Act (RPA) Program and Assessment. The plaintiffs claim that the final plan was required to be released by March 31, 1995. A draft was published but was never finalized after receiving public comments. The plaintiffs are asking the court to halt all national forest timber sales. NFA staff, NFRC Legal Committee, as well as other regional and national associations, will be evaluating this suit for possible industry involvement. */Chris West*

## Land Exchanges

The Forest Service is performing a discretionary review of administrative appeals on three major land exchanges. These are the already-completed 40,000 acre Huckleberry Exchange between Weyerhaeuser and the Mt. Baker-Snoqualmie National Forest, a pending 85,000 acre exchange with Plum Creek Timber in the I-90 corridor near Snoqualmie Pass, and a pending exchange with Crown Pacific in central and southern Oregon. The discretionary review is in response to allegations by the Seattle based environmental group Western Land Exchange Project that appraisals undervalued private land in the exchange process. */Chuck Burley*

# FORESTRY FORUM

COMPLIMENTARY

Vol. XII, No. 22 December 16, 1998

## NFA/NFRC Merger Complete

The memberships of the Northwest Forestry Association (NFA) and the Northwest Forest Resource Council (NFRC) voted unanimously on December 8 to consolidate the two organizations into one. The new organization will retain the NFA name and will continue to perform the work and functions of the two organizations, but under a single banner.

Members voted unanimously to establish NFA's existing Board of Directors as the "interim" Board of the new organization until the annual meeting in April 1999. Consistent with the NFRC tradition of involving other trade associations in decision making procedures, the members also voted to offer Board positions to the Associated Oregon Loggers, the Washington Contract Loggers Association, the Oregon Forest Industries Council and the Douglas Timber Operators. The participation of other association representatives will be welcomed.

Another important action taken by the members was the appointment of a Finance/Recruitment Committee. This committee will work between now and the annual meeting to refine a new dues structure and promote participation in the new NFA.

Again, the intent of this merger is to consolidate the activities of NFA and NFRC into one organization and continue the tradition of including the participation of other regional associations in the governance of the organization. We hope members will choose to be active in the committees that will continue work in 1) Wildlife Research; 2) Legal Strategies; 3) Communications; 4) Forest Policy; 5) DNR Timber Sales and 6) Federal Timber Sales. The Executive Committee of the new organization will meet monthly on the first Tuesday of each month.

If anyone has any questions, concerns or suggestions about this consolidation, don't hesitate to call NFA President Jim Geisinger or Board Chairman Bruce Daucsavage. */Jim Geisinger*

---

## Hogan Denies Cutthroat Delisting

U.S. District Court Judge Michael Hogan has ruled against Douglas County in its challenge of the decision to list the Umpqua Cutthroat Trout as endangered. In his decision, Hogan ruled that Douglas County's overwhelming scientific evidence was outside the National Marine Fisheries Service (NMFS) record when it made the listing determination. Douglas County argued that the agency had failed to use the best available science

DEx14

What's Hot

Trust beneficiaries looking for help....................page 3
Governors coin a new word....................page 3
Looking for Mountain Quail....................page 7
No more old growth Nikes....................page 7

Printed on recycled paper

and had shown that this information was available or easily obtainable.

In his decision Hogan has placed the burden of providing quality scientific evidence on those who oppose a listing proposal. The agencies can pick and choose which information it wants to consider and it is not enough to have public comments pointing out other information or flaws in information. The good news, is that as a result of Douglas County's lawsuit, NMFS began a status review of the Umpqua Cutthroat Trout listing and will have to consider all the new scientific evidence presented in this case. /*Chris West*

## Tower Fire Needs EIS

The Ninth Circuit Court of Appeals ruled that the Forest Service must prepare an environmental impact statement for the Tower Fire salvage and restoration effort. As part of its ruling, the court also ordered all logging and hauling to stop until the additional environmental analysis is completed. However, the Forest Service is allowed to conduct its mitigation work.

The lawsuit challenged the salvage logging of just over 4,000 acres of the 50,000 that burned. The Forest Service had prepared an environmental assessment. The plaintiffs argued that an environmental impact statement was necessary to fully address cumulative effects and other issues.

Despite the legal challenges, the Forest Service did sell and award the timber sale earlier this year. At least 80 percent of the logging has been completed with the remainder now in jeopardy due to further delays. /*Chuck Burley*

## Mapping & Assessing Owl Habitat

This month, NFA hosted a meeting between the Forest Service, BLM, U.S. Fish and Wildlife Service (FWS) and OFIC to discuss the ramifications of the current mapping effort being undertaken by the land management agencies.

Some background is in order here. The President's Northwest Forest Plan requires the Forest Service and BLM to conduct "effectiveness monitoring." Effectiveness monitoring is done to find out if the actions mandated in the plan are achieving their desired results. As an example, the plan sets aside a vast expanse of federal land so the northern spotted owl will persist on these lands for the next hundred years. Effectiveness monitoring is supposed to ask the question, "Are owls persisting on federal lands as a result of setting aside all of this land?" Similar questions would be asked for all the other wildlife species as well as other management goals in the plan.

In order to do effectiveness monitoring, the land management agencies realized they needed an up-to-date vegetative and habitat map for the entire region covered by the plan. All of the available databases are hodgepodge patchworks of localized information except one, the western Oregon database commissioned by OFIC to be used to address private land issues like the development of a 4(d) rule for the spotted owl. The OFIC database is a state-of-the-art tool developed using the latest satellite imagery technology. It has the most extensive ground truthing ever done, was subject to an unprecedented accuracy assessment and has been peer reviewed by well respected owl biologists such as Dr. Eric Forsman.

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwforestry.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1998 Northwest Forestry Association

A year ago, OFIC went to the effectiveness monitoring team and asked if they wanted to use this database. The agencies declined and embarked on their own effort. This puts the FWS in an awkward position. They have already reviewed the OFIC database and have agreed it is the most accurate available. Now the Forest Service and BLM will develop a new database which will also be accurate. The two databases will, however, be different. Depending on how different they are, the FWS will be in a position of having to decide which one they will use when reviewing 4(d) Rules, Habitat Conservation Plans, or deciding how much habitat is needed on private lands to protect threatened species.

This was the purpose of the meeting to search out ways to minimize a "database war" when the effectiveness monitoring database is completed. As a result of this meeting, NFA and OFIC will be invited to review and comment on many of the ongoing sub-projects within the effectiveness monitoring program. This will include participating in a comparison of the two databases, the development of growth models to be used to project vegetation and habitat into the future, and the development of owl population viability models. */Ross Mickey*

## Where Has all the Money Gone?

Washington's trust beneficiaries received a rude awakening in early December when the Board of Natural Resources received from DNR the stark reality of a collapsed market place. The Common School Trust (which funds K-12 construction) will be broke and in arrears while DNR faces a multi-million dollar operations budget shortfall. The shortfall cause is multi-faceted, begun by market forces, exacerbated by higher operating costs from HCP implementation.

The Board and DNR, as are many in the forest industry, struggle to deal with the shortfall and may ask the legislature for help. The legislature, however, has a full agenda of paying for the Governor's proposed programs, Referendum 49 (transportation) funding, salmon restoration along with a burgeoning Boeing layoff. Stay tuned. / *Bob Dick*

## Governors Embrace "Enlibra"

The Western Governors' Association (WGA) has adopted a new shared doctrine for environmental management they have termed "Enlibra." While you won't find the word in the dictionary and the spell checker on your word processing software won't correct a misspelling of the term, it is an exciting new approach to resolving environmental issues that has strong bi-partisan support from western governors. Quite simply, it is an effort to empower states and local interests in resolving environmental issues heretofore dictated by federal regulators.

Nearly 400 representatives of industries, government and environmental groups participated in an Environmental Summit December 3-4 in Phoenix, Arizona to hear directly from the WGA about the new approach. In addition to NFA, some of the notable participants included Chairman-elect of the President's Council on Environmental Quality George Frampton, Director of the U.S. Fish and Wildlife Service Jamie Clark, Director of the BLM Tom Fry, a number of national environmental groups and several western governors.

Governor John Kitzhaber (D-OR), WGA Chairman Governor Jim Geringer (R-WY), Governor Mike Leavitt (R-UT) and Governor Gary Johnson (R-NM) hosted the two day meeting and participated with invited guests in explaining the Enlibra doctrine. Enlibra is founded on eight fundamental principals: 1) National Standards, Neighborhood Solutions; 2) Collaboration, Not Polarization; 3) Reward Results, Not Programs; 4) Science for Facts, Process for Priorities; 5) Markets Before Mandates; 6) Change a Heart, Change a Nation; 7) Recognition of Costs and Benefits; and 8) Solutions Transcend Political Boundaries. Utah Governor Mike Leavitt observed, "This nation's

environmental laws are 25 years old. They compel people to do things. The process is too slow, too costly and too contentious. Enlibra is a symbol to perpetuate a new way of resolving environmental issues with balance. Those that want to solve problems will find this attractive, those that want to divide and polarize won't."

Environmental representatives expressed skepticism about Enlibra from the opening forum through the closing ceremonies, particularly regarding how the new process might affect the management of federal lands. They clearly are nervous about state governments enhancing their influence on how federal lands are managed in the respective states. This participant, however, found the discussion to be extremely productive, exciting and refreshingly bi-partisan. While a lot of work remains to be done, it is clear that western governors are committed to this process. The train is leaving the station and NFA, for the time being, plans on going for the ride. */Jim Geisinger*

## Emergency Rule Update

NFA, Washington Contract Loggers Association, Association of Washington Businesses and small woodlot owners' challenge of the Washington State Forest Practices Board's Salmonoid Emergency Rule is moving ahead. Thurston County Judge Hicks has accepted our motion to supplement the original complaint to include the Forest Practice Board's (FPB) new Salmonoid Emergency Rule. Hicks wrote his own order that specified this would proceed as if it were a new appeal from a new administrative record. We view this as a positive situation since the state was likely to argue that they were just following the court's earlier order.

A small group of Washington organizations are considering filing an amicus brief on our side. The groups include: Washington Association of Realtors, Building Industry Association of Washington, Washington Farm Bureau, Association of Washington Cities, Association of Washington Counties and Washington Public Ports. Our amended complaint will also include the FPB's new Bull Trout Emergency Rule, which basically applies the salmonoid rule to the eastside. */Chris West*

## Negotiations Break Off

As was reported in the last FORUM, U.S. District Court Judge Dwyer granted defendant intervenor status to four western Oregon companies that are the high bidders on BLM sales. These timber sales and many others have not been awarded due to ONRC's challenge of the President's Northwest Forest Plan. ONRC and the Clinton Administration refused to grant the industry access to the negotiations making claims that the two parties have a privileged relationship. Industry attorney Mark Rutzick filed papers with the court asking the government to present a knowledgeable individual to be deposed. Then all of a sudden, the negotiations broke off and now the government has asked us to join in requesting Dwyer dismiss the case.

While we are not certain what caused the negotiations to break down, we are pleased that the government has decided to ask Judge Dwyer to dismiss the case. Still pending are the award of several dozen BLM and Forest Service timber sales. Should the agencies move forward and award the sales, we would expect ONRC to ask the judge for an injunction. */Chris West*

## Timber Sales Approved

Finally, after three decision notices and two appeals, the Forest Service has approved the Cold Springs/Switchback Timber Sales. The three sales have been appealed by environmental groups alleging that they would harm wolverines, sensitive plants, soils, water quality, and the wilderness and roadless characteristics of the area. After two iterations of analysis and appeal, the Forest Service was finally satisfied that all these concerns had been adequately addressed.

Of the three sales, the first, the Long sale, has already been sold. It includes about 5.5 million cubic feet of timber and sold for just under $450,000. The second, the Switchblade sale, is scheduled to be sold in early 1999. The third, the Pelican sale, has not been scheduled for sale. / *Chuck Burley*

## Hi-ridge Cancels Contracts

Hi-ridge Lumber Company of Yreka, California has come to a mutual agreement with Undersecretary of Agriculture Jim Lyons to cancel six high priced timber sales, totaling 13 million board feet. The sales were prepared and sold prior to the President's Northwest Forest Plan and the state's spotted owl plan. Given these facts, Hi-ridge argued that it was in the public's interest to cancel the sales. The company even enlisted local environmentalists in their cause.

The Forest Service responded by having the sales reviewed by a team of research and timber sale experts, who determined that there was no justifiable reason to cancel the sales. They also noted in their report that any federal officer that cancels the sales may be personally liable for foregone financial return to the Federal Treasury. The decision to cancel the sales came from Washington D.C., but agency officials all the way down the chain refused to sign the cancellation letter. Ultimately the letter was signed by Lyons and now there has been a whistleblowers complaint filed with the Department's Office of Inspector General, as well as several Freedom of Information Act requests. /*Chris West*

## New Suspension & Debarment Rules

The Forest Service has issued new direction to the field on suspension and debarment actions associated with timber sale contracts. Under the new guidance, causes for debarment include conviction of or civil judgement for: 1) commission of fraud or a criminal offense in connection with obtaining a timber sale contract, 2) violation of antitrust laws, 3) timber theft, 4) other offenses indicating a lack of business integrity; and violations of terms of the timber sale contract such as: 1) willful failure to perform, 2) history of failure to perform, and 3) willful violation of a statutory or regulatory provision of the contract. Furthermore, the proposed export rule to implement the Forest Resource Conservation and Shortage Relief Act of 1990 will also include provisions for debarment.

The direction on what constitutes unsatisfactory performance on timber sale contracts includes: 1) contract cancellations for serious or continued violations of contract terms, 2) contract cancellation for violations of criminal or civil statutes or environmental quality regulations and 3) contracts terminated for purchaser's failure to cut or defaulted sales.

Under a recent Office of General Counsel opinion, debarment can also be caused by the conviction under a Forest Service Violation Notice. There are a few exceptions to this mandatory referral policy for Violation Notices (VN) which are: 1) if the VN is issued to a person who is not a timber sale contractor or sub-contractor and 2) if the VN is issued for violations of individual issued permits such as firewood or Christmas trees.

NFA staff will continue to track this issue and work with other regional and national associations to address what appears to be a significant lowering of the threshold for debarment and/or suspension. / *Chris West*

## Washington Inventory Due

It seems such a short time ago the industry debated federal inventory of Washington's forest lands, yet it has been almost ten years. As Oregon finishes their inventory, the Forest Service gears up to do Washington.

The Forest Service conducts three kinds of inventories. The annual Forest Health survey determines forest health on all forest lands,

including reserves (national parks, wilderness areas, etc). National Forest System (NFS) lands are inventoried by Region Six for planning purposes and President's Northwest Forest Plan monitoring. The Forest Inventory and Analysis (FIA) inventory is conducted on all non NFS forest lands through a combination of air photo interpretation and ground truthing.

The FIA survey creates a state, regional and national database that reflects land base changes, timber type, growth and mortality. A variety of useful statistics can be used from this data ranging from commodity production studies and large-scale forest health analysis, to documenting urban sprawl's effect on the timber base. Washington's FIA inventory is expected to be conducted in 2000 and will concentrate on regulatory affects, especially riparian zones.

The University of Washington College of Forest Resources is coordinating user group input to ensure the next FIA survey collects and analyzes pertinent data. NFA is part of this group and will continue to report on its progress. */Bob Dick*

## Cost Share/Access Meeting

On December 9, the AF&PA Cost Share and Access Committee met in NFA's Portland Office to discuss several important issues and develop strategies to deal with them. The agenda included: 1) cost share formula in light of reduced federal harvest, 2) reductions in federal road maintenance budgets, 3) loss of qualified cost share specialists, 4) status of the Forest Service's roads moratorium and assessment, 5) update on the BLM reciprocal right-of-ways and 6) access problems due to endangered species and other agency requirements.

Company representatives described dramatic changes in cost share formulas when replacing storm damaged bridges. They also told of lop-sided maintenance expenses due to the Forest Service's limited budget. Probably the most disturbing fact was the loss of certified cost share specialists. The committee is considering asking for a meeting with agency representatives to discuss our concerns. / *Chris West*

## Water Quality Management Plan

The Clean Water Act requires states to assess waterways and determine if their water quality is "limited." These water quality limited streams are then placed on what is called the 303(d) list, referring to section 303(d) of the Clean Water Act. Once a stream or river is placed on this list, Oregon landowners whose land included the waterway are required to develop a Water Quality Management Plan which is in compliance with the TMDL (Total Maximum Daily Load) developed by the Oregon DEQ. This requirement pertains to federal, state and private landowners.

The Siskiyou National Forest and the Medford BLM have developed such a plan for the Greyback and Sucker Creek watersheds in southern Oregon. Written comments on this plan are being accepted until January 15 and should be mailed to John Blanchard, Oregon DEQ, 201 West Main, Suite 2-D, Medford, Oregon 97501. Copies of the plan and TMDL can be found on the Internet at http://www.deq.state.or.us. Click on "water quality" then on "water quality program public notices." / *Ross Mickey*

## Seattle Unveils Watershed HCP

The City of Seattle recently published for comment a draft watershed Habitat Conservation Plan (HCP). Seattle's Cedar River Watershed comprises over 90,000 acres of the upper Cedar River in Washington's central Cascades which provides high quality water, timber and fish habitat.

The preferred alternative will cost Seattle residents $84 million over the fifty year plan life. While timber harvest has never been the driving land use on watershed lands, it has paid for many improvements to Seattle's water supply system.

Timber production under the HCP is relegated to a minor role. Environmentalists criticize proposed modest harvest preferring to eliminate commercial logging within ten years.

Timber harvest, ironically, has provided the city substantial revenues for almost a century at no cost to water quality. Sounds a lot like Portland's Bull Run! */Bob Dick*

## Mountain Quail Decline

According to Oregon State University (OSU) researchers, the mountain quail population in eastern Oregon has declined to the point where it may soon be considered for endangered species listing. This preliminary finding is based on two years of study out of a four-year research project involving OSU, the Oregon Department of Fish and Wildlife, the BLM and the Forest Service.

Mountain quail are abundant on the westside of the Cascades. However, their numbers are so low on the eastside, they are already considered a sensitive species. Their habitat was once quite extensive and several decades ago it was believed they existed in every county of eastern Oregon.

The researchers believe the mountain quail's demise is conversion of wildland to agriculture and other uses. Also, the changes in how fires occur across the landscape is believed to have had an impact. Historically, small, fast-moving fires in eastern Oregon cleared out the underbrush and stimulated the growth of seed-bearing plants which were a staple for the quail. Now, however, with the suppression of wildfire, underbrush has taken over and reduced this food supply.

Don't confuse the mountain quail with the other, much more common quail, the California valley quail. The valley quail is seen throughout most of eastern Oregon and is believed to be doing quite well. */Chuck Burley*

## Old Growth Products & US Corps

Environmentalists have apparently persuaded 27 United States corporations to renounce buying wood and paper products made from old growth trees. Companies include: IBM, Nike, Hewlett-Packard, Kinko's, Starbucks, Hallmark Cards, Johnson & Johnson, Levi Strauss, 3M, Bristol Myers Squibb, McGraw Hill and fifteen others. The campaign was organized by the Coastal Rainforest Coalition with its most prominent target being the harvest of trees from the coastal forests of British Columbia.

Three of the companies have now denounced the use of their names as members of the old growth boycott. IBM, Hallmark Cards and Starbucks have withdrawn their support and state their names were used without their permission. Thanks to organized labor for following up with each of the companies to verify the claims of the Coastal Rainforest Coalition. The coalition in a full page ad in the New York times criticized several companies including Home Depot, AT&T, Wal-Mart, Home Base and the Los Angeles Times for purchasing products made from old growth. */Chris West*

## Blackwood/Quigley Get Award

The High Desert Museum in Central Oregon has awarded Jeff Blackwood and Tom Quigley the Earle A. Chiles Award and $10,000 apiece. The award recognizes them for their leadership of the Interior Columbia Basin Ecosystem Management Project and its associated long-term shift in resource management philosophies.

"We've sunk our hearts and souls in the project," Quigley said. He feels that the project has led to a different view of the world. "As we spent five years sharing and studying the same problems, we now have a far better common understanding." Quigley believes that "Our views of how the world operates are grounded on common understandings now. We can talk in substance."

The Chiles award, established in 1983, was named for the late Earle A. Chiles, a long-time executive of Fred Meyer Inc. Mr. Chiles had a keen interest in conservation of the Northwest's natural resources. */Chuck Burley*

## FS Personnel Changes

Forest Service Chief Mike Dombeck has announced that Ann Bartuska will be the new director of forest management, replacing Dave Hessel who retired earlier this year. Bartuska is the first woman in this position and will be coming from a post in the agency's State and Private Forestry where she was director of forest health protection. She has a B.S. in biology, M.S. in botany and a Ph.D. in biology.

Chief Dombeck also announced that Jack Craven will be the new director of lands. Craven has been acting director since Ellie Towns became the new Regional Forester in Albuquerque, NM. He has held a variety of positions with the agency in several regions and the Washington Office. Craven is a native of Kalispell, MT. */Chris West*

### Holiday Office Closures

NFA's offices will be closed December 24 and 25 for the Christmas Holiday and January 1 for New Year's Day.

Our staff wishes everyone a happy and safe holiday season.

FORESTRY FORUM

COMPLIMENTARY

Vol. XIII, No. 6 March 19, 1999

## It's Official: Salmon Listed

This week, seven salmonid stocks in Washington and two in Oregon were listed under the federal Endangered Species Act. The new listings will require federal rules that will govern what people can and cannot do on federal lands or under any action requiring a federal permit or decision. Rules will also be developed that will govern what can or cannot happen on state and private lands. State and local governments will have nominal control, but the federal government is poised to take over if, in its opinion, state/local governments falter.

There is a major disconnect between public perception of salmon protection and who pays for it. A Washington state poll found people quite willing to spend someone else's money to protect salmon, but they don't think the listings will affect their lives. The list of potential impacts includes developers, agriculture, commercial and sports fisheries, small hydro projects and homeowners. Planning will become more stringent, permits will be more complex and restrictive, homeowners may find restrictions on water, and pesticide use.

For some time, timberland owners and operators have been negotiating solutions. It remains to be seen what effect listings will have on urban and industrial environments, especially ports and other estuarine areas. The same goes for flood control dikes and channelization, urban developments, etc... Since the ESA provides for citizen suits, as the timber industry knows all too well, there is the risk that there will be this form of legal mischief. / *Bob Dick*

## Property Rights

Congressman Don Young (R-AK) has introduced the "Landowners Equal Treatment Act of 1999" in an effort to level the playing field for the enforcement of the Endangered Species Act. The stated purpose of the bill is "to increase the efforts of private property owners to protect and restore habitat for wildlife, by ensuring that their constitutional and legal property rights will be honored, respected, and protected in the implementation of the Endangered Species Act of 1973."

The key provision in the bill is the extension of the term "constructive use" from federal lands to private property as well. For purposes of this Act, "constructive use" is defined as 1) substantial diminution in the normal or reasonably expected uses of non-Federal property; 2) a reduction in fair market value of non-Federal property of 25

What's Hot

Forget doing an HCP....page 2
Schools & counties unite....page 2
ESA too costly....page 4
A conflict of interest....page 5



D. Ex. 5

percent or more; or 3) in the case of the right to receive water, any diminution in the quantity of water received or available for use. The bottom line here is if private property is affected in any of these ways as a result of ESA enforcement, the owner is entitled to compensation from the Federal government. The "constructive use" doctrine has traditionally applied only to Federal lands when non-Federal entities use such properties.

The bill, which formally amends the Endangered Species Act, will be referred to the House Resources Committee which Congressman Young chairs. */Jim Geisinger*

## HCP Process Take Direct Hit

This week, U.S. District Court Judge Marilyn Patel issued a preliminary injunction in a case brought by environmentalists against Pacific Lumber Company (PALCO) and their Habitat Conservation Plan (HCP). The challenge had claimed that once a landowner apply for a HCP with the federal government, no new activities could occur. Judge Patel enjoined three of PALCO's approved timber harvest plans from any further logging, including removal of felled timber. The preliminary injunction is to remain in effect pending a decision on the merits.

The added twist is that PALCO had recently petitioned the court to dismiss the case since it was now moot given their HCP had been approved on March 2 as part of the infamous Headwater deal. The plaintiffs argued that the case should proceed because consultation may be reopened for any number of reasons. Judge Patel issued her decision just hours before hearing arguments on the mootness issue.

This is a very bad decision for any company with a pending HCP application or anyone considering filing one. It adds considerable risk to all HCP applications. Given the fact that Judge Patel issued this injunction just prior to hearing arguments on whether the case was moot, one could conclude that the case will be heard on the merits. Given the decision on the preliminary injunction, the judge could issue a final decision that finds timber activities must halt while HCP applications are pending and that timber harvests can be enjoined after a final HCP is issued whenever issues arise that require consultation to be "reinitiated" or reopened. Stay tuned. */Chris West*

## County/School Coalition

The National Association of Counties (NACO), organized labor, the American Association of School Administrators, Organizations Concerned About Rural Education, the U.S. Chamber of Commerce, the Farm Bureau, the National Education Association and others have formed the Forest Counties and Schools Coalition. The purpose of the coalition is to protect the economic viability of rural communities, and the school children in these communities, by working to ensure that federal lands are managed for the benefit of the communities that depend on them. The catalyst for forming the coalition was the Clinton Administration's proposal to "decouple" Forest Service payments to counties from the agency's timber sale program.

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwforestry.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1999 Northwest Forestry Association

The coalition believes that 1) forest resources should be managed in an environmentally responsible manner to produce long-term sustainable revenue to share with schools and counties as well as products for the nation; 2) the revenue loss to counties from federal ownership of forest resources should be mitigated by the Federal government with funds for schools, roads and other local purposes and 3) compensation to counties should be equivalent to 25% of all gross receipts from the national forests, 50% of the O&C receipts and 4% from Public Domain land receipts.

Should a "safety net" approach be adopted by the administration, the coalition would insist that it be short term in nature, that county receipts be the higher of either the safety net amount or the actual timber receipts, and that when the safety net amount is the higher figure, the difference be paid from the agency's budget from non-revenue producing accounts.

NFA and many other forest products organizations have signed onto the Coalition which will be lobbying Congress to adopt this approach. */Jim Geisinger*

## Dwyer Decides Survey & Manage Case

This week, U.S. District Court Judge William Dwyer issued his opinion on motions by the government and industry intervenors to dismiss the environmentalist's case challenging the President's Northwest Forest Plan. The good news is that Dwyer dismissed the claims challenging the survey and manage protocols, finding that the claims were not ripe. Unfortunately, Dwyer refused to dismiss the plaintiff's claim that the Forest Service and BLM must prepare a supplemental environmental impact statement for the plan due to changed circumstances since 1994. The alleged new circumstances include new endangered species listings, new Clean Water Act designations, Section 2001 timber sales, as well as a lack of rare species surveys. The case is still alive.

Also this week, but prior to the Judge's decision, the plaintiffs filed a motion asking the court to grant a temporary restraining order or preliminary injunction against four BLM sales in southern Oregon and one sale on the Mt. Hood National Forest. They are attempting to block the award and/or operation of these sales. Since the basis of their request is the survey and manage protocols it is unclear what will happen to the motion. Given Dwyer's decision, the environmentalists have an option to amend their compliant. Stay tuned. / *Chris West*

## Neotropical Migratory Bird Conservation Act

This week the House Resources Committee approved the Neotropical Migratory Bird Conservation Act. The committee chairman, Congressman Don Young (R-Alaska) sponsored the bill (H.R. 39). A similar bill has been introduced in the Senate (S.148) by Senator Spencer Abraham (R-MI).

The legislation would require the Secretary of the Interior to establish a program to provide financial assistance for projects to promote the conservation of neotropical migratory birds. It authorizes project proposals to be submitted by the following entities: 1) individuals or other private entities; 2) Federal, State, or local government entities or foreign government entities; 3) other entities subject to U.S. or foreign jurisdiction; and 4) international organizations. It also limits the federal share of project costs to 33 percent. The funding for these projects would be maintained through the Multinational Species Conservation Fund of the Treasury in a Neotropical Migratory Bird Conservation Account. When Young introduced the bill, he stated that he hoped the bill would "contribute to the recovery and conservation of migratory birds, without violations to private property rights." A copy of the act can be viewed on the Internet at http://thomas.loc.gov/cgi-bin/query/z?c106:H.R.39. */Ross Mickey*

## Loomis Controversy Won't Die

We've told you about the Loomis over the past several years. Bugs are eating their way through a substantial part of the central Washington common school trust forest. Beneficiaries sued the trust manager DNR for mismanagement, getting a favorable decision but no compensation. The environmentalists sued DNR alleging violations of federal ESA and state Clean Water Act. DNR settled the suit by allowing the environmentalists to attempt to purchase 24,000 acres (about 15%) of the Loomis forest. DNR's appraisal is questioned by many for undervaluing land and timber. The environmentalists have been soliciting Microsoft employees to pony up the $13 million needed to pay for what is, in essence, a permanent cutting right for timber that never will be harvested. They have reportedly raised $5 million.

The latest chapter is a group of five north-central Washington school districts have taken strong exception to the agreement and the accompanying price tag. They also have yet to receive from DNR a copy of the appraisal, although they did receive a copy from environmentalists. The school districts are extremely unhappy.

The school districts letter expressed concerns with the appraisal, actual and potential revenue production, impact on local school districts, timber markets and values, etc. The word, "lawsuit" does not appear in the letter, but the stage is certainly set for yet another trip to court or the legislature. / *Bob Dick*

## How is DNR Spending Trust Money??

This week, the Washington Contract Loggers Association released a report that documents questionable spending by DNR. For instance, DNR purchased 1,800 eco-writer pencils ($2,700) for the Tahoma Audubon Society to give away at the Puyallup Fair. DNR gave top managers whose present salaries range from $70,000 to $95,000 per year, 10% raises, while cutting staff at field and production levels and trying to manage a projected $30 million deficit. DNR requires multiple signatures to buy critical equipment, such as GIS software, but spends $30,000 to remodel a reception area. Perhaps most telling is a personal services contract to hire a facilitator for an Executive Management Team meeting. All these expenses were paid by trust beneficiaries who wonder why their revenues are down. */Bob Dick*

## Enviro's Say ESA Too Costly

For years, the industry has documented the severe economic impact related to restriction resulting from the listing of species under the Endangered Species Act. Long ago, this argument was dropped in discussions about changes to the ESA because the press and public seemed to accept the fact that the protection of these species was worth the price being paid by business.

A recent court case involving private lands taking is causing environmentalist to fear that the public will not support protecting all of these species if they have to foot the bill. The case involves a piece of land Boise Cascade planned on harvesting, but was prevented from doing so because of historic use by spotted owls. After years of litigation, Boise Cascade was awarded $1.8 million as partial compensation for leaving the trees. Environmentalists fear that if this becomes commonplace, taxpayers will revolt and not be as supportive of the ESA. */Ross Mickey*

## Coos Bay Road Case Appealed

The plaintiffs in the Coos Bay BLM road case have appeal to the Ninth Circuit Court of Appeals, U.S. District Court Judge Michael Hogan's decision dismissing their case. Judge Hogan had determined that the BLM's supplemental Environmental Assessment adequately considered the potential spread of the Port Orford Cedar Root Rot disease, the impact of several timber sales and a reciprocal right-of-way. Hogan's dismissal also relied on the recent Supreme Court decision, Ohio

Forestry, where it was decided that challenges must be brought on site-specific projects or decisions and not general management plans.

In their appeal, the plaintiffs argue that they can challenge the Coos Bay Resource Management Plan and that Hogan misapplied Ohio Forestry. They are also challenging Hogan's decision that the supplemental EA was adequate. NFA and DTO plan to intervene in the appeal. */Chris West*

## FWS Takes Contradictory Position

The U.S. Fish and Wildlife Service (FWS) has contradicted itself on resource management issues. The agency opposes the Pelican Butte ski resort based on concerns that development will harm threatened bald eagles and other species.

However, the FWS has enlisted the aid of the BLM to log the Bear Valley National Wildlife Refuge in the Klamath basin. It's the first time logging has occurred in a wildlife refuge according to the agency. The FWS called upon the BLM to help out since they have no prior experience with timber sales.

The valley, a patch of old growth pine and Douglas fir, is one of the largest North American bald eagle wintering areas outside of Alaska. The logging is supposed to reduce fuel loading and enhance the habitat. The sale included harvesting trees up to 30 inches in diameter. */Chuck Burley*

## Ranger Under Investigation

Rob Shull, Klamath District Ranger for the Winema National Forest, is under investigation for a possible conflict of interest. Shull is responsible for the environmental impact statement relating to the proposed Pelican Butte ski resort on the Winema. Until recently, Shull was the president of the Klamath Falls Chamber of Commerce, which is a big supporter of the proposed project.

The inquiry was launched after an article appeared in the newsletter of the Association of Forest Service Employees for Environmental Ethics. The article questioned Shull's involvement with the chamber while he was also responsible for the project's analysis. The article also questioned Shull's accompanying a group of Klamath Falls city officials, chamber representatives and Jeld-Wen officials on a trip to Utah last year to seek improved airline service to their city. */Chuck Burley*

## WWF Targets Klamath-Siskiyou Area

The World Wildlife Fund (WWF) has set up an office in Ashland, Oregon and is teaming up with local environmental groups to work towards more preservation of land in the Klamath-Siskiyou ecoregion. Last year, the WWF issued a report which identified more than 200 of "the world's most outstanding and essential habitats." They call this assessment the Global 200. In order to focus their efforts, the WWF picked 25 areas to concentrate on over the next few years. The Klamath-Siskiyou ecoregion is one of them.

In each of the Focal 25, WWF seeks "to mobilize action by putting a comprehensive conservation strategy to work, protect key habitats and wildlife populations, unite development and conservation by promoting sustainable industries and markets for their products, and lay the foundation for lasting conservation through training, education, policy shaping, and strengthening of local partners." You can obtain more information about this on the Internet at http://www.worldwildlife.org/index/frame_index.htm. */Ross Mickey*

## Court Rejects Enviro's Appeal

The Ninth Circuit Court of Appeals in a 3-0 decision rejected environmentalist's challenge of the National Marine Fisheries Service's (NMFS) plans to protect Columbia River salmon from the effects of federal dams. The Appeals Court ruled that NMFS used proper standards in a 1995

assessment of dams' impact on the sockeye, spring and summer chinook and fall chinook. The agency's decision was to increase river flows to assist young salmon to sea and to continue to use barges to carry salmon past dams. In this decision, the Ninth Circuit upheld U.S. District Court Judge Malcom Marsh's earlier decision in favor of the government. /*Chris West*

## Fish and Diamond Lake

Diamond Lake in central Oregon is teaming with fish. The problem is that these fish are tui chub which the FWS feels is having deleterious effects on the lakes rainbow trout and other aquatic species. This same problem existed in the early 1950's when the lake was poisoned to kill the tui chub so that rainbow trout could be reestablished. The FWS is currently developing an environmental impact statement to analyze different alternatives to deal with this problem. For more information, contact Dave Loomis at 541-440-3353. /*Ross Mickey*

## Marking Paint Suit

Last week, a group of current and former Forest Service employees filed a lawsuit in Washington D.C. to stop the agency from using oil-based tree marking paint, which they claim causes miscarriages and other ailments. You will recall that on December 21, 1998, Forest Service Deputy Chief Bob Joslin issued direction that by May 15, 1999, all tree marking will be done with water-borne paint. The plaintiffs filed the suit because they said the agency was backing off of the mid-May deadline. A Forest Service spokesman denied the claim and stated that the agency remains on schedule to terminate all use of oil-based paint in May.

Earlier this month, Congresswoman Helen Chenoweth (R-ID), Chairman of the Resource Committee's Forests and Forest Health Subcommittee, sent a letter to Forest Service Chief Michael Dombeck on this issue. Chenoweth asked the agency to provide the committee with a comparison of the current paint and the new water-borne paint as they relate to OSHA and GSA standards. Chenoweth also asked questions regarding current paint inventories and the ability to procure enough of the new paint to meet the needs for this coming field season.

Also this month, the Federal Timber Purchasers Committee (FTPC) sent a letter to the Chief expressing concerns over the new paint's durability, as well as the impact to the timber sale program based on availability of the paint, as well as the cost of disposing of the oil-based and purchasing the new water-borne paint. FTPC asked the Chief to consider a phase-in approach for the new paint. This would minimize the disruption to the timber sale program, allow for additional paint durability testing and would be fiscally responsible. /*Chris West*

## Timber Protest Bill

Oregon State Senator Bill Fisher of Roseburg has introduced legislation aimed at restricting protests at timber sites. Senate Bill 653 creates a crime of "unlawful presence" for individuals within a quarter-mile of a timber harvest who are not authorized to be there. The perimeter includes all access roads to the site, effectively eliminating the chance of protesters within the vicinity of any logging operation. Those found to have violated this statute would face a felony punishable by up to five years in prison and a $100,000 fine. Fisher introduced a similar bill last session but it never made it out of committee. His intent is to stop protesters from disrupting legal timber harvests. /*Chris West*

## Battling Websites

The Idaho Conservation League is upset over a new web site created by the Pulp and Paper Workers Resource Council in Lewiston, Idaho. The new site can be found at

www.idahoconservation.org. The union's objective for the web site is to rebut information on the Idaho Conservation League web site which goes by another internet address.

What is so ironic is that it was the Idaho Conservation League that has brought all kinds of attention to the new site, including an article in the Wall Street Journal. Prior to the news story, the Pulp and Paper Workers' site had received less than 150 "visits" in about three months. Within a day of the Wall Street Journal article, the web site had more than doubled its visits. Pulp and Paper Workers are excited about all the publicity. Way to go you guys. */Chris West*

## Winema Gets New Supervisor

The Forest Service has announced that Chuck Graham, currently forest supervisor of the Fremont National Forest, will also be the new supervisor of the Winema National Forest. This is one more move in a sweeping reform by the administration to improve efficiency and reduce costs.

Graham will replace Bob Castaneda who recently transferred to the Kootenai National Forest in Montana. Graham has already selected Mary Erickson, the Chemult District Ranger, as his acting deputy for the Winema.

There are several other similar instances in Region 6, where the agency is looking at combining offices to lower costs. The Siskiyou and Rogue River National Forests are currently being administered by one forest supervisor. With the retirement of Jim Hancock, BLM district manager for the Prineville district, the two agencies are looking at ways to combine staffs and co-manage their lands. Also in Oregon, the Snow Mountain Ranger District on the Ochoco National Forest and the Burns Ranger District on the Malheur National Forest are exploring co-locating with the BLM office in Burns. */Chuck Burley*

# TIMBER SALE PROSPECTUS

Timber Sale: Jack Heli, Klamath National Forest, Scott River Ranger District

1. INTRODUCTION. This prospectus furnishes prospective bidders with information not contained in the published advertisement and is designed to enable bidders to decide whether or not to further investigate the sale. The contract does not include descriptions, estimates, and other data in this prospectus, unless otherwise stated. In the event that the prospectus contains an error or contradicts the sample contract, the contract governs. Bidders are urged to examine the timber sale and make their own estimates. The sale uses form FS-2400-6. Inspect the sale area and the sample contract before submitting a bid. Obtain the appraisal, other information on the timber, and conditions of sale and bidding at Forest Service offices named in the attached advertisement.

2. BIDDING. This is an ORAL AUCTION sale. Bidders must submit sealed initial bids on prepared forms they can obtain from Forest Service offices listed in the attached advertisement. The forms include instructions for bidding and submission of the required bid guarantee of $10,700.

Total Value Bidding and Proportional Rate Bid Distribution:

Submit bids in terms of the total bid value for the timber sale. Only bids that display the total bid value for the timber sale shall be accepted. The proportionate rate method will be used for distributing the bid premium among advertised species or species groups with listed volumes.

For such sales, the contracting officer shall accept only those bids that represent the total bid value for the timber sale. Species bid values shown on the bid form by the bidder will be disregarded. After receipt of bids and determination of high bidder, the contracting officer shall assign bid premiums and include this information in the bid award information sent to the high bidder.

The bid premium shall be assigned using the following formula:

Bid ratio = total bid value divided by total advertised value.

Bid rate per hundred cubic feet (CCF) = bid ratio multiplied by the advertised rate for each species c species group.

The average bid rate after assignment of the bid premium shall total to within $0.01 per CCF of the average bi rate prior to the assignment of the bid premium.

3. LOCATION AND DESCRIPTION OF TIMBER. Refer to the sale area map attached to the samp contract and to the sample contract for legal subdivisions and the location of cutting areas, the acreage of sa area, and the harvest unit acreage. THE FOLLOWING GENERAL LOCATION, ROUTES OF ACCES ACREAGES, AND OTHER SPECIAL LOCATION DATA DO NOT SUPERSEDE THE SALE AREA MA OR SAMPLE CONTRACT. Sale is located approximately 50 miles southwest of Yreka, California, and accessed via State Highway 3 southwest to Callahan, County Road IC02, then southwest into sale area. Sale approximately 10 miles from Callahan. Units 11 and 12 can be accessed best through private land. See Sa Area Map. Sale consists of 25 units with approximately 14,120 CCF on approximately 1,507 acres planned f helicopter yarding. All trees are Individual Tree Marked with blue paint on stump and bole. Quadratic me DBH, all species combined, is 18.0 DBH. This is a pre-marked sale.

EXHIBIT
1 (tab 10F)

4. TIMBER VOLUMES AND RATES. The quality, size, and age class of the timber are estimates based on detailed cruise information on file and available for inspection at the Forest Service offices listed in the advertisement. INFORMATION LISTED HEREIN IS MADE AVAILABLE WITH THE UNDERSTANDING THAT VALUES SHOWN ARE NOT ESTIMATES OF A PURCHASER'S OWN RECOVERY AND ARE NOT A PART OF THE TIMBER SALE CONTRACT.

THE MINIMUM ACCEPTABLE BID RATE IS STATED IN THE ATTACHED BID FORM. THESE RATES ARE EFFECTIVE AT THE TIME OF ADVERTISEMENT.

| Species | PP/JP | SP/WWP | WF/RF | DF | IC | Total |
|---|---|---|---|---|---|---|
| Estimated Volume, CCF Sawtimber | 4,280 | 234 | 6,864 | 1,793 | 949 | 14,120 |
| Base Indices ($/CCF) | 357.23( E) | 467.63(E) | 191.86(D) | 211.07(D) | (xx) | xx |
| Base Rate | $10.00 | 10.00 | 5.00 | 10.00 | 5.00 | $102,134 |
| Advertised Rate | $10.58 | 11.05 | 5.00 | 10.00 | 6.25 | $106,049 |
| Required Deposits: | | | | | | |
| Slash Disposal (16 U.S.C. 490) | $ 30.40 | 30.40 | 30.40 | 30.40 | 30.40 | $429,248 |
| Estimated Volume, MBF Sawtimber | 2,648 | 142 | 4,091 | 1,072 | 547 | 8,500 |
| CF ratio (sawtimber) | 6.187 | 6.068 | 5.960 | 5.979 | 5.764 | 6.022 |
| Base Indices, MBF | 571.56 | 748.21 | 333.67 | 367.08 | xx | xx |

This sale is being offered using the cubic unit of measure - CCF, or one hundred cubic feet. For informational purposes, the board foot volume (MBF) is also stated in the above table.

Bid rates for timber, except incense-cedar, will be tentative, subject to quarterly adjustment during the contract period. In order to convert WWPA lumber price indices to a cubic foot basis, the following procedure is used:

There are ten conversion factor classifications for each of the species or species groups represented by the WWPA indices. The conversion factor ranges are:

| | Board Feet per Cubic Feet Ranges | MBF to CCF Average | Conversion Factor |
|---|---|---|---|
| A. | 4.0 to 4.49 | 4.25 | 0.425 |
| B. | 4.5 to 4.99 | 4.75 | 0.475 |
| C. | 5.0 to 5.49 | 5.25 | 0.525 |
| D. | 5.5 to 5.99 | 5.75 | 0.575 |
| E. | 6.0 to 6.49 | 6.25 | 0.625 |
| F. | 6.5 and greater | 6.75 | 0.675 |
| G. | 2.0 to 2.49 | 2.25 | 0.225 |
| H. | 2.5 to 2.99 | 2.75 | 0.275 |
| I. | 3.0 to 3.49 | 3.25 | 0.325 |
| J. | 3.5 to 3.99 | 3.75 | 0.375 |

A-415

The objective is to utilize a conversion factor that most closely resembles the actual conversion factor for a given species or species group as indicated in the timber sale cruise report. The selected classification factor identification (A, B, C, D, E, F, G, H, I, or J) will be based on which one of the ranges that the conversion factor

determined from the cruise report falls into. For example, a timber sale of large western larch and small lodgepole pine might have indices identified as Douglas-fir Larch (E) and White Woods (B). Another timber sale consisting of small inland Douglas fir might have a WWPA index identified as Douglas-fir Larch (C).

This procedure has now been set up in the timber sale accounting system. The values represented on the new tables would be the WWPA value for each Index Species multiplied by the MBF to CCF conversion factor.

The term WWPA followed by the factor identification letter would be entered by the Forest for each species-product-unit of measure (S-P-U) as appropriate along with the respective Index Species code and Index Base Value at the time the contract is loaded into the TSA system. The billing adjustment and quarterly escalation processes would use these table values. The computations for the Timber Sale Statement of Account (TSSA) would use the new table values and would follow the same process as is currently performed using the values from the WWPA index table.

The minimum acceptable bid is $106,049 for the sale-as-a-whole. The bid rate for species and unit of measure are assigned under procedures for proportionate rate method to distribute bid premium as noted in this prospectus. The bid rate is based upon the pricing procedures provided by the timber sale contract. This rate has been established by appraisal as though roads specified by the contract are in place. The Forest Service shall credit the purchaser's timber sale account as specified roads are constructed and accepted and Deposits for Reconstruction Engineering Services are paid with applicable purchaser credit up to $186,653.

At advertised prices $182,692 of purchaser credit will be unusable.

Estimated Knutson-Vandenberg deposit for sale area improvement work in a total amount of $54,191 is included in total timber value.

5. PERIOD OF CONTRACT. The normal operating season covers the period between May 15 and October 15. The contract terminates on March 31, 2001. Extensions of this contract may be granted only when the purchaser has met specified conditions.

The purchaser must submit a general operating plan to the Forest Service for approval before operations begin or within 60 days of sale award, whichever is earlier. The plan must show how the purchaser plans to complete the contract by the termination date.

6. PAYMENT. The purchaser shall make timber-related charges in advance of cutting, but may use established purchaser credit, transfer purchaser credit into the contract, or use an acceptable payment guarantee to permit cutting in advance. The purchaser shall make advance deposits in accordance with C4.221 - Advance Deposits of the timber sale contract.

The high bidder whose bid is accepted shall, at the time the contract is signed and returned by the bidder, make a downpayment pursuant to Title 36, Section 223.49, of the Code of Federal Regulations. The Contracting Officer will notify the high bidder of the amount necessary to make this payment. In no case shall the downpayment be less than 10 percent of the total bid value. The bidder may use effective purchaser credit to meet this requirement. After receipt of the downpayment and a satisfactory performance bond and upon execution of the timber sale contract, the Forest Service will return the bid guarantee. This downpayment shall not apply for any payments, transfer to other sales, or qualify for refund until 25 percent of the total bid value has been charged and paid for.

By June 8, 2000, the purchaser shall have paid for or deposited cash in lieu of payment in the greater amount of, either 50 percent of the total estimated bid premium or 35 percent of the total estimated sale value, both estimated as of bid date. Unused effective purchaser credit earned on the sale or transferred in may be used to meet this requirement. The purchaser may not subsequently transfer such credit to another sale unless the credit is replaced by cash. By August 1, 2000, purchaser shall have paid for or deposited cash in lieu of additional payment in the amount of 75 percent of total contract value at bid date, exclusive of Required Deposits.

If a qualified bidder elects to have the Forest Service construct specified roads, the contract shall provide for collection of not less than the full estimated cost of the roads stated in this prospectus in addition to the base rate value and required deposits. For scaled sales, the purchaser must pay the cost as timber is scaled, at a rate accelerated on 80 percent of the estimated volume.

7. PERFORMANCE BOND. A performance bond is mandatory. The penal sum of the bond is to be 10 percent of the total bid value of the sale, rounded up to the nearest $100 when the total bid value is $10,000 or less and rounded up to the nearest $1,000 when the total bid value exceeds $10,000. The minimum bond must not be lower than $404,300.

**The minimum bond requirement must not be less than the estimated costs of postlogging purchaser requirements. For helicopter sales, use 10 percent of the contract bid value or 25 percent of the total merchantable timber yarding costs plus 50 percent of any cost for yarding or piling unutilized material, whichever is greater.**

8. SPECIFIED ROADS. See the sample contract for verification of specific details and information concerning construction specifications. CONSTRUCTION ESTIMATES AND INFORMATION CONTAINED HEREIN, TOGETHER WITH RELATED MATERIAL, ARE NOT GUARANTEED. The following roads are those that Forest Service considers necessary to remove the timber from this sale.

| Road Number: | Name: | | Service Level: | Approximate Mileage: | Purchaser Credit Limit: | Required Completion Date: |
|---|---|---|---|---|---|---|
| 39N63 | East Boulder | (R) | S-10 | 1.36 | $67,058 | August 15, 1999 |
| 41N14 | Camp Eden | (R) | S-10 | 1.57 | 29,372 | August 15, 1999 |
| 41N16 | French Jackson | (R) | S-10 | 6.22 | 70,216 | August 15, 1999 |
| 41N16B | French Jackson | (R) | S-10 | 0.47 | 20,007 | August 15, 1999 |

Total purchaser credits are $186,653.
Total estimated construction cost is $226,128.

A bidder qualifying as a small business concern may elect to have the Forest Service construct the specified roads listed above. Completion dates for construction apply whether construction is performed by the purchaser or by the Forest Service. If the bidder elects Forest Service construction, it is the Forest Service's intent to perform construction through **contract**. In that case, the Forest Service shall not award the timber sale contract unless either it receives a satisfactory road construction bid or, if it fails to receive such a bid within 120 days of opening timber sales bids, the bidder agrees to perform road construction.

9. INAPPLICABLE STANDARD PROVISIONS. See sample contract.

10. SPECIAL PROVISIONS. See sample contract.

11. FINANCIAL ASSISTANCE. The Small Business Administration (SBA) may be able to assist small business concerns in financing construction of specified roads listed in the sample timber sale contract. Such SBA assistance, if available, may be in the form of guaranteed bank loans or direct participation SBA loans. Applicants must meet SBA size and eligibility requirements. APPLICANTS ALSO MUST MEET CREDIT REQUIREMENTS OF SBA AND/OR A LOCAL BANK. APPROVAL OF LOAN ASSISTANCE RESTS WITH SBA AND IS CONTINGENT ON AVAILABILITY OF LOCAL FUNDS OR SBA FUNDS. FAILURE TO BE ELIGIBLE OR TO OBTAIN A LOAN IN NO WAY AFFECTS REQUIREMENTS OF BID FOR ADVERTISED TIMBER SALE OR THE TIMBER SALE CONTRACT. If requested by the purchaser, the timber sale contract can provide repayment of direct SBA loans through the Forest Service as the timber is cut.

12. LOG EXPORT AND SUBSTITUTION RESTRICTIONS. The contract requires domestic processing of included timber except for species declared to be surplus, and prohibits the use of such included timber in substitution for unprocessed private timber exported. These restrictions are based on Title 36, Section 223.160, of the Code of Federal Regulations. The bidder is required to submit a certification that the bidder is in compliance with applicable prohibitions against export and substitution prescribed in the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, et seq.) with each bid.

13. EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE REVIEW. If the total bid value plus required deposits for this contract exceeds $10 million, before the award, the Forest Service shall request an equal employment opportunity compliance review of the high bidder to determine compliance with the provisions of Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, and 41 CFR 60-1.20(d).

14. AWARD: The Contracting Officer is required to make a determination of financial ability as stated in Title 36, Section 223.101, of the Code of Federal Regulations. If high bidder has one or more defaulted timber sale contracts with undetermined, disputed, or unpaid damages, the bidder may be required to furnish information or securities sufficient to document its financial ability prior to award of this contract.

15. CHANGE IN SAMPLE CONTRACT.

The following changes will be made to the sample contract when Forest Service constructs specified roads.

TIMBER SALE CONTRACT "A" DIVISION

A9 - Title will be changed to: "Permanent Roads to be Constructed by Forest Service."
A10 - Title will be changed to " Purchaser Credit."
A22 - The following provision will be added:
- B2.32 Construction Clearing.

A22 - The following provisions will be removed:
- B5.211 Priority of Drawings
- B5.251 Difference in Rock Cost
- B5.252 Difference in Culvert Installation
- B5.253 Cost Adjustment for Physical Change
- B5.254 Design Change

A23 - The following changes will be made:
- C2.32 "Construction Clearing" will be added.
- C4.1# "Amount Payable for Timber" will be added.
- C provisions relating to Construction of

A-418

Specified Roads will be removed.
C8.41 "Limitation on Performance by Other Than Purchaser" will be added.
Road Specification List and Schedule of Items for each road will be removed.
Individual Special Project Specifications will be removed.

16. GENERAL.

a. Scaling: Special division C contract provisions are included in this contract which require the purchaser to deposit funds in the Timber Sale Accounting (TSA) which the Forest Service will use to pay for Scaling Services provided by Log Scaling Contractors. Bidders should be aware that several significant changes in timber sale contract administration procedures will be required to implement contract scaling using Forest Service provided scaling services. Such changes include, but are not limited to,the following C provisions listed in this prospectus: C6.81, C6.811#, and C6.842.

b. Special Information.

( 1 ) When bidder elects Forest Service construction, bidder shall deliver within 30 days of notice of award a surety bond, or in lieu thereof cash or negotiable securities. Forest Service may consider a request for additional time for delivery of surety bond. Such request will only be considered when the extension period ...s within the time period provided for award of the public works contract for construction of the turned back roads.

( 2 ) Anyone planning to review the sale area on-the-ground should be aware of barrier or gate on Roads 39N16, 40N30, and 40N75. Information concerning road conditions of the appraised haul route may be obtained from the District Ranger's Office.

( 3 ) There are controlled areas within the timber sale area that will require special protection measures.

( 4 ) During the period of advertisement, road plans are available for review or a copy may be purchased at the Forest Supervisor's Office.

( 5 ) C8.211 - Delay of Award. (8/88) To the extent that an appeal or lawsuit is filed challenging the decision to award this contract and results in delay in award for 30 calendar days or more during Normal Operating Season after bid opening, Contracting Officer shall, upon award, adjust the contract term to include additional calendar days in one or more Normal Operating Seasons equal to the actual time award is delayed.

( 6 ) C8.2 - Termination: (10/96) The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (a) to comply with a court order, regardless of whether this sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this sale; or (b) upon a determination by the Chief that the continuation of all or part of this contract would:

(i) cause serious environmental degradation or resource damage;

(ii) be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(iii) cause serious damage to cultural resources pursuant to C6.24#;

(iv) adversely affect species listed as threatened or endangered under the Endangered Species Act, 16 U.S.C. 1531, et seq., or a sensitive species, identified by the Regional Forester.

Compensation for termination under this provision shall be calculated pursuant to C9.5, except; compensation for termination under (a) shall be calculated pursuant to C9.51 when included in this contract and compensation for termination under (b)(iv) shall be calculated pursuant to C9.52 when included in this contract.

( 7 ) C9.51 - Settlement. (8/88) Forest Service may modify or terminate this contract in whole or in part as a result of an administrative appeal or litigation of the decision to sell timber included in this contract.

In the event of modification or partial termination, changes to the contract shall be limited to those determined by Contracting Officer to be necessary for correction of the deficiencies raised by the appeal or lawsuit. Changes to the contract shall be limited to requirements with which Purchaser can reasonably comply.

In the event that this contract is modified or terminated, in part or in whole, under this provision, Purchaser agrees that the liability of the United States shall be limited to the sum of (a) the value of unused Effective Purchaser Credit earned on this sale; and (b) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area. Cost estimates listed in (b) shall be based upon Forest Service appraisal methods in use on the date contract is modified or terminated.

( 8 ) C9.52 - Settlement for Environmental Cancellation. (10/96) In the event of termination of this contract, in whole or in part, by the Chief, Forest Service, based upon the Chief's determination that continuation of all or part of this contract would adversely affect a species listed as threatened or endangered under the Endangered Species Act, 16 U.S.C. 1531, et seq., or a sensitive species identified by the Regional Forester, Purchaser agrees that the liability of the United States shall be limited to the express remedies contained within this provision.

In the event of termination or partial termination, Purchaser agrees that its sole and exclusive remedy shall be the sum of (a) the value of unused Effective Purchaser Credit earned on this sale; (b) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area; and (c) the out-of-pocket expenses involved in acquiring and holding this contract. Cost estimates for items listed in (b) shall be based upon Forest Service appraisal methods in use on the date contract is terminated. Out-of-pocket expenses in (c) do not include lost profits, replacement cost of timber, attorney's fees, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

( 9 ) C6.313# - Limited Operating Period. (1/84) Except when agreed otherwise, Purchaser's Operations shall be limited as follows: No Purchaser's Operations in Unit 31 from March 1 through August 31.

No Purchaser's Operations in Unit 57 from February 1 through July 31. No hauling of more than 5 loads per day on Road 41N16 between Jackson Creek and Little Jackson Creek from February 1 through August 31. No hauling of more that 5 loads per day on Road 41N14 in T40N, R9W, Section 20; M.D.M., from February 1 through August 31. No Purchaser's Operations in Units 98, 100, 102, and 104 from May 23 through September 7, or during first 7 days of deer season. Purchaser is required to give Forest Service 30 days notice before beginning operations in these units.

( 10 ) C6.5# - Streamcourse Protection. (8/31/98) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 300 feet slope distance of the apparent high water mark on Scott River in Units 11 and 12, within 300 feet slope distance of the apparent high water mark in Boulder Creek and East

Boulder Creek in Units 15, 18, and 19, within 300 feet slope distance of the apparent high water mark in Jackson Creek in Units 49 and 53, and within 150 feet of streamcourses shown on Sale Area Map, except as necessary for fire suppression activities. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.

Culverts, bridges or other suitable structures shall be required on tractor roads and skid trails only at points where it is necessary to protect Streamcourses. The type of crossing structure, method of installation and removal shall be determined by agreement. Such structures and associated fills shall be removed by Purchaser in accordance with C6.5.

Damage to Streamcourse or Buffer Strips caused by unauthorized Purchaser's Operations shall be repaired by Purchaser in a timely and agreed manner to the extent practicable as determined by Forest Service to restore and prevent further damage to Streamcourses.

This provision allows establishment of Buffer Strips in riparian reserves as required by the President's Northwest Forest Plan incorporated into the Klamath's Land and Resources Management Plan. The ability to require Buffers of different widths is needed to accommodate Buffers for fish-bearing streams and non-fish-bearing streams, in addition to Buffers needed for late successional species. This provision eliminates the need to post streamcourses within the sale area requiring a Buffer Strip greater than 50 feet. An increasing number of sales contain streamcourses requring various widths in the same unit. An example of the insert for the Jack Timber Sale is as follows: 300 feet in Units 11 and 12 on the Scott River and Boulder Creeks; Units 15, 18, and on the East Boulder Creek, and Units 49 and 53 on the Jackson Creek; and 150 feet in all intermittent and year-round streams other than those listed for 300-foot buffers. Streamcourses will be shown on Sale Area Map.

( 11 ) Sale was cruised with random sample method and was divided into two stratas: trees under 20.9" DBH and trees over 20.9" DBH. After cruise was completed, portions of Units 27, 40, and 57 were deleted. The cruised volume for those units was reduced by the same percentage of acres deleted: Unit 27= 67%, Unit 40= 40%, and Unit 57 = 5%. Sampling error percent from the cruise is 6.95%.

( 12 ) Purchaser is required to pile created slash in Units 27, 40, 102, 104, and 350 and in Required Disposal Strip, or other roads, trails, or private property in Units 5, 9, 15, 18, 19, 31, 49, 53, 57, 98, 100, 103, 105, 390, and 512, estimated 352 acres.

( 13 ) Purchaser is required to scatter to within 30 inches of ground created logging slash in all Units except Units 27, 40, 102, 104, and 350, estimated 1,271 total acres: estimate 25% of total acres to be scattered = 318 acres.

( 14 ) Purchaser is required to remove all created logging slash 66 feet either side of Pacific Crest Trail within 10 days of logging to Units 100 and 104. Removed slash will be treated as required in remainder of these units.

( 15 ) Purchaser is required to pile created logging slash 25 feet either side of ditches in Units 11, 12, 49, and 56; 25 feet either side of road in Unit 12; 150 feet within 10 days after yarding pile and remove either side of Pacific Crest Trail in Units 98 and 100; and 100 feet from private property in Unit 105, estimated acres included 352 acres in No. 12. Remove acres estimated to be 2 acres.

( 16 ) Purchaser is required to cover all piles; estimated 149 acres.

( 17 ) Trees under 20" DBH in Unit 100 are required to be yarded to landing before limbing. This treatment will reduce fuels within the unit.

( 18 ) Flagmen will be required during operations along all roads and trails. The Pacific Crest Trail will be open daily with flagmen required at each end during operations. Hikers may be delayed a maximum of one hour; then operations will be shut down and hikers allowed to go through.

( 19 ) Three temporary land use agreements are included in this sale.

a. License Agreement with Jorgen Danielson for a temporary road to a helicopter landing for Unit 56. This agreement requires insurance and road must be restored to original contour.

b. Encroachment Permit with Siskiyou County. Insurance and traffic control is required and damage to Road 1C02 must be repaired.

c. Purchaser will be required to obtain a Temporary Permit from Fruit Growers Supply Co. to haul from Unit 105 and for use of landing in Unit 350. Insurance and a payment of $1.50/MBF (equates to $ 0.90 /CCF) to Fruit Growers is required.

Copies of the first two agreements are available for inspection, as well as a sample agreement for Fruit Growers Temporary Permit.

( 20 ) There is a nominal amount of mountain hemlock and brewer spruce in this sale. Mountain hemlock is included in white fir volume and brewer spruce is included in sugar pine volume.

( 21 ) There are old telephone line trees in Units 5, 15, and 49. Purchaser should exercise care in felling, there may be old insulators or pieces of metal in these trees.

( 22 ) Purchaser is required to provide a Certificate of Insurance in the amount of $1,000,000 to use cost-share roads.

( 23 ) This sale has been identified in a lawsuit in which plaintiffs contend that Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit government's liability in case of cancellation to the holding costs.

( 24) <u>ROAD OR BRIDGE REGULATION LIST (C5.12)</u>

| ROAD OR BRIDGE NO. | TERMINI FROM | TO | MAP LEGEND | REGULATION |
|---|---|---|---|---|
| ~~40N17~~ | 40N16 | ~~Callahan~~ | ~~X~~ | ~~Hauling prohibited~~ |
| 41N16 | 41N16E | 41N16C | R | Hauling restricted from |
| 39N10 | 40N17 | 39N63 | R | October 16 to May 14 |
| 40N26 | IC02 | M.P. 0.95 | R | prior to completion of |
| 40N75 | 40N26 | M.P. 0.40 | R | rocking or spot rocking. |
| 41N14 | 41N16 | M.P. 2.66 | R | Rocking or spot |
| 40N17D | 40N17 | M.P. 0.15 | R | rocking must be |
| 39N11 | IC02 | M.P. 1.38 | R | completed prior to |

October 15 and must conform to Forest Service Specification 304, as directed by Forest Service.

( 25 ) Wet Weather Operation Standards dated September 8, 1998, will be used to determine when ground conditions are such that damage willl result under B(T)6.6. This document is available for inspection.

( 26 ) The United States Department of Agriculture (USDA) prohibits discrimination in its programs on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. Persons with disabilities who require alternative means of communication of program information should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

Persons believing they have been discriminated against in any Forest Service related activity should write the Secretary of Agriculture, U.S. Department of Agriculture, Washington, DC 20250, or call 1-800-245-6340 (voice) or 202-720-1127 (TDD). USDA is an equal employment opportunity employer.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC. )<br>)<br>Plaintiff, )<br>)<br>v )<br>)<br>THE UNITED STATES, )<br>)<br>Defendant. ) | No. 01-570C<br>(Judge Williams) |
| TIMBER PRODUCTS COMPANY )<br>)<br>Plaintiff, )<br>)<br>v )<br>)<br>THE UNITED STATES, )<br>)<br>Defendant. ) | No. 01-627C<br>(Judge Williams) |
| CLR TIMBER HOLDINGS, INC., )<br>)<br>Plaintiff, )<br>)<br>v )<br>)<br>THE UNITED STATES, )<br>)<br>Defendant. )<br>) | No. 04-501C<br>(Judge Williams) |

Declaration of Ed Matthews

I, Ed Matthews, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and recollection:

1. After graduating from Purdue University with a Bachelor of Science degree in Forest Production in 1968, I began my career with the Forest Service on the Klamath National Forest. I retired from the Forest Service 35 years later, in 2003. During my first 18 years

with the Forest Service, I worked on four ranger districts on three National Forests. My duties included working in the three main areas of timber management: 1) sale preparation, 2) sale administration, and 3) silviculture. After working at the District-level, I moved on and spent the next 17 years of my career working in the Klamath National Forest Supervisor's Office. I began as the timber sale planning officer and, then, for the last ten years of my career, served as the Forest-level timber sale Contracting Officer. I also was designated as the Forest-level timber sale Contracting Officer for the Shasta-Trinity National Forest during the last four years of my career. As the Forest timber sale Contracting Officer, I was responsible for the offer, sale, award, and administration of the contacts I signed.

2. When I awarded the Happy Thin and Jack Heli timber sale contracts, I believed that both timber sales fully complied with all legal requirements. I was aware that the Forest Service's interpretation of the Northwest Forest Plan was being challenged in the ONRC Action litigation, but I did not expect that the Forest Service would lose the litigation. I believed that the two sales complied with FS policy and other legal requirements, and therefore expected that the timber sale purchasers would able to operate without any serious impact from the ONRC Action litigation.

3. The Forest Service timber sale contract award process during the ONRC Action litigation – including that for Happy Thin and Jack Heli – involved far more caution and deliberation than the normal award process. A normal sale offering would be to advertise the sale, receive bids, determine the apparent high bidder, and award the contract. This process normally took approximately 45 to 60 days. The sale offering process during the

ONRC Action litigation often took several months, and involved consulting with various individuals at the Forest, regional, and national levels. The purpose of such care and deliberation, as I understood it, was to avoid awarding sales that were at high risk of being stopped by the litigation.

4. By the time the Happy Thin and Jack Heli sales were awarded, each sale had gone through a long clearance process. Before I awarded the Happy Thin and Jack Heli sales, USDA Office of the General Counsel and U.S. Department of Justice attorneys were provided information on the sales, and they indicated that proceeding with sale award was reasonable.

5. While I was ultimately the one responsible for the decision to award the Jack Heli and Happy Thin contracts, I cannot recall anyone in the Government advising me that awarding the sales was improper or unreasonable. No one ever advised me to withhold award until after the litigation had been resolved due to the risk of such sales being enjoined.

6. While I had delayed contract award for the Jack Heli and Happy Thin sales several times prior to their ultimate award, I decided to award both sales while the litigation was pending because I did not believe the sales would be negatively affected by the litigation. Awarding timber sales was a critical step in accomplishing the goals of the Northwest Forest Plan, and it was never Forest Service policy to halt the timber sale award process whenever a law suit challenging a Forest Service decision was filed.

7. One particular reason I did not expect the Happy Thin sale to be affected by the ONRC Action litigation was that the ONRC Action plaintiffs were given 10 days' notice prior to

contract award of the sale, but the plaintiffs took no action to stop the sale, such as filing a motion for a temporary restraining order or preliminary injunction. Therefore, I thought the Happy Thin sale would proceed without impact. Advance notice was also given to plaintiffs prior to the award of the Jack Heli sale, but plaintiffs made no effort to enjoin the sale.

8. During the second half of 1998 and the first half of 1999, prior to awarding the Jack Heli and Happy Thin timber sales, I routinely met with, or had telephone conversations with, timber industry representatives, including representatives from Blue Lake Forest Products and Timber Products, Inc. During those communications, we discussed the ONRC Action litigation and the potential for the litigation to affect the Klamath's timber sale program.

9. I did not inform the industry representatives that any particular sales, including Happy Thin or Jack Heli, would be suspended after award as a result of the litigation. This was because I did not expect those sales to be suspended by the litigation.

10. While the timber industry was generally aware of the ONRC Action and its relationship to the Forest Service's timber program, the bidders on the Jack Heli and Happy Thin sales had even more specific notice. At the Happy Thin bid opening, I referred to the ONRC Action litigation and let the bidders know that the sale had been listed in the litigation. I also told the bidders that the sale was no longer included in the litigation, because that was what I understood to be the case at the time.

11. As to the Jack Heli sale, the timber sale prospectus stated, "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest

Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost." While I did not believe that the sale would be affected by the litigation, this provided notice to the bidders of the potential for impact and allowed them to judge for themselves whether it was wise to bid on the contract.

12. In sum, prior to and at the time of contract award, I believed that the Forest Service had complied with all laws and policies related to the Happy Thin and Jack Heli timber sales. Therefore, I did not think it was unwise to award either the Happy Thin or Jack Heli contracts.

4-29-08 — Ed Matthews

Date — Ed Matthews

USDA - Forest Service R5-6200-42 (9/92)

FAX COVER SHEET
Region 5 -- Pacific Southwest Region
(Ref: FSH 6209.14)

Date: 1/29/99 URGENT? Yes [X] No [ ]

PLEASE NOTIFY THE FOLLOWING INDIVIDUAL THAT A FAX HAS ARRIVED FOR THEM:

This FAX is directed to:

Full Name: Bill [illegible]

Unit: Timber Products Staff:

Telephone Number: ( ) FAX Number: (530) 842-3825

Total Number of Pages Including this Cover Sheet: 1

Special Instructions:

Bill your bid on Jack Hole expires on February 1 – Monday. If you wish to extend the period of bid, please write a letter giving time you wish to extend. Letter needs to arrive at Forest Service before close of business on Monday February 1.

This FAX Was Sent By:

Full Name: Bud Cox

Unit: Klamath Staff: Timber

Telephone Number: (530) 841-4516 FAX Number: (530) 841-4571

# Timber Products
COMPANY

Yreka Veneer Division
and Timberlands
P.O. Box 766
Yreka, California 96097

Ph: (530) 842-2310
Fax: (530) 842-3825

February 1, 1999

Ed Matthews
Contracting Officer
Klamath National Forest
1312 Fairlane Road
Yreka, CA 96097

Re: Jack Heli Timber Sale

Dear Ed:

Due to the Forest Service delay in awarding the Jack Heli timber sale Timber Products would like to extend the time of consideration of our bid. However, as mentioned in my letter of January 10, 1999, the delay makes scheduling of operations very difficult, especially with helicopters. Consequently, I would also request that if, and when, the Forest Service is able to award this sale that the termination date of the sale be pushed back by an equal number of days to the delay.

Under normal circumstances this sale would have been awarded within days of the bid. The Jacktrac timber sale bid on November 3, 1998, the same day as the Jack Heli timber sale. Timber Products Company was the apparent high bidder on Jacktrac and we were awarded the sale on November 5, 1998. Jack Heli should have had a similar two-day turnaround time if the Forest Service did not decide to delay it due to a pending lawsuit.

I realize that this delay has not yet occurred during the normal operating period. However, with the minimal impacts caused by helicopter logging, we had hoped to harvest some of this sale in the wintertime. We have a contractor selected for the job and as time goes on without a commitment from the Forest Service we cannot commit to them on timing until we have a contract from the your office. Helicopter logging operations are much more difficult to schedule than traditional loggers due to the relatively few contractors and the impacts caused by limited operating schedules.

We are hoping that this sale will be allowed to proceed, be awarded and that you will adjust the termination date as requested above. If you need more information, please give me a call.

Sincerely,

Bill Turner

Bill Turner
Timber Procurement Manager

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

## DECLARATION OF THOMAS LINK

I, Thomas K. Link, declare and state as follows:

1. My professional career with the USDA-Forest Service (Forest Service) spanned approximately 32 years. I spent the last 24 of those years working in various positions on the Siskiyou National Forest (Siskiyou NF). I was the Siskiyou NF Timber Program Manager since 1995 and the Forest Timber Sale Contracting Officer since 1997. As the former, I was responsible for timber sale planning, the field location and designation timber sale areas, and the preparation of timber sale appraisals and contracts. As a Contracting Officer, I was responsible

for the award and administration of timber sale contracts. I retired from the Forest Service in 2005.

2. I am familiar with the Too Wild Timber Sale (TS), which was advertised August 18, 1998, auctioned September 17, 1998, and awarded May 14, 1999. I am also familiar with the events that delayed me for eight months in awarding the sale to the apparent high bidder, CLR Timber Holdings, Inc. (CLR).

3. Forest Service timber sales on the Siskiyou NF frequently were involved in litigation from the early 1990's through the end of my employment in 2005. During that timeframe, havoc was played with the regularly scheduled timber sale program as a result of the many issues, including: the listing of species, such as the northern spotted owl, under the Endangered Species Act; the passing of Section 318 of the Department of the Interior Appropriations Act of 1990 (commonly referred to as "Section 318"); the development and implementation of the Northwest Forest Plan (NFP); and the associated litigation. Conservation groups frequently brought environmental challenges against the Forest's timber sales, and those challenges frequently delayed award of timber sales or the harvest of timber. The timber industry also brought suits against the Forest Service when it attempted to withhold timber sales on environmental grounds. One such instance was the industry lawsuit involving Section 318 alternative timber, to which CLR was a party.

4. During those very litigious years preceding the Too Wild TS, local and regional timber industry associations had begun actively coordinating with the Siskiyou NF to guard against the well-publicized legal risks of purchasing federal timber. The Northwest Forestry Association (NFA) (later known as American Forest Resource Council) was one of the regional associations that informed the timber industry during the period of the Too Wild TS offering,

award, and contract delays. The Southern Oregon Timber Industry Association (SOTIA) was a local group, which also coordinated with the Siskiyou NF during that time period. Both NFA and SOTIA issued periodic newsletters that were wildly distributed to industry. The Siskiyou NF Supervisors Office in Grants Pass, OR, also received these newsletters, and I recall that they were very up-to-date on the litigation issues that affected federal timber sales in the Northwest region.

5. Additionally, as the Timber Program Manager and Contracting Officer, I regularly communicated to timber sale purchasers about the status of the various litigations and the impact that litigation could have upon sales. To that end, I participated in scheduled periodic informational meetings with timber industry representatives; I had frequent informal phone calls, office visits and field visits with timber sale purchasers; and I had formal written correspondence with purchasers.

6. CLR was among those companies with which I regularly communicated. As it relates to the present lawsuit involving the Too Wild TS, CLR was present at an industry/Forest Service meeting on April 30, 1998, in which it was explained how the Survey and Manage (S&M) program of the NFP potentially affected Forest Service Timber sales. I recall that it was explained to the attendees that additional survey requirements would be phased in under the S&M program on October 1, 1998.

7. I also frequently spoke about the Too Wild TS with CLR representatives, including Darrel Bonde and Virgil Frazier, by phone and in person. I recall that, during the time period leading up to the award of the Too Wild TS, I frequently communicated with both Mr. Bonde and Mr. Frazier about the Too Wild TS. I also discussed with them CLR's other sales

already under contract that were involved in litigation, including its replacement timber that was subject to the Section 318 Alternative timber litigation.

8. In several of those communications, I provided updates to Mr. Bonde and Mr. Frazier on whatever new information I learned about the litigation affecting the Too Wild TS. I specifically told them about the lawsuit captioned Oregon Natural Resource Council Action v. United States (ONRC Action) and updated them about the case. Those updates included what I knew about the implications that case had upon the Too Wild TS, how those issues affected the delay in award, what I knew about ongoing settlement negotiations that potentially affected the sale, and the general issues with the case, such as when the Forest Service would have to implement the new S&M requirements.

9. I also generally contacted representatives of CLR by phone prior to issuing any written correspondence. That was done as a courtesy to provide a heads-up on any orders which might affect their operations. On one such occasion, I called to request written confirmation that, if the Too Wild TS were awarded, CLR would not begin operations on or prior to July 1, 1998. On April 30, 1999, CLR promptly confirmed in writing their continued interest in the Too Wild TS and its willingness to delay operations to appease the plaintiffs in ONRC Action in order that I could award the sale.

10. I acted in good faith and, I believe, diligently to award the Too Wild TS to CLR. I had reviewed the NEPA documentation on the sale and felt strongly that this sale met the objectives and resource requirements of the Siskiyou Forest Plan. I had been involved with the appeals of the Decision Notice, talked with representatives of the appellant groups, which included ONRC Action, Forest Guardians, and Klamath Siskiyou Wildlands Center (KSWC),

and I tracked the appeal reviewing officer's (Robert Devlin) upholding of Forest Supervisor's decision notice.

11. I recall working on this sale, as well as others sales affected by ONRC Action, with the Regional Office to try to resolve the issues. Sue Zike was my primary contact at the Regional Office, and I regularly pressed her for the opportunity to award and proceed with the implementation of the Too Wild TS. I also recall, between November 1998 and May 1999, regularly communicating with Ms. Zike about the status of settlement negotiations between the Department of Justice and plaintiffs' attorneys. Whatever information I learned, I relayed to CLR's representatives.

12. After eight months of delay, I determined it was appropriate to award the Too Wild TS for several reasons. First, I understood from my discussions with the Siskiyou NF S&M specialist Lee Webb, who was the Forest wildlife biologist, that the S&M species were primarily thought to be dependant on old growth forests. The Too Wild TS was primarily a thinning sale in timber stands approximately 80 years of age and, therefore, contained little or no habitat that was appropriate for S&M species. Further, the survey work that had been done in the area had not revealed many existing occurrences of those species.

13. Second, the forest had completed the NEPA process and signed the decision notice for the Too Wild TS well before October 1, 1998. I recall that the Too Wild TS complied with the Forest Service's policies on the S&M survey requirements for NEPA decisions signed prior to October 1, 1998, which were set forth in the November 1, 1996, November 4, 1996, and September 11, 1998, memoranda.

14. Further, I understood that the plaintiffs in ONRC Action did not object to the award of the sale because CLR had agreed not to begin operations before July 1, 1999. I was

unaware of any other reason not to award a timber sale that had a completed NEPA decision and was considered consistent with the standards and guidelines of both the NFP and the Siskiyou NF plan.

15. Finally, I believed that CLR's representatives were prudent businessmen who were well aware of the long-standing and well-publicized legal risk of purchasing federal timber. In light of their continued interest in the sale eight months after the auction, I believed it was reasonable to award the Too Wild TS in May 1999.

16. I also recall, even after awarding the Too Wild TS contract, working to keep CLR aware of further developments in the ONRC Action lawsuit. When I learned of the court's August 26, 1999, order enjoining the sale, I immediately notified CLR.

17. In response to the ONRC Action injunction, the Siskiyou NF promptly began work first to satisfy the court's concerns and later those concerns the plaintiffs identified pursuant to the parties' settlement agreement in order that the Too Wild TS could be released for harvest.

18. I coordinated the Siskiyou NF's effort to comply with S&M survey requirements for all the timber sales that were identified by the court. I recall directing our trained staff of specialists and our timber sale preparation workforce to prioritize completing this survey work on any sales under contract first. The Too Wild TS was one of those sales.

19. I directly communicated with the local representative for the plaintiffs in ONRC Action, Jay Lininger of KSWC, to facilitate our ability to address those issues specific to the Too Wild TS in order that the sale could be released to operate as soon as possible. On September 24, 1999, following one such communication, the plaintiffs stipulated to an order modifying the injunction to allow CLR to yard and haul timber from Units 2 and 16 of the sale.

20. I believe that the Siskiyou NF worked diligently in order that CLR would not be unduly delayed in its harvest of the Too Wild TS. I also believe that the sale was brought into compliance with the S&M requirements identified in the ONRC Action as soon as was possible, given the amount of work that was necessary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 21 day of December, 2007.

Thomas K. Link

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . .

BLUE LAKE FOREST PRODUCTS,

INC.,

Plaintiff,

No. 01-570C

vs. (Judge Williams)

THE UNITED STATES,

Defendant.

_______________________________ /

D E P O S I T I O N

OF

JERRY BROOM

. . .

THURSDAY, SEPTEMBER 13, 2007

. . .

1:10 P.M.

. . .

PAULA KILLION, CSR #2071

solicitation myself. Sometimes it was done for me. Several methods.

Q. Would advertisements come directly to you in the mail?

A. Some.

Q. Would you review newspapers for advertisements and other sales?

A. Sometimes.

Q. Did you have any responsibilities prior to bidding a particular timber sale?

A. Restate that, please.

Q. What would you do prior to bid on a particular timber sale?

A. First, I would view it. On occasion I would cruise it.

Q. Why would you cruise a sale?

A. See if the volume as stated was there, and sometimes we hired that done. If we were busy, sometimes we would hire a third party to do that, as well.

Q. Was it important to Blue Lake to have a consistent flow of timber volume?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., | ) |
| Plaintiff, | ) |
| | ) No. 01-570C |
| vs. | ) (Judge Williams) |
| THE UNITED STATES, | ) |
| Defendant. | ) |
| | ) |

D E P O S I T I O N

OF

BILL TURNER

. . .

WEDNESDAY, SEPTEMBER 12, 2007

. . .

1:07 P.M.

. . .

PAULA KILLION, CSR #2071

Products' process is for evaluating sales?

A. We in general, will do a field review of the timber sale, do an appraisal of the logging systems and all the other associated costs and know where the markets are and do an appraisal, what it's worth, and determine what we're going to bid, if we're going to bid.

Q. What does a field review consist of?

A. It varies widely with each timber sale, depending on how -- the circumstances of the sale. We might cruise it. We might not cruise it. We might spend several days walking the ground. We might look at the ground with a logger. We might not. It depends on the sale. Everyone is different. Boy, I can --

Q. Why would you cruise a timber sale?

A. To know what the volume is. The Forest Service gives an estimate, but we don't always see the same volumes.

Q. Did anyone from Timber Products cruise the Jack Sale?

A. I don't recall.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, )
INC., )
Plaintiff, )
) No. 01-570C
vs. ) (Judge Williams)
THE UNITED STATES, )
Defendant. )
)

D E P O S I T I O N

OF

DARREL BONDE

. . .

TUESDAY, SEPTEMBER 11, 2007

. . .

1:20 P.M.

. . .

PAULA KILLION, CSR #2071

merit"?

A. "A lawsuit with merit"? I'm not a lawyer. I guess what --

Q. Well, according to that interrogatory, that was your belief, that the Forest Service would not award a sale if it was subject to a lawsuit with merit.

A. With merit to challenging the sale. Well, in other words, a lawsuit that -- the way I interpret that, I guess, would be a lawsuit that had any meat to it, that meant anything, because it might have some of these -- what you call -- crazies that sue on every sale, no matter what they are and that -- that wouldn't have much merit, as far as I would be concerned.

Q. How would you go about finding out if the lawsuit had merit?

A. I have no idea. We would rely on the Forest Service to keep us updated as to what --

Q. You testified earlier today that, in the process of evaluating a timber sale, CLR goes out and does its own cruising, and the reason for that

is that the Forest Service cruising estimates are not always accurate; is that correct?

A. Correct. Right.

Q. Why would you rely on the Forest Service to keep you updated with regard to a lawsuit when you don't rely on the Forest Service for the cruising information?

A. We believe with our having a working relation with them, that they are up front. We believe that. It's just that we know that their cruising is not as accurate as we feel it should be. And, for that reason, we don't trust the cruising, but I think, otherwise, they try to keep us -- they're pretty up front with us.

Q. Going back to the issue of whether or not a lawsuit has merit, would CLR consult anyone to find out if a particular lawsuit has merit?

MR. STEVENS: Objection. Asked and answered.

You can go ahead and respond.

BY THE WITNESS:

A. This would maybe be one that we would talk to AFRC today on, to ask if it has -- if a sale has -- if there is something of merit. If you are talking individual sale -- now, you are not talking Too Wild; correct?

Q. Just in general.

A. In general.

MR. STEVENS: Today.

THE WITNESS: Today?

MR. STEVENS: Not in 1998.

BY THE WITNESS:

A. No. We would probably bounce that off AFRC, if -- if -- if they felt that there was something there because they are looking at all the other districts and --

BY MS. LYNCH:

Q. And it's your testimony today that back in the 1998, 1999 time frame, you did not look to AFRC or, at the time, NFA?

A. No. It was all new. Those things were new at that time.

MAR-31-99 15:00 FROM:KLAMATH NATIONAL FOREST ID:5308426131 PAGE 2/2

United States Department of Agriculture

Klamath National Forest

1312 Fairlane Road
Yreka, CA 96097-9549
(530) 842-6131
TTY (530) 841-4573

File Code: 2450
Date: March 31, 1999

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Certified Return Receipt Requested
#Z 112 134 805

Re: ONRC Action, et al v. USFS, et al, CV C98-942WD, (WDWa); 10 day notice prior to award of Upper South Fork Heli Timber Sale and Happy Thin Heli Timber Sale, Klamath National Forest

Dear Mr. Axline:

As outlined in the Stipulation For Order Establishing Schedule For Summary Judgment Briefing, dated March 24, 1999, in the above-referenced case, this letter provides the required ten working days notice prior to the award of sales "appealed by one or more of the Plaintiffs in this action and . . . identified by Plaintiffs based on claims presented in the Complaint." I intend to award Upper South Fork Heli Timber Sale no sooner than April 14, 1999 and Happy Thin Heli Timber Sale no sooner that May 5, 1999.

Sincerely,

Edward L. Matthews

EDWARD L. MATTHEWS
Contracting Officer

cc: O.Schmidt-OGC
S.Zike-R6
B.Stone-R5
T.Boling-DOJ

A-724

Caring for the Land and Serving People

Printed on Recycled Paper

03/31/99 WED 17:57 [TX/RX NO 9453]

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

PLAINTIFF'S EXHIBIT 77 8-22-07 SKK

G05-0122-0208

U.S. Department of Justice

Environment and Natural Resources Division

EAB
90-1-4-09179

*General Litigation Section*
*P.O. Box 663*
*Washington, DC 20044-0663*

*Telephone (202) 305-0504*
*Facsimile (202) 305-0506*

March 1, 1999

**For settlement purposes only, subject to Federal Rule of Evidence 408**

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Via U.S. Mail and Fax: 541-485-2457

Re: ONRC Action v. Forest Service, Civ. No. C98-942WD

Dear Michael:

This is in response to your request for additional information regarding BLM and Forest Service plans to award certain timber sales that may be of concern to your clients. As I noted in our conversation on February 22, BLM and Forest Service are planning to make award decisions in preparation for the coming operating season. Specifically, BLM and Forest Service plan to award various timber sales after March 1, 1999, beginning with the following timber sales:

Bureau of Land Management

| Sale | District |
|---|---|
| North Murphy | Medford |
| Burma Shave | Roseburg |

Forest Service

| Sale | Forest |
|---|---|
| Spencer | Winema |
| Jack Heli | Klamath |
| Siskiyou Heli | Six Rivers |

Based on your fax from February 26, 1999, it appears that Burma Shave and Spencer are not a concern for your clients. While we will endeavor to provide you with further updates regarding the award status of other timber sales on your list, because of the number of timber sales listed and significant potential for mis-communication we cannot commit to notification with regard to any specific timber sale or within any specific

16 717

EXHIBIT 1 (tab 10A)

Exhibit A

timeframe. Please call us if you have any questions or concerns with regard to the timber sales identified above.

Sincerely,

Edward A. Boling
John Watts
Trial Attorneys

cc: Owen Schmidt
Roger Nesbit









Exhibit A

Michael Axline (OSB #83414)
Marianne Dugan (OSB #93256)
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

Corrie Yackulic (WSBA No. 16063)
Schroeter, Goldmark & Bender
810 Third Avenue, 5th Floor
Seattle, WA 98104
(206) 622-8000
Local Counsel

Counsel for Plaintiffs

FILED ENTERED
LODGED RECEIVED
JUL 08 1998
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

Z 409 253 859
REGISTERED OR CERTIFIED MAIL
REC'D BY:
TIME:

JUL 16 1998
TIME: 1630
UNITED STATES ATTORNEY
Seattle, WA

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| OREGON NATURAL RESOURCES COUNCIL ACTION, an Oregon nonprofit corporation; PILCHUCK AUDUBON SOCIETY, a Washington nonprofit membership organization; KLAMATH FOREST ALLIANCE, a California nonprofit organization; KLAMATH SISKIYOU WILDLANDS CENTER, an unincorporated Oregon association; CALIFORNIA WILDERNESS COALITION, a California nonprofit organization; AMERICAN LANDS ALLIANCE, an Oregon nonprofit corporation; UMPQUA WATERSHEDS, INC., an Oregon nonprofit corporation; NORTHCOAST ENVIRONMENTAL CENTER, a California nonprofit organization; PORTLAND AUDUBON SOCIETY, an Oregon nonprofit corporation; CITIZENS FOR BETTER FORESTRY, a California nonprofit organization; GIFFORD PINCHOT TASK FORCE, a Washington nonprofit corporation; NORTHWEST ECOSYSTEM ALLIANCE, a Washington nonprofit corporation; and HEADWATERS, an Oregon nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE and BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | Civil No.<br><br>**C98-942**<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>JUL 10 1998 |

## I. STATEMENT OF THE CASE

1. This is a civil action for declaratory and injunctive relief under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 551-706. The claims arise from Defendants' violations of the National Environmental Policy Act (NEPA) 42 U.S.C.§§ 4321-4370d, and its implementing regulations, 40 C.F.R. §§ 1500-1508; the National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq., and its implementing regulations; 36 C.F.R. §§ 219.1-219.29; and the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq., and its implementing regulations, 43 C.F.R. §§ 1601.0-1 et seq. The action is prosecuted pursuant to the right of review provision of the APA, 5 U.S.C. § 702.

2. Plaintiffs challenge the failure of the Forest Service (FS) and the Bureau of Land Management (BLM) to comply with the Record of Decision (ROD) on Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl. The ROD was adopted in 1994 and amended the planning documents of 19 National Forests and seven BLM districts. Plaintiffs also challenge the Defendants' failure to prepare a supplemental EIS (SEIS) examining changed circumstances and new information subsequent to the adoption of the ROD.

3. The ROD was adopted pursuant to the NFMA, which requires Defendant FS to "develop, maintain, and, as appropriate, revise land and resource management plans," 16 U.S.C. § 1604(a). NFMA requires that the public be involved in revisions of land management plans. 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b). NFMA also requires that Defendant FS's activities carried out on National Forests "shall be consistent with the land management plans." 16 U.S.C. § 1604(i). See also 36 C.F.R. § 219.10 (e).

4. The ROD was also adopted pursuant to FLPMA, which requires Defendant BLM to "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a). FLPMA requires the Secretary to involve the public in revisions of land use plans. 43 U.S.C. § 1712(a), 43 C.F.R. § 1610.2. FLMPA also requires Defendant BLM to "manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a).

5. Plaintiffs seek:

An order declaring that Defendants' failure to comply with the ROD, and revisions of the ROD without public participation, violate NFMA, FLPMA, and the APA;

An order declaring that Defendants have failed to comply with NEPA, by revising the ROD without preparing an SEIS, and by failing to prepare an SEIS that examines significant new information and changed circumstances that have developed subsequent to adoption of the ROD.

An order declaring that the Defendants' actions as set forth in this complaint are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, and therefore must be set aside pursuant to the APA, 5 U.S.C. § 706 (2);

An order enjoining Defendants from undertaking activities that do not comply with the ROD, NEPA, NFMA, FLPMA, and the APA.

The requested orders are necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

## II. JURISDICTION AND VENUE

6. Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. § 706.

7. A substantial part of the actions giving rise to this complaint took place in this District; thus, venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## III. PARTIES

8. Plaintiff Oregon Natural Resources Council Action (ONRC Action) is a nonprofit corporation organized under the laws of the State of Oregon. ONRC Action is headquartered in Portland, Oregon. ONRC Action's mission is to protect and restore Oregon's wild lands, wildlife, and water as an enduring legacy. ONRC Action has approximately 3000 individual and organizational members that use and enjoy the National Forests and BLM lands of Oregon, Washington, and California for recreational, educational, aesthetic, and other purposes. ONRC

Action has a long-standing interest in the sound management of the forests managed under the ROD. ONRC Action and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of ONRC Action and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

9. Plaintiff Pilchuck Audubon Society (PAS) is a 501(c)(3) non-profit membership corporation incorporated in the state of Washington, and based in Everett, Washington. PAS has approximately 1,600 members in western Washington, primarily in Snohomish County and Island Counties. PAS is a chapter of National Audubon Society and was formed in 1971. Its mission is to conserve and restore natural ecosystems, focusing on birds and other wildlife, for the benefit of the Earth's biological diversity. PAS's members use and enjoy the National Forests and BLM lands of Washington for recreational, educational, aesthetic, and other purposes. PAS and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of PAS and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

10. Plaintiff Klamath Forest Alliance (KFA) is a non-profit, public interest organization organized under the laws of California. KFA was created to promote sustainable forest ecosystems and economies in California and Southwest Oregon. In particular, KFA is dedicated to ensuring the continued existence of healthy and diverse ecosystems in the Klamath Province, which spans part of the states of Oregon and California. KFA and its members actively participate in governmental decision making processes with respect to public lands, and rely on information provided through the NEPA process to increase the effectiveness of their participation. KFA's members, volunteers, and Board of Directors use and enjoy the Klamath, Six Rivers, and Shasta-Trinity National Forests, among other National Forests and BLM lands of

California, for recreational, educational, aesthetic, and other purposes, including hiking, photography, bird observation, fishing, hunting, commercial outfitting, nature study, ceremonial and cultural activities, scientific pursuits and collection of forest products for arts and crafts. The KFA also has an interest in promoting a stable and diverse economy through protection and wise use of all resources. KFA has a long-standing interest in the sound management of the area managed under the ROD. The interests of KFA and its members will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

11. The Klamath Siskiyou Wildlands Center (KSWC) is an unincorporated association of over 200 members with offices in Williams, Oregon. KSWC is dedicated to protecting the unique biological diversity of the Klamath-Siskiyou bioregion of southwestern Oregon and northern California. KSWC and its members use, study, and enjoy lands administered by the Forest Service and BLM for scientific, educational, recreational, aesthetic and spiritual purposes, and KSWC has commented on, appealed and litigated timber sales under the Northwest Forest Plan proposed by these agencies. KSWC has a long-standing interest in the sound management of the forests managed under the ROD. KSWC and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of KSWC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

12. California Wilderness Coalition is a 501(c)(3), registered in California. CWC has 80 member organizations and over 800 individual members, located throughout the state of California. CWC's mission is to work for the protection of California's publicly owned wildlands. CWC's members use and enjoy the federal lands in the Shasta-Trinity, Mendocino, Six Rivers, and Klamath National Forests, for hiking, camping, hunting, fishing and nature observing. CWC and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to

increase the effectiveness of their participation. The interests of CWC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

13. Plaintiff the American Lands Alliance (ALA) is a non-profit 501(c)(3) incorporated in the state of Oregon with headquarters in Washington, D.C., and a satellite office in Portland, OR. ALA is not a membership organization, but represents the interests of grassroots forest protection activists and organizations. ALA is dedicated to protecting and preserving forest and aquatic ecosystems and restoring ecological integrity to the landscape. ALA's work covers the entire United States with an emphasis on public federal lands. ALA actively participates in governmental decision making processes with respect to the public lands subject to the ROD, and relies on information provided through the NEPA process to increase the effectiveness of its participation. The interests of ALA in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

14. Umpqua Watersheds, Inc. (Umpqua) is a nonprofit 501(c)(3) corporation organized under the laws of Oregon dedicated to the protection and restoration of the watersheds of the Umpqua Basin in Douglas County, Oregon. Umpqua works to accomplish this mission through a diverse statement of purpose to monitor the activities of federal, state, and local agencies charged with the responsibility of forest management within the designated area, and to advocate sound stewardship of public lands and resources with emphasis on sustainability of life systems. Umpqua seeks to improve communication with public agencies, private landowners and industry, and to educate the public in the interest of informed consent and the pubic's right to participate in decisions that affect the management of their natural resources. Additionally, Umpqua coordinates educational research projects and presentations that give a broader knowledge to the public. Umpqua currently lists 450 supporters who receive its quarterly newsletter. Umpqua and its supporters actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of

Umpqua and its supporters in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

15. Plaintiff Northcoast Environmental Center ("NEC") is a non-profit, tax exempt, public interest organization organized under the laws of California. NEC was created to protect and conserve Northern California's ecosystems, wildlife, and natural resources. Most of NEC's approximately 4,500 members live in Northern California and Oregon. NEC and its member actively participate in governmental decision making processes with respect to forest health and rely on information provided through the NEPA process to increase the effectiveness of their participation. Members of NEC use and enjoy the forests of California and Oregon for fishing, camping, nature study, hiking and other recreational and aesthetic purposes. The interests of NEC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

16. Plaintiff Portland Audubon Society (PAS II) is an nonprofit corporation organized under the laws of Oregon, dedicated to protecting and conserving Oregon's wildlife, lands, waters, and natural resources. PAS II is headquartered in Portland, Oregon, and its approximately 5,000 members live in and around Portland. Members of PAS II use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. PAS II and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of PAS II and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

17. Plaintiff Citizens for Better Forestry (CBF) is a 501(c)(3) nonprofit organization organized under the laws of California, dedicated to the protection of public forest lands in northern California. Representing hundreds of individuals throughout the region, CBF promotes sound science based management and watershed restoration, and researches, educates and advocates for a true stewardship approach to the land. CBF works to generate local citizen

activism and a greater awareness of timber harvest practices and impacts to old-growth forests, critical salmonid watersheds, roadless areas, and other important habitats in the Klamath-Siskiyou ecoregion. CBF actively participates in governmental decision making processes with respect to the public lands subject to the ROD, and relies on information provided through the NEPA process to increase the effectiveness of their participation. The interests of CBF in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

18. Plaintiff Gifford Pinchot Task Force (GPTF) is a 501(c)(3) nonprofit corporation organized under the laws of Washington state, with approximately 25 members located primarily in Washington and Oregon. GPTF is dedicated to promoting the conservation and restoration of natural ecosystems and their processes on the Gifford Pinchot National Forest and in Southwest Washington. GPTF and its members advocate for ancient and native forests, ecologically significant areas, and the regional biodiversity in Southwest Washington with particular attention and focus on the Gifford Pinchot National Forest. GPTF and its members promote and increase ecologically sustainable recreational use of public forests, with recognition of all the ecologically important benefits derived by local economies from non consumptive uses. GPTF serves as an informational and educational resource on the forest ecosystems of southwest Washington for interested citizens and organizations. Members of GPTF use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. GPTF's members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of GPTF and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

19. Plaintiff Northwest Ecosystem Alliance (NWEA) is a nonprofit corporation organized under the laws of Washington state, with its principal place of business in Bellingham, Washington. NWEA and its members are dedicated to the protection and restoration of wildlands

in Washington State and southern British Columbia. NWEA carries out research and advocacy, working with scientists, environmental activists, policymakers, and the general public to encourage the conservation of biological diversity and ecological integrity on public lands. NWEA members extensively use and enjoy national forests throughout the Pacific Northwest, including lands on the Mt. Baker-Snoqualmie National Forest. NWEA and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of NWEA and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

20. Plaintiff Headwaters is non-profit corporation organized under the laws of a Oregon, dedicated to protecting and conserving Oregon's wildlife, lands, waters, and natural resources. Headwaters' approximately 800 members live in and around southern Oregon. Members of Headwaters use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. Headwaters and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of Headwaters and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

21. Defendant United States Forest Service (FS) is the agency within the United States Department of Agriculture charged with compliance with NFMA, NEPA, and the ROD.

22. Defendant Bureau of Land Management (BLM) is an agency within the United States Department of the Interior charged with compliance with FLPMA, NEPA, and the ROD.

## IV. STATEMENT OF FACTS

23. On April 13, 1994, Defendants released the ROD. The ROD's availability was announced in the Federal Register on April 20, 1994. 59 Fed. Reg. 18788 (1994). The ROD was

adopted in response to court orders requiring Defendants to come into compliance with a variety of federal environmental statutes. The ROD amended the planning documents of 19 National Forests and seven BLM districts.

24. In an opinion issued on or about December 21, 1994, this Court upheld the legality of the ROD. The Court warned, however, that "[w]hether the plan and its implementation will remain legal will depend on future events and conditions." Seattle Audubon Society v. Lyons, 871 F. Supp. 1291, 1300 (W.D. Wash. 1994), aff'd 80 F. 3d 1401 (9th Cir. 1996). The Court also noted: "Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered." Id. at 1324. The Court further stated: "If the plan as implemented is to remain lawful the monitoring, watershed analysis, and mitigation steps called for by the ROD will have to be faithfully carried out." Id. at 1322.

25. The process leading to the ROD recognized that over 400 species had some viability risk or habitat concern despite the protections of the ROD. For these species, the ROD recognized the need for more information. The ROD therefore requires that Defendants conduct surveys to determine more about these species' location and habitat needs, and develop management standards to protect these species' habitat. These species are referred to in the ROD as "survey and manage" species. The ROD requires Defendants to implement four separate survey "strategies" for these "survey and manage" species. ROD at C-4, 5.

26. Defendants have not developed management standards to manage habitat for the survey and manage species where they are located.

27. The ROD requires that "Annual status reports on the survey and manage program are to be submitted . . . beginning at the end of F.Y. 1995." ROD at C-6. Information from these reports was to form the basis for any changes which might be proposed to the survey and manage program. ROD at C-6.

28. Defendants have failed to submit annual status reports as required by the ROD.

29. The ROD acknowledges that for 77 of the approximately 400 "survey and manage" species, additional information could be readily obtained through surveys. The ROD

refers to these 77 species as "Strategy 2" species. Many of these species have less than an 80% chance of remaining viable under the ROD unless surveys are conducted prior to ground disturbing activities and located sites are managed. For these and other reasons, the ROD anticipates that additional strategies will be necessary to insure the viability of these species, and therefore requires Defendants to "survey prior to ground disturbing activities" in the habitat of these species. ROD at C-5.

30. The "Strategy 2" survey standards require that Defendants:

a. Immediately [in 1994] start design of survey protocols and implement surveys. ROD at C-5.

b. Complete surveys for the red tree vole, the Del Norte salamander, the Larch Mountain salamander, the Van Dyke's salamander, the Shasta salamander, and the Siskiyou Mountains salamander, within these species' habitat. These surveys "must precede the design of all ground disturbing activities that will be implemented in [Fiscal Year] 1997 [Oct. 1, 1996] or later." ROD at C-5.

c. Immediately begin developing survey protocols for the 71 other "Strategy 2" species and survey for these species "prior to ground disturbing activities that will be implemented in F.Y. 1999 [Oct. 1, 1998] or later." ROD at C-5.

d. "Manage" habitat for these species on sites where they are located and manage new habitat sites when the species are found. ROD at C-5.

31. On or about November 1, 1996, Ed Ahstey, California State Director of the BLM, G. Lynn Sprague, Regional Forester for Region 5 of the FS, Elaine Y. Zielinski, Oregon/Washington State Director of the BLM, and Robert W. Williams, Regional Forester for Region 6 of the FS, wrote a directive to BLM District Managers, BLM Area Managers, and FS Supervisors within the areas governed by the ROD. This directive addressed survey protocols for Strategy 2 survey and manage species. The directive was not accompanied by any NEPA document, and was not circulated for public review or comment.

32. The November 1, 1996, directive arbitrarily defines the word "implement" in the

ROD to exclude numerous projects from the Strategy 2 Survey and Manage requirements. The directive declares that activities are to be considered "implemented" as of the time NEPA decisions are signed, even if ground disturbing activities are months or even years away.

33. The Regional Forester for Region 6 of the FS, and the Oregon/Washington State Director for the BLM also issued a joint directive dated November 4, 1996, which provides "interim guidance" amending the ROD's red tree vole survey requirement. Citing the need to cut costs, the directive states that site-specific surveys need not be conducted in most of the habitat types or vegetation communities associated with the red tree vole. The directive was not accompanied by any NEPA document, and was not circulated for public review or comment.

34. There are approximately 6.2 million acres of suitable red tree vole habitat within the area covered by the ROD. The November 4, 1996, directive excludes approximately 5.5 million acres, constituting nearly 90% of the total red tree vole habitat, from the survey requirement. The directive also excludes all activities in California from the survey requirement, even though the red tree vole has been found in California.

35. The FS and BLM have also failed to conduct surveys and follow protocols for the Strategy 2 salamander species.

36. The ROD requires "Extensive Surveys" for "Strategy 3" species. ROD at C-5. The ROD defines "Extensive Surveys" as broad surveys intended for species whose characteristics make site and time-specific surveys difficult. ROD at C-5 and C-6.

37. The ROD requires the Defendants to begin surveys for "Strategy 3" species by 1996. ROD at C-6.

38. Defendants failed to begin "Strategy 3" surveys by 1996 as required by the ROD.

39. The ROD requires "General Regional Surveys" for "Strategy 4" species. ROD at C-6.

40. The ROD defines "General Regional Surveys" as both extensive and expensive surveys. The ROD states "The information from [general regional surveys] is critical to successful implementation of ecosystem management." ROD at C-6.

41. The ROD requires the Defendants to begin surveys for "Strategy 4" species by 1996. ROD at C-6.

42. Defendants failed to begin "Strategy 4" surveys by 1996 as required by the ROD.

43. The CEQ regulations implementing NEPA require that agencies "provide for monitoring" to assure that their decisions are carried out and that "[m]itigation . . . and other conditions established in the environmental impact statement or during its review and committed as part of the decision [are] implemented by the lead agency or other appropriate consenting agency." 40 C.F.R. § 1505.3.

44. The ROD states, "Monitoring is an essential component of the selected alternative. It ensures that management actions meet the prescribed standards and guidelines and that they comply with applicable laws and policies." ROD at 57.

a. "Implementation monitoring," which will "determine if the standards and guidelines of the Plan are being followed";

b. "Effectiveness monitoring," which will "verify if the management actions under the Plan are achieving the desired results"; and

c. "validation monitoring," which will "determine if underlying assumptions are sound." ROD at 57.

45. In 1995, the Regional Ecosystem Office's Implementation Monitoring Work Group, an inter-agency committee formed to develop implementation monitoring procedures, drafted five question "sets" designed to determine whether the ROD was being properly implemented. The first question set addressed whether the ROD was being implemented with respect to a limited group of site-specific "projects," such as timber sales. The four remaining question sets addressed whether the ROD was being implemented at the programmatic level. The Implementation Monitoring Work Group abandoned these last four question sets, and has published only the results from the first question set, involving site-specific "projects." As a consequence, no implementation monitoring has been conducted to determine whether

Defendants are complying with the ROD on the programmatic level.

46. Defendants did not issue any implementation monitoring findings until March, 1997. This document was entitled "Results of the FY 1996 (Pilot Year) Implementation Monitoring Program." The document reviewed 40 of the timber sales that had been sold since the ROD was adopted. Although the document asserts that the FS and BLM achieved 97% compliance with the ROD's standards for timber sales (at least with respect to the 40 sales examined), the report failed to provide any data regarding ROD compliance by the Regional Ecosystem Office, Regional FS offices, and BLM state offices. The report also failed to examine timber sales other than the 40 that were selected for the report, or any land management activities other than timber sales.

47. The goal of effectiveness monitoring is to measure whether the ROD's provisions, as implemented, are able to meet the goals and objectives of the ROD. ROD at E-6. The ROD states that effectiveness monitoring will assess whether the "objectives of [the Plan's] standards and guidelines" are being met. ROD at E-6.

48. No results from effectiveness monitoring have been issued by defendants.

49. The work group assigned by Defendants to conduct the required effectiveness monitoring has developed five focus areas. The five areas are Late-Successional Old Growth Habitat, the Northern Spotted Owl, Marbled Murrelet, Survey and Manage Species, and Riparian/Aquatic.

50. In the more than four years since the ROD was issued, defendants have failed to move effectiveness monitoring for Survey and Manage Species past the stage of "initial discussions."

51. In the more than four years since the ROD was issued, defendants have failed to move effectiveness monitoring for Riparian/Aquatic areas past the stage of "conceptual framework."

52. Several REO documents acknowledge that effectiveness monitoring for both Survey and Manage Species and Riparian/Aquatic areas has not occurred because of a lack of

funding.

53. Over four years have passed since the Defendants issued the ROD, and five years of information has accumulated since the analysis for the ROD was completed.

54. Since the ROD was adopted, at least eight new species that occur within forests covered by the ROD have been listed as threatened or endangered under the Endangered Species Act (ESA). At least nine additional new species have been proposed for listing, and at least seven additional new species have become candidates for listing. The Defendants' EIS, however, predicted that there would be "zero" risk of extirpation from federal lands for these species under the provisions of the ROD. EIS at 3&4-197.

55. Since the ROD was adopted, over 1,000 streams within the forests covered by the ROD have been identified by regulatory agencies as not meeting water quality standards. Defendants' EIS, however, stated that, under the ROD, water quality would be "maintained and improved." EIS at 2-71.

56. Lands designated as Late-Successional Reserves (LSRs) in the ROD are "designed to serve as habitat for late-successional and old-growth related species including the northern spotted owl." ROD at 6. The objective of establishing LSRs was to "protect and enhance conditions of late-successional and old-growth forest ecosystems." ROD at C-9. With limited exceptions, timber harvest is prohibited in LSRs, and LSR acres are not to be included in calculations of the timber base. ROD at C-12-16.

57. Lands designated as Riparian Reserves (RRs) are areas where "the conservation of aquatic and riparian-dependent terrestrial species receive primary emphasis." ROD at 7. With limited exceptions, timber harvest is prohibited in RRs, and RR acres are not to be included in calculations of the timber base. ROD at C-31.

58. Since the ROD was adopted, Defendants have logged extensively in Reserves which were to be protected under the ROD. For example, in FY 1997 alone, the FS sold over 143 million board feet of timber from Reserves. This figure represents over 20% of the total FS volume sold from the area governed by the ROD in FY 97.

59. In five of the National Forests within the range of the northern spotted owl, the volume of timber sales in Reserves was greater than the volume outside Reserves during the 1997 fiscal year. In two of those National Forests, over 90% of the timber cut on the Forest came from Reserves.

60. The Defendants have developed detailed projections of timber they expect to sell out of Reserves in the future, and prescribed a goal of obtaining timber volume from Reserves on a forest-wide basis.

61. In 1996, forty eight timber sales were sold within the area covered by the ROD without complying with the ROD. These sales were sold pursuant to congressional directive under the "Rescissions Act" of 1996. Pub. L. No. 104-19, §2001. The Regional Interagency Executive Committee was concerned that these sales might constitute "changed circumstances" requiring a SEIS, but elected not to prepare such an SEIS.

62. The ROD requires Defendants to "provide for retention of old-growth fragments in watersheds where little remains." ROD at C-44. The ROD requires that this provision be applied in "fifth field watersheds (20 to 200 square miles) in which federal forest lands are currently comprised of 15 percent or less late successional forest." ROD at C-44.

63. In 1997 the REO issued a memorandum interpreting these provisions as including trees as young as eighty years old, thereby reducing the number of watersheds subject to the requirement and increasing the amount of old growth cutting that may occur in watersheds that are subject to the requirement.

64. Upon information and belief, Defendants have made substantial changes in the proposed action that are relevant to environmental concerns, without public participation and NEPA analysis.

## V. CLAIMS FOR RELIEF

### COUNT 1
### NFMA Violation —
### Failure to Act Consistently With Land Management Plans

65. Paragraphs 1 through 66 are incorporated here by reference.

66. NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). See also 36 C.F.R. § 219.10(e). NFMA also requires that the public be involved in revisions of land management plans. 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b).

67. The ROD is a "land management plan." The Defendants' actions, as described in paragraphs 1 through 65, above, are not consistent with the ROD, revise the ROD, and therefore violate 16 U.S.C. §§ 1604(d) and 1604(i), and 36 C.F.R. §§ 219.10(b) and (e).

68. The Forest Service's actions as described above were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA. 5 U.S.C. § 706.

**COUNT 2**
**FLPMA Violation –**
**Failure to Act Consistently With Land Management Plans**

69. Paragraphs 1 through 66 are incorporated here by reference.

70. FLMPA requires the Secretary of Interior to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title, when they are available. . . ." 43 U.S.C. § 1732(a), 43 C.F.R. § 1610.2. FLPMA also requires the Secretary to involve the public in revisions of land use plans. 43 U.S.C. § 1712(a), 43 C.F.R. § 1610.2.

71. The ROD is a "land use plan." The Defendants' actions, as described in paragraphs 1 through 65, above, are not in accordance with the ROD, revise the ROD without public participation, and therefore violate 43 U.S.C. §§ 1712(a) and 1732(a), and 43 C.F.R. §1610.2.

72. BLM's actions as described above were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA. 5 U.S.C. § 706.

**COUNT 3**
**NEPA Violation –**

**Failure to Prepare Supplemental Environmental Impact Statement**

73. Paragraphs 1 through 66 are incorporated here by reference.

74. NEPA requires that agencies prepare supplemental EIS's if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new . . . circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. 1502.9(c)(1).

75. Since the ROD was adopted, substantial changes have been made to the proposed action and significant new circumstances and information relevant to environmental concerns and bearing on the actions governed by the ROD have developed.

76. The Defendants have violated NEPA by failing to prepare a SEIS to consider these substantial changes in the proposed action and new and significant information.

77. These actions were taken not in accordance with law, without observance of procedures required by law, and are arbitrary and capricious within the meaning of the APA. 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

Declare that Defendants' failure to survey and manage for "Strategy 2, 3, and 4" species, and failure to prepare management standards and annual survey and manage reports violates NFMA, 16 U.S.C. § 1600 et seq., the Forest Service regulations implementing NFMA, 36 C.F.R. §§ 219.10(b) and (e), FLPMA, 43 U.S.C. §§ 1701 et seq., and the BLM's regulations implementing FLPMA, 43 C.F.R. §§ 1601.0-1 et seq.;

Declare that Defendants' failure to involve the public in revisions to the ROD violates FLPMA, 43 U.S.C. § 1712(a), 43 C.F.R. § 1601.2, and NFMA, 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b).

Declare that Defendants' failure to prepare a supplemental EIS examining changed circumstances and new information violates NEPA, 42 U.S.C.§§ 4321-4370d, and its implementing regulations, 40 C.F.R. §§ 1500-1508, including 40 C.F.R. 1502.9(c)(1);

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract

Purchaser Blue Lake Forest Products

Sale Name Happy Thin Heli

Award Date 07/06/99

Contract No. 060772

Region Five

National Forest Klamath

Ranger District Happy Camp

★U.S.GPO:1989-0-624-786

FS-2400-13(7/70)

deposits are based on the estimated volume and distance hauled and the Purchaser's commensurate use of each road listed in the Road Maintenance Plan in CT5.4.

Purchaser and Forest Service may agree in writing on adjustment of such rates. If purchaser uses roads under jurisdiction of Forest Service other than those listed in the Road Maintenance Plan, Forest Service shall establish rates commensurate with Purchaser's use of such roads.

The Required Deposits for Forest Service work in lieu of Purchaser performance and for deferred maintenance is: $0.02 per CCF.

Purchaser shall make deposits for road maintenance directly to N/A for roads subject to the terms of a Road Maintenance Agreement which is available for inspection at the Forest Supervisor's office. Such deposits shall be at the rate of $N/A per N/A.

CT5.414 - Snow Removal. (1/77) If Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources.

Snow berms shall be removed or placed to avoid accumulation of melt water on the road and prevent water concentration on erosive slopes or soils. If the road surface is damaged, Purchaser shall replace lost surface material and repair structures damaged in blading operations prior to hauling, unless climatic conditions prevent necessary work from being accomplished or as otherwise agreed in writing.

Single lane roads shall be plowed full width including turnouts. In event double lane roads are not plowed to full width, warning signs shall be required and plowing shall be no less than single lane (12 feet) with intervisible turnouts.

CT5.415 - Surface Replacement Deposits. (11/81) Purchaser shall make Required Deposits for deferred surface replacement (16 U.S.C. 537). Such deposits shall be based upon the volume and distance hauled on the roads and at the applicable rates listed in attached table titled Surface Replacement Deposit Schedule. If Purchaser uses surfaced roads under jurisdiction of Forest Service other than those listed, Forest Service may establish applicable rates for such surfaced roads.

CT5.421 - Water Supply Development. (6/78) National Forest water supply locations, access, method of filling trucks, period of water availability and procedures designed to maintain water quality at each location shall be agreed in advance of use. Such use shall at no time reduce water supplies to the level that further use may be detrimental to aquatic resources or other established use. Waterholes and other improvements relating to said water supplies shall be put into condition, prior to expected seasonal periods of precipitation or runoff, to avoid resource damage.

Damage to resources at such locations caused by Purchaser's Operations, other than fire suppression activities, shall be repaired by Purchaser in a timely and agreed manner to the extent practicable to restore and prevent further resource damage.

CT6.0 - Operations. (6/90) Purchaser agrees to conduct its operations under this contract and other related business activities in compliance with Federal, State, and local statutes, standards, orders, permits, or other regulations.

State and local environmental quality laws must be applicable to National Forest System lands. The contract shall govern if such laws conflict with or preclude performance of contractual requirements.

A conviction of, or a civil judgment for, any of the following offenses, shall be considered a breach of this provision and may result in termination of this contract pursuant to CT9.3:

CT6.411# - Directional Felling. (6/79) Unless otherwise agreed in writing, trees which cannot normally be felled away from other ownership, reserve trees, pipelines, survey movements, and stream courses, shown on Sale Area Map shall be directionally felled away from said areas with the aid of specialized equipment. Such directional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing.

CT6.414# - Limbing. (7/86) Outside of construction clearings, Clearcutting Units and regeneration units, unless otherwise provided by BT6.413, Purchaser shall, prior to skidding operations, cut exposed limbs from products which are to be yarded. Such limbing of stems shall be done to a top diameter of approximately 3 inches, at which point the top shall be cut from the remainder of the stem.

Notwithstanding other provisions herein, inside units N/A; products shall be skidded to agreed landing locations prior to limbing and lopping.

Within units on subdivisions designated NO LOP on Sale Area Map, limbing and cutting unutilized tops shall not be required.

CT6.422# - Tractor Skidding Requirements. (2/89) Unless otherwise agreed, skid road pattern shall be agreed in advance of felling and main skid roads shall be flagged on the ground in advance of felling. Purchaser shall stage-log by felling and skidding Included Timber in two or more separate operations when necessary to prevent undue damage to the resources or residual stand. Needed tractor trails shall be constructed in advance of skidding.

Products shall be end-lined as needed to protect resources or residual timber from unnecessary damage. Endlining shall not be required for distances in excess of 75 feet. The number of chokers shall be limited as necessary to avoid unnecessary damage to resources or residual timber. By agreement, tractors may be used to separate products to prevent stain.

On units N/A products shall be skidded with leading end clear of ground.

CT6.424 - Arches and Dozer Blades. (3/74) Skidding tractors equipped with pull-type arches or crawler tractors with dozer blades shall not be used in residual timber off constructed tractor roads or landings unless there is written agreement that dozer blades are needed for safety or that residual timber or desirable reproduction will not be unnecessarily damaged by such use. C-frames may be left in place if the blade is removed and the C-frame is made inoperative by restrictive chain. Rubber-tired skidders with dozer blades narrower than tire width shall be permitted.

CT6.426 - Maximum Tractor Size. (3/74) Tractors used for skidding outside Clearcutting Units, regeneration units or other authorized clearings, shall not exceed the overall width, and shall be of the type (rubber-tired or track-laying) designated on Sale Area Map, unless otherwise agreed in writing.

CT6.429 - Helicopter Yarding. (3/74) Unless agreed otherwise in writing, within Payment Units so designated on Sale Area Map, yarding shall be by a helicopter capable of lifting and transporting products to landings without unnecessary damage to residual trees.

CT6.5 - Streamcourse Protection. (12/75) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 50 feet slope distance of the apparent high water mark in Streamcourses, except as necessary for fire suppression activities. Buffer Strips of greater or lesser width, if any, have been posted by Forest Service prior to advertising. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.