# APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page Number**

Excerpts from the Standards and Guidelines, Att. A to the Record of Decision..........................97

Declaration of Tom Hussey..........................................................................................99

Declaration of Robert J. Devlin....................................................................................108

November 1, 1996 Memorandum "Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline.......................116

Declaration of John R. Hickenbottom..........................................................................122

November 4, 1996 Memorandum "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole...............................................................132

Excerpts from L. Schiffer Depo., August 27, 2007.......................................................137

Excerpts from E. Boling Depo., August 24, 2007.........................................................140

Letter from E. Lynch to G. Stevens re P. Coppelman...................................................146

Excerpts from the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl.................................................................147

Declaration of Robert J. Devlin....................................................................................153

Declaration of Richard O. Fitzgerald, with Exhibits.....................................................161

Excerpts from Jack Heli Timber Sale Contract ............................................................266

Excerpts from Too Wild Timber Sale Contract.............................................................271

Forestry Forum Newsletters..........................................................................................277

Jack Heli Timber Sale Prospectus.................................................................................296

Declaration of E. Matthews..........................................................................................306

January 29, 1999 Fax to B. Turner re bid extension......................................................311

February 1, 1999 Letter to E. Matthews from B. Turner...............................................312

Declaration of T. Link ....................................................................................................313

Deposition of J. Broom.....................................................................................................320

Deposition of B. Turner....................................................................................................322

Deposition of D. Bonde....................................................................................................324

March 31, 1999 Letter from E. Matthews to M. Axline..................................................328

March 1, 1999 Letter from E. Boling to M. Axline.........................................................329

# Standards and Guidelines

**for**
**Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl**

## Attachment A

**to the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl**

appropriate action will be protection of relatively small sites, on the order of tens of acres. For some species, including some vascular plants, the appropriate action will include the use of specific management treatments such as prescribed fire. For rare and endemic fungus species, areas of 160 acres should be temporarily withdrawn from ground-disturbing activities around known sites until those sites can be thoroughly surveyed and site-specific measures prescribed. For one fungus species, *Oxyporous nobilissimus*, there are only six known sites and two of these do not currently have a protected status. Management areas of all useable habitat up to 600 acres are to be established around these two sites for the protection of those populations until the sites can be thoroughly surveyed and site-specific measures prescribed. The actions to protect *Oxyporous* must be undertaken immediately.

2. *Survey prior to ground-disturbing activities*. Measures to survey for species and manage newly discovered sites are to be phased-in over a somewhat longer timeframe than the measures specified for currently known sites (see above). For some species, these efforts have been ongoing through rare and sensitive species programs. Where such efforts have been ongoing, they should continue. However, protocols have not been developed for surveys for all of these species, and the expertise needed to conduct them is not readily available in some cases. Efforts to design protocols and implement surveys should be started immediately. Where surveys are completed, the information gathered from them should be used to establish managed sites for species. Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles (and lynx, see page C-47), must precede the design of all ground-disturbing activities that will be implemented in 1997 or later. Development of survey protocols for the other 71 species listed in Table C-3 must begin in 1994 and proceed as soon as possible. These surveys must be completed prior to ground disturbing activities that will be implemented in F.Y. 1999 or later. Work to establish habitat requirements and survey protocols may be prioritized relative to the estimated threats to the species as reflected in the SEIS. Management standards will be developed to manage habitat for the species on sites where they are located. These surveys may be conducted at a scale most appropriate to the species. For most species, this survey would start at the watershed analysis level with identification of likely species locations based on habitat. Those likely locations would then be thoroughly searched prior to implementation of activities. For other species, the identification of likely sites may be most appropriately done at the scale of individual projects. Surveys should be designed for maximum efficiency, focusing on the likely range and habitats of the target species. Multispecies surveys should be used wherever they would be most efficient. To the degree possible, surveys should be designed to minimize the number of site visits needed to acquire credible information. Survey protocols and proposed site management should be incorporated into interagency conservation strategies developed as part of ongoing planning efforts coordinated by the Regional Ecosystem Office.

3. *Extensive surveys*. Conduct extensive surveys for the species to find high-priority sites for species management. Specific surveys prior to ground-disturbing activities are not a requirement. Rather, the surveys will be done according to a schedule that is most efficient, and sites will be identified for protection at that time. This strategy entails some risk because some species sites may be disturbed prior to completion of surveys. It is recommended primarily for species whose characteristics make site and time-specific surveys difficult. For example, some fungi only produce fruiting bodies under specific

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF TOM HUSSEY**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I obtained my B.S. in Forestry from the University of Maine in 1972, and my M.S. in Forestry from Yale University in 1974.

2. My career with the USDA - Forest Service (Forest Service) spans 31 years from 1976 to the present day. Since 1994, I have worked as the Policy Planner on the Resource Planning and Monitoring staff for the Pacific Northwest Region (R6). In that capacity, my major

duties have included, *inter alia*, implementation issues surrounding the Northwest Forest Plan (NFP).

3. The NFP Record of Decision was signed in April 1994. It was developed by direction of President Clinton in response to controversy, litigation, and court injunctions over management of federal forest lands in Washington, Oregon, and northern California. The plan was based on a scientific analysis of the status of habitat for late successional and old-growth forest-related species. The NFP amended the existing land management plans for national forests and Bureau of Land Management (BLM) districts within the range of the northern spotted owl. That range covered 24 million acres of federal lands.

4. One of the key components of the NFP was its allocation of lands into different categories. Of the 24 million acres the plan covered, only 22 percent were made available for programmed timber harvest. The plan designated the remaining 78 percent as some type of reserve or land otherwise not available for programmed timber harvest.

5. In addition to setting aside large reserves of land, the NFP's standards and guidelines required that land managers "survey and manage" for certain rare species of plants and animals. "Survey and manage" (S&M) was a mitigation measure intended to benefit species closely associated with late successional or old-growth forests whose long term persistence was not assured by the land allocations and other standards and guidelines. The measures included management of known sites, surveys for species prior to ground-disturbing activities, and extensive regional surveys for species.

6. Because of the high level of coordination and cooperation among agencies during the plan's implementation, the NFP established a formal interagency structure to communicate

directions, coordinate activities, and resolve issues. Some of the key components of that structure included: (a) the Regional Interagency Executive Committee (RIEC), which comprised the regional heads of those federal agencies that were involved with the plan; and (b) the Regional Ecosystem Office (REO), which was an interagency staff group that provided technical support and analysis to RIEC.

7. During the spring and summer of 1994, in the first few months following the adoption of the NFP, it became apparent that there were many questions and issues concerning the plan's implementation. Field unit personnel were forwarding questions directly to REO staff or to Regional Office (or BLM State Office) functional staff specialists in their program areas. This was chaotic. Responses were sometimes inconsistent between agencies or between function disciplines within the same agency. REO staff were swamped with questions that could have been resolved by agency staff.

8. In order to respond to this situation, in the summer of 1994, a NFP Issue Resolution Team (IRT) was established. The two lead staff were Joyce Casey, who at the time went by Joyce Ulrich, and myself. For both of us, this was our major duty requiring almost three-quarters of our time for three to four years. There were several other Regional Office (RO) staff involved, but to a much lesser degree. The BLM had a similar set up, with Larry Larson as their key staff. Joyce and I coordinated closely with Larry on most of the issues and questions.

9. The protocol was for questions from Forest Service field units or documents requiring REO/RIEC review to first be sent to the Director of Strategic Planning, Tom Nygren, and Tom would refer the matter to Joyce and me for resolution. Our process began with a review of the question or issue and then agreement on which one of us would assume the IRT

lead for it, based on how well the issue matched our different backgrounds and expertise or on our current workload. The IRT lead would then initiate discussions with staff specialists who had knowledge and expertise pertinent to the issue, interface with BLM staff, discuss the issue with REO staff, facilitate agreement on the appropriate answer or response, and begin the process for transmittal of the response to the field.

10. In most cases, issues were resolved by the two land management agencies (Forest Service and BLM). The interagency REO staff was not required to concur or approve our positions. We did, however, consult regularly with REO staff on an informal basis during the issue resolution process. It was very common to meet with REO staff to sound out tentative positions, discuss, debate, and test our logic. Sometimes an issue or question was complex or controversial enough that, instead of a Forest Service/BLM issue resolution, we would formally request an interagency issue resolution by REO staff. Any of the RIEC federal executives could request interagency REO staff work on NFP issues.

11. Before the staff's agreed issue resolution could be officially transmitted to the field, it would be reviewed by higher level agency managers. Our draft issue resolution was always reviewed by RO Directors: 1) the Director of Strategic Planning, and 2) the Director of whatever functional areas (sometimes several) were most affected by the issue. Once approved by the Directors, the issue resolution was issued by official correspondence; sometimes signed by the Director, sometimes by the Regional Forester. In many cases, the issue resolution applied to both BLM and Forest Service. In those cases; the staff analysis and the review, approval, and official transmittal were interagency.

12. From its establishment in 1994 to 1996, the IRT addressed well over 100 questions. Those questions fell along a continuum from easy to difficult. On the easy end of the spectrum, the IRT was able answer some questions in minutes, if there was a clear "right answer." Those we often disposed of informally by phone call or email. On the other end of the spectrum, some questions presented issues that took us several days, weeks, or months, and were processed through higher level managers, as described above.

13. I recall that one of the more difficult issues to resolve concerned the transition period, which the NFP provided for phasing in the survey requirement for Category 2 species that ultimately would be required prior to any ground-disturbing activities. That transition period was set forth on page C-5 of the 1994 NFP ROD, Standards and Guidelines, under the heading "Survey prior to ground-disturbing activities." Three questions arose concerning how to interpret that standard and guideline. Those three questions are identified in the November 1, 1996, memo, which many now commonly refer to as the "NEPA Equals Implementation" letter. In brief, those questions were:

a. The "Survey prior to ground-disturbing activities" Standard and Guideline on page C-5 requires survey prior to design of ground disturbing activities to be implemented in 1997 or later. The ROD on page 36 uses FY1997 for the same requirement. Which is correct?

b. What is the definition of the term "ground disturbing activity" in the context of this standard?

c. What is the definition of "implemented" in the context of this standard?

14. I was the Forest Service member of the IRT who worked on those issues, which I collectively referred to as "the survey prior to ground-disturbing activities issues." I worked with Larry Larson, my BLM counterpart within the IRT. Larry and I concluded that, in order to resolve those issues, we needed Randy Hickenbottom, who was the Chair of the S&M Workgroup, and a wildlife ecologist; Cheryl McAfree, who was a botanist specializing in plant surveys; Lyndon Werner, who was a BLM Timber Sale Specialist; and Nancy Anderson, who also worked for the BLM. These four had expertise to assist our team.

15. The six of us met several times (four to eight times) to address the three questions noted in the November 1, 1996, NEPA Implementation letter.

16. Questions one and two were quickly resolved. However, the third question, "At what point in the process, setting in motion, and executing a project, is it 'implemented' in context with Component 2 Survey and Manage S&G requirement" was discussed over a period of months.

17. In search of an answer to this third question, we looked at three possible interpretations. Namely, that "implementation" could mean:

a. when there is physical activity on the ground;

b. when agency signs a contract; or

c. when the responsible official signs the NEPA decision.

18. The first possible interpretation had the advantage of simplicity and intuitive common understanding by almost anyone. It would tie "implementation" to an action you can go out and see in the forest.

19. The second possible interpretation tied "implementation" to the signing of a contract (almost in all cases, a timber sale contract) because this is when the government makes a relatively final commitment to act.

20. The third possible interpretation, which is the one we eventually adopted, was to define "implementation" as being the point at which the responsible official signs a NEPA decision document. I recall long arduous discussions over this point. What tipped the scale of the debate was the context for why the NFP adopted this requirement. The survey and manage standards were adopted to provide protective measures for a suite of species, which were relatively rare or had relatively little known about their life requirement, but which were believed to be associated with late-successional habitat. In addition to a standard to protect known sites occupied by these species, the NFP adopted a standard that required a survey for the presence of these species prior to ground disturbing activities. Our group arrived at the conclusion that it made more sense to interpret this language so that the surveys would be done and the information available to the responsible official before he or she made a project NEPA decision. To do otherwise would be to expose the government to a situation where our surveys might occur and the resulting information made available to the responsible official after a NEPA decision was made, or worse yet, after a contract was signed. This could cause us to expend time and money re-working decisions or project design and field layout or contract modification or termination.

21. This issue discussion was complicated by the fact that some NEPA decisions had already been signed or contracts signed without having done the surveys based on one of the alternative interpretations of this language. We were very concerned about adopting an issue

resolution that would require all of these projects to be surveyed for S&M species, and possibly be reworked based on the outcomes of the surveys. We dealt with this concern by recommending a transition phase in the period for adopting the interpretation of when the surveys are required as outlined in the November 1, 1996, letter.

22. I recall some discussion about the possibility of deferring projects, which had passed the NEPA decision point without yet having surveys, but which had not yet been offered for contract. The thought here was that perhaps other projects could be brought forward for contract to replace the ones awaiting S&M surveys. However, by this period (mid-90's), our timber sale program was pretty much "hand-to-mouth." The listing of the marbled murrelet and the northern spotted owl under the Endangered Species Act had deleted the most of the shelf stock of approved NEPA decisions in the region of the NFP. We had no timber projects near completion to bring forward to make up for any projects deferred for S&M surveys. Therefore, any project sent back for survey completion would represent a program fall-down.

23. A further complicating factor was the fact the not all the survey protocols were completely developed, reviewed, and approved for use. We dealt with this concern by recommending that the draft version of the species survey protocol be used until the approved version is issued.

24. Once the group of us agreed on the recommended interpretation of the NFP language concerning the "survey prior to ground-disturbing activities" standard and guideline, we drafted a letter for signature by the Forest Service Regional Foresters and BLM State Directors. Our letter was reviewed and edited by higher level managers in both agencies prior to being signed and issued on November 1, 1996.

25. In retrospect, I still believe that interpreting the "survey prior to ground-disturbing activities" standard and guideline to require surveys prior to the NEPA decisions was the appropriate outcome. If we accept the scientists' analysis of the situation for these species and the NFP decision that the agencies should survey for their presence prior to conducting an activity that might affect them, then it only makes sense to have that information before we make a decision about project design. My previous experience as a District Ranger for nine years influences my thinking. I recall that modifying contracts or changing the layout and marking of timber sales was so time consuming and expensive that we should make every effort to collect needed information prior to the NEPA decision rather than collect it later and accept the risk that the late arriving information could cause us to change a project layout or modify a contract.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3 day of January, 2008.

Tom Hussey

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBE RPRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | ) | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF ROBERT J. DEVLIN**

I, Robert J. Devlin, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. Over the course of my 42-year career with the USDA-Forest Service (Forest Service), I worked in a variety of positions before retiring in June of 2000. In 1994, I became the Director of Natural Resources for the Pacific Northwest Region of the USDA-Forest Service (Region 6, or R6). In that capacity, I represented the Regional Forester and the Deputy Regional Forester in oversight of the staff from various programs. My responsibilities also included

oversight on matters associated with the Northwest Forest Plan and its implementation within Region 6.

2. Timber management was one of the programs that I oversaw. It was my responsibility to track the program's financing and output for the Regional Forester and Deputy Regional Forester.

3. Annually, the R6 Regional Forester compiled data projecting the amount of timber that the region and its national forests could offer for sale. This information would be combined with data from the other eight regions of the Forest Service and used to develop the entire agency's out-year budget proposal to the President. After several reviews and modifications, the President would submit the agency's proposal to Congress for approval. Congress would further review and modify the President's proposal and would eventually approve and budget, for the entire Forest Service, a very specific volume of timber to be offered for sale and later harvested. The Forest Service Chief distributed Congress's established volume among the nine regions of the Forest Service. The Regional Foresters, in turn, distributed that volume among the respective regions' national forests.

4. The timber-harvest levels established and approved by Congress were expected to be met. In other words, it was not discretionary by the Forest Service to vary the quantity established by Congress. Most line officers, from the District Rangers up to the Forest Supervisors in Region 6, had performance requirements to meet their allocated sale offerings. In my role as Region 6's Director of Natural Resources, I worked with the national forest supervisors and supported their efforts to prepare timber sale offerings to ensure that the timber management program met the region's allocated harvest levels.

5. It was a challenge to meet timber harvest levels because a significant amount of time was required to prepare sales before they were auctioned and awarded. Under the National Environmental Policy Act (NEPA), the forests had to analyze the environmental impact of a timber sale before deciding whether to offer that timber for harvest. That analysis typically took up to a full year from the date a line officer initiated a timber sale project to the date that officer signed the NEPA document and the Decision Notice (DN). After signing the DN, but before auctioning the timber sale, the field foresters would use the NEPA document to prepare the timber sale. This preparation would include marking the timber designated for harvest, laying out roads, cruising (measuring) the timber volume, and appraising the value of the sale. This sale preparation commonly required another one to two years to complete. In total, a forest needed up to three years to prepare a timber sale for auction. Thus, in order for Region 6 to meet its harvest levels, the line officers had to plan timber sales many years in advance of the planned award date.

6. Attaining the region's harvest levels was further complicated by the fact that during the intervening years unforeseen events frequently changed the specified harvest levels or the forests' ability to meet those levels. For example, from time to time Congress would increase the Forest Service's annual harvest levels or the Chief of the Forest Service would redistribute harvest volumes from one region to another or one forest to another. Additionally, unforeseeable natural events such as forest fires occasionally delayed or burned out certain sales requiring the modification or, if too severe, the cancellation of the timber sale.

7. Consequently, if a national forest had not completed in advance NEPA documents and DN to provide for an adequate number of timber-sale contracts in advance for offer and award, it would have been unable to accommodate unexpected increases set by Congress or to

compensate for shortfalls due to natural causes. Again, annual harvest offerings set by Congress were expected to be achieved. Thus, it was a good management practice for line officers to keep a "shelf" of signed NEPA documents and DNs, which could be used in response to unexpected increases or shortfalls.

8. When I took over my duties as Director of Natural Resources, there was very little timber volume on the "shelf." The listing of the marbled murrelet and the northern spotted owl, under the Endangered Species Act, caused sales that had already been awarded to be delayed or canceled. Additionally, those listings deleted the majority of timber sale projects with signed NEPA decisions on the "shelf", which line officers, otherwise, could have used to compensate for volume shortfalls.

9. The listing of the murrelet and owl was the context for the adoption of the 1994 Northwest Forest Plan (NFP). The listings reduced R6's timber sale offerings to the point of severely impacting the local communities dependent upon the timber harvest for their livelihood and Congress's budgeted and expected harvest volumes. The NFP, largely supported by President Clinton, was a major undertaking in which the Forest Service and the Bureau of Land Management (BLM) adopted a coordinated management direction for the lands those agencies administered within the range of the spotted owl. The NFP set aside millions of acres of late-successional and old-growth forest for species, such as the northern spotted owl, which depended upon that type of habitat. Additionally, the NFP and its "survey and management mitigation measures" (later to be known as Survey and Manage Standards and Guidelines) required that the agencies survey and manage habitat for a large number of species, known or unknown, which the agencies had no experience dealing with or locating.

10. While the specific requirements of the Survey and Manage Standards and Guidelines were new and somewhat nebulous, Congress's timber-harvest requirements were unambiguous. When the NFP was adopted, Congress had set the combined harvest level for the Forest Service and BLM at 1.1 billion board-feet. Because of the shortage of signed NEPA documents on the "shelf" in R6 affected by the NFP, forests had to begin timber projects from scratch, which necessarily impeded their ability to attain immediate harvest-volume expectations. The Chief persuaded the administration that the forests covered under the NFP could not meet their portion of the 1.1 billion board-feet for the first two years of the plan. We, in R6, determined that we needed three years to prepare a sufficient number of sales to meet our portion of the 1.1 billion board-feet volume.

11. Over that same timeframe, R6 and R5 (California) of the Forest Service and both Oregon and Washington districts of BLM were tasked with determining and implementing the new requirements of the NFP. Survey and Manage Standards and Guidelines was one of those new requirements. The plan provided a timeline for developing procedures for surveying and managing for certain species. A Survey and Manage Workgroup worked on developing survey protocols. Once the members of the Survey and Manage Workgroup reached consensus on the protocols to be used by the Federal agencies, they reported them to the Regional Ecosystem Office (REO). After the REO reviewed a protocol, it would circulate the protocol to the R5, R6, and Oregon and Washington BLM executives for them to sign and send out as policy. I was not involved with the Survey and Manage Workgroup or the development of survey protocols.

12. However, I was a member of the Intermediate Management Group (IMG) and, both in that capacity and in my capacity as R6 Director of Natural Resources, did work on questions concerning how to interpret the NFP. The IMG comprised representatives from all the

agencies that were called for in the NFP, including the Forest Service, BLM, Fish and Wildlife Service, the National Marine Fisheries Service, the Environmental Protection Agency, and the Parks Service. I became a member of the IMG after Tom Nygren retired. Nancy Diaz (previously Nancy Molina) and I were the Forest Service representatives on the IMG. Bill Bradley was the BLM representative.

13. The IMG worked with the Issue Resolution Team (IRT) to help interpret the NFP. Tom Hussey was the Forest Service representative on the IRT, with whom I worked. Whenever the IRT was faced with an issue that impacted one of the forest management program areas, the team would seek advice from the IMG on how to interpret the NFP. The IRT would develop alternatives and submit those alternatives to the IMG for comment.

14. One question that the IRT addressed was how to interpret the language on page C-5 of the Standards and Guidelines, which provided a transition period for phasing in the surveys for Category 2 species that ultimately would be required prior to any ground-disturbing activities. The survey requirements were phased in for different species based upon the date a project was "implemented." However, it was unclear from the NFP whether timber projects should be deemed implemented at 1) the date the NEPA document and DN were signed by the line officer (*i.e.,* when projects were added to the "shelf" of NEPA documents and DN); 2) the date the sale was offered or awarded; or 3) the date the timber companies broke ground on the project (*i.e.*, ground disturbing activities). There was also a question as to what constituted ground disturbing activities for the latter.

15. The question of when a project should be deemed implemented was especially significant because of the amount of time the Forest Service needed to prepare its timber sales for award, which included the NEPA documents and DN. It was apparent that for the surveys to

be useful, they were to be incorporated into the NEPA process. However, the NFP provided that survey protocols were to be developed over the first several years of the plan. Therefore, the forests were unable to incorporate the surveys into the NEPA process for timber sales during those first several years because the protocols did not yet exist. However, as I explained above, a timber sale typically required up to one year from project initiation to the signed NEPA document and DN and up to another two years of sale preparation before the award. Therefore, it was necessary for the forests to have the survey protocols years before a timber sale's anticipated award date in order to incorporate the surveys into the NEPA process.

16. Under those circumstances, if the Forest Service deemed a project "implemented" upon groundbreaking, the forests would have been unable to complete and award timber sales for years while the Forest Service developed survey protocols. That delay effectively would have removed the transition period, which the NFP clearly intended to provide, for developing and applying the survey protocols. Finally, it would have made it impossible for the region to attain its required timber-harvest volume for several years.

17. During this NFP transition period and development of the survey and manage protocols, the interpretation that the Forest Service and BLM ultimately adopted was that a project was deemed "implemented" on the date the NEPA document was signed. This commonly has been referred to as "NEPA Equals Implementation." This resolved the tension between the various requirements of the NFP. We saw that this balanced the requirements that the agencies could achieve their Congressionally-set timber-harvest volumes along with the requirements of the survey and manage program when those protocols were developed. It also ensured that the data collected from surveys would be obtained prior to, and therefore incorporated into, the NEPA document. Finally, it gave effect to the transition period that the

NFP provided for phasing in the requirement to perform surveys prior to ground-disturbing activities.

18. Given the NFP's requirements of meeting both timber harvest goals and survey and management requirements, the transition period set forth in page C-5 of the Standards and Guidelines, and the undefined term "implemented," I agreed that the most reasonable interpretation to be applied during this transition period was that a project should be deemed implemented at the time the NEPA document and DN were signed. With that interpretation, the Forest Service and BLM issued a policy-directional letter on November 1, 1996, instructing their field units that existing timber sales having completed their NEPA documents and DN could proceed to sale preparation and offering while protocols were being developed. It is this letter that has become known as the "NEPA Equals Implementation" letter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 18th day of DECEMBER, 2007.

[signature]

Robert J. Devlin

| | | | | | |
|---|---|---|---|---|---|
| United States Department of Agriculture | Forest Service | R-5<br>R-6 | OR/WA<br>CA | Bureau of Land Management | United States Department of Interior |

Reply to: 1734-PFP(BLM-OR931) / 1920(FS) Date: November 1, 1996

EMS TRANSMISSION 11/1/96

FS-Memorandum

**BLM-Instruction Memorandum No. OR-97- 007**
**Expires 09/30/98**

To: USDI Bureau of Land Management District Managers (Coos Bay, Eugene, Lakeview, Medford, Roseburg, Salem) and Area Managers (Arcata, Redding); USDA Forest Service Forest Supervisors within the Area of the Northwest Forest Plan

Subject: Implementation of Survey and Manage Component 2 "Survey prior to Ground-Disturbing Activities" Standard and Guideline

This memorandum/bulletin pertains to the Survey and Manage Component 2 Standard and Guideline (S&G) found on page C-5 of the Northwest Forest Plan. The S&G states: "Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles . . . [Component 2 species], must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." This S&G is referred to as "Survey and Manage Component 2 Implementation."

This memorandum/bulletin addresses the following topics of clarification using a question-and-discussion format:

- Is calendar or fiscal year to be used to determine when surveys are required?
- What constitutes a "ground-disturbing" activity?
- When is a project considered "implemented?"
- What should be done about surveying for the red tree vole?

The information contained in this memorandum/bulletin gives guidance to help you determine when activities will potentially affect Component 2 species. During discussions on this topic, questions arose regarding the Bureau of Land Management (BLM) and Forest Service interpretation of this S&G. We have drafted this document to reflect a blending of approaches.

If you have additional questions, please contact Larry Larsen (503-952-6080) or Nancy Anderson (503-952-6072) at BLM; or Tom Hussey (503-326-3589) or Randy Hickenbottom (503-326-3626) at the Forest Service.

Ed Hastey
State Director, CA
USDI Bureau of Land Management

for G. Lynn Sprague
Regional Forester, Region 5
USDA Forest Service

DEFENDANT'S EXHIBIT B

ONRC-G-05-0207-0062

Elaine Y. Zielinski
State Director, OR/WA
USDI Bureau of Land Management

Robert W. Williams
Regional Forester, Region 6
USDA Forest Service

1 Attachment
1 - Questions & Discussion re
S&M Component 2 Implementation (4 pp)

BLM Distribution
WO-330 (Room 204 LS) - 1
CA-340 - 1
OR-930 - 1
REO (Knowles, Pietrzak) - 2
Tom Hussey, Forest Service R-6

# Survey and Manage Component 2 Implementation Issues

rev. 10/22/96

This paper discusses questions regarding implementation of the Survey and Manage standard and guideline (S&G) entitled "Survey prior to ground-disturbing activities" located on page C-5 of the Northwest Forest Plan (NFP). The S&G states:

- "Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders, and red tree voles . . . [Component 2 species], must precede the design of all ground-disturbing activities that will be implemented in 1997 or later." (emphasis added)

- "protocols have not been developed for surveys for all of these [Survey and Manage] species . . . Efforts to design protocols and implement surveys should be started immediately."

**Question 1:** The S&G on page C-5, cited above, states "implemented in 1997 or later." The Record of Decision (ROD), page 36, states "will have surveys conducted prior to ground disturbing activities that will be implemented in FY 1997 or later." Should the fiscal year or calendar year be used as the threshold when surveys are required to proceed project implementation?

DISCUSSION: When the NFP says fiscal year, use the fiscal year; when it gives year, use calendar year (commencing January 1). In this case where there is a conflict between the specified fiscal year (ROD-36) and the calendar year (S&G C-5), use the more specific fiscal year ROD date for implementation over the non-specific S&G language. Using fiscal year is the more conservative approach and corresponds to the fiscal year cycle used in project planning and, also, to the subsequent reference to surveys to be implemented prior to FY 1999.

**Question 2:** The S&G requires "surveys . . . precede . . . all ground-disturbing activities." Should "ground-disturbing" be defined as specifically meaning "soil-disturbing" activities or as a more generic "habitat-disturbing" activities criteria?

DISCUSSION: Survey protocols and management recommendations for Component 2 species include guidance on the type of activities likely to negatively affect a given species, and they also define likely "ground-disturbing activities." Activities with disturbances having a likely "significant" negative impact on the species' habitat, its life cycle, microclimate, or life support requirements should be surveyed and assessed per protocol and are included within the definition of "ground-disturbing activity."



ATTACHMENT I-1

Limiting the definition of ground-disturbing activities to "soil-disturbing" activities does not adequately take into consideration the scope and intensity of impact of the activity. Activities, technically not disturbing the ground, might clearly affect microclimate or life cycle habitat factors enough to require a survey (e.g., harvesting over a snowpack or the use of helicopters). At the same time, all activities clearly having soil-disturbing effect might not have a large enough scope to trigger a need to survey. Such a case would be the installation of a signpost within a campground. The "significance" of potential negative impacts on the species and its habitat should be evaluated. Evaluation of the scope and intensity of the project's anticipated negative impact on habitat or life requirements should include an assessment of the type, timing, and intensity of the disturbing activity.

The responsible official should seek the recommendation of specialists to help judge the need for a survey based on site-by-site information. The need for a survey should be determined by the line officer's consideration of both the probability of the species being present on the project site and the probability that the project would cause a significant negative affect on its habitat.

**Question 3:** At what point in the process of developing, setting in motion, and executing a project is it "implemented" in context with the Component 2 Survey and Manage S&G requirement?

DISCUSSION: S&G C-5 states "surveys [for Component 2 species] must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later." ROD•36 states "surveys [must be] conducted prior to ground disturbing activities." The specific direction in S&G C-5 will be used. The intention is to accomplish surveys prior to the design phase since the presence or absence of Survey and Manage species is a significant piece of information and should be available prior to the signing of the National Environmental Policy Act (NEPA) document. The interagency interpretation is that the "NEPA decision equals implemented" in context to Component 2 species survey requirements.

Many organizational units have not used this definition of "implemented" for projects potentially affecting Component 2 species. Many NEPA decisions have been signed with the intention to survey prior to the contract offering. "Draft" survey protocols for Component 2 salamanders have been available since March 1996; see Question 4 for the red tree vole situation.

A "transition period" (October 1, 1996, to May 31, 1997) will be allowed to adjust our planning process to the interagency interpretation "NEPA decision equals implemented." Requiring surveys and shifting surveys from prior to contract offering to prior to the NEPA decision will take a period of adjustment. The following transition categories based on NEPA decision and contract offering are expected (see Table 1 for a timeline of likely scenario groups):



ATTACHMENT 1-2



ONRC-G-05-0207-0065

| Summary of survey requirements: |
| --- |
| • Contracts offered before January 1, 1997. No survey is required.<br>• Contracts offered before June 1, 1997. One season survey required.<br>• Contracts offered on or after June 1, 1997. Standard "draft" protocols required. |

a. Pre-Transition:
*Projects with NEPA decisions signed prior to October 1, 1996, AND contracts offered before October 1, 1996* - No survey was required. (Group 0)

b. Transition:
*Projects with NEPA decisions signed prior to October 1, 1996, AND contracts offered before January 1, 1997* - No survey is required. (Group 1)

*Projects with NEPA decisions signed on or after October 1, 1996, and/or contracts offered on or after January 1, 1997, and before June 1, 1997* - One season of survey is required prior to contract offering. (Groups 2 and 3)

*Projects with contracts offered on or after June 1, 1997* - Standard "draft" protocol surveys are required prior to contract offering. (Group 4)

c. Post-Transition
*Projects with NEPA decisions to be signed on or after June 1, 1997* - Standard "draft" protocol surveys are required prior to the signing of the NEPA decision. (Group 5)

* NOTE: The standard "draft" salamander protocols refer to two survey seasons when there is a negative finding; that is, the species is not detected during the first survey and a second season survey is recommended. For this policy, the survey requirement is at least one survey season prior to the contract offering during the transition period. After the transition period has expired, standard "draft" protocol surveys (i.e., two survey seasons when there is a negative finding) are required prior to the signing of the NEPA document.

**Question 4:** The red tree vole, a Component 2 Survey and Manage species, does not currently have a draft survey protocol. What should we do about surveying for red tree voles, and are surveys required in FY 1997?

DISCUSSION: Follow implementation guidance given in Question 3. "Draft" protocols are being issued in October 1996.



ATTACHMENT 1-3

# SURVEY & MANAGE COMPONENT 2 IMPLEMENTATION SCENARIOS

NEPA Decision = Implementation

Transition Period = surveys prior to contract offered to prior to the NEPA decision

| Survey Required? | Group | | Survey Season: Spring '96 | Sept 30 1996 | <—TRANSITION PERIOD: Oct 1 1996 | Jan 1 Survey Season: Fall '96 | Jan 1 Survey Season: Spring '97 | May 31 1997 | June 1 1997 |
|---|---|---|---|---|---|---|---|---|---|
| **Pre-Transition** | | | | | | | | | |
| No | 0 | NEPA Decision | no survey required | Contract Offered | | | | | |
| **Transition** | | | | | | | | | |
| No | 1 | NEPA Decision | no survey required | | Contract Offered | | | | |
| No | 1 | | no survey required | NEPA Decision | Contract Offered | | | | |
| Yes | 2 | one survey required | NEPA Decision | | | survey 1 | Contract Offered | | |
| Yes | 2 | one survey required | | NEPA Decision | | | survey 1 | Contract Offered | |
| Yes | 3 | one survey required | | | NEPA Decision | survey 1 | Contract Offered | | |
| Yes | 3 | one survey required | | | | survey 1 | NEPA Decision | Contract Offered | |
| Yes | 4 | standard surveys required | | NEPA Decision | | survey 1 | survey 2* | | Contract Offered |
| Yes | 4 | standard surveys required | survey 1 | | NEPA Decision | | survey 2* | | Contract Offered |
| **Post-Transition** | | | | | | | | | |
| Yes | 5 | standard surveys required | | | | survey 1 | survey 2* | | NEPA Decision Contract Offered |

*Salamander survey protocols require 2nd survey if first survey does not detect the species presence.

ATTACHMENT 1-4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF JOHN R. HICKENBOTTOM**

I, John R. Hickenbottom, declare and state as follows:

1. I have a B.S. in wildlife ecology from the University of Arizona. Currently, I am the District Ranger on the South Platte Ranger District, Pike and San Isabel National Forest, Comanche Cimarron National Grasslands, in the Rocky Mountain Region (Region 2 or R2) of the USDA-Forest Service (Forest Service). I assumed that position in 1999. Prior to that, from approximately 1997, I served as the Threatened, Endangered (T & E), and Sensitive Species Program manager for the Intermountain Region of the FS (Region 4 or R4). In that position, I

advised the R4 wildlife director and R4 leadership team on issues related to T & E and Sensitive Species. I also helped the Forest Service coordinate with U.S. Fish and Wildlife Service (FWS) on issues related to such species. From 1991 through 1997, I served in the Regional Office for the Pacific Northwest Region of the Forest Service (Region 6 or R6) as the region's T & E Assistant Program Manager.

2. On April 2, 1993, President Clinton convened a "Forest Conference" in Portland, Oregon, to produce a comprehensive plan for managing federal forests in the Pacific Northwest that balanced the importance of the forests and timber to the local economy and jobs with the need to preserve the old-growth forests and the species associated with those forests.

3. After the conference, the Forest Ecosystem Management Assessment Team (FEMAT) was assembled to prepare an assessment that took an ecosystem approach to forest management. FEMAT was composed of scientists and technical experts of a various disciplines from the Forest Service, Bureau of Land Management (BLM), Environmental Protection Agency (EPA), FWS, National Park Service, National Marine Fisheries Service (NMFS), and several universities. The team developed and analyzed 10 options encompassing various mixtures of Late-Successional Reserves (LSRs), Riparian Reserves (RRs), and prescriptions for the management of the forest both inside and outside of reserves, with the vast majority of management activities occurring in those lands called the Matrix, which were outside the LSRs and RRs. For each of the 10 options, FEMAT evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls. In addition, for seven of the options, similar assessments were done for over 1,000 plant and animal species thought to be closely associated with late-successional forests. FEMAT assessed the likelihood that the species' populations would stabilize, well distributed across

federal lands under each of the seven options. An 80 percent or greater likelihood of achieving that outcome was set as the benchmark for assuring a species' viability. FEMAT was careful to note, however, that species with scores lower than 80 percent should not automatically be regarded as unviable. The team assembled its assessment of the various options into a comprehensive report commonly referred to as the "FEMAT Report."

4. Using the FEMAT Report, an Interdisciplinary Team, composed of members from the Forest Service and BLM, prepared a draft Supplementary Environmental Impact Statement (SEIS) with FEMAT's 10 options identified as alternatives. Alternative 9 was the preferred alternative identified in the SEIS. After receiving public comment upon the draft, additional analysis was conducted on many of the late-successional and old-growth related species. This additional analysis was included as an appendix to the Final SEIS, which later was referred to as "Appendix J2" or "Additional Species Analysis." The Additional Species Analysis identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well distributed across federal lands. The prescribed management became known as "survey and manage mitigation measures" and, in short, was designed to further assure the viability of the species identified in the Additional Species Analysis.

5. In April 1994, the Record of Decision (ROD) selecting preferred Alternative 9 of the Final SEIS was signed. That ROD became commonly known as the Northwest Forest Plan (NFP). The NFP incorporated into its standards and guidelines the "survey and manage mitigation measures," which later became known as the "Survey and Manage Mitigation Measure Standards and Guidelines" of the NFP.

6. During my time in Region 6, I was heavily involved in the preparation of the Draft and Final SEIS, the Additional Species Analysis, and the 1994 ROD. Additionally, after the NFP was adopted, I worked to help the federal agencies determine and implement the requirements for the survey and manage mitigation measures.

7. The implementation of the NFP called for a high level of coordination and cooperation among Federal agencies. The principal decision-making authority rested with the Regional Interagency Executive Committee (RIEC). The RIEC consisted of the Pacific Northwest federal agency heads of the Forest Service, BLM, FWS, NMFS, EPA, and the Bureau of Indian Affairs (BIA). The Regional Ecosystem Office (REO) provided staff work and support to facilitate the RIEC decision-making and direction for the implementation of the NFP standards and guidelines. Among its various tasks, the REO was responsible for developing, evaluating and resolving inconsistencies on issues involving the implementation of the NFP. However, resolutions developed by the REO were only recommendations to the RIEC.

8. When the NFP was first adopted, there was much uncertainty regarding how to interpret and implement the survey and manage mitigation measures. The REO was overwhelmed with questions from the field. Similarly, staff working to develop issue resolutions was unable to obtain input in a timely manner from the executive members of the RIEC. To screen issues and facilitate timelier responses, additional interagency groups were created. The Intermediate Management Group (IMG) was set up to provide management input for staff working to develop issue resolutions. As the name suggests, the IMG's members were intermediate-level managers and were more accessible than the executive-level members of the RIEC. Therefore, issues that required management input before proceeding could be raised to the IMG, which could respond in a timelier manner than the RIEC. Although the IMG did not

substitute itself for the RIEC, it did provide management resolutions to the field staff on less controversial matters.

9. At the same time, a Survey and Manage Workgroup was created to address questions concerning the implementation of the survey and manage mitigation measures set forth in the Additional Species Analysis and incorporated into the NFP. The Survey and Manage Workgroup, which consisted of a select core of people from the agencies involved in the NFP, provided recommendations to the REO concerning the biological aspects of those mitigation measures.

10. In late 1994 or early 1995, I was assigned as the lead Forest Service representative on the Survey and Manage Workgroup. In that capacity, I spent a high percentage of my time working to develop survey and manage guidance, protocols, survey standards, *et cetera*. Cheryl McCaffrey was the lead representative from the BLM. Together, we addressed the issues of developing survey protocols and management recommendations from a biological perspective.

11. On survey and manage issues, I reported directly to Robert Devlin, who was a member of the IMG and the R6 Director of Natural Resources. Mr. Devlin provided input regarding how issues impacted the forest management program areas.

12. The Oregon red tree vole, *Arborimus longicaudus* (red tree vole), and the California red tree vole, *Arborimus pomo* (*A. pomo*), were both identified in the Additional Species Analysis. I am familiar with the species from my involvement with the Additional Species Analysis, the Draft and Final SEIS, the ROD, and the Survey and Manage Workgroup.

13. Although the red tree vole was included in the NFP's survey and manage standards and guidelines, its population was thought to be in less dire circumstances, according to the research set forth in the FEMAT Report and the Additional Species Analysis, than other species included in the survey and manage categories. The FEMAT report concluded that under Alternative 9, which the NFP selected, the red tree vole had a 73 percent likelihood of achieving habitat of sufficient quality, distribution, and abundance to allow the species population to stabilize, well distributed, across federal lands. If the red tree vole had received a 7 percent higher likelihood rating in the FEMAT report, it would not have been included among the species in the Additional Species Analysis or those in the NFP's survey and manage standards and guidelines.

14. The Additional Species Analysis set forth certain mitigation measures that, it was believed, would increase to at least 80 percent the likelihood of providing for a well-distributed red tree vole population. The Final SEIS Species Analysis Team's Mammal Subgroup felt there was no need to immediately protect every known red tree vole site, and, therefore, it was not included among the Component 1 Survey and Manage species in the NFP Standards and Guidelines. Rather, individual red tree vole sites needed to be assessed as to their value in adding to connectivity between LSRs. Both LSRs and RRs played a large role in the continued persistence of the species, the latter providing corridors between LSRs. However, at the time the NFP was adopted, some LSRs and many riparian zones were not ecologically functional due to past management activities. Under the NFP, that functionality would be restored over approximately 75 years. In the interim, the concern was to prevent the isolation of major portions of the red tree vole regional meta-population by additionally managing vole populations within Matrix lands between LSRs, which was the approach selected in the NFP to prevent

possible isolation. Because of that isolation concern, the red tree vole was included among the Component 2 Survey and Manage species in the NFP Standards and Guidelines.

15. In my capacity as a core member of the Survey and Manage Workgroup, I worked to develop the interim guidance for agencies to implement the Component 2 Survey and Manage Standard and Guideline requirement for the red tree vole. The workgroup determined those requirements should be designed to maximize efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population. Where possible, we solicited input from the FEMAT scientists, Additional Species Analysis team, and Final SEIS team who had worked on the question of the red tree vole population's viability in the range of the northern spotted owl. Based upon that input, the Survey and Manage Workgroup developed recommendations, which ultimately were adopted in the November 4, 1996 memorandum described as "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole" (Red Tree Vole Memo).

16. The Red Tree Vole Memo instructed that, as a precursor to on-the-ground surveys, existing geographic information system (GIS) information was to be used to analyze federal lands at the fifth-field watershed level and to screen those lands based upon their value in increasing LSR connectivity. The first screen was to determine how much land in the watershed was under federal management (Screen 1). If the watershed contained less than 10 percent federal lands, neither site-specific surveys nor management for red tree voles was necessary because those areas, due to the small percentage of federal lands in the watershed, could not contribute to LSR connectivity and, therefore, were unlikely to contribute to the viability of red tree voles. Under the second screen, the threshold for the survey and manage requirement was

whether at least 40 percent of the federal lands in the watershed was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and whether that closure and diameter could be maintained through the year 2000 (Screen 2). If federal lands in a watershed met that habitat threshold in Screen 2, no site-specific surveys for red tree voles were necessary because those areas already contributed adequately to LSR connectivity. The Red Tree Vole Memo also directed that neither site-specific surveys nor management for red tree voles was necessary in California because the evidence available then was insufficient to establish that the population extended into California.

17. As a practicing biologist, I believed at the time that the GIS approach using Screens 1 and 2 was biologically appropriate. The inclusion of the red tree vole among the Component 2 Survey and Manage species was an effort to utilize a mitigation measure, which was already being developed for a great many other Survey and Manage species, but which did not cleanly fit with the kind of action needed for red tree voles. For almost all other Survey and Manage species, the needs were to identify known sites, survey for additional sites, protect and manage those new and old sites for the retention of those narrowly endemic and poorly known species. In the case of the red tree vole, however, there was no need to protect individual sites because the threat to the species' viability was minimal. Instead, the concerns were about the past management practices that resulted in fragmentation and conversion of LSRs to young, even-aged forests. Therefore, the needs for the species were to improve LSR connectivity, better enable population dispersal, and, thereby, provide the opportunity to repopulate areas if, when, and where small populations might otherwise have become isolated or been eliminated. Those needs were best met by analyzing watersheds, rather than surveying every square inch and then protecting known sites. Therefore, the methods specified in the Red Tree Vole Memo, a

watershed-scale GIS analysis followed up by site- and situation-specific surveys, were appropriate.

18. Although Judge Dwyer held that the instructions of the Red Tree Vole Memo were unlawful, as a practicing biologist and more specifically as one of the biologists that worked on the Additional Species Analysis, the Draft and Final SEIS, and the ROD, it remains my opinion that those instructions were entirely reasonable and directed at meeting the concerns raised by FEMAT and the Additional Species Analysis. As I stated, although the red tree vole was included in the Survey and Manage Standards and Guidelines, the threat to its viability was minimal and the focus of the species' mitigation measures was to increase connectivity of the LSR populations through those in Matrix lands. With that purpose, the value of a Matrix stand would depend upon how much it contributed to LSR connectivity. If a stand containing red tree voles was in the middle of a large Matrix block comprised principally of older forests, then the stand would add little to the connectivity already provided by the older forests. By contrast, a stand containing red tree voles with almost no older forest or suitable habitat around it might have a much higher value in maintaining connectivity between LSRs. Further, if a stand containing red tree voles was isolated from federally managed lands, and so necessarily from LSRs, it had next to no value in increasing connectivity between red tree vole populations in LSRs and, therefore, could not measurably contribute to improving the population's viability. Given those factors, it was appropriate to reserve site-specific surveys for the forests that, according to GIS information, were valuable in terms of LSR connectivity and that, therefore, improved the red tree vole population's viability.

19. For similar reasons, requiring site-specific surveys and management for red tree voles in California would have had little value in improving the species' viability. At the time, the general understanding was that the species was restricted to mesic forest communities west of the crest of the Cascade Mountains in Oregon. Whether the red tree vole's range extended into California was in question. Whether the red tree vole was genetically distinct from its sibling species in California, *A. pomo*, was also in question. However, it was known that the vast majority, if not all, of red tree voles existed in Oregon. Therefore, managing the population in that region would necessarily have the greatest likelihood of mitigating the minimal threat to the species' viability, which was identified in the FEMAT Report and Additional Species Analysis.

20. As a biologist and as a member of the teams that worked on Additional Species Analysis, the Draft and Final SEIS, and the ROD, I continue to believe that the Red Tree Vole Memo properly interpreted the Component 2 Survey and Manage Standard and Guideline requirement for the red tree vole to most efficiently and effectively use federal resources to increase the species' viability. On the other hand, I continue to believe that the viability of the red tree vole population would not have improved measurably by performing on-the-ground surveys in every instance, as Judge Dwyer interpreted the NFP's standards and guidelines to require.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 1st day of February, 2008.

John R. Hickenbottom

John R. Hickenbottom

| United States Department of Agriculture | Forest Service | R-6 | OR/WA | Bureau of Land Management | United States Department of Interior |
|---|---|---|---|---|---|

Reply to: 1736-PFP(BLM-OR931) / 1950(FS) Date: November 4, 1996
EMS TRANSMISSION 11/4/96

FS-Memorandum BLM-Instruction Memorandum No. OR-97- 009
Expires 09/30/98

To: USDI Bureau of Land Management District Managers (Coos Bay, Eugene, Lakeview, Medford, Roseburg, Salem); USDA Forest Service Forest Supervisors within the Range of the Northern Spotted Owl in Oregon

Subject: Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole

*INTRODUCTION:*

This memorandum provides interim guidance to Oregon field units of the Forest Service and Bureau of Land Management to meet requirements in the Record of Decision (ROD) for the Northwest Forest Plan (NFP) relative to Component 2 surveys for the red tree vole [*Arborimus longicaudus* (*Phenacomys longicaudus* in the ROD)]. This guidance is to apply for a short term, estimated to be one-to-two years. The concept of this guidance was developed by an interagency team of field and research staff and approved by the Intermediate Management Group consisting of regional management representatives from the USDI Fish and Wildlife Service, USDA Forest Service, USDA Pacific Northwest Research Station, and USDI Bureau of Land Management (BLM). A copy of this guidance is being sent to the Regional Ecosystem Office (REO) for distribution to other agencies for informational purposes.

Viability ratings for this species were only slightly below acceptable when analyzed for the Final Supplemental Environmental Impact Statement (FSEIS) for the NFP, indicating that the risk to the species' viability is not great (see criteria in Appendix J-2 to the FSEIS). Early survey results suggest broader habitat usage than previously documented, and that site-specific surveys are not adding sufficiently to the scientific knowledge necessary to determine appropriate management for the species. Addition of this species to Component 4 (general regional surveys), while maintaining it as Component 2, will be recommended to the REO to augment species information on red tree vole habitat characteristics and populations. Because of the relatively low risk to species viability in the short term and the expected increase in data from regional surveys, it has been determined that field surveys are not needed for all project areas for the next couple of years and that the following, interim approach to survey and management of this species will be followed for the next one-to-two years.

Under this interim guidance, the landscape will be analyzed to determine red tree vole habitat availability through the year 2000, and to determine opportunities to maintain populations of red tree voles which can utilize that habitat to interbreed and disperse to Late-Successional Reserves or other suitable habitats. This will be facilitated by the use of existing geographic information system (GIS) themes containing particular forest characteristics to assess current and potential habitat. The results of this analysis will

guide the need for surveys and for management. The need for survey is restricted to marginal habitat where potential source populations would be maintained. Management options provide flexibility for managers to maintain populations and to accomplish projects.

Attachment 1 provides background on the intent of the ROD and rationale for this guidance. Attachment 2 provides background on documented red tree vole biology and a survey protocol to be used in implementing the interim guidance contained in this memorandum. Attachment 3 presents answers to some of the anticipated questions about this guidance.

*INTERIM GUIDANCE:*
The following interim guidance will apply to land areas below 4,300 ft. (1,300 m.) on BLM Salem, Eugene, Roseburg, Coos Bay, and Medford Districts; below 4,300 ft. elevation on the Siuslaw, Siskiyou, Willamette, Umpqua, and Rogue River National Forests; and on the Mt. Hood National Forest, west of the Cascade Crest and below 3,300 ft. (1,000 m.). Although there is some indication that the Oregon red tree vole (*Arborimus longicaudus*) may also be found in northern California, this preliminary information needs further analysis before applying Component 2 Standards and Guidelines for this species to California. This interim guidance will apply in Oregon until further notice (approximately one-to-two years):

*Screen 1 - Amount of Federal Land:*
For the purpose of this memorandum, federal land is defined as lands administered by BLM and/or the Forest Service. Throughout the range of the Oregon red tree vole, identify the fifth-field watersheds in which projects are planned. In those watersheds where less than 10 percent of the land is under federal management and there is no direct dispersal connection to BLM or Forest Service lands in other watersheds, neither site-specific surveys nor management of red tree voles is required. If the watershed has greater than 10 percent federal lands, follow Screen 2.

*Screen 2 - Habitat Condition Threshold:*
This screen is to evaluate habitat conditions in those fifth-field watersheds with more than 10 percent federal lands. Fifth-field watersheds which have a sufficient threshold level of potential red tree vole habitat on federal lands are treated differently from those which do not have sufficient potential habitat on federal lands.

The threshold determining survey and management requirements for the red tree vole is:
a minimum of 40 percent of the federal land in the fifth-field watershed is forested and (a) has approximately 60 percent crown closure or greater, and (b) has an average conifer tree diameter at breast height (DBH) of approximately 10 inches or greater, and (c) this closure and diameter can be maintained through the end of the decade (year 2000).

This initial threshold analysis can be done by local offices in a relatively short period of time through the use of GIS. Agencies or offices may differ in the data recorded for parameters such as canopy closure (e.g., data may be captured as 50-70 percent closure) and diameter. For GIS analysis, use existing agency data which is as close to the screen parameters (60 percent closure; 10 inch DBH) as is possible. These parameters may be convertible to more readily usable measurements (such as stand age) for the analysis. When GIS data is not considered adequate to determine these features, consult other

informational sources such as recent aerial photos. Factor projects proposed for the short and long term into GIS analysis to aid in projecting future red tree vole dispersal opportunities.

*Surveys Where Lands Pass Screen 1*:

Where conditions meet threshold: Where conditions meet the habitat threshold (potential habitat is sufficient for dispersal), no site-specific surveys are required.

Where conditions do not meet threshold: Where fifth-field watersheds do NOT meet the habitat threshold (i.e., potential habitat may not be sufficient for dispersal), surveys are required before ground-disturbing activities. Follow the survey method in Attachment 2. If populations are found in the project area, managers have the option of conducting additional surveys outside of the perimeter of the project area to find nearby (within approximately 1/4 mile) populations for supplemental protection. In such a situation, the entire 1/4 mile band around the project perimeter need not be surveyed if the additional populations found will likely provide reproduction and dispersal capability when habitat conditions become appropriate. The definition of a red tree vole population is "two or more active nest trees spaced no more than 100 m. (330 ft.) apart."

*Management of Known or Found Populations:* Since the red tree vole is not a Component 1 species, all known sites are not required to be protected. As described below, management varies depending on whether the habitat threshold is or is not met.

Where the habitat threshold is met or exceeded: Where fifth-field watersheds meet the habitat screen criteria (i.e., potential habitat is sufficient), no surveys are needed before ground-disturbing activities. However, within the project area, prior surveys may have located one or more known red tree vole populations. These populations should be evaluated to determine the appropriate management. The focus of this standard and guideline is to maintain dispersal capability and gene flow (Appendix J-2, pp. 473-475). Management of each known site is not critical in these potential habitats as there should be suitable opportunity for reproduction, dispersal, and genetic exchange. In conjunction with discussions with biologists, managers have the flexibility to make a determination regarding whether or not (and by which method) populations will be maintained to contribute to the viability of the species. They also have flexibility in determining how many, if any, populations need to be maintained considering population size, condition, dispersal opportunities, overall quality of dispersal habitat in the watershed, proximity of other populations, and other factors. Appendix J-2 (pp. 474-475) and this memorandum's Attachments 2 and 3 contain information about the species which can be factored into management considerations and decisions. When one or more populations are found within a project area and a determination has been made to maintain some or all of the populations in the area, it is recommended that managers consider options a. through c. below. They should also consider the retention of clusters of large green trees around the populations or the monitoring of red tree vole populations before and after actions are completed to assist in refining management direction.

a. Protect populations within the project area with an approximate 10-acre buffer; or

b. Where adjacent Riparian Reserves have a high proportion of Douglas-fir and other habitat characteristics meeting the threshold, adjust the boundaries to incorporate the population area; or

c. Conduct additional surveys outside of the perimeter of the project area to find nearby (i.e., within approximately 1/4 mile) populations (as defined above) for protection by an approximate 10-acre buffer. The approximate 1/4 mile band for supplemental survey would allow identification and protection of populations in the project vicinity to ensure existence of local, source populations for interbreeding and dispersal, thus addressing concerns about the red tree vole. This distance is based on the greatest distance documented for red tree vole movement from its natal tree, which is 1115 ft. or, roughly, 1/4 mile. Protection of these nearby populations, instead of those in a project area, would allow management flexibility in implementing actions while at the same time providing protection for populations in that vicinity.

Where the habitat threshold is not met: The purpose of managing for red tree vole populations in this "marginal habitat" is so that populations are not lost which could be the source for dispersal at a later time, when the habitat is appropriate and when the landscape loses its fragmented characteristics. If populations are found within the project area, then either the populations within the project area or those populations found near the project area (approximate 1/4 mile perimeter) must be protected. Protect such populations using management options a. through c. listed above.

*PROTOCOL MODIFICATIONS:*
The protocol was designed to ensure a high probability of finding populations of this species across its range. Follow the standard protocol as closely as possible. In some situations, there may be specific conditions at a provincial or local level which may warrant modification of the protocol. Permanent staff biologists should make the decision on any needed modifications to protocol implementation based on their professional judgment. Where there is any deviation from the protocol, biologists are requested to document the specific changes made and the rationale for those changes. In addition, the data sets collected using the modified protocol should be clearly identified. This information will assist in future protocol revisions and in interpreting survey results.

*COMPONENT 4:*
As part of this interim strategy, we will submit to the REO the documentation for adding the red tree vole to Component 4 under the guidance for changing species status found on p. C-6 of the ROD. The goal of this change is to allow the collection of key habitat and population information which will clarify assumptions regarding the current abundance, distribution, and habitat relationships of red tree voles within the various physiographic provinces, and to refine our description of what stand conditions are desirable in maintaining some resident vole populations within the Matrix lands.

This direction is applicable immediately. Please address any questions to Cheryl McCaffrey (BLM), telephone number: 503-952-6050, email: cmccaffr; or Randy Hickenbottom (Forest Service), telephone number: 503-326-3626, DG: R.Hickenbottom:R06C.

Elaine Y. Zielinski
State Director, OR/WA
USDI Bureau of Land Management

Robert W. Williams
Regional Forester, Region 6
USDA Forest Service

3 Attachments:
1 - Jeske/Biswell Issue Paper dtd 09/05/96 (3 pp)
2 - Biology & Interim Survey Protocol (17 pp) – 4 pages sent under separate cover
3 - Answers to Expected Questions (2 pp)

BLM Distribution:
WO-230 (Room 204 LS) - 1
CA-056 (P. Roush) - 1
OR-930 - 1
REO (Knowles, McNair, Pietrzak, Watson) - 4

24558
CS



UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -x
BLUE LAKE FOREST PRODUCTS, INC., :
Plaintiff, :
vs. : No. 01-570C
THE UNITED STATES, : (Judge Williams)
Defendant. :
- - - - - - - - - - - - - - - - - -x
TIMBER PRODUCTS COMPANY, :
Plaintiff, :
vs. : No. 01-627C
THE UNITED STATES, : (Judge Williams)
Defendant. :
- - - - - - - - - - - - - - - - - -x
CLR TIMBER HOLDINGS, INC., :
Plaintiff, :
vs. : No. 04-501C
THE UNITED STATES, : (Judge Williams)
Defendant. :
- - - - - - - - - - - - - - - - - -x

DEPOSITION OF LOIS SCHIFFER

Washington, DC

Monday, August 27, 2007

REPORTED BY: CARMEN SMITH

A I was a professor of environmental law at Georgetown University Law Center.
Q When did you first assume that position?
A I have been an adjunct professor at Georgetown Law School since 1985. I became a full-time visiting professor or lecturer from late January 2001 through approximately May 2001.
Q So what were you doing prior to January 2001 when you --
A I was Assistant Attorney General for the Environment and Natural Resources Division at the U.S. Department of Justice.
Q When did you first assume that position?
A I was acting Assistant Attorney General from September 1993 through October 7, 1994. On October 7, 1994, I was confirmed and became the Assistant Attorney General and was in that job continuously to January 20, 2001.
Q Are you aware of lawsuits brought by various environmental groups, beginning in the early 1990s, challenging various aspects of the Northwest Forest Plan?

for litigation today?

A I don't think so.

Q I'll represent to you that these are handwritten notes of Suzanne Zike, telephone conference with Mr. Boling after he reported having met with you and Mr. Coppelman.

You see under "Schiffer" on the left-hand side, item number one, she writes "interpretation of implement equals DN is nonsense," double underscored. Does that refresh your recollection?

A It does not.

Q Could it be that Mr. Coppelman said that and not you?

A Since I don't have any knowledge of this, I don't have a way to answer that question.

Q All right. Well, it's very important. And I apologize for being repetitive here, but I appreciate your patience.

And at the top under item number 3 on the left, below that, first subitem, again it says "'implement' defin," meaning definition, "is nonsense."

24557
JB



UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | : | No. 04-501C (Judge Williams) |

DEPOSITION OF EDWARD BOLING

Washington, DC

Friday, August 24, 2007

REPORTED BY: JULIE BAKER

Q Were there any materials that were prepared for you by anyone else in order to assist you in preparing for the deposition today?
A Aside from just the document?
Q Aside from the documents.
A No.
Q You were the lead government counsel in the ONRC action case before Judge Dwyer; is that right?
A That's correct.
Q You also had a colleague working with you on that case, Mr. John Watts?
A Yes, that's correct.
Q Do you recall that one of the key issues in that case involved a definition known by the shorthand NEPA decision equals implementation?
A Yes. That was one of the issues in the case.
Q So you're generally familiar with it?
A Generally familiar with that.
Q A second major issue involved the survey restrictions on the red tree vole. Do you recall

allegation in his September 25, 1998 letter, so that certainly would be part of our discussion. I think the prospect of going before Judge Dwyer to explain that this is a logical and reasonable explanation -- reasonable interpretation of the requirement to get these surveys up and running was somewhat -- it was not as clean and simple in retrospect as one would like.

It had the problem of this allegation that the agencies were rushing to get timber sales out the door to avoid the requirement. That's fairly obvious, and I expect that she -- I believe she had some concerns about that. That's sort of the nature of litigation risk.

Q Did Mr. Coppelman have the same concerns?

A I believe he shared them.

Q Did Ms. Schiffer at this meeting indicate to you that she thought that definition was so weak, that she wasn't prepared to make a decision to defend it in court until she had a chance to talk with the assistant secretary of agriculture, Mr. Lyons?

A He's the undersecretary.

Q Excuse me.

A Well, your Exhibit 53 says that "Shiffer and Coppelman want to confer with Ag and Interior Depts," and I assume that meant, amongst other people, Mr. Lyons "re: The key issues and cost assessment of reaching settlement." In other words, they wanted to make sure that the client at a fairly high level of leadership was aware that this was the choice being made.

There was an offer on the table that the agencies had assessed it as being too high a cost, and she wanted to confer, or they wanted to confer, with Ag and Interior departments to ensure that the leadership at those departments was aware that that judgment had been made before proceeding with litigation.

MR. STEVENS: Could you read my question back.

(The reporter read the record as requested.)

BY MR. STEVENS:

Q Can you answer that yes or no?