A No, I don't have a specific recollection. My answer was based on a -- based on my general recollection of these negotiations and discussions within the Department of Justice and your -- Plaintiff's Exhibit 53, which references this. So I'm filling in there. I don't have a specific recollection of what Lois Schiffer said to me at that briefing.

Q Do you recall reporting to Sue Zike what Ms. Schiffer said to you?

A I don't recall it in preparation for this deposition. I did see an e-mail that Sue Zike -- a text, recounting the discussion.

Q And?

A Turning you to your Exhibit 30A, your Plaintiff's Exhibit 30A, I don't know who this is to, but it's a fragment of an e-mail. It appears to be the text of a fragment of an e-mail, "Nancy and others: Ted Boling just called to answer my Qs about what were Shiffer's," again, misspelled, "and Coppelman's concerns about this case. He answered agency definition of implement 'was nonsense.'" And

it goes on. I assume that's what you're getting at.
Q That's part of what I'm getting at. You don't have a recollection?
A I don't recall that conversation. I don't recall if that's an accurate characterization of what I had told her.
Q Would you have any reason to doubt Ms. Zike if she said that is what you told her?
A Only in that I would be surprised that Sue Zike had a clearer recollection than I do of that conversation.
Q Did you take any notes of that conversation?
A I don't know. This is her characterization of what I said.
Q Do you have Plaintiff's Exhibit 52 in the book in front of you?
A Yes.
Q Ms. Zike testified in her deposition last week that these were her notes during a telephone conversation with you when you told her what happened at that meeting.

**U.S. Department of Justice**

Civil Division

D.J. Nos. 154-01-570, 154-01-627,
154-04-501
JED:KAB:EMLynch

Telephone: (202) 353-7994
Facsimile: (202) 514-8624

*Washington, D.C. 20530*

September 26, 2007

VIA MAIL AND FAX

Gary G. Stevens
Saltman & Stevens, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006

Re: Blue Lake Forest Products, Inc. v. United States, Fed. Cl. No. 01-570C; Timber Products Company v. United States, Fed. Cl. No. 01-627C; and CLR Timber Holdings, Inc. v. United States, Fed. Cl. No. 01-501C

Dear Gary:

As we discussed last week, I spoke with Peter Coppelman, former Deputy Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the Department of Justice ("DOJ") on September 19, 2007. I contacted Mr. Coppelman at your request, to find out whether he recalled a meeting with Lois Schiffer, former Assistant Attorney General for ENRD, and Ted Boling, an ENRD senior trial attorney, regarding ONRC Action v. U.S. Forest Service and Bureau of Land Management, No. C98-942WD, where Ms. Schiffer allegedly said that the Forest Service's "NEPA equals implementation" definition was "nonsense." Mr. Coppelman has no recollection of such a meeting.

If you have any questions or concerns, please feel free to contact me at (202) 353-7994.

Sincerely,

Ellen M. Lynch
Trial Attorney
Commercial Litigation Branch

# RECORD OF DECISION

## for

## Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl

### Table of Contents


I. Summary . . . . . 1

II. Introduction . . . . . 2

III. Decision . . . . . 4
- A. Statutory Basis for Ecosystem Management . . . . . 5
- B. Land Allocations . . . . . 6
- C. Standards and Guidelines . . . . . 7
- D. Application of Decision . . . . . 11
  1. Application to Land and Resource Management Plans . . . . . 11
     - a. Bureau of Land Management
     - b. Forest Service
  2. Relationship of Standards and Guidelines to Existing Plans . . . . . 12
  3 Application to Timber Sales . . . . . 13
  4. Application to other Contracts, Permits, and Special Use Authorizations . . . . . 15
  5. Application to Research Activities . . . . . 15
  6. Relationship to Other Plans and Proposals . . . . . 15
  7. Relationship to Other Lands . . . . . 16

IV. The Alternatives . . . . . 17
- A. Alternatives Considered . . . . . 17
- B. The Action Alternatives . . . . . 19
- C. No-Action Alternative . . . . . 24
- D. The Environmentally Preferable Alternative . . . . . 25

V. The Selected Alternative . . . . . 25

VI. Mitigation . . . 29
A. Mitigation Measures Adopted . . . 29
B. Mitigation Measures Not Adopted . . . 29
1. Vertebrates
2. Invertebrates and Plants

VII. Changes in Standards and Guidelines Between Final SEIS and Record of Decision . . . 34

VIII. Findings . . . 38
A. Court Injunctions . . . 38
B. Legal and Regulatory Compliance . . . 39
1. National Environmental Policy Act (NEPA) . . . 40
2. National Forest Management Act . . . 42
3. Federal Land Policy and Management Act . . . 48
4. Oregon and California Lands Act . . . 49
5. Endangered Species Act . . . 50
6. Coastal Zone Management Act . . . 51
7. Executive Order 11990 - Protection of Wetlands . . . 51
8. Clean Air Act . . . 51
9. Clean Water Act . . . 52
10. Federal Advisory Committee Act . . . 52

IX. Implementation . . . 53
A. Interagency Coordination . . . 53
B. Planning and Analysis . . . 54
C. Consultation and Coordination . . . 54
D. Protection of Tribal Treaty Rights and Trust Resources . . . 54
E. Initial Implementation of this Decision . . . 55
F. Fiscal Year 1994 Watershed Restoration Program . . . 57
G. Monitoring . . . 57
H. Authority to Amend or Modify this Decision . . . 58

X. Public Involvement . . . 58
A. Public Comments on the Draft SEIS . . . 59
B. Summary of the Comments Received . . . 60
C. Response to Comments on the Draft SEIS . . . 61
D. Response to Comments on the Final SEIS . . . 65

XI. Review and Approval . . . 73
A. Administrative Review . . . 73
B. Effective Date . . . 74
C. Administrative Record . . . 74
D. Signatures . . . 74

## I. Summary

This Record of Decision is the culmination of an unprecedented effort in public land management. On April 2, 1993, President Clinton convened the Forest Conference in Portland, Oregon to address the human and environmental needs served by the federal forests of the Pacific northwest and northern California. The President, Vice-President and much of the Cabinet spent an entire day listening to all points of view and collecting information. The President then directed his Cabinet to craft a balanced, comprehensive and long-term policy for the management of over 24 million acres of public land. An interagency, interdisciplinary team of expert scientists, economists, sociologists and others was assembled -- the Forest Ecosystem Management Assessment Team led by Dr. Jack Ward Thomas. After three months of intensive work, which included the review of all fully-developed proposals for management of federal forests within the range of the northern spotted owl, the team produced a report assessing in detail ten options.

President Clinton announced his proposed "Forest Plan for a Sustainable Economy and a Sustainable Environment" on July 1, consisting of strategies for forest management, economic development, and agency coordination. The forest management and implementation portion of the strategy, which is the subject of this Record of Decision, was analyzed in a Draft Supplemental Environmental Impact Statement (Draft SEIS) issued in July that received over 100,000 public comments during a three month public comment period. A Final Supplemental Environmental Impact Statement (Final SEIS) was made available to the public in February 1994.

In this Record of Decision, we, the Secretary of Agriculture and the Secretary of the Interior, jointly amend the planning documents of nineteen National Forests and seven Bureau of Land Management Districts. This represents the first time that two of the largest federal land management agencies, the Bureau of Land Management and the Forest Service, have developed and adopted a common management approach to the lands they administer throughout an entire ecological region.

The management direction consists of extensive standards and guidelines, including land allocations, that comprise a comprehensive ecosystem management strategy. The strategy is based on Alternative 9 of the Final SEIS, except for minor modifications noted in this document or made in the attached standards and guidelines. The conservation measures included in this strategy are based upon the best available science and attempt to anticipate and forestall future

environmental problems, avoiding the severe economic dislocation and legal gridlock that occur when environmental problems are ignored.

There are more than 24 million acres of federal land in the planning area for our decision (defined as the range of the northern spotted owl). Approximately 30% of these acres have been set aside by Act of Congress. The remaining 70% is allocated by this management direction as: late-successional reserves (30%); adaptive management areas (6%); managed late-successional areas (1%); administratively withdrawn areas (6%); riparian reserves (11%); and matrix (16%). Standards and guidelines for each land allocation provide a coordinated ecosystem management approach to the planning area. Although certain thinning and salvage activities would be allowed in the reserves, programmed timber harvest would only occur in the 22% of the land designated as matrix or adaptive management areas, and only in compliance with standards and guidelines designed to achieve conservation objectives.

## II. Introduction

The controversy over the northern spotted owl and old-growth federal forests of the Pacific northwest has continued since the 1970s. At present there have been or are pending over a dozen lawsuits involving the northern spotted owl, marbled murrelet, and possible future timber harvesting in old growth. There are currently three separate court injunctions that have severely restricted new timber sale programs on federal forests in northern spotted owl habitat for the past three years.

The federal agencies most directly involved in the issues concerning the management of late-successional and old-growth forest within the range of the northern spotted owl are the U.S. Forest Service, Bureau of Land Management, National Park Service, Bureau of Indian Affairs, U.S. Fish and Wildlife Service, National Biological Survey, National Marine Fisheries Service and the Environmental Protection Agency. The five major federal laws that apply to federal land management in the planning area are the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), National Forest Management Act (NFMA), Federal Land Policy and Management Act (FLPMA), and Oregon and California Lands Act (O&C Act).

President Clinton asked at the April 2, 1993, Forest Conference:

> How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?

The President set forth five principles to guide the federal interagency effort to develop a management strategy to protect the old-growth related species and produce a sustainable level of timber:

> First, we must never forget the human and the economic dimensions of these problems. Where sound management policies can preserve the health of forest lands, sales should go forward. Where this requirement cannot be met, we need to do our best to offer new economic opportunities for year-round, high-wage, high-skill jobs.
>
> Second, as we craft a plan, we need to protect the long-term health of our forests, our wildlife, and our waterways. They are a ... gift from God, and we hold them in trust for future generations.
>
> Third, our efforts must be, insofar as we are wise enough to know it, scientifically sound, ecologically credible, and legally responsible.
>
> Fourth, the plan should produce a predictable and sustainable level of timber sales and nontimber resources that will not degrade or destroy the environment.
>
> Fifth, to achieve these goals, we will do our best, as I said, to make the federal government work together and work for you. We may make mistakes but we will try to end the gridlock within the federal government and we will insist on collaboration not confrontation.

President Clinton summed up the Forest Conference:

> We're here to begin a process that will ensure that you will be able to work together in your communities for the good of your businesses, your jobs, and your natural environment. The process we [have begun] will not be easy. Its outcome cannot possibly make everyone happy. Perhaps it won't make anyone completely happy. But the worst thing we can do is nothing.

The land allocations and standards and guidelines that are adopted here satisfy all of the objectives set forth by the President. They comply with the requirements of federal law, including the five statutes listed above. They are based on the best available science and are ecologically sound. They will protect the long-term health of the federal forests. They will provide for a steady supply of timber sales and nontimber resources that can be sustained over the long term without

degrading the health of the forest or other environmental resources. Moreover, they involve a commitment by the federal agencies to work together.

This decision marks the turning point from formulation to implementation. Initial standards and guidelines have been developed, subjected to public comment, modified slightly, and adopted by this decision. The next step is to apply the standards and guidelines and adapt management of federal forests to sustain both the old-growth ecosystem and a supply of timber. In order to coordinate the activities of the various federal agencies that are involved, we have established an interagency structure that includes the Regional Interagency Executive Committee (RIEC), the Regional Ecosystem Office (REO), and provincial teams. These groups will oversee the necessary monitoring and research to continuously seek new information and understanding of the complexities involved in managing the old-growth and late-successional forest ecosystem in the Pacific northwest.

We view the action of adopting these standards and guidelines as a beginning and not an end of the process of resolving the issues that have developed during the controversy over federal forest management. We expect and welcome the continuing involvement of the public in the management of these valuable resources.

## III. Decision

In this Record of Decision, we jointly adopt Alternative 9 of the Final SEIS, as modified by this decision, and as amplified in the attachment to this Record of Decision entitled "Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl" (Attachment A). This decision, as spelled out in Attachment A (sometimes referred to herein as "the Standards and Guidelines"), is to be applied to lands administered by the USDA Forest Service and the USDI Bureau of Land Management within the range of the northern spotted owl, as provided in this Record of Decision. The following discussion explains the decision but is not intended to cover every aspect of the Standards and Guidelines, which set forth the management direction adopted by this decision in a single document and are intended to facilitate the agencies' implementation of our decision.

The Standards and Guidelines apply to the land allocations that are identified on the official maps of the Final SEIS, as corrected for minor mapping errors. These maps are stored electronically in the spatially unified database (SPUD) maintained by the interagency geographic information system (GIS) staff in the Regional Ecosystem Office at 333 S.W. First Avenue, Portland, Oregon 97204. Maps at 1/2-inch to the mile scale showing the land allocations are available for each Forest Service and BLM administrative unit at the respective unit offices.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

BLUE LAKE FOREST PRODUCTS, INC., )
Plaintiff, )
)
v. )
) Nos. 01-570C, 01-627C, 04-501C
THE UNITED STATES, ) (Judge Williams)
Defendant. )
)
TIMBE RPRODUCTS COMPANY, )
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
Defendant. )
)
CLR TIMBER HOLDINGS, INC., )
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
Defendant. )
)

**DECLARATION OF ROBERT J. DEVLIN**

I, Robert J. Devlin, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. Over the course of my 42-year career with the USDA-Forest Service (Forest Service), I worked in a variety of positions before retiring in June of 2000. In 1994, I became the Director of Natural Resources for the Pacific Northwest Region of the USDA-Forest Service (Region 6, or R6). In that capacity, I represented the Regional Forester and the Deputy Regional Forester in oversight of the staff from various programs. My responsibilities also included

oversight on matters associated with the Northwest Forest Plan and its implementation within Region 6.

2. Timber management was one of the programs that I oversaw. It was my responsibility to track the program's financing and output for the Regional Forester and Deputy Regional Forester.

3. Annually, the R6 Regional Forester compiled data projecting the amount of timber that the region and its national forests could offer for sale. This information would be combined with data from the other eight regions of the Forest Service and used to develop the entire agency's out-year budget proposal to the President. After several reviews and modifications, the President would submit the agency's proposal to Congress for approval. Congress would further review and modify the President's proposal and would eventually approve and budget, for the entire Forest Service, a very specific volume of timber to be offered for sale and later harvested. The Forest Service Chief distributed Congress's established volume among the nine regions of the Forest Service. The Regional Foresters, in turn, distributed that volume among the respective regions' national forests.

4. The timber-harvest levels established and approved by Congress were expected to be met. In other words, it was not discretionary by the Forest Service to vary the quantity established by Congress. Most line officers, from the District Rangers up to the Forest Supervisors in Region 6, had performance requirements to meet their allocated sale offerings. In my role as Region 6's Director of Natural Resources, I worked with the national forest supervisors and supported their efforts to prepare timber sale offerings to ensure that the timber management program met the region's allocated harvest levels.

5. It was a challenge to meet timber harvest levels because a significant amount of time was required to prepare sales before they were auctioned and awarded. Under the National Environmental Policy Act (NEPA), the forests had to analyze the environmental impact of a timber sale before deciding whether to offer that timber for harvest. That analysis typically took up to a full year from the date a line officer initiated a timber sale project to the date that officer signed the NEPA document and the Decision Notice (DN). After signing the DN, but before auctioning the timber sale, the field foresters would use the NEPA document to prepare the timber sale. This preparation would include marking the timber designated for harvest, laying out roads, cruising (measuring) the timber volume, and appraising the value of the sale. This sale preparation commonly required another one to two years to complete. In total, a forest needed up to three years to prepare a timber sale for auction. Thus, in order for Region 6 to meet its harvest levels, the line officers had to plan timber sales many years in advance of the planned award date.

6. Attaining the region's harvest levels was further complicated by the fact that during the intervening years unforeseen events frequently changed the specified harvest levels or the forests' ability to meet those levels. For example, from time to time Congress would increase the Forest Service's annual harvest levels or the Chief of the Forest Service would redistribute harvest volumes from one region to another or one forest to another. Additionally, unforeseeable natural events such as forest fires occasionally delayed or burned out certain sales requiring the modification or, if too severe, the cancellation of the timber sale.

7. Consequently, if a national forest had not completed in advance NEPA documents and DN to provide for an adequate number of timber-sale contracts in advance for offer and award, it would have been unable to accommodate unexpected increases set by Congress or to

compensate for shortfalls due to natural causes. Again, annual harvest offerings set by Congress were expected to be achieved. Thus, it was a good management practice for line officers to keep a "shelf" of signed NEPA documents and DNs, which could be used in response to unexpected increases or shortfalls.

8. When I took over my duties as Director of Natural Resources, there was very little timber volume on the "shelf." The listing of the marbled murrelet and the northern spotted owl, under the Endangered Species Act, caused sales that had already been awarded to be delayed or canceled. Additionally, those listings deleted the majority of timber sale projects with signed NEPA decisions on the "shelf", which line officers, otherwise, could have used to compensate for volume shortfalls.

9. The listing of the murrelet and owl was the context for the adoption of the 1994 Northwest Forest Plan (NFP). The listings reduced R6's timber sale offerings to the point of severely impacting the local communities dependent upon the timber harvest for their livelihood and Congress's budgeted and expected harvest volumes. The NFP, largely supported by President Clinton, was a major undertaking in which the Forest Service and the Bureau of Land Management (BLM) adopted a coordinated management direction for the lands those agencies administered within the range of the spotted owl. The NFP set aside millions of acres of late-successional and old-growth forest for species, such as the northern spotted owl, which depended upon that type of habitat. Additionally, the NFP and its "survey and management mitigation measures" (later to be known as Survey and Manage Standards and Guidelines) required that the agencies survey and manage habitat for a large number of species, known or unknown, which the agencies had no experience dealing with or locating.

10. While the specific requirements of the Survey and Manage Standards and Guidelines were new and somewhat nebulous, Congress's timber-harvest requirements were unambiguous. When the NFP was adopted, Congress had set the combined harvest level for the Forest Service and BLM at 1.1 billion board-feet. Because of the shortage of signed NEPA documents on the "shelf" in R6 affected by the NFP, forests had to begin timber projects from scratch, which necessarily impeded their ability to attain immediate harvest-volume expectations. The Chief persuaded the administration that the forests covered under the NFP could not meet their portion of the 1.1 billion board-feet for the first two years of the plan. We, in R6, determined that we needed three years to prepare a sufficient number of sales to meet our portion of the 1.1 billion board-feet volume.

11. Over that same timeframe, R6 and R5 (California) of the Forest Service and both Oregon and Washington districts of BLM were tasked with determining and implementing the new requirements of the NFP. Survey and Manage Standards and Guidelines was one of those new requirements. The plan provided a timeline for developing procedures for surveying and managing for certain species. A Survey and Manage Workgroup worked on developing survey protocols. Once the members of the Survey and Manage Workgroup reached consensus on the protocols to be used by the Federal agencies, they reported them to the Regional Ecosystem Office (REO). After the REO reviewed a protocol, it would circulate the protocol to the R5, R6, and Oregon and Washington BLM executives for them to sign and send out as policy. I was not involved with the Survey and Manage Workgroup or the development of survey protocols.

12. However, I was a member of the Intermediate Management Group (IMG) and, both in that capacity and in my capacity as R6 Director of Natural Resources, did work on questions concerning how to interpret the NFP. The IMG comprised representatives from all the

agencies that were called for in the NFP, including the Forest Service, BLM, Fish and Wildlife Service, the National Marine Fisheries Service, the Environmental Protection Agency, and the Parks Service. I became a member of the IMG after Tom Nygren retired. Nancy Diaz (previously Nancy Molina) and I were the Forest Service representatives on the IMG. Bill Bradley was the BLM representative.

13. The IMG worked with the Issue Resolution Team (IRT) to help interpret the NFP. Tom Hussey was the Forest Service representative on the IRT, with whom I worked. Whenever the IRT was faced with an issue that impacted one of the forest management program areas, the team would seek advice from the IMG on how to interpret the NFP. The IRT would develop alternatives and submit those alternatives to the IMG for comment.

14. One question that the IRT addressed was how to interpret the language on page C-5 of the Standards and Guidelines, which provided a transition period for phasing in the surveys for Category 2 species that ultimately would be required prior to any ground-disturbing activities. The survey requirements were phased in for different species based upon the date a project was "implemented." However, it was unclear from the NFP whether timber projects should be deemed implemented at 1) the date the NEPA document and DN were signed by the line officer (*i.e.*, when projects were added to the "shelf" of NEPA documents and DN); 2) the date the sale was offered or awarded; or 3) the date the timber companies broke ground on the project (*i.e.*, ground disturbing activities). There was also a question as to what constituted ground disturbing activities for the latter.

15. The question of when a project should be deemed implemented was especially significant because of the amount of time the Forest Service needed to prepare its timber sales for award, which included the NEPA documents and DN. It was apparent that for the surveys to

be useful, they were to be incorporated into the NEPA process. However, the NFP provided that survey protocols were to be developed over the first several years of the plan. Therefore, the forests were unable to incorporate the surveys into the NEPA process for timber sales during those first several years because the protocols did not yet exist. However, as I explained above, a timber sale typically required up to one year from project initiation to the signed NEPA document and DN and up to another two years of sale preparation before the award. Therefore, it was necessary for the forests to have the survey protocols years before a timber sale's anticipated award date in order to incorporate the surveys into the NEPA process.

16. Under those circumstances, if the Forest Service deemed a project "implemented" upon groundbreaking, the forests would have been unable to complete and award timber sales for years while the Forest Service developed survey protocols. That delay effectively would have removed the transition period, which the NFP clearly intended to provide, for developing and applying the survey protocols. Finally, it would have made it impossible for the region to attain its required timber-harvest volume for several years.

17. During this NFP transition period and development of the survey and manage protocols, the interpretation that the Forest Service and BLM ultimately adopted was that a project was deemed "implemented" on the date the NEPA document was signed. This commonly has been referred to as "NEPA Equals Implementation." This resolved the tension between the various requirements of the NFP. We saw that this balanced the requirements that the agencies could achieve their Congressionally-set timber-harvest volumes along with the requirements of the survey and manage program when those protocols were developed. It also ensured that the data collected from surveys would be obtained prior to, and therefore incorporated into, the NEPA document. Finally, it gave effect to the transition period that the

NFP provided for phasing in the requirement to perform surveys prior to ground-disturbing activities.

18. Given the NFP's requirements of meeting both timber harvest goals and survey and management requirements, the transition period set forth in page C-5 of the Standards and Guidelines, and the undefined term "implemented," I agreed that the most reasonable interpretation to be applied during this transition period was that a project should be deemed implemented at the time the NEPA document and DN were signed. With that interpretation, the Forest Service and BLM issued a policy-directional letter on November 1, 1996, instructing their field units that existing timber sales having completed their NEPA documents and DN could proceed to sale preparation and offering while protocols were being developed. It is this letter that has become known as the "NEPA Equals Implementation" letter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 18th day of DECEMBER, 2007.

Robert J. Devlin

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC.<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | ) | No. 01-570C<br>(Judge Williams) |
| TIMBER PRODUCTS COMPANY<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | ) | No. 01-627C<br>(Judge Williams) |
| CLR TIMBER HOLDINGS, INC.,<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | ) | No. 04-501C<br>(Judge Williams) |

Declaration of Richard O. Fitzgerald

I, Richard Fitzgerald, declare as follows:

1. I am the Assistant Director of Forest Management in the Washington, D.C. office of the United States Department of Agriculture, Forest Service ("Forest Service"). I have held this position since1992. As the Assistant Director of Forest Management, I am responsible for timber sale and stewardship contract

preparation and administration. I also am responsible for work involving special forest products and small business timber sale set-aside issues. I have worked with the Forest Service in various capacities throughout the country for more than fifty years.

2. I am familiar with the lawsuits filed by the above-referenced plaintiffs, and understand plaintiffs have asserted that the contract terms and conditions for each of the timber sale contracts involved in the lawsuits (Happy Thin – contract no. 060772; Jack Heli – contract no. 060715; and Too Wild – contract no. 075862) were drafted entirely by the Forest Service, and that the contracts are contracts of adhesion, the terms and conditions of which are not negotiable. Plaintiffs' assertions incorrectly characterize the standard Forest Service timber sale contract used in each of the contracts at issue in these lawsuits and the input members of the timber industry have had in the timber sale contract's development.[1]

3. As the National Forest Products Association (NFPA), a timber industry member organization, recognized in its Buyer's Guide to Forest Service Timber Sale Contracts, Second Edition (1974), the 2400-6 contract was developed in July 1970 as "a result of extended discussions between NFPA's Federal Timber Purchasers Committee [NFPA] and the Forest Service, . . . ."[2]

[1] There are two standard timber sale contracts used to sell large, complex, timber sales from National Forest System lands pursuant to the National Forest Management Act, 16 U.S.C. § 472a ("NFMA"). Form FS-2400-6 is used when timber is harvested, then measured to determine the amount to be paid based a contractor's bid rate (commonly referred to as a scaled sale). Form FS-2400-6T is used when the timber to be sold is measured prior to harvesting (commonly referred to as a tree measurement sale). The terms and conditions of the contracts are virtually identical. For ease of reference, the contracts will be referred to as the 2400-6/6T.

[2] Exhibit 18, Buyers Guide, at 1.

The 2400-6T contract was issued for use in 1972. Buyers Guide at 1. Beginning early in 1971, the Forest Service, NFPA and other timber industry organizations, as well as individuals in the timber industry began meeting and discussing revisions to the 2400-6 contract for use nationally. Exhibits 1-5.[3] These discussions and meetings continued through 1971 and 1972.

4. In September 1973, after the extended discussions, and based on experience gained since the 2400-6 and 2400-6T's inception, both forms of the standard contract were revised. *See* Buyer's Guide at 1. It is this 1973 version of the contract, likely with some changes in special "C" provisions of the contract unrelated to the issues in these lawsuits that was executed with the plaintiffs.

5. From its inception, the standard timber sale contract permitted timber sale contractors to operate under extremely generous and favorable terms to the industry. For example, timber sale purchasers could conduct their contract operations with little oversight by the Forest Service. The contract contained no express provisions detailing the rights of the parties in the event a contract needed to be suspended, modified, or terminated to ensure compliance with environmental laws. The contract contained no termination for the convenience of the government or liquidated damages provisions.

---

[3] In many instances, the Exhibits to my declaration contain letters between the Forest Service and either timber industry organizations or individual members of the timber industry. The attachments to those letters, draft contract provisions, may not be included in the exhibits to this declaration as some of the documents are quite lengthy. However, where the attachments to the letters contain industry comments or contract provisions at issue in the above-referenced lawsuits, the attachments have been included in the exhibit.

6. The standard timber sale contract essentially remained unchanged for about the first two decades, with timber sale contractors continuing to operate under generous and favorable terms.

7. The relationship forged between the Forest Service and members of the timber industry in the initial development of the 2400-6/6T continued throughout the more than thirty years since its inception. Specifically, over the past thirty years, the Forest Service continued to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. Exhibits 6-17.

8. In the late 1980s and early 1990s, when the Forest Service sought to revise the 2400-6/6T contract to reflect changes in environmental laws, court decisions interpreting those laws, and to protect the government's financial interests, the Forest Service sought input from the timber industry. In particular, the NFPA provided numerous comments on C/C(T)6.01, the contract provision authorizing suspension of plaintiffs' contracts at issue in these lawsuits. Exhibit 14.

9. In its comments on proposed C/CT6.01 dated December 4, 1989, Exhibit 14 (Letter from Frank Gladics to David Hessel), the NFPA stated, among other items, its belief that section (a) of the proposed C/CT6.01 was not necessary as "Contracting Officer's [sic] already have sufficient authority to interrupt operations under B9.3 – BREACH when used in conjunction with other existing environmental protection provisions" and stated that section (a) of C/CT6.01 "should be dropped." Later in May 1990, the NFPA

"acknowledged the [Forest Service's] efforts to modify [C/CT6.01] in response to [NFPA's] earlier concerns." Exhibit 14, May 1, 1990 letter from Frank Gladics, Manager, NFPA to Dave Hessel, Director, Timber Management.

10. The plaintiffs' contracts contain the October 1996 version of C/CT6.01. This version of the provision reads, in relevant part, as follows:

> C6.01 – INTERRUPTION OR DELAY OF OPERATIONS. (10/96) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3, or termination pursuant to C8.2;
>
> (b) To comply with a court order, issued by a court of competent jurisdiction; or
>
> (c) Upon determination of the appropriate Regional Forester that conditions existing on this timber sale are the same as or nearly the same as, conditions existing on timber sale(s) named in such an order, as described in paragraph (b).
>
> . . . .

11. The language in C/CT6.01 (10/96) included in plaintiffs' contracts is similar to the language in C/CT6.01 proposed in June 1990, and upon which members of the timber industry commented. Exhibits 13 and 14. The proposed June 1990 version reads in relevant part as follows:

> C(T)6.01 – INTERRUPTION OR DELAY OF OPRATIONS. (Proposed) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent environmental damage; or
>
> (b) To comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale.
>
> . . . .

12. Members of the timber industry clearly had ample opportunity to, and in fact did, provide input into the provision authorizing suspension of plaintiffs' contracts.

13. While the NFPA may not have fully agreed with all aspects of C/CT6.01 and other provisions proposed for inclusion in the 2400-6/6T contract concerning suspension, modification, termination, and compensation, it is clear the timber industry had ample opportunity to comment on and negotiate the terms of the provisions. NFPA specifically acknowledged the Forest Service's attempts to make changes to C/CT6.01 in response to NFPA's comments. *See* Exhibit 14, December 4, 1989 letter from Frank Gladics to David Hessel ("We appreciate the opportunity we had to discuss the proposed liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did."); *See also*, Exhibit 14, May 1, 1990 letter from Frank Gladics to Dave Hessel (Expressing appreciation for the opportunity to discuss proposed contract provisions C/CT6.01 and others addressing modification, termination, and compensation under the 2400-6/6T contract, and acknowledging that the proposed contract provisions are an improvement over previous proposed versions).

14. Again, prior to revisions to the 2400-6/6T in 2004 to, among other items, further refine the rights of the parties in the event suspension, termination or modification of the contract became necessary for environmental reasons, the Forest Service sought input from members of the industry. The Forest Service

met with members of the NFPA FTPC, and its counsel, Alan Saltman, to receive their comments about the proposed provisions and to consider the appropriateness of making any revisions. When the proposed revisions were made available for public comment, the Forest Service again accepted comments from members of the industry and made appropriate changes based on those comments.[4]

15. After the 2004 revisions to the 2400-6/6T contract were made available for use nationally, the NFPA and other members of the industry sought further revisions. The NFPA also asked that a third party neutral review the contract and render an opinion on whether the contract fairly balanced the risks of contracting between the parties. The Forest Service agreed to hire a third party reviewer and after receiving the reviewer's opinions, issued additional revisions to the contract in 2006.[5]

16. In addition to seeking written comments on the 2400-6/6T from members of the timber industry, the Forest Service has met, over the past thirty years, and continues to meet on at least a bi-annual basis with the NFPA Federal Timber Purchasers Committee and its counsel, Alan Saltman, to discuss the timber sale contract, revisions to it, and other issues effecting timber purchasers' operations on the ground. Exhibit 19.

17. While engaging in dialogue with members of the timber industry about the timber sale contract and issues effecting the timber industry, the Forest Service is careful to ensure its compliance with laws governing the

---

[4] 68 Fed. Reg. 70758 (Dec. 19, 2003); 69 Fed. Reg. 25367 (May 6, 2004).

[5] 71 Fed. Reg. 43096 (July 31, 2006).

formulation of regulation and policy, including the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, and the Federal Advisory Committee Act, 5 U.S.C. App. 2.

18. Based on the long history of collaboration between the Forest Service and members of the timber industry, I respectfully disagree with the plaintiffs' contention that the standard Forest Service timber sale contract and other associated documents were drafted entirely by the Forest Service and that the terms of such documents are not negotiable. The history of the development of the standard timber sale contract is well-documented and demonstrates that members of the timber industry have had ample opportunity to provide and have given significant input into the terms included therein.

19. I declare under penalty of perjury that the foregoing is true to the best of knowledge and belief.

Dated this 23 day of April, 2008.

Richard O. Fitzgerald

Industry - Forest Service Timber Sale Contract Meeting
(2400-6T), Milwaukee, Wisc. Aug. 4-5, 1971

| | | |
|---|---|---|
| Doug Smith | WWPA | Boise, Idaho |
| Bill MacConnachie | NW Paper Co. | Cloquet, Minnesota |
| Ted Meredith | SFPA | New Orleans |
| Henry Haalck | National Forest Products Association | Washington D.C. |
| R. Kirk Ewart | Boise Cascade | Boise, Idaho |
| Jim A. Coon | North West Tbr. Assn. | Eugene, Oregon |
| Richard A. Yankee | Packaging Corp of America | Filer City, Michigan |
| Peter J. Wagner | USFS R-9 | Milwaukee, Wisc. |
| Bernie A. Swift | USFS R-1 | Missoula, Montana |
| Norman O. Nelson | USFS R-9 | Milwaukee, Wisc. |
| William J. Bryan | USFS R-8 | Atlanta, Georgia |
| DeWilton C.Smith | USFS WO | Washington, D.C. |
| John E. Todd | USFS WO | Washington, D.C. |
| Louis M. Gabel | USFS R-6 | Portland, Oregon |
| Robert G. Rue | O.G.C., USDA | Washington, D.C. |
| Lynn Sandberg | Mead Corp. | Escanaba, Michigan |

Exhibit 1

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE

WO

REPLY TO: 2450 Commercial Timber Sale Contracts MAR 19 1971

SUBJECT: Proposed National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due April 19, 1971

Enclosed are three copies of proposed National C Provisions for use with the 2400-6 contract. We need the benefit of your careful review and comment before we meet with the Federal Timber Purchasers Committee to discuss these draft provisions. The same draft provisions will be sent in a few days to industry's National committee so they also may have adequate time to study them before we meet.

There are three categories of provisions included on the enclosed list:

1. Provisions used previously in 2400-5 contracts, but edited to fit the 2400-6 contract.

2. Provisions in developmental stage for either the 2400-5 or 2400-6 contracts and which have had some previous review in the Regions.

3. New proposals not previously reviewed in the Regions.

Please review all of the provisions, even though little time need be spent on those in category 1. For our mutual convenience, any suggested changes should be handwritten directly on the draft provisions, unless impractical for a complex change. Please return two photo copies of those provisions on which you have indicated revisions.

Although we ask for reply by April 19, 1971, earlier replies will give us more time to assemble your comments and will be much appreciated.

HOMER J. HIXON
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

Exhibit 2

List of National C Provisions Proposed for 2400-6 Contracts

Category

| | | | |
|---|---|---|---|
| (1) | C2.11 | - | Timber Subject to Agreement (2/71) |
| (2) | C2.3 | - | Reserve Trees (2/71) |
| (1) | C4.22 | - | SBA Road Loan Repayment (2/71) |
| (2) | C4.221 | - | Advance Deposits (2/71) |
| (2) | C4.23 | - | Refund of Excess Cash (2/71) |
| (2) | C4.25 | - | Extension Deposits (2/71) |
| (1) | C5.201# | - | Cooperative Construction (2/71) |
| (2) | C5.202 | - | Surface Treatment (2/71) |
| (1) | C5.24 | - | Estimated Cost (2/71) |
| (3) | C5.251 | - | Difference in Rock Riprap Costs (2/71) |
| (1) | C5.41# | - | Road Deposits (2/71) |
| (3) | C6.32# | - | Protection of Reserve Trees (2/71) |
| (2) | C6.71 | - | Clearcutting Units (2/71) |
| (2) | C6.72 | - | Group Regeneration Areas (2/71) |
| (1) | C6.82 | - | Presentation for Scaling (2/71) |
| (1) | C8.64 | - | Domestic Processing (2/71) (Alternatives A thru E) |
| (2) | C8.71 | - | Tripartite Land Exchange (2/71) |
| (2) | C8.72 | - | Bipartite Land Exchange (2/71) |

National C Provisions for Use Only in 2400-5 Contracts

C6.86 - Scaling Services (2/71)

National Forest Products Association
1619 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-332-1050

October 12, 1971

Mr. Paul E. Neff
Director
Division of Timber Management
Forest Service, U.S.D.A.
3207 South Agriculture Building
Washington, D.C. 20250

Dear Paul:

At the Denver industry meeting in August, Federal Timber Purchasers Committee discussed the proposed national division C provisions which you sent last July for industry review. Enclosed is a copy of these provisions with industry suggested changes marked in ink.

Copies of national division C5.4 - Road Maintenance proposal, which you sent last June, were forwarded to the appropriate industry committees for their comments and suggestions. This proposal was not reviewed at the Denver meeting, since some regional contract committees were redrafting this C provision for regional use. We would appreciate, however, receiving a copy of your latest revision of this national division C provision on road maintenance, so that industry may have an opportunity to review it.

Please send us a national division C provision card for C4.224 (9/71) and C6.81 (8/71). Also, I asked Bill Settle to see whether it was possible for the Federal Timber Purchasers Committee to receive a complete set of each Forest Service Region's regional division C provision cards. Region 1 is the only one that has sent us their C provisions for form 2400-6 timber sale contracts.

Sincerely,

Henry G. Haalck
Forester

Exhibit 3

Enclosure

Alaska Loggers Association • American Institute of Timber Construction • American Plywood Association • American Walnut Manufacturers Association • American Wood Preservers Institute • Appalachian Hardwood Manufacturers, Inc. • California Redwood Association • Canadian Wood Council • Fine Hardwoods Association • Hardwood Dimension Manufacturers Association • Hardwood Plywood Manufacturers Association • Maple Flooring Manufacturers Association • National Oak Flooring Manufacturers Association • National Particleboard Association • National Woodwork Manufacturers Association • Northeastern Lumber Manufacturers Association, Inc. • Northern Hardwood and Pine Manufacturers Association, Inc. • Red Cedar Shingle & Handsplit Shake Bureau • Southern Cypress Manufacturers Association • Southern Forest Products Association • Southern Hardwood Lumber Manufacturers Association • Western Wood Products Association

WO-C5.111
(7/71)

C5.111# - Right-of-Way Reversion (7/71). Rights-of-way for the following listed roads will revert to the Grantor unless the roads are constructed prior to the dates shown:

| Road No. | Grantor | Reversion Date |
|---|---|---|

Purchaser shall ~~Substantially Complete~~ have initiated construction of Specified Roads needed by Purchaser on the above rights-of-way before the reversion dates. If rights-of-way revert because of Purchaser's failure to ~~Substantially Complete~~ Initiate construction of roads prior to the reversion date, Forest Service shall obtain new rights-of-way. Unless Purchaser's failure was caused by circumstances which would qualify for a Contract Term Adjustment, Purchaser shall reimburse Forest Service for costs incurred, and delays or interruptions caused by reversion of the right-of-way shall not qualify Purchaser for a Contract Term Adjustment.

---

Instructions: Include in new contracts if any right-of-way has a reversion date prior to Termination Date. Include by modification when Contract Term Extension or Contract Term Adjustment establishes a new Termination Date later than any right-of-way reversion date and the involved roads have not been ~~Substantially Completed.~~ Adequate time, a minimum of one year, shall be available for construction prior to reversion dates.

WO-C5.12
(7/71)

C5.12 Use of Roads by Purchaser (7/71). Unless agreed otherwise, Existing ~~temporary or permanent~~ roads where Purchaser's use is prohibited or subject to restrictive limitations are identified on Sale Area Map by the following codes:

| Code | Use Limitations |
|---|---|
| X | Hauling prohibited |
| R | Hauling restricted |
| U | Unsuitable for hauling prior to reconstruction |

Unsuitable roads (code U) shall not be used for hauling until completion of agreed reconstruction work.

Purchaser's use of restricted roads (code R) shall be limited by restrictions and for the reason stated in the attached Restricted Road List.

---

Instructions: Include in contract when limitation of road use is necessary for the reasons described in B5.12. Note reference to Sale Area Map. The Restricted Road List, to be inserted in the contract ahead of Road Specifications, will be prepared in the following format:

Restricted Road List (C5.12)

| Road No. | Road Name | Road Termini | Description of Restrictions | Reason |
|---|---|---|---|---|
| | | | | |

WO-C5.121#
(7/71)

C5.121# - Road Reconstruction Deposits (7/71). Unless agreed otherwise, roads listed below shall not be used for log hauling prior to completion of reconstruction by Forest Service. Purchaser shall be authorized to use such roads by making deposits under Public Law 88-657 for reconstruction on the following schedule:

| Road No. | Termini from - to | Schedule of Amounts to be Deposited | Date Reconstruction will be completed ~~Approx. Period of Time Needed to Reconstruct (days)~~ |
|---|---|---|---|
| (3N24) | (0+00-25+00) | ($5,000 by Sept.10, 1971) | (25 days; expected completion date - Oct. 5, 1971) |

Any deposits unexpended for such reconstruction shall be retained by Forest Service.

---

Instructions: Use this provision when Forest Service (either by force account or by contract) will perform needed reconstruction, such as replacement of surface rock on an existing road. Not to be used to replace surfacing on roads where replacement deposits ~~(maint.)~~ have been collected for the same purpose.

C5.3 - Purchaser Credit Computation (7/71). When Purchaser performs Surface Treatment if provided elsewhere herein or makes deposits for road reconstruction under C5.121, Forest Service shall credit Timber Sale Account each month as such work proceeds or as such deposits are made. Crediting of Timber Sale Account for deposits for road reconstruction or for share-cost roads shall be in the full amount of such deposits, notwithstanding B5.3.

---

Instructions: Required when other provisions of the contract provide for Surface Treatment or deposits for share-cost roads or road reconstruction.

C6.71 - Assistance in Slash Burning (7/71). If Forest Service requests, Purchaser shall furnish equipment and equipment operators to assist in preparation for slash burning at agreed times prior to the normal slash burning season in the area.

Purchaser shall furnish equipment and equipment operators for burning and mop-up when requested. The amount and kind of equipment requested shall be that normally used in slash [~~disposal work~~] burning and reasonably available under the existing equipment organization of Purchaser. Forest Service shall reimburse Purchaser for such work at rates [~~for firefighting~~] common in the area, or at previously agreed rates.

---

Instructions: For optional use when it is anticipated that Purchaser's assistance in preparation or burning will be needed. Purchaser's assistance should not be requested if Forest Service can reasonably accomplish the job by either force account or contracting.

C6.84 - Accountability (7/71). Purchaser shall not place products in storage for deferred Scaling, except when agreed under C6.82, until an accountability system has been agreed in writing for a stated period.

---

Instructions: To be included in all contracts where there is a possibility of deferred scaling. This provision supplements but does not replace B6.84. Pending development of a new log accountability system, the agreement should specify use of the system provided in B6.84. The agreement should last no longer than one logging season so that a new accountability system may be implemented promptly after development.

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE

WO

REPLY TO 2450 Sale Contracts and Permits NOV 2 1971

SUBJECT: National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due November 22, 1971

This is to bring you up to date on the status of several National C provisions and to invite your comments on other provisions still in the proposal stage.

For proposed National C provisions, our normal procedure is to obtain Regional review and then establish a Servicewide position before proposals are sent for industry's review. When timing is critical, we may depart from that procedure, as we did when we issued C4.224 and C6.81 following resolution of the deferred scaling-payment bond controversy.

Three groups of provisions are enclosed as follows:

1. Previously reviewed provisions which we are approving for use now. Cards will be sent as soon as printed.

C4.228 - Performance Bond as Security for Felled Timber (10/71). This is similar to the sample Regional provision C4.221 shown in FSM 2432.42a. The number was changed because it conflicted with C4.221 (2/71) and defined terms were capitalized.

C5.12 - Use of Roads by Purchaser (10/71). The draft dated 7/71 was edited for clarity, but no change in intent. Regions 1 and 5 suggestions are more proper as Manual instructions, which we will do.

C5.3 - Purchaser Credit Computation (10/71). Phrase added in first sentence to include deposits for share-cost roads. No other change from the 7/71 draft.

2. Revised proposals which need further review by you and industry before issuance:

Exhibit 4

C5.111# - Right-of-Way Reversion (11/71). This is changed considerably from the 7/71 draft as a result of advice from the Division of Lands and the Office of the General Counsel. The provision now serves primarily to put the purchaser on notice, but gives incentive for construction because of the limitation on contract term adjustment. The Manual will contain further guidelines on the use of this provision and will state that right-of-way extension will be at Forest Service expense unless the purchaser desires to speed the process through his payment of the costs.

C5.121# - Road Reconstruction Deposits (11/71). Edited to consider Regional and industry comments. Last sentence of instructions to be incorporated in the Manual. Although the intent is not really changed, we believe you should see this provision again before it is approved.

C6.71 - Assistance in Slash Burning (11/71). Next to last sentence changed. In last sentence, industry suggested that rates not be tied to firefighting rates. Since this provision, in effect, provides for an unadvertised service contract, rates must be established in advance by terms of the timber sale contract. However, the Manual will explain that rates used in the appraisal will reflect actual rates paid by industry for such work.

C6.81 - Scaling Services (11/71). This is a revision of the 8/71 provision, based on suggestions by Region 5. Broadened to provide for discontinuance of scaling at any site when standards are not met.

3. New proposals. Not sent to industry, as we need your comments first.

C7.4 - Negligence in Prevention or Suppression (11/71). Sent to you on October 19, but included here to completed this package.

C3.12 - Rates After Scheduled or Emergency Rate Redetermination (11/71) and C3.15 - Rates When Contract Term Extended (11/71). These two proposals relate to 2400-5 contracts modified to reduce resource or environmental damage, but would be used only when such modifications cause reduction in stumpage rates. One intent (C3.12) is to protect the price differential (determined by the "before and after" modification appraisals) in event scheduled or emergency rate redetermination indicates rates below base rates. In sales with little or no bid premium, such protection may not be possible because rates

may never go below base rates. The other intent (C3.15) is to restore bid premium rates, up to original levels, to the extent rates may be increased by extension appraisal. For contracts having scheduled rate redeterminations, both provisions would be used. Other sales would use only provision C3.15.

We will appreciate your comments by November 22, or earlier if possible. We want to summarize your replies before our San Francisco meeting, December 7-9.

for PAUL E. NEFF
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE
WO

REPLY TO: 2450 Sale Contracts and Permits

DEC 28 1971

SUBJECT: National C Provisions

TO: Regional Foresters

AIRMAIL

Reply Due January 21, 1972

In consideration of our discussions in San Francisco, December 7-9, the following National C provisions are enclosed and approved for use at this time. Cards will be sent later.

C4.228 - Performance Bond as Security for Felled Timber (12/71). This supersedes provision dated 10/71.

C5.3 - Purchaser Credit Computation (12/71). Supersedes provision dated 10/71.

C5.111# - Right-of-Way Reversion (12/71). New provision.

C5.121# - Road Reconstruction Deposits (12/71). New provision.

Because the following provision is considered to be an unnecessary amplification of B6.81, it is canceled and should be removed from your card sets:

C6.81 - Scaling Services (8/71).

The enclosed C5.12 - Use of Roads by Purchaser (12/71) is a revision in accordance with our discussions. We agreed to provide you more time for study and comments. Please let us have your suggestions by January 21, 1972. At the same time please send any further comments you may have on the following proposals which were sent to you with our November 2 letter:

C7.4 - Negligence in Prevention or Suppression (11/71).

C3.12 and C3.15. Two proposals for 2400-5 contracts which are modified for environmental reasons.

Exhibit 5

As agreed, C6.71 - Assistance in Slash Burning (11/71) will not be issued as a National provision. Regions will issue a similar provision to meet Regional needs.

PAUL E. NEFF
Director of Timber Management

Enclosures

LIMITED DISTRIBUTION

**SUMMARY NOTES - STAFF MEETING**

9:00 a.m., November 23, 1987

Director's Office

Norm Sears attending for Strickland

**General Discussion:**

Wilcox: The Regional Engineers Meeting was excellent. The formal presentations the first day set the stage. The next two days were devoted to open discussions which resulted in an identified list of follow-up actions which we will share with the Regions in a few days. The Technology and Development people from both Centers did an excellent job.

On November 18, the Forest Service Seminar entitled "Alternative Road Building Strategies" was presented by Joel Holtrop, Chuck Blomdahl, and Gary Marple, was well received. It was standing room only in the South Building.

Buster LaMoure, Director of M&GM, advised us that he was working with MTDC to develop and construct a Lime Injector machine for use in strip mine reclamation.

Peg let us know that she made it to the South Building without any hitches.

Today is Vivian's first day as Peg's replacement. Glad to have her in the job. We have asked her to cover two jobs (her new one and her previous one in Reed's shop) until we find her replacement.

Schwarzhoff: A meeting between the Forest Service and the Federal Timber Purchaser Committee was held on November 9 regarding the timber sale contract revision process. A new time table has been established. A copy is enclosed. [redacted]

The National Transportation Development and Geotech Workshops are now going to be held in Eugene, OR, February 29-March 3. This is a change in place, from what we told the Regional Directors at San Dimas (they were going to be held in Washington, DC).

George Lippert had an excellent Functional Performance Evaluation trip to the Southern Station last week. The timing of the trip was important as the SO/SE Station Engineer is retiring January 2. Trip travelers included: SO Assistant Director, Wayne Hunt; R-8 Assistant Director of Engineering, Jim Milner; and SO/SE Station Engineer, Glen Brittian.

On Tuesday, November 24, George Lippert and Suzanne Buntrock will attend the USDA Radiological Safety Committee Meeting. The purpose of this meeting is to discuss Agency activities regarding radon and whether or not a USDA-wide monitoring program is warranted.

University of Wisconsin short course - "Inspection, Evaluation, Maintenance and Repair of Wood Structures. Tentative plans have been completed for a joint training session with U.S. Army Facility Engineering Support Agency (Ft. Belvoir) at Madison, WI, March 22-23. This session will be video taped for later distribution within our Facility Training Library. Twenty pre-paid trainee slots will be available to FS field personnel for "live" audience. More information to come later.

Sears: During the week of December 7, a follow-up meeting is scheduled with Research, Lee Northcutt, and Dick Silberberger on action items from a joint Research/Technology and Development meeting held last summer in Missoula.

Reed: House and Senate are on Thanksgiving recess this week. They will be back on Monday, November30 and we are expecting conference action on our appropriation either Tuesday or Wednesday.

We have received most the Regional ROADS spreadsheets and States reports and have been evaluating and validating the data for use in the FY 1987 Report of the Forest Service. So far, the spreadsheet program is working smoothly at our level.

On Wednesday and Friday, both Mike and I will be on annual leave. Be back in the office on Monday, November 30.

OMB Marks for FY 1989 will be in after the first week of December.

STERLING

November 23, 1987

FOREST SERVICE POSITION PAPER
ON
TIMBER SALE CONTRACT REVISION
POLICY ISSUES

This is the Forest Service response to Industry's position paper submitted at the FTPC meeting in San Francisco on November 9, 1987.

1. Treatment of Purchaser Credit:

Forest Service Position - Maintain the current concept of purchaser credit with regard to availability for use in payment for stumpage above base rates and transfer-in limits. Changes proposed by FTPC would require legislative action to amend the Forest Roads and Trails Act of 1964.

FTPC Position - Modify existing purchaser credit definition to make all earned effective purchaser credit equivalent to cash. Remove the transfer-in limit of earned purchaser credit and permit withdrawal of purchaser credit at anytime during the contract period. Provide for refund of unused purchaser credit if there are no sales to transfer it to.

FTPC further contends that 16 USC 535, which amends the FR&T Act, does not prohibit the changes proposed in their wording.

Forest Service Reasoning - Purchaser credit or road amortization has always been limited toward application to stumpage payments in excess of base rates. 1963 the Worrel Commission recommended and the Forest Service agreed to eliminate the "accelerated amortization" concept and use the "gross stumpage" (ie: stumpage plus roads) in advertizements and bids. Sales prior to this period under the 2400-2 timber sale contract provided for stumpage payments to be be adjusted by a formula consisting of road amortization rate deficit, base rates, and tentative rates. Depending upon the particular sale, it was common for the purchasers rates not to increase during the contract period due to the road amortization rate deficit and therefore not recover the full cost of road construction.

This concept was evidenced in the legislative history of the drafting of the Forest Roads and Trails Act of 1964. In 1965 the Forest Service issued the 2400-5 timber sale contract with purchaser credit being available only for stumpage in excess of base rates. This contract form did not define "effective purchaser credit". Subsequently, the 7/70 and 9/73 versions of the 2400-6 contract were published and Effective Purchaser Credit became a defined term in B4.21. Although not specifically defined in the law, the amendment to the FR&T Act in 1975 provided for purchasers to transfer-in "unused effective purchaser credit" up to a specified limit. This limit was specifically set to protect the base rate value and subsequently included salvage sale funds. Effective purchaser credit in the law was recognized as that definition included in the existing Forest Service contracts.

The Forest Service does not agree with the proposals provided by the FTPC subcommittee due to the required legislation necessary to implement them. This concept is outside the scope of the revision process.

Exhibit 7

2. Down Payment:

Forest Service Position - The Forest Service has included the existing Division C Provision C4.220# in response to the requirements of the Federal Timber Contract Payment Modification Act (16 USC 618(d)).

FTPC Position - The subcommittee has recommended language which would permit use of government securities to be used in lieu of cash to satisfy the down payment requirement.

Forest Service Reasoning - The FTPC wording is currently prohibited by statute and therefore is outside of the scope of the contract revision process.

3. Debt Collection Act:

Forest Service Position - Language implementing the requirements of the Debt Collection Act of 1982 has been included. Offset procedures are included in the draft language.

FTPC Position - Remove language pertaining to the Debt Collection Act and let each contract stand on it's own.

Forest Service Reasoning - The Forest Service is bound to implement the r--uirements of the Debt Collection Act of 1982. The United States Claims , has ruled that the DCA does not cover intra-contractual disputes (AVCO C. ,ortation vs United States, No. 14-85C, dated August 19, 1986). The Administrative offset provisions do apply to claims that arise: a) Under a contact that is separate from the contract in which offset is taken; b) From a noncontractual source outside of the contract in which offset is taken.

The offset procedures are therefore required. Debts due the United States may generally be offset against any amounts held by the Forest Service pending payment or refund to the debtor. The following items, however, are usually not available for administrative offset: a) Cash, negotiable securities, letters of credit, or assigned savings accounts furnished to secure bid, payment or performance bonds; b) Advance payments under timber sale contracts that are not available for refund as excess cash as defined in the contract; c) Effective or ineffective purchaser credit; d) Any other payment by the debtor for a specific purpose or account.

FTPC's contention that use of offset procedures could possibly cause a purchaser to default on the sale being offset against is unfounded due to the restrictions indicated above.

4. Safety:

Forest Service Position - Safety is a responsibility of both parties to the contract. Forest Service should not place purchaser in a position which would create an unsafe situation.

Position - Include language which would identify Forest Service ,onsibility for safe operations.

.st Service Reasoning - Language needs to be drafted which would provide for prompt resolution of purchaser safety concerns. Forest Service should not be so inflexible as to jeopardize a safe working environment for the purchaser. Compensation for such additional work will be handled through the existing contract provisions.

5. Eco-terrorism:

Forest Service Position - Forest Service has included vandalism to included timber and has assumed liability for loss in value.

FTPC Position - Include language which covers acts of terrorism which causes damage to timber, equipment, of threatens human life.

Forest Service Reasoning - Forest Service recognizes this as a problem in isolated situations. Due to the unforseen nature of this activity it does not appear that the entire risk should be assumed by the Forest Service. The parties must work together to resolve these occurances and likewise share in the cost of investigation. Compensation to the purchaser seems reasonable for time lost in investigation. In areas of known or potential terrorism this appears to be a legitimate appraisal item for security patrols or other measures and not necessarily a contractual problem. It is doubtful that it is common practice for industry to be afforded this type of protection and warrantee when operating on private lands.

:quitable Compensation Provisions:

Forest Service Position - Language has been proposed which would provide for cash credits, increased purchaser credit limits, and contract term adjustment due to changes in anticipated road construction needs. Certain compensation is afforded the purchaser when changes are made by the Forest Service. Flexibility is provided through contract modification in addressing changes which were not recognized by either party at the time of contract award.

FTPC Position - Provide language which would provide for compensation of time and money when Forest Service requires changes in contract requirements that were not contemplated by either party at the time of bid formation. Eliminate the use of net ineffective purchaser credit.

Forest Service Reasoning - The Forest Service appraises each timber sale on the premise that the work can be reasonably performed by an operator of average efficiency. There are no warrantees as to the volumes and values expected to be experienced by the successful bidder. FTPC's contention that conditions which were not contemplated by either party, and requiring modification, nullify the original bid formation is incorrect. No matter how carefully the sale is planned, the need for adjustments or modifications usually arise. The bidding reflects the anticipated values of the offering in the market place. Errors discovered after award of the contract and unknown to either party are acknowledged as mistakes. Such mistakes are not a basis for contract reformation as the agreement entered into originally continues to exist. Modifications work both ways and are entered into mutually and if appropriate, compensating adjustments.

Forest Service proposed language provides for compensation in numerous provisions for changes brought about through the normal operations of the contract. The Forest Service proposes to make a cash credit to the purchaser's account for changes brought about during the construction of Specified Roads which would not be compensated for due to an increase in net ineffective purchaser credit. Contract Term Adjustment would be granted in accordance with B8.21. Further, there are other provisions which provide for compensation to purchaser for actions taken by the Forest Service for environmental protection.

7. Extension Policy:

Forest Service Position - Forest Service intends to utilize the existing Chief's extension policy with minor modification for volume removal requirements.

FTPC Position - Change proposed language to accomodate revised volume estimates as a basis for determining diligent performance, eliminate requirement for meeting the road completion date, and to provide for actual cost payments for remarking and boundary establishment.

Forest Service Reasoning - Forest Service proposes to include a measure of area cut over in addition to volume removed as a measure of diligent performance.

Road completion dates are required by section 14i(2) of the National Forest Management Act of 1976. Road completion is a measure of diligent performance ould conceivably not be met at time of request of extension. Road completion dates may be adjusted to meet the approved plan of operations.

Purchasers will enter into a collection agreement to cover the cost of remarking and boundary reestablishment. The initial payment required before extension shall be for the estimated cost of such work and may be adjusted up or down based on actual costs.

8. Extended Contract Term AdjustmentsL

Forest Service Position - The Forest Service believes there is merit in providing relief to purchasers when extended interuption occurs and will pursue appropriate language. Federal Register notice published 11/6/87 addresses handling of down payment when interruptions occur.

9. Extraordinary Adjustment:

Forest Service Position - Provision language addresses delays experienced by the purchaser due to loss of primary processing facilities. CTA's will be granted for interruptions in planned operations.

FTPC Position - Proposes to provide for CTA for all timber sales within the tributary area regardless of the Normal Operating Season. Delays on private timber contracts would result in subsequent CTA for Forest Service sales.

Forest Service Reasoning - The draft language does not provide for CTA outside the Normal Operating Season. Contract Term Adjustment is provided for interruptions in planned operations and not on a blanket basis for all sales. It is recognized that there is a "pipeline" effect on timber removal from other

... er sales when manufacturing processes are interrupted. FTPC language provides for granting CTA when interruptions occur on sales on non-Forest Service lands and is not appropriate.

10. Threatened, Endangered, and Sensitive Species:

Forest Service Position - Forest Service language includes Sensitive species as possible indicators for the need to environmentally modify the contract.

FTPC Position - Require only federally listed Threatened and Endangered species to be protected under the timber sale contract.

Forest Service Reasoning - Forest Service is bound by the National Forest Management Act to provide protection for these species.

11. Contract Termination and Compensation:

Forest Service Position - Language is provided which permits modification to delete certain requirements of the contract, including portions of the sale area. Forest Service may terminate the entire contract under certain circumstances due to purchaser's actions. Termination may also occur by mutual agreement or by the purchaser when certain gates are met. Provisions are made to compensate the purchaser for certain items as a result of the terminination or modification action.

... Position - FTPC proposes language to address termination in whole or in p... Purchasers should be afforded the option of termination when the modification substantially affects the original offering. Compensation is expanded to include all costs incurred for abandonded work and severance fees for subcontacts.

Forest Service Reasoning - Partial termination as proposed by FTPC is currently handled as a modification, which requires mutual assent. Compensating adjustments to stumpage rates will be made through a rate redetermination and the estimated cost of waived work will be credited to the Timber Sale Account. In the event of environmental modification, the purchaser should be given an opportunity to elect to terminate the contract if certain gates are met. The FS revision committee is preparing language which would be similar to that established for catastrophic damage.

12. Operating Plans and Schedules:

Forest Service Position - Existing Division C language has been incorporated in the proposed draft. These requirements are established by NFMA.

FTPC Position - FTPC proposes to eliminate the requirement that the FS approve the plan of operations and that the operating schedule be in substantial compliance with the plan of operations.

Forest Service Reasoning - The requirement for operating plans is established b... the NFMA of 1976. Diligent performance for the purpose of extension or term ...tment is predicated on the plans and schedules.

Results of the Executive Meeting with George Leonard, Lamar Beasley, Dave Hassel, and selected FTPC representatives on December 4, 1987. Actions decided shown in bold type below.

PURCHASER CREDIT

FTPC DOES NOT DISAGREE WITH THE CONCEPT OF INEFFECTIVE PURCHASER CREDIT, HOWEVER, THEY WANT TO BE COMPENSATED FOR THE INVESTMENT BEING CONSTRUCTED.

REMOVE TRANSFER IN LIMITS:

**We will review the need for the limits. The reasons that the limit was established was to protect the returns to the counties. The basis may now have changed.**

LET SSF SALES TRANSFER PC:

**We will prepare FSH/FSM language to not collect all SSF $ and thereby make some PC available for transfer.**

REFUND UNUSED EFFECTIVE PC:

**PC is a creature of the TSC. Although we have stated that PC is equivilant to cash for purposes of stumpage payments, in actuality it is not cash. We will not consider this in the revision.**

DOWN PAYMENT

WANTS TO USE GOVERNMENT SECURITIES FOR DOWN PAYMENT.

USE OF GOVERNMENT SECURITIES:

**We are bound by the law in this case. Use of Government securities is not acceptable.**

USE OF PC FOR DOWN PAYMENT:

**We streached the interpretation to include PC as an acceptable form of down payment. We will keep this option available to purchasers.**

DEBT COLLECTION/OFFSET PROCEDURES

WHAT ARE THE FUNDS THAT CAN BE OFFSET AGAINST? DO WE NEED TO SPELL OUT IN THE CONTRACT?

POLICY ON USE OF FUNDS:

**Our objective is to prevent FS refund of surplus monies when the purchaser owes monies elsewhere. We will work with OGC to clarify language in the contract.**

SAFETY

IS FS RESPONSIBILITY TO PROVIDE FOR A SAFE WORKING ENVIRONMENT.

LANGUAGE TO EXPIDITE RESOLUTION:

**We will pursue language to expidite resolution with OGC.**

COMPENSATION TO PURCHASER:

**We will not provide compensation outside of existing provisions.**

ECO-TAGE

FTPC NEEDS AN ENCENTIVE TO HARVEST DAMAGED TIMBER.

DEVELOPE PLAN BETWEEN PURCHASER AND FS:

**We will develope language which will provide for a plan to be developed if eco-tage occurs. There will be no specified liability beyond title to damaged timber. As appropriate, we will provide appraisal estimates.**

COMPENSATION TO PURCHASER:

**Not thru the TSC but thru the plan/agreement indicated above.!**

EQUITABLE COMPENSATION

:DE REASSURANCE THAT ORDERED DESIGN CHANGE IS USED SPARINGLY. NEED TO h...EW WORDING ON CASH CREDIT FOR INCREASED IPC TO PROVIDE FOR ANY INCREASE.

REWORD COMPENSATION FOR IPC:

**We have addressed the concerns in the draft TSC. Need to review one more time.**

EXTENSION POLICY

FTPC WANTS CHANGE IN DILIGENT PERFORMANCE FOR ROAD COMPLETION DATE DUE TO IRREPARIABLE BREACH.

FAILURE TO MEET ROAD COMPLETION DATE IS TERMINATION OF TSC:

**Failure to meet road completion date is irremedial breach of the contract, unless adjusted by modification. This date is important, similar to periodic payment dates. We will provide direction to RF's on enforcement.**

ROADS MUST BE COMPLETED AS A CONDITION OF RIGHT TO EXTENSION:

**This will be dropped from our language and FSM policy.**

EXTENSION POLICY (CONT)

OF EXTENSION:

We will address this in FSM language as to the sideboards to be used in establishing the costs.

EXTENDED CTA

COMPENSATION FOR EXTENDED CTA DUE TO FS APPEAL, T&E, etc., IN DOWN PAYMENT, INTEREST, ESCALATION, AND LOST MARKETS.

DOWN PAYMENT:

Regulations will be modified to provide use of guarantees.

LOST MARKETS, ESCALATION AND OTHER COMPENSATION:

We will consider a process for reimbursing the purchaser for out-of-pocket expenses as a result of FS request to delay. (ie: move-in/move-out costs)

EXTRAORDINARY ADJUSTMENT

TAKE INTO ACCOUNT THE PIPELINE EFFECT ON OTHER SALES.

EARLY EXTENSION:

T--- is under our current direction.

P...LINE EFFECT:

We will review. We may want to establish a gate "a percentage" of a purchaser's portfolio which has been affected and thereby qualify for CTA.

T&E AND SENSITIVE SPECIES

HANDLING OF SENSITIVE SPECIES AS A CAUSE FOR ENVIRONMENTAL MODIFICATION.

DISCOVERY OF NEW SENSITIVE SPECIES:

We must specify the measures to be taken in the planning stages of the TSC. Adjustments should be handled thru environmental modification. We do not need to define sensitive species in the TSC.

CONTRACT TERMINATION AND COMPENSATION

PROVIDE FOR COMPENSATION TO PURCHASER FOR PARTIAL TERMINATION IN ADDITION TO RATE REDETERMINATION AND COST OF WORK ABANDONED.

COMPENSATION FOR TIMBER DELETED:

Cost of replacement timber is reflected in hte Rate Redetermination. Reimbursment for work accomplished is appropriate. No compensation for lost p--fits.