CONTRACT TERM. AND COMP. (CONT)

:PT OF ORIGINAL SALE PREMISE:

Cannot make the process too simple because the pressure to change will become too great. We will pursue a gate similar to catastrophic damage, whereby the purchaser may opt to terminate the contract. Try to make it simple and not another process. Need to look at the before and after appraisal to see if this is a true indicator of the value loss as a result of modification.

OPERATING PLANS AND SCHEDULE OF OPERATIONS

DO NOT TIE SCHEDULE TO PLAN OF OPERATIONS. SUBSTANTIAL COMPLIANCE IS ASSURED BY PERIODIC PAYMENTS, DOWN PAYMENTS, etc..

ELIMINATE SUBSTANTIAL COMPLIANCE:

We will eliminate the third paragraph of B6.311.

# TIMBER SALE CONTRACT REVISION

The Federal Timber Purchasers Committee and Forest Service agreed to the following plan of action to complete the timber sale contract revision process.

1. NFPA Contract Revision Subcommittee will complete it's white paper on the thirteen policy issues which outlines specific reasoning for the proposed changes included in the industry 7/87 contract draft. The Forest Service will receive the industry white paper by November 20.

2. The Forest Service will provide a written response to industry's white paper prior to a meeting between industry representatives and the Forest Service Chief and staff. The Agency white paper will describe it's reaction to industry's position on the thirteen policy issues.

3. Industry representatives and the Forest Service Chief and staff will meet in early December to resolve the thirteen policy issues. The meeting will focus on the policy level issues, not specific contract provision wording.

4. The Forest Service contract drafters will begin to incorporate the concepts agreed upon with industry the 2nd week of December. Copies of the completed draft will be made available to all Forest Service offices for in-service review during mid-December thru January.

5. Industry will provide the Forest Service with written proposals to modify the Agency's draft 2400-6T timber sale contract by December 31.

6. During the Agency drafting process, industry representatives will be given the opportunity to review provision working to ensure the Agency's contract draft clearly reflects the agreed upon concepts. A meeting of industry, Forest Service, and OGC representatives will occur in late January to resolve and draft provision language where conceptual agreement can be reached.

7. With the conclusion of the process outlined above the remaining issues will be available to be addressed through the publication of a notice in the Federal Register that the Agency updated draft timber sale contracts are available for public comment. It is anticipated that the notice will be published during March 1988.

Exhibit 8

PROVISIONS REMAINING TO BE RESOLVED 12/87

THE FOLLOWING IS A LISTING OF THE REMAINING PROVISIONS WHICH STILL NEED TO BE RESOLVED. THIS WILL BE THE FOCUS OF OUR DECEMBER 8-10 REWRITE HERE IN WASHINGTON, DC.

| Reference Number | Title |
|---|---|
| B2.6 | Volume Estimate<br>REVIEW: Need firm OGC decision as to how to best handle the implied warrantee disclaimer. |
| B3.1 | Current Contract Rates<br>REVIEW: We have incorporated a listing of all Other Contract Charges in Division A. Need to look again at the logistics of what we have done to Div. A. |
| B3.31 | Rate Redetermination for Environmental Modification<br><br>REVIEW: Need to look at compensation for increased ineffective purchaser credit as a result of modification or for work abandoned. |
| B3.41 | Material Not in A2<br>REVIEW: Is the flexibility and intented to permit removal of material not subject to the terms of the contract clear? |
| B4.223 | Purchaser Credit as Deposits<br>REVIEW: Should we pursue wording which provides for cash payment for unused purchaser credit which cannot be transfered to other sales. Does this require legislation? |
| B4.25 | Periodic Payments<br>REVIEW: Is the wording coordinated with the current Federal Register proposal? Do we need to revise the wording or the mechanics of periodic payments? Can we leave essentially as is and plan to issue a C provision when the dust settles? |
| B5.2 | Purchaser Road Maintenance<br>REWRITE: Include definition of pre-haul maintenance in glossary and wordsmith provision. |
| B5.52 | Construction Staking<br>REVIEW: Need to look at how purchaser is to be compensated if purchaser assumes staking responsibility. This looks more like a coop-agreement rather than an ordered design change. |

B5.54 thru B5.545 — Construction Cost Adjustments

Pricing and Payment for Physical and Design Change
REVIEW: Look at wording of these provisions and clean-up. Is FS proposal inadequate to address industry concerns about compensation for increased time or funding?

B5.62 — Road Completion Dates When Purchaser Elects Forest Service Construction
REVIEW: FS failure to provide access in a timely manner could provide relief for delay including cost of holding down payment, performance guarantees, etc.. Follows after concept of extended CTA at FS request (B8.21).

B6.33 — Safety
REVIEW: Need to pursue language for expidited resolution of purchaser saftey concerns.

B6.421 — Temporary Roads, Landings, and Skid Trails
REVIEW: Temporary road needs to be resolved.

B8.12 — Liability for Loss
REVIEW: I think this is resolved, but let's go over it one more time.

B8.21 — Contract Term Adjustment
REVIEW: Need to look into the extended CTA concept. FS has recently published some relief due to delays prior to meeting the down payment volume requirements in the Federal Register. Do we need to follow up on bonding requirements, changing market conditions, etc.?

**B8.211** — **Extraordinary Adjustment.**
REVIEW: This whole concept needs to be reviewed. FTPC has argued that the "pipeline" effect on other sales is significant. Further, how are we to treat purchasers who are non-manufacturers? Do we want to pursue?

**B8.212** — **Market Related Term Adjustment**
WRITE: Forest Service published a proposed rule in the Federal Register on November 6, 1987. Need to draft proposed language.

B8.221 — Conditions for Contract Term Extension
REVIEW: Is proposed wording clear as revised?

B8.3 thru B8.33 — Contract Modification

Modification or Termination for Catastrophe
REVIEW: Look at need to revise language to provide for safety of purchaser; provide for purchaser termination for environmental modification; and moving termination into B9.5.

B9.11 thru B9.121 Performance Guarantee

Blanket Payment Guarantee
REVIEW: Need to check with Financial Security work group.

B9.41 Failure to Cut
REVIEW: Need to review simplification of damage determination. Average bids received or determination by appraisal rather than resale needs to be finalized.

B9.5 thru B9.53 Contract Termination

Other Contract Termination
REVIEW: Need to look at concept of termination by purchaser for environmental modification, etc..

////////////////////////////////////////////////////////////////////

ADDITIONAL AREAS TO BE REVIEWED

1. Glossary terms need to be finalized.

2. Divisions A and AT need to be reviewed.

3. Division C and CT provisions need to be finalized.

4. Training packages for new and experienced sale administrators and engineers.

Steve: I have gone through the draft, one more time. Following are a few of the notes I took. We may want to discuss some of these items next week in addition to the list you sent out.

B3.44 - The reference to B2.132 should be changed to B2.42.

B3.46 - This provision refers to timber that is "damaged or lost" because of Abnormal Delay. I believe this should be changed to "damaged, lost or stolen". I believe that it is our intent to hold the purchaser liable for all loses that result from Abnormal Delay, including theft by firewood cutters. It would be easier to add the word theft at this time, rather than to try to argue later on that lost means or includes theft.

B4.4 - Are the 1st and 3rd sentences in conflict? The 1st sentence states that interest shall be assessed on any payment not received within 15 days. The 3rd sentence states that if payment is not made in 30 days interest shall accrue from date of issuance. I had understood that a bill would be due 15 days after issuance and it would be a breach not to pay it then, but interest would not be charged if it was paid within 30 days. If this is the case, is it correct to say that interest shall be assessed on a payment not received in 15 days?

B5.4, B5.541, B5.546, and B5.8 - We have retained similar language to that used in B5.21 of the 9/73 version when we refer to "estimating procedures used in preparation of Schedule of Items" and "estimating procedures in effect at the time of the adjustment". I think we should add after procedures "and unit prices" or "unit costs", since what we are really trying to say is that we are going to use prices or costs that were effective at a given time and not necessarily just follow a procedure.

B5.546 - This provision deals with pricing and payment for physical changes, design changes and differing site conditions. In the last paragraph it states that we will pay cash for ineffective PC caused by physical change or ordered design change. Was it the intent that we are not going to pay cash for ineffective PC resulting from differing site condition?

B5.62 - The reference to C2.322 should be C2.32.

B6.22 - The reference to C6.221 should be C6.22.

B6.221 - The 2nd and 3rd paragraphs appear to be in conflict. One states that the Forest Service shall make arrangements and the other states that the purchaser shall make arrangements. I think our intent was that we would make the arrangements with the utility companies and the purchaser would notify them before they began work. The provision may need a little rewording.

B6.24 & B6.25 - Both of these provisions state that the Chief may terminate pursuant to B9.53. The reference should probably be to B9.51, under which the CO terminates on behalf of the Chief. I think B9.51 would be better if it said subject to approval of the Chief rather than on behalf of. In any event B9.53 is not correct.

Exhibit 9

B6.24 - The reference in the last paragraph to "tractor roads or skid roads" should be changed to "tractor roads or skid trails" to be consistent with B6.421 and B6.65. Since these terms appear in at least three places and there seems to be some confusion with them, it may be appropriate to define them in the glossary?

B6.411 - There are two problems with this provision on stump heights. The provision, as written, permits occasional high stumps when necessary for safe and efficient conduct of logging and permits them to be left high. This Region would prefer that the purchaser be required to recut these high stumps along with the ones that were not permitted. This could be accomplished by deleting the words "Except for acceptable high stumps stated above," in the 2nd paragraph. It is a common practice in this region to cut high stumps immediately below the road to deck against and we would like the provision to require that these be recut.

The second problem concerns the disposition of the severed portion. In accordance with a previous message I sent out, I don't believe the present language permits our requiring the purchaser to present this material for scaling and I definitely think that it should.

B8.21 - I am concerned about a portion of the language in this provision for contract term adjustment that is the same as in the present 9/73 version. In the 3rd paragraph is a reference to the purchaser experiencing delay in starting scheduled operations or interruption in active operations, either of which stops removal of included timber. There is a broad array of interpretations that have been applied to this language, some of which are difficult to relate back to the words in the contract. There is no mention of prorated term adjustment when one side is shut down and the other is operating. Prorated term adjustment is being granted. Doesn't stop mean stop? We have had situations where hauling was substantially reduced in freezing and thawing weather when hauling was restricted to a few loads early in the morning on some days. We have not granted term adjustment in such situations unless hauling was totally stopped for 10 consecutive days. Do we need to provide for adjustment when operations are substantially reduced, but not stopped?

There is no mention of how or when delays in road construction do or do not stop removal of timber scheduled for removal in future years, yet we have expanded the provision to cover delays from every type of change or adjustment in road construction. In some areas any delay in road construction qualifies for term adjustment. In other places it must be shown that the delay postponed the completion of the road into the period of planned haul. Whether or not such a delay will eventually result in stopping or delaying removal of timber may be impossible to determine at the time the request must be made by the purchaser and the determination made by the CO.

With the opportunity to delay scheduled payments, term adjustment is the greatest plum in the contract for the purchaser to go after. Tying term adjustment for road construction delays to planned logging operations only encourages a purchaser to submit a plan of operations that provides for logging immediately after road construction to assure his term adjustment options are all open. With the emphasis on and the importance of term adjustment I feel strongly that the contract language needs to come a little closer to what we

intend than it does now. I would not be opposed to deleting the tie to scheduled operations, at least for delays during road construction, if it would help clarify when term adjustment is or is not granted.

B8.22 - There are excessive words in the 1st sentence of the 2nd paragraph. It would say the same thing without the words "which amount shall be".

B8.221 - This provision was changed to permit an extension when the purchaser harvested 75% of the area as an option to removing 75% of the estimated volume. This was done to permit extension when the purchaser had logged over 75% of the area but due to an underrun had not reached the volume requirement. The provision, however, went in the opposite direction with the wording "which ever is greater". If the entire sale contained only 75% of the estimated volume that would be greater than 75% of the area and he would have to log the entire sale to qualify, as he does with our present contract. Shouldn't the provision have said which ever is less?

Also the reference to A9 in item (b) should be changed to A10.

B9.121 - The 3rd sentence should be changed as follows: When there is no cutting planned for 30 calendar days or more, **there is no timber cut but not removed**, and payment of current charges has been made...... As presently written the purchaser would not need to have any payment guarantee allocated to the sale when he shut down if he had paid his current charges, even if he left the sale with timber that had been cut but not removed.

B9.2 - The reference in paragraph (a) to PL 95-563 is not consistent with other references to laws in the contract. B1.1, B4.4 and B9.41 refer to the USC number. B3.31 refers the Statute. B4.226 states that it is based upon legal authorization with no cite to the law. We need OGC to get us straightened out on this one.

B9.3 - We could eliminate the confusion about weekends created by the term "30 practical operating days" if we added "including Saturdays, Sundays and holidays", provided that is what we mean.

B9.41 - In paragraph (4) is it necessary to base interest for defaults on a different rate than that used for late payments in B4.4 and extensions in B8.22? B9.41 refers to the Treasury Current Value of Funds Interest Rate, prescribed by the United States Department of the Treasury under Section 11 of the Debt Collection Act of 1982, as ammended (31 U.S.C. 3717). B4.4 and B8.22 refer to the rate prescribed by the United States Department of the Treasury under section 12 of the Contract Disputes Act of 1978, as ammended (41 U.S.C. 601 et seq).

Dave Faulkner

COMMENTS ON NFPA SUMMARY OF 12/4/87 MEETING WITH CHIEF

R[illegible]ew of the documentation of our meeting on December 4, 1987, indicates general agreement of the discussion with the exception of the following:

Contract Termination and Compensation: Initially, the concept of compensating the purchaser for replacement timber, when portions of the sale were deleted for environmental reason, was rejected. However, as the conversation continued it was unclear as to what was agreed to. The revision team discussed this concept and decided to provide both a rate redetermination and an allowance for replacement timber. This was thought to be equitible as the FS was directing the purchaser and the purchaser was not afforded the opportunity to operate the deleted timber.

Extended CTA: George stated that we should cover certain out-of-pocket expenses for move-in/out, if the interuption occurred while operations were in progress. This is in addition to relief on down payments.

Eco-terrorism: We agreed that certain costs would be compensated for as a result of the action. Extra handling was discussed and I believe that we agreed that we would absorb it.

Transfer-in Limits: George said it would be worthwhile for us to look at the limit and see if it's original intent was valid. Our review showed that PC cannot be used for base rate charges and SSF is considered as a part of stumpage. We will continue with our language as proposed.

Exhibit 10

TO TM/DIRECTORS CC D.SPORES
CC S.PAULSON

From: David L. Hessel
Postmark: Dec 07,87 4:55 PM
Status: Previously read
Subject: CONTRACT REVISION-MTG WITH EXEC. GRP OF IND & LEONARD

---

Message:

WE MET FRIDAY WITH INDUSTRY ON 12 AREAS WHERE THE FS AND IND HAVE NOT REACHED RESOLUTION. I THINK WE CAME AWAY WITH A BETTER UNDERSTANDING ON THESE PROBLEM AREAS. STEVE HAS FS COMMITTEE IN WO THIS WEEK TO TRY AND COMPLETE. COMMITTEE MEMBERS WILL BRING HOME DRAFT REVISION FOR YOUR REVIEW OR WE WILL GET COPY TO YOU PRIOR TO FINALIZING TO GO TO FED REG. FOR COMMENT. YOU SHOULD DECIDE ON WHAT KIND OF REVIEW TO CONDUCT AS YOUR TIME FRAME WILL BE ABOUT 30 DAYS. WE NEED THE REGIONS CONSOLIDATED RESPONSE AT THIS POINT.IF WE GET ALOT OF COMMENTS FOR MANY CHANGES I'M NOT SURE HOW WE'LL HANDLE AT THIS POINT BUT WE'L TRY!

Exhibit 11

IDAHO FOREST INDUSTRIES, INC.

December 29, 1987

Mr. David Hessel
Director, Timber Management
USDA - Forest Service
P. O. Box 96090
Washington, DC 20013-6090

Re: Timber Contract Revision

Dear Dave:

This letter is to follow-up our conversation last week concerning the development of the revised Forest Service timber sale contract. I appreciated our candid discussion and apologize for not bringing my concerns to you sooner.

The relationship with the Federal Timber Purchasers Committee and the Washington office staff has been excellent. However, we should continue to strive to improve communication at the working subcommittee level. To assist in strengthening our communications throughout the remainder of the contract revision process, I seek your agreement on the following five points.

1. Provide an opportunity for a few members of my committee to work with Steve in preparing the January contract draft. I understand that Steve is willing to accommodate this request.

2. As soon as possible, provide industry with draft copies of the "C" clauses for its review. We can follow up with our assistance in drafting revisions if necessary.

3. Provide industry adequate time to review the January draft and "C" clauses.

4. Provide industry an opportunity to meet with Steve and a representative of the Chief in an attempt to resolve any remaining issues.

5. If there are some major philosophical differences remaining, we would request a meeting with the Chief's office, to which they have already agreed. By having a representative of the Chief at

P. O. BOX 1030 COEUR D'ALENE IDAHO 83814 A. C. 208-765-1414

received
1/5/88 TM

Exhibit 12

the meeting with Steve, I would hope that this step would be unnecessary.

Through the approach outlined above, I believe that we can reach our goal of a complete, equitable, and fair revised timber sale contract. Please give me a call if you would like to further discuss any of the items I have addressed.

Sincerely,

IDAHO FOREST INDUSTRIES, INC.

Michael C. Welling
Resource Manager

MCW/pab

cc: David Ford

United States Department of Agriculture
Forest Service
Washington Office
12th & Independence SW
P.O. Box 96090
Washington, D.C. 20090-6090

Reply To: 2450

Date: November 1, 1989

Mr. Frank Gladics
National Forest Products Association
1250 Connecticut Ave., Suite 200
Washington, DC 20036

Dear Mr Gladics:

We request that the Federal Timber Purchaser's Committee review the enclosed proposed contract provisions, and return their comments to me by November 17, 1989.

These proposed provisions are:

C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS,
C(T)8.2 - TERMINIATION
C(T)8.3 - CONTRACT MODIFICATION
C(T)9.5 - SETTLEMENT

Proposed provision C(T)6.01 is new, the other three provisions are revisions and will replace existing provisions C(T)8.2 (5/84), C(T)8.211 (8/88), C(T)8.3 (1/86), C(T)9.5 (10/77), and C(T)9.51 (8/88). Proposed-revisions of C(T)8.211 and C(T)9.51 previously submitted to the committee are being dropped.

These provisions are intended for immediate use in the sales released from the injunction in Region 6. We expect these sales to begin being advertised on or about the 15th of November, therefore, your quick review is critical.

Sincerely;

/s/ Dave Hessel, for

F. Dale Robertson,
Chief.

Enclosures

Exhibit 13

C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS. (Proposed) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent unless environmental damage; or

(b) To comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale.

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be a Contract Term Adjustment pursuant to B(T)8.21. It is further agreed that the United States specifically intends to limit its waiver of sovereign immunity to the remedy for an interruption or delay of operations provided herein.

WO-2451-C(T)6.01
(proposed)

INSTRUCTIONS: Include in all new contracts and in existing contracts when extended.

Contracting Officer ... consult ... before

C(T)8.2 - TERMINATION. (PROPOSED) The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (1) to comply with a court order, regardless of whether this sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this sale; or (2) upon a determination that Purchaser's Operations would:

(a) cause ~~unacceptable~~ serious environmental damage;

(b) be inconsistant with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(c) cause unacceptable damage to cultural resources pursuant to C(T)6.24#;

(d) cause damage to habitat of sensitive, threatened, and endangered species pursuant to C(T)6.25#.

Damages due Purchaser for termination under this provision shall be determined pursuant to C(T)9.5.

WO-2451-C(T)8.2
(Proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of contract extension or upon mutual agreement. Include C(T)9.5 as a companion provision. Do not list B(T)8.2 as inapplicable.

C(T)8.3 - CONTRACT MODIFICATION. (proposed) This contract shall be modified, in whole or in part, in writing by the Contracting Officer:

(a) When necessary to comply with a court order, regardless of whether this contract is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale;

(b) upon determination of the Contracting Officer, in his/her sole discretion, that Purchaser's Operations would:

(1) cause ~~unacceptable~~ serious environmental damage;

(2) be inconsistant with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended.

(3) cause unacceptable damage to cultural resources pursuant to C(T)6.24#;

(4) cause damage to habitat of sensitive, threatened and endangered species pursuant to C(T)6.25#;

(c) upon Purchaser's agreement, to revise A(T)9 and A(T)10 to add roads not listed in A(T)9 as necessary to facilitate reconstruction of existing Forest Service roads or accepted Specified Roads including appurtenances thereto. Roads or road segments to be added must meet the follwing conditions: a) the required work must be on an actual hauling route used by, or scheduled for use by Purchaser, b) the required work must be the result of an unforeseen cause, such as slides, slumps, washouts, subgrade conditions or similar causes, and c) the work must be necessary for economic, safe and practical use of the road. Additions will not be made when reconstruction is made necessary by Purchaser's actions.

Modifications pursuant to this provision shall be limited to requirements with which the Contracting Officer, in his/her sole discretion, determines that Purchaser can reasonable comply.

Modifications under (a) and (b) shall receive compensating adjustments where appropriate pursuant to C(T)9.5.

Modification under (c) shall be made in accordance with B(T)5.2. Increases in Purchaser Credit Limit shall be limited to $20,000 or less. Cost adjustment for increase in Purchaser Credit Limit for added roads shall be calculated in accordance with C(T)5.221#, C(T)5.251#, C(T)5.253 and C(T)5.254.

WO-2451-C(T)8.3
(proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of extension, or upon mutual agreement. Include C(T)9.5 as a companion provision. Do not list B(T)8.3 as inapplicable.

C(T)9.5 - SETTLEMENT. (Proposed) If this contract is terminated pursuant to C(T)8.2, Purchaser agrees that its sole and exclusive remedy shall be the sum of (1) the value of unused Effective Purchaser Credit earned on this sale; (2) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area; (3) the out-of-pocket expenses involved in acquiring and holding this contract; and (4) one half the difference between (a) Current Contract Rates for remaining uncut volume, and (b) rates paid for comparable timber, if higher, on the same National Forest during the preceding 6-month period multiplied times the remaining uncut volume, which Purchaser had to replace. Comparable timber is timber of similar size and quality ~~with~~ on similar topography and access. Cost estimates for items listed in (2) shall be based upon Forest Service appraisal methods in use on the date contract is terminated. Out-of-pocket expenses in (3) do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify actual expenditures. No out-of-pocket costs shall be allowed for expenditures which cannot be verified to the satisfaction of the Contracting Officer.

Purchaser agrees that if modification of this contract pursuant to C(T)8.3 results in the elimination of 10 percent of the estimated volume of Included Timber stated in A2, or more than one million board feet or equivalent, Purchaser may request a rate redetermination under C(T)3.312 for remaining volume. Rates so redetermined shall apply to timber removed from Sale Area after the effective date of the modification. Purchaser's sole and exclusive remedy in event of a modification under this provision shall be the aforementioned rate redetermination.

In the event of termination or modification of this contract by Forest Service, Purchaser agrees that the liability of the United States shall be limited to the express remedies contained within this provision. It is further agreed that the United States specifically intends to limit its waiver of sovereign immunity to the express provisions contained herein.

WO-2451-C(T)9.5
(Proposed)

INSTRUCTIONS: Include in all new contracts, in existing contracts at time of contract extension or upon mutual agreement. Include C(T)8.2 and C(T)8.3 as companion provisions. Do not list B(T)9.5 as inapplicable.

NFPA

July 23, 1990

Mr. Alan C. Raul
General Council
Department of Agriculture
14th and Independence Ave, SW
Room 234-W
Washington, DC 20250

R.E. U.S. Forest Service Timber Sale Contract Provision C(T)9.3 - Breach (6/90)

Dear Mr. Raul:

I am writing on behalf of the National Forest Products Association's Federal Timber Purchasers Committee concerning a timber sale contract provision recently implemented by the United States Forest Service. We have requested the Chief of the Forest Service withdraw C-provisions C(T)9.3 - Breach because it does not comply with existing regulation. We would like you to review this situation and advise the Chief of the Forest Service to comply with existing regulation, as well as the Administrative Procedures Act.

National Forest Products Association represents a large number of companies who are partially or wholly dependant on national forests for their supply of timber. The Federal Timber Purchasers Committee is a committee of timber purchasers, consisting of both NFPA members and non-NFPA members, which meet with the Forest Service on a regular basis to discuss issues related to the harvest of timber from National Forest Lands. The Federal Timber Purchasers Committee is the nationally recognized group with whom the Forest Service works to develop timber sale contract specifications.

On June 21, 1990 the Forest Service implemented C(T)9.3 Breach. As the attached letter of protest to Chief F. Dale Robertson explains, we believe that the Agency violated the Administrative Procedure Act by implementing a timber sale contract provision which violates existing regulation.

Exhibit 14

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

The issue, and our concern, revolves around the wording in 36 CFR 223.116 (b) and the first sentence of the revised C-Provision C(T)9.3 -Breach (6.90).

36 CFR 223.116 (b) specifically directs:

"Cancellation will be by the Chief, Forest Service. Authority to cancel contracts under paragraph (a)(1) through (4) of this section may be delegated to Regional Foresters for sales within their authorization. All contract cancellations under paragraph (a)(5) of this section shall be by the Chief, Forest Service....".

The new provision delegates the authority to cancel timber sale contracts to the Contracting Officers, with the concurrence of the Regional Forester. NFPA does not believe that requiring the Regional Forester to "concur" with a Contracting Officers opinion fulfills the requirements of 36 CFR 223.116 (b). Furthermore, we object to the Agency adopting this provision over our continued protest.

The Forest Service Timber Sale contract is supposed to be a bi-lateral contract which is agreed upon by the Forest Service and the timber industry. NFPA's Federal Timber Purchasers Committee noted our concerns with C(T)9.3 on a number of occasions. We philosophically disagree with delegating authority to terminate a timber sale contract to the Contracting Officer level and we have continually expressed that opinion. Further, we even suggested that the Forest Service should amend 36 CFR 223.116 (a) & (b) to reflect their wants and needs before implementing C(T)9.3-Breach (6/90).

We hope that you will review this situation and advise the Forest Service to follow standard governmental procedures when they wish to modify regulation. NFPA and the timber purchasers whom we represent see an emerging pattern of flagrant disregard for the willing buyer/willing seller concept so important to the bi-lateral nature of the Forest Service Timber Sale Contract. The Forest Service has, on an increasing basis, disregarded the timber industry's wants and needs when developing new or revised timber sale contract provisions. This results in a timber sale contract that is "dictated" to the purchasers rather than one which is "mutually agreed upon". Perhaps we can not expect the Forest Service to take the time to craft mutually agreeable C-provisions on all issues, but we do have the right to expect the Agency to follow prescribed procedures.

Thank you for your interest on this issue and we are looking forward to your comments on our concerns. If you have any questions please contact me at 202/463-2752.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

Attachments
FG/jw

NFPA

July 23, 1990

Mr. F. Dale Robertson
Chief
Forest Service - USDA
201 14th Street at Independence Ave., SW
Washington, DC 20250

Dear Chief Robertson:

As Chairman of the Federal Timber Purchasers Committee, I am writing to acknowledge the implementation of several new C-provisions and to remind you of our previous concerns related to C(T)4.220#, C(T)6.0, C(T)6.01, and C(T)9.3.

The Federal Timber Purchasers Committee also requests that you withdraw C(T)9.3 Breach (6/90) from use until the Agency meets the requirements of the Administrative Procedures Act. We do not believe that this provision conforms to current regulations and believe that implementation of this provision has the effect of changing regulation without public comment. By implementing C(T)9.3 Breach (6/90) without developing new regulations, the Forest Service has violated requirements of the Administrative Procedures Act.

I. C(T)9.3 Breach (6/90) Comments

The provision authorizes the Contracting Officer to terminate a contract, with the concurrence of the Regional Forester. We do not believe that current regulations allow the Agency to delegate the authority to terminate the contract to the Contracting Officer. 36 CFR 223.116 (b) specifically limits authority to terminate a contract to the Chief and to the Regional Forester (see attached copy of regulation). Further, we question whether the Chief could delegate this authority to the Regional Foresters for contracts that do not fall within the Regional Foresters authority to sell the contract.

We have pointed out this concern to your staff on a number of occasions (see attached letters) and are extremely upset that the Agency has chosen to implement this provision over our protests. Due to this, we have forwarded a copy of this letter with attachments to General Council Alan C. Raul.

II. **C(T)6.01 - Interruption or Delay of Operations (6/90) Comments**

We acknowledge implementation of this provision, although we do not fully support its use due to inadequacies in the settlement portions of the provision.

This provision limits compensation for delays to Contract Term Adjustment (CTA) pursuant to B(T)8.21 if delay is less than 30 days and to CTA plus out of pocket expenses if the number of days of delay exceeds more than 30 days. There are a number of concerns that should be addressed, as follows:

1. In the event of delay of less than 30 days CTA is not sufficient compensation. In all likelihood an operator would have to move his equipment off site to another sale in order to continue operating. The purchaser would also have the expense of moving equipment back onto the sale when operations are allowed again. Limiting settlement in this situation to only CTA is inequitable.

2. Delays outside the Normal Operating Season are not covered in the settlement portion of this provision and that is unfair. Most timber sales currently under contract have short contract lengths and purchasers are forced to operate the timber sale outside of the normal operating season to survive economically. Compensation should be awarded to any purchaser who must cease actual woods operations no mater what time of year the purchaser's operations are delayed.

3. In the event this provision is invoked in a large scale fashion, (most timber sales on a forest) we do not believe the Agency should be allowed to walk away from its commitments. Clearly, a wide spread shutdown should require the Agency to compensate the purchaser for the cost of the replacement volume so that logging crews have some volume to sustain their operations until Forest Service sales become operable.

III. **C(T)6.0 Operations (6/90) Comments**

We acknowledge implementation of this provision.

IV. **C(T)4.220# (Optional)**

We acknowledge implementation of this provision. We still have the concerns articulated in our Dec. 6, 1989 letter to Mr. Dave Hessel. Additionally, we would like to know what mechanism has been set-up with the BLM to obtain information about defaulted BLM timber sale contracts.

V. **Conclusion**

We repeatedly opposed your staff's proposal to delegate authority to terminate timber sale contacts to the Contracting Officer on a philosophical basis. With the Agency's June 21st decision to implement C(T)9.3, NFPA is now forced to also opposed the provision on a procedural basis.

We expect the Forest Service will withdraw C(T)9.3 and begin work to develop a proposal that will modify the current regulations to reflect the Agencies desires. We request that you respond to this protest by letting us know, as soon as possible, what course of action the Agency expects to take on this matter.

Sincerely,

Mike Welling

Mike Wellling
Chairman
Federal Timber Purchasers Committee

List of Attachments:

1. 6/21/90 letter to Regional Foresters - Additional Downpayments
2. Undated letter to Regional Foresters - C(T)6.0, 6.01, 9.3
3. 36 CRF 223.116 Cancellation
4. 12/4/89 NFPA letter to Hessel - Limited liability Comments
5. 1/5/90 NFPA letter to Hessel - Purchaser Integrity Comments
6. 5/1/90 NFPA letter to Hessel - Limited Liability and Purchasers Integrity Comments

MW/jw
cc: General Council Alan C. Raul

United States Department of Agriculture
Forest Service
Washington Office
14th & Independence SW
P.O. Box 96090
Washington, DC 20090-6090

Reply to: 2430-2

Date: June 21, 1990

Subject: Additional Downpayment Requirement

To: Regional Foresters

Federal Regulations at 36 CFR 223.49 Downpayment have been amended to include requirements for additional downpayment when purchasers or their affiliates default timber sale contract(s). Title 36 CFR 223.49(e) and (g) specify conditions for the additional downpayment. The so called "double" downpayment provisions requires a minimum downpayment of 20 percent of the total advertised value of the sale plus 40 percent of the total bid premium. A purchaser subject to the additional downpayment requirements cannot apply the amount deposited as downpayment to other uses until: on scaled sales, the estimated value of the unscaled timber is equal to or less than the amount of the downpayment; or, on tree measurement sales, the estimated value remaining to be cut and removed as shown on the statement of account is equal to or less than the amount of the downpayment.

Purchasers who meet the following circumstances are required to provide the additional downpayment:

(1) Purchasers or its affiliate after September 29, 1988, has failed to perform in accordance with the terms of a Forest Service or Bureau of Land Management timber sale contract which results in notification by the Contracting Officer that a contract has expired uncompleted or is terminated for cause; and

(2) The estimated value of unscaled timber on scaled sales or the estimated value of timber outstanding on tree measurement sales included in those terminated or expired contracts exceeds $100,000, and

(3) Unpaid damages claimed by the Government remain outstanding prior to award of a new sale at issue and corrective action has not been taken to avoid future deficit performance.

This amount of the additional downpayment in the current bidding situation and the additional length of retention should deter most purchasers from defaulting sales. Close coordination between Forests and Regions will need to be maintained to insure that sales defaulted after September 29, 1988, are properly and timely identified.

The following modification of the text for the timber sale prospectus, item 15 Award, notifying purchasers of the additional downpayment requirement is provided for immediate use:

C4.228# (Option 1)- DOWNPAYMENT. (6/98) Notwithstanding B4.22, Purchaser agrees to make a downpayment in the amount of S<>. Only cash or Effective Purchaser Credit earned on this sale or transferred to this contract pursuant to <> may be used to meet this requirement. No other forms of payment are acceptable in meeting this requirement. This payment must be made at the time the contract is executed and returned by Purchaser, and may not be applied towards payments under B4.8, transferred to other sales or refunded, until the estimated value of the unscaled timber is equal to or less than the amount of the downpayment.

Purchaser's failure to make the downpayment at the time the contract is executed and returned by Purchaser in accordance with C9.41 constitutes breach of this contract. As Purchaser's only remedy, Purchaser shall have 3-calendar days for Forest Service to receive the downpayment at the Forest Service designated office. B9.3 does not apply to C4.228# (Option 1). Purchaser shall pay interest on the unpaid downpayment for the period within the 3-calendar days in which the downpayment is late. The rate of interest shall be <> percent per annum. Failure to make the downpayment within 3-calendar days of the time the executed contract is returned by Purchaser, shall constitute repudiation of this contract. In such event, Purchaser and Forest Service agree that Purchaser's bid guarantee shall be retained by Forest Service as liquidated damages.

If a subsequent final determination is made that this contract should not have been included under the increased downpayment classification, the downpayment shall be revised and applied in accordance with 36 CFR 223.49(f).

INSTRUCTIONS: Substitute for C4.228# prior to award of new contracts where it has been determined to award the contract contingent upon the double downpayment requirements in 36 CFR 223.49 (e) through (h).

Enter the appropriate amount of double downpayment as determined under the rules in the above referenced CFR.

In the second blank, enter the number of the provision dealing with transfer of Purchaser Credit (C4.211# or C4.211# (Option 1).

In the third blank, enter the rate of interest as prescribed by the U.S. Department of Treasury and Rate Renegotiation Board/Prompt Payment (CDA) published in the Federal Register that is effective on the bid date.

If section 223.49(f) should apply, TSA shall be corrected to delete the requirements of the double downpayment and return to the normal downpayment in effect at bid date. The release gate shall also be changed to 25 percent of volume scaled and paid for.

Reply To: 2450

Date:

al Foresters, ALL

llowing special "C(T)" timber sale contract provisions are approved for ate use.

0 - Operations. (6/90) This revises and replaces the present provision (3/74).

01 - Interruption or Delay of Operations. (6/90) This new provision is included in all new contracts. Contracting Officers are reminded to the costs and benefits and seek appropriate counsel before using this ion. Resulting costs incurred by the Purchaser must be paid from riated project funds, there are no special or reserved accounts set up is purpose.

3 - Breach. (6/90) This provision revises and expands the present C9.3 provision and is new to the 2400-6T contract.

le Robertson

sures:

PA and other Industry Associations

to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C(T)8.3 or termination pursuant to C(T)8.2.;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to B(T)8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B(T)8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

WO-C(T)6.01
(6/90)

INSTRUCTIONS: Include in all new contracts and in existing contracts when extended. Contracting Officer shall seek the advice and council of the Regional Attorney and the Regional Forester before interrupting or delaying operations under this provision. (Ref. FSM 2453.24 and FSH 2409.15, Ch. 33.2)

:29, Dec. 17, 1979. Redesignated at .. Jan. 23, 1984]

Proof of bidder's financial abili-

necessary in the judgment of oving officer, any applicant or nay be required to submit, pense is incurred in acting on lication or before award is response to a bid a satisfac- wing of financial ability and er may be required to show has or can obtain equipment plies suitable for logging the und for meeting the resource on provisions of the contract.

1301, Pub. L. 95-465)

029, Dec. 17, 1979. Redesignated at 31, Jan. 23, 1984]

ONTRACT ADMINISTRATION

Delegation to regional forester.

Chief, Forest Service, after ap- of conditions of sale, may au- Regional Foresters formally to timber sale contracts and re- apers in sales exceeding the which the Regional Forester n authorized to sell.

Administration of contracts in gnated disaster areas.

section is to implement the pro- of section 242 (a), (b), and (c) Disaster Relief Act of 1970 (84 956) which relate to contracts sale of National Forest timber nection with areas damaged by disaster as designated by the nt pursuant to the Act.

Where an existing contract for le of National Forest timber not provide relief from major al change not due to purchaser's ence prior to approval of con- on of any section of specified r other specified development and, as a result of a major dis- in a designated area a major al change results in additional uction work by the purchaser in ction with such a road or facili- United States shall bear such sed construction cost if, as deter- by the Chief, Forest Service, stimated cost is (1) more than $1,000 for sales under 1 million board feet, or (2) more than $1 per thousand board feet for sales of 1 to 3 million board feet, or (3) more than $3,000 for sales over 3 million board feet.

(b) Where the Chief, Forest Service, determines that damages are so great that restoration, reconstruction, or construction is not practical under the cost-sharing arrangement in paragraph (a) of this section, he may allow cancellation of the contract notwithstanding provisions therein or in § 223.116.

(c) The Chief, Forest Service, is authorized to reduce to 7 days the minimum time to advertise the sale of National Forest timber whenever he determines that (1) the sale of such timber will assist in the construction of any area of a State damaged by a major disaster, (2) the sale of such timber will assist in sustaining the economy of such area, or (3) the sale of such timber is necessary to salvage the value of timber damaged in such major disaster or to protect undamaged timber.

(d) Any request for relief under paragraph (a) or (b) of this section shall be made in writing to the Forest Supervisor having administrative responsibility for the land involved.

(Sec. 242 (a), (b), and (c), 84 Stat. 1756, 42 U.S.C. 4461)

**§ 223.112 Modification of contracts.**

Timber sale contracts may be modified only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States. Modifications may be made by the officer approving the sale, by his successor, or by his superior, except as provided in § 223.110.

**§ 223.113 Modification to prevent environmental damage or to conform to forest plans.**

Timber sale contracts may be modified to prevent environmental damage or to make them consistent with guidelines and standards developed to implement section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended, and with land management plans adopted thereunder. Modifications shall be subject to the purchaser's valid existing rights. Rates of payment for timber shall be adjusted to reflect changes, if any, in the value of the timber, subject to existing contract limitations on rates.

**§ 223.114 Acquisition by third party.**

No agreement permitting a third party to acquire the rights of a purchaser under a timber sale contract may be recognized and approved by the Forest Service except in writing, signed by the officer approving the sale, his successor, or superior officer. Such approval shall not relieve the purchaser of his responsibilities or liabilities under the timber sale contract and may be given only if (a) the third party is acceptable to the Forest Service as a purchaser of timber under the conditions and requirements then in effect for similar timber sales and assumes in writing all of the obligations to the Forest Service under the terms of the timber sale contract as to the uncompleted portion thereof, or (b) the rights are acquired in trust as security and subject to such conditions as may be necessary for the protection of the public interests.

**§ 223.115 Contract extensions.**

The term of any contract or permit shall not be extended unless the approving officer finds:

(a) That the purchaser has diligently performed in accordance with contract provisions and an approved plan of operation; or

(b) That the substantial overriding public interest justifies the extension.

**§ 223.116 Cancellation.**

(a) Timber sale contracts and permits may be canceled:

(1) For serious or continued violation of their terms.

(2) Upon application, or with the consent of the purchaser, when such action is of advantage to the United States or not prejudicial to its interests.

(3) Upon application of the purchaser if the value of the timber remaining to be cut is diminished materially because of catastrophic damage caused by forces beyond the control of the purchaser resulting in (i) physical

change in the sale area or access to it, or (ii) damage to timber remaining to be cut.

(4) For conviction of violation of criminal statutes or, following final agency or judicial determination, of violation of civil standards, orders, permits, or others regulations for the protection of environmental quality issued by a Federal agency, State agency, or political subdivision thereof, in the conduct of operations thereunder, on National Forest System land, unless compliance with such laws or regulations would preclude performance of other contractual requirements.

(5) Upon determination by the Chief, Forest Service, that operations thereunder would result in serious environmental degradation or resource damage and with reasonable compensation to the purchaser for unrecovered costs incurred under the contract and the difference between the current contract value and the average value of comparable National Forest timber sold during the preceding 6-month period.

(b) Cancellation will be by the Chief, Forest Service. Authority to cancel contracts under paragraph (a) (1) through (4) of this section may be delegated to Regional Foresters for sales within their authorization. All contract cancellations under paragraph (a)(5) of this section shall be by the Chief, Forest Service, whose decision shall be the final agency decision.

[42 FR 28252, June 2, 1977, as amended at 48 FR 23819, May 27, 1983. Redesignated at 49 FR 2761, Jan. 23, 1984]

**§ 223.117 Administration of cooperative or Federal sustained yield units.**

With respect to sustained yield units established pursuant to the provisions of the Act of March 29, 1944 (58 Stat. 132; 16 U.S.C. 583-583i), the Chief, Forest Service, with authority to delegate to other officers and employees of the Forest Service:

(a) Shall provide that National Forest timber in any sustained yield unit shall be available in sufficient amounts to meet the needs of bona fide farmers, settlers, miners, residents and prospectors for minerals for personal and domestic use as provided by law and by regulation.

(b) May offer for sale to cooperators, without competition but at not less than appraised value, timber on National Forest lands within an approved cooperative sustained yield unit; or, if the approved sustained yield unit consists entirely of federally owned or administered forest land and if necessary for the maintenance of a stable community or communities, may offer National Forest timber for sale to responsible operators within such community or communities, at not less than appraised value but without competition or with competition restricted to responsible operators who will manufacture the timber to at least a stated degree within the community or communities to be maintained. Each such sale which involves more than $500 in stumpage value may be made only after notice has been given in advance by such means as may be deemed effective in informing the public of the proposed action, including in any event, publication, once weekly for four consecutive weeks and with additional insertions if needed, in one or more newspapers of general circulation in the vicinity of the place where the timber is located, of a notice of the proposed sale stating at least:

(1) The location, estimated quantity and appraised value of the timber to be cut;

(2) The name and address of the proposed purchaser or those of the operators among whom bidding is to be restricted;

(3) The time and place of a public advisory hearing on the proposed sale, to be held not earlier than 30 days after the first publication of said notice, if requested by the State or county where the timber is located or by any other person deemed to have a reasonable interest in the proposed sale or in its terms; and

(4) The title and address of the officer of the Forest Service to whom any request for such hearing should be made.

Such requests need be considered only if received at the place designated in the notice not later than 15 days after the first publication of such notice. If



a public advisory hearing is to be he notice of it shall be published in t same newspaper or newspapers as t original notice, stating the place whe it will be held and the time, whi shall not be earlier than 10 days aft the first publication of the said not of hearing, and shall appear once ea week, but not for more than four s cessive weeks in any event, until t date set for the hearing. Any su hearing shall be conducted by t Chief or by any officer designated him as his representative, except th if the amount of the proposed sale not in excess of that which the R gional Forester has been authorized sell without prior approval of t Chief the hearing may be held by t Regional Forester concerned or by representative and decision may be the Regional Forester. At any su hearing, opportunity shall be given those having a reasonable interest make oral statements or to file writt statements discussing the advanta and disadvantages of the propo sale; and the officer holding the he ing may, in his discretion, permit filing of such statements within a r sonable period after the close of hearing to become part of the rec for consideration before a decision made.

(c) Shall keep available for public spection, (1) During the life of sustained yield unit, the minutes other record of the hearing held the establishment thereof, and the termination of action taken follow the hearing including any modif tion of the proposals as submitted the hearing; and (2) during the life any cooperative agreement for coo nated management the similar rec of the hearings and actions de mined upon; and (3) during the life any sustained yield unit the sim record of any public hearing wh may be held on a sale made with competition or with restricted con tition and the action determined up Such records of any case may be k in any office of the Forest Service ignated by the Chief as being suit and convenient of access for prob interested persons.

(d) Shall make provision, in any tract for the purchase of timber w

NFPA

December 4, 1989

Mr. David Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, DC 20090-6090

RE: Comments on proposed limited liability provisions C(T)6.01, C(T)8.2, C(T)8.3, and C(T)9.5

Dear Dave:

We appreciate the opportunity we had to discuss the proposed limited liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did. However, we continue to be extremely displeased with the limited liability provisions.

The November 22nd proposal fails to respond to our key concerns. Thus, we cannot support implementation of the limited liability provisions at this time. We do however believe equitable limited liability provisions can be developed. The following comments are submitted in hopes of reaching such a solution.

I. PRINCIPAL OBJECTIONS

A. Shifting 50% of Government's Liability for Replacement Costs of Settlement to the Purchaser is Not Appropriate.

It is extremely frustrating to our members, given the time and energy they have invested on this issue, that the Forest Service persists in its belief that the purchaser should shoulder partial liability for agency actions. The agency seems to be concerned that it will be forced to terminate some timber sale contracts due to court orders. Realistically, the courts will only rule against the agency in those cases where it has failed to meet current NEPA requirements. The Forest Service must accept responsibility for its actions. The shift of liability, to the purchaser, brings a number of contract law principals into questions.

Your arguments that other government contracts provide only for out-of-pocket expenses, ignores the concept of just compensation. Other government contracts include a wide range of

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

compensation for government actions, or inactions. Many contractors, involved in agency service contracts, report that the Forest Service pays on almost all contractor claims. The agency's reliance on one small piece of a much larger compensation package is misguided. The exculpatory nature of the November 22nd proposal, if implemented, will imperil the contractual agreements timber purchasers and the Forest Service have developed over the years. A purchaser's responsibility under the contract is to complete the contract in a timely manner, within the contract guidelines (provisions). The purchaser's responsibility should not include insuring the agency has done an adequate job on NEPA documentation.

B. It is an Inappropriate Policy for the Forest Service to Develop Contract Provisions that Obviate the Agency's Responsibility to Produce Strong Environmental Documents.

As proposed, these provision afford the agency guaranteed protection from liability for its work. Knowing that the government is protected from a timber purchaser's claim does little to encourage the attention to detail that NEPA documentation deserves. Insulating the agency from liability sends the message, that NEPA is <u>not</u> important. These provisions will discourage the attention to detail, and thoughtful preparation, required to meet NEPA standards.

C. Expanding the Contracting Officer's Authority to Unilaterally Modify the Timber Sale Contract Violates Regulation and Imperils the Willing Buyer/Willing Seller Relationship.

In practice a unilateral modification is nothing less than a partial termination of the contract. 36 CFR §223.166 clearly delegates authority to terminate contracts for environmental reasons, to the Chief; or to Regional Foresters for: (1) serious or continued violation of a contract terms; (2) application by, or with consent, of the purchaser; (3) in the event of catastrophic damage; or (4) for conviction of violation of criminal statutes or, following final agency or judicial determination of violation of civil standards, orders, permits, or other regulations for the protection of environmental quality. As proposed, these provisions unacceptably re-delegate this authority.

The addition of caveats and reminders does not alter the implications of C(T)8.3. As written, it delegates authority to unilaterally modify a timber sale contract to the Contracting Officer (CO). The inclusion of these provisions so changes the buyer/seller relationship, that purchasers will no longer be able to consider themselves "willing buyers".

D. The Forest Service Should Not Expand a Court's Decision Beyond The Sale(s) Named in Such a Decision.

Decisions concerning the scope of an individual court order rests solely in the judicial branch of government, not the executive branch. Stay orders are serious and the courts need to understand the impacts of their decisions. Many times the scope of a stay depends on its expected impact. Contract language that allows the Forest Service to expand the impact of court orders, after the court has ruled: (1) usurps the court's authority; (2) places the agency in the position of having to make arbitrary and capricious decisions; and (3) interjects an opened end, and unacceptable, risk to the timber purchaser.

In the past the Forest Service and timber purchasers have dealt with court decisions by developing individual C-provisions that address the specific issue(s) involved. All court actions deserve this carefully reasoned approach. Since the timber sale contract is mutually developed by the buyer and the seller, we expect that industry will continue to be afforded the opportunity to addresses new issues on an individual basis.

II. SPECIFIC TECHNICAL CONCERNS

These are additional concerns related to the specific provisions that require attention. Many of our above mentioned principal objections stem from more than one provision and are not readdressed in this portion of our response.

A. C(T)6.01 - INTERRUPTION OR DELAY OF OPERATIONS

1. Section (a) of this provision is addressed in other parts of the contract. Contracting Officer's already have sufficient authority to interrupt operations under B9.3 - BREACH when used in conjunction with other existing environmental protection provisions. This section of the provision is redundant and should be dropped.

2. The financial impacts of a delay are triggered as soon as that interruption or delay occurs. The magnitude of the impact grows in relation to the length of the delay. Purchasers should not have to suffer a 30 day waiting period before the delay is of sufficient magnitude to warrant a damage claim. We recommend removal of the 30 day trigger.

Further, as we have commented in the past, the addition of yet another trigger: (1) clouds the meaning of other provisions, such as the 10 day time limit for CTA; (2) adds

to the administrative work load of the Contracting Officer; and (3) lessens the seriousness of agency caused delays.

B. C(T)8.2 - TERMINATION

1. Although we did not comment on this point in our previous discussions, we believe some clarification on "consistency with the land management plans" might be helpful. We would suggest, in sections (b) of C(T)8.2 and section (d)(2) of C(T)8.3, that the word "inconsistent" be preceded by the word "materially".

2. We feel Forest Service Manual language should not be referenced in the contract. Manuals (FSM) are protected from public input, formal review, and are now completely protection under the current appeals process. In short, changes to Forest Service manuals and handbooks are to easily made and purchasers no longer have the ability to effect meaningful comments on proposed changes. The agency should reference; (1) other contract provisions; (2) federal law or regulation; or (3) other states laws or regulation. We believed that your staff agreed to make reference to State Designated Sensitive Species in C8.2 and 8.3 and do not understand why this can't be included in the proposal. We still believe sensitive species designation by individual states to be the best reference to use. References to C6.24# and C6.25# are more preferable than the latest proposal.

C. C(T)8.3 - CONTRACT MODIFICATION

We continue to be confused with the sections of this provision that deal with changes to A(T)9 and A(T)10. Can the parties to the contract agree to add new specified roads to the contract to facilitate a modification? Portions of the proposed provision seem to key on changes only needed to "necessary to facilitate reconstruction".

During previous discussions our members questioned the $20,000 limit for increases in purchaser credit. We suggested that the original Available Purchaser Credit Limit be used as an upper limit. While increasing the limit to $50,000 is a positive step, we continue to believe the provision should allow for the maximum amount of flexibility possible.

Finally, the existing contract also allows for modifications to other portions of the timber sale contract. Is it the intent of the agency to limit modifications to only the B(T)5.0 Transportation Facilities section of the

contract? Existing language, in the last section of C(T)8.3, also addressed changes in B2.0 Timber Specifications and B6.0 Operations. We trust this oversight will be corrected.

D. C(T)9.5 - SETTLEMENT

We have concerns with several different sections of this provisions, as follows:

1. Lead Paragraph - Rather than referencing C(T)8.2 in the opening sentence, the provision should say: "if terminated in whole, or in part". This adds clarity and leaves no doubt in the readers mind concerning partial terminations.

2. Section (4) (b) - Portions of this section need some clarification. History shows that "the preceding 6-month period" sometimes leads to confusion. Is it 6 months from the point of termination, or 6 months from when the operations where first delayed? If no timber is sold in the preceding 6 months on the effected Forest, do we relay on a neighboring forest? This section needs additional clarification.

3. New Section - The section on determination of uncut volume is confusing. If one subtracts A(T)2 volume from the Volume Cut and Removed on an uncompleted timber sale, theoretically one would end up with a negative number. We suggest the following wording:

> "In determining remaining uncut volume, the parties to the contract must first mutual agree on the remaining A(T)2 volume".

We believe, particularly in cases where the original AT2 volume has shown to be over estimated, that the purchaser and the Forest Service must begin this computation with a common agreement on remaining A(T)2 volume.

4. Section (4)(b) new wording - While wording on logging cost characteristics represents some improvement, many of our members would prefer to see timber value more clearly articulated in the provision. Although logging characteristics are included in the RV appraisal system, they may not be in many of the TEA appraisal systems. We suggest the following wording:

> "Comparable timber is timber with generally similar species composition, size, quality, value, and logging cost characteristics,"

## III. CONCLUSION

We hope you understand our frustration in dealing with these issues and look forward to working with your staff to ensure these proposed provisions are mutually acceptable to the different parties to the contract. Just as purchaser's don't expect the agency to log their timber sales, we hope you will not expect purchasers to accept the government's liability to complete NEPA documents. If you have any questions, I would be happy to meet with you at your earliest convenience.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

NFPA

January 5, 1990

Dave Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, D.C. 20090-6090

RE: Proposed Purchaser Integrity Provision C(T)6.0 and C(T)9.3

Dear Dave:

In response to your November 1 proposed purchaser integrity provisions, the Federal Timber Purchasers Committee submits the following comments. Our members appreciated the opportunity to discuss these provisions with you and your staff in Scottsdale. As we told you at that meeting, while the concept of these provisions is acceptable, there are a number of concerns that need to be addressed.

I. POLICY ISSUES

A. The Time to Deal With Unscrupulous Operators is Before the Contract is Awarded.

The time to weed out bad operators is prior to the bid opening. Once a sale is let, the purchaser's performance should be judged on a sale by sale basis. The Agency has worked very hard through the financial security initiative to encourage the timely harvest of timber sales. This proposal could result in unnecessary terminations that would heavily impact the Agency, as well as the purchaser.

B. The Policy Needs to Differentiate Between: (1) a Purchaser's Actions and Those of His/Her Employees; and (2) Whether Those Actions are Directly Related to Timber Sale Operations.

We understand and support the Agency's desire to deal with the unscrupulous operators. Conviction of some offenses must be considered as being directly related each and every business transaction a person may make.

Provided due process is followed, we support the Agency in its efforts to avoid doing business with dishonest operators. However, termination of an entire portfolio seems excessive in relationship to some of the offenses listed in C(T)9.3. For instance, is it reasonable to terminate an entire portfolio if a purchaser has been found to have rutted a road during his/her timber sale operations? We believe overzealous enforcement of these provisions could result in such an action. Implementation of these provisions by Contracting Officers will be closely monitored by our members. We trust we will continue to be able to work with your staff to ensure these provisions are implemented in a reasonable fashion.

Additionally, there is a need for a strong linkage between an operator's behavior and his/her timber sale operations. As written, a Contracting Officer could terminate all contracts in a purchasers portfolio if a subcontractor's employee is convicted of DWI or even hunting without a licence. Some of the activities sanctioned in the proposed provisions (subsections (b) of C(T)9.3 and (c) of C(T)6.0) are very broad when viewed in the context of a subcontractor's employees or affiliates.

Our members expect to be held responsible for their own actions, as well as those of subcontractors, affiliates, and employees <u>related</u> to timber sale operations, but are not comfortable with being responsible for their subcontractors, or employees actions, unrelated to timber sale operations.

C. <u>The Delegation of Authority to Terminate a Timber Sale Contract for Breach Should Not Rest With the CO.</u>

Authority to terminate a contract as a result of environmental conflict rests with the Chief. Delegation of authority to terminate for environmental conflict, as well as for non-compliance of terms of the contract, to the CO is improper. If implemented and utilized, these provisions could result in defacto debarments. In the past, debarment has been viewed as so serious that only the Chief has authority to take such an action. Current regulation preclude the delegation of authority to terminate a timber sale contract below the regional forester level. Thus, as proposed, these provision appear to violate existing regulation.

II. <u>SPECIFIC COMMENTS AND SUGGESTIONS</u>

A. C(T)9.3 - <u>BREACH</u> (Proposed)

1. In order to more clearly tie the provisions to existing

regulation, we recommend the following substitute preamble.

> "Breach of this contract may result in termination by the Chief pursuant to 36 CFR §223.116(a)(5), or by the Regional Forester pursuant to 36 CFR §223.116 (a)(1) - (4).
>
> The Contracting Officer may recommend termination of this contract for breach in the event:"

2. We believe subsections (d), (e), and (f) are adequately addressed in the existing contact. Existing provisions covering these situation have realistic liquidated damages, and we do not support modification of the current norm. We request that these subsections be dropped from the proposed provision.

3. We support the inclusion of subsections (a), (b), (c), and (h) with the following wording changes to clarify the proposal.

a. Subsection (a) - We support proposed language as is.

b. Subsection (b) - We suggest the following modification:

> "is convicted for a violation of criminal statutes or civil standards, orders, permits, or other regulations for the protection of environmental quality issued by a Federal agency, State agency, or political subdivision thereof in the conduct of his/her operations directly related to this timber sale contract pursuant to C(T)6.0;"

c. Subsection (c) - We support wording in this subsection.

d. Subsection (h) - We support wording in this subsection.

4. Subsection (g) is vague and unclear. We are unsure of what activities remain that are not covered by subsections (a), (b), (c), and (h). Thus, we request this subsection be dropped from the provision.

B. C(T)6.0 - <u>OPERATIONS</u> (Proposed)

1. The sanctioned activities must be directly related to the purchaser's operation of the timber sale contract. Thus, we suggest the following modification to the preamble:

> "Purchaser agrees to conduct sale operations under this contract and other directly related business activities in compliance with Federal, State, and local statutes, standards, orders, permits, or other regulations so as not to damage the environment or be injurious to the interests of the United States."

2. The public interest and the interests of the United States are the same, and we suggest that one or the other be dropped from the preamble.

3. We cannot support the open ended language in paragraph three. We will support use of this paragraph if it is modified to read:

> "A conviction of, or a civil judgement for, any of the following offenses will be considered a breach of this provision and may result in termination of this contract pursuant to C(T)9.3:"

4. We support inclusion of subsection (a), (b), and (c) as written.

III. CONCLUSION

We believe these provisions should reflect: (1) a direct tie between a purchasers activities and the individual sale; and (2) assignment of the authority to terminate a timber sale in accordance with 36 CFR §233.116.

We appreciate the opportunity to provide these comments and will be happy to meet with you to discuss or explain our views on this issue. If you have any questions, please contact me at 202/463-2752.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sales Programs

NFPA

May 1, 1990

Mr. Dave Hessel
Director, Timber Management
Forest Service - USDA
P.O. Box 96090
Washington, DC 20090-6090

RE: Comments on Proposed Limited Liability and Purchaser Integrity Provisions C(T) 6.0, C(T)6.01, C(T)8.3, C(T)9.3, C(T)9.5, and C(T) 9.5 (option 1).

Dear Dave:

We appreciate the time you took to discuss these proposals with our members at the recent Federal Timber Purchasers Committee meeting in Dallas. As those discussions indicate, our members continue to be concerned with portions of the proposal. Rather than restate all of our concerns, I would ask that your staff review our July 24, 1989, December 4, 1989, and January 5, 1990 comments on past proposals addressing these issues.

Although the agency's latest proposals are an improvement, our members continue to express two basic concerns.

I. <u>Basic Concerns</u>

A. The agency has proposed or implemented a number of provisions that deal with contract settlements resulting from environmental modification or termination. All prescribe a different settlement solution. We would prefer to have one or two settlement provisions rather than four or five.

B. Our members believe authority to terminate a timber sale contract should rest with someone other than the Contracting Officer (CO). Allowing the CO to be chief negotiator, judge, and jury jeopardizes the willing buyer/willing seller relationship.

We feel termination of a timber sale contract is of such a consequence, that authority to terminate should rest with the Regional Forester for most terminations and with the Chief for those terminations mandated by environmental modifications.

NATIONAL FOREST PRODUCTS ASSOCIATION
1250 CONNECTICUT AVE. NW • SUITE 200 • WASHINGTON, DC 20036 • 202 463-2700

This chain of command offers two distinct advantages over the C(T)9.3 proposal. First, it allows for agency review of CO decisions to ensure uniformity. Second, it provides for an unbiased internal review of CO decisions prior to a dispute evolving into a formal claim. Our members prefer to work disputes out as low in the contract chain of command as possible. Requiring the CO to terminate timber sale contracts would negatively affect the CO's ability to negotiate future disputes.

II. Specific Comments

A. C(T)6.0 - Operations

We agree with the provision as proposed.

B. C(T)6.01 - Interruption or Delay of Operations

We acknowledge the agency's efforts to modify this proposal in response to our earlier concerns. Making the Regional Foresters responsible for deciding whether contracts not named in civil actions should be delayed is much preferable to having individual contracting officers attempting to make such judgements. We trust the Washington Office will help guide Regional Foresters in their efforts to make these difficult decisions.

As stated in our July 25, 1989 comments on C(T)8.211 (proposed), we believe court-imposed delays are beyond the control of the timber purchaser. Thus, such delays should be treated in a similar fashion to delays addressed in B(T) 8.21.

We request the proposed 30-day time limit be reduced to 10 days in order to make C(T)6.01 (proposed) conform with existing B(T)8.21.

C. C(T) 8.3 - Contract Modification

We agree with the provision as written, provided the following questions can be satisfactorily addressed.

1. Will the agency continue to allow contract modification involving B2.0, B5.0 and B6.0? We would like to see this articulated in the final provision language.

2. We believe rate redetermination is a viable tool in developing mutually agreed upon contract modifications. Why has this option been dropped from the current proposal? We request the following C(T)8.3 language be carried forward in the final language.

> "Such modifications shall be limited to requirements with which Purchaser can reasonably comply. Resulting changes in the value of remaining Timber shall be reflected in a rate redetermination conducted in accordance with C3.312. Rates so redetermined shall apply to timber removed from Sale Area after the effective date of the modification".

D. C(T)9.3 - Breach

Our members continue to believe authority to terminate a contract should rest with the Regional Forester or the Chief (see above comments). On one hand, the agency seems to agree that Regional Forests should make the decision as to when an individual sale might be impacted by civil law suits (see C(T)6.01 proposed), while in this instance it seems to insist that Regional Foresters cannot be in the contract chain of command.

Given your staff's insistence that the CO must be unencumbered to make contract decisions, we are hard-pressed to propose a new solution.
We request our January 5, 1990 proposal, to have the Contracting Officer recommend termination, be reconsidered and incorporated in the final contract language.

Short of that, we expect the agency will amend 36 CFR 223.116(a) (1-5), through the federal register process, before implementing this proposed c-provision.

E. C(T) 9.5 - Settlement

We agree with this provision as written.

F. C(T)9.5 (option 1) - Settlement

Our members see this proposal as an unwarranted expansion of C(T) 9.52 - Settlement For T&E Species and are troubled by it. We feel a bit betrayed by the agency, given the hard fought agreements hammered out in previous discussions. However, given our conversation in Dallas, we request the following modification to paragraph two of the provision.

> "The Chief has determined that this contract qualifies for limited settlement compensation due to the high probability that ______________ may force cancellation of this contract prior to termination date in A(T)16. In such event, compensation will be limited to the expenses contained in (1), (2), and (3) only."

We request the following paragraph be added in the provision as new paragraph three.

"Settlement compensation will only be limited for those events listed in the preceding paragraph. All other contract termination settlement negotiations will be addressed under C9.5 - <u>Settlement</u>".

Instructions for this provision should include the following statements.

"Contract preparer will fill in the blank with the **<u>specific</u>** event that is expected to imperil the contract. Timber Sale prospectus will include a discussion of the event that may trigger use of C(T)9.5 Option 1 and the likelihood that it will occur".

" Acceptable events, beyond the control of the agency, are limited to: civil law suits, salvage sales delayed by civil actions, and strong potential of listing of species, known to exist on the sale area, being listed as Threatened or Endangered by U.S. Fish & Wildlife Service. All other situations require Chief's approval before they may be listed in paragraph two".

Finally, we request use of C(T) 9.51 <u>Settlement</u> and C(T) 9.52 <u>Settlement for T&E Species</u> be discontinued. Situations covered by these two provisions should logically fall under C(T)9.5 Option 1, as amended by our previous comments. Limiting the variety of different settlement provisions will help avoid confusion and frustration in future settlement negotiations.

III. <u>Conclusions</u>

We trust you will incorporate our proposed changes in the final C-provision language. In the event the agency finds it cannot incorporate our proposed changes, we request a meeting be scheduled during May 6, 7 or 9th between yourself and Mike Welling, Chairman of the Federal Timber Purchasers Council, to iron out our differences. Hopefully, this meeting will not be necessary and we can move beyond our protracted discussions on limited liability.

Sincerely,

Frank M. Gladics
Manager
Federal Timber Sale Programs

FG/lh

United States Department of Agriculture | Forest Service | Washington Office | 14th & Independence SW
P. O. Box 96090
Washington, DC 20090-6090

File Code: 2450
Date: October 31, 2000

Ms. Mary Coulombe
American Forest & Paper Association
1111Nineteenth Street, NW. Suite 800
Washington, DC 20036

Dear Ms. Coulombe:

Enclosed for your review are proposed revisions to the B/BT Divisions for the FS-2400-6 and 2400-6T contracts. Also enclosed are proposed revisions to the A/AT pages and proposed revisions to the C/CT provisions. We hope that we will have an opportunity to discuss this proposal with the Federal Timber Purchaser's Committee at the Flagstaff meeting in November.

This proposal to revise the contracts is due to changes in computer and word processing technology. If adopted, in the future, changes in contract provisions that are applicable to all contracts would result in a revised B/BT Division and changes in contract provisions that are applicable in only specific situations would result in new or revised C/CT provisions. The B/BT Divisions would not be commercially printed, but would be available in electronic format.

There are no policy changes being made with this proposed contract revision, although some minor editorial changes have been made, such as the elimination of gender specific nouns and pronouns, use of a more active voice, formatting for consistency within the contract, minor changes to increase consistency in wording between the two contracts, and conversion from board feet to cubic feet. The intent is to consolidate the B/BT and C/CT Divisions and make the contracts easier to use for both timber sale purchasers and Forest Service personnel.

The font size would be increased from 8 to 10 in the B/BT Division to assist reading.

We believe that this proposal would:

1. Reduce the complexity of the contract for Forest Service timber sale preparation people and sale administrators, who are less experienced and knowledgeable than in the past, and industry representatives. The chance of error in contract preparation and administration is reduced, thus reducing the likelihood of contract disputes and claims.

a. The number of C provisions is reduced from 106 to 32.

b. The number of CT provisions is reduced from 100 to 31.

Exhibit 15

c. The "typical" contract is changed as follows:

i. The number of pages would be reduced from 116 to 53 pages (10 of the 53 pages are additional pages due to increased font size).

ii. The number of Special Provisions would be reduced from 78 to 6.

iii. The number of inapplicable Standard Provisions would be reduced from 37 to 0.

d. Inaccurate cross-references would be fixed, e.g., references to inapplicable B/BT provisions.

e. Provisions would seldom be supplemented, i.e., there would usually be no B/BT and C/CT provisions with the same number.

f. The A/AT Division would include most of the data that varies by contract, making it easier to find.

g. Proposed minor editorial changes would simplify reading and assist interpretation.

2. Be much easier for the Forest Service to maintain within the Timber Information Manager (TIM), within the Forest Products Staff, and at the Regional, Forest, and District levels.

The specific changes proposed to the A/AT Division pages include:

1. 2400-6 (page 102) is revised to remove the issue date of the Division B Standard Provisions and to substitute a fill-in blank. This is the date that should be referenced when referring to the contract and referencing a date.

2. 2400-6 (page 104) is revised to add contract scaling as a required deposit and to update contract provision references.

3. 2400-6 (page 106) is revised to convert it to a landscape format.

4. 2400-6 (page 107) is revised to add A13 – Forest Service Engineering Completion Schedule, change the number of current A13 to A14, and to update contract provision references.

5. 2400-6 (page 108) is revised to change the number of current A14 through A21 to A15 through A22, respectively, and to add A23 – Downpayment and A24 – Periodic Payment Amounts.

6. 2400-6 (page 109) is revised to change the number of current A22 through A23 to A27 through A28, respectively, and to add A25 – Purchaser Credit Transfer-in Limit Amount and A26 – Market-Related Contract Term Addition Producer Price Index.

7. 2400-6T (page 102) is revised to remove the issue date of the Division BT Standard Provisions and to substitute a fill-in blank. This is the date that should be referenced hen referring to the contract and referencing a date.

8. 2400-6T (page 105) is revised to update contract provision references.

9. 2400-6T (page 107) is revised to convert it to a landscape format.

10. 2400-6T (page 108) is revised to add AT13 – Forest Service Engineering Completion Schedule, to change the number of current AT13 through AT18 to AT14 through AT19, respectively, and to update contract provision references.

11. 2400-6T (page 109) is revised to add AT20 – Downpayment, AT21 – Periodic Payment Amounts, AT22 – Purchaser Credit Transfer-in Limit Amount, and AT23 – Market-Related Contract Term Addition Producer Price Index; and to change the number of current AT19 through AT20 to AT24 through AT25, respectively.

The changes proposed to the B/BT Division and the current C/CT provisions include:

1. B/BT1.1 – Sale Area Map is revised to eliminate the reference to the identification of historic sites, since these are no longer shown on the sale area map. References to wildlife and plant habitat, cave resources, traffic control devices, weed-free areas, wetlands, and temporary roads to be kept open are added since the B/BT Division requires that these be shown on the sale area map.

2. B/BT2.133 – Damaged by Catastrophe is revised to change the volume gate from one million board feet to two hundred thousand cubic feet. In addition, B2.133 was revised, so that the criterion for catastrophic damage is based on value, rather than volume and value, making the provision consistent with BT2.133. Use of volume as a criterion is redundant with the remainder of the provision and is not necessary.

3. B2.36 – Incompletely Marked Timber is revised to make it consistent with the 2400-6T contract by requiring the location of representative sample areas of incompletely marked timber to be shown on the sale area map.

4. C2.41 – Adjustment for Volume Deficit is no longer approved as a C provision. Its text has been incorporated into the B Division, replacing B2.41.

5. CT2.41 – Adjustment for Quantity Deficit is no longer approved as a CT provision. Its text has been incorporated into the BT Division, replacing BT2.41.

6. B/BT3.2 – Current Contract Rates has a reference added to B/BT8.212, thus stating that current contract rates will continue during a contract term addition.

7. C/CT3.2 – Escalation Procedure is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.2.

8. C/CT3.21 – Unavailable Index is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.21.

9. C/CT3.3# – Rate Redetermination After Environmental Modification is renumbered as 3:321#.

10. C/CT3.31 – Scheduled Rate Redetermination is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT3.31. B/BT3.311 – Emergency Rate Redetermination is currently listed as inapplicable in all contracts and is not included in the revised contract.

11. C/CT3.312 – Rate Redetermination for Environmental Modification is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT3.32.

12. C/CT3.32 – Rate Redetermination After Catastrophic Damage is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT3.33.

13. B/BT3.41 – Material Not in A2 has the term Forest Service Officer changed to Contracting Officer.

14. C/CT4.11# – Amount Payable for Timber is renumbered as C/CT4.12# and updated to reflect revised provision references.

15. CT4.12 – Adjustment of Quantity is no longer approved as a CT provision. Its text has been incorporated into the BT Division, as BT4.11.

16. C/CT4.2 – Timber Sale Account is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.2.

17. C/CT4.211# – Transfer of Purchaser Credit is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.21, replacing B/BT4.21 – Purchaser Credit. The transfer-in limit is now stated in A25 or AT22.

18. C/CT4.220# – Downpayment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.221, replacing B/BT4.221 – Advance Deposits. The downpayment amount and interest rate are now stated in A23 or AT20.

19. C/CT4.221 – Advance Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.222, replacing B/BT4.222 – Purchaser Credit as Deposits.

20. C/CT4.222 – Transferred-in Purchaser Credit as Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as a final paragraph in B/BT4.21.

21. B/BT4.223 – Deposits for Charges Subject to Escalation is renumbered as B/BT4.224, replacing B/BT4.225 – Deposits When Payment Guaranteed.

22. C/CT4.224 – Deposits When Payment Guaranteed is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.225, replacing B/BT4.225 – Cooperative Deposits.

23. B/BT4.225 – Cooperative Deposits is renumbered as B/BT4.228.

24. B/BT4.227 – Blanket Cash Deposits is renumbered as B/BT4.226, replacing B/BT4.226 – Use of Deposits.

25. C/CT4.228 – Performance Bond as Security for Felled Timber is updated to reflect revised provision references and has been renumbered as C/CT4.33.

26. C/CT4.229 – Temporary Reduction of Downpayment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.23, replacing B/BT4.23 – Refund of Excess Cash.

27. C/CT4.23 – Refund of Excess Cash is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.24, replacing B/BT4.24 – Refund After Scaling Completed.

28. B/BT4.24 – Refund After Scaling Completed is renumbered as B/BT4.25.

29. C/CT4.254 – Extension Deposits is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.227, replacing B/BT4.227 – Blanket Cash Deposits.

30. C/CT4.264# – Periodic Payment Schedule is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.223, replacing B/BT4.223 – Deposits for Charges Subject to Escalation. The periodic payment schedule is now stated in A24 or AT21.

31. C/CT4.3 – Letters of Credit for Payment Bond is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.32.

32. C/CT4.31 – Blanket Bond is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.31.

33. C/CT4.4 – Payments Not Received for Timber Cut and Other Charges is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT4.4 – Payments Not Received.

34. C/CT4.41 – Other Payments Not Received is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT4.41. A cross reference to restoration of downpayment is added.

35. C/CT5.101# – Road Completion Date is renumbered as C/CT5.13# and is updated to reflect revised provision references.

36. B5.12 – Use of Roads by Purchaser is modified so that it uses the same language as the BT contract, specifically, it now refers to permanent or temporary roads, rather than just roads.

37. C/CT5.121# – Deposit for Reconstruction Engineering Services is updated to reflect revised provision references.

38. C/CT5.122# – Deposit for Actual Reconstruction is updated to reflect revised provision references.

39. C/CT5.2 – Specified Roads is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.2.

40. C/CT5.21# – Engineering is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.21. The engineering work schedule is now stated in A/AT13.

41. C/CT5.211 – Contract Drawings is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.211.

42. C/CT5.212 – Construction Staking is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.212.

43. B5.22 – Material Delivery is modified so that it uses the same language as the BT contract, specifically, a sentence was added to specify where unused materials should be returned.

44. C/CT5.221# – Material Sources is updated to reflect revised provision references.

45. B/BT5.24 – Estimated Cost has the term Forest Service Officer changed to Contracting Officer.

46. C/CT5.24 – Estimated Costs for Cooperative Roads is renumbered as C/CT5.241 and updated to reflect revised provision references.

47. C/CT5.25 – Construction Cost Adjustment is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.25.

48. C/CT5.251# – Variation in Quantities is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.251 – Difference in Rock Cost. The following sentence is substituted for the insert: "Only changes in quantities where other than design and lump sum measurement is specified in the Schedule of Items are subject to this Item."

49. C/CT5.253 – Physical Change is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.252, replacing B/BT5.252 – Difference in Culvert Installation.

50. C/CT5.254 – Design Change is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.253, replacing B/BT5.253 – Cost Adjustment for Physical Change.

51. C/CT5.26 – Alternate Facilities is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT5.26.

52. C/CT5.4 – Road Maintenance is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT5.3, replacing B/BT5.3 – Purchaser Credit Computation. In addition, one sentence, which states that road maintenance does not include reconstruction or repairs of an extraordinary manner, has been added from B/BT5.4.

53. C/CT5.31# – Road Maintenance Requirements is a new provision to provide the Contract Road Maintenance Requirements Summary that was formerly in C/CT5.4#.

54. B/BT5.41 – Road Maintenance Deposits is removed from the B/BT Division and is replaced by C/CT5.32# – Road Maintenance Deposit Schedule.

55. C/CT5.41# – Road Maintenance Deposit Schedule is renumbered C/CT5.32#.

56. B/BT5.5 – Use by Others has been renumbered as B/BT5.4.

57. C/CT6.0 – Operations is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.01 – Statutory Compliance.

58. C/CT6.01 – Interruption or Delay of Operations is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division as B/BT6.02.

59. C/CT6.1 – Representatives is no longer approved as a C/CT provision. Its text has been incorporated into the B/BT Division, replacing B/BT6.1.

60. C/CT6.2 – Improvements is no longer approved as a C/CT provision. Its text has been combined with B/BT6.2 and incorporated into the B/BT Division as B/BT6.2.