C6.331 - Log Trucking. (11/76) To promote safe operations on National Forest roads and on Specified Roads, loads shall be safely secured before trucks move from the landing or loading location.

C6.332 - Restricted Flight Pattern. (10/30/97) Designated on the Sale Area Map are areas where flight pattern is restricted.

Logs shall not be yarded over these areas unless otherwise agreed in writing.

Helicopters involved in logging shall not fly over these areas unless otherwise agreed in writing.

C6.341 - Prevention of Oil Spills. (6/81) If Purchaser maintains storage facilities for oil or oil products on Sale Area, Purchaser shall take appropriate preventive measures to insure that any spill of such oil or oil products does not enter any stream or other waters of the United States or any of the individual States.

If the total oil or oil products storage exceeds 1320 gallons or if any single container exceeds a capacity of 660 gallons, Purchaser shall prepare a Spill Prevention Control and Countermeasures (SPCC) Plan. Such plan shall meet applicable EPA requirements (40 CFR 112) including certification by a registered professional engineer.

C6.35 - Final Acceptance of Specified Roads. (1/80) Prior to request for final inspection, roadways, borrow pits, and quarries occupied and no longer needed by Purchaser in connection with Purchaser's Operations shall be cleared of all rubbish, excess materials, and temporary structures.

C6.36 - Substitute Methods. (6/82) Notwithstanding other provisions herein, for minor changes such as changes in logging systems for areas smaller than 5 acres, Purchaser and Forest Service may agree in writing that use of substitute methods or equipment will achieve Forest Service objectives under this contract and may be used in lieu of those specified for Purchaser's Operations.

C6.41 - Felling and Bucking. (4/74) When agreed, dead timber not meeting Utilization Standards in open stands, may be pushed or pulled down with equipment. Other Included Timber shall not be felled in this manner except hardwoods as provided in C6.7.

In order to minimize damage to the residual stand, Purchaser shall coordinate his felling with tributary skid road and landing locations so as to avoid turning logs in partial cut areas. To the extent possible and consistent with minimizing breakage of Included Timber, and minimizing damage to the residual stand, trees shall be felled with lead toward the tributary landing or skid road.

Notwithstanding other provisions herein, Purchaser need not buck pieces to lengths that are multiples of less than 2 feet and resulting residues need not be removed or paid for.

C6.411# - Directional Felling. (6/79) Unless otherwise agreed in writing, trees which cannot normally be felled away from other ownership, wilderness boundary, controlled area, survey monument, ditch, trail, Pacific Crest Trail, pipeline, and streamcourse shown on Sale Area Map shall be directionally felled away from said areas with the aid of specialized equipment. Such directional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing.

C6.414# - Limbing. (7/86) Outside of construction clearings, Clearcutting Units and regeneration units, unless otherwise provided by B6.414, Purchaser shall, prior to skidding operations, cut exposed limbs from products which are to be yarded. Such limbing of stems shall be done to a top diameter of approximately 3 inches, at which point the top shall be cut from the remainder of the stem.

A-661

Notwithstanding other provis... herein, inside unit 100 for trees unde... " DBH, products shall be skidded to agreed landing locations prior to limbing and lopping.

Within units on subdivisions designated NO LOP on Sale Area Map, limbing and cutting unutilized tops shall not be required.

C6.429 - Helicopter Yarding. (3/74) Unless agreed otherwise in writing, within subdivisions so designated on Sale Area Map, yarding shall be by a helicopter capable of lifting and transporting products to landings without unnecessary damage to residual trees.

C5.411 - Dust Abatement for Temporary Roads. (5/79) Purchaser shall abate dust to promote safe use of road and to prevent excessive loss of road material. Purchaser may choose the material used in dust abatement. When anything other than water is to be used, such material must be approved in writing by Forest Service.

If water is used, complete abatement once for each hauling day shall satisfy this requirement, except that when production exceeds 50 M board feet per operating day, water shall be applied to dusting roads through the day while hauling.

C6.5# - Streamcourse Protection. (8/31/98) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 300 feet slope distance of the apparent high water mark on Scott River in Units 11 and 12, within 300 feet slope distance of the apparent high water mark in Boulder Creek and East Boulder Creek Creek in Units 15, 18, and 19, within 300 feet slope distance of the apparent high water mark in Jackson Creek in Units 49 and 53, and within 150 feet of streamcourses shown on Sale Area Map, except as necessary for fire suppression activities. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.

Culverts, bridges or other suitable structures shall be required on tractor roads and skid trails only at points where it is necessary to protect Streamcourses. The type of crossing structure, method of installation and removal shall be determined by agreement. Such structures and associated fills shall be removed by Purchaser in accordance with C6.6.

Damage to Streamcourse or Buffer Strips caused by unauthorized Purchaser's Operations shall be repaired by Purchaser in a timely and agreed manner to the extent practicable as determined by Forest Service to restore and prevent further damage to Streamcourses.

C6.6 - Erosion Prevention and Control. (9/72) Erosion prevention and control work, including Streamcourse protection, required by C6.5 and B6.6 shall be completed within 15 calendar days after skidding operations related to each landing are substantially completed or after Forest Service designation on the ground of work where such designation is required hereunder. Said time limit shall be exclusive of full days lost in Purchaser's Operations due to causes beyond Purchaser's control. Such on the ground designation shall be done as promptly as feasible unless it is agreed that the location of such work can be established without marking on the ground. After September 15 and as long thereafter as operations continue the work shall be done as promptly as practicable. Damage resulting from Purchaser's Operations due to failure to perform required work shall be repaired by Purchaser.

C6.7# - Slash Treatment. (3/83) All vegetative debris associated with construction of Specified Roads such as unutilized timber, brush and grubbed stumps is Construction Slash. Measures to be taken by Purchaser for treatment of Construction Slash are set forth in the attached road construction specifications and in item (1) below.

Copy for Purchaser

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract

Purchaser CLR TIMBER HOLDINGS, INC.

Sale Name TOO WILD

Award Date 5/14/1999

Contract No. 075862

Region SIX

National Forest SISKIYOU

Ranger District GOLD BEACH

A-790

Copy for Purchaser

| U.S. DEPARTMENT OF AGRICULTURE - FOREST SERVICE<br>**TIMBER SALE CONTRACT**<br>(Applicable to Sales to be Measured Before Felling) | | NAME OF PURCHASER<br>CLR TIMBER HOLDINGS, INC. | | |
|---|---|---|---|---|
| NATIONAL FOREST<br>Siskiyou | RANGER DISTRICT<br>Gold Beach | REGION<br>Six | CONTRACT NO.<br>075862 | |
| SALE NAME<br>Too Wild | | SUBREGION<br>Douglas-fir | AWARD DATE<br>5/14/99 | TERMINATION DATE ~~12/31/00~~ ~~4/30/00~~ 8/31/03 8/31/05 (3/1/0…) |

The parties to this contract are The United States of America, acting through the Forest Service, United States Department of Agriculture, hereinafter called Forest Service, and 1/ CLR Timber Holdings, Inc.

a Corporation, organized and existing under laws of the State of Oregon hereinafter called Purchaser.

2/ Forest Service having advertised a sale at which either (1) Purchaser, whose required bid deposit is now held by Forest Service as an initial deposit, was the successful bidder, or (2) no bids were received and Purchaser having subsequently offered at least the minimum advertised price and made an initial deposit in the same amount as the bid deposit specified in the sale advertisement; and the parties hereto desiring to record their agreement; now therefore,

In consideration of the premises and the promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber.

This contract consists of three Divisions: AT - Specific Conditions, BT - Standard Provisions, and CT - Special Provisions, together with Sale Area Map, Drawings and specifications for developments (if any) and such attachments as may be provided for in Division CT. Specific Conditions are numbered and apply to the Part, Section, Subsection, or Item of the Standard Provisions, as indicated hereunder. Other conditions of this contract are stated in Division CT-Special Provisions.

**IN WITNESS WHEREOF**, the parties hereto have executed this contract as of the award date.

UNITED STATES OF AMERICA

BY [signature]

Contracting Officer
(Title)

Two Witnesses: 3/

______________________ (Name)

______________________ (Address)

______________________ (Name)

______________________ (Address)

CLR Timber Holdings, Inc.
(Purchaser) 4/

BY [signature]

President
(Title)

P.O. Box 670
(Business Address)
Brookings, OR 97415

I, 5/ Lilace Keech, certify that I am the Assistant Secretary of the corporation named as Purchaser herein; that Ron Fallert who signed this contract on behalf of Purchaser, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

[signature: Lilace Keech] | CORPORATE SEAL 6/ |

A-791

(OVER)

FS 2400-6T, Page 101 (10/73)

**CT6.25# - PROTECTION OF HABITAT OF ENDANGERED, THREATENED, AND SENSITIVE SPECIES.** (1/93) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973, as amended, or as sensitive by the Regional Forester under authority of FSM 2670, are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

> In area shown as "ATP" on Sale Area Map in Harvest Units 6A, 9A and 12, all operational activities will be kept away from those areas. These areas are layed out so that the Area to Protect are "outside" the Harvest Unit boundaries.

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed, Forest Service may either cancel under CT8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known. Discovery of such areas by either party shall be promptly reported to the other party.

In the event of contract modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by Forest Service. Amount of reimbursement shall be determined by Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing. However, in no event may Current Contract Rates be reduced below Base Rates.

**CT6.3 - PLAN OF OPERATION.** (10/77) Within 60 days of final award of contract, Purchaser shall furnish Forest Service a written general plan of operation which shall be in addition to the annual operating schedule required under BT6.31. The plan shall set forth planned periods for and methods of road construction, timber harvesting, and completion of slash disposal, erosion control measures and other contractual requirements. Forest Service written approval of the plan of operation is prerequisite to commencement of Purchaser's Operations. Purchaser may revise this plan of operation when necessitated by weather, markets or other unpredictable circumstances, subject to the written approval of Forest Service. In the event of delays beyond the control of Purchaser which qualify for Contract Term Adjustment, the plan of operation shall be mutually adjusted as necessary to accommodate the adjusted contract period.

**CT6.343 (OPTION 2) - CLEANING OF EQUIPMENT.** (12/97) Unless otherwise agreed, to prevent the introduction of the seeds of noxious weeds onto National Forest land, Purchaser shall ensure all equipment moved onto National Forest land is free of soil, seeds, vegetative matter, or other debris that could contain or hold seeds. Purchaser shall employ whatever cleaning methods necessary to ensure compliance with the terms of this provision, and shall notify Forest Service prior to moving each piece of equipment onto National Forest land, unless otherwise agreed. Notification will include identifying the location of the equipment's most recent operations. Upon request of Forest Service, arrangements will be made for Forest Service to inspect each piece of equipment prior to it being moved onto National Forest Land.

Purchaser shall certify in writing, compliance with the terms of this provision prior to each start-up of sale operations. For the purposes of this provision, "equipment" includes all logging machinery except for log trucks, chip vans, pickup trucks, cars, or other vehicles used to daily transport personnel.

**CT6.351 - ACCEPTANCE OF SPECIFIED ROAD.** (9/93) Specified Road work may be accepted subject to completion of planting and seeding for soil stabilization when completion is delayed for reasons beyond control of Purchaser, such as seasonal limitations. Purchaser shall complete planting or seeding on such road during the next suitable planting season.

Specified Road work may be conditionally accepted prior to the application of dust palliatives when application is not necessary to prevent dusting of the road surface due to Purchaser's operating schedule or climatic conditions. Purchaser shall apply dust palliative on such roads prior to use during periods when dusting may occur.

**CT6.41# - SPECIAL FELLING OBJECTIVES.** (1/93) Notwithstanding BT6.41, BT6.411, BT6.5, and BT6.61, felling objectives shall be accomplished by the type of felling methods and equipment listed herein. Methods or equipment other than those specified may be approved. For Payment Units shown below, Purchaser shall submit a cutting plan for Forest Service acceptance, prior to the start of felling operations.

| FELLING METHODS | HARVEST UNITS |
|---|---|
| All designated trees shall be felled away from existing plantation. | ALL |
| All designated trees shall be felled away from designated streamcourses. | 2, 4, 5, 6A, 6B, 6C, 6D, 7, 7A, 9, 9A, 10, 12, 16 & 17 |
| Conifers shall be directionally felled to minimize breakage and damage to residual stand. | ALL |
| All designated trees shall be felled away from areas shown as "ATP" on Sale Area Map. | 1, 6A, 9A & 12 |
| All designated trees shall be felled away from meadow. | 2 & 4 |

A-879

**CT6.42# - SPECIAL YARDING/SKIDDING METHODS.** (1/93) Methods other than those specified may be approved. When appropriate, such approval shall include changes in Current Contract Rates and Sale Area Map shall be revised.

| YARDING/SKIDDING METHODS | HARVEST UNITS |
|---|---|
| A skyline yarder with at least a 47 foot tower capable of transporting logs at least 1500' horizontally uphill. | 1, 2, 4, 5, 6A, 6B, 6C 7, 7A, 9, 9A, 10, 12, and 16. |
| The yarder will be capable of providing one-end suspension by means of multi-span rigging in those areas designated MTSPAN of the Sale Area Map. | 5, 9A & 10 |
| Tail Trees will be selected prior to felling units<br>Average spacing between TT's will be 150 feet. | all cable yarded |
| Yarding will be directed away from: | |
| Designated streamcourses | 2, 4, 5, 6A, 6B, 6C, 6D 7, 7A, 9, 9A, 10, 12, 16, 17 |
| Existing plantations | 1, 3, 4 |
| Area Shown As "ATP" on Sale Area Map which is outside Harvest Unit boundary. | 6A, 9A & 12 |
| Area shown as "ATP" on Sale Area Map | 1 |
| The yarding system must provide one-end-suspension (except during lateral skidding) in areas designated on Sale Area Map. | All cable yarded units |
| A carriage capable of providing a means of pulling slack and maintaining a fixed position on the skyline during lateral in-haul will be required to minimize damage to reserve trees. | All cable yarded units |
| Skyline corridors shall normally not exceed 10 feet in width. Damaged trees designated with ORANGE leave paint and outside the 10 foot corridor will not be cut or removed. | 1, 2, 4, 5, 7, 7A, 9, 9A, 10 & 12 |
| Helicopter yarding specified. | 17 |
| A tractor equipped with an integral arch and winch system capable of elevating the leading ends of the logs during skidding. | 3, 4A, 13, 6D, 8, 13&18 Portions of the following 2, 4, 5, 7, 9, 9A, 10, 12 & 6B. |
| Tractor width should not exceed 107 inches | Tractor skidded units |
| Average spacing between tractor skid trails should be a minimum of 100 feet. | Tractor skidded units |
| No tractor landings shall be constructed on the 3318 Rd. | Tractor skidded units |

| | |
|---|---|
| Designated tractor skid trail locations shall be agreed to by the Forest Service and flagged on the ground prior to felling. Tractors will not be allowed off the skid trails. Skidding will be limited to those times when soil moisture will not lead to compaction (approximately June 1 to Sept. 30) or otherwise approved by Forest Service during dry periods. | Tractor skidded units |
| Tractors shall be required to operate without a blade to reduce damage to residual trees. | Tractor skidded units |
| Purchaser shall clean all yarding and associated equipment (yarder, loader, landing cat, etc.) Cleaning shall consist of the removal of soil by steam cleaning or washing with a high pressure hose. Equipment shall be cleaned prior to entering National Forest System lands. Non-diseased water sources on Roads 3318130 and 3680350 or from town will be used. | All |
| Maximum product length that can be removed will be 44 feet plus trim allowance. | All |

**CT6.422 - CONSTRUCTED LANDINGS.** (1/93) In an effort to avoid irrepairable soil and watershed damage, in areas on Sale Area Map designated "Landing Construction Critical," Purchaser shall construct landings in accordance with plans and specifications attached hereto.

LANDING CONSTRUCTION SPECIFICATIONS CT6.422 Schedule

1. The limits of all proposed landing areas shall be flagged for Forest Service approval prior to start of landing construction. The limits shall include the total area of excavation and fill.

2. A plan for disposal of clearing debris shall be prepared by the operator for Forest Service approval. All vegetative material shall be removed from fill area. Material less than 3" in diameter and 3' in length may be scattered within the clearing limits.

3. Compaction shall be required to maintain fill stability. Prior to placement of fill materials, the following requirements shall be met:

   a. A 10' wide bench shall be constructed at the toe of fill area.

   b. Additional key benches may be needed for fill stabilization.

   c. Fill materials will be placed in layers not exceeding 12 inches and compacted by at least 3 passes by a crawler tractor prior to placement of the next layer.

4. Landings on slopes over 55%, or in critical soil areas as shown on the Sale Area Map, shall have excavated material placed in designated waste areas as close as practicable to the landings.

FORESTRY FORUM

COMPLIMENTARY

Vol. XII, No. 16 September 11, 1998

## Challenge to BLM R/Ws

On August 27, a 60-day notice of intent to sue was sent by the Klamath Siskiyou Wildlands Center to the BLM and National Marine Fisheries Service claiming that the BLM was violating the Endangered Species Act because it had failed to consult on the Reciprocal Right-of-Way Agreements. Specifically, the environmental group is claiming that the two agencies failed to enter into formal consultation on the effects logging and road building activities, facilitated by reciprocal right-of-way agreements, would have on listed threatened and endangered species. They also claim that the BLM's right-of way agreements are resulting in illegal takes of both coho salmon and Bull Trout.

In the notice they state that they intend to file a citizen suit as provided for under the ESA. Interestingly, the notice does not include the US Fish & Wildlife Service, which retains jurisdiction over the Bull Trout since it is a resident fish species. NFA staff and the NFRC Legal Committee will evaluate this potential litigation and consider industry involvement. /*Chris West*

## NMFS Violates ESA

A river user group has asserted that the National Marine Fisheries Service (NMFS) acted unlawfully by allowing tribal commercial gill net harvest of endangered fall chinook and steelhead on the Columbia River above Bonneville Dam. The Columbia River Alliance (CRA), a coalition representing river users and dependent communities, requested United States Commerce Secretary William Daley investigate the federal action allowing harvest and sale of an endangered species.

"Judge Malcolm Marsh clearly told the fisheries service on September 3 the proposed harvest action was illegal, however, on September 4 the fisheries service announced their decision to continue the harvest through September 12" said Bruce Lovelin, CRA Executive Director. In rejecting the harvest deal on September 3, Judge Marsh noted "the federal government appears to be more concerned with what the Tribes are willing to accept in reductions to their fall commercial harvest than they are with the needs of the listed species." He continued: "once the government determined that the proposed action will likely jeopardize the listed steelhead, it was beyond prudence to then claim that the Act no longer applies."

What's Hot

Option 9 sales at risk....................page 2
Ag Committee comes to Portland....................page 3
Public safety & landslides....................page 3
Fifth Amendment....................page 3

Following Marsh's decision, NMFS Regional Director, Will Stelle, issued a press release on September 4 authorizing the continued commercial salmon harvest claiming "it is consistent with the provisions of the Endangered Species Act."

Judge Marsh's ruling was requested by the states of Oregon, Washington, and Idaho after the tribes and the federal government developed an agreement that would allow the tribes to conduct their gillnet fishery. The states asked Marsh to reject the agreement and based their case on the argument that NMFS is legally bound to conduct a scientific assessment of the effect of fishing endangered steelhead before permitting any fishing. The states maintained that NMFS was reluctant to conduct the assessment because it would find the stocks in such poor shape that fishing would be prohibited. */Chuck Burley*

## Forest Practices Case on Deck

NFA claims the Washington Forest Practices Board has abused the emergency rule-making process and has asked Thurston County Judge Hicks to void the rule. The Board claims an emergency really does exist with relationship to listed salmon therefore, justifying the emergency rule-making process. Besides the present disputed fish rule, the judge will hear how the Board passed several significant emergency rules (owls, murrelets and stream typing) since 1993.

Attorneys speculate Judge Hicks may render an opinion from the bench on September 11 at a hearing at the Thurston County Courthouse beginning at 1:30 p.m.

It may not be the stuff to make it on Court TV, but it is vitally important to forest landowners and operators, not to mention citizens who want full access to the rule making system. It is ironic that the same board that has limited public involvement in the rule making process is proposing a new set of rules vastly increasing the amount of bureaucratic hurdles and public input steps for most forest practices applications. */Bob Dick*

## Secret Negotiations?

On July 13, the Oregon Natural Resources Council and a dozen other environmental groups filed a case challenging the implementation of the President's Northwest Forest Plan. The case has been assigned to Judge Dwyer who heard the original challenge of the plan. The plaintiffs are represented by Mike Axline of the Western Environmental Law Center in Eugene, Oregon. The primary focus of the case is a claim that the agencies are not complying with the various requirements specified in the Record of Decision for the plan. The plaintiffs have not sought to enjoin the plan, but should they prevail in this litigation, it could result in halting most timber sales while surveying for sensitive species is conducted.

NFA has heard that the plaintiffs and Justice Department have entered into secret settlement negotiations. Our understanding is that ONRC has given Justice a list of 160 timber sales and is demanding they are terminated, suspended or revised as part of the settlement. Other sources have told NFA that the list has been narrowed down to about 30 timber sales. We are attempting to secure a copy of this alleged list. */Chris West*

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwtrees.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1998 Northwest Forestry Association

## Hearing on Region 6 Management

Congressman Bob Smith (R-OR), chairman of the House Committee of Agriculture, held a field hearing in Portland on September 3 to receive testimony on the barriers to implementing forest health restoration and salvage projects in Region 6. Witnesses included Chuck Burley, NFA's Eastern Oregon Manager, who testified on the problems encountered during the planning and implementation of the Summit Fire Recovery Project on the Malheur National Forest. In addition to his testimony, he presented visuals including some finished product and pieces of trees harvested from the Summit Fire. These displayed very clearly the deterioration due to delay in implementing salvage projects.

Also testifying were Judge Dennis Reynolds, Grant County Commissioner, and Bob Batty, director for the Grant County Education Service District. Both testified on the economic impacts of not managing the national forest on the local communities.

Tim Lillebo, Oregon Natural Resources Council, testified on behalf of the environmental community. His testimony was, in essence, that the burned area is already impacted and any further activities would simply exacerbate the problem. */Chuck Burley*

## A New Property Takings Case??

SDS Lumber Company of Bingen, Washington has fee timber it wants to harvest. A spotted owl pair lives in the vicinity and hence SDS has a problem. After one trip to court, preparation of an Environmental Impact Statement and an appearance before the Forest Practices Appeals Board, SDS now has a conditional forest practices permit. The conditions specified in the forest practices permit for SDS's 210 acres prohibits harvesting 40 percent of the area and SDS can only cut three trees per acre on the remainder. Now SDS may want to claim a constitutional "taking."

The fifth amendment was one of the first ten United States Constitutional amendments known as the Bill of Rights proposed in September, 1789 and ratified in December, 1791. Amendment V is one paragraph and deals with double jeopardy, self incrimination, due process and just compensation for property. Specifically, Amendment V states, in part, "*...private property* (shall not) *be taken for public use, without just compensation.*" */Bob Dick*

## Oregon's Salmon Plan

The latest development surrounding the future of Oregon's salmon plan came with the recent release by Governor Kitzhaber of a draft executive order. The draft order commits every state agency in Oregon to a vigorous effort to restore all species of salmon across the state. It replaces an earlier memorandum of agreement between NMFS and the state that was a required condition of a decision not to list the coho salmon. The draft order expands recovery efforts to include all salmon and steelhead across the state and not just coastal coho. Furthermore, it reduces the role that NMFS would play in revising state rules for habitat management on state and private lands. Comments are being accepted on the draft executive order until September 16. */Chuck Burley*

## Landslides Task Force Issues Report

The Joint Interim Task Force on Landslides and Public Safety that was established by the Oregon Senate in 1997, has released a draft report that makes several recommendations to the legislature. The task force, chaired by Gail Achterman, an attorney with Stoel Rives, was asked to focus on four broad areas: Hazard Identification, Land Use Conflicts, Public Education and Hazard Mitigation. They took four field trips including the Portland Metro Area, the Tillamook/Wilson River Highway and two to Douglas County. The task force received public testimony and numerous written comments and publications.

The draft findings recommend that the Forest Practices Act be amended to give the State Forester the ability to react to public safety. They also recommend that the Beach Law and Removal-Fill Law be amended to consolidate overlapping authorities. The task force feels that the Zoning Laws need amending to place limits on restoration or replacement of structures that were adversely affected by natural hazards. They also would like to require geotechnical reviews for newly created plans and require disclosure of known natural hazards affecting property. The task force plans to have a final report and proposed legislation completed by November. */Chris West*

## Protection for Little Sandy

Senator Ron Wyden (D-OR) and Congressman Earl Blumenauer (D-OR) have introduced legislation to expand the Bull Run Watershed to include the Little Sandy drainage on the Mt. Hood National Forest. In 1996, now retired Oregon Senator Mark Hatfield passed the Oregon Resource Conservation Act which legislated no timber harvesting in the Bull Run Watershed that provides drinking water for the City of Portland. The Act also directed the Forest Service to conduct a study on the Little Sandy drainage that was recently released and called for no special protection beyond the Northwest Forest Plan.

The Wyden and Blumenauer legislative proposal would expand the no cut protection to the 14,000 acre Little Sandy Drainage, half of which is in matrix under the Northwest Forest Plan. Ironically, the City of Portland has no concrete proposal or need to develop the Little Sandy as a source of domestic water. Furthermore, the City does not have the water rights which are held by Portland General Electric/Enron.

Given the listing of the Lower Columbia Steelhead it is questionable if the Little Sandy could ever be developed as a domestic water source. Finally, as part of the legislation the City hopes to obtain title to the land under its dams and facilities in the Bull Run Watershed. This is an attempt to cut the Forest Service out of hydro-dam relicensing and ESA issues. Given the Congressional schedule in this election year, this legislation is not likely to go anywhere until next year. */Chris West*

## Suit on Delayed RPA

On September 9, the Southwest Center for Biological Diversity and 20 other groups filed suit in San Francisco against the Forest Service alleging that the agency is overdue in releasing the five-year national plan and accompanying environmental impact statement, also known as the Resource Planning Act (RPA) Program and Assessment. The plaintiffs claim that the final plan was required to be released by March 31, 1995. A draft was published but was never finalized after receiving public comments. The plaintiffs are asking the court to halt all national forest timber sales. NFA staff, NFRC Legal Committee, as well as other regional and national associations, will be evaluating this suit for possible industry involvement. */Chris West*

## Land Exchanges

The Forest Service is performing a discretionary review of administrative appeals on three major land exchanges. These are the already-completed 40,000 acre Huckleberry Exchange between Weyerhaeuser and the Mt. Baker-Snoqualmie National Forest, a pending 85,000 acre exchange with Plum Creek Timber in the I-90 corridor near Snoqualmie Pass, and a pending exchange with Crown Pacific in central and southern Oregon. The discretionary review is in response to allegations by the Seattle based environmental group Western Land Exchange Project that appraisals undervalued private land in the exchange process. */Chuck Burley*

# FORESTRY FORUM

COMPLIMENTARY

**Vol. XII, No. 22** **December 16, 1998**

## NFA/NFRC Merger Complete

The memberships of the Northwest Forestry Association (NFA) and the Northwest Forest Resource Council (NFRC) voted unanimously on December 8 to consolidate the two organizations into one. The new organization will retain the NFA name and will continue to perform the work and functions of the two organizations, but under a single banner.

Members voted unanimously to establish NFA's existing Board of Directors as the "interim" Board of the new organization until the annual meeting in April 1999. Consistent with the NFRC tradition of involving other trade associations in decision making procedures, the members also voted to offer Board positions to the Associated Oregon Loggers, the Washington Contract Loggers Association, the Oregon Forest Industries Council and the Douglas Timber Operators. The participation of other association representatives will be welcomed.

Another important action taken by the members was the appointment of a Finance/Recruitment Committee. This committee will work between now and the annual meeting to refine a new dues structure and promote participation in the new NFA.

Again, the intent of this merger is to consolidate the activities of NFA and NFRC into one organization and continue the tradition of including the participation of other regional associations in the governance of the organization. We hope members will choose to be active in the committees that will continue work in 1) Wildlife Research; 2) Legal Strategies; 3) Communications; 4) Forest Policy; 5) DNR Timber Sales and 6) Federal Timber Sales. The Executive Committee of the new organization will meet monthly on the first Tuesday of each month.

If anyone has any questions, concerns or suggestions about this consolidation, don't hesitate to call NFA President Jim Geisinger or Board Chairman Bruce Daucsavage. /*Jim Geisinger*

## Hogan Denies Cutthroat Delisting

U.S. District Court Judge Michael Hogan has ruled against Douglas County in its challenge of the decision to list the Umpqua Cutthroat Trout as endangered. In his decision, Hogan ruled that Douglas County's overwhelming scientific evidence was outside the National Marine Fisheries Service (NMFS) record when it made the listing determination. Douglas County argued that the agency had failed to use the best available science

DEx 14

**What's Hot**

Trust beneficiaries looking for help........page 3
Governors coin a new word........page 3
Looking for Mountain Quail........page 7
No more old growth Nikes........page 7

Printed on recycled paper

and had shown that this information was available or easily obtainable.

In his decision Hogan has placed the burden of providing quality scientific evidence on those who oppose a listing proposal. The agencies can pick and choose which information it wants to consider and it is not enough to have public comments pointing out other information or flaws in information. The good news, is that as a result of Douglas County's lawsuit, NMFS began a status review of the Umpqua Cutthroat Trout listing and will have to consider all the new scientific evidence presented in this case. /*Chris West*

## Tower Fire Needs EIS

The Ninth Circuit Court of Appeals ruled that the Forest Service must prepare an environmental impact statement for the Tower Fire salvage and restoration effort. As part of its ruling, the court also ordered all logging and hauling to stop until the additional environmental analysis is completed. However, the Forest Service is allowed to conduct its mitigation work.

The lawsuit challenged the salvage logging of just over 4,000 acres of the 50,000 that burned. The Forest Service had prepared an environmental assessment. The plaintiffs argued that an environmental impact statement was necessary to fully address cumulative effects and other issues.

Despite the legal challenges, the Forest Service did sell and award the timber sale earlier this year. At least 80 percent of the logging has been completed with the remainder now in jeopardy due to further delays. /*Chuck Burley*

## Mapping & Assessing Owl Habitat

This month, NFA hosted a meeting between the Forest Service, BLM, U.S. Fish and Wildlife Service (FWS) and OFIC to discuss the ramifications of the current mapping effort being undertaken by the land management agencies.

Some background is in order here. The President's Northwest Forest Plan requires the Forest Service and BLM to conduct "effectiveness monitoring." Effectiveness monitoring is done to find out if the actions mandated in the plan are achieving their desired results. As an example, the plan sets aside a vast expanse of federal land so the northern spotted owl will persist on these lands for the next hundred years. Effectiveness monitoring is supposed to ask the question, "Are owls persisting on federal lands as a result of setting aside all of this land?" Similar questions would be asked for all the other wildlife species as well as other management goals in the plan.

In order to do effectiveness monitoring, the land management agencies realized they needed an up-to-date vegetative and habitat map for the entire region covered by the plan. All of the available databases are hodgepodge patchworks of localized information except one, the western Oregon database commissioned by OFIC to be used to address private land issues like the development of a 4(d) rule for the spotted owl. The OFIC database is a state-of-the-art tool developed using the latest satellite imagery technology. It has the most extensive ground truthing ever done, was subject to an unprecedented accuracy assessment and has been peer reviewed by well respected owl biologists such as Dr. Eric Forsman.

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwforestry.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1998 Northwest Forestry Association

A year ago, OFIC went to the effectiveness monitoring team and asked if they wanted to use this database. The agencies declined and embarked on their own effort. This puts the FWS in an awkward position. They have already reviewed the OFIC database and have agreed it is the most accurate available. Now the Forest Service and BLM will develop a new database which will also be accurate. The two databases will, however, be different. Depending on how different they are, the FWS will be in a position of having to decide which one they will use when reviewing 4(d) Rules, Habitat Conservation Plans, or deciding how much habitat is needed on private lands to protect threatened species.

This was the purpose of the meeting to search out ways to minimize a "database war" when the effectiveness monitoring database is completed. As a result of this meeting, NFA and OFIC will be invited to review and comment on many of the ongoing sub-projects within the effectiveness monitoring program. This will include participating in a comparison of the two databases, the development of growth models to be used to project vegetation and habitat into the future, and the development of owl population viability models. /*Ross Mickey*

## Where Has all the Money Gone?

Washington's trust beneficiaries received a rude awakening in early December when the Board of Natural Resources received from DNR the stark reality of a collapsed market place. The Common School Trust (which funds K-12 construction) will be broke and in arrears while DNR faces a multi-million dollar operations budget shortfall. The shortfall cause is multi-faceted, begun by market forces, exacerbated by higher operating costs from HCP implementation.

The Board and DNR, as are many in the forest industry, struggle to deal with the shortfall and may ask the legislature for help. The legislature, however, has a full agenda of paying for the Governor's proposed programs, Referendum 49 (transportation) funding, salmon restoration along with a burgeoning Boeing layoff. Stay tuned. / *Bob Dick*

## Governors Embrace "Enlibra"

The Western Governors' Association (WGA) has adopted a new shared doctrine for environmental management they have termed "Enlibra." While you won't find the word in the dictionary and the spell checker on your word processing software won't correct a misspelling of the term, it is an exciting new approach to resolving environmental issues that has strong bi-partisan support from western governors. Quite simply, it is an effort to empower states and local interests in resolving environmental issues heretofore dictated by federal regulators.

Nearly 400 representatives of industries, government and environmental groups participated in an Environmental Summit December 3-4 in Phoenix, Arizona to hear directly from the WGA about the new approach. In addition to NFA, some of the notable participants included Chairman-elect of the President's Council on Environmental Quality George Frampton, Director of the U.S. Fish and Wildlife Service Jamie Clark, Director of the BLM Tom Fry, a number of national environmental groups and several western governors.

Governor John Kitzhaber (D-OR), WGA Chairman Governor Jim Geringer (R-WY), Governor Mike Leavitt (R-UT) and Governor Gary Johnson (R-NM) hosted the two day meeting and participated with invited guests in explaining the Enlibra doctrine. Enlibra is founded on eight fundamental principals: 1) National Standards, Neighborhood Solutions; 2) Collaboration, Not Polarization; 3) Reward Results, Not Programs; 4) Science for Facts, Process for Priorities; 5) Markets Before Mandates; 6) Change a Heart, Change a Nation; 7) Recognition of Costs and Benefits; and 8) Solutions Transcend Political Boundaries. Utah Governor Mike Leavitt observed, "This nation's

environmental laws are 25 years old. They compel people to do things. The process is too slow, too costly and too contentious. Enlibra is a symbol to perpetuate a new way of resolving environmental issues with balance. Those that want to solve problems will find this attractive, those that want to divide and polarize won't."

Environmental representatives expressed skepticism about Enlibra from the opening forum through the closing ceremonies, particularly regarding how the new process might affect the management of federal lands. They clearly are nervous about state governments enhancing their influence on how federal lands are managed in the respective states. This participant, however, found the discussion to be extremely productive, exciting and refreshingly bi-partisan. While a lot of work remains to be done, it is clear that western governors are committed to this process. The train is leaving the station and NFA, for the time being, plans on going for the ride. */Jim Geisinger*

## Emergency Rule Update

NFA, Washington Contract Loggers Association, Association of Washington Businesses and small woodlot owners' challenge of the Washington State Forest Practices Board's Salmonoid Emergency Rule is moving ahead. Thurston County Judge Hicks has accepted our motion to supplement the original complaint to include the Forest Practice Board's (FPB) new Salmonoid Emergency Rule. Hicks wrote his own order that specified this would proceed as if it were a new appeal from a new administrative record. We view this as a positive situation since the state was likely to argue that they were just following the court's earlier order.

A small group of Washington organizations are considering filing an amicus brief on our side. The groups include: Washington Association of Realtors, Building Industry Association of Washington, Washington Farm Bureau, Association of Washington Cities, Association of Washington Counties and Washington Public Ports. Our amended complaint will also include the FPB's new Bull Trout Emergency Rule, which basically applies the salmonoid rule to the eastside. */Chris West*

## Negotiations Break Off

As was reported in the last FORUM, U.S. District Court Judge Dwyer granted defendant intervenor status to four western Oregon companies that are the high bidders on BLM sales. These timber sales and many others have not been awarded due to ONRC's challenge of the President's Northwest Forest Plan. ONRC and the Clinton Administration refused to grant the industry access to the negotiations making claims that the two parties have a privileged relationship. Industry attorney Mark Rutzick filed papers with the court asking the government to present a knowledgeable individual to be deposed. Then all of a sudden, the negotiations broke off and now the government has asked us to join in requesting Dwyer dismiss the case.

While we are not certain what caused the negotiations to break down, we are pleased that the government has decided to ask Judge Dwyer to dismiss the case. Still pending are the award of several dozen BLM and Forest Service timber sales. Should the agencies move forward and award the sales, we would expect ONRC to ask the judge for an injunction. */Chris West*

## Timber Sales Approved

Finally, after three decision notices and two appeals, the Forest Service has approved the Cold Springs/Switchback Timber Sales. The three sales have been appealed by environmental groups alleging that they would harm wolverines, sensitive plants, soils, water quality, and the wilderness and roadless characteristics of the area. After two iterations of analysis and appeal, the Forest Service was finally satisfied that all these concerns had been adequately addressed.

Of the three sales, the first, the Long sale, has already been sold. It includes about 5.5 million cubic feet of timber and sold for just under $450,000. The second, the Switchblade sale, is scheduled to be sold in early 1999. The third, the Pelican sale, has not been scheduled for sale. / *Chuck Burley*

## Hi-ridge Cancels Contracts

Hi-ridge Lumber Company of Yreka, California has come to a mutual agreement with Undersecretary of Agriculture Jim Lyons to cancel six high priced timber sales, totaling 13 million board feet. The sales were prepared and sold prior to the President's Northwest Forest Plan and the state's spotted owl plan. Given these facts, Hi-ridge argued that it was in the public's interest to cancel the sales. The company even enlisted local environmentalists in their cause.

The Forest Service responded by having the sales reviewed by a team of research and timber sale experts, who determined that there was no justifiable reason to cancel the sales. They also noted in their report that any federal officer that cancels the sales may be personally liable for foregone financial return to the Federal Treasury. The decision to cancel the sales came from Washington D.C., but agency officials all the way down the chain refused to sign the cancellation letter. Ultimately the letter was signed by Lyons and now there has been a whistleblowers complaint filed with the Department's Office of Inspector General, as well as several Freedom of Information Act requests. /*Chris West*

## New Suspension & Debarment Rules

The Forest Service has issued new direction to the field on suspension and debarment actions associated with timber sale contracts. Under the new guidance, causes for debarment include conviction of or civil judgement for: 1) commission of fraud or a criminal offense in connection with obtaining a timber sale contract, 2) violation of antitrust laws, 3) timber theft, 4) other offenses indicating a lack of business integrity; and violations of terms of the timber sale contract such as: 1) willful failure to perform, 2) history of failure to perform, and 3) willful violation of a statutory or regulatory provision of the contract. Furthermore, the proposed export rule to implement the Forest Resource Conservation and Shortage Relief Act of 1990 will also include provisions for debarment.

The direction on what constitutes unsatisfactory performance on timber sale contracts includes: 1) contract cancellations for serious or continued violations of contract terms, 2) contract cancellation for violations of criminal or civil statutes or environmental quality regulations and 3) contracts terminated for purchaser's failure to cut or defaulted sales.

Under a recent Office of General Counsel opinion, debarment can also be caused by the conviction under a Forest Service Violation Notice. There are a few exceptions to this mandatory referral policy for Violation Notices (VN) which are: 1) if the VN is issued to a person who is not a timber sale contractor or sub-contractor and 2) if the VN is issued for violations of individual issued permits such as firewood or Christmas trees.

NFA staff will continue to track this issue and work with other regional and national associations to address what appears to be a significant lowering of the threshold for debarment and/or suspension. / *Chris West*

## Washington Inventory Due

It seems such a short time ago the industry debated federal inventory of Washington's forest lands, yet it has been almost ten years. As Oregon finishes their inventory, the Forest Service gears up to do Washington.

The Forest Service conducts three kinds of inventories. The annual Forest Health survey determines forest health on all forest lands,

including reserves (national parks, wilderness areas, etc). National Forest System (NFS) lands are inventoried by Region Six for planning purposes and President's Northwest Forest Plan monitoring. The Forest Inventory and Analysis (FIA) inventory is conducted on all non NFS forest lands through a combination of air photo interpretation and ground truthing.

The FIA survey creates a state, regional and national database that reflects land base changes, timber type, growth and mortality. A variety of useful statistics can be used from this data ranging from commodity production studies and large-scale forest health analysis, to documenting urban sprawl's effect on the timber base. Washington's FIA inventory is expected to be conducted in 2000 and will concentrate on regulatory affects, especially riparian zones.

The University of Washington College of Forest Resources is coordinating user group input to ensure the next FIA survey collects and analyzes pertinent data. NFA is part of this group and will continue to report on its progress. */Bob Dick*

## Cost Share/Access Meeting

On December 9, the AF&PA Cost Share and Access Committee met in NFA's Portland Office to discuss several important issues and develop strategies to deal with them. The agenda included: 1) cost share formula in light of reduced federal harvest, 2) reductions in federal road maintenance budgets, 3) loss of qualified cost share specialists, 4) status of the Forest Service's roads moratorium and assessment, 5) update on the BLM reciprocal right-of-ways and 6) access problems due to endangered species and other agency requirements.

Company representatives described dramatic changes in cost share formulas when replacing storm damaged bridges. They also told of lop-sided maintenance expenses due to the Forest Service's limited budget. Probably the most disturbing fact was the loss of certified cost share specialists. The committee is considering asking for a meeting with agency representatives to discuss our concerns. / *Chris West*

## Water Quality Management Plan

The Clean Water Act requires states to assess waterways and determine if their water quality is "limited." These water quality limited streams are then placed on what is called the 303(d) list, referring to section 303(d) of the Clean Water Act. Once a stream or river is placed on this list, Oregon landowners whose land included the waterway are required to develop a Water Quality Management Plan which is in compliance with the TMDL (Total Maximum Daily Load) developed by the Oregon DEQ. This requirement pertains to federal, state and private landowners.

The Siskiyou National Forest and the Medford BLM have developed such a plan for the Greyback and Sucker Creek watersheds in southern Oregon. Written comments on this plan are being accepted until January 15 and should be mailed to John Blanchard, Oregon DEQ, 201 West Main, Suite 2-D, Medford, Oregon 97501. Copies of the plan and TMDL can be found on the Internet at http://www.deq.state.or.us. Click on "water quality" then on "water quality program public notices." / *Ross Mickey*

## Seattle Unveils Watershed HCP

The City of Seattle recently published for comment a draft watershed Habitat Conservation Plan (HCP). Seattle's Cedar River Watershed comprises over 90,000 acres of the upper Cedar River in Washington's central Cascades which provides high quality water, timber and fish habitat.

The preferred alternative will cost Seattle residents $84 million over the fifty year plan life. While timber harvest has never been the driving land use on watershed lands, it has paid for many improvements to Seattle's water supply system.

Timber production under the HCP is relegated to a minor role. Environmentalists criticize proposed modest harvest preferring to eliminate commercial logging within ten years.

Timber harvest, ironically, has provided the city substantial revenues for almost a century at no cost to water quality. Sounds a lot like Portland's Bull Run! /*Bob Dick*

## Mountain Quail Decline

According to Oregon State University (OSU) researchers, the mountain quail population in eastern Oregon has declined to the point where it may soon be considered for endangered species listing. This preliminary finding is based on two years of study out of a four-year research project involving OSU, the Oregon Department of Fish and Wildlife, the BLM and the Forest Service.

Mountain quail are abundant on the westside of the Cascades. However, their numbers are so low on the eastside, they are already considered a sensitive species. Their habitat was once quite extensive and several decades ago it was believed they existed in every county of eastern Oregon.

The researchers believe the mountain quail's demise is conversion of wildland to agriculture and other uses. Also, the changes in how fires occur across the landscape is believed to have had an impact. Historically, small, fast-moving fires in eastern Oregon cleared out the underbrush and stimulated the growth of seed-bearing plants which were a staple for the quail. Now, however, with the suppression of wildfire, underbrush has taken over and reduced this food supply.

Don't confuse the mountain quail with the other, much more common quail, the California valley quail. The valley quail is seen throughout most of eastern Oregon and is believed to be doing quite well. /*Chuck Burley*

## Old Growth Products & US Corps

Environmentalists have apparently persuaded 27 United States corporations to renounce buying wood and paper products made from old growth trees. Companies include: IBM, Nike, Hewlett-Packard, Kinko's, Starbucks, Hallmark Cards, Johnson & Johnson, Levi Strauss, 3M, Bristol Myers Squibb, McGraw Hill and fifteen others. The campaign was organized by the Coastal Rainforest Coalition with its most prominent target being the harvest of trees from the coastal forests of British Columbia.

Three of the companies have now denounced the use of their names as members of the old growth boycott. IBM, Hallmark Cards and Starbucks have withdrawn their support and state their names were used without their permission. Thanks to organized labor for following up with each of the companies to verify the claims of the Coastal Rainforest Coalition. The coalition in a full page ad in the New York times criticized several companies including Home Depot, AT&T, Wal-Mart, Home Base and the Los Angeles Times for purchasing products made from old growth. /*Chris West*

## Blackwood/Quigley Get Award

The High Desert Museum in Central Oregon has awarded Jeff Blackwood and Tom Quigley the Earle A. Chiles Award and $10,000 apiece. The award recognizes them for their leadership of the Interior Columbia Basin Ecosystem Management Project and its associated long-term shift in resource management philosophies.

"We've sunk our hearts and souls in the project," Quigley said. He feels that the project has led to a different view of the world. "As we spent five years sharing and studying the same problems, we now have a far better common understanding." Quigley believes that "Our views of how the world operates are grounded on common understandings now. We can talk in substance."

The Chiles award, established in 1983, was named for the late Earle A. Chiles, a long-time executive of Fred Meyer Inc. Mr. Chiles had a keen interest in conservation of the Northwest's natural resources. */Chuck Burley*

## FS Personnel Changes

Forest Service Chief Mike Dombeck has announced that Ann Bartuska will be the new director of forest management, replacing Dave Hessel who retired earlier this year. Bartuska is the first woman in this position and will be coming from a post in the agency's State and Private Forestry where she was director of forest health protection. She has a B.S. in biology, M.S. in botany and a Ph.D. in biology.

Chief Dombeck also announced that Jack Craven will be the new director of lands. Craven has been acting director since Ellie Towns became the new Regional Forester in Albuquerque, NM. He has held a variety of positions with the agency in several regions and the Washington Office. Craven is a native of Kalispell, MT. */Chris West*

## Holiday Office Closures

NFA's offices will be closed December 24 and 25 for the Christmas Holiday and January 1 for New Year's Day.

Our staff wishes everyone a happy and safe holiday season.

FORESTRY FORUM

COMPLIMENTARY

Vol. XIII, No. 6 March 19, 1999

## It's Official: Salmon Listed

This week, seven salmonid stocks in Washington and two in Oregon were listed under the federal Endangered Species Act. The new listings will require federal rules that will govern what people can and cannot do on federal lands or under any action requiring a federal permit or decision. Rules will also be developed that will govern what can or cannot happen on state and private lands. State and local governments will have nominal control, but the federal government is poised to take over if, in its opinion, state/local governments falter.

There is a major disconnect between public perception of salmon protection and who pays for it. A Washington state poll found people quite willing to spend someone else's money to protect salmon, but they don't think the listings will affect their lives. The list of potential impacts includes developers, agriculture, commercial and sports fisheries, small hydro projects and homeowners. Planning will become more stringent, permits will be more complex and restrictive, homeowners may find restrictions on water, and pesticide use.

For some time, timberland owners and operators have been negotiating solutions. It remains to be seen what effect listings will have on urban and industrial environments, especially ports and other estuarine areas. The same goes for flood control dikes and channelization, urban developments, etc… Since the ESA provides for citizen suits, as the timber industry knows all too well, there is the risk that there will be this form of legal mischief. / *Bob Dick*

## Property Rights

Congressman Don Young (R-AK) has introduced the "Landowners Equal Treatment Act of 1999" in an effort to level the playing field for the enforcement of the Endangered Species Act. The stated purpose of the bill is "to increase the efforts of private property owners to protect and restore habitat for wildlife, by ensuring that their constitutional and legal property rights will be honored, respected, and protected in the implementation of the Endangered Species Act of 1973."

The key provision in the bill is the extension of the term "constructive use" from federal lands to private property as well. For purposes of this Act, "constructive use" is defined as 1) substantial diminution in the normal or reasonably expected uses of non-Federal property; 2) a reduction in fair market value of non-Federal property of 25

What's Hot

Forget doing an HCP....page 2
Schools & counties unite....page 2
ESA too costly....page 4
A conflict of interest....page 5



D. Ex. 5

percent or more; or 3) in the case of the right to receive water, any diminution in the quantity of water received or available for use. The bottom line here is if private property is affected in any of these ways as a result of ESA enforcement, the owner is entitled to compensation from the Federal government. The "constructive use" doctrine has traditionally applied only to Federal lands when non-Federal entities use such properties.

The bill, which formally amends the Endangered Species Act, will be referred to the House Resources Committee which Congressman Young chairs. */Jim Geisinger*

## HCP Process Take Direct Hit

This week, U.S. District Court Judge Marilyn Patel issued a preliminary injunction in a case brought by environmentalists against Pacific Lumber Company (PALCO) and their Habitat Conservation Plan (HCP). The challenge had claimed that once a landowner apply for a HCP with the federal government, no new activities could occur. Judge Patel enjoined three of PALCO's approved timber harvest plans from any further logging, including removal of felled timber. The preliminary injunction is to remain in effect pending a decision on the merits.

The added twist is that PALCO had recently petitioned the court to dismiss the case since it was now moot given their HCP had been approved on March 2 as part of the infamous Headwater deal. The plaintiffs argued that the case should proceed because consultation may be reopened for any number of reasons. Judge Patel issued her decision just hours before hearing arguments on the mootness issue.

This is a very bad decision for any company with a pending HCP application or anyone considering filing one. It adds considerable risk to all HCP applications. Given the fact that Judge Patel issued this injunction just prior to hearing arguments on whether the case was moot, one could conclude that the case will be heard on the merits. Given the decision on the preliminary injunction, the judge could issue a final decision that finds timber activities must halt while HCP applications are pending and that timber harvests can be enjoined after a final HCP is issued whenever issues arise that require consultation to be "reinitiated" or reopened. Stay tuned. */Chris West*

## County/School Coalition

The National Association of Counties (NACO), organized labor, the American Association of School Administrators, Organizations Concerned About Rural Education, the U.S. Chamber of Commerce, the Farm Bureau, the National Education Association and others have formed the Forest Counties and Schools Coalition. The purpose of the coalition is to protect the economic viability of rural communities, and the school children in these communities, by working to ensure that federal lands are managed for the benefit of the communities that depend on them. The catalyst for forming the coalition was the Clinton Administration's proposal to "decouple" Forest Service payments to counties from the agency's timber sale program.

**FORESTRY FORUM**
*is the bi-monthly newsletter of the*
Northwest Forestry Association
1500 S.W. First, Suite 770
Portland, Oregon 97201
(503) 222-9505 • (503) 222-3255 - fax
www.nwforestry.org

Jim Geisinger, *Publisher*
Chris West, *Editor*
Cindi Barrett, *Assistant Editor*

**Contributors:**
Chuck Burley, (541) 389-2306
Bob Dick, (360) 352-3910
Ross Mickey, (541) 342-1892

The Forestry Forum can be found on WoodCom under The Wood World - Associations - NFA - Forestry Forum

Copyright 1999 Northwest Forestry Association

The coalition believes that 1) forest resources should be managed in an environmentally responsible manner to produce long-term sustainable revenue to share with schools and counties as well as products for the nation; 2) the revenue loss to counties from federal ownership of forest resources should be mitigated by the Federal government with funds for schools, roads and other local purposes and 3) compensation to counties should be equivalent to 25% of all gross receipts from the national forests, 50% of the O&C receipts and 4% from Public Domain land receipts.

Should a "safety net" approach be adopted by the administration, the coalition would insist that it be short term in nature, that county receipts be the higher of either the safety net amount or the actual timber receipts, and that when the safety net amount is the higher figure, the difference be paid from the agency's budget from non-revenue producing accounts.

NFA and many other forest products organizations have signed onto the Coalition which will be lobbying Congress to adopt this approach. */Jim Geisinger*

## Dwyer Decides Survey & Manage Case

This week, U.S. District Court Judge William Dwyer issued his opinion on motions by the government and industry intervenors to dismiss the environmentalist's case challenging the President's Northwest Forest Plan. The good news is that Dwyer dismissed the claims challenging the survey and manage protocols, finding that the claims were not ripe. Unfortunately, Dwyer refused to dismiss the plaintiff's claim that the Forest Service and BLM must prepare a supplemental environmental impact statement for the plan due to changed circumstances since 1994. The alleged new circumstances include new endangered species listings, new Clean Water Act designations, Section 2001 timber sales, as well as a lack of rare species surveys. The case is still alive.

Also this week, but prior to the Judge's decision, the plaintiffs filed a motion asking the court to grant a temporary restraining order or preliminary injunction against four BLM sales in southern Oregon and one sale on the Mt. Hood National Forest. They are attempting to block the award and/or operation of these sales. Since the basis of their request is the survey and manage protocols it is unclear what will happen to the motion. Given Dwyer's decision, the environmentalists have an option to amend their compliant. Stay tuned. / *Chris West*

## Neotropical Migratory Bird Conservation Act

This week the House Resources Committee approved the Neotropical Migratory Bird Conservation Act. The committee chairman, Congressman Don Young (R-Alaska) sponsored the bill (H.R. 39). A similar bill has been introduced in the Senate (S.148) by Senator Spencer Abraham (R-MI).

The legislation would require the Secretary of the Interior to establish a program to provide financial assistance for projects to promote the conservation of neotropical migratory birds. It authorizes project proposals to be submitted by the following entities: 1) individuals or other private entities; 2) Federal, State, or local government entities or foreign government entities; 3) other entities subject to U.S. or foreign jurisdiction; and 4) international organizations. It also limits the federal share of project costs to 33 percent. The funding for these projects would be maintained through the Multinational Species Conservation Fund of the Treasury in a Neotropical Migratory Bird Conservation Account. When Young introduced the bill, he stated that he hoped the bill would "contribute to the recovery and conservation of migratory birds, without violations to private property rights." A copy of the act can be viewed on the Internet at http://thomas.loc.gov/cgi-bin/query/z?c106:H.R.39. */Ross Mickey*

## Loomis Controversy Won't Die

We've told you about the Loomis over the past several years. Bugs are eating their way through a substantial part of the central Washington common school trust forest. Beneficiaries sued the trust manager DNR for mismanagement, getting a favorable decision but no compensation. The environmentalists sued DNR alleging violations of federal ESA and state Clean Water Act. DNR settled the suit by allowing the environmentalists to attempt to purchase 24,000 acres (about 15%) of the Loomis forest. DNR's appraisal is questioned by many for undervaluing land and timber. The environmentalists have been soliciting Microsoft employees to pony up the $13 million needed to pay for what is, in essence, a permanent cutting right for timber that never will be harvested. They have reportedly raised $5 million.

The latest chapter is a group of five north-central Washington school districts have taken strong exception to the agreement and the accompanying price tag. They also have yet to receive from DNR a copy of the appraisal, although they did receive a copy from environmentalists. The school districts are extremely unhappy.

The school districts letter expressed concerns with the appraisal, actual and potential revenue production, impact on local school districts, timber markets and values, etc. The word, "lawsuit" does not appear in the letter, but the stage is certainly set for yet another trip to court or the legislature. /*Bob Dick*

## How is DNR Spending Trust Money??

This week, the Washington Contract Loggers Association released a report that documents questionable spending by DNR. For instance, DNR purchased 1,800 eco-writer pencils ($2,700) for the Tahoma Audubon Society to give away at the Puyallup Fair. DNR gave top managers whose present salaries range from $70,000 to $95,000 per year, 10% raises, while cutting staff at field and production levels and trying to manage a projected $30 million deficit. DNR requires multiple signatures to buy critical equipment, such as GIS software, but spends $30,000 to remodel a reception area. Perhaps most telling is a personal services contract to hire a facilitator for an Executive Management Team meeting. All these expenses were paid by trust beneficiaries who wonder why their revenues are down. /*Bob Dick*

## Enviro's Say ESA Too Costly

For years, the industry has documented the severe economic impact related to restriction resulting from the listing of species under the Endangered Species Act. Long ago, this argument was dropped in discussions about changes to the ESA because the press and public seemed to accept the fact that the protection of these species was worth the price being paid by business.

A recent court case involving private lands taking is causing environmentalist to fear that the public will not support protecting all of these species if they have to foot the bill. The case involves a piece of land Boise Cascade planned on harvesting, but was prevented from doing so because of historic use by spotted owls. After years of litigation, Boise Cascade was awarded $1.8 million as partial compensation for leaving the trees. Environmentalists fear that if this becomes commonplace, taxpayers will revolt and not be as supportive of the ESA. /*Ross Mickey*

## Coos Bay Road Case Appealed

The plaintiffs in the Coos Bay BLM road case have appeal to the Ninth Circuit Court of Appeals, U.S. District Court Judge Michael Hogan's decision dismissing their case. Judge Hogan had determined that the BLM's supplemental Environmental Assessment adequately considered the potential spread of the Port Orford Cedar Root Rot disease, the impact of several timber sales and a reciprocal right-of-way. Hogan's dismissal also relied on the recent Supreme Court decision, Ohio

Forestry, where it was decided that challenges must be brought on site-specific projects or decisions and not general management plans.

In their appeal, the plaintiffs argue that they can challenge the Coos Bay Resource Management Plan and that Hogan misapplied Ohio Forestry. They are also challenging Hogan's decision that the supplemental EA was adequate. NFA and DTO plan to intervene in the appeal. */Chris West*

## FWS Takes Contradictory Position

The U.S. Fish and Wildlife Service (FWS) has contradicted itself on resource management issues. The agency opposes the Pelican Butte ski resort based on concerns that development will harm threatened bald eagles and other species.

However, the FWS has enlisted the aid of the BLM to log the Bear Valley National Wildlife Refuge in the Klamath basin. It's the first time logging has occurred in a wildlife refuge according to the agency. The FWS called upon the BLM to help out since they have no prior experience with timber sales.

The valley, a patch of old growth pine and Douglas fir, is one of the largest North American bald eagle wintering areas outside of Alaska. The logging is supposed to reduce fuel loading and enhance the habitat. The sale included harvesting trees up to 30 inches in diameter. */Chuck Burley*

## Ranger Under Investigation

Rob Shull, Klamath District Ranger for the Winema National Forest, is under investigation for a possible conflict of interest. Shull is responsible for the environmental impact statement relating to the proposed Pelican Butte ski resort on the Winema. Until recently, Shull was the president of the Klamath Falls Chamber of Commerce, which is a big supporter of the proposed project.

The inquiry was launched after an article appeared in the newsletter of the Association of Forest Service Employees for Environmental Ethics. The article questioned Shull's involvement with the chamber while he was also responsible for the project's analysis. The article also questioned Shull's accompanying a group of Klamath Falls city officials, chamber representatives and Jeld-Wen officials on a trip to Utah last year to seek improved airline service to their city. */Chuck Burley*

## WWF Targets Klamath-Siskiyou Area

The World Wildlife Fund (WWF) has set up an office in Ashland, Oregon and is teaming up with local environmental groups to work towards more preservation of land in the Klamath-Siskiyou ecoregion. Last year, the WWF issued a report which identified more than 200 of "the world's most outstanding and essential habitats." They call this assessment the Global 200. In order to focus their efforts, the WWF picked 25 areas to concentrate on over the next few years. The Klamath-Siskiyou ecoregion is one of them.

In each of the Focal 25, WWF seeks "to mobilize action by putting a comprehensive conservation strategy to work, protect key habitats and wildlife populations, unite development and conservation by promoting sustainable industries and markets for their products, and lay the foundation for lasting conservation through training, education, policy shaping, and strengthening of local partners." You can obtain more information about this on the Internet at http://www.worldwildlife.org/index/frame_index.htm. */Ross Mickey*

## Court Rejects Enviro's Appeal

The Ninth Circuit Court of Appeals in a 3-0 decision rejected environmentalist's challenge of the National Marine Fisheries Service's (NMFS) plans to protect Columbia River salmon from the effects of federal dams. The Appeals Court ruled that NMFS used proper standards in a 1995

assessment of dams' impact on the sockeye, spring and summer chinook and fall chinook. The agency's decision was to increase river flows to assist young salmon to sea and to continue to use barges to carry salmon past dams. In this decision, the Ninth Circuit upheld U.S. District Court Judge Malcom Marsh's earlier decision in favor of the government. */Chris West*

## Fish and Diamond Lake

Diamond Lake in central Oregon is teaming with fish. The problem is that these fish are tui chub which the FWS feels is having deleterious effects on the lakes rainbow trout and other aquatic species. This same problem existed in the early 1950's when the lake was poisoned to kill the tui chub so that rainbow trout could be reestablished. The FWS is currently developing an environmental impact statement to analyze different alternatives to deal with this problem. For more information, contact Dave Loomis at 541-440-3353. */Ross Mickey*

## Marking Paint Suit

Last week, a group of current and former Forest Service employees filed a lawsuit in Washington D.C. to stop the agency from using oil-based tree marking paint, which they claim causes miscarriages and other ailments. You will recall that on December 21, 1998, Forest Service Deputy Chief Bob Joslin issued direction that by May 15, 1999, all tree marking will be done with water-borne paint. The plaintiffs filed the suit because they said the agency was backing off of the mid-May deadline. A Forest Service spokesman denied the claim and stated that the agency remains on schedule to terminate all use of oil-based paint in May.

Earlier this month, Congresswoman Helen Chenoweth (R-ID), Chairman of the Resource Committee's Forests and Forest Health Subcommittee, sent a letter to Forest Service Chief Michael Dombeck on this issue. Chenoweth asked the agency to provide the committee with a comparison of the current paint and the new water-borne paint as they relate to OSHA and GSA standards. Chenoweth also asked questions regarding current paint inventories and the ability to procure enough of the new paint to meet the needs for this coming field season.

Also this month, the Federal Timber Purchasers Committee (FTPC) sent a letter to the Chief expressing concerns over the new paint's durability, as well as the impact to the timber sale program based on availability of the paint, as well as the cost of disposing of the oil-based and purchasing the new water-borne paint. FTPC asked the Chief to consider a phase-in approach for the new paint. This would minimize the disruption to the timber sale program, allow for additional paint durability testing and would be fiscally responsible. */Chris West*

## Timber Protest Bill

Oregon State Senator Bill Fisher of Roseburg has introduced legislation aimed at restricting protests at timber sites. Senate Bill 653 creates a crime of "unlawful presence" for individuals within a quarter-mile of a timber harvest who are not authorized to be there. The perimeter includes all access roads to the site, effectively eliminating the chance of protesters within the vicinity of any logging operation. Those found to have violated this statute would face a felony punishable by up to five years in prison and a $100,000 fine. Fisher introduced a similar bill last session but it never made it out of committee. His intent is to stop protesters from disrupting legal timber harvests. */ Chris West*

## Battling Websites

The Idaho Conservation League is upset over a new web site created by the Pulp and Paper Workers Resource Council in Lewiston, Idaho. The new site can be found at

www.idahoconservation.org. The union's objective for the web site is to rebut information on the Idaho Conservation League web site which goes by another internet address.

What is so ironic is that it was the Idaho Conservation League that has brought all kinds of attention to the new site, including an article in the Wall Street Journal. Prior to the news story, the Pulp and Paper Workers' site had received less than 150 "visits" in about three months. Within a day of the Wall Street Journal article, the web site had more than doubled its visits. Pulp and Paper Workers are excited about all the publicity. Way to go you guys. */Chris West*

## Winema Gets New Supervisor

The Forest Service has announced that Chuck Graham, currently forest supervisor of the Fremont National Forest, will also be the new supervisor of the Winema National Forest. This is one more move in a sweeping reform by the administration to improve efficiency and reduce costs.

Graham will replace Bob Castaneda who recently transferred to the Kootenai National Forest in Montana. Graham has already selected Mary Erickson, the Chemult District Ranger, as his acting deputy for the Winema.

There are several other similar instances in Region 6, where the agency is looking at combining offices to lower costs. The Siskiyou and Rogue River National Forests are currently being administered by one forest supervisor. With the retirement of Jim Hancock, BLM district manager for the Prineville district, the two agencies are looking at ways to combine staffs and co-manage their lands. Also in Oregon, the Snow Mountain Ranger District on the Ochoco National Forest and the Burns Ranger District on the Malheur National Forest are exploring co-locating with the BLM office in Burns. */Chuck Burley*

# TIMBER SALE PROSPECTUS

Timber Sale: Jack Heli, Klamath National Forest, Scott River Ranger District

1. INTRODUCTION. This prospectus furnishes prospective bidders with information not contained in the published advertisement and is designed to enable bidders to decide whether or not to further investigate the sale. The contract does not include descriptions, estimates, and other data in this prospectus, unless otherwise stated. In the event that the prospectus contains an error or contradicts the sample contract, the contract governs. Bidders are urged to examine the timber sale and make their own estimates. The sale uses form FS-2400-6. Inspect the sale area and the sample contract before submitting a bid. Obtain the appraisal, other information on the timber, and conditions of sale and bidding at Forest Service offices named in the attached advertisement.

2. BIDDING. This is an ORAL AUCTION sale. Bidders must submit sealed initial bids on prepared forms they can obtain from Forest Service offices listed in the attached advertisement. The forms include instructions for bidding and submission of the required bid guarantee of $10,700.

Total Value Bidding and Proportional Rate Bid Distribution:

Submit bids in terms of the total bid value for the timber sale. Only bids that display the total bid value for the timber sale shall be accepted. The proportionate rate method will be used for distributing the bid premiurr among advertised species or species groups with listed volumes.

For such sales, the contracting officer shall accept only those bids that represent the total bid value for the timber sale. Species bid values shown on the bid form by the bidder will be disregarded. After receipt of bid: and determination of high bidder, the contracting officer shall assign bid premiums and include this informatior in the bid award information sent to the high bidder.

The bid premium shall be assigned using the following formula:

Bid ratio = total bid value divided by total advertised value.

Bid rate per hundred cubic feet (CCF) = bid ratio multiplied by the advertised rate for each species c species group.

The average bid rate after assignment of the bid premium shall total to within $0.01 per CCF of the average bi rate prior to the assignment of the bid premium.

3. LOCATION AND DESCRIPTION OF TIMBER. Refer to the sale area map attached to the samp
contract and to the sample contract for legal subdivisions and the location of cutting areas, the acreage of sa
area, and the harvest unit acreage. THE FOLLOWING GENERAL LOCATION, ROUTES OF ACCES:
ACREAGES, AND OTHER SPECIAL LOCATION DATA DO NOT SUPERSEDE THE SALE AREA MA
OR SAMPLE CONTRACT. Sale is located approximately 50 miles southwest of Yreka, California, and
accessed via State Highway 3 southwest to Callahan, County Road IC02, then southwest into sale area. Sale
approximately 10 miles from Callahan. Units 11 and 12 can be accessed best through private land. See Sa
Area Map. Sale consists of 25 units with approximately 14,120 CCF on approximately 1,507 acres planned f
helicopter yarding. All trees are Individual Tree Marked with blue paint on stump and bole. Quadratic me:
DBH, all species combined, is 18.0 DBH. This is a pre-marked sale.

EXHIBIT
tabbies
1 (tab 10F)

4. TIMBER VOLUMES AND RATES. The quality, size, and age class of the timber are estimates based on detailed cruise information on file and available for inspection at the Forest Service offices listed in the advertisement. INFORMATION LISTED HEREIN IS MADE AVAILABLE WITH THE UNDERSTANDING THAT VALUES SHOWN ARE NOT ESTIMATES OF A PURCHASER'S OWN RECOVERY AND ARE NOT A PART OF THE TIMBER SALE CONTRACT.

THE MINIMUM ACCEPTABLE BID RATE IS STATED IN THE ATTACHED BID FORM. THESE RATES ARE EFFECTIVE AT THE TIME OF ADVERTISEMENT.

| Species | PP/JP | SP/WWP | WF/RF | DF | IC | Total |
|---|---|---|---|---|---|---|
| Estimated Volume, CCF Sawtimber | 4,280 | 234 | 6,864 | 1,793 | 949 | 14,120 |
| Base Indices ($/CCF) | 357.23( E) | 467.63(E) | 191.86(D) | 211.07(D) | (xx) | xx |
| Base Rate | $10.00 | 10.00 | 5.00 | 10.00 | 5.00 | $102,134 |
| Advertised Rate | $10.58 | 11.05 | 5.00 | 10.00 | 6.25 | $106,049 |
| Required Deposits: | | | | | | |
| Slash Disposal (16 U.S.C. 490) | $ 30.40 | 30.40 | 30.40 | 30.40 | 30.40 | $429,248 |
| Estimated Volume, MBF Sawtimber | 2,648 | 142 | 4,091 | 1,072 | 547 | 8,500 |
| CF ratio (sawtimber) | 6.187 | 6.068 | 5.960 | 5.979 | 5.764 | 6.022 |
| Base Indices, MBF | 571.56 | 748.21 | 333.67 | 367.08 | xx | xx |

This sale is being offered using the cubic unit of measure - CCF, or one hundred cubic feet. For informational purposes, the board foot volume (MBF) is also stated in the above table.

Bid rates for timber, except incense-cedar, will be tentative, subject to quarterly adjustment during the contract period. In order to convert WWPA lumber price indices to a cubic foot basis, the following procedure is used:

There are ten conversion factor classifications for each of the species or species groups represented by the WWPA indices. The conversion factor ranges are:

| | Board Feet per Cubic Feet Ranges | MBF to CCF Average | Conversion Factor |
|---|---|---|---|
| A. | 4.0 to 4.49 | 4.25 | 0.425 |
| B. | 4.5 to 4.99 | 4.75 | 0.475 |
| C. | 5.0 to 5.49 | 5.25 | 0.525 |
| D. | 5.5 to 5.99 | 5.75 | 0.575 |
| E. | 6.0 to 6.49 | 6.25 | 0.625 |
| F. | 6.5 and greater | 6.75 | 0.675 |
| G. | 2.0 to 2.49 | 2.25 | 0.225 |
| H. | 2.5 to 2.99 | 2.75 | 0.275 |
| I. | 3.0 to 3.49 | 3.25 | 0.325 |
| J. | 3.5 to 3.99 | 3.75 | 0.375 |

A-415

The objective is to utilize a conversion factor that most closely resembles the actual conversion factor for a given species or species group as indicated in the timber sale cruise report. The selected classification factor identification (A, B, C, D, E, F, G, H, I, or J) will be based on which one of the ranges that the conversion factor

determined from the cruise report falls into. For example, a timber sale of large western larch and small lodgepole pine might have indices identified as Douglas-fir Larch (E) and White Woods (B). Another timber sale consisting of small inland Douglas fir might have a WWPA index identified as Douglas-fir Larch (C).

This procedure has now been set up in the timber sale accounting system. The values represented on the new tables would be the WWPA value for each Index Species multiplied by the MBF to CCF conversion factor.

The term WWPA followed by the factor identification letter would be entered by the Forest for each species-product-unit of measure (S-P-U) as appropriate along with the respective Index Species code and Index Base Value at the time the contract is loaded into the TSA system. The billing adjustment and quarterly escalation processes would use these table values. The computations for the Timber Sale Statement of Account (TSSA) would use the new table values and would follow the same process as is currently performed using the values from the WWPA index table.

The minimum acceptable bid is $106,049 for the sale-as-a-whole. The bid rate for species and unit of measure are assigned under procedures for proportionate rate method to distribute bid premium as noted in this prospectus. The bid rate is based upon the pricing procedures provided by the timber sale contract. This rate has been established by appraisal as though roads specified by the contract are in place. The Forest Service shall credit the purchaser's timber sale account as specified roads are constructed and accepted and Deposits for Reconstruction Engineering Services are paid with applicable purchaser credit up to $186,653.

At advertised prices $182,692 of purchaser credit will be unusable.

Estimated Knutson-Vandenberg deposit for sale area improvement work in a total amount of $54,191 is included in total timber value.

5. PERIOD OF CONTRACT. The normal operating season covers the period between May 15 and October 15. The contract terminates on March 31, 2001. Extensions of this contract may be granted only when the purchaser has met specified conditions.

The purchaser must submit a general operating plan to the Forest Service for approval before operations begin or within 60 days of sale award, whichever is earlier. The plan must show how the purchaser plans to complete the contract by the termination date.

6. PAYMENT. The purchaser shall make timber-related charges in advance of cutting, but may use established purchaser credit, transfer purchaser credit into the contract, or use an acceptable payment guarantee to permit cutting in advance. The purchaser shall make advance deposits in accordance with C4.221 - Advance Deposits of the timber sale contract.

The high bidder whose bid is accepted shall, at the time the contract is signed and returned by the bidder, make a downpayment pursuant to Title 36, Section 223.49, of the Code of Federal Regulations. The Contracting Officer will notify the high bidder of the amount necessary to make this payment. In no case shall the downpayment be less than 10 percent of the total bid value. The bidder may use effective purchaser credit to meet this requirement. After receipt of the downpayment and a satisfactory performance bond and upon execution of the timber sale contract, the Forest Service will return the bid guarantee. This downpayment shall not apply for any payments, transfer to other sales, or qualify for refund until 25 percent of the total bid value has been charged and paid for.

By June 8, 2000, the purchaser shall have paid for or deposited cash in lieu of payment in the greater amount of, either 50 percent of the total estimated bid premium or 35 percent of the total estimated sale value, both estimated as of bid date. Unused effective purchaser credit earned on the sale or transferred in may be used to meet this requirement. The purchaser may not subsequently transfer such credit to another sale unless the credit is replaced by cash. By August 1, 2000, purchaser shall have paid for or deposited cash in lieu of additional payment in the amount of 75 percent of total contract value at bid date, exclusive of Required Deposits.

If a qualified bidder elects to have the Forest Service construct specified roads, the contract shall provide for collection of not less than the full estimated cost of the roads stated in this prospectus in addition to the base rate value and required deposits. For scaled sales, the purchaser must pay the cost as timber is scaled, at a rate accelerated on 80 percent of the estimated volume.

7. PERFORMANCE BOND. A performance bond is mandatory. The penal sum of the bond is to be 10 percent of the total bid value of the sale, rounded up to the nearest $100 when the total bid value is $10,000 or less and rounded up to the nearest $1,000 when the total bid value exceeds $10,000. The minimum bond must not be lower than $404,300.

**The minimum bond requirement must not be less than the estimated costs of postlogging purchaser requirements. For helicopter sales, use 10 percent of the contract bid value or 25 percent of the total merchantable timber yarding costs plus 50 percent of any cost for yarding or piling unutilized material, whichever is greater.**

8. SPECIFIED ROADS. See the sample contract for verification of specific details and information concerning construction specifications. CONSTRUCTION ESTIMATES AND INFORMATION CONTAINED HEREIN, TOGETHER WITH RELATED MATERIAL, ARE NOT GUARANTEED. The following roads are those that Forest Service considers necessary to remove the timber from this sale.

| Road Number: | Name: | | Service Level: | Approximate Mileage: | Purchaser Credit Limit: | Required Completion Date: |
|---|---|---|---|---|---|---|
| 39N63 | East Boulder | (R) | S-10 | 1.36 | $67,058 | August 15, 1999 |
| 41N14 | Camp Eden | (R) | S-10 | 1.57 | 29,372 | August 15, 1999 |
| 41N16 | French Jackson | (R) | S-10 | 6.22 | 70,216 | August 15, 1999 |
| 41N16B | French Jackson | (R) | S-10 | 0.47 | 20,007 | August 15, 1999 |

Total purchaser credits are $186,653.
Total estimated construction cost is $226,128.

A bidder qualifying as a small business concern may elect to have the Forest Service construct the specified roads listed above. Completion dates for construction apply whether construction is performed by the purchaser or by the Forest Service. If the bidder elects Forest Service construction, it is the Forest Service's intent to perform construction through **contract**. In that case, the Forest Service shall not award the timber sale contract unless either it receives a satisfactory road construction bid or, if it fails to receive such a bid within 120 days of opening timber sales bids, the bidder agrees to perform road construction.

9. INAPPLICABLE STANDARD PROVISIONS. See sample contract.

10. SPECIAL PROVISIONS. See sample contract.

11. FINANCIAL ASSISTANCE. The Small Business Administration (SBA) may be able to assist small business concerns in financing construction of specified roads listed in the sample timber sale contract. Such SBA assistance, if available, may be in the form of guaranteed bank loans or direct participation SBA loans. Applicants must meet SBA size and eligibility requirements. APPLICANTS ALSO MUST MEET CREDIT REQUIREMENTS OF SBA AND/OR A LOCAL BANK. APPROVAL OF LOAN ASSISTANCE RESTS WITH SBA AND IS CONTINGENT ON AVAILABILITY OF LOCAL FUNDS OR SBA FUNDS. FAILURE TO BE ELIGIBLE OR TO OBTAIN A LOAN IN NO WAY AFFECTS REQUIREMENTS OF BID FOR ADVERTISED TIMBER SALE OR THE TIMBER SALE CONTRACT. If requested by the purchaser, the timber sale contract can provide repayment of direct SBA loans through the Forest Service as the timber is cut.

12. LOG EXPORT AND SUBSTITUTION RESTRICTIONS. The contract requires domestic processing of included timber except for species declared to be surplus, and prohibits the use of such included timber in substitution for unprocessed private timber exported. These restrictions are based on Title 36, Section 223.160, of the Code of Federal Regulations. The bidder is required to submit a certification that the bidder is in compliance with applicable prohibitions against export and substitution prescribed in the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, et seq.) with each bid.

13. EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE REVIEW. If the total bid value plus required deposits for this contract exceeds $10 million, before the award, the Forest Service shall request an equal employment opportunity compliance review of the high bidder to determine compliance with the provisions of Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967, and 41 CFR 60-1.20(d).

14. AWARD: The Contracting Officer is required to make a determination of financial ability as stated in Title 36, Section 223.101, of the Code of Federal Regulations. If high bidder has one or more defaulted timber sale contracts with undetermined, disputed, or unpaid damages, the bidder may be required to furnish information or securities sufficient to document its financial ability prior to award of this contract.

15. CHANGE IN SAMPLE CONTRACT.

The following changes will be made to the sample contract when Forest Service constructs specified roads.

TIMBER SALE CONTRACT "A" DIVISION

A9 - Title will be changed to: "Permanent Roads to be Constructed by Forest Service."
A10 - Title will be changed to " Purchaser Credit."
A22 - The following provision will be added:
  B2.32 Construction Clearing.
A22 - The following provisions will be removed:
  B5.211 Priority of Drawings
  B5.251 Difference in Rock Cost
  B5.252 Difference in Culvert Installation
  B5.253 Cost Adjustment for Physical Change
  B5.254 Design Change
A23 - The following changes will be made:
  C2.32 "Construction Clearing" will be added.
  C4.1# "Amount Payable for Timber" will be added.
  C provisions relating to Construction of

A-418

Specified Roads will be removed.
C8.41 "Limitation on Performance by Other Than Purchaser" will be added.
Road Specification List and Schedule of Items for each road will be removed.
Individual Special Project Specifications will be removed.

16. GENERAL.

a. Scaling: Special division C contract provisions are included in this contract which require the purchaser to deposit funds in the Timber Sale Accounting (TSA) which the Forest Service will use to pay for Scaling Services provided by Log Scaling Contractors. Bidders should be aware that several significant changes in timber sale contract administration procedures will be required to implement contract scaling using Forest Service provided scaling services. Such changes include, but are not limited to,the following C provisions listed in this prospectus: C6.81, C6.811#, and C6.842.

b. Special Information.

( 1 ) When bidder elects Forest Service construction, bidder shall deliver within 30 days of notice of award a surety bond, or in lieu thereof cash or negotiable securities. Forest Service may consider a request for additional time for delivery of surety bond. Such request will only be considered when the extension period ..s within the time period provided for award of the public works contract for construction of the turned back roads.

( 2 ) Anyone planning to review the sale area on-the-ground should be aware of barrier or gate on Roads 39N16, 40N30, and 40N75. Information concerning road conditions of the appraised haul route may be obtained from the District Ranger's Office.

( 3 ) There are controlled areas within the timber sale area that will require special protection measures.

( 4 ) During the period of advertisement, road plans are available for review or a copy may be purchased at the Forest Supervisor's Office.

( 5 ) C8.211 - Delay of Award. (8/88) To the extent that an appeal or lawsuit is filed challenging the decision to award this contract and results in delay in award for 30 calendar days or more during Normal Operating Season after bid opening, Contracting Officer shall, upon award, adjust the contract term to include additional calendar days in one or more Normal Operating Seasons equal to the actual time award is delayed.

( 6 ) C8.2 - Termination: (10/96) The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (a) to comply with a court order, regardless of whether this sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this sale; or (b) upon a determination by the Chief that the continuation of all or part of this contract would:

(i) cause serious environmental degradation or resource damage;

(ii) be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(iii) cause serious damage to cultural resources pursuant to C6.24#;

(iv) adversely affect species listed as threatened or endangered under the Endangered Species Act, 16 U.S.C. 1531, et seq., or a sensitive species, identified by the Regional Forester.

Compensation for termination under this provision shall be calculated pursuant to C9.5, except; compensation for termination under (a) shall be calculated pursuant to C9.51 when included in this contract and compensation for termination under (b)(iv) shall be calculated pursuant to C9.52 when included in this contract.

( 7 ) C9.51 - Settlement. (8/88) Forest Service may modify or terminate this contract in whole or in part as a result of an administrative appeal or litigation of the decision to sell timber included in this contract.

In the event of modification or partial termination, changes to the contract shall be limited to those determined by Contracting Officer to be necessary for correction of the deficiencies raised by the appeal or lawsuit. Changes to the contract shall be limited to requirements with which Purchaser can reasonably comply.

In the event that this contract is modified or terminated, in part or in whole, under this provision, Purchaser agrees that the liability of the United States shall be limited to the sum of (a) the value of unused Effective Purchaser Credit earned on this sale; and (b) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area. Cost estimates listed in (b) shall be based upon Forest Service appraisal methods in use on the date contract is modified or terminated.

( 8 ) C9.52 - Settlement for Environmental Cancellation. (10/96) In the event of termination of this contract, in whole or in part, by the Chief, Forest Service, based upon the Chief's determination that continuation of all or part of this contract would adversely affect a species listed as threatened or endangered under the Endangered Species Act, 16 U.S.C. 1531, et seq., or a sensitive species identified by the Regional Forester, Purchaser agrees that the liability of the United States shall be limited to the express remedies contained within this provision.

In the event of termination or partial termination, Purchaser agrees that its sole and exclusive remedy shall be the sum of (a) the value of unused Effective Purchaser Credit earned on this sale; (b) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area; and (c) the out-of-pocket expenses involved in acquiring and holding this contract. Cost estimates for items listed in (b) shall be based upon Forest Service appraisal methods in use on the date contract is terminated. Out-of-pocket expenses in (c) do not include lost profits, replacement cost of timber, attorney's fees, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

( 9 ) C6.313# - Limited Operating Period. (1/84) Except when agreed otherwise, Purchaser's Operations shall be limited as follows: No Purchaser's Operations in Unit 31 from March 1 through August 31.

No Purchaser's Operations in Unit 57 from February 1 through July 31. No hauling of more than 5 loads per day on Road 41N16 between Jackson Creek and Little Jackson Creek from February 1 through August 31. No hauling of more that 5 loads per day on Road 41N14 in T40N, R9W, Section 20; M.D.M., from February 1 through August 31. No Purchaser's Operations in Units 98, 100, 102, and 104 from May 23 through September 7, or during first 7 days of deer season. Purchaser is required to give Forest Service 30 days notice before beginning operations in these units.

( 10 ) C6.5# - Streamcourse Protection. (8/31/98) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 300 feet slope distance of the apparent high water mark on Scott River in Units 11 and 12, within 300 feet slope distance of the apparent high water mark in Boulder Creek and East

Boulder Creek in Units 15, 18, and 19, within 300 feet slope distance of the apparent high water mark in Jackson Creek in Units 49 and 53, and within 150 feet of streamcourses shown on Sale Area Map, except as necessary for fire suppression activities. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.

Culverts, bridges or other suitable structures shall be required on tractor roads and skid trails only at points where it is necessary to protect Streamcourses. The type of crossing structure, method of installation and removal shall be determined by agreement. Such structures and associated fills shall be removed by Purchaser in accordance with C6.5.

Damage to Streamcourse or Buffer Strips caused by unauthorized Purchaser's Operations shall be repaired by Purchaser in a timely and agreed manner to the extent practicable as determined by Forest Service to restore and prevent further damage to Streamcourses.

This provision allows establishment of Buffer Strips in riparian reserves as required by the President's Northwest Forest Plan incorporated into the Klamath's Land and Resources Management Plan. The ability to require Buffers of different widths is needed to accommodate Buffers for fish-bearing streams and non-fish-bearing streams, in addition to Buffers needed for late successional species. This provision eliminates the need to post streamcourses within the sale area requiring a Buffer Strip greater than 50 feet. An increasing number of sales contain streamcourses requring various widths in the same unit. An example of the insert for the Jack Timber Sale is as follows: 300 feet in Units 11 and 12 on the Scott River and Boulder Creeks; Units 15, 18, and on the East Boulder Creek, and Units 49 and 53 on the Jackson Creek; and 150 feet in all intermittent and year-round streams other than those listed for 300-foot buffers. Streamcourses will be shown on Sale Area Map.

( 11 ) Sale was cruised with random sample method and was divided into two stratas: trees under 20.9" DBH and trees over 20.9" DBH. After cruise was completed, portions of Units 27, 40, and 57 were deleted. The cruised volume for those units was reduced by the same percentage of acres deleted: Unit 27= 67%, Unit 40= 40%, and Unit 57 = 5%. ~~Sampling error percent from the cruise is 6.95%.~~

( 12 ) Purchaser is required to pile created slash in Units 27, 40, 102, 104, and 350 and in Required Disposal Strip, or other roads, ~~trails, or private property~~ in Units 5, 9, 15, 18, 19, 31, 49, 53, 57, 98, 100, 103, 105, 390, and 512, estimated 352 acres.

( 13 ) Purchaser is required to scatter to within 30 inches of ground created logging slash in all Units except Units 27, 40, 102, 104, and 350, estimated 1,271 total acres: estimate 25% of total acres to be scattered = 318 acres.

( 14 ) Purchaser is required to remove all created logging slash 66 feet either side of Pacific Crest Trail within 10 days of logging to Units 100 and 104. Removed slash will be treated as required in remainder of these units.

( 15 ) Purchaser is required to pile created logging slash 25 feet either side of ditches in Units 11, 12, 49, and 56; 25 feet either side of road in Unit 12; 150 feet within 10 days after yarding pile and remove either side of Pacific Crest Trail in Units 98 and 100; and 100 feet from private property in Unit 105, estimated acres included . 352 acres in No. 12. Remove acres estimated to be 2 acres.

( 16 ) Purchaser is required to cover all piles; estimated 149 acres.

A-421