( 17 ) Trees under 20" DBH in Unit 100 are required to be yarded to landing before limbing. This treatment will reduce fuels within the unit.

( 18 ) Flagmen will be required during operations along all roads and trails. The Pacific Crest Trail will be open daily with flagmen required at each end during operations. Hikers may be delayed a maximum of one hour; then operations will be shut down and hikers allowed to go through.

( 19 ) Three temporary land use agreements are included in this sale.

a. License Agreement with Jorgen Danielson for a temporary road to a helicopter landing for Unit 56. This agreement requires insurance and road must be restored to original contour.

b. Encroachment Permit with Siskiyou County. Insurance and traffic control is required and damage to Road 1C02 must be repaired.

c. Purchaser will be required to obtain a Temporary Permit from Fruit Growers Supply Co. to haul from Unit 105 and for use of landing in Unit 350. Insurance and a payment of $1.50/MBF (equates to $ 0.90 /CCF) to Fruit Growers is required.

Copies of the first two agreements are available for inspection, as well as a sample agreement for Fruit Growers Temporary Permit.

( 20 ) There is a nominal amount of mountain hemlock and brewer spruce in this sale. Mountain hemlock is included in white fir volume and brewer spruce is included in sugar pine volume.

( 21 ) There are old telephone line trees in Units 5, 15, and 49. Purchaser should exercise care in felling, there may be old insulators or pieces of metal in these trees.

( 22 ) Purchaser is required to provide a Certificate of Insurance in the amount of $1,000,000 to use cost-share roads.

( 23 ) This sale has been identified in a lawsuit in which plaintiffs contend that Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit government's liability in case of cancellation to the holding costs.

( 24 ) ROAD OR BRIDGE REGULATION LIST (C5.12)

| ROAD OR BRIDGE NO. | TERMINI FROM | TERMINI TO | MAP LEGEND | REGULATION |
|---|---|---|---|---|
| ~~40N17~~ | 40N16 | ~~Callahan~~ | ~~X~~ | ~~Hauling prohibited~~ |
| 41N16 | 41N16E | 41N16C | R | Hauling restricted from October 16 to May 14 prior to completion of rocking or spot rocking. Rocking or spot rocking must be completed prior to |
| 39N10 | 40N17 | 39N63 | R | |
| 40N26 | IC02 | M.P. 0.95 | R | |
| 40N75 | 40N26 | M.P. 0.40 | R | |
| 41N14 | 41N16 | M.P. 2.66 | R | |
| 40N17D | 40N17 | M.P. 0.15 | R | |
| 39N11 | IC02 | M.P. 1.38 | R | |

A-422

October 15 and must conform to Forest Service Specification 304, as directed by Forest Service.

( 25 ) Wet Weather Operation Standards dated September 8, 1998, will be used to determine when ground conditions are such that damage willl result under B(T)6.6. This document is available for inspection.

( 26 ) The United States Department of Agriculture (USDA) prohibits discrimination in its programs on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. Persons with disabilities who require alternative means of communication of program information should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

Persons believing they have been discriminated against in any Forest Service related activity should write the Secretary of Agriculture, U.S. Department of Agriculture, Washington, DC 20250, or call 1-800-245-6340 (voice) or 202-720-1127 (TDD). USDA is an equal employment opportunity employer.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC.<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | No. 01-570C<br>(Judge Williams) |
| TIMBER PRODUCTS COMPANY<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | No. 01-627C<br>(Judge Williams) |
| CLR TIMBER HOLDINGS, INC.,<br>Plaintiff,<br>v<br>THE UNITED STATES,<br>Defendant. | No. 04-501C<br>(Judge Williams) |

Declaration of Ed Matthews

I, Ed Matthews, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge and recollection:

1. After graduating from Purdue University with a Bachelor of Science degree in Forest Production in 1968, I began my career with the Forest Service on the Klamath National Forest. I retired from the Forest Service 35 years later, in 2003. During my first 18 years

with the Forest Service, I worked on four ranger districts on three National Forests. My duties included working in the three main areas of timber management: 1) sale preparation, 2) sale administration, and 3) silviculture. After working at the District-level, I moved on and spent the next 17 years of my career working in the Klamath National Forest Supervisor's Office. I began as the timber sale planning officer and, then, for the last ten years of my career, served as the Forest-level timber sale Contracting Officer. I also was designated as the Forest-level timber sale Contracting Officer for the Shasta-Trinity National Forest during the last four years of my career. As the Forest timber sale Contracting Officer, I was responsible for the offer, sale, award, and administration of the contacts I signed.

2. When I awarded the Happy Thin and Jack Heli timber sale contracts, I believed that both timber sales fully complied with all legal requirements. I was aware that the Forest Service's interpretation of the Northwest Forest Plan was being challenged in the ONRC Action litigation, but I did not expect that the Forest Service would lose the litigation. I believed that the two sales complied with FS policy and other legal requirements, and therefore expected that the timber sale purchasers would able to operate without any serious impact from the ONRC Action litigation.

3. The Forest Service timber sale contract award process during the ONRC Action litigation – including that for Happy Thin and Jack Heli – involved far more caution and deliberation than the normal award process. A normal sale offering would be to advertise the sale, receive bids, determine the apparent high bidder, and award the contract. This process normally took approximately 45 to 60 days. The sale offering process during the

ONRC Action litigation often took several months, and involved consulting with various individuals at the Forest, regional, and national levels. The purpose of such care and deliberation, as I understood it, was to avoid awarding sales that were at high risk of being stopped by the litigation.

4. By the time the Happy Thin and Jack Heli sales were awarded, each sale had gone through a long clearance process. Before I awarded the Happy Thin and Jack Heli sales, USDA Office of the General Counsel and U.S. Department of Justice attorneys were provided information on the sales, and they indicated that proceeding with sale award was reasonable.

5. While I was ultimately the one responsible for the decision to award the Jack Heli and Happy Thin contracts, I cannot recall anyone in the Government advising me that awarding the sales was improper or unreasonable. No one ever advised me to withhold award until after the litigation had been resolved due to the risk of such sales being enjoined.

6. While I had delayed contract award for the Jack Heli and Happy Thin sales several times prior to their ultimate award, I decided to award both sales while the litigation was pending because I did not believe the sales would be negatively affected by the litigation. Awarding timber sales was a critical step in accomplishing the goals of the Northwest Forest Plan, and it was never Forest Service policy to halt the timber sale award process whenever a law suit challenging a Forest Service decision was filed.

7. One particular reason I did not expect the Happy Thin sale to be affected by the ONRC Action litigation was that the ONRC Action plaintiffs were given 10 days' notice prior to

contract award of the sale, but the plaintiffs took no action to stop the sale, such as filing a motion for a temporary restraining order or preliminary injunction. Therefore, I thought the Happy Thin sale would proceed without impact. Advance notice was also given to plaintiffs prior to the award of the Jack Heli sale, but plaintiffs made no effort to enjoin the sale.

8. During the second half of 1998 and the first half of 1999, prior to awarding the Jack Heli and Happy Thin timber sales, I routinely met with, or had telephone conversations with, timber industry representatives, including representatives from Blue Lake Forest Products and Timber Products, Inc. During those communications, we discussed the ONRC Action litigation and the potential for the litigation to affect the Klamath's timber sale program.

9. I did not inform the industry representatives that any particular sales, including Happy Thin or Jack Heli, would be suspended after award as a result of the litigation. This was because I did not expect those sales to be suspended by the litigation.

10. While the timber industry was generally aware of the ONRC Action and its relationship to the Forest Service's timber program, the bidders on the Jack Heli and Happy Thin sales had even more specific notice. At the Happy Thin bid opening, I referred to the ONRC Action litigation and let the bidders know that the sale had been listed in the litigation. I also told the bidders that the sale was no longer included in the litigation, because that was what I understood to be the case at the time.

11. As to the Jack Heli sale, the timber sale prospectus stated, "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest

Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost." While I did not believe that the sale would be affected by the litigation, this provided notice to the bidders of the potential for impact and allowed them to judge for themselves whether it was wise to bid on the contract.

12. In sum, prior to and at the time of contract award, I believed that the Forest Service had complied with all laws and policies related to the Happy Thin and Jack Heli timber sales. Therefore, I did not think it was unwise to award either the Happy Thin or Jack Heli contracts.

4-29-08 Ed Matthews

Date Ed Matthews

USDA - Forest Service R5-6200-42 (9/92)

FAX COVER SHEET
Region 5 -- Pacific Southwest Region
(Ref: FSH 6209.14)

Date: 1/29/99 URGENT? Yes [X] No [ ]

PLEASE NOTIFY THE FOLLOWING INDIVIDUAL THAT A FAX HAS ARRIVED FOR THEM:

This FAX is directed to:

Full Name: Bill Ja[illegible]

Unit: Timber Products Staff:

Telephone Number: ( ) FAX Number: (530) 842-3825

Total Number of Pages Including this Cover Sheet: 1

Special Instructions:

Bill your bid on Jack Hole expires on February 1 - Monday. If you wish to extend the period of bid, please write a letter giving time you wish to extend. Letter needs to arrive at Forest Service before close of business on Monday February 1.

This FAX Was Sent By:

Full Name: Bud Cox

Unit: Klamath Staff: Timber

Telephone Number: (530) 841-4516 FAX Number: (530) 841-4571

# Timber Products
COMPANY

Yreka Veneer Division
and Timberlands
P.O. Box 766
Yreka, California 96097

Ph: (530) 842-2310
Fax: (530) 842-3825

February 1, 1999

Ed Matthews
Contracting Officer
Klamath National Forest
1312 Fairlane Road
Yreka, CA 96097

Re: Jack Heli Timber Sale

Dear Ed:

Due to the Forest Service delay in awarding the Jack Heli timber sale Timber Products would like to extend the time of consideration of our bid. However, as mentioned in my letter of January 10, 1999, the delay makes scheduling of operations very difficult, especially with helicopters. Consequently, I would also request that if, and when, the Forest Service is able to award this sale that the termination date of the sale be pushed back by an equal number of days to the delay.

Under normal circumstances this sale would have been awarded within days of the bid. The Jacktrac timber sale bid on November 3, 1998, the same day as the Jack Heli timber sale. Timber Products Company was the apparent high bidder on Jacktrac and we were awarded the sale on November 5, 1998. Jack Heli should have had a similar two-day turnaround time if the Forest Service did not decide to delay it due to a pending lawsuit.

I realize that this delay has not yet occurred during the normal operating period. However, with the minimal impacts caused by helicopter logging, we had hoped to harvest some of this sale in the wintertime. We have a contractor selected for the job and as time goes on without a commitment from the Forest Service we cannot commit to them on timing until we have a contract from the your office. Helicopter logging operations are much more difficult to schedule than traditional loggers due to the relatively few contractors and the impacts caused by limited operating schedules.

We are hoping that this sale will be allowed to proceed, be awarded and that you will adjust the termination date as requested above. If you need more information, please give me a call.

Sincerely,

Bill Turner

Bill Turner
Timber Procurement Manager

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 01-570C, 01-627C, 04-501C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | |

**DECLARATION OF THOMAS LINK**

I, Thomas K. Link, declare and state as follows:

1. My professional career with the USDA-Forest Service (Forest Service) spanned approximately 32 years. I spent the last 24 of those years working in various positions on the Siskiyou National Forest (Siskiyou NF). I was the Siskiyou NF Timber Program Manager since 1995 and the Forest Timber Sale Contracting Officer since 1997. As the former, I was responsible for timber sale planning, the field location and designation timber sale areas, and the preparation of timber sale appraisals and contracts. As a Contracting Officer, I was responsible

for the award and administration of timber sale contracts. I retired from the Forest Service in 2005.

2. I am familiar with the Too Wild Timber Sale (TS), which was advertised August 18, 1998, auctioned September 17, 1998, and awarded May 14, 1999. I am also familiar with the events that delayed me for eight months in awarding the sale to the apparent high bidder, CLR Timber Holdings, Inc. (CLR).

3. Forest Service timber sales on the Siskiyou NF frequently were involved in litigation from the early 1990's through the end of my employment in 2005. During that timeframe, havoc was played with the regularly scheduled timber sale program as a result of the many issues, including: the listing of species, such as the northern spotted owl, under the Endangered Species Act; the passing of Section 318 of the Department of the Interior Appropriations Act of 1990 (commonly referred to as "Section 318"); the development and implementation of the Northwest Forest Plan (NFP); and the associated litigation. Conservation groups frequently brought environmental challenges against the Forest's timber sales, and those challenges frequently delayed award of timber sales or the harvest of timber. The timber industry also brought suits against the Forest Service when it attempted to withhold timber sales on environmental grounds. One such instance was the industry lawsuit involving Section 318 alternative timber, to which CLR was a party.

4. During those very litigious years preceding the Too Wild TS, local and regional timber industry associations had begun actively coordinating with the Siskiyou NF to guard against the well-publicized legal risks of purchasing federal timber. The Northwest Forestry Association (NFA) (later known as American Forest Resource Council) was one of the regional associations that informed the timber industry during the period of the Too Wild TS offering,

award, and contract delays. The Southern Oregon Timber Industry Association (SOTIA) was a local group, which also coordinated with the Siskiyou NF during that time period. Both NFA and SOTIA issued periodic newsletters that were wildly distributed to industry. The Siskiyou NF Supervisors Office in Grants Pass, OR, also received these newsletters, and I recall that they were very up-to-date on the litigation issues that affected federal timber sales in the Northwest region.

5. Additionally, as the Timber Program Manager and Contracting Officer, I regularly communicated to timber sale purchasers about the status of the various litigations and the impact that litigation could have upon sales. To that end, I participated in scheduled periodic informational meetings with timber industry representatives; I had frequent informal phone calls, office visits and field visits with timber sale purchasers; and I had formal written correspondence with purchasers.

6. CLR was among those companies with which I regularly communicated. As it relates to the present lawsuit involving the Too Wild TS, CLR was present at an industry/Forest Service meeting on April 30, 1998, in which it was explained how the Survey and Manage (S&M) program of the NFP potentially affected Forest Service Timber sales. I recall that it was explained to the attendees that additional survey requirements would be phased in under the S&M program on October 1, 1998.

7. I also frequently spoke about the Too Wild TS with CLR representatives, including Darrel Bonde and Virgil Frazier, by phone and in person. I recall that, during the time period leading up to the award of the Too Wild TS, I frequently communicated with both Mr. Bonde and Mr. Frazier about the Too Wild TS. I also discussed with them CLR's other sales

already under contract that were involved in litigation, including its replacement timber that was subject to the Section 318 Alternative timber litigation.

8. In several of those communications, I provided updates to Mr. Bonde and Mr. Frazier on whatever new information I learned about the litigation affecting the Too Wild TS. I specifically told them about the lawsuit captioned Oregon Natural Resource Council Action v. United States (ONRC Action) and updated them about the case. Those updates included what I knew about the implications that case had upon the Too Wild TS, how those issues affected the delay in award, what I knew about ongoing settlement negotiations that potentially affected the sale, and the general issues with the case, such as when the Forest Service would have to implement the new S&M requirements.

9. I also generally contacted representatives of CLR by phone prior to issuing any written correspondence. That was done as a courtesy to provide a heads-up on any orders which might affect their operations. On one such occasion, I called to request written confirmation that, if the Too Wild TS were awarded, CLR would not begin operations on or prior to July 1, 1998. On April 30, 1999, CLR promptly confirmed in writing their continued interest in the Too Wild TS and its willingness to delay operations to appease the plaintiffs in ONRC Action in order that I could award the sale.

10. I acted in good faith and, I believe, diligently to award the Too Wild TS to CLR. I had reviewed the NEPA documentation on the sale and felt strongly that this sale met the objectives and resource requirements of the Siskiyou Forest Plan. I had been involved with the appeals of the Decision Notice, talked with representatives of the appellant groups, which included ONRC Action, Forest Guardians, and Klamath Siskiyou Wildlands Center (KSWC),

and I tracked the appeal reviewing officer's (Robert Devlin) upholding of Forest Supervisor's decision notice.

11. I recall working on this sale, as well as others sales affected by ONRC Action, with the Regional Office to try to resolve the issues. Sue Zike was my primary contact at the Regional Office, and I regularly pressed her for the opportunity to award and proceed with the implementation of the Too Wild TS. I also recall, between November 1998 and May 1999, regularly communicating with Ms. Zike about the status of settlement negotiations between the Department of Justice and plaintiffs' attorneys. Whatever information I learned, I relayed to CLR's representatives.

12. After eight months of delay, I determined it was appropriate to award the Too Wild TS for several reasons. First, I understood from my discussions with the Siskiyou NF S&M specialist Lee Webb, who was the Forest wildlife biologist, that the S&M species were primarily thought to be dependant on old growth forests. The Too Wild TS was primarily a thinning sale in timber stands approximately 80 years of age and, therefore, contained little or no habitat that was appropriate for S&M species. Further, the survey work that had been done in the area had not revealed many existing occurrences of those species.

13. Second, the forest had completed the NEPA process and signed the decision notice for the Too Wild TS well before October 1, 1998. I recall that the Too Wild TS complied with the Forest Service's policies on the S&M survey requirements for NEPA decisions signed prior to October 1, 1998, which were set forth in the November 1, 1996, November 4, 1996, and September 11, 1998, memoranda.

14. Further, I understood that the plaintiffs in ONRC Action did not object to the award of the sale because CLR had agreed not to begin operations before July 1, 1999. I was

unaware of any other reason not to award a timber sale that had a completed NEPA decision and was considered consistent with the standards and guidelines of both the NFP and the Siskiyou NF plan.

15. Finally, I believed that CLR's representatives were prudent businessmen who were well aware of the long-standing and well-publicized legal risk of purchasing federal timber. In light of their continued interest in the sale eight months after the auction, I believed it was reasonable to award the Too Wild TS in May 1999.

16. I also recall, even after awarding the Too Wild TS contract, working to keep CLR aware of further developments in the ONRC Action lawsuit. When I learned of the court's August 26, 1999, order enjoining the sale, I immediately notified CLR.

17. In response to the ONRC Action injunction, the Siskiyou NF promptly began work first to satisfy the court's concerns and later those concerns the plaintiffs identified pursuant to the parties' settlement agreement in order that the Too Wild TS could be released for harvest.

18. I coordinated the Siskiyou NF's effort to comply with S&M survey requirements for all the timber sales that were identified by the court. I recall directing our trained staff of specialists and our timber sale preparation workforce to prioritize completing this survey work on any sales under contract first. The Too Wild TS was one of those sales.

19. I directly communicated with the local representative for the plaintiffs in ONRC Action, Jay Lininger of KSWC, to facilitate our ability to address those issues specific to the Too Wild TS in order that the sale could be released to operate as soon as possible. On September 24, 1999, following one such communication, the plaintiffs stipulated to an order modifying the injunction to allow CLR to yard and haul timber from Units 2 and 16 of the sale.

20. I believe that the Siskiyou NF worked diligently in order that CLR would not be unduly delayed in its harvest of the Too Wild TS. I also believe that the sale was brought into compliance with the S&M requirements identified in the ONRC Action as soon as was possible, given the amount of work that was necessary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 21 day of December, 2007.

Thomas K. Link

Thomas K. Link

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . .

BLUE LAKE FOREST PRODUCTS,
INC.,

Plaintiff,

No. 01-570C

vs. (Judge Williams)

THE UNITED STATES,

Defendant.

_______________________________ /

D E P O S I T I O N

OF

JERRY BROOM

. . .

THURSDAY, SEPTEMBER 13, 2007

. . .

1:10 P.M.

. . .

PAULA KILLION, CSR #2071

solicitation myself. Sometimes it was done for me. Several methods.

Q. Would advertisements come directly to you in the mail?

A. Some.

Q. Would you review newspapers for advertisements and other sales?

A. Sometimes.

Q. Did you have any responsibilities prior to bidding a particular timber sale?

A. Restate that, please.

Q. What would you do prior to bid on a particular timber sale?

A. First, I would view it. On occasion I would cruise it.

Q. Why would you cruise a sale?

A. See if the volume as stated was there, and sometimes we hired that done. If we were busy, sometimes we would hire a third party to do that, as well.

Q. Was it important to Blue Lake to have a consistent flow of timber volume?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-570C |
| vs. | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

D E P O S I T I O N

OF

BILL TURNER

. . .

WEDNESDAY, SEPTEMBER 12, 2007

. . .

1:07 P.M.

. . .

PAULA KILLION, CSR #2071

Products' process is for evaluating sales?
A. We in general, will do a field review of the timber sale, do an appraisal of the logging systems and all the other associated costs and know where the markets are and do an appraisal, what it's worth, and determine what we're going to bid, if we're going to bid.
Q. What does a field review consist of?
A. It varies widely with each timber sale, depending on how -- the circumstances of the sale. We might cruise it. We might not cruise it. We might spend several days walking the ground. We might look at the ground with a logger. We might not. It depends on the sale. Everyone is different. Boy, I can --
Q. Why would you cruise a timber sale?
A. To know what the volume is. The Forest Service gives an estimate, but we don't always see the same volumes.
Q. Did anyone from Timber Products cruise the Jack Sale?
A. I don't recall.