IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, | ) |
| vs. | ) No. 01-570C (Judge Williams) |
| THE UNITED STATES, Defendant. | ) |

D E P O S I T I O N

OF

DARREL BONDE

. . .

TUESDAY, SEPTEMBER 11, 2007

. . .

1:20 P.M.

. . .

PAULA KILLION, CSR #2071

merit"?

A. "A lawsuit with merit"? I'm not a lawyer. I guess what --

Q. Well, according to that interrogatory, that was your belief, that the Forest Service would not award a sale if it was subject to a lawsuit with merit.

A. With merit to challenging the sale. Well, in other words, a lawsuit that -- the way I interpret that, I guess, would be a lawsuit that had any meat to it, that meant anything, because it might have some of these -- what you call -- crazies that sue on every sale, no matter what they are and that -- that wouldn't have much merit, as far as I would be concerned.

Q. How would you go about finding out if the lawsuit had merit?

A. I have no idea. We would rely on the Forest Service to keep us updated as to what --

Q. You testified earlier today that, in the process of evaluating a timber sale, CLR goes out and does its own cruising, and the reason for that

is that the Forest Service cruising estimates are not always accurate; is that correct?

A. Correct. Right.

Q. Why would you rely on the Forest Service to keep you updated with regard to a lawsuit when you don't rely on the Forest Service for the cruising information?

A. We believe with our having a working relation with them, that they are up front. We believe that. It's just that we know that their cruising is not as accurate as we feel it should be. And, for that reason, we don't trust the cruising, but I think, otherwise, they try to keep us -- they're pretty up front with us.

Q. Going back to the issue of whether or not a lawsuit has merit, would CLR consult anyone to find out if a particular lawsuit has merit?

MR. STEVENS: Objection. Asked and answered.

You can go ahead and respond.

BY THE WITNESS:

A. This would maybe be one that we would talk to AFRC today on, to ask if it has -- if a sale has -- if there is something of merit. If you are talking individual sale -- now, you are not talking Too Wild; correct?

Q. Just in general.

A. In general.

MR. STEVENS: Today.

THE WITNESS: Today?

MR. STEVENS: Not in 1998.

BY THE WITNESS:

A. No. We would probably bounce that off AFRC, if -- if -- if they felt that there was something there because they are looking at all the other districts and --

BY MS. LYNCH:

Q. And it's your testimony today that back in the 1998, 1999 time frame, you did not look to AFRC or, at the time, NFA?

A. No. It was all new. Those things were new at that time.

MAR-31-99 15:00 FROM:KLAMATH NATIONAL FOREST ID:5308426131 PAGE 2/2

**United States Department of Agriculture**

Klamath National Forest

1312 Fairlane Road
Yreka, CA 96097-9549
(530) 842-6131
TTY (530) 841-4573

File Code: 2450
Date: March 31, 1999

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Certified Return Receipt Requested
#Z 112 134 805

Re: <u>ONRC Action, et al v. USFS, et al,</u> CV C98-942WD, (WDWa); 10 day notice prior to award of Upper South Fork Heli Timber Sale and Happy Thin Heli Timber Sale, Klamath National Forest

Dear Mr. Axline:

As outlined in the Stipulation For Order Establishing Schedule For Summary Judgment Briefing, dated March 24, 1999, in the above-referenced case, this letter provides the required ten working days notice prior to the award of sales "appealed by one or more of the Plaintiffs in this action and . . . identified by Plaintiffs based on claims presented in the Complaint." I intend to award Upper South Fork Heli Timber Sale no sooner than April 14, 1999 and Happy Thin Heli Timber Sale no sooner that May 5, 1999.

Sincerely,

Edward L. Matthews

EDWARD L. MATTHEWS
Contracting Officer

cc: O.Schmidt-OGC
S.Zike-R6
B.Stone-R5
T.Boling-DOJ

A-724

Caring for the Land and Serving People

Printed on Recycled Paper

03/31/99 WED 17:57 [TX/RX NO 9453]

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

PLAINTIFF'S EXHIBIT 77
8-22-07 SKK

G05-0122-0208

U.S. Department of Justice

Environment and Natural Resources Division

EAB
90-1-4-09179

General Litigation Section
P.O. Box 663
Washington, DC 20044-0663

Telephone (202) 305-0504
Facsimile (202) 305-0506

March 1, 1999

**For settlement purposes only, subject to Federal Rule of Evidence 408**

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Via U.S. Mail and Fax: 541-485-2457

Re: ONRC Action v. Forest Service, Civ. No. C98-942WD

Dear Michael:

This is in response to your request for additional information regarding BLM and Forest Service plans to award certain timber sales that may be of concern to your clients. As I noted in our conversation on February 22, BLM and Forest Service are planning to make award decisions in preparation for the coming operating season. Specifically, BLM and Forest Service plan to award various timber sales after March 1, 1999, beginning with the following timber sales:

Bureau of Land Management

| Sale | District |
|---|---|
| North Murphy | Medford |
| Burma Shave | Roseburg |

Forest Service

| Sale | Forest |
|---|---|
| Spencer | Winema |
| Jack Heli | Klamath |
| Siskiyou Heli | Six Rivers |

Based on your fax from February 26, 1999, it appears that Burma Shave and Spencer are not a concern for your clients. While we will endeavor to provide you with further updates regarding the award status of other timber sales on your list, because of the number of timber sales listed and significant potential for mis-communication we cannot commit to notification with regard to any specific timber sale or within any specific

16 717

EXHIBIT 1 (tab 10A)

Exhibit A

timeframe. Please call us if you have any questions or concerns with regard to the timber sales identified above.

Sincerely,

Edward A. Boling
John Watts
Trial Attorneys

cc: Owen Schmidt
Roger Nesbit









Exhibit A

Michael Axline (OSB #83414)
Marianne Dugan (OSB #93256)
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

Corrie Yackulic (WSBA No. 16063)
Schroeter, Goldmark & Bender
810 Third Avenue, 5th Floor
Seattle, WA 98104
(206) 622-8000
Local Counsel

Counsel for Plaintiffs

FILED ENTERED
LODGED RECEIVED
JUL 08 1998
AT SEATTLE CLERK U.S. DISTRICT COURT WESTERN DISTRICT OF WASHINGTON BY DEPUTY

Z 409 253 859
REGISTERED OR CERTIFIED MAIL
REC'D BY: [signature]
TIME:

JUL 16 1998
TIME: 1630
UNITED STATES ATTORNEY
Seattle, WA

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| OREGON NATURAL RESOURCES COUNCIL ACTION, an Oregon nonprofit corporation; PILCHUCK AUDUBON SOCIETY, a Washington nonprofit membership organization; KLAMATH FOREST ALLIANCE, a California nonprofit organization; KLAMATH SISKIYOU WILDLANDS CENTER, an unincorporated Oregon association; CALIFORNIA WILDERNESS COALITION, a California nonprofit organization; AMERICAN LANDS ALLIANCE, an Oregon nonprofit corporation; UMPQUA WATERSHEDS, INC., an Oregon nonprofit corporation; NORTHCOAST ENVIRONMENTAL CENTER, a California nonprofit organization; PORTLAND AUDUBON SOCIETY, an Oregon nonprofit corporation; CITIZENS FOR BETTER FORESTRY, a California nonprofit organization; GIFFORD PINCHOT TASK FORCE, a Washington nonprofit corporation; NORTHWEST ECOSYSTEM ALLIANCE, a Washington nonprofit corporation; and HEADWATERS, an Oregon nonprofit corporation, | Civil No. C98-942 |
| Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| UNITED STATES FOREST SERVICE and BUREAU OF LAND MANAGEMENT, | |
| Defendants. | JUL 10 1998 |

## I. STATEMENT OF THE CASE

1. This is a civil action for declaratory and injunctive relief under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 551-706. The claims arise from Defendants' violations of the National Environmental Policy Act (NEPA) 42 U.S.C.§§ 4321-4370d, and its implementing regulations, 40 C.F.R. §§ 1500-1508; the National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq., and its implementing regulations; 36 C.F.R. §§ 219.1-219.29; and the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq., and its implementing regulations, 43 C.F.R. §§ 1601.0-1 et seq. The action is prosecuted pursuant to the right of review provision of the APA, 5 U.S.C. § 702.

2. Plaintiffs challenge the failure of the Forest Service (FS) and the Bureau of Land Management (BLM) to comply with the Record of Decision (ROD) on Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl. The ROD was adopted in 1994 and amended the planning documents of 19 National Forests and seven BLM districts. Plaintiffs also challenge the Defendants' failure to prepare a supplemental EIS (SEIS) examining changed circumstances and new information subsequent to the adoption of the ROD.

3. The ROD was adopted pursuant to the NFMA, which requires Defendant FS to "develop, maintain, and, as appropriate, revise land and resource management plans," 16 U.S.C. § 1604(a). NFMA requires that the public be involved in revisions of land management plans. 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b). NFMA also requires that Defendant FS's activities carried out on National Forests "shall be consistent with the land management plans." 16 U.S.C. § 1604(i). <u>See also</u> 36 C.F.R. § 219.10 (e).

4. The ROD was also adopted pursuant to FLPMA, which requires Defendant BLM to "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a). FLPMA requires the Secretary to involve the public in revisions of land use plans. 43 U.S.C. § 1712(a), 43 C.F.R. § 1610.2. FLMPA also requires Defendant BLM to "manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a).

5. Plaintiffs seek:

An order declaring that Defendants' failure to comply with the ROD, and revisions of the ROD without public participation, violate NFMA, FLPMA, and the APA;

An order declaring that Defendants have failed to comply with NEPA, by revising the ROD without preparing an SEIS, and by failing to prepare an SEIS that examines significant new information and changed circumstances that have developed subsequent to adoption of the ROD.

An order declaring that the Defendants' actions as set forth in this complaint are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, and therefore must be set aside pursuant to the APA, 5 U.S.C. § 706 (2);

An order enjoining Defendants from undertaking activities that do not comply with the ROD, NEPA, NFMA, FLPMA, and the APA.

The requested orders are necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

## II. JURISDICTION AND VENUE

6. Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. § 706.

7. A substantial part of the actions giving rise to this complaint took place in this District; thus, venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## III. PARTIES

8. Plaintiff Oregon Natural Resources Council Action (ONRC Action) is a nonprofit corporation organized under the laws of the State of Oregon. ONRC Action is headquartered in Portland, Oregon. ONRC Action's mission is to protect and restore Oregon's wild lands, wildlife, and water as an enduring legacy. ONRC Action has approximately 3000 individual and organizational members that use and enjoy the National Forests and BLM lands of Oregon, Washington, and California for recreational, educational, aesthetic, and other purposes. ONRC

Action has a long-standing interest in the sound management of the forests managed under the ROD. ONRC Action and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of ONRC Action and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

9. Plaintiff Pilchuck Audubon Society (PAS) is a 501(c)(3) non-profit membership corporation incorporated in the state of Washington, and based in Everett, Washington. PAS has approximately 1,600 members in western Washington, primarily in Snohomish County and Island Counties. PAS is a chapter of National Audubon Society and was formed in 1971. Its mission is to conserve and restore natural ecosystems, focusing on birds and other wildlife, for the benefit of the Earth's biological diversity. PAS's members use and enjoy the National Forests and BLM lands of Washington for recreational, educational, aesthetic, and other purposes. PAS and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of PAS and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

10. Plaintiff Klamath Forest Alliance (KFA) is a non-profit, public interest organization organized under the laws of California. KFA was created to promote sustainable forest ecosystems and economies in California and Southwest Oregon. In particular, KFA is dedicated to ensuring the continued existence of healthy and diverse ecosystems in the Klamath Province, which spans part of the states of Oregon and California. KFA and its members actively participate in governmental decision making processes with respect to public lands, and rely on information provided through the NEPA process to increase the effectiveness of their participation. KFA's members, volunteers, and Board of Directors use and enjoy the Klamath, Six Rivers, and Shasta-Trinity National Forests, among other National Forests and BLM lands of

California, for recreational, educational, aesthetic, and other purposes, including hiking, photography, bird observation, fishing, hunting, commercial outfitting, nature study, ceremonial and cultural activities, scientific pursuits and collection of forest products for arts and crafts. The KFA also has an interest in promoting a stable and diverse economy through protection and wise use of all resources. KFA has a long-standing interest in the sound management of the area managed under the ROD. The interests of KFA and its members will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

11. The Klamath Siskiyou Wildlands Center (KSWC) is an unincorporated association of over 200 members with offices in Williams, Oregon. KSWC is dedicated to protecting the unique biological diversity of the Klamath-Siskiyou bioregion of southwestern Oregon and northern California. KSWC and its members use, study, and enjoy lands administered by the Forest Service and BLM for scientific, educational, recreational, aesthetic and spiritual purposes, and KSWC has commented on, appealed and litigated timber sales under the Northwest Forest Plan proposed by these agencies. KSWC has a long-standing interest in the sound management of the forests managed under the ROD. KSWC and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of KSWC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

12. California Wilderness Coalition is a 501(c)(3), registered in California. CWC has 80 member organizations and over 800 individual members, located throughout the state of California. CWC's mission is to work for the protection of California's publicly owned wildlands. CWC's members use and enjoy the federal lands in the Shasta-Trinity, Mendocino, Six Rivers, and Klamath National Forests, for hiking, camping, hunting, fishing and nature observing. CWC and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to

increase the effectiveness of their participation. The interests of CWC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

13. Plaintiff the American Lands Alliance (ALA) is a non-profit 501(c)(3) incorporated in the state of Oregon with headquarters in Washington, D.C., and a satellite office in Portland, OR. ALA is not a membership organization, but represents the interests of grassroots forest protection activists and organizations. ALA is dedicated to protecting and preserving forest and aquatic ecosystems and restoring ecological integrity to the landscape. ALA's work covers the entire United States with an emphasis on public federal lands. ALA actively participates in governmental decision making processes with respect to the public lands subject to the ROD, and relies on information provided through the NEPA process to increase the effectiveness of its participation. The interests of ALA in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

14. Umpqua Watersheds, Inc. (Umpqua) is a nonprofit 501(c)(3) corporation organized under the laws of Oregon dedicated to the protection and restoration of the watersheds of the Umpqua Basin in Douglas County, Oregon. Umpqua works to accomplish this mission through a diverse statement of purpose to monitor the activities of federal, state, and local agencies charged with the responsibility of forest management within the designated area, and to advocate sound stewardship of public lands and resources with emphasis on sustainability of life systems. Umpqua seeks to improve communication with public agencies, private landowners and industry, and to educate the public in the interest of informed consent and the pubic's right to participate in decisions that affect the management of their natural resources. Additionally, Umpqua coordinates educational research projects and presentations that give a broader knowledge to the public. Umpqua currently lists 450 supporters who receive its quarterly newsletter. Umpqua and its supporters actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of

Umpqua and its supporters in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

15. Plaintiff Northcoast Environmental Center ("NEC") is a non-profit, tax exempt, public interest organization organized under the laws of California. NEC was created to protect and conserve Northern California's ecosystems, wildlife, and natural resources. Most of NEC's approximately 4,500 members live in Northern California and Oregon. NEC and its member actively participate in governmental decision making processes with respect to forest health and rely on information provided through the NEPA process to increase the effectiveness of their participation. Members of NEC use and enjoy the forests of California and Oregon for fishing, camping, nature study, hiking and other recreational and aesthetic purposes. The interests of NEC and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

16. Plaintiff Portland Audubon Society (PAS II) is an nonprofit corporation organized under the laws of Oregon, dedicated to protecting and conserving Oregon's wildlife, lands, waters, and natural resources. PAS II is headquartered in Portland, Oregon, and its approximately 5,000 members live in and around Portland. Members of PAS II use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. PAS II and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of PAS II and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

17. Plaintiff Citizens for Better Forestry (CBF) is a 501(c)(3) nonprofit organization organized under the laws of California, dedicated to the protection of public forest lands in northern California. Representing hundreds of individuals throughout the region, CBF promotes sound science based management and watershed restoration, and researches, educates and advocates for a true stewardship approach to the land. CBF works to generate local citizen

activism and a greater awareness of timber harvest practices and impacts to old-growth forests, critical salmonid watersheds, roadless areas, and other important habitats in the Klamath-Siskiyou ecoregion. CBF actively participates in governmental decision making processes with respect to the public lands subject to the ROD, and relies on information provided through the NEPA process to increase the effectiveness of their participation. The interests of CBF in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

18. Plaintiff Gifford Pinchot Task Force (GPTF) is a 501(c)(3) nonprofit corporation organized under the laws of Washington state, with approximately 25 members located primarily in Washington and Oregon. GPTF is dedicated to promoting the conservation and restoration of natural ecosystems and their processes on the Gifford Pinchot National Forest and in Southwest Washington. GPTF and its members advocate for ancient and native forests, ecologically significant areas, and the regional biodiversity in Southwest Washington with particular attention and focus on the Gifford Pinchot National Forest. GPTF and its members promote and increase ecologically sustainable recreational use of public forests, with recognition of all the ecologically important benefits derived by local economies from non consumptive uses. GPTF serves as an informational and educational resource on the forest ecosystems of southwest Washington for interested citizens and organizations. Members of GPTF use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. GPTF's members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of GPTF and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

19. Plaintiff Northwest Ecosystem Alliance (NWEA) is a nonprofit corporation organized under the laws of Washington state, with its principal place of business in Bellingham, Washington. NWEA and its members are dedicated to the protection and restoration of wildlands

in Washington State and southern British Columbia. NWEA carries out research and advocacy, working with scientists, environmental activists, policymakers, and the general public to encourage the conservation of biological diversity and ecological integrity on public lands. NWEA members extensively use and enjoy national forests throughout the Pacific Northwest, including lands on the Mt. Baker-Snoqualmie National Forest. NWEA and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of NWEA and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

20. Plaintiff Headwaters is non-profit corporation organized under the laws of a Oregon, dedicated to protecting and conserving Oregon's wildlife, lands, waters, and natural resources. Headwaters' approximately 800 members live in and around southern Oregon. Members of Headwaters use, enjoy, and recreate on the public lands covered by the ROD for educational, aesthetic, recreational, scientific, and other purposes. Headwaters and its members actively participate in governmental decision making processes with respect to the public lands subject to the ROD, and rely on information provided through the NEPA process to increase the effectiveness of their participation. The interests of Headwaters and its members in the area managed under the ROD will be irreparably harmed if Defendants continue to violate the ROD, NEPA, NFMA, FLPMA, and the APA.

21. Defendant United States Forest Service (FS) is the agency within the United States Department of Agriculture charged with compliance with NFMA, NEPA, and the ROD.

22. Defendant Bureau of Land Management (BLM) is an agency within the United States Department of the Interior charged with compliance with FLPMA, NEPA, and the ROD.

## IV. STATEMENT OF FACTS

23. On April 13, 1994, Defendants released the ROD. The ROD's availability was announced in the Federal Register on April 20, 1994. 59 Fed. Reg. 18788 (1994). The ROD was

adopted in response to court orders requiring Defendants to come into compliance with a variety of federal environmental statutes. The ROD amended the planning documents of 19 National Forests and seven BLM districts.

24. In an opinion issued on or about December 21, 1994, this Court upheld the legality of the ROD. The Court warned, however, that "[w]hether the plan and its implementation will remain legal will depend on future events and conditions." Seattle Audubon Society v. Lyons, 871 F. Supp. 1291, 1300 (W.D. Wash. 1994), aff'd 80 F. 3d 1401 (9th Cir. 1996). The Court also noted: "Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered." Id. at 1324. The Court further stated: "If the plan as implemented is to remain lawful the monitoring, watershed analysis, and mitigation steps called for by the ROD will have to be faithfully carried out." Id. at 1322.

25. The process leading to the ROD recognized that over 400 species had some viability risk or habitat concern despite the protections of the ROD. For these species, the ROD recognized the need for more information. The ROD therefore requires that Defendants conduct surveys to determine more about these species' location and habitat needs, and develop management standards to protect these species' habitat. These species are referred to in the ROD as "survey and manage" species. The ROD requires Defendants to implement four separate survey "strategies" for these "survey and manage" species. ROD at C-4, 5.

26. Defendants have not developed management standards to manage habitat for the survey and manage species where they are located.

27. The ROD requires that "Annual status reports on the survey and manage program are to be submitted . . . beginning at the end of F.Y. 1995." ROD at C-6. Information from these reports was to form the basis for any changes which might be proposed to the survey and manage program. ROD at C-6.

28. Defendants have failed to submit annual status reports as required by the ROD.

29. The ROD acknowledges that for 77 of the approximately 400 "survey and manage" species, additional information could be readily obtained through surveys. The ROD

refers to these 77 species as "Strategy 2" species. Many of these species have less than an 80% chance of remaining viable under the ROD unless surveys are conducted prior to ground disturbing activities and located sites are managed. For these and other reasons, the ROD anticipates that additional strategies will be necessary to insure the viability of these species, and therefore requires Defendants to "survey prior to ground disturbing activities" in the habitat of these species. ROD at C-5.

30. The "Strategy 2" survey standards require that Defendants:

a. Immediately [in 1994] start design of survey protocols and implement surveys. ROD at C-5.

b. Complete surveys for the red tree vole, the Del Norte salamander, the Larch Mountain salamander, the Van Dyke's salamander, the Shasta salamander, and the Siskiyou Mountains salamander, within these species' habitat. These surveys "must precede the design of all ground disturbing activities that will be implemented in [Fiscal Year] 1997 [Oct. 1, 1996] or later." ROD at C-5.

c. Immediately begin developing survey protocols for the 71 other "Strategy 2" species and survey for these species "prior to ground disturbing activities that will be implemented in F.Y. 1999 [Oct. 1, 1998] or later." ROD at C-5.

d. "Manage" habitat for these species on sites where they are located and manage new habitat sites when the species are found. ROD at C-5.

31. On or about November 1, 1996, Ed Ahstey, California State Director of the BLM, G. Lynn Sprague, Regional Forester for Region 5 of the FS, Elaine Y. Zielinski, Oregon/Washington State Director of the BLM, and Robert W. Williams, Regional Forester for Region 6 of the FS, wrote a directive to BLM District Managers, BLM Area Managers, and FS Supervisors within the areas governed by the ROD. This directive addressed survey protocols for Strategy 2 survey and manage species. The directive was not accompanied by any NEPA document, and was not circulated for public review or comment.

32. The November 1, 1996, directive arbitrarily defines the word "implement" in the

ROD to exclude numerous projects from the Strategy 2 Survey and Manage requirements. The directive declares that activities are to be considered "implemented" as of the time NEPA decisions are signed, even if ground disturbing activities are months or even years away.

33. The Regional Forester for Region 6 of the FS, and the Oregon/Washington State Director for the BLM also issued a joint directive dated November 4, 1996, which provides "interim guidance" amending the ROD's red tree vole survey requirement. Citing the need to cut costs, the directive states that site-specific surveys need not be conducted in most of the habitat types or vegetation communities associated with the red tree vole. The directive was not accompanied by any NEPA document, and was not circulated for public review or comment.

34. There are approximately 6.2 million acres of suitable red tree vole habitat within the area covered by the ROD. The November 4, 1996, directive excludes approximately 5.5 million acres, constituting nearly 90% of the total red tree vole habitat, from the survey requirement. The directive also excludes all activities in California from the survey requirement, even though the red tree vole has been found in California.

35. The FS and BLM have also failed to conduct surveys and follow protocols for the Strategy 2 salamander species.

36. The ROD requires "Extensive Surveys" for "Strategy 3" species. ROD at C-5. The ROD defines "Extensive Surveys" as broad surveys intended for species whose characteristics make site and time-specific surveys difficult. ROD at C-5 and C-6.

37. The ROD requires the Defendants to begin surveys for "Strategy 3" species by 1996. ROD at C-6.

38. Defendants failed to begin "Strategy 3" surveys by 1996 as required by the ROD.

39. The ROD requires "General Regional Surveys" for "Strategy 4" species. ROD at C-6.

40. The ROD defines "General Regional Surveys" as both extensive and expensive surveys. The ROD states "The information from [general regional surveys] is critical to successful implementation of ecosystem management." ROD at C-6.

41. The ROD requires the Defendants to begin surveys for "Strategy 4" species by 1996. ROD at C-6.

42. Defendants failed to begin "Strategy 4" surveys by 1996 as required by the ROD.

43. The CEQ regulations implementing NEPA require that agencies "provide for monitoring" to assure that their decisions are carried out and that "[m]itigation . . . and other conditions established in the environmental impact statement or during its review and committed as part of the decision [are] implemented by the lead agency or other appropriate consenting agency." 40 C.F.R. § 1505.3.

44. The ROD states, "Monitoring is an essential component of the selected alternative. It ensures that management actions meet the prescribed standards and guidelines and that they comply with applicable laws and policies." ROD at 57.

a. "Implementation monitoring," which will "determine if the standards and guidelines of the Plan are being followed";

b. "Effectiveness monitoring," which will "verify if the management actions under the Plan are achieving the desired results"; and

c. "validation monitoring," which will "determine if underlying assumptions are sound." ROD at 57.

45. In 1995, the Regional Ecosystem Office's Implementation Monitoring Work Group, an inter-agency committee formed to develop implementation monitoring procedures, drafted five question "sets" designed to determine whether the ROD was being properly implemented. The first question set addressed whether the ROD was being implemented with respect to a limited group of site-specific "projects," such as timber sales. The four remaining question sets addressed whether the ROD was being implemented at the programmatic level. The Implementation Monitoring Work Group abandoned these last four question sets, and has published only the results from the first question set, involving site-specific "projects." As a consequence, no implementation monitoring has been conducted to determine whether

Defendants are complying with the ROD on the programmatic level.

46. Defendants did not issue any implementation monitoring findings until March, 1997. This document was entitled "Results of the FY 1996 (Pilot Year) Implementation Monitoring Program." The document reviewed 40 of the timber sales that had been sold since the ROD was adopted. Although the document asserts that the FS and BLM achieved 97% compliance with the ROD's standards for timber sales (at least with respect to the 40 sales examined), the report failed to provide any data regarding ROD compliance by the Regional Ecosystem Office, Regional FS offices, and BLM state offices. The report also failed to examine timber sales other than the 40 that were selected for the report, or any land management activities other than timber sales.

47. The goal of effectiveness monitoring is to measure whether the ROD's provisions, as implemented, are able to meet the goals and objectives of the ROD. ROD at E-6. The ROD states that effectiveness monitoring will assess whether the "objectives of [the Plan's] standards and guidelines" are being met. ROD at E-6.

48. No results from effectiveness monitoring have been issued by defendants.

49. The work group assigned by Defendants to conduct the required effectiveness monitoring has developed five focus areas. The five areas are Late-Successional Old Growth Habitat, the Northern Spotted Owl, Marbled Murrelet, Survey and Manage Species, and Riparian/Aquatic.

50. In the more than four years since the ROD was issued, defendants have failed to move effectiveness monitoring for Survey and Manage Species past the stage of "initial discussions."

51. In the more than four years since the ROD was issued, defendants have failed to move effectiveness monitoring for Riparian/Aquatic areas past the stage of "conceptual framework."

52. Several REO documents acknowledge that effectiveness monitoring for both Survey and Manage Species and Riparian/Aquatic areas has not occurred because of a lack of

funding.

53. Over four years have passed since the Defendants issued the ROD, and five years of information has accumulated since the analysis for the ROD was completed.

54. Since the ROD was adopted, at least eight new species that occur within forests covered by the ROD have been listed as threatened or endangered under the Endangered Species Act (ESA). At least nine additional new species have been proposed for listing, and at least seven additional new species have become candidates for listing. The Defendants' EIS, however, predicted that there would be "zero" risk of extirpation from federal lands for these species under the provisions of the ROD. EIS at 3&4-197.

55. Since the ROD was adopted, over 1,000 streams within the forests covered by the ROD have been identified by regulatory agencies as not meeting water quality standards. Defendants' EIS, however, stated that, under the ROD, water quality would be "maintained and improved." EIS at 2-71.

56. Lands designated as Late-Successional Reserves (LSRs) in the ROD are "designed to serve as habitat for late-successional and old-growth related species including the northern spotted owl." ROD at 6. The objective of establishing LSRs was to "protect and enhance conditions of late-successional and old-growth forest ecosystems." ROD at C-9. With limited exceptions, timber harvest is prohibited in LSRs, and LSR acres are not to be included in calculations of the timber base. ROD at C-12-16.

57. Lands designated as Riparian Reserves (RRs) are areas where "the conservation of aquatic and riparian-dependent terrestrial species receive primary emphasis." ROD at 7. With limited exceptions, timber harvest is prohibited in RRs, and RR acres are not to be included in calculations of the timber base. ROD at C-31.

58. Since the ROD was adopted, Defendants have logged extensively in Reserves which were to be protected under the ROD. For example, in FY 1997 alone, the FS sold over 143 million board feet of timber from Reserves. This figure represents over 20% of the total FS volume sold from the area governed by the ROD in FY 97.

59. In five of the National Forests within the range of the northern spotted owl, the volume of timber sales in Reserves was greater than the volume outside Reserves during the 1997 fiscal year. In two of those National Forests, over 90% of the timber cut on the Forest came from Reserves.

60. The Defendants have developed detailed projections of timber they expect to sell out of Reserves in the future, and prescribed a goal of obtaining timber volume from Reserves on a forest-wide basis.

61. In 1996, forty eight timber sales were sold within the area covered by the ROD without complying with the ROD. These sales were sold pursuant to congressional directive under the "Rescissions Act" of 1996. Pub. L. No. 104-19, §2001. The Regional Interagency Executive Committee was concerned that these sales might constitute "changed circumstances" requiring a SEIS, but elected not to prepare such an SEIS.

62. The ROD requires Defendants to "provide for retention of old-growth fragments in watersheds where little remains." ROD at C-44. The ROD requires that this provision be applied in "fifth field watersheds (20 to 200 square miles) in which federal forest lands are currently comprised of 15 percent or less late successional forest." ROD at C-44.

63. In 1997 the REO issued a memorandum interpreting these provisions as including trees as young as eighty years old, thereby reducing the number of watersheds subject to the requirement and increasing the amount of old growth cutting that may occur in watersheds that are subject to the requirement.

64. Upon information and belief, Defendants have made substantial changes in the proposed action that are relevant to environmental concerns, without public participation and NEPA analysis.

## V. CLAIMS FOR RELIEF

### COUNT 1
### NFMA Violation — Failure to Act Consistently With Land Management Plans

65. Paragraphs 1 through 66 are incorporated here by reference.

66. NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). See also 36 C.F.R. § 219.10(e). NFMA also requires that the public be involved in revisions of land management plans. 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b).

67. The ROD is a "land management plan." The Defendants' actions, as described in paragraphs 1 through 65, above, are not consistent with the ROD, revise the ROD, and therefore violate 16 U.S.C. §§ 1604(d) and 1604(i), and 36 C.F.R. §§ 219.10(b) and (e).

68. The Forest Service's actions as described above were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA. 5 U.S.C. § 706.

**COUNT 2**
**FLPMA Violation –**
**Failure to Act Consistently With Land Management Plans**

69. Paragraphs 1 through 66 are incorporated here by reference.

70. FLMPA requires the Secretary of Interior to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title, when they are available. . . ." 43 U.S.C. § 1732(a), 43 C.F.R. § 1610.2. FLPMA also requires the Secretary to involve the public in revisions of land use plans. 43 U.S.C. § 1712(a), 43 C.F.R. § 1610.2.

71. The ROD is a "land use plan." The Defendants' actions, as described in paragraphs 1 through 65, above, are not in accordance with the ROD, revise the ROD without public participation, and therefore violate 43 U.S.C. §§ 1712(a) and 1732(a), and 43 C.F.R. §1610.2.

72. BLM's actions as described above were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA. 5 U.S.C. § 706.

**COUNT 3**
**NEPA Violation –**

**Failure to Prepare Supplemental Environmental Impact Statement**

73. Paragraphs 1 through 66 are incorporated here by reference.

74. NEPA requires that agencies prepare supplemental EIS's if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new . . . circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. 1502.9(c)(1).

75. Since the ROD was adopted, substantial changes have been made to the proposed action and significant new circumstances and information relevant to environmental concerns and bearing on the actions governed by the ROD have developed.

76. The Defendants have violated NEPA by failing to prepare a SEIS to consider these substantial changes in the proposed action and new and significant information.

77. These actions were taken not in accordance with law, without observance of procedures required by law, and are arbitrary and capricious within the meaning of the APA. 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

Declare that Defendants' failure to survey and manage for "Strategy 2, 3, and 4" species, and failure to prepare management standards and annual survey and manage reports violates NFMA, 16 U.S.C. § 1600 et seq., the Forest Service regulations implementing NFMA, 36 C.F.R. §§ 219.10(b) and (e), FLPMA, 43 U.S.C. §§ 1701 et seq., and the BLM's regulations implementing FLPMA, 43 C.F.R. §§ 1601.0-1 et seq.;

Declare that Defendants' failure to involve the public in revisions to the ROD violates FLPMA, 43 U.S.C. § 1712(a), 43 C.F.R. § 1601.2, and NFMA, 16 U.S.C. § 1604(d), 36 C.F.R. § 219.10(b).

Declare that Defendants' failure to prepare a supplemental EIS examining changed circumstances and new information violates NEPA, 42 U.S.C.§§ 4321-4370d, and its implementing regulations, 40 C.F.R. §§ 1500-1508, including 40 C.F.R. 1502.9(c)(1);

United States
Department of
Agriculture

Forest
Service

# Timber Sale Contract

**Purchaser** Blue Lake Forest Products

**Sale Name** Happy Thin Heli

**Award Date** 07/06/99

**Contract No.** 060772

**Region** Five

**National Forest** Klamath

**Ranger District** Happy Camp

★U.S.GPO:1989-0-624-786

FS-2400-13(7/70)

deposits are based on the estimated volume and distance hauled and the Purchaser's commensurate use of each road listed in the Road Maintenance Plan in CT5.4.

Purchaser and Forest Service may agree in writing on adjustment of such rates. If purchaser uses roads under jurisdiction of Forest Service other than those listed in the Road Maintenance Plan, Forest Service shall establish rates commensurate with Purchaser's use of such roads.

The Required Deposits for Forest Service work in lieu of Purchaser performance and for deferred maintenance is: $0.02 per CCF.

Purchaser shall make deposits for road maintenance directly to N/A for roads subject to the terms of a Road Maintenance Agreement which is available for inspection at the Forest Supervisor's office. Such deposits shall be at the rate of $N/A per N/A.

CT5.414 - Snow Removal. (1/77) If Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources.

Snow berms shall be removed or placed to avoid accumulation of melt water on the road and prevent water concentration on erosive slopes or soils. If the road surface is damaged, Purchaser shall replace lost surface material and repair structures damaged in blading operations prior to hauling, unless climatic conditions prevent necessary work from being accomplished or as otherwise agreed in writing.

Single lane roads shall be plowed full width including turnouts. In event double lane roads are not plowed to full width, warning signs shall be required and plowing shall be no less than single lane (12 feet) with intervisible turnouts.

CT5.415 - Surface Replacement Deposits. (11/81) Purchaser shall make Required Deposits for deferred surface replacement (16 U.S.C. 537). Such deposits shall be based upon the volume and distance hauled on the roads and at the applicable rates listed in attached table titled Surface Replacement Deposit Schedule. If Purchaser uses surfaced roads under jurisdiction of Forest Service other than those listed, Forest Service may establish applicable rates for such surfaced roads.

CT5.421 - Water Supply Development. (6/78) National Forest water supply locations, access, method of filling trucks, period of water availability and procedures designed to maintain water quality at each location shall be agreed in advance of use. Such use shall at no time reduce water supplies to the level that further use may be detrimental to aquatic resources or other established use. Waterholes and other improvements relating to said water supplies shall be put into condition, prior to expected seasonal periods of precipitation or runoff, to avoid resource damage.

Damage to resources at such locations caused by Purchaser's Operations, other than fire suppression activities, shall be repaired by Purchaser in a timely and agreed manner to the extent practicable to restore and prevent further resource damage.

CT6.0 - Operations. (6/90) Purchaser agrees to conduct its operations under this contract and other related business activities in compliance with Federal, State, and local statutes, standards, orders, permits, or other regulations.

State and local environmental quality laws must be applicable to National Forest System lands. The contract shall govern if such laws conflict with or preclude performance of contractual requirements.

A conviction of, or a civil judgment for, any of the following offenses, shall be considered a breach of this provision and may result in termination of this contract pursuant to CT9.3:

CT6.411# - Directional Felling. (6/79) Unless otherwise agreed in writing, trees which cannot normally be felled away from other ownership, reserve trees, pipelines, survey movements, and stream courses, shown on Sale Area Map shall be directionally felled away from said areas with the aid of specialized equipment. Such directional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing.

CT6.414# - Limbing. (7/86) Outside of construction clearings, Clearcutting Units and regeneration units, unless otherwise provided by BT6.413, Purchaser shall, prior to skidding operations, cut exposed limbs from products which are to be yarded. Such limbing of stems shall be done to a top diameter of approximately 3 inches, at which point the top shall be cut from the remainder of the stem.

Notwithstanding other provisions herein, inside units N/A; products shall be skidded to agreed landing locations prior to limbing and lopping.

Within units on subdivisions designated NO LOP on Sale Area Map, limbing and cutting unutilized tops shall not be required.

CT6.422# - Tractor Skidding Requirements. (2/89) Unless otherwise agreed, skid road pattern shall be agreed in advance of felling and main skid roads shall be flagged on the ground in advance of felling. Purchaser shall stage-log by felling and skidding Included Timber in two or more separate operations when necessary to prevent undue damage to the resources or residual stand. Needed tractor trails shall be constructed in advance of skidding.

Products shall be end-lined as needed to protect resources or residual timber from unnecessary damage. Endlining shall not be required for distances in excess of 75 feet. The number of chokers shall be limited as necessary to avoid unnecessary damage to resources or residual timber. By agreement, tractors may be used to separate products to prevent stain.

On units N/A products shall be skidded with leading end clear of ground.

CT6.424 - Arches and Dozer Blades. (3/74) Skidding tractors equipped with pull-type arches or crawler tractors with dozer blades shall not be used in residual timber off constructed tractor roads or landings unless there is written agreement that dozer blades are needed for safety or that residual timber or desirable reproduction will not be unnecessarily damaged by such use. C-frames may be left in place if the blade is removed and the C-frame is made inoperative by restrictive chain. Rubber-tired skidders with dozer blades narrower than tire width shall be permitted.

CT6.426 - Maximum Tractor Size. (3/74) Tractors used for skidding outside Clearcutting Units, regeneration units or other authorized clearings, shall not exceed the overall width, and shall be of the type (rubber-tired or track-laying) designated on Sale Area Map, unless otherwise agreed in writing.

CT6.429 - Helicopter Yarding. (3/74) Unless agreed otherwise in writing, within Payment Units so designated on Sale Area Map, yarding shall be by a helicopter capable of lifting and transporting products to landings without unnecessary damage to residual trees.

CT6.5 - Streamcourse Protection. (12/75) Wheeled or track-laying equipment shall not operate within "Buffer Strips" which are areas within 50 feet slope distance of the apparent high water mark in Streamcourses, except as necessary for fire suppression activities. Buffer Strips of greater or lesser width, if any, have been posted by Forest Service prior to advertising. Boundaries of Buffer Strips may be modified by agreement to meet unforeseen operating conditions.