**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 01-570C<br>(Judge Williams) |
| TIMBER PRODUCTS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 01-627C<br>(Judge Williams) |
| CLR TIMBER HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-501C<br>(Judge Williams) |

**PLAINTIFFS' RESPONSE TO THE ADDENDUM TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to RCFC 56(h)(2), plaintiffs respond to the Addendum to Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF").

Defendant's Proposed Finding of Uncontroverted Fact No. 21

The Northwest Forest Plan ("NFP") Record of Decision ("ROD") instructed that Category 2 surveys should "precede the design of all ground-disturbing activities . . . implemented in [Fiscal Year] 1999 or later. App. 98,[1] NFP ROD Standards and Guidelines at C-5.

Plaintiffs' Response:

Plaintiffs object because the language quoted by the proposed finding does not appear in the ROD. First, the government cites to the Standards and Guidelines attached to the ROD, not the ROD itself. Def. App. 97-98. Second, the government improperly uses ellipses to join together the directives of the Standards and Guidelines for the FY 1997 and FY 1999 surveys. The Standards and Guidelines state that for the FY 1997 Category 2 species, "[S]urveys for … salamanders, and red tree voles (and lynx, see page C-47) must precede the design of all ground disturbing activities that will be implemented in 1997 or later." Id. at 98. For the other 71 Category 2 species whose surveys were required in FY 1999 or later, the standards and guidelines state, "These surveys must be complete prior to ground disturbing activities that will be implemented in F.Y. 1999 or later." Id.

Defendant's Proposed Finding of Uncontroverted Fact No. 22

Questions arose within the Forest Service and the Bureau of Land Management regarding the implementation of the NFP, and, to ensure consistent responses between agencies and

[1] All citations to "App." within the defendant's proposed findings refer to the defendant's appendix. In plaintiffs' responses, plaintiffs use "Def. App." to refer to the defendant's appendix and "App. Tab" to refer to plaintiffs' appendix.

between functional disciplines within the same agency, the agencies established the NFP Issue Resolution Team ("IRT"). App. 101, T. Hussey Decl. ¶¶ 7-8. Tom Hussey and Joyce Casey were the lead Forest Service staff on the NFP IRT. Larry Larson was the BLM lead on the NFP IRT. App. 101, T. Hussey Decl. ¶ 8.

Plaintiffs' Response:

Plaintiffs agree that one of the purposes of the IRT was to develop joint Forest Service and BLM interpretations of the NFP but object to the proposed finding to the extent that it purports to identify "ensuring consistent responses between agencies" as the only purpose of the IRT. As the document the proposed finding cites admits, "[T]here were many questions and issues concerning the [Northwest Forest] plan's implementation." Def. App. 101 (T. Hussey Decl. ¶ 7). One concern among IRT members and others working with the IRT was that Forest Service timber sale decision notices would be rushed to completion prior to the survey target dates (October 1, 1996 and October 1, 1998) to evade the Category 2 survey requirements. App Tab. 171 at A-1400 to -1402 (L. Larsen Dep. Tr. 30:6-32:3).

Defendant's Proposed Finding of Uncontroverted Fact No. 23

One of the issues the IRT dealt with was interpreting the transition period established by the NFP for phasing in the survey requirements, "Survey prior to ground-disturbing activities." Specifically, the IRT was asked to define the term "implemented" within the context of the NFP ROD and the accompanying Standards and Guidelines. App. 98, NFP ROD, Standards and Guidelines at C-5; App. 103, T. Hussey Decl. ¶ 13. Tom Hussey and Larry Larson decided that they needed assistance to resolve this issue, and, therefore, met with Randy Hickenbottom, Chair

of the Survey and Manage Workgroup, Cheryl McAfree, a botanist, Lyndon Werner, a BLM timber sale specialist, and Nancy Anderson, another BLM employee, several times. App. 104, T. Hussey Decl. ¶ 14. This group looked at three possible ways to define "implementation" in the context of the NFP ROD. Implementation could mean: (1) when there is physical activity on the ground; (2) when an agency signs a contract; or (3) when the NEPA decision is signed. App. 104, T. Hussey Decl. ¶.

Plaintiffs' Response:

Plaintiffs object to the first sentence because the documents cited do not support a finding that the NFP provided for a "transition period" for phasing in the survey requirements. Plaintiffs agree to the second and third sentences. Plaintiffs object to the last sentence because it suggests that the interpretation "when the NEPA decision is signed" could be within the meaning intended by the NFP ROD, and this purported fact was specifically rejected by the district court in ONRC Action. Plaintiffs' Proposed Finding of Fact ("PPFUF") ¶ 210. Plaintiffs agree that those three interpretations were generally considered by the IRT in conjunction but together with several other interpretations that would allow Category 2 surveys to be performed at various times such as interpreting "implementation" as when a timber sale contract is awarded. See, e.g., PPFUF ¶¶ 37, 41, 44, 46.

Defendant's Proposed Finding of Uncontroverted Fact No. 24

The IRT decided that a project is implemented when the NEPA decision is signed. The group adopted this definition because it made more sense for the responsible official to have the survey information before he or she signed off on a project's NEPA decision. Any other

definition of "implement" would create a situation where surveys could require changes in the NEPA decision documents after those documents were signed or after contract award, which would lead to additional costs and possible contract modification or termination. App. 105, T. Hussey Decl. ¶ 20.

Plaintiffs' Response:

Plaintiffs agree to the first sentence. Plaintiffs object to the second and third sentences because they characterize the IRT's rationale for adopting the definition as a fact when the rationale stated was only opinion. Further, plaintiffs object to the implication that selecting the NEPA decision signing date as the "implementation" date necessarily required that all sales with decision notices signed before the target date be exempted from Category 2 surveys. The Forest Service could have adopted the decision notice signing date and instructed the responsible Forest Service officials to not sign the decision notice until the surveys had been completed. This approach was considered by the IRT but not adopted by the Forest Service and BLM. App. Tab 171 at A-1403 (L. Larsen Dep. Tr. 36:8-14). This approach would have avoided exempting numerous timber sales, including plaintiffs' in this action, from Category 2 surveys.

Defendant's Proposed Finding of Uncontroverted Fact No. 25

Another definition of "implement" would effectively read out the NFP's phased-in survey requirements, which the NFP intended to provide time to develop and apply the survey protocols. App. 114, R. Devlin Decl. ¶ 16.

Plaintiffs' Response:

Plaintiffs object on the grounds that the proposed finding is directly controverted by the plain language of the NFP itself (the best evidence), as found by the district court in ONRC Action. ONRC Action, 59 F. Supp. 2d 1093; PPFUF ¶ 212; see Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls' Reply Br.") at 53-54. Plaintiffs also object that the proposed finding is opinion and based on hearsay. Further, see plaintiffs' objection to DPFUF ¶ 24.

Defendant's Proposed Finding of Uncontroverted Fact No. 26

The IRT forwarded this recommendation to the Regional Foresters for Regions 5 and 6, and to the BLM State Directors for Oregon and California, who jointly issued a memorandum on November 1, 1996. This memorandum, commonly referred to as the "NEPA Decision Equals Implementation" memorandum, states that a project is implemented for purposes of the NFP when the NEPA decision is signed. App. 116-121.

Plaintiffs' Response:

Plaintiffs object to the first sentence because it is ambiguous as to what "this recommendation" refers to. Plaintiffs agree that on November 1, 1996 the Regional Foresters for Regions 5 and 6 of the FS and the BLM State Directors for Oregon and California issued the joint memorandum known as the "NEPA decision equals implementation" memorandum. This memorandum states that under the NFP, ground disturbing activities are "implemented" when the NEPA decision for the ground disturbing activity is signed. When a project is implemented is not the same as when ground-disturbing activities are implemented.

Defendant's Proposed Finding of Uncontroverted Fact No. 27

The Forest Ecosystem Management Assessment Team ("FEMAT") assembled after President Clinton's April 1993 "Forest Conference" in Portland, Oregon. The FEMAT, a group made up of scientists and technical experts from the Forest Service, BLM, Environmental Protection Agency, Fish & Wildlife Service, National Marine Fisheries Services, and several universities, was charged with preparing an assessment based upon an ecosystem approach to forest management. App. 122, J. Hickenbottom Decl. ¶ 2.

Plaintiffs' Response:

Plaintiffs object to this finding as irrelevant. The NFP requires the Forest Service and BLM to survey for certain species by certain dates prior to the implementation of ground disturbing activities. How or why the survey requirements of the NFP were created is not relevant to whether those requirements were clear and whether the Forest Service was reasonable in awarding plaintiffs' timber sales without conducting the required surveys. Plaintiffs also object to the final sentence as based on hearsay; Mr. Hickenbottom was not a member of FEMAT and therefore there is no foundation that he has personal knowledge of what the FEMAT was "charged" with doing.

Defendant's Proposed Finding of Uncontroverted Fact No. 28

The FEMAT analyzed ten different options that encompassed mixtures of Late-Successional Reserves ("LSRs"), Riparian Reserves ("RRs"), and prescriptions for forest management both inside and outside of the reserves. The vast majority of management activities would occur in Matrix lands, those lands outside of the LSRs and RRs. For each of the ten

options, the FEMAT "evaluated the likelihood of maintaining well-distributed habitat conditions on the federal lands for threatened marbled murrelets and northern spotted owls." Furthermore, assessments were done for over 1,000 plant and animal species that were "thought to be closely associated with late-successional forests." For these 1,000 species, the FEMAT suggested that if the species had an 80 percent or greater likelihood of stabilizing, well-distributed across federal lands, that was the point at which a species' viability could be assured. Significantly, the FEMAT noted that "species with scores lower than 80 percent should not automatically be regarded as unviable." The FEMAT put together a report commonly known as the FEMAT Report. App. 123-124, J. Hickenbottom Decl. ¶ 3.

Plaintiffs' Response:

Plaintiffs object to this finding as irrelevant. The NFP requires the Forest Service and BLM to survey for certain species by certain dates prior to the implementation of ground disturbing activities. How or why the survey requirements of the NFP were created is not relevant to whether those requirements were clear and whether the Forest Service was reasonable in awarding plaintiffs' timber sales without conducting the required surveys. Additionally, plaintiffs object to the proposed finding because it is based on hearsay. The proposed finding cites Mr. Hickenbottom's declaration as its only support; Mr. Hickenbottom was not on the FEMAT and has no personal knowledge of what the FEMAT considered or concluded. If Mr. Hickenbottom is purporting to state the contents of the FEMAT report referenced in the final sentence of the proposed finding, then plaintiffs further object on the grounds that the FEMAT report is the best evidence of its contents and defendant has not included that report in its appendices.

Defendant's Proposed Finding of Uncontroverted Fact No. 29

A team from the Forest Service and BLM used the FEMAT Report to prepare a draft Supplemental Environmental Impact Assessment ("SEIS"), identifying FEMAT's ten different alternatives as options. The team decided upon Alternative 9, and prepared the draft SEIS, which was sent out for public comment. After receiving public comment, additional analysis was conducted on many of the 1,000 species; this additional analysis was included as an appendix to the final SEIS, and is commonly referred to as "Appendix J2" or "Additional Species Analysis." The Additional Species Analysis "identified species to be surveyed and a prescribed management of the species' habitat to increase the likelihood that the species' populations would stabilize, well distributed across federal lands." App. 124, J. Hickenbottom Decl. ¶ 4.

Plaintiffs' Response:

Plaintiffs object to this finding as irrelevant. The NFP requires the Forest Service and BLM to survey for certain species by certain dates prior to the implementation of ground disturbing activities. How or why the survey requirements of the NFP were created is not relevant to whether those requirements were clear and whether the Forest Service was reasonable in awarding plaintiffs' timber sales without conducting the required surveys. Appendix J2 is the best evidence of its content. Mr. Hickenbottom's declaration is hearsay. There is no foundation for his claimed personal knowledge of what the "team" did or was charged with doing.

Defendant's Proposed Finding of Uncontroverted Fact No. 30:

The red tree vole was identified in the Additional Species Analysis. App. 126, J. Hickenbottom Decl. ¶ 12. However, research in the FEMAT Report and the Additional Species Analysis demonstrates that the red tree vole was "thought to be in less dire circumstances." The FEMAT Report determined that Alternative 9 resulted in a 73 percent likelihood of achieving habitat sufficient to allow the red tree vole to stabilize across federal lands; had the red tree vole received a 7 percent higher likelihood rating in the FEMAT Report, it would not have been included in the Additional Species Analysis. App. 127, J. Hickenbottom Decl. ¶ 13.

Plaintiffs' Response:

Plaintiffs object to this finding as irrelevant. The NFP requires the Forest Service and BLM to survey for certain species by certain dates prior to the implementation of ground disturbing activities. How or why the survey requirements of the NFP were created is not relevant to whether those requirements were clear and whether the Forest Service was reasonable in awarding plaintiffs' timber sales without conducting the required surveys. Plaintiffs object to the second sentence as opinion and based on hearsay. There is no foundation for Mr. Hickenbottom's claimed personal knowledge. Plaintiffs also object that the proposed finding characterizes the contents, research, and determinations found in the FEMAT Report and the referenced "Species Analysis." The FEMAT Report and the "Species Analysis" are the best evidence of their contents.

Defendant's Proposed Finding of Uncontroverted Fact No. 31

The final SEIS Species Analysis Team's Mammal Subgroup determined that it was unnecessary to protect every red tree vole site; therefore, the red tree vole was not included in the Category 1 Survey and Manage species. The subgroup further decided that the red tree vole sites should be assessed in relation to their value in adding to connectivity between LSRs and RRs, many of which were not ecologically functional because of past management practices. The group decided that it was important to prevent isolation of major portions of the red tree vole population. Therefore, they determined that the red tree vole should be included in the Component 2 Survey and Manage species by managing the red tree vole population in the lands between LSRs. App. 127-128, J. Hickenbottom Decl. ¶ 14.

Plaintiffs' Response:

Plaintiffs object to the first sentence in that it is ambiguous as to when the Subgroup made its alleged determination. Plaintiffs object to the entire proposed finding as irrelevant. The NFP requires the Forest Service and BLM to survey for certain species by certain dates prior to the implementation of ground disturbing activities. How or why the survey requirements of the NFP were created is not relevant to whether those requirements were clear and whether the Forest Service was reasonable in awarding plaintiffs' timber sales without conducting the required surveys. Plaintiffs also object that the proposed fining is based on hearsay; defendant has put forth nothing to show that Mr. Hickenbottom was on the final SEIS Species Analysis Team's Mammal Subgroup or had personal knowledge of what was discussed and determined. To the extent Mr. Hickenbottom purports to describe the contents of the final SEIS, then plaintiffs further object on the grounds that the final SEIS is the best evidence of its contents.

Defendant's Proposed Finding of Uncontroverted Fact No. 32

The Survey and Manage Workgroup developed interim guidance for the Forest Service and BLM to implement the Component 2 Survey and Manage requirement for the red tree vole. Id. The group determined that, because of concerns related to ensuring connectivity between LSRs, "those requirements should be designed to maximize the efficiency and efficacy in increasing the likelihood of providing for a well-distributed red tree vole population." The group solicited input from the FEMAT scientists, the Additional Species Analysis Team, and the final SEIS team, and, based upon that input, the group developed the recommendations that were ultimately adopted in the November 4, 1996 memorandum entitled "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole," informally known as the Red Tree Vole Memorandum. App. 128, J. Hickenbottom Decl. ¶ 15.

Plaintiffs' Response:

Plaintiffs agree.

Defendant's Proposed Finding of Uncontroverted Fact No. 33

The threat to the red tree vole's continued viability was minimal. App. 130, J. Hickenbottom Decl. ¶ 18, App. 132. Rather, the concern with the red tree vole related to past forest management practices that fragmented the LSRs and resulted in the creation of young, even-aged forests. Therefore, the focus of the red tree vole mitigation measure was to improve LSR connectivity, rather than managing known sites that may be isolated due to a lack of LSR connectivity. App. 129, J. Hickenbottom Decl. ¶ 17. For example, the group decided that if a stand of trees containing a red tree vole population was surrounded principally by older forests,

that stand of trees would add little to the connectivity already provided by the older forests. On the other hand, a stand containing red tree voles in an area with almost no older forest or suitable habitat would have a much higher value in maintaining connectivity between LSRs. Finally, if a stand of trees containing red tree voles was located in an area isolated from federally managed lands, and, therefore, LSRs, that stand could not contribute to improving the species' viability. App. 130, J. Hickenbottom Decl. ¶ 18.

Plaintiffs' Response:

Plaintiffs object to the first sentence of the finding because it is lay opinion and/or based upon an expert opinion without any supporting evidence. Mr. Hickenbottom, whose deposition the sentence cites as its only support, has not been qualified as an expert. Plaintiffs object to the second sentence because it discusses "concern[s]" with the RTV, but does not state whose concerns they were or offer evidence supporting the existence and nature of the concerns. Plaintiffs object to the proposed finding as a whole because it references no documentary support, and it is speculative hearsay as to what an undefined "group" thought or concluded. The written reports or findings of the "group" are the best evidence. All else is speculation.

Defendant's Proposed Finding of Uncontroverted Fact No. 34

According to the Red Tree Vole Memorandum, before conducting surveys, geographic information system ("GIS") information was to be used to analyze federal lands to screen the lands based upon their value in increasing LSR connectivity. The first screen would determine how much land was federally managed, and, if the watershed contained less than 10 percent federal lands, survey and manage was not required for those areas. The group decided not to

survey in areas with less than 10 percent federal lands because, due to the small portion of federal lands, those areas could not contribute to the goal of LSR connectivity. The second screen would determine whether "at least 40 percent of the federal lands in the watershed was forested with at least 60 percent crown closure, an average conifer tree diameter at breast height of at least 10 inches, and whether that closure and diameter could be maintained through the year 2000." If federal lands met the requirements outlined in the second screen, then there was no need to survey and manage for the red tree vole because the habitat already provided adequate LSR connectivity. App. 128-129, J. Hickenbottom Decl. ¶ 16.

Plaintiffs' Response:

Plaintiffs object on the grounds that the proposed finding relies on hearsay contained in the declaration of Mr. Hickenbottom and purports to describe and paraphrase the contents of the RTV Directive. The RTV Directive is the best evidence of its contents.

Defendant's Proposed Finding of Uncontroverted Fact No. 35

Ms. Lois Schiffer, Assistant Attorney General for the Department of Justice's Environment and Natural Resources Division ("ENRD") at the time of the ONRC Action litigation, did not have any recollection regarding the statement "NEPA decision equals implementation is nonsense." App. 137-139, L. Schiffer Depo. Tr. at 7:14-7:18, 52:3-52:15.

Plaintiffs' Response:

Plaintiffs agree to the extent that this proposed finding states only that Ms. Schiffer has no recollection whether she did or did not make the statement "NEPA decision equals implementation is nonsense" or words to that effect.

Defendant's Proposed Finding of Uncontroverted Fact No. 36

Mr. Edward Boling, lead counsel for the ONRC Action litigation, and Mr. Peter Coppelman, the Deputy Assistant Attorney General at ENRD, do not recall any conversation where Ms. Schiffer allegedly said "NEPA decision equals implementation is nonsense." App. 140-145, E. Boling Depo. Tr. at 8:7-8:10, 91:15-92:11; App. 146.

Plaintiffs' Response:

Plaintiffs agree to the extent that this proposed finding states only that Mr. Boling and Mr. Coppelman have no recollection of whether Ms. Schiffer did or did not make the statement "NEPA decision equals implementation is nonsense" or words to that effect.

Defendant's Proposed Finding of Uncontroverted Fact No. 37

The Forest Service must consider the competing interests of the environment and the timber industry, a fact that President Clinton recognized during the Forest Conference on April 2, 1993: "How can we achieve a balanced and comprehensive policy that recognizes the importance of the forest and timber to the economy and jobs in this region, and how can we preserve our precious old-growth forests, which are part of our national heritage and that, once destroyed, can never be replaced?" App. 150.

Plaintiffs' Response:

Plaintiffs object to this proposed finding as a hearsay characterization of what President Clinton said and hearsay commentary on that alleged statement. In addition, even if accurate, President Clinton's statement is itself speculative hearsay and irrelevant legal opinion. Plaintiffs also object on the grounds that the proposed finding is irrelevant and without any time frame. The fact that the Forest Service must consider the interests of the timber industry (whatever that means) does not tend to show that the Forest Service was reasonable for violating the law by adopting the "NEPA decision equals implemented" interpretation and the RTV Directive.

Defendant's Proposed Finding of Uncontroverted Fact No. 38

The Forest Service must meet congressionally-mandated timber-harvest levels. App. 109, R. Devlin Decl. ¶ 4.

Plaintiffs' Response:

Plaintiffs object to the proposed finding as hearsay and lay legal opinion. If Mr. Devlin's declaration, which the proposed finding cites as its only support, is based on Mr. Devlin's opinion as to what a United States statute requires, then it is for the Court and not Mr. Devlin to interpret the meaning and effect of any such law. Plaintiffs also object to the proposed finding because it is directly controverted by other statements in Mr. Devlin's declaration which clearly indicate that to the extent there is any congressional mandate on this subject it is limited to the "volume of timber to be offered for sale." For example, paragraph 3 of the Devlin declaration states, "Annually, the Region 6 Regional Forester compiled data projecting the amount of timber that the region and its national forest could offer for sale. This information would be combined

with data from the other eight regions of the Forest Service and used to develop the entire agency's out-year budget proposal to the President. . . . Congress would further review and modify the President's proposal and would eventually approve and budget, for the entire Forest Service, a very specific volume of timber to be offered for sale and later harvested." Timber sales, such as Happy Thin, Jack Heli and Too Wild permit harvesting over multiple years. App. Tabs 93, 11, 124. There is no requirement in the law or in the contracts that requires any specific level of timber harvest on these sales in any of the years within which the purchaser may cut and remove the timber. Mr. Devlin's hearsay account of how the Forest Service budget is prepared and what the Congress and the President do with that budget without any reference to any statutes, regulations or even official Forest Service policy in writing constitutes multiple levels of hearsay and lay legal opinion. The best evidence of any such legal requirement would obviously be the statutes or regulations setting forth the alleged obligation of the Forest Service. Further, although Mr. Devlin's declaration may accurately reflect some political pressure perceived by Mr. Devlin and others in the Forest Service to maintain certain levels of timber sale offerings within each fiscal year, there is no basis even cited by Mr. Devlin for concluding that the Forest Service is required to achieve these levels even if it means violating the clear directions in the President's NFP. Mr. Devlin's declaration does, however, clearly indicate his belief that the Forest Service's mission was to offer a certain volume of timber for sale in order to satisfy political pressure from Congress.

Defendant's Proposed Finding of Uncontroverted Fact No. 39

The National Forest Products Association ("NFPA") acknowledged that the 2400-6 standard timber sale contract was developed in 1970 with "extended discussions between

NFPA's Federal Timber Purchaser's Committee and the Forest Service." App. 162-163, R. Fitzgerald Decl. ¶ 3, Ex. 18 (App. 255-257).

Plaintiffs' Response:

Plaintiffs object to this finding as based on multiple levels of irrelevant hearsay. The alleged discussions between the Forest Service and NFPA concerned the 1970 version of the standard timber sale contract. This version was subsequently revised in 1973, and it is the 1973 version that is included as part of plaintiffs' contracts. Def. App. 163 (R. Fitzgerald Decl. ¶ 4). Accordingly, the hearsay statements regarding the 1970 contract are irrelevant to the contracts currently before the Court. Defendant has established no nexus between the events at issue in this action occurring in 1998 and 1999 or the plaintiffs in this action and the excerpt from the 1974 "Buyer's Guide" on which the proposed finding relies (Def. App. 255-257). Activities which transpired 25 or more years prior to the award of plaintiffs' sales relating generally to a trade association's interaction with the Forest Service bear no meaningful relationship to the issues in this case and are not attributable to the plaintiffs in this case. Mr. Fitzgerald's declaration does not establish that he has personal knowledge of any or all of the alleged communications which he broadly claims took place between representatives of the Forest Service and the National Forest Products Association, including any so-called "extended discussions." Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in discussions with the timber industry about standard timber sale contract provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Mr. Fitzgerald's attempt to narrate

his subjective impression of decades of alleged activities involving Forest Service representatives and timber industry groups is too remote, speculative and contains to much impermissible lay opinion to be admissible as evidence on the parties' cross-motions on summary judgment.

Defendant's Proposed Finding of Uncontroverted Fact No. 40

The Forest Service, NFPA, other timber industry groups, and individual members of the timber industry, communicated throughout 1971 and 1972 regarding possible revisions to the standard timber sale contract. App. 162-163, R. Fitzgerald Decl. ¶ 3, Exs. 1-5 (App. 169-183). After these communications, the standard timber sale contracts were revised in September 1973. App. 163, R. Fitzgerald Decl. ¶ 4, Ex. 18 (App. 255-257).

Plaintiffs' Response:

Plaintiffs object to this finding to the extent that it relies solely upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of the Forest Service communications with the NFPA and other timber industry groups in developing the standard timber sale contract. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this finding because the declaration and documents it relies upon are inadmissible hearsay on two or more levels.

Plaintiffs also object on the grounds that this finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language, defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 41

The standard timber sale contracts contained terms that were favorable to the timber industry, including allowing the purchasers to operate their sales with little Forest Service oversight, and the contract did not contain a clause that would allow the Forest Service to terminate the contract for its own convenience, or a liquidated damages provision. App. 163, R. Fitzgerald Decl. ¶ 5. These terms remained unchanged for about two decades. App. 164, R. Fitzgerald Decl. ¶ 6.

Plaintiffs' Response:

Plaintiffs object to Mr. Fitzgerald's hearsay speculation and personal opinion that the terms of the standard timber sale contract were necessarily "favorable" for any purpose to any party. Plaintiffs also object to Mr. Fitzgerald's declaration as speculation, personal opinion and hearsay regarding his unsupported claims that purchasers operated their sales under the standard timber sale contract with "little" Forest Service oversight. To the extent that the declaration suggests that there is little Forest Service oversight of the contracts at issue, the Happy Thin, Jack Heli and Too Wild timber sale contracts are filled with a combined 347 pages of detailed specifications which must be followed by the purchaser and which require consistent Forest Service oversight of purchaser's operations on the sale areas. App. Tabs 93, 111, 126. These contracts are the best evidence of their contents and Mr. Fitzgerald's hearsay characterizations and speculative lay opinions of them are inadmissible. Finally, plaintiffs object to this proposed finding as irrelevant to whether plaintiffs' timber sale contracts were contracts of adhesion.

Defendant's Proposed Finding of Uncontroverted Fact No. 42

The Forest Service has continued, over the past thirty years, to meet with and seek comment from the timber industry concerning revisions to the timber sale contract. App. 164, R. Fitzgerald Decl. ¶ 7, Exs. 6-17 (App. 184-254).

Plaintiffs' Response:

Plaintiffs object to this finding to the extent that it relies solely upon the declaration of Mr. Fitzgerald and not the 70 pages of excerpts and documents attached as exhibits to his declaration. Defendant has not established that Mr. Fitzgerald has personal knowledge of the Forest Service communications with the NFPA and other timber industry groups in allegedly developing a standard timber sale contract. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he had no role in drafting timber sale contract provisions or involved in any discussions with the timber industry about standard timber sale provisions before 1999. Ex. A (R. Fitzgerald Dep. Tr. 34:19-36:15). Moreover, plaintiffs object to this finding because the declaration and documents it relies upon are inadmissible hearsay on two or more levels. Plaintiffs also object on the grounds that this entire finding is totally irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted

evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case. Finally, plaintiffs object to the findings' reliance upon the correspondence found at Def. App. 237-254 because these documents were all purportedly written in either 2000 or 2001. Clause C(T)6.01 in each of plaintiffs' contracts was promulgated in October 1996 (as indicated in the formal title of the clause – "C(T)6.01 – Interruption or Delay of Operations. (10/96)") and therefore any purported "timber industry" comments, alleged negotiations or interaction regarding clause C(T)6.01 after October 1996 are irrelevant. In the alternative, at a minimum, any evidence of such activities occurring after July 6, 1999, the award date of Happy Thin, the last of plaintiffs' contracts to be awarded, is irrelevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 43

When the Forest Service, in the late 1980s and early 1990s, decided to revise the standard timber sale contract to reflect changes in environmental laws, court decisions interpreting environmental laws, and to protect the Forest Service's financial interests, the Forest Service sought input from the timber industry. In particular, NFPA provided numerous comments on C/CT6.01. App. 164, R. Fitzgerald Decl. ¶ 8, Ex. 14 (App. 211-236).

Plaintiffs' Response:

Plaintiffs object to the vague and general nature of the proposed finding. Specifically, the proposed finding speaks to some unspecified alleged FS decision "in the late 1980s and early 1990s," a period spanning a decade, without any further identification of the date of that so-called decision or who in the Forest Service made this so-called decision. Additionally, the proposed finding vaguely references so-called "input from the timber industry," and other than its mention of the NFPA, does not further describe which other groups or companies the FS sought input from or when such solicitations were made. Plaintiffs also object to this finding to the extent that it relies solely upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of the Forest Service communications with the NFPA and other timber industry groups that he references. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this

finding because the declaration and the documents it relies upon are inadmissible hearsay on two or more levels. Plaintiffs also object on the grounds that this entire finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 44

The C/CT6.01 language from the June 1990 timber sale contracts, which the NFPA commented on, is similar to the C/CT6.01 language in the plaintiffs' timber sale contracts. The 1990 version of C.CT6.01 permitted interruption or delay of operations upon the written request of the Contracting Officer "[t]o comply with a court order, regardless of whether this sale is named in such an order, upon determination of the Contracting Officer, in his/her sole discretion, that the order would be applicable to the conditions existing on this sale . . . ." App. 165, R. Fitzgerald Decl. ¶ 11, Exs. 13-14 (App. 206-236). The plaintiffs' timber sale contracts provide for the interruption or delay of operations upon the written request of the Contracting Officer "to comply with a court order, issued by a court of competent jurisdiction." App. 165, R. Fitzgerald Decl. ¶ 10.

Plaintiffs' Response:

Plaintiffs object because the first sentence of this proposed finding offers a lay legal opinion regarding the terms of the C/CT6.01 clauses. Whatever clauses are referenced speak for themselves and are the best evidence of their contents. Plaintiffs further object to the entire finding to the extent that it relies solely upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of the alleged Forest Service communications with the NFPA and other timber industry groups be referenced. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale

provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this finding because the declaration and documents it relies upon are inadmissible hearsay on two or more levels. Plaintiffs also object on the grounds that this entire finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 45

The NFPA commented specifically on C/CT6.01 in a letter dated December 4, 1989, in which NFPA stated its belief that the Forest Service had "sufficient authority to interrupt operations under B9.3 - BREACH when used in conjunction with other existing environmental protection provisions" and stated that section (a) of C/CT6.01 "should be dropped." App. 164-165, R. Fitzgerald Decl. ¶ 9, Ex. 14 (App. 211-236). In another letter, NFPA wrote:

> We also appreciate the opportunity we had to discuss the proposed liability provisions with you and your staff in Scottsdale. We also recognize the effort your staff put forth to: (1) address some of our concerns in the revised proposal; and (2) respond to our concerns as quickly as they did.

App. 166, R. Fitzgerald Decl. ¶ 13, Ex. 14 (App. 211-236).

Plaintiffs' Response:

Plaintiffs object to the extent that this finding solely relies upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of the Forest Service communications with the NFPA and other timber industry groups which he references. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this finding because the declaration and documents it relies upon are inadmissible hearsay on two or more levels. Additionally, the proposed finding

purports to describe the contents of a letter from NFPA; plaintiffs object on the grounds that the letter is the best evidence of its contents. Plaintiffs also object on the grounds that this entire finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 46

Another letter from NFPA, dated May 1990, NFPA acknowledged that the Forest Service made efforts to modify C/CT6.01 in response to NFPA's concerns, and acknowledged that the Forest Service provided it an opportunity to comment on and negotiate the terms of the contracts. App. 164-165, R. Fitzgerald Decl. ¶ 9, Ex. 14 (App. 211-236). The NFPA further expressed its appreciation for the opportunity to discuss proposed contract provision C/CT6.01, and other provisions addressing modification, termination, and compensation in the timber sale contracts. App. 166, R. Fitzgerald Decl. ¶ 13, Ex. 14 (App. 211-236).

Plaintiffs' Response:

Plaintiffs object to the proposed findings' assertion that the FS provided NFP with an opportunity to "negotiate" the terms of a contract as unsupported by the declaration and documents cited. Plaintiffs object to the entire finding to the extent that it solely relies upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of the Forest Service communications with the NFPA and other timber industry groups he references. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this finding because the declaration and documents it relies upon are inadmissible hearsay on two or more levels. Additionally, the proposed finding purports to describe the contents of a letter, if relevant, from NFPA; plaintiffs

object on the grounds that the letter is the best evidence of its contents. Plaintiffs also object on the grounds that this entire finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 47

The Forest Service still communicates with the timber industry regarding these standard timber sale contracts. The Forest Service met with members of the NFPA Federal Timber Purchaser's Committee ("FPTC") and its counsel, Alan Saltman, to consider revisions to the latest version of the standard timber sale contracts. App. 166-167, R. Fitzgerald Decl. ¶ 14.

Plaintiffs' Response:

Plaintiffs object to this finding as totally irrelevant because the proposed finding concerns events that occurred long after the award of plaintiffs' contracts. Clause C(T)6.01 in each of plaintiffs' contracts was promulgated in October 1996 (as indicated in the formal title of the clause – "C(T)6.01 – Interruption or Delay of Operations. (10/96)") and therefore any purported "timber industry" comments, alleged negotiations or interaction regarding clause C(T)6.01 after October 1996 are irrelevant. In the alternative, at a minimum, any evidence of such activities occurring after July 6, 1999, the award date of Happy Thin, the last of plaintiffs' contracts to be awarded, is irrelevant to the issues in this case.

Defendant's Proposed Finding of Uncontroverted Fact No. 48

Over the past thirty years, and within the bounds of laws governing the formulation of regulation and policy, the Forest Service has engaged in discussions with members of the timber industry about the standard timber sale contracts and issues affecting the timber industry. App. 167-168, R. Fitzgerald Decl. ¶ 17.

Plaintiffs' Response:

Plaintiffs object that the proposed finding is hearsay speculation, lay legal opinion and is unsupported by the document cited. Plaintiffs object to this finding to the extent that it relies solely upon the declaration of Mr. Fitzgerald and not the exhibits attached to his declaration because defendant has not established that Mr. Fitzgerald has personal knowledge of 30 years worth of the Forest Service's communications with the NFPA and other timber industry groups as referenced by him. Indeed, at his subsequent deposition, Mr. Fitzgerald admitted that he was not involved in the drafting of the version of the timber sale contract used for plaintiffs' sales. Ex. A (R. Fitzgerald Dep. Tr. 34:11-35:7). Mr. Fitzgerald also admitted that he was not involved in any discussions with the timber industry about standard timber sale provisions before plaintiffs' contracts were awarded in 1999. Id. (36:9-37:8). Moreover, plaintiffs object to this finding because it the declaration and documents it relies upon are inadmissible hearsay on two or more levels and the authenticity of the documents has not been established. Plaintiffs also object on the grounds that this entire finding is irrelevant. Although defendant references involvement by the "timber industry" including alleged "negotiations with the timber industry" regarding the drafting of Forest Service timber sale contract language defendant offers no evidence that Blue Lake, Timber Products or CLR authorized any "timber industry" groups to represent them in submitting comments on Forest Service proposed contract language, much less engage in any so-called negotiations. Without proof of any such agency relationship, there is absolutely no connection between the plaintiffs in this case and a generalized and undefined "timber industry." In addition, even if defendant had submitted evidence that plaintiffs were members of a timber industry association or group which submitted comments on Forest Service proposed standard contract language, including clause C(T)6.01, during a relevant time period

such activities would not constitute contract negotiations. A timber industry group's submitting comments and engaging in discussions with agency personnel regarding Forest Service proposals for standard contract language is no different than various industry groups or individual companies submitting comments to the FAR Council about proposed changes in standard federal procurement contract language. In such instances there is no offer and acceptance or consideration, and obviously no contract being negotiated. Plaintiffs' timber sale contracts are not negotiated contracts, and defendant cannot transform them into negotiated contracts by offering discursive evidence or comments submitted by "timber industry" groups on various Forest Service proposals regarding its standard contract language over the years. Such evidence is simply not relevant to the issues in this case. Finally, plaintiffs object to the findings' reliance upon the correspondence found at Def. App. 237-254 because they all were purportedly written in either 2000 or 2001, after the execution and suspension of plaintiffs' contracts. Clause C(T)6.01 in each of plaintiffs' contracts was promulgated in October 1996 (as indicated in the formal title of the clause – "C(T)6.01 – Interruption or Delay of Operations. (10/96)") and therefore any purported "timber industry" comments, alleged negotiations or interaction regarding clause C(T)6.01 after October 1996 are irrelevant. In the alternative, at a minimum, any evidence of such activities occurring after July 6, 1999, the award date of Happy Thin, the last of plaintiffs' contracts to be awarded, is irrelevant to the issues in this case.

<u>Defendant's Proposed Finding of Uncontroverted Fact No. 49</u>

These timber sale contracts include a clause that permits deviation by requiring purchasers to submit their own plans of operation prior to commencing work each season. App. 268, 273.

Plaintiffs' Response:

Plaintiffs object on the grounds that the documents cited in the proposed finding do not support the finding. The contract clause cited, C6.3(#), expressly states that all plans of operation and any revisions thereto must be approved in writing by the Forest Service prior to the commencement of operations on the timber sale. Nothing in clause C6.3(#) allows the purchaser to unilaterally modify or deviate from the specifications or other terms in the contract.

Defendant's Proposed Finding of Uncontroverted Fact No. 50

Other clauses in the timber sale contracts contain "objectives" and "methods" for harvesting timber. For example, the Too Wild contract contains C6.41# - Special Felling Objectives, which states: "felling objectives shall be accomplished by the type of felling methods or equipment listed herein. Methods or equipment other than those specified may be approved." App. 274. The Too Wild contract also contains C6.42# - Special Yarding/Skidding Methods, allows for the use of "[m]ethods or equipment other than those specified . . . ." App. 275. The Jack Heli contract, in clause C6.411# - Directional Felling, provides that: "[D]irectional felling shall not be required when in the faller's judgment it is unsafe to do so, and the tree shall be left standing." App. 269. The Jack Heli contract also includes clause C5.411 - Dust Abatement for Temporary Roads, which states: "Purchaser may choose the material used in dust abatement." App. 270. The Happy Thin contract includes the Directional Felling clause, and clause CT5.414 - Snow Removal, which states: "[i]f Purchaser removes snow from roads, such work shall be done in a manner that will protect roads and adjacent resources. App. 350-351.

Plaintiffs' Response:

Plaintiffs agree that the quoted language in the finding is found in the respective Happy Thin, Jack Heli, and Too Wild timber sale contracts as awarded. However, these contracts are the best evidence of their contents, speak for themselves, and should be read in context and in their entirety.

Plaintiffs object to the proposed finding's intentional omission of other language in the clauses quoted, which ought in fairness be considered with it:

- Clause C6.41# quoted in the proposed finding also states that the provision is made "[n]otwithstanding BT 6.41, BT6.411, BT6.5, and BT 6.61," all of which are provisions further specifying how the purchaser is to perform the contract.

- Clause C6.42#, although it allows use of other methods than the ones specified in the contract, explicitly states that such other use is subject to Forest Service approval: "Methods other than those specified may be approved" (emphasis added).

- Clause C6.411#, while providing that directional felling is not required when unsafe and then providing alternative specifications as to what the purchaser is to do with the tree that cannot be directionally felled, also specifies that written permission of the Forest Service is required in all other circumstances where directional felling cannot be accomplished: "Unless otherwise agreed to in writing, trees which cannot normally be felled away from other ownership, wilderness boundary, controlled area, survey monument, ditch, trail, Pacific Crest

Trail, pipeline, and streamcourse shown on the Sale Area Map shall be directionally felled away from said areas with the aid of specialized equipment" (emphasis added).

- Clause C6.5411 does allow the purchaser to choose the material used for dust abatement on roads, but the contract requires written approval of the Forest Service if the purchaser chooses any material other than water: "Purchaser may choose the material used in dust abatement. When anything other than water is to be used, such material must be approved in writing by Forest Service."

- Clause CT5.414 goes on to provide specifications on the purchaser's snow removal: "Snow berms shall be placed to avoid accumulation of melt water on the road and prevent water concentration on erosive slopes and soils. . . . Single lane roads shall be plowed full width including turnouts. In the event double lane roads are not plowed to full width, warning signs shall be required and plowing shall be no less than single lane (12 feet) with intervisible turnouts."

Finally, plaintiffs object that the proposed finding purports to set forth the only contract provisions relevant to deciding whether plaintiffs' timber sale contracts contain design specifications. The contracts must be considered in their entirety. App. Tabs 93, 111, 124.

Plaintiffs respectfully refer the Court to Plaintiffs' Reply Brief at 15-23 for a detailed discussion of the design specifications in plaintiffs' timber sale contracts and the detailed

provisions through which the Forest Service exercises control over plaintiffs' operations through their contracts.

Defendant's Proposed Finding of Uncontroverted Fact No. 51

The Northwest Forestry Association, a timber industry group, issued a newsletter, Forestry Forum, that, among other things, tracked the ONRC Action litigation – including making reference to the alleged "secret agreements" between the ONRC Action plaintiffs and the Government. App. 277-295. The newsletter also discussed the lawsuit's potential impact on timber sales in the region. Id.

Plaintiffs' Response:

Plaintiffs object that the proposed finding purports to describe the contents of the Northwest Forestry Association newsletters, the newsletters are the best evidence of their contents. The pages of the newsletter cited do not demonstrate any "tracking" of the ONRC Action litigation and, if anything, the brief and cryptic references to ONRC Action demonstrate what little accurate information was publically available about the actual scope and applicability of this lawsuit.

Plaintiffs also object that the proposed finding is irrelevant; defendant has put forth no evidence that plaintiffs read or otherwise knew of the contents of the referenced newsletters. Indeed, when presented with the newsletters at the depositions, plaintiffs could not recall ever having seen those specific newsletters before. Ex. B (D. Bonde Dep. Tr. 19:6-20:21); Ex. C (J.

Broom Dep. Tr. 29:9-30:3); Ex. D (B. Taylor Dep. Tr. 33:21-34:2, 36:1-11); Ex. E (B. Turner Dep. Tr. 80:8-13).

Plaintiffs also object on the grounds that the documents relied upon by the proposed finding do not support a finding that the newsletter made reference to "secret agreements." The September 11, 1998 newsletter referred only to secret "settlement negotiations." Def. App. 278.

Plaintiffs also object to the proposed finding because it does not contain quotes from or references to other portions of the newsletter that ought in fairness be considered with it pursuant to FRE 106. The newsletters, to the extent they are relevant, also indicate uncertainty as to whether any secret negotiations are actually taking place ("Secret Negotiations?") and the number of sales involved in the negotiations. Def. App. 278. Moreover, the newsletters also state that the government and ONRC Action refused to grant the industry access to the parties' settlement negotiations, Def. App. 284. Finally, the newsletter on March 19, 1999, states (incorrectly) that the government succeeded in dismissing the claims related to the survey and manage surveys. Def. App. 291.

Plaintiffs also object to the extent that the proposed finding claims that the newsletter included any further articles regarding ONRC Action litigation beyond March 19, 1999 as unsupported by the documents cited by defendant.

<u>Defendant's Proposed Finding of Uncontroverted Fact No. 52</u>

The prospectus for the Jack Heli timber sale included the language: "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit the government's liability in case of cancellation to the holding cost." App. 304; App. 309-310, E. Matthews Decl. ¶ 11.

<u>Plaintiffs' Response</u>:

Plaintiffs agree. <u>See</u> PPFUF ¶ 175.

<u>Defendant's Proposed Finding of Uncontroverted Fact No. 53</u>

The Forest Service delayed awarding these sales. For the Jack Heli timber sale, the Forest Service requested and received permission to extend the purchaser's bid. App. 311-312.

<u>Plaintiffs' Response</u>:

Plaintiffs agree. <u>See</u> PPFUF ¶ 185.

<u>Proposed Finding of Uncontroverted Fact No. 54</u>

In late 1998 and early 1999, Ed Matthews, Contracting Officer for the Happy Thin and Jack Heli timber sales, routinely communicated with representatives from the timber industry, including Blue Lake Forest Products, Inc. and Timber Products Co., and discussed the ONRC Action litigation and its potential impact on the Klamath's timber sale program. App. 309, E. Matthews Decl. ¶ 8.

Plaintiffs' Response:

Plaintiffs object that the proposed finding is unduly vague as to the substance of Mr. Matthews's communications with Blue Lake and Timber Products. The term "routinely communicated" is subjective personal opinion and ambiguous as to the frequency or form of any alleged communications. Plaintiffs therefore also object that the proposed finding is unduly vague as to the dates of the claimed communications; specifically, whether such communications occurred prior to the time Blue Lake and Timber Products were awarded their sales.

Defendant's Proposed Finding of Uncontroverted Fact No. 55

Prior to awarding the Too Wild timber sale contract, Tom Link, Contracting Officer for the Too Wild timber sale, provided information to CLR Timber Holdings, Inc., regarding ONRC Action, including general information about the case, how it affected the delay in award, and information regarding ongoing settlement negotiations. App. 316, T. Link Decl. ¶ 8.

Plaintiffs' Response:

Plaintiffs object because the proposed finding is ambiguous and vague as to the substance of Mr. Link's alleged communications with CLR. Mr. Link's declaration states nothing more than that he provided CLR with some form of unspecified, general information regarding the ONRC Action organization; unspecified information "about the case" and how it affected the delay in award and "regarding ongoing settlement negotiations." This general and unspecific recollection has no substantive evidentiary weight. In his declaration Mr. Link states that he "provided updates to Mr. Bonde and Mr. Frazier on whatever new information I learned about the litigation affecting the Too Wild TS." Mr. Link's vague references to so-called "updates" or

providing "whatever new information I learned" does not establish that any specific information relevant to a specific time period or any potential impact of the ONRC Action litigation on the Too Wild sale was ever conveyed to representatives of CLR. Accordingly, it follows that Mr. Link has no specific recollection of his communications with either Mr. Bonde or Mr. Frazier on any specific subject concerning the relationship between ONRC Action and Too Wild timber sale. By way of contrast, Mr. Bonde specifically testified at his deposition (subject to cross examination and not solely in a subsequent declaration) that CLR was never told that Too Wild was included on a list of "at-risk" or "problem" sales secretly provided by the ONRC Action plaintiffs to the FS or that the FS anticipated that any ground-disturbing operations on the Too Wild sale would likely provoke a motion for a TRO or a preliminary injunction from the ONRC Action plaintiffs. PPFUF ¶¶ 202, 205, 206. Mr. Link's declaration regarding undated, general and vague communications with CLR does not contradict Mr. Bonde's deposition testimony.

Defendant's Proposed Finding of Uncontroverted Fact No. 56

Plaintiffs did not accept the Forest Service's estimates regarding the amount of timber available for harvest on a particular sale; instead, the plaintiffs all cruised the sales themselves to obtain more accurate estimates of the amount of timber available for harvest. App. 325, D. Bonde Depo. Tr. at 48:10-49:3; App. 323, B. Turner Depo. Tr. at 45:16-45:19; App.321, J. Broom Depo. Tr. at 10:16-10:20.

Plaintiffs' Response:

Plaintiffs object to the proposed finding as irrelevant. Whether plaintiffs cruised their sales to estimate the amount and quality of timber thereon before bidding on the sale does not

tend to show that plaintiffs knew or should have known that the ONRC Action litigation would cause the Forest Service to suspend their sales after award. Subject to that objection, plaintiffs agree that they cruised their sales, and further state that the Forest Service expressly disclaimed the accuracy of its own cruise volume estimates and directed each plaintiff in the prospectuses for their sales to warrant that they had undertaken their own cruise estimates. App. Tab 109 at A-799; Ex. F (Happy Thin Instructions to Bidders); Ex. G (Jack Heli Instructions to Bidders). See discussion in Pls' Reply Br. at 31-32.

Defendant's Proposed Finding of Uncontroverted Fact No. 57

The Forest Service provided notice to the ONRC Action plaintiffs of its intent to award the three timber sales at issue, and the ONRC Action plaintiffs did not take action prior to award. App. 328-330, App. 317-318 (T. Link Decl. ¶ 14).

Plaintiffs' Response:

Plaintiffs agree that there is no evidence that the ONRC Action plaintiffs sought a TRO or injunction against the award of Happy Thin, Jack Heli and Too Wild. However, there is no evidence from Mr. Link's declaration or the documents cited to support a finding that "the ONRC Action plaintiffs did not take any action prior to award." For example, Mr. Link states, "I understood that the plaintiffs in ONRC Action did not object to the award of the sale because CLR had agreed not to begin operations before July 1, 1999." Def. App. 317 (T. Link Decl. ¶14). There is no statement in Mr. Link's declaration or any other evidence indicating that CLR was informed that it must agree not to begin operations before July 1, 1999 in order to prevent ONRC Action from seeking an immediate TRO or injunction of the award. Although Mr. Link

requested that CLR briefly delay operations on Too Wild, nothing in Mr. Link's declaration states that he told CLR that he was requesting this "to appease the plaintiffs in ONRC Action in order that [he] could award the sale." Def. App. 316 (T. Link Decl. ¶ 9). The letter from Contracting Officer Ed Matthews to the ONRC Action plaintiffs' attorneys and not disclosed to Blue Lake stated that Mr. Matthews intended to award Happy Thin "no sooner than May 5, 1999" but provides no evidence to whether the Forest Service knew or should have known that Happy Thin was an explicit target of the ONRC Action plaintiffs and would likely be challenged with a motion for injunctive relief as soon as operations began. See PPFUF ¶ 160. Likewise, the letter from the chief trial attorney for the government, Edward Boling, to the ONRC Action plaintiffs' attorneys only provides evidence that notice by the government was given to ONRC Action of the Forest Service's intent to award Jack Heli after March 1, 1999 because the government was informed that Jack Heli was one of several timber sales "that may be of concern to your [ONRC Action's] clients." This document does not provide evidence that no action of any type was taken or not taken by ONRC Action regarding the Jack Heli timber sale, and the document supports a finding that the government had a secret express or implicit understanding or agreement with the ONRC Action plaintiffs that plaintiffs' sales in this action could be awarded without triggering a TRO or a preliminary injunction so long as the government gave ONRC Action adequate notice of the Forest Service's approval of any ground-disturbing activities. See PPFUF ¶ 187.

Defendant's Proposed Finding of Uncontroverted Fact No. 58

ONRC Action filed a complaint challenging, among other things, the Forest Service's November 1, 1996 memo that defined the term "implement" as the time when the NEPA decision documents are signed, and the November 4, 1996 memo that "excludes approximately 5.5 million acres . . . nearly 90% of the red tree vole habitat . . . from the survey requirement." ONRC Action Compl., ¶¶ 31-34. App. 341-342.

Plaintiffs' Response:

Plaintiffs agree.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - *
SCOTT TIMBER COMPANY, *
Plaintiff, * No. 05-708C
vs. * (Judge Lettow)
UNITED STATES OF AMERICA, *
Defendant. *
- - - - - - - - - - - - - - - - *

DEPOSITION Of RICHARD O. FITZGERALD
Washington, D.C.
Tuesday, June 24, 2008

Ex. A

Q. You have no recollection about this?
A. I have no recollection.
Q. Okay. I think you testified earlier -- I'm sorry, before I go on, is there something you want to add about the exhibit?
A. No, I just --
Q. I believe you testified earlier that you didn't participate in the preparation of the contract documents for Pigout, Jigsaw and Whitebird.
A. No.
Q. Did you participate in the drafting of the Forest Service's standard 2400-6 or 6(T) contract?
A. Which version are you talking about?
Q. Well, I will represent to you that the version that is in the sales at issue in this case is the 1973 or '71 version.
A. No, I did not participate in the 1973 versions.
Q. Okay. I was going to ask a more general question about the contract clauses, but I probably need to be a little more specific then. You said you didn't participate in drafting of the '73

**Ex. A**

version. Did you participate in drafting of some other version?

A. Well, I reviewed the versions that we're using now.

Q. And do you know how long those have been in existence?

A. About four years.

Q. I'm going to break this into time periods. Prior to 1999, did you participate in drafting particular contract clauses?

A. '99. I was trying to think who did most of that at that point in time. I may have reviewed some but I did not participate to a great extent.

Q. And you said you may have reviewed, and I think you also said that about the contract -- the standard contract versions currently in effect.

A. Yeah.

Q. Did you have any responsibility for drafting contract clauses?

A. The people who worked for me had the responsibility to do that. That's why I hesitated. I was not doing it myself.

**Ex. A**

Q. Do you know who drafted contract clause C or C(T) 6.01?
A. Not offhand, no.
Q. Do you know when it was drafted?
A. I couldn't answer that right away, no.
Q. Okay, but did you have any role in the drafting --
A. The original drafting, no.
Q. Did you have a role in some other drafting or --
A. Only the discussions we've had recently with the industry.
Q. And when you say recently, can you give me a time period?
A. The last three to four years.
Q. And what is the context of those discussions?
A. Well, what are the interpretations of the provisions, and it was partly as a result of the revision of the 2400-6 contract.
Q. And when you say the revision, that's the one that's been in effect for about four years?

**Ex. A**

A. Yes.
Q. But going back to the period before 1999 --
A. Uh-huh.
Q. Did you have any discussions or participation in the development of C 6.01?
A. I can't recollect having any discussions of that.
Q. Okay. Are you familiar with the plaintiff, Scott Timber Company?
A. I am familiar with the company, yes.
Q. And you're familiar with the parent company, Roseburg Forest Products?
A. Yes, I know who they are.
Q. And its predecessor, Roseburg Lumber Company?
A. Yes.
Q. To your knowledge, and again I want to go back to the period before 1999 and then after -- in the period before 1999, did anyone from Scott or Roseburg participate in the drafting of the standard contract?

**Ex. A**

MS. LYNCH: I'd like to have this marked as Defense Exhibit 3, please.

(Deposition Exhibit No. 3 was marked for identification.)

BY MS. LYNCH:

Q. Mr. Bonde, I'm just going to ask you to take a look at that document, and do you recognize the document?

**A. I recognize that it's Forestry Forum, but I don't remember this from -- but this is how they would be writing.**

Q. How who would be writing it?

**A. NFA or AFRC or whomever this is at that time. Like -- I don't remember Forestry Forum.**

Q. Has CLR, to your knowledge, received these types of newsletter or this newsletter, in particular?

**A. I don't recall it. I really don't.**

Q. Not even this specific issue but just the newsletter in general?

**A. That's what I'm saying, Forestry Forum. They may have called it that at that time, but I**



Ex. B

**don't remember it being called that, but it was written as it is now -- AFRC is kind of set up similar to this.**

Q. Okay. Would there have been someone in your office who received these newsletters?

**A. There would have been two of us that would -- that would receive these.**

Q. Okay. Yourself and one other person; is that correct?

**A. One other person, yes.**

Q. Who is that person?

**A. Virgil Frazier.**

Q. And I'd like to direct your attention to page 2 of this document, the right-hand column. If you could just take a look at that, there are two paragraphs, and see if that refreshes your recollection at all with regard to this particular newsletter.

**A. I don't -- I don't recall seeing this before, no. But this is a long time ago, '98. Exactly nine years ago.**

Q. Yes. That is true. September 11th.

**A. I don't believe so.**

Q. Or Bruce Taylor?

**A. I don't believe so.**

Q. Did you ever investigate any aspects of the ONRC Action case?

**A. I may have been cognizant of it; but, as far as conversation about it, I don't -- I don't remember, but I don't think so.**

Q. I'd like to draw your attention to what has previously been marked Defense Exhibit 3.

(Exhibit 3 was placed before the witness.)

BY MS. LYNCH:

Q. Mr. Broom, do you recognize that document?

**A. I do not. I don't recollect having seen it.**

Q. Do you remember ever receiving or viewing this type of publication, the Forestry Forum newsletter?

**A. You know, I got stuff in the mail and, as a general rule of thumb, I would throw it in the garbage because, at my level -- you know, my level**

**didn't require a whole lot of this. I was more concerned about procurement of logs, and I can't say that I've ever seen it.**

Q. Isn't it true, though, that the procurement of logs could be affected by environmental litigation?

**A. Yes.**

Q. And that environmental litigation could result in suspension or cancellation of timber sales; is that correct?

**A. In my world, in those days, it was a procurement of logs. Bruce was insistent the mill continue to flow -- the logs to the mill continue to flow -- and my determination at that point in my life was to fulfill his mission as well as my own, and I spent huge amounts of time procuring logs. In my world, at that time, this type form that you showed me didn't catch my attention.**

MR. STEVENS: The witness is referring to Defendant's Exhibit 3.

BY MS. LYNCH:

Q. But, at that time, did the fact that



Ex. C

Q. Did you receive any publications from these organizations?
**A. Yes.**
Q. Did you review those publications?
**A. Sometimes.**
Q. Did those publications concern any information related to timber sale litigation?
**A. Sometimes.**
Q. Do you recall what litigation the publications were referring to?
**A. No, not at this time. I don't know if I could have told you at that time.**
Q. Do you recall the general time frame?
**A. The time frame that we got newsletters?**
Q. That the publications were referring to litigation.
**A. From -- no, I don't. We got news -- I would say this: Both CFA and IFPA sent out -- sent out newsletters on a monthly or quarterly basis, and we'd look at them.**
Q. Do you recall if those newsletters ever mentioned the ONRC Action lawsuit that ultimately



Ex. D

suspended operations on the Happy Thin Sale?
**A. I don't recall right now.**
Q. Did you ever attend any meetings for these organizations?
**A. Yes.**
Q. Did you attend meetings for these organizations between 1998 and 2000?
**A. Yes.**
Q. And at any of those meetings, did the groups discuss the ONRC Action litigation?
**A. I don't -- I can't recall anything specific on that, no.**
Q. Was there any discussion of litigation, in general, and how it affected timber sales?
**A. Yeah. There -- yes. I recall that.**
Q. What kinds of discussions did people have about litigation affecting timber sales?
**A. There's -- that there was some.**
Q. Were people giving each other ideas on how to deal with that litigation?
**A. I don't recall that. That was up to the lawyers.**



Ex. D

BY MS. LYNCH:

Q. If you could just take a look at this document, Mr. Taylor, and tell me if you just generally recognize the type of document it is?

**A. Well, it looks like a newsletter.**

Q. It's the Forestry Forum newsletter; is that correct?

**A. That's what it says.**

Q. Have you ever seen this newsletter before, not necessarily this issue, just --

**A. No, never.**

Q. Thank you.

Did you ever have any discussions with people from the Forest Service regarding timber sales?

**A. I guess, in general, it -- Chief Robertson, I believe we would see him at a meeting, and conversations went like this: "We need timber sales."**

**He said, "Well, we're working on it."**

MR. STEVENS: The record should reflect the witness previously did testify about



Ex. D

BY THE WITNESS:

**A. The NEPA documentation commented on, prior to Jack, was the national forest, the planning process and the bigger global issues that affected it. So the reason why is they impacted the timber sales program.**

**BY MS. LYNCH:**

Q. Just direct your attention, again, back to Defense Exhibit 3, which is the Forestry Forum newsletter. Is it true that you have never seen this --

**A. That's true.**

Q. -- newsletter prior to today? You testified earlier that you -- excuse me -- Timber Products currently comments on NEPA documentation regarding individual timber sales; is that correct?

**A. Occasionally.**

Q. But that was not the case before the Jack Heli sale; is that correct?

**A. Correct.**

Q. Is there a reason for that change in policy for Timber Products?



Ex. E

BLUE LAKE FOREST PROD

Total Sale Value Bidding

FS-2400-14 (8/98) Page 1 of 11
(OMB No. 0596-0114 Exp. 05/31/99

USDA -Forest Service

**BID FOR ADVERTISED TIMBER**
(Reference FSM 2430, FSH 2409.18, Section 57.2)

| | | | |
|---|---|---|---|
| 1. Sale Number: 009 | 2. Date of Bid Opening: May 4, 1999 2:00 p.m. | 3. Opened By: W. Gomez | 4. In the Presence of: B. Cox |
| 5. Sale Name: **Happy Thin Heli Timber Sale** | | | 8. Type of Bid<br>a. [ ] Sealed Bid<br>b. [✓] Confirmation of Oral Bid |
| 6. National Forest: Klamath | 7. Ranger District: Happy Camp | | |

| | | |
|---|---|---|
| 9. To: (Title and address of Sale Officer receiving bids<br>Forest Supervisor<br>Klamath National Forest<br>1312 Fairlane Road<br>Yreka, CA 96097 | 10. Name of Newspaper: Siskiyou Daily News | 11. Date Published: March 31, 1999 |
| | 12. City: Yreka | 13. State: CA |

INSTRUCTIONS TO SALE OFFICER: Complete applicable blanks before sending to prospective bidders. Attach copy of sale advertisement. Entries are required in in blocks 1, 2, 5, 6, 7, 8a or b, 9, 10, 11, 12, 13, 14a, b, c, d, e, f, h, i & j, 15a, and 20; and instruction 14 in all sales. Strike out spaces for entries in one or more of columns e, h, or i, if not applicable to the sale.

*************In Response to the Notice of Sale published in the newspaper specified above, and subject to the conditions attached hereto, the following bid is submitted and shall constitute a Firm Offer:***********

14. Bid Information: Rates Per Unit of Measure

| Species (a) | Product (b) | Unit of Measure (c) | Estimated Quantity (d) | Base (e) | Minimum Acceptable Bid Rate (f) | Total Sale Bid (g) | Additional Deposits for Slash Disposal (h) | Base Indices (i) |
|---|---|---|---|---|---|---|---|---|
| Ponderosa (PP) and Jeffrey (JP) pine | Sawtimber Log | CCF | 15 | $10.00 | $10.00 | - * - ///////// | $23.24 | 211.37(E) |
| Sugar pine (SP) and western white pine (WWP) | Sawtimber Log | CCF | 82 | $10.00 | $10.00 | - * - ////////// | $23.24 | 211.37(E) |
| White fir (WF) and red-fir (RF) | Sawtimber Log | CCF | Nominal | $5.00 | $5.00 | 5.00 ** | $23.24 | 177.55(C) |
| Douglas-fir (DF) | Sawtimber Log | CCF | 3,448 | $10.00 | $10.00 | - * - //////////// | $23.24 | 194.46(D) |
| Incense-cedar (IC) | Sawtimber Log | CCF | Nominal | $5.00 | $5.00 | 5.00 ** | $23.24 | XX |
| **Timber subject to Agreement under CT2.11#:** | | | | | | | | |
| Cull, all species | Sawtimber | CCF | Unestimated, gross | $0.50 | $0.50 | 0.50 * | XX | XX |
| Hardwood, all species | Sawtimber | CCF | Unestimated, gross | $0.50 | $0.50 | 0.50 * | XX | XX |
| | | CCF | 3,545 | | | | | |

**Minimum Acceptable Total Sale Value, 14(j)** $35,450

**Bidder's Total Sale Value Bid, 14(g)** $35450

* **Total Value Bidding: Forest Service to determine proportionate rates for Species and Products.**

** **Fixed Rates; no different rates will be considered.**

**Required Removal at Fixed Rate. Only the Fixed Rate Applies.** Fixed Rate

N/A

15. BID GUARANTEE: (a) The minimum guarantee which must accompany this bid is: $ 3,600. (b) The form of guarantee accompanying this bid is a(n) BID BOND in the amount of: $3600.00. (See Instruction 6 for acceptable forms of payment)

Ex. F

**16. BIDDER RESPONSIBILITY CERTIFICATION:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following representations are accurate and complete:

a. That the Bidder has not employed or retained any company or person (other than a full-time bona fide employee working solely for the bidder) to solicit or secure a contract for this timber or forest product.

b. That the Bidder has not paid or agreed to pay any company or person (other than a full-time bona fide employee working solely for the bidder) any fee, commission, percentage or brokerage fee, contingent upon or resulting from the award of contract for this timber or forest product, and agrees to furnish information relating thereto as requested by the Contracting Officer.

c. That the Bidder meets the requirements in 36 CFR 223.101 regarding determination of purchaser responsibility.

d. That if awarded this contract that Bidder will complete the timber sale contract to its terms and any modifications thereof including requirements to purchase, cut, and remove the included timber or forest product by the termination date.

**16a. BIDDER CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER MATTERS:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following representations are accurate and complete.

a. That the Bidder and its principles are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntary excluded from covered transactions by any Federal department or agency.

b. That the Bidder and its principles have not within a three-year period preceding this bid been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property.

c. That the Bidder and its principles are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph b of this certification.

d. That the Bidder and its principles have not within a three-year period preceding this bid had one or more public transactions (Federal, State or local) terminated for breach or default of a timber or forest product contract.

Bidders that cannot certify this block, in whole or in part, shall submit an explanation with their bid (see Instruction 17).

**16b. BIDDER INFORMATION REQUIREMENTS:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following information is accurate.

a. That the Bidder [X] has, [ ] has not participated in a previous contract subject to the provision of section 202 of Executive Order 11246 (Non-discrimination in Employment) of 9/24/65, as amended; and that the Bidder [X] has, [ ] has not submitted required compliance reports under such previous contracts.

b. That the Bidder together with its affiliates employs the following number of persons and is classified as:

[ ] 1-25 [X] 26-500 [ ] Over 500 **and a**: [X] Manufacturer [ ] Nonmanufacturer

Ex. F

**17. CERTIFICATE OF INDEPENDENT PRICE DETERMINATION:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies and represents, by signing this bid form, that the following representations are accurate and complete:

A. By submission of this bid each Bidder also certifies, and in the case of a joint bid each party thereto certifies as to its own organization, that in connection with this sale:

(1) The prices in this bid have been arrived at independently, without consultation, communication, or agreement, as to any matter relating to such prices with any other bidder or with any potential competitor;
(2) The prices which have been quoted in this bid have not been knowingly disclosed by the Bidder and will not knowingly be disclosed by the Bidder prior to opening of bid, directly or indirectly to any other bidder or to any potential competitor; and
(3) No attempt has been made or will be made by the Bidder to induce any other person or firm to submit or not to submit a bid.

B. Each person signing this bid or proposal certifies that:

(1) The Signer is the person in the Bidder's organization responsible within that organization for the decision as to the prices bid herein and that the Signer has not participated, and will not not participate, in any action contrary to A (1) through A (3) above; or
(2) The Signer is not the person in the bidder's organization responsible within that organizationfor the decision as to prices bid herein but that the Signer has been authorized in writing to act as agent for the persons responsible for such decision in certifying that such persons have not participated, and will not participate, in any action contrary to A (1) through A (3) above, and as their agent does hereby so certify; and that the Signer has not participated, and will not participate, in any action contrary to A (1) through A (3) above.

C. A bid will not be considered for award where any portion of A or B above has been deleted or modified. Where these provisions have been deleted or modified the bid will not be considered for award unless bidder furnishes with the bid a sworn statement which sets forth in detail the circumstances of the disclosure and the Chief, Forest Service, or the Chief's designee, determines that such disclosure was not made for the purpose of restricting competition.

**18. CONTRACT, DOWNPAYMENT AND BOND:** The bidder whose bid is accepted will, within 30 days of the award letter's date, or any written extension thereof by the Forest Service, execute a timber sale contract which shall be provided by the Forest Service and be based on the sample contract referenced in the prospectus. Simultaneously, bidder shall submit a downpayment and furnish a satisfactory performance bond, in accordance with the provisions of such timber sale contract, in the penal sum as prescribed in the prospectus for this sale, and otherwise complete the process described on this form and pages attached hereto. Bidder agrees that its failure to comply with this paragraph shall result in a termination of this contract for breach under provisions of instruction 9 of the Instructions to Bidders portion of this form.

**19. DOWNPAYMENT:** Pursuant to 36 CFR 223.49, the bidder to whom award is made must make a downpayment at the time the contract is signed by the bidder and returned to the Forest Service in the amount of:

( ) Ten percent of the advertised value plus twenty percent of the total bid premium.
( X ) 10 percent of the advertised value, plus 20 percent of the total bid premium based on the Chief's determination that this amount is necessary to deter speculation.

NOTICE: The indicated downpayment amount shall be increased to twenty percent of the total advertised value and 40 percent of the total bid premium if the Contracting Officer determines that the Bidder meets the criteria for additional downpayment established by 36 CFR 223.49.

**20. FIRM OFFER:** Subject to the penalties prescribed in 18 U.S.C. 1001, Chapter 47-Fraud and False Statements: the Bidder hereby agrees not to withdraw this bid after the bid opening. Signing this bid form binds the Bidder to accept award under the terms of the sample contract and this bid form if its bid is accepted within 90 days after bid opening. The period for acceptance may be extended by written notice from Bidder. If Bidder qualifies as a small business and elects road construction by the Forest Service, then the Bidder agrees that its offer shall remain open through the period stated in the prospectus although that period may exceed 90 days.

**21. TERMS OF BIDDER'S OFFER:** Bidder certifies and represents that the Bidder has read and understands each and every provision of this bid form (together with any attachments thereto) and the sample sale contract. The Bidder agrees that it assumes the responsibility to clarify any questions before signing this form. The Bidder agrees that the written provisions of this bid form (together with any attachments) and the sample sale contract constitute the entire agreement of the parties until a written contract is executed and neither the bid form (and any attachments) nor the sample contract can be orally modified. The Bidder expressly adopts the terms of this bid form and the sample contract as material parts of the Bidder's offer for the advertised timber or forest product.

Ex. F

**22. DISCLAIMER OF ESTIMATES AND BIDDER'S WARRANTY OF INSPECTION:** Before submitting this bid, the Bidder is advised and cautioned to inspect the sale area, review the requirements of the sample sale contract, and take other steps as may be reasonably necessary to ascertain the location, estimated volumes, construction estimates, and operating costs of the offered timber or forest product. Failure to do so will not relieve the Bidder from responsibility for completing the contract.

The Bidder warrants that this bid/offer is submitted solely on the basis of its examination and inspection of the quality and quantity of the timber or forest product offered for sale and is based solely on its opinion of the value thereof and its costs of recovery, without any reliance on Forest Service estimates of timber or forest product quality, quantity or costs of recovery. Bidder further acknowledges that the Forest Service: (i) expressly disclaims any warranty of fitness of timber or forest product for any purpose; (ii) offers this timber or forest product as is without any warranty of quality (merchantability) or quantity and (iii) expressly disclaims any warranty as to the quantity or quality of timber or forest product sold except as may be expressly warranted in the sample contract.

The Bidder further holds the Forest Service harmless for any error, mistake, or negligence regarding estimates except as expressly warranted against in the sample contract.

**23. CERTIFICATION OF COMPLIANCE WITH EXPORT AND SUBSTITUTION RESTRICTIONS:** The Bidder certifies, by signing this bid form, that the Bidder is in compliance with applicable prohibitions against export and substitution prescribed in the Forest Resources Conservation and Shortage Relief Act of 1990 (36 CFR Part 223, Subpart F) and 16 U.S.C. 620, et seq. In Alaska, exports of logs, cordwood or primary products derived from included timber may not be transported from Alaska without Regional Forester approval (see instruction 16).

**24. SMALL BUSINESS SET-ASIDE SALE:** This is a small business set-aside sale. Section 15 of the Small Business Act of 1958 authorizes award of this sale to a qualified small business as stated in 13 CFR 121.507. If the Contracting Officer or another interested party questions the representation of the high bidder within 5 working days of bid opening, the Contracting Officer may defer award of this sale pending consideration by the Small Business Administration.

In addition to certifying Bidder's small business status, small businesses awarded set-aside sales, will also be required to execute SBA form 723, Small Business Certification, which is required on every preferential sale of set-aside timber at the time the sale contract is executed. The Small Business Administration certification confirms the representation of the size status of the firm, provides assurance that the firm will maintain records of all sales or exchanges of sawtimber from this sale for 3 years, and acknowledges the possible penalties for violating the foregoing.

The Bidder certifies, by signing this bid form, that it is a small business concern within the terms of definitions listed below:

(a) In sales of National Forest timber, a small business is a concern that is primarily engaged in the logging or forest products industry, is independently owned and operated, is not dominant in its field of operation, and together with its affiliates, does not employ more than 500 persons.

(b) In sales of National Forest timber with any part to be resold, a small business is a concern that meets the requirements of item (a), above, and agrees that it will not sell or exchange more than 30 percent of the advertised sawtimber quantities to a concern that does not qualify as small business.

(c) In sales of National Forest timber not to be resold for manufacture into lumber and timbers, a concern is small business when it meets the requirements of item (a), above, and it agrees that in manufacturing lumber or timbers from National Forest timber, it will do so only with its own facilities or those of concerns that qualify as small businesses.

**25. CERTIFICATION OF NON-AFFILIATION:** The timber or forest product included in this sale is timber or forest products remaining from an uncompleted sale contract. Title 36, Code of Federal Regulations, part 223.86, states: "Except as otherwise provided in this section, no bid will be considered in the resale of timber remaining from any uncompleted timber sale contract from any person, or from an affiliate of such person, who failed to complete the original contract: (1) because of termination for purchaser's breach or (2) through failure to cut designated timber on portions of the sale area by the termination date, . . . . As used in this section, 'person' includes any individual, corporation, company, association, firm, partnership, society, joint stock company, or other business entity or the successor in interest of any of the foregoing business entities. A person is an 'affiliate' when either directly or indirectly: (1) a person controls or has the power to control the other, or (2) a third person or persons control or have the power to control both."

The purchaser of the original contract for this timber was __________________ of __________________.

The Bidder certifies, by signing this bid form, that it is not the purchaser who failed to complete the original contract, and that bidder is not an affiliate of this person.

Ex. F

**Total Sale Value Bidding**

**26. CERTIFICATION OF AFFILIATION:** The bidder certifies that a complete listing of Bidder's affiliates who are primarily engaged in the logging of forest products is included with this bid: (Add additional pages if needed; See Instructions 10 and 14):

| Full Name of All Partners & Affiliates (Type or Print) | Tax Identification Number |
|---|---|
| NONE | |
| | |
| | |
| | |
| | |

**Before signing this bid, review the attached instructions to bidders and fill in the applicable blanks in boxes 14g, 15b, 16b, 18 and 28.**

| | | |
|---|---|---|
| Name of Bidder: (Type or Print) BLUE LAKE FOREST PRODUCTS, INC | By: (Signature in ink) [signature] | |
| Tax Identification No. 68-0105320 | Title: (Type or Print) TIMBER MANAGER | Date: 6/22/99 |

Business Address (Include Zip Code) (Type or Print)
P.O. BOX 1176
ARCATA, CA. 95518

Public reporting burden for this collection is estimated to be 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Under the Paperwork Reduction Act of 1995, an agency shall not conduct or sponsor, and no persons are required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this collection of information is 0596-0114.

Deposits will be returned to unsuccessful bidders by certified mail unless deposits are returned personally.

Receipt for Returned Deposits:

Check Number_______ in the amount of $__________ dated ____________ was returned

to ______________________________

Signature ________________________ Date:__________

Ex. F

## INSTRUCTIONS TO BIDDERS

**1. BIDDER'S QUALIFICATIONS:** Before a bid is considered for award, the Bidder may be required to submit a statement regarding the Bidder's previous experience in performing comparable work, business affiliates and technical organizations, financial resources, intended product processing facilities and its timber exporting history.

**2. PREPARATION OF SEALED BIDS:** Bids shall be manually signed, bid prices entered in the "Bidder's Total Sale Bid Value" column (Box 14g) for all material subject to bidding and all fill-in blanks completed. If erasures or other changes appear on the forms, each erasure or change must be initialled by the person signing the bid.

**3. SUBMISSION OF SEALED BIDS:** Sealed bids, with the accompanying bid guarantee, must be submitted to the Sale Officer, designated by the advertisement as the receiving officer, at or prior to the time established by the advertisement. Such bids must be enclosed in a sealed envelope addressed to the designated receiving officer. The envelope should show on the outside (a) that it is a "Bid for Timber," and (b) the sale name or number, and the date and time of opening bids as shown by the advertisement. Bids received after the time specified in the sale advertisement are late bids, Forest Service Handbook 2409.18, Chapter 60 will govern acceptance of such bids.

**4. PUBLIC OPENING OF SEALED BIDS:** Sealed bids will be publicly opened and posted at the time and place set for opening in the advertisement.

**5. ORAL AUCTION BIDDING:** If the advertisement provides for Sealed and Oral bids, each bidder to participate in the oral auction must submit a sealed bid in accordance with these instructions. All parties who submit a satisfactory sealed bid will be permitted to continue bidding orally following opening and posting of the sealed bids. The Apparent High Bidder must confirm it's oral bid in writing immediately upon being declared the Apparent High Bidder.

**6. BID GUARANTEE:** A bid guarantee in the form of a bid bond on form FS-6500-13 (4/82 or later version), certification of annual bid bond allocation on form FS-6500-13a (4/82 or later version), an irrevocable letter of credit, the format of which has been pre-approved by the Forest Service Regional Forester, a certified check, official bank check, bank draft, cashier's check, bank or postal money order payable to the Forest Service, USDA, or cash, in an amount no less than that specified in item 15(a), must accompany each sealed bid. Failure to submit an acceptable bid guarantee with the sealed bid will require rejection of the bid as non-responsive unless there is no other acceptable bid, or unless the Forest Service, in its sole discretion, decides to briefly delay a sale advertised for sealed bids followed by oral bids in order to allow any bidder to cure any deficiency in its bid guarantee prior to oral bidding. Bid bonds must be accompanied by a power of attorney indicating that the person signing the bond for the surety has the power to do so. The Bidder acknowledges that bid guarantee shall be retained, in whole or in part, by the Forest Service to satisfy any damages that may be assessed if the bid is accepted and bidder subsequently fails to furnish a cash downpayment or return the executed contract and performance bond as required (see instruction 9); and that the bid guarantee may be retained, in whole or in part, if the bid is accepted and bidder has failed to abide by the terms of the bid or sample contract violating the False Statements Act including not meeting the requirements in 36 CFR 223.101, determination of purchaser responsibility, and bidder has made a false statement (block 16). Otherwise, the bid guarantee shall be returned to each bidder whose bid is not accepted.

**7. AWARD OF CONTRACT:** Award of the contract will be made to that responsible bidder whose bid, conforming to the invitation for bids, is most advantageous to the United States on the basis of total value at rates bid for the estimated quantities. The Government may, when in its interest, reject any or all bids or waive any informality in bids received. A written award mailed (or otherwise furnished) to the successful bidder shall be deemed to result in a binding contract without further action by either party. If timber is advertised as set-aside for competitive bidding by Small Businesses, award will be made to the highest bidder qualified as a Small Business and who has not been determined by the SBA to be ineligible for preferential award of set-aside sales. If there are no qualified Small Business bidders, the Forest Service will advertise this sale without restrictions on bidder size. All small businesses qualified as a small business by the SBA shall be required to follow the small business set-aside provisions of the sample contract.

Ex. F

**8. DOWN PAYMENT:** The bidder to whom award is made must make a down payment at the time the bidder signs the contract and returns the contract to the Forest Service. The amount of the down payment will be calculated as shown in Item 20 of this bid for advertised timber. Only cash or effective purchaser credit may be used to meet this requirement. Cash deposited must be in the form of bank draft, certified, official bank, or cashier's check, bank or postal money order, or company check. After receipt of down payment and executed contract with required performance bond, the bid guarantee will be returned to the successful bidder.

**9. DAMAGES:** Bidder acknowledges that this contract shall be terminated for breach pursuant to block 16, 16a, 16b, 19, 21, 24, 25, 26, 27 and/or 28 of this bid form and the terms of the sample contract if: (1) the Bidder fails to execute a timber sale contract, furnish a downpayment, or furnish a satisfactory performance bond, within the number of days listed in block 19, of award letter's date; (2) the Bidder is found to have violated the False Statements Act in making any statement or certification on this bid form including not meeting purchaser responsibility requirements and Bidder has made a false statement. The Bidder acknowledges that the Bidder shall not be entitled to cure this breach and that it will pay damages pursuant to the terms of the sample contract. The primary component of these damages shall be the difference between the Bidder's bid value and the resale bid value. If, in its sole discretion, the Forest Service decides not to reoffer the sale, the Bidder agrees that damages shall still be assessed by appraisal as provided in the sample contract.

**10. PRIVACY ACT:** All personal information is requested on a voluntary basis; however, if you do not provide this personal information, your bid will not be accepted and the contract will not be awarded to you. Solicitation of this information is necessary for the government to conduct its sale program and thus is authorized under the National Forest Management Act of 1976, (16 U.S.C. 472a). The principal purpose for collecting this information is to allow for proper award of a timber sale contract and to provide for administration of that contract after award. Other routine uses of this data include: (1) compilation of Small Business data to determine needs for set-aside sales, (2) determination of volume purchased in any specific time period by a single purchaser, and (3) determination of volume under contract by a purchaser.

**11. ELECTION OF ROAD OPTION AND CERTIFICATE OF SMALL BUSINESS STATUS:** The National Forest Management Act of 1976 (16 USC 472h(i)) provides that the Secretary of Agriculture may permit timber purchasers qualifying as small business concerns under the Small Business Act to elect, when submitting a bid for timber, to have the Secretary build the specified roads. Bidders qualifying as a Small Business concern under the Small Business Act, as amended, and the regulations thereunder, may elect to have the Forest Service construct the Specified Roads required by this contract. The Bidder who does not elect agrees, if awarded the contract, to construct the roads in accordance with the contract. A Bidder who does elect acknowledges that Bidder is aware of and agrees to the conditions stated in Instruction 11 above and that the Bidder is a Small Business concern.

If you wish to elect Government construction, you must so indicate in Block 18 on the bid form that you submit in response to the advertisement. You may not accept this election at a later time. If you do not elect Government construction on your original bid form and you receive contract award, you must construct needed specified roads. You must elect Government construction for all of the specified roads as a package. Election of Government construction of a portion of the roads constitutes a nonresponsive bid. When you elect Government construction, you must certify your firm as a qualified small business concern and acknowledge your understanding that award of the sale cannot take place until the Forest Service ensures road construction.

Except in rare instances, and then only when indicated in the advertisement, the Forest Service must rely upon independent contractors to construct the roads when you request Government construction. The Forest Service shall make a good-faith effort to let a contract for the construction. Without receipt of a satisfactory bid under Federal Procurement Regulations, the Forest Service can only award the timber sale contract to you if you agree to perform the construction. This problem does not arise often, but you should consider the possibility when deciding upon your election.

The Act also requires that when the purchaser elects to have the Secretary build the roads, the price paid for the timber must include all of the estimated construction costs of the roads. The purchaser must pay the total cost of the road, regardless of the purchaser credit limit or the amount that the bid value exceeds base rate value. This means that you may be billed at a rate higher than the bid rate.

Ex. F

**12. DEFINITIONS:**

Affiliates: Business concerns or individuals are affiliates of each other if, directly or indirectly, (a) either one controls or has the power to control the other; or (b) a third party controls or has the power to control both.
Bidder: A Bidder is any individual, organization, or other legal entity that submits a bid for, or may be expected to submit a bid for, a National Forest timber sale.
Covered Transactions: A primary or lower tier covered transaction. A primary covered transaction is any nonprocurement transaction between an agency and a person. A lower tier covered transaction is any transaction between a participant and a person other than a procurement contract unless the procurement contract is greater than $25,000.
Participant: Any person who submits a proposal for, enters into, or reasonably may be expected to enter into a covered transaction. This term also indicates any person who acts on behalf of or is authorized to commit a participant in a covered transaction as an agent or representative of another participant.
Sale Officer: An individual delegated responsibility for any specific aspect or task in the bidding or awarding process for timber sales.
Small Business: In sales of National Forest timber a Small Business is a concern that: (1) is primarily engaged in the logging and forest products industry; (2) is independently owned and operated; (3) is not dominant in its field of operation; and (4) together with its affiliates does not employ more than 500 persons.

**13. CERTIFICATION OF COMPLIANCE WITH EXPORT RESTRICTIONS:** Certain restrictions on the purchase and export of unprocessed logs cut from National Forest timber apply in various parts of the country. Pursuant to the Forest Resources Conservation and Shortage Relief Act of 1997 (16 U.S.C. 620, et seq.) the Bidder acknowledges that the bidder is aware of the applicable export restrictions. The Bidder is aware that these restrictions affect the disposition of the included timber and is aware that the restrictions may reduce the potential value of the timber (36 CFR Part 223, Subpart F).

**14. CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED DEBARMENT AND OTHER RESPONSIBILITY MATTERS-PRIMARY COVERED TRANSACTIONS:** The inability of a person to provide the certifications in block 16 will not necessarily result in denial of participation in this covered transaction. The prospective participant shall submit an explanation of why it cannot provide the certification. The certification or explanation will be considered in connection with the Forest Service's determination whether to enter into this transaction. However, failure of the prospective primary participant to furnish a certification or an explanation shall disqualify such person from participation in this transaction.

The certification is a material representation of fact upon which reliance was placed when the Forest Service determined to enter into this transaction. If it is later determined that the prospective primary participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the Forest Service may terminate this transaction for cause or default.

The prospective primary participant shall provide immediate written notice to the Forest Service to whom this proposal is submitted if at any time the prospective primary participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

The terms 'covered transaction,' 'debarred,' 'suspended,' 'ineligible,' 'lower tier covered transaction,' 'participant,' 'person,' 'primary covered transaction,' 'principal,' 'proposal,' and 'voluntarily excluded,' as used in this clause, have the meanings set out in the Definitions and Coverage sections of the rules implementing Executive Order 12549. You may contact the Forest Service for assistance in obtaining a copy of those regulations.

The prospective primary participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the Forest Service entering into this transaction.

The prospective primary participant further agrees by submitting this proposal that it will provide the addendum titled 'Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transaction,' without modification, to all lower tier covered transactions and in all solicitations for lower tier covered transactions.

A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of PartiesExcluded from Federal Procurement and Nonprocurement Programs.

Ex. F

Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this provision. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

Except for transactions authorized under these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the Forest Service may terminate this transaction for cause or default.

**15. CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELGIBILITY, AND VOLUNTARY EXCLUSION - LOWER TIER COVERED TRANSACTIONS:** Pursuant to Title 7 of the Code of Federal Regulations, Part 3017, Section .510 each participant shall require participants in lower tier covered transactions to include a certification for it and its principals in any proposal submitted in connection with such lower tier covered transactions. Purchasers shall keep the certifications on file until the termination date of the contract.

A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of Parties Excluded from Federal Procurement and Nonprocurement Programs.

Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this provision. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the Forest Service may pursue available remedies, including suspension and/or debarment. The instructions and certification are listed below:

**CERTIFICATION Regarding Debarment, Suspension, Ineligibility And Voluntary Exclusion - Lower Tier Covered Transactions**

1. By signing and submitting this proposal, the prospective lower tier participant is providing the certification set out below:
2. The certification is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the Forest Service with which this transaction originated may pursue available remedies, including suspension and/or debarment.
3. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.
4. The terms 'covered transaction,' 'debarred,' 'suspended,' 'ineligible,' 'lower tier covered transaction,' 'participant,' 'person,' 'primary covered transaction,' 'principal,' 'proposal,' and 'voluntarily excluded,' as used in this clause, have the meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations.
5. The prospective lower tier participant agrees by submitting this certification that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the Forest Service.
6. The prospective lower tier participant further agrees by submitting this certification that it will include this certification titled 'Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transaction,' without modification, and instructions in all lower tier covered transactions and in all solicitations for its lower tier covered transactions.

Ex. F

## CERTIFICATION

Sale Name: ______________________

National Forest: ______________________

The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

Name of Lower Tier Participant: NONE

Business Address: ______________________

6/22/99
Date

[signature]
Signature

## CERTIFICATION OF NONSEGREGATED FACILITIES

(a) Segregated facilities, as used in this provision, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom, or otherwise.

(b) By the submission of this offer, the offeror certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The offeror agrees that a breach of this certification is a violation of the Equal Opportunity provision in the contract.

(c) The offeror further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will -

(1) Obtain identical certification from proposed subcontractors before the award of subcontracts under which the subcontractor will be subject to the Equal Opportunity provision:

(2) Retain the certifications in the files; and

(3) Forward the following notice to the proposed subcontractors (except if the proposed subcontractors have submitted identical certifications for specific time periods):

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities must be submitted before the award of a subcontract under which the subcontractor will be subject to the Equal Opportunity provision. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

Ex. F

R&T
1:41 PM
6-22-99

BLUE LAKE FOREST PRODUCTS
P.O. BOX 1176
ARCATA, CALIFORNIA 95518

**OFFER**

SOLICITATION NO. HAPPY THIN HECI

DATE FOR RECEIPT OF OFFERS ~~5/4/99~~ 6/22/99

TIME FOR RECEIPT OF OFFERS AM 2:00 PM

OFFICE DESIGNATED TO RECEIVE OFFERS Klamath S.O., Yreka, CA

☆ GPO:1994-367-191

Ex. F

Total Sale Value Bidding TIMBER PRODUC FS-2400-14 (8/98) Page 1 of 10
(OMB No. 0596-0114 Exp. 05/31/99

USDA -Forest Service

**BID FOR ADVERTISED TIMBER**
(Reference FSM 2430, FSH 2409.18, Section 57.2)

| 1. Sale Number: 002 | 2. Date of Bid Opening: Nov. 3, 1998 2:00 p.m. | 3. Opened By: M. Gomez | 4. In the Presence of: |
|---|---|---|---|

5. Sale Name: Jack Heli Timber Sale

| 6. National Forest: Klamath | 7. Ranger District: Scott River | 8. Type of Bid a. [ ] Sealed Bid b. [X] Confirmation of Oral Bid |
|---|---|---|

| 9. To: (Title and address of Salet Officer receiving bids | 10. Name of Newspaper: | 11. Date Published: |
|---|---|---|
| Forest Supervisor<br>Klamath National Forest<br>1312 Fairlane Road<br>Yreka, CA 96097 | Siskiyou Daily News | Sept. 25, 1998 |
| | 12. City<br>Yreka | 13. State<br>CA |

INSTRUCTIONS TO SALE OFFICER: Complete applicable blanks before sending to prospective bidders. Attach copy of sale advertisement. Entries are required in in blocks 1, 2, 5, 6, 7, 8a or b, 9, 10, 11, 12, 13, 14a, b, c, d, e, f, h, i & j, 15a, and 20; and instruction 14 in all sales. Strike out spaces for entries in one or more of columns e, h, or i, if not applicable to the sale.

***********In Response to the Notice of Sale published in the newspaper specified above, and subject to the conditions attached hereto, the following bid is submitted and shall constitute a Firm Offer:*********

## 14. Bid Information:

| | | | | Rates Per Unit of Measure | | | | |
|---|---|---|---|---|---|---|---|---|
| Species (a) | Product (b) | Unit of Measure (c) | Estimated Quantity (d) | Base (e) | Minimum Acceptable Bid Rate (f) | Total Sale Bid (g) | Additional Deposits for Slash Disposal (h) | Base Indices (i) |
| Ponderosa (PP) and Jeffrey (JP) pine | Sawtimber Log | CCF | 4,280 | $10.00 | $10.58 | - * - ////////// | 30.40 | 357.23 |
| Sugar pine (SP), western white pine (WWP), and brewer spruce (BS) | Sawtimber Log | CCF | 234 | $10.00 | $11.05 | - * - ////////// | 30.40 | 467.63 |
| White fir (WF), red fir (RF), and Mountain hemlock (MH) | Sawtimber Log | CCF | 6,864 | $ 5.00 | $ 5.00 | - * - ////////// | 30.40 | 191.86 |
| Douglas-fir (DF) | Sawtimber Log | CCF | 1,793 | $10.00 | $10.00 | - * - ////////// | 30.40 | 211.07 |
| Incense-cedar (IC) | Sawtimber Log | CCF | 949 | $ 5.00 | $ 6.25 | - * - ////////// | 30.40 | xx |
| | | | | | | - * - ////////// | | |
| | | | | | | - * - ////////// | | |
| | | | | | | - * - ////////// | | |
| | | | | | | - * - ////////// | | |
| | | CCF | 14,120 | | | - * - ////////// | | |

| | |
|---|---|
| Minimum Acceptable Total Sale Value, 14(j) | $ 106,049 |
| Bidder's Total Sale Value Bid, 14(g) | $ 106,049 |

* Total Value Bidding: Forest Service to determine proportionate rates for Species and Products.

Required Removal at Fixed Rate. Only the Fixed Rate Applies.

| | | | | | | Fixed Rate | | |
|---|---|---|---|---|---|---|---|---|
| N/A | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

15. BID GUARANTEE: (a) The minimum guarantee which must accompany this bid is $ 10,700.
(b) The form of guarantee accompanying this bid is a(n) Bid Bond in the amount of: $ 10,700 $^{00}$. (See Instruction 6 for acceptable forms of payment)

Ex. G

**16. BIDDER RESPONSIBILITY CERTIFICATION:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following representations are accurate and complete:

a. That the Bidder has not employed or retained any company or person (other than a full-time bona fide employee working solely for the bidder) to solicit or secure a contract for this timber or forest product.

b. That the Bidder has not paid or agreed to pay any company or person (other than a full-time bona fide employee working solely for the bidder) any fee, commission, percentage or brokerage fee, contingent upon or resulting from the award of contract for this timber or forest product, and agrees to furnish information relating thereto as requested by the Contracting Officer.

c. That the Bidder meets the requirements in 36 CFR 223.101 regarding determination of purchaser responsibility.

d. That if awarded this contract that Bidder will complete the timber sale contract to its terms and any modifications thereof including requirements to purchase, cut, and remove the included timber or forest product by the termination date.

**16a. BIDDER CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER MATTERS:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following representations are accurate and complete.

a. That the Bidder and its principles are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntary excluded from covered transactions by any Federal department or agency.

b. That the Bidder and its principles have not within a three-year period preceding this bid been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property.

c. That the Bidder and its principles are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph b of this certification.

d. That the Bidder and its principles have not within a three-year period preceding this bid had one or more public transactions (Federal, State or local) terminated for breach or default of a timber or forest product contract.

Bidders that cannot certify this block, in whole or in part, shall submit an explanation with their bid (see Instruction 17).

**16b. BIDDER INFORMATION REQUIREMENTS:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies, by signing this bid form, that to the best of bidder's knowledge that the following information is accurate.

a. That the Bidder [✓] has, [ ] has not participated in a previous contract subject to the provision of section 202 of Executive Order 11246 (Non-discrimination in Employment) of 9/24/65, as amended; and that the Bidder [✓] has, [ ] has not submitted required compliance reports under such previous contracts.

b. That the Bidder together with its affiliates employs the following number of persons and is classified as:

[ ] 1-25 [ ] 26-500 [✓] Over 500 **and a:** [✓] Manufacturer [ ] Nonmanufacturer

Ex. G

**17. CERTIFICATE OF INDEPENDENT PRICE DETERMINATION:** Subject to the penalties prescribed in 18 U.S.C. 1001, bidder certifies and represents, by signing this bid form, that the following representations are accurate and complete:

A. By submission of this bid each Bidder also certifies, and in the case of a joint bid each party thereto certifies as to its own organization, that in connection with this sale:

(1) The prices in this bid have been arrived at independently, without consultation, communication, or agreement, as to any matter relating to such prices with any other bidder or with any potential competitor;

(2) The prices which have been quoted in this bid have not been knowingly disclosed by the Bidder and will not knowingly be disclosed by the Bidder prior to opening of bid, directly or indirectly to any other bidder or to any potential competitor; and

(3) No attempt has been made or will be made by the Bidder to induce any other person or firm to submit or not to submit a bid.

B. Each person signing this bid or proposal certifies that:

(1) The Signer is the person in the Bidder's organization responsible within that organization for the decision as to the prices bid herein and that the Signer has not participated, and will not not participate, in any action contrary to A (1) through A (3) above; or

(2) The Signer is not the person in the bidder's organization responsible within that organizationfor the decision as to prices bid herein but that the Signer has been authorized in writing to act as agent for the persons responsible for such decision in certifying that such persons have not participated, and will not participate, in any action contrary to A (1) through A (3) above, and as their agent does hereby so certify; and that the Signer has not participated, and will not participate, in any action contrary to A (1) through A (3) above.

C. A bid will not be considered for award where any portion of A or B above has been deleted or modified. Where these provisions have been deleted or modified the bid will not be considered for award unless bidder furnishes with the bid a sworn statement which sets forth in detail the circumstances of the disclosure and the Chief, Forest Service, or the Chief's designee, determines that such disclosure was not made for the purpose of restricting competition.

**18. ROAD CONSTRUCTION OPTION:** [ ] Check box if Bidder is a Small Business and wishes to have Forest Service construct all specified roads. You may not change an election once made. Failure to mark box constitutes agreement to build roads. Election may not be changed subsequent to time set for opening bids (See also Instructions 12 and 13).

**19. CONTRACT, DOWNPAYMENT AND BOND:** The bidder whose bid is accepted will, within 30 days of the award letter's date, or any written extension thereof by the Forest Service, execute a timber sale contract which shall be provided by the Forest Service and be based on the sample contract referenced in the prospectus. Simultaneously, bidder shall submit a downpayment and furnish a satisfactory performance bond, in accordance with the provisions of such timber sale contract, in the penal sum as prescribed in the prospectus for this sale, and otherwise complete the process described on this form and pages attached hereto. Bidder agrees that its failure to comply with this paragraph shall result in a termination of this contract for breach under provisions of instruction 9 of the Instructions to Bidders portion of this form.

**20. DOWNPAYMENT:** Pursuant to 36 CFR 223.49, the bidder to whom award is made must make a downpayment at the time the contract is signed by the bidder and returned to the Forest Service in the amount of:

( ) Ten percent of the advertised value plus twenty percent of the total bid premium.

( X ) 10 percent or the advertised value, plus 20 percent of the total bid premium based on the Chief's determination that this amount is necessary to deter speculation.

NOTICE: The indicated downpayment amount shall be increased to twenty percent of the total advertised value and 40 percent of the total bid premium if the Contracting Officer determines that the Bidder meets the criteria for additional downpayment established by 36 CFR 223.49.

**21. FIRM OFFER:** Subject to the penalties prescribed in 18 U.S.C. 1001, Chapter 47-Fraud and False Statements: the Bidder hereby agrees not to withdraw this bid after the bid opening. Signing this bid form binds the Bidder to accept award under the terms of the sample contract and this bid form if its bid is accepted within 90 days after bid opening. The period for acceptance may be extended by written notice from Bidder. If Bidder qualifies as a small business and elects road construction by the Forest Service, then the Bidder agrees that its offer shall remain open through the period stated in the prospectus although that period may exceed 90 days.

**22. TERMS OF BIDDER'S OFFER:** Bidder certifies and represents that the Bidder has read and understands each and every provision of this bid form (together with any attachments thereto) and the sample sale contract. The Bidder agrees that it assumes the responsibility to clarify any questions before signing this form. The Bidder agrees that the written provisions of this bid form (together with any attachments) and the sample sale contract constitute the entire agreement of the parties until a written contract is executed and neither the bid form (and any attachments) nor the sample contract can be orally modified. The Bidder expressly adopts the terms of this bid form and the sample contract as material parts of the Bidder's offer for the advertised timber or forest product.

**23. DISCLAIMER OF ESTIMATES AND BIDDER'S WARRANTY OF INSPECTION:** Before submitting this bid, the Bidder is advised and cautioned to inspect the sale area, review the requirements of the sample sale contract, and take other steps as may be reasonably necessary to ascertain the location, estimated volumes, construction estimates, and operating costs of the offered timber or forest product. Failure to do so will not relieve the Bidder from responsibility for completing the contract.

The Bidder warrants that this bid/offer is submitted solely on the basis of its examination and inspection of the quality and quantity of the timber or forest product offered for sale and is based solely on its opinion of the value thereof and its costs of recovery, without any reliance on Forest Service estimates of timber or forest product quality, quantity or costs of recovery. Bidder further acknowledges that the Forest Service: (i) expressly disclaims any warranty of fitness of timber or forest product for any purpose; (ii) offers this timber or forest product as is without any warranty of quality (merchantability) or quantity and (iii) expressly disclaims any warranty as to the quantity or quality of timber or forest product sold except as may be expressly warranted in the sample contract.

The Bidder further holds the Forest Service harmless for any error, mistake, or negligence regarding estimates except as expressly warranted against in the sample contract.

**24. CERTIFICATION OF AFFILIATION:** The bidder certifies that a complete listing of Bidder's affiliates who are primarily engaged in the logging of forest products is included with this bid: (Add additional pages if needed; See Instructions 10 and 14):

| Full Name of All Partners & Affiliates (Type or Print) | Tax Identification Number |
|---|---|
| TP CO, INC | 36-4135216 |
| JHG LLC | 53-5401386 |
| EAGLE INVESTMENT GROUP LIMITED PARTNERSHIP | 36-3629289 |
| EAGLE TIMBER PRODUCTS LLC | 36-4156453 |
| | |

**Before signing this bid, review the attached instructions to bidders and fill in the applicable blanks in boxes 14g, 15b, 16b, 18 and 28.**

| Name of Bidder: (Type or Print) | By: (Signature in ink) | |
|---|---|---|
| TIMBER PRODUCTS COMPANY | Bill T[signature] | |
| Tax Identification No. | Title: (Type or Print) | Date: |
| 36-2639465 | TIMBER PROCUREMENT MGR | 11-3-98 |

Business Address (Include Zip Code) (Type or Print)
P.O. BOX 766
YREKA, CA 96097

Public reporting burden for this collection is estimated to be 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Under the Paperwork Reduction Act of 1995, an agency shall not conduct or sponsor, and no persons are required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this collection of information is 0596-0114.

Ex. G

Deposits will be returned to unsuccessful bidders by certified mail unless deposits are returned personally.

Receipt for Returned Deposits:

Check Number_______ in the amount of $____________ dated ________________ was returned

to ______________________________________________ ___________________________

Signature ______________________________________________ Date:_________________

## INSTRUCTIONS TO BIDDERS

1. BIDDER'S QUALIFICATIONS: Before a bid is considered for award, the Bidder may be required to submit a statement regarding the Bidder's previous experience in performing comparable work, business affiliates and technical organizations, financial resources, intended product processing facilities and its timber exporting history.

2. ORAL AUCTION BIDDING: If the advertisement provides for Sealed and Oral bids, each bidder to participate in the oral auction must submit a sealed bid in accordance with these instructions. All parties who submit a satisfactory sealed bid will be permitted to continue bidding orally following opening and posting of the sealed bids. The Apparent High Bidder must confirm it's oral bid in writing immediately upon being declared the Apparent High Bidder.

3. SUBMISSION OF SEALED BIDS: Sealed bids, with the accompanying bid guarantee, must be submitted to the Sale Officer, designated by the advertisement as the receiving officer, at or prior to the time established by the advertisement. Such bids must be enclosed in a sealed envelope addressed to the designated receiving officer. The envelope should show on the outside (a) that it is a "Bid for Timber," and (b) the sale name or number, and the date and time of opening bids as shown by the advertisement. Bids received after the time specified in the sale advertisement are late bids, Forest Service Handbook 2409.18, Chapter 60 will govern acceptance of such bids.

4. PUBLIC OPENING OF SEALED BIDS: Sealed bids will be publicly opened and posted at the time and place set for opening in the advertisement.

5. BID GUARANTEE: A bid guarantee in the form of a bid bond on form FS-6500-13 (4/82 or later version), certification of annual bid bond allocation on form FS-6500-13a (4/82 or later version), an irrevocable letter of credit, the format of which has been pre-approved by the Forest Service Regional Forester, a certified check, official bank check, bank draft, cashier's check, bank or postal money order payable to the Forest Service, USDA, or cash, in an amount no less than that specified in item 15(a), must accompany each sealed bid. Failure to submit an acceptable bid guarantee with the sealed bid will require rejection of the bid as non-responsive unless there is no other acceptable bid, or unless the Forest Service, in its sole discretion, decides to briefly delay a sale advertised for sealed bids followed by oral bids in order to allow any bidder to cure any deficiency in its bid guarantee prior to oral bidding. Bid bonds must be accompanied by a power of attorney indicating that the person signing the bond for the surety has the power to do so. The Bidder acknowledges that bid guarantee shall be retained, in whole or in part, by the Forest Service to satisfy any damages that may be assessed if the bid is accepted and bidder subsequently fails to furnish a cash downpayment or return the executed contract and performance bond as required (see instruction 9); and that the bid guarantee may be retained, in whole or in part, if the bid is accepted and bidder has failed to abide by the terms of the bid or sample contract violating the False Statements Act including not meeting the requirements in 36 CFR 223.101, determination of purchaser responsibility, and bidder has made a false statement (block 16). Otherwise, the bid guarantee shall be returned to each bidder whose bid is not accepted.

6. AWARD OF CONTRACT: Award of the contract will be made to that responsible bidder whose bid, conforming to the invitation for bids, is most advantageous to the United States on the basis of total value at rates bid for the estimated quantities. The Government may, when in its interest, reject any or all bids or waive any informality in bids received. A written award mailed (or otherwise furnished) to the successful bidder shall be deemed to result in a binding contract without further action by either party. If timber is advertised as set-aside for competitive bidding by Small Businesses, award will be made to the highest bidder qualified as a Small Business and who has not been determined by the SBA to be ineligible for preferential award of set-aside sales. If there are no qualified Small Business bidders, the Forest Service will advertise this sale without restrictions on bidder size. All small businesses qualified as a small business by the SBA shall be required to follow the small business set-aside provisions of the sample contract.

7. DOWN PAYMENT: The bidder to whom award is made must make a down payment at the time the bidder signs the contract and returns the contract to the Forest Service. The amount of the down payment will be calculated as shown in Item 20 of this bid for advertised timber. Only cash or effective purchaser credit may be used to meet this requirement. Cash deposited must be in the form of bank draft, certified, official bank, or cashier's check, bank or postal money order, or company check. After receipt of down payment and executed contract with required performance bond, the bid guarantee will be returned to the successful bidder.

Ex. G

8. **DAMAGES:** Bidder acknowledges that this contract shall be terminated for breach pursuant to block 16, 16a, 16b, 19, 21, 24, 25, 26, 27 and/or 28 of this bid form and the terms of the sample contract if: (1) the Bidder fails to execute a timber sale contract, furnish a downpayment, or furnish a satisfactory performance bond, within the number of days listed in block 19, of award letter's date; (2) the Bidder is found to have violated the False Statements Act in making any statement or certification on this bid form including not meeting purchaser responsibility requirements and Bidder has made a false statement. The Bidder acknowledges that the Bidder shall not be entitled to cure this breach and that it will pay damages pursuant to the terms of the sample contract. The primary component of these damages shall be the difference between the Bidder's bid value and the resale bid value. If, in its sole discretion, the Forest Service decides not to reoffer the sale, the Bidder agrees that damages shall still be assessed by appraisal as provided in the sample contract.

9. **PRIVACY ACT:** All personal information is requested on a voluntary basis; however, if you do not provide this personal information, your bid will not be accepted and the contract will not be awarded to you. Solicitation of this information is necessary for the government to conduct its sale program and thus is authorized under the National Forest Management Act of 1976, (16 U.S.C. 472a). The principal purpose for collecting this information is to allow for proper award of a timber sale contract and to provide for administration of that contract after award. Other routine uses of this data include: (1) compilation of Small Business data to determine needs for set-aside sales, (2) determination of volume purchased in any specific time period by a single purchaser, and (3) determination of volume under contract by a purchaser.

10. **ROAD COMPLETION DATE:** The Bidder hereby acknowledges that the Bidder is aware of the road completion date of the sample contract. The Bidder also acknowledges that if the Bidder elects to have Forest Service construct specified roads, the Bidder is aware: (a) that the Forest Service expects to contract for road construction, (b) that the timber sale contract will not be awarded unless a satisfactory road construction bid is received and a road construction contract is awarded or, if the Forest Service fails to receive such a bid within a maximum period stated in the advertisement, the Bbidder agrees to perform road construction, (c) that the Forest Service may extend the maximum award delay time by the amount of time needed to confirm either sale or road bidder's size status or by any time in excess of 40 days from timber sale bid opening needed to begin solicitation of construction bids, and (d) that if the Forest Service extends the maximum award delay period because solicitation of the road contract is delayed, the Bidder may withdraw its bid without penalty.

11. **ELECTION OF ROAD OPTION AND CERTIFICATE OF SMALL BUSINESS STATUS:** The National Forest Management Act of 1976 (16 USC 472h(i)) provides that the Secretary of Agriculture may permit timber purchasers qualifying as small business concerns under the Small Business Act to elect, when submitting a bid for timber, to have the Secretary build the specified roads. Bidders qualifying as a Small Business concern under the Small Business Act, as amended, and the regulations thereunder, may elect to have the Forest Service construct the Specified Roads required by this contract. The Bidder who does not elect agrees, if awarded the contract, to construct the roads in accordance with the contract. A Bidder who does elect acknowledges that Bidder is aware of and agrees to the conditions stated in Instruction 11 above and that the Bidder is a Small Business concern.

If you wish to elect Government construction, you must so indicate in Block 18 on the bid form that you submit in response to the advertisement. You may not accept this election at a later time. If you do not elect Government construction on your original bid form and you receive contract award, you must construct needed specified roads. You must elect Government construction for all of the specified roads as a package. Election of Government construction of a portion of the roads constitutes a nonresponsive bid. When you elect Government construction, you must certify your firm as a qualified small business concern and acknowledge your understanding that award of the sale cannot take place until the Forest Service ensures road construction.

Except in rare instances, and then only when indicated in the advertisement, the Forest Service must rely upon independent contractors to construct the roads when you request Government construction. The Forest Service shall make a good-faith effort to let a contract for the construction. Without receipt of a satisfactory bid under Federal Procurement Regulations, the Forest Service can only award the timber sale contract to you if you agree to perform the construction. This problem does not arise often, but you should consider the possibility when deciding upon your election.

The Act also requires that when the purchaser elects to have the Secretary build the roads, the price paid for the timber must include all of the estimated construction costs of the roads. The purchaser must pay the total cost of the

road, regardless of the purchaser credit limit or the amount that the bid value exceeds base rate value. This means that you may be billed at a rate higher than the bid rate.

12. DEFINITIONS:

Affiliates: Business concerns or individuals are affiliates of each other if, directly or indirectly, (a) either one controls or has the power to control the other; or (b) a third party controls or has the power to control both.
Bidder: A Bidder is any individual, organization, or other legal entity that submits a bid for, or may be expected to submit a bid for, a National Forest timber sale.
Covered Transactions: A primary or lower tier covered transaction. A primary covered transaction is any nonprocurement transaction between an agency and a person. A lower tier covered transaction is any transaction between a participant and a person other than a procurement contract unless the procurement contract is greater than $25,000.
Participant: Any person who submits a proposal for, enters into, or reasonably may be expected to enter into a covered transaction. This term also indicates any person who acts on behalf of or is authorized to commit a participant in a covered transaction as an agent or representative of another participant.
Sale Officer: An individual delegated responsibility for any specific aspect or task in the bidding or awarding process for timber sales.
Small Business: In sales of National Forest timber a Small Business is a concern that: (1) is primarily engaged in the logging and forest products industry; (2) is independently owned and operated; (3) is not dominant in its field of operation; and (4) together with its affiliates does not employ more than 500 persons.

13. CERTIFICATION OF COMPLIANCE WITH EXPORT RESTRICTIONS: Certain restrictions on the purchase and export of unprocessed logs cut from National Forest timber apply in various parts of the country. Pursuant to the Forest Resources Conservation and Shortage Relief Act of 1997 (16 U.S.C. 620, et seq.) the Bidder acknowledges that the bidder is aware of the applicable export restrictions. The Bidder is aware that these restrictions affect the disposition of the included timber and is aware that the restrictions may reduce the potential value of the timber (36 CFR Part 223, Subpart F).

14. CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED DEBARMENT AND OTHER RESPONSIBILITY MATTERS-PRIMARY COVERED TRANSACTIONS: The inability of a person to provide the certifications in block 16 will not necessarily result in denial of participation in this covered transaction. The prospective participant shall submit an explanation of why it cannot provide the certification. The certification or explanation will be considered in connection with the Forest Service's determination whether to enter into this transaction. However, failure of the prospective primary participant to furnish a certification or an explanation shall disqualify such person from participation in this transaction.

The certification is a material representation of fact upon which reliance was placed when the Forest Service determined to enter into this transaction. If it is later determined that the prospective primary participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the Forest Service may terminate this transaction for cause or default.

The prospective primary participant shall provide immediate written notice to the Forest Service to whom this proposal is submitted if at any time the prospective primary participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

The terms 'covered transaction,' 'debarred,' 'suspended,' 'ineligible,' 'lower tier covered transaction,' 'participant,' 'person,' 'primary covered transaction,' 'principal,' 'proposal,' and 'voluntarily excluded,' as used in this clause, have the meanings set out in the Definitions and Coverage sections of the rules implementing Executive Order 12549. You may contact the Forest Service for assistance in obtaining a copy of those regulations.

The prospective primary participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the Forest Service entering into this transaction.

The prospective primary participant further agrees by submitting this proposal that it will provide the addendum titled 'Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transaction,' without modification, to all lower tier covered transactions and in all solicitations for lower tier covered transactions.

A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each

Ex. G

participant may, but is not required to, check the List of PartiesExcluded from Federal Procurement and Nonprocurement Programs.

Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this provision. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

Except for transactions authorized under these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the Forest Service may terminate this transaction for cause or default.

15. CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELGIBILITY, AND VOLUNTARY EXCLUSION - LOWER TIER COVERED TRANSACTIONS: Pursuant to Title 7 of the Code of Federal Regulations, Part 3017, Section .510 each participant shall require participants in lower tier covered transactions to include a certification for it and its principals in any proposal submitted in connection with such lower tier covered transactions. Purchasers shall keep the certifications on file until the termination date of the contract.

A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of Parties Excluded from Federal Procurement and Nonprocurement Programs.

Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this provision. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the Forest Service may pursue available remedies, including suspension and/or debarment. The instructions and certification are listed below:

**CERTIFICATION Regarding Debarment, Suspension, Ineligibility And Voluntary Exclusion - Lower Tier Covered Transactions**

1. By signing and submitting this proposal, the prospective lower tier participant is providing the certification set out below:

2. The certification is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the Forest Service with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

4. The terms 'covered transaction,' 'debarred,' 'suspended,' 'ineligible,' 'lower tier covered transaction,' 'participant,' 'person,' 'primary covered transaction,' 'principal,' 'proposal,' and 'voluntarily excluded,' as used in this clause, have the meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations.

5. The prospective lower tier participant agrees by submitting this certification that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the Forest Service.

6. The prospective lower tier participant further agrees by submitting this certification that it will include this certification titled 'Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transaction,' without modification, and instructions in all lower tier covered transactions and in all solicitations for its lower tier covered transactions.

## CERTIFICATION

Sale Name: ______________________________

National Forest: ______________________________

The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any Federal department or agency.

Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

Name of Lower Tier Participant: ______________________________

Business Address: ______________________________

______________________________

______________________________

______________ ______________________________
Date Signature

## CERTIFICATION OF NONSEGREGATED FACILITIES

(a) Segregated facilities, as used in this provision, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom, or otherwise.

(b) By the submission of this offer, the offeror certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The offeror agrees that a breach of this certification is a violation of the Equal Opportunity provision in the contract.

(c) The offeror further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will -

(1) Obtain identical certification from proposed subcontractors before the award of subcontracts under which the subcontractor will be subject to the Equal Opportunity provision:

(2) Retain the certifications in the files; and

(3) Forward the following notice to the proposed subcontractors (except if the proposed subcontractors have submitted identical certifications for specific time periods):

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities must be submitted before the award of a subcontract under which the subcontractor will be subject to the Equal Opportunity provision. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

Ex. G