**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 01-570C (Judge Williams) |

| | | |
|---|---|---|
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 01-627C (Judge Williams) |

| | | |
|---|---|---|
| CLR TIMBER HOLDINGS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-501C |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

**TABLE OF CONTENTS**

**PAGE**

Table of Authorities ........ iii

I. The Court Should Grant Plaintiffs' Motion For Partial Summary Judgment On Liability ........ 1

A. Contract Clause C(T)6.01 Does Not Exculpate The FS From Liability Where Conduct Within Its Control Caused The Issuance Of The Court Order That Resulted In The FS's Suspensions of Performance On Plaintiffs' Contracts ........ 2

B. The FS Assumed The Risk Of Liability For The Suspensions Of Performance It Caused ........ 5

C. The Spearin Doctrine Applies To FS Timber Contracts ........ 10

1. Plaintiffs' Timber Sale Contracts Contain Design Specifications Regarding How Ground-Disturbing Operations Are To Be Accomplished ........ 15

a. Examples Of Some Of The Design Specifications In FS Timber Sale Contracts ........ 16

b. FS Timber Sale Contractors Do Not Have Discretion To Disregard FS Design Specifications ........ 19

c. Even If Plaintiffs Had Some Limited Discretion Under The Contracts, This Would Not Be Dispositive Of The Issue Of Whether The FS Breached Its Implied Warranty Of Specifications ........ 23

2. The FS Breached Its Implied Warranty Of Specifications Because It Did Not Know Whether Its Specifications Could Be Successfully Carried Out As Written (And Whether It Could Permit Performance Based On Those Specifications) ........ 24

D. The FS's Suspensions Breached The Contracts Because The FS Failed To Disclose The Vital Information That The Sales Were On ONRC Action's Secret "At-Risk" Lists And Were Specifically Threatened By The ONRC Action Litigation ........ 28

E. Summary Judgment On Liability For Plaintiffs On The Issue Of Whether The FS Breached Its Duties To Cooperate And Not To Hinder Is Appropriate ....35

1. In Scott Timber, The Federal Circuit Did Not Rule That Whether The FS Caused A Timber Sale Suspension Is Always Inappropriate For Summary Judgment On Liability ....36

2. The Uncontroverted Facts Establish That The FS Caused The Suspension Of Plaintiffs' Contracts Because It Awarded Those Contracts And Authorized Ground-Disturbing Activities Without First Conducting The Required Surveys ....39

3. Defendant Has Not Controverted The Basic Facts Which Establish That The FS's Interpretation "NEPA Decision Equals Implementation" And Its Red Tree Vole Directive Were Arbitrary, Capricious And Unreasonable And That The FS Should Have Performed The Required Surveys Before Awarding Plaintiffs' Contracts And Ground-Disturbing Activities Were Authorized ....51

4. There Are No Genuine Issues Of Material Fact Precluding A Finding By This Court That The FS's Red Tree Vole Directive Was In Direct Conflict With The Plain Language Of The NFP ROD And That The FS's Proceeding On The Basis Of It Wrongfully Caused The Suspension Of Performance On Plaintiffs' Contracts ....57

F. The Fact That The FS's Suspension Of Performance On Plaintiffs' Contracts Was Caused By Its Pre-Award Actions And Inactions Does Not Absolve The FS Of Liability ....61

G. The Contracts Were Not Void Ab Initio ....63

H. Timber Products' Alternative Claim For Compensation Under Contract Clause C6.01 Is Properly Before This Court And Timber Products Is Entitled to Partial Summary Judgment On The Issue Of The FS's Liability To It For Additional Operating Costs Incurred As A Direct Result Of The FS's Suspension Of The Jack Heli Timber Sale ....66

II. The Court Should Deny Defendant's Motion For Summary Judgment ....68

CONCLUSION ....69

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Al Johnson Constr. Co. v. United States,
854 F.2d 467 (Fed. Cir. 1988)....................11

American Telephone & Telegraph v. United States,
177 F.3d 1368 (Fed. Cir. 1999)....................65, 66

Beauchamp Constr. Co., Inc. v. United States,
14 Cl. Ct. 430 (1988)....................27

Blake Constr. Co., Inc. v. United States,
987 F.2d 743 (Fed. Cir. 1993)....................15, 23

Bloedel Donovan Lumber Mills v. United States,
74 F. Supp. 470 (Ct. Cl. 1947)....................14

Blue Lake Forest Products, Inc. v. United States,
75 Fed. Cl. 779 (2007)....................37

Castle Constr. Co.,
ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984)....................26

Cedar Lumber, Inc. v. United States,
5 Cl. Ct. 539 (1984)....................3, 32

Chaney and James Constr. Co. v. United States,
421 F.2d 728 (Ct. Cl. 1970)....................25, 27

C.J. Betters Corp. v. United States,
25 Cl. Ct. 674 (1992)....................3, 4, 5

David Nassif Assocs. v. United States,
644 F.2d 4 (Ct. Cl. 1981)....................62

Dep't of Natural Resources and Conservation of Montana v. United States,
1 Cl. Ct. 727 (1983)....................3

Everett Plywood Corp. v. United States,
651 F.3d 723 (Ct. Cl. 1981)....................5, 6, 13, 25

George A. Fuller Co. v. United States,
69 F. Supp. 409 (Ct. Cl. 1947)....................2

Helene Curtis Industries, Inc. v. United States,
312 F.2d 774 (Ct. Cl. 1963)....................31, 61

Hercules, Inc. v. United States,
516 U.S. 417 (1996)....................12, 13

H.N. Wood Products, Inc. v. United States,
59 Fed. Cl. 479 (2003)....................38, 63

Huber, Hunt & Nichols, Inc.,
GSBCA No. Gs-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975)....................26

J.A. Jones Const. Co. v. United States,
390 F.2d 886 (Ct. Cl. 1968)....................31, 33, 61

James Stewart & Co. v. United States,
105 Ct. Cl. 284 (1946)....................3

J. L. Simmons Co., Inc. v. United States,
412 F.2d 1360 (Ct. Cl. 1969)....................15

John Reiner and Co. v. United States,
325 F.2d 438 (Ct. Cl. 1963)....................64

Laburnum Constr. Co. v. United States,
325 F.2d 451 (Ct. Cl. 1963)....................27

Lowenschuss v. Kane,
520 F.2d 255 (2nd Cir. 1975)....................4

Luria Bros. & Co., Inc. v. United States,
369 F.2d 710 (Ct. Cl. 1966)....................27

New Valley Corp. v. United States,
119 F.3d 1576 (Fed. Cir. 1997)....................3

North Murphy Timber Sale,
146 IBLA 305, 1998 WL 951006 (Nov. 20, 1998)....................51, 52, 54

Oregon Natural Resources Council Action v. United States Forest Service,
59 F. Supp. 2d 1085 (W.D. Wash. 1999).................... *passim*

Ozark Dam Constructors v. United States,
127 F. Supp. 187 (Ct. Cl. 1955)........................................................................................5

Precision Pine & Timber Co., Inc. v. United States,
50 Fed. Cl. 34 (2001) ...................................................................................... *passim*

Precision Pine & Timber Co., Inc. v. United States,
81 Fed. Cl. 235 (2007) .......................................................................................68

R.E.D.M. Corp. v. United States,
428 F.2d 1304 (Ct. Cl. 1970) ..............................................................................15

Rick's Mushroom Service, Inc. v. United States,
521 F.3d 1338 (Fed. Cir. 2008)...................................................................11, 12

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992)...............................................................................32

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003)........................................................................ *passim*

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1990).........................................................................5, 6

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001) ..........................................................................................6

Seaboard Lumber Co. v. United States,
41 Fed. Cl. 401 (1998) ..........................................................................................7

Sergent Mechanical Systems, Inc. v. United States,
34 Fed. Cl. 505 (1995) ....................................................................................25, 27

Southwest Forest Industries,
AGBCA No. 79-178-3, 81-1 BCA ¶ 14,877 (1981) ....................................13, 14

Superior Timber Co., Inc.,
IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996) .................................................24, 37

TECOM, Inc. v. United States,
66 Fed. Cl. 736 (2005) .........................................................................................38

Trilon Education Corp. v. United States,
578 F.2d 1356 (Ct. Cl. 1979) ........................................................................64, 65

Trinity River Lumber Co. v. United States,
66 Fed. Cl. 98 (2005) ....................................................................................38, 63

Webco Lumber, Inc. v. United States,
677 F.2d 860 (Ct. Cl. 1982) ..............................................................................32

**STATUTES AND REGULATIONS**

16 U.S.C. § 472a(a).......................................................................................................16

16 U.S.C. § 475...............................................................................................................15

16 U.S.C. § 528...............................................................................................................16

16 U.S.C. § 1600 et seq. ........................................................................................ *passim*

42 U.S.C. § 4321 et seq. ..........................................................................26, 59, 60, 61, 64

**MISCELLANEOUS**

J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS
(4th ed. 1995) ..............................................................................................15, 27

Forest Service Manual
§ 2403.5 (eff. 8/8/96, amend 96-4) .......................................................................16

## I. The Court Should Grant Plaintiffs' Motion For Partial Summary Judgment On Liability

Contrary to defendant's assertions, the key question in this case is not whether clause C(T)6.01 gives the Forest Service ("FS") suspension authority. Rather, the question before the Court is whether clause C(T)6.01 limits the FS's liability in the circumstances of this particular case. Precision Pine & Timber Co., Inc. v. United States, 50 Fed. Cl. 35 (2001), Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003), and all of the subsequent relevant authority that address the question of FS liability for its suspension of performance on timber sales recognize that this is the appropriate inquiry and uniformly conclude that the limitation of liability contained in clause C(T)6.01 can be defeated in appropriate circumstances. The uncontroverted facts of this case present the requisite appropriate circumstances for the Court to conclude that clause C(T)6.01 does not limit the FS's liability for its suspension of performance on the Happy Thin, Jack Heli and Too Wild timber sale contracts.

The uncontroverted facts of this case demonstrate that the FS's actions and inactions caused the suspension of operations on the sales and breached plaintiffs' contracts because (1) there was no open legal question regarding the Northwest Forest Plan ('NFP") requirement for Category 2 surveys for ground-disturbing activities that would take place after October 1, 1998 (2) the FS proceeded to award the contracts without having performed the Category 2 surveys and (3) the court in Oregon Natural Resources Council Action v. United States Forest Service ("ONRC Action"), 59 F. Supp. 2d 1085 (W.D. Wash. 1999), enjoined the FS from allowing contract performance.

Plaintiffs have demonstrated entitlement to partial summary judgment as a matter of law under each of its theories of liability individually and under all of the theories collectively. Defendant has not pointed to any genuine issues of material fact that would preclude the Court from granting plaintiffs' motion. The Court should grant plaintiffs' motion for partial summary judgment on liability.

### A. Contract Clause C(T)6.01 Does Not Exculpate The FS From Liability Where Conduct Within Its Control Caused The Issuance Of The Court Order That Resulted In The FS's Suspensions Of Performance On Plaintiffs' Contracts

Defendant does not acknowledge, much less discuss, the governing authority in this Circuit cited by plaintiffs which establishes that the government cannot escape contractual liability where conduct within its control has caused delay to contract performance and there is no clause in the contract that clearly and expressly exculpates it from liability for such delay-causing conduct. E.g., George A. Fuller Co. v. United States, 69 F. Supp. 409, 412 (Ct. Cl. 1947) ("it has never been doubted that the Government is liable for delays caused by it, in the absence of a clause in the contract expressly exempting it from liability therefor"); Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment [hereinafter "Pl. Br."] at 21-22.

The Court need not find that the FS's conduct was unreasonable in order to conclude that the language of clause C(T)6.01 fails to exculpate the government for delay caused by conduct within its control. Precision Pine, 50 Fed. Cl. at 58 ("If the [FS] sought to exculpate itself from delays or misrepresentations caused by conduct within the Government's own control, there

would need to be a clear expression of that intent in [clause C(T)6.01]. . . . However, nowhere in [clause C(T)6.01] is such language to be found"). See C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992) ("the efficacy of a limitation of liability clause does not extend to those situations where the breach arises out of events within the Government's control"); Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984) (citing Dep't of Natural Resources and Conservation of Montana v. United States, 1 Cl. Ct. 727, 734 (1983)) ("When the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent"); see also Precision Pine, 50 Fed. Cl. at 66 ("exculpatory provisions are also construed 'narrowly and strictly'") (citing New Valley Corp. v. United States, 119 F.3d 1576, 1584 (Fed. Cir. 1997)).[1] "Barring an exculpatory clause which clearly and expressly states otherwise, this Circuit has consistently held that delays caused by the government breach of duty not to hinder the contracts." Precision Pine, 50 Fed. Cl. at 59 (citing James Stewart & Co. v. United States, 105 Ct. Cl. 284, 328 (1946)).

---

[1]Contrary to defendant's contention, plaintiffs do not assert that Precision Pine held that clause C(T)6.01 is generally "invalid" as a limited liability clause. See Defendant's Opposition to Plaintiffs' Cross-Motion for Summary Judgment [hereinafter "Def. Opp."] at 34-35. Indeed, plaintiffs' previous briefs discussed several examples of situations where clause C(T)6.01 functions as a limited liability clause. Pl. Br. at 21 n.5; Plaintiffs' Opposition to Defendant's Motion for Summary Judgment [hereinafter "Pl. Opp."] at 4-5. Thus, clause C(T)6.01 is not rendered void or meaningless by interpreting it as inapplicable to limit the FS's liability where conduct within the government's control caused the court order to issue which required the FS to suspend the contracts or render the clause "nugatory." See Def. Opp. at 16. Precision Pine expressly rejected this argument. 50 Fed. Cl. at 61. Similarly, in Scott Timber and the subsequent timber sale suspension cases before this Court and the Department of Agriculture Board of Contract Appeals ("AGBCA"), this argument was rejected at least implicitly when the matters were remanded for trial. Moreover, even if ruling that the loss limitation language of C(T)6.01 was ineffective where FS fault caused the suspension of plaintiffs' contracts would render C(T)6.01 nugatory, that is the correct result under established law. The FS assumes the risk of any failure to draft an effective exculpatory clause.

The FS did not employ "clear and express language" in clause C(T)6.01 to exempt itself from liability for conduct within its own control that breaches the contract by rendering the FS unable to meet its fundamental contractual obligation to make the timber available for plaintiffs to harvest. The failure of the FS to comply with the clear Category 2 survey requirements of the NFP before awarding the contracts to plaintiffs caused the FS to have to suspend performance on plaintiffs' contracts after award so that it could conduct the surveys (before allowing ground-disturbing activity). Clause C(T)6.01 does not exculpate the FS from liability for causing an injunction which in turn necessitated the FS's suspension of contract performance.

The conclusion that the FS should be held liable in the circumstances of this case is not a novel proposition of law. It is entirely consistent with the cases that have held that while issuance of a court order prohibiting performance of a contract generally excuses performance on the grounds of impossibility, that precept is inapplicable where, as here, the actions of one of the parties was the basis for the injunction. See, e.g., Lowenschuss v. Kane, 520 F.2d 255, 265 (2nd Cir. 1975).

Although it fails to even acknowledge most of the case law on exculpatory clauses relied on by plaintiffs, defendant does seek to distinguish C.J. Betters by suggesting that the case is limited to situations where there is a breach of an express warranty. Def. Opp. at 34. Defendant ignores the Precision Pine Court's cogent analysis and application of the well-established rule in the Federal Circuit that is articulated in C.J. Betters. See 50 Fed. Cl. at 59 ("the efficacy of a limitation on liability clause does not extend to those situations where the breach, whether total

or partial, arises out of events within the Government's control"); see also Ozark Dam Constructors v. United States, 127 F. Supp. 187, 191 (Ct. Cl. 1955) ("the nonliability provision in the contract, when fairly interpreted in the light of public policy, and of the rational intention of the parties, did not provide for immunity from liability" when the government was almost willfully negligent in failing to make deliveries of cement on time; government knew that railroad strike was probable but took no steps to arrange for alternative transportation until after strike had begun). Defendant also ignores the fact that Ozark Dam, a decision rendered by this Court's appellate authority that was relied on in C.J. Betters, did not involve an express warranty. The Court should reject the narrow reading of C.J. Betters urged by defendant and should conclude that under the law of this Circuit clause C(T)6.01 does not exculpate the FS from delays caused by conduct within the government's own control.

### B. The FS Assumed The Risk Of Liability For The Suspensions Of Performance It Caused

Instead of responding to plaintiffs' contention that the FS assumed the risk of liability because it did not include a provision in the contracts clearly and explicitly exculpating itself of such liability, defendant makes irrelevant attacks on plaintiffs' reliance on Court of Claims precedent holding that FS timber sale contracts are contracts of adhesion, Everett Plywood Corp. v. United States, 651 F.3d 723, 730 (Ct. Cl. 1981), without even citing or attempting to distinguish that binding case law. See Def. Opp. at 32, 35.[2] Apparently, defendant's only

[2]Defendant cites Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1565-66 (Fed. Cir. 1990), for the proposition that "[c]ontracts offered on a take-it-or-leave-it basis are not automatically adhesion contracts." Def. Opp. at 35. Seaboard argued that its waiver of the right to have the government establish its breach claim in an Article III court before a jury was not

response to plaintiffs' argument that the FS assumed the risk of liability for any of its own acts or failures to act that precluded it from performing is that timber sale contracts are not contracts of adhesion because "the timber industry" provided input to the agency in the development of both the standard form FS timber sale contract and various contract clauses.

In support of its apparent effort to convince the Court that the contracts are not take-it-or-leave-it contracts of adhesion, defendant presents a litany of allegations that the amorphous "timber industry" "assisted in drafting these timber sale contracts." Def. Opp. at 35 (heading); id. (industry played an "integral role . . . in drafting these timber sale contracts, including C6.01"). Without citing Everett Plywood, defendant apparently asks the Court to make a finding inconsistent with that precedent on the grounds that "the timber industry" had the opportunity to and did provide input to the FS in the government's development of its standard timber sale contract clauses. Despite any input provided by the "timber industry," FS timber sale contracts are take-it-or-leave-it contracts of adhesion drafted by the government. E.g., Everett Plywood, 651 F.2d at 730 ("bidders had to accept the contract terms the government wrote into the invitation [for bids], only the price being open for the bidder to specify"); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001) ("Interested parties are invited to bid based on the information provided in the prospectus and the bidder's own examination of the site. The terms

voluntary because government contracts are inherently adhesion contracts. The Federal Circuit rejected Seaboard's argument: "The bare fact that the contracts in question are 'take it or leave it' offers by the government is not controlling on the dispute resolution provisions' validity, as we read the precedent." 903 F.2d at 1564. Seaboard Lumber did not reject or even discuss the proposition that a FS timber sale contract should be construed narrowly against the government as the drafter of the contract. Seaboard Lumber held only that the contractual waiver of a trial before an Article III court was fully enforceable, notwithstanding that timber sale contracts are "take-it-or-leave-it" contracts.

laid out in the prospectus are not open to negotiations"); Seaboard Lumber Co. v. United States, 41 Fed. Cl. 401, 408 (1998) ("contract terms laid out in the prospectus and those in the final contract are not open to negotiation"); Precision Pine, 50 Fed. Cl. at 66. Of course, the contracts at issue in this case are between Blue Lake, Timber Products, and CLR and the FS. The "timber industry" is not a party to any of the contracts. Nor has defendant proffered evidence that any of the plaintiffs authorized the "timber industry" to negotiate with the FS on their behalf or that plaintiffs were members of any timber industry association(s) that even provided input to the FS when it was drafting the standard form contract.

For purposes of plaintiffs' motion for partial summary judgment, plaintiffs assume that all of defendant's factual allegations regarding the participation of "the timber industry" in the development of the FS's standard form contracts are true. However, taking those allegations as true does not lead to the conclusion that contract clause C(T)6.01 somehow exculpates the FS from liability. As discussed above, exculpatory language is read narrowly and must be clear in order for the government to avoid liability for conduct within its control that causes the suspension of performance of a contract. This is true regardless of whether "the timber industry" was allowed to provide input to the FS regarding clause C(T)6.01. Even assuming that the contracts are not contracts of adhesion as argued by defendant, contract clause C(T)6.01 does not meet the standard in this Circuit for a clause that limits the FS's liability for causing suspension of contract performance.[3]

[3] Defendant's effort to recast plaintiffs' argument as a contra proferentem argument misses the mark. Ambiguity and contra proferentem are not at issue in this case. Clause C(T)6.01 does not exculpate the FS from liability for conduct within its control that caused the

In any event, defendant's factual allegations regarding the participation by "the timber industry" in the development of the FS's standard timber sale contract clauses before the contracts in this case were awarded[4] demonstrate at most that "the timber industry" submitted comments on the FS timber sale contract forms and clauses and changes the FS proposed to make to those forms and clauses but the FS retained complete discretion as to whether to accept or reject any of the input provided by industry. See, e.g., Appendix to Defendant's Addendum to Proposed Findings of Uncontroverted Fact [hereinafter "Def. App."] 164 (Fitzgerald Decl. ¶ 7 (FS meets with the timber industry and seeks comment concerning revisions to the standard form timber sale contract); ¶¶ 8-9 (FS sought input from industry; industry provided numerous comments on clause C(T)6.01 which FS had drafted)); Def. App. 165 (Fitzgerald Decl. ¶ 11 (industry commented on early version of clause C(T)6.01 which FS had drafted)); 166-67 (Fitzgerald Decl. ¶ 14 (FS accepted comments from industry on revisions to contract drafted by FS and made "appropriate" changes)); Def. App. 186-190 (FS does not agree with most of industry proposals for changes to timber sale contract); Def. App. 191-194 (FS considers industry proposals but decides which it will accept or reject); Def. App. 212 (FS disregards industry wants and needs when developing contract provisions).

---

suspensions of performance of plaintiffs' contracts because the clause does not explicitly say so, as is required by the law.

[4]The Court should ignore defendant's allegations regarding any input provided by "the timber industry" which occurred after the contracts at issue in this case were prepared and awarded. Defendant's Proposed Findings of Uncontroverted Fact [hereinafter "DPFUF"] ¶¶ 42, 47, 48. These allegations have no possible relevance to the issues in this case regarding contracts that were awarded in July 1999 at the latest, the terms of which were drafted some time before then, and suspended beginning in August 1999.

Defendant's arguments also fail to refute the undeniable fact that, like any other government contract for which bids are sought on a formally advertised basis, the FS timber sale contracts at issue in this case were offered for sale and awarded to the plaintiffs on a "take-it-or-leave-it" basis. For all of its focus on the "timber industry," defendant has put forth not one piece of evidence that demonstrates that plaintiffs had the ability to negotiate the addition, deletion or modification of any term in their standard form contracts. The FS advertised the sales and specified the terms on which it would entertain bids and plaintiffs had no opportunity to negotiate or affect any term of the resulting contracts other than the price. That "the timber industry" provided comments to the FS on the standard form timber sale contract and on particular clauses, similar to the manner in which the procurement community provides comment and input to the FAR Council regarding standard form procurement contracts and particular clauses, does not somehow transform a standard form government contract from one drafted by the government to one "negotiated" by both contracting parties.

There is a clear difference between contracts in the private sector where a potential contractor can negotiate about almost anything and a contract based on a government issued invitation for bids like the FS timber sale contract, in which the government specifies in detail how the work is to be accomplished.[5] To the extent relevant, the FS timber sale contract is much closer to the latter, i.e., the FS specifies what is to be done and generally the means by which it is

[5]The FS decides unilaterally what contract form to use and what B(T) and C(T) clauses to include in individual timber sale contracts. The FS also decides unilaterally whether and when to use clauses in its contracts that deviate from the norm. FS timber sale contracts are not negotiated contracts.

to be accomplished and the contractor bids a price to do the work, in this case to pay for the timber. That "the timber industry" like other industries exercises its rights to comment on proposed contract language, meets with agency representatives, and argues for changes to the language proposed by the government for use in standard form advertised government contracts does not somehow transform the contracts into negotiated contracts or eliminate precedential rulings of this Court's appellate authority regarding the take-it-or-leave-it nature of FS timber sale contracts. The Court should reject defendant's apparent effort to deflect the focus in this case from the well-established authority of this Court and its appellate authority regarding the requirement for clear exculpatory language in government contracts in general, and timber sale contracts in particular, where the government seeks to exculpate itself from liability for its own conduct which in turn necessitates its suspension of contract performance.

### C. The Spearin Doctrine Applies To FS Timber Contracts

Defendant argues that the Spearin doctrine "only applies to cases involving construction contracts or contracts for the procurement, by the government, of goods and services." Def. Opp. at 39. The authorities cited by defendant do not support this contention. To the contrary, the case law demonstrates that the Spearin doctrine applies to all government contracts including FS timber sale contracts. The FS's failure to ensure that its design specifications had been prepared in full conformity with its obligations under the NFP when it awarded the contracts to plaintiffs resulted directly in the breach of plaintiffs' contracts when the FS had to suspend performance on the contracts in order to conduct the required surveys.

The Spearin doctrine applies to any contract where the government furnishes the contractor with design specifications. Defendant cites a number of cases in which the Spearin doctrine has been applied by the courts to contracts for the procurement of goods and services by the government, in addition to its well-established application to construction contracts. See Def. Opp. at 39-40. From these cases, defendant somehow leaps to the erroneous conclusion that the doctrine applies only in the context of construction or procurement. None of the cases on which defendant relies establish that the doctrine is so limited.[6]

In particular, defendant cites Rick's Mushroom Service, Inc. v. United States, 521 F.3d 1338 (Fed. Cir. 2008), for the proposition that the Spearin doctrine "applies only to cases involving construction contracts or contracts for the procurement, by the government, of goods and services." Def. Opp. at 39. Rick's Mushroom involved a cooperative, cost-sharing agreement in which the government provided specifications for the handling of organic waste created as a by-product of mushroom farming. Neighboring landowners brought suit against Rick's in federal district court, alleging that the improper handling of the waste on Rick's property had resulted in run-off and nitrogen pollution of neighboring lands and waters. The district court ruled that Rick's had violated the Clean Water Act and county environmental requirements and enjoined Rick's operations. Rick's took remedial actions to mitigate the run-off and settled the environmental suit brought by the neighboring landowners for $950,000. 521 F.3d at 1341. Thereafter, Rick's filed a Contract Disputes Act ("CDA") claim against the

[6]The Spearin doctrine is not limited to construction contracts. E.g., Al Johnson Constr. Co. v. United States, 854 F.2d 467, 568 (Fed. Cir. 1988) ("the Spearin doctrine is much alive today, and we have recently had occasion to extend and apply it in a case other than a construction contract dispute").

government alleging, among other things, breach of contract due to defective specifications and a claim for equitable indemnification based on an implied-in-fact warranty arising under the Spearin doctrine. Id. at 1342.

The trial court and the Federal Circuit on appeal dismissed both of these claims on jurisdictional grounds, never reaching the merits of the claims. Id. at 1342, 1343-44. The Federal Circuit ruled that there was no jurisdiction over Rick's breach of contract claim because the cost-sharing agreement between Rick's and the government was not subject to the CDA and did not contain any money-mandating provisions necessary to establish Tucker Act jurisdiction.[7] Id. at 1343-44. Additionally, the Federal Circuit concluded that both it and the trial court lacked jurisdiction over Rick's Spearin warranty claim because that claim suffered from the same jurisdictional defects as Rick's general breach of contract claim. Id. at 1344. The Federal Circuit also noted that Supreme Court precedent foreclosed Rick's Spearin claim for indemnification because a Spearin warranty "does not extend as far as third-party claims." Id. at 1345 (citing Hercules, Inc. v. United States, 516 U.S. 417, 424-25 (1996)). The court, however, did expressly recognize that the Spearin doctrine could apply outside the procurement contract context. 521 F.3d at 1345.

Although government specifications are often supplied (and litigated) in the context of procurement contracts, many of which involve construction, this does not mean that the Spearin

[7]The court explained that there was no jurisdiction because "the agreement did not provide for transfer of goods or services, there was no evidence of a buyer-seller relationship, and the government did not receive a direct benefit from the operation of [Rick's] facility." 521 F.3d at 1344.

doctrine is inapplicable in other contractual settings where the government has provided specifications in its contracts. As the Supreme Court has held: "When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications." Hercules, 516 U.S. at 425. Thus, the key issue for the application of Spearin is the existence of government specifications in a contract, not the nature of the contract under consideration. In this regard, as demonstrated in plaintiffs' opening brief, tribunals have consistently recognized that detailed specifications cover all aspects of FS timber sale contract operations. See Pl. Br. at 26-27.

In addition to the above, defendant ignores the fact that several cases have applied the logic and reasoning of Spearin in the context of FS timber sale contracts. In Everett Plywood, the court observed that the FS had designed the logging roads and concluded that it had therefore assumed the risk that construction of the roads in conformity with the specifications would cause environmental damages. 651 F.2d at 731. In Southwest Forest Industries, AGBCA No. 79-178-3, 81-1 BCA ¶ 14,877 (1981), the AGBCA found that a Spearin-type warranty analysis applied to FS timber sale road specifications. The specifications required the contractor to use a "grid rolling" methodology to remove rock from a designated pit. The contractor believed that this specification was defective and the FS permitted the contractor to use crushed rock in lieu of grid-rolled rock, which was a more expensive manner of performance, but declined to agree to a design change to increase the rock cost as requested by the contractor. In examining the question, the Board used a Spearin analysis and stated: "Where the Government dictates a

particular method of contractor performance, it implies the method will produce satisfactory results." Id. at 73,568. The Board, however, was not persuaded that the grid-rolling method would produce unsatisfactory results and concluded that the contractor had not proved that the specification was defective.

That the logic and reasoning of Spearin applies to the design specifications included in FS timber sale contracts in the same manner that it applies to the design specifications included in all government contracts can be seen in other cases. See Bloedel Donovan Lumber Mills v. United States, 74 F. Supp. 470 (Ct. Cl. 1947) (timber sale contract gave FS the right to specify the time and manner for burning slash (logging debris); FS liable because compliance by contractor with specified time and manner dictated by the FS resulted in wildfire that destroyed logs and equipment of contractor); Precision Pine, 50 Fed. Cl. at 67 ("The Defendant's contention that its interpretation of the contract should prevail because courts generally uphold the autonomous rights of parties to contract rings hollow in the face of precedent in which the Government is liable for cases where a contractor cannot perform according to government-drafted specifications because the specifications themselves are defective").

The Spearin doctrine simply does not apply only within the context of construction and procurement contracts.

### 1. Plaintiffs' Timber Sale Contracts Contain Design Specifications Regarding How Ground-Disturbing Operations Are To Be Accomplished

Defendant contends that the FS's timber sale contracts contain only performance specifications, not design specifications and therefore that the Spearin doctrine does not apply. Def. Opp. at 41. The distinction between "design specifications" and "performance specifications" can be stated succinctly: "Performance specifications detail the performance characteristics of the end product and are distinguished from design specifications, which dictate contractor performance." J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS at 285 (4th ed. 1995); accord Blake Constr. Co., Inc. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993) (performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection") (quoting J. L. Simmons Co., Inc. v. United States, 412 F.2d 1360, 1363 (Ct. Cl. 1969)); R.E.D.M. Corp. v. United States, 428 F.2d 1304, 1310 (Ct. Cl. 1970) (performance specifications are found where a "contractor is simply told to achieve a given result and essentially left to his own devises as to how to do so") (citation omitted).

A FS timber sale contract is part of a statutorily mandated program developed over more than a century to improve timber stand productivity across the National Forest System, manage fire, conserve fish and wildlife habitat, develop a road system (with its attendant increase in access to the forest for recreational purposes), regulate water flows and improve many other resources. See Organic Administration Act, 16 U.S.C. § 475; Multiple-Use Sustained-Yield Act,

16 U.S.C. § 528; National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq.; 16 U.S.C. § 472a(a); 36 C.F.R. § 223.1; Plaintiffs' Appendix [hereinafter "Pl. App."] Tab 19 (FS Manual ("FSM") § 2403.5 (eff. 8/8/96, amend 96-4)). Indeed, the FS's contracts at issue in this case, which are approximately 100 pages each, specify in detail precisely how and when the standing timber is to be accessed, felled (i.e., cut) and removed from federal lands. See generally Pl. App. Tabs 93, 111, 124.

**a. Examples Of Some Of The Design Specifications In FS Timber Sale Contracts**

The contracts include detailed design specifications governing the ground-disturbing activities which the contracts authorize. For example, in standard "B" clauses located at B(T)6.1 through B(T)6.9 in each of the contracts, the FS dictates many fundamental aspects of when and how the contractor must conduct its harvesting operations. This includes specifying the equipment that can be used to fell timber, Pl. App. Tabs 93 at A-643, 111 at A-833, 124 at A-1021 (B(T)6.41); the manner in which the fallen timber is "bucked" or cut to size, id.; the height of the stumps remaining after the timber has been felled, id. (B(T)6.412); the methods of skidding and yarding the felled timber to the landing and the equipment that may be used for skidding and yarding, id. (B(T)6.42); and the size and location of landings, id. (B(T)6.422).

Corresponding "C" clauses (C(T)6.0 - C(T)6.84) contain even more detailed requirements with which harvesting and other operations under the contract must comply. E.g., Pl. App. Tab 111 at A-875 (C(T)6.315# - "Sale Operation Schedule") (specifying additional restrictions on the timing of certain contract operations and the equipment that can be used); Pl.

App. Tab 111 at A-879 to 80 (CT6.41# - "Special Felling Objectives") (specifying, unit-by-unit, the methods and equipment the contractor can use when felling timber; FS approval required for any deviation from the methods and equipment specified); see also Pl. App. Tab 111 at A-880 to 81 (CT6.42# - Special Yarding/Skidding Methods") (specifying the methods and equipment the contractor can use when yarding and skidding timber in the various units of the sale area; FS approval required for any deviation from the yarding and skidding equipment and methods specified).

Perhaps no place in the FS's timber sale contract are the existence of design specifications more apparent that in clause CT6.422 - "Constructed Landings." In clause CT6.422, the FS requires that "Purchaser shall construct landings in accordance with plans and specifications attached hereto." Pl. App. Tab 111 at A-881 (emphasis supplied).

The FS also controls restoration of the sale area following harvest. In clause CT6.6# - "Erosion Control And Soil Treatment By Purchaser," the FS specifies the means by which the contractor is to prevent erosion and restore the sale area, identifies the areas where mechanized equipment may be used for these tasks, and even provides a detailed description of the type and quality of grass seed, fertilizer, mulch and straw to be used. Pl. App. Tab 111 at A-882 to 83. In the same way, the FS controls the disposal of "slash," i.e., "cull logs, blasted or pushed out stumps, chunks, broken tops, limbs, branches, rotten wood, damaged brush, damaged or destroyed reproduction, saplings or poles," remaining upon the completion of harvesting in a given area of the sale Pl. App. Tab 111 at A-884 (CT6.7 - "Slash Disposal"); Pl. App. Tab 111

at A-884 to 85 (CT6.74 - "Slash Treatment Requirements"); and Pl. App. Tabs 93 at A-662 to 65 and 124 at A-1044 to 46 (C(T)6.7# - "Slash Disposal").

A visible representation of some of the specifications detailed in the contracts is found in the sale area and slash disposal maps. E.g., Pl. App. Tab 111 at A-803 to 20. The Too Wild contract alone contains 17 pages of maps pinpointing areas to protect pursuant to clause CT6.25#, stream courses protected pursuant to clause BT6.5, areas where CLR is to leave dead timber on the ground, areas where CLR is to leave dead timber standing, areas where skyline yarding is acceptable and areas where tractor skidding is acceptable, among others. Id.

Additional specifications included in the contracts dictate the manner in which ground-disturbing road construction activities are to be conducted on the timber sale area. See contracts at B(T)5.1-B(T)5.5 and C(T)5.1-C(T)5.254. Pl. App. Tabs 93 at A-630 to 32, A-649 to 55, 111 at A-829 to 31, A-850 to 57, 124 at A-1017 to 19. Among other things, these include specifications dictating in substantial detail exactly where and what kind of road is to be constructed as part of the timber sale contract. Finally, each of plaintiffs' contracts contains Limited Operating Periods specifically to restrict the times during which the contractors may operate on the sales. See Pl. App. Tabs 93 at A-660 (C6.313#), 111 at A-875 (CT6.315#), 124 at A-1038 (CT6.313#). These specifications are for the protection of various species of wildlife and plants for whom active operations during certain times of the year (typically breeding seasons) may be harmful.

Simply put, the FS's contracts specify in exacting detail how all aspects of ground-disturbing activities are to be accomplished. Whether the FS could permit the contract to be performed depended on it having complied with all aspects of the NFP including performing the Category 2 surveys before establishing the contract specifications. Upon completion of the Category 2 surveys during the suspensions which breached plaintiffs' contracts, the FS had to reassess the efficacy of each such specification in light of the survey findings.

**b. FS Timber Sale Contractors Do Not Have Discretion To Disregard FS Design Specifications**

The above notwithstanding, defendant argues that the contracts provide the contractor with "discretion" to deviate from the specifications and that the specifications do not rise to the level of design specifications subject to the Spearin doctrine. Def. Opp. at 41-42. Defendant is incorrect. The "deviations" it identifies that are permitted by the contract merely allow alternative performance subject to FS review and approval.[8] For example, defendant cites the contractors' ability to submit "their own plan of operations" as evidence of plaintiffs' discretion under their contracts. Def. Opp. at 41 (citing DPFUF ¶ 49), which in turns cites to clause C(T)6.3 - "Operations." However, clause C(T)6.3 provides: "Forest Service written approval of the plan of operations is a prerequisite to commencement of Purchaser's Operations." Def. App. 268, 273.[9] Thus, a contractor's obligation to submit a plan of operations for FS approval lends

[8] The same can be said of virtually every design specification.

[9] Defendant's reliance on clause C(T)6.41# - "Special Felling Objectives" is similarly misplaced because, as defendant's discussion of the clause reveals, FS review and approval are required for any deviation from the methods or equipment specified in the clause. Def. Opp. at 43 (citing DPFUF ¶ 50).

no support whatsoever to defendant's contention that a contractor may conduct its operations as it sees fit and deviate at will from the contractual specifications provided by the FS. To the contrary, the clause specifically cited by defendant (C(T)6.3) demonstrates that the contractor may not commence operations until the FS has first approved the submitted plan.

Next, defendant selectively quotes clause C6.42# - "Special Yarding/Skidding Methods" for the proposition that the contractor has discretionary control over the work because the clause allows the use of "methods or equipment other than those specified. . . ." Def. Opp. at 42 (ellipsis in original). Defendant's assertion is extremely misleading. The sentence in question actually provides: "Methods or equipment other than those specified <u>may be approved</u>. Def. App. 275 (emphasis added). Here, again, because the "deviation" from a specification requires FS approval, the contractor has no independent discretion to deviate from the FS's specifications.

Defendant engages in the same sort of misleading argument with respect to clause C(T)5.411 - "Dust Abatement for Temporary Roads" when it claims that the clause "lets the purchaser chose the material used for dust abatement." Def. Opp. at 42 (<u>citing</u> DPFUF ¶ 50). The clause actually provides: "Purchaser may chose the material used in dust abatement. <u>When anything other than water is to be used, such material must be approved in writing by the Forest Service</u>." Def. App. 270 (emphasis added). Thus, the contractor's "choice" is limited to either using water as specified by the FS or obtaining FS approval to use some other means of abating dust. Notwithstanding the FS's selective and misleading quotation of the clause, the "choice" of

using water as specified by the FS or obtaining FS approval to use some other means does not provide the contractor any independent discretion or control over how to perform.

Defendant also claims to rely on clause C(T)5.414 of the Happy Thin Heli contract which pertains to snow removal. Def. Opp. at 42. However, this clause provides precisely how the contractor is to conduct snow plowing, depending on the size of the road being plowed; it requires that the contractor protect the road surface (or repair it if the surface is damaged) and mandates that the contractor remove and pile the snow in such a way as to prevent damage by erosion to surrounding resources. Again, this clause does not provide the purchaser with discretion over how to accomplish snow removal.[10]

Least credible of all is defendant's claim that clause C(T)6.411 provides the contractor with discretion to cut timber as it sees fit because the clause does not require directional felling "when in the faller's judgment it is unsafe to do so and the tree shall be left standing." Def. Opp. at 42 (citing DPFUF ¶ 50). The proviso of C(T)6.411, however, is little more than a corollary to the general contract requirement that "Purchaser's operations shall be conducted in a workmanlike and orderly manner." Pl. App. Tabs 93 at A-634, 111 at A-832, 124 at A-1020 (B(T)6.3). In short, having the "discretion" to follow the FS's falling specifications in all

[10]That the Happy Thin contract permits, but does not require, snow removal is simply a recognition that during some of the normal operating season, i.e., May 1 to October 15 Pl. App. Tab 124 at A-1005 (AT 1.7), there is likely to be no snow to remove. The point remains that once the contractor undertakes snow removal, the clause specifies the manner in which it must be accomplished.

circumstances unless doing so will put the contractor's equipment and/or the lives of the logging crew at risk is really no discretion at all.

Virtually all of the above-described specifications regulate ground-disturbing activities on plaintiffs' timber sales. The presence of the red tree vole or any of the 71 Category 2 invertebrate species which might have been located by the required surveys could have required changes in these specifications to ensure adequate protection for habitat or the species themselves. Without the surveys there would be no way of knowing what parts of the sale areas, what logging systems, what road construction or maintenance programs specified in the contract would have to be modified in order to comply with NFP wildlife or plant requirements. Thus, there is a direct link between the suspension of plaintiffs' contracts in order to conduct Category 2 surveys and the foregoing contract specifications, all of which had to be reassessed in light of the survey results.

In sum, FS timber contracts contain numerous design specifications, which, like both typical construction and supply contracts, set out in exacting detail when the contractor may access the work site and how the contractor must conduct the work. Just like a more traditional government contractor, a FS timber sale contractor is not free to disregard the specifications and perform the contract in any manner it chooses. Defendant fails to identify a single instance of true discretion vested in the contractor, despite the fact that the three contracts at issue contain a combined 347 pages of provisions. That the FS remains free to agree to an alternative means of performance or even to waive its original design specifications does not change the fact that,

absent more, the specifications are binding on the contractor and the contractor cannot deviate from them unilaterally.

### c. Even If Plaintiffs Had Some Limited Discretion Under The Contracts, This Would Not Be Dispositive Of The Issue Of Whether The FS Breached Its Implied Warranty Of Specifications

Even assuming that plaintiffs were afforded limited discretion under some aspects of the FS timber sale contracts specifications (something that defendant has not demonstrated), as the Federal Circuit has held, the issue would still be whether plaintiffs were afforded the opportunity to go forward with contract performance as anticipated or whether the defective design specifications impeded performance of the contracts:

> It is not only possible, but likely that a contractor will be granted at least limited discretion to find the best way to achieve goals within the design parameters set by a contract. See, e.g., Penguin Indus., Inc. v. United States, 209 Ct .Cl. 121, 530 F.2d 934, 937 (1976). "On occasion the labels 'design specification' and 'performance specification' have been used to connote the degree to which the government has prescribed certain details of performance on which the contractor could rely. However, those labels do not independently create, limit, or remove a contractor's obligations." Zinger Constr. Co. v. United States, 807 F.2d 979, 981 (Fed. Cir. 1986) (citations omitted). These labels merely help the court discuss the discretionary elements of a contract. It is the obligations imposed by the specification which determine the extent to which it is "performance" or "design," not the other way around. The real issue is not whether the drawings and diagrammatic notes in their entirety should be labeled design specifications or performance specifications, but how much discretion the specifications gave [the contractor]. . . .

Blake Constr., 987 F.2d at 747 (although contract gave contractor discretion as to precise location to place power lines overhead, the contract did not confer any discretion to place power lines under ground). As discussed in the next section, the crucial point here is that when the contracts were awarded, the FS simply did not know whether or not its design specifications as

written could be performed in accordance with the NFP Record of Decision ("ROD") because it had not conducted the necessary surveys for Category 2 species.

### 2. The FS Breached Its Implied Warranty Of Specifications Because It Did Not Know Whether Its Specifications Could Be Successfully Carried Out As Written (And Whether It Could Permit Performance Based On Those Specifications)

Defendant argues that plaintiffs' contention that the government breached the implied warranty of specifications must fail because "the proximate cause of the suspensions and any resulting delay was the court order [in ONRC Action]," not any deficiency of the specifications outlined in the contracts. Def. Opp. at 43. What defendant fails to recognize is that where, as here, a court concludes that the FS cannot allow ground-disturbing activities on the contracts to proceed because the FS had failed to conduct the required Category 2 surveys, all of the contract specifications governing ground-disturbing activities have been rendered defective because a contractor cannot proceed with contract performance in accordance with them.[11] These circumstances are not substantively different from the more common situation where individual specifications which the government has provided a contractor are functionally defective and unperformable. In both instances, the government's failure to issue useable specifications has caused the performance of the contract to stop.

[11]Defendant contends that "but for the court order suspending work on the timber sales" contract performance could have proceeded in accordance with the contract specifications. Def. Opp. at 43. Contrary to defendant's contention, the court order did not "suspend [] work on the timber sales." The court order enjoined the FS from allowing work on the timber sales to proceed. The FS complied with the court order by suspending performance of the contracts. Work could not have proceeded in accordance with the contract specifications until the FS lifted the suspensions. See Superior Timber Co., Inc., IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996), at 143,436 (court orders were only the secondary causes of timber sale contract suspension).

The FS prepared all of the specifications pertaining to ground-disturbing activities, and was not only in the best position to determine whether or not those specifications were in conformity with its own obligations under the NFP so that they could be carried out as written but it was the only one that could make such a determination. See Everett Plywood, 651 F.3d at 731. Nevertheless, at the time of award the FS had no idea whether or not the contract could be performed as written because it had not conducted the requisite Category 2 surveys. As in Everett Plywood, the risk is on the government that environmental damage might occur if its specifications are followed. Concomitantly, if a contractor is delayed because the specifications contained in the contract cannot be followed when the contractor wants to commence performance (and the government must suspend performance until it conducts additional investigations to comply with its forest plan obligations and verifies that the specifications are appropriate), it is the government that is liable for the damages sustained by its contractor. See Sergent Mechanical Systems, Inc. v. United States, 34 Fed. Cl. 505, 526 (1995) ("The case law has held that any delay is per se unreasonable for the purpose of applying the standard suspension clause if the delay is caused by a deficient specification in the contract") (citing Chaney and James Constr. Co. v. United States, 421 F.2d 728, 731 (Ct. Cl. 1970)).

In Precision Pine, Chief Judge Damich ruled:

> Similarly, another fundamental expectation of a contractor at the time of the bargain, relevant to this case, is that when the Government discloses certain restrictions placed on the performance of the contracts . . . the Government had a reasonable basis for its disclosure. Such a fundamental expectation is analogous to the rule in which the Government's liability for a breach of warranty cannot be limited by clear exculpatory language when the breach arises out of events within the Government's control.

50 Fed. Cl. at 65. Although this discussion was made within the context of an express warranty, the same fundamental expectation of a contractor applies where, as here, the government specified the means by which the timber was to be accessed, felled and removed from the sale area, but had no adequate basis to believe that the specifications were viable because it had not done the requisite Category 2 surveys. Thus, the specifications were defective and inadequate for their purpose because the FS simply did not know whether the specifications could be performed consistent with the NFP. See id. at 70 ("The misrepresentation contained in the warranty was that the [FS] had no reasonable basis to know whether its warranty was true. . . .").[12] For this reason, the FS is liable for the impact that any delay (whether reasonable as to causation or not) had on its contractors.

Several other authorities have also recognized that the government's inclusion of a contract specification that runs afoul of applicable underlying laws, regulations and standards is a breach of the implied warranty of specifications. Castle Constr. Co., ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984), at 84,859 (government's preparation of specifications that did not comply with applicable national plumbing standards breached the implied warranty of specifications and entitled contractor to damages); Huber, Hunt & Nichols, Inc., GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975), at 54,572 (contractor awarded damages for complying with more

[12]Contrary to defendant's contention, Def. Opp. at 17, Scott Timber did not hold that clause C(T)6.25 contains no express warranty regarding threatened, endangered and sensitive species protection measures in contracts such as those at issue in this case and in Precision Pine. These latter contracts are subject to the requirements of NFMA and National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., whereas the contracts at issue in Scott Timber were deemed by statute to be in compliance with NFMA and NEPA. See 333 F.3d at 1370-71; Pl. Opp. at 2 n.4.

costly municipal Department of Water and Power requirements which conflicted with contract specifications); accord J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS at 279-80, 282 (4th ed. 1995) ("The government also assumes the risk if its detailed specifications require performance contradictory to local codes or ordinances . . . . Design specifications depicting a method of performance or the particular process a contractor is to follow are also warranted"). Each of these authorities was cited in plaintiffs' opening brief, see Pl. Br. at 25-26, and, except for defendant's argument that these cases are distinguishable because they involved construction contracts, see Def. Opp. at 40, defendant does not argue that the same principle is inapplicable in the instant case.

That defendant misapprehends both the law of defective specifications and plaintiffs' argument under the Spearin doctrine is apparent from its argument that it followed FS policy in drafting and awarding the contracts and did not know the specifications were inadequate until ONRC Action was decided. Def. Opp. at 44. Defendant ignores the binding authorities which expressly hold that where specifications supplied by the government cannot be followed and this results in delay of a contractor's operation, the government is liable. See, e.g., Chaney, 421 F.2d at 731; Luria Bros. & Co., Inc. v. United States, 369 F.2d 710, 707-08 (Ct. Cl. 1966); Laburnum Constr. Co. v. United States, 325 F.2d 451, 453-54 (Ct. Cl. 1963); Sergent Mechanical, 34 Fed. Cl. at 526; Beauchamp Constr. Co., Inc. v. United States, 14 Cl. Ct. 430, 438 (1988); Pl. Br. at 31. Whether defendant's actions in preparing its specifications were in some sense reasonable or

the government did not willfully produce defective specifications is not the question.[13] Plaintiffs had a basic right to perform the contracts at the time permitted thereunder in conformity with the specifications provided. Here, that right was taken away from them and defendant suspended its performance because defendant, by failing to conduct the requisite surveys, could not assure that the specifications were not defective.

In sum, the harvesting and road building (i.e., ground-disturbing) specifications contained in the Happy Thin, Jack Heli and Too Wild contracts were not adequate to allow contract performance to proceed until they could be reassessed in light of the Category 2 surveys that the FS had failed to perform before contract award. Because the FS's implied warranty of its specifications under the Spearin doctrine does not require any proof that the FS was unreasonable or negligent, the FS is liable for the consequences of the delay arising from these inadequate specifications.

### D. The FS's Suspensions Breached The Contracts Because The FS Failed To Disclose The Vital Information That The Sales Were On ONRC Action's Secret "At-Risk" Lists And Were Specifically Threatened By The ONRC Action Litigation

Defendant contends that the FS's superior knowledge regarding ONRC Action litigation and the inclusion of plaintiffs' sales on ONRC Action's secret at-risk lists does not demonstrate that the FS's suspension of performance breached plaintiffs' contracts. See Def. Opp. at 44. Defendant, however, does not dispute that plaintiffs did not know that their sales were on ONRC

[13] By including specifications in plaintiffs' contracts without first performing required Category 2 surveys that were necessary for the agency to determine if those specifications adversely affected Category 2 species, the FS was totally unreasonable.

Action's at-risk lists when they entered into the contracts. See Pl. Br. at 34-40. Nor does defendant dispute that the FS knew that these sales were on ONRC Action's at-risk lists and that if plaintiffs had that information it could have had an impact on how they approached the sales, yet intentionally withheld that information from plaintiffs. See Pl. Br. at 32-41. Instead, defendant contends that plaintiffs had pre-award knowledge of the existence of the ONRC Action litigation and the statement by the FS that contract award might be delayed as a result of ONRC Action provided plaintiffs with sufficient knowledge that these particular sales were at risk of being suspended after contract award as a result of ONRC Action. Def. Opp. at 45-47. Defendant is wrong.

As defendant admits, the contracting officer expressly represented to plaintiff Blue Lake before bid opening that the Happy Thin "sale was no longer included in the [ONRC Action] litigation. . . ." Def. App. 309 (E. Matthews Decl. ¶ 10). Moreover, defendant does not dispute that at the time of contract award, the FS knew that Blue Lake lacked the vital knowledge that the Happy Thin sale remained specifically at risk in the ONRC Action litigation. See Def. Response to Plaintiffs' Proposed Findings of Uncontroverted Fact and Exhibit A[14] [together "Def. Resp. to PPFUF"] ¶ 157. Thus, defendant's argument that all of the plaintiffs had knowledge that the sales were at risk of being suspended as a result of the ONRC Action

[14]As Exhibit A to this brief plaintiffs have attached an analysis identifying all of plaintiffs' proposed findings of uncontroverted fact as to which defendant has raised no factual objection or asserted any contrary facts and as to which defendant has either agreed or stated only a legal objection. In Exhibit A, plaintiffs respond to these legal objections as well as any asserted factual objections made by defendant. As part of this reply in support of plaintiffs' proposed findings of uncontroverted fact, plaintiffs also have attached an errata containing corrected versions of eight App. Tab documents.

litigation clearly does not apply to Blue Lake. Defendant implicitly acknowledges these undisputed facts by its omission of any discussion of Blue Lake's Happy Thin sale in the superior knowledge portion of its opposition brief. See Def. Opp. at 46-47.

With respect to Timber Products' Jack Heli sale and CLR's Too Wild sale, defendant relies on the Northwest Forestry Association's Forestry Forum newsletter, the prospectus language, and the FS's "standard" oral announcement at bid opening that award of the sales might be delayed as a result of the litigation. Id. Plaintiffs do not dispute that the FS included certain language in the prospectus for the Jack Heli sale, that Timber Products extended its bid, that the FS made its "standard" announcement at the bid opening for the Too Wild sale,[15] or that company representatives had some general discussions with FS personnel regarding the status of the ONRC Action litigation. However, even assuming for purposes of plaintiffs' motion for partial summary judgment that the proposed facts on which defendant relies establishes that plaintiffs were aware of the hearsay information and generalities contained in the Northwest Forestry Association's Forestry Forum, DPFUF ¶ 51, the documents that defendant cites make clear that the ONRC Action at-risk lists were kept secret by the government and that timber industry representatives and purchasers like plaintiffs were excluded from the secret discussions between the government and ONRC Action. See Def. App. at 278, 284. Likewise, even assuming for purposes of plaintiffs' motion for partial summary judgment that the contracting officers made contract awards to plaintiffs without personally being aware that the sales were still at risk, see DPFUF ¶¶ 54, 55, defendant does not rebut the evidence showing that the

[15] See Pl. Br. at 38.

government knew or should have known at the time of award that the sales were still at risk of delay due to ONRC Action, even if the contracting officers subjectively believed otherwise. See, e.g., Def. Resp. to PPFUF ¶¶ 129, 121, 142, 143, 153, 162.

Nonetheless, without any citation whatsoever, defendant baldly claims that the government had no duty to inform plaintiffs about its assessments of the risk that the sales might have to be suspended after contract award or of its secret negotiations with ONRC Action relating to the award and operation of the sales. Def. Opp. at 48. In this regard, it is well-established that the government has an affirmative duty to provide bidders with all information in its possession that is pertinent to performance of the contract and not to mislead them through silence as it did in this case. See, e.g., J.A. Jones Const. Co. v. United States, 390 F.2d 886 (Ct. Cl. 1968) (government liable for contractor's increased labor costs because it knew but failed to tell bidders that a large, high priority construction program, premised in large part on the payment of premium wages, was to be initiated in same labor area); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774 (Ct. Cl. 1963); Pl. Br. at 33-34. Defendant breached that duty.[16]

[16]According to defendant, superior knowledge is a performance doctrine that cannot apply to this case. Def. Opp. at 44. Apparently, it is defendant's position that the government had no affirmative duty to disclose to plaintiffs the superior knowledge it possessed because of the manner in which plaintiffs allege they could have avoided damages if they had known that their sales were specifically threatened in the ONRC Action litigation and that the government had secret agreements with ONRC Action related to the award and operation of the contracts. Plaintiffs have demonstrated that the government breached its duty to disclose its superior knowledge. See Pl. Br. at 33-40.

Defendant's response to plaintiffs' contention that the FS failed to disclose relevant information in its possession prior to bidding is to analogize this circumstance to that involving estimates of the volume on a timber sale. That is, defendant claims that plaintiffs' reliance upon the FS's representations that the sales were not at risk "is particularly suspect" because plaintiffs did not rely upon the FS's estimates of timber volume when they bid for the sales. Def. Opp. at 48. However, defendant fails to advise the Court that the FS expressly disclaims its estimates of the volumes of timber offered for sale in its instructions to bidders and expressly "advise[s] and caution[s]" bidders to undertake their own efforts to ascertain the volume of timber being sold and requires bidders to warrant that they did not rely upon FS estimates. Pl. App. Tab 109 at A-779; Exs. F and G to Plaintiffs' Response to Defendant's Addendum to Defendant's Proposed Findings of Uncontroverted Fact. Both the Federal Circuit and this Court have upheld the FS disclaimer of its volume estimates. E.g., Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 666-67 (Fed. Cir. 1992); Webco Lumber, Inc. v. United States, 677 F.2d 860, 863 (Ct. Cl. 1982); Cedar Lumber, 5 Cl. Ct. at 546-57 & cases cited therein.

In sharp contrast, the FS routinely represents to the public in general and to timber purchasers in particular the wholly unsurprising fact that its timber sale contracts are (at least purportedly) prepared in accordance with all applicable laws. See Def. App. 307 (Matthews Decl. ¶ 2) ("When I awarded the Happy Thin and Jack Heli timber sale contracts, I believed that both timber sales fully complied with all legal requirements"); Def. App. 310 (Matthews Decl. ¶ 12) ("prior to and at the time of contract award, I believed that the [FS] had complied with all laws and policies related to the Happy Thin and Jack Heli timber sales"); Def. App. 316 (Link

Decl. ¶ 10) (before awarding the Too Wild timber sale contract "I had reviewed the NEPA documentation on the sale and felt strongly that this sale met the objectives and resource requirements of the Siskiyou Forest Plan"). Again not surprisingly, unlike the FS's disclaimer of its estimates of timber volume, the FS does not disclaim its representations that the contracts it prepares and put out for bidding at least putatively comply with the law.

Based on the above, defendant's contention that the FS had reason to believe that plaintiffs would take steps to verify that the sales were no longer at risk (based on the fact that plaintiffs are required to verify the volume of timber on the sales in light of the FS's volume disclaimer) is ridiculous. Plaintiffs could not verify the information they were provided by the FS regarding the ONRC Action litigation because the identity of the sales on the "at-risk" lists and the government's agreements with ONRC Action were specifically kept secret by the government. As such, what is involved here was no mere negligent failure to disclose; but just as in J.A. Jones the FS intentionally withheld this vital information from plaintiffs.

Finally, defendant contends that material facts on which plaintiffs rely are contested. A review of the parties' proposed findings of fact and the responses thereto, however, demonstrates that there is no genuine issue of material fact regarding the superior knowledge that the FS intentionally withheld from plaintiffs. Although defendant may not want to call its agreements with ONRC Action regarding the award and operation of plaintiffs' contracts "secret agreements," that is indisputably what they were. Defendant does not contend that either these agreements or ONRC's list of at-risk sales were available to the public. Furthermore, the claim

that the FS reasonably believed that ONRC Action was not interested in stopping work on these sales simply because the FS provided notice to ONRC Action that it was making contract award is nonsense in light of the agreement by the government to provide ONRC Action with 10 days notice before the commencement of sale operations. Plaintiffs' Proposed Findings of Uncontroverted Fact and Exhibit A [together "PPFUF"] ¶¶ 140, 160, 187. The only logical reason that ONRC wanted 10-day advance notice was to give it sufficient time to do whatever was needed, including filing for a temporary restraining order, to stop any anticipated contractor operations (including ground-disturbing activities) on the sale. Indeed, it is undisputed that the government knew that ONRC Action would likely pursue injunctive relief to prevent any ground-disturbing activities. See Def. App. 316 (Link Decl. ¶ 9); PPFUF ¶¶ 189-92.

As demonstrated in plaintiffs' motion for partial summary judgment and as amplified above, the FS withheld important information in its possession regarding ONRC's interest in these specific sales and that there was a substantial likelihood ONRC Action would seek to obtain an injunction against the FS which would necessitate the suspension of performance of the sales. Such being the case, the FS must be held accountable for the damages plaintiffs suffered as a direct result of the suspensions. There is no genuine issue of material fact that would preclude the Court from granting plaintiffs' motion for partial summary judgment on this basis.

**E. Summary Judgment On Liability For Plaintiffs On The Issue Of Whether The FS Breached Its Duties To Cooperate And Not To Hinder Is Appropriate**[17]

Defendant argues that the Federal Circuit's decision in Scott Timber and the "weight of authority" in the Court of Federal Claims, require an inquiry into the reasonableness of the FS's actions when the FS has caused the suspension of contract performance and establish that "any consideration of reasonableness, an issue that is 'intensely factual,' is not properly determined upon summary judgment." Def. Opp. at 19. These arguments are without merit.

First, there is nothing in Scott Timber to the effect that whether the FS caused a suspension creates a factual issue that is inappropriate for disposition by summary judgment. Second, there is no "weight of authority" in the Court of Federal Claims to support defendant's position. Most importantly, a host of uncontroverted facts in this case establish that (1) the FS knew or should have known that its interpretations of the NFP survey requirements for plaintiffs' sales were clearly incorrect prior to awarding plaintiffs' contracts, and (2) assuming arguendo that the FS had even a colorable argument that its interpretations were reasonable, the FS knew that its interpretations were highly vulnerable to legal challenge and would be very difficult to defend in the ONRC Action litigation, but (3) the FS nevertheless awarded plaintiffs' contracts without having performed Category 2 surveys. Consequently, the FS assumed the risk of liability to plaintiffs when the district court enjoined the FS from allowing sale operations to go forward until after it conducted the Category 2 surveys required by the NFP ROD.

[17] Plaintiffs respectfully refer the Court to their opening brief in which they anticipated many of defendant's arguments regarding the ripeness of this case for summary judgment under the legal theory of breach of the duties to cooperate and not to hinder, see Pl. Br. at 68-77, as well as to the instant brief for plaintiffs' position on this issue.

### 1. In Scott Timber, The Federal Circuit Did Not Rule That Whether The FS Caused A Timber Sale Suspension Is Always Inappropriate For Summary Judgment On Liability[18]

As plaintiffs have previously demonstrated, Scott Timber does not, as defendant asserts, state that questions relating to the FS's having caused the suspension of timber sale contract performance are "intensely factual." Pl. Br. at 71-77. In the portion of Scott Timber on which defendant relies, the focus of the Federal Circuit was Scott's claim that the timber sale contract suspensions in that case were unreasonably long. Accordingly, it is contained in the portion of the Scott Timber decision entitled "Reasonableness of the Suspension Period" and not "Reasonableness of Forest Service Conduct in Causing the Suspension." 333 F.3d at 1368.[19] In that context, and in that context only, the Federal Circuit reversed the grant of summary judgment to the government, stated that "the reasonableness issue is intensely factual," and remanded the question of the reasonableness of the length of the suspensions for trial. Id. at 1369. The court then went on to note various alleged actions by both the FS and Scott that could have contributed to the length of the suspensions. Id. at 1368-70. Factually intensive questions regarding the duration of the suspensions are not before this Court on the parties' cross-motions in this case.

[18]In their opening brief plaintiffs present several arguments and discuss numerous proposed findings of uncontroverted fact that simply were not addressed in defendant's opposition brief. Pl. Br. at 51-68. Plaintiffs respectfully refer the Court to our opening brief for additional discussion of findings not addressed by defendant.

[19]Defendant acknowledges that "in Scott Timber, the Federal Circuit recognized that any reasonableness inquiry is only appropriate as it relates to the duration of the suspension. . . ." Def. Opp. at 17.

Some decisions after Scott Timber both by the Court of Federal Claims and the AGBCA have denied summary judgment to plaintiffs based upon the perceived factual intensity of the issues presented in those cases. Nevertheless, each of those cases has recognized that summary judgment was appropriate in both Precision Pine and Superior Timber. See Pl. Br. at 68-69. Defendant asserts that Precision Pine and Superior Timber are distinguishable and suggest that these two cases hold that a timber selling agency can be found to have acted unreasonably only when prior to award of a timber sale contract the agency has ignored a federal district court decision which establishes the agency's pre-award environmental obligations. In support of this contention, defendant seizes on the Precision Pine court's ruling that until the district court issued such a decision pertaining specifically to Land and Resource Management Plans adopted prior to the award of timber sale contracts, there was still a "genuine legal argument" regarding the FS's obligations. Def. Opp. at 19-20; Precision Pine, 50 Fed. Cl. at 68. However, there is nothing in Precision Pine or Superior Timber (much less in Scott Timber) stating that it is only after the FS goes so far as to ignore an on-point federal court decision before it can be found liable for having caused performance of that contract to be suspended.

The basic question before the court in Precision Pine and the IBCA in Superior Timber, and before the courts and the AGBCA in timber sale suspension cases after Precision Pine, was what did the agency know or what should it have known prior to awarding the contracts.[20] Here, prior to award, the FS knew, or should have known, that the specifications it had drafted were

[20]In deciding plaintiffs' motion to compel, this Court recognized that a crucial question in the instant case is what did the FS know and when did it know it. Blue Lake Forest Products, Inc. v. United States, 75 Fed. Cl. 779, 786 (2007).

suspect because it had not performed required Category 2 surveys prior to award.[21] Armed with such knowledge, the FS's proceeding with contract award and ground-disturbing activities on the sales invited liability.

Not surprisingly, each case before the courts or the boards in which the issue is whether or not the FS caused the suspension will involve different facts. Depending upon the uncontroverted facts and the particular allegations, a case may or may not be appropriate for summary judgment. The Federal Circuit has not articulated any general rule that precludes or alters this case-by-case approach.[22]

---

[21]Defendant briefly argues that "Government officials are presumed to act in good faith" and that "it requires 'well-nigh irrefragable proof' to induce a court to abandon the presumption of good faith." Def. Opp. at 22 (citations omitted). There are no allegations of bad faith in this case, and the "good faith-bad faith" rubric referenced by defendant has no bearing on plaintiffs' claim that the FS breached its duties to cooperate and not to hinder plaintiffs' performance:

> [C]laims of a breach of the implied covenant of good faith and fair dealing – including claims that the duties to cooperate and not to hinder performance of a contract have been breached – are to be treated like any other claim for breach of contract. The presumption of good faith conduct of government officials has no relevance. Were it otherwise, and were the presumption considered particular to government officials, it would no longer be the case that "the duty applies to the government just as it does to private parties," Centex Corp., 395 F.3d at 1304.

TECOM, Inc. v. United States, 66 Fed. Cl. 736, 758-71 (2005).

[22]Apart from relying on a misinterpretation of Scott Timber, defendant relies on Trinity River Lumber Co., Inc. v. United States, 66 Fed. Cl. 98 (2005), and H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479 (2003), for the proposition that the "weight of authority" and the "recent trend of decisions in this court" "dictates that any consideration of reasonableness" involving FS fault in causing a timber sale contract suspension is intensely factual and "not properly determined upon summary judgment." Def. Opp. at 19. Two decisions of this Court (neither or which are binding) hardly constitute a trend.

### 2. The Uncontroverted Facts Establish That The FS Caused The Suspension Of Plaintiffs' Contracts Because It Awarded Those Contracts And Authorized Ground-Disturbing Activities Without First Conducting The Required Surveys

It is obvious that if the FS waited until after August 2, 1999 when the ONRC Action court issued its decision on the merits, there would have been no award of the Happy Thin, Jack Heli and Too Wild timber sale contracts without the required surveys. Of course, the FS did not do so but rather awarded Jack Heli to Timber Products on March 2, 1999 (approximately five months prior to the ONRC Action decision); the FS awarded Too Wild to CLR on May 14, 1999 (approximately three months prior to the ONRC Action decision and during the briefings on cross-motions for summary judgment); and the FS awarded Happy Thin to Blue Lake on July 6, 1999 (after the oral argument on cross-motions for summary judgment on July 1, 1999 and less than one month prior to the ONRC Action decision). PPFUF ¶¶ 165, 188, 204. The question then is, what did the FS know prior to award of these contracts that would bear on whether it was prudent for it to award them before the anticipated final decision on the merits in ONRC Action. Plaintiffs' proposed findings of uncontroverted fact provide a clear answer to this question.[23]

- The FS was aware from the deliberations of the Interagency Resource Team that concerns were raised among IRT members and by field personnel regarding the fact that the interpretation "NEPA decision equals implementation" would exempt from surveys a number of

[23]Although plaintiffs are not required to prove that the FS acted unreasonably in causing the suspensions, uncontroverted facts demonstrate that the FS's decision to award the contracts and allow ground-disturbing activities on plaintiffs' sales without having first conducted surveys was wholly unreasonable.

timber sales to be operated after the survey trigger dates of October 1, 1996 and October 1, 1998. Pl. Br. at 51-60; PPFUF ¶¶ 48, 51, 53.

- The FS knew also from the administrative appeals filed by environmental activists challenging the interpretation "NEPA decision equals implementation" and the Red Tree Vole Directive, the filing of the ONRC Action lawsuit on July 6, 1998 and the detailed letter from the ONRC Action plaintiffs' attorneys to the Department of Justice specifying their concerns regarding these two interpretations of the NFP, that operations on a timber sale exempted from the surveys would provoke a motion in ONRC Action for injunctive relief. Pl. Br. at 60-63; PPFUF ¶ 83.

- During the pendency of ONRC Action, Robert Devlin, the Director of Timber Management for Region 6 of the FS, directed FS personnel to sign decision notices prior to survey target dates in order to be able to offer and award those sales without Category 2 surveys. Mr. Devlin's direction stated:

> We have a process in place to agree at level one teams that documentation of consistency with NW Plan is adequate. The letter dated June 5, 1998 to Umpqua with copies to all forests in NW Plan area outlines that process. When you complete agreement at level one team that documentation is complete for consistency with NW Plan aquatic strategy, as outlined in letter, you may sign Decision Notices for those projects. We do not expect any additional conditions in the BO's when we receive them if level one teams are in agreement with consistency documentation.
>
> There is always a risk that something may come up that causes you to redo a decision notice but I believe that is a safe risk to take. By signing DN's before 9-30-98, we avoid having to put these projects under the S&M timeline that kicks in on 10-1-98. If all you have waiting on the projects is final BO, I would

> recommend that you sign DN's after level one team agreement. If you have other work to do for NEPA besides final BO, then this doesn't apply.
>
> We are working with NMFS on getting them to reprioritize their work to get BO's out but to be honest with you, the workload has them overwhelmed. If we recognize that workload as fact then it is more important to get DN's signed when level one teams have completed the consistency documentation and agreed.
>
> I know this will make some folks in Strategic Planning nervous but it is a reasonable risk. We will have the documentation of agreement at level one teams to fall back on. I guess if we find out that this strategy will not work we will have to rethink what we are up to.

Pl. App. Tab 50.

- In a memorandum dated July 29, 1998, Robert M. Simmons, Regional Attorney for Region 5 of the FS, advised the Regional Foresters for Regions 5 and 6 that appropriate language should be included in timber sale contracts to protect the FS against liability to purchasers arising out of sales threatened by ONRC Action that were to be offered without surveys. PPFUF ¶ 99.

- As early as August 8, 1998, Susan Zike, Litigation Coordinator for FS Region 6 and the primary Litigation Coordinator for ONRC Action, together with Jerry Hofer, Regional Contracting Officer for Region 6, and Robert Devlin, Director of Timber Management for Region 6, all believed it would be prudent to advise FS timber sale bidders at bid openings for sales that the sales offered to them were threatened by ONRC Action. PPFUF ¶ 100.

- From shortly after the filing of ONRC Action through the award of plaintiffs' contracts, the FS periodically received lists of "at-risk" sales from the ONRC Action plaintiffs

which identified timber sales (including plaintiffs') that were threatened by the ONRC Action litigation and likely to trigger motions for injunctive relief, even though those sales were not identified in the ONRC Action complaint. PPFUF ¶¶ 104-11, 114, 118-20, 126-27, 137-142. Because the identity of the sales on these "at-risk" lists was kept secret by the FS from plaintiffs and other members of the public, the FS knew that plaintiffs' sales were explicitly at risk and that plaintiffs did not. PPFUF ¶¶ 106-08, 138-143.

- Beginning at least in the fall of 1998, the FS was aware that its own agency lawyers were concerned about liability to purchasers if sales threatened by the ONRC Action litigation were awarded, PPFUF ¶ 99, and that the Deputy Assistant Attorney General for Environment and Natural Resources, Lois Schiffer, her immediate subordinate, Peter Coppelman, and Edward (Ted) Boling, chief trial attorney for the government in the ONRC Action litigation, had, at a minimum, expressed serious concerns about the legal viability of the FS's interpretation "NEPA decision equals implementation." PPFUF ¶¶ 84-93. [24]

---

[24]Defendant argues that because Ms. Schiffer and Messrs. Coppeleman and Boling now assert they have no recollection about whether they did or did not express such concerns and in particular whether Ms. Schiffer did or did not tell Mr. Boling that "NEPA decision equals implementation is nonsense," there is no evidence that these statements of concern actually occurred. Def. Opp. at 30. To the contrary, plaintiffs have presented unrebutted evidence from FS attorney and Litigation Coordinator for ONRC Action, Susan Zike; Robert Devlin, Director of Timber Management for Region 6 of the FS; Nancy Graybeal, Deputy Regional Forester for Region 6 of the FS; and Owen Schmidt, the FS's chief agency lawyer responsible for the ONRC Action litigation, which demonstrates that such concerns were expressed and known to the FS prior to the award of plaintiffs' contracts. PPFUF ¶¶ 84-93. The fact that the Department of Justice ultimately defended the interpretation "NEPA decision equals implementation" and the Red Tree Vole Directive in ONRC Action does not detract from the importance of these concerns. This Court can take judicial notice of the fact that the Department of Justice has on many occasions defended agency actions challenged in court even where the government's position was not substantially justified, and Equal Access to Justice Act fees were ultimately

- In an email to her Distribution List, which included FS Contracting Officers Ed Matthews (Happy Thin and Jack Heli) and Tom Link (Too Wild), on or about November 8, 1998, Susan Zike reminded these individuals and the other contracting officers on her Distribution List:

> Please keep in mind (as C.O.'s always do) the liability that may come to the USFS if the sale is awarded and then enjoined. Is there a need for regional conf call re: the award question? I'm thinking we need to at least air the needs and risks of going forward. Please let me know.

PPFUF ¶ 125.

- At least from January 1999 until the end of July 1999, the Department of Justice expected FS agency counsel Owen Schmidt and other FS personnel to assess whether the award of a timber sale contract that was on one of ONRC Action's lists of "problem" or "at-risk" sales was worth the risk that the sale would be used by the ONRC Action plaintiffs as an example in an emergency motion to enjoin all sales in the area of the NFP. PPFUF ¶ 126.

- By letter dated December 4, 1998 from Edward Boling to Sue Zike and Alan Wood of the Bureau of Land Management ("BLM"), the Department of Justice notified the FS and the BLM that they were free to award any of the "at-risk sales" or "problem sales" which had been the subject of settlement discussions in the ONRC Action litigation. However, agency personnel and agency counsel were expected to do a risk assessment of each proposal for award

---

awarded to the plaintiffs. In fact, the undisputed facts in this case demonstrate that in ultimately settling ONRC Action, the government agreed to pay the ONRC Action plaintiffs' attorneys' fees in accordance with the Equal Access to Justice Act. PPFUF ¶ 147.

before actually making the award, including the award of Happy Thin, Jack Heli and Too Wild. PPFUF ¶ 127.

- In a memorandum dated November 9, 1998 from Susan Zike to Bob Williams, Regional Forester for Region 6 of the FS, and BLM State Director Elaine Zielinski, Ms. Zike analyzed the pros and cons of awarding contracts for sales that the ONRC Action plaintiffs named as examples of sales violating the NFP requirements. One of the "pro" considerations Ms. Zike identified in favor of awarding such contracts was that doing so "puts purchasers squarely at the table." By this Ms. Zike meant the agencies would have better litigation arguments and better defense arguments if the purchasers talk about harm and what happens to their companies and their employees in the event of an injunction. At the same time, Ms. Zike observed that one of the "cons" would be that contract awards may create liability to the government if it lost the ONRC Action case. PPFUF ¶ 129.

- Under cover of a memorandum dated January 22, 1999, Paul Brouha, Associate Deputy Chief of the FS, sent a memorandum including background and analysis of the ONRC Action litigation to Anne Kennedy, Deputy Under Secretary for Natural Resources and the Environment for the Department of Agriculture; Barbara Weber, FS Washington Office; and Al Ferlo, counselor to the Chief of the FS. This memorandum was also hand-delivered to the acting chair of the President's Council on Environmental Quality, George Frampton. Several FS employees in Regions 5 and 6 were involved in the preparation of this memorandum. Significantly, the memorandum stated: "The agencies would argue vigorously against surveying

sales that have been awarded. The [FS] has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species." PPFUF ¶ 130.

- In an email exchange between Susan Zike and Brian Stone, at that time the Region 5 Litigation Coordinator for the ONRC Action lawsuit, dated January 22, 1999, Mr. Stone informed FS contracting officers and others on his Distribution List, including Ed Matthews, contracting officer for Happy Thin and Jack Heli, that "the question needs to be answered for each sale that would go forward: why do we need to go forward with this particular sale NOW, instead of waiting for the conclusion of the ONRC litigation??" PPFUF ¶ 134.

- Prior to the award of Jack Heli to Timber Products and Happy Thin to Blue Lake, Contracting Officer Ed Matthews believed that recent administrative proceedings of the Interior Board of Land Appeals had resulted in a stay preventing the BLM from awarding or operating any BLM sales that involved the red tree vole in Oregon. According to Mr. Matthews, "The board does not feel the interim survey direction is consistent with the NWFP." Mr. Matthews noted "there was a lot of discussion about the red tree vole including the fact that there are scientists that feel that we should be surveying for California red tree voles." PPFUF ¶ 135. Nevertheless, Mr. Matthews proceeded with the award of Happy Thin which he viewed as a potential test in California for other timber sales that might be challenged on the Red Tree Vole Directive. PPFUF ¶ 153.

- In an email dated May 19, 1999, Susan Zike informed her Distribution List that certain timber sale contracts had been awarded recently based on an agreement between the Department of Justice and the ONRC Action attorneys that the awards would not be challenged because there would be no operations on these sales until later in 1999. Those sales included the Jack Heli and Too Wild timber sales. However, neither Timber Products nor CLR were informed at or before the award of their contracts that their sales were targeted as "problem" sales in the <u>ONRC Action</u> litigation or that immediately after award they would likely have been challenged with a motion for injunctive relief, but for the secret agreement between the ONRC Action lawyers and the Department of Justice attorneys. PPFUF ¶ 139.

- Leading up to the award of Jack Heli, Too Wild and Happy Thin, Timber Products, CLR and Blue Lake were not informed by the FS or the Department of Justice that their sales were specifically targeted by the <u>ONRC Action</u> plaintiffs and that the award of these contracts had been delayed pursuant to secret written and oral communications between the Department of Justice and the <u>ONRC Action</u> plaintiffs. PPFUF ¶¶ 140-43.

- By letter dated March 25, 1999, Ed Matthews notified Michael Axline, lead counsel for the <u>ONRC Action</u> plaintiffs, that the FS intended to award Happy Thin no sooner than May 9, 1999. Blue Lake was not informed of this letter. PPFUF ¶ 160.

- At the bid opening for Happy Thin but prior to the opening of bids, Contracting Officer Ed Matthews announced to all bidders, including Blue Lake, that Happy Thin had been a

part of some lawsuit but that Happy Thin was no longer included in the lawsuit. PPFUF ¶ 157. Notwithstanding Mr. Matthews' announcement, the FS and the Department of Justice knew that the Happy Thin sale was still a target of the ONRC Action plaintiffs. PPFUF ¶ 161.

- In an email on or about June 7, 1999, Susan Zike suggested to her FS contacts "the quiet award" of Happy Thin. Ms. Zike noted in her email making the suggestion that "DOJ is likely to request that we wait until we have our ONRC Action hearing with Judge Dwyer, but there is no date set yet." Ms. Zike noted that Happy Thin was the "lesser of two evils between Happy Thin and Lower Hayfork [timber sale]." PPFUF ¶ 162.

- By letter dated June 23, 1999 and signed by Robert Devlin for Nancy Graybeal, Acting Regional Forester for Region 6 of the FS, Edward Boling was given notice that the FS had assessed the litigation risk in connection with awarding Happy Thin, including a review by Owen Schmidt, Office of General Counsel of the Department of Agriculture, and that the FS intended to award Happy Thin after July 1, 1999. The letter further noted that Happy Thin was on a list of sales "identified by plaintiffs [in the ONRC Action litigation] on April 5 as sales they had concerns with." Neither this letter nor the contents of this letter were disclosed to representatives of Blue Lake. PPFUF ¶ 163.

- When she learned of it, Susan Zike was surprised and unhappy that Edward Boling intended to inform ONRC Action counsel of the FS's plans to award Happy Thin and other timber sale contracts after July 1, 1999. PPFUF ¶ 164.

- After Timber Products was declared the high bidder on Jack Heli, FS representatives informed Bill Turner of Timber Products that the FS could not award Jack Heli to Timber Products "until the Justice Department says we can." PPFUF ¶ 177.

- By letter dated January 10, 1999, Bill Turner, Timber Procurement Manager for Timber Products, asked Ed Matthews, the contracting officer for Jack Heli, what were the FS's expectations for award of that contract and whether it would be possible for the FS to allow harvesting of that sale in the 1999 logging season. PPFUF ¶ 181.

- In a letter dated January 21, 1999 in response to Bill Turner's January 10, 1999 letter, Ed Matthews told Timber Products, "The Forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that the government attorneys have filed for dismissal of the case . . . I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February." PPFUF ¶ 184.

- On March 1, 1999, Edward Boling wrote Michael Axline, lead counsel for ONRC Action, to provide him with additional information regarding "certain timber sales that may be of concern to your client." Specifically, the letter stated that the FS and BLM planned to award five timber sale contracts after March 1, 1999. Jack Heli was one of the sales listed. Timber Products was not informed of Mr. Boling's notice to Mr. Axline. PPFUF ¶ 187.

- The next day, the FS awarded Jack Heli to Timber Products by letter dated March 2, 1999. The letter made no mention of the status of this timber sale in relation to ONRC Action or to Edward Boling's March 1, 1999 letter to Michael Axline. The letter did not inform Timber Products that the lawsuit had not been dismissed with respect to Jack Heli. PPFUF ¶ 188.

- The FS's internal report about the Jack Heli timber sale contract award, Form FS-2400-17, noted that the contract award was "made upon approval of [the] Department of Justice." PPFUF ¶ 188A.

- During the first six months of 1999, the Department of Justice and the ONRC Action plaintiffs reached an agreement that the FS would award certain timber sale contracts on ONRC Action's "problem list" without immediately triggering a motion for injunctive relief. Jack Heli was one of the contracts awarded as a result of this agreement. This agreement, however, did not preclude ONRC Action from challenging any actual operations on Jack Heli after it was awarded. The Department of Justice, the ONRC Action plaintiffs and the FS did not disclose the existence of this agreement to Timber Products and Timber Products was not aware of this agreement until after the filing of this lawsuit. PPFUF ¶ 189-90.

- The FS was aware that if operations were approved on Jack Heli which was awarded in March of 1999, it was likely to trigger a motion for injunctive relief from the ONRC Action plaintiffs. PPFUF ¶ 191. This information was not provided to Timber Products. PPFUF ¶ 192.

- After the oral auction of the Too Wild timber sale to CLR on September 17, 1998, Contracting Officer Tom Link told CLR representatives that the contract would not be immediately awarded, but would be awarded soon and that the government had only a few things to do before being able to approve the award. PPFUF ¶ 205. Accordingly, CLR did not believe that the FS would award Too Wild to CLR if the FS thought that it was likely that there would be a meritorious motion for injunctive relief against the sale after award. PPFUF ¶ 206.

- Prior to award, CLR was not told by the FS that the Too Wild sale, although not mentioned in the ONRC Action complaint, was on a list of "at-risk" or "problem" sales which were specifically targeted by ONRC Action. PPFUF ¶¶ 139, 142, 143, 202-04.

- At his deposition and in his declaration, Robert Devlin testified that the plaintiffs' timber sale contracts were awarded because the FS was regularly directed by Congress to award a certain volume of timber sales each fiscal year and these target volumes were allocated to various line officers including the contracting officers of plaintiffs' sales. PPFUF ¶10; Def. App. 109 (R. Devlin Decl. ¶ 4).[25] The federal fiscal year ends September 30 each year. Even assuming that the volume of timber on plaintiffs' sales represented a significant portion of the

[25]Defendant erroneously contends that the FS "must meet congressionally-mandated timber-harvest levels." Def. Opp. at 8, 31, citing DPFUF ¶ 38. The "timber targets" have to do with the volume of timber offered for sale in a given year. See Def. App. 109 (Devlin Decl. ¶ 3). While there is an expectation that timber offered for sale will eventually be harvested, the simple awarding of a timber sale contract puts a volume of timber under contract but does not mean that the timber will be harvested during the fiscal year in which the contract is awarded, especially since most contracts have multi-year terms. E.g., Pl. App. Tabs 93 at A-611, 111 at A-791, 124 at A-997.

target volume for the FS for fiscal year 1999, there was no reason for the FS to award plaintiffs' timber sale contracts prior to the August 2, 1999 ONRC Action decision. Although the government could not predict with certainty when the ONRC Action court would decide the pending cross-motions for summary judgment, the FS contracting officers could have postponed the award of plaintiffs' contracts until September 30, 1999 and still gotten timber target "credit" for those sales by awarding them before the end of the fiscal year.

The foregoing uncontroverted facts entitle plaintiffs to summary judgment on liability because prior to award, the FS knew, or should have known, that the specifications it had drafted were suspect because it had not performed required Category 2 surveys.

### 3. Defendant Has Not Controverted The Basic Facts Which Establish That The FS's Interpretation "NEPA Decision Equals Implementation" And Its Red Tree Vole Directive Were Arbitrary, Capricious And Unreasonable And That The FS Should Have Performed The Required Surveys Before Awarding Plaintiffs' Contracts And Ground-Disturbing Activities Were Authorized

Defendant argues that awarding plaintiffs' contracts based upon the interpretation "NEPA decision equals implementation" was reasonable because the administrative decision in In re North Murphy Timber Sale, 146 IBLA 305, 1998 WL 951006 (Nov. 20, 1998), provided "independent validation of the Forest Service's interpretation of the NFP" (Def. Opp. at 24), and that the process followed by the NFP IRT in developing the interpretation "NEPA decision equals implementation" allegedly demonstrates that this interpretation was also reasonable. Def. Opp. at 22-25. These two arguments neither establish that the FS's interpretation was reasonable; nor do they demonstrate the existence of any genuine issue of material fact.

As explained in plaintiffs' opening brief, the IBLA's North Murphy decision constituted nothing more than an interim administrative decision immediately reviewable under the Administrative Procedure Act in the district court. In fact, the reviewing court for North Murphy was the same court before which the ONRC Action lawsuit was pending at the time the North Murphy administrative decision was issued because the BLM's North Murphy timber sale was one of the nine sales specifically challenged in the ONRC Action case.

Although not addressed by defendant, in ONRC Action, based on the uncontroverted evidence[26] and the intent and plain language of the NFP ROD and its survey requirements, the district court concluded that the "NEPA decision equals implementation" interpretation was in direct conflict with the basic purpose of the Category 2 surveys and that the adoption of this interpretation was arbitrary, capricious and contrary to law. PPFUF ¶ 210.[27] As outlined in plaintiffs' initial brief, the legal reasoning and findings of the court in ONRC Action are sound, and, coupled with the express language of the NFP ROD, are sufficient to demonstrate that the FS should not have put the subject contracts out for bid or awarded them without first having conducted the requisite surveys. Pl. Br. at 43-51.

---

[26]In ONRC Action, the government and the plaintiffs stipulated that there were no genuine issues of material fact precluding summary judgment for either party on the question of whether the interpretation "NEPA decision equals implementation" and the Red Tree Vole Directive were arbitrary, capricious or contrary to law. 59 F. Supp. 2d at 1088. That the government now attempts to argue that there are genuine issues of material fact on the question of the reasonableness of this same interpretation of the ROD which precludes summary judgment is, at a minimum, strikingly inconsistent.

[27]Plaintiffs have attached as an appendix hereto additional proposed findings of uncontroverted fact relating to the district court's findings in ONRC Action.

More specifically, in ONRC Action, the court found that the NFP ROD was not ambiguous and clearly required surveys prior to ground-disturbing activities. PPFUF ¶ 214. This was true based on the language in the standards and guidelines which states "surveys . . . must precede the design of all ground-disturbing activities that will be implemented in 1997 or later" and the language in the ROD itself which states simply that "surveys [must be] conducted prior to ground-disturbing activities." 59 F. Supp. 2d at 1092. As the district court noted, the intended meaning in either instance is the same; namely, Category 2 surveys, which are titled in the NFP as "Survey prior to ground-disturbing activities," had to be performed on all sales on which ground-disturbing activities were anticipated after October 1, 1996 and October 1, 1998. The ONRC Action court reasoned:

> There is no mention of NEPA decisions [in the NFP statement of Category 2 survey requirements]. Environmental impact statements often precede ground-breaking activities by a number of years. To equate the NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements. It would also create an incentive to rush NEPA decisions to avoid conducting surveys. Of the nine timber sales being challenged here, four received a final NEPA decision in September 1998, the last month before the survey requirements were to apply under the defendant's memoranda.

59 F. Supp. 2d at 1093 (footnote omitted); PPFUF ¶ 211.[28]

As to the IBLA's observation that the only way that four fiscal years would be available for development of protocols for the surveys would be if "implemented" were interpreted to mean "designed" or "authorized," (146 IBLA at 332; Def. Opp. at 24), the district court ruled

[28] Robert Devlin, the Director of Timber Management for Region 6 of the FS, has not denied giving direction to FS personnel to sign decision notices signifying completion of the required environmental analysis for FS timber sales prior to the survey target dates in order to be able to offer and award such sales without Category 2 surveys. PPFUF ¶ 80; see supra at 40.

that the language in the ROD plainly stated that the [NFP] was designed to give the agencies "a maximum of four full fiscal years (FYs 1995, 1996, 1997 and 1998) in which to develop and apply survey protocols for these species." "But," the court emphasized, "that 'maximum' is a ceiling, not a floor, and is consistent with the specific, phase-in requirements stating that surveys must be conducted prior to ground-disturbing activities being implemented after fiscal years 1996 and 1998." 59 F. Supp. 2d at 1093 (emphasis added); PPFUF ¶ 212.

The ONRC Action court further stated:

> Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends. The surveys were designed to identify and locate species; if this is not done before logging starts, plants and animals listed in the ROD would face a potentially fatal loss of protection.

Id.; PPFUF ¶ 213. The district court concluded:

> The ROD's category two survey requirements are clear, plain, and unmistakable. For the salamanders and red tree voles, surveys must be completed prior to the design of ground-breaking activities to be implemented on or after October 1, 1996. For other category two species, surveys must precede the ground-disturbing activities implemented on or after October 1, 1998. . . . Agency actions exempting timber sales from the plan's category two survey requirements by equating 'implemented' with 'NEPA decision' are unlawful and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

Id. at 1094 (footnote omitted); PPFUF ¶ 214.

ONRC Action was filed on July 6, 1998, more than four months before the IBLA's North Murphy administrative decision issued on November 20, 1998. By November 1998, the FS was well-aware of the issues raised in the ONRC Action lawsuit and that the legal validity of its interpretation "NEPA decision equals implementation" and its Red Tree Vole Directive would be

decided both for the North Murphy sale and for all other FS and BLM NFP timber sales by the United States District Court, not by the IBLA. Relying on the administrative decision in North Murphy in this context to award contracts subject to the anticipated ONRC Action decision did not reduce the risk that the district court would likely disagree with the FS's suspect interpretation and would question the FS's decision to proceed with contract award without having first performed Category 2 surveys.

In addition, as ONRC Action holds, there is no ambiguity in the NFP with regard to the requirement to conduct Category 2 surveys prior to any ground-disturbing activities anticipated to take place after October 1, 1996 and October 1, 1999. In order to meet this requirement and conduct Category 2 surveys prior to the issuance of decision notices, all the FS had to do was not sign decision notices for contracts scheduled to be awarded after these trigger dates until the surveys for them were done. The FS's decision not to do this but rather to sign decision notices so that the contracts could be awarded without surveys is the basis for the ONRC Action court holding that the FS's "NEPA decision equals implementation" interpretation was arbitrary, capricious and contrary to law. The interim IBLA decision totally missed this critical point and was obviously wrong.

Also, by the end of November 1998, the FS knew that the Deputy Assistant Attorney General for Environment and Natural Resources, her immediate subordinate and the chief trial lawyer for the government in ONRC Action all had serious doubts about the legal defensibility of the interpretation "NEPA decision equals implementation." PPFUF ¶¶ 84, 85, 87. Awarding

plaintiffs' timber sale contracts in the face of these warnings without the required surveys was highly imprudent.

Defendant describes in detail the process used by the IRT to develop the interpretation "NEPA decision equals implementation" in an apparent effort to demonstrate the reasonableness of the interpretation and raise genuine issues of material fact. Def. Opp. at 2-4 and 22-25. However, this narrative does not provide any further support for the FS's contention that this interpretation was reasonable. It is clear from plaintiffs' proposed findings that as IRT members worked through the different interpretations which they believed might be possible, at a minimum, there were serious concerns regarding selecting an interpretation that would exempt timber sales from surveys for which ground-disturbing activities were anticipated after the survey trigger dates. PPFUF ¶¶ 43, 45-51, 53-54, 58, 60.

It is also noteworthy that defendant's own proposed findings demonstrate that rather than following the plain language and intent of the ROD standards and guidelines, IRT members focused on how they thought the balance between timber production and protecting the environment could be best achieved. While such policy considerations were entirely appropriate in preparing the NFP ROD and in designing the Category 2 survey requirements, it was not the prerogative of the IRT to rethink policy decisions already made in the NFP ROD. If a change in the direction of the ROD was deemed desirable, then the proper course was to amend the ROD to that effect. In fact, the FS advocated doing just this in the spring and summer of 1998 for the purpose of delaying for one year surveys for certain Category 2 species. PPFUF ¶ 69. But the

government chose not to follow this appropriate approach when it adopted the interpretation "NEPA decision equals implementation." Notwithstanding all of its presumed good intentions, the IRT should have addressed, as the United States District Court in ONRC Action did, the plain language of the ROD in light of the clear purpose of "surveys prior to ground-disturbing activities" and not reconsidered and revised the survey requirements without an amendment of the ROD as required by NEPA and NFMA.

**4. There Are No Genuine Issues Of Material Fact Precluding A Finding By This Court That The FS's Red Tree Vole Directive Was In Direct Conflict With The Plain Language Of The NFP ROD And That The FS's Proceeding On The Basis Of It Wrongfully Caused The Suspension Of Performance On Plaintiffs' Contracts**

Defendant argues that "[w]hether the evidence shows that the FS approached the red tree vole issue reasonably and in good faith, based upon scientific information, is a disputed question of fact that is not properly determined upon summary judgment." Def. Opp. at 25. Following this assertion are several pages of narrative summarizing first the process leading up to the decision made in the NFP to include the red tree vole in the Category 2 surveys and second the efforts of the Survey and Manage Workgroup in developing the Red Tree Vole Directive after the NFP had issued. Def. Opp. at 25-29. This argument misses the point.

The issue in this case concerning the Red Tree Vole Directive, as it was in ONRC Action, however, is not the reasonableness of the policy considerations or the assessment of biological evidence which formed the basis for the Red Tree Vole Directive issued on November 4, 1996 or whether the Red Tree Vole Directive was adopted in good faith but rather whether the Red Tree

Vole Directive departed from the explicit direction contained in the NFP ROD. If the science behind the NFP red tree vole survey requirements had changed after the NFP was adopted, the appropriate course of action would have been to amend the NFP to reflect that change, not ignore the plain requirements for red tree vole surveys in the NFP.

The analysis of the Red Tree Vole Directive by the ONRC Action court focuses directly on the pertinent language in the NFP ROD and the language in the Red Tree Vole Directive. 59 F. Supp. 2d at 1094-95. As the court in ONRC Action observed, the Red Tree Vole Directive "eliminates the requirement that surveys be conducted in a number of areas." 59 F. Supp. 2d at 1094. The net result of the Red Tree Vole Directive was "to exempt about 90% of the red tree voles' habitat, including all of its California habitat, from the survey requirements." Id.; PPFUF ¶ 215. In ONRC Action, as in this case, the government defended its decision in the Red Tree Vole Directive to exempt a substantial portion of red tree vole habitat from the Category 2 surveys on the grounds that scientific studies showed:

> [W]here habitat is abundant management of particular red tree vole sites is not necessary, and where populations already are isolated, with no potential for the creation of connective corridors, trying to protect the voles would be futile. Stating that site-specific surveys were adding little to scientific knowledge, and that the risk to species viability from foregoing surveys would be small, the [Red Tree Vole Directive] concludes that "field surveys are not needed" in widespread areas.

59 F. Supp. 2d at 1094; PPFUF ¶ 216. But, as the ONRC Action court pointedly observed, "There has been no attempt to amend the ROD to reflect this change." Id.

Citing the NFP ROD at C-5, the ONRC Action court found: "The [NFP] contemplates that for most species surveys would begin at the watershed level 'with identification of likely species locations based on habitat.' Then, 'those likely locations would . . . be thoroughly searched prior to implementation of activities.'" 59 F. Supp. 2d at 1095 (emphasis and ellipsis in original). There is no language in the ROD that any effort less than a thorough search of these locations is required, and defendant has identified no such language.

The ONRC Action court further found that the plain language of the ROD was very clear: "As to the red tree vole in particular, the [NFP] requires that surveys be conducted within the species' 'known or suspected ranges and within the habitat types or vegetation communities associated with' it." Id. (emphasis in original); PPFUF ¶ 218. Once again, there is no language to the contrary, and defendant has pointed to none.

The ONRC Action court then concluded that the Red Tree Vole Directive did "exactly the opposite" of what the ROD required. Id. "[The Red Tree Vole Directive] determines where red tree voles are most likely to be found, identifying its 'known or suspected ranges,' 'habitat types,' and 'vegetation communities,' and 'then exempts those areas from the survey requirements.'" Id.; PPFUF ¶ 217. Following up on its finding that there had been no attempt to amend the NFP (in accordance with NEPA and NFMA), the court held that "[t]he [NFP's] requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that 'field surveys are not needed.'" Id.

The record demonstrates that the NFP ROD could be amended with or without additional substantial environmental analysis. For example, when it was determined that the Canada lynx was mistakenly included in the Category 2 species, the Regional Interagency Executive Committee ("RIEC") simply moved it to a different category under the provision of the NFP which allowed such modifications. PPFUF ¶ 16. No additional environmental analysis was required in this instance. However, in the spring of 1998 the FS and the BLM approached the RIEC with a request to consider a one-year delay of survey implementation for several Category 2 surveys. These surveys were believed to be not-technically-feasible or protocols had not yet been developed. This request for modification was accepted by the RIEC, but because it involved a departure from clear direction in the ROD, an environmental assessment was required to analyze, among other things, whether this one-year delay in surveying imposed substantial risks to the species.

In the case of the Red Tree Vole Directive, if scientific opinion had changed and thereby justified change in the ROD, the appropriate approach was not simply to issue a directive contrary to the ROD language but to amend the ROD with whatever environmental analysis would be required under NEPA and NFMA. That is the process which the RIEC followed at the recommendation of the FS and the BLM in amending the ROD to allow for a one-year delay in certain Category 2 surveys, not including the red tree vole. PPFUF ¶ 69.[29] The absence of this

[29]The language of the ROD concerning the red tree vole, and the clear direction as to surveys to be performed prior to ground-disturbing activities, had been in place since the NFP ROD issued in April of 1994. If available scientific evidence appeared to justify surveys for red tree voles throughout their habitat or if it was necessary to postpone the commencement of all Category 2 surveys until after ground-disturbing activities had commenced and thereby exempt

process is what led the court in ONRC Action to find that the Red Tree Vole Directive was arbitrary, capricious and contrary to law. 59 F. Supp. 2d at 1094.

The Red Tree Vole Directive, however arguably well supported by scientific evidence, departs from the clear direction in the ROD and is an unreasonable interpretation in the absence of a formal amendment of the ROD. The Survey and Manage Workgroup may have had the best of scientific and policy intentions in developing the Red Tree Vole Directive, but it simply did not follow the explicit language in the ROD and therefore adoption of this directive was arbitrary, capricious, contrary to law, and therefore unreasonable.

### F. The Fact That The FS's Suspension Of Performance On Plaintiffs' Contracts Was Caused By Its Pre-Award Actions And Inactions Does Not Absolve The FS Of Liability

Defendant argues that the FS cannot be liable to plaintiff for any actions taken or not taken by it prior to award. See Def. Opp. at 14-15. This is fallacious. Not only is this view inconsistent with Spearin, J.A. Jones, Helene Curtis and a host of related cases, it is also refuted by the Federal Circuit's decision in Scott Timber. In the section of Scott Timber dealing with the reasonableness of the length of the suspension, the court stated that a finding of unreasonableness could be supported by the pre-award actions or inactions of the FS. That is, the court pointed out that prior to award the FS knew that the marbled murrelet would soon be

---

timber sales from the surveys, an amendment of the ROD should and could have been prepared with adequate NEPA and NFMA analysis as soon as possible after April of 1994. This would have allowed several years within which to complete this process before the trigger dates for Category 2 surveys. There is no evidence to indicate that the FS ever requested any such action until the spring of 1998 when it asked the RIEC to authorize an amendment which would defer surveys for certain Category 2 species for one year. PPFUF ¶ 69.

listed as a threatened species and that the prospective timber sale areas encompassed murrelet habitat but the FS failed to commence any surveys (something that might have greatly reduced the length of the post-award suspension to conduct those surveys.) Scott Timber, 333 F.3d at 1369.

Simply put, the Federal Circuit made clear in Scott Timber that FS pre-award conduct can demonstrate that a lengthy suspension of performance might have been minimized or avoided altogether and thus whether there had been a breach contracts. Defendant does not even acknowledge, much less discuss, this explicit analysis in Scott Timber. Instead, defendant contends simply and simplistically that there is no pre-award covenant of good faith and fair dealing and therefore that the FS's pre-award conduct could not possibly form the basis for a breach of plaintiffs' contracts. Def. Opp. at 15.[30] Scott Timber establishes that defendant's contention is wrong.[31]

Judges of this Court have had occasion to apply the teachings of Scott Timber in other timber sale suspension cases since the Federal Circuit issued its decision in 2003. In these cases, the judges uniformly have recognized that FS pre-award conduct can be used to establish that a

[30]Defendant cites case law in which the government's conduct during contract administration was found not to rise to the level of improper coercion or duress for the proposition that "the assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing." Def. Opp. at 15, citing David Nassif Assocs. v. United States, 644 F.2d 4, 12 (Ct. Cl. 1981). As discussed in plaintiffs' opening brief, plaintiffs' opposition brief, and in the preceding sections of this reply brief, clause C(T)6.01 cannot be interpreted to limit the FS's liability where the FS's unreasonable conduct caused the suspensions of plaintiffs' contracts. David Nassif is inapposite.

[31]Order denying defendant's first motion in limine at 2, Scott Timber Co. v. United States, No. 05-708 (Fed. Cl. June 19, 2008).

post-award suspension constituted a breach, notwithstanding the inclusion of clause C(T)6.01 in the contract. E.g., Trinity River, 66 Fed. Cl. at 112 (notwithstanding the inclusion of clause C6.01 in the contract, if the FS had knowledge that its pre-award environmental documentation "was inadequate before it was issued, it would be unreasonable to award a timber sale contract in light of the risk that environmental groups would challenge" the sale based on that documentation); H.N. Wood, 59 Fed. Cl. at 490-91 (FS could be liable for unreasonably suspending contract which includes clause CT6.01 if FS "knew or should have known that its [pre-award environmental documentation] was inadequate when it awarded the Contract").[32]

Defendant's contention that the FS cannot be held liable for the suspension of performance on plaintiffs' contracts based on the FS's pre-award conduct is wrong as a matter of law.

### G. The Contracts Were Not Void Ab Initio

At pages 12-14 of it response brief, defendant asserts that if plaintiffs are correct that the FS failed to follow the law when preparing these sales for bid and authorizing ground-disturbing activities to proceed after awarding them, then the contracts were void ab initio because no government official can enter into a contract that conflicts with statute or regulation. Defendant's argument is a red herring. The legality of plaintiffs' contracts is not at issue.

[32]Although decisions of other judges of the Court of Federal Claims and of the Board of Contract Appeals are not binding on this Court, the cited decisions contain persuasive analysis regarding the proper interpretation of contract clause C(T)6.01 in light of the ruling of the Federal Circuit in Scott Timber. This Court should reach the same conclusion as the other judges who have considered the issue of the proper interpretation of clause C(T)6.01 as limited by the implied duties to cooperate and not to hinder.

The FS did not violate any statute or regulation by making contract awards to plaintiffs before conducting the required Category 2 surveys. While proceeding in this manner exposed the FS to substantial liability for breach of contract should the FS be required to suspend performance on the sale after award in order to conduct the Category 2 surveys required by the NFP, making such an award in and of itself violated no statute or regulation. Indeed, nothing in the NFP or in the ROD prohibited the FS from conducting Category 2 surveys after the signing of the NEPA decision document or even after contract award as long as the surveys were conducted before the onset of ground-disturbing activities. Defendant does not contend otherwise.[33]

Moreover, assuming that the legality of plaintiffs' contracts was at issue here, the seminal cases on this subject hold that where a contract is awarded in contravention of the letter of the law but in good faith, the contract is not void ab initio unless the court finds "palpable illegality." Trilon Education Corp. v. United States, 578 F.2d 1356 (Ct. Cl. 1979) restating the rule laid down in John Reiner and Co. v. United States, 325 F.2d 438 (Ct. Cl. 1963). As the cases hold, palpable illegality exists where there is a departure from applicable statues and regulations which affects the propriety of the contract or the award thereof and that departure was both substantial and obvious to the bidder. Trilon, 578 F.2d at 1360.

---

[33]Defendant argues that if plaintiffs are correct that there was no open legal question about the requirement that the FS conduct Category 2 surveys before allowing plaintiffs to engage in ground-disturbing activities, plaintiffs have called into question the authority of the FS to enter into the contracts. Def. Opp. at 13. Plaintiffs have not challenged the authority of the FS to enter into the contracts and there is nothing in the pleadings to support defendant's contention.

None of these elements is present here. That is, the departure from applicable statute or regulation that occurred here did not directly affect the legality of the contract or result in the contract award being in contravention of statutory and regulatory requirements for competitive bidding and, even if that were not the case, the departure from the law was not obvious to the plaintiffs when they bid the contracts.

In the latter regard, defendant has not asserted that the departure from the law in this case was obvious. Indeed, just as the Court of Claims opined in Trilon regarding procurement laws, the fact is that contracting officers (both with regard to timber sales and most other government contracts) when attempting to ensure that contracts comport with environmental laws "must [also] work their way through a maze of statutes and regulations which bidders know little about." Id. As such, whether any particular act or omission of the agency conducted in the bowels of the timber sale planning process constitutes a departure from law is highly unlikely to be obvious to a bidder on a FS timber sale contract.[34]

By definition, no ground-disturbing activities had occurred on any of the sales at the time of contract award. Thus, the simple act of awarding the contracts to plaintiffs, while fraught with risk to the FS because contract performance might have to be halted in those circumstances, did

[34]When a departure from law will be found obvious to a bidder is exemplified in American Telephone & Telegraph v. United States, 177 F.3d 1368 (Fed. Cir. 1999 (en banc),where a contract for supplying sonar equipment was quite clearly let in contravention of a congressional prohibition against awarding such contracts on a fixed price basis.

not violate the NFP or any statutory or regulatory authority because of the FS's failure to conduct the Category 2 surveys before ground-disturbing activities could take place.

While in this case the FS did suspend performance on the sales after contract award in order to conduct the required surveys, it lifted the suspensions after the surveys were completed, and the Happy Thin and Jack Heli contracts were fully performed. PPFUF ¶¶ 166, 169, 170, 193, 194, 207, 208. Such being the case, it is well-established that they cannot simply be declared void ab initio: "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void ab initio." American Telephone & Telegraph, 177 F.3d at 1376. Therefore, even assuming that the contracts violated the law because of the FS's failure to conduct Category 2 surveys before award and that violation should have been obvious to all bidders, the contracts cannot be declared void ab initio.

### H. Timber Products' Alternative Claim For Compensation Under Contract Clause C6.01 Is Properly Before This Court And Timber Products Is Entitled To Partial Summary Judgment On The Issue Of The FS's Liability To It For Additional Operating Costs Incurred As A Direct Result Of The FS's Suspension Of The Jack Heli Timber Sale

Defendant argues that Timber Products' alternative claim under clause C6.01 of the Jack Heli timber sale contract raises issues of damages not properly before the Court at this time. Def. Opp. at 49. However, as stated in plaintiffs' opening brief, Timber Products seeks only a ruling from the Court that the FS is liable to Timber Products under clause C6.01 for its

increased operating costs, including its increased logging and hauling costs. Pl. Br. at 77-81. Timber Products does not seek summary judgment from the Court as to any quantum of damages with respect to its alternative clause C6.01 claim.

It appears that defendant does not contest the government's liability for such costs, if properly documented by Timber Products during the damages phase of this case:

> [T]he Forest Service does not dispute that Timber Products may be entitled to out-of-pocket expenses pursuant to C6.01, so long as those expenses are properly documented. Timber Products' supplemental claims for out-of-pocket expenses pursuant to C6.01 are currently pending before the contracting officer.

Def. Opp. at 49.

Even assuming that Timber Products' alternative C6.01 claims are not subsumed within Timber Products' initial breach claim because they arise from the same operative facts, see Scott Timber, 333 F.3d at 1365-66, Timber Products' alternative C6.01 claim has been "pending" before the contracting officer since Timber Products submitted its supplemental claims on August 24, 2005 (Pl. App. Tab 164) and on June 13, 2007 (Pl. App. Tab 165), but the FS has not responded to these claims, and now defendant tepidly admits in its opposition brief only that Timber Products "may be entitled to out-of-pocket expenses pursuant to C6.01." Def. Opp. at 49. Accordingly, plaintiffs seek a definitive ruling from the Court stating that, in the alternative to recovery under a breach theory, Timber Products is entitled to compensation under clause C6.01 for its additional timber sale operating expenses, including the amount of the additional logging and hauling expenses it incurred as a direct result of the FS's suspensions. This is an issue of liability presently before the Court. Given defendant's somewhat tentative admission of

liability to Timber Products under clause C6.01 and its statement that somehow, despite the pendency of the instant action before this Court for approximately seven years, Timber Products' alternative requests for compensation under clause C6.01 "are currently pending before the contracting officer," this liability question provides a reasonable basis for Timber Products' request that the Court grant it partial summary judgment on its entitlement to compensation under clause C6.01 if for some reason it cannot recover under a breach of contract theory.[35]

## II. The Court Should Deny Defendant's Motion For Summary Judgment

For the reasons set forth in plaintiffs' opposition to defendant's motion for summary judgment and as amplified by plaintiffs' arguments in support of its own motion for partial summary judgment, Scott Timber precludes the Court from granting defendant's motion for summary judgment. In arguing that contract clause C(T)6.01 read in isolation limits the government's liability for its suspensions of plaintiffs' contracts, defendant ignores the FS's implied duties to cooperate and not to hinder that limit whatever suspension authority the FS possesses in contract clause C(T)6.01 and any limitation of liability it provides. Defendant also ignores the ultimate holding of the Federal Circuit in Scott Timber that despite the inclusion of

[35]Defendant relies upon the decision on damages in Precision Pine & Timber, Inc. v. United States, 81 Fed. Cl. 235, 289 (2007), for the overbroad proposition that "a claim for out-of-pocket expenses provided by C6.01 precludes further recovery." Def. Opp. at 50. The ruling on damages regarding clause C(T)6.01 referenced in Precision Pine does not mean that Timber Products cannot seek, in the alternative, damages under clause C6.01 if damages under a theory of breach of contract are not available. It is true, of course, that a plaintiff cannot recover the same element of damages twice; therefore, the recovery of damages under clause C(T)6.01 is not permissible to the degree that this would result in double recovery. The referenced Precision Pine ruling is merely that "plaintiff may not recover under both CT 6.01 and its common law breach of contracts claim," 81 Fed. Cl. at 289, not that once a purchaser makes a claim, in the alternative, for C(T)6.01 damages, it is then precluded under an election of remedies theory from seeking partial summary judgment on liability under a breach of contract theory.

clause C6.01 in some of the contracts at issue in that case, whether or not the FS's suspensions of the contracts were reasonable was "a triable issue of fact to be adjudicated on remand." 333 F.3d at 1370. The Court should deny defendant's motion for summary judgment.

**CONCLUSION**

For all of the reasons set forth above, in plaintiffs' motion for partial summary judgment and in opposition to defendant's motion for summary judgment, the Court should grant plaintiffs' motion and should deny defendant's motion.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSES/OBJECTIONS TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

**INTRODUCTION**

This reply is organized in the following manner. First, plaintiffs restate each proposed finding in its entirety. Where defendant has expressly agreed with the finding or has cited no contrary evidence and interposes only a legal objection, plaintiffs have shaded the text within the restated proposed finding.[1] Second, plaintiffs have reproduced defendant's response and/or objection to each proposed finding. Third, plaintiffs reply to defendant's factual or legal objections.

Plaintiffs have proposed a substantial number of findings of uncontroverted fact, including multiple findings in support of plaintiffs' legal theories of liability. As the party opposing plaintiffs' motion for partial summary judgment, defendant has the burden to "by affidavits or otherwise . . . set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e). Defendant has failed to meet this burden. Consequently, all of plaintiffs' adequately supported findings are established for deciding plaintiffs' motion for partial summary judgment. RCFC 56(h)(3). Of course, it is not necessary for plaintiffs to establish that all of the proposed findings in support of any particular legal theory are uncontroverted if the Court can determine from the uncontroverted facts that there are no genuine issues of material fact and that plaintiffs are entitled to summary judgment on the issue of liability as a matter of law.

[1]Plaintiffs' decision not to shade all or part of a proposed finding is not an admission that defendant has successfully controverted the proposed finding. Rather, the shading is offered as an aid to the court in identifying those very few places where there is at least an argument over whether the proposed finding is uncontroverted.

**FORMATION OF THE HAPPY THIN, JACK HELI AND TOO WILD FOREST SERVICE TIMBER SALE CONTRACTS**

1. The process by which a timber sale comes into being starts with initial planning and the preparation of a preliminary document, the timber sale project plan, in which the feasibility of proceeding with the project, which may contain one or more sales, is verified. App. Tab 8 (United States Forest Service ("Forest Service") Manual ("FSM") § 2432.1, 2432.11 (amend. 95-3, eff. Apr. 28, 1995)).

Defendant's Response: Defendant objects characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not assert that the Forest Service Manual carries the force of law. Rather, it is an internal agency document that instructs Forest Service personnel on the standards and practices they are to abide by when performing various duties. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

Additionally, Forest Service actions and responsibilities prior to the award of plaintiffs' contracts are relevant to proving that Forest Service conduct caused the Forest Service to breach plaintiffs' contracts by suspending them afterward. Plaintiffs respectfully refer the Court to their briefs where this point is addressed in full. Plaintiffs' Motion for Partial Summary Judgment

(hereinafter "Pls.' Br.") at 42-43; Plaintiffs' Reply in Support of Plaintiffs' Motion for Summary Judgment (hereinafter "Pls.' Reply Br.") at 61-63. **PLEASE NOTE: Plaintiffs incorporate this reply into each of the following replies where defendant has raised this relevance objection.**

2. The timber sale project plan must present appropriate data needed by the responsible Forest Service official to determine whether to proceed with the environmental analysis and project design. App. Tab 8 (FSM § 2432.13 (amend. no. 95-3, eff. Apr. 28, 1995)). Such data is to include current surveys, aerial photos, and inventories plus on-the-ground reviews of the project areas to verify existing data. Id. (FSM § 2432.14 (amend. 95-3, eff. Apr. 28, 1995)).

Defendant's Response: Defendant objects to plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: See reply to proposed finding no. 1.

3. After completion of the timber sale project plan, the Forest Service conducts "an intensive field investigation within and adjacent to the proposed project area." App. Tab 8 (FSM § 2432.2 (amend. 95-3, eff. Apr. 28, 1995)). As part of this step, the Forest Service is to perform its statutory obligations under the National Forest Management Act, 16 U.S.C. § 1600 et seq.

("NFMA"), and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"): complete the appropriate environmental analysis (typically either an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA")), prepare alternative actions (including a no-action alternative), decide which alternative to select and document the decision in a Decision Notice with a Finding of No Significant Impact, or a Record of Decision. App. Tab. 8 (FSM § 2432.22g (amend. 95-3, eff. Apr. 28, 1995)).

Defendant's Response: Defendant objects to plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: See reply to proposed finding no. 1.

4. The FSM makes it clear that it is the Forest Supervisor's duty to ensure that sale planners consider the environmental effects both in the environmental and sale preparation process. App. Tab 8 (FSM § 2432.04b (amend. 95-3, eff. Apr. 28, 1995)).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, not a statement of fact. Additionally, plaintiffs' characterization of the FSM because the document speaks for itself. Defendant denies that the FSM has the force and effect of law or regulation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior

to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: See reply to proposed finding no. 1. Additionally, the proposed finding is not plaintiffs' opinion but rather a statement of fact supported by the FSM.

5. Throughout the 1990s, including all time periods pertinent to the ONRC Action lawsuit filed in July 1998, the Forest Service had a regular practice of completing the environmental analysis and issuing the final NEPA decision document required for a timber sale months or even years before that timber sale would be offered to the public and involve any ground-disturbing activities. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 34:23-35:8; 58:14-61:3; 121:11-122:14).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Devlin testified that completing the environmental analysis for a timber sale in advance of that sale's being offered to the public was "not a common practice as much as it is a given just because of the time of preparing projects." R. Devlin Dep. Tr. 35:7-8. Additionally, this contention contains plaintiff's legal conclusion concerning what constitutes "ground-disturbing" activities, which is not a contention of fact, and was not the subject of Mr. Devlin's testimony. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant objects that the proposed finding refers to the Forest Service's "regular practice" of signing NEPA decisions months or years before a timber sale is offered to the public when Mr. Devlin testified that such actions were a "given." At best, defendant's objection is one of characterization. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding. Defendant also objects that plaintiffs make a legal conclusion by using the term "ground-disturbing activities." In the context of the proposed finding, plaintiffs merely use "ground-disturbing activities" in accordance with the commonly accepted meaning of these words. This usage comports with the definition identified by defendant in response to plaintiffs' proposed finding of fact no. 18 and plaintiffs' reply thereto.

6. The NEPA decision notice for the Happy Thin timber sale was issued on September 15, 1998. App. Tab 142. The Happy Thin timber sale contract no. 060772 ("Happy Thin") was awarded to plaintiff Blue Lake Forest Products, Inc. ("Blue Lake") on July 6, 1999. App. Tabs 122, 124. The NEPA decision notice for the Jack Heli timber sale was issued on July 14, 1998. App. Tab 143. The Jack Heli timber sale contract no. 060715 ("Jack Heli") was awarded to plaintiff Timber Products Company ("Timber Products") on March 2, 1999. App. Tabs 91, 93. The NEPA decision notice for the Too Wild timber sale was issued on June 15, 1998. App. Tab 40. The Too Wild timber sale contract no. 075862 ("Too Wild") was awarded to plaintiff CLR Timber Holdings, Inc. ("CLR") on May 14, 1999. App. Tabs 110-11.

Defendant's Response: Defendant does not dispute these facts.

Plaintiffs' Reply: No dispute.

7. The advertisements, prospectuses, instructions to bidders and all contract terms and conditions for each of the timber sale contracts involved in this consolidated action (Happy Thin, Jack Heli and Too Wild) were drafted entirely by the Forest Service. All three contracts are contracts of adhesion, the terms and conditions of which are not negotiable. App. Tabs 93, 111, 124.

Defendant's Response: Defendant admits that the Forest Service drafted the advertisements, prospectuses, and instructions to bidders for each of the timber sale contracts involved in this action. Defendant objects to plaintiff's characterization of the contracts as "contracts of adhesion" because it is plaintiffs' legal conclusion, not a factual contention that the terms of the contract were not negotiable. Additionally, defendant states that the Forest Service has continually consulted with the timber industry in drafting the standard timber sale contract (designated 2400-6), and the timber industry has participated in the drafting of timber sale contracts, including the contracts at issue here. App. __ (R. Fitzgerald Declaration).

Plaintiffs' Reply: Defendant admits that the Forest Service drafted the advertisements, prospectuses and instructions to bidders. Plaintiffs' characterization of the Forest Service's timber sale contract as one of adhesion is supported by precedent. See Pls.' Br. at 22-23. Defendant's argument regarding its communications with members of the timber industry is irrelevant to the issue of whether plaintiffs' contracts were contracts of adhesion. See Pls.' Reply Br. at 5-10. Defendant does not claim that anyone other than plaintiffs and the Forest Service were parties to plaintiffs' contracts when awarded or that plaintiffs' contracts were presented by defendant to each plaintiff on a take-it-or-leave-it basis.

8. Happy Thin and Jack Heli were located on the Klamath National Forest in northern California within Region 5 of the National Forest System. Too Wild was located on the Siskiyou National Forest within Region 6 of the National Forest System. At all times the National Forest land on which all three sales were located was within the area governed by the Northwest Forest Plan ("NFP") and under the complete administration and control of the Forest Service. App. Tabs 93, 111, 124; App. Tab 1 (Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl – Standards and Guidelines for Management of Habitat for Late-Successional and Old Growth Forest Related Species Within the Range of the Northern Spotted Owl).

Defendant's Response: Defendant agrees that Happy Thin and Jack Heli are located in the Klamath National Forest, which falls within Region 5 of the National Forest System. Defendant also agrees that Too Wild is located in the Siskiyou National Forest, which falls within Region 6 of the National Forest System. Defendant objects to plaintiffs' characterization of the forests as being under the "complete administration and control of the Forest Service" as that is plaintiffs' opinion and not a contention of fact. Additionally, plaintiffs' opinion is not supported by the documents cited. The Forest Service is charged with managing National Forests within the United States and administering timber contracts, but it does not have "complete" control over the forests which are subject to weather conditions, fires, and unpredictable natural disasters, as well as encompassing areas of private rights such as easements and contract rights.

Plaintiffs' Reply: Plaintiffs agree that the Forest Service does not have "complete control" over National Forests in the sense that the Forest Service cannot control acts of nature and that some

national forest areas are subject to private rights. Defendant does not dispute that all of plaintiffs' sales in this action were subject to the NFP.

9. By awarding Happy Thin, Jack Heli and Too Wild, the Forest Service represented that it had complied with all pre-award requirements under NFMA and NEPA. App. Tabs 93, 111, 124; ¶¶ 1-8 above.

Defendants' Response: Defendant objects to this contention because it is plaintiff's legal conclusion and not a contention of fact. Defendant specifically denies that the Happy Thin, Jack Heli, and Too Wild timber sale contracts contained any express or implied warranty of compliance with any particular legal requirement. App. Tabs 93, 111, 124.

Plaintiffs' Reply: Defendant makes only a legal objection to the proposed finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

10. During the 1990s and at least through the pendency of the ONRC Action lawsuit, all Forest Service line officers on National Forests, including District Rangers and Forest Supervisors, were regularly assigned certain target volumes of timber which each National Forest was expected to sell to the public, including the forests within the NFP, such as the Umpqua National Forest and the Klamath National Forest. Regional Foresters and the Chief of the Forest Service had similar target volumes for timber sales on the regional and national levels. One element of each of these line officers' job performance evaluations included whether or not

they met these targets or had very good reasons for not meeting these targets. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 119:17-120:6).

Defendant's Response: Defendant objects to plaintiffs' characterization of Mr. Devlin's testimony because it is not supported by the testimony cited. Mr. Devlin testified "It is just I think as an agency I have always assumed that if we're given a task to do and financing to do it, we have an obligation to the public to meet that." App. Tab 172 (R. Devlin Dep. Tr. 119:23-120:1). Thus, Mr. Devlin testified that meeting the timber sale volume targets was important because it was a responsibility of the agency to the public. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is neither material nor relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: That Mr. Devlin believes that meeting timber sale targets is part of the Forest Service's duties to the public does not contradict the existence of those targets and the requirement that line officers meet them. Defendant's response also ignores the deposition testimony of Mr. Devlin cited in the proposed finding in which Mr. Devlin states that most line officers in the Forest Service have timber sale volume targets and that an employee who does not meet those targets "won't be in that job very long." App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 119:17-120:6). Moreover, plaintiffs' proposed finding is supported by defendant's similar proposed finding and appendix thereto. Defendant's proposed finding of fact no. 38 states: "The Forest Service must meet congressionally-mandated timber-harvest levels." In support of this finding, defendant cites to the declaration of Mr. Devlin in which he states: "Most line officers,

from the District Rangers up to the Forest Supervisors in Region 6, had performance requirements to meet their allocated sale offerings." Def. App. 109, R. Devlin Decl. ¶ 4. Although plaintiffs contend that there is no support for the proposition that "harvest levels" are mandated, plaintiffs agree that there were congressionally specified timber sale "offering" targets, i.e., the Forest Service was expected by Congress to use its best efforts within the law to award a target volume of timber sales each fiscal year. See Pl. Response to Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 38. There is no legal or factual basis for concluding that there are any "harvest levels" mandated by Congress or otherwise. The Forest Service including the Klamath and Siskiyou National Forests did have timber sale offering targets. See Pls.' Reply Br. at 50 n.24.

11. As a prerequisite to receiving the award of Happy Thin, Jack Heli and Too Wild, the Forest Service could have required that Blue Lake, Timber Products or CLR, respectively, execute a release and waiver of all claims for replacement timber costs or lost profits arising out of any suspension of operations specifically resulting from the ONRC Action lawsuit regardless of whether Forest Service fault or failure to comply with law was the ultimate cause of the suspension. The Forest Service did not request any such releases or waivers even though it has done so with other timber sale purchasers as a prerequisite before awarding other timber sales threatened with litigation in Region 5. See App. Tab 163 (Letter from Mark Bosetti, Sierra Pacific Inc., to Joseph Franco, Forest Service (June 28, 2005) with attached "Pre-award Waiver, Release and Limitation of Liability Agreement 04/09/2007").

Defendant's Response: Defendant objects to this contention because it is plaintiff's legal conclusion, and constitutes parol evidence, and not a contention of fact. Additionally, it is irrelevant what the Forest Service may have done with another timber contract signed six years after the contracts at issue in this lawsuit, and the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure.

Plaintiffs' Reply: The proposed finding makes statements of fact, not law. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding. The parol evidence rule only bars evidence of prior or contemporaneous statements between the parties when used to contradict an integrated agreement. The rule has no application in this instance because the proposed finding concerns a third-party agreement made after the execution of plaintiffs' contracts. Moreover, plaintiffs do not rely upon the proposed finding or its supporting evidence to contradict the terms of their contracts but to show that it was feasible for the Forest Service to draft a contract clause that limited its liability for suspending a timber sale contract for any reason. The "subsequent remedial measures" bar of Federal Rule of Evidence ("FRE") 407 does not apply to the proposed finding and the evidence on which it relies because "evidence of remedial measures does not run afoul of Rule 407 when it is used to prove the feasibility of a particular measure." M.A. Mortenson Co. v. United States, 40 Fed. Cl. 389, 421 (1998) (quoting Neal & Co., Inc. v. United States, 36 Fed. Cl. 600, 626 n.49 (1996)). The proposed finding is used by plaintiffs to prove the feasibility of the Forest Service requiring a purchaser to execute an explicit waiver of liability for the suspension of its contracts. This purpose is both relevant and expressly allowed under FRE 407 ("This rule does not require the exclusion of evidence of

subsequent measures when offered for [the purpose of proving] feasibility of precautionary measures, if controverted").[2]

12. As early as November 20, 1998, the Forest Service was considering a new timber sale contract clause that would explicitly allow the Forest Service to unilaterally modify the contract for the protection of survey and manage species. App. Tab 61. The Forest Service elected not to include this clause in the Happy Thin, Jack Heli or Too Wild contracts. See App. Tabs 93, 111, 124.

Defendant's Response: Defendant objects to this contention because it is plaintiff's legal conclusion, and constitutes parol evidence, and is not a contention of fact.

Plaintiffs' Reply: The proposed finding makes statements of fact, not law. The parol evidence rule only bars evidence of prior or contemporaneous statements between the parties when used to contradict an integrated agreement. The rule has no application in this instance because the proposed finding concerns a third-party agreement made after the execution of plaintiffs' contracts. Moreover, plaintiffs do not rely upon the proposed finding or its supporting evidence

[2] Moreover, FRE 407 is written in the language of tort, not contract. The public policy underlying FRE 407 also is directed to issues of tort and personal injury. "The rule [principally] rests on . . . a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." FRE 407 advisory committee's notes to 1972 proposed rules. "Rule 407 bars the use of safety measures only when offered to show a belief by the actor that he was guilty of a breach of a duty of care, either under the law of torts or under a criminal statute punishing negligent conduct." Charles Alan Wright, Kenneth W. Graham, Jr., 23 FEDERAL PRACTICE AND PROCEDURE § 5285. The issues in this case have nothing to do with safety or any of the purposes underlying FRE 407. Consequently, it is reasonable to conclude that FRE 407 does not apply to breach of contract claims at all.

to contradict the terms of their contracts but to show that it was feasible for the Forest Service to draft a contract clause that limited its liability for suspending a timber sale contract for any reason. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

**THE NFP WILDLIFE AND PLANT SURVEYS**

13. In April 1994, Secretaries of the United States Department of Agriculture on behalf of the Forest Service and the United States Department of the Interior on behalf of the BLM issued a Record of Decision ("ROD") for "Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl." This document amended the plan and resource management plans governing the operation of the National Forest and BLM forestlands in the states of Washington, Oregon and Northern California where it was believed that populations of northern spotted owls existed. The Klamath National Forest in Northern California and the Umpqua National Forest in Oregon were among those forests governed by the NFP. The provisions in the NFP were drawn from Alternative 9 of the Final Environmental Impact Statement prepared as part of the planning effort leading up to the adoption of the Plan. The fundamental purpose of the Plan was to permit a predictable and sustainable level of timber sales and use of non-timber resources that would not degrade or destroy the environment or endanger the viability of a variety of species of plants and animals present on NFP federal forests. App. Tab 1.

Defendant's Response: Defendant agrees with the contentions in the first four sentences, but objects to the contention in the last sentence, because it constitutes plaintiff's opinion, and not a contention of fact.

Plaintiffs' Reply: Defendant agrees with all but the last sentence of the proposed finding. The last sentence addresses the fundamental purpose of the NFP, which is a statement of fact based on the NFP language, not opinion. Defendant cites no fact, document, or deposition testimony that contradicts the last sentence of the proposed finding.

14. As part of the NFP ROD, survey and manage standards and guidelines were developed as mitigation measures for over 400 old-growth related species where there was a concern for the continued persistence of these species across the landscape, but where little knowledge existed of the species themselves. App. Tab 185 (R. Holthausen Dep. Tr. 7:23-15:4); App. Tab 1 at A-3 to A-5; App. Tab 6.

Defendant's Response: Defendant objects to this contention because it is plaintiff's opinion of the survey and manage guidelines, and not a contention of fact. Additionally, the Mr. Holthausen's memo refers to "300+" species that were covered by the original Survey and Manage mitigation measure, but states that "only 70 require specific survey requirements prior to ground-disturbing activity." (Tab 6, A-43). Similarly, the ROD (App. Tab 1) refers to 71 species covered by the survey and manage requirements, not 400 species. (Tab 1 at A-4). Moreover, pages 7-14 of Mr. Holthausen's deposition are not provided at Tab 185. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of

these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs agree that Mr. Holthausen's memo refers to "300+ species covered by the measure," not "over 400" and so amend their proposed finding to read "over 300" species. Defendant's other objection asserting that only 71 Category 2 species required surveys prior to ground disturbing activities is inapposite. Plaintiffs' amended proposed finding indicates that the "over 300" species refers to all species included in the survey and manage standards and guidelines, which includes all Category 1, 2, 3, and 4 species and not just the 71 Category 2 species. As explained in plaintiffs' errata, plaintiffs inadvertently omitted pages 7-14 of Mr. Holthausen's deposition transcript. Plaintiffs' corrected App. Tab 185 includes these pages, which further support the proposed finding.

15. The NFP identified four survey strategies for the Survey and Manage ("S&M") species: (1) manage known sites; (2) survey prior to ground-disturbing activities; (3) conduct extensive surveys to find high priority sites for management; and (4) conduct general regional surveys to acquire additional information to determine necessary levels of protection. App. Tab 1 at A-10 to A-12; App. Tab 11. Survey and manage species fall into one or more of these categories, also sometimes called "components" or "strategies." Id.

Defendant's Response: Defendant objects to plaintiffs' characterization of the documents; the documents are the best evidence of their contents. Furthermore, the documents cited concern the

Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant points to no language in the NFP, ROD or standards and guidelines, or any other document, or deposition testimony that contradicts the proposed finding.

16. The Oregon red tree vole, five species of salamanders, and the Canada lynx were initially designated as the Category 2 species (also sometimes referred to as "Component 2" or "Strategy 2" species). App. Tab 11. Prior to the award of Happy Thin, Jack Heli, and Too Wild, the Canada lynx was removed from the Category 2 species by the Regional Interagency Executive Committee ("RIEC") under a provision of the NFP which allowed such modifications. App. Tab 1 at A-12. Surveys for these species were required for certain timber sales as of October 1, 1996. App. Tabs 1, 11. Approximately seventy-one other invertebrate species, including certain bryophytes, lichens, fungi, mollusks, and vascular plants, were also designated as Category 2 species, and surveys for those species were required for certain timber sales as of October 1, 1998. App. Tab 11.

Defendant's Response: Defendant objects to the final sentence because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant agrees to all but the final sentence of the proposed finding. The final sentence is not a legal conclusion as defendant argues, but rather a fact that the defendant has not attempted to controvert through citation to any other fact, document, or deposition testimony.

17. The Category 2 surveys required under the NFP were important to an environmental evaluation of the sales before the sales were authorized, and it was important to have this information before the issuance of a decision notice approving the sales as in compliance with NEPA and NFMA. App. Tab 178 (E. Boling Dep. Tr. 38:9-42:5).

Defendant's Response: Defendant objects to plaintiffs' characterization that it was "important" to have the Category 2 surveys "before the issuance of a decision notice" because it constitutes plaintiffs' opinion, not a contention of fact. Additionally, the Category 2 survey requirements are governed by the ROD, not by Mr. Boling's testimony. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not plaintiffs' legal conclusion but rather the statement that Edward Boling agreed to at his deposition. Although defendant asserts that the ROD governs Category 2 survey requirements, defendant makes no citation to language in the NFP, ROD or any other fact, document, or deposition testimony, contradicting the proposed finding.

18. Category 2 surveys were "designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon, and for which adequate searches could be conducted in a single year." "High-risk" species refers to the risk of extirpation as does the phrase "persistence concerns." App. Tab 185 (R. Holthausen Dep. Tr. 15:10-16:3; 19:24-20:21). For Category 2 species, it was necessary that surveys be conducted prior to ground-disturbing activities which could result in the destruction or impairment of habitat necessary for those species' survival. App. Tabs 9, 35, 49; App. Tab 185 (R. Holthausen Dep. Tr. 15:8-23:18). The Category 2 surveys were the most restrictive in terms of the potential impact on federal lands, including Forest Service timber sales, of the NFP wildlife and plant surveys. App. Tab 185 (R. Holthausen Dep. Tr. 23:3-18).

Defendant's Response: Defendant agrees with the first sentence of this contention. Defendant objects to the contention in the second sentence because it is not supported by the documents or testimony cited. The September 11, 1998 memorandum states only that Category 2 surveys were required to be done prior to ground-disturbing activity, it did not define "ground-disturbing activity." (App. Tab 49). The October 26, 1996 document titled "Survey and Manage Component 2 Implementation Issues," and the December 2, 1994 "Meeting Notes on Intent of Survey and Manage Strategies in ROD" define "ground-disturbing activity" as "Activities with disturbances having a likely "significant" negative impact on the species' habitat. . ." (App. Tab 9 at A-62 and Tab 35 at A-278). Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant does not dispute Mr. Holthausen's deposition testimony and admits that "ground-disturbing activity" at least includes "Activities with disturbances having a likely 'significant' negative impact on the species' habitat. . ." Plaintiffs agree with this assertion, which is even broader than the "destruction or impairment of habitat necessary for those species' survival."

19. As more time passed and more activities such as timber sales were undertaken prior to the implementation of the Category 2 surveys, the risk of extirpation to Category 2 species in all or part of the NFP area increased. App. Tab 185 (R. Holthausen Dep. Tr. 28:19-29:24).

Defendant's Response: Defendant objects to plaintiffs' characterization of the Mr. Holthausen's testimony. Mr. Holthausen testified that "I think the general concept is correct, that the more time passed and the more activities that were undertaken prior to effective implementation of these strategies, would increase risk to species, but that's a very general statement." (App. Tab 185, Holthausen Dep. 30:15-19). Mr. Holthausen also testified that "Although our knowledge of these species was so poor that it would be impossible to quantify that increase in risk." (App. Tab 185, Holhausen Dep. 31:13-15). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs' proposed finding does not address the quantity of increase in risk or state that the risk was quantifiable. Plaintiffs' proposed finding is merely that there was an

increase in risk. Defendant's response presents no evidence that contradicts this proposed finding.

20. One of the fundamental purposes of the Category 2 surveys was for the government to acquire a sufficient knowledge base to have a better idea of the degree of risk of extirpation to species prior to the initiation of ground-disturbing projects like timber sales. App. Tab 185 (R. Holthausen Dep. Tr. 31:1-21).

<u>Defendant's Response</u>: Defendant objects to plaintiffs' characterization of Mr. Holthausen's testimony. Mr. Holthausen stated that "Although our knowledge of these species was so poor that it would be impossible to quantify that increase in risk." (App. Tab 185, Holhausen Dep. 31:13-15). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

<u>Plaintiffs' Reply</u>: Defendant's objection ignores that the text of the proposed finding was read nearly word-for-word to Mr. Holthausen at his deposition. When asked whether the statement was true, Mr. Holthausen replied, "Correct." Defendant's objection that the proposed finding does not indicate that the degree of risk was not quantifiable is belied by the text of the finding itself, which states that the purpose of the Category 2 surveys was to provide the government with the knowledge of the species so that it could then assess the degree of risk. The finding does not purport to state that at the time of the NFP ROD the government already possessed sufficient knowledge to quantify the risk of extirpation to the species.

21. A critical purpose of the Category 2 surveys was to help insure the viability of the species that were being surveyed. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 30:17-32:3).

Defendant's Response: The testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding. The purpose of the Category 2 surveys is directly relevant to the contention that defendant's mitigation of the Category 2 survey requirements was unreasonable.

22. One of the important objectives of the NFP was to develop as soon as possible the protocols necessary for the Category 2 "prior to ground-disturbing activities" surveys which the NFP directed were to be implemented for certain vertebrate species as of October 1, 1996 and for the remainder of the Category 2 species as of October 1, 1998. App. Tab 1 at A-4.

Defendant's Response: Defendant objects to plaintiffs' characterization of the document as it is plaintiff's opinion, not a factual contention concerning the document. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding. This proposed finding asserts a fact not plaintiffs' opinion.

23. Survey protocols for the five Category 2 salamanders were approved for use by the Forest Service and available at least as early as March 16, 1996. App. Tab 14 (Memo from W. Bradley, BLM, to BLM district managers (Mar. 19, 1996)).

Defendant's Response: Defendant objects to plaintiffs' characterization of the Category 2 salamander survey protocols as "approved for use" because it is not supported by the document cited. The document states that the attached amphibian protocols are "drafts" and also refers to instructional memoranda attached that are not provided in plaintiff's appendix. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiff's Reply: Plaintiffs withdraw proposed finding no. 23.

**IMPLEMENTATION OF NORTHWEST FOREST PLAN SURVEYS**

24. Under the NFP there were several government groups with various levels of authority for recommending and determining the intent and meaning of the NFP survey and manage requirements. At least as early as the spring-summer of 1994, there existed a Survey and Manage Working Group (which included a smaller entity referred to as the "Survey and Manage Core Group") composed of representatives from the Forest Service, the BLM and other agencies.

Among other things, the purpose of the Survey and Manage Working Group was to develop working definitions and directions for the implementation of NFP wildlife and plant surveys and to recommend the adoption of certain definitions and interpretations to higher levels of authority within the management structure of the NFP. At various times from at least December 1994 through 1998, the team leaders of this group included Cheryl McCaffrey of the BLM and Randy Hickenbottom of the Forest Service. App. Tabs 2-6, 189.

Defendant's Response: Defendant objects to this contention because the documents cited do not support plaintiffs' contentions in the final sentence. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant agrees with all but the last sentence of the proposed finding. The final sentence is supported by DPFUF ¶ 23 and Def. App. 126 (J. Hickenbottom Decl. ¶ 10).

25. There was an Intermediate Management Group ("IMG") immediately above the Survey and Manage Working Group in the NFP administrative hierarchy. This group included representatives of the Forest Service and the BLM at what was determined to be the intermediate management level. One purpose of the IMG was to act on and approve the recommendations from the Survey and Manage Working Group with regard to definitions, directions and interpretations of the survey requirements under the NFP when, in the view of the IMG members, such decisions could be made without referring the matter to the next higher level of

authority, the RIEC. From at least December 1994 through 1998 at various times, Tom Nygren of the Forest Service and Bill Bradley of BLM were members of the IMG. App. Tab 189.

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited. The document cited does not mention the Internediate Management Group; they discuss the Survey and Manage Work Group. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The first sentence of the proposed finding is supported by, inter alia, Def. App. 125 (J. Hickenbottom Decl. ¶ 8), App. Tab 189 at A-1701 ("An Intermediate Management Group has been formed to provide management and policy direction. . . . Survey and Manage Core Group representatives will report and coordinate with Intermediate Management Group representatives as needed. . . . Intermediate Management Group will provide overview of Survey and Manage Work Group including securing personnel time and resources from agencies") and A-1706 ("The Survey and Manage Work Group would consist of the Survey and Manage Core Group and Taxa Group members. . . ."). The second sentence of the proposed finding is supported by, inter alia, Def. App. 112-13 (R. Devlin Decl. ¶ 12), App. Tab 189 at A-1704 ("Intermediate Management Group [Bradley (BLM), Nygren (FS), Geyer (PNW), Crete (FWS)] created to work with the Survey and Manage Core Group for guidance and policy decisions"). The third sentence of the proposed finding is supported by, inter alia, Def. App. 125-26 (J. Hickenbottom Decl. ¶¶ 8-11), App. Tab 189 at A-1707 ("Intermediate Management Group will be responsible to: provide timely direction and approval of Survey and Manage Core Group

process") and A-1709 ("The Intermediate Management Group will have responsibility and authority to approve the Survey and Manage Core Group to proceed with actions or tasks, to review products, and to determine when it is necessary and appropriate to bring survey and manage issues or processes to the RIEC"). The final sentence of the proposed finding is supported by, inter alia, Def. App. 112-13 (R. Devlin Decl. ¶ 12), App. Tab 189 at A-1704 ("Intermediate Management Group [Bradley (BLM), Nygren (FS), Geyer (PNW), Crete (FWS)] created to work with the Survey and Manage Core Group for guidance and policy decisions").

26. The RIEC represented the highest level of agency authority at the regional level within the NFP administrative hierarchy. The RIEC included the Regional Foresters of Regions 5 and 6 of the Forest Service and the Director of the Oregon State Office of the BLM or their designated representatives. App. Tabs 12, 189.

Defendant's Response: Defendant objects because document cited does not support plaintiffs' contentions. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Although the documents cited by the proposed finding do not sufficiently support the proposed finding, the declarations of defendant's employees and the NFP ROD defendant included in its own appendix do support plaintiffs' proposed finding. Def. App. 100-01 (T. Hussey Decl. ¶ 6), Def. App. 125 (J. Hickenbottom Decl. ¶ 7), Def. App. 152 (NFP ROD).

Plaintiffs amend the proposed finding to include these citations. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

27. As part of the administrative structure for the NFP there existed a Regional Ecosystem Office ("REO") under the direction of Donald Knowles, Executive Director, which functioned as the staff of the RIEC coordinating certain agency actions and reporting thereon to the RIEC. Mr. Knowles and other members of the REO from time to time worked with other administrative levels under the NFP including the Survey and Manage Working Group and the IMG. App. Tabs 12, 189.

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it related to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

28. Beginning as early as May 26, 1994, Richard Holthausen, the Team Leader of the Species Analysis Team responsible for developing recommendations regarding the species surveys which ultimately became the survey and manage program under the NFP, provided oral and written presentations explaining the background, rationale for and intent of the wildlife and

plant surveys required under the NFP, including the Category 2 surveys. See App. Tabs 2, 6, 10; App. Tab 185 (R. Holthausen Dep. Tr. 32:21-33:8).

Defendant's Response: Defendant objects to this contention because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

29. In his paper on the background and intent of the NFP survey requirements entitled "Development of the Survey and Manage Measure," Mr. Holthausen discussed the Category 2 surveys which he described as "survey prior to ground-disturbing activities and manage sites that are discovered (Strategy II)." He further stated, "Ground-disturbing activities also were not described, but a common sense definition would include any disturbances of a type and intensity that would have a significant, negative effect on species on the list and/or the habitat that supports them." Mr. Holthausen concluded in his paper that "the survey and manage strategy in the ROD was intended to provide additional protection for species whose outcomes were judged to be low under draft Alternative 9 [the alternative analysis under NEPA which became the NFP]," and Mr. Holthausen offered the observation that "if survey and manage is marked by

delays, inconsistencies, and clearly inadequate processes, flexibility will likely be lost and implementation of survey and manage will be likely become more difficult." App. Tab 6.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

30. At a meeting on December 2, 1994 involving Cheryl McCaffrey of the BLM, identified as the "lead" for the Survey and Manage Working Group, Randy Hickenbottom, Richard Holthausen and others, Mr. Holthausen addressed the intent and meaning of the survey and manage provisions in the ROD of the NFP. The basic purpose of this meeting was to clarify both the intent and development of the survey and manage standards and guidelines and to address the meaning behind some specific terms or phrases. At this meeting it was agreed that the intent of the NFP ROD in requiring wildlife and plant surveys was "to maintain the viability of the species addressed." Also at this meeting it was generally recognized that Category 2 surveys were "designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon and for which adequate searches can be conducted in a single year." App. Tab 10.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

31. By at least January 1996 a group called the Issue Resolution Team ("IRT") was added to the NFP administrative structure. This team was charged with, among other things, developing and recommending interpretations of the NFP Category 2 survey requirements. Typically, recommendations from this team would be provided to the IMG and/or to the RIEC for official adoption as direction to field personnel for both the Forest Service and BLM employees. Tom Hussey (Forest Service) and Larry Larsen (BLM) were members of the IRT and John R. "Randy" Hickenbottom (Forest Service) worked with the IRT on developing interpretations of the NFP requirements for Category 2 surveys. App. Tabs 12, 20.

Defendant's Response: Defendant objects to this contention because it the documents cited do not support it. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The first, second, and fourth sentences of the proposed finding are supported by, inter alia, App. Tab 12, at A-86. The fourth sentence of the proposed finding is supported by App. Tab 20, at A-201. Moreover, the entire proposed finding is supported by Def. App. 101-03 (T. Hussey Decl. ¶¶ 8-13). Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

32. A joint Forest Service and BLM memorandum dated March 18, 1996 issued to all Forest Supervisors within the area of the NFP, including Forest Supervisors for the Klamath National Forest in California and the Siskiyou National Forest in Oregon, addressed draft standard protocols for the five salamanders to be surveyed before the implementation of ground-disturbing activities in FY 1997. Although these protocols were designated at that time as "draft standard protocols," the memorandum directed that "projects surveyed according to the draft protocols (including modifications by agency biologists) will be considered as meeting the requirements of Component 2 for FY 1996." App. Tab 7.

Defendant's Response: Defendant objects to this contention because the document cited is notes from a meeting dated December 2, 1996, and does not support plaintiffs' contentions. Additionally, both the contention and the document cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs provided the incorrect document at App. Tab 7, cited by the proposed finding. Plaintiffs' corrected App. Tab 7 well supports the proposed finding.

33. [Intentionally left blank]

34. The Survey and Manage Working Group meeting minutes from the August 23, 1995 meeting were reproduced in part and distributed to Survey and Manage Working Group members in connection with a Survey and Manage Working Group meeting on March 22, 1996. Those 1995 minutes stated that Component 2 (Category 2) "Surveyed Prior to Ground-Disturbing Activities ("GDA")" required that surveys for 71 species be completed before ground-disturbing activities were implemented in FY 1999 (relying on ROD C-5) and that surveys for five salamanders and the red tree vole had to be completed before ground-disturbing activities were implemented before 1997 (citing ROD C-5). These minutes further stated that efforts to develop these protocols were to be started immediately. App. Tab 13.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

35. [Intentionally left blank]

36. In the Survey and Manage Working Group's proposed FY 1996 organization and work plan dated July 19, 1996, the following recommendation was made:

> Component 2: Complete survey protocols for all species. Surveys for amphibians and red tree voles are required for FY 1997 projects. For other species, surveys required for FY 1999 projects. All protocols should be complete in FY 1996 or 1997.

App. Tab 17 at A-152.

<u>Defendant's Response</u>: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

<u>Plaintiffs' Reply</u>: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

37. At a January 17, 1996 Forest Plan Implementation workshop designed to provide guidance to Forest Service field personnel on the meaning and intent of the NFP, the question was asked "When is a project implemented?" At the workshop, Tom Hussey, a member of the IRT, answered that question as follows: "Project implementation is when the Forest Service has committed to a project to the point where it would be unreasonable (cost or resource impacts) to

delay or cancel the project. When the Forest Service has entered into legal contractual agreement, the project is considered implemented (IRT Response)." App. Tab 12 at A-90.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

38. In the summer of 1996 two members of the IRT, Larry Larsen of the BLM and Tom Hussey of the Forest Service, and Randy Hickenbottom, who was the team leader of the Survey and Manage Working Group at the time, collaborated to write a proposed answer/resolution to the question: when are ground-disturbing activities implemented on a project or timber sale for purposes of directing when Category 2 surveys are required. Multiple drafts were prepared throughout the summer and into the fall of 1996 in an attempt to provide a proposed answer/resolution. App. Tabs 16, 18, 20-24, 26-34, 39, 43, 71-72, 74-75, 77, 83, 87-88, 104-07; App. Tab 171 (L. Larsen Dep. Tr. 6:17-22); App. Tab 38 ("Notes on S&M Concerns Meeting" (Jan. 22, 1997)); App. Tab 37 ("Memo from Robin Bown, S&M Workgroup Representative, to Various Offices" (Nov. 25, 1996)).

Defendant's Response: Defendant objects to this contention because several of the documents cited do not support plaintiffs' statements. The documents at Tab 87 and 88, 104, 105, do not concern the definition of "ground-disturbing." The document at Tab 37 does not relate to the summer or fall of 1996. Furthermore, the documents and testmony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs agree that App. Tabs 87, 88, 104, and 105 do not discuss the definition of "ground-disturbing" and therefore plaintiffs withdraw the citations to these documents as support for the proposed finding. Plaintiff also agrees that App. 37 does not relate to the summer or fall of 1996; the document was written on November 25, 1996 and therefore falls within the winter season. Plaintiffs amend the proposed finding to eliminate these citations. However, this amendment does not controvert or otherwise diminish the substance of the finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

39. [Intentionally left blank]

40. [Intentionally left blank]

41. In the summer of 1996, in a draft paper addressing, among other points, the definition of implementation of ground-disturbing activities for purposes of the ROD direction requiring Category 2 surveys, Larry Larsen, a member of the IRT, wrote:

> Rationale: By requiring the S&M survey prior to the project decision, we can assure that the responsible official, other agencies, and the public have the benefit of the survey information prior to making an informed decision. This is consistent with the stated objective for doing the surveys: ". . . information gathered from them should be used to establish managed sites for the species." This definition of implementation would also allow us to move ahead with projects for which a decision has already been made, but will not begin operations until 1997.

App. Tab 18 at A-194.

Defendant's Response: Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Regardless of whether Mr. Larsen was the author of the document, the document was among the drafts circulated amongst the IRT and its contents supports the substance of the proposed finding.

42. In Mr. Larsen's paper referred to in paragraph 41 above, he also stated that an alternative definition of implementation could be the date at which project operations actually began. As to this definition Mr. Larsen stated:

> The chief problem is that it would be inconsistent with the stated objective for doing the surveys as mentioned above. The information from the surveys would not be available in a timely manner for the project designed to include the managed sites as needed for these species. A second problem with using the initiation of project [including timber sale] operations would be that there are a number of projects [timber sales] that need to begin operations in early 1997 and they would be delayed pending the completion of surveys.

App. Tab 18 at A-194.

Defendant's Response: Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Regardless of whether Mr. Larsen was the author of the document, the document was among the drafts circulated amongst the IRT and its contents supports the substance of the proposed finding.

43. In Mr. Larsen's draft referenced in paragraph 41 above, he also made the following observation:

> QUESTION 3: HOW SHOULD WE HANDLE SITUATIONS WHERE THE DRAFT S&M PROTOCOLS ISSUED IN THE NEXT FEW MONTHS REQUIRE SURVEYS THAT CANNOT BE PERFORMED UNTIL NEXT SPRING, YET WE NEED TO PLAN THE PROJECT AND MAKE A DECISION THIS FALL OR WINTER?
>
> Response: There may be projects [including timber sales] where the draft protocol is available but for biological reasons the survey cannot be conducted until the spring or summer of 1997. In cases where these projects [timber sales] need to have a decision made prior to the time that the survey can be conducted, then the decision document can be signed but the project [timber sale] cannot commence operations until the survey is conducted and the project design adjusted to include the S&M species considerations as appropriate. Clearly, this should be a reluctant "last resort" option because of the possible difficulties of adjusting a project to include the S&M information obtained after project design and decision. As discussed in Question 1, wherever possible we should schedule project decisions [timber sale Decision Notices] to include the results of S&M surveys.

App. Tab 18 at A-194 to A-195.

Defendant's Response: Defendant objects to this contention because it is not clear that Mr. Larsen drafted the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Regardless of whether Mr. Larsen was the author of the document, the document was among the drafts circulated amongst the IRT and its contents supports the substance of the proposed finding.

44. One of the possible interpretations of how "implementation" should be defined for purposes of ascertaining the implementation of ground-disturbing activities which was considered by the IRT was the concept that ground-disturbing activities would be considered implemented on the date that an appropriate decision document, such as a Decision Notice, was signed signifying completion of the environmental analysis required under NEPA and NFMA before a timber sale could be offered to the public. This interpretation came to be known as "NEPA decision equals implementation" or "NEPA decision equals implemented." This interpretation was ultimately adopted by both the Forest Service and the BLM, and it was subsequently determined to be arbitrary and capricious and contrary to law in the ONRC Action litigation. App. Tabs 18, 34, 49; Oregon Natural Resources Council Action v. United States Forest Service, 59 F. Supp. 2d 1085, 1091-94 (W.D. Wash. 1999).

Defendant's Response: Defendant agrees that the Forest Service concluded after considerable analysis, that for purposes of complying with the ROD, a timber sale would be considered implemented as of the time the environmental review was completed, and the NEPA documents were signed. (App. Tab 34). Defendant objects to the final sentence of this contention because it is plaintiff's legal conclusion, and not a contention of fact. Furthermore, the documents cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant agrees with all but the final sentence of the proposed finding. Defendant asserts that the last sentence in the proposed finding states a legal conclusion. The final sentence of the finding is not a legal conclusion but a statement of fact, i.e., the court in ONRC Action found the "NEPA decision equals implemented" interpretation arbitrary and capricious and contrary to law. PPFUF ¶ 210. The court's opinion, which the finding cites, states, "Agency actions exempting timber sales from the plan's category two survey requirements by equating 'implemented' with 'NEPA decision' are unlawful and must be set aside under the APA, 5 U.S.C. § 706(2)(A) [which directs the court to set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law']." ONRC Action, 59 F. Supp. 2d at 1094; PPFUF ¶ 210.

45. The IRT members and other government personnel working with them on the development of the interpretation "NEPA decision equals implementation" took both legal risk and biological risk into consideration as they analyzed alternative interpretations of the NFP Category 2 survey requirements. "Legal risk" in this context meant, for example, the

government's risk of losing a lawsuit brought by environmental activists who might dispute the official interpretation. "Biological risk" referred to the risk to the viability of the species if the Category 2 surveys were not required for a significant number of timber sales. App. Tab 168 (R. Hickenbottom Dep. Tr. 105:15-107:1). Randy Hickenbottom, a working member of the IRT and for a period of time team leader of the Survey and Manage Working Group, thinks it is really important to know how many timber sales were going to be grandfathered in without surveys if the interpretation "NEPA decision equals implementation" was selected. Id. (R. Hickenbottom Dep. Tr. 108:3-15).

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects that the testimony cited is hearsay, it does not support plaintiffs' contention, and plaintiffs mischaracterize the testimony. Mr. Hickenbottom testified that he did not recall any discussions about the threat of environmental litigation as a "legal risk" potentially affecting an awarded timber sale. (App. Tab 168, Hickenbottom Dep. 106:7-21). Mr. Hickenbottom also testified that the practice of "grandfathering" timber sales was not something he "would have delved into." (Hickenbottom Dep. 107:18-19). Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The deposition testimony cited (and testimony relating to what other government employees said) is an admission by party opponent and classified as non-hearsay by FRE 801(d)(2)(D). The testimony satisfies the requirements of FRE 801(d)(2)(D) because the

statements are offered against defendant, were made by employees of defendant, and concern matters within the scope of employment of those employees. Long Island Sav. Bank, FSB v. United States, 63 Fed. Cl. 157, 163-64 (2004); Globe Sav. Bank, FSB v. United States, 61 Fed. Cl. 91, 97 (2004). **PLEASE NOTE: Plaintiffs incorporate this reply for each instance where defendant raises the objection of hearsay or that the statements of its employees cannot "bind" defendant or its agencies.** Mr. Hickenbottom was a member of the IRT during the time during which the events he discussed occurred and the subjects he discusses relate to his official duties on the IRT. See Pls.' Br. at 5. He was also employed by defendant at the time of his deposition. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

46. During the IRT deliberations which ultimately resulted in the IRT recommending the adoption of the interpretation "NEPA decision equals implementation," Randy Hickenbottom preferred an interpretation which would define implementation as some point after the signing of a NEPA decision notice but before the Forest Service or the BLM made a relatively irreversible commitment to the project. Mr. Hickenbottom advocated this interpretation because it would require more projects to be surveyed, and therefore more projects would have the benefit of the knowledge of the presence or absence of the S&M species before timber harvest or other operations might adversely alter the available habitat of these species. App. Tab 168 (R. Hickenbottom Dep. Tr. 108:23-109:20); App. Tab 21.

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further

objects because the testimony does not support plaintiffs' contention and mischaracterizes the testimony. See Pls.' App. Tab 168 (R. Hickenbottom Dep. Tr. 109:18109:23) (Mr. Hickenbottom did not recall drafting the document, and did not know who drafted the document). Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not state that Mr. Hickenbottom drafted the document cited by the proposed finding, App. Tab 21. Regardless of who authored the document in App. Tab 21, Mr. Hickenbottom testified that he shared the view stated in the document, that an alternate definition defining "implementation" at a point after the signing of the NEPA documentation had the advantage of allowing more projects to benefit from knowledge of the presence of survey and manage species prior to the start of operations. Defendant's objection that the proposed finding mischaracterizes "the document" is inapposite because, while the finding cites to a document for support, the finding does not discuss the contents of that document and therefore cannot mischaracterize it. Rather, the proposed finding demonstrates that amongst the IRT, there were differing opinions on the definition of "implementation," including one where "implementation" was defined as occurring at some point after the signing of the NEPA decision and that such an alternate definition would decrease the risk to Category 2 species compared with the "NEPA decision equals implementation" interpretation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

47. When Randy Hickenbottom was a working member of the IRT and team leader of the Survey and Manage Working Group, he believed that whenever possible a timber sale's NEPA Decision Notice should include consideration of the results of the S&M surveys. It was optimal from a management standpoint to have as much information as possible in order to make a well-informed NEPA decision. App. Tab 168 (R. Hickenbottom Dep. Tr. 109:24-110:16); App. Tab 21.

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant's characterization and best evidence objections are inapposite because the proposed finding does not describe the contents of the document or Mr. Hickenbottom's testimony. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

48. As of August 28, 1996, the IRT was still analyzing different interpretations of the required start date for Category 2 species surveys under the NFP. With regard to the interpretation "NEPA decision equals implementation" under which no Category 2 surveys would be required prior to actual timber sale operations for timber sales with decision notices signed on or before September 30, 1996 regardless of whether those sales might not be offered to

the public, awarded and operated for months or even years later, the following concerns were expressed:

> This could result in projects being operated on in fiscal years 1997, 1998, and possibly even 1999 without surveys having been done. We have been unable to determine how many projects this might include, nor have we been able to get an estimate of the possible resource damage that could occur. There is strong concern on the part of many FS, BLM, and F&WS personnel that allowing major activities such as timber sale or road building operations to proceed after 9/30/96 without surveys is unacceptable because it does not meet a commonly accepted understanding of when implementation occurs.

App. Tab 22; App. Tab 168 (R. Hickenbottom Dep. Tr. 113:5-19).

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Additionally, plaintiffs mischaracterize Mr. Hickenbottom's testimony. Mr. Hickenbottom testified that he did not share the "strong concern" about operating sales without Category 2 surveys being done. In a portion of Mr. Hickenbottom's testimony not provided by plaintiff, Mr. Hickenbottom testified that he did not share this concern because "Quite frankly I felt that the distribution of activity relative to the known range of those species and the overall amount of activity that could be proposed and on the shelf for those was unlikely to result in serious extirpation viability issues for those species." (Hickenbottom Dep. Tr. 113:23-25-114:4.) Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant's objection that the proposed finding mischaracterizes Mr. Hickenbottom's testimony because Mr. Hickenbottom did not have the "strong concern" discussed in the proposed finding is inapposite. The proposed finding does not discuss Mr. Hickenbottom's concerns at all. Rather, the proposed finding discusses the strong concerns of Forest Service, BLM, and FWS personnel about allowing operations to proceed on sales after FY 1996 without Category 2 surveys, a fact that is supported by the direct quote of the government document admitting as much. App. Tab 22. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

49. Prior to January of 1997, Richard Holthausen, Team Leader for the NFP wildlife Species Team, was asked by Don Knowles, Director of the Regional Ecosystems Office, if it was possible to do an assessment of the potential impact of different implementation dates for the surveys required under the NFP. Mr. Holthausen told Mr. Knowles at that time, "That in general, one could reasonably assume that delay of implementation strategies would result in some negative effect for some species, but that it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects." In short, there was no way of knowing whether the negative effect on the species would be relatively small or whether it would cause extirpation of a species. App. Tab 185 (R. Holthausen Dep. Tr. (9/30/07) 48:4-51:23).

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Additionally, pages 49-51 are not found at Tab 184 of the Appendix. Furthermore, the testimony cited concerns the Forest Service's actions and

responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs inadvertently omitted pages 49-51 of Mr. Holthausen's deposition transcript. Plaintiffs' corrected App. Tab 185 includes these pages. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

50. In a draft memorandum produced by members of the IRT prior to October 4, 1996 but late in the process of the IRT finalizing its recommendation regarding the interpretation of the Category 2 survey implementation date requirements, the potential impact of adopting the interpretation "NEPA decision equals implementation" was discussed as follows:

> Question 2: Does The Above Definition Of The Point Of Implementation [NEPA Decision Equals Implementation] Allow Us To Make A Large Number Of NEPA Decisions Prior To September 30, 1996 For Outyear Projects In Order To Avoid The Need For Category 2 S&M Surveys?
>
> Response: The ROD clearly intended that we perform surveys for Category 2 species prior to the design and implementation of projects; and it also clearly intended that we have until FY 97 to phase in this requirement. But the "banking" of NEPA decisions prior to FY 97 for projects that will not begin for several years is inappropriate. If we do not plan to make an irreversible commitment to proceed with the project prior to mid-year 1997, then we should conduct the survey for the Category 2 S&M species prior to making a NEPA decision on the project. If for some reason it is necessary to make a NEPA decision prior to Sept. 30 for an outyear project, then it might also be appropriate to do so but plan to conduct the S&M survey prior to making an irreversible commitment to proceed with the project. This should be a reluctant "last-resort" approach, as it creates the risk that the project will need to be re-designed based on the results of the S&M survey and the NEPA process recycled. The definition of the term "irreversible commitment to proceed" will vary according to the type of project and the policies and procedures of the managing agency, but it usually should be the point at which it is relatively difficult and expensive to redesign or cancel a

> project. Examples of that point might be the award of a timber sale, the signing of a service contract, or the actual operational start of a force account project.

App. Tab 28.

Defendant's Response: Defendant objects to plaintiffs' characterization of the document; the document is the best evidence of its contents. Defendant further objects because the date and authorship of the document are not clear from the face of the document. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

51. As the IRT was considering how to interpret the NFP direction for the implementation of Category 2 surveys, including the interpretation of the point at which ground-disturbing activities were implemented for purposes of timber sales, members of the IRT were aware of concerns raised by agency personnel regarding the possibility that the Forest Service and the BLM could rush the environmental analysis process forward in order to get decision documents signed prior to October 1, 1996. Individuals voicing such concerns included Cheryl McCaffrey of the BLM and Robin Bown of the Fish & Wildlife Service. Both Tom Hussey, a member of the IRT, and Randy Hickenbottom, who worked with the IRT on this interpretation question, were aware of these concerns. App. Tab 171 (L. Larsen Dep. Tr. 30:6-32:11).

Defendant's Response: Defendant objects to this contention because it plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects on the basis that the proffered testimony constitutes inadmissible hearsay. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding. Mr. Larsen's testimony regarding the concerns raised by agency personnel is not hearsay because these concerns constitute admissions by party opponent that are properly admissible under FRE 801(d)(2)(D). See reply to PPF No. 45. The statements of Ms. McCaffrey and Ms. Bown to which Mr. Larsen testified were made in the context of Ms. McCaffrey's and Ms. Bown's employment with defendant. Ms. McCaffrey was leader of the Survey & Manage Workshop, Pls.' Br. at 5, and Ms. Bown was the FWS Supervisor for Oregon for NFP implementation.

52. In determining which interpretation to recommend regarding the date on which ground-disturbing activities would be considered implemented for purposes of Category 2 surveys, the IRT considered the potential contractual liability of the Forest Service and the BLM to purchasers of timber sales. App. Tab 171 (L. Larsen Dep. Tr. 37:18-39:7).

Defendant's Response: Defendant objects to plaintiffs' characterization of the testimony; the testimony is the best evidence of its contents. Defendant further objects because plaintiffs

mischaracterize the testimony. See Pls.' App. Tab 171 (L. Larsen Dep. Tr. 38:25-39:2) (Mr. Larsen stated "amongst ourselves we probably discussed it . . . ."). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not (mis)characterize Mr. Larsen's testimony. When asked whether the members of the IRT considered amongst themselves ways to minimize the risk to agencies of contract liability to purchasers in deciding upon their recommended "implementation" interpretation, Mr. Larsen testified, "Well, amongst ourselves we probably discussed it, but again it was -- one of the factors we look at was a liability question." Mr. Larsen's testimony cited by defendant does not contradict the proposed finding that the IRT considered contractual liability to purchasers in deciding upon their recommended "implementation" interpretation.

53. At least as early as August 1996 while the IRT was trying to reach a consensus on its interpretation of what was meant by implementation of ground-disturbing activities for purposes of the requirement to perform Category 2 surveys on timber sales, members of the IRT were made aware of concerns expressed by field personnel at both the BLM and the Forest Service that adopting an interpretation such as "NEPA decision equals implementation" could lead to the exemption of a significant number of timber sales from the Category 2 survey requirements. At this time there was concern among IRT members that it would be important to know how many timber sales might be exempted by such an interpretation and what the possible resource damage would be if that interpretation were adopted. It was generally understood by IRT members that

the Forest Service had significantly more timber sales in this potential position than the BLM. App. Tab 171 (L. Larsen Dep. Tr. 47:15-51:3); App. Tab 22.

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Defendant further objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further objects because the contention is not supported by the testimony cited. Mr. Larsen testified that the Survey and Manage group raised concerns to the "decision makers," but he did not testify as to any knowledge about any concerns the IRT members may have had, nor what was "generally understood" by the (unspecified) IRT members. (App. Tab 171, Larsen Dep. 49:14-50:16). This contention is therefore unsupported and amounts to nothing more than plaintiffs' opinion. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Larsen's testimony regarding the concerns raised by agency personnel and statements made by other IRT members are not hearsay because those concerns and statements constitute admissions by party opponent. See reply to PPF No. 45. The agency personnel and IRT were obviously employed by defendant at the time they made their statements and it was the IRT's responsibility to elicit feedback from such persons in deciding the means by which to implement the NFP. See Pls.' Br. at 6-7.

54. In the draft "Survey and Manage Current Implementation Issues" paper dated September 1, 1996, prepared by Larry Larsen for IRT consideration, situations involving timber sales with NEPA documents signed prior to October 1, 1996 but awarded on or after October 1, 1996 was considered. As to these situations, Mr. Larsen noted that survey protocols for Category 2 salamanders had been available since March of 1996, that the red tree vole did not currently have approved survey protocols, and that the presence or absence of survey and manage species was a significant piece of information that should be analyzed prior to the execution of a NEPA decision document. App. Tab 24. Mr. Larsen also observed that there was legal risk to the agencies and potential biological risk to the species in not performing Category 2 surveys on timber sales for which NEPA decision documents were signed prior to October 1, 1996 but which were not awarded until after that date. Mr. Larsen concluded that in such situations there was a substantial risk to both species and the agencies because the Category 2 surveys were key information which should be available to decision makers at the time the NEPA decision was signed. Thus, not performing Category 2 surveys for timber sales in this situation raised a significant concern. Id.; App. Tab 171 (L. Larsen Dep. Tr. 61:25-62:16).

Defendant's Response: Defendant objects to plaintiffs' characterization of the document and testimony; the document and testimony are the best evidence of their contents. Defendant further objects to this contention because it is not supported by the document or testimony cited. The September 1, 1996 states only that it is based on the "assumptions" that the Salamander surveys were available, that the red tree vole did not have protocols, and that the intention was to perform surveys prior to the design phase and signing of NEPA documents. App. Tab 24. Additionally, Mr. Larsen did not testify that there was a "substantial risk" he said, in response to a question

about what kind of "risk" would be involved by saying, "To the species, to the agency, whatever, yes." Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs agree that Mr. Larsen testified that there was only a "risk" to both species and agencies by not conducting Category 2 surveys prior to NEPA decisions and not a "substantial risk." Plaintiffs also withdraw the second sentence of the proposed finding regarding the assumptions the IRT relied upon in making their recommendation. Defendant cites no fact, document or deposition testimony that contradicts the proposed finding as amended.

55. As of October 4, 1996, Larry Larsen, Tom Hussey and Randy Hickenbottom had reached agreement on the interpretation they would recommend for determining when ground-disturbing activities had been implemented for purposes of Category 2 surveys. App. Tab 171 (L. Larsen Dep. Tr. 65:12-24); App. Tab 32.

Defendant's Response: Defendant objects to this contention because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it related to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

56. The document entitled "Survey and Manage (Component 2) Implementation Issues" dated October 22, 1996 reflects the interpretation of the implementation of ground-disturbing activities for purposes of performing Category 2 surveys under the NFP as recommended by the IRT and as adopted by the RIEC. App. Tab 171 (L. Larsen Dep. Tr. 66:4-67:21); App. Tab 43.

Defendant's Response: Defendant objects to this contention because the document[1] and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

[1] The document is dated November 1, 1996; not October 22, 1996. Pls.' App. Tab 43.

Plaintiffs' Reply: Plaintiffs agree that the document is dated November 1, 1996 and not October 22, 1996. Defendant objects to the proposed finding as being irrelevant, yet defendant proposed a nearly identical finding. DPFUF ¶ 26. The relevance of the proposed finding is therefore proved by defendant's need for a similar finding in order to respond to plaintiffs' motion for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

57. Nothing in the November 1, 1996 or September 11, 1998 joint agency memoranda adopting the interpretation "NEPA decision equals implementation," or elsewhere in the NFP precluded a Forest Service deciding officer (typically a Forest Supervisor) from opting not to sign a Decision Notice for a proposed timber sale before that sale had been surveyed for

Category 2 species. In other words, the interpretation "NEPA decision equals implementation" did not preclude the Forest Service from delaying the execution of a Decision Notice on a timber sale until all Category 2 surveys required for FY 97 and/or FY 99 had been completed for that sale and fully considered before approval of that sale for public offering. App. Tabs 34, 49.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Whether the "NEPA decision equals implementation" memorandum contained any language prohibiting surveys from being conducted after the signing of the NEPA decision is a fact that is based on the plain language of the cited memorandum and is not a legal conclusion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

58. As of August 28, 1996, one of the concerns of the IRT in deciding the meaning of "implementation of ground-disturbing activities" for purposes of Category 2 surveys was "how much risk do we want to take in going ahead with activities without surveys." App. Tab 74.

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited. The memorandum cited was not written by the IRT, it was from the Forest Service's litigation coordinator, and it is dated December 11, 1998, not August 28, 1996. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior

to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs inadvertently included the incorrect document at App. Tab 74, cited by the proposed finding. Plaintiffs' corrected App. Tab 74 well supports the proposed finding.

59. The document entitled "IMPLEMENTATION OF SURVEY AND MANAGE (COMPONENT 2) REQUIREMENTS" was an early staff paper prepared by Tom Hussey for IRT consideration by Larry Larsen of the BLM, Cheryl McCaffrey of the BLM, Randy Hickenbottom of the Forest Service and Lyndon Werner of the BLM. App. Tab 170 (T. Hussey Dep. Tr. 40:6-41:22); App. Tab 18.

Defendant's Response: Defendant objects to this contention because the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it related to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

60. As the IRT was considering alternative interpretations of the concept of implementation of ground-disturbing activities for purposes of performing the Category 2 surveys, it was aware that some interpretations such as "NEPA decision equals implementation" would permit more timber to be sold on a faster timetable and would therefore assist the Forest Service in meeting its timber sale targets under the NFP. Thus, the IRT members were aware that, depending upon the interpretation ultimately adopted, the Forest Service could come up short on its timber sale program goals under the NFP and it could risk coming up short on its species protection goals under the NFP. The IRT was also always aware that there was a risk of lawsuits by environmental activists challenging an interpretation that favored the Forest Service's timber sale program goals over its species protection goals. App. Tab 170 (T. Hussey Dep. Tr. 45:21-47:14).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Hussey testified that the balancing of meeting environmental concerns and continuing to operate the timber program was not his primary focus, but rather "something that occurred at higher levels than our team." Mr. Hussey further testified that "Our team was far more worried about the Northwest Forest Plan direction than specific projects or targets or anything like that." App. Tab 170 (Hussey Dep. 45:25-46:7). Additionally, Mr. Hussey stated that balancing timber sales with environmental concerns affected him but "it wasn't weighted anywhere near as heavily as trying to figure out what the plan said and come up with direction that would meet it." Id. 46:12-16. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not state that such balancing was the primary focus of the IRT. The proposed finding states that the IRT was aware of certain risks to the NFP's environmental goals and the Forest Service's timber sale targets implicated by the alternative definitions of "implementation." The facts asserted are well supported by the cited testimony of Mr. Hussey; defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

61. The document entitled "IMPLEMENTATION OF SURVEY AND MANAGE (COMPONENT 2) REQUIREMENTS" was a draft provided for review to the IMG, including Tom Nygren of the Forest Service and Bill Bradley of the BLM. App. Tab 21; App. Tab 170 (T. Hussey Dep. Tr. 51:24-53:12).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Hussey testified that a version of this document would eventually have been provided to Mr. Nygren and Mr. Bradley, not that this particular document was. App. 170 (Hussey Dep. 51:21-23). Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The testimony the government relies upon to argue that Mr. Hussey testified that the draft document discussed in the proposed finding (App. Tab 21) was not provided to Mr. Nygren and Mr. Bradley was given before Mr. Hussey was presented with the document found in App. Tab 21. At his deposition, Mr. Hussey was handed the document found at App. Tab 21

and specifically asked, "[W]as this paper . . . then provided to Nygren and Bradley?" To which Mr. Hussey replied, "To my knowledge it was. . . ." App. Tab 170 (T. Hussey Dep Tr. 52:21-24).

62. There was general agreement among the IRT members that whenever possible the Forest Service should schedule timber sale project decisions to include the results of S&M surveys before the Decision Notices were executed. App. Tab 170 (T. Hussey Dep. Tr. 58:25-59:10).

Defendant's Response: Defendant objects to the use of the term "general agreement" because it is vague and ambigous, Additionally, we object to this contention because it is not supported by the testimony cited. Mr. Hussey testified only that he personally agreed with the statement referred to. App. 170 (Hussey Dep. 59:1-10). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Hussey's testimony cited by the proposed finding relates to a staff paper prepared by the IRT. App. Tab 170 (T. Hussey Dep Tr. 52:6-11). Among other things, that IRT staff paper recommended that "whenever possible, we should schedule project decisions to include results of S and M surveys." Id. (T. Hussey Dep Tr. 58:21-59:5). The fact that Mr. Hussey, a member of the IRT, personally agreed with the IRT's recommendation is neither unsurprising nor contradicts the proposed finding.

63. Despite the fact that the IRT members all agreed that the NEPA analysis leading up to the execution of a Decision Notice for a timber sale should whenever possible include the results of

S&M surveys for Category 2 species, no recommendation was ever made by the IRT to the IMG or the RIEC that Forest Service deciding officers should hold off on executing Decision Notices until the S&M surveys had been completed. App. Tab 170 (T. Hussey Dep. Tr. 58:21-60:9); App. Tab 171 (L. Larsen Dep. Tr. 36:8-17).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited, and is therefore merely plaintiffs' opinion. Neither Mr. Hussey nor Mr. Larsen testified that "the IRT members all agreed" about plaintiffs' counsel's statement. App. Tab 170 (T. Hussey Dep. Tr.58:21-60:9); App. Tab 171 (L. Larsen Dep. Tr. 36:8-17). Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs amend the proposed finding to read in its entirety: "No recommendation was ever made by the IRT to the IMG or the RIEC that Forest Service deciding officers should hold off on executing Decision Notices until the S&M surveys were completed. App. Tab 170 (T. Hussey Dep. Tr. 58:20-60:9)."

64. According to Tom Hussey, a member of the IRT during the time that the interpretation "NEPA decision equals implementation" was being developed, the commonly accepted understanding of when implementation of ground-disturbing activities occur was as follows:

> My recollection at least was what was in my mind when we were discussing this is to most people implementation is an action, big yellow machines driving off

> low boys, chain saws roaring, dirt being moved and stuff like that rather than signing of a decision document.

App. Tab 170 (T. Hussey Dep. Tr. 63:18-64:1).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Hussey testified only as to what was in his mind, regarding the definition of "ground-disturbing." Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant objects because in recalling his understanding of the commonly accepted understanding of "implementation," Mr. Hussey only testified to what was in his mind at the time the IRT was developing its definition. However, the proposed finding directly quotes Mr. Hussey on his recollection, including his statement that his recollection related to "what was in [his] mind."

65. The document entitled "Survey and Manage Current Implementation Issues," dated September 1, 1996, was very near the final IRT agreed position on how to interpret the NFP Category 2 survey requirements and their implementation dates. App. Tab 170 (T. Hussey Dep. Tr. 66:9-20); App. Tab 24.

Defendant's Response: Defendant objects to this contention because page 66 of Mr. Hussey's deposition is not attached at Tab 170. Furthermore, the document and testimony cited concern

the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs accidentally omitted page 66 of the cited portion of Mr. Hussey's deposition transcript. Plaintiffs' corrected App. Tab 170 well supports the proposed finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

66. Tom Hussey and Larry Larsen were the primary drafters of the document entitled "Survey and Manage Current Implementation Issues" dated September 1, 1996. App. Tab 170 (T. Hussey Dep. Tr. 68:5-22); App. Tab 24.

Defendant's Response: Defendant objects to this contention because document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

67. The Forest Service issued interim guidance for the surveys of the Oregon red tree vole ("RTV") on November 4, 1996. By its own terms this guideline was to expire on September 30, 1998. App Tab 36 (RTV Directive). Although there was evidence at that time that the Oregon

RTV may also be found in northern California, the interim guidance did not require surveys to be conducted in California. Id. The interim guidance also did not require surveys to be conducted in National Forest areas where at least 40% of the land contained habitat suitable for the Oregon RTV. Id. This November 4, 1996 interim guidance was extended by the Forest Service on September 25, 1998. App. Tab 52 (Memo extending RTV Directive).

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited. The RTV Memorandum does not state that there was "evidence" that the Oregon RTV was found in Northern California, nor that surveys were not required where at least 40% of the land contained habitat suitable for the Oregon RTV. App. Tab 36. The RTV Memorandum states that surveys are required in areas where an area is at least 40% forested, and "has at least a 60% crown closure or greater." Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs agree that the RTV Directive stated that there was "some indication" that the RTV may be found in northern California, not "evidence" that it may be found in Northern California. Defendant's objection on this point presses a distinction without a difference. Plaintiffs also agree that the RTV Directive did not require surveys where 40% of the land contained habitat suitable for the RTV; indeed, as the ONRC Action court found, surveys were required on just 10% of the lands containing RTV habitat after all of the habitat screens were applied. ONRC Action, 59 F. Supp. 2d. at 1094. The government is apparently confused when it argues that surveys are required in areas that meet the habitat threshold (i.e., 40%

forested with 60% crown closure) of the RTV Directive, which is understandable given that a reasonable person would expect surveys to be conducted in areas where the RTV can live. However, the RTV Directive excludes lands meeting the habitat threshold from the survey requirement: "Where conditions meet the habitat threshold, . . . no site-specific surveys are required." App. Tab 36, at A-284 (emphasis added). Hence, why the RTV Directive was found arbitrary and capricious by the ONRC Action court.

68. From approximately April 13, 1994, when the NFP ROD was issued, through October 1, 1998, the Forest Service knew that it was going to be very difficult to develop the necessary protocols for performing all of the Category 2 surveys in time to survey sales on which ground-disturbing activities would first take place on or after October 1, 1998. Thus, substantially before October 1, 1998, the Forest Service was well aware that many of the Category 2 surveys required by the NFP would probably have to be postponed. App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 166:6-171:2).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion based on speculation by Ms. Zike; it is not a contention of fact. Defendant further objects because Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant objects on the grounds that the proposed finding is based on speculative testimony given by Ms. Zike in her deposition in which she was defended by counsel for the defendant. Notably, when Ms. Zike testified as indicated at her deposition, defendant did not object that the testimony was speculation, opinion, a conclusion, or lacked foundation. The statements are not opinion but facts based upon Ms. Zike's personal knowledge given her position as the Litigation Coordinator for Region 6. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF No. 45.

69. In April 1998, the Forest Service and the BLM approached the RIEC with a request to consider a one-year delay of survey implementation for several Category 2 surveys, based on the language on the ROD, page C-6 and the problems associated with some Category 2 species surveys. As a result, the RIEC directed the Survey and Manage workgroup to try to devise a way that the socio-economic goals of the NFP (i.e., the Forest Service and BLM timber sale programs) could be upheld without increasing the risk of extirpation to the species. The group came up with a classification that considered the risk posed by a one-year delay of surveys from FY 1999 to FY 2000 and the technical feasibility of accomplishing the surveys. Accordingly, the RIEC authorized the development of an EA to change the implementation schedule for 32 species where surveys were believed to be not-technically-feasible and where this one-year delay in surveying did not appear to substantially increase risk to the species. The analysis used in this EA also identified 12 species which were estimated to be at "substantially increased risk" if surveys were delayed from FY 1999 to FY 2000 and planned Forest Service and BLM timber sales continued to be sold and harvested. The possibility of these types of changes was expressly

contemplated in the NFP and was within the authority of the RIEC, provided that the necessary NEPA and NFMA analysis was performed first. App. Tab 75 at A-538.

Defendant's Response: Defendant objects to this contention because the concluding sentence is not supported by the document cited, it is merely plaintiffs' opinion. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant has agreed with all but the final sentence of the proposed finding, subject to its standard relevance objection to evidence relating to pre-award conduct. Defendant is wrong when it objects that the last sentence of the proposed finding, addressing the NFP's allowing changes to be made to the survey requirements, is not supported by the documents cited. The document states, "Flexibility was built into the [NFP]. . . . The Regional Interagency Executive Committee (RIEC) can change the schedule, move species from one survey strategy to another, or drop the mitigation strategy for species whose status is found to be more secure than originally projected (ROD, p. C-6)." App. Tab 75 at A-538. However, such changes may require NEPA and NFMA analysis. See ONRC Action, 59 F. Supp. 2d at 1088.

70. [Intentionally left blank]

71. On or about December 11, 1998, Sue Zike and Peggy Kain of the Forest Service and Judy Nelson of the BLM submitted briefing information to Paul Brouha of the Washington Office of the Forest Service and Chris Jauhola, an official in the Washington Office of the BLM. This

briefing paper discussed several items including Category 2 species surveys referred to as "survey before ground-disturbing activities." Addressing these Category 2 or "Strategy 2" surveys the paper states:

> Strategy 2 surveys have multiple implementation dates with surveys for red tree voles and amphibians beginning in FY 1996; and surveys for the remaining 71 species beginning in FY 1999. The ROD recognized that little was known about the species and that difficulties would be encountered in meeting the survey and manage requirements. Flexibility was built into the plan: as experience is acquired, the Regional Interagency Executive Committee (RIEC) can change the schedule, move a species from one survey strategy to another, or drop the mitigation strategy for species whose status is found to be more secure than originally projected (ROD, p. C-6).

App. Tab 75 at A-537 to A-538.

Defendant's Response: Defendant objects to this contention because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

72. As of approximately October 5, 1999, with respect to Happy Thin, Jack Heli and Too Wild, the following required wildlife and plant surveys had not been performed. In many cases,

indicated below, protocols for these surveys were not yet available. In some cases these surveys were not scheduled to be completed until the year 2000.

| **Species** | **Happy Thin, KLA** | **Jack Heli, KLA** | **Too Wild, SIS** |
|---|---|---|---|
| Bridgeoporus nobilissimus (fungi) | To be completed Fall 2000 | To be completed Fall 2000 | To be completed Fall 2000 |
| Aleuria rhenana (fungi) | No protocol available | No protocol available | No protocol available |
| Bondarzewia Montana (fungi) | No protocol available | No protocol available | No protocol available |
| Otidea leporina (fungi) | No protocol available | No protocol available | No protocol available |
| Otidea onotica (fungi) | No protocol available | No protocol available | No protocol available |
| Otidea smithii (fungi) | No protocol available | No protocol available | No protocol available |
| Polyozellus multiplex (fungi) | No protocol available | No protocol available | No protocol available |
| Sarcosoma Mexicana (fungi) | No protocol available | No protocol available | No protocol available |
| Ptilidium californicum (bryophytes) | | To be completed Fall 2000 | |
| Ulota meglospora (bryophytes) | No protocol available | | No protocol available |
| Buxbaumia vidiris (bryophytes) | | | No protocol available |
| Kurzia makinoana (bryophytes) | | | No protocol available |

| **Species** | **Happy Thin, KLA** | **Jack Heli, KLA** | **Too Wild, SIS** |
|---|---|---|---|
| Rhizomnium nudum (bryophytes) | | | No protocol available |
| Tetraphis geniculata (bryophytes) | | | No protocol available |
| Helminthoglypta hertleini (Oregon Shoulderband) (mollusks) | To be completed June 2000 | To be completed Summer 2000 | |
| Helminthoglypta talmadgei (Klamath Shoulderband) (mollusks) | | To be completed Summer 2000 | |
| Megomphix hemphilli (Oregon Megomphix) (mollusks) | | | To be completed November 1999 |
| Monadenia churchi (Church's Sideband) (mollusks) | | To be completed Summer 2000 | |
| Monadenia chaceana (Siskiyou Sideband) (mollusks) | | To be completed Summer 2000 | |
| Monadenia troglodytes (Shasta Sideband) (mollusks) | | To be completed Summer 2000 | |

| **Species** | **Happy Thin, KLA** | **Jack Heli, KLA** | **Too Wild, SIS** |
|---|---|---|---|
| Monadenia troglodytes wintu (Wintu Sideband) (mollusks) | | To be completed Summer 2000 | |
| Prophysaon coeuleum (Blue-grey Tail-dropper) (mollusks) | To be completed June 2000 | | To be completed November 1999 |
| Prophysaon dubium (Papillose Tail-dropper) (mollusks) | To be completed June 2000 | To be completed Summer 2000 | To be completed November 1999 |
| Trilobopsis roperi (Shasta Chaparral) (mollusks) | | To be completed Summer 2000 | |
| Trilobopsis tehamana (Tehana Chaparral) (mollusks) | To be completed June 2000 | To be completed Summer 2000 | |
| Allotropa virgata (Sugar Stick) (vascular plants) | To be completed June 2000 | | |
| Cypripedium fasciculatum (Klamath) (Clustered Lady's Slipper) (vascular plants) | To be completed Summer 2000 | | |

| **Species** | **Happy Thin, KLA** | **Jack Heli, KLA** | **Too Wild, SIS** |
|---|---|---|---|
| Cypripedium montanum (west Cascades) (Mountain Lady's Slipper) (vascular plants) | To be completed Summer 2000 | | |

App. Tab 134.

Defendant's Response: Defendant objects to this contention of fact because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

**EVENTS SUBSEQUENT TO THE ISSUANCE OF THE JOINT FOREST SERVICE/ BLM MEMORANDUM ADOPTING THE INTERPRETATION "NEPA DECISION EQUALS IMPLEMENTATION"**

73. On November 1, 1996, the Forest Service and BLM issued a joint guidance memorandum adopting the interpretation "NEPA decision equals implementation" for the purpose of determining when ground-disturbing activities are implemented in the context of Category 2 species survey requirements. Although issued on November 1, 1996 the "NEPA decision equals

implementation" interpretation was deemed effective direction to Forest Service line officers as of October 1, 1996. The joint memorandum adopting this interpretation by its own terms was to expire as of September 30, 1998. App. Tab 34.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

74. Prior to the Forest Service's adoption of the interpretation "NEPA decision equals implementation" in the joint agency memorandum dated November 1, 1996, the Forest Service had information available which would have allowed anyone who was interested in the Forest Service to ascertain how many and which timber sales were likely to have sufficient environmental analysis completed to allow the execution of Decision Notices prior to October 1, 1996, assuming Category 2 surveys did not have to be performed prior to the execution of those Decision Notices. Thus, it was possible to determine before this joint memorandum was issued, how many (and specifically which) Forest Service and BLM timber sales were in the planning pipeline and would likely be offered to the public after October 1, 1996 without Category 2 surveys. Nevertheless, the Forest Service did not ascertain how many such timber sales were in the planning pipeline. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 36:21-39:17).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited, and is merely plaintiffs' opinion. Defendant further objects because the plaintiffs have taken Mr. Devlin's testimony out of context and Mr. Devlin's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant does not bother to explain how Mr. Devlin's testimony has been taken out of context. Mr. Devlin's statements are not personal opinion but rather statements of fact based on his personal knowledge, including knowledge gained while employed by the Forest Service as Director of Natural Resources. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

75. The interpretation "NEPA decision equals implementation" in the November 1, 1996 joint memorandum was re-adopted on September 11, 1998 for the second group of Category 2 surveys (the invertebrates) which were required as of October 1, 1998 for certain timber sales. App. Tab 49.

Defendant's Response: Defendant objects to this contention because document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

76. Just as was the case with the joint memorandum dated November 1, 1996, re-adoption of the interpretation "NEPA decision equals implementation" with respect to the October 1, 1998 Category 2 surveys meant that the Forest Service was not required to perform Category 2 surveys if Decision Notices were signed for timber sales in the planning pipeline prior to October 1, 1998, even if the Category 2 invertebrate surveys had not been performed and these timber sales were not offered to the public months or even years later. Prior to October 1, 1998, the Forest Service had information available that would have allowed anyone in the Forest Service who was interested to ascertain how many (and specifically which) Forest Service and BLM timber sales were in the planning pipeline and could have Decision Notices executed prior to October 1, 1998, assuming no Category 2 surveys had to be performed on these sales prior to October 1, 1998. Nevertheless, prior to the re-adoption of the interpretation "NEPA decision equals implementation" in this September 1998 joint memorandum, the Forest Service did not ascertain how many such timber sales were in the planning pipeline. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 36:21-39:17).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Defendant further objects because the plaintiffs have taken Mr. Devlin's testimony out of context and Mr. Devlin's personal opinion cannot bind the Forest Service. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior

to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant does not bother to explain how Mr. Devlin's testimony is taken out of context. Mr. Devlin's statements are not personal opinion but rather statements of fact based on his personal knowledge, including knowledge gained while employed by the Forest Service as Director of Natural Resources. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

77. The Forest Service did not consult with the Department of Justice regarding the legal viability of the interpretation "NEPA decision equals implementation" before the Forest Service adopted that interpretation. App. Tab 131; App. Tab 179 (M. Gippert Dep. Tr. 44:25-48:16; 50:12-53:22).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Whether the Forest Service consulted with the Department of Justice ("DOJ") is an issue of fact, not law. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

78. However, the "NEPA decision equals implementation" interpretation was discussed with the Department of Justice and representatives of the President's Council on Environmental Quality in the Washington Office of the Forest Service before the filing of the ONRC Action lawsuit. At that time Michael Gippert, lead Washington Office attorney for the Forest Service on NEPA and NFMA issues, advised the Forest Service that in light of existing case law the NFP needed to be formally amended if the definition of "NEPA decision equals implementation" was to be extended to FY99 and beyond. App. Tab 131; App. Tab 179.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a statement of fact. Defendant further objects because Mr. Gippert's personal opinion cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Whether the Forest Service consulted with the DOJ and the substance of Mr. Gippert's recommendation on amending the NFP is an issue of fact, not law; Mr. Gippert's statements are not opinion but rather statements of fact based upon his personal knowledge, including knowledge gained while employed by the Department of Agriculture as an attorney in the Office of General Counsel. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

79. One implication of the joint agency interpretation "NEPA decision equals implementation" was that for those actions authorized prior to the deadline, there would be an incentive for the agency to hurry up and sign decision notices before the deadline occurred. This allegation was raised by the ONRC Action plaintiffs in their lawsuit filed July 8, 1998, and it was a concern to Edward (Ted) Boling, lead attorney for the government in the ONRC Action litigation. App. Tab 178 (E. Boling Dep. Tr. 58:12-61:3).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a statement of fact. Defendant further objects because Mr. Boling's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion; Mr. Boling testified it was a concern that the Forest Service would "hurry up [and] get [the NEPA decision signings] done before the deadline." App Tab 178 (E. Boling Dep. Tr. 60:20-61:2). Mr. Boling's statements "bind" defendant in that they are admissions by party opponent. See reply to PPF No. 45. The statements contained in the deposition concern matters easily within the scope of Mr. Boling's employment with the United States. Mr. Boling's deposition testimony concerns the government's handling of the ONRC Action litigation. At the time the events Mr. Boling discusses in his deposition occurred, Mr. Boling was employed by the DOJ as the lead trial counsel for the United States in the ONRC Action litigation. In his deposition, Mr. Boling discusses his assessment of the legal viability of the Forest Service's definition, "NEPA decision

equals implementation," which was a subject of the ONRC Action litigation; his communications with his superiors in the DOJ and members of the Forest Service involved in the ONRC Action litigation; his communications with the ONRC Action plaintiffs regarding their lists of "at-risk" timber sales sent to the government; the government's agreement to delay award of the "at-risk" sales to prevent a motion for a preliminary injunction by the ONRC Action plaintiffs; the settlement of the ONRC Action litigation; and documents relating to these events. See Attachment 2. All of these topics are squarely within the subject matter of Mr. Boling's job description as lead counsel for the government in that litigation. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

80. Prior to September 30, 1998, Robert Devlin, Director of Natural Resources for Region 6, sent an email to all national forests in Region 6 urging them to sign Decision Notices prior to October 1, 1998 in order to avoid the obligation to conduct Category 2 species in instances in which apart from these surveys and formal biological opinions all the work necessary for the Decision Notices had been completed. App. Tab 50; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 27:6-28:3).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Devlin's message to the forests stated his belief that his instructions met the requirements of the Northwest Forest Plan, and therefore it was acceptable to sign Decision Notices. Defendant further objects because Ms. Zike's deposition testimony

constitutes inadmissible hearsay, and her personal opinion cannot bind the Forest Service. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant claims that Mr. Devlin stated in his e-mail urging national forests to sign NEPA decision notices prior to the October 1, 1998 deadline for the start of certain Category 2 surveys that his direction complied with the NFP. Mr. Devlin made no such assertion in his e-mail and defendant does not quote or cite to any such statement. Indeed, Mr. Devlin's e-mail speaks of the "risk" of signing DNs where there is no formal completion of biological opinions, and suggests the possibility that "this strategy will not work." App. Tab 50. Ms. Zike's deposition testimony is not hearsay because the statements made by other Forest Service employees which she relates are admissions by party opponent. See reply to PPF Nos. 45, 79. The statements contained in the deposition concern matters easily within the scope of Ms. Zike's employment with the United States. Ms. Zike's deposition testimony concerns events occurring while she was employed by the Forest Service as Litigation Coordinator for Region 6 (the position she still holds today). Ms. Zike's statements concern the Forest Service's receipt of lists of "at-risk" or "problem" sales from the ONRC Action plaintiffs, the Forest Service's evaluation of these "at-risk" timber sales prior to contract award to determine their likelihood of being enjoined, the Forest Service's communications with the DOJ regarding these and related issues, and other matters and documents relating to how the Forest Service handled the ONRC Action litigation within Region 6. All of these subjects were plainly within the scope of Ms. Zike's duties as Forest Service Litigation Coordinator for the ONRC Action litigation. Moreover, the

statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

81. Oregon Natural Resources Council Action et al. v. U.S. Forest Service and Bureau of Land Management, CV 98-942 WD ("ONRC Action"), was filed on July 8, 1998 in the U.S. District Court for the Western District of Washington. The plaintiffs in the ONRC Action litigation claimed that both the Forest Service's "NEPA decision equals implementation" interpretation and the Oregon red tree vole interim survey guidelines violated the NFP ROD, NEPA and NFMA. ONRC Action, 59 F. Supp. 2d 1085, 1088 (W.D. Wash. 1999).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant incorrectly asserts that the proposed finding is a legal conclusion. Whether the ONRC Action case was filed on the date and in the forum asserted is a question of fact, not law. What claims the ONRC Action brought against the Forest Service and BLM is also a question of fact, not law, and the proposed finding on this point is more than adequately supported by the ONRC Action decision cited. Moreover, DPFUF ¶ 58 is almost identical in

substance to plaintiffs' proposed finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

82. At the time of the ONRC Action lawsuit, lead Department of Justice counsel for the government in the ONRC Action litigation Edward Boling was aware of the fact that a sizable number of timber sales had been approved and awarded by the Forest Service without surveys based upon the "NEPA decision equals implementation" interpretation. This practice was of concern to Mr. Boling as part of the litigation risk analysis conducted by the government with respect to the ONRC Action litigation. App. Tab 178 (E. Boling Dep. Tr. 33:2-34:22, 35:18-36:3).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion, but paraphrases the testimony of Edward Boling relating the facts of the finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

83. By letter dated September 25, 1998, the ONRC Action plaintiffs, at the express request of Department of Justice counsel for the government in the ONRC Action lawsuit, provided a detailed description, including examples, of how the ONRC Action plaintiffs believed the NFP

was being improperly implemented with respect to Category 2 or Strategy 2 surveys. This letter specifically discussed ONRC Action's argument that the interpretation "NEPA decision equals implementation" is a violation of the NFP ROD and would allow "the Forest Service and BLM to quickly 'implement' projects [including timber sales] before survey requirements kick in, by simply signing NEPA documents." This letter also argued that the NFP ROD's red tree vole survey requirement had been misinterpreted by the November 4, 1996 red tree vole directive because that directive stated that site-specific surveys need not be conducted in most of the habited types or vegetation communities associated with the red tree vole and an arbitrary line had been drawn at the California border excluding all activities in California National Forests, such as the Klamath National Forest, for the red tree vole survey requirements, even though the red tree vole is found in California. The letter also noted that the adoption of the interpretation "NEPA decision equals implementation" and the red tree vole directive was not accompanied by any NEPA document and was not circulated for public review or comment. App. Tab 51.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second hand legal conclusions, and not a contention of fact. Furthermore, the document cited concerns the Forest Service's responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding discusses the contents of a letter sent to the DOJ from the ONRC Action plaintiffs. The contents of the letter are a question of fact, not law, and thus the proposed finding cannot be a second-hand legal conclusion. While the letter itself may contain legal conclusions, they are not plaintiffs and the proposed finding is not used to prove the

truth of those conclusions but to demonstrate that defendant received a detailed description of and basis for the claims brought by the ONRC Action plaintiffs. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

84. On or about November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, briefed the Assistant Attorney General for Natural Resources and the Environment, Lois Schiffer, and her immediate subordinate, Peter Coppleman, on the issues involved in the ONRC Action litigation and proposals to settle that lawsuit. Among the subjects discussed was the Forest Service/BLM interpretation of the Category 2 survey requirements known as "NEPA decision equals implementation." Ms. Schiffer told Mr. Boling at this meeting that the interpretation "NEPA decision equals implementation was nonsense." Mr. Coppleman agreed. Then, Ms. Schiffer indicated that she would need to have further discussions with high level officials in the Department of Agriculture and the Department of the Interior before deciding whether the Department of Justice would defend that interpretation in court. The substance of this meeting was communicated by Mr. Boling to Sue Zike, litigation coordinator within the Forest Service for the ONRC Action litigation, and Ms. Zike in turn communicated the substance of this meeting to Robert Devlin, the Director of Natural Resources within the Forest Service for Region 6, and others. App. Tabs 64, 66-67.

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal conclusion and not a contention of fact, and is not supported by the documents cited. Defendant further objects because the documents cited are inadmissible hearsay. Additionally, Ms. Schiffer, Mr. Boling, and Mr. Coppelman did not recall the conversation. Furthermore, the

documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant attempts to controvert the proposed finding by stating that Ms. Schiffer, Mr. Boling, and Mr. Coppelman had no recollection of Ms. Schiffer stating that she believed the "NEPA decision equals implemented" interpretation was nonsense. The witnesses' lack of recollection of an event does not controvert the memorandum Ms. Zike contemporaneously wrote when she was told that Ms. Schiffer indeed believed the interpretation was "nonsense." Ms. Zike's contemporaneous memorandum of and later deposition testimony concerning what she had heard and the underlying statements of Mr. Boling and Ms. Schiffer are not hearsay because they are admissions by party opponent under FRE 801(d)(2). See reply to PPF Nos. 45, 79, 80. Ms. Schiffer was Mr. Boling's superior at the DOJ and thus overseeing the ONRC Action litigation and defendant's litigation strategy and analysis thereof were part of her duties. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

85. At the November 25, 1998 meeting, Ms. Schiffer expressed concerns that the "NEPA decision equals implementation" interpretation would allow the Forest Service and the BLM to authorize timber sales without having first conducted Category 2 surveys even though the sales might not be offered or awarded months or even years later. This was an allegation raised by the

ONRC Action plaintiffs. Ms. Schiffer's subordinate, Mr. Coppleman, shared Ms. Schiffer's concerns. App. Tabs 64, 66; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 10:6-12:9, 96:8-97:17); App. Tab 178 (E. Boling Dep. Tr. 88:10-89:16).

Defendant's Response: Defendant objects to this contention because it is a legal conclusion, and not a contention of fact. Defendant further objects on the ground that these contentions are hearsay, that Ms. Zike's personal opinion does not bind the Forest Service, and that the documents and testimony cited do not support the contention. Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Whether Ms. Schiffer and Mr. Coppelman shared concerns regarding the "NEPA decision equals implemented" interpretation is a factual issue, not a legal conclusion, and the deposition testimony and documents cited by the proposed finding show that Ms. Schiffer and Mr. Coppelman did have such concerns. Ms. Zike's contemporaneous memorandum of and later deposition testimony concerning what she had heard and the underlying statements of Mr. Boling and Ms. Schiffer are not hearsay because they are admissions by party opponent under FRE 801(d)(2). See reply to PPF Nos. 45, 79, 80, 84. Ms. Zike's statements themselves "bind" defendant because they are admissions by party opponent. See id. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the

testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

86. By facsimile dated November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, sent an email to Dinah Bear, general counsel for the President's Council on Environmental Quality, the lead NEPA lawyer for the federal government, with an attached memorandum drafted by Mr. Boling and his co-counsel for the government, John Watts, in which Mr. Boling and Mr. Watts concluded "the agencies' interpretation of the ROD is difficult to square with the common meaning of the term 'implemented.'" App. Tab 65 at A-501; App. Tab 178 (E. Boling Dep. Tr. 98:16-101:1).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The date, substance, sender, and recipients of the facsimile are statements of fact, not conclusions of law. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

87. On November 25, 1998, the day Edward Boling briefed Schiffer and Coppleman, Forest Service attorney Owen Schmidt called Nancy Graybeal, Deputy Regional Forester for Region 6, to report that Lois Schiffer would not agree to defend the "NEPA decision equals

implementation" interpretation until she had talked to higher officials. Ms. Graybeal wrote to others in the Forest Service about the conversation saying, "Owen Schmidt, OGC, called this morning to say Ted Boling reported a non-decision from Lois Schiffer. Lois wants to talk to an Asst Sec. (I don't know which one) before deciding course of action. I agreed we'd delay award of any sales until December 3. Bob [Devlin] – please let Forest CO's know." App. Tab 67.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The occurrence and substance of Mr. Schmidt's telephone conversation and the occurrence and substance of Ms. Graybeal's e-mail are statements of fact, not conclusions of law. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

88. Nancy Graybeal, who worked with Mr. Devlin, concluded that the Department of Justice would not accept the Forest Service's recommendation not to settle the ONRC Action case, which would require additional surveys of Category 2 species, if the only Forest Service arguments were based on the additional cost and the delay in proceeding with timber sales. Ms. Graybeal concluded that the Department of Justice, which as a matter of law had final authority to settle litigation on behalf of the United States, would have to be convinced that there were good resource reasons supporting the continued litigation of the ONRC Action case as opposed

to agreeing to settle that lawsuit based upon the Forest Service's commitment to complete Category 2 surveys for all timber sales implicated in the lawsuit, including plaintiffs' timber sales in this action, even if such sales had to be suspended for two seasons or more in order to perform those surveys. App. Tab 63 at A-496 to A-497; App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 11:5-13:23).

Defendant's Response: Defendant objects this contention because it concerns discussions regarding settlement of a lawsuit, which is inadmissible pursuant to Federal Rule of Evidence 408. We further object because the contention relies on inadmissible hearsay. Additionally, the document and testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF No. 45.

**PLAINTIFFS' REPLY TO DEFENDANT'S FRE 408 OBJECTIONS**

Plaintiffs' proposed findings and the documentary evidence and testimony on which they rely are not barred by FRE 408 on several grounds. First, FRE 408(b) allows evidence of settlement negotiations when used for a purpose other than to prove liability. These authorized uses include proving facts contained in documents and testimony which may be related to or a part of settlement negotiations and a party's knowledge of those facts. Second, Rule 408 allows

a proposed finding and evidence on which it relies that involve statements and events that occurred during a period in which there were no settlement negotiations. Third, FRE 408 only bars the use of documents and testimony involved in settlement negotiations to prove liability for the claim being negotiated. Rule 408 does not bar use of such evidence to prove liability of a different claim. Fourth, FRE 408 does not apply to internal memoranda or information not communicated to the opposing party during the settlement negotiations.

### 1. Plaintiffs' Proposed Findings Of Fact And Underlying Evidence Are Admissible Under FRE 408(b) To Prove Defendant's Knowledge Of Facts

Proposed findings and the evidence on which they rely are not barred from use at trial because "Rule 408 is inapplicable when evidence of the compromise is offered to prove notice." FRE 408 advisory committee's notes to 2006 amendments. One of the permissible uses allowed under FRE 408(b) is to prove a party's knowledge of the facts contained in settlement negotiations. Perri v. Daggy, 776 F. Supp. 1345, 1349 (N.D. Ind. 1991); accord Spell v. McDaniel, 824 F.2d 1380, 1400 (4th Cir. 1987) (cited in FRE 408 advisory committee's notes to 2006 amendments). For example, in Perri, the plaintiff brought a civil rights action against the police officers who arrested him and the police chief. At trial, the plaintiff sought to introduce the city's settlement of a prior claim against one of the officers. The plaintiff wanted to use the settlement agreement to prove the police chief was liable for violating the plaintiff's civil rights by continuing to employ an officer he knew was dangerous. The court held that the settlement was admissible against the police chief because the plaintiff was not using it to prove the city's liability for the prior excessive force claim but instead to show that the police chief either knew or should have known of the officer's prior misconduct. Id.

Like the plaintiff in Perri, Blue Lake, Timber Products, and CLR utilize proposed findings and underlying evidence to prove facts presented within defendant's settlement negotiations with ONRC Action to establish defendant's knowledge of those facts, such as the fact that Happy Thin, Jack Heli and Too Wild were on ONRC Action's "at-risk" lists, that ONRC Action threatened to move for injunctive relief if defendant allowed ground-disturbing operations on the sales, and that defendant kept the fact that Blue Lake's, Timber Products', and CLR's sales were on ONRC Action's "at-risk" lists a secret. Pls.' Br. at 32-42. In short, Blue Lake, Timber Products, and CLR are using these proposed findings and underlying evidence to prove what the Forest Service knew, when it knew it and the actions it took despite this knowledge. FRE 408 does not bar a proposed finding and evidence when used for this purpose.

**2. FRE 408 Does Not Apply To Documents Prepared Between December 4, 1998 And August 2, 1999, Because There Were No Settlement Negotiations During This Time**

Settlement negotiations began shortly after the filing of ONRC Action in July 1998 but stopped by December 3, 1998. Beginning December 4, 1998, settlement negotiations had broken down and the government did not believe that settlement was likely. At his deposition, Edward (Ted) Boling, lead counsel for the government in ONRC Action, testified that by December 1998 it became apparent to the government that it was not going to settle the case. This fact is further confirmed by the government's internal correspondence. In an e-mail sent on or about December 3, 1998, Sue Zike, Litigation Coordinator for Region 6 of the Forest Service, stated that the government's settlement negotiations with ONRC Action would end on December 3rd and that the Forest Service should notify the DOJ before it awarded any sale because doing so would likely prompt a motion for injunctive relief by the ONRC Action plaintiffs:

> Govt's promise to delay the award of certain timber sales pending settlement ends on Dec 3. Settlement of the case does not appear likely. To be prepared for what legal maneuverings ONRC might employ (motion for a broad prel. inj. is likely), DOJ Ted Boling requested today that the Forest Service give him a 5 day notice before awarding any of the sales listed by ONRC in their 9/17/98 letter.

App. Tab 69.

The day after the government's promise ended, on December 4, 1998, Mr. Boling wrote Ms. Zike to inform her, "As of today, we have no agreement with plaintiffs to hold on to the award of any timber sales." App. Tab 70 at A-519. Mr. Boling went on to request that the Forest Service not award any sale until:

> after 1) having reviewed the issues common to the administrative appeal and the ONRC Action suit with agency counsel (Owen Schmidt and Roger Nesbit), [and] 2) communicated to us its judgment that the award of the sale is worth the risk that the sale will be used by plaintiffs as an example in an emergency motion to enjoin all sales in the area of the Northwest Forest Plan. . . .

Id. Thus, after December 4, 1998, both the DOJ and the Forest Service manifested a belief that settlement negotiations with ONRC Action had ended. From December 4, 1998 through the ONRC Action court's order awarding summary judgment to the ONRC Action plaintiffs, there were no settlement discussions and FRE 408 is not a bar to proposed findings and evidence relating to events during this time period. In addition, once settlement negotiations between the government and ONRC Action started again after the court granted summary judgment to ONRC Action on August 2, 1999, these discussions focused only on relief, liability having been decided by the court. Accordingly, these settlement negotiations did not involve the issue of liability and plaintiffs may use documents or testimony relating to the settlement in this time period under FRE 408 to prove liability. Blue Lake's, Timber Products', and CLR's exhibits from this time period that are challenged by defendant are also admissible and not barred by FRE 408.

**3. FRE 408 Only Bars Evidence Of Settlement Negotiations Of The Same Claim And Blue Lake's, Timber Products', And CLR's Breach Of Contract Claims Are Not The Same As ONRC Action's Statutory Claims**

By its own terms, Rule 408 excludes evidence related to settlement negotiations only if such evidence is offered to prove liability for the claim which is the subject of the settlement negotiations. Armstrong v. H.R.B. Royalty, Inc., 392 F. Supp. 2d 1302, 1304 (S.D. Ala. 2005); accord Zurich American Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 689-90 (7th Cir. 2005); Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B., 111 F.3d 1284, 1293-94 (6th Cir. 1997); Broadcort Capital Corp. v. Summa Med. Corp., 972 F.2d 1183, 1194 (10th Cir. 1992); Vulcan Hart Corp. (St. Louis Div.) v. N.L.R.B., 718 F.2d 269, 277 (8th Cir. 1983); Jamesbury Corp. v. United States, 1980 WL 20818, at *4 n.1 (Ct. Cl. 1980). Rule 408 does not prohibit Blue Lake, Timber Products, and CLR from introducing evidence of settlement negotiations between the government and ONRC Action to prove a different claim than the claim being negotiated.

Armstrong offers the most extensive and cogent analysis on this point. 392 F. Supp. 2d 1304-09. After termination of its franchise agreement, a franchisee sued the franchisor to recover the "fair and equitable price" for the business owed under the contract. To prove a "fair and equitable price," the plaintiff franchisee sought to introduce a failed settlement offer made by defendant to plaintiff and other franchisees in an earlier case which provided that upon contract renewal, the franchisor would pay four times the franchisee's gross revenue. The defendant argued that FRE 408 barred the admission of its settlement offer. The Armstrong court disagreed, finding that at the time of the offer, the meaning of "fair and equitable price" was not a disputed claim between the parties and that the settlement offer was not intended to

resolve the issue. Id. at 1305. Accordingly, because the settlement offer and the case before the court were for different claims, FRE 408 by its own terms did not apply. Id. at 1304, 1306.

The Armstrong court likewise rejected the franchisor's argument that evidence of the settlement offer was barred by FRE 408 because it involved claims that were related to the one currently before the court. In support of its argument, the franchisor had cited several cases where courts have barred evidence of a settlement because it involved the "same transaction" as the one being litigated. The "same transaction" test arose from the common law and "has often been applied in situations involving one plaintiff, multiple wrongdoers and one event, although it has also been applied in situations involving multiple plaintiffs, one wrongdoer and one event." Id. at 1306. The Armstrong court agreed that "use of a 'same transaction' test in such circumstances is arguably consistent with Rule 408's 'same claim' requirement." Id. at 1306-07. However, the court reasoned that the common law "same transaction" test applied to a broader range of situations than the "same claim" requirement adopted by FRE 408.[3] See id. at 1309.

[3]A Court of Claims case has reasoned that FRE 408's "same claim" requirement, at a minimum, does not bar more evidence than does the common law's "same transaction" test. See Jamesbury, 1980 WL 20818, at *4 n.1. In Jamesbury, the plaintiff brought a patent infringement claim against the government. Contemporaneously, the plaintiff brought suit in Massachusetts federal district court against another infringer of the same patent. Id. at *1. The plaintiff settled the district court suit, and the infringer promised to pay a certain amount as royalties for continued use of the patent. In the Court of Claims, the government sought to introduce the settlement agreement as evidence of a reasonable amount of royalties the government should pay for its infringing use. Id. at *3-4. Over the plaintiff's Rule 408 objection, the court allowed the settlement agreement to be introduced for this purpose. Id. at *4 n.1.

The Jamesbury court allowed the settlement agreement to be introduced because the claim that was the subject of the agreement was different from the claim before the court. Specifically, the court noted that at common law "a settlement agreement was inadmissible in a subsequent lawsuit if it arose out of the same transaction as the suit in which introduction of the evidence was sought." Id. The court distinguished this rule from the broader one proposed in

In explaining the distinction between the common law's "same transaction" test and the narrower "same claim" requirement of FRE 408, the Armstrong court pointed to the facts of a contrary Fourth Circuit case. Id. at 1308 (citing Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652 (4th Cir. 1988)). That case concerned a series of five lawsuits brought over the course of eight years by shareholders of a closely-held corporation that arose from the corporation's dissolution. Id. at 1307 (citing Dupuy, 856 F.2d at 653). The plaintiff sought to use evidence of settlement negotiations regarding two of the earlier dissolution claims to prove a later-brought antitrust claim. Id. The Armstrong court stated that while the series of lawsuits arguably may have arisen out of the same transaction – the failure of the corporation – "by no known measurement can causes of action regarding dissolution and a cause of action regarding antitrust violations occurring years later be viewed as a single claim." Id. at 1308. After distinguishing the franchisor's cases and surveying the Eleventh Circuit cases involving the issue, the Armstrong court concluded: "Nothing in these decisions [supports defendant's] invitation to re-write Rule 408's 'same claim' requirement as a lower, 'same transaction' threshold." Id. at 1309.

---

the National Conference of Commissioners on Uniform State Laws Uniform Rules of Evidence that made "inadmissible a [settlement] to prove the claim or any other claim." Id. (emphases added). Accordingly, the court held that because the "same transaction" limitation would not bar the government from introducing the settlement agreement of an "other claim" by a third-party, the result under FRE 408 must be the same. See id.

Unlike the district court in Armstrong, the Jamesbury court did not need to determine whether there was a distinction between the common law's "same transaction" test and FRE 408's "same claim" requirement. The claim in Jamesbury clearly involved separate transactions – the patent was infringed by two different and unrelated parties and the actual acts of infringement were also different and unrelated. Thus, it was sufficient for the Jamesbury court to hold that FRE 408 retained at least the limitations of the "same transaction" test. Moreover, to the extent Jamesbury can be interpreted as ruling that the "same claim" test under FRE 408 is the same as the common law "same transaction test," the Jamesbury court's interpretation is dicta.

As was the case in Armstrong, Blue Lake's, Timber Products', and CLR's claims and ONRC Action's claims are not the same. Blue Lake, Timber Products, and CLR are seeking to prove defendant's liability for breach of contract. The claim that the ONRC Action plaintiffs proved was that the Forest Service was arbitrary and capricious and acted contrary to law in adopting and implementing the "NEPA decision equals implemented" interpretation and RTV Directive. The settlement negotiations between the government and the ONRC Action plaintiffs did not concern the breach of contract claims of Blue Lake, Timber Products, and CLR. Accordingly, FRE 408 does not bar the proposed finding or the evidence on which it relies because ONRC Action's claim is not the same claim as Blue Lake's, Timber Products', and CLR's.

The public policy behind FRE 408 does not demand a different result than the one advanced by Blue Lake, Timber Products, and CLR. Blue Lake, Timber Products, and CLR does not dispute that the purpose behind FRE 408 is to encourage settlements. "Courts, however, enforce rules, not simply the policy promoting their enactment, and Rule 408 cannot be extended beyond the reach its language will allow, regardless of the policy implications." Armstrong, 392 F. Supp. 2d. at 1309 (citing Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997)). FRE 408 is necessarily limited by FRE 402, which seeks to put all relevant information before the trier of fact. The "same claim" requirement of FRE 408 is a deliberate balancing between the conflicting policies behind the two rules. Id. By adhering to the "same claim" requirement of FRE 408, the Court is enforcing the balance that Congress struck when it enacted the Federal Rules of Evidence. Accordingly, the public policy of encouraging settlement

is not a bar to use at trial of proposed findings and underlying evidence to prove defendant's liability for a different claim than the one under negotiation.

**4. FRE 408 Does Not Apply To Exhibits And Findings Where The Underlying Evidence Was Not Disclosed To ONRC Action And Was Not Used In Settlement Negotiations With The Other Side**

Rule 408 does not bar most of plaintiffs' proposed findings and the underlying evidence for another reason. "Rule 408 does not apply to internal memoranda unless communicated to the other side in an attempt at settlement." Blue Circle Atlantic, Inc. v. Falcon Materials, Inc., 760 F. Supp. 516, 522 (D. Md. 1991), aff'd mem., 960 F.2d 145 (4th Cir. 1992).

It appears that only three courts of appeals have addressed this issue, Affiliated Mfrs., Inc. v. Aluminum Co. of America, 56 F.3d 521, 528-30 (3rd Cir. 1995); Ramada Development Co. v. Rauch, 644 F.2d 1097, 1106-07 (5th Cir. Unit B May 1981), and the Fourth Circuit in affirming Blue Circle. Affiliated Manufacturers and Ramada reached a different result than Blue Circle on this legal issue, but the facts and reasoning of those cases are distinguishable because the internal memoranda at issue in those cases served as a basis on which the preparing party calculated the actual amount it offered in settlement and therefore were directly involved in settlement negotiations. Affiliated Manufacturers, 56 F.3d at 528-30; Ramada, 644 F.2d at 1106-07. Unlike the memoranda in Affiliated Manufacturers and Ramada, defendant's internal assessments of the risks of awarding specific timber sales and the legal defensibility of the "NEPA decision equals implemented" interpretation and RTV Directive are not communication of the government's proposed settlement terms to ONRC Action. The content of these internal memoranda were kept strictly confidential and were used by the government to assess its

litigation risks, including whether it was worth the risk to award particular timber sales and authorize ground-disturbing activities despite ONRC Action's threat that doing so would cause it to file a motion for injunctive relief. Indeed, the internal memoranda here were not used to communicate settlement offers to ONRC Action but rather were used by the government to authorize actions that risked undermining the possibility of settlement.

The majority of Blue Lake's, Timber Products', and CLR's exhibits challenged by defendant under Rule 408 deal with Sue Zike and other Forest Service personnel with knowledge of the ONRC Action plaintiffs' "at-risk" sales lists in deciding whether the risk of awarding those sales, including Blue Lake's, Timber Products', and CLR's sales at issue in this action, are worth the risk of triggering a motion for a temporary restraining order or a preliminary injunction by ONRC Action. These documents do not in any way discuss offers, compromises or address settlement negotiations themselves. Blue Lake, Timber Products, and CLR intend to use this evidence and related testimony to establish what the Forest Service knew and when it knew it as well as what risks the Forest Service knowingly assumed in awarding the contracts to Blue Lake, Timber Products, and CLR while keeping knowledge that these sales were on the "at-risk" lists secret.

Defendant's assertion that any evidence, including internal memoranda and communications kept entirely secret from the ONRC Action plaintiffs, should be barred under FRE 408 is overboard and contrary to the policies behind FRE 408. See Power Authority of New York v. United States, 62 Fed. Cl. 376, 378 (2004) (defendant's "less nuanced approach to Rule 408 [is] unfair and contrary to the spirit the rule"). If FRE 408 were meant to be applied so

broadly, then Congress would not have included FRE 408(b) which expressly recognizes that evidence of settlement negotiations may be used for purposes other than proving liability. Moreover, merely because the Forest Service acquired knowledge of facts in the context of settlement negotiations with a third party regarding a different claim from the one at bar, Blue Lake, Timber Products, and CLR should not be barred from introducing evidence of those facts. The overly broad application of FRE 408 advocated by defendant in this action is unfair and contrary to the spirit of the rule because it "work[s] a hardship on Plaintiff's ability to mount its case." Power Authority of New York, 62 Fed. Cl. at 379.

**Conclusion**

FRE 408 does not preclude evidence of the ONRC Action settlement negotiations because such negotiations concerned third-party claims that are different than the ones brought by plaintiff. Even if FRE 408 did apply to the negotiations, FRE 408(b) allows Blue Lake, Timber Products, and CLR to use evidence of the facts discussed therein to prove defendant's knowledge of those facts. Moreover, the majority of the plaintiffs' proposed findings objected to by defendant were prepared after settlement negotiations had ended and were never used by defendant to evaluate or offer settlement terms to ONRC Action or otherwise communicated to ONRC Action. Defendant is asking the Court to stretch the public policy behind FRE 408 to exclude far more evidence than Congress intended in drafting the Rule and thereby work an unfair hardship upon Blue Lake's, Timber Products', and CLR's ability to prove its breach of contract case.

**Plaintiffs incorporate the foregoing reply, rather than restating it, for each instance where defendant raises a Rule 408 objection to one of plaintiffs' proposed findings of fact.**

89. After hearing of Ms. Schiffer's reaction to the joint agency interpretation "NEPA decision equals implementation" and her decision to seek guidance from higher officials within the Department of Agriculture and/or the Department of the Interior, Robert Devlin, the Director of Timber Management for Region 6 within the Forest Service, began to strategize with his colleagues in Region 6 of the Forest Service regarding the preparation of a briefing paper for submission to the Department of Agriculture, the Department of the Interior, and the Washington, D.C. Offices of both the Forest Service and the BLM. According to Mr. Devlin, "the trick is going to be to get both WO's [Washington Offices of the Forest Service and Bureau of Land Management] and Secretary's offices [the Secretaries of the Department of Agriculture and the Department of the Interior] to support where we are and not let DOJ decide for us. Not being able to defend us is one thing but not agreeing with what we are doing is another." App. Tab 63 at A-496; App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 11:5-26:9).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and is not supported by the testimony cited. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs accidentally omitted pages 11-26 of Mr. Devlin's deposition transcript. Plaintiffs' corrected App. Tab 176 includes these pages,

which well supports the proposed finding. The cited testimony of Mr. Devlin describing the communications he had with other Forest Service employees as well as the cited e-mail from Mr. Devlin discussing the briefing paper supports the proposed finding, which states a fact, not plaintiffs' opinion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

90. In an email from Robert Devlin to Sue Zike and Peggy Kain of Region 6 of the Forest Service, sent on November 28, 1998, just after Edward Boling's briefing of Lois Schiffer and Peter Coppleman, Mr. Devlin stated that it was his understanding that the DOJ did not agree "with our definition of implement." App. Tab 63 at A-496.

Defendant's Response: Defendant objects to this contention because it concerns discussions regarding the settlement of a lawsuit which are inadmissible pursuant to Federal Rule of Evidence 408. We further object because the document does not support the contention. The document states: "if they don't agree with our definition . . . ." See Pls.' App. Tab 63 at A-496 (emphasis added). Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant asserts that the proposed finding is not supported by the document cited because Mr. Devlin used the word "if" when discussing the DOJ's disagreement with the Forest Service definition of implement. The entire e-mail must be read as a whole for its meaning to be fairly understood. Mr. Devlin discusses the difficultly the Forest Service has had

with convincing the DOJ on why sales should not be delayed because of ONRC Action. In this context Mr. Devlin's uses the word "if" incorrectly, as the sentence supports reading "if" as "given" or "because." Even if Mr. Devlin did intend "if" to mean a future supposition as defendant apparently asserts, then Mr. Devlin's statement at least demonstrates that the Forest Service was aware that the DOJ could not immediately agree with the Forest Service's definition of "implement" but needed time to consider the matter. Rule 408 does not apply. The quoted language reflects Mr. Devlin's understanding of the DOJ's concerns about the Forest Service's interpretation "NEPA decision equals implementation" regardless of any settlement negotiations with ONRC Action and his email was not part of any settlement communications with ONRC Action.

91. On or about November 25, 1998, Edward Boling, lead attorney for the government in the ONRC Action litigation, called Sue Zike to report that Lois Schiffer, Assistant Attorney General for Natural Resources and the Environment at the Department of Justice, and Peter Coppleman, Ms. Schiffer's subordinate, believed that the NFP Category 2 survey interpretation adopted by the Forest Service known as "NEPA decision equals implementation" was nonsensical and that they had concerns "with trying to defend this case because they read our [the Forest Service's] implement memo to be nonsensical." App. Tab 64; App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 10:6-14:15). This information was communicated via email by Ms. Zike to Nancy Graybeal, Robert Devlin, and Peggy Kain. App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 22:10-23:4).

Defendant's Response: Defendant objects to this contention because it is not supported by the documents or testimony cited. Pages 10-14 of Ms. Zike's testimony are not attached at App. Tab

173. Defendant further objects because it is based on additional hearsay. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs inadvertently omitted pages 10-14 of Ms. Zike's deposition testimony. Plaintiffs' corrected App. Tab 173 includes these pages. The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80, 84. Mr. Coppelmann's statements concern matters within the scope of his employment because he was Mr. Boling's superior and Ms. Schiffer's subordinate at the DOJ. As such, he was involved with the planning, implementation, and oversight of defendant's litigation strategy and analysis of the ONRC Action lawsuit.

92. [Intentionally left blank]

93. Edward Boling, chief counsel for the government in the litigation, indicated to Owen Schmidt, the principal lawyer for the Forest Service Regions 5 and 6 for the ONRC Action litigation, that Mr. Boling was "leery" of the government's legal theory regarding the rationale for the Forest Service's interpretation "NEPA decision equals implementation." Accordingly, Mr. Schmidt believed that there were concerns within the Department of Justice as to whether it would defend this definition in federal court. Part of the Department of Justice's concern about rationale for the definition "NEPA decision equals implementation" was that an attempt had

been made to find some support in the administrative record for adopting this interpretation, but no support was found. App. Tab 174 (O. Schmidt Dep. Tr. 17:24-19:7, 28:12-29:10).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion not a contention of fact. Defendant further objects because the contention is based on inadmissible hearsay, and Mr. Schmidt's personal opinion cannot bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not constitute a legal conclusion but rather paraphrases the substance of Mr. Schmidt's testimony. Mr. Schmidt's statements and the underlying statements of Mr. Boling are admissions by a party opponent and therefore classified as non-hearsay under FRE 801(d). See reply to PPF Nos. 45, 79. Mr. Schmidt was an attorney in the Department of Agriculture's Office of General Counsel and was part of the team assigned to represent the Forest Service in the ONRC Action litigation. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

94. [Intentionally left blank]

95. A June 8, 1999 memorandum by Ann Bartuska, Washington Office Director of Forest Management for the Forest Service, entitled "Implementation of Timber Sale Decisions and Presale Activities," stated that, "It is the position of the Forest Service that implementation of a timber sale decision for purposes of 36 C.F.R. § 215.10 occurs when a timber sale contract is awarded by the agency. This date is the date of the Contracting Officer's letter of award." App. Tab 114. Two days later, on June 10, 1999, Ann Bartuska issued a memorandum withdrawing her June 8, 1999 implementation memorandum, citing the need for further direction "regarding timber sales in litigation." App. Tab 117. That "further direction" came on October 5, 1999 in a memorandum written by James Furnish, Deputy Chief of the National Forest System. The October 5, 1999 memorandum re-adopted, using the same language, the interpretation expressed in the June 8, 1999 memorandum. App. Tab 133.

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal conclusion not a contention of fact. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The existence and contents of the Bartuska and Furnish memoranda are issues of fact, not law. The proposed finding is well-supported by the three memoranda cited and does not make a legal conclusion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

96. On August 26, 1999, Judge Dwyer issued an injunction prohibiting the Forest Service and the BLM from approving any plan of operations for or proceeding with the operation of 25 timber sales, including Happy Thin, Jack Heli and Too Wild. App. Tab 128.

Defendant's Response: Defendant does not dispute this fact.

Plaintiffs' Reply: No dispute.

**ONRC ACTION'S LISTS OF "PROBLEM" SALES AND FOREST SERVICE PRE-BID ANNOUNCEMENTS**

97. When ONRC Action was pending, it was Forest Service policy and practice to make a standard oral announcement at the oral auction of timber sales which were involved in litigation. That announcement told prospective bidders that "the sale is currently under litigation and award may be delayed." This standard announcement did not include any warning to bidders that the sale might be suspended after award. There was no other announcement specifically crafted for the ONRC Action lawsuit. This standard announcement was required to be made at the oral auction for Too Wild on the Umpqua National Forest in Region 6 and for Jack Heli and Happy Thin on the Klamath National Forest in Region 5. App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 3:12-8:9).

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Mr. Devlin stated that if there had been an announcement specifically crafted for the ONRC action, he would not have known about it. App. Tab 176 (Devlin Dep. 5:25-6:4)

Defendant further objects to this contention because it is plaintiffs' legal conclusion not a statement of fact. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Except for the fourth sentence of the proposed finding, defendant cites no fact, document, or deposition testimony that contradicts the proposed finding. Plaintiffs withdraw the fourth sentence of the proposed finding, "There was no other announcement specifically crafted for the ONRC Action lawsuit."

98. The same day that ONRC Action filed its lawsuit, Michael Axline, lead attorney for ONRC Action, wrote the Regional Foresters for the two Forest Service regions containing Happy Thin, Jack Heli and Too Wild asking them to warn potential purchasers of the existence of the lawsuit and the potential for an injunction. App. Tab 41. Specifically, Michael Axline requested that the Forest Service "inform potential purchasers of sales offered subsequent to the filing of the complaint, within the area covered by the ROD, that such sales may be the subject of a request for injunctive relief for noncompliance with the ROD. This is particularly true for sales within the range and habitat type of 'Strategy 2' species for which the survey and management requirements of the ROD have not been performed. Such a notice to potential purchasers will provide protection for the federal government should these sales be enjoined, and insure that purchasers are fully informed of the pending lawsuit and its potential effect on noncomplying sales." Id.

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. We further object because this contention is plaintiffs' second-hand legal conclusion and not a statement of fact. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not hearsay or a legal conclusion because plaintiffs are offering the substance of Mr. Axline's letter not to prove the truth of the facts and conclusions asserted therein, but to show that the Forest Service had been requested to warn purchasers that their sales were at risk of being subject to a request for injunctive relief. See Pls.' Br. at 32. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

99. In a memorandum dated July 29, 1998, Robert M. Simmons, regional attorney for Region 5 of the Forest Service, advised Regional Foresters for Region 5 and Region 6 of the Forest Service that certain Forest Service timber sales were being challenged in ONRC Action Accordingly, Mr. Simmons advised:

> Should you proceed with the auction of these sales ["sales of concern" identified by the ONRC Action plaintiffs on the Klamath and Mt. Hood National Forests], you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit [the ONRC Action lawsuit] have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs, and that, if this is not acceptable to the bidders, they should withdraw their bids at that time. All bidders should be given the opportunity to withdraw

> their bids simply because of the litigation. Finally, you should take action to make sure that the appropriate language is in the contract.

App. Tab 190; App. Tab 35 at A-341; App. Tab 169 S. Zike Dep. Tr. (1/4/07) 12:9-18:8).

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Defendant further objects on the ground that this contention is parol evidence, and that the foundation established for the documents indicates that the notice was sent to individuals on the Umpqua National Forest, which is not relevant to this litigation. See Pls.' App. Tab 169 S. Zike Dep. Tr. (1/4/07) (12:16-12:18). Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's testimony that she forwarded Mr. Simmons' memorandum to Forest Service employees on the Umpqua National Forest does not contradict the fact that Mr. Simmons addressed the memorandum to the Regional Foresters for Regions 5 and 6. App. Tab 190. (Ms. Zike's copy of the memorandum at A-341 is part of App. Tab 45, not App. Tab 35 as cited by the proposed finding.) The parol evidence rule applies only to evidence of prior or contemporaneous statements between the parties and to contradict an integrated agreement. The rule does not apply here because the proposed findings and the evidence which supports it does not relate to any such statements. The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF No. 45.

100. As early as August 8, 1998, Susan Zike, the litigation coordinator for Forest Service Region 6 and the primary litigation coordinator for ONRC Action for both Region 5 and Region 6, Jerry Hofer, Regional Contracting Officer for Region 6, and Robert Devlin, Director of Timber Management for Region 6, all believed that "it would be prudent to advise" the Forest Service timber sale bidders at bid openings for timber sales threatened by the ONRC Action litigation that there was a pending lawsuit which threatened their sales. A draft letter prepared at or about the same time for signature by Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, stated, "the Forest Service is prepared to notify bidders on the three timber sales scheduled in auction for August that these timber sales have been identified in connection with this lawsuit [the ONRC Action lawsuit]." App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 12:9-14:8); App. Tab 45.

Defendant's Response: Defendant objects to this contention because it is based on plaintiffs' inadmissible hearsay, and because Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80. Mr. Hofer and Mr. Devlin, whose statements Ms. Zike testifies about, were, at the time of their statements, the Contracting Officer for Region 6 and Director of Timber for Region 6, respectively. Accordingly, the managing and

implementation of timber sales within the region were within the scope of their employment with defendant. Moreover, Ms. Zike's statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

101. In the fall of 1998 the Department of Justice requested that the Forest Service direct contracting officers for involved timber sales to notify all bidders prior to the opening of the bids on timber sales threatened by the ONRC Action litigation that the plaintiffs in ONRC Action had identified the sale as one which they claimed was prepared in violation of the NFP, that language in the sale's contract has been included to limit the government's liability in case of cancellation to holding costs, and that bidders should be allowed to withdraw their bids simply because of the lawsuit. App. Tabs 54, 190. After the Department of Justice provided this advice, the Forest Service merely instructed the contracting officers for timber sales involved in the litigation to "make your standard announcement before bid opening that tells the prospective bidders that the sale is currently under litigation and award may be delayed." Id.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' secondhand legal conclusion and not a statement of fact. Defendant further objects because the documents cited do not support the contention regarding the Forest Service's actions. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs withdraw proposed finding no. 101.

102. [Intentionally left blank]

103. During the period July 8, 1998 (the filing of the ONRC Action complaint) through Judge Dwyer's decision finding the "NEPA decision equals implementation" interpretation and the November 4, 1996 red tree vole directive arbitrary, capricious and contrary to law, the Forest Service awarded a number of timber sales within NFP National Forests which were not challenged in ONRC Action. For example, Jack Trac (Klamath National Forest) and Spenser (Winema National Forest) were awarded. Likewise, the Bureau of Land Management awarded sales within the NFP area during the same time frame that were not challenged by ONRC Action; for example, Burma Shave. App. Tab 181 (B. Turner Dep. Tr. 60:3-14); App. Tab 88 at A-586; App. Tabs 85, 89.

Defendant's Response: Defendant objects to this contention because it is not supported by the documents and testimony cited. Mr. Turner's testimony was only his opinion that some unidentified contract should have been awarded on November 4. P. App. Tab 181 (Turner Dep. 60-3-4). We further object because the document at Tab 89 of the plaintiffs' appendix concerns the settlement of a lawsuit and is inadmissible under Federal Rule of Evidence 408. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant's objection that Mr. Turner's testimony does not support the proposed finding ignores Mr. Turner's testimony that on the same day that Timber Products bid on Jack Heli, it also bid on another timber sale that was authorized under the same EA, yet that other sale was awarded the next day whereas Jack Heli was not awarded until months later. App. Tab 181 (B. Turner Dep. Tr. 60:7-14). The identification of this other sale as the Jack Trac sale is confirmed by Mr. Turner's letter to the Forest Service found at App. Tab 85. Rule 408 does not apply. The proposed finding discusses only which sales were awarded during the pendency of ONRC Action and whether the sales were the subject of injunctive relief. Plaintiffs' use of App. Tab 89 is not prohibited by Rule 408 because plaintiffs use the document only to prove facts contained therein, i.e., whether a sale was awarded during the relevant timeframe. See reply to PPF No. 88. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

104. From time to time after the ONRC Action lawsuit was filed in July of 1998, the ONRC Action plaintiffs provided the Department of Justice and the Forest Service with lists of "problem sales" or "at-risk sales" that they indicated they would challenge in court if awarded. The sales on these lists were in many cases not specifically named in the ONRC Action lawsuit. App. Tab 176 (R. Devlin Dep. Tr. (1/8/07) 109:19-110:14).

Defendant's Response: Defendant objects to this contention because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award

of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

105. The ONRC Action plaintiffs indicated to the Department of Justice and the Forest Service that if the Forest Service proceeded to award the sales identified as "problem sales" or "at-risk sales" in the course of the ONRC Action litigation, the ONRC Action plaintiffs would immediately move for a temporary restraining order or a preliminary injunction with respect to each such sale. App. Tab 178 (E. Boling Dep. Tr. 67:7-68:4; 70:14-18).

Defendant's Response: Defendant objects because the testimony does not support plaintiffs' contention that the ONRC Action plaintiffs would "immediately move for a temporary restraining order or a preliminary injunction," and the contention represents plaintiffs' legal conclusion. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: ONRC Action did warn the Forest Service that it would "immediately move" for a temporary restraining order or preliminary injunction if the Forest Service awarded a sale listed on ONRC Action's "at risk" or "problem sales" lists, as evidenced by their July 6, 1999

letter to Mr. Boling. App. Tab 121 at A-980. The proposed finding does not constitute a legal conclusion but provides a statement of fact supported by the deposition testimony of Mr. Boling. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

106. It was the uniform policy of the Forest Service throughout the ONRC Action litigation, at what Forest Service personnel believed was the request of Mr. Boling of the Department of Justice, not to disclose lists of "at-risk sales" or "problem sales" to anyone outside of the Federal Government and, in particular, not to potential bidders on such sales as Blue Lake Forest Products, Timber Products Co. or CLR Timber Holdings, the plaintiffs in this action. App. Tab 100; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 35:12-40:15); App. Tab 48; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 32:7-33:10).

Defendant's Response: Defendant objects because plaintiffs' contention is based upon inadmissable hearsay, and Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by a party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80. Moreover, Ms. Zike's statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited

was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

107. Edward Boling, lead trial attorney for the government in the ONRC Action litigation, assumed that the Forest Service would treat these lists as privileged and confidential. App. Tab 178 (E. Boling Dep. Tr. 74:20-75:8).

Defendant's Response: Defendant objects because the testimony cited does not support plaintiffs' contention. Mr. Boling stated: "Certainly I would not expect the Forest Service to take this privileged and confidential information and put it on the fax machine hither and yon to all potential purchasers of a timber sale, but I don't know what they did with the fact of that information." App. Tab 178 (E. Boling Dep. Tr. 75:3-75:8). Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The testimony of Mr. Boling cited by defendant is consistent with the proposed finding.

108. The Forest Service intentionally withheld from plaintiffs and other potential timber purchasers the names of timber sales that were considered "at-risk" or "problem" sales by the ONRC Action plaintiffs. App. Tabs 48, 108. Additionally, neither the ONRC Action court nor the private industry intervenors in that case were apprised of the existence of the lists of "at-risk"

or “problem” sales or the names of the sales, including Happy Thin, Jack Heli and Too Wild, on those lists. App. Tab 123.

Defendant’s Response: Defendant objects because the documents cited do not support plaintiffs’ contention, and plaintiffs’ contention represents a legal conclusion. The document cited in Tab 48 notes: “If you have a request for [the list of sales], send the request to the RO and we’ll process.” Tab 48. Furthermore, plaintiffs’ contention is that industry was unaware of the existence of these lists is unfounded. DPFUF ¶ 51. Additionally, the documents cited concern the Forest Service’s actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs’ claims for breach of contract.

Plaintiffs’ Reply: Defendant argues that because Ms. Zike in her e-mail instructs the recipients to forward any FOIA requests by members of the timber industry for the “at risk” sales lists to the Forest Service regional office for processing, there is no support for the fact that the Forest Service withheld releasing those lists. Ms. Zike’s instruction does not contradict the proposed finding. Ms. Zike’s e-mail does not explain what she means by “process” the request; certainly, there is nothing to indicate that “process” means “release the lists to members of the timber industry.” Indeed, Ms. Zike’s e-mail suggests that the “at risk” lists would not have been disclosed even if the industry had made a FOIA request for them: “DO NOT SHARE THIS TABLE OR OTHERS LIST OF SALES OUTSIDE THE AGENCY. All of this info is either confidential with DOJ/OGC or protected by the Fed. Rules of Evidence 408. Industry to [sic] dying to know this info and it’s not available to them.” App. Tab 108. Defendant’s proposed

finding no. 51 does not support its contention that plaintiffs were aware of the "at risk" lists. See Pls.' Response to DPFUF ¶ 51.

109. Shortly after the filing of the complaint in the ONRC Action litigation in July 1998, attorneys representing ONRC Action and the Department of Justice attorneys representing the United States, including the Forest Service, began to exchange communications concerning possible settlement of the litigation. Settlement discussions continued at least until some time in December of 1998. Throughout this time period, the Forest Service did not award any timber sales which were identified as "at-risk sales" or "problem sales" on lists provided by the ONRC Action plaintiffs to the Department of Justice without Department of Justice concurrence. The reason for this was that both the Forest Service and the Department of Justice did not want to trigger a motion for a preliminary injunction or a temporary restraining order based only on the award of certain sales. If the litigation was not to be settled, the Department of Justice and the Forest Service strongly preferred that any decision on the merits of the case be decided by cross-motions for summary judgment on the merits rather than in the context of a temporary restraining order or a preliminary injunction aimed only at one or a few timber sales. App. Tab 100.

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion and based upon speculation. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding asserts facts, not legal conclusions. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

110. While the government was trying to settle the ONRC Action litigation, the Department of Justice had final authority over whether a sale which the ONRC Action plaintiffs had identified as an "at-risk sale" or "problem sale" could be sold by the Forest Service. Accordingly, from time to time the Department of Justice rejected the Forest Service's request to award a timber sale. This is precisely what happened regarding a Forest Service proposal to award Too Wild in October of 1998. App. Tab 55; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 45:14-50:9).

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Furthermore, defendant objects because the document cited does not support the plaintiffs' contention that the Department of Justice had "final authority" over when a sale could be sold; the document cited states: "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we delay the award until 11/23. I ran the idea past Devlin who agreed that one month . . . was ok." Tab 55. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding asserts facts, not legal conclusions. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, her statements are not opinion but facts based upon personal knowledge.

Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Plaintiffs amend the proposed finding to read in its entirety: "During the ONRC Action litigation, the Department of Justice reviewed the Forest Service's decisions to award timber sales listed on the 'at risk' or 'problem sale' lists provided by the ONRC Action plaintiffs. The Department of Justice on occasion advised the Forest Service not to proceed with the award of a sale. For Too Wild, although the Forest Service tried to convince the Department of Justice that award should proceed, in October 1998, the Department of Justice advised the Forest Service that it not do so. App. Tab 55; App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 45:14-50:9)."

111. In Ms. Zike's capacity as the principal litigation coordinator for ONRC Action for both Region 5 and Region 6, it was her job to coordinate the preparation of the Forest Service's defense in the litigation between counsel from the Department of Justice and the Forest Service. Ms. Zike was an attorney licensed to practice in the State of Oregon. In particular, Ms. Zike regularly disseminated information, including lists of "at-risk sales" and "problem sales," together with other ONRC Action-related information to Forest Service personnel within both Region 5 and Region 6, including the contracting officers and forest supervisors for Happy Thin (Klamath National Forest, California), Jack Heli (Klamath National Forest, California) and Too Wild (Siskiyou National Forest, Oregon). App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 5:24-6:7); App. Tabs 44, 83, 108.

Defendant's Response: Defendant objects because the documents and testimony do not support plaintiffs' conclusion. Defendant further objects because Ms. Zike was not acting as an attorney

in her position as the principal litigation coordinator. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: This proposed finding does not assert that Ms. Zike was acting as an attorney in her position as principal litigation coordinator. However, the Court has already ruled that communications sent to and from the attorneys in the DOJ and the USDA Office of General Counsel through Ms. Zike are still covered by the attorney-client privilege – a privilege that defendant waived as to three broad subject matters. Blue Lake Forest Products, Inc. v. United States, 75 Fed. Cl. 779, 796 (2007). Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

112. In her capacity as Regions 5 and 6 litigation coordinator, Ms. Zike frequently sent out group emails to groups designated as "Distribution List" or "ONRC Action coordinators." In both cases she frequently communicated in this manner with Ed Matthews, who was the contracting officer on Happy Thin and Jack Heli, and Tom Link, who was the contracting officer on Too Wild, among other Forest Service personnel. App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 23:12-25:11, 61:1-12).

Defendant's response: Defendant objects because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

113. During the pendency of the ONRC Action litigation, Sue Zike requested information from the NFP National Forests about timber sales that the Forests wanted to award. Ms. Zike also asked the Forests to provide her with their rationale for the need to award such sales. Such rationales had to include resource reasons in order to convince the Department of Justice to approve the award. App. Tab 40; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 62:3-63:1).

Defendant's Response: Defendant objects because the contention is plaintiffs' legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Defendant further objects because plaintiffs' contention wrongfully imply that the Department of Justice had "final approval" over the timber sale decisions. See Tab 55, "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we delay the award until 11/23. I ran the idea past Devlin who agreed that one month . . . was ok." Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Although defendant did not raise the point, plaintiffs note that the proposed finding's citation to "App. Tab 40" should read "App. Tab 60" (which is plaintiffs' deposition exhibit 40 referenced in Ms. Zike's deposition testimony). The proposed finding offers

statements of fact, not conclusions of law, that are based upon the document and testimony cited. The proposed finding does not state that the DOJ had "final approval" over timber sale decisions. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF No. 45. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

114. At least as early as December 7, 1998, Sue Zike, the principal litigation coordinator for the Forest Service for the ONRC Action case, was preparing forms for the Forest Service to use in assessing the risks and liabilities of awarding any of the timber sales on the ONRC Action's "problem" or "at-risk" lists. The principal objective of this assessment was to determine which timber sales put the government in the strongest litigation position if they were awarded. App. Tabs 71, 75.

Defendant's Response: Defendant objects because this contention is plaintiffs' legal conclusion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion, but rather offers nearly a word-for-word excerpt of Ms. Zike's e-mail cited by the proposed finding. App. Tab 71. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

115. Robert Devlin, Director of Natural Resources for Region 6, worked very closely with Sue Zike, the Region 6 litigation coordinator on the ONRC Action lawsuit. Mr. Devlin characterized their relationship as "anything I did with lawsuits, Sue Zike was right joined at my hip on so it wouldn't be just my answer, it would be our answer." App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 95:7-13). Mr. Devlin stated that he "would have no reason to dispute anything about what Sue says." App. Tab 176 (R. Devlin Dep. Tr. (8/21/07) 28:19-29:20).

Defendant's Response: Defendant objects because the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

116. At all times pertinent to the issues in this case, Owen Schmidt was an attorney employed by the Office of General Counsel of the Department of Agriculture and he was the lead Forest Service attorney within the Office of General Counsel for Forest Service Region 5 and 6 for the ONRC Action litigation. Mr. Schmidt also served as Forest Service counsel for the development and implementation of the NFP. App. Tab 174 (O. Schmidt Dep. Tr. 5:22-7:11, 8:20-10:5); App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 5:19-23).

Defendant's Response: Defendant objects to this contention as plaintiffs' legal conclusion Additionally, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The position held by and responsibilities of Mr. Schmidt are issues of fact, not law; accordingly, the proposed finding states facts not legal conclusions. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

117. During the period of March through June 1999, the Department of Justice and the ONRC Action plaintiffs negotiated the award of certain "problem list" sales, including Jack Heli. App. Tab 99.

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention, this contention is plaintiffs' legal conclusion. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is supported by the document cited, in which Ms. Zike describes talks between the DOJ and ONRC Action and that their "sharing of info" allowed defendant to "break loose" the 11 sales listed in the cited document. App. Tab 99. Moreover, the proposed finding states a fact, not a legal conclusion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

118. During the pendency of the ONRC Action litigation when the various Forest Service contracting officers, in consultation with others on their National Forests, determined that the Forest wanted to award a sale that was on a list of "at-risk sales" or "problem sales" that had been provided by the ONRC Action plaintiffs, the next step was to contact Sue Zike who would take up the matter with Peggy Kain or Robert Devlin and then, if they were in agreement, the matter would be presented to Edward Boling for his concurrence. That is the general process which occurred regarding the Forest Service's decisions to award Happy Thin, Jack Heli and Too Wild during the pendency of the ONRC Action litigation. App. Tab 54; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 36:22-41:12, 44:22-45:12).

Defendant's Response: Defendant objects to the contention because it is plaintiffs' legal conclusion, not a statement of fact, and because Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding states facts, not legal conclusions, and is well-supported by the document and testimony cited. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

119. In deciding what sales from the ONRC Action plaintiffs' lists of "problem sales" or "at-risk sales" the Forest Service would award prior to the conclusion of the ONRC Action litigation, the Department of Justice trial attorneys in the ONRC Action litigation consulted with Owen Schmidt of the Forest Service's Office of General Counsel and Roger Nesbit, an attorney representing the BLM. The purpose of these consultations was to assess the litigation risk of proceeding with award of such sales. App. Tab 178 (E. Boling Dep. Tr. 82:6-84:21).

Defendant's Response: Defendant objects because plaintiffs' contention suggests that the Department of Justice had final authority over the award of timber sales. "DOJ analyzed the risk of liability to the govt [sic] and thought that it was in the interest of the settlement nego's [sic] and to avoid any claims that we delay the award until 11/23. I ran the idea past Devlin who agreed that one month . . . was ok." Tab 55. Also, "DOJ is not asking to be a part of the award decision." Tab 100. Furthermore, the testimony cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding neither states nor suggests that the DOJ had "final authority" over the award of timber sales. Rather, the proposed finding discusses the government's risk assessment process prior to the award of the sales. The documents quoted by defendant do not contradict the proposed finding; indeed, they support it.

120. During the pendency of the ONRC Action lawsuit, the Forest Service did not award any timber sales which had been designated as "at-risk sales" or "problem sales" by the ONRC

Action plaintiffs without first consulting the Department of Justice attorneys representing the government in the ONRC Action lawsuit. In cases where the Forest Service desired to award a sale, it needed "to assure DOJ that we [the Forest Service] have a strong defense on the sales and that we [the Forest Service] intend to award even though DOJ is not asking to be a part of the award decision." App. Tab 100; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 35:12-39:11). However, if Edward Boling, lead counsel for the government in the ONRC Action lawsuit, had any concerns regarding the award of a particular sale, the Forest Service would not have awarded that sale. App. Tab 172 (R. Devlin Dep. Tr. (1/8/07) 97:22-101:17).

Defendant's Response: Defendant objects because neither Ms. Zike's nor Mr. Devlin's personal opinion can bind the Forest Service, and the first sentence of this contention represents plaintiffs' legal conclusion, not a statement of fact. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's and Mr. Devlin's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 79, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's and Mr. Devlin's personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant also objects that the first sentence of the proposed finding is a legal conclusion; however, whether the Forest Service awarded "at risk" sales without first consulting with the DOJ is a question of fact, not a legal conclusion, and the

cited documents and testimony support the proposed finding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

121. On or about June 17 and 18, 1999, officials in the Washington Office of the Forest Service, Region 5 Office of the Forest Service, and Sue Zike, principal litigation coordinator for Regions 5 and 6, including Richard Fitzgerald, Assistant Director for Forest Products in the Washington Office, conferred regarding the possibility that ONRC Action would seek a preliminary injunction or temporary restraining order to stop operations on the Upper South Fork timber sale on the Klamath National Forest. Upper South Fork, like Happy Thin, Jack Heli and Too Wild, was not named in the ONRC Action lawsuit, but like Happy Thin, Jack Heli and Too Wild it was a sale on the list of "problem" or "at-risk" sales shared between ONRC Action and the Forest Service acting through the Department of Justice. The Washington Office of the Forest Service concluded that the Forest Service could not stop harvesting operations on the Upper South Fork sale without incurring liability if it did so without a court order imposing a temporary restraining order or preliminary injunction with regard to the sale's operations. App. Tab 115.

Defendant's Response: Defendant objects because the documents cited do not support plaintiffs' contention, the contention represents plaintiffs' legal conclusion, not a statement of fact, and the Upper South Fork timber sale is irrelevant to this litigation. Furthermore, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding states facts, not legal conclusions, that are supported by the e-mail exchange cited by the proposed finding. For example, App. Tab 115 supports the finding that the Upper South Fork was not named in the ONRC Action complaint, but was on the list of "at risk" sales: "Upper South Fork (not named specifically in the lawsuit, but listed in a 'settlement' list shared between ONRC and DOJ.)" Id. at A-964. Contrary to defendant's assertion, the Forest Service's belief as to what actions were allowed under the Upper South Fork timber sale and its liability to the purchaser of that timber sale if the Forest Service cancelled the sale are relevant to this case. All timber sale contracts rely upon the same standard timber sale contract. Thus, the Forest Service's belief as to what the contract allowed for Upper South Fork necessarily must be the same for that allowed in all contracts, included those for Happy Thin, Jack and Too Wild. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

122. By letter dated August 26, 1998, attorneys representing ONRC Action notified the Justice Department which in turn notified the Forest Service that the proposed Jack Heli sale on the Klamath National Forest and the proposed Too Wild sale on the Siskiyou National Forest were "problem sales," meaning that these were sales that the ONRC Action plaintiffs were threatening to challenge in court. App. Tab 46; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 20:15-23:9).

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention, the contention is plaintiffs' second-hand legal conclusion, not a statement of fact, and Ms. Zike's personal opinion cannot bind the Forest Service. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to

the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant frivolously objects to the finding on the ground that it is unsupported by the document cited. The document on its face supports the finding and consequently the proposed finding states facts, not legal conclusions. The letter cited is sent from Michael Axline, counsel for the ONRC Action plaintiffs, to Edward Boling of the DOJ, lead counsel for the government in that case. App. Tab 46. The first page of the document shows that Mr. Boling faxed the letter to Sue Zike, Litigation Coordinator for Region 6 of the Forest Service. The letter lists the Jack Heli on the list of "unsold problem sales." Id. at A-354. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. As explained in plaintiffs' errata, plaintiffs inadvertently omitted pages 20-21 of Ms. Zike's deposition testimony. Plaintiffs' corrected App. Tab 169 includes these pages, which further support the proposed findings. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

123. By letter dated October 26, 1998 to ONRC Action counsel, signed by Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, the government agreed not to award certain BLM and Forest Service timber sales which were being challenged by the ONRC Action plaintiffs until November 23, 1998. This list of sales included Too Wild on

the Siskiyou National Forest. App. Tab 56. This letter was provided to Sue Zike of the Forest Service. App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 23:10-26:22).

Defendant's Response: Defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

124. In a memorandum dated October 28, 1998, Sue Zike informed Robert Devlin, Peggy Kain, Lisa Friedman and Ernie Holden of the Forest Service's Office of Strategic Planning of the Department of Justice's proposals for settling the ONRC Action litigation. Ms. Zike noted in her memorandum that at that time there were "around 20 or so" timber sales which "Forests would be wanting to move ahead and the DOJ will be wanted [sic] to delay!" Mr. Boling of the Department of Justice was concerned that an award of these sales would prompt motions for preliminary injunctions from the ONRC Action plaintiffs and thus would interfere with the government's strategy of withholding award of such sales to ensure that in the event that settlement talks broke down a decision on the merits would be decided in cross-motions for summary judgment regarding the whole case and not just one of a few select sales. App Tabs 58-59; App. Tab 175 (S. Zike Dep. Tr. (8/20/07) 50:10-54:9, 54:24-59:15).

Defendant's Response: Defendant objects because the cited testimony is hearsay, and Ms. Zike's personal opinion cannot bind the Forest Service. Furthermore, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 70, 100. Ms. Zike's statements themselves "bind" defendant because they are admissions by party opponent. See id., 80. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when Ms. Zike gave the cited testimony, defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

125. In an email to her Distribution List, which included Forest Service contracting officers Ed Matthews (Happy Thin and Jack Heli) and Tom Link (Too Wild), on or about November 8, 1998, Ms. Zike reminded these individuals and the other contracting officers on her Distribution List that: "Please keep in mind (as CO's always do) the liability that may come to the USFS if the sale is awarded and then enjoined. Is there a need for a regional conf call re: the award question? I'm thinking we need to at least air the needs and risks of going forward. Please let me know. As usual we want Ted [Boling] up to speed on our plans and you all have been so helpful keeping us posted." App. Tab 69; App. Tab 173 (S. Zike Dep. Tr. (8/20/07) 67:3-69:14).

Defendant's Response: Defendant objects because document and testimony cited do not support the first sentence. Defendant further objects because the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant has agreed with all but the first sentence of the proposed finding, subject to defendant's standard relevance objection. Defendant's objection to the first sentence is apparently directed to the fact that Ed Matthews and Thomas Link were included on Ms. Zike's e-mail "distribution list," to whom the document cited was addressed, App. Tab 69. Plaintiffs' proposed finding no. 112 provides the finding of fact and requisite support that Mr. Matthews and Mr. Link were included on Ms. Zike's e-mail "distribution list." Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

126. From at least January 1999 until the end of July 1999, the Department of Justice expected Forest Service agency counsel Owen Schmidt and other Forest Service personnel to assess whether the award of a timber sale that was on one of ONRC Action's lists of "problem" or "at-risk" sales was worth the risk that the sale would be used by the ONRC Action plaintiffs as an example in an emergency motion to enjoin all sales in the area of the NFP. App. Tab 101 (Letter from E. Boling, DOJ, to Forest Service and BLM (Apr. 6, 1999)).

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' legal conclusion regarding the ONRC Action "problem" or "at risk" sales. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior

to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant's objection that the letter from Edward Boling to Forest Service Regional Foresters relied upon by the proposed finding does not support the fact that the DOJ expected the Forest Service to evaluate the risk of prompting an injunction posed by awarding a particular timber sale is directly refuted by the text of the document: "To reiterate, Forest Service and BLM should inform us in writing of the proposed date for award after 1) having reviewed the issues common to the administrative appeal and the ONRC Action suit with agency counsel (Owen Schmidt and Roger Nesbit), 2) communicated to us their judgment that the award of the sale is worth the risk that the sale will be used by plaintiffs as an example in an emergency motion to enjoin all sales in the area of the Northwest Forest Plan, 3) compiled the essential elements of the administrative record that we will need to defend against such a motion. . . ." App. Tab 101 at A-755. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

127. By letter dated December 4, 1998 from Edward Boling to Sue Zike and Alan Wood of the BLM, the Department of Justice notified the Forest Service and the BLM that they were free to award any of the "at-risk sales" or "problem sales" which had been the subject of settlement discussions in the ONRC Action litigation. However, the Forest Service and the BLM were asked to communicate their respective judgment if the award of the sale was worth the risk that it would trigger an emergency motion from the ONRC Action plaintiffs to enjoin all sales in the area of the NFP. The agency lawyers at the Office of General Counsel representing the Forest

Service were to communicate to the Department of Justice attorneys representing the government in the ONRC Action litigation their assessment of the risk that awarding any such sale would trigger a temporary restraining order or a preliminary injunction. Thus, the Forest Service with the aid of agency counsel did a risk assessment for each proposed award before actually making the award, including award of Happy Thin, Jack Heli and Too Wild. App. Tab 70; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 115:13-121:13).

Defendant's Response: Defendant objects because the testimony is inadmissible hearsay, and Ms. Zike's personal opinion does not bind the Forest Service. Defendant further objects because the document cited does not support plaintiffs' legal conclusion regarding "at risk sales" or "problem sales." Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: It is unclear exactly what legal conclusion "regarding 'at risk sales' or 'problem sales'" defendant objects to. Each of the assertions made by the proposed finding are facts supported by the documents and testimony cited and are not legal conclusions. Ms. Zike's statements as well as the statements of defendant's other employees to which Ms. Zike testified "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 79, 80. Moreover, Ms. Zike's statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked

foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

128. By email dated December 7, 1998 to her Distribution List, Sue Zike stated that she was drafting a form for Forest Service use in Region 5 and Region 6 for evaluating "the risks and liabilities of awarding any of the timber sales ONRC has named as violations of the NWFP ROD." Ms. Zike's form was based on the five points Edward Boling referenced in his December 4, 1998 letter to Ms. Zike. Ms. Zike told her Distribution List recipients that "I think it is prudent that we determine which sales put us in the strongest litigation position in this case." App. Tab 71; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 124:4-127:22). Accordingly, using Ms. Zike's form and with the assistance of agency counsel, the Forest Service evaluated the litigation risk associated with each proposed award of a timber sale, including the awards of Happy Thin, Jack Heli and Too Wild.

Defendant's Response: Defendant objects because the contention is plaintiffs' legal conclusion, not a statement of fact. Defendant further objects because the contention is not supported by the document and testimony cited, and Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Although defendant objects that the entire proposed finding is a legal conclusion, the proposed finding nearly repeats verbatim the contents of the e-mail from Ms.

Zike cited and in that regard asserts facts and not conclusions. App. Tab 71. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

129. In a memorandum dated December 9, 1998 from Sue Zike, regional litigation coordinator, to Bob Williams, Regional Forester, and BLM State Director Elaine Zielinski, Ms. Zike analyzed the pros and cons of awarding sales the plaintiffs in the ONRC Action litigation named as examples of sales violating the NFP survey requirements. One of the "pro" considerations she identified in favor of awarding such sales was that doing so "puts purchasers squarely at the table." Ms. Zike later explained this advantage to the government as follows: "That means, in my view, that we have much better litigation arguments. We have better defense arguments when we let the purchasers be the ones who talk about harm and what happens to their company and their employees if in fact an injunction were to lie." One of the "cons" identified by Ms. Zike in her memorandum was, "May create $$ liability to govt if lose case." Ms. Zike explained this reference as follows: "If . . . we were to lose the PI which we thought was likely, then we would have, most likely, contractual damages to the purchasers that we awarded them to." These "pros" and "cons" were never communicated to any of the plaintiffs in this action. App. Tab 191 at A-1754; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 146:21-150:7).

Defendant's Response: Defendant objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's statements "bind" defendant because they are admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

130. In their memorandum to Paul Brouha and Chris Jauhola dated December 11, 1998, Peggy Kain and Sue Zike advised these Washington Office Forest Service and BLM officials about "the contracting implications of surveying awarded sales." In that regard they stated, "The agencies [Forest Service and BLM] would argue vigorously against surveying sales that have been awarded." The reason why the Forest Service would vigorously argue against such surveys was that: "The Forest Service has no provisions in its timber sale contracts that allow for suspension for survey and/or discovery of survey and manage species." App. Tab 75 at A-541.

Defendant's Response: Defendant objects because the document cited does not support plaintiffs' contention; specifically, it is not clear who drafted this document. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of

these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant argues that the authorship of the memorandum referenced in the proposed finding is unclear; yet, the memorandum states in its "from" field that it is from Peggy Kain, Sue Zike, and Judy Nelson. App. Tab 75 at A-541. The first line of the memorandum states, "Enclosed is our revised briefing information. . . ." This information is sufficient to support a finding that the document was jointly drafted by Ms. Kain, Ms. Zike, and Ms. Nelson. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

131. By memorandum dated December 11, 1998, Sue Zike informed all ONRC Action coordinators at the Forest level and other Forest Service personnel on her Distribution List of the process that would be followed by the Forest Service in deciding whether or not to award a timber sale which had been identified by the ONRC Action plaintiffs as an "at-risk sale" or "problem sale." First, representatives of the National Forest, normally the contracting officer, would complete a chart prepared by Ms. Zike to be used in the evaluation of the litigation risk for each such sale. The information and the chart was then sent to Ms. Zike and Peggy Kain in the Region 6 office in Portland, Oregon. This procedure applied not only to the Region 6 Oregon National Forest timber sales such as Too Wild on the Siskiyou National Forest but also to the Region 5 California National Forest timber sales that were included within the NFP also, such as Happy Thin and Jack Heli on the Klamath National Forest. Utilizing the information contained in the Zike charts, Forest Service personnel, normally including Sue Zike, Robert Devlin, Peggy Kain and Owen Schmidt of the Office of General Counsel, reviewed the facts and

circumstances surrounding the proposed award of each sale and made a determination as to whether "the award is worth the risk of ONRC Action using it as a basis of a TRO or Preliminary Injunction." The Forest Service and the Justice Department expected any such sales would be challenged by the ONRC Action plaintiffs with a motion for a temporary restraining order or a preliminary injunction. If the Forest Service determined that awarding a timber sale was worth the risk of triggering a temporary restraining order or a preliminary injunction, then the Forest Service would communicate its rationale for the sale award to Edward Boling, lead counsel for the government in the ONRC Action litigation. As of Mr. Boling's December 4, 1998 letter, the Department of Justice did not indicate that it would veto any such requests and the Department of Justice left the final decision of whether or not to award the sale to the Forest Service. Mr. Boling, however, requested that he receive advanced notice of any such award and that the Forest Service "compile the essential elements of the administrative record that we will need to defend against such a motion [for a temporary restraining order or a preliminary injunction]." All of this documentation and other information requested by the Department of Justice based on Mr. Boling's December 4, 1998 letter to the Forest Service and the BLM were required to be in his hands five days before award. App. Tab 70 at A-519; App. Tab 74; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 115:13-121:13, 152:3-158:19).

Defendant's Response: Defendant objects because the documents cited do not support plaintiffs' contention that the Forest Service and Department of Justice expected sales would be challenged by the ONRC Action plaintiffs, and Ms. Zike's personal opinion cannot bind the Forest Service or the Department of Justice. Defendant further objects because the statement attributed to Mr. Schmidt is inadmissible hearsay. Additionally, the documents and testimony cited concern the

Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant argues there is no support for the part of the proposed finding which states that the Forest Service and the DOJ "expected" the award of "at risk" sales to be challenged by the ONRC Action plaintiffs with a request for an injunction. Defendant's argument is belied by Ms. Zike's e-mail that says the DOJ requested that the Forest Service evaluate the risk of awarding a sale on the "at risk" "in anticipation of ONRC seeking a Pre. Inj." App. Tab 70 at A-519. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Similarly, Mr. Schmidt's statements are also admissions of party opponent classified as non-hearsay. Id.; reply to PPF No. 93. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Similarly, the statements attributed to Mr. Schmidt are not hearsay because they too constitute an admission by a party opponent. Id. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

132. In preparing portions of a draft briefing paper to be sent to Paul Brouha, Al Ferlo and Nancy Green in the Washington Office of the Forest Service, Sue Zike concluded, based upon conferring with Jerry Hofer, the Region 6 Forest Service contracting officer, that the standard Forest Service timber sale contract did not contain provisions which allowed the government to make unilateral changes imposing a suspension on awarded contracts in order to perform surveys

required under the NFP. App. Tab 191 at A-1749; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 141:22-23).

Defendant's Response: Defendant objects because this contention is purely plaintiffs' legal conclusion. Defendant also objects because this contention is parol evidence, it is taken out of context, and the cited testimony does not support plaintiff's contention. Furthermore, defendant objects because Ms. Zike's personal opinions cannot bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The parol evidence rule only bars use of prior or contemporaneous statements between the parties used to contradict an integrated agreement. The rule is inapplicable here because the proposed finding and evidence which supports it do not involve any such statements. Plaintiffs' citation to Ms. Zike's testimony inadvertently omits a page of relevant testimony. The citation should read, and plaintiffs amend the proposed finding, "App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 141:22-142:23)." This amendment to the citation moots defendant's objection that the proposed finding is a legal conclusion because Ms. Zike's testimony supports the facts asserted by the proposed finding. Ms. Zike's statements "bind" defendant because they are admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the

testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

133. Under cover memorandum dated January 22, 1999, Paul Brouha, Associate Deputy Chief of the Forest Service, sent a memorandum including background and analysis of the ONRC Action litigation to Anne Kennedy, Deputy Under Secretary for Natural Resources and Environment for the Department of Agriculture; Barbara Webber, Forest Service Washington Office; and Al Ferlo, counselor to the Chief of the Forest Service. Mr. Brouha's cover memorandum indicates that the brief was also hand-delivered to the acting chair of the President's Council on Environmental Quality, George Frampton, on January 19, 1999 and that Forest Service employees in Regions 5 and 6 were involved in the preparation of the memorandum. In his cover memorandum Mr. Brouha observed "it [the attached memorandum] offers a good overview of the current situation surrounding the lawsuit." At page 3 of 5 of the memorandum, under the heading "What are the contracting implications of surveying awarded sales?," the memorandum states:

> The agencies would argue vigorously against surveying sales that have been awarded. The Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species. The "Protection of Habitat of Endangered, Threatened, and Sensitive Species" clause (C6.25#) only includes those species listed as Threatened, Endangered or Sensitive (Regional Forester's list). None of the survey and manage species are on the Threatened & Endangered List and many are not on the Sensitive List. A contract modification under this subsection would require reimbursement to the purchaser.

App. Tab 82; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 180:3-181:9).

Defendant's Response: Defendant objects because this contention is parol evidence. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The parol evidence rule only bars evidence of prior or contemporaneous statements between the parties used to contradict an integrated agreement. The rule is inapplicable here because the proposed finding and evidence which supports it do not involve any such statements. Rather, the proposed finding demonstrates that high-level employees of the Forest Service were concerned about the Forest Service's liability if it were to award sales and then suspend them to conduct Category 2 species surveys, as was the case with plaintiffs' sales. The proposed finding is evidence that the Forest Service knowingly accepted the risk of liability when it awarded plaintiffs' sales without having first conducted the Category 2 surveys. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

134. In an email exchange between Sue Zike and Brian Stone, at that time a Region 5 litigation coordinator for the ONRC Action lawsuit, dated January 22, 1999, Mr. Stone informed the Forest Service contracting officers and others on his Distribution List, including Ed Matthews, contracting officer for Happy Thin and Jack Heli, that "the question needs to be answered for each sale that would go forward: why do we need to go forward with this particular sale NOW, instead of waiting for the conclusion of the ONRC litigation??" In response to Mr. Stone, Ms. Zike stated "We'll need to consider our determination in light of the Motion to Dismiss Schedule which the court 'noted' for 'consideration' on 1/29/99." By this

Ms. Zike meant that the Forest Service "should not be awarding timber sales that could promote a motion for a preliminary injunction while the court was considering" the government's motion to dismiss. App. Tab 83; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 178:13-180:2).

Defendant's Response: Defendant objects because the document and testimony do not support the plaintiffs' contention as to who received the document, and Ms. Zike's personal opinion does not bind the Forest Service. Additionally, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Regardless of who was on Mr. Stone's e-mail "distribution list," to whom the e-mail at App. Tab 83 was sent, Mr. Stone's e-mail shows that the Forest Service knew there were risks involved in proceeding to award sales prior to a final decision in ONRC Action. Mr. Stone was the Forest Service Region 5 Litigation Coordinator who communicated with Edward Matthews, Contracting Officer on Happy Thin and Jack Heli, and with Ms. Zike about awarding sales. E.g., App. Tabs 83, 94, 115. Ms. Zike's statements "bind" defendant because they are admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

135. Prior to the award of Jack Heli, Contracting Officer Ed Matthews was made aware that in a recent administrative proceeding the Interior Board of Land Appeals had issued a stay preventing the BLM from awarding or operating any BLM timber sales that involved the Oregon red tree vole. According to Mr. Matthews, "The Board does not feel the interim survey direction is consistent with the NWFP." Mr. Matthews also noted in an internal email dated February 1, 1999 that, "There was a lot of discussion about the red tree vole including the fact that there are scientists that feel that we should be surveying for California red tree voles." App. Tab 192.

Defendant's Response: Defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

136. In an email exchange dated March 19, 1999 from Sue Zike to Robert Devlin, Ms. Zike agreed with Mr. Devlin that the Department of Justice no longer required "concurrence" on any decision to award "at-risk sales" or "problem sales;" however, she understood that the Department of Justice wanted to be assured that the Forest Service would not award timber sales that would be likely to prompt the ONRC Action plaintiffs to file a motion for temporary restraining order or a preliminary injunction prior to the resolution of the case by cross-motions on summary judgment. In Ms. Zike's words,

> DOJ wants out of the "concurrence" but wants to be assured that "no dogs are let out on the street" while he [Edward Boling] is preparing our motion for Summary Judgment to the amended complaint and while the judge is considering the case, estimated to be May 15. So Owen [Schmidt] and I thought we might do the following to keep the bad dogs in the yard: For the sales they expect to award by June 1, ask the Forest to compare the issues (I'll do the chart for them) in the amended complaint to the issues raised in the P's appeal and assess the litigation risks. We know the RTV and "implement" are already in court, so they are not a worry.

App. Tab 96; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 185:2-188:10).

Defendant's Response: Defendant objects because plaintiffs' contention is inadmissible hearsay. Defendant also objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by a party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80, 93. Moreover, Ms. Zike's statements are not opinion but facts based upon her personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

137. By letter dated April 12, 1999, the ONRC Action plaintiffs notified the Department of Justice through Edward Boling and John Watts that Happy Thin, Jack Heli and Too Wild, among

others, were "at-risk sales" which might be awarded and operated prior to June 1, 1999 and which, if awarded, would likely be challenged by the ONRC Action plaintiffs. App. Tab 102; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 43:21-45:22). The ONRC Action plaintiffs sought an agreement from the government not to award these sales and other sales on the list prior to June 11, 1999 and, absent such an agreement, the ONRC Action plaintiffs were putting the Justice Department and the Forest Service on notice that they would seek a temporary restraining order against any such sales being awarded or operated. The Justice Department sent this letter and the attached lists to Sue Zike of the Forest Service. Id.

Defendant's Response: Defendant objects because the contention is plaintiffs' legal conclusion, and Ms. Zike's personal opinion cannot bind the Forest Service, the Department of Justice, or the ONRC Action plaintiffs. Defendant further objects to plaintiffs' characterization of the sales as "at-risk sales," when the document cited clearly states: "Not all of these sales are equally at risk . . . ." Tab 102. Furthermore, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding does not assert that all timber sales listed by the ONRC Action plaintiffs were equally at risk of being awarded and prompting a request for injunctive relief. Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon Ms. Zike's personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a

conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

138. In an email dated April 28, 1999, Sue Zike advised Forest Service personnel that they were not to share with others outside of the agency the list of "at-risk sales" or "problem sales" or the charts that were prepared by Ms. Zike to assist in the Forest Service's assessment of litigation risk in awarding those sales. App. Tab 108; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 188:11-192:3).

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion, not a statement of fact. Defendant further objects because this contention is directly challenged by he document cited in Tab 48, which notes: "If you have a request for [the list of sales], send the request to the RO and we'll process." Tab 48. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's instruction to forward FOIA requests for the "at risk" lists to the Regional Office for processing does not contradict the proposed finding. Ms. Zike's e-mail does not explain what she means by "process" the request; certainly, there is nothing to indicate that "process" means "release the lists to members of the timber industry." Indeed, Ms. Zike's e-mail suggests that the "at risk" lists would not have been disclosed even if the industry had made a FOIA request for them: "DO NOT SHARE THIS TABLE OR OTHERS LIST OF SALES OUTSIDE THE AGENCY. All of this info is either confidential with DOJ/OGC or protected by

the Fed. Rules of Evidence 408. Industry to [sic] dying to know this info and it's not available to them." App. 108. The proposed finding neatly paraphrases the directions given by Ms. Zike and therefore is not a legal conclusion but a well-supported statement of fact.

139. In an email to her Distribution List dated May 19, 1999, Sue Zike stated that "during the last few months our DOJ Atty's have been talking with ONRC about moving ahead with some of the projects ONRC listed in their Feb. 26 and April 5 letters re: 'problem' timber sales." Among the sales which had been awarded pursuant to the agreement between the Department of Justice attorneys and the ONRC Action attorneys were Jack Heli awarded March 2, 1999 to Timber Products and Too Wild awarded May 14, 1999 to CLR. However, neither Timber Products nor CLR were informed at or before the award of their sales that their sales were targeted as "problem" sales in the ONRC Action litigation or that these sales would have been immediately challenged with a motion for a temporary restraining order or a preliminary injunction but for a secret agreement between the ONRC Action lawyers and the Department of Justice attorneys in the ONRC Action litigation. App. Tab 112; App. Tab 123 at A-986.

Defendant's Response: Defendant objects because plaintiffs' contention is a legal conclusion and is not supported by the cited documents. Specifically, there is no evidence in the documents cited that there was an agreement between the Department of Justice attorneys and the ONRC Action plaintiffs, and there is no evidence that the sales would be "immediately" challenged absent such agreement. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: App. Tab 123 at A-986 provides ample support for the existence of the agreement between the Department of Justice and ONRC Action attorney regarding the award of "at risk" timber sales. In that document, Ms. Zike writes of "ONRC Action [asking] USFS/BLM to delay "problem sales," the subsequent delay of "35-40 out of the USFS sales," the DOJ's compliance with ONRC Actions' request to be informed of the status of certain sales, and the negotiation of the "award of 10 USFS projects from the 'problem list.'" App. Tab 123 at A-986. Consequently, the proposed finding is not a legal conclusion but a statement of fact regarding the existence of an implicit and/or express oral agreement between defendant and ONRC Action attorneys. Plaintiffs agree that the documents cited do not demonstrate that the ONRC Action plaintiffs would "immediately" challenge the award of the "at risk" sales and amend the proposed finding to eliminate the word "immediately." Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

140. By letter dated July 6, 1999 to Department of Justice attorneys Edward Boling and John Watts, the ONRC Action plaintiffs provided the Department of Justice, and through them the Forest Service, with an updated list of sales the ONRC Action plaintiffs regarded as "at-risk sales" or "problems sales" which would be targets of a motion for a preliminary injunction or a temporary restraining order if awarded. Pursuant to an agreement between the government and the ONRC Action plaintiffs, the plaintiffs agreed to hold off seeking preliminary injunctive relief with respect to these sales until at least July 31, 1999 if the Forest Service and the BLM agreed to provide plaintiffs with at least ten days' advanced notice prior to approving any plan of operations for the sales. This list included Happy Thin and Jack Heli, among others. Blue Lake

and Timber Products were not told of these developments either prior to submitting a bid or prior to award of these sales. App. Tab 121; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 49:14-50:15).

Defendant's Response: Defendant objects because plaintiffs' contentions are not supported by the document and testimony, the contentions are plaintiffs' legal conclusions, and Ms. Zike's personal opinion does not bind the Forest Service. Furthermore, the document and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding neatly paraphrases the letter referred to and cited by the proposed finding and therefore asserts facts, not legal conclusions. Ms. Zike's statements "bind" defendant because they are admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

141. By letter dated July 6, 1999, the ONRC Action plaintiffs' counsel notified the Department of Justice, and through the Department of Justice the Forest Service, that Happy Thin, Jack Heli and Too Wild, among others, remained on ONRC Action plaintiffs' "at-risk" list. App. Tab 123 at A-986 to A-995. Despite this information the Forest Service went ahead with the award of Happy Thin on July 6th. Blue Lake was not informed of this development. App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 224:17-230:5).

Defendant's Response: Defendant objects because plaintiffs' contentions are not supported by the documents and testimony. Tab 123 at A-986 to A-995 is not the July 6, 1999 letter, and the cited testimony contains no information about Blue Lake or the award of Happy Thin. Defendant further objects because Ms. Zike's personal opinion cannot bind the Forest Service. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Although ONRC Action's July 6, 1999 letter is not cited by the proposed finding, Ms. Zike's memorandum sufficiently describes the contents of that letter to support the proposed finding. Tab 123 at A-987, A-990, A-993. Ms. Zike's statements regarding the contents of the letter are non-hearsay under FRE 801 as admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, Ms. Zike's statements in her memorandum and her testimony are not opinion but facts based upon her personal knowledge as the Litigation Coordinator for Region 6. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation.

142. On July 7, 1999, Sue Zike prepared a current list of "at-risk sales" or "problem sales" which identified the actual or proposed award date of those sales. This list was provided to Edward Boling, lead trial counsel for the government in the ONRC Action litigation, and Robert Devlin, Director of Natural Resources in Region 6 of the Forest Service, in order for the Forest Service and the Department of Justice to "get an idea of the threat from ONRC Action for an injunction." Happy Thin, Jack Heli and Too Wild are shown on that list. The list indicates the

award of Jack Heli was March 2, 1999, the award date for Too Wild was May 14, 1999 and the award for Happy Thin which had been projected for May 5, 1999 was now delayed until after the summary judgment hearing before Judge Dwyer in the ONRC Action litigation which was schedule for July 1, 1999. Blue Lake, Timber Products and CLR were not told about this development. App. Tab 126; App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 50:16-52:14).

Defendant's Response: Defendant objects because the contentions are plaintiffs' legal conclusions, the document does not support plaintiffs' contentions, and Ms. Zike's personal opinion cannot bind the Forest Service. Specifically, the list does not include any information regarding the Too Wild timber sales, and there is no support for plaintiffs' contention that the plaintiffs were never informed. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's testified that the chart of "at risk" sales and the information contained therein was not provided to anyone outside of the Forest Service and the Department of Justice. App. Tab 169 (S. Zike Dep. Tr. (1/4/07) 52:6-10). Ms. Zike's statements "bind" defendant because they are admissions by a party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. Plaintiffs amend the proposed finding to remove the references to the Too Wild timber sale, thus mooting defendant's objections that the proposed finding is a legal conclusion and not supported by the documents cited.

143. The Forest Service engaged in written and oral communications with the ONRC Action plaintiffs from shortly after the filing of the ONRC Action complaint in July 1998 through at least July 6, 1999. These written and oral communications included commitments by the Forest Service to delay auction, award or approval of any ground-disturbing operations on numerous sales, including Happy Thin, Jack Heli and Too Wild until the Forest Service had given notice to the ONRC Action plaintiffs that it was going to take such action. In return, the ONRC Action plaintiffs agreed not to immediately seek a preliminary injunction or temporary restraining order against the Forest Service if it offered or awarded these sales but informed the Forest Service that the ONRC Action plaintiffs may seek such injunctive relief if the Forest Service allowed any harvesting operations to proceed. App Tabs 102-03, 112, 121, 125-26. Neither Blue Lake, Timber Products nor CLR were informed of these commitments until discovery in the above-captioned action. App. Tab 187 (B. Taylor Decl. ¶ 4); App. Tab 188 (B. Turner Decl. ¶ 2); App. Tab 186 (D. Bonde Decl. ¶ 3).

Defendant's Response: Defendant objects because plaintiffs' contentions are hearsay, and defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not hearsay because the first three sentences are not offered to prove the existence of the secret agreement between defendant and the ONRC Action plaintiffs, but to show that plaintiffs were never made aware of any such agreement. The last

sentence is not hearsay at all but rather states plaintiffs' personal knowledge regarding the existence of the secret agreement. Defendant objects to plaintiffs' use of their own declarations to support the proposed finding, yet defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

144. The Forest Service awarded Happy Thin despite the risk of the sale being enjoined by Judge Dwyer in part because the Forest Service feared that it would be liable for breach of contract if it withheld award of the timber sale. App. Tab 115.

Defendant's Response: Defendant objects because the plaintiffs' contention is not supported by the documents, which refer to the Upper South Fork Timber Sale, not any of the timber sales at issue in this litigation, and the plaintiffs' contention is a legal conclusion. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Contrary to defendant's assertion, the beliefs of the Washington Office of the Forest Service as to what actions were allowed under the Upper South Fork timber sale and its liability to the purchaser of that timber sale if the Forest Service cancelled the sale are relevant to this case. All timber sale contracts rely upon the same standard timber sale contract. Thus, the

Forest Service's belief as to what the contract allowed for Upper South Fork necessarily must be the same for that allowed in all contracts, included those for Happy Thin, Jack and Too Wild. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

145. In a memorandum to officials in the General Counsel's Office in Washington, D.C., Owen Schmidt, the principal Forest Service lawyer for the ONRC Action litigation, advised that the Forest Service's liability for damages under the timber sale contracts to purchasers would be less if the sale in question was suspended pursuant to court order as opposed to unilaterally suspended by the Forest Service. App. Tab 135.

Defendant's Response: Defendant objects because the plaintiffs' contention is parol evidence, and, furthermore, the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure (dated October 15, 1999). Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The parol evidence rule only applies to evidence of prior or contemporaneous statements between the parties used to contradict an integrated agreement. The rule does not apply here because neither the proposed finding nor the evidence that supports it relates to such statements. The proposed finding is not parol evidence because it does not concern any agreements between the Forest Service and plaintiffs that occurred prior to or contemporaneous with the execution of their timber sale contracts. FRE 407 does not apply here because Mr. Schmidt is not discussing a subsequent remedial measure but offering his legal analysis

regarding the current standard timber sale contract. The proposed finding also is not barred by FRE 407 because the "subsequent remedial measures" bar of FRE 407 does not apply to the proposed finding and the evidence on which it relies because "evidence of remedial measures does not run afoul of Rule 407 when it is used to prove the feasibility of a particular measure." M.A. Mortenson Co. v. United States, 40 Fed. Cl. 389, 421 (1998) (quoting Neal & Co., Inc. v. United States, 36 Fed. Cl. 600, 626 n.49 (1996)). The proposed finding is used by plaintiffs to prove the feasibility of the Forest Service requiring a purchaser to execute an explicit waiver of liability for the suspension of its contracts. This purpose is both relevant and expressly allowed under FRE 407 ("This rule does not require the exclusion of evidence of subsequent measures when offered for [the purpose of proving] feasibility of precautionary measures, if controverted").[4] Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

146. On November 18, 1999, Edward Boling, lead trial counsel for the government in ONRC Action, wrote a memorandum for Lois Schiffer, then Assistant Attorney General of the Environment and Natural Resources Division of the Department of Justice, recommending settlement of the ONRC Action litigation. As part of providing the factual background, the

[4]Moreover, FRE 407 is written in the language of tort, not contract. The public policy underlying FRE 407 also is directed to issues of tort and personal injury. "The rule [principally] rests on . . . a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." FRE 407 advisory committee's notes to 1972 proposed rules. "Rule 407 bars the use of safety measures only when offered to show a belief by the actor that he was guilty of a breach of a duty of care, either under the law of torts or under a criminal statute punishing negligent conduct." Charles Alan Wright, Kenneth W. Graham, Jr., 23 FEDERAL PRACTICE AND PROCEDURE § 5285. The issues in this case have nothing to do with safety or any of the purposes underlying FRE 407. Consequently, it is reasonable to conclude that FRE 407 does not apply to breach of contract claims at all.

memo discusses the Forest Service's red tree vole interim survey protocol, stating that the protocol did not comply with the ROD: "The protocol effectively excluded much of the red tree vole's habitat from survey, which is inconsistent with the ROD requirement to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.' ROD C-5." In evaluating the validity of the red tree vole interim survey protocol, the memo concludes, "[S]elective surveys for red tree voles are not clearly allowed by the language of the ROD." As for the validity of the "NEPA equals implemented" interpretation, the memo concludes, "[T]he agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" App. Tab 136.

Defendant's Response: Defendant objects because this document was drafted after the ONRC Action summary judgment decision issued, and, therefore, has no relevance to the reasonableness of the Forest Service's actions prior to contract award. Additionally, the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The legal opinion of the government's lead counsel in the ONRC Action litigation on the legal soundness of the Forest Service having adopted the "NEPA decision equals implemented" interpretation and RTV Directive, even though memorialized after the decision in ONRC Action, is relevant to the unreasonableness of the Forest Service's decision to adopt those two directives. Although defendant does not make a hearsay objection, Mr. Boling's legal

assessment of the Forest Service's actions is an admission of party opponent under FRE 801(d). See reply to PPF Nos. 45, 79. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

147. The terms and conditions for the settlement of the ONRC Action lawsuit agreed to by the government and the ONRC Action plaintiffs were included in a "Stipulation For Order Dismissing Action; Order Thereon" dated and filed December 17, 1999. In accordance with paragraph 6 of this stipulated order, the government agreed to pay the ONRC Action plaintiffs' attorneys fees as of December 17, 1999 under the Equal Access to Justice Act. In addition, among other requirements, the stipulated order required the Forest Service to perform certain Category 2 surveys on a specified list of Forest Service sales, including Happy Thin, Jack Heli and Too Wild. This stipulation was regarded as a "settlement agreement" between the ONRC Action plaintiffs and the government, and it governed the obligations of the Forest Service regarding Category 2 surveys on Happy Thin, Jack Heli and Too Wild after the lawsuit was dismissed on December 17, 1999. The government ultimately paid the ONRC Action plaintiffs $221,300 in attorneys' fees under the Equal Access to Justice Act. App. Tab 200 (ONRC Action, Stipulation For Order Dismissing Action; Order Thereon (Dec. 17, 1999)); App. Tab 193 (Letter from E. Boling, Department of Justice, to M. Axline and C. Stilwell, counsel for ONRC Action plaintiffs (May 1, 2000)); App. Tab 146 (Letter from M. Axline, counsel for ONRC Action plaintiffs, to J. Watts, Department of Justice (December 5, 2000)).

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions, which are inadmissible under FRE 408.

Plaintiffs' Reply: The first three sentences of the proposed finding are not based on statements made during settlement negotiations but the stipulation filed in ONRC Action, a public document. App. Tab 200. The remainder of the proposed finding relies upon evidence admissible under Rule 408 because it is not offered to prove defendant's liability for the same claims brought by ONRC Action and because settlement of the attorneys' fees did not relate to the issue of the government's liability, which was decided by the district court's opinion. See reply to PPF No. 88.

**HAPPY THIN TIMBER SALE CONTRACT**

148. The Forest Service did not perform certain Category 2 surveys on Happy Thin prior to the award of that sale to Blue Lake on July 6, 1999 because the NEPA Decision Notice for that sale was signed on September 15, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tabs 134, 195.

Defendant's Response: Defendant objects to plaintiffs' contention as inadmissible legal conclusions, not statements of fact. Defendant further objects because the documents do not support the contention that "timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future." Additionally, this contention concerns the Forest Service's actions and responsibilities prior to the award of

these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion but defendant's own litigation position and is supported by defendant's admission, "All 17 [sales on a list that includes Too Wild] have survey/manage species . . . that have NOT been surveyed for because they relied on the 'implement' and 'red tree vole' memo's [sic]," App. Tab 134 at A-1118, the text of the "NEPA decision equals implementation," App. Tab 34 and DPFUF ¶ 26. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

149. Category 2 surveys for the red tree vole were not performed by the Forest Service on the Happy Thin sale prior to award for the additional reason that the interim survey protocol for the red tree vole, in effect at the time of award, limited the survey area to north of the Oregon/California border and excluded California from the survey even if there was known red tree vole habitat in NFP forests south of the Oregon/California border. App. Tabs 36, 134.

Defendant's Response: Defendant objects to plaintiffs' contention as inadmissible legal conclusions, not statements of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion but is supported by defendant's admission, "All 17 [sales on a list that includes Jack] have survey/manage species . . . that have

NOT been surveyed for because they relied on the 'implement' and 'red tree vole' memo's [sic]," App. Tab 134 at A-1118, and the RTV Directive, App. Tab 36. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

150. The eighteen Category 2 surveys that were not performed by the Forest Service on the Happy Thin sale prior to award were the red tree vole (mammal), *Aleuria rhenana* (a.k.a. *Sowerbyella rhenana*) (fungi), *Bondarzewia Montana* (a.k.a. *Bondarzewia mesenterica*) (fungi), *Otidea leporina* (fungi), *Otidea onotica* (fungi), *Otidea smithii* (fungi), *Polyozellus mutiplex* (fungi), *Sarcosoma Mexicana* (fungi), *Buxbaumia vidiris* (bryophytes), *Ptilidium californicum* (bryophytes), *Ulota meglospora* (bryophytes), *Helminthoglypta hertleini* (Oregon Shoulderband) (mollusks), *Prophysaon coeuleum* (Blue-grey Tail-dropper) (mollusks), *Prophysaon dubium* (Papillose Tail-dropper) (mollusks), *Trilobopsis tehamana* (Tehana Chaparral) (mollusks), *Allotropa virgata* (Sugar Stick) (vascular plants), *Cypripedium fasciculatum* (Clustered Lady's Slipper) (vascular plants), and *Cypripedium montanum* (Mountain Lady's Slipper) (vascular plants). App. Tab 138.

Defendant's Response: Defendant objects because the contention is plaintiffs' inadmissible legal conclusion, not a statement of fact. Defendant further objects because document cited is dated June 22, 2000, and, therefore, is not relevant to the Forest Service's precontract actions.

Plaintiffs' Reply: In a twist on its standard objection that everything occurring prior to award is irrelevant, defendant now objects that everything after award is irrelevant as well. This case concerns, inter alia, the reasonableness of the Forest Service's actions in provoking the

suspension of plaintiffs' contracts. The post-award actions that the Forest Service took with regard to those suspensions, including their nature, scope, duration, and effect upon plaintiffs' operations, are all relevant to whether the suspensions were reasonable. Plaintiffs respectfully refer the Court to their briefs where this point is addressed in full. Pls.' Br. at 42-43. **PLEASE NOTE: Plaintiffs incorporate this reply for each instance where defendant raises this objection to one of plaintiffs' proposed findings of fact.** The proposed finding is not a legal conclusion, but a statement of fact based on defendant's own document which states that the stipulation in ONRC Action required the Forest Service to survey for Category 2 species that it had not surveyed before because of the invalidated "NEPA decision equals implementation" memo, that those surveys were now completed, and that surveys were conducted for the listed species. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

151. The Klamath Forest Alliance timely filed an administrative appeal of the Forest Service's approval of the Happy Thin Environmental Assessment on October 30, 1998. The appeal challenged, inter alia, the Forest Service's failure to conduct the required survey and manage surveys prior to FY 1999:

> In addition to surveys for the Del Norte Salamander (PLEL), the ROD requires surveys to be completed for the other 71 species listed in Table C-3 [of the ROD] prior to ground-disturbing activities that will be implemented in FY 1999 or later. The Happy Thin project will be implemented in FY 199 or later, and thus surveys for these species are required. The EA fails to address these species, and until such an assessment is completed no project should be implemented.

App. Tab 198 (Letter from K. Haines and F. Pace, Klamath Forest Alliance to M. Lee, Forest Service Acting Forest Supervisor (Oct. 30, 1998)). The Klamath Forest Alliance also challenged

the interim survey protocol for the red tree vole. Id. On December 17, 1998, the Forest Service deciding officer upheld the Forest Service's decision to implement the Happy Thin EA. The deciding officer concurred with the Appeal Reviewing Officer's finding that Klamath Forest Alliance objection regarding the Forest Service's definition of "implement" concerned a decision beyond the scope of the Jack EA and could not be challenged: "The Decision Notice for the Happy Thinning was signed on September 15, 1998, and is in compliance with an Interagency Memorandum dated September 11, 1998. This Interagency Memorandum defines the point at which "implementation" takes place. It is my opinion that this issue is outside the scope of the Decision." App. Tab 199 (Letter from R. Moltzen, Forest Service Deciding Officer, to K. Haines, Klamath Forest Alliance (Dec. 17, 1998)).

Defendant's Response: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

152. The chart prepared by Sue Zike which included information from others within the Forest Service used for the evaluation of litigation risk with respect to proposed award of the Happy Thin timber sale recognized that at least one of the ONRC Action plaintiffs had challenged the Forest Service's interpretation "NEPA decision equals implementation" in the administrative

appeal of Happy Thin prior to it being offered to the public. Ms. Zike's chart also indicates that the Forest Service's decision not to survey for red tree voles in the sale area was also challenged in the administrative appeal. Finally, as of the date of preparation of this chart on or about March 9, 1999, the chart indicates that no red tree vole surveys were required on Happy Thin because at that time such surveys were limited by the Forest Service to Oregon and did not include California National Forest timber sales such as Happy Thin. App. Tab 94.

Defendant's Response: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

153. On March 9, 1999, prior to the award of Happy Thin, Ed Matthews, contracting officer for that sale, recommended awarding the sale in part because he believed it was important for the Forest Service to know if it was going to be challenged on the red tree vole directive not to survey south of the Oregon state line. Mr. Matthews' concern was that this issue needed to be tested soon because there were other sales in the National Forests in northern California that were scheduled to proceed under this same red tree vole directive and it was important to find out if they were in jeopardy too. App. Tab 94; App. Tab 177 (E. Matthews Dep. Tr. (8/22/07) 30:25-38:5).

Defendant's Response: Defendant objects because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

154. On March 31, 1999, the Forest Service published the advertisement for Happy Thin. App. Tab 96.

Defendant's Response: Defendant does not dispute these facts. However, this document is irrelevant to plaintiffs' breach of contract claims because it relates to the Forest Service's actions and responsibilities prior to award.

Plaintiff's Reply: Defendant has agreed to the proposed finding, subject only to its standard relevance objection.

155. In March 1999, the Forest Service issued the Happy Thin prospectus. The prospectus did not specifically mention the ONRC Action litigation or that Happy Thin would likely be the subject of a motion for a temporary restraining order or a preliminary injunction, if awarded. Happy Thin timber sale prospectus. App. Tab 96.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, not a statement of fact. Furthermore, defendant objects because the document cited concerns the Forest Service's actions and responsibilities prior to contract award, and, therefore, is not relevant to this case.

Plaintiffs' Reply: The proposed finding is not a legal conclusion; whether the prospectus used the words "ONRC Action" or "temporary restraining order" or "preliminary injunction" is a question of fact, not law, that is resolved by the face of the prospectus itself. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

156. When Blue Lake submitted its bid on Happy Thin, it did not know that Happy Thin was threatened by the ONRC Action lawsuit or by any other lawsuit. App. Tab 187 (B. Taylor Decl. ¶ 5).

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, the declaration concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, is not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant objects to plaintiffs' use of their own declarations to support the proposed finding, yet defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties

will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

157. At the bid opening for Happy Thin but prior to the opening of bids, Ed Matthews, the Forest Service Contracting Officer for Happy Thin, announced to all the bidders, including Blue Lake, that Happy Thin had been a part of some lawsuit but that Happy Thin was no longer included in the lawsuit. App Tab 177 (E. Matthews Dep. Tr. 82:10-84:22); App. Tab 167 (B. Cox Dep. Tr. 24:10-26:5); App. Tab 182 (R. Johnston Dep. Tr. 31:8-34:18); App. Tab 120.

Defendant's Response: Defendant objects because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

158. Before Blue Lake bid on Happy Thin, it learned that the sale had been administratively appealed prior to being offered to the public. At that time Blue Lake representative Jerry Broom asked the Forest Service Contracting Officer for Happy Thin, Ed Matthews, what the Forest Service was planning to do to remedy the appeal. Mr. Matthews told Mr. Broom that the Forest Service was working on it. Prior to bidding Mr. Broom also asked a Forest Service

representative, probably Ed Matthews, "Is this sale clean? Is it ready to go?" The response from the Forest Service was "Yes." App. Tab 183 (J. Broom Dep. Tr. 32:16-33:10, 63:16-64:11).

Defendant's Response: Defendant objects because the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

159. In bidding on Happy Thin and accepting the award of that sale, Blue Lake relied upon its understanding from the Forest Service that Happy Thin was not threatened by the ONRC Action litigation or any other litigation or administrative appeals. App. Tab 187 (B. Taylor Decl. ¶ 6). Blue Lake began operating Happy Thin shortly after it was awarded, and Blue Lake was surprised when it was suspended by the Forest Service due to the ONRC Action litigation and the Forest Service's failure to perform required surveys. App. Tab 187 (B. Taylor Dep. Tr. 43:22-44:14, 52:1-10).

Defendant's Response: Defendant objects to this contention because it is a legal conclusion, not a statement of fact. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Defendant further objects because the documents and testimony cited concern the Forest Service's actions

and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion, but Blue Lake's own testimony as to its expectations, actions, and reactions to events. Defendant objects to plaintiffs' use of their own declarations to support the proposed finding, but the proposed finding cites deposition testimony, not a declaration. Even so, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits and testimony in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

160. By letter dated March 25, 1999, Edward Matthews notified Michael Axline, lead counsel for the ONRC Action plaintiffs, that the Forest Service intended to award Happy Thin no sooner than May 5, 1999. Blue Lake was not informed of this letter. App. Tabs 97-98; App. Tab 187 (B. Taylor Decl. ¶ 7).

Defendant's Response: Defendant does not dispute that Mr. Matthews informed Mr. Axline of the Forest Service's intent to award Happy Thin; however, because this relates to the Forest Service's pre-award conduct or responsibilities, this contention has little relevance. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight.

Plaintiffs' Reply: Defendant has agreed to the first sentence of the proposed finding, subject to its standard relevance objection. Defendant objects to plaintiffs use of their own declarations to

support the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits and declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

161. On May 4, 1999, the oral auction for Happy Thin was held. App. Tab 96. Prior to the start of the auction, the Forest Service announced, "The Happy Thin Heli Timber Sale was listed in litigation but is not currently involved in the litigation. The sale will not be awarded until after July 5, 1999." App. Tab 120. At the time of the oral auction Happy Thin was still under threat of an injunction in the ONRC Action litigation but this fact was not divulged by the Forest Service to Blue Lake. App. Tab 187 (B. Taylor Decl. ¶¶ 5-7). Blue Lake was declared the apparent high bidder at the conclusion of the auction. App. Tab 122.

Defendant's Response: Defendant does not dispute that Blue Lake was declared the apparent high bidder. Defendant objects to the extent this contention is plaintiffs' legal conclusion, not a statement of fact. Defendant also objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Additionally, defendant objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant has agreed to the last sentence of the proposed finding. Defendant does not describe to what extent it believes the proposed finding is a legal conclusion. When the oral auction was held, what was announced, and Happy Thin's status in the ONRC Action litigation are matters of fact, not law, and the proposed finding's statements are supported by the documents cited. Defendant objects to plaintiffs use of their own declarations to support the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

162. In an internal email on or about June 7, 1999, Sue Zike suggested "the quiet award" of Happy Thin. In this email Ms. Zike noted that "DOJ is likely to request that we wait until we have our ONRC Action hearing with J. Dwyer, but there is no date set yet." Ms. Zike then suggested that the Forest Service propose the award of "the lesser of the two evils between Happy Thin and Lower Hayfork." App. Tabs 113, 115; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 192:9-195:5, 200:4-203:5). Blue Lake was not informed of Ms. Zike's suggestions or any other Forest Service or DOJ strategies involving the ONRC Action lawsuit and the proposed award of Happy Thin. App. Tab 187 (B. Taylor Decl. ¶ 3).

Defendant's Response: Defendant objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

163. By letter dated June 23, 1999 signed by Robert Devlin for Nancy Graybeal, Acting Regional Forester for Region 6 of the Forest Service, Edward Boling was given notice that the Forest Service had assessed the litigation risk in connection with awarding Happy Thin, including a review by Owen Schmidt, of the Office of General Counsel of the Department of Agriculture, and that the Forest Service intended to award Happy Thin in the normal course of business after July 1, 1999. The letter further noted that Happy Thin was on a list of sales "identified by Plaintiffs [in the ONRC Action litigation] on April 5 as sales they had concerns with." Neither this letter nor the contents of this letter were disclosed to representatives of Blue Lake Forest Products. App. Tab 187 (B. Taylor Decl. ¶ 9); App. Tab 118; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 212:14-214:9).

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Defendant further objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant objects to plaintiffs' use of their own declarations to support the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos.

22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

164. When she learned of it, Sue Zike was surprised and unhappy that Edward Boling intended to inform ONRC Action counsel of the Forest Service's plans to award Happy Thin and other timber sales after July 1, 1999. App. Tab 119; App. Tab 173 (S. Zike Dep. Tr. (8/21/07) 214:10-217:3).

Defendant's Response: Defendant objects because Ms. Zike's personal opinion cannot bind the Forest Service. Defendant further objects because the documents and declaration cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Ms. Zike's statements "bind" defendant because they are admissions by party opponent. See reply to PPF Nos. 45, 80. Moreover, the statements are not opinion but facts based upon personal knowledge. Notably, when the deposition testimony cited was given defendant did not object that the testimony was opinion, a conclusion, or lacked foundation. The proposed finding shows that Ms. Zike believed Happy Thin was likely to be challenged by the ONRC Action plaintiffs if the award of the sale became known to them. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

165. The Forest Service did not award Happy Thin to Blue Lake until July 6, 1999. App. Tab 122. The letter awarding Blue Lake Happy Thin (Contract No. 060715) made no mention of the status of the timber sale in relation to ONRC Action or the likelihood that the ONRC Action plaintiffs would seek a temporary restraining order or a preliminary injunction against any harvesting on the sale. Id.

Defendant's Response: Defendant does not dispute this fact.

Plaintiffs' Reply: No dispute.

165A. When Blue Lake accepted contract award at the price it bid, Blue Lake expected that its operations would not be suspended based on the ONRC Action litigation. App. Tab 187 (B. Taylor Decl. ¶¶ 5, 8).

Defendant's Response: Defendant objects to plaintiffs' use of their own declarations to support their contentions as unsupported, self-serving, and entitled to little evidentiary weight. Furthermore, Mr. Taylor's expectations were contradicted by an unambiguous contract clause, C6.01, which explicitly permits suspension of operations.

Plaintiffs' Reply: Defendant objects to plaintiffs' use of their own declarations to support the finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment.

Moreover, contract clause C6.01, while permitting the FS to suspend contracts under certain circumstances, does not mention ONRC Action and is not an exculpatory clause when Forest Service fault gives rise to the need for a suspension. See Pls.' Br. at 19-25.

166. In response to the preliminary injunction issued in ONRC Action on August 26, 1999, the Forest Service wrote Blue Lake on August 27, 1999 and directed that Blue Lake immediately suspend all operations on Happy Thin. App. Tab 129.

Defendant's Response: Defendant does not dispute this fact.

Plaintiffs' Reply: No dispute.

166A. Blue Lake was "absolutely devastated" and "shocked" when the Forest Service suspended its operations on the Happy Thin sale as a result of the ONRC Action lawsuit. App. Tab 184 (B. Taylor Dep. Tr. 51:15-18). Blue Lake was surprised when the Forest Service suspended its ongoing operations because Blue Lake had no reason to believe that anything was going to happen to Happy Thin as a result of the ONRC Action lawsuit. Id. (B. Taylor Dep. Tr. 52: 5-8).

Defendant's Response: Defendant objects to this contention because it is not a statement of fact, it is a self-serving opinion that should be afforded little evidentiary weight.

Plaintiffs' Reply: The proposed finding is not opinion but Blue Lake's own factual testimony as to its own expectations, actions, and reactions to events. Defendant objects to plaintiffs use of their own declarations to support the finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

166B. If Blue Lake had known about the Forest Service's secret agreements with the ONRC Action plaintiffs when it bid on the sale, Blue Lake could have taken steps to prevent the damages it incurred. App. Tab 187 (B. Taylor Decl. ¶ 12).

Defendant's Response: Defendant objects to this contention because it is not a statement of fact, it is a self-serving opinion that should be afforded little evidentiary weight.

Plaintiff's Reply: The proposed finding is not opinion but Blue Lake's own factual testimony as to its own expectations, actions, and reactions to events. Defendant objects to plaintiffs use of their own declarations to support the finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

167. Blue Lake timely submitted a Contract Disputes Act claim for breach of contract arising out of Happy Thin to Ed Matthews on June 13, 2000. App. Tab 137 (Letter from B. Taylor, Blue Lake Forest Products, to E. Matthews, Forest Service (June 13, 2000)). The contracting officer issued a final decision on Blue Lake's claim on October 6, 2000. App. Tab 143 (Letter from E. Matthews, Forest Service, to B. Taylor, Blue Lake Forest Products (October 6, 2000)).

Defendant's Response: Defendant does not dispute this fact.

Plaintiffs' Reply: No dispute.

168. On February 18, 2000, the Forest Service revised its red tree vole survey directive to require surveys south of the Oregon/California border where there was known red tree vole habitat, as there was in the Happy Thin sale area. App. Tab 138.

Defendant's Response: Defendant objects because this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims. Defendant further objects because the letter cited is inadmissible under Federal Rule of Evidence 407 as a subsequent remedial measure.

Plaintiffs' Reply: Rule 407 does not apply here because the finding does not reference a subsequent remedial measure. By February 18, 2000, the Forest Service was required to survey Happy Thin for the red tree vole under the ONRC Action settlement agreement. App. Tab 200.

PPF No. 168 merely documents the Forest Service's after-the-fact recognition of the science supporting that requirement.

169. Pursuant to a settlement agreement entered into between the Department of Justice, representing the Forest Service, and the ONRC Action plaintiffs which was the basis for the dismissal of the ONRC Action lawsuit, the Forest Service prepared a Supplemental Information Report ("SIR") for Happy Thin. That report, dated June 22, 2000, indicated that as part of the settlement of the lawsuit, during the suspension of Happy Thin, the Forest Service had surveyed the sale for various Category 2 species including the Oregon red tree vole, several species of fungi, bryophytes, mollusks and vascular plants. These surveys were completed during the period August 28, 1999 through June 22, 2000 when Happy Thin was suspended. A SIR, signed by Margaret J. Boland, Forest Supervisor for the Klamath National Forest, concluded that the original Decision Notice for Happy Thin remained valid because "the new information on these species does not present a different picture of the environmental consequences already considered in the Happy Thinning EA," and that "A finding of no significant impact can still be concluded." Based on the SIR some modifications were made for harvesting requirements on Happy Thin. App. Tab 138.

Defendant's Response: Defendant objects because this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to post-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

170. The Forest Service lifted the suspension on Happy Thin by letter dated August 17, 2000. App. Tab 141.

Defendant's Response: Defendant does not dispute this fact; however, this action, taken after the timber sale contract was awarded, is irrelevant to Blue Lake's breach of contract claims.

Plaintiffs' Reply: Defendant has agreed with the proposed finding, subject to defendant's standard relevance objection.

**JACK HELI TIMBER SALE CONTRACT**

171. The Forest Service did not perform certain Category 2 surveys on Jack prior to the award of that sale to Timber Products on March 2, 1999 because the NEPA Decision Notice for that sale was signed on July 14, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tab 134.

Defendants' Response: Defendant objects to the last sentence of this contention because it is not supported by the document cited, and is merely plaintiffs' opinion. Additionally, the documents

cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant agrees with all but the last sentence of the proposed finding, subject to defendant's standard relevance objection. The second sentence is not plaintiffs' opinion but defendant's own litigation position and is supported by defendant's admission, "All 17 [sales on a list that includes Jack] have survey/manage species . . . that have NOT been surveyed for because they relied on the 'implement' and 'red tree vole' memo's [sic]", the text of the "NEPA decision equals implementation," App. Tab 134 at A-1118, as well as defendant's proposed finding no. 26. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

172. The twenty-one Category 2 surveys that were not performed by the Forest Service on the Jack sale prior to award were *Aleuria rhenana* (a.k.a. *Sowerbyella rhenana*) (fungi), *Bondarzewia Montana* (a.k.a. *Bondarzewia mesenterica*) (fungi), *Otidea leporine* (fungi), *Otidea onotica* (fungi), *Otidea smithii* (fungi), *Polyozellus mutiplex* (fungi), *Sarcosoma Mexicana* (fungi), *Buxbaumia vidiris* (bryophytes), *Ptilidium californicum* (bryophytes), *Helminthoglypta hertleini* (Oregon Shoulderband) (mollusks), *Helminthoglypta talmadgei* (Klamath Shoulderband) (mollusks), *Monadenia churchi* (Church's Sideband) (mollusks), *Monadenia chaceana* (Siskiyou Sideband) (mollusks), *Monadenia troglodytes* (Shasta Sideband) (mollusks), *Monadenia troglodytes wintu* (Wintu Sideband) (mollusks), *Prophysaon dubium* (Papillose Tail-dropper) (mollusks), *Trilobopsis roperi* (Shasta Chaparral) (mollusks), *Trilobopsis tehamana* (Tehana Chaparral) (mollusks), *Allotropa virgata* (Sugar Stick) (vascular plants), *Cypripedium*

*fasciculatum* (Clustered Lady's Slipper) (vascular plants), and *Cypripedium montanum* (Mountain Lady's Slipper) (vascular plants). App. Tab 140.

Defendant's Response: Defendant does not object to this contention.

Plaintiffs' Reply: No dispute.

173. The Klamath Siskiyou Wildlands Center timely filed an administrative appeal of the Forest Service's approval of the Jack Environmental Assessment on August 21, 1998. The appeal challenged, inter alia, the Forest Service's definition of implement:

> Surveys for all species in Table C-3 [of the ROD] must be completed, since portions of this timber sale will be implemented in 1999. Despite Forest Service claims, implementing a timber sale includes on-the-ground disturbance. Since this timber sale will be implemented over the next 5 years, Survey and Manage requirements for all species, including mollusks, fungi, lichens, bryophytes, vertebrates, and plants, must be completed prior to any timber falling or roadbuilding.

App. Tab 196 (Letter from Klamath Siskiyou Wildlands Center to L. Sprague, Forest Service Regional Forester (Aug. 20, 1998)). The Forest Service deciding officer upheld the Forest Service's decision to implement the Jack EA on October 15, 1998. The deciding officer found that the Klamath Siskiyou Wildlands Center objection regarding the Forest Service's definition of "implement" concerned a decision made in the Land Resource Management Plan (LRMP) and therefore was beyond the scope of the Jack EA and could be no longer challenged: "I have determined that objection[] number 3 . . . [is] not within the scope of the decision. Objection 3 refers to the timing of surveys under 'survey and manage' standards and guidelines which was

decided in the LRMP (LRMP 4-26 and 4-33)." App. Tab 197 (Letter from J. Cruz, Forest Service Deciding Officer, to M. Bergoffen, Klamath Siskiyou Wildlands Center (Oct. 15, 1998)).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding makes no legal conclusions but merely provides the contents of public comments and the Forest Service's written responses thereto. Whether the documents contain the information described is a question of fact, not law. While the quoted documents themselves may include legal conclusions, these conclusions are not plaintiffs'; moreover, the proposed finding is used to show that the Forest Service had received warnings regarding its obligation to comply with the NFP's Category 2 survey requirements and not to prove the truth of what was asserted in those warnings. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

174. On September 25, 1998, the Forest Service published the advertisement for Jack Heli. App. Tab 132.

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale

contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

175. In October 1998, the Forest Service issued the timber sale prospectus for Jack Heli. The prospectus stated, inter alia, "This sale has been identified in a lawsuit in which plaintiffs contend that the Forest Service has violated the Northwest Forest Plan in preparing the sale; language in this sale's contract has been included to limit the government's liability in case of cancellation as to holding costs." App. Tab 53.

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

Plaintiffs' Reply: Defendant's objection that the proposed finding is irrelevant should be deemed frivolous and waived given that defendant's proposed finding of fact no. 52 is nearly identical. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

176. The oral auction for Jack Heli was held on November 3, 1998. App. Tabs 79, 91. Timber Products was declared the apparent high bidder at the conclusion of the auction; however, the Forest Service did not immediately award the timber sale contract to Timber Products. Id.

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract. object to this contention.

Plaintiffs' Reply: Defendant objects that this finding is irrelevant, yet defendant's proposed finding no. 53 also states, "The Forest Service delayed awarding these sales." Defendant cites no fact, documents, or deposition testimony that contradicts the proposed finding.

177. On November 24, 1998, Bev Cox of the Forest Service informed Bill Turner that the Forest Service could not award Jack Heli to Timber Products "until the Justice Department says we can." This was done on the advice of Brian Stone, a litigation coordinator for Region 5 of the Forest Service. App. Tab 167 (B. Cox Dep. Tr. 13:8-14:16); App. Tab 132.

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony cited. Ms. Cox testified that she did not remember discussing award of the Jack Heli timber sale with either Mr. Turner or Mr. Stone. P. App. Tab 167 (Cox 14:25). Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of

these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The fact that Ms. Cox could not recall receiving advice from Mr. Stone regarding the award of Jack Heli does not contradict the cited note Ms. Cox wrote on the bid form for the Jack Heli sale, which Ms. Cox testified was written in her handwriting and was standard procedure for her to record.

178. At the time of the Jack Heli oral auction, it was customary for timber sales on the Klamath National Forest to be awarded the day following the designation of a high bidder at the oral auction. App. Tab 167 (B. Cox Dep. Tr. 17:18-20); App. Tab 181 (B. Turner Dep. Tr. 60:3-14).

Defendant's Response: Defendant objects to plaintiffs' use of the term "customary" which is plaintiffs' opinion and is not supported by the testimony cited. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding's use of the word "customary" is well supported by the testimony cited. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

179. On the same day of the oral auction for Jack Heli, there was also an auction of the Jack Trac timber sale within the same ranger district on the Klamath National Forest. Both Jack Heli and Jack Trac were analyzed under the same Environmental Assessment and the Decision Notices for each of these sales were pursuant to that assessment. Both Jack Trac and Jack Heli were timber sales within the NFP area and subject to all of the requirements of the NFP including any required wildlife and plant surveys. Timber Products was declared the high bidder on Jack Trac and within a few days of the oral auction was awarded that sale by the Forest Service. Although it was within the NFP area and subject to all of the applicable provisions of the NFP, Jack Trac was not one of the sales enjoined in the ONRC Action litigation and it was never suspended. App. Tab 181 (B. Turner Dep. Tr. 60:3-14); App. Tab 85.

Defendant's Response: Defendant objects to this contention because it is not supported by the testimony or document cited. Mr. Turner testified only as to his understanding of the timber sale award process. Defendant further objects to this contention because it is plaintiffs' legal conclusion, and not a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The cited document and testimony supports the proposed finding. Mr. Turner's testimony describes bidding on a sale the same day as Jack Heli that was issued under the same EA as Jack Heli. The cited letter from Mr. Turner to the Forest Service identifies this sale as the Jack Trac timber sale and states that Jack Trac was awarded on November 5, 1998,

two days after the November 3, 1998 bidding. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

180. On December 2, 1998, Contracting Officer Ed Matthews notified Brian Stone in the Region 5 Forest Service office via email that Mr. Matthews was planning on awarding Jack Heli on December 18, 1998. App. Tab 70; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 170).

Defendant's Response: Defendant objects to this contention because it is based on inadmissible hearsay. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80. Mr. Matthews was the contracting officer for the Klamath National Forest, on which Jack Heli was located. Accordingly, notifying Mr. Stone of his intent to award that sale was within the scope of his duties as contracting officer.

181. By letter dated January 10, 1999, Bill Turner, timber procurement manager for Timber Products, asked Ed Matthews, the contracting officer for Jack Heli, what were the Forest Service's expectations for award of that timber sale and whether it was possible that the Forest Service would allow harvesting of that timber sale in the 1999 logging season. App. Tab 77.

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

182. When Jack Heli had not been awarded over two months after the oral auction, on January 10, 1999, Bill Turner of Timber Products wrote Edward Matthews requesting "some formal communication as to what the Forest Service expectations are for award." It was Bill Turner's understanding from his conversation with Edward Matthews that the Forest Service would not award Jack Heli if it was still under threat of injunction in ongoing litigation. Timber Products relied upon the Forest Service's representations. App. Tab 77; App. Tabs 78, 80; App. Tab 181 (B. Turner Dep. Tr. 26:12-30:8, 50:8-51:8, 51:21-52:19, 54:10-14, 55:3-56:18, 63:10-65:19); App. Tab 161 (Timber Products' Answer to Defendant's Interrogatory No. 24); App. Tab 188 (B. Turner Decl. ¶ 5).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, rather than a contention of fact. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As author of the letter written to Mr. Matthews and the person with whom Mr. Matthews communicated, Mr. Turner has personal knowledge of the existence and contents of the letter, his understandings of Mr. Matthews' statements, and the actions he took in reliance upon those statements. Accordingly, the proposed finding represents statements of facts based upon Mr. Turner's personal knowledge, and not mere opinion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

183. The charts prepared by Sue Zike which included information from others within the Forest Service used for the evaluation of litigation risk with respect to proposed award of the Jack Heli timber sale recognizes that at least one of the ONRC Action plaintiffs had challenged the Forest Service's interpretation "NEPA decision equals implementation" in the administrative appeal of Jack Heli prior to it being offered to the public. Ms. Zike's chart also indicates that as of the date of preparation of this chart on or about January 20, 1999 no red tree vole surveys were required on Jack Heli because at that time such surveys were limited by the Forest Service to Oregon and did not include California National Forest timber sales such as Jack Heli. App. Tab 42.

Defendant's Response: Defendant objects to this contention because it constitutes plaintiffs' legal opinion and is not a contention of fact. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Plaintiffs recognize that legal opinions are for the Court to issue, and the proposed finding does not propose to offer a legal opinion. Rather, the proposed finding restates the information contained in defendant's document, which adequately supports the proposed finding. The document and its contents are not hearsay because the statements made by defendant's employees, even when relayed by other employees, constitute admissions by a party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 80. Ms Zike distributed her charts to Forest Service employees with personal knowledge of the circumstances of each timber sale to which they offered information on. Because these employees were complying with an official request to complete the charts, these employees were acting within the scope of their employment when they did so. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

184. In a letter dated January 21, 1999 in response to Bill Turner's January 10, 1999 letter, Edward Matthews told Timber Products that, "The Forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that government attorneys have filed for dismissal of the case. . . . I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February." App. Tabs 80-81. Bill Turner understood from this letter that the Jack Heli sale would only be awarded if it was no longer threatened by the lawsuit referenced by Mr. Matthews. See citations to ¶ 182 above.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' self-serving opinion that is not supported by the documents cited. Additionally, the documents and testimony

cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: All but the last sentence of the proposed finding is a quotation of a letter from defendant's own employee to Mr. Turner, and is not plaintiffs' opinion. The last sentence of the proposed finding merely states what was in Mr. Turner's mind based on the statements made by Forest Service employees and likewise is not opinion. Defendant apparently objects to plaintiffs' use of their own declarations to support the last sentence of the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

185. Bev Cox, the Forest Service contracting officer, sent a fax to Bill Turner on January 29, 1999 informing him that Timber Products' bid on Jack Heli was scheduled to expire on February 1, 1999. App. Tab 84. A bid on a Forest Service timber sale expires in 90 days if the sale is not awarded if the bidder does not extend its bid. In a letter dated February 1, 1999, Timber Products extended its bid. App. Tabs 85-86. Timber Products extended its bid with the understanding, based on Bill Turner's communication with the Forest Service, that Jack Heli would only be awarded to Timber Products after the sale was no longer threatened by the lawsuit. App. Tab 188 (B. Turner Decl. ¶ 5).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion, and plaintiffs self-serving opinion not supported by the documents or testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: All but the last sentence of the proposed finding describes the contents of facsimiles and letters exchanged between the parties and is not plaintiffs' opinion. The communications and representations made by Forest Service employees is not hearsay. First, Mr. Turner's declaration is relied upon only to show that the Forest Service did make such representations, not that it was actually true that the Forest Service would award Jack Heli only when it was no longer threatened by ONRC Action. Second, the statement made by Ms. Cox and Mr. Matthews to Mr. Turner are admissions by a party opponent, classified as non-hearsay under FRE 801(d). See reply to PPF No. 45. Both Ms. Cox and Mr. Matthews were contracting officers for the Jack Heli sale. Accordingly, it was within the scope of their duties to handle all contracting matters for the sale, including communicating with the purchaser. Mr. Turner's declaration regarding his understanding of when Jack Heli would be awarded goes to his state of mind and is not opinion. Defendant apparently objects to plaintiffs' use of their own declarations to support the last sentence of the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

186. By memorandum dated February 2, 1999, Sue Zike informed Edward Boling of the Forest Service's intent to award the Jack Heli timber sale. App. Tab 87; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 181:15-185:1).

Defendant's Response: Defendant objects to this contention because it is not supported by the document or testimony cited. The document does not mention the Jack Heli sale, or any other sale, and Ms. Zike did not testify that she informed Mr. Boling of any intent to award the Jack Heli contract. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: As explained in plaintiffs' errata, plaintiffs accidentally omitted the second page of App. Tab 87. Plaintiffs' corrected App. Tab 87 includes this second page, which well supports the proposed finding. The statements made by defendant's employees, even when relayed by other employees, constitute admissions by a party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

187. On March 1, 1999, Edward Boling wrote Michael Axline, lead counsel for ONRC Action, to provide him with additional information regarding "certain timber sales that may be of concern to your client." App. Tab 89. Specifically, the letter stated that the Forest Service and BLM planned to award five timber sales after March 1, 1999. Jack Heli was one of the timber

sales listed. Timber Products was not informed of Mr. Boling's notice to Mr. Axline. Id.; App. Tab 188 (B. Turner Decl. ¶ 6).

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Boling's letter to Mr. Axline constitutes admissions by a party opponent and therefore is classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79. These admissions are not barred by FRE 408. See reply to PPF No. 88. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

188. The next day, the Forest Service awarded Jack Heli to Timber Products by letter dated March 2, 1999. App. Tab 90. The letter made no mention of the status of this timber sale in relation to ONRC Action or to Edward Boling's March 1, 1999 letter to Michael Axline. The letter did not inform Timber Products that the lawsuit had not been dismissed with respect to Jack Heli. Id.

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions

and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant frivolously makes its standard objection that the proposed finding concerned events before award of the contracts at issue. The proposed finding discusses the award of the contract, and not anything before or after. For this same reason, defendant's FRE 408 objection is inapposite because it concerns a Forest Service communication to plaintiff Timber Products, and not settlement discussions with ONRC Action. Defendant's hearsay objection is also inapposite, because the proposed finding relates to the contents of that letter, and not to what an out-of-court declarant said. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

188A. The Forest Service's Report about the Jack Heli timber sale award, Form FS-2400-17, noted that contract award was "made upon approval of [the] Department of Justice." App. Tab 92.

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

188B. When Timber Products accepted contract award at the price it bid, Timber Products expected that its operations would not be suspended based on the ONRC Action lawsuit. App. Tab 188 (B. Turner Decl. ¶¶ 5-7); App. Tab 181 (B. Turner Dep. Tr. 28:13-31:2, 51:21-22, 54:12-56:18, 63:21-65:19).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' unsupported self-serving opinion. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The communications and representations made by Forest Service employees are not hearsay. First, Mr. Turner's deposition testimony and declaration is relied upon only to show that the Forest Service did make such representations, not that it was actually true that the Forest Service would not suspend Jack Heli based on the ONRC Action lawsuit. Second, the statements made by Forest Service employees to Mr. Turner are admissions by a party opponent, classified as non-hearsay under FRE 801(d). See reply to PPF Nos. 45, 185. Additionally, Mr. Turner's deposition testimony and declaration regarding his understanding of when Jack Heli would be awarded goes to his state of mind and is not opinion. Defendant apparently objects to plaintiffs' use of their own declaration to support the proposed finding, yet the defendant does this same thing for defendant's proposed finding nos. 22-25, 27-34, 38-48, 52, 54-55, and 57. Of course, RCFC 56 expressly contemplates that parties will rely upon their own supporting affidavits or declarations in their motions for summary judgment. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

189. During the first six months of 1999 the Department of Justice and the ONRC Action plaintiffs reached an agreement that the Forest Service could award certain timber sales on ONRC Action's "problem list" without immediately triggering a motion for summary judgment or for a temporary restraining order. Jack Heli was one of the sales awarded as a result of this agreement. This agreement, however, did not preclude ONRC Action from challenging the actual operations on Jack Heli after it was awarded. The Department of Justice, the ONRC Action plaintiffs and the Forest Service did not disclose the existence of this agreement to Timber Products and Timber Products was not aware of this agreement until after the filing of the above-captioned action. App. Tabs 99, 112; App. Tab 188 (B. Turner Decl. ¶ 2).

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Turner's declaration regarding the communications and representations made by Forest Service employees is not hearsay. Plaintiffs do not rely upon Mr. Turner's declaration to support the first three sentences of the proposed finding. The last sentence is not hearsay at all but rather states plaintiffs' personal knowledge regarding the existence of the secret agreement. App. Tabs 99 and 112, which do support the first three sentences of the proposed finding also are not hearsay because the statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified

as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80, 183. These admissions are not barred by FRE 408. See reply to PPF No. 88. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

190. The Department of Justice and ONRC Action reached a secret agreement during March-June 1999 that the Forest Service could award Jack Heli and that ONRC Action would not seek a temporary restraining order or a preliminary injunction on the basis of that award so long as ONRC Action was given advance notice of any actual operations on Jack Heli. ONRC Action reserved the right to seek a temporary restraining order or a preliminary injunction with respect to any actual operations on that sale. Timber Products was not informed of this agreement. App. Tab 123.

Defendant's Response: Defendant objects to this contention because it relates to litigation settlement discussions which are inadmissible under Federal Rule of Evidence 408. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The statements made by defendant's employees, even when relayed by Ms. Zike in her memorandum the proposed finding cites, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80, 183. These admissions are not barred by FRE 408. See reply to PPF No. 88. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

191. In an email on or about July 9, 1999, Sue Zike informed her Distribution List (which included Ed Matthews) that if operations were to be approved on Jack Heli, which had been awarded in March of 1999, the Department of Justice and the Department of Agriculture's Office of General Counsel needed to be notified as soon as possible because such operations were highly likely to trigger a motion for a temporary restraining order or a preliminary injunction from the ONRC Action plaintiffs. Timber Products was not informed of this development. App. Tab 127; App. Tab 175 (S. Zike Dep. Tr. (8/21/07) 230:6-234:9); App. Tab 188 (B. Turner Decl. ¶ 7).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and not a contention of fact, and is not supported by the documents or testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Turner's declaration regarding the communications and representations made by Forest Service employees is not hearsay. Plaintiffs do not rely upon Mr. Turner's declaration to support the first sentence of the proposed finding. The last sentence is not hearsay at all but rather states plaintiffs' personal knowledge regarding the existence of the secret agreement. The other documents and testimony of Ms. Zike cited, which do support the first sentence of the proposed finding, also are not hearsay because the statements made by defendant's employees, even when relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45,

79, 80. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

192. As early as July 9, 1999, the Department of Justice lawyers representing the government in ONRC Action believed that it was likely that if operations commenced on Jack Heli ONRC Action would file a motion for a temporary restraining order or a preliminary injunction with respect to that sale. This information was not provided to Timber Products. App. Tab 127.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact, and is not supported by the testimony cited. Additionally, it is based on inadmissible hearsay, and the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is not a legal conclusion, but a statement of fact supported by Ms. Zike's e-mail, which states in pertinent part: "We don't know if ONRC will run to the court for a TRO/PI on these July sales [listed above, including Jack Heli], but DOJ believes it is likely." App. Tab 127. The cited e-mail written by Ms. Zike is not hearsay because the statements made by defendant's employees, including those relayed by other employees, constitute admissions by party opponent and therefore are classified as non-hearsay under FRE 801. See reply to PPF Nos. 45, 79, 80. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

193. In response to the preliminary injunction issued in ONRC Action on August 26, 1999, the Forest Service wrote Timber Products on August 27, 1999 and directed that Timber Products immediately suspend all operations on Jack Heli. App. Tab 129.

Defendant's Response: Defendant does not object to this contention.

Plaintiffs' Reply: No dispute.

193A. Timber Products was surprised when the Forest Service suspended its ongoing operations because Timber Products had no reason to believe that anything was going to happen to Jack Heli as a result of the ONRC Action lawsuit. App. Tab 188 (B. Turner Decl. ¶ 9).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, and not a contention of fact.

Plaintiffs' Reply: The proposed finding states what was in Mr. Turner's mind based on the statements made by Forest Service employees and is not opinion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

193B. If Timber Products had known about the Forest Service's secret agreements with the ONRC Action plaintiffs when it bid on the sale, Timber Products could have taken steps to prevent the damages it incurred. App. Tab 188 (B. Turner Decl. ¶ 12).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion, and not a contention of fact.

Plaintiffs' Reply: The proposed finding is not opinion, but a statement of fact supported by Mr. Turner's many years of experience as timber procurement manager for Timber Products. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

194. On July 24, 2000, the Forest Service completed a SIR for Jack Heli. This SIR reported the results of additional environmental analyses and surveys performed by the Forest Service as part of a settlement agreement between the government and the ONRC Action plaintiffs which included the dismissal of the ONRC Action lawsuit. According to the SIR, during the suspension of Jack Heli from August 27, 1999 through July 24, 2000 surveys were conducted on that sale only for units 5, 9, 11, 12, 14, 56 and 106 because the majority of units on Jack Heli (15, 18, 19, 27, 31, 40, 44, 49, 53, 57, 98, 100, 102, 103, 104, 350, 390 and 512) were covered with snow and could not be surveyed. Thus, suspension of this sale was continued after July 24, 2000. The SIR, signed by District Ranger Ray A. Haupt, concluded that Jack Heli included the potential habitat for fungi, bryophytes, mollusks and vascular plants but that no survey and manage or protection buffer species were found to exist in the units surveyed. Accordingly, Ranger Haupt determined that no additional environmental disclosures or changes in the original DN were necessary and that the original finding of no significant impact in connection with the original Decision Notice issued July 14, 1998 was still valid. App. Tab 140.

Defendant's Response: Defendant does not object to this contention.

Plaintiffs' Reply: No dispute.

195. Timber Products timely submitted a Contract Disputes Act claim for breach arising out of Jack Heli to Edward Matthews on July 14, 2000. App. Tab 139 (Letter from B. Turner, Timber Products, to E. Matthews, Forest Service (July 14, 2000)). The contracting officer issued his final decision on Timber Products' claim on November 9, 2000. App. Tab 143 (Letter from E. Matthews, Forest Service, to B. Turner, Timber Products (November 9, 2000)).

Defendant's Response: Defendant does not object to this contention.

Plaintiffs' Reply: No dispute.

**TOO WILD TIMBER SALE CONTRACT**

196. The Forest Service did not perform certain Category 2 surveys on Too Wild prior to the award of that sale to CLR on May 14, 1999 because the NEPA Decision Notice for that sale was signed on June 15, 1998. Under the Forest Service's interpretation "NEPA decision equals implementation," timber sales whose Decision Notices were signed prior to October 1, 1998 were considered implemented and no Category 2 surveys were required even though those timber sales might not be offered to the public until months or years in the future. App. Tabs 40, 134.

Defendants' Response: Defendant objects to the last sentence of this contention because it is not supported by the document cited, and is merely plaintiffs' opinion. Additionally, the documents

cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant agrees with the first sentence of the proposed finding, subject to its standard relevance objection. The second sentence is not plaintiffs' opinion but defendant's own litigation position and is supported by defendant's admission, "All 17 [sales on a list that includes Too Wild] have survey/manage species . . . that have NOT been surveyed for because they relied on the 'implement' and 'red tree vole' memo's [sic]," App. Tab 134 at A-1118, the text of the "NEPA decision equals implementation," App. Tax 34, as well as defendant's proposed finding no. 26. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

197. Category 2 surveys for the red tree vole were not performed by the Forest Service on the Too Wild sale prior to award for the additional reason that the red tree vole directive in effect at the time did not require surveys for the red tree vole on that sale even though there was abundant red tree vole habitat on the Too Wild sale area. App. Tabs 34, 134.

Defendant's Response: Defendant objects to this contention because it is not supported by the documents cited. Additionally, the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is supported by defendant's admission, "All 17 [sales on a list that includes Jack] have survey/manage species . . . that have NOT been surveyed for because they relied on the 'implement' and 'red tree vole' memo's [sic]," pp. Tab 134 at A-1118, and the RTV Directive, App. Tab 36. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

198. The twenty-seven Category 2 surveys that were not performed by the Forest Service on the Too Wild sale prior to award were red tree vole (mammal), *Aleuria rhenana* (a.k.a. *Sowerbyella rhenana*) (fungi), *Bridgeoporus nobilissimus* (fungi), *Bondarzewia Montana* (a.k.a. *Bondarzewia mesenterica*) (fungi), *Otidea leporine* (fungi), *Otidea onotica* (fungi), *Otidea smithii* (fungi), *Polyozellus mutiplex* (fungi), *Sarcosoma Mexicana* (fungi), *Buxbaumia vidiris* (bryophytes), *Kurzia makinoana* (bryophytes), *Ptilidium californicum* (bryophytes), *Rhizomnium nudum* (bryophytes), Tetraphis geniculata (bryophytes), *Ulota meglospora* (bryophytes), *Megomphix hemphilli* (Oregon Megomphix) (mollusks), *Prophysaon coeuleum* (Blue-grey Tail-dropper) (mollusks), *Prophysaon dubium* (Papillose Tail-dropper) (mollusks), *Allotropa virgata* (Sugar Stick) (vascular plants), *Aster vialis* (vascular plants), *Botrychium montanum* (vascular plants), *Clintonia andrewsiana* (vascular plants), *Cypripedium fasciculatum* (Clustered Lady's Slipper) (vascular plants), and *Cypripedium montanum* (Mountain Lady's Slipper) (vascular plants), *Hypogymnia duplicata* (lichens), *Lobaria linita* (lichens), *Psuedocyohellaria reinierensis* (lichens). App. Tab 145 (Too Wild SIR).

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

199. During the public comment period for the Too Wild Timber Sale EA (December 31, 1997 through February 2, 1998), the government received comments objecting to the interim survey protocol for the Oregon red tree vole and the Forest Service's failure to survey Too Wild for the vole. App. Tab 147. The government paraphrased the substance of the comments as stating:

> The proposed timber sale does not meet the "Survey and Manage" requirements of the Northwest Forest Plan Record of Decision (page C-5). The ROD requires that 'Within the known or suspected ranges and within the habitat types or vegetation communities associated with the species, surveys for red tree voles, must proceed [sic] the design of all ground-disturbing activities that will be implemented in 1997 or later.'" "The timber sale includes suitable habitat for red tree voles yet the sale area has not been surveyed as required by the PNW ROD. The Regional Ecosystem Office (REO) memo amending the ROD is objected to.

Id. The EA provided the following response to the comments:

> There was an interagency memorandum concerning Red Tree Voles was [sic] issued on November 4, 1996. It stated that if there was more than 40 percent suitable habitat in the fifth order watershed that the project occurred, surveys were not required. The suitable habitat in the Lawson watershed is 76 percent, so surveys were not required. Authority to amend or modify the ROD is found on page 58 section H of the ROD and pages 3 and 4 of Appendix E of the Final SEIS of the Northwest Forest Plan. The comment refers to management direction that is outside the scope of the Too Wild Timber Sale project. The Forest personnel

> and IDT members used the latest policy and direction in the analysis of the proposal.

Id.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second-hand legal conclusion and not a contention of fact. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding makes no legal conclusions but merely provides the contents of public comments and the Forest Service's written responses thereto. Whether the documents contain the information described is a question of fact, not law. While the quoted documents themselves may include legal conclusions, these conclusions are not plaintiffs'; moreover, the proposed finding is used to show that the Forest Service had received warnings regarding its obligation to comply with the NFP's Category 2 survey requirements and not to prove the truth of what was asserted in those warnings. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

200. The government also received comments on the Too Wild EA objecting to the "NEPA decision equals implementation" interpretation. App. Tab 147. The government paraphrased the substance of the comments as stating, "The Forest Service is delaying implementation of the strategy 2 survey and manage requirements beyond the phase-in period allowed by the ROD.

Disagrees with the definition the agency uses for implementation." Id. The EA provided the following response to the comments, "The comment refers to management direction that is outside the scope of the Too Wild Timber Sale project. The Forest personnel and IDT members used the latest policy and direction in the analysis of the proposal." Id.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' second-hand legal conclusion and not a contention of fact. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: See reply to PPF No. 199.

200A. The Too Wild DN and EA were administratively appealed by the ONRC Action plaintiffs regarding the interpretation "NEPA decision equals implementation and the RTV Directive. App. Tab 131.

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, it is not supported by the document cited. Additionally, the document cited is unidentified and authorless, and concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The citation for the proposed finding should read App. Tab 200 at A-1832, A-1838 not App. Tab 131. The amended citation is to the stipulation for dismissal in ONRC Action, which states that the sales listed in Exhibit A to the stipulation are those administratively appealed by the ONRC Action plaintiffs or their members. Too Wild is listed in Exhibit A.

201. The Decision Notice for Too Wild was signed on June 15, 1998. App. Tab 40; App. Tab 145 (Supplemental Information Report for the Too Wild Timber Sale ("Too Wild SIR")).

Defendant's Response: Defendant objects to this contention because the documents cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant offers only a relevance objection to the proposed finding solely because it relates to pre-award conduct and cites no fact, document, or deposition testimony that contradicts the proposed finding.

202. The oral auction for Too Wild was held on September 17, 1998. CLR was declared the high bidder at the conclusion of the auction; however, the Forest Service did not immediately award the timber sale contract to CLR. App. Tab 145 (Too Wild SIR). Prior to submitting its bid on Too Wild, CLR was not informed that the ONRC Action plaintiffs had identified Too Wild to the Forest Service as a sale on a list of "problem" or "at-risk" sales that the ONRC Action plaintiffs would seek to enjoin if awarded. App. Tab 180 (D. Bonde Dep. Tr. 31:18-32:13); App. Tab 187 (D. Bonde Decl. ¶ 2).

Defendant's Response: Defendant objects to this contention because it is not supported by the documents or testimony cited. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: The proposed finding is well-supported by the document and testimony cited. The Too Wild SIR sates that auction was held on September 17, 1998 and that award was not made until May 14, 1999. App. Tab 145 at A-1217. The second sentence of the proposed finding is nearly verbatim of Mr. Bonde's declaration (which is found at App. Tab 186, not App. Tab 187 as cited). Moreover, Mr. Bonde's cited testimony shows that the Forest Service did not make CLR aware prior to bidding that Too Wild was involved in any sort of litigation. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

203. Nothing in the Too Wild prospectus issued to CLR prior to the submission of bids informed CLR that Too Wild was threatened by the ONRC Action lawsuit. App. Tab 109 (Too Wild Timber Sale Prospectus).

Defendant's Response: Defendant objects to this contention because the document cited concerns the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

204. By letter dated May 14, 1999, Thomas Link, contracting officer for the Forest Service, awarded Too Wild to CLR. App. Tab 110 (Too Wild SIR). Nothing in the Forest Service's award letter disclosed that Too Wild was still threatened by the ONRC Action lawsuit. Id.

Defendant's Response: Defendant objects to the second sentence of this contention because it is plaintiffs' legal conclusion and not a contention of fact. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Defendant has agreed to the first sentence of the proposed finding, subject to its standard relevance objection. The contents of the Forest Service's letter and whether it made mention in any way of the ONRC Action litigation is an issue of fact, not law, and support for the proposed finding is found on the face of the cited letter and thus is not a legal conclusion. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

205. After the oral auction CLR was assured by Tom Link, the contracting officer for Too Wild, that, although the sale would not be immediately awarded, Too Wild was going to be awarded soon and that the government had only a few more things to do before being able to approve the award. App. Tab 180 (D. Bonde Dep. Tr. 33:13-35:3, 34:12-35:3, 58:4-16).

Defendant's Response: Defendant objects to this contention because it relies on inadmissible hearsay and plaintiffs' legal conclusion. Additionally, the documents and testimony cited

concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: Mr. Bonde's testimony regarding the communications and representations made by Forest Service employees is not hearsay. First, Mr. Bonde's testimony is relied upon only to show that the Forest Service did make such representations, not to prove that it was true that the Forest Service had only a few things to do before it could award Too Wild. Second, the statement made by Forest Service employees to Mr. Bonde are admission by party opponent, classified as non-hearsay under FRE 801(d). See reply to PPF No. 45. Mr. Link was the contracting officer for the Too Wild sale. Accordingly, it was within the scope of his duties to know the status of the sale, including anything that would prevent him from awarding the sale, and communicating with the purchaser regarding the status of the sale. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

206. CLR did not believe that the Forest Service would award Too Wild to CLR if the Forest Service believed that it was likely that there would be a meritorious motion for a preliminary injunction or a temporary restraining order against the sale after award. App. Tab 180 (D. Bonde Dep. Tr. 48:4-48:19).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' opinion and not a contention of fact. Additionally, the documents and testimony cited concern the Forest Service's actions and responsibilities prior to the award of these timber sale contracts, and, therefore, are not relevant to plaintiffs' claims for breach of contract.

Plaintiffs' Reply: What CLR believed prior to award of Too Wild is a matter of fact, not opinion. Mr. Bonde's cited deposition testimony well supports the proposed finding's statement of what those beliefs were. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

207. In response to the preliminary injunction issued in ONRC Action on August 26, 1999, the Forest Service telephoned CLR on August 27, 1999 and directed that CLR immediately suspend all operations on Too Wild. App. Tab 130. Thomas Link, the Forest Service contracting officer, reiterated the order in a letter to CLR dated September 1, 1999. Id.

Defendant's Response: Defendant objects to this contention because it is not supported by the document cited.

Plaintiffs' Reply: Defendant's objection is frivolous and is directly rebutted by the text of the letter itself. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

208. On November 17, 2000, the Forest Service issued a SIR for Too Wild pursuant to the Forest Service's obligations under the settlement agreement entered into by the government and the ONRC Action plaintiffs resulting in the dismissal of the ONRC Action lawsuit. The SIR indicated that during the suspension of Too Wild between August 25, 1999 and November 17, 2000 various surveys for animal and plant life were performed including surveys for various vascular plants, bryophytes, lichens, fungi, mollusks and the red tree vole. As a result of these

surveys, various survey and manage species were found on Too Wild's units and harvest requirements for these units were altered by greater protection. Nevertheless, Too Wild's SIR was executed by Forest Supervisor Jack E. Williams who determined in the SIR that the existing environmental disclosure in the Too Wild EA was adequate and that neither a revised EA nor a new Decision Notice for the Too Wild EA was required. App. Tab 145 (Too Wild SIR).

Defendant's Response: Defendant objects to this contention because it is plaintiffs' legal conclusion and not a contention of fact.

Plaintiffs' Reply: The proposed finding does not state a legal conclusion but fairly and accurately describes the substance of the Too Wild SIR. Defendant cites no fact, document, or deposition testimony that contradicts the proposed finding.

209. By letter dated September 10, 2003, CLR submitted a timely Contract Disputes Act claim in accordance with the requirements of the Contract Disputes Act. App. Tab 154. By letter dated November 25, 2003, the Forest Service contracting officer for Too Wild issued a final decision finding that CLR was entitled to payment in the amount of $38,588 for out-of-pocket expenses associated with the delay of operations on Too Wild and otherwise denying the remainder of CLR's Contract Disputes Act claim. App. Tab 158 (Letter from R. Thomas, Forest Service, to R. Fallert, CLR (November 25, 2003)).

Defendant's Response: Defendant does not object to this contention.

Plaintiffs' Reply: No dispute.

Respectfully submitted,

s/Gary G. Stevens

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-570C (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| TIMBER PRODUCTS COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-627C (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant | ) | |

| | | |
|---|---|---|
| CLR TIMBER HOLDINGS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | No. 04-501C (Judge Williams) |
| Defendant. | ) | |

**ERRATA TO THE APPENDIX TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

In replying to defendant's response to plaintiffs' proposed findings of uncontroverted fact ("PPFUF"), plaintiffs identified eight instances where the cited document found in plaintiffs' appendix ("App. Tab") either was missing pages (mostly in the case of deposition transcripts) or was not the document described in the PPFUF (e.g., when the PPFUF referenced a deposition exhibit in Scott Timber but the appendix provided the same-numbered exhibit from the Blue Lake depositions, or vice versa). For each of these instances, plaintiffs have attached the corrected documents, described below.

1. App. Tab 7, replacing Blue Lake deposition Ex. 3 with Scott Timber deposition Ex. 3, cited in PPFUF ¶ 32;
2. App. Tab 74, replacing Blue Lake deposition Ex. 65 with Scott Timber deposition Ex. 65, cited in PPFUF ¶ 58;
3. App. Tab 87, replacing Scott Timber deposition Ex. 74 with Blue Lake deposition Ex. 74, cited in PPFUF ¶ 186;
4. App. Tab 169, adding missing pages 21-22 of the S. Zike 1/4/07 deposition in Scott Timber, cited in PPFUF ¶ 122;
5. App. Tab 170, adding missing page 66 of the T. Hussey 1/4/07 deposition in Scott Timber, cited in PPFUF ¶ 65;
6. App. Tab 173, adding missing pages 10-14 of the S. Zike 8/20/07 deposition in Blue Lake, cited in PPFUF ¶ 91;
7. App. Tab 176, adding missing pages 11-26 of the R. Devlin 8/21/07 deposition in Blue Lake, cited in PPFUF ¶ 89; and

8. App. Tab 185, adding missing pages 7-14 and 49-51 of the R. Holthausen 9/30/07 deposition in Blue Lake, cited in PPFUF ¶¶ 14 and 49.

Plaintiffs respectfully request that the Court replace the documents found at the App. Tabs listed above with the corrected versions attached hereto.

Respectfully submitted,

s/Gary G. Stevens

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

App. Tab 7
Corrected

| | | | |
|---|---|---|---|
| **United States Department of Agriculture** | **Forest Service R-5/6** | **United States Department of Interior** | **Bureau of Land Management OR/WA/CA** |

**Reply to:** FS: 1920/2430
BLM: 1736-PFP (OR931)
BLM-Information Bulletin No. OR-96

Date: March 18, 1996

**Subject:** Protocols for Survey and Manage Amphibians

**To:** Forest Supervisors and District Managers Within the Area of the Northwest Forest Plan

The Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl include the conducting of surveys before the design of all ground-disturbing activities that will be implemented in 1997 or later (Component 2, p. C-5). Surveys are required within the known or suspected range and within the habitat types or vegetative communities associated with five amphibian species identified within Component 2.

Enclosed are the draft standard protocols for conducting surveys of these five amphibians: Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders. Known sites of these species were sent to each district last July. Please use that database and any other range or site information to determine if and where to survey for these species.

The protocols were designed so that there would be a high probability of finding populations of these species. Please follow the standard protocol as closely as possible. We realize, however, that in some situations the time identified per visit may preempt other high-priority work. If the identified time is more than can reasonably be expended under your current workload, the length of time spent per visit may be reduced but not the number of visits. The time between visits should be kept close to that identified in the protocols. Permanent staff biologists should make the decision on any needed modifications to protocol implementation based on their professional judgment. ?

Where there is any deviation from the protocol, biologists are requested to document the action taken and the rationale for the change. This will assist in future protocol revisions and in interpreting survey results.

The protocol is being distributed as a draft for use, field testing, and comment in the spring and fall of 1996. It will undergo peer review later this year. Comments from field users will be very helpful in making the final protocol efficient and effective.

Although the protocol will likely be revised, projects surveyed according to the draft protocol (including modifications by agency biologists) will be considered as meeting the requirements of Component 2 for FY 1996.

PLAINTIFF'S EXHIBIT
tabbies
3
1-4-07 Hussey

App. Tab 74
Corrected

# Survey and Manage

8/28/96

There are four questions relative to survey and manage that currently need to be answered. These questions, as well as proposed answers, are detailed in the attached paper. This handout summarizes these questions, and the factors that need to be considered in answering them.

**1. When is a project implemented?**

- ROD requires category 2 surveys before projects are implemented
- possible implementation points could be NEPA decision or project start
- there is a need to make survey information for decision maker
- some field units have not completed surveys
- how much risk do we want to take in going ahead with activities without surveys

**2. What is a ground-disturbing activity?**

- element of "you'll know it when you see it"
- many don't trust the line officer to make the call
- consider scope, intensity, and needs of the species

**3. Do we use fiscal year 1997 or calendar year 1997 as the implementation date for the category 2 surveys?**

- the ROD specifies fiscal year but the S&Gs don't specify either fiscal year or calendar year
- assume that fiscal year was intended because this is more conservative and follows our project planning cycle

**4. We don't yet have a survey protocol for red tree voles, yet these surveys will be required starting October 1, 1996.**

- the survey and manage core team is meeting on September 3; they hope to produce an interim protocol then
- we could use Appendix J2 but this could be very confusing to field units
- if a protocol is not forthcoming very soon, we will need to consider a grace period before these surveys are required
- consider addressing all of this in a separate letter specific to the red tree vole issue

Larsen
EXHIBIT NO. 65
1-5-07
SCHMITT & LEHMANN, INC

Next Thurs. 5th

# Survey and Manage

**Current Implementation Issues** **8/28/96**

This paper presents options for answering the current questions on how to implement the ROD survey and manage direction.

**Question 1: The survey and manage category 2 direction uses the year of project implementation as the point when the survey becomes a requirement. In this context, when is a project "implemented?"**

**Proposed response:**

For the purpose of the ROD survey and manage direction, a project is implemented when the decision document is signed. Projects with a decision document signed on or before 9/30/96 do not need surveys for category 2 species prior to operations. Projects with a decision document signed after that date need to have the survey completed prior to making the project NEPA decision.

**Other considerations:**

This will result in all projects signed off on in FY '97 having surveys before the NEPA decision. There is consensus that this was the intent of the ROD.

option 1 If 90 did survey

This will also result in projects being operated on in fiscal years 1997, 1998, and possibly even 1999 without surveys having been done. We have been unable to determine how many projects this might be, nor have we been able to get an estimate of the possible resource damage that could occur. However, there is strong concern on the part of FS, BLM, and USF&WS biologists that allowing any operations to proceed after 9/30/96 without surveys is unacceptable because it does not meet the intent of the ROD.

option 2 If 90 had not surveyed

We considered two approaches to this question one as stated in the preferred, above. The other approach would be to require surveys prior to operations. This was unacceptable because it would result in key information not being available at the time the decision is signed. We could combine these two approaches. In this way, we could require surveys on all projects with decisions signed after 9/30/96 or for which operations begin after a specified date (such as after 9/30/96 or 3/30/97, for example). This would satisfy concerns about meeting the intent of the ROD, but could appear contradictory or difficult t implement.

There is also a reality that some field units are behind in their surveys. This is a particular problem for BLM and FS units in southwestern Oregon. They have large amounts of habitat to survey for amphibians.

**Question 2: The ROD directs that surveys be performed prior to "ground-disturbing activities." In this context, what is a ground-disturbing activity?**

**Preferred response:**

"Ground disturbing activity" is any disturbance of a type and intensity that could reasonably have a significant negative impact on species or the habitat that supports them.

Evaluating significant negative impact includes looking at both the scope and intensity. Some activities that are clearly ground-disturbing might not have a wide enough scope to trigger a survey (placing a sign in a campground, for example). Another activity might not technically be ground disturbing, but could clearly affect habitat enough to require a survey (helicopter logging, for example).

The life requirements of the species in question should also be considered. The need for a survey should be determined by both the possibility of the species being present on the project site and the possibility of the project negatively affecting its habitat. The survey and manage protocols will include some guidance on the type of activities likely to negatively affect a given species (and thus likely to meet the definition of ground disturbing for that species). Timing of year.

Neither a staff paper or survey protocols can define exactly what a ground-disturbing activity is for every situation. It will be necessary that the line officer determine which activities are ground disturbing, based on scope and intensity of impact and the life requirements of the species affected. Scope & impact emphasis

**Question 3: Please clarify the dates for survey and manage category 2. On page 36, the ROD uses fiscal year, but on C-5 only the year is specified. Do we use fiscal year or calendar year?**

**Preferred response:**

If the ROD says fiscal year, use fiscal year. If it specifies calendar year, then use calendar year. In this case, there is a conflict between the specified year on ROD-36 and the unspecified year on C-5. We believe the specific fiscal year direction should take precedence over the non-specific language on C-5. This has the benefit of being the more conservative approach. Also, it corresponds to the fiscal year cycle we use in project planning.

CONSIDER LEAVING OUT THIS NEXT QUESTION ALTOGETHER. DEAL WITH THE ISSUE OF RED TREE VOLE SURVEYS IN A SEPARATE LETTER ON THAT TOPIC.

**Question 4: What should we do about surveying for red tree voles? Surveys are required in**

In the mean-time what do we done?

**FY 1997, but we currently don't have a draft protocol.**

**Preferred response:**

The survey and manage core team will meet on 9/3/96. It is their intent at that meeting to issue interim procedures for red tree voles. Randy Hickenbottom believes it may be possible to develop an interim procedure that would require only some map study. We propose to incorporate that interim protocol into the direction package on 9/3.

**Other considerations:**

In an 8/3/94 letter signed by John Lowe and Elaine Zielinski, field units are guided to draw interim survey and manage guidance from Appendix J2. This would be an alternative approach. However, for the red tree vole, Appendix J2 contains little in the way of specific management suggestions. There is a suggestion to create corridors, but this approach has already been turned down by managers. At this time, suggesting to field units to draw from Appendix J2 for the red tree vole could easily result in many different, confusing interim management regimes.

It is possible we will not have even an interim red tree vole protocol by 9/30/96. In that case, allow field units a six month grace period from the date of the draft red tree vole protocol. Six months after a draft protocol is issued, all projects must have been surveyed for red tree voles prior to signing the decision document.

App. Tab 87
Corrected

Subject: ONRC Action v. USFS, BLM proposed awards chart
Sender: Susan Zike /r6pnw
Attached Date: 02/06/99 16:34
Priority: normal
Sensitivity: normal
Importance: normal

Part 1

TO: DISTRIBUTION (Title: Distribution list)

Part 2

Attached (in Rich Text Format for BLM, OS and OGC) is the rough draft of the chart of proposed sales to award in the ONRC Action case. I'd suggest that the WIN, 6Riv, KLA, and BLM edit the chart appropriately to reflect your rationale for recommending award; get your RF or State Director concurrence; then I'll finalize the chart for transmittal to DOJ. Sound like a plan? I'm thinking our window of opportunity is opening up and I want us to be ready. Feedback welcome!

*****

Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us

**********

Part 3

This item is of type Applix Words and cannot be displayed as TEXT

Released Pursuant to
Court of Federal Claims
Order of 3/29/07





PLAINTIFF'S EXHIBIT
tabbies
74
8.21.07 SKK

# MEMORANDUM

Ted Boling, DOJ, General Litigation

From: Sue Zike, USFS, R6 Litigation Coordinator; Alan Wood; Oregon BLM coordinator

Date: February 2, 1999

**Subject: ONRC Action: delayed sales recommended to be awarded in February 1999**

| Sale | Agency | Strengths | Weaknesses |
|---|---|---|---|
| Burma Shave | BLM | Did full RTV survey; found none? | |
| North Murphy | BLM | "implement" memo upheld by IBLA | |
| Siskiyou Heli | R5-FS | CA RTV no req't to survey in ROD); P may not have standing because no comments during comment period; | thinning in LSR is >80 yrs old |
| Jack Heli | R5- FS | No RTV in appeal; | 15% rule raised on appeal; meet 9/14/98 ltr?? |
| Long | R6-FS | No RTV habitat; need to review the Coldwater Sprgs EA/DN | |
| ͅpencer | R6-FS | v. good EA/DN; no RTV habitat; conservative approach to matrix entry and balance between eagle and NSO habitat in Pond. Pine stands | |

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

App. Tab 169
Corrected

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-708C |
| vs. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

DEPOSITION OF

SUE ZIKE

Taken in behalf of Plaintiff

* * *

January 4, 2007

333 S.W. First Avenue

Portland, Oregon

Teresa L. Dunn, CSR, RPR

Court Reporter

Q. You did that?

A. I did.

Q. You found out something about them?

A. Well, we had these charts that we refer to here that had status on it and what issues had been raised.

Q. That's the as-is chart?

A. As is the chart, meaning privileged.

Q. Okay. Let's look at plaintiff's Exhibit 35A. The first page is a fax cover sheet and it looks like would I be correct a fax you sent?

A. It is.

Q. That's your business card that you photocopied?

A. It is.

Q. And you sent it to Mike Hupp and Brenda Woodard on the Umpqua National Forest?

A. Correct.

Q. What were their positions at the time do you recall?

A. Mike Hupp was the forest planner I believe and Brenda Woodard was the contracting officer. They were also sent to Herb Wick on the Willamette and Fred Dorn on the Gifford Pinchot and those are both contracting officers on those forests.

Q. I took it Ms. Woodard was the contracting officer on some of the sales on plaintiff's list?

A. I don't know. I don't know where the plaintiff's list -- Attached is a draft letter.

Q. We will go through this and reconsider that question later.

A. Okay.

Q. That's your handwriting on the first page?

A. It is.

Q. And you ask, Are you willing to notify the bidders before you open bids?

A. Correct.

Q. Notify them of what?

A. That there was a pending lawsuit.

Q. What was the answer?

A. I don't recall. I don't know what they decided to do about at bid opening. We felt it would be prudent to notify the bidders.

Q. Who is "we"?

A. It would be who I was conferring with was Jerry Hofer, regional contract officer, and Devlin, Bob Devlin.

Q. What was Mr. Devlin's position at the time?

A. He was director of timber.

Q. For Region 6?

A. Correct.
Q. What was the other gentleman's name?
A. Jerry Hofer.
Q. H-O-L-F-E-R?
A. H-O-F-E-R.
Q. All right. So you, Devlin, and Hofer thought it would be prudent to advise them?
A. Correct.
Q. Okay. Further down in your handwritten statement staying there you say, There is no reason yet to plan on delaying award of the USFS sales.
Why not?
A. Because we hadn't made any agreement with plaintiffs to delay award of sales.
Q. Okay. The next two pages are the draft letter you refer to in your fax sheet?
A. Uh-huh.
Q. Did you draft the letter?
A. No. Department of Justice doesn't let us have their letterhead.
Q. On page two of the draft there's a statement in the letter that says, In the interest of facilitating settlement discussions the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales

have been identified in connection with this lawsuit.
Do you know what timber sales they were referring to?
A. These three.
Q. Sorry, which three?
A. I don't know. It says -- that sentence you read refers to three timber sales.
Q. Yes, it does.
A. I would have to read the letter.
Q. Okay.
A. Three are scheduled for auction in late August and only Lois is scheduled --
Q. Is it L. Horse Peak and Yaka Guard at the top of page two?
A. Yes. Are you asking if that's what that means?
Q. Those are the three sales?
A. I don't know.
Q. Okay. Do you know if notification was, in fact, given to the bidders on those three sales, the three referenced here, whichever it is?
A. I don't know. Whatever they are. That's just a draft because it doesn't identify what three.
Q. Okay. Turning over to the next document which is on page 00030, do you see that in the right-hand

corner, bottom right-hand corner that control number?

A. Got it.

Q. Okay. If you look -- hold your place there, but look back to the first page of 35A. Your PS notation says OGC memo is attached but DOJ?

A. That.

Q. Why don't you read it to me?

A. PS, OGC memo is attached that DOJ based its sentence on. RO-NR meaning Regional Office Natural Resources, which is Bob Devlin, sent this out late last week.

Q. And that's what we're looking at that started with 00030?

A. Oh, I don't think so.

Q. You don't?

A. No, but let me look. This is from Simmons. Okay. Oh, it is, yep, yes.

Q. And if you turn back to page 00030 and look in the bottom paragraph of this document -- by the way I read it as dated July 29, 1998.

Do you agree with that in the upper right-hand corner?

A. You think it's what?

Q. July 29, 1998, that's the date.

A. It is probably right.

Q. Okay. In that last paragraph the first part reads, Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs and that if this is not acceptable to the bidders they should withdraw their bid at that time.

Do you know if that warning was conveyed to the purchasers, rather the high bidders on all of the sales?

A. Yeah, I would have no way of knowing that.

Q. Do you know if that warning was supposed to be in writing or oral?

A. What I recall is that we had, meaning Jerry Hofer and Bob Devlin and I and with probably general counsel's help had determined that if it had not been in the advertisement for the sale and, of course, it would not have, but for the sales that we had bid openings that we would make an oral announcement.

When we would have time to get the warning put

in the advertisement that this sale is the subject matter of litigation, then we would put it in the advertisement.

Q. Was it put in the instructions to bidders?

A. I have no idea.

Q. That wasn't the direction?

A. You know, all of the terms of contract administration isn't my deal, but --

Q. Okay. On page two of this memo at the top the paragraph there begins, As indicated in the new case memo from Katherine Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6.

What were you doing with Owen and the sales in Region 6?

A. We were determining the status of the sales that plaintiffs sent to us in these series of lists.

Q. And the status as to what?

A. Well, there was a number of pieces of information. One was whether or not the NEPA was done, what the date of the NEPA was, had it had been appealed, who had appealed, what were the issues raised in the appeal, and then if it had been awarded and when it had been awarded and to whom it had been awarded and if it was awarded, what was the status of the sale in

Q. Okay. On page 00036, a fax message from Ted Boling to Mike Gippert, do you see that?
A. No, no, oh, six, I'm sorry, I'm looking at five.
Q. 00036.
A. From Ted to -- correct.
Q. Mr. Boling was the attorney representing the government in the ONRC Action case, right?
A. Yes.
Q. And he is asking for certain information ASAP. Do you know why he needed it no later than close of business Thursday?
A. No, I don't, but that's often the way the requests for information came. No, I don't.
Q. Okay. Let's look at 35B. Do you see the handwriting at the bottom of this page?
A. I do.
Q. Is it yours?
A. No.
Q. Can you read it?
A. No, I can't other than, Have you something anything on something, oh, Parkaboo, that was a timber sale, Parkaboo.
Q. Parkaboo?
A. Parkaboo. I think it is, Have you sent us

anything on Parkaboo. That would be my guess. That's Ted's writing so he would have scratched that on there before he faxed it.

Q. Next page is another letter from the ONRC Action plaintiffs to the government's attorneys.

A. Yes.

Q. And two pages after that there's a list of timber sales entitled Category 1 Unsold Problem Sales With Calendar Year 1998 Auction Dates.

Is that something to your knowledge the Forest Service produced or is that something from the plaintiffs, the ONRC Action?

A. I don't know. I don't recall. I don't think I have seen it. It certainly doesn't ring a bell and it doesn't look familiar.

Q. Would you understand by the adjective "problem" as in problem sales that these were sales that the ONRC Action plaintiffs were also threatening to challenge?

A. I would and I would also assume Category 1 is from page one of their memo.

Q. Category 2, that would be the same and that would refer to the second category mentioned later on?

A. Sales with proposed action dates, auction dates, yes, calendar year 1998, right.

Q. And we can make the same inference with respect to Category 3?

A. Yes. The "problem" word is plaintiff's characterization.

Q. Yes, I understand.

A. Okay.

Q. What about the last page PT 0049, does that look familiar to you?

A. It does not.

Q. This says Category 4 up in the left-hand corner and it is kind of hard to read?

A. It does.

Q. Let's see --

A. That aligns with Category 4 on page one, PT 0040, sales on Gifford Pinchot.

Q. So it would be your testimony that you don't believe these are lists that were produced by the Forest Service?

A. That would be my testimony.

Q. Were these lists ever disclosed to the high bidders on these sales?

A. I would have no knowledge of that.

Q. You never disclosed it?

A. To bidders?

Q. This information.

A. I would have no way to do that.
Q. Was it your understanding that these lists were to be kept confidential and not disclosed --
A. That was my understanding, yes.
Q. -- and not disclosed to anyone outside of the agency?
A. Other than to DOJ, correct.
Q. As far as you know that's what happened?
A. As far as I know that's correct.
Q. Take a look at 37C, Exhibit 37C. If you look at the very top of this letter which has apparently been faxed there are some fax numbers in area code 503.
Are any of those Forest Service numbers?
A. Well, the 808 number is for our building.
Q. That's the Region 6 office?
A. Correct. The 326 number is the Federal building which is Office of General Counsel.
Q. OGC?
A. Right.
Q. Okay. Was a copy of this letter provided to you?
A. I would have to assume that it was. It doesn't look familiar particularly.
Q. If you turn to page five of this letter, the five is on the bottom, it says page nine in the upper

right-hand corner.

A. I'm with you.

Q. The letter reads, Also we are prepared to not award the Forest Service timber sales listed below until November 23, 1998. And there's a list that follows.

Did you help put that list together?

A. Did I help put the list together, well, yes, I would have.

Q. How did you go about doing that?

A. As we looked in the earlier fax, I don't remember the exhibit number, but it was through those faxes out to my forests that plaintiff's list that we developed charts of the status of the sales that plaintiffs were interested in.

So that compendium of data then would tell us status of those sales and choices would then be made on whether to advertise an award or hold the award.

Q. So you have three columns here, Forest Service, Sale, and that's the name of the sale?

A. Correct.

Q. The forest is the National Forest it is on and Status is either awarded or no award, although, all of these but it looks like two, all of them are no award.

What does it mean to say, Award by agreement

with purchaser in settlement of NFRC vs. Glickman?

A. That was the National Forest Research Council's lawsuit against USDA on the Forest Service under the Recisions Act that we were not prosecuting our duties under the Recisions Act which was primarily to provide replacement volume for the sales that had nesting birds, you know, the Rescissions Act has lots of funky details like that.

So we did have a court overseeing mediation with Judge Hogan on NFRC vs. Glickman and as part of that we agreed and then the court ordered us to award certain sales.

Q. Okay. Take a look at what's been previously marked plaintiff's Exhibit 38. Have you seen that before?

A. No.

Q. Do you know what Allen Apliss (phonetic) is?

A. I do know who Ellen Apliss was, yes.

Q. Is she no longer with us?

A. She's not in Department of Justice anymore I don't believe.

Q. Sorry. And have you not seen this cover sheet or the pages attached to it previously?

A. No, I haven't.

Q. Okay. Do you see on the first page of this

document where it says, As I promised here is the list of Forest Service and Bureau of Land Management timber sales rushed through to avoid the Survey and Manage requirements?

Do you see that?

A. I do.

Q. Do you have any knowledge of environmental groups providing such a list to the government other than in the ONRC Action litigation?

A. I do not.

Q. Did you hear from anyone in the course of your duties that an allegation had been made that the Forest Service and the Bureau of Land Management had rushed through the decision documents on sales in order to avoid Survey and Manage requirements?

A. We had heard that from plaintiffs in the ONRC Action case as well as they did public press releases and those sorts of things.

It was fairly general knowledge to those of us who follow such things that plaintiffs believed we had rushed through to make decisions to avoid the oncoming Survey and Manage requirement.

Q. Did the Forest Service do that?

A. No.

Q. What's your basis for that answer?

A. My answer is as far as I know we observed every law that we needed to do in terms of NEPA and NFMA and Endangered Species Act for all of the sales that we did NEPA decisions for.

I don't think anything was rushed necessarily.

Q. Did you ever hear there had been instructions or directions to forests to hurry up and finish Decision Notices in order to beat the October 1, 1996, deadline?

A. Yes, I had heard that.

Q. From whom?

A. I'm aware there's an e-mail from Bob Devlin out to the forests where he urges them to appreciate that the October 1 deadline was coming.

Q. And your understanding is that he urged them to finish up the Decision Notices rather than wait until after the deadline?

A. Well, we knew as did -- Bob knew and our forests knew that as of October 1 the survey obligations were greatly increased.

So I think his e-mail stands for itself. I mean, he said what he said and if you need to interpret that as plaintiffs did that that was a rush, to rush, you know, the public is entitled to so many days of review on NEPA documents anyway and that was short-cut

so rush what, you know. I'm not sure.

Legally we couldn't rush anything. You had to meet your statutory time frame.

Q. Did you discuss this e-mail you are talking about with Mr. Devlin?

A. No.

Q. Did you discuss the Devlin e-mail with anyone else?

A. At the time?

Q. At any time.

A. Only through the discovery of Blue Lake case, your Blue Lake case. When we ran across it during that discovery I discussed it then.

Q. With whom?

A. I would have discussed it with, who was our counsel, Jack Groat I believe.

Q. So you didn't talk to anyone else about it like Jerry Jensen, he was in Region 5, but anyone else from Region 6 did you talk to?

A. I didn't know Devlin sent it out. I didn't know. I wouldn't have any reason to know that. It wasn't a litigation matter and Bob would do his director job, you know, with his timber people and I would have no reason to know what he was directing them to do or not do until it became a matter of litigation

question?

A. Meaning that it is a policy level call.

Q. Whether to advertise them or not?

A. Correct.

Q. At the bottom of the page there's a reference to the ALA lawsuit. What's that?

A. That's the American Lands Alliance lawsuit.

Q. In brief what was that about?

A. You know, there were two of them and I don't remember what the issues were in those cases, but I think we won them both, but I can't remember.

Q. Let's move to another document. Take a look at plaintiff's Exhibit 41A. On the first page of 41A this looks like an electronic message. Am I right?

A. It is.

Q. Is this in the old DG system?

A. You know, I actually had to mark down on my Rolodex because of your Blue Lake discovery when we moved from Applix to IBM and I don't recall the date, Gary, but if I look down here at my e-mail address it is the IBM system address.

So this would not have been -- this would not have been the Applix time.

Q. Can you tell the approximate time period when this e-mail was sent?

A. What I'm recalling is when I talk about March 26, that's shortly after their third amended complaint.

Q. That's 1999?

A. Yes, and this would make sense that we got a briefing schedule after that last amended complaint came in.

Q. What is promise one and promise two about?

A. That's for awarded sales. Promise one would be ten days of notice before we approved the plan of operations, that being the pre-work the purchasers do with us.

Q. These are for the nine sales actually named in the complaint?

A. Right, and apparently they were awarded sales.

Q. And promise two?

A. Those would be as to unawarded sales, certain unawarded sales --

Q. All right.

A. -- because we would be giving them notice of our decision to award.

Q. You say further down in the e-mail, To help you with that I will be sending an issue chart tomorrow.

What was that?

A. We developed charts that had in columns I believe the issues that were raised in the amended complaint and then we asked the forest to look at any appeals that came in on the named sales so we could conclude whether or not plaintiffs had raised or waived an issue because they can't take it to court -- they can't take the issue to court if they didn't raise it in their appeal.

Q. And what would that mean in terms of what the Forest Service could do with that sale?

A. Well, that would mean if they had not raised the issue, that we would ask the court to dismiss the claim as to those sales where plaintiffs did not raise that and then if we were successful, then that sale would not be part of the lawsuit.

Q. But you need to raise that in a motion and the judge would have to decide?

A. Correct, correct.

Q. You say in here, We need to assure DOJ that we have a strong defense on the sales that we intend to award even though DOJ is not asking to be a part of the award decision. Good news you say?

A. Good news, that's true.

Q. Why is that good news?

A. Well, because there's always tension between

the client and the attorney in our cases on who is making the policy calls when we get into litigation.

Q. Who made the policy call here?

MS. STENTIFORD: Objection. Don't answer that.

THE WITNESS: What's the rule, Counsel?

MS. STENTIFORD: Privileged.

THE WITNESS: Okay. So don't answer?

MS. STENTIFORD: Don't answer.

MR. STEVENS: What was the question?

(Reporter read back last question.)

MR. STEVENS: You are instructing her not to answer that question?

MS. STENTIFORD: Yes, I'm instructing her not to answer that question.

MR. STEVENS: We will pursue that absolutely later on, but I don't think we are going to be able to get the judge on the phone at 8:00 at night back there.

Q. (By Mr. Stevens) Let me ask you this, was the policy call made by the Forest Service for the Forest Service?

A. The Forest Service made the decision whether or not to award sales.

Q. And the Forest Service had the final say as to whether a sale would be awarded?

A. I don't know how to answer that.

Q. Did the Forest Service have to concur with any other governmental agency?

A. We certainly conferred with trial counsel and this sentence means we needed to assure our trial counsel that we had a strong defense generally meaning that the issues raised in the complaint were not raised in appeal.

And so if they were not raised in appeal, we felt -- the agency felt we had a pretty strong defense to try to get that sale out of the lawsuit.

Q. Further on down in this e-mail you say, R5 is sending a ten-day notice letter to ONRC today for two sales, Upper South Fork and Happy Thin.

What's the ten-day notice letter?

A. That was part of the stipulation on the briefing schedule promise, well, it would be promise one or two and I don't remember if it was whether or not they were going to award Happy Thin or whether or not they had approved their plan of operation.

Q. So in either case it would be ten days' notice before any ground-disturbing activities could take place, at least that?

A. At least that, correct.

Q. Do you know if any purchasers were notified

that this ten-day notice letter had been sent out on Happy Thin?

A. I don't know about Happy Thin. That's Region 5.

Q. And you say at the very bottom, As before the sale list is not -- it is not be, but you meant to say is not to be distributed outside the agency?

A. Where are you reading?

Q. The very last sentence at the bottom of this paragraph that is in all caps.

A. Correct. What's your question?

Q. Well, so would I be correct that that list was not made available to anyone outside the agency so far as you know, the list being referred to?

A. Correct.

Q. And that's the list of sales that the Forest Service intended to award?

A. You know, that's a good question because I don't know what sale list really I'm referring to. It would not be the named sales in the complaint because that would be public knowledge.

Q. Right, that's fair enough.

A. So here we say, Attached is an R6 chart of the sales that are subject to promise two, you need to check the appeal files to be sure plaintiffs appealed.

Q. Okay.

A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.

Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?

A. I would characterize it differently.

Q. How would you characterize it?

A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.

Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?

A. The 808-2255 number is my fax which is here in

the Regional Office.

Q. So in the ONRC Action the plaintiffs faxed this to you?

A. I would not think so. I would have gotten it from Ted Boling.

Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.

What's he talking about, the at-risk category?

A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.

Q. Yes, we are. Sorry.

A. I'm sorry, it is from Axline.

Q. It is not that I have it and you don't. It is not in my copy either.

A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.

Q. So it was not too veiled a threat, they might

sue and try to get a temporary restraining order?

A. Correct. They had already sued. They would be asking for injunctive relief during the summary judgment briefing schedule.

Q. Okay.

A. See, the second paragraph says that, And some of the sales seem unlikely to be awarded and operated prior to completing summary judgment motions. Because we believe in Murphy's law, however, we think they might be awarded and might be operated during our summary judgment schedule.

Q. Well, the control number on here, 338 followed by 339 indicates that this was the way we got it from the government. I agree with you it looks like at least the signature page is missing?

A. Yes.

Q. Sales at Risk Pre-June 11 and so the Forest Service sales on that list are sales at least as of the date of this letter, April 12, 1999, the ONRC Action plaintiffs were threatening to challenge with TROs if they were awarded?

A. Correct.

Q. We're going to look at 41D next. In this letter from you to Brenda Woodard you say, I forwarded your April 19, 1999, letter to the Department of

telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.

Q. Okay.

A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.

Q. Okay.

A. That would be my read of it, but I don't recognize the handwriting or the topic.

Q. And you don't have independent recollection?

A. I don't.

Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?

A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.

Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?

A. Correct.

Q. So if anybody needed to know what was on that list or which list, you were the authoritative source

to call?

A. I had files.

Q. And you could read them what was on the document?

A. I could.

Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?

A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.

Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?

A. I don't know.

Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?

A. I do.

Q. Can you identify it then for the record?

A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.

Q. As of July 6th?

A. As of that -- it was their July 6th letter which I believe we just looked at.

Q. Okay. Did you prepare this chart?
A. I think someone on my staff prepared it.
Q. Okay. What was the purpose in preparing it?
A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.
Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?
A. On July 7th, right, that appears to be when we printed this off.
Q. And you can tell that from the date on the lower left?
A. Yes.
Q. Was this chart used in any decision-making process that you are aware of?
A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.
Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.
What hearing is that a reference to?
A. Well, we would have to check the docket for

this case.

Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?

A. That would be my interpretation of it.

Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?

A. Not to my knowledge.

Q. Was it made available to Mr. Axline?

A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.

Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?

A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.

Q. Who would be on that -- is that your distribution list you are talking about?

A. Yes.

Q. Who would be on that list?

A. It would be my case coordinators on these west-side national forests.

App. Tab 170
Corrected

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., Plaintiff, vs. THE UNITED STATES, Defendant. | ) | No. 05-708C |

ORIGINAL

DEPOSITION OF

TOM HUSSEY

Taken in behalf of Plaintiff

* * *

January 4, 2007

333 S.W. First Avenue

Portland, Oregon

Teresa L. Dunn, CSR, RPR

Court Reporter

A-1375

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

was how to take this policy interpretation and phase into it.

Q. Okay. Let's go off the record for just a minute.

(A discussion was held off the record.)

Q. (By Mr. Stevens) Let's look at plaintiff's Exhibit 11, please. Does this document look familiar to you?

A. Yes, it does. It looks like the initial stages of our staff paper on this question we have been discussing.

Q. Do you know who drafted this document?

A. It might have been me.

Q. Why do you say that?

A. Some of the phraseology is stuff, words that I would use.

Q. For example?

A. I saw something here. Please edit freely, I use that.

Q. You sound like a man who has been involved in a lot of editing.

A. It does look familiar.

Q. Do you recall that you were given the initial task of developing the first rough draft?

A. No, but it was a common practice among the

team to assign one individual to get the process started and then everyone else would edit and embellish and improve upon the starting point so it very well could have been.

Q. And there's a reference under Background on this first page in brackets to, Need to confirm these estimated dates with Randy, and I assume that's Randy Hickenbottom?

A. I make that assumption also.

Q. Okay. Towards the bottom of the page the last paragraph above the heading question one, the first sentence reads, The following questions and recommended answers were developed by a joint BLM and Forest Service staff group.

Who was that?

A. I think it is that same group I was referring to in response to one of your earlier questions, myself, Larry Larsen, Cheryl McCaffrey, Randy Hickenbottom, and I think Lyndon Werner, also.

Q. So it is the Issue Resolution Team with these what I will call ad hoc members?

A. Yes.

Q. On page two involving the responses and the rationales to question one which is at the bottom of page one in the Rationale section the document states,

as it had planned to sell to the public?
A. I don't recall that being a major topic of discussion.
Q. Is it your recollection that in discussing the appropriate interpretation of implementation the only considerations given to it were biological considerations relating to the viability of the species?
A. I would respond differently. I would say the major consideration was trying to interpret the direction in the Northwest Forest Plan where it was a little unclear or in some cases a lot unclear and do so in a way that was reasonable in terms of keeping the programs from coming to a screeching halt.
Now, that is sort of what you asked, but a little bit different thrust.
Q. The programs in the context of my question would be the timber sale programs?
A. The vast majority of these were timber sale projects by a huge percentage.
Q. On one hand the Forest Service is trying to follow the direction of the Northwest Forest Plan to ensure the viability of species and on the other hand it is trying to get out its timber sale program?
A. Yeah, you know, the balancing of those two

considerations was something that occurred at higher levels than our team, but we were certainly aware of those as things that leadership would definitely worry about.

Our team was far more worried about the Northwest Forest Plan direction than specific projects or targets or anything like that.

Q. I'm just getting at the extent to which if I may call it tension between ensuring viability of species and selling the timber sales affected the interpretation that you selected of implementation.

A. For me and my role on the team it affected me, but it wasn't weighted anywhere near as heavily as trying to figure out what the plan said and come up with direction that would meet it. I was certainly aware of that, though.

Q. So you knew that certain interpretations would be less of a problem for the Forest Service in selling timber and other interpretations might cause more problems, more delay in selling timber?

A. The way I was processing that I guess it was sort of a risk thing where we move ahead with selling sales. Without having a solid basis for saying we're consistent with our plan, it exposes us to other risks, primarily legal challenge.

Q. From environmental activists?

A. From whomever. So we have a risk one way of coming up short of our program goals if we don't move ahead aggressively and we have a risk another way of coming up short of our program goals, of coming out too aggressively, and there's always that tension that's between those two risks.

Q. Did reducing the risk of lawsuits challenging the interpretation play a role for you in deciding which interpretation of implementation to advocate?

A. It was certainly one of the many things that was sort of background consideration, but not to the extent we or I did any quantitative weighing or anything like that, but it was always there.

Q. In the work that the Issue Resolution Team did in developing a definition of implementation, did they make an effort to find out how many timber sales would be exempted from Category 2 survey requirements depending on which interpretation they chose?

A. I don't recall if that was part of the process or if it was someone else that may have chased that down rather than myself.

Q. But if the Issue Resolution Team had selected an interpretation that said, well, implementation of ground-disturbing activities means award of a contract,

with the next management tier within agencies.

Do you remember how that review took place?

A. Not specifically, but generically I would describe the way the team typically processed issues was we developed drafts and then circulated them for review, comment, reaction.

Q. Were the drafts circulated outside of the formal IRT members and the ad hoc members?

A. Sometimes.

Q. So would you occasionally send the draft --

A. I will amend that. Oftentimes they were circulated outside of the team.

Q. In those situations who would they tend to go to?

A. Often they would go to subject matter experts, people that had a deeper expertise in a particular subject than the individual team members had.

Q. Would those drafts sometimes be circulated to upper-level management like Bob Devlin and Tom Nygren?

A. Always eventually.

Q. In this draft stage, though, the review stage?

A. That's what I was getting to. Always eventually to them and sometimes in the early stages.

Q. All right. Let's look at Exhibit 13. Now, Exhibit 13 is as the document was provided to us by the

government so after you get past the first page, this Message Scan For Randy Hickenbottom, there's another piece of some kind of electronic message and then there is a draft paper on Implementation of Survey and Manage.

First of all, on the first page it says, From Tom Hussey to J. Casey and R. Hickenbottom. Here is the latest draft version of the S and M staff paper we have all been working on.

Is that the paper that starts on page three?

A. Yes.

Q. And is that a paper that you drafted?

A. Again, I don't remember whether I was the first drafter or a reviewer, but it is the paper.

Q. You were involved?

A. Yes.

Q. All right. It says, The next step will be to get it to Tom Nygren and Bill Bradley and get their direction.

A. Yes.

Q. So to your knowledge was this paper beginning on the third page of plaintiff's Exhibit 13 then provided to Nygren and Bradley?

A. To my knowledge it was and the reason I say that is because I do recall official correspondence

going out under the executive signature and in order to get to the executives it would have gone through those two directors.

Q. Is that because they were on the Intermediate Management Group, the IMG?

A. Possibly, but what my response was just correspondence protocol would involve a director reviewing correspondence before it goes to an executive.

Q. Now, Mr. Nygren we have talked about. Mr. Bradley was with the BLM?

A. Yes.

Q. Do you remember his position then?

A. I don't remember it by title, but by function he was a director that was sort of Tom Nygren's equivalent, he covered planning and natural resource issues in the BLM.

I may be a little bit off on the role, but that's close to correct.

Q. And your cover sheet says that the intention was to get their direction on where to proceed next.

What kind of direction were you looking for? What was the next step you were anticipating if they came back and said it is okay?

A. Well, if they came back and said it is okay, I

may eventually come out with the following.

Q. Well, did you or anyone else on the Issue Resolution Team in the summer of 1996 make any recommendations or suggestions to higher-ups that a direction should be issued to the field that decision documents on Forest Service timber sales and BLM timber sales should be held in abeyance until this was decided?

A. I don't recall any of that sort. It may have happened, but I don't recall.

Q. Was there discussion amongst your group of, gee, should we raise this to this level right now because the decision documents are coming down as we speak?

A. I don't recall a discussion of that.

Q. Did you have any discussions on that topic outside of the group with Mr. Nygren, for example, one on one, or others that you knew?

A. Not that I know of. Again, that's pretty far back.

Q. If you turn through this document to the third page of the implementation memo at the top there's a heading that says question three?

A. Got it.

Q. And under the question three there's a

response and in the response in the last sentence it states, As discussed in question one whenever possible we should schedule project decisions to include the results of S and M surveys.

A. Okay.

Q. Was that something that you agreed with at this time?

A. Let me read the whole paragraph.

Q. Sure.

A. Yes, I recall being in agreement with that.

Q. Why didn't that prompt you or someone else in the IRT to suggest to the higher-ups that decision documents be held in abeyance until the surveys could be conducted?

A. I don't know that we even or at least I don't know that I even considered telling folks to hold decision documents in abeyance.

Q. But the statement is whenever possible we should schedule project decisions to include the results of S and M surveys. So isn't that just another way of saying hold off on the S and M surveys until you get this information?

A. Or do the surveys prior to the project decision.

Q. Right, right, right.

A. It sort of inverts the -- it is another way of saying it.
Q. That's the way I was reading it.
A. Yeah.
Q. So I'm thinking why not just hold off on the project decisions, on the decision documents, get the surveys done, then issue decision documents and then award the timber sales, everybody is happy.
A. I don't know.
MR. STEVENS: Why don't we stop now and take our lunch break if that's all right.
(Recess taken from 1:03 p.m. to 2:04 p.m.)
Q. (By Mr. Stevens) Okay. Let's start with plaintiff's Exhibit 14. Is this a document you recognize?
A. Vaguely, it looks like one of the documents that was -- I'm not sure where it was in the sequence, but it was one of the ones that was involved in getting to the final outcome of that limitation issue.
Q. In the upper left-hand corner on the first page underneath the words Survey and Manage is a line that reads, File B, implement 829.
Does that mean anything to you?
A. No, it doesn't.
Q. So you can't -- you don't know that you -- you

and with assumed presence then you figure out how the project might impact them if they were present, but that's one gigantic assumption.

Q. Okay. The next sentence in this same paragraph says, There is strong concern on the part of many FS, BLM and F&WS personnel that allowing major activity such as timber sale or road building operations to proceed after 9-30-96 without surveys is unacceptable because it does not meet the, and it says a and I think that's a typo, commonly accepted understanding of when implementation occurs.

Do you recall anyone in the field raising that issue?

A. I recall the issue. I don't think it was so much from the field, but it was internal within the group of us that were trying to resolve this and debate possible approaches.

Q. What was the commonly accepted understanding of when implementation occurs as referenced in this language?

A. My recollection at least what was in my mind when we were discussing this is to most people implementation is an action, big yellow machines driving off low boys, chainsaws roaring, dirt being moved and stuff like that rather than the signing of a

decision document.

Q. On the next page at the top the first complete sentence states, We could require surveys on all projects with decisions signed, and then "after" is crossed out and "before" is written in, 9-30-96, and then "or" is crossed out and "and" is written in for which operations begin after a specified date such as 9-30-96 or 5-30-97 for example. This would satisfy concerns about meeting the intent of the ROD, but could appear contradictory or difficult to implement.

Do you know why this interpretation would be contradictory or difficult to implement?

A. Give me a minute to do some mental gymnastics here. From my read of this I'm focusing on the last sentence, Satisfy concerns about meeting the intent of the Record of Decision. The intent of the Record would be to have the information about these plants and animals in time to have that information influence the decision-maker.

Q. For the decision document?

A. Yes.

Q. Okay. So where is the contradictory or difficult to implement aspect of it?

A. I'm not sure what it is referring to. Contradictory to what. This was probably clear to me

Q. By "pretty good shape" you mean --
A. There was good conclusion, reasonable comfort that we came out and the best available position we could come up with, and this I think reflects some of the to'ing and fro'ing that went on when we did this.
Q. But, again, the final would reflect the most consensus?
A. Yes.
Q. Let's look at 14A next, please. Take a look at this document and after you have looked at it for a bit tell me if you recognize it.
A. Yes, I do.
Q. And what is it?
A. I believe that this is very near the final team position on the issues.
Q. And you say that based on the date?
A. The date and the inclusion of -- this attempt to clarify this table that's attached to it. I recall us not developing the table until fairly late in the process.
Q. How was the table developed?
A. I don't remember.
Q. Was any one person primarily responsible for putting the table together?
A. Again, I don't remember, although, I will tell

A. In the context of this issue it would have meant more protective of the species because we would have had more information about the species by having those extra three months' worth of time to get surveys.

Q. Okay. I don't know if I asked you this or not. If I did bear with me again. Do you know if there was a principal author or authors of this version of the Survey and Manage Current Implementation Issues paper?

A. Well, you know, there was a lot of back and forth. I think the principal people would have been either me or Larry Larsen.

Q. Why do you say that?

A. Because for the most part this is what is more heavily weighted toward policy kind of stuff rather than technical and scientific and Cheryl McCaffrey, Randy Hickenbottom tended to deal more with the technical and scientific end of the issues than the policy and NEPA end of the issues.

Again, there's overlap, but that was the tendency so I think it was either Larry or I that were in the lead role on some of this.

Q. You can't pick out any particular parts, can you, that are yours?

A. No, it is all kind of blended together in my

memory.

Q. Under question three on page two there are three different sub parts A, B, and C. And C states, Projects designed and NEPA documents signed prior to 10-01-96, but awarded on or after 10-01-96 enter the grey zone.

What does that mean?

A. First thing I'm looking for is whether this chart has a grey zone in it. It almost looks like that stippling is a grey.

Q. What page are you on now?

A. I'm on the second of the chart pages, the one that says Survey and Manage Implementation Timeline and it almost looks like a grey stippling down the middle of it.

Q. Horizontally?

A. No, vertically. On my copy it looks grey.

Q. It is about an inch in width?

A. Yes.

Q. Just on either side of what looks like 1-1-97 time period?

A. Yes, that's what I'm referring to and that's just a possibility. I don't know for certain that that matches up.

Q. Thank you. Your eyes are better than mine.

App. Tab 173
Corrected

THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C |

DEPOSITION OF

SUSAN M. ZIKE

Taken in behalf of Plaintiffs

* * *

August 20, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

the original copies. If for some reason, Miss Lynch, you are missing a copy or something happens, let me know and I'll immediately give you a copy of it.

MS. LYNCH: Okay.

MR. STEVENS: It just seemed a lot simpler and perhaps even less expensive if we did that rather than copy yet again for everybody else.

Q. (By Mr. Stevens) All right. Miss Zike, I've put in front of you what's been previously marked as plaintiff's deposition Exhibit 24A. And you've had a moment to look at it. But as you can see, it is a letter from Edward Boling to Michael Gippert and Renee Stone. And if you look on the last page of this document, page 3, there's a CC shown to you and to Owen Schmidt.

A. Correct.

Q. And the date of the document is July 29, 1998.

Who is Owen Schmidt and what was he doing, in general, for the forest service at that time?

A. Owen Schmidt is in -- was employed by the Office of General Counsel here in Portland and he was our -- our lead attorney in OGC for this case.

Q. Okay. And, in general, you and your responsibilities at that time?

that --

MS. LYNCH: I will.

MR. STEVENS: -- ahead of time. We can find out whether those documents existed or not.

(Discussion off the record.)

Q. (By Mr. Stevens) This next exhibit has been premarked as plaintiffs' Exhibit 30A. This is an E-mail. And I take it that it is from you?

A. Yes.

Q. To Nancy and others. And the Nancy would be Nancy Graybeal?

A. Correct.

Q. And her position at the time was?

A. She was either acting regional forester, because she did that for some period of time, or deputy regional forester.

Q. For region 6?

A. For region 6, correct.

Q. And in this E-mail you say "Ted Boling just called to answer my Qs about what were Shiffer's and Coppelman's concerns about this case, he answered" the "agency definition of implement was nonsense." Do you recall asking that question?

A. I do.

Q. And -- and why did you -- why did you have

that question to start with?

A. What I recall was that -- 'cause we had many, many conference calls. And I think it was shared with our litigation team that the department of justice had some concerns with trying to defend this case because they read our implement memo to be nonsensical, and -- and so actually Ted -- Ted didn't tell us that they thought it was nonsense. Ted told us there's some concerns in the higher levels of DOJ whether or not we can defend your case. So then the follow-up question was from me to say more privately than on this big phone call --

Q. Sure.

A. -- what is their concern about it? And so when Ted and I talked then this is what he told me their concerns were.

Q. Did he elaborate any further on what was meant by the definition of implement was nonsense?

A. Not -- not that I recall.

Q. Did he give any explanation for why -- why that definition didn't make any sense?

A. I think what Ted and I went on to discuss is if you look at the word implement from the dictionary, you know, it gives us an idea that it actually means ground turning or ground disturbing or that things are

being implemented, that's sort of the plain meaning of what the word implement is. And so the fact that our implement memo referred to implement as a decision-making time rather than a ground-disturbing time to Lois Shiffer and Peter Coppelman, it -- they didn't believe that it made sense, that in fact implement should mean ground disturbing, and it didn't in this sense. That's why we wrote the memo -- or they wrote the memo.

Q. Would you just repeat that last question for me, please. Read it back.

And answer, excuse me, not the question.

THE REPORTER: The whole answer?

MR. STEVENS: Actually I just want the last couple sentences.

THE REPORTER: Okay.

(The reporter read the record as follows:

"Answer: And so the fact that our implement memo referred to implement as a decision- making time rather than a ground-disturbing time to Lois Shiffer and Peter Coppelman, it -- they didn't believe that it made sense, that in fact implement should mean ground disturbing, and it didn't in this sense. That's why

we wrote the memo -- or they wrote the
memo.")
Q. (By Mr. Stevens) Now, did Mr. Boling explain to you the -- the occasion for him having this discussion with Miss Shiffer and Mr. Coppelman?
A. No.
Q. Okay. Did -- was it your understanding that he was -- he was to give them a briefing and that then you heard from the briefing that they had some concerns and then you followed up with this and said what specific concerns?
A. Our arrangement with the department of justice on this case was we ended up having phone calls scheduled every week at a certain time.
Q. M-hm.
A. So whatever went on in -- in all of our lives regarding this case from week to week we shared on these conference calls. So whatever we wouldn't know -- I wouldn't know when or how or why Ted was conferring with Lois and Peter other than we knew that there was this big -- there was a lot of political interest in this case and so we weren't surprised that he was conferring with Lois and Peter. Many, many cases never got discussed at that level, at that political appointee level, but this one did. So when

he shared what his observations were, then that led to my follow-up inquiry.

Q. What did Mr. Boling tell you his observations were about the definition of implement?

A. I don't recall his personal impressions of it, but what I think speaks to it is that they defended it. So our -- our rationale, the forest service, and BLM's rationale for why that letter was needed and came to be, it seems to me if they stayed on this, if the department of justice believed it was nondefendable, something changed their mind and they -- and they defended it so --

Q. Did you subsequently learn what had changed their mind, if anything?

A. No, no. Higher levels than me.

Q. Did Mr. Boling ever give you any legal advice on -- relating to the -- this definition of implement?

A. Ask that again.

Q. Well, the definition of implement meaning NEPA equals implement --

A. Correct.

Q. -- did Mr. Boling ever give you any legal advice or express any legal advice in your presence regarding that definition?

A. Boy, I don't know. I -- I don't know.
Q. So do you recall what you meant by the initial briefing?
A. Well, if -- if in fact this was -- I don't know the date of this E-mail. But if it was in the first, you know, three or four weeks after the lawsuit was filed, you know, if it was in the first -- in July of '98, then it would be the very first one, the very first initial -- it would be the first briefing.
Q. This E-mail is addressed to Nancy Graybeal.
A. M-hm.
Q. Do you recall her response to it, if any?
A. I don't recall her response. It was more FYI.
Q. And others. Who were the others you sent it to, do you remember?
A. You know, typically I would send it to the directors and the deputy regional foresters, so that would have been Devlin and Peggy probably.
Q. Do you remember Devlin's response, if any?
A. No. He typically didn't respond unless I asked him to respond because I was more of a purveyor of information rather than asking questions so --
Q. I take it in this case you don't recall asking him?

A. No. There's nothing here. You know --

Q. Apart from this.

A. No, no.

Q. Okay.

This next exhibit has been marked as 24B. For some reason that's mismarked as 25 and the last page is missing?

MS. LYNCH: I'll just make a note to get a copy from you.

MR. STEVENS: Yeah. If you look on with Miss Zike, she has a copy. I apologize for that.

Q. (By Mr. Stevens) Okay. This Exhibit 24B begins on page 18919 running through page 18922. The very top of the page it's dated September 1, that's first page, 919. It's dated September 1, 1998, from S. Zike. That's you?

A. That's correct.

Q. To ONRC Action coordinators. And am I correct that on each national forest during the pendency of the ONRC lawsuit there was someone designated as a coordinator for that forest?

A. Correct. But only on the west side forests that were covered by the Northwest Forest Plan.

Q. Okay.

A. Not every national forest out here.

Q. Sure.
And in some cases, that would include the contracting officer for the sales in question?
A. At times it was the -- the forest supervisor designated who my case coordinator was. Sometimes it was the environmental coordinator, sometimes it was the contractor officer or other positions.
Q. But when you have an E-mail that says to ONRC Action coordinators, you send it out to all -- all the coordinators?
A. Correct, on all the --
Q. As a group?
A. As a group.
Q. And so that would have included Ed Matthews, am I right, on the Klamath?
A. You know, I don't -- off the top, I don't recall if Ed was my case coordinator for that forest. I certainly know he was the contracting officer.
Q. Okay. You recall having E-mails with him?
A. Oh, yes, I had a lot of -- you know, I had communications with him.
Q. Okay. And Brenda Woodard --
A. Brenda Woodard on the Umpqua --
Q. -- on the Umpqua National Forest?
A. -- was my case coordinator.

Q. And Tom Link on the Siskiyou?
A. Tom Link was also.
Q. At the Siskiyou?
A. He's on the Siskiyou.
Q. Siskiyou.
A. Contracting officer.
Q. Okay. So when I see ONRC Action coordinators, we knew at least whatever you sent out went to Miss Woodard and to Mr. Link and perhaps to Mr. Matthews?
A. Matthews, correct.
Q. Okay. If you -- let's see. And when it says ONRC Action coordinators, apart from the coordinators did you also include in that group others? For example, would Owen Schmidt have always gotten a copy?
A. No.
Q. Okay. Would Mr. Devlin have always gotten a copy?
A. No.
Q. Okay. So just the ONRC Action coordinators?
A. Correct.
Q. Okay. At the end of the second paragraph you write "You'll probably be allowed to award, but DOJ needs to know." What did you mean by you'll

the next two pages, the last two pages of this document, 18921, 922; 921 is the E-mail which led to the chart you just described and 922 is --

A. Is a sample of it.

Q. Is a sample of the chart?

A. Yes.

Q. Okay. This next document is plaintiffs' Exhibit 26. Now, if I'm reading this correctly, this is an E-mail to you from Mr. Jerry Jensen?

A. Yes.

Q. And he's in region 5 of the forest service?

A. He was.

Q. And his position at the time was what?

A. I can't tell you. He was in their timber shop, but I never knew his title.

Q. I find these E-mails somewhat hard to read, but under part 2 it says "I need to remind you that the list of sales I sent out to you is privileged info and not available to the public, as is the chart." Is that your -- is that you telling --

A. That's me, m-hm.

Q. So it's you sending this E-mail message to Mr. Jensen?

A. Jensen's message at the bottom came to me first, and then I responded to that.

Q. I see, okay.
And the reason why you regarded this information as not available to the public was what?
A. It was my understanding, from my justice counsel, that there was a privilege that we would apply because we were in settlement discussions. I can't recall the rule, but --
Q. So it's your recollection that Mr. Boling gave you that direction?
A. Yes.
Q. Do you recall Mr. Boling giving you any reason for not making this information available to the public other than that it was a part of settlement discussions?
A. No. That was the basis.
Q. Did Mr. Boling tell you that the ONRC Action plaintiffs had insisted that the information remain confidential and not available to the public?
A. I was aware of that because it was stated on each one of plaintiffs' memos/letters to us.
Q. What was stated on those memos?
A. That plaintiffs believed that these communications were privileged.
Q. On this E-mail further up, the last sentence in your portion -- or next to last sentence, you write

thought about it?

A. No, they didn't.

Q. And did you ever have any concerns yourself about the correctness of the implementation definition, the forest service's implementation definition?

A. No, I didn't. It wasn't -- it's not my job to assess what the agency -- what their policy papers were.

Q. You never offered any advice on that memo?

A. No.

Q. Even after it was issued?

A. No.

Q. Same thing for the red tree vole?

A. Correct.

Q. I take it no one ever asked for your advice?

A. You know, I -- it isn't for anyone to come to me to ask for my advice. It was done, the executive signed off on it, and then my job is to coordinate a defense for it, and so that's -- that's what I do.

Q. This next document is marked plaintiffs' Exhibit 31. Again, you can help me out a little bit about reading the E-mail. Under the heading part 1, about the middle of the page --

A. M-hm.
Q. -- it says "To: Distribution (Title: Distribution list)." Did that -- is that a term of art? Does that include certain people?
A. I assume that it does. Each of us in our E-mail system at the time could develop your own distribution list, mailing list essentially, created by the sender. So when Bob Devlin sent this to his distribution list, I mean, it was whatever list he put together.
Q. If you look under part 2 Mr. Devlin refers to you.
A. M-hm.
Q. And he says, in about the middle of his part 2 portion, "Until we know where these discussions are headed," meaning the settlement discussions, "do not award any of these sales. If you have any specific questions on any of the sales on the list, call Sue Zike for advice." What kind of advice were you giving with respect to these sales?
A. The advice was if you convince Sue that the sale needs to go forward, she'll take it up with Ted Boling. And that's -- that's -- I think advice is probably a poor choice of words because I wasn't advising whether to award or not or what would help or

hinder the settlement agreements. It was more that I was the conduit between contracting officers and my case coordinators on what their schedule was for awarding these sales.

Q. So the procedure, at least at this point, which is October 16, 1998 --

A. M-hm.

Q. -- was that if a -- if a forest wanted to award a sale that was on a list that had been provided by the plaintiffs, the first step was to call you and convince you that they had good reasons?

A. Right.

Q. And I take it if they did not have good reasons you would say forget it?

A. And -- yeah -- well, I didn't have the authority to say forget it. I would say, you know, it's not convincing to me but we could take it up with Peggy and we could take it up with Bob Devlin. And the pressure usually from the purchasers and the community that was -- that were looking to our timber sales, if the pressure was there that these guys needed it to get logs to their yard, then it was at a higher level at that point than me for us to put -- make the push on DOJ that these need to go forward for whatever reasons so --

Q. Okay. So that if in fact the concurrence of the department of justice was sought on a particular sale, I take it that some kind of a case, if you want, for awarding the sale was made in writing through your chart or through some other mechanism?

A. No, it wasn't on a chart and it wasn't in writing. These are pretty much over the phone. We just get Ted on the phone and -- and we would talk them through with -- with where it was and whether or not it appeared to him that these would be good to go.

I assume that he would take those sale names to plaintiffs' counsel because they were in a settlement agreement. And that's what I assumed happened. I was never a part of that, never -- you know, never had to do anything in writing for Ted to brief anybody else. It was always over the phone.

And -- and because we were in settlement agreements -- or settlement negotiations it seemed to make sense that if we could -- if we, being the government, could get plaintiffs to concur that the award could go forward, then it wouldn't prompt the PI. So it was all about trying to keep us out of the preliminary injunction phase in the case so -- so I don't know who all Ted would go to, you know, to get a thumbs up or a thumbs down, 'cause he wouldn't

particularly tell us that --

Q. Are you aware of any occasions in which representatives of the forest service included purchasers in deciding whether or not to award a timber sale that was on one of the plaintiffs' lists?

A. I don't know if that happened or not. I would -- I mean, a contracting officer would have had those discussions, not me.

Q. That information was never mentioned to you directly or indirectly?

A. No, hm-m. No, not between -- you're asking between the forest service and the purchasers whether to award or not?

Q. Yes.

A. No, there wouldn't have been any reason for, for instance, Brenda Woodard to call me and say talked to X, Y, Z purchaser and he really wants that sales. She wouldn't -- she wouldn't have shared that kind of information with me. The rationale for the cases that they put together - and I know we've released -- there's charts of those, too, in the documents that we've released to you - would be surveys are done, price is right, think the market can hold it. You know, there were -- there were reasons. But I don't recall that she would -- for instance, that Brenda

Woodard would tell me that she talked with a purchaser.

Q. There's no place on your chart, for example, that says whether the purchaser wants the sale or doesn't want the sale or needs the sale?

A. I don't recall that there was. But I certainly had a lot of charts so --

Q. And the fact that the sales were on lists that the plaintiffs indicated might provoke a temporary restraining order or preliminary injunction, that was not released to the public?

A. Correct.

Q. Nor were the purchasers told?

A. I don't believe that -- well, the purchasers were told at the time of bid opening if they'd been named by the plaintiffs in this case, and they were told -- the public would have known if they followed the activities when that boilerplate language got put in the ads which would have been post this -- you know, post July '98.

Q. And what do you believe they would have known? What would a purchaser have known from this statement?

A. That this -- I think the language was -- the announcement that I understood that Hofer and folks

individuals; right?
A. It is.
Q. Okay. And turn to 1881 because you can read the text of the E-mail more easily there. You say "We received the okay to award the Wildfire and Evans timber sales on the MTH." That's the national forest, MTH?
A. That stands for the Mt. Hood National Forest.
Q. Okay. And when you say the okay to award, you mean from the department of justice?
A. It is.
Q. Okay. And so would this reflect a -- a pattern, at least at this point in time, which is in October of 1998, it looks like October 13th if you look on page 18 --
A. Oh, my gosh, there is a date up there, isn't there?
Q. I won't ask you to read it. It's too difficult.
A. Thank you.
Q. I'm just trying to get the procedures straight here. After the forest indicated a desire to go forward and award a sale or sales that were on the plaintiffs' list, their -- their information in

support of that award was provided to you, you either passed it directly on to justice or there was a conference involving Mr. Devlin or Miss Kain or others.

A. And Peggy, correct. Correct.

Q. And if the consensus of that group was that you would still want to go forward with the award, then it was presented to Mr. Boling?

A. Correct.

Q. And when you have an E-mail like this that says "We received the okay to award," that means Mr. Boling concurred?

A. That's correct.

Q. Okay. This next document is Exhibit 33. Now, the first page of Exhibit 33 has your name at the bottom and, again, this is one of those E-mails that's not always easy for me to read so can you just tell me what's going on here and who's writing to whom?

A. Well, let me see. The -- where it says to Sue Zike, that would be coming to me from Devlin which is on the second page, his signature block in the messages there.

Q. Where it says "I sent similar message to D. Bus --"

A. Right.

Q. "-- on Willamette and she got it"?

A. Right.

Q. Okay.

A. So the way this E-mail system worked was it's backwards in time. So when I say "Tom made my best shot," I think I said best "at convincing DOJ." I would -- that CC'ed to Devlin and Devlin replied to that saying "I sent a similar message to Diana Bus on the Willamette and she got it."

Q. Okay.

A. So he was just conferring that what I was saying here, he had sent a similar message to Diana. And my guess, Diana was the contracting officer and my case coordinator on the Willamette and she had probably had a -- had another sale, you know, that was -- that --

Q. Okay. Well, my particular interest here is with the message addressed to Tom. That would be Tom Link?

A. Tom Link, correct.

Q. On the Siskiyou National Forest?

A. Right.

Q. And the sale he's referring to would be the Too Wild timber sale?

A. Correct.

Q. And you say here you made your best shot but it wasn't successful?

A. Correct.

Q. Do you recall why not?

A. Well, the why not is the next sentence that says DOJ analyzed the risk and thought it was in their best interest for the settlement negotiations and to avoid claims that we delay the award of Too Wild so --

Q. Do you remember the rationale, the department of justice rationale, for denying the forest service's request to award Too Wild?

A. I think there was -- as I recall, there had been a lot of opposition to Too Wild timber sale and it -- my recollection was that plaintiffs would have threatened to go for the injunction if we had moved to award that. And throughout this whole settlement time in '98, now this is October of '98, I think Ted Boling continued to believe that we and plaintiffs' counsel could work out a deal if we could just keep the injunction at bay.

Q. So at this point, his decision was not to allow the award?

A. His being Boling's?

Q. Yes.

A. That's what we were counseled.

Q. And I take it the forest service followed that advice?

A. That's -- that's my recollection.

Q. Do you know why the forest service wanted to go ahead with the award as opposed to waiting to see if the settlement talks played out?

A. You know, I don't recall Tom Link's briefing paper on Too Wild, you know, what the -- or a chart, you know. We did these charts that asked -- that laid out their rationale for wanting to to award I guess it was big old growth volume.

Q. I don't understand, excuse me.

A. That when we had a sale that had large volume which usually came out of old growth trees, that the forest service was wanting to get those awarded to purchasers.

Q. Okay. And you don't remember -- or perhaps I should put it this way: Do you remember any of the specifics of -- of Mr. Boling's reasoning in deciding to not allow the award of Too Wild at this point?

A. I do not.

Q. Okay.

A. Let me correct that, Gary. What I recall is that Ted's reasoning for delaying this award was that he believed he could get -- he believed he could get a

settlement agreement with plaintiffs' counsel, so that's what I recall his rationale was. It wasn't whether or not the sale was good or bad, but this -- but Too Wild had enough opposition to it that he thought moving forward into award would chill the settlement negotiations that he was undertaking.

Q. So in this -- in this period of after the lawsuit was filed through October, this is dated October 24th, 1998 --

A. M-hm.

Q. -- is it your recollection that the justice department approved the award of some sales but vetoed the award of other sales?

A. Yes, it is. And we went through one of these exhibits earlier where we got the okay to award these two Mt. Hood sales. And part of the reason that we got the okay to award those two Mt. Hood sales was, even though they were named by plaintiffs in their list, plaintiffs had not appealed. And of course under Administrative Procedures Act you have to -- you have to exhaust your administrative remedy before you can take us into court, you know.

So on the sales that plaintiffs -- these plaintiffs had not appealed, we felt safe going forward to award because they didn't have standing to

sue us on those. So -- so we did get an okay on some of those. And that was all a part of the sale data that my case coordinators would feed me. Because plaintiffs' grab was wide and big and nondiscriminatory of these list of 156 sales they wanted to shut down. So that's why we lobbed through them one at a time.

Q. Okay.

A. Okay.

Q. This next document is Exhibit 37.

All right. The first page of this document is a memorandum from you to Mr. Devlin and Miss Kain and someone named Lisa Freedman and Arnie Holden. Can you identify Miss Freedman and Mr. Holden?

A. Lisa Freedman is the director of strategic planning at the time and Arnie Holden I believe was her deputy. And that's the department that I work in so she's my boss. And then it also goes to regional forester.

Q. What were the general duties of the people in strategic planning at that time? What did strategic planning do?

A. There is -- in addition to me, which is the litigation end of the house, there is an environmental coordination department which are the NEPA experts and

the NFMA experts, and then there is an appeal department who run the administrative appeal reviews and program. And I think at that time Lisa also had the program budget and development folks who do our out year budget planning I think reported to her back in '98.

Q. Okay. If you look at paragraph 6 on page 1 of -- actually page 70 but it's the first page of Exhibit 37.

A. M-hm.

Q. There's a reference to a list of BLM and forest service sales that would not be awarded until after November 23rd.

A. M-hm.

Q. And then it goes on to make some further comments. Can you explain in a little more detail what that is about?

A. Items 1 through 6 were the bullets of our counteroffer to plaintiffs in the settlement discussions. So plaintiffs were asking and apparently the government, through Ted's negotiations, were offering to do items 1 through 6 to settle this case, so -- and the letter that I'm referring to, the 10-26, 1998, letter from Ted Boling to Axline, is not attached to this exhibit, just so you know.

Q. Okay.

A. It's probably somewhere, but -- so I'm paraphrasing because attachments do often get lost.

Q. Sure.

A. So I'm paraphrasing in items 1 through 6 for my executives what the government was counteroffering. So No. 6, as I read it today, says that our counteroffer said that we would give plaintiffs a list of forest service and BLM sales that would not be awarded until after 11-23-98, 34 of which were BLM and 38 which were forest service.

Q. All right.

A. So we were offering to give them that list.

Q. Okay, thank you.

A. M-hm.

Q. Below that paragraph 6 there is a section of this first page entitled "What Next" and in paragraph 2 --

A. M-hm.

Q. -- and at the bottom of paragraph 2 you write "I think there will be around 20 or so and the forests will be wanting to move ahead and DOJ will be wanting to delay." What is that about?

A. Ted was wanting -- Ted Boling was wanting to wrap up his settlement negotiations. And it's what we

had thought and talked about already is that our forests had sales in various stages of settlement and they were wanting to move into auction and award, and the concern from Ted Boling was that that would prompt PIs, preliminary injunctions. And he didn't want to be distracted from his settlement discussions with such a motion. So I knew we would have more convincing to do that, of the sales that were advertising in this period in the previous sentence described here, that we would have some more arguments to make with our trial counsel as to whether or not we could award those.

Q. And how did you come up with this estimate of 20 or so?

A. I would have only gotten that from my forest coordinators.

Q. So these were ones that the forests wanted to move ahead on and you assumed that justice would not want to move ahead on any until the settlement discussions had actually come to a conclusion on?

A. I wouldn't say any, because it wasn't a black line. If in fact the plaintiffs did not have standing through the appeal process or if the plaintiffs had appealed but did not raise the implement memo issue or the retrieval issue, then our

trial counsel were pretty comfortable with letting us move ahead because they felt they had an argument that there was no standing.

Q. Now, you said the implement issue or the red tree vole --

A. Red tree vole memo issue, yes.

Q. Referring to the interpretations with respect to both of those types of surveys?

A. Correct.

Q. Okay. Let's see, is the last page of this exhibit page 0093?

A. It is.

Q. Okay. And the first page is 0070?

A. Correct.

Q. Okay. Then we're all set.

I think you have a couple of pages that don't go with that exhibit, but you're welcome to them anyway.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. Should we take a little break right now?

A. That's fine.

(Recess: 10:30 to 10:48 AM.)

Q. (By Mr. Stevens) The next document will be Exhibit 35. It begins on page 102 and runs to page

105. The first page is a memorandum from you, again, to the ONRC Action coordinators.

A. M-hm.

Q. You've told us who that would be before.

A. Correct.

Q. All right. And in the second paragraph of your memo you write "However, as you will note the DOJ has promised certain sales will not be awarded until after November 23, 1998." So am I correct this was your understanding of what was going on in the settlement discussions?

A. It was due to that, correct.

Q. So this would be another reason for the department of justice not allowing sales to be awarded, that they had made an agreement with the ONRC Action plaintiffs?

A. Well, I don't know if ONRC counsel and my counsel, the department of justice, in fact agreed to these sales 'cause I -- because I wouldn't know that. But I do know that Ted Boling, DOJ, and plaintiffs' counsel were meeting through these -- or, you know, having conversation through that period of time in the request. And they thought they could get their deal cut by around the end of November. So then the requests came from department of justice can you delay

these certain sales until that 23rd date. So I don't know that I would represent it as -- as an agreement between plaintiffs and defendants that these sales would not be awarded.

Q. Okay. The reason I ask that is because you say here that "DOJ has promised certain sales will not be awarded." I assume you promised that to the ONRC Action plaintiffs?

A. Correct.

Q. So that part you do know?

A. Right.

Q. And that's consistent with the statement further down in the same paragraph where you say "I need to remind you of Bob Devlin's message to the forest supervisors October 16 asking that you not award any of the listed sales until I can get an okay from DOJ, period."

A. Correct.

Q. And you say "I've inserted Bob's message below," and that's on page 103, and I think we've seen that in another context already.

A. Correct. However, again what's not attached to this briefing memo is the October 23, '98, counteroffer.

Q. I understand that.

A. Okay.

Q. And in the last paragraph of your memo on page 102, the first sentence, you say that, in part, "The DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless we can show good reasons (resource reasons) why the sale needs to be awarded within the next month." Why did you think that was true?

A. It was my observation that until an agreement got reached between plaintiffs and defendants, that these controversial sales, controversial to the plaintiffs, we would be asked to delay those. That was just my -- my reading of the way Ted Boling managed the case so far.

Q. And did Mr. Boling make it clear to you that in terms of good reasons he meant resource reasons, protection of natural resources?

A. Correct.

Q. As opposed to purchasers desires to have sales awarded?

A. Correct. Or targets. You know, if the -- if the region was not going to meet their timber targets, that was not important enough to the department of justice to move forward with these sales that are likely to prompt the injunction.

Q. Timber targets meaning the projected target for volume of sales of timber?
A. Just volume.
Q. Volume.
A. Timber volume.
Q. So that each forest had a certain target in terms of the volume of sales it was hoping to sell that year?
A. Correct. That's what we get financed for by Congress.
Q. So it's important?
A. They're very important targets, but we were -- and that's why we needed Devlin's understanding and agreeing with delaying these, because that all meant targets were not going to be met.
Q. Okay. And what did you mean by the last couple of sentences in this last paragraph where you write "DOJ is aware that the timber market in the Portland area is not strong, so we have a bit of an uphill struggle to move ahead. But" we will -- "but try we will. And we do have some good reasons for many of these sales"?
A. Right. Well, as we had looked in the earlier exhibit, Lois Shiffer and Peter Coppelman were

of the opinion -- they're in Washington, DC, were of the opinion that the timber market in Oregon was soft and so that's what the first part of that sentence means. Ted's bosses realize it's a soft timber market.

But that doesn't mean that the forest service does not advertise and award sales. I mean, we have advertised and awarded sales -- it's a purchaser's -- I mean, that's the market is whether the purchasers wanted to buy the stuff or not. So you put the -- you put the timber sales out there. If they believe they can make money by buying that sale, they buy it. And it isn't for us to slow down the offering of timber sales because of soft market. Just makes a difference on whether we'll sell them or not.

Q. Okay. The next document will be Exhibit 38.

A. Thank you.

Q. Okay. Well, the first page is another copy of the memo we were just talking about, but the attachments is what I'm really interested in, pages 92940 and 92941. This document is addressed, on page 1, to ONRC Action coordinators, and I'm just asking you if you can verify that the -- the list on page 92940, which is produced in more readable form on 92941, these are the individuals to whom you sent

Q. Would it be fair to say that you were the principal litigation coordinator for the ONRC Action litigation for both region 5 and region 6, in general?

A. That would be correct.

Q. And so if Mr. Matthews had some sales on the Klamath and he wanted to award, he would get in touch with you --

A. Correct.

Q. -- and provide you with the information and the process would proceed as you have previously described it?

A. That is correct.

Q. Okay. The -- this list for the Umpqua identifies Michael Hupp but does not identify Brenda Woodard.

A. That's right.

Q. You would have sent some -- some of these to Miss Woodard and some to Mr. Hupp and you would expect Mr. Hupp would pass them on to --

(Mr. Wah left the room.)

THE WITNESS: I expected -- because Mike Hupp was the environmental coordinator and their forest planner, and in some cases that's who the forest supervisor wanted me to go through so that's who I used. I know I had, from time to time,

independent discussions/E-mails with Brenda on particular sales.

Q. (By Mr. Stevens) Okay. Taking you back down memory lane, the next exhibit is 40, plaintiffs' Exhibit 40.

(Mr. Wah entered the room.)

Q. (By Mr. Stevens) And this is an E-mail -- at least part of this is an E-mail from you to various other individuals.

A. Correct.

Q. And under part 2 that's your E-mail?

A. It is.

Q. The bottom of the paragraph under part 2 you say "DOJ is willing to consider the merits of each sale that we want to award, so the door isn't shut."

A. Correct.

Q. Meaning at this point it was still possible for sales to be awarded but DOJ had to be convinced?

A. Correct.

Q. And then when you say "Please put your rationale for need to award in the far right column," you're talking about your chart?

A. A chart.

Q. Okay. And all of that was standard procedure at this point in time?

A. It was.

Q. Okay. The next exhibit is Exhibit 42.

And this is another one of your E-mails. You can't read the date very clearly on the first page, but I've deciphered it as November 6, 1998, and you could just take that as representation.

A. Okay.

Q. And the text which is more readable is on the second page, page 1844. On page 1844 the paragraph under part 2 and at the end of the second sentence you say "Encourage the rest of --" starting in the middle of the sentence, "Encourage the rest of you to" make -- "to review the sales in the sideways chart I sent out yesterday to see if you want to make a concerted effort to discuss the award likelihood with DOJ slash OGC." Now, why, at this point, are you talking about a concerted effort? Were you suggesting to them that unless they had a very strong reason for going forward, that they shouldn't urge you to do that or --

A. Because there was this delay period that plaintiffs -- as I recall, plaintiffs had a list of sales that they didn't want to go forward while they were negotiating with Ted Boling and that we were assured by -- I recall being assured by Mr. Boling

verified them and they should be right.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. This is a -- Exhibit 56 is page 1745 through 1746. It's another one of these E-mails or perhaps E-mail exchanges. And let me ask you to turn to the second page, though I'll note, for the record, my reading of the date is November 8th, 1998. And if you turn to page 2 under part 4.2, three short paragraphs, that's your E-mail I take it?

A. That's correct.

Q. Let me draw your attention to the last paragraph and the first sentence where you say "Please keep in mind (as COs always do) the liability that may come to the USFS if the sale is awarded and enjoined." What were you referring to there?

A. Well, I'm -- I'm certainly not a contract lawyer for the government, but it was just a reminder to perhaps my case coordinators who were not contracting officers that if we have to award and then we are enjoined, that we then would have to use one of the clauses in the contract to suspend the sales. So it was just a -- just a reminder.

Q. And COs refers to contracting officers?

A. Officers, correct.

Q. And were you asking them not to press for

the award if they thought there would be liability to the government?

A. Yes.

Q. In the second sentence in that same paragraph you say "Is there a need for a regional conference call re the award question?" What kind of regional conference call were you talking about?

A. With our -- with Jerry Hofer, the regional contracting officer, and Peggy Kain to see if we needed to talk through collectively the sales that the forest wanted to award.

Q. Now, you're asking your -- your folks on distribution list if you think there is a need for a regional conference call. What would determine whether there would be a need or not be a need?

A. E-mails back or phone calls back to me from those case coordinators if they wanted to talk it through.

Q. And the nature of the conference call would be to, as you put it, air the needs and risks of going forward?

A. Correct.

Q. So would Owen Schmidt be involved in that at all?

A. He would.

Q. And when you have a conference call like this, how is the final decision made to go to the justice department and go forward with the award? Was it made by the highest-ranking individual involved in the conference like Miss Kain or Mr. Devlin or --
A. Typically that's how it -- there would be a -- there would be a discussion with -- with Devlin, and if he wasn't on it'd be Peggy. And we looked to those managers to make the policy call.
Q. Did Owen Schmidt have veto power?
A. No.
Q. What was his function in this process?
A. Advice, help us think it through, litigation risk.
Q. Okay. The next document I'm handing you has been marked as Exhibit 47. It has lots of pages to it, it has lots of charts attached to it. My main questions for you are on the first page.
A. Okay.
Q. All right. This is a memorandum that you prepared and it's dated November 19th, 1998. In the first single-spaced paragraph, the first sentence you write "Below is chart of the 12 species listed in the S slash M EA that are survey dash able and considered to have a substantially increased risk." What risk

were you referring to?
A. It's what I understand for the survey/ manage species there is a risk of not extirpation but a risk of becoming more rare by having timber sales affect their habitat.
Q. And that's what you were referring to here --
A. Yes.
Q. -- that risk?
A. Yes.
Q. In the second paragraph of this E-mail beginning with "R5 colon" you state "I do not have your sales in my data base. Please refer to the sale chart Brian Stone assembled 9 slash 24 slash 98 and only consider the sales with DN or ROD'S between 7 slash 1 dash 9 slash 30 slash 98." Why was consideration limited to that time period?
A. That's the last quarter of fiscal year '98 and those were the discussions about that quarter of timber sales that Ted Boling and ONRC's counsel were trying to negotiate.
Q. As part of the settlement negotiations?
A. Correct.
Q. The next document I'm handing you has been marked as Exhibit 49. This is another one of your

E-mails with the clearest text on page 1815 and another version of the same E-mail on 1814 which bears the date which I have read as November 23, 1998.

A. Okay.

Q. This is to distribution so that means it goes to the same people on your distribution list that we talked about before.

A. Right.

Q. If you look towards about the bottom third and over on the right-hand side of your E-mail you say "We've built a good factual case with DOJ about the unreasonableness of, open quote, going back, close quotes, and the reliance the agencies put on the, open quote, implement, close quote, definition, period." What did you mean by that?

A. Okay. Let me read it again.

Q. Sure.

A. Well, the first part of the sentence about the unreasonableness of going back would -- would relate to the position of the plaintiffs that we go back and survey these last quarter timber sales.

Q. That's this timber -- that's the timber sales that were awarded between July 1, 1998, and October 1?

A. I don't -- I don't know that they were

awarded. I think they had decision notices between those dates.

Q. Decision notices?

A. I don't think they were awarded --

Q. Okay.

A. -- particularly. There were probably some awards, but I think the dates for the last quarter fiscal year '98 was the decision notices that occurred in that period of time.

Q. Okay.

A. And that the cost of doing that and the delay of doing that was unreasonable. So if that's what -- in terms of expertise, fungi, mycologists are hard to come by; red tree vole, tree climbers are hard to come by. So the cost of trying to beef up and do that sort of survey for this last quarter, in our view, was unreasonable. And apparently, at this point, we had convinced DOJ that that was an unreasonable settlement term to do that.

Q. Oh, is that what you meant by "We built a good factual case"?

A. Right, right. That we had put our information together, the costs, the availability of people, some of the fungi you can -- they only bloom once every five years so you have to keep surveying

for at least six years, you know, to be sure. And so there was a lot of practical impediments I guess in going back and doing these old sales.

Q. And decision notices, just for the record, those are the documents that are signed for environmental assessment that indicate that the environmental work is completed?

A. Correct.

Q. And that has to be done before a sale is advertised and offered to the public?

A. To -- today that's the case. I think back in '98 and years before that we would advertise before the decision notice was out because then we could get our advertisement period taken care of, but I'm -- I'm pretty sure that we never awarded them. I would have to say I'm very sure that we never awarded them until that decision notice and -- had been issued.

Q. And so what was the purpose of signing the decision notice? What was your understanding of what that signified?

A. It's our legal obligation under the National Environmental Policy Act that you do an environmental assessment and then issue a decision so the public knows which alternative you've picked. And that's all public and it's all subject to appeal, you know, which

gives -- which gives us -- gives our opponents a standing to sue us if they participate in that appeal period.

Q. So would it be fair to say that the signing of the decision notice signifies that all of the environmental analysis that was needed in order to approve the sale had been done?

A. Correct, correct.

Q. What did you mean in the second part of the sentence that we've been discussing here about the reliance the agencies put on the implement definition? Is that related to the first part of the sentence?

A. Well, I don't know. You know, when I read it here that we have built a good factual case on point 1 and then as to our reliance the agencies put on the implement definition, I -- yes, it -- yes, it would relate to the first part of the sentence.

And the point of that being is that we moved -- we issued those decision notices in the last quarter of fiscal year '98 in reliance on the definition of implement in that letter. So it sounds obvious at this point, but we had done a fair amount of convincing to the department of justice if we recall Miss Shiffer's and Mr. Coppelman's concern that the implement was nonsense, you know, our definition

of implement was nonsense. So we worked very hard to convince them that it was defendable.

Q. But here you're not talking about the defendability, are you? Here you're talking about the unreasonableness of going back and the reliance?

A. Well, I think that those two are defendable because the settlement efforts failed. So we knew we were in -- we were now in a defensive posture. So I was just intending to compliment our guys for all that they had given us about the cost and expense of going back and that they had been very clear that our reliance on the implement definition from the implement memo had been reasonable.

Q. And substantial?

A. It had been substantial.

Q. Okay.

A. Indeed, yeah.

Q. Okay. The next document I'm handing you has been marked as Exhibit 51.

(Discussion off the record.)

Q. (By Mr. Stevens) All right. Exhibit 51 runs from page 93303 to 93315 in the bottom right-hand corner. And the first page is a memorandum dated November 23, 1998, from you to the regional forest service, Miss Graybeal who was regional deputy

could we survey for more than what the ROD required or could we do it in a speedier way or -- I think he was still -- I don't think -- I think he would have liked to have settled the case and so I think he was fishing for maybe one last ditch sort of offer is how I would take that today.

Q. Okay. Let me just take a quick look at one more document and we may just drop it and free you up for the day.

A. Pick it up? Appreciate it.

Q. Is the timing okay with you?

A. Yeah.

Q. I want just to look at my great book of documents.

Okay. Let's just do one more, I think it'll be fairly quick here, Exhibit 63, and that will bring us to a good stopping point. I've handed you Exhibit 63 which is another one of your E-mails in the form of a more readable version of the text on page 1720 and a less readable version but with a date, if you have a magnifying glass, on page 1719. And the date, as I read it, is December 8th, 1998.

Okay. This is an E-mail from you to Graybeal, Devlin, and Williams; correct?

A. Yes.

Q. Okay. And you are reporting to Bob and Nancy, meaning in the first paragraph Mr. Devlin and Ms. Graybeal, maybe also Mr. Williams.
A. Yeah, I think -- I think probably Williams because he was the regional forester.
Q. Yeah, you would probably put him first.
A. He's important.
Q. You would probably put him first.
A. Yeah.
Q. And I take it you were updating them briefly on what the latest news from DOJ is --
A. M-hm.
Q. -- and you say "DOJ agreed to defend our definition of implement under the ROD to mean NEPA decision." So you learned that on or about the 8th of December?
A. Must have, that's the -- your --
Q. Assuming that's the date?
A. Right.
Q. Whatever the date of this is --
A. Right.
Q. -- it was on or about that date?
A. Right.
Q. And do you recall how you learned about that and --

A. I most likely would have heard that from Ted Boling.

Q. Did he tell you how the decision was made?

A. No.

Q. Okay. Or who was involved in the decision?

A. Not -- no, not that -- not that I recall.

Q. All right. And in the same paragraph, No. 2 --

A. M-hm.

Q. -- you see where it says "To make the defense, DOJ wants to tell the court that even though implement means NEPA decision --"

A. M-hm.

Q. "-- the agencies are going to do the FY '99 12 S-P-P --"

A. Species, that stands for species.

Q. SPP period stands for species?

A. M-hm.

Q. "-- surveys on the last quarter sales anyway (or in the alternative, the cost of doing these surveys is so much dollar sign and so much MMBF forgone for FY 99/2000)."

A. M-hm.

Q. All right. So Mr. Boling is telling you there that they're going to defend the definition but

they still want to tell the court that you'll -- you'll do surveys for the last quarter of '98?

A. '98, m-hm.

Q. And why did he want to do that?

A. Well, your guess is as good as mine.

Q. He didn't give you any reason?

A. No.

Q. Did he --

A. Not that I recall.

Q. Did anyone else give you any reason for this DOJ position?

A. Not that I recall. We all had our ideas why that was.

Q. What was your idea?

A. Well, my idea was that they were trying to appease the environmental community.

Q. Okay.

A. And doing these 12 species surveys that became an obligation in fiscal year '99, to go back and do them on '98 timber sales would be what plaintiffs were asking for in settlement, so if you just put those two things together, plaintiffs are asking for it in settlement and then we have our department of justice political appointees asking us to do what plaintiffs were asking to do in settlement,

you can surmise that they felt some obligation to that community.

Q. Was this something Mr. Lyons wanted to do?

MS. LYNCH: I'm going to object.

THE WITNESS: I don't know.

MS. LYNCH: I was going to say this is speculation on the witness' part so --

THE WITNESS: I don't know.

Q. (By Mr. Stevens) Did you hear from anyone else Mr. Lyons --

A. No, I don't -- I would not hear from Mr. Lyons.

Q. No, no, no. But I mean our people about Mr. Lyons --

A. No.

Q. -- taking a position. Mr. Devlin, for example?

A. No, no. Bob didn't share much of that policy and stuff with me.

Q. In the second paragraph you make a point about unawarded or so-called unawarded FY '98 advertised timber sale volume and DOJ concluding thus no harm to timber industry.

A. M-hm.

Q. What was the forest service's response to

App. Tab 176
Corrected

THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, | ) | |
| v. | ) | No. 01-570C |
| THE UNITED STATES, Defendant. | ) | (Judge Williams) |
| | ) | ORIGINAL |
| TIMBER PRODUCTS COMPANY, Plaintiff, | ) | |
| v. | ) | No. 01-627C |
| THE UNITED STATES, Defendant. | ) | (Judge Williams) |
| | ) | |
| CLR TIMBER HOLDINGS, INC., Plaintiff, | ) | |
| v. | ) | No. 04-501C |
| THE UNITED STATES, Defendant. | ) | |

DEPOSITION OF

ROBERT J. DEVLIN

Taken in behalf of Plaintiffs

* * *

August 21, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

A-1572

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

PORTLAND, OREGON; TUESDAY, AUGUST 21, 2007

1:25 PM

* * *

ROBERT J. DEVLIN

called as a witness in behalf of the Plaintiffs,

having first been sworn by the Reporter,

testifies as follows:

EXAMINATION

BY MR. STEVENS:

Q. Good afternoon, Mr. Devlin.

A. Good afternoon.

Q. Thank you for being here, again. I'm going to hand you what's been previously marked as plaintiffs' Exhibit 39. You can look on with him for a minute.

The first page of 39 you can see is a memorandum by Sue Zike, and feel free to look at that, but I'm really going to ask you a couple of questions about the second page in which as an attachment she includes a E-mail that you sent out. Page 103 of this exhibit shows at the top "Sender: Robert J. Devlin," and that's you, dated October 16, 1998, and it's to distribution. And I understand from Miss Zike and I think from your testimony earlier in the depositions that you had a distribution list that you sent these

kinds of E-mails out to that included a number of people.

A. Yeah, it was -- as I recall, the distribution list was the -- obviously the forests that were covered by the Northwest Plan, region 5 and region 6.

Q. So it would have gone to the ONRC Action litigation coordinators in the forests?

A. I'm not sure who it went to in the forests. I know what units they went to, that's all.

Q. Units meaning?

A. Forest, excuse me.

Q. Forests, okay.

All right. If you look at the text under part 2 on page 103.

A. M-hm.

Q. You may need to read that whole paragraph to get the drift of what you have said here after all this time, but I want to ask you, when you get to it, a question about the very last three lines and the statement that says "If you have bid openings before we decide to award these sales, make your standard announcement before the bid opening that tells prospective bidders that the sale is currently under litigation."

A. Okay.
Q. All right. Now, was that standard announcement oral or was it in writing?
A. As -- as I -- well, I can't tell you how it was done on each forest. I know how it was done when I was on a forest. It was orally announced before the bid opening.
Q. Okay. So this is a standard announcement that predates the ONRC Action litigation, prior --
A. Yes.
Q. -- to July 1998?
A. Yes.
Q. And -- and do you recall it's correctly characterized there as telling prospective bidders that the sale is, one, currently under litigation and, two, award may be delayed?
A. Yeah. This -- this announcement would have said that. Some announcements may not have had those exact words, Gary.
Q. Okay. That was the intent --
A. Yes.
Q. -- to convey those two pieces of information?
A. Right.
Q. Was there any announcement that, to your

knowledge, was crafted for the ONRC Action litigation?

A. If there was, I wouldn't know it. I don't -- I don't recall any -- any special announcement.

Q. Staying with that same paragraph on page 103, the very middle of that paragraph you say "Until we know where these discussions," meaning settlement discussions, "are headed, do not award any of these sales." Was that a direction that you had occasion to give from time to time during the ONRC Action litigation while settlement talks were going on or was this a one-time affair?

A. I don't -- I don't know if we had -- if we did -- if we gave that direction more than once. I do know that it's -- that it was not only the ONRC lawsuit, we had other lawsuits where we gave some of the same direction, especially where there was negotiations going on.

Q. Now, when you sent this out to the distribution list, I assume that included all the forests within the Northwest Forest Plan so it would have included, for example, the Klamath even though it was in region 5?

A. Well, what I don't know is if this went to a distribution list for just those forests that were

covered under this lawsuit or whether it went to a distribution list that had all the Northwest Plan forests in it which would include the Klamath, Shasta, Trinity, Mendocino.

Q. Okay.

A. I don't -- because I don't recall whether that specific lawsuit had sales on all those forests or not.

Q. Well, just for informational purposes, turn to the next page, 104, and, if you want, look at 105. On 104 you'll see a -- an E-mail from Brian Stone. And you recognize his name --

A. Yes.

Q. -- as an official in region 5 of the forest service?

A. Right.

Q. And you also see Ed Matthews and the Klamath National Forest. And Mr. Matthews was a contracting officer on the Klamath National Forest at the time?

A. M-hm. Yes, excuse me.

Q. And the reference here in the middle is to a Jack Heli sale.

A. Oh, here, yes.

Q. And the Jack Heli sale is listed in a typed table on page 105 in about the middle, you can see the

title of it if you look in the -- turn it sideways, look at the far left-hand corner, it says "Region 5 timber sales ONRC Action." So I would assume that your distribution reached people like Mr. Matthews on the Klamath?

A. Yeah. Well, it -- I think what I said was if the -- if the forest had a sale that was included in this lawsuit in region 5, they certainly were on the distribution list.

Q. Right.

A. And also Brian I guess. That distribution list was something that Sue Zike made up for all the communications so --

Q. Let's go off the record for just a moment.

A. Can I go back on this, too?

Q. Let's go back on the record for a minute.

A. No, then we won't go back.

Q. What were you about to say?

A. Well, I don't know how it ties into Sue's letter -- or Sue's note, that's the --

Q. The Klamath reference?

A. Yeah.

Q. It may not. It's just there to refresh your recollection.

A. Okay.

A. Yeah, like the survey protocol, No. 12, on 93320, salamander protocol not being followed on GP, that -- that's stuff that I would never have known on the --

Q. Okay. Let me ask you to keep turning in this document to two pages from the end. It's a page lower right-hand corner TAB 93325.

A. 25?

Q. Yeah.

And that is an E-mail from you to Sue Zike, Peggy Kain, and it looks like Judy Nelson dated November 28th, 1998.

A. M-hm. Yes, I see that's from me.

Q. In the first part of this you're referring to Sue and Peggy and so that's Sue Zike and Peggy Kain, and you say "I left you voice mail about Nancy's suggested changes to briefing paper." That would be Nancy Graybeal?

A. Right.

Q. "She and I talked about it and her thoughts are that if we just hang our hats on costs and delay in sales coming out, the response from DOJ doesn't seem to care about that." What were you referring to there?

A. Well, as I review it now, I -- I assume that

it meant that the -- just 'cause it cost us more money in delayed sales, that that's not -- that that's not an issue that DOJ cared about at that time.

Q. Right.

And why did you think that was the case, given that selling a certain volume of timber was one of the government's objectives in the Northwest Forest Plan?

A. I have no idea why the response from DOJ doesn't seem to care about that because I don't think the response from DOJ discussed anything about the meeting the target. That was strictly an internal forest service concern.

Q. Well, I understand that you and Miss Graybeal came to the conclusion that if you just hang your hat on costs and delay and sales coming out, the response from DOJ doesn't seem to care about that, and I understand that to mean that if you were going to persuade DOJ to defend the forest service in this case, it would have to be defense that dealt with more than just costs and delay that you were going to incur.

MS. LYNCH: Objection to the form of the question.

Q. (By Mr. Stevens) Am I -- am I reading that

wrong?

A. All I know is that when we had the -- we had the discussions with the DOJ lawyers, it was always -- the question was always are there resource reasons, are there cost reasons. You know, there's more than just costs and delay. We had some sales, for example, that were fire salvage so obviously we wanted to get them if we could get them awarded and get them moved. So it wasn't just -- it just wasn't the costs involved in the delay in the sales. It was just in the -- that wasn't the only discussion we had with DOJ.

Q. In other words, there were other objectives in the Northwest Forest Plan and that included resources, protecting resources?

A. Yeah, I didn't -- I'm not putting my answer in the context of the Northwest Plan. I think I'm putting in the context of there were -- there were -- we were answering questions about what were some of the reasons that we should go forward with award of sales so we could feed that back to the DOJ lawyers so when they negotiated with the plaintiffs they had that information. Costs and delay of sales was obviously part of it, but there was also resource reasons.

Q. Okay. The next -- then the next sentence you write "Those are facts of life for sure but if

they don't agree with our definition of implement and think the market is low so who cares about delay in sales, then we need to build response with her suggested changes but still include the facts you have in the draft." I assume the they you're referring to in that sentence is the department of justice?

A. I'm not sure. I don't know who they is.

Q. Do you ever recall, at any point in time, anyone in the department of justice expressing any concerns about the interpretation of the Northwest Plan surveys known as NEPA decision equals implementation?

A. I never had any discussion with anybody in the department of justice that indicated any concern. There may have been, but I'm not aware of it.

Q. Did you ever hear about that from Miss Zike, that the DOJ had those concerns?

A. Boy, I don't -- I don't remember if I did or not.

Q. Okay. Do you remember there was a time after the complaint was filed when DOJ was considering whether they would defend that interpretation in court or not?

A. I don't -- I don't recall that at all.

Q. Do you recall a DOJ official known as Lois

Shiffer?

A. I know who Lois it. I met her one time at another meeting.

Q. And Peter Coppelman, is that a name that is familiar to you?

A. Peter was there also at the same meeting.

Q. Were you ever made aware that Miss Shiffer and Mr. Coppelman said that the interpretation NEPA decision equals implementation was nonsense?

A. No, I had -- I'm not aware of that.

Q. You never heard that?

A. I don't recall hearing that.

Q. Okay. You don't recall one way or the other?

A. No.

Q. You might have heard it or you might not have heard it?

MS. LYNCH: Objection, asked and answered.

Q. (By Mr. Stevens) Well, as you know the word recall is a little ambiguous. I just want to know whether you just don't know one way or the other or whether you know it was never mentioned to you.

A. I don't -- I don't know that it was ever mentioned to me --

Q. Okay.

A. -- about their -- any concern they may have had.

Q. So your answer is you just don't know?

A. No.

Q. All right. And as you look at this E-mail today, the pronoun they in that sentence that I read to you, you don't -- you don't know whether that refers to the justice department or not?

MS. LYNCH: Objection, again, asked and answered. You can go ahead and answer if you can.

THE WITNESS: I -- I'm not -- I'm not sure who they is. I think I'd be guessing if I tried to interpret who they are.

Q. (By Mr. Stevens) And that next sentence where it says "The other thing that I think we both," looks like forest service slash BLM, "have to remind these folks is that our current effort to change schedule of survey with EA and EIS effort to make other changes has to be considered when DOJ decides whether they agree with our proposals." Wouldn't you agree with me that the pronouns they in that sentence and in the previous sentence refers to the justice department?

MS. LYNCH: Objection, form.

THE WITNESS: Well, as I read it, I can't --

I can't really tell who they is. I don't know if it's DOJ or whether it's the plaintiffs.

Q. (By Mr. Stevens) Well, continue on in that paragraph and you come to a sentence that reads "The trick is going to be to get both WO's," meaning Washington, "office and secretary's offices to support where we are and not let DOJ decide for us." Now, that's clearly department of justice; right?

A. Yes.

Q. And then you say "Not being able to defend us is one thing but not agreeing with what we are doing is another." And you're obviously there referring to the justice department; correct?

MS. LYNCH: Objection. The witness should answer to the facts in the E-mail, not your interpretation, Mr. Stevens.

MR. STEVENS: He wrote the E-mail.

THE WITNESS: Can I hear the question again?

MR. STEVENS: Why don't you read the question back. Let's see how clear it was.

(The reporter read the record as follows:

"Question: And then you say "Not being able to defend us is one thing but not agreeing with what we are doing is another." And you're obviously there

referring to the justice department;
correct?")
MS. LYNCH: And the objection stands, the witness should interpret his own E-mail.
THE WITNESS: Well, as I -- as I interpret that sentence, because I'm saying defend us, I'm assuming, again, and I think I'm correct, that I was, with that sentence, talking about DOJ because that's who was defending us.
Q. (By Mr. Stevens) Okay.
A. Or deciding whether they could defend us.
Q. What did you mean by "Not agreeing with what we are doing is another"?
A. I -- well, as I read the sentence, I believe what I meant was that being able to defend us and giving us legal reasons why they can't defend us is one thing, but not agreeing with what decision we're making as an agency is another.
Q. Now, given what we've just read through in this paragraph going back to my previous question where you say "Those are facts of life for sure but if they can't agree with our definition of implement and think the market is low so who cares about delay in sales, then we need to build response with her suggested changes," etcetera, etcetera, the they there

is the department of justice; isn't it?

MS. LYNCH: Again, objection, and let the witness interpret his own E-mail.

THE WITNESS: Again, I'm not sure I can say for positive that they is department of justice or that it may be the plaintiffs not agreeing with our definition of implement.

Q. (By Mr. Stevens) And the plaintiffs think the market is so low so who cares about delay in sales, is that something the plaintiffs in this case would say?

A. I can see where the plaintiffs could say that with a negotiation because on their part if in fact we're using reasons to award that include, as was in one of the other documents, award a two-year sales, I can see where the plaintiffs would make the argument that if the market's low who cares.

Q. In this last sentence that we talked about just a moment ago where you were talking about the justice department and you talked about the department not being able to defend us, where did that information come from?

A. I don't see where you're saying -- I don't see where that says department -- not being -- are you talking about the last sentence, "Not being able to

defend us"?

Q. Yes. That must be the justice department, I believe that's what you testified before.

A. Yes.

Q. So what --

A. But I'm not sure I know what -- I'm not sure I understand the question you just asked me.

Q. The question is -- the question is: How did you learn that the justice department would not be able to or might not be able to defend the forest service?

A. I don't think -- I don't think that says that I learned anything. All that is is statement on my part that says not being able to defend us is one thing but not agreeing with what we were doing is another.

Q. I understand that. I'm focusing on the first part because I can't believe you made it up. You must have had some basis in fact for reaching the conclusion that the justice department might not be able to defend you.

A. If -- I don't recall. I don't remember any specific where on this case they said they were not going to defend us.

Q. And do you remember the issue being raised

at any point as to whether they would or not defend you?

A. The only -- the only place that I remember whether they were going to defend us on this case was on the individual sales. That's why the negotiation was going sale by sale by sale rather than just carte blanche. That's the -- that's the only place I remember any -- any discussion about being -- whether they were going to defend us or not defend us.

Q. On the next page, 93326, there is an E-mail from Nancy Graybeal -- Graybeal, excuse me, to Miss Kain, Miss Freedman, and to you dated November 27th, 1998. If you look at her E-mail you'll see that she's discussing markups on a draft prepared by Miss Zike. Miss Zike has previously testified about that. And if you look more carefully at her E-mail you will see that, in part, Miss Graybeal says "Let's be clear about what we're recommending (no settlement) and why." And then later on in the E-mail she says "If our only why is that R6 won't get the next year's timber program out, we'll likely be told to settle." Do you see that?

A. M-hm. Yes, I see it.

Q. And did you agree with that at the time?

A. Let me read it.

I don't -- I don't remember this E-mail. Doesn't mean it didn't happen. There were lots of E-mails. But I'm not sure where Nancy was -- was getting this opinion from.

Q. Did you share it?

A. I have never shared -- no, I don't recall sharing this with Nancy.

Q. Well, my question is whether you shared that opinion with her.

A. Oh, whether I -- my opinion?

Q. At that time, did you believe that was true?

A. Boy, I don't even know if we had this discussion or if I had this discussion.

Q. Put Miss Graybeal out of the question here. My question is: At the time, did you believe it was true that if R6 could only show that they couldn't get next year's timber program out if there was a settlement, the justice department would likely tell R6 to settle the ONRC Action litigation?

A. I -- the whole time I was in the regional office with the responsibility of having the timber program under me in regards to what the job was I don't -- I never was told that not getting the next year's timber sale program was -- was -- was a satisfactory answer, so I don't -- I don't believe

that I've ever had that opinion, that -- whether they decide to settle or not or recommend we settle or not, getting the timber program out was a very important mandate that we had.

Q. I understand that. So my question is: Do you agree -- did you, at that time, agree with the statement or not agree with it, the statement being "If our only why is that R6 won't get the next year's timber program out, we'll likely be told to settle"?

A. I -- I can't tell you whether I agreed with it at the time or not, but I know if someone asked me that today the answer would be no, that I wouldn't agree with it, because the -- getting the timber program out was the mandate we had, one of the mandates for the Northwest Plan.

Q. So for you at that time, that was reason enough not to settle, just the fact that you wouldn't be able to get the timber sale program out if you entered into a settlement as it was then proposed?

A. Well, it wasn't -- it wasn't my responsibility or my authority to say whether we settled or didn't settle. My responsibility was to help the region get the timber sale program out. So the settle -- the settle side of the question was never something that I had to decide on.

Q. You didn't weigh in on that ever?

A. We had recommendations about impacts of settling for sure including getting the timber sale program out, but the discussions about settlement whether -- whether we should settle or not settle was usually between department of justice legal counsel and the executive officers which Nancy is one of.

Q. So what input did you have?

A. Impacts.

Q. What impacts did you forecast?

A. Oh, no. I'm not talking about specifically on this letter. I'm talking about what I -- what my responsibility would have been would have been to project what the impacts would have been if we settled the program, costs, resource damage, if there were fire salvage sale, that sort of thing.

Q. So what, in general, was your recommendation or your projection of impacts with respect to this settlement?

A. I don't -- I don't recall or remember what any recommendation was except that I know that I would certainly have covered information and impacts on those subjects I just brought up.

Q. Were you against it because it would have made getting the timber out anywhere near the

projected targets impossible?

A. Well, I'm assuming, from this E-mail, that getting out timber -- next year's timber program out meant that we were not going to be able to meet our target.

Q. So what is the answer to my question?

A. Ask the question again.

Q. If you'll read it back to him.

(The reporter read the record as follows:

"Question: Were you against it because it would have made getting the timber out anywhere near the projected targets impossible?")

THE WITNESS: Was I against the settlement?

Q. (By Mr. Stevens) Yes.

A. Oh. I was never asked an opinion, personal opinion, about whether settlement was good or bad. That was not my discussion. The discussion had to do with here's the facts, execs, here's what the impacts are. Then the discussion about settlement or nonsettlement was usually between department of justice, sometimes the Washington office secretary's office got involved, and the executives. In this case it would be the regional forester and deputy regional forester.

Q. And what were your discussions here?
A. Impacts.
Q. And what impact did you forecast?
A. If -- again, going to this because I don't -- I don't remember what exactly what the impact was, based upon what I'm reading in this E-mail, they -- if Nancy's saying we will not get next year's timber program out, she had to get that from me.
Q. Okay.
A. Because she wouldn't have known it without getting it from our staff.
Q. Okay. Do you have an Exhibit 54 in the book in front of you?
A. Yes.
Q. Would you turn to that, please.
This is an E-mail from Nancy Graybeal dated November 25, 1998.
A. 1720?
Q. No. This would be Exhibit 54, Exhibit 54.
A. Oh, excuse me, I went too far.
Oh, here, all right.
Q. So you see the Graybeal E-mail, the date of November 25, 1998?
A. Yes.
Q. And it's addressed to you and other people?

A. I -- I would have to guess about what.

Q. You have no recollection? This doesn't refresh your recollection at all?

A. May I go back to the previous --

Q. Oh, of course. You can look at anything you want.

A. What was the number?

Q. 50.

A. The previous.

MR. WAH: 50, just the one before that, Bob.

THE WITNESS: The only thing I want to see is the date.

Q. (By Mr. Stevens) Sure.

A. No, I don't know, because I -- what I thought it might be is a reference to this briefing that went back, but that's dated after this E-mail from Nancy Graybeal, so I'm not sure what this is referring to.

Q. In your work for the forest service dealing with the ONRC Action litigation, you worked very closely with Miss Zike; isn't that right?

A. Yes.

Q. In fact, I think in your previous deposition you described the two of you as being joined at the hip with respect to this?

A. Pretty much.

Well, her and our staff, yes.

Q. So would it refresh your recollection if I represented to you that she has testified that the nondecision from Lois Shiffer referred to on plaintiffs' Exhibit 54 was Miss Shiffer's nondeciding whether the justice department would defend forest service on the NEPA decision equals implementation issue?

MS. LYNCH: Objection, the question has been asked and answered several times.

THE WITNESS: That doesn't -- that doesn't clarify it for me because it's still -- I can't tell whether this particular E-mail was referring to that specific question or not.

Q. (By Mr. Stevens) Okay. As we sit here today, though, you have no reason to dispute Miss Zike's testimony about this E-mail?

A. I -- I would have no reason to dispute anything about what Sue says.

Q. Okay. Do you have an Exhibit 59 in your book?

MR. WAH: He does not.

MR. STEVENS: Okay.

MR. WAH: Hang on, it's right here.

App. Tab 185
Corrected

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC., )
Plaintiff, )
v. ) No. 01-570C (Judge Williams)
THE UNITED STATES, )
Defendant. )

TIMBER PRODUCTS COMPANY, )
Plaintiff, )
v. ) No. 01-627C (Judge Williams)
THE UNITED STATES, )
Defendant. )

CLR TIMBER HOLDINGS, INC., )
Plaintiff, )
v. ) No. 04-501C (Judge Williams)
THE UNITED STATES, )
Defendant. )

CERTIFIED COPY

DEPOSITION OF ~~ROBERT~~ RICHARD HOLTHAUSEN
September 30, 2007
Flagstaff, Arizona

PERFORMANCE REPORTERS, INC.
121 East Birch Avenue, Suite 501
Flagstaff, Arizona 86001
By: Lerryn Horton Roberds, RPR, CCR

responsibility for coordinating the work of wildlife ecologists in each one of the Forest Service regions, and in that capacity, I gave them a lot of guidance on technical aspects of the wildlife job in the Forest Service.

Q. You retired from that position January 3, 2007. When did you first start that work -- that position, approximately?

A. I believe it was 1991.

Q. And what were you doing before you became the National Wildlife Ecologist?

A. I was the Wildlife Ecologist for the Pacific Northwest Region.

Q. That would be for the Forest Service?

A. For the Forest Service, yes, headquartered in Portland.

Q. Headquartered in Portland?

A. Right.

Q. By the way, do people who know you well call you Holt, H-o-l-t?

A. Yes.

Q. Okay. Did you have any involvement with the development of the Northwest Forest Plan?

A. Yes.

Q. Would you just describe that involvement

generally for me.

A. I was one of the members of the FEMAT Team, the Forest Ecosystem Management Assessment Team. That's the group that came together to formulate options for the Forest Plan and to evaluate effects of those options.

I then became the leader of what was called the Species Analysis Team, which is the team that did further analysis on -- I don't remember -- 600, 800 species between the draft and the final EIS for the Northwest Forest Plan, and I consulted a bit on the ROD when it was developed.

Q. By the way, a moment ago when I asked you if you were employed and you said you were retired, congratulations, by the way. Are you working anywhere as a volunteer or --

A. Not at the current. I've done a couple --

Q. You're not doing consulting on your own, or anything like that?

A. I've been asked to do a couple assignments, but they've been fairly brief; a month, or two.

Q. So the fact that we're meeting in this room for your deposition is just a courtesy that has been afforded to you?

A. Exactly.

Q. And you live here in Flagstaff or in the area?
A. Yes, I do.
Q. What is your address?
A. It is 778 Pawnee, P-a-w-n-e-e, Street, in Flagstaff.
Q. In Flagstaff.
A. Do you need a zip?
Q. If you have it handy.
A. It's 86001.
Q. Thank you. Going back to your career with the Forest Service, you said that you served on the FEMAT Team and you formulated options and, I guess, evaluated the effects for those various options?
A. The team did, yes.
Q. That would be on the Northwest Forest Region 6 and Region 5 forests, or --
A. And it included BLM lands, also.
Q. Excuse me.
A. And it didn't include all of Region 5. It included the range of the northern spotted owl, basically.
Q. If I said the northern spotted owl forests meaning the physical area covered by the Northwest Forest Plan, that would be correct?

A. Yes.
Q. You were looking at that area when you formulated those ~~duties~~ options?
A. That's correct.
Q. That was for the Forest Service; is that right, or were you --
A. Well, it was an interagency group.
Q. You said that when you were the leader of the Species Analysis Team, that you and other members of the team did some kind of further analysis on species that had not been done prior to that in the planning process?
A. It supplemented analysis that had been done prior to that.
Q. So prior to you being the leader of the Species Analysis Team, there had been some work done on evaluating various wildlife and plants in terms of certain activities going on in the northwest forest that occurred before you got in this position?
A. Analysis was done of the projected effects of the alternatives on those plants and animals.
Q. So I think I have the sequence now right. Let me know if I've got it right. There were alternatives that were being evaluated in an Environmental Impact Statement?

A. (Shakes head)
Q. No?
A. The work of FEMAT was completed before the Environmental Impact Statement was initiated.
Q. But you looked at alternatives under FEMAT?
A. Exactly.
Q. And these alternatives were evaluated in terms of their potential impact on wildlife and plants?
A. Yes.
Q. And then when you served on the Species Analysis Team, you evaluated the impact on other species, or these alternative --
A. No.
Q. That's what I need you to tell me in detail.
A. It was a sub-set of the full set of species that had been initially evaluated, so it was additional analysis on a sub-set of those species, and the numbers were roughly -- I think we evaluated 1100 species in the first analysis, and in the additional analysis we evaluated somewhere between 400 and 600 of them in greater detail.
Q. Why was that done? Why was the second analysis done?

A. It was done -- that analysis -- first off, that was done subsequent to the publication of the draft EIS. The projected effects for these 400 to 600 species had been not particularly favorable under the alternative that was identified as the preferred in the draft EIS, and so we were asked to look at them again.

Q. When we're talking about the draft EIS, we're talking about the draft Environmental Impact Statement for the Northwest Forest Plan?

A. Right.

Q. When you say not favorable, you mean not favorable to species under the preferred alternative in that draft?

A. Exactly.

Q. Was that Alternative 9 at that time?

A. Exactly.

Q. Okay. So how was a decision made to go back and do this additional analysis?

A. (No response)

Q. Did someone tell you to do it, or --

A. I don't know how the decision was made. I was asked to do it.

Q. And I take it that this work was being done because it was thought that these species or some of

them might need some additional protective measures that were not in the draft plan?

A. That's right.

Q. And the objective here was to make sure that the preferred alternative did not lead to the extirpation of any of these species?

A. Basically that's correct, yes.

Q. Do you want to fine-tune that for me?

A. Yeah. The objective of the team that I led was to identify potential measures that could be incorporated as mitigation to the preferred alternative that would achieve that objective of not mitigating those species.

Q. Did this initial analysis that you were involved in, involve doing surveys?

A. You mean actual field work?

Q. Actual field work.

A. No. It did not.

Q. Okay, but were surveys thought to be necessary for at least some of these species?

A. That was one of the outcomes of this additional analysis.

Q. It was a conclusion that you reached?

A. That was one of the measures -- potential measures that we identified as mitigation for those

species.

Q. And would I be correct, then, that the idea was that once the information from these surveys had been evaluated, the agencies would then be in a better position to devise specific protective measures, if needed, for a particular species?

A. That's correct, but, I mean, there were several different levels of that strategy identified, some with more immediacy than others.

Q. They're developed by the Northwest Forest Plan in its final form of a process -- perhaps I should say two related processes called Survey and Manage. Are you familiar with that?

A. Yes.

Q. What is your understanding of that generally?

A. Well, my understanding of it is that it evolved from the potential measures that we had identified, and that the Survey and Manage Program consisted of -- I think four components, and different species fell out under different components. For some of those species, there were surveys required prior to activities on the ground with the intent that some mitigation measures might be undertaken for those species that were discovered by those surveys, and for

others, the intent was to do much longer term surveys to basically enhance the overall knowledge of those species.

Q. Do you recall that there were, I believe, four categories --

A. Right.

Q. -- of surveys? We'll get to the ones we need to talk about in a minute and make sure I'm on the same page here. This might help us do that. I'm going to hand you Plaintiff's Exhibit 137. Feel free to take your time to look at any of these documents that I'm going to hand you before you answer questions. I may ask you questions before you've read the entire document, and I don't want to prevent you from doing that, but sometimes we're not going to go through the entire document, so it doesn't matter.

Let me identify this for the record. The first page is a memorandum dated September 5th, 1995, and it refers to some draft notes from the December 2, 1994 Survey and Monitoring Committee meeting, and if you turn to that next page of the document, you see those meeting notes, and under the attendees, you are listed.

A. (Nods head)

Q. And in your capacity as the Species Analysis

Team Leader?

A. Yes.

Q. Now, I think you testified earlier in this deposition that you had some involvement in the implementation of the Northwest Forest Plan, for some period of time, anyway?

A. I don't think we discussed that earlier, but --

Q. I'm sorry. I thought we did. Did you?

A. Um, I was actually asked to participate on the Watershed Analysis Team which was devising processes to be used for watershed analysis, which was one of the components of the plan, and I was asked to consult several different times on the Survey and Manage provisions.

Q. It is that consulting on the Survey and Manage provisions I want to focus on, and I believe this document a meeting you attended which ~~at which you were at a meeting~~ dealt with Survey and Manage questions. We'll go through this, and you may have a better recollection, as you do.

But do you recall being at this meeting in December of 1994? It may have been, in fact, the very first meeting of what became the Survey and Manage core group.

MS. LYNCH: I'll object to that. Assumes facts not in evidence.

MR. STEVENS: I'm just suggesting to see if it refreshes his recollection, is all.

THE DEPONENT: I don't remember being at this specific meeting.

BY MR. STEVENS:

Q. Okay. If you look under "Purpose" on the second page, we're still in about the middle of that paragraph, it says, "This meeting was convened to clarify both the intent behind the development of the survey and manage standards and guidelines and to address the meaning behind some specific terms or phrases," and in that regard, at the very bottom of that paragraph, it says, "Richard Holthausen, the team leader for the Species Analysis Effort, has more fully addressed the background and intent of the survey and manage standards and guidelines in the enclosed paper, open quote, Development of the Survey and Manage Measure," close quote.

If you would turn forward one, two, three, four more pages, there is a typed document that says, "Background and Intent from R. Holthausen. Development of the Survey and Manage Measure," and I take it this is a document that you prepared, or at

least you prepared with others?

A. I'm sure I did.

Q. Okay. Incidentally, do you recall working with a Mrs. Cheryl McCaffrey when you were working on the Northwest Forest Plan?

A. I remember that Cheryl actually became the lead on -- I believe, on the Survey and Manage --

Q. That's correct.

A. -- working group, and so when I came to meetings to consult with that group, I certainly worked with her at those meetings.

Q. Okay, and do you remember also working with a Mr. Randy Hickenbottom?

A. Yes, I do.

Q. Do you remember what his function was at those meetings?

A. He was -- I believe he was just another one of those team members at the Survey and Manage working group.

Q. And how about Tom Hussey, H-u-s-s-e-y?

A. I remember Tom. I don't remember him in regards to Survey and Manage.

Q. Do you remember working with him at all in other respects?

A. No. I remember interacting with him, but

never formally working with him.

Q. Robin Lesher, L-e-s-h-e-r?

A. Yes.

Q. Is it Ms. Lesher, or Mr. Lesher?

A. Ms.

Q. What was her function with respect to Survey and Manage?

A. She actually was one of the members of that Species Analysis Team that I had led.

Q. Okay.

A. She may have gone on to become a member of the core group, the working group. I don't know.

Q. Okay. If you will go back to that page that has meeting notes at the top of the second page of the exhibit in front of you, turn to the third page. Looking at the bottom of the page, there is some handwriting, "Weak," exclamation point, "Decision by who," question mark. Do you recognize that handwriting?

A. No.

Q. It is not yours, as far as you know; is it?

A. Not as far as I know.

Q. Just turn to the next page, if you would, and on this page, you see certain strategies addressed, Strategy 1, Strategy 2, Strategy 3, and

Strategy 4. Strategy 2 is entitled Survey prior to ground-disturbing activities. Is that the category that you were talking about before when you said that certain surveys had to be done prior to certain ground-disturbing activities?

A. That's correct.

Q. Where it says here, "This strategy was designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon, and for which adequate searches could be conducted in a single year." Does that ring a bell with you?

A. Those were criteria for including the species in that strategy.

Q. For clarification, what did the term "high-risk species" refer to? What kind of risks?

A. Basically risk of extirpation.

Q. And that is also what "persistence concerns" refers to, I assume?

A. Right.

Q. I'm making sure of your statement. Let's turn back to your paper, the Development of the Survey and Manage Measure. As we look at this copy in front of you now, do you recall when you prepared this paper, approximately?

A. I mean, I think we could place it in time by looking at the day of the meeting and the date of the EIS, but I don't have a specific recollection.

Q. I think I have another copy I'll show you in a minute. I'm not trying to trick you. We'll date it 1994. After April of 1994, but before the end of December of 94.

A. That sounds reasonable, but I have no recollection of the date.

Q. That's fine. In the first paragraph of this paper where you refer to, "Relatively low ratings in the draft EIS," what is that in reference to?

A. That is again a reference to the risk assessment that had been done in the draft EIS, and in this instance, low ratings would imply high risk.

Q. If you come to the next sentence beginning, "Consequently," where it says, "The experts tended to project favorable outcomes for them only under those alternatives that prohibited activities on virtually all federal lands." Can you explain in a little more detail what you meant by that?

A. That is a reference to the alternatives that were considered first by FEMAT, and then considered in the draft EIS, and it refers to the evaluations that were done of those alternatives, and it suggests that

the only alternatives for which ratings for these species ~~were placed in a fairly-secured position~~ indicated a favorable outcome, were those alternatives where there was very little activity on federal land.

Q. Meaning no timber sales or other ground-disturbing projects.

A. That's correct.

Q. And "favorable outcomes" means avoiding extirpation?

A. That's right. It means low risk, yes.

Q. If you look down at the second paragraph, one, two, three, four lines down, over to the far right, there is a sentence that begins with this language. "The Species Analysis Team, in conjunction with the EIS team, developed measures that would accomplish this objective," and I'm interested -- I think I know the Species Analysis Team. You described what they did. Who were you referring to by the EIS team here?

A. We -- during the work -- throughout the work of the Species Analysis Team, we actually coordinated very closely with the EIS team, which was obviously already in place because they had prepared the draft EIS for the Northwest Forest Plan. So it's referring to the -- to members of that team with whom we

coordinated and interacted.

Q. And if you turn to page 2 of your paper, the first full paragraph that bears the heading "Survey prior to ground-disturbing activities and manage sites that are discovered," open paren, "Strategy Roman number II," close paren, in the first line you say, "This is probably perceived as the most restrictive of the survey and manage strategies." What did you mean by "restrictive"?

A. In that context, I think the meaning of "restrictive" is that it would have some effect in restricting activities on federal lands, or potentially have some effect on restricting activities on federal land.

Q. This was the most restrictive in that regard; the Strategy II?

A. Correct.

Q. And at the bottom of this paragraph we're looking at right now, just to summarize, ~~that~~ you say that one could go about trying to define "ground-disturbing activities" or perhaps prepare a list, but then you say, "A checklist of activities that would be included in this category could be developed, but it might do more harm than good." Why would it do possibly more harm than good?

A. (No response)

Q. Is that what you said?

A. And we're talking strictly about the Species Analysis Team; is that correct?

Q. Well, yes, right now.

A. To my recollection, they did not.

Q. Did you individually make a recommendation?

A. I do not recall making a recommendation on those dates.

Q. Were you consulted on either of those two questions?

A. I believe that I was, but I don't have clear recollection of the discussions that ensued.

Q. What is your best recollection of those discussions?

A. My best recollection is that they occurred, but I can't even tell you who they occurred with.

Q. Let's stay on the same page of your paper, but look at the last paragraph. It says, "Conduct extensive surveys and manage for the species on high-priority sites (Strategy III)." Do you see that?

A. Yes.

Q. That involves Strategy III and not Strategy II, but it carries on over to the paragraph on the very next page, and the last sentence of that

paragraph states, "While no completion date is stated for the strategy, it would obviously be ineffective if the completion of surveys took so long that the risk of extirpation of species substantially increased."

Now, I take it that was your conclusion and interpretation of the Strategy III survey requirements. Right?

A. Yeah. It's in my paper, so, yes, we would have to conclude that.

Q. Would that also apply with equal strength to the Strategy II surveys?

A. Well, I mean, I think the terminology would be a little bit incorrect because, you know, "Completion date" is not something that was part of the Strategy II concept, but I think the general concept, is correct that the more time passed and the more activities that were undertaken prior to effective implementation of these strategies, would increase risk to species, but that's a very general statement.

Q. And the activities you were referring to, they were ground-disturbing activities like timber sales?

A. Correct.

Q. At the very bottom of this page we're on right now, in the last two sentences of the last

implemented in a timely and credible way," it seems to me that at that point you are speaking to the timeliness of the surveys. Is that right?

A. I certainly am, but with no specificity.

Q. But you're emphasizing that it is important?

A. Yes. That's correct.

Q. And I take it that would be because if the surveys were not performed in a timely fashion and too much time expired before those surveys were completed, that would increase the risk to the species that were being surveyed, the risk of extirpation?

A. That would certainly be the underlying assumption. Although, our knowledge of these species was so poor that it would be impossible to quantify that increase in risk.

Q. Right, but one of the fundamental purposes of the surveys was to acquire a sufficient knowledge base to have a better idea of the degree of the risk. Is that correct?

A. That's correct.

Q. Please take a look at Plaintiff's Exhibit 142. There are several documents here that are attached to this first page of Exhibit 142. That is the way the documents were produced to us by the Government, and I assume that they go together. If

team, so I certainly don't recollect whether I had interaction with them.

Q. Did -- did the Forest Service, to your knowledge -- let me rephrase that question. To your knowledge, did anyone in the Government ever try to assess the impact on Strategy II species if the surveys were implemented as of a particular date; for example, October 1, 1996, or October 1, 1998?

MS. LYNCH: I'm going to object to that question. It's very, very broad and vague. Anyone in the Government?

THE DEPONENT: I was actually asked that question in a general sense at one point in time.

BY MR. STEVENS:

Q. At what point in time were you asked that question?

A. Boy, I cannot give you a specific date when it was asked to me. It was -- I can tell you it was prior to January of 1997, but that's about all I can tell you.

Q. Why does that time period stick in your mind?

A. Because that's when I moved from Corvalis to Flagstaff.

Q. Who asked you the question?

A. Don Knowles.

Q. And so what more specifically did he ask you?

A. He asked me if we could do an assessment of effects of ~~effective~~ different implementation dates of the Survey and Manage ~~Team~~. strategies

Q. Did he tell you why he wanted this information?

A. I don't recollect that he told me why he wanted it.

Q. Did he make this request to you in writing?

A. I don't recollect that it was in writing.

Q. Was it in a face-to-face meeting?

A. Boy, I just don't recollect.

Q. Was anyone else there when he made this recommendation to you?

A. I don't remember anyone else. It wasn't a recommendation. It was a question.

Q. Excuse me. The question. I used the wrong word.

A. Right. I don't recall that there was anybody else there.

Q. Did he give you specific dates to consider?

A. I don't recall specific dates, no.

Q. And so what did you tell him?

A. My recollection is that I told him that in general, one could reasonably assume that delay of implementation of the strategies would result in some negative effect for some species, but that it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects.

Q. Now, I take it that you didn't mean to tell him that that would be impossible no matter how late the implementation date was. For example, if you decided not to actually implement the surveys until 25 years after the issuance of the plan, you wouldn't have to do a whole lot of basic ground work to reach a conclusion that that could have serious implications?

A. You know, I don't think we specifically discussed time frame, but I also believe that the understanding was that we weren't talking about a period as long as -- I mean, certainly we were talking about a period within the normal EIS cycle, the normal forest planning cycle, so it would not have been a period as long as 25 years.

Q. Why in your view was it not possible to reach a conclusion about the level of negative effect?

A. Again, because the level of knowledge of these species was very poor. We did not know at what

locations we might find species if we went out and surveyed for them, and we didn't even know with any certainty where any activities would take place over that period of time.

Q. Okay. So you were telling him that there could be little negative effect, or there could be extirpation; there just wasn't any way to tell?

A. That's right, and, again, that the effect would occur to some sub-set of species, and we would not have a clear way of knowing what sub-set of species it would influence.

Q. And the purpose of the surveys was to provide the Government with some database where it could make an assessment of those negative effects?

A. Strategy II surveys?

Q. Yes, the Strategy II surveys.

A. The purpose of the Strategy II surveys was twofold. Number one, to actually provide site-specific information that would allow for mitigation measures to be applied and, number two, to increase our knowledge of the species so we would have a better means of assessing them over time.

Q. One of the results from the Strategy II surveys could be a conclusion that the species might be extirpated in certain areas as a result of ongoing

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

**PLAINTIFFS' ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Plaintiffs submit the following additional proposed findings of uncontroverted fact, all of which rely entirely upon the district court's opinion in Oregon Natural Resources Council Action v. United States Forest Service ("ONRC Action"), 59 F. Supp. 2d 1085 (W.D. Wash. 1999).

210. The district court in ONRC Action held that the Forest Service's and BLM's actions in issuing and relying upon the "NEPA decision equals implementation" interpretation were "arbitrary and contrary to the plain language of the ROD . . . [and] are unlawful and must be set aside under the APA, 5 U.S.C. § 706(2)(A)." 59 F. Supp. 2d at 1093.

211. The district court in ONRC Action found that "equat[ing] the NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements. It would also create an incentive to rush NEPA decisions to avoid conducting surveys." 59 F. Supp. 2d at 1093.

212. Summarizing defendant's argument that the "NEPA decision equals implemented" interpretation was reasonable, the district court in ONRC Action said: "Defendants argue that their interpretation is reasonable and entitled to deference because the plan gives them 'a maximum of four full fiscal years (FYs 1995, 1996, 1997, and 1998) in which to develop and apply survey protocols for these species.'" 59 F. Supp. 2d at 1093. The district court rejected the argument, stating, "But that 'maximum [of four full fiscal years referred to in the ROD]' is a ceiling, not a floor, and is consistent with the specific, phased-in requirements stating that surveys must be conducted prior to ground-disturbing activities being implemented after fiscal years 1996 and 1998." Id.

213. The district court in ONRC Action recognized the importance of the site-specific analysis required by the NFP for Category 2 species: "Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends. The surveys are designed to identify and locate species; if they are not done before logging starts, plants and animals listed in the ROD will face a potentially fatal loss of protection." 59 F. Supp. 2d at 1093.

214. The district court in ONRC Action found the ROD's Category 2 survey requirements to be "clear, plain, and unmistakable." 59 F. Supp. 2d at 1093.

215. The district court in ONRC Action found that the "net result" of the RTV Directive was "to exempt about ninety percent of the red tree voles' habitat, including all of its California habitat, from the survey requirements." 59 F. Supp. 2d at 1094.

216. Summarizing defendant's argument that the RTV Directive was reasonable, the district court in ONRC Action said: "Defendants argue that the protocol is reasonable because where habitat is abundant management of particular red tree vole sites is not necessary, and where populations already are isolated, with no potential for the creation of connective corridors, trying to protect the voles would be futile. Stating that site-specific surveys were adding little to scientific knowledge, and that the risk to species viability from foregoing surveys would be small, the red tree vole memorandum concludes that 'field surveys are not needed' in widespread areas." 59 F. Supp. 2d at 1094.

217. Regarding the legality of the RTV Directive, the district court in ONRC Action concluded, "The decision not to conduct red tree vole surveys in areas where habitat is abundant or isolated has no basis in law. The ROD gives the Forest Service and BLM the discretion to conduct surveys 'at a scale most appropriate to the species' (ROD at C-5), but does not allow the agencies to forgo surveys altogether, or to exempt broad areas from the requirements." 59 F. Supp. 2d at 1094-95.

218. The district court in ONRC Action found that the NFP "requires that surveys be conducted within the [RTV's] '*known or suspected ranges and within the habitat types or vegetation communities associated with' it* . . . [and] provides explicit instruction as to where red tree vole surveys must be conducted." 59 F. Supp. 2d at 1095, 1095 n.8 (emphasis in original). However, the district court concluded that the RTV Directive "adopted by the defendants does exactly the opposite." Id. at 1095. Accordingly, the Court held that the Forest Service's and BLM's actions in issuing and relying upon the RTV Directive were arbitrary and capricious and contrary to law.

Respectfully submitted,

s/Gary G. Stevens

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008