**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

**ERRATA TO THE APPENDIX TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

In replying to defendant's response to plaintiffs' proposed findings of uncontroverted fact ("PPFUF"), plaintiffs identified eight instances where the cited document found in plaintiffs' appendix ("App. Tab") either was missing pages (mostly in the case of deposition transcripts) or was not the document described in the PPFUF (e.g., when the PPFUF referenced a deposition exhibit in Scott Timber but the appendix provided the same-numbered exhibit from the Blue Lake depositions, or vice versa). For each of these instances, plaintiffs have attached the corrected documents, described below.

1. App. Tab 7, replacing Blue Lake deposition Ex. 3 with Scott Timber deposition Ex. 3, cited in PPFUF ¶ 32;
2. App. Tab 74, replacing Blue Lake deposition Ex. 65 with Scott Timber deposition Ex. 65, cited in PPFUF ¶ 58;
3. App. Tab 87, replacing Scott Timber deposition Ex. 74 with Blue Lake deposition Ex. 74, cited in PPFUF ¶ 186;
4. App. Tab 169, adding missing pages 21-22 of the S. Zike 1/4/07 deposition in Scott Timber, cited in PPFUF ¶ 122;
5. App. Tab 170, adding missing page 66 of the T. Hussey 1/4/07 deposition in Scott Timber, cited in PPFUF ¶ 65;
6. App. Tab 173, adding missing pages 10-14 of the S. Zike 8/20/07 deposition in Blue Lake, cited in PPFUF ¶ 91;
7. App. Tab 176, adding missing pages 11-26 of the R. Devlin 8/21/07 deposition in Blue Lake, cited in PPFUF ¶ 89; and

8. App. Tab 185, adding missing pages 7-14 and 49-51 of the R. Holthausen 9/30/07 deposition in Blue Lake, cited in PPFUF ¶¶ 14 and 49.

Plaintiffs respectfully request that the Court replace the documents found at the App. Tabs listed above with the corrected versions attached hereto.

Respectfully submitted,

s/Gary G. Stevens

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiffs

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 27, 2008

App. Tab 7
Corrected

| | | | |
|---|---|---|---|
| **United States Department of Agriculture** | **Forest Service R-5/6** | **United States Department of Interior** | **Bureau of Land Management OR/WA/CA** |

**Reply to:** FS: 1920/2430
BLM: 1736-PFP (OR931)
BLM-Information Bulletin No. OR-96

Date: March 18, 1996

**Subject:** Protocols for Survey and Manage Amphibians

**To:** Forest Supervisors and District Managers Within the Area of the Northwest Forest Plan

The Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl include the conducting of surveys before the design of all ground-disturbing activities that will be implemented in 1997 or later (Component 2, p. C-5). Surveys are required within the known or suspected range and within the habitat types or vegetative communities associated with five amphibian species identified within Component 2.

Enclosed are the draft standard protocols for conducting surveys of these five amphibians: Del Norte, Larch Mountain, Shasta, Siskiyou Mountains, and Van Dyke's salamanders. Known sites of these species were sent to each district last July. Please use that database and any other range or site information to determine if and where to survey for these species.

The protocols were designed so that there would be a high probability of finding populations of these species. Please follow the standard protocol as closely as possible. We realize, however, that in some situations the time identified per visit may preempt other high-priority work. If the identified time is more than can reasonably be expended under your current workload, the length of time spent per visit may be reduced but not the number of visits. The time between visits should be kept close to that identified in the protocols. Permanent staff biologists should make the decision on any needed modifications to protocol implementation based on their professional judgment.

Where there is any deviation from the protocol, biologists are requested to document the action taken and the rationale for the change. This will assist in future protocol revisions and in interpreting survey results.

The protocol is being distributed as a draft for use, field testing, and comment in the spring and fall of 1996. It will undergo peer review later this year. Comments from field users will be very helpful in making the final protocol efficient and effective.

Although the protocol will likely be revised, projects surveyed according to the draft protocol (including modifications by agency biologists) will be considered as meeting the requirements of Component 2 for FY 1996.

PLAINTIFF'S EXHIBIT 3 1-4-07 Hussey

App. Tab 74
Corrected

# Survey and Manage

8/28/96

There are four questions relative to survey and manage that currently need to be answered. These questions, as well as proposed answers, are detailed in the attached paper. This handout summarizes these questions, and the factors that need to be considered in answering them.

**1. When is a project implemented?**

- ROD requires category 2 surveys before projects are implemented
- possible implementation points could be NEPA decision or project start
- there is a need to make survey information for decision maker
- some field units have not completed surveys
- how much risk do we want to take in going ahead with activities without surveys

**2. What is a ground-disturbing activity?**

- element of "you'll know it when you see it"
- many don't trust the line officer to make the call
- consider scope, intensity, and needs of the species

literal

**3. Do we use fiscal year 1997 or calendar year 1997 as the implementation date for the category 2 surveys?**

- the ROD specifies fiscal year but the S&Gs don't specify either fiscal year or calendar year
- assume that fiscal year was intended because this is more conservative and follows our project planning cycle

**4. We don't yet have a survey protocol for red tree voles, yet these surveys will be required starting October 1, 1996.**

- the survey and manage core team is meeting on September 3; they hope to produce an interim protocol then
- we could use Appendix J2 but this could be very confusing to field units
- if a protocol is not forthcoming very soon, we will need to consider a grace period before these surveys are required
- consider addressing all of this in a separate letter specific to the red tree vole issue

Larsen
EXHIBIT NO. 65
1-5-07
SCHMITT & LEHMANN, INC

# Survey and Manage

**Current Implementation Issues** **8/28/96**

This paper presents options for answering the current questions on how to implement the ROD survey and manage direction.

**Question 1: The survey and manage category 2 direction uses the year of project implementation as the point when the survey becomes a requirement. In this context, when is a project "implemented?"**

**Proposed response:**

For the purpose of the ROD survey and manage direction, a project is implemented when the decision document is signed. Projects with a decision document signed on or before 9/30/96 do not need surveys for category 2 species prior to operations. Projects with a decision document signed after that date need to have the survey completed prior to making the project NEPA decision.

**Other considerations:**

This will result in all projects signed off on in FY '97 having surveys before the NEPA decision. There is consensus that this was the intent of the ROD.

This will also result in projects being operated on in fiscal years 1997, 1998, and possibly even 1999 without surveys having been done. We have been unable to determine how many projects this might be, nor have we been able to get an estimate of the possible resource damage that could occur. However, there is strong concern on the part of FS, BLM, and USF&WS biologists that allowing any operations to proceed after 9/30/96 without surveys is unacceptable because it does not meet the intent of the ROD.

We considered two approaches to this question one as stated in the preferred, above. The other approach would be to require surveys prior to operations. This was unacceptable because it would result in key information not being available at the time the decision is signed. We could combine these two approaches. In this way, we could require surveys on all projects with decisions signed after 9/30/96 or for which operations begin after a specified date (such as after 9/30/96 or 3/30/97, for example). This would satisfy concerns about meeting the intent of the ROD, but could appear contradictory or difficult t implement.

There is also a reality that some field units are behind in their surveys. This is a particular problem for BLM and FS units in southwestern Oregon. They have large amounts of habitat to survey for amphibians.

**Question 2: The ROD directs that surveys be performed prior to "ground-disturbing activities." In this context, what is a ground-disturbing activity?**

**Preferred response:**

"Ground disturbing activity" is any disturbance of a type and intensity that could reasonably have a significant negative impact on species or the habitat that supports them.

Evaluating significant negative impact includes looking at both the scope and intensity. Some activities that are clearly ground-disturbing might not have a wide enough scope to trigger a survey (placing a sign in a campground, for example). Another activity might not technically be ground disturbing, but could clearly affect habitat enough to require a survey (helicopter logging, for example).

The life requirements of the species in question should also be considered. The need for a survey should be determined by both the possibility of the species being present on the project site and the possibility of the project negatively affecting its habitat. The survey and manage protocols will include some guidance on the type of activities likely to negatively affect a given species (and thus likely to meet the definition of ground disturbing for that species). Timing of year.

Neither a staff paper or survey protocols can define exactly what a ground-disturbing activity is for every situation. It will be necessary that the line officer determine which activities are ground disturbing, based on scope and intensity of impact and the life requirements of the species affected.

Scope & impact emphasis

**Question 3: Please clarify the dates for survey and manage category 2. On page 36, the ROD uses fiscal year, but on C-5 only the year is specified. Do we use fiscal year or calendar year?**

**Preferred response:**

If the ROD says fiscal year, use fiscal year. If it specifies calendar year, then use calendar year. In this case, there is a conflict between the specified year on ROD-36 and the unspecified year on C-5. We believe the specific fiscal year direction should take precedence over the non-specific language on C-5. This has the benefit of being the more conservative approach. Also, it corresponds to the fiscal year cycle we use in project planning.

CONSIDER LEAVING OUT THIS NEXT QUESTION ALTOGETHER. DEAL WITH THE ISSUE OF RED TREE VOLE SURVEYS IN A SEPARATE LETTER ON THAT TOPIC.

**Question 4: What should we do about surveying for red tree voles? Surveys are required in**

In the mean-time what do we do?

**FY 1997, but we currently don't have a draft protocol.**

**Preferred response:**

The survey and manage core team will meet on 9/3/96. It is their intent at that meeting to issue interim procedures for red tree voles. Randy Hickenbottom believes it may be possible to develop an interim procedure that would require only some map study. We propose to incorporate that interim protocol into the direction package on 9/3.

**Other considerations:**

In an 8/3/94 letter signed by John Lowe and Elaine Zielinski, field units are guided to draw interim survey and manage guidance from Appendix J2. This would be an alternative approach. However, for the red tree vole, Appendix J2 contains little in the way of specific management suggestions. There is a suggestion to create corridors, but this approach has already been turned down by managers. At this time, suggesting to field units to draw from Appendix J2 for the red tree vole could easily result in many different, confusing interim management regimes.

It is possible we will not have even an interim red tree vole protocol by 9/30/96. In that case, allow field units a six month grace period from the date of the draft red tree vole protocol. Six months after a draft protocol is issued, all projects must have been surveyed for red tree voles prior to signing the decision document.

App. Tab 87
Corrected

Subject: ONRC Action v. USFS, BLM proposed awards chart
Sender: Susan Zike /r6pnw
Attached Date: 02/06/99 16:34
Priority: normal
Sensitivity: normal
Importance: normal

Part 1

TO: DISTRIBUTION (Title: Distribution list)

Part 2

Attached (in Rich Text Format for BLM, OS and OGC) is the rough draft of the chart of proposed sales to award in the ONRC Action case. I'd suggest that the WIN, 6Riv, KLA, and BLM edit the chart appropriately to reflect your rationale for recommending award; get your RF or State Director concurrence; then I'll finalize the chart for transmittal to DOJ. Sound like a plan? I'm thinking our window of opportunity is opening up and I want us to be ready. Feedback welcome!

*****

Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us

**********

Part 3

This item is of type Applix Words and cannot be displayed as TEXT

Released Pursuant to
Court of Federal Claims
Order of 3/29/07





PLAINTIFF'S
EXHIBIT
74
8.21.07 SKK

# MEMORANDUM

Ted Boling, DOJ, General Litigation

From: Sue Zike, USFS, R6 Litigation Coordinator; Alan Wood; Oregon BLM coordinator

Date: February 2, 1999

**Subject: ONRC Action: delayed sales recommended to be awarded in February 1999**

| Sale | Agency | Strengths | Weaknesses |
|---|---|---|---|
| Burma Shave | BLM | Did full RTV survey; found none? | |
| North Murphy | BLM | "implement" memo upheld by IBLA | |
| Siskiyou Heli | R5-FS | CA RTV no req't to survey in ROD); P may not have standing because no comments during comment period; | thinning in LSR is >80 yrs old |
| Jack Heli | R5- FS | No RTV in appeal; | 15% rule raised on appeal; meet 9/14/98 ltr?? |
| Long | R6-FS | No RTV habitat; need to review the Coldwater Sprgs EA/DN | |
| ,pencer | R6-FS | v. good EA/DN; no RTV habitat; conservative approach to matrix entry and balance between eagle and NSO habitat in Pond. Pine stands | |

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

App. Tab 169
Corrected

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-708C |
| vs. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

DEPOSITION OF

SUE ZIKE

Taken in behalf of Plaintiff

* * *

January 4, 2007

333 S.W. First Avenue

Portland, Oregon

Teresa L. Dunn, CSR, RPR

Court Reporter

Q. You did that?

A. I did.

Q. You found out something about them?

A. Well, we had these charts that we refer to here that had status on it and what issues had been raised.

Q. That's the as-is chart?

A. As is the chart, meaning privileged.

Q. Okay. Let's look at plaintiff's Exhibit 35A. The first page is a fax cover sheet and it looks like would I be correct a fax you sent?

A. It is.

Q. That's your business card that you photocopied?

A. It is.

Q. And you sent it to Mike Hupp and Brenda Woodard on the Umpqua National Forest?

A. Correct.

Q. What were their positions at the time do you recall?

A. Mike Hupp was the forest planner I believe and Brenda Woodard was the contracting officer. They were also sent to Herb Wick on the Willamette and Fred Dorn on the Gifford Pinchot and those are both contracting officers on those forests.

Q. I took it Ms. Woodard was the contracting officer on some of the sales on plaintiff's list?

A. I don't know. I don't know where the plaintiff's list -- Attached is a draft letter.

Q. We will go through this and reconsider that question later.

A. Okay.

Q. That's your handwriting on the first page?

A. It is.

Q. And you ask, Are you willing to notify the bidders before you open bids?

A. Correct.

Q. Notify them of what?

A. That there was a pending lawsuit.

Q. What was the answer?

A. I don't recall. I don't know what they decided to do about at bid opening. We felt it would be prudent to notify the bidders.

Q. Who is "we"?

A. It would be who I was conferring with was Jerry Hofer, regional contract officer, and Devlin, Bob Devlin.

Q. What was Mr. Devlin's position at the time?

A. He was director of timber.

Q. For Region 6?

A. Correct.
Q. What was the other gentleman's name?
A. Jerry Hofer.
Q. H-O-L-F-E-R?
A. H-O-F-E-R.
Q. All right. So you, Devlin, and Hofer thought it would be prudent to advise them?
A. Correct.
Q. Okay. Further down in your handwritten statement staying there you say, There is no reason yet to plan on delaying award of the USFS sales.
Why not?
A. Because we hadn't made any agreement with plaintiffs to delay award of sales.
Q. Okay. The next two pages are the draft letter you refer to in your fax sheet?
A. Uh-huh.
Q. Did you draft the letter?
A. No. Department of Justice doesn't let us have their letterhead.
Q. On page two of the draft there's a statement in the letter that says, In the interest of facilitating settlement discussions the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales

have been identified in connection with this lawsuit.
Do you know what timber sales they were referring to?
A. These three.
Q. Sorry, which three?
A. I don't know. It says -- that sentence you read refers to three timber sales.
Q. Yes, it does.
A. I would have to read the letter.
Q. Okay.
A. Three are scheduled for auction in late August and only Lois is scheduled --
Q. Is it L. Horse Peak and Yaka Guard at the top of page two?
A. Yes. Are you asking if that's what that means?
Q. Those are the three sales?
A. I don't know.
Q. Okay. Do you know if notification was, in fact, given to the bidders on those three sales, the three referenced here, whichever it is?
A. I don't know. Whatever they are. That's just a draft because it doesn't identify what three.
Q. Okay. Turning over to the next document which is on page 00030, do you see that in the right-hand

corner, bottom right-hand corner that control number?
A. Got it.
Q. Okay. If you look -- hold your place there, but look back to the first page of 35A. Your PS notation says OGC memo is attached but DOJ?
A. That.
Q. Why don't you read it to me?
A. PS, OGC memo is attached that DOJ based its sentence on. RO-NR meaning Regional Office Natural Resources, which is Bob Devlin, sent this out late last week.
Q. And that's what we're looking at that started with 00030?
A. Oh, I don't think so.
Q. You don't?
A. No, but let me look. This is from Simmons. Okay. Oh, it is, yep, yes.
Q. And if you turn back to page 00030 and look in the bottom paragraph of this document -- by the way I read it as dated July 29, 1998.
Do you agree with that in the upper right-hand corner?
A. You think it's what?
Q. July 29, 1998, that's the date.
A. It is probably right.

Q. Okay. In that last paragraph the first part reads, Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs and that if this is not acceptable to the bidders they should withdraw their bid at that time.

Do you know if that warning was conveyed to the purchasers, rather the high bidders on all of the sales?

A. Yeah, I would have no way of knowing that.

Q. Do you know if that warning was supposed to be in writing or oral?

A. What I recall is that we had, meaning Jerry Hofer and Bob Devlin and I and with probably general counsel's help had determined that if it had not been in the advertisement for the sale and, of course, it would not have, but for the sales that we had bid openings that we would make an oral announcement.

When we would have time to get the warning put

in the advertisement that this sale is the subject matter of litigation, then we would put it in the advertisement.

Q. Was it put in the instructions to bidders?

A. I have no idea.

Q. That wasn't the direction?

A. You know, all of the terms of contract administration isn't my deal, but --

Q. Okay. On page two of this memo at the top the paragraph there begins, As indicated in the new case memo from Katherine Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6.

What were you doing with Owen and the sales in Region 6?

A. We were determining the status of the sales that plaintiffs sent to us in these series of lists.

Q. And the status as to what?

A. Well, there was a number of pieces of information. One was whether or not the NEPA was done, what the date of the NEPA was, had it had been appealed, who had appealed, what were the issues raised in the appeal, and then if it had been awarded and when it had been awarded and to whom it had been awarded and if it was awarded, what was the status of the sale in

Q. Okay. On page 00036, a fax message from Ted Boling to Mike Gippert, do you see that?
A. No, no, oh, six, I'm sorry, I'm looking at five.
Q. 00036.
A. From Ted to -- correct.
Q. Mr. Boling was the attorney representing the government in the ONRC Action case, right?
A. Yes.
Q. And he is asking for certain information ASAP. Do you know why he needed it no later than close of business Thursday?
A. No, I don't, but that's often the way the requests for information came. No, I don't.
Q. Okay. Let's look at 35B. Do you see the handwriting at the bottom of this page?
A. I do.
Q. Is it yours?
A. No.
Q. Can you read it?
A. No, I can't other than, Have you something anything on something, oh, Parkaboo, that was a timber sale, Parkaboo.
Q. Parkaboo?
A. Parkaboo. I think it is, Have you sent us

anything on Parkaboo. That would be my guess. That's Ted's writing so he would have scratched that on there before he faxed it.

Q. Next page is another letter from the ONRC Action plaintiffs to the government's attorneys.

A. Yes.

Q. And two pages after that there's a list of timber sales entitled Category 1 Unsold Problem Sales With Calendar Year 1998 Auction Dates.

Is that something to your knowledge the Forest Service produced or is that something from the plaintiffs, the ONRC Action?

A. I don't know. I don't recall. I don't think I have seen it. It certainly doesn't ring a bell and it doesn't look familiar.

Q. Would you understand by the adjective "problem" as in problem sales that these were sales that the ONRC Action plaintiffs were also threatening to challenge?

A. I would and I would also assume Category 1 is from page one of their memo.

Q. Category 2, that would be the same and that would refer to the second category mentioned later on?

A. Sales with proposed action dates, auction dates, yes, calendar year 1998, right.

Q. And we can make the same inference with respect to Category 3?

A. Yes. The "problem" word is plaintiff's characterization.

Q. Yes, I understand.

A. Okay.

Q. What about the last page PT 0049, does that look familiar to you?

A. It does not.

Q. This says Category 4 up in the left-hand corner and it is kind of hard to read?

A. It does.

Q. Let's see --

A. That aligns with Category 4 on page one, PT 0040, sales on Gifford Pinchot.

Q. So it would be your testimony that you don't believe these are lists that were produced by the Forest Service?

A. That would be my testimony.

Q. Were these lists ever disclosed to the high bidders on these sales?

A. I would have no knowledge of that.

Q. You never disclosed it?

A. To bidders?

Q. This information.

A. I would have no way to do that.

Q. Was it your understanding that these lists were to be kept confidential and not disclosed --

A. That was my understanding, yes.

Q. -- and not disclosed to anyone outside of the agency?

A. Other than to DOJ, correct.

Q. As far as you know that's what happened?

A. As far as I know that's correct.

Q. Take a look at 37C, Exhibit 37C. If you look at the very top of this letter which has apparently been faxed there are some fax numbers in area code 503.

Are any of those Forest Service numbers?

A. Well, the 808 number is for our building.

Q. That's the Region 6 office?

A. Correct. The 326 number is the Federal building which is Office of General Counsel.

Q. OGC?

A. Right.

Q. Okay. Was a copy of this letter provided to you?

A. I would have to assume that it was. It doesn't look familiar particularly.

Q. If you turn to page five of this letter, the five is on the bottom, it says page nine in the upper

right-hand corner.

A. I'm with you.

Q. The letter reads, Also we are prepared to not award the Forest Service timber sales listed below until November 23, 1998. And there's a list that follows.

Did you help put that list together?

A. Did I help put the list together, well, yes, I would have.

Q. How did you go about doing that?

A. As we looked in the earlier fax, I don't remember the exhibit number, but it was through those faxes out to my forests that plaintiff's list that we developed charts of the status of the sales that plaintiffs were interested in.

So that compendium of data then would tell us status of those sales and choices would then be made on whether to advertise an award or hold the award.

Q. So you have three columns here, Forest Service, Sale, and that's the name of the sale?

A. Correct.

Q. The forest is the National Forest it is on and Status is either awarded or no award, although, all of these but it looks like two, all of them are no award.

What does it mean to say, Award by agreement

with purchaser in settlement of NFRC vs. Glickman?

A. That was the National Forest Research Council's lawsuit against USDA on the Forest Service under the Recisions Act that we were not prosecuting our duties under the Recisions Act which was primarily to provide replacement volume for the sales that had nesting birds, you know, the Rescissions Act has lots of funky details like that.

So we did have a court overseeing mediation with Judge Hogan on NFRC vs. Glickman and as part of that we agreed and then the court ordered us to award certain sales.

Q. Okay. Take a look at what's been previously marked plaintiff's Exhibit 38. Have you seen that before?

A. No.

Q. Do you know what Allen Apliss (phonetic) is?

A. I do know who Ellen Apliss was, yes.

Q. Is she no longer with us?

A. She's not in Department of Justice anymore I don't believe.

Q. Sorry. And have you not seen this cover sheet or the pages attached to it previously?

A. No, I haven't.

Q. Okay. Do you see on the first page of this

document where it says, As I promised here is the list of Forest Service and Bureau of Land Management timber sales rushed through to avoid the Survey and Manage requirements?

Do you see that?

A. I do.

Q. Do you have any knowledge of environmental groups providing such a list to the government other than in the ONRC Action litigation?

A. I do not.

Q. Did you hear from anyone in the course of your duties that an allegation had been made that the Forest Service and the Bureau of Land Management had rushed through the decision documents on sales in order to avoid Survey and Manage requirements?

A. We had heard that from plaintiffs in the ONRC Action case as well as they did public press releases and those sorts of things.

It was fairly general knowledge to those of us who follow such things that plaintiffs believed we had rushed through to make decisions to avoid the oncoming Survey and Manage requirement.

Q. Did the Forest Service do that?

A. No.

Q. What's your basis for that answer?

A. My answer is as far as I know we observed every law that we needed to do in terms of NEPA and NFMA and Endangered Species Act for all of the sales that we did NEPA decisions for.

I don't think anything was rushed necessarily.

Q. Did you ever hear there had been instructions or directions to forests to hurry up and finish Decision Notices in order to beat the October 1, 1996, deadline?

A. Yes, I had heard that.

Q. From whom?

A. I'm aware there's an e-mail from Bob Devlin out to the forests where he urges them to appreciate that the October 1 deadline was coming.

Q. And your understanding is that he urged them to finish up the Decision Notices rather than wait until after the deadline?

A. Well, we knew as did -- Bob knew and our forests knew that as of October 1 the survey obligations were greatly increased.

So I think his e-mail stands for itself. I mean, he said what he said and if you need to interpret that as plaintiffs did that that was a rush, to rush, you know, the public is entitled to so many days of review on NEPA documents anyway and that was short-cut

so rush what, you know. I'm not sure.

Legally we couldn't rush anything. You had to meet your statutory time frame.

Q. Did you discuss this e-mail you are talking about with Mr. Devlin?

A. No.

Q. Did you discuss the Devlin e-mail with anyone else?

A. At the time?

Q. At any time.

A. Only through the discovery of Blue Lake case, your Blue Lake case. When we ran across it during that discovery I discussed it then.

Q. With whom?

A. I would have discussed it with, who was our counsel, Jack Groat I believe.

Q. So you didn't talk to anyone else about it like Jerry Jensen, he was in Region 5, but anyone else from Region 6 did you talk to?

A. I didn't know Devlin sent it out. I didn't know. I wouldn't have any reason to know that. It wasn't a litigation matter and Bob would do his director job, you know, with his timber people and I would have no reason to know what he was directing them to do or not do until it became a matter of litigation

question?

A. Meaning that it is a policy level call.

Q. Whether to advertise them or not?

A. Correct.

Q. At the bottom of the page there's a reference to the ALA lawsuit. What's that?

A. That's the American Lands Alliance lawsuit.

Q. In brief what was that about?

A. You know, there were two of them and I don't remember what the issues were in those cases, but I think we won them both, but I can't remember.

Q. Let's move to another document. Take a look at plaintiff's Exhibit 41A. On the first page of 41A this looks like an electronic message. Am I right?

A. It is.

Q. Is this in the old DG system?

A. You know, I actually had to mark down on my Rolodex because of your Blue Lake discovery when we moved from Applix to IBM and I don't recall the date, Gary, but if I look down here at my e-mail address it is the IBM system address.

So this would not have been -- this would not have been the Applix time.

Q. Can you tell the approximate time period when this e-mail was sent?

A. What I'm recalling is when I talk about March 26, that's shortly after their third amended complaint.
Q. That's 1999?
A. Yes, and this would make sense that we got a briefing schedule after that last amended complaint came in.
Q. What is promise one and promise two about?
A. That's for awarded sales. Promise one would be ten days of notice before we approved the plan of operations, that being the pre-work the purchasers do with us.
Q. These are for the nine sales actually named in the complaint?
A. Right, and apparently they were awarded sales.
Q. And promise two?
A. Those would be as to unawarded sales, certain unawarded sales --
Q. All right.
A. -- because we would be giving them notice of our decision to award.
Q. You say further down in the e-mail, To help you with that I will be sending an issue chart tomorrow.
What was that?

A. We developed charts that had in columns I believe the issues that were raised in the amended complaint and then we asked the forest to look at any appeals that came in on the named sales so we could conclude whether or not plaintiffs had raised or waived an issue because they can't take it to court -- they can't take the issue to court if they didn't raise it in their appeal.

Q. And what would that mean in terms of what the Forest Service could do with that sale?

A. Well, that would mean if they had not raised the issue, that we would ask the court to dismiss the claim as to those sales where plaintiffs did not raise that and then if we were successful, then that sale would not be part of the lawsuit.

Q. But you need to raise that in a motion and the judge would have to decide?

A. Correct, correct.

Q. You say in here, We need to assure DOJ that we have a strong defense on the sales that we intend to award even though DOJ is not asking to be a part of the award decision. Good news you say?

A. Good news, that's true.

Q. Why is that good news?

A. Well, because there's always tension between

the client and the attorney in our cases on who is making the policy calls when we get into litigation.

Q. Who made the policy call here?

MS. STENTIFORD: Objection. Don't answer that.

THE WITNESS: What's the rule, Counsel?

MS. STENTIFORD: Privileged.

THE WITNESS: Okay. So don't answer?

MS. STENTIFORD: Don't answer.

MR. STEVENS: What was the question?

(Reporter read back last question.)

MR. STEVENS: You are instructing her not to answer that question?

MS. STENTIFORD: Yes, I'm instructing her not to answer that question.

MR. STEVENS: We will pursue that absolutely later on, but I don't think we are going to be able to get the judge on the phone at 8:00 at night back there.

Q. (By Mr. Stevens) Let me ask you this, was the policy call made by the Forest Service for the Forest Service?

A. The Forest Service made the decision whether or not to award sales.

Q. And the Forest Service had the final say as to whether a sale would be awarded?

A. I don't know how to answer that.

Q. Did the Forest Service have to concur with any other governmental agency?

A. We certainly conferred with trial counsel and this sentence means we needed to assure our trial counsel that we had a strong defense generally meaning that the issues raised in the complaint were not raised in appeal.

And so if they were not raised in appeal, we felt -- the agency felt we had a pretty strong defense to try to get that sale out of the lawsuit.

Q. Further on down in this e-mail you say, R5 is sending a ten-day notice letter to ONRC today for two sales, Upper South Fork and Happy Thin.

What's the ten-day notice letter?

A. That was part of the stipulation on the briefing schedule promise, well, it would be promise one or two and I don't remember if it was whether or not they were going to award Happy Thin or whether or not they had approved their plan of operation.

Q. So in either case it would be ten days' notice before any ground-disturbing activities could take place, at least that?

A. At least that, correct.

Q. Do you know if any purchasers were notified

that this ten-day notice letter had been sent out on Happy Thin?

A. I don't know about Happy Thin. That's Region 5.

Q. And you say at the very bottom, As before the sale list is not -- it is not be, but you meant to say is not to be distributed outside the agency?

A. Where are you reading?

Q. The very last sentence at the bottom of this paragraph that is in all caps.

A. Correct. What's your question?

Q. Well, so would I be correct that that list was not made available to anyone outside the agency so far as you know, the list being referred to?

A. Correct.

Q. And that's the list of sales that the Forest Service intended to award?

A. You know, that's a good question because I don't know what sale list really I'm referring to. It would not be the named sales in the complaint because that would be public knowledge.

Q. Right, that's fair enough.

A. So here we say, Attached is an R6 chart of the sales that are subject to promise two, you need to check the appeal files to be sure plaintiffs appealed.

Q. Okay.

A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.

Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?

A. I would characterize it differently.

Q. How would you characterize it?

A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.

Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?

A. The 808-2255 number is my fax which is here in

the Regional Office.

Q. So in the ONRC Action the plaintiffs faxed this to you?

A. I would not think so. I would have gotten it from Ted Boling.

Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.

What's he talking about, the at-risk category?

A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.

Q. Yes, we are. Sorry.

A. I'm sorry, it is from Axline.

Q. It is not that I have it and you don't. It is not in my copy either.

A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.

Q. So it was not too veiled a threat, they might

sue and try to get a temporary restraining order?

A. Correct. They had already sued. They would be asking for injunctive relief during the summary judgment briefing schedule.

Q. Okay.

A. See, the second paragraph says that, And some of the sales seem unlikely to be awarded and operated prior to completing summary judgment motions. Because we believe in Murphy's law, however, we think they might be awarded and might be operated during our summary judgment schedule.

Q. Well, the control number on here, 338 followed by 339 indicates that this was the way we got it from the government. I agree with you it looks like at least the signature page is missing?

A. Yes.

Q. Sales at Risk Pre-June 11 and so the Forest Service sales on that list are sales at least as of the date of this letter, April 12, 1999, the ONRC Action plaintiffs were threatening to challenge with TROs if they were awarded?

A. Correct.

Q. We're going to look at 41D next. In this letter from you to Brenda Woodard you say, I forwarded your April 19, 1999, letter to the Department of

telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.

Q. Okay.

A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.

Q. Okay.

A. That would be my read of it, but I don't recognize the handwriting or the topic.

Q. And you don't have independent recollection?

A. I don't.

Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?

A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.

Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?

A. Correct.

Q. So if anybody needed to know what was on that list or which list, you were the authoritative source

to call?

A. I had files.

Q. And you could read them what was on the document?

A. I could.

Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?

A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.

Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?

A. I don't know.

Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?

A. I do.

Q. Can you identify it then for the record?

A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.

Q. As of July 6th?

A. As of that -- it was their July 6th letter which I believe we just looked at.

Q. Okay. Did you prepare this chart?
A. I think someone on my staff prepared it.
Q. Okay. What was the purpose in preparing it?
A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.
Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?
A. On July 7th, right, that appears to be when we printed this off.
Q. And you can tell that from the date on the lower left?
A. Yes.
Q. Was this chart used in any decision-making process that you are aware of?
A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.
Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.
What hearing is that a reference to?
A. Well, we would have to check the docket for

this case.

Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?

A. That would be my interpretation of it.

Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?

A. Not to my knowledge.

Q. Was it made available to Mr. Axline?

A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.

Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?

A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.

Q. Who would be on that -- is that your distribution list you are talking about?

A. Yes.

Q. Who would be on that list?

A. It would be my case coordinators on these west-side national forests.

App. Tab 170
Corrected

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-708C |
| vs. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | ORIGINAL |
| Defendant. | ) | |
| | ) | |
| | ) | |

DEPOSITION OF

TOM HUSSEY

Taken in behalf of Plaintiff

* * *

January 4, 2007

333 S.W. First Avenue

Portland, Oregon

Teresa L. Dunn, CSR, RPR

Court Reporter

A-1375

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

was how to take this policy interpretation and phase into it.

Q. Okay. Let's go off the record for just a minute.

(A discussion was held off the record.)

Q. (By Mr. Stevens) Let's look at plaintiff's Exhibit 11, please. Does this document look familiar to you?

A. Yes, it does. It looks like the initial stages of our staff paper on this question we have been discussing.

Q. Do you know who drafted this document?

A. It might have been me.

Q. Why do you say that?

A. Some of the phraseology is stuff, words that I would use.

Q. For example?

A. I saw something here. Please edit freely, I use that.

Q. You sound like a man who has been involved in a lot of editing.

A. It does look familiar.

Q. Do you recall that you were given the initial task of developing the first rough draft?

A. No, but it was a common practice among the

team to assign one individual to get the process started and then everyone else would edit and embellish and improve upon the starting point so it very well could have been.

Q. And there's a reference under Background on this first page in brackets to, Need to confirm these estimated dates with Randy, and I assume that's Randy Hickenbottom?

A. I make that assumption also.

Q. Okay. Towards the bottom of the page the last paragraph above the heading question one, the first sentence reads, The following questions and recommended answers were developed by a joint BLM and Forest Service staff group.

Who was that?

A. I think it is that same group I was referring to in response to one of your earlier questions, myself, Larry Larsen, Cheryl McCaffrey, Randy Hickenbottom, and I think Lyndon Werner, also.

Q. So it is the Issue Resolution Team with these what I will call ad hoc members?

A. Yes.

Q. On page two involving the responses and the rationales to question one which is at the bottom of page one in the Rationale section the document states,

as it had planned to sell to the public?

A. I don't recall that being a major topic of discussion.

Q. Is it your recollection that in discussing the appropriate interpretation of implementation the only considerations given to it were biological considerations relating to the viability of the species?

A. I would respond differently. I would say the major consideration was trying to interpret the direction in the Northwest Forest Plan where it was a little unclear or in some cases a lot unclear and do so in a way that was reasonable in terms of keeping the programs from coming to a screeching halt.

Now, that is sort of what you asked, but a little bit different thrust.

Q. The programs in the context of my question would be the timber sale programs?

A. The vast majority of these were timber sale projects by a huge percentage.

Q. On one hand the Forest Service is trying to follow the direction of the Northwest Forest Plan to ensure the viability of species and on the other hand it is trying to get out its timber sale program?

A. Yeah, you know, the balancing of those two

considerations was something that occurred at higher levels than our team, but we were certainly aware of those as things that leadership would definitely worry about.

Our team was far more worried about the Northwest Forest Plan direction than specific projects or targets or anything like that.

Q. I'm just getting at the extent to which if I may call it tension between ensuring viability of species and selling the timber sales affected the interpretation that you selected of implementation.

A. For me and my role on the team it affected me, but it wasn't weighted anywhere near as heavily as trying to figure out what the plan said and come up with direction that would meet it. I was certainly aware of that, though.

Q. So you knew that certain interpretations would be less of a problem for the Forest Service in selling timber and other interpretations might cause more problems, more delay in selling timber?

A. The way I was processing that I guess it was sort of a risk thing where we move ahead with selling sales. Without having a solid basis for saying we're consistent with our plan, it exposes us to other risks, primarily legal challenge.

Q. From environmental activists?

A. From whomever. So we have a risk one way of coming up short of our program goals if we don't move ahead aggressively and we have a risk another way of coming up short of our program goals, of coming out too aggressively, and there's always that tension that's between those two risks.

Q. Did reducing the risk of lawsuits challenging the interpretation play a role for you in deciding which interpretation of implementation to advocate?

A. It was certainly one of the many things that was sort of background consideration, but not to the extent we or I did any quantitative weighing or anything like that, but it was always there.

Q. In the work that the Issue Resolution Team did in developing a definition of implementation, did they make an effort to find out how many timber sales would be exempted from Category 2 survey requirements depending on which interpretation they chose?

A. I don't recall if that was part of the process or if it was someone else that may have chased that down rather than myself.

Q. But if the Issue Resolution Team had selected an interpretation that said, well, implementation of ground-disturbing activities means award of a contract,

with the next management tier within agencies.
Do you remember how that review took place?
A. Not specifically, but generically I would describe the way the team typically processed issues was we developed drafts and then circulated them for review, comment, reaction.
Q. Were the drafts circulated outside of the formal IRT members and the ad hoc members?
A. Sometimes.
Q. So would you occasionally send the draft --
A. I will amend that. Oftentimes they were circulated outside of the team.
Q. In those situations who would they tend to go to?
A. Often they would go to subject matter experts, people that had a deeper expertise in a particular subject than the individual team members had.
Q. Would those drafts sometimes be circulated to upper-level management like Bob Devlin and Tom Nygren?
A. Always eventually.
Q. In this draft stage, though, the review stage?
A. That's what I was getting to. Always eventually to them and sometimes in the early stages.
Q. All right. Let's look at Exhibit 13. Now, Exhibit 13 is as the document was provided to us by the

government so after you get past the first page, this Message Scan For Randy Hickenbottom, there's another piece of some kind of electronic message and then there is a draft paper on Implementation of Survey and Manage.

First of all, on the first page it says, From Tom Hussey to J. Casey and R. Hickenbottom. Here is the latest draft version of the S and M staff paper we have all been working on.

Is that the paper that starts on page three?

A. Yes.

Q. And is that a paper that you drafted?

A. Again, I don't remember whether I was the first drafter or a reviewer, but it is the paper.

Q. You were involved?

A. Yes.

Q. All right. It says, The next step will be to get it to Tom Nygren and Bill Bradley and get their direction.

A. Yes.

Q. So to your knowledge was this paper beginning on the third page of plaintiff's Exhibit 13 then provided to Nygren and Bradley?

A. To my knowledge it was and the reason I say that is because I do recall official correspondence

going out under the executive signature and in order to get to the executives it would have gone through those two directors.

Q. Is that because they were on the Intermediate Management Group, the IMG?

A. Possibly, but what my response was just correspondence protocol would involve a director reviewing correspondence before it goes to an executive.

Q. Now, Mr. Nygren we have talked about. Mr. Bradley was with the BLM?

A. Yes.

Q. Do you remember his position then?

A. I don't remember it by title, but by function he was a director that was sort of Tom Nygren's equivalent, he covered planning and natural resource issues in the BLM.

I may be a little bit off on the role, but that's close to correct.

Q. And your cover sheet says that the intention was to get their direction on where to proceed next.

What kind of direction were you looking for? What was the next step you were anticipating if they came back and said it is okay?

A. Well, if they came back and said it is okay, I

may eventually come out with the following.

Q. Well, did you or anyone else on the Issue Resolution Team in the summer of 1996 make any recommendations or suggestions to higher-ups that a direction should be issued to the field that decision documents on Forest Service timber sales and BLM timber sales should be held in abeyance until this was decided?

A. I don't recall any of that sort. It may have happened, but I don't recall.

Q. Was there discussion amongst your group of, gee, should we raise this to this level right now because the decision documents are coming down as we speak?

A. I don't recall a discussion of that.

Q. Did you have any discussions on that topic outside of the group with Mr. Nygren, for example, one on one, or others that you knew?

A. Not that I know of. Again, that's pretty far back.

Q. If you turn through this document to the third page of the implementation memo at the top there's a heading that says question three?

A. Got it.

Q. And under the question three there's a

response and in the response in the last sentence it states, As discussed in question one whenever possible we should schedule project decisions to include the results of S and M surveys.

A. Okay.

Q. Was that something that you agreed with at this time?

A. Let me read the whole paragraph.

Q. Sure.

A. Yes, I recall being in agreement with that.

Q. Why didn't that prompt you or someone else in the IRT to suggest to the higher-ups that decision documents be held in abeyance until the surveys could be conducted?

A. I don't know that we even or at least I don't know that I even considered telling folks to hold decision documents in abeyance.

Q. But the statement is whenever possible we should schedule project decisions to include the results of S and M surveys. So isn't that just another way of saying hold off on the S and M surveys until you get this information?

A. Or do the surveys prior to the project decision.

Q. Right, right, right.

A. It sort of inverts the -- it is another way of saying it.

Q. That's the way I was reading it.

A. Yeah.

Q. So I'm thinking why not just hold off on the project decisions, on the decision documents, get the surveys done, then issue decision documents and then award the timber sales, everybody is happy.

A. I don't know.

MR. STEVENS: Why don't we stop now and take our lunch break if that's all right.

(Recess taken from 1:03 p.m. to 2:04 p.m.)

Q. (By Mr. Stevens) Okay. Let's start with plaintiff's Exhibit 14. Is this a document you recognize?

A. Vaguely, it looks like one of the documents that was -- I'm not sure where it was in the sequence, but it was one of the ones that was involved in getting to the final outcome of that limitation issue.

Q. In the upper left-hand corner on the first page underneath the words Survey and Manage is a line that reads, File B, implement 829.

Does that mean anything to you?

A. No, it doesn't.

Q. So you can't -- you don't know that you -- you

and with assumed presence then you figure out how the project might impact them if they were present, but that's one gigantic assumption.

Q. Okay. The next sentence in this same paragraph says, There is strong concern on the part of many FS, BLM and F&WS personnel that allowing major activity such as timber sale or road building operations to proceed after 9-30-96 without surveys is unacceptable because it does not meet the, and it says a and I think that's a typo, commonly accepted understanding of when implementation occurs.

Do you recall anyone in the field raising that issue?

A. I recall the issue. I don't think it was so much from the field, but it was internal within the group of us that were trying to resolve this and debate possible approaches.

Q. What was the commonly accepted understanding of when implementation occurs as referenced in this language?

A. My recollection at least what was in my mind when we were discussing this is to most people implementation is an action, big yellow machines driving off low boys, chainsaws roaring, dirt being moved and stuff like that rather than the signing of a

decision document.

Q. On the next page at the top the first complete sentence states, We could require surveys on all projects with decisions signed, and then "after" is crossed out and "before" is written in, 9-30-96, and then "or" is crossed out and "and" is written in for which operations begin after a specified date such as 9-30-96 or 5-30-97 for example. This would satisfy concerns about meeting the intent of the ROD, but could appear contradictory or difficult to implement.

Do you know why this interpretation would be contradictory or difficult to implement?

A. Give me a minute to do some mental gymnastics here. From my read of this I'm focusing on the last sentence, Satisfy concerns about meeting the intent of the Record of Decision. The intent of the Record would be to have the information about these plants and animals in time to have that information influence the decision-maker.

Q. For the decision document?

A. Yes.

Q. Okay. So where is the contradictory or difficult to implement aspect of it?

A. I'm not sure what it is referring to. Contradictory to what. This was probably clear to me

Q. By "pretty good shape" you mean --
A. There was good conclusion, reasonable comfort that we came out and the best available position we could come up with, and this I think reflects some of the to'ing and fro'ing that went on when we did this.
Q. But, again, the final would reflect the most consensus?
A. Yes.
Q. Let's look at 14A next, please. Take a look at this document and after you have looked at it for a bit tell me if you recognize it.
A. Yes, I do.
Q. And what is it?
A. I believe that this is very near the final team position on the issues.
Q. And you say that based on the date?
A. The date and the inclusion of -- this attempt to clarify this table that's attached to it. I recall us not developing the table until fairly late in the process.
Q. How was the table developed?
A. I don't remember.
Q. Was any one person primarily responsible for putting the table together?
A. Again, I don't remember, although, I will tell

A. In the context of this issue it would have meant more protective of the species because we would have had more information about the species by having those extra three months' worth of time to get surveys.
Q. Okay. I don't know if I asked you this or not. If I did bear with me again. Do you know if there was a principal author or authors of this version of the Survey and Manage Current Implementation Issues paper?
A. Well, you know, there was a lot of back and forth. I think the principal people would have been either me or Larry Larsen.
Q. Why do you say that?
A. Because for the most part this is what is more heavily weighted toward policy kind of stuff rather than technical and scientific and Cheryl McCaffrey, Randy Hickenbottom tended to deal more with the technical and scientific end of the issues than the policy and NEPA end of the issues.
Again, there's overlap, but that was the tendency so I think it was either Larry or I that were in the lead role on some of this.
Q. You can't pick out any particular parts, can you, that are yours?
A. No, it is all kind of blended together in my

memory.

Q. Under question three on page two there are three different sub parts A, B, and C. And C states, Projects designed and NEPA documents signed prior to 10-01-96, but awarded on or after 10-01-96 enter the grey zone.

What does that mean?

A. First thing I'm looking for is whether this chart has a grey zone in it. It almost looks like that stippling is a grey.

Q. What page are you on now?

A. I'm on the second of the chart pages, the one that says Survey and Manage Implementation Timeline and it almost looks like a grey stippling down the middle of it.

Q. Horizontally?

A. No, vertically. On my copy it looks grey.

Q. It is about an inch in width?

A. Yes.

Q. Just on either side of what looks like 1-1-97 time period?

A. Yes, that's what I'm referring to and that's just a possibility. I don't know for certain that that matches up.

Q. Thank you. Your eyes are better than mine.

App. Tab 173
Corrected

THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-570C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |
| | ) | |
| TIMBER PRODUCTS COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-627C |
| THE UNITED STATES, | ) | (Judge Williams) |
| Defendant. | ) | |
| | ) | |
| CLR TIMBER HOLDINGS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-501C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF

SUSAN M. ZIKE

Taken in behalf of Plaintiffs

* * *

August 20, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

the original copies. If for some reason, Miss Lynch, you are missing a copy or something happens, let me know and I'll immediately give you a copy of it.

MS. LYNCH: Okay.

MR. STEVENS: It just seemed a lot simpler and perhaps even less expensive if we did that rather than copy yet again for everybody else.

Q. (By Mr. Stevens) All right. Miss Zike, I've put in front of you what's been previously marked as plaintiff's deposition Exhibit 24A. And you've had a moment to look at it. But as you can see, it is a letter from Edward Boling to Michael Gippert and Renee Stone. And if you look on the last page of this document, page 3, there's a CC shown to you and to Owen Schmidt.

A. Correct.

Q. And the date of the document is July 29, 1998.

Who is Owen Schmidt and what was he doing, in general, for the forest service at that time?

A. Owen Schmidt is in -- was employed by the Office of General Counsel here in Portland and he was our -- our lead attorney in OGC for this case.

Q. Okay. And, in general, you and your responsibilities at that time?

that --

MS. LYNCH: I will.

MR. STEVENS: -- ahead of time. We can find out whether those documents existed or not.

(Discussion off the record.)

Q. (By Mr. Stevens) This next exhibit has been premarked as plaintiffs' Exhibit 30A. This is an E-mail. And I take it that it is from you?

A. Yes.

Q. To Nancy and others. And the Nancy would be Nancy Graybeal?

A. Correct.

Q. And her position at the time was?

A. She was either acting regional forester, because she did that for some period of time, or deputy regional forester.

Q. For region 6?

A. For region 6, correct.

Q. And in this E-mail you say "Ted Boling just called to answer my Qs about what were Shiffer's and Coppelman's concerns about this case, he answered" the "agency definition of implement was nonsense." Do you recall asking that question?

A. I do.

Q. And -- and why did you -- why did you have

that question to start with?

A. What I recall was that -- 'cause we had many, many conference calls. And I think it was shared with our litigation team that the department of justice had some concerns with trying to defend this case because they read our implement memo to be nonsensical, and -- and so actually Ted -- Ted didn't tell us that they thought it was nonsense. Ted told us there's some concerns in the higher levels of DOJ whether or not we can defend your case. So then the follow-up question was from me to say more privately than on this big phone call --

Q. Sure.

A. -- what is their concern about it? And so when Ted and I talked then this is what he told me their concerns were.

Q. Did he elaborate any further on what was meant by the definition of implement was nonsense?

A. Not -- not that I recall.

Q. Did he give any explanation for why -- why that definition didn't make any sense?

A. I think what Ted and I went on to discuss is if you look at the word implement from the dictionary, you know, it gives us an idea that it actually means ground turning or ground disturbing or that things are

being implemented, that's sort of the plain meaning of what the word implement is. And so the fact that our implement memo referred to implement as a decision-making time rather than a ground-disturbing time to Lois Shiffer and Peter Coppelman, it -- they didn't believe that it made sense, that in fact implement should mean ground disturbing, and it didn't in this sense. That's why we wrote the memo -- or they wrote the memo.

Q. Would you just repeat that last question for me, please. Read it back.

And answer, excuse me, not the question.

THE REPORTER: The whole answer?

MR. STEVENS: Actually I just want the last couple sentences.

THE REPORTER: Okay.

(The reporter read the record as follows:

"Answer: And so the fact that our implement memo referred to implement as a decision- making time rather than a ground-disturbing time to Lois Shiffer and Peter Coppelman, it -- they didn't believe that it made sense, that in fact implement should mean ground disturbing, and it didn't in this sense. That's why

we wrote the memo -- or they wrote the memo.")

Q. (By Mr. Stevens) Now, did Mr. Boling explain to you the -- the occasion for him having this discussion with Miss Shiffer and Mr. Coppelman?

A. No.

Q. Okay. Did -- was it your understanding that he was -- he was to give them a briefing and that then you heard from the briefing that they had some concerns and then you followed up with this and said what specific concerns?

A. Our arrangement with the department of justice on this case was we ended up having phone calls scheduled every week at a certain time.

Q. M-hm.

A. So whatever went on in -- in all of our lives regarding this case from week to week we shared on these conference calls. So whatever we wouldn't know -- I wouldn't know when or how or why Ted was conferring with Lois and Peter other than we knew that there was this big -- there was a lot of political interest in this case and so we weren't surprised that he was conferring with Lois and Peter. Many, many cases never got discussed at that level, at that political appointee level, but this one did. So when

he shared what his observations were, then that led to my follow-up inquiry.

Q. What did Mr. Boling tell you his observations were about the definition of implement?

A. I don't recall his personal impressions of it, but what I think speaks to it is that they defended it. So our -- our rationale, the forest service, and BLM's rationale for why that letter was needed and came to be, it seems to me if they stayed on this, if the department of justice believed it was nondefendable, something changed their mind and they -- and they defended it so --

Q. Did you subsequently learn what had changed their mind, if anything?

A. No, no. Higher levels than me.

Q. Did Mr. Boling ever give you any legal advice on -- relating to the -- this definition of implement?

A. Ask that again.

Q. Well, the definition of implement meaning NEPA equals implement --

A. Correct.

Q. -- did Mr. Boling ever give you any legal advice or express any legal advice in your presence regarding that definition?

A. Boy, I don't know. I -- I don't know.

Q. So do you recall what you meant by the initial briefing?

A. Well, if -- if in fact this was -- I don't know the date of this E-mail. But if it was in the first, you know, three or four weeks after the lawsuit was filed, you know, if it was in the first -- in July of '98, then it would be the very first one, the very first initial -- it would be the first briefing.

Q. This E-mail is addressed to Nancy Graybeal.

A. M-hm.

Q. Do you recall her response to it, if any?

A. I don't recall her response. It was more FYI.

Q. And others. Who were the others you sent it to, do you remember?

A. You know, typically I would send it to the directors and the deputy regional foresters, so that would have been Devlin and Peggy probably.

Q. Do you remember Devlin's response, if any?

A. No. He typically didn't respond unless I asked him to respond because I was more of a purveyor of information rather than asking questions so --

Q. I take it in this case you don't recall asking him?

A. No. There's nothing here. You know --

Q. Apart from this.

A. No, no.

Q. Okay.

This next exhibit has been marked as 24B. For some reason that's mismarked as 25 and the last page is missing?

MS. LYNCH: I'll just make a note to get a copy from you.

MR. STEVENS: Yeah. If you look on with Miss Zike, she has a copy. I apologize for that.

Q. (By Mr. Stevens) Okay. This Exhibit 24B begins on page 18919 running through page 18922. The very top of the page it's dated September 1, that's first page, 919. It's dated September 1, 1998, from S. Zike. That's you?

A. That's correct.

Q. To ONRC Action coordinators. And am I correct that on each national forest during the pendency of the ONRC lawsuit there was someone designated as a coordinator for that forest?

A. Correct. But only on the west side forests that were covered by the Northwest Forest Plan.

Q. Okay.

A. Not every national forest out here.

Q. Sure.
And in some cases, that would include the contracting officer for the sales in question?
A. At times it was the -- the forest supervisor designated who my case coordinator was. Sometimes it was the environmental coordinator, sometimes it was the contractor officer or other positions.
Q. But when you have an E-mail that says to ONRC Action coordinators, you send it out to all -- all the coordinators?
A. Correct, on all the --
Q. As a group?
A. As a group.
Q. And so that would have included Ed Matthews, am I right, on the Klamath?
A. You know, I don't -- off the top, I don't recall if Ed was my case coordinator for that forest. I certainly know he was the contracting officer.
Q. Okay. You recall having E-mails with him?
A. Oh, yes, I had a lot of -- you know, I had communications with him.
Q. Okay. And Brenda Woodard --
A. Brenda Woodard on the Umpqua --
Q. -- on the Umpqua National Forest?
A. -- was my case coordinator.

Q. And Tom Link on the Siskiyou?
A. Tom Link was also.
Q. At the Siskiyou?
A. He's on the Siskiyou.
Q. Siskiyou.
A. Contracting officer.
Q. Okay. So when I see ONRC Action coordinators, we knew at least whatever you sent out went to Miss Woodard and to Mr. Link and perhaps to Mr. Matthews?
A. Matthews, correct.
Q. Okay. If you -- let's see. And when it says ONRC Action coordinators, apart from the coordinators did you also include in that group others? For example, would Owen Schmidt have always gotten a copy?
A. No.
Q. Okay. Would Mr. Devlin have always gotten a copy?
A. No.
Q. Okay. So just the ONRC Action coordinators?
A. Correct.
Q. Okay. At the end of the second paragraph you write "You'll probably be allowed to award, but DOJ needs to know." What did you mean by you'll

the next two pages, the last two pages of this document, 18921, 922; 921 is the E-mail which led to the chart you just described and 922 is --

A. Is a sample of it.

Q. Is a sample of the chart?

A. Yes.

Q. Okay. This next document is plaintiffs' Exhibit 26. Now, if I'm reading this correctly, this is an E-mail to you from Mr. Jerry Jensen?

A. Yes.

Q. And he's in region 5 of the forest service?

A. He was.

Q. And his position at the time was what?

A. I can't tell you. He was in their timber shop, but I never knew his title.

Q. I find these E-mails somewhat hard to read, but under part 2 it says "I need to remind you that the list of sales I sent out to you is privileged info and not available to the public, as is the chart." Is that your -- is that you telling --

A. That's me, m-hm.

Q. So it's you sending this E-mail message to Mr. Jensen?

A. Jensen's message at the bottom came to me first, and then I responded to that.

Q. I see, okay.

And the reason why you regarded this information as not available to the public was what?

A. It was my understanding, from my justice counsel, that there was a privilege that we would apply because we were in settlement discussions. I can't recall the rule, but --

Q. So it's your recollection that Mr. Boling gave you that direction?

A. Yes.

Q. Do you recall Mr. Boling giving you any reason for not making this information available to the public other than that it was a part of settlement discussions?

A. No. That was the basis.

Q. Did Mr. Boling tell you that the ONRC Action plaintiffs had insisted that the information remain confidential and not available to the public?

A. I was aware of that because it was stated on each one of plaintiffs' memos/letters to us.

Q. What was stated on those memos?

A. That plaintiffs believed that these communications were privileged.

Q. On this E-mail further up, the last sentence in your portion -- or next to last sentence, you write

thought about it?
A. No, they didn't.
Q. And did you ever have any concerns yourself about the correctness of the implementation definition, the forest service's implementation definition?
A. No, I didn't. It wasn't -- it's not my job to assess what the agency -- what their policy papers were.
Q. You never offered any advice on that memo?
A. No.
Q. Even after it was issued?
A. No.
Q. Same thing for the red tree vole?
A. Correct.
Q. I take it no one ever asked for your advice?
A. You know, I -- it isn't for anyone to come to me to ask for my advice. It was done, the executive signed off on it, and then my job is to coordinate a defense for it, and so that's -- that's what I do.
Q. This next document is marked plaintiffs' Exhibit 31. Again, you can help me out a little bit about reading the E-mail. Under the heading part 1, about the middle of the page --

A. M-hm.

Q. -- it says "To: Distribution (Title: Distribution list)." Did that -- is that a term of art? Does that include certain people?

A. I assume that it does. Each of us in our E-mail system at the time could develop your own distribution list, mailing list essentially, created by the sender. So when Bob Devlin sent this to his distribution list, I mean, it was whatever list he put together.

Q. If you look under part 2 Mr. Devlin refers to you.

A. M-hm.

Q. And he says, in about the middle of his part 2 portion, "Until we know where these discussions are headed," meaning the settlement discussions, "do not award any of these sales. If you have any specific questions on any of the sales on the list, call Sue Zike for advice." What kind of advice were you giving with respect to these sales?

A. The advice was if you convince Sue that the sale needs to go forward, she'll take it up with Ted Boling. And that's -- that's -- I think advice is probably a poor choice of words because I wasn't advising whether to award or not or what would help or

hinder the settlement agreements. It was more that I was the conduit between contracting officers and my case coordinators on what their schedule was for awarding these sales.

Q. So the procedure, at least at this point, which is October 16, 1998 --

A. M-hm.

Q. -- was that if a -- if a forest wanted to award a sale that was on a list that had been provided by the plaintiffs, the first step was to call you and convince you that they had good reasons?

A. Right.

Q. And I take it if they did not have good reasons you would say forget it?

A. And -- yeah -- well, I didn't have the authority to say forget it. I would say, you know, it's not convincing to me but we could take it up with Peggy and we could take it up with Bob Devlin. And the pressure usually from the purchasers and the community that was -- that were looking to our timber sales, if the pressure was there that these guys needed it to get logs to their yard, then it was at a higher level at that point than me for us to put -- make the push on DOJ that these need to go forward for whatever reasons so --

Q. Okay. So that if in fact the concurrence of the department of justice was sought on a particular sale, I take it that some kind of a case, if you want, for awarding the sale was made in writing through your chart or through some other mechanism?

A. No, it wasn't on a chart and it wasn't in writing. These are pretty much over the phone. We just get Ted on the phone and -- and we would talk them through with -- with where it was and whether or not it appeared to him that these would be good to go.

I assume that he would take those sale names to plaintiffs' counsel because they were in a settlement agreement. And that's what I assumed happened. I was never a part of that, never -- you know, never had to do anything in writing for Ted to brief anybody else. It was always over the phone.

And -- and because we were in settlement agreements -- or settlement negotiations it seemed to make sense that if we could -- if we, being the government, could get plaintiffs to concur that the award could go forward, then it wouldn't prompt the PI. So it was all about trying to keep us out of the preliminary injunction phase in the case so -- so I don't know who all Ted would go to, you know, to get a thumbs up or a thumbs down, 'cause he wouldn't

particularly tell us that --

Q. Are you aware of any occasions in which representatives of the forest service included purchasers in deciding whether or not to award a timber sale that was on one of the plaintiffs' lists?

A. I don't know if that happened or not. I would -- I mean, a contracting officer would have had those discussions, not me.

Q. That information was never mentioned to you directly or indirectly?

A. No, hm-m. No, not between -- you're asking between the forest service and the purchasers whether to award or not?

Q. Yes.

A. No, there wouldn't have been any reason for, for instance, Brenda Woodard to call me and say talked to X, Y, Z purchaser and he really wants that sales. She wouldn't -- she wouldn't have shared that kind of information with me. The rationale for the cases that they put together - and I know we've released -- there's charts of those, too, in the documents that we've released to you - would be surveys are done, price is right, think the market can hold it. You know, there were -- there were reasons. But I don't recall that she would -- for instance, that Brenda

Woodard would tell me that she talked with a purchaser.

Q. There's no place on your chart, for example, that says whether the purchaser wants the sale or doesn't want the sale or needs the sale?

A. I don't recall that there was. But I certainly had a lot of charts so --

Q. And the fact that the sales were on lists that the plaintiffs indicated might provoke a temporary restraining order or preliminary injunction, that was not released to the public?

A. Correct.

Q. Nor were the purchasers told?

A. I don't believe that -- well, the purchasers were told at the time of bid opening if they'd been named by the plaintiffs in this case, and they were told -- the public would have known if they followed the activities when that boilerplate language got put in the ads which would have been post this -- you know, post July '98.

Q. And what do you believe they would have known? What would a purchaser have known from this statement?

A. That this -- I think the language was -- the announcement that I understood that Hofer and folks

individuals; right?

A. It is.

Q. Okay. And turn to 1881 because you can read the text of the E-mail more easily there. You say "We received the okay to award the Wildfire and Evans timber sales on the MTH." That's the national forest, MTH?

A. That stands for the Mt. Hood National Forest.

Q. Okay. And when you say the okay to award, you mean from the department of justice?

A. It is.

Q. Okay. And so would this reflect a -- a pattern, at least at this point in time, which is in October of 1998, it looks like October 13th if you look on page 18 --

A. Oh, my gosh, there is a date up there, isn't there?

Q. I won't ask you to read it. It's too difficult.

A. Thank you.

Q. I'm just trying to get the procedures straight here. After the forest indicated a desire to go forward and award a sale or sales that were on the plaintiffs' list, their -- their information in

support of that award was provided to you, you either passed it directly on to justice or there was a conference involving Mr. Devlin or Miss Kain or others.

A. And Peggy, correct. Correct.

Q. And if the consensus of that group was that you would still want to go forward with the award, then it was presented to Mr. Boling?

A. Correct.

Q. And when you have an E-mail like this that says "We received the okay to award," that means Mr. Boling concurred?

A. That's correct.

Q. Okay. This next document is Exhibit 33. Now, the first page of Exhibit 33 has your name at the bottom and, again, this is one of those E-mails that's not always easy for me to read so can you just tell me what's going on here and who's writing to whom?

A. Well, let me see. The -- where it says to Sue Zike, that would be coming to me from Devlin which is on the second page, his signature block in the messages there.

Q. Where it says "I sent similar message to D. Bus --"

A. Right.

Q. "-- on Willamette and she got it"?
A. Right.
Q. Okay.
A. So the way this E-mail system worked was it's backwards in time. So when I say "Tom made my best shot," I think I said best "at convincing DOJ." I would -- that CC'ed to Devlin and Devlin replied to that saying "I sent a similar message to Diana Bus on the Willamette and she got it."
Q. Okay.
A. So he was just conferring that what I was saying here, he had sent a similar message to Diana. And my guess, Diana was the contracting officer and my case coordinator on the Willamette and she had probably had a -- had another sale, you know, that was -- that --
Q. Okay. Well, my particular interest here is with the message addressed to Tom. That would be Tom Link?
A. Tom Link, correct.
Q. On the Siskiyou National Forest?
A. Right.
Q. And the sale he's referring to would be the Too Wild timber sale?
A. Correct.

Q. And you say here you made your best shot but it wasn't successful?

A. Correct.

Q. Do you recall why not?

A. Well, the why not is the next sentence that says DOJ analyzed the risk and thought it was in their best interest for the settlement negotiations and to avoid claims that we delay the award of Too Wild so --

Q. Do you remember the rationale, the department of justice rationale, for denying the forest service's request to award Too Wild?

A. I think there was -- as I recall, there had been a lot of opposition to Too Wild timber sale and it -- my recollection was that plaintiffs would have threatened to go for the injunction if we had moved to award that. And throughout this whole settlement time in '98, now this is October of '98, I think Ted Boling continued to believe that we and plaintiffs' counsel could work out a deal if we could just keep the injunction at bay.

Q. So at this point, his decision was not to allow the award?

A. His being Boling's?

Q. Yes.

A. That's what we were counseled.

Q. And I take it the forest service followed that advice?
A. That's -- that's my recollection.
Q. Do you know why the forest service wanted to go ahead with the award as opposed to waiting to see if the settlement talks played out?
A. You know, I don't recall Tom Link's briefing paper on Too Wild, you know, what the -- or a chart, you know. We did these charts that asked -- that laid out their rationale for wanting to to award I guess it was big old growth volume.
Q. I don't understand, excuse me.
A. That when we had a sale that had large volume which usually came out of old growth trees, that the forest service was wanting to get those awarded to purchasers.
Q. Okay. And you don't remember -- or perhaps I should put it this way: Do you remember any of the specifics of -- of Mr. Boling's reasoning in deciding to not allow the award of Too Wild at this point?
A. I do not.
Q. Okay.
A. Let me correct that, Gary. What I recall is that Ted's reasoning for delaying this award was that he believed he could get -- he believed he could get a

settlement agreement with plaintiffs' counsel, so that's what I recall his rationale was. It wasn't whether or not the sale was good or bad, but this -- but Too Wild had enough opposition to it that he thought moving forward into award would chill the settlement negotiations that he was undertaking.

Q. So in this -- in this period of after the lawsuit was filed through October, this is dated October 24th, 1998 --

A. M-hm.

Q. -- is it your recollection that the justice department approved the award of some sales but vetoed the award of other sales?

A. Yes, it is. And we went through one of these exhibits earlier where we got the okay to award these two Mt. Hood sales. And part of the reason that we got the okay to award those two Mt. Hood sales was, even though they were named by plaintiffs in their list, plaintiffs had not appealed. And of course under Administrative Procedures Act you have to -- you have to exhaust your administrative remedy before you can take us into court, you know.

So on the sales that plaintiffs -- these plaintiffs had not appealed, we felt safe going forward to award because they didn't have standing to

sue us on those. So -- so we did get an okay on some of those. And that was all a part of the sale data that my case coordinators would feed me. Because plaintiffs' grab was wide and big and nondiscriminatory of these list of 156 sales they wanted to shut down. So that's why we lobbed through them one at a time.

Q. Okay.

A. Okay.

Q. This next document is Exhibit 37.

All right. The first page of this document is a memorandum from you to Mr. Devlin and Miss Kain and someone named Lisa Freedman and Arnie Holden. Can you identify Miss Freedman and Mr. Holden?

A. Lisa Freedman is the director of strategic planning at the time and Arnie Holden I believe was her deputy. And that's the department that I work in so she's my boss. And then it also goes to regional forester.

Q. What were the general duties of the people in strategic planning at that time? What did strategic planning do?

A. There is -- in addition to me, which is the litigation end of the house, there is an environmental coordination department which are the NEPA experts and

the NFMA experts, and then there is an appeal department who run the administrative appeal reviews and program. And I think at that time Lisa also had the program budget and development folks who do our out year budget planning I think reported to her back in '98.

Q. Okay. If you look at paragraph 6 on page 1 of -- actually page 70 but it's the first page of Exhibit 37.

A. M-hm.

Q. There's a reference to a list of BLM and forest service sales that would not be awarded until after November 23rd.

A. M-hm.

Q. And then it goes on to make some further comments. Can you explain in a little more detail what that is about?

A. Items 1 through 6 were the bullets of our counteroffer to plaintiffs in the settlement discussions. So plaintiffs were asking and apparently the government, through Ted's negotiations, were offering to do items 1 through 6 to settle this case, so -- and the letter that I'm referring to, the 10-26, 1998, letter from Ted Boling to Axline, is not attached to this exhibit, just so you know.

Q. Okay.

A. It's probably somewhere, but -- so I'm paraphrasing because attachments do often get lost.

Q. Sure.

A. So I'm paraphrasing in items 1 through 6 for my executives what the government was counteroffering. So No. 6, as I read it today, says that our counteroffer said that we would give plaintiffs a list of forest service and BLM sales that would not be awarded until after 11-23-98, 34 of which were BLM and 38 which were forest service.

Q. All right.

A. So we were offering to give them that list.

Q. Okay, thank you.

A. M-hm.

Q. Below that paragraph 6 there is a section of this first page entitled "What Next" and in paragraph 2 --

A. M-hm.

Q. -- and at the bottom of paragraph 2 you write "I think there will be around 20 or so and the forests will be wanting to move ahead and DOJ will be wanting to delay." What is that about?

A. Ted was wanting -- Ted Boling was wanting to wrap up his settlement negotiations. And it's what we

had thought and talked about already is that our forests had sales in various stages of settlement and they were wanting to move into auction and award, and the concern from Ted Boling was that that would prompt PIs, preliminary injunctions. And he didn't want to be distracted from his settlement discussions with such a motion. So I knew we would have more convincing to do that, of the sales that were advertising in this period in the previous sentence described here, that we would have some more arguments to make with our trial counsel as to whether or not we could award those.

Q. And how did you come up with this estimate of 20 or so?

A. I would have only gotten that from my forest coordinators.

Q. So these were ones that the forests wanted to move ahead on and you assumed that justice would not want to move ahead on any until the settlement discussions had actually come to a conclusion on?

A. I wouldn't say any, because it wasn't a black line. If in fact the plaintiffs did not have standing through the appeal process or if the plaintiffs had appealed but did not raise the implement memo issue or the retrieval issue, then our

trial counsel were pretty comfortable with letting us move ahead because they felt they had an argument that there was no standing.

Q. Now, you said the implement issue or the red tree vole --

A. Red tree vole memo issue, yes.

Q. Referring to the interpretations with respect to both of those types of surveys?

A. Correct.

Q. Okay. Let's see, is the last page of this exhibit page 0093?

A. It is.

Q. Okay. And the first page is 0070?

A. Correct.

Q. Okay. Then we're all set.

I think you have a couple of pages that don't go with that exhibit, but you're welcome to them anyway.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. Should we take a little break right now?

A. That's fine.

(Recess: 10:30 to 10:48 AM.)

Q. (By Mr. Stevens) The next document will be Exhibit 35. It begins on page 102 and runs to page

105. The first page is a memorandum from you, again, to the ONRC Action coordinators.

A. M-hm.

Q. You've told us who that would be before.

A. Correct.

Q. All right. And in the second paragraph of your memo you write "However, as you will note the DOJ has promised certain sales will not be awarded until after November 23, 1998." So am I correct this was your understanding of what was going on in the settlement discussions?

A. It was due to that, correct.

Q. So this would be another reason for the department of justice not allowing sales to be awarded, that they had made an agreement with the ONRC Action plaintiffs?

A. Well, I don't know if ONRC counsel and my counsel, the department of justice, in fact agreed to these sales 'cause I -- because I wouldn't know that. But I do know that Ted Boling, DOJ, and plaintiffs' counsel were meeting through these -- or, you know, having conversation through that period of time in the request. And they thought they could get their deal cut by around the end of November. So then the requests came from department of justice can you delay

these certain sales until that 23rd date. So I don't know that I would represent it as -- as an agreement between plaintiffs and defendants that these sales would not be awarded.

Q. Okay. The reason I ask that is because you say here that "DOJ has promised certain sales will not be awarded." I assume you promised that to the ONRC Action plaintiffs?

A. Correct.

Q. So that part you do know?

A. Right.

Q. And that's consistent with the statement further down in the same paragraph where you say "I need to remind you of Bob Devlin's message to the forest supervisors October 16 asking that you not award any of the listed sales until I can get an okay from DOJ, period."

A. Correct.

Q. And you say "I've inserted Bob's message below," and that's on page 103, and I think we've seen that in another context already.

A. Correct. However, again what's not attached to this briefing memo is the October 23, '98, counteroffer.

Q. I understand that.

A. Okay.

Q. And in the last paragraph of your memo on page 102, the first sentence, you say that, in part, "The DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless we can show good reasons (resource reasons) why the sale needs to be awarded within the next month." Why did you think that was true?

A. It was my observation that until an agreement got reached between plaintiffs and defendants, that these controversial sales, controversial to the plaintiffs, we would be asked to delay those. That was just my -- my reading of the way Ted Boling managed the case so far.

Q. And did Mr. Boling make it clear to you that in terms of good reasons he meant resource reasons, protection of natural resources?

A. Correct.

Q. As opposed to purchasers desires to have sales awarded?

A. Correct. Or targets. You know, if the -- if the region was not going to meet their timber targets, that was not important enough to the department of justice to move forward with these sales that are likely to prompt the injunction.

Q. Timber targets meaning the projected target for volume of sales of timber?

A. Just volume.

Q. Volume.

A. Timber volume.

Q. So that each forest had a certain target in terms of the volume of sales it was hoping to sell that year?

A. Correct. That's what we get financed for by Congress.

Q. So it's important?

A. They're very important targets, but we were -- and that's why we needed Devlin's understanding and agreeing with delaying these, because that all meant targets were not going to be met.

Q. Okay. And what did you mean by the last couple of sentences in this last paragraph where you write "DOJ is aware that the timber market in the Portland area is not strong, so we have a bit of an uphill struggle to move ahead. But" we will -- "but try we will. And we do have some good reasons for many of these sales"?

A. Right. Well, as we had looked in the earlier exhibit, Lois Shiffer and Peter Coppelman were

of the opinion -- they're in Washington, DC, were of the opinion that the timber market in Oregon was soft and so that's what the first part of that sentence means. Ted's bosses realize it's a soft timber market.

But that doesn't mean that the forest service does not advertise and award sales. I mean, we have advertised and awarded sales -- it's a purchaser's -- I mean, that's the market is whether the purchasers wanted to buy the stuff or not. So you put the -- you put the timber sales out there. If they believe they can make money by buying that sale, they buy it. And it isn't for us to slow down the offering of timber sales because of soft market. Just makes a difference on whether we'll sell them or not.

Q. Okay. The next document will be Exhibit 38.

A. Thank you.

Q. Okay. Well, the first page is another copy of the memo we were just talking about, but the attachments is what I'm really interested in, pages 92940 and 92941. This document is addressed, on page 1, to ONRC Action coordinators, and I'm just asking you if you can verify that the -- the list on page 92940, which is produced in more readable form on 92941, these are the individuals to whom you sent

Q. Would it be fair to say that you were the principal litigation coordinator for the ONRC Action litigation for both region 5 and region 6, in general?
A. That would be correct.
Q. And so if Mr. Matthews had some sales on the Klamath and he wanted to award, he would get in touch with you --
A. Correct.
Q. -- and provide you with the information and the process would proceed as you have previously described it?
A. That is correct.
Q. Okay. The -- this list for the Umpqua identifies Michael Hupp but does not identify Brenda Woodard.
A. That's right.
Q. You would have sent some -- some of these to Miss Woodard and some to Mr. Hupp and you would expect Mr. Hupp would pass them on to --
(Mr. Wah left the room.)
THE WITNESS: I expected -- because Mike Hupp was the environmental coordinator and their forest planner, and in some cases that's who the forest supervisor wanted me to go through so that's who I used. I know I had, from time to time,

independent discussions/E-mails with Brenda on particular sales.

Q. (By Mr. Stevens) Okay. Taking you back down memory lane, the next exhibit is 40, plaintiffs' Exhibit 40.

(Mr. Wah entered the room.)

Q. (By Mr. Stevens) And this is an E-mail -- at least part of this is an E-mail from you to various other individuals.

A. Correct.

Q. And under part 2 that's your E-mail?

A. It is.

Q. The bottom of the paragraph under part 2 you say "DOJ is willing to consider the merits of each sale that we want to award, so the door isn't shut."

A. Correct.

Q. Meaning at this point it was still possible for sales to be awarded but DOJ had to be convinced?

A. Correct.

Q. And then when you say "Please put your rationale for need to award in the far right column," you're talking about your chart?

A. A chart.

Q. Okay. And all of that was standard procedure at this point in time?

A. It was.

Q. Okay. The next exhibit is Exhibit 42.

And this is another one of your E-mails. You can't read the date very clearly on the first page, but I've deciphered it as November 6, 1998, and you could just take that as representation.

A. Okay.

Q. And the text which is more readable is on the second page, page 1844. On page 1844 the paragraph under part 2 and at the end of the second sentence you say "Encourage the rest of --" starting in the middle of the sentence, "Encourage the rest of you to" make -- "to review the sales in the sideways chart I sent out yesterday to see if you want to make a concerted effort to discuss the award likelihood with DOJ slash OGC." Now, why, at this point, are you talking about a concerted effort? Were you suggesting to them that unless they had a very strong reason for going forward, that they shouldn't urge you to do that or --

A. Because there was this delay period that plaintiffs -- as I recall, plaintiffs had a list of sales that they didn't want to go forward while they were negotiating with Ted Boling and that we were assured by -- I recall being assured by Mr. Boling

verified them and they should be right.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. This is a -- Exhibit 56 is page 1745 through 1746. It's another one of these E-mails or perhaps E-mail exchanges. And let me ask you to turn to the second page, though I'll note, for the record, my reading of the date is November 8th, 1998. And if you turn to page 2 under part 4.2, three short paragraphs, that's your E-mail I take it?

A. That's correct.

Q. Let me draw your attention to the last paragraph and the first sentence where you say "Please keep in mind (as COs always do) the liability that may come to the USFS if the sale is awarded and enjoined." What were you referring to there?

A. Well, I'm -- I'm certainly not a contract lawyer for the government, but it was just a reminder to perhaps my case coordinators who were not contracting officers that if we have to award and then we are enjoined, that we then would have to use one of the clauses in the contract to suspend the sales. So it was just a -- just a reminder.

Q. And COs refers to contracting officers?

A. Officers, correct.

Q. And were you asking them not to press for

the award if they thought there would be liability to the government?

A. Yes.

Q. In the second sentence in that same paragraph you say "Is there a need for a regional conference call re the award question?" What kind of regional conference call were you talking about?

A. With our -- with Jerry Hofer, the regional contracting officer, and Peggy Kain to see if we needed to talk through collectively the sales that the forest wanted to award.

Q. Now, you're asking your -- your folks on distribution list if you think there is a need for a regional conference call. What would determine whether there would be a need or not be a need?

A. E-mails back or phone calls back to me from those case coordinators if they wanted to talk it through.

Q. And the nature of the conference call would be to, as you put it, air the needs and risks of going forward?

A. Correct.

Q. So would Owen Schmidt be involved in that at all?

A. He would.

Q. And when you have a conference call like this, how is the final decision made to go to the justice department and go forward with the award? Was it made by the highest-ranking individual involved in the conference like Miss Kain or Mr. Devlin or --

A. Typically that's how it -- there would be a -- there would be a discussion with -- with Devlin, and if he wasn't on it'd be Peggy. And we looked to those managers to make the policy call.

Q. Did Owen Schmidt have veto power?

A. No.

Q. What was his function in this process?

A. Advice, help us think it through, litigation risk.

Q. Okay. The next document I'm handing you has been marked as Exhibit 47. It has lots of pages to it, it has lots of charts attached to it. My main questions for you are on the first page.

A. Okay.

Q. All right. This is a memorandum that you prepared and it's dated November 19th, 1998. In the first single-spaced paragraph, the first sentence you write "Below is chart of the 12 species listed in the S slash M EA that are survey dash able and considered to have a substantially increased risk." What risk

were you referring to?
A. It's what I understand for the survey/ manage species there is a risk of not extirpation but a risk of becoming more rare by having timber sales affect their habitat.
Q. And that's what you were referring to here --
A. Yes.
Q. -- that risk?
A. Yes.
Q. In the second paragraph of this E-mail beginning with "R5 colon" you state "I do not have your sales in my data base. Please refer to the sale chart Brian Stone assembled 9 slash 24 slash 98 and only consider the sales with DN or ROD'S between 7 slash 1 dash 9 slash 30 slash 98." Why was consideration limited to that time period?
A. That's the last quarter of fiscal year '98 and those were the discussions about that quarter of timber sales that Ted Boling and ONRC's counsel were trying to negotiate.
Q. As part of the settlement negotiations?
A. Correct.
Q. The next document I'm handing you has been marked as Exhibit 49. This is another one of your

E-mails with the clearest text on page 1815 and another version of the same E-mail on 1814 which bears the date which I have read as November 23, 1998.

A. Okay.

Q. This is to distribution so that means it goes to the same people on your distribution list that we talked about before.

A. Right.

Q. If you look towards about the bottom third and over on the right-hand side of your E-mail you say "We've built a good factual case with DOJ about the unreasonableness of, open quote, going back, close quotes, and the reliance the agencies put on the, open quote, implement, close quote, definition, period." What did you mean by that?

A. Okay. Let me read it again.

Q. Sure.

A. Well, the first part of the sentence about the unreasonableness of going back would -- would relate to the position of the plaintiffs that we go back and survey these last quarter timber sales.

Q. That's this timber -- that's the timber sales that were awarded between July 1, 1998, and October 1?

A. I don't -- I don't know that they were

awarded. I think they had decision notices between those dates.

Q. Decision notices?

A. I don't think they were awarded --

Q. Okay.

A. -- particularly. There were probably some awards, but I think the dates for the last quarter fiscal year '98 was the decision notices that occurred in that period of time.

Q. Okay.

A. And that the cost of doing that and the delay of doing that was unreasonable. So if that's what -- in terms of expertise, fungi, mycologists are hard to come by; red tree vole, tree climbers are hard to come by. So the cost of trying to beef up and do that sort of survey for this last quarter, in our view, was unreasonable. And apparently, at this point, we had convinced DOJ that that was an unreasonable settlement term to do that.

Q. Oh, is that what you meant by "We built a good factual case"?

A. Right, right. That we had put our information together, the costs, the availability of people, some of the fungi you can -- they only bloom once every five years so you have to keep surveying

for at least six years, you know, to be sure. And so there was a lot of practical impediments I guess in going back and doing these old sales.

Q. And decision notices, just for the record, those are the documents that are signed for environmental assessment that indicate that the environmental work is completed?

A. Correct.

Q. And that has to be done before a sale is advertised and offered to the public?

A. To -- today that's the case. I think back in '98 and years before that we would advertise before the decision notice was out because then we could get our advertisement period taken care of, but I'm -- I'm pretty sure that we never awarded them. I would have to say I'm very sure that we never awarded them until that decision notice and -- had been issued.

Q. And so what was the purpose of signing the decision notice? What was your understanding of what that signified?

A. It's our legal obligation under the National Environmental Policy Act that you do an environmental assessment and then issue a decision so the public knows which alternative you've picked. And that's all public and it's all subject to appeal, you know, which

gives -- which gives us -- gives our opponents a standing to sue us if they participate in that appeal period.

Q. So would it be fair to say that the signing of the decision notice signifies that all of the environmental analysis that was needed in order to approve the sale had been done?

A. Correct, correct.

Q. What did you mean in the second part of the sentence that we've been discussing here about the reliance the agencies put on the implement definition? Is that related to the first part of the sentence?

A. Well, I don't know. You know, when I read it here that we have built a good factual case on point 1 and then as to our reliance the agencies put on the implement definition, I -- yes, it -- yes, it would relate to the first part of the sentence.

And the point of that being is that we moved -- we issued those decision notices in the last quarter of fiscal year '98 in reliance on the definition of implement in that letter. So it sounds obvious at this point, but we had done a fair amount of convincing to the department of justice if we recall Miss Shiffer's and Mr. Coppelman's concern that the implement was nonsense, you know, our definition

of implement was nonsense. So we worked very hard to convince them that it was defendable.

Q. But here you're not talking about the defendability, are you? Here you're talking about the unreasonableness of going back and the reliance?

A. Well, I think that those two are defendable because the settlement efforts failed. So we knew we were in -- we were now in a defensive posture. So I was just intending to compliment our guys for all that they had given us about the cost and expense of going back and that they had been very clear that our reliance on the implement definition from the implement memo had been reasonable.

Q. And substantial?

A. It had been substantial.

Q. Okay.

A. Indeed, yeah.

Q. Okay. The next document I'm handing you has been marked as Exhibit 51.

(Discussion off the record.)

Q. (By Mr. Stevens) All right. Exhibit 51 runs from page 93303 to 93315 in the bottom right-hand corner. And the first page is a memorandum dated November 23, 1998, from you to the regional forest service, Miss Graybeal who was regional deputy

could we survey for more than what the ROD required or could we do it in a speedier way or -- I think he was still -- I don't think -- I think he would have liked to have settled the case and so I think he was fishing for maybe one last ditch sort of offer is how I would take that today.

Q. Okay. Let me just take a quick look at one more document and we may just drop it and free you up for the day.

A. Pick it up? Appreciate it.

Q. Is the timing okay with you?

A. Yeah.

Q. I want just to look at my great book of documents.

Okay. Let's just do one more, I think it'll be fairly quick here, Exhibit 63, and that will bring us to a good stopping point. I've handed you Exhibit 63 which is another one of your E-mails in the form of a more readable version of the text on page 1720 and a less readable version but with a date, if you have a magnifying glass, on page 1719. And the date, as I read it, is December 8th, 1998.

Okay. This is an E-mail from you to Graybeal, Devlin, and Williams; correct?

A. Yes.

Q. Okay. And you are reporting to Bob and Nancy, meaning in the first paragraph Mr. Devlin and Ms. Graybeal, maybe also Mr. Williams.

A. Yeah, I think -- I think probably Williams because he was the regional forester.

Q. Yeah, you would probably put him first.

A. He's important.

Q. You would probably put him first.

A. Yeah.

Q. And I take it you were updating them briefly on what the latest news from DOJ is --

A. M-hm.

Q. -- and you say "DOJ agreed to defend our definition of implement under the ROD to mean NEPA decision." So you learned that on or about the 8th of December?

A. Must have, that's the -- your --

Q. Assuming that's the date?

A. Right.

Q. Whatever the date of this is --

A. Right.

Q. -- it was on or about that date?

A. Right.

Q. And do you recall how you learned about that and --

A. I most likely would have heard that from Ted Boling.
Q. Did he tell you how the decision was made?
A. No.
Q. Okay. Or who was involved in the decision?
A. Not -- no, not that -- not that I recall.
Q. All right. And in the same paragraph, No. 2 --
A. M-hm.
Q. -- you see where it says "To make the defense, DOJ wants to tell the court that even though implement means NEPA decision --"
A. M-hm.
Q. "-- the agencies are going to do the FY '99 12 S-P-P --"
A. Species, that stands for species.
Q. SPP period stands for species?
A. M-hm.
Q. "-- surveys on the last quarter sales anyway (or in the alternative, the cost of doing these surveys is so much dollar sign and so much MMBF forgone for FY 99/2000)."
A. M-hm.
Q. All right. So Mr. Boling is telling you there that they're going to defend the definition but

they still want to tell the court that you'll -- you'll do surveys for the last quarter of '98?

A. '98, m-hm.

Q. And why did he want to do that?

A. Well, your guess is as good as mine.

Q. He didn't give you any reason?

A. No.

Q. Did he --

A. Not that I recall.

Q. Did anyone else give you any reason for this DOJ position?

A. Not that I recall. We all had our ideas why that was.

Q. What was your idea?

A. Well, my idea was that they were trying to appease the environmental community.

Q. Okay.

A. And doing these 12 species surveys that became an obligation in fiscal year '99, to go back and do them on '98 timber sales would be what plaintiffs were asking for in settlement, so if you just put those two things together, plaintiffs are asking for it in settlement and then we have our department of justice political appointees asking us to do what plaintiffs were asking to do in settlement,

you can surmise that they felt some obligation to that community.

Q. Was this something Mr. Lyons wanted to do?

MS. LYNCH: I'm going to object.

THE WITNESS: I don't know.

MS. LYNCH: I was going to say this is speculation on the witness' part so --

THE WITNESS: I don't know.

Q. (By Mr. Stevens) Did you hear from anyone else Mr. Lyons --

A. No, I don't -- I would not hear from Mr. Lyons.

Q. No, no, no. But I mean our people about Mr. Lyons --

A. No.

Q. -- taking a position. Mr. Devlin, for example?

A. No, no. Bob didn't share much of that policy and stuff with me.

Q. In the second paragraph you make a point about unawarded or so-called unawarded FY '98 advertised timber sale volume and DOJ concluding thus no harm to timber industry.

A. M-hm.

Q. What was the forest service's response to