App. Tab 176
Corrected

THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | ORIGINAL No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-501C |

DEPOSITION OF

ROBERT J. DEVLIN

Taken in behalf of Plaintiffs

* * *

August 21, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

A-1572

PORTLAND, OREGON; TUESDAY, AUGUST 21, 2007

1:25 PM

* * *

ROBERT J. DEVLIN

called as a witness in behalf of the Plaintiffs,

having first been sworn by the Reporter,

testifies as follows:

EXAMINATION

BY MR. STEVENS:

Q. Good afternoon, Mr. Devlin.

A. Good afternoon.

Q. Thank you for being here, again. I'm going to hand you what's been previously marked as plaintiffs' Exhibit 39. You can look on with him for a minute.

The first page of 39 you can see is a memorandum by Sue Zike, and feel free to look at that, but I'm really going to ask you a couple of questions about the second page in which as an attachment she includes a E-mail that you sent out. Page 103 of this exhibit shows at the top "Sender: Robert J. Devlin," and that's you, dated October 16, 1998, and it's to distribution. And I understand from Miss Zike and I think from your testimony earlier in the depositions that you had a distribution list that you sent these

kinds of E-mails out to that included a number of people.
A. Yeah, it was -- as I recall, the distribution list was the -- obviously the forests that were covered by the Northwest Plan, region 5 and region 6.
Q. So it would have gone to the ONRC Action litigation coordinators in the forests?
A. I'm not sure who it went to in the forests. I know what units they went to, that's all.
Q. Units meaning?
A. Forest, excuse me.
Q. Forests, okay.
All right. If you look at the text under part 2 on page 103.
A. M-hm.
Q. You may need to read that whole paragraph to get the drift of what you have said here after all this time, but I want to ask you, when you get to it, a question about the very last three lines and the statement that says "If you have bid openings before we decide to award these sales, make your standard announcement before the bid opening that tells prospective bidders that the sale is currently under litigation."

A. Okay.

Q. All right. Now, was that standard announcement oral or was it in writing?

A. As -- as I -- well, I can't tell you how it was done on each forest. I know how it was done when I was on a forest. It was orally announced before the bid opening.

Q. Okay. So this is a standard announcement that predates the ONRC Action litigation, prior --

A. Yes.

Q. -- to July 1998?

A. Yes.

Q. And -- and do you recall it's correctly characterized there as telling prospective bidders that the sale is, one, currently under litigation and, two, award may be delayed?

A. Yeah. This -- this announcement would have said that. Some announcements may not have had those exact words, Gary.

Q. Okay. That was the intent --

A. Yes.

Q. -- to convey those two pieces of information?

A. Right.

Q. Was there any announcement that, to your

knowledge, was crafted for the ONRC Action litigation?

A. If there was, I wouldn't know it. I don't -- I don't recall any -- any special announcement.

Q. Staying with that same paragraph on page 103, the very middle of that paragraph you say "Until we know where these discussions," meaning settlement discussions, "are headed, do not award any of these sales." Was that a direction that you had occasion to give from time to time during the ONRC Action litigation while settlement talks were going on or was this a one-time affair?

A. I don't -- I don't know if we had -- if we did -- if we gave that direction more than once. I do know that it's -- that it was not only the ONRC lawsuit, we had other lawsuits where we gave some of the same direction, especially where there was negotiations going on.

Q. Now, when you sent this out to the distribution list, I assume that included all the forests within the Northwest Forest Plan so it would have included, for example, the Klamath even though it was in region 5?

A. Well, what I don't know is if this went to a distribution list for just those forests that were

covered under this lawsuit or whether it went to a distribution list that had all the Northwest Plan forests in it which would include the Klamath, Shasta, Trinity, Mendocino.

Q. Okay.

A. I don't -- because I don't recall whether that specific lawsuit had sales on all those forests or not.

Q. Well, just for informational purposes, turn to the next page, 104, and, if you want, look at 105. On 104 you'll see a -- an E-mail from Brian Stone. And you recognize his name --

A. Yes.

Q. -- as an official in region 5 of the forest service?

A. Right.

Q. And you also see Ed Matthews and the Klamath National Forest. And Mr. Matthews was a contracting officer on the Klamath National Forest at the time?

A. M-hm. Yes, excuse me.

Q. And the reference here in the middle is to a Jack Heli sale.

A. Oh, here, yes.

Q. And the Jack Heli sale is listed in a typed table on page 105 in about the middle, you can see the

title of it if you look in the -- turn it sideways, look at the far left-hand corner, it says "Region 5 timber sales ONRC Action." So I would assume that your distribution reached people like Mr. Matthews on the Klamath?

A. Yeah. Well, it -- I think what I said was if the -- if the forest had a sale that was included in this lawsuit in region 5, they certainly were on the distribution list.

Q. Right.

A. And also Brian I guess. That distribution list was something that Sue Zike made up for all the communications so --

Q. Let's go off the record for just a moment.

A. Can I go back on this, too?

Q. Let's go back on the record for a minute.

A. No, then we won't go back.

Q. What were you about to say?

A. Well, I don't know how it ties into Sue's letter -- or Sue's note, that's the --

Q. The Klamath reference?

A. Yeah.

Q. It may not. It's just there to refresh your recollection.

A. Okay.

A. Yeah, like the survey protocol, No. 12, on 93320, salamander protocol not being followed on GP, that -- that's stuff that I would never have known on the --

Q. Okay. Let me ask you to keep turning in this document to two pages from the end. It's a page lower right-hand corner TAB 93325.

A. 25?

Q. Yeah.

And that is an E-mail from you to Sue Zike, Peggy Kain, and it looks like Judy Nelson dated November 28th, 1998.

A. M-hm. Yes, I see that's from me.

Q. In the first part of this you're referring to Sue and Peggy and so that's Sue Zike and Peggy Kain, and you say "I left you voice mail about Nancy's suggested changes to briefing paper." That would be Nancy Graybeal?

A. Right.

Q. "She and I talked about it and her thoughts are that if we just hang our hats on costs and delay in sales coming out, the response from DOJ doesn't seem to care about that." What were you referring to there?

A. Well, as I review it now, I -- I assume that

it meant that the -- just 'cause it cost us more money in delayed sales, that that's not -- that that's not an issue that DOJ cared about at that time.

Q. Right.

And why did you think that was the case, given that selling a certain volume of timber was one of the government's objectives in the Northwest Forest Plan?

A. I have no idea why the response from DOJ doesn't seem to care about that because I don't think the response from DOJ discussed anything about the meeting the target. That was strictly an internal forest service concern.

Q. Well, I understand that you and Miss Graybeal came to the conclusion that if you just hang your hat on costs and delay and sales coming out, the response from DOJ doesn't seem to care about that, and I understand that to mean that if you were going to persuade DOJ to defend the forest service in this case, it would have to be defense that dealt with more than just costs and delay that you were going to incur.

MS. LYNCH: Objection to the form of the question.

Q. (By Mr. Stevens) Am I -- am I reading that

wrong?

A. All I know is that when we had the -- we had the discussions with the DOJ lawyers, it was always -- the question was always are there resource reasons, are there cost reasons. You know, there's more than just costs and delay. We had some sales, for example, that were fire salvage so obviously we wanted to get them if we could get them awarded and get them moved. So it wasn't just -- it just wasn't the costs involved in the delay in the sales. It was just in the -- that wasn't the only discussion we had with DOJ.

Q. In other words, there were other objectives in the Northwest Forest Plan and that included resources, protecting resources?

A. Yeah, I didn't -- I'm not putting my answer in the context of the Northwest Plan. I think I'm putting in the context of there were -- there were -- we were answering questions about what were some of the reasons that we should go forward with award of sales so we could feed that back to the DOJ lawyers so when they negotiated with the plaintiffs they had that information. Costs and delay of sales was obviously part of it, but there was also resource reasons.

Q. Okay. The next -- then the next sentence you write "Those are facts of life for sure but if

they don't agree with our definition of implement and think the market is low so who cares about delay in sales, then we need to build response with her suggested changes but still include the facts you have in the draft." I assume the they you're referring to in that sentence is the department of justice?

A. I'm not sure. I don't know who they is.

Q. Do you ever recall, at any point in time, anyone in the department of justice expressing any concerns about the interpretation of the Northwest Plan surveys known as NEPA decision equals implementation?

A. I never had any discussion with anybody in the department of justice that indicated any concern. There may have been, but I'm not aware of it.

Q. Did you ever hear about that from Miss Zike, that the DOJ had those concerns?

A. Boy, I don't -- I don't remember if I did or not.

Q. Okay. Do you remember there was a time after the complaint was filed when DOJ was considering whether they would defend that interpretation in court or not?

A. I don't -- I don't recall that at all.

Q. Do you recall a DOJ official known as Lois

Shiffer?

A. I know who Lois it. I met her one time at another meeting.

Q. And Peter Coppelman, is that a name that is familiar to you?

A. Peter was there also at the same meeting.

Q. Were you ever made aware that Miss Shiffer and Mr. Coppelman said that the interpretation NEPA decision equals implementation was nonsense?

A. No, I had -- I'm not aware of that.

Q. You never heard that?

A. I don't recall hearing that.

Q. Okay. You don't recall one way or the other?

A. No.

Q. You might have heard it or you might not have heard it?

MS. LYNCH: Objection, asked and answered.

Q. (By Mr. Stevens) Well, as you know the word recall is a little ambiguous. I just want to know whether you just don't know one way or the other or whether you know it was never mentioned to you.

A. I don't -- I don't know that it was ever mentioned to me --

Q. Okay.

A. -- about their -- any concern they may have had.

Q. So your answer is you just don't know?

A. No.

Q. All right. And as you look at this E-mail today, the pronoun they in that sentence that I read to you, you don't -- you don't know whether that refers to the justice department or not?

MS. LYNCH: Objection, again, asked and answered. You can go ahead and answer if you can.

THE WITNESS: I -- I'm not -- I'm not sure who they is. I think I'd be guessing if I tried to interpret who they are.

Q. (By Mr. Stevens) And that next sentence where it says "The other thing that I think we both," looks like forest service slash BLM, "have to remind these folks is that our current effort to change schedule of survey with EA and EIS effort to make other changes has to be considered when DOJ decides whether they agree with our proposals." Wouldn't you agree with me that the pronouns they in that sentence and in the previous sentence refers to the justice department?

MS. LYNCH: Objection, form.

THE WITNESS: Well, as I read it, I can't --

I can't really tell who they is. I don't know if it's DOJ or whether it's the plaintiffs.

Q. (By Mr. Stevens) Well, continue on in that paragraph and you come to a sentence that reads "The trick is going to be to get both WO's," meaning Washington, "office and secretary's offices to support where we are and not let DOJ decide for us." Now, that's clearly department of justice; right?

A. Yes.

Q. And then you say "Not being able to defend us is one thing but not agreeing with what we are doing is another." And you're obviously there referring to the justice department; correct?

MS. LYNCH: Objection. The witness should answer to the facts in the E-mail, not your interpretation, Mr. Stevens.

MR. STEVENS: He wrote the E-mail.

THE WITNESS: Can I hear the question again?

MR. STEVENS: Why don't you read the question back. Let's see how clear it was.

(The reporter read the record as follows:

"Question: And then you say "Not being able to defend us is one thing but not agreeing with what we are doing is another." And you're obviously there

referring to the justice department;
correct?")

MS. LYNCH: And the objection stands, the witness should interpret his own E-mail.

THE WITNESS: Well, as I -- as I interpret that sentence, because I'm saying defend us, I'm assuming, again, and I think I'm correct, that I was, with that sentence, talking about DOJ because that's who was defending us.

Q. (By Mr. Stevens) Okay.

A. Or deciding whether they could defend us.

Q. What did you mean by "Not agreeing with what we are doing is another"?

A. I -- well, as I read the sentence, I believe what I meant was that being able to defend us and giving us legal reasons why they can't defend us is one thing, but not agreeing with what decision we're making as an agency is another.

Q. Now, given what we've just read through in this paragraph going back to my previous question where you say "Those are facts of life for sure but if they can't agree with our definition of implement and think the market is low so who cares about delay in sales, then we need to build response with her suggested changes," etcetera, etcetera, the they there

is the department of justice; isn't it?

MS. LYNCH: Again, objection, and let the witness interpret his own E-mail.

THE WITNESS: Again, I'm not sure I can say for positive that they is department of justice or that it may be the plaintiffs not agreeing with our definition of implement.

Q. (By Mr. Stevens) And the plaintiffs think the market is so low so who cares about delay in sales, is that something the plaintiffs in this case would say?

A. I can see where the plaintiffs could say that with a negotiation because on their part if in fact we're using reasons to award that include, as was in one of the other documents, award a two-year sales, I can see where the plaintiffs would make the argument that if the market's low who cares.

Q. In this last sentence that we talked about just a moment ago where you were talking about the justice department and you talked about the department not being able to defend us, where did that information come from?

A. I don't see where you're saying -- I don't see where that says department -- not being -- are you talking about the last sentence, "Not being able to

defend us"?

Q. Yes. That must be the justice department, I believe that's what you testified before.

A. Yes.

Q. So what --

A. But I'm not sure I know what -- I'm not sure I understand the question you just asked me.

Q. The question is -- the question is: How did you learn that the justice department would not be able to or might not be able to defend the forest service?

A. I don't think -- I don't think that says that I learned anything. All that is is statement on my part that says not being able to defend us is one thing but not agreeing with what we were doing is another.

Q. I understand that. I'm focusing on the first part because I can't believe you made it up. You must have had some basis in fact for reaching the conclusion that the justice department might not be able to defend you.

A. If -- I don't recall. I don't remember any specific where on this case they said they were not going to defend us.

Q. And do you remember the issue being raised

at any point as to whether they would or not defend you?

A. The only -- the only place that I remember whether they were going to defend us on this case was on the individual sales. That's why the negotiation was going sale by sale by sale rather than just carte blanche. That's the -- that's the only place I remember any -- any discussion about being -- whether they were going to defend us or not defend us.

Q. On the next page, 93326, there is an E-mail from Nancy Graybeal -- Graybeal, excuse me, to Miss Kain, Miss Freedman, and to you dated November 27th, 1998. If you look at her E-mail you'll see that she's discussing markups on a draft prepared by Miss Zike. Miss Zike has previously testified about that. And if you look more carefully at her E-mail you will see that, in part, Miss Graybeal says "Let's be clear about what we're recommending (no settlement) and why." And then later on in the E-mail she says "If our only why is that R6 won't get the next year's timber program out, we'll likely be told to settle." Do you see that?

A. M-hm. Yes, I see it.

Q. And did you agree with that at the time?

A. Let me read it.

I don't -- I don't remember this E-mail. Doesn't mean it didn't happen. There were lots of E-mails. But I'm not sure where Nancy was -- was getting this opinion from.

Q. Did you share it?

A. I have never shared -- no, I don't recall sharing this with Nancy.

Q. Well, my question is whether you shared that opinion with her.

A. Oh, whether I -- my opinion?

Q. At that time, did you believe that was true?

A. Boy, I don't even know if we had this discussion or if I had this discussion.

Q. Put Miss Graybeal out of the question here. My question is: At the time, did you believe it was true that if R6 could only show that they couldn't get next year's timber program out if there was a settlement, the justice department would likely tell R6 to settle the ONRC Action litigation?

A. I -- the whole time I was in the regional office with the responsibility of having the timber program under me in regards to what the job was I don't -- I never was told that not getting the next year's timber sale program was -- was -- was a satisfactory answer, so I don't -- I don't believe

that I've ever had that opinion, that -- whether they decide to settle or not or recommend we settle or not, getting the timber program out was a very important mandate that we had.

Q. I understand that. So my question is: Do you agree -- did you, at that time, agree with the statement or not agree with it, the statement being "If our only why is that R6 won't get the next year's timber program out, we'll likely be told to settle"?

A. I -- I can't tell you whether I agreed with it at the time or not, but I know if someone asked me that today the answer would be no, that I wouldn't agree with it, because the -- getting the timber program out was the mandate we had, one of the mandates for the Northwest Plan.

Q. So for you at that time, that was reason enough not to settle, just the fact that you wouldn't be able to get the timber sale program out if you entered into a settlement as it was then proposed?

A. Well, it wasn't -- it wasn't my responsibility or my authority to say whether we settled or didn't settle. My responsibility was to help the region get the timber sale program out. So the settle -- the settle side of the question was never something that I had to decide on.

Q. You didn't weigh in on that ever?

A. We had recommendations about impacts of settling for sure including getting the timber sale program out, but the discussions about settlement whether -- whether we should settle or not settle was usually between department of justice legal counsel and the executive officers which Nancy is one of.

Q. So what input did you have?

A. Impacts.

Q. What impacts did you forecast?

A. Oh, no. I'm not talking about specifically on this letter. I'm talking about what I -- what my responsibility would have been would have been to project what the impacts would have been if we settled the program, costs, resource damage, if there were fire salvage sale, that sort of thing.

Q. So what, in general, was your recommendation or your projection of impacts with respect to this settlement?

A. I don't -- I don't recall or remember what any recommendation was except that I know that I would certainly have covered information and impacts on those subjects I just brought up.

Q. Were you against it because it would have made getting the timber out anywhere near the

projected targets impossible?
A. Well, I'm assuming, from this E-mail, that getting out timber -- next year's timber program out meant that we were not going to be able to meet our target.
Q. So what is the answer to my question?
A. Ask the question again.
Q. If you'll read it back to him.
(The reporter read the record as follows:
"Question: Were you against it because it would have made getting the timber out anywhere near the projected targets impossible?")
THE WITNESS: Was I against the settlement?
Q. (By Mr. Stevens) Yes.
A. Oh. I was never asked an opinion, personal opinion, about whether settlement was good or bad. That was not my discussion. The discussion had to do with here's the facts, execs, here's what the impacts are. Then the discussion about settlement or nonsettlement was usually between department of justice, sometimes the Washington office secretary's office got involved, and the executives. In this case it would be the regional forester and deputy regional forester.

Q. And what were your discussions here?

A. Impacts.

Q. And what impact did you forecast?

A. If -- again, going to this because I don't -- I don't remember what exactly what the impact was, based upon what I'm reading in this E-mail, they -- if Nancy's saying we will not get next year's timber program out, she had to get that from me.

Q. Okay.

A. Because she wouldn't have known it without getting it from our staff.

Q. Okay. Do you have an Exhibit 54 in the book in front of you?

A. Yes.

Q. Would you turn to that, please.

This is an E-mail from Nancy Graybeal dated November 25, 1998.

A. 1720?

Q. No. This would be Exhibit 54, Exhibit 54.

A. Oh, excuse me, I went too far.

Oh, here, all right.

Q. So you see the Graybeal E-mail, the date of November 25, 1998?

A. Yes.

Q. And it's addressed to you and other people?

A. I -- I would have to guess about what.

Q. You have no recollection? This doesn't refresh your recollection at all?

A. May I go back to the previous --

Q. Oh, of course. You can look at anything you want.

A. What was the number?

Q. 50.

A. The previous.

MR. WAH: 50, just the one before that, Bob.

THE WITNESS: The only thing I want to see is the date.

Q. (By Mr. Stevens) Sure.

A. No, I don't know, because I -- what I thought it might be is a reference to this briefing that went back, but that's dated after this E-mail from Nancy Graybeal, so I'm not sure what this is referring to.

Q. In your work for the forest service dealing with the ONRC Action litigation, you worked very closely with Miss Zike; isn't that right?

A. Yes.

Q. In fact, I think in your previous deposition you described the two of you as being joined at the hip with respect to this?

A. Pretty much.

Well, her and our staff, yes.

Q. So would it refresh your recollection if I represented to you that she has testified that the nondecision from Lois Shiffer referred to on plaintiffs' Exhibit 54 was Miss Shiffer's nondeciding whether the justice department would defend forest service on the NEPA decision equals implementation issue?

MS. LYNCH: Objection, the question has been asked and answered several times.

THE WITNESS: That doesn't -- that doesn't clarify it for me because it's still -- I can't tell whether this particular E-mail was referring to that specific question or not.

Q. (By Mr. Stevens) Okay. As we sit here today, though, you have no reason to dispute Miss Zike's testimony about this E-mail?

A. I -- I would have no reason to dispute anything about what Sue says.

Q. Okay. Do you have an Exhibit 59 in your book?

MR. WAH: He does not.

MR. STEVENS: Okay.

MR. WAH: Hang on, it's right here.

App. Tab 185
Corrected

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC., )
Plaintiff, )
v. ) No. 01-570C (Judge Williams)
THE UNITED STATES, )
Defendant. )

TIMBER PRODUCTS COMPANY, )
Plaintiff, )
v. ) No. 01-627C (Judge Williams)
THE UNITED STATES, )
Defendant. )

CLR TIMBER HOLDINGS, INC., )
Plaintiff, )
v. ) No. 04-501C (Judge Williams)
THE UNITED STATES, )
Defendant. )

CERTIFIED COPY

DEPOSITION OF ~~ROBERT~~ RICHARD HOLTHAUSEN
September 30, 2007
Flagstaff, Arizona

PERFORMANCE REPORTERS, INC.
121 East Birch Avenue, Suite 501
Flagstaff, Arizona 86001
By: Lerryn Horton Roberds, RPR, CCR

responsibility for coordinating the work of wildlife ecologists in each one of the Forest Service regions, and in that capacity, I gave them a lot of guidance on technical aspects of the wildlife job in the Forest Service.

Q. You retired from that position January 3, 2007. When did you first start that work -- that position, approximately?

A. I believe it was 1991.

Q. And what were you doing before you became the National Wildlife Ecologist?

A. I was the Wildlife Ecologist for the Pacific Northwest Region.

Q. That would be for the Forest Service?

A. For the Forest Service, yes, headquartered in Portland.

Q. Headquartered in Portland?

A. Right.

Q. By the way, do people who know you well call you Holt, H-o-l-t?

A. Yes.

Q. Okay. Did you have any involvement with the development of the Northwest Forest Plan?

A. Yes.

Q. Would you just describe that involvement

generally for me.

A. I was one of the members of the FEMAT Team, the Forest Ecosystem Management Assessment Team. That's the group that came together to formulate options for the Forest Plan and to evaluate effects of those options.

I then became the leader of what was called the Species Analysis Team, which is the team that did further analysis on -- I don't remember -- 600, 800 species between the draft and the final EIS for the Northwest Forest Plan, and I consulted a bit on the ROD when it was developed.

Q. By the way, a moment ago when I asked you if you were employed and you said you were retired, congratulations, by the way. Are you working anywhere as a volunteer or --

A. Not at the current. I've done a couple --

Q. You're not doing consulting on your own, or anything like that?

A. I've been asked to do a couple assignments, but they've been fairly brief; a month, or two.

Q. So the fact that we're meeting in this room for your deposition is just a courtesy that has been afforded to you?

A. Exactly.

Q. And you live here in Flagstaff or in the area?

A. Yes, I do.

Q. What is your address?

A. It is 778 Pawnee, P-a-w-n-e-e, Street, in Flagstaff.

Q. In Flagstaff.

A. Do you need a zip?

Q. If you have it handy.

A. It's 86001.

Q. Thank you. Going back to your career with the Forest Service, you said that you served on the FEMAT Team and you formulated options and, I guess, evaluated the effects for those various options?

A. The team did, yes.

Q. That would be on the Northwest Forest Region 6 and Region 5 forests, or --

A. And it included BLM lands, also.

Q. Excuse me.

A. And it didn't include all of Region 5. It included the range of the northern spotted owl, basically.

Q. If I said the northern spotted owl forests meaning the physical area covered by the Northwest Forest Plan, that would be correct?

A. Yes.
Q. You were looking at that area when you formulated those ~~duties~~ options?
A. That's correct.
Q. That was for the Forest Service; is that right, or were you --
A. Well, it was an interagency group.
Q. You said that when you were the leader of the Species Analysis Team, that you and other members of the team did some kind of further analysis on species that had not been done prior to that in the planning process?
A. It supplemented analysis that had been done prior to that.
Q. So prior to you being the leader of the Species Analysis Team, there had been some work done on evaluating various wildlife and plants in terms of certain activities going on in the northwest forest that occurred before you got in this position?
A. Analysis was done of the projected effects of the alternatives on those plants and animals.
Q. So I think I have the sequence now right. Let me know if I've got it right. There were alternatives that were being evaluated in an Environmental Impact Statement?

A. (Shakes head)

Q. No?

A. The work of FEMAT was completed before the Environmental Impact Statement was initiated.

Q. But you looked at alternatives under FEMAT?

A. Exactly.

Q. And these alternatives were evaluated in terms of their potential impact on wildlife and plants?

A. Yes.

Q. And then when you served on the Species Analysis Team, you evaluated the impact on other species, or these alternative --

A. No.

Q. That's what I need you to tell me in detail.

A. It was a sub-set of the full set of species that had been initially evaluated, so it was additional analysis on a sub-set of those species, and the numbers were roughly -- I think we evaluated 1100 species in the first analysis, and in the additional analysis we evaluated somewhere between 400 and 600 of them in greater detail.

Q. Why was that done? Why was the second analysis done?

A. It was done -- that analysis -- first off, that was done subsequent to the publication of the draft EIS. The projected effects for these 400 to 600 species had been not particularly favorable under the alternative that was identified as the preferred in the draft EIS, and so we were asked to look at them again.

Q. When we're talking about the draft EIS, we're talking about the draft Environmental Impact Statement for the Northwest Forest Plan?

A. Right.

Q. When you say not favorable, you mean not favorable to species under the preferred alternative in that draft?

A. Exactly.

Q. Was that Alternative 9 at that time?

A. Exactly.

Q. Okay. So how was a decision made to go back and do this additional analysis?

A. (No response)

Q. Did someone tell you to do it, or --

A. I don't know how the decision was made. I was asked to do it.

Q. And I take it that this work was being done because it was thought that these species or some of

them might need some additional protective measures that were not in the draft plan?

A. That's right.

Q. And the objective here was to make sure that the preferred alternative did not lead to the extirpation of any of these species?

A. Basically that's correct, yes.

Q. Do you want to fine-tune that for me?

A. Yeah. The objective of the team that I led was to identify potential measures that could be incorporated as mitigation to the preferred alternative that would achieve that objective of not mitigating those species.

Q. Did this initial analysis that you were involved in, involve doing surveys?

A. You mean actual field work?

Q. Actual field work.

A. No. It did not.

Q. Okay, but were surveys thought to be necessary for at least some of these species?

A. That was one of the outcomes of this additional analysis.

Q. It was a conclusion that you reached?

A. That was one of the measures -- potential measures that we identified as mitigation for those

species.

Q. And would I be correct, then, that the idea was that once the information from these surveys had been evaluated, the agencies would then be in a better position to devise specific protective measures, if needed, for a particular species?

A. That's correct, but, I mean, there were several different levels of that strategy identified, some with more immediacy than others.

Q. They're developed by the Northwest Forest Plan in its final form of a process -- perhaps I should say two related processes called Survey and Manage. Are you familiar with that?

A. Yes.

Q. What is your understanding of that generally?

A. Well, my understanding of it is that it evolved from the potential measures that we had identified, and that the Survey and Manage Program consisted of -- I think four components, and different species fell out under different components. For some of those species, there were surveys required prior to activities on the ground with the intent that some mitigation measures might be undertaken for those species that were discovered by those surveys, and for

others, the intent was to do much longer term surveys to basically enhance the overall knowledge of those species.

Q. Do you recall that there were, I believe, four categories --

A. Right.

Q. -- of surveys? We'll get to the ones we need to talk about in a minute and make sure I'm on the same page here. This might help us do that. I'm going to hand you Plaintiff's Exhibit 137. Feel free to take your time to look at any of these documents that I'm going to hand you before you answer questions. I may ask you questions before you've read the entire document, and I don't want to prevent you from doing that, but sometimes we're not going to go through the entire document, so it doesn't matter.

Let me identify this for the record. The first page is a memorandum dated September 5th, 1995, and it refers to some draft notes from the December 2, 1994 Survey and Monitoring Committee meeting, and if you turn to that next page of the document, you see those meeting notes, and under the attendees, you are listed.

A. (Nods head)

Q. And in your capacity as the Species Analysis

Team Leader?

A. Yes.

Q. Now, I think you testified earlier in this deposition that you had some involvement in the implementation of the Northwest Forest Plan, for some period of time, anyway?

A. I don't think we discussed that earlier, but --

Q. I'm sorry. I thought we did. Did you?

A. Um, I was actually asked to participate on the Watershed Analysis Team which was devising processes to be used for watershed analysis, which was one of the components of the plan, and I was asked to consult several different times on the Survey and Manage provisions.

Q. It is that consulting on the Survey and Manage provisions I want to focus on, and I believe this document ~~at which you were at a meeting~~ a meeting you attended which dealt with Survey and Manage questions. We'll go through this, and you may have a better recollection, as you do.

But do you recall being at this meeting in December of 1994? It may have been, in fact, the very first meeting of what became the Survey and Manage core group.

MS. LYNCH: I'll object to that. Assumes facts not in evidence.

MR. STEVENS: I'm just suggesting to see if it refreshes his recollection, is all.

THE DEPONENT: I don't remember being at this specific meeting.

BY MR. STEVENS:

Q. Okay. If you look under "Purpose" on the second page, we're still in about the middle of that paragraph, it says, "This meeting was convened to clarify both the intent behind the development of the survey and manage standards and guidelines and to address the meaning behind some specific terms or phrases," and in that regard, at the very bottom of that paragraph, it says, "Richard Holthausen, the team leader for the Species Analysis Effort, has more fully addressed the background and intent of the survey and manage standards and guidelines in the enclosed paper, open quote, Development of the Survey and Manage Measure," close quote.

If you would turn forward one, two, three, four more pages, there is a typed document that says, "Background and Intent from R. Holthausen. Development of the Survey and Manage Measure," and I take it this is a document that you prepared, or at

least you prepared with others?

A. I'm sure I did.

Q. Okay. Incidentally, do you recall working with a Mrs. Cheryl McCaffrey when you were working on the Northwest Forest Plan?

A. I remember that Cheryl actually became the lead on -- I believe, on the Survey and Manage --

Q. That's correct.

A. -- working group, and so when I came to meetings to consult with that group, I certainly worked with her at those meetings.

Q. Okay, and do you remember also working with a Mr. Randy Hickenbottom?

A. Yes, I do.

Q. Do you remember what his function was at those meetings?

A. He was -- I believe he was just another one of those team members at the Survey and Manage working group.

Q. And how about Tom Hussey, H-u-s-s-e-y?

A. I remember Tom. I don't remember him in regards to Survey and Manage.

Q. Do you remember working with him at all in other respects?

A. No. I remember interacting with him, but

never formally working with him.

Q. Robin Lesher, L-e-s-h-e-r?

A. Yes.

Q. Is it Ms. Lesher, or Mr. Lesher?

A. Ms.

Q. What was her function with respect to Survey and Manage?

A. She actually was one of the members of that Species Analysis Team that I had led.

Q. Okay.

A. She may have gone on to become a member of the core group, the working group. I don't know.

Q. Okay. If you will go back to that page that has meeting notes at the top of the second page of the exhibit in front of you, turn to the third page. Looking at the bottom of the page, there is some handwriting, "Weak," exclamation point, "Decision by who," question mark. Do you recognize that handwriting?

A. No.

Q. It is not yours, as far as you know; is it?

A. Not as far as I know.

Q. Just turn to the next page, if you would, and on this page, you see certain strategies addressed, Strategy 1, Strategy 2, Strategy 3, and

Strategy 4. Strategy 2 is entitled Survey prior to ground-disturbing activities. Is that the category that you were talking about before when you said that certain surveys had to be done prior to certain ground-disturbing activities?

A. That's correct.

Q. Where it says here, "This strategy was designed to address the high-risk species (persistence concerns) for which survey protocols exist or could be developed reasonably soon, and for which adequate searches could be conducted in a single year." Does that ring a bell with you?

A. Those were criteria for including the species in that strategy.

Q. For clarification, what did the term "high-risk species" refer to? What kind of risks?

A. Basically risk of extirpation.

Q. And that is also what "persistence concerns" refers to, I assume?

A. Right.

Q. I'm making sure of your statement. Let's turn back to your paper, the Development of the Survey and Manage Measure. As we look at this copy in front of you now, do you recall when you prepared this paper, approximately?

A. I mean, I think we could place it in time by looking at the day of the meeting and the date of the EIS, but I don't have a specific recollection.

Q. I think I have another copy I'll show you in a minute. I'm not trying to trick you. We'll date it 1994. After April of 1994, but before the end of December of 94.

A. That sounds reasonable, but I have no recollection of the date.

Q. That's fine. In the first paragraph of this paper where you refer to, "Relatively low ratings in the draft EIS," what is that in reference to?

A. That is again a reference to the risk assessment that had been done in the draft EIS, and in this instance, low ratings would imply high risk.

Q. If you come to the next sentence beginning, "Consequently," where it says, "The experts tended to project favorable outcomes for them only under those alternatives that prohibited activities on virtually all federal lands." Can you explain in a little more detail what you meant by that?

A. That is a reference to the alternatives that were considered first by FEMAT, and then considered in the draft EIS, and it refers to the evaluations that were done of those alternatives, and it suggests that

the only alternatives for which ratings for these species ~~were placed in a fairly-secured position~~ indicated a favorable outcome, were those alternatives where there was very little activity on federal land.

Q. Meaning no timber sales or other ground-disturbing projects.

A. That's correct.

Q. And "favorable outcomes" means avoiding extirpation?

A. That's right. It means low risk, yes.

Q. If you look down at the second paragraph, one, two, three, four lines down, over to the far right, there is a sentence that begins with this language. "The Species Analysis Team, in conjunction with the EIS team, developed measures that would accomplish this objective," and I'm interested -- I think I know the Species Analysis Team. You described what they did. Who were you referring to by the EIS team here?

A. We -- during the work -- throughout the work of the Species Analysis Team, we actually coordinated very closely with the EIS team, which was obviously already in place because they had prepared the draft EIS for the Northwest Forest Plan. So it's referring to the -- to members of that team with whom we

coordinated and interacted.

Q. And if you turn to page 2 of your paper, the first full paragraph that bears the heading "Survey prior to ground-disturbing activities and manage sites that are discovered," open paren, "Strategy Roman number II," close paren, in the first line you say, "This is probably perceived as the most restrictive of the survey and manage strategies." What did you mean by "restrictive"?

A. In that context, I think the meaning of "restrictive" is that it would have some effect in restricting activities on federal lands, or potentially have some effect on restricting activities on federal land.

Q. This was the most restrictive in that regard; the Strategy II?

A. Correct.

Q. And at the bottom of this paragraph we're looking at right now, just to summarize, ~~that~~ you say that one could go about trying to define "ground-disturbing activities" or perhaps prepare a list, but then you say, "A checklist of activities that would be included in this category could be developed, but it might do more harm than good." Why would it do possibly more harm than good?

A. (No response)
Q. Is that what you said?
A. And we're talking strictly about the Species Analysis Team; is that correct?
Q. Well, yes, right now.
A. To my recollection, they did not.
Q. Did you individually make a recommendation?
A. I do not recall making a recommendation on those dates.
Q. Were you consulted on either of those two questions?
A. I believe that I was, but I don't have clear recollection of the discussions that ensued.
Q. What is your best recollection of those discussions?
A. My best recollection is that they occurred, but I can't even tell you who they occurred with.
Q. Let's stay on the same page of your paper, but look at the last paragraph. It says, "Conduct extensive surveys and manage for the species on high-priority sites (Strategy III)." Do you see that?
A. Yes.
Q. That involves Strategy III and not Strategy II, but it carries on over to the paragraph on the very next page, and the last sentence of that

paragraph states, "While no completion date is stated for the strategy, it would obviously be ineffective if the completion of surveys took so long that the risk of extirpation of species substantially increased."

Now, I take it that was your conclusion and interpretation of the Strategy III survey requirements. Right?

A. Yeah. It's in my paper, so, yes, we would have to conclude that.

Q. Would that also apply with equal strength to the Strategy II surveys?

A. Well, I mean, I think the terminology would be a little bit incorrect because, you know, "Completion date" is not something that was part of the Strategy II concept, but I think the general concept, is correct that the more time passed and the more activities that were undertaken prior to effective implementation of these strategies, would increase risk to species, but that's a very general statement.

Q. And the activities you were referring to, they were ground-disturbing activities like timber sales?

A. Correct.

Q. At the very bottom of this page we're on right now, in the last two sentences of the last

implemented in a timely and credible way," it seems to me that at that point you are speaking to the timeliness of the surveys. Is that right?

A. I certainly am, but with no specificity.

Q. But you're emphasizing that it is important?

A. Yes. That's correct.

Q. And I take it that would be because if the surveys were not performed in a timely fashion and too much time expired before those surveys were completed, that would increase the risk to the species that were being surveyed, the risk of extirpation?

A. That would certainly be the underlying assumption. Although, our knowledge of these species was so poor that it would be impossible to quantify that increase in risk.

Q. Right, but one of the fundamental purposes of the surveys was to acquire a sufficient knowledge base to have a better idea of the degree of the risk. Is that correct?

A. That's correct.

Q. Please take a look at Plaintiff's Exhibit 142. There are several documents here that are attached to this first page of Exhibit 142. That is the way the documents were produced to us by the Government, and I assume that they go together. If

team, so I certainly don't recollect whether I had interaction with them.

Q. Did -- did the Forest Service, to your knowledge -- let me rephrase that question. To your knowledge, did anyone in the Government ever try to assess the impact on Strategy II species if the surveys were implemented as of a particular date; for example, October 1, 1996, or October 1, 1998?

MS. LYNCH: I'm going to object to that question. It's very, very broad and vague. Anyone in the Government?

THE DEPONENT: I was actually asked that question in a general sense at one point in time.

BY MR. STEVENS:

Q. At what point in time were you asked that question?

A. Boy, I cannot give you a specific date when it was asked to me. It was -- I can tell you it was prior to January of 1997, but that's about all I can tell you.

Q. Why does that time period stick in your mind?

A. Because that's when I moved from Corvalis to Flagstaff.

Q. Who asked you the question?

A. Don Knowles.
Q. And so what more specifically did he ask you?
A. He asked me if we could do an assessment of ~~effective~~ effects of different implementation dates of the Survey and Manage ~~Team~~. strategies
Q. Did he tell you why he wanted this information?
A. I don't recollect that he told me why he wanted it.
Q. Did he make this request to you in writing?
A. I don't recollect that it was in writing.
Q. Was it in a face-to-face meeting?
A. Boy, I just don't recollect.
Q. Was anyone else there when he made this recommendation to you?
A. I don't remember anyone else. It wasn't a recommendation. It was a question.
Q. Excuse me. The question. I used the wrong word.
A. Right. I don't recall that there was anybody else there.
Q. Did he give you specific dates to consider?
A. I don't recall specific dates, no.
Q. And so what did you tell him?

A. My recollection is that I told him that in general, one could reasonably assume that delay of implementation of the strategies would result in some negative effect for some species, but that it would be virtually impossible to specify either the level of that effect or the species that would undergo negative effects.

Q. Now, I take it that you didn't mean to tell him that that would be impossible no matter how late the implementation date was. For example, if you decided not to actually implement the surveys until 25 years after the issuance of the plan, you wouldn't have to do a whole lot of basic ground work to reach a conclusion that that could have serious implications?

A. You know, I don't think we specifically discussed time frame, but I also believe that the understanding was that we weren't talking about a period as long as -- I mean, certainly we were talking about a period within the normal EIS cycle, the normal forest planning cycle, so it would not have been a period as long as 25 years.

Q. Why in your view was it not possible to reach a conclusion about the level of negative effect?

A. Again, because the level of knowledge of these species was very poor. We did not know at what

locations we might find species if we went out and surveyed for them, and we didn't even know with any certainty where any activities would take place over that period of time.

Q. Okay. So you were telling him that there could be little negative effect, or there could be extirpation; there just wasn't any way to tell?

A. That's right, and, again, that the effect would occur to some sub-set of species, and we would not have a clear way of knowing what sub-set of species it would influence.

Q. And the purpose of the surveys was to provide the Government with some database where it could make an assessment of those negative effects?

A. Strategy II surveys?

Q. Yes, the Strategy II surveys.

A. The purpose of the Strategy II surveys was twofold. Number one, to actually provide site-specific information that would allow for mitigation measures to be applied and, number two, to increase our knowledge of the species so we would have a better means of assessing them over time.

Q. One of the results from the Strategy II surveys could be a conclusion that the species might be extirpated in certain areas as a result of ongoing