# In the United States Court of Federal Claims

### Nos. 01-570C, 01-627C, 04-501C
### (Filed February 26, 2009)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **BLUE LAKE FOREST PRODUCTS, INC.,** * | |
| Plaintiff, * | |
| * | |
| v. * | |
| * | |
| **THE UNITED STATES,** * | **Summary Judgment; Breach Of** |
| Defendant. * | **Contract; Contract Interpretation;** |
| * | **Limitation of Liability Clause;** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**Summary Judgment; Breach Of Contract; Contract Interpretation; Limitation of Liability Clause; Implied Duty To Cooperate And Not Hinder.**

**TIMBER PRODUCTS COMPANY,** *
        Plaintiff, *
           *
v. *
           *
**THE UNITED STATES,** *
        Defendant. *
           *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**CLR TIMBER HOLDINGS, INC.,** *
        Plaintiff, *
           *
v. *
           *
**THE UNITED STATES,** *
        Defendant. *
           *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

    Gary G. Stevens, Saltman & Stevens, P.C., Washington, D.C., for Plaintiff; Ruth G. Tiger, Eric J. Pohlner, Saltman & Stevens, P.C., Of Counsel.

    Jeffrey S. Bucholtz, Jeanne E. Davidson, Bryant G. Snee, Ellen M. Lynch, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for Defendant; Lori Polin Jones, James L. Rosen, Marcus R. Wah, Ben Hartman, Department of Agriculture, Office of General Counsel, Washington, D.C., Of Counsel.

_____

## OPINION AND ORDER DENYING CROSS-MOTIONS
## FOR PARTIAL SUMMARY JUDGMENT

_____

**WILLIAMS**, Judge

Plaintiffs Blue Lake Forest Products, Inc. ("Blue Lake"), Timber Products Company ("Timber Products"), and CLR Timber Holdings, Inc. ("CLR") bring this action claiming breach of their timber sale contracts by the United States Forest Service ("Forest Service"). Currently before the Court are the parties' cross-motions for partial summary judgment. At issue is whether Plaintiffs are entitled to certain consequential damages due to the Forest Service's suspension of their contracts or whether the limitation of liability clause in the contracts prevents such recovery.

Plaintiffs claim that the Government acted unreasonably in provoking the suspension of their contracts because it awarded the timber sales without performing requisite environmental surveys. Specifically, Plaintiffs claim that the Government knew and failed to disclose that the sales were "at risk" due to the pendency of a district court action challenging the Government's determination that such surveys were unnecessary. Plaintiffs claim that Defendant knew that its interpretation of law which led it to forego the surveys, was not likely to prevail in the pending litigation, and acted unreasonably in awarding the contracts in the face of this knowledge.

Subsequent to the award of these timber sales, the United States District Court for the Western District of Washington in fact found that the Government's interpretation of law and failure to perform the surveys were unreasonable. In particular, soon after the Forest Service awarded the subject timber contracts to Plaintiffs, the District Court enjoined the Forest Service from allowing operations on various timber sale sites, and, a few weeks later, expanded the injunction to the three sites upon which Plaintiffs were operating. The Forest Service suspended performance on those sites pursuant to the District Court's order, and then negotiated a settlement with the environmental plaintiffs in the District Court action, agreeing to maintain the suspensions until the surveys had been conducted. As a result, Plaintiffs were barred from operating their timber sales for periods ranging in duration from eleven months to fifteen months. Plaintiffs filed timely claims under the Contract Disputes Act seeking costs they incurred for replacement timber, as well as lost profits and bond and interest expenses.

Defendant contends that the limitation of liability clause in Plaintiffs' timber sale contracts bars recovery of these damages because the clause limits liability to out-of-pocket expenses in the event of a court-ordered suspension. Plaintiffs claim that this clause is unenforceable because, by awarding and suspending the contracts, the Forest Service acted unreasonably and breached the implied duty to cooperate and not hinder. Because the determination of reasonableness entails an intensely factual inquiry and material facts are in dispute here, summary judgment is denied.[1]

---

[1] Relying on the same factual predicate, Plaintiffs proffer two additional legal theories -- that Defendant failed to disclose superior knowledge and breached the implied warranty of adequacy of specifications. Summary judgment is equally inappropriate on these grounds. Triable issues of material fact remain as to what knowledge, if any, each Plaintiff had of the pending litigation at the time of auction or award. Under the breach of the implied warranty of specifications claim, Plaintiffs argue that the failure to conduct surveys led to deficient environmental specifications in the contracts

## Background[2]

### The Northwest Forest Plan

In 1994, the United States Department of Agriculture and the United States Department of the Interior issued a "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl" ("Northwest Forest Plan ROD"), which amended the Land and Resource Management Plans governing the operation of the National Forest and Bureau of Land Management ("BLM") lands in Washington, Oregon, and northern California. Pls.' App. at A-1. The amended management plans are referred to collectively as the Northwest Forest Plan. The Northwest Forest Plan covers the two national forests in which the three timber sites at issue are located. Blue Lake's site, known as Happy Thin, and Timber Products' site, Jack Heli, are located in the Klamath National Forest in California. CLR's site, Too Wild, is located in the Siskiyou National Forest in Oregon.

Land management plans such as the Northwest Forest Plan are administered pursuant to two statutes. The National Forest Management Act ("NFMA") requires the development of land management plans for national forests which must "provide for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B), and comply with the requirements of the National Environmental Policy Act ("NEPA"). See 16 U.S.C. § 1604(g)(1); see also 42 U.S.C. § 4321 et seq. In addition, the Federal Land Policy and Management Act ("FLPMA") requires that land use plans be developed in conjunction with the Forest Service which "give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3). All timber sales must be conducted consistent with such land management plans. See, 16 U.S.C. § 1604(i) ("[C]ontracts . . . for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title . . . .").

The Northwest Forest Plan was administered under a three-level organizational hierarchy. Pls.' App. at A-1709. At the bottom of this structure, a Survey and Manage ("S&M") Working Group promulgated working definitions and recommendations for implementing the Northwest Forest Plan's survey requirements. An Intermediate Working Group ("IMG"), was responsible for approving and acting on the recommendations of the S&M Working Group. Id. When deemed necessary, the IMG would refer decisions to the next and highest level of authority, the Regional Interagency Executive Committee ("RIEC"). Id. at A-86, A-1709. All three levels of this administrative hierarchy were composed of representatives from the Forest Service and the BLM.

_____

which had to be reworked once surveys were required. The contested reasonableness of the Government's awards and suspensions also underlies this claim, and the record on summary judgment is inadequate to determine whether the Government's conduct breached this implied warranty.

[2] This background is derived from the appendices to the parties' motion papers.

Parallel to this three-tiered management structure, several other bodies helped to administer the Northwest Forest Plan. A Regional Ecosystem Office ("REO"), under the direction of Donald Knowles, Executive Director, coordinated agency actions and served as a staff group for RIEC. Id. at A-86, A-1699. An Issue Resolution Team, composed of Forest Service and BLM staff members, developed and recommended interpretations of the Category 2 survey requirements. Id. at A-86, A-201.

**"NEPA Decision Equals Implementation" Interpretation**

As part of the Northwest Forest Plan ROD, a series of S&M Standards and Guidelines were developed with regard to species habitat sites. See Pls.' App. at A-7 to A-12. The S&M Standards and Guidelines required that surveys be conducted for each of four categories of species. For each category of species, the S&M Standards and Guidelines established a corresponding survey strategy, indicating when and how surveys must be conducted. For Category 2 species -- which are the sole category of concern in the instant litigation -- the S&M Standards and Guidelines required "[s]urvey prior to ground-disturbing activities." Id. at A-11. Approximately 75 species were initially designated as Category 2 species. Id. at A-75. These included the red tree vole, a type of lynx, five species of salamander, and other species ranging from lichens and fungi to mollusks and vascular plants. Id. at A-11, A-75 to A-77.

Category 2 species were separated into two groups, each with a corresponding "trigger date," after which surveys for the listed species would be required. Under the first trigger date, within the known or suspected ranges of the red tree vole and salamander species, surveys were required to "precede the design of all ground-disturbing activities that [were to] be implemented in 1997 or later." Pls.' App. at A-11. This language referred to the fiscal year (FY)1997, rather than the calendar year. Id. at A-272. FY 1997 began on October 1, 1996. Under the second trigger date, surveys were to be completed for the remaining Category 2 species prior to ground disturbing activities that would be implemented in FY 1999, which began on October 1,1998, or later. Id. at A-11, A-272. Thus, timber sales "implemented" after October 1, 1996, were subject to survey requirements for the red tree vole and salamander, and timber sales implemented after October 1, 1998, had to be surveyed for the remaining species.

Beginning in the summer of 1996, the Issue Resolution Team members collaborated with the S&M Working Group in an effort to determine how the Forest Service and BLM would define the date of "implementation" for a given timber sale. Id. at A-198, A-201. Of specific concern was at what point ground-disturbing activities would be considered "implemented" for purposes of complying with the Category 2 survey trigger dates. Id. at A-201. The agencies cited an ambiguity in the language used by the Northwest Forest Plan and the S&M Standards and Guidelines. Id. at A-201, A-270. The S&M Standards and Guidelines required that, for the salamander and red tree vole species subject to the FY 1997 trigger date, surveys had to "precede the design of all ground-disturbing activities that would be implemented in 1997 or later." Id. at A-11. (emphasis added). However, the Northwest Forest Plan ROD stated that these same species were to have surveys conducted prior to actual ground-disturbing activities that would be implemented in FY 1997 or

4

later. Id. at A-3.

At some point in October 1996, the Forest Service and BLM formally adopted what came to be known as the "NEPA Decision Equals Implementation" Memorandum. Pls.' App. at A-270 to A-275. In this memorandum, the Forest Service and BLM decided that the language in the S&M Standards and Guidelines, rather than the ROD, would determine the applicability of the survey requirements -- i.e., that surveys had to "'precede the design of all ground-disturbing activities'" that would be implemented in FY 1997 or later. Id. at A-273 (emphasis added ) (citation omitted). The Forest Service and BLM identified the date of design as the date on which a NEPA decision for the project site was issued, stating:

> The intention is to accomplish surveys prior to the design phase since the presence or absence of Survey and Manage species is a significant piece of information and should be available prior to the signing of the [NEPA] document. The interagency interpretation is that the "NEPA decision equals implemented" in context to Component 2 species survey requirements.

Id.[3] In other words, any timber sale for which the NEPA decision had been issued prior to the Category 2 trigger dates would be exempt from the requisite surveys.

The "NEPA Decision Equals Implementation" Memorandum, as first issued, applied only to the FY 1997 trigger date. In a September 11, 1998 memorandum, the Forest Service and BLM re-adopted the "NEPA decision equals implementation" interpretation with regard to the FY 1999 trigger date as well. Pls.' App. at A-366 to A-370.

According to Issue Resolution Team member Tom Hussey, a Forest Service Policy Planner for the Pacific Northwest Region, this interpretation of "implementation" was favored over two other alternatives that were considered, i.e., (1) when there is physical activity on the ground, or (2) when the agency signs the timber sale contract. Def.'s App. at 104-05 (Hussey Decl. ¶ 16-20). The Issue Resolution Team rejected the first alternative despite the fact that it had "the advantage of simplicity and intuitive common understanding by almost anyone" and would "tie 'implementation' to an action you can go out and see in the forest." Id. at 104 (Hussey Decl. ¶ 18). The Issue Resolution Team also rejected the second alternative, which would have tied implementation to the point "when the government makes a relatively final commitment to act." Id. at 105 (Hussey Decl. ¶ 19). Instead, the Issue Resolution Team selected "NEPA decision equals implementation" as the appropriate

---

[3] A NEPA decision is the documentation a federal agency must issue prior to any "major Federal actions significantly affecting the quality of the human environment" concerning the environmental impact of that action. 42 U.S.C. § 4332. NEPA decision documents may take the form of (1) an Environmental Assessment or (2) a more detailed Environmental Impact Statement. 40 C.F.R. §§ 1508.9, 1508.11 (2008).

interpretation.[4]  According to Mr. Hussey, this interpretation was based upon the following:

> Our group arrived at the conclusion that it made more sense to interpret this language so that the surveys would be done and the information available to the responsible official <u>before</u> he or she made a project NEPA decision.  To do otherwise would be to expose the government to a situation where our surveys might occur and the resulting information made available to the responsible official after a NEPA decision was made, or worse yet, after a contract was signed. This could cause us to expend time and money re-working decisions or project design and field layout or contract modification or termination.

Def.'s App. at 105 (Hussey Decl. ¶ 20) (emphasis in original).[5]

## The Red Tree Vole Memorandum

According to a joint memorandum -- commonly referred to as the "Red Tree Vole Memorandum" -- issued by the Forest Service and BLM dated November 4, 1996, early survey results indicated that the red tree vole's habitat was broader than had been previously documented and that the risk to the species' viability was not great. Pls.' App. at A-282 to A-286.  In the Red Tree Vole Memorandum, the Forest Service and BLM determined that "[e]arly survey results suggest broader habitat usage than previously documented, and that site-specific surveys are not adding

---

[4] Principal members of the Issue Resolution Team included Tom Hussey, Randy Hickenbottom, Larry Larsen, Cheryl McAfree, Lyndon Werner, and Nancy Anderson.  Tom Hussey held the title of Policy Planner with the Forest Service's Resource Planning and Monitoring staff for the Pacific Northwest Region.  Def.'s App. at 99 (Hussey Decl. ¶ 2). Randy Hickenbottom served as an Assistant Program Manager in the Forest Service's Regional Office for the Pacific Northwest Region.  Id. at 123 (Hickenbottom Decl. ¶ 1).  Larry Larsen served as a State Civil Culturist for the BLM.  Pls.' App. at A-1392.  Cheryl McAfree was a botanist for the BLM "specializing in plant surveys."  Def.'s App. at 104.  Lyndon Werner held the title of BLM Timber Sale Specialist.  Id. Nancy Anderson "worked for the BLM" but the record does not disclose her job title.  Id.  It is not clear from the record whether this list of IRT members is exhaustive.

[5] When the question arose as to whether an informal memorandum would legally suffice to resolve the question of when a timber sale should be considered "implemented," or whether a formal amendment of the ROD was needed, Forest Service attorney Michael Gippert recalled, "I believe I advised an amendment was needed . . . ."  Pls.' App. at A-1112.  Nevertheless, according to a memorandum later prepared by Department of Justice ("DOJ") attorney Edward (Ted) A. Boling, the Forest Service and BLM elected to issue the "NEPA Decision Equals Implementation" Memorandum "as an interpretation, not an amendment, of the ROD, without following NEPA and land management plan amendment procedures."  Pls.' App. at A-1139.

sufficiently to the scientific knowledge necessary to determine appropriate management for the species." Id. at A-282. Because of the relatively low risk to this species' viability in the short term and the expected increase in data from other surveys, the Forest Service and BLM concluded that Category 2 field surveys were not needed for all project areas for the next couple of years.[6]

The Red Tree Vole Memorandum stated that the guidance contained therein would "apply for a short term, estimated to be one-to-two years." Pls.' App. at A-282. Through a September 25, 1998 memorandum, this directive was later extended through September 30, 1999. Id. at A-413. Pursuant to the Red Tree Vole Memorandum, California, where portions of the Happy Thin and Jack Heli sites were located, was excluded from any Category 2 surveys for red tree voles. Pls.' App. at A-283, A-1183, A-1774.

**The ONRC Action Litigation**

In 1998, various environmental groups filed administrative appeals of the NEPA decision documents for timber sales for which Category 2 surveys had not been performed, including the Happy Thin, Jack Heli, and Too Wild sites. Pls.' App. at A-1101, A-1107.[7]  On July 8, 1998, 14 nonprofit environmental groups filed an action in the District Court for the Western District of Washington, challenging the Forest Service's adoption of the "NEPA Decision Equals Implementation" and Red Tree Vole Memoranda as violating the NFMA, FLPMA, NEPA, and the terms of the Northwest Forest Plan. Oregon Natural Resources Council Action v. United States Forest Service ("ONRC Action"), 59 F. Supp. 2d 1085, 1087-88, 1092-95 (W.D. Wash. 1999).

In a September 25, 1998 letter to the DOJ attorneys in the ONRC Action litigation, Ted Boling and John Watts, the ONRC Action plaintiffs described their allegations, including examples of how the plaintiffs believed the Category 2 surveys were being improperly implemented. Pls.' App. at A-373 to A-397.  This letter cited both the "NEPA Decision Equals Implementation" Memorandum and the Red Tree Vole Memorandum. Id.

Soon after the filing of the ONRC Action, DOJ attorneys commenced settlement negotiations with those plaintiffs.  Periodically, the ONRC Action plaintiffs provided the DOJ and the Forest Service with lists of "at-risk sales" or "problem sales" -- sales the ONRC Action plaintiffs deemed

---

[6]  First, "[i]n those watersheds where less than 10 percent of the land [was] under federal management and there [was] no direct dispersal connection to BLM or Forest Service lands in other watersheds, neither site-specific surveys nor management of red tree voles [was] required." Pls.' App. at A-283. Second, areas with a "sufficient threshold of potential red tree vole habitat" were exempted from surveys. Id. at A-283 to A-284.

[7]  Parties who had previously submitted comments to a proposed agency action could file administrative appeals challenging agency decisions for projects and activities implementing land and resource management plans documented in an ROD or decision notice. 36 C.F.R. §§ 215.11 et seq.

7

at risk of being awarded and operated -- which they would seek to enjoin if awarded or operated. See, e.g., Pls.' App. at A-756 to A-757, A-979 to A-981. These lists included sites which were not named in the ONRC Action litigation. The Forest Service promised to provide the ONRC Action plaintiffs with 10 days notice prior to awarding or approving any plan of operations on any sale from the at-risk list so they could seek immediate injunctive relief. Pls.' App. at A-752, A-979 to A-981, A-987. The Forest Service, citing privilege concerns because of the ongoing settlement negotiations, maintained a policy of not disclosing the existence or contents of these lists to potential bidders. Id. at A-365; Pls.' App. at A-1367. According to an internal memorandum, from Susan Zike, the ONRC Action Litigation Coordinator, to Regional Forest Service personnel, between March 1999 and June 1999, DOJ attorneys and the ONRC Action plaintiffs negotiated the award of some sales from the "at-risk" lists, including Jack Heli. See Pls.' App. at A-986 to A-995.[8] The record is unclear as to the terms of the agreement between DOJ and the ONRC Action plaintiffs. Nor is it clear who authorized the agreement on behalf of DOJ, or what the ONRC Action plaintiffs' reasons were for allowing these sales to go forward.

**The Jack Heli Sale**

The oral auction for the Jack Heli sale was held on November 3, 1998. Timber Products was declared the high bidder. Pls.' App. at A-561. However, the contract was not awarded until four months later.

On November 24, 1998, Beverly Cox, the Contracting Officer, wrote a handwritten notation on Timber Products' bid sheet for Jack Heli, stating that she "left [a] message on [Timber Products timber procurement manager] Bill Turner's cell phone . . . advising him we cannot award until Justice Dept. says we can." Id. at A-1113. Ms. Cox further indicated in her handwritten notation that "[t]his was done on advice of Brian Stone" -- a litigation coordinator for Region 5 of the Forest Service. Id.[9]

---

[8] Susan M. Zike, who holds a J.D. from Northwestern School of Law, was employed as the Regional Litigation Coordinator for the Pacific Northwest Region (Region 6) of the Forest Service, in Portland, Oregon. Zike Dep. (Jan. 4, 2007) at 6; Decl. of Susan M. Zike (Oct. 14, 2005) ¶ 1. The position description for Ms. Zike's position is titled "Paralegal Specialist," and the description states that an individual in this position "serves as the Regional Litigation and FOIA Coordinator responsible for preparing Regional evaluations to legal challenges resulting from lawsuits against the Agency . . . ." Attachment to Zike Decl. Ms. Zike began working on the ONRC Action lawsuit shortly after it was filed and was designated by the Regional Foresters for Regions 5 and 6 as the "primary Forest Service contact in the field for the Department of Justice" in mid-July 1998. Zike Decl. ¶ 5; see also Blue Lake Forest Prods. Inc. v. United States, 75 Fed. Cl. 779, 796 (2007).

[9] Brian Stone was the Region 5 Section Head for Timber Sale Preparation and Valuation. Second Decl. of Brian Stone ¶ 3 ("Stone Decl."). He acted as a litigation coordinator for various lawsuits arising in the region and was involved in ONRC Action. Id. ¶¶ 3-4.

Two months after auction, by letter dated January 10, 1999, Bill Turner requested a formal communication from Contracting Officer Ed Matthews regarding the final award of the sale and the possibility of harvesting during the 1999 logging season. Pls.' App. at A-561. The Jack Heli contract lists the Normal Operating Season as extending from May 15 to October 15. Id. at A-619. Mr. Matthews responded by letter dated January 21, 1999, and stated that the Forest Service was preparing information to submit to government attorneys in order to proceed with the award, but did not expect resolution before early February. Id. at A-569. Because the 90-day period for its bid was soon to expire, Timber Products extended its bid by a letter dated February 1, 1999. Id. at A-580. Bill Turner stated in his declaration:

> [I]t was my firm understanding from my conversation with Ed Matthews . . . and our exchanged written communications that the Forest Service would not award the Jack Heli sale if it was still under threat of an injunction in some ongoing litigation. I relied on the Forest Service's representations and the fact that the Forest Service never gave me any indication that the Jack Heli timber sale was threatened by the ONRC Action litigation and could be suspended after award as a result of the ONRC Action litigation when I agreed to extend Timber Products' bid on Jack Heli.

Pls.' App. at A-1695 to A-1696 (Turner Decl. ¶ 6). In his deposition, Mr. Turner testified that he sought no written or verbal assurances that the Jack Heli sale had been released from the ONRC Action suit. Id. at A-1641 to A-1642 (Turner Dep. 28:19-29:4, Sept. 12, 2007). Mr. Turner testified:

> Q: Did you ask for any assurances that the sale was released from the lawsuit?
>
> A: Written ones?
>
> Q: Written or verbal.
>
> A: I don't think so. If I recall, [Mr. Matthews] had said they could not award it unless they got it released. So his actions speak to that . . . .
>
> . . .
>
> Q: Did you ever ask, once the sale was awarded, if the case had, indeed, been dismissed?
> . . .
>
> A: It wasn't an issue anymore because [the sale] was released. They wouldn't award the sale unless it was released from the lawsuit.

> Once it was awarded, I didn't care what the lawsuit was. It was not encumbering me. It doesn't bother me. It's somebody else's problem.

Id. at A-1641 to A-1643.

On March 1, 1999, DOJ attorneys notified lead counsel for the ONRC Action plaintiffs that the Forest Service and BLM intended to award Jack Heli after March 1, 1999. Pls.' App. at A-603 to A-604. The record does not indicate who authorized award of the sale or why the Government decided to award sale at this time. The following day, March 2, 1999, the Forest Service formally awarded the Jack Heli sale to Timber Products. Id. at A-605 to A-606. The Forest Service's "Report Of Timber Sale Convertible and Nonconvertible Products," Form FS-2400-17, on the Jack Heli sale indicated that "[a]ward made upon approval of Department of Justice." Pls.' App. at A-609. An internal Forest Service memorandum dated July 7, 1999, listed Jack Heli as one of 10 sites from the at-risk lists for which "DOJ and ONRC Action 'negotiated' the award." Id. at A-986. The record does not indicate the details of this negotiation, the terms of the agreement reached, or why Jack Heli was one of the listed sites.

Though the Jack Heli sale was awarded on March 2, 1999, -- five months after the FY 1999 trigger date for Category 2 surveys -- surveys for some species were not conducted because the NEPA Decision Notice had been issued on July 14, 1998, two-and-a-half months before the trigger date. See id. at A-324, A-366 to A-370; A-605 to A-606; A-1183 to A-1198. Under the guidance of the Red Tree Vole Memorandum, Category 2 surveys for that species were not performed. Id. at A-324.

The timber sale prospectus for Jack Heli stated: "This sale has been identified in a lawsuit in which plaintiffs contend that Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit government's liability in case of cancellation to the holding costs." Pls.' App. at A-422. The prospectus did not mention suspension. See id. at A-414 to A-423.

**The Too Wild Sale**

The oral auction for the Too Wild sale was held on September 17, 1998. Pls.' App. at A-1217. CLR was declared the high bidder, but the formal award was not issued until eight months later.

Nothing in the Too Wild prospectus indicated that the sale was the subject of pending litigation. See id. at A-777 to A-785. CLR Timber Manager Darrell Bonde testified:

> Q: In that process [of evaluating a timber sale], was it anyone's responsibility to determine if a particular sale was involved in litigation, any kind of litigation -- administrative appeals or --

> A:  That, we expected the Forest Service to let us know. . . . [i]t should have surfaced, and it didn't.

> Q:  What do you mean "it should have surfaced"?

> A:  Well, if there was any litigation before the sale, we would have been told about it.

Id. at A-1631 to A-1632.

Contracting Officer Tom Link stated in his declaration that he "frequently communicated" with Mr. Bonde about the Too Wild sale.  Def.'s App. at 315.  Specifically, Mr. Link stated that he:

> provided updates . . . on whatever new information I learned about the litigation affecting the Too Wild [sale].  I specifically told them about the [ONRC Action] lawsuit . . . and updated them about the case.  Those updates included what I knew about the implications that case had upon the Too Wild [sale], how those issues affected the delay in award, what I knew about ongoing settlement negotiations that potentially affected the sale, and the general issues with the case, such as when the Forest Service would have to implement the new S&M requirements.

Id. at 316 (Link Decl. ¶ 8).

The Forest Service formally awarded the Too Wild sale to CLR on May 14, 1999 -- over seven months after the FY 1999 trigger date for Category 2 surveys.  Pls.' App. at A-786.  However, because the NEPA Decision Notice had been issued on June 15, 1998 -- three-and-a-half months before the trigger date -- the requisite Category 2 surveys for some species had not been performed. Id. at A-1217.  It appears that red tree vole surveys also were not performed.[10]

**The Happy Thin Sale**

Prior to advertising or auctioning the Happy Thin timber sale, Contracting Officer Edward Matthews indicated in an email to Brian Stone, the Forest Service litigation coordinator for Region 5, that "we should proceed with ad and award.  We need to know now if we are going to be challenged on the interim [red tree vole] direction not to survey south of the Oregon line.  Waiting any longer only means that other sales following this direction may be in jeopardy."  Id. at A-702; see also id. at A-1582 to A-1590.

---

[10]  A November 17, 2000 Supplemental Information Report indicates that new red tree vole surveys were later conducted on Too Wild in order to comply with the ONRC Action ruling.  Pls.' App. at A-1218.

The oral auction and bid opening for Happy Thin took place on May 4, 1999. Pls.' App. at A-710. Contracting Officer Ed Matthews testified that, prior to bid opening, he announced to all bidders that Happy Thin had previously been the subject of litigation, but that Happy Thin was no longer included in the lawsuit. Id. at A-1329. It appears that the following printed announcement was distributed at bid opening: "The Happy Thin Heli Timber Sale was listed in litigation but is not currently involved in this litigation. The sale will not be awarded until after July 5, 1999." Id. at A-978.[11] Blue Lake was aware at the time of bidding that the sale had been the subject of an administrative appeal. Blue Lake representative Jerry Broom testified in his deposition that he was told by either Ed Matthews or Beverly Cox that the sale was "ready to go." Pls.' App. at A-1661 to A-1664.

The Happy Thin prospectus did not disclose the pending litigation. Id. at A-710 to A-718. Blue Lake was declared the high bidder. Id. at A-982.

In an internal e-mail dated June 7, 1999, Susan Zike recommended the "quiet award" of 18 sites, including Happy Thin. Id. at A-956. She further stated that "DOJ is likely to request that we wait until we have our ONRC Action hearing with [Judge] Dwyer, but there is no date set yet." Id. She suggested that "maybe [the Forest Service] could nego[tiate] to award . . . the lesser of two evils between Happy Thin and Lower Hayfork." Id. The email did not indicate Ms. Zike's reasons for this suggestion.

By letter dated June 23, 1999, signed by Robert Devlin, Region 6 Director of Natural Resources, for Nancy Graybeal, Acting Regional Forester for the Pacific Northwest Region, the Forest Service notified DOJ attorney Ted Boling that the Forest Service intended to award several sales after July 1, 1999, including Happy Thin. Pls.' App. at A-969 to A-970. This letter stated that the Forest Service had reviewed Happy Thin for litigation risk in light of the issues raised in ONRC Action with Owen Schmidt from the Forest Service's Office of the General Counsel, and had determined that the sale was "defendable against the issues in this lawsuit." Id. at A-969.

The record is unclear as to what negotiations, if any, took place between the Government and the ONRC Action plaintiffs regarding the sale of Happy Thin. The Happy Thin sale was formally awarded to Blue Lake on July 6, 1999 -- two months after auction. Id. at A-982 to A-983. Category 2 surveys had not been performed on the Happy Thin site because the NEPA Decision Notice was issued on September 15, 1998 -- two weeks before the trigger date. Pls.' App. at A-1164. It appears that red tree vole surveys had not been performed.[12]

---

[11]   Ms. Cox, a Forest Service contracting officer, indicated in her deposition that she "suspect[s] that [the announcement] was put in the sale after the bid opening." Pls.' App. at A-1336.

[12]   A June 22, 2000 Supplemental Information Report indicates that new red tree vole surveys were conducted on Happy Thin in order to comply with the ONRC Action ruling. Pls.' App. at A-1165.

**The Terms of the Timber Sale Contracts**

The contracts at issue in this case contain the following limitation of liability clause:[13]

> C6.01 – <u>Interruption or Delay of Operations</u>.  (10/96)  Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> . . . .
>
> (b)  To comply with a court order, issued by a court of competent jurisdiction . . . .
>
> . . . .
>
> Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to B8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision.  Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser.

Pls.' App. at A-657.

The contracts also contain the following language regarding environmental measures:

> C6.25# – <u>Protection of Habitat of Endangered Species</u>.  (10/78) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R-5 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground.  Measures needed to protect such areas have been included elsewhere in this contract or are as follows:
> None

---

[13]  The C6.01 clause is in the Jack Heli contract.  Pls.' App. at A-657.  The Too Wild and Happy Thin contract each contain clause CT6.01, which employs virtually identical language.  <u>See</u> <u>id.</u> at A-870 to A-871, A-1037.  The parties agree that these clauses are substantively the same, and that the slight differences between them are immaterial.  <u>See</u>  Mot. for Partial Summ. J. at 20 n.4; Def.'s Cross-Mot. for Partial Summ. J. at 3 n.2.  This Opinion will refer to this clause as C6.01.

13

> If protection measures prove inadequate, if other such areas are
> discovered, or if new species are listed on the Endangered Species
> List, Forest Service may either cancel under C8.2 or unilaterally
> modify this contract to provide additional protection regardless of
> when such facts become known.

Id. at A-659.[14]

## The ONRC Action Decision

On August 2, 1999, the District Court entered partial summary judgment in favor of the
ONRC Action plaintiffs.  ONRC Action, 59 F. Supp. 2d at 1096-97.  The Court held that both the
"NEPA decision equals implementation" interpretation and the Red Tree Vole Memorandum were
unlawful, arbitrary and contrary to the plain language of the Northwest Forest Plan.  ONRC Action,
59 F. Supp. 2d at 1093-95.  With regard to the Forest Service's argument that "implemented"
referred to the NEPA decision, rather than operations on the ground, the Court found:

> The [Northwest Forest Plan] requires that surveys for five salamander
> species and the red tree vole "precede the design of all ground-
> disturbing activities that will be implemented" on October 1, 1996,
> or later.  Surveys for other category two species "must be completed
> prior to ground-disturbing activities that will be implemented" on
> October 1, 1998, or later.  In both instances, "implemented" refers to
> ground-disturbing activities.  Indeed, the title of the category two
> survey requirements is "*Survey prior to ground-disturbing activities.*"
> There is no mention of NEPA decisions.  Environmental impact
> statements often precede ground-breaking activities by a number of
> years.  To equate the NEPA decision with the implementation of
> ground-disturbing activities would arbitrarily exempt a large number
> of timber sales from the plan's survey requirements.  It would also
> create an incentive to rush NEPA decisions to avoid conducting
> surveys; of the nine timber sales being challenged here, four received
> a final NEPA decision in September 1998, the last month before the
> survey requirements were to apply under the defendants' memoranda.

Id. at 1093 (emphasis in original).

---

[14]  This C6.25# clause is included in the Jack Heli contract.  Pls.' App. at A-659.  The Too
Wild and Happy Thin contracts each contain clause CT6.25#, which employs virtually identical
language, and is substantively the same as C6.25#.  See id. at A-874, A-1039. For convenience, this
Opinion will reference C6.25#, and all legal conclusions drawn from this language shall apply to the
CT6.25# clause.  For the sake of convenience, the Court refers to the C6.25# clause as C6.25.

The Court further noted the effect that the failure to conduct Category 2 surveys had on the management strategy of the Northwest Forest Plan:

> Far from being minor or technical violations, widespread exemptions from the survey requirements would undermine the management strategy on which the ROD depends. The surveys are designed to identify and locate species; if they are not done before logging starts, plants and animals listed in the ROD will face a potentially fatal loss of protection.

Id. The Court held that Category 2 surveys had to be completed for any sales for which ground disturbing activities had not been initiated prior to the trigger dates of October 1, 1996, and October 1, 1998. Id. at 1094.

With regard to the Red Tree Vole Memorandum, the Court found that the decision to exempt surveys in areas where habitat was abundant or isolated had "no basis in law." Id. at 1094-95. While the Forest Service had discretion to conduct surveys "'at a scale most appropriate to the species,'" it did not have the authority to forego surveys altogether, or exempt broad areas from the requirements. Id. at 1095 (citation omitted). The Court stated:

> As to the red tree vole in particular, the plan requires that surveys be conducted within the species' "*known or suspected ranges and within the habitat types or vegetation communities associated with*" it. The protocol adopted by the defendants does exactly the opposite. It determines where red tree voles are most likely to be found, identifying its "known or suspected ranges," "habitat types," and "vegetation communities," and then exempts those areas from the survey requirements. The plan's requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that "field surveys are not needed."

Id. (internal citations omitted) (emphasis in original). The Court enjoined the Forest Service and BLM from proceeding with the award or operation of seven timber sales, not at issue here. Id. at 1097.[15] The Court also ordered that the Forest Service provide at least 10 days' advance written notice to the plaintiffs before awarding any further sales that had been administratively appealed. Id.

---

[15] Previously, the district court had entered a preliminary injunction on July 26, 1999, prohibiting the Forest Service and BLM from proceeding with the award or operation of two timber sales -- North Murphy and Bear. The district court's order of August 2, 1999, expanded this injunction to seven additional sites. See Pls.' App. at 1100; ONRC Action, 59 F. Supp. 2d at 1097.

On August 26, 1999, the district court further enjoined the Forest Service and BLM from "approving a plan of operations for or proceeding with operation of" 25 timber sales, including Jack Heli, Too Wild, and Happy Thin.  Pls.' App. at A-1100 to A-1107.

**Suspensions of Jack Heli, Too Wild, and Happy Thin**

On August 27, 1999, the Forest Service suspended operations on Jack Heli, Too Wild, and Happy Thin.  At this time all three Plaintiffs were in the process of harvesting their sales.  Pls.' App. at A-1146, A-1171, A-1242.

In the fall of 1999, the District Court ordered the ONRC Action environmental plaintiffs, the Forest Service and the BLM to engage in settlement negotiations concerning the scope and duration of the court's injunction.

As a result, on November 23, 1999, these plaintiffs, the Forest Service and the BLM filed a stipulation and proposed order of dismissal under which the Forest Service agreed, among other things, not to lift the suspensions on the timber sales until certain wildlife survey requirements which the Forest Service had failed to fulfill prior to award were satisfied.  The Forest Service also gave the ONRC Action plaintiffs the right to review any completed surveys and to object to their sufficiency before operations on the sales could resume.  These restrictions were incorporated into a Stipulation for Order Dismissing Action approved by the Court on December 17, 1999.  Pls.' App. at A-1830 to A-1843.

Because a district court order in another case -- Pacific Coast Fed. of Fishermen's Assoc. v. Nat'l Marine Fisheries Serv., No. 00 Civ. 1757 (W.D. Wash. Dec. 7, 2000) -- later imposed new injunctions leading to additional suspensions, the record is unclear as to when operations finally concluded on Jack Heli, Happy Thin, and Too Wild.  Plaintiffs submit that, with regard to the ONRC Action decision, the suspension for Jack Heli was lifted on July 24, 2000, 11 months after operations were halted, the suspension for Happy Thin was lifted on August 17, 2000, one year after operations were halted, and the suspension for Too Wild was lifted on November 17, 2000, 15 months after operations were halted.

Plaintiffs Blue Lake, Timber Products, and CLR filed timely claims under the Contract Disputes Act for breach of contract.  The Contracting Officers, for each claim, approved out-of-pocket expenses associated with the delay in operations, but denied all claims for costs associated with replacement of timber and lost profits.  Pls.' App. at A-1205, A-1211, A-1284.[16]

---

[16] Blue Lake seeks $884,710.74 in timber replacement costs, expenses and lost profits.  Pls.' App. at A-1205.  Timber Products seeks $1,300,426.54 in timber replacement costs, expenses and lost profits.  Id. at A-1211.  CLR seeks $2,008,611.00 in timber replacement costs and unamortized road construction costs.  Id. at A-1284.

16

**Discussion**

Plaintiffs seek an entry of summary judgment that: (1) the Forest Service assumed the risk of liability for suspending the contracts because it failed to include valid exculpatory language in the contracts or seek waivers of liability excusing the Forest Service from fault; (2) the Forest Service breached its implied warranty of specifications; (3) the Forest Service breached its implied duty to disclose superior knowledge; (4) the Forest Service breached its implied duty to cooperate and not hinder; and (5) Timber Products is entitled to compensation under C6.01 for additional operating costs.

Defendant moves for entry of summary judgment that Clause C6.01 expressly authorized the Forest Service to suspend the contracts to comply with a court order such as that issued by the ONRC Action court and limited available remedies to contract term adjustments and out of pocket expenses.[17]

**Summary Judgment Standard**

The Court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue is one that "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit." Id. at 248. The movant has the burden of establishing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256. It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. Celotex, 477 U.S. at 324; Liberty Lobby, 477 U.S. at 249-50; Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). A court does not "weigh" each side's evidence when considering a motion for summary judgment. Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002). Rather, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

---

[17] Defendant also seeks a ruling that Clause C6.25 does not constitute a warranty that all protective measures had been taken for endangered, threatened, sensitive, or Category 2 species. In response to this argument, Plaintiffs concede that the clause, by its express terms, extends only to threatened, endangered, or sensitive species -- and not to Category 2 species. Pls.' Opp'n to Def.'s Cross-Mot. for Partial Summ. J. at 2-3 n.4. Because only Category 2 species are at issue in the instant action, Plaintiffs have withdrawn any claims that the Forest Service breached C6.25. Id.

When considering cross-motions for summary judgment, the court evaluates each motion under the same standard.  Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999).  If genuine disputes exist over material facts, both motions must be denied.  Mingus Constructors, 812 F.2d at 1391.

## Genuine Issues of Material Fact Preclude Entry of Summary Judgment

### Defendant's Motion for Summary Judgment

At issue is whether Clause C6.01 limits the Government's liability for the suspensions to out-of-pocket expenses.  Clause C6.01, entitled "Interruption or Delay of Operations," states in part: "Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer . . . [t]o comply with a court order, issued by a court of competent jurisdiction . . . ."  Pls.' App. at A-657.  In such cases, C6.01 further limits relief to a contract term adjustment and out-of-pocket expenses for interruptions or delays exceeding 30 days during Normal Operating Season.

Because the District Court in ONRC Action enjoined the three timber sales in question, Defendant submits that the Forest Service was authorized to suspend operations while Category 2 surveys were conducted and that all damages other than out-of-pocket expenses are precluded. Plaintiffs argue that clause C6.01 cannot limit liability because the suspensions arose from the Government's own fault.[18]

Under longstanding precedent, the United States Court of Appeals for the Federal Circuit and its predecessor declined to apply these types of limitation on liability clauses where the Government's own unreasonable conduct caused a delay or suspension.  See George A. Fuller, Inc. v. United States, 108 Ct. Cl. 70 ; 69 F. Supp. 409 (1947);  Ozark Dam Constructors v. United States, 130 Ct. Cl. 354, 360; 127 F. Supp. 187 (1955); see also Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003).  While these courts have characterized the Government's offending conduct in various ways -- as a breach of the implied duty to cooperate and not hinder, Fuller, or as a refusal to immunize the Government from the harmful consequences of its own negligence, Ozark, or as a breach of the implied duty to act reasonably in exercising its discretion to suspend contracts, Scott Timber -- the overarching principle is essentially the same: the Government cannot limit its liability if it acted unreasonably, failed to cooperate with, or hindered its contracting partner in the performance of its contractual undertaking.

---

[18]  This argument implicates two of the five grounds upon which Plaintiffs seek entry of summary judgment: 1) that the Forest Service assumed the risk of liability for suspending the contracts and 4) that the Forest Service breached its implied duty to cooperate and not hinder. Because these asserted grounds for entry of judgment involve, at bottom, the issue of the reasonableness of the Government's conduct, the Court considers them together in addressing that issue.

In <u>Fuller</u>, the Court of Claims held that the Government was liable for delays stemming from its failure to deliver models needed to complete construction of the National Archives Building, in the absence of a clause in the contract expressly exempting it from liability.  108 Ct. Cl. at 96; 69 F. Supp. at 412.  The <u>Fuller</u> Court noted the lack of "any provision, either express or implied, exempting the Government from liability for damages incurred as a result of delays in the furnishing of the materials to be used by the contractor" and found that "[i]n the absence of such a provision . . . the Government has breached its implied agreement not to prevent, hinder or delay the contractor in the performance of its contract."  <u>Id.</u> at 100; 69 F. Supp. at 414.

In <u>Ozark</u>, the Court of Claims expanded the rule enunciated in <u>Fuller</u>, finding that even the inclusion of an express non-liability clause did not afford the Government immunity from liability. <u>Ozark</u>, 130 Ct. Cl. at 360; 127 F. Supp. at 191.  In <u>Ozark</u>, a contractor sued for delays on a construction contract when the Government failed to timely deliver government-furnished cement due to a railroad strike.  The contract stated that "[t]he Government [would] not be liable for any expense or delay caused the contractor by delayed deliveries except as provided under Article 9 of the contract."  <u>Id.</u> at 356; 127 F. Supp. at 189.  Article 9, "the standard Delays-Damages article . . . provided that if the work was delayed for causes beyond the control of the contractor, including strikes, the contract should not be terminated by the Government, and the contracting officer should extend the contractor's time for completion of the contract."  <u>Id.</u>; 127 F. Supp. at 189.  Despite knowledge of the strike, the Government made no effort to deliver the cement by alternative means.

The Court of Claims held that the "the non-liability provision in the contract, when fairly interpreted in the light of public policy, and the rational intention of the parties, did not provide for immunity from liability" in the circumstances there.  <u>Id.</u> at 360; 127 F. Supp. at 191.  In so holding, the <u>Ozark</u> Court acknowledged its departure from the literal language of the contract:

> We do not say that a provision for nonliability such as was inserted in the instant contract may not be effective with regard to some kinds or degrees of negligence.  We do say that the Government's position that the provision must be taken literally, so that the Government is not liable for the consequences of any conduct whatever of its representatives, is wrong.

<u>Id.</u> at 359-60; 127 F. Supp. at 190-91.  In refusing to enforce the non-liability clause, the <u>Ozark</u> Court relied primarily on public policy concerns stating:

> A contract for immunity from the harmful consequences of one's own negligence always presents a serious question of public policy. That question seems to us to be particularly serious when, as in this case, if the Government got such an immunity, it bought it by requiring bidders on a public contract to increase their bids to cover the contingency of damages caused to them by the negligence of the Government's agents.  Why the Government would want to buy and

> pay for such an immunity is hard to imagine.  If it does, by such a
> provision in the contract, get the coveted privilege, it will win an
> occasional battle, but lose the war.

Id. at 359; 127 F. Supp. at 190.  The Ozark Court also noted the Government's failure to make any effort to deliver the cement by alternative means, stating that "[t]he possible consequences were so serious, and the action necessary to prevent those consequences was so slight, that the neglect was almost willful.  It showed a complete lack of consideration for the interests of the plaintiffs." Id. at 360; 127 F. Supp. at 191.[19]

Relying on Ozark, Judge Wiese in C. J. Betters Corp. v. United States, 25 Cl. Ct. 674 (1992), declined to apply an express limitation of liability provision.  The plaintiff in C.J. Betters alleged that the Government breached a contract of sale of a rent-subsidized apartment complex when a number of units failed to meet federal housing quality standards as warranted in the contract.  The contract included a provision which stated: "Seller's liability shall not exceed the amount of funds paid by Purchaser to Seller hereunder." Id. at 675.  The Court refused to apply this clause, finding that to do so "would allow the Government to essentially walk away from its agreement without liability save for an obligation to restore the status quo by refunding the purchase price." Id. at 676. Construing Ozark, the Court stated:

> The rule in this Circuit, then, is that the efficacy of a limitation of
> liability clause does not extend to those situations where the breach,
> whether total or partial, arises out of events within the Government's
> control. . . . In such circumstances, public policy considerations favor
> preservation of an unrestricted damages remedy.

Id. at 677 (internal citations omitted).

More recently, in interpreting a clause substantively identical to Clause CT6.01 implicated here, the Federal Circuit affirmed the COFC's ruling in Scott Timber Company v. United States, 40 Fed. Cl. 492, 499 (1998), that the Forest Service's right to suspend the contracts is subject to a rule of reasonableness.  Scott Timber, 333 F.3d at 1368 (Fed. Cir. 2003).[20]  The Federal Circuit quoted the trial court stating: "[t]herefore, in order for the prolonged suspensions in this case to be considered a breach of the C6.01 contracts the 'court must determine whether the suspensions were reasonable.'" Id. (quoting 40 Fed. Cl. at 502 (citing Thomas Creek Lumber & Log Co. v. United States, 32 Fed. Cl. 787, 790 (1995) ("It is a well-established principle of law that a party vested with

---

[19]  In a subsequent decision following a trial, the Ozark Court found that the plaintiffs had failed to prove that the Government's actions were negligent, citing evidence that alternative means of delivering the cement were not practicable.  Ozark Dam Constructors v. United States, 153 Ct. Cl. 120, 122-30; 288 F.2d 913, 917-20 (1961).

[20]  However, the Circuit reversed the trial court's entry of summary judgment.

contractual discretion must exercise his discretion reasonably and may not do so arbitrarily and capriciously.")")); see also Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001), appeal docketed, No. 08-5092 (Fed. Cir. July 8, 2008) (recognizing that suspensions of timber sales under C6.01 are subject to this reasonableness standard); Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005) (stating that "implied duties prevent the Forest Service from suspending contracts indefinitely [under C6.01] in order to comply with a court order if its own unreasonable or wrongful actions caused the order to be imposed, or if it unreasonably delayed in remedying the offending circumstances"); H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 487 (2003) (same).  The boards of contract appeals likewise have held the Government to a reasonableness standard in exercising its discretion to suspend under this type of clause.  Shawn Montee, Inc., 04-1 B.C.A. ¶ 32,564 (March 10, 2004) ("[T]he Government may still be liable for breach notwithstanding its right to suspend under CT6.01, if its actions in suspending or continuing a suspension of a contract are found not to be reasonable."); Tamarack Mills, LLC, 04-1 B.C.A. ¶ 32,591 (March 31, 2004) ("[C]lause 6.01 will not serve to protect the Government from breach, where it is found that the suspension or the length of the suspension was not reasonable.").

As Senior Judge Bruggink recognized in Trinity River Lumber, citing Precision Pine, Scott Timber IV, H.N. Wood, Shawn Montee, and Tamarack Mills:

> These cases demonstrate that a breach of the implied duties to cooperate and not to hinder may be found where the government causes delay by unreasonably prolonging timber contract suspensions or by unreasonably provoking the suspension of a contract.  If such a breach causes harm to purchasers, the government may be found liable for damages.

66 Fed. Cl. at 111.

In seeking summary judgment here, Defendant urged the Court to apply clause C6.01 at face value without assessing the reasonableness of the Government's conduct and to find that the court-ordered suspensions were warranted and that damages are limited to out-of-pocket expenses. However, given the longstanding precedent of the Federal Circuit and the persuasive recent rulings of this court and the board of contract appeals, the limitation of liability clause is not to be interpreted literally without regard to the reasonableness of the Government's conduct or an assessment of whether the Government, in invoking the protection of the clause, has breached the implied duty to cooperate and not hinder.[21]  As such, the Court denies Defendant's cross-motion for

---

[21] More explicit clauses, however, have been held to bar claims for breach. In Wells Brothers Co. v. United States, 254 U.S. 83, 87 (1920), the plaintiff brought a breach action for delays caused by the government.  The contract contained a clause reading "no claim shall be made or allowed to the contractor for any damages which may arise out of any delay caused by the United States." Id. at 85.  Such plain, unambiguous language was held to preclude an action for breach.  However, unlike Wells, the provision in the instant contracts does not disavow claims outright.

summary judgment.

**Plaintiffs' Motion for Summary Judgment**

Plaintiffs' motion for summary judgment fares no better. Although invoking several creative legal theories, Plaintiffs seek entry of judgment in their favor on the ground that the Government acted unreasonably in awarding their timber sales knowing the sales would likely be enjoined by court order and thus suspended under clause C6.01. In Scott Timber, 333 F.3d at 1369-70, the Federal Circuit found that a genuine issue of material fact existed as to the reasonableness of a suspension in analogous circumstances. The Scott Timber plaintiffs questioned both the reasonableness of the duration of the suspension and, as in the instant case, the Government's preaward conduct. Specifically, the Scott Timber plaintiffs argued that "because the Forest Service knew the murrelet was likely to be listed as threatened before award of the § 318 contracts, the Forest Service's failure to conduct surveys and studies earlier also contributed to the unreasonably long suspensions." Id. at 1368. The Federal Circuit held that "[b]ecause the reasonableness issue is intensely factual . . . the Court of Federal Claims erred when it determined the suspensions were reasonable on summary judgment." Id. at 1369.

Subsequent decisions of the Court of Federal Claims have followed the Federal Circuit's ruling that this type of reasonableness inquiry is not suitable for summary judgment. In H.N. Wood, the contractor alleged that the Forest Service's failure to conduct sufficient pre-award surveys breached the express terms of the contract and the implied duty to cooperate and not hinder, and claimed that the length of the suspension was per se unreasonable. 59 Fed. Cl. at 484. The Court denied summary judgment, quoting the Federal Circuit's instruction in Scott Timber that the reasonableness of a suspension is an "intensely factual" determination and ruling that "[s]uch fact-intensive findings are more appropriately made after hearing all of the evidence at trial." Id. at 487, 492.

In the instant action, Plaintiffs argue that the Forest Service unreasonably caused the suspensions of the contracts by failing to conduct environmental surveys as required by statute, and awarding the timber sales despite the likelihood of injunction. Plaintiffs argue that the district court's injunction was not the true cause of the suspensions, and instead cite the Forest Service's unreasonable actions in adopting the "NEPA Decision Equals Implementation" strategy and the Red Tree Vole Memorandum. Plaintiffs contend that personnel within the Forest Service evidenced concerns prior to the award of Plaintiffs' contracts as to: the definition of "implementation" adopted, the number of sales which might have been exempted from survey requirements, the potential incentive to "rush" NEPA decision documents in order to exempt sales from surveys, the Government's decision to forego the formal amendment process for the ROD; the decision to award Plaintiffs' sales despite the inclusion of Happy Thin, Jack Heli, and Too Wild on the "at-risk" lists generated during the ONRC Action litigation, and internal assessments that an injunction would be likely if sales were awarded. However, the record the parties have submitted in support of the motions is unclear in many respects and does not support entry of judgment in Plaintiffs' favor.

Plaintiffs ask the Court to determine on summary judgment the state of the Government's and Plaintiffs' knowledge of a potential judicial decision at the time of awards as well as the bona fides of a number of different Government players in going forward with the sales when they did. The record as it stands does not contain a clear statement of why the Government awarded the sales when it did, or who among the many Government lawyers, contracting officials, environmentalists, scientists and managers participated in the decisionmaking process, let alone what their motives were or whether the ultimate determinations were reasonable.  Plaintiffs rely on innuendo derived from a hodgepodge of e-mail traffic and confusing and limited deposition testimony to argue that the Forest Service awarded the sales in part to test and strengthen its own litigation position in the ONRC Action case.

It is unclear on this record what knowledge, belief or opinions various Government actors had about the future fate of timber sales at any given point in time.  Nor is it clear what it meant for a sale to be "at risk."  Piecing together the Government's prediction of a litigation outcome from documents authored by non-lawyers and emails sent by lawyers or paralegals in the throes of litigation and settlement negotiations is not a sufficient predicate for this Court to enter judgment as a matter of law.

As this Court held in Mansfield v. United States, 71 Fed. Cl. 687 (Fed. Cl. 2006),  summary judgment is "inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."  71 Fed. Cl. at 693-94 (citing Statesman II Apts. v. United States, 66 Fed. Cl. 608, 624 (2005) (denying summary judgment because record was insufficient for Court to construe term "material differences"); H.N. Wood, 59 Fed. Cl. at 486 ("[T]he better course is to proceed to trial because the Court lacks a sufficient factual record to determine whether or not the Forest Service's suspension of H.N. Wood's contract violated the implied duty to cooperate and not hinder or was otherwise per se unreasonable.").

Plaintiffs cite the ONRC Action decision as conclusive that both the "NEPA Decision Equals Implementation" and Red Tree Vole Memorandum were unreasonable.  The ONRC Action court examined the language of the S&M Standards and Guidelines and found that, in both instances, the word "implemented" referred to ground-breaking activities.  ONRC Action, 59 F. Supp. 2d at 1093.

As damaging as the ONRC Action court's assessment of these Government decisions may ultimately have been, these judicial pronouncements were not made until after the three timber sale contracts at issue were awarded.  Further, despite the District Court's holding in ONRC Action, Defendant maintains that the interpretations of law behind the decision to forego Category 2 surveys were reasonable, citing Mr. Hussey's testimony that it was preferable to interpret the language "so that the surveys would be done and the information available to the responsible official before he or she made a project NEPA decision."  Def.'s App. at 105 (emphasis in original).  Moreover, Defendant posits that the Forest Service received independent validation of this interpretation from the Interior Board of Land Appeals in In re North Murphy Timber Sale, 146 I.B.L.A. 305, 1998 WL

951006 (Nov. 20, 1998), which upheld the "NEPA decision equals implementation" interpretation.[22]

Defendant also asserts that there were valid scientific reasons behind the guidelines in the Red Tree Vole Memorandum, citing its biologist's testimony that: "In the case of the red tree vole, however, there was no need to protect individual sites because the threat to the species' viability was minimal."   Def.'s App. at 129.

Finally, Defendant defends its interpretations by noting that the Forest Service had non-environmental responsibilities to consider in implementing the Northwest Forest Plan -- for example, regional economic and job effects and Congressionally-mandated timber harvest volumes -- and that the reasonableness of its interpretations of law must therefore be evaluated in light of the need to balance such competing interests.

In a different vein, Defendant argues that Plaintiffs are not entitled to judgment because they had reason to know of the ONRC Action litigation and the possibility of injunction when they submitted their bids.   However, the record does not clearly establish what each Plaintiff knew of the litigation prior to award.[23]

---

[22]   In North Murphy the Department of Agriculture Board of Contract Appeals stated: "As a general matter, we would be inclined to agree with appellants that ground-disturbing activities are 'implemented' when they, in fact, occur.   However . . . there is a latent ambiguity within the [Northwest Forest Plan] as to the proper interpretation of the 'implementation' concept."   1998 WL 951006 at *11.   The Board found that the word "implemented" is used in two different contexts within the Northwest Forest Plan.   With respect to seven listed species, surveys "must precede the design of all ground-disturbing activities that will be implemented in 1997 or later."   Id. at *9.   With regard to 71 other species, however, "surveys must be completed prior to ground disturbing activities that will be implemented in F.Y. 1999 or later."   Id.   The Board found that while the first clause differentiated between design and implementation, the second clause did not.   The Board concluded, "While the matter is clearly not free of controversy or doubt, we will defer to the interpretation of 'implemented' promulgated by [the 'NEPA Decision Equals Implementation' Memorandum]."   Id. at *12.

[23]   For the Too Wild sale, neither the prospectus nor the award letter mention pending litigation, but there is conflicting testimony as to CLR's knowledge of the litigation during the eight-month period between oral auction and award.   CLR representative Darrell Bonde did not recall such knowledge.   Pls.' App. at A-1631 to A-1635.   Contracting Officer Tom Link, however, stated that he routinely updated CLR on the status of the litigation.   Def.'s App. at 315-16.

The prospectus for the Happy Thin sale did not mention the litigation.   See Pls.' App. at A-710 to A-721.   However, Contracting Officer Ed Matthews stated in his deposition that he announced at bid opening that the sale had previously been the subject of litigation -- though he also announced that Happy Thin was no longer part of that litigation, and it appears that a print announcement may have been distributed after bid opening.   Id. at A-978, A-1329.   Blue Lake

Courts do not make findings of fact on summary judgment.  Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1988).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.  Any doubt over factual issues must be resolved in favor of the non-moving party, to whom the benefit of all presumptions and inferences runs.  Matsushita, 475 U.S. at 587-88; Beta Sys., Inc. v. United States, 838 F.2d 1179, 1184 (Fed. Cir. 1988).

Under this precedent, summary judgment is not warranted on the reasonableness of Defendant's conduct or assumption of risk or on Defendant's breach of the implied duty to cooperate and not hinder.  Plaintiffs have raised two other legal theories based upon the same factual predicate, but summary judgment on these theories -- the breach of the duty to disclose superior knowledge, and the implied warranty of specifications -- is equally inappropriate.  Triable issues of material fact remain as to what knowledge, if any, each Plaintiff had of the pending litigation at the time of bid or award.  As for the implied warranty of specifications, Plaintiffs allege that their contracts contained detailed specifications governing the manner in which timber was to be harvested in order to protect natural resources and wildlife.  Plaintiffs identify specifications pertaining to the equipment to be used to fell timber, the height of stumps left behind after felling, the methods for skidding and yarding felled timber, the construction of landings and roads, the restoration of the sale area following harvest, and maps pinpointing areas of endangered species protection pursuant to clause C6.25.  Without the information provided by Category 2 surveys, Plaintiffs allege that there is no way the Forest Service could have ascertained whether these specifications were adequate.  The success of this allegation depends in large part upon the same factual dispute which underlies Plaintiffs' other theories -- whether Defendants acted reasonably in awarding the contracts without performing the Category 2 surveys.  As such, summary judgment on this ground is not warranted.

Finally, with regard to Jack Heli, Plaintiffs seek summary judgment that Timber Products is entitled to compensation for its increased sale operating costs under the limitation of liability provision.  That provision, clause C.6.01, in the Jack Heli contract states:

---

representative Jerry Broom acknowledged that he was aware at the time of bidding that the sale had been the subject of administrative appeal, but stated in his deposition that an unidentified Forest Service representative -- possibly Ed Matthews -- indicated the sale was "ready to go." Id. at A-1661 to A-1664.

For Jack Heli, the sale prospectus stated: "This sale has been identified in a lawsuit in which plaintiffs contend that Forest Service has violated the Northwest Forest Plan in preparing the sale. Language in this sale's contract has been included to limit government's liability in case of cancellation to the holding costs." Id. at A- 422.  The record indicates some communication between Blue Lake and the Forest Service regarding the litigation and the need for DOJ approval to award the sale, during the four-month delay between auction and award.  Id. at A-561, A-1645 to A-1654, A-1695 to A-1696.  However, the state of Blue Lake's knowledge of the litigation at this juncture is not clear.

> Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to B8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision.   Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. . . .

Pls.' App. at A-657.   Plaintiffs argue that increased sale operating costs do not fall within any of the listed exclusions and must therefore be awarded under the express terms of the contract.   The Forest Service does not dispute that Timber Products may be entitled to out-of-pocket expenses pursuant to C6.01, so long as those expenses are properly documented.   However, Timber Products' supplemental claims for out-of-pocket expenses pursuant to C6.01 are currently pending before the contracting officer.   As such, the Court defers ruling on this matter at this juncture.

## Conclusion

1.  The parties' cross-motions for partial summary judgment are **DENIED**.

2.  The court will conduct a telephonic status conference on **March 10, 2009, at 11:00 a.m. ET.**   Counsel shall confer beforehand and agree on the schedule and location of trial.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**